1  BINGHAM McCUTCHEN LLP
   CHRISTOPHER B. HOCKETT (SBN
2  121539)
   GEOFFREY M. HOWARD (SBN 157468)
3  HOLLY A. HOUSE (SBN 136045)
   ZACHARY J. ALINDER (SBN 209009)
4  BREE HANN (SBN 215695)
   Three Embarcadero Center
5  San Francisco, CA  94111-4067
   Telephone:  (415) 393-2000
6  Facsimile:  (415) 393-2286
   chris.hockett@bingham.com
7  geoff.howard@bingham.com
   holly.house@bingham.com
8  zachary.alinder@bingham.com
   bree.hann@bingham.com
9

10  DORIAN DALEY (SBN 129049)
    JEFFREY S. ROSS (SBN 138172)
11  500 Oracle Parkway
    M/S 5op7
12  Redwood City, CA  94070
    Telephone:  (650) 506-4846
13  Facsimile:  (650) 506-7114
    dorian.daley@oracle.com
14  jeff.ross@oracle.com
15
    Attorneys for Plaintiffs
16  Oracle Corporation, Oracle USA, Inc.,
    and Oracle International Corporation

JONES DAY
ROBERT A. MITTELSTAEDT (SBN 060359)
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700
ramittelstaedt@jonesday.com

JONES DAY
THARAN GREGORY LANIER (SBN 138784)
JANE L. FROYD (SBN 220776)
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:     (650) 739-3939
Facsimile:     (650) 739-3900
tglanier@jonesday.com
jfroyd@jonesday.com

JONES DAY
SCOTT W. COWAN (Admitted *Pro Hac Vice*)
JOSHUA L. FUCHS (Admitted *Pro Hac Vice*)
717 Texas, Suite 3300
Houston, TX  77002
Telephone:     (832) 239-3939
Facsimile:     (832) 239-3600
swcowan@jonesday.com
jlfuchs@jonesday.com

Attorneys for Defendants
SAP AG, SAP America, Inc., and
TomorrowNow, Inc.

17

## UNITED STATES DISTRICT COURT

18

## NORTHERN DISTRICT OF CALIFORNIA

19

## SAN FRANCISCO DIVISION

20

| | |
|---|---|
| 21  ORACLE CORPORATION, a Delaware corporation, ORACLE USA, INC., a Colorado 22  corporation, and ORACLE INTERNATIONAL CORPORATION, a California corporation, 23 | Case No. 07-CV-1658 (MJJ) **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** |
|     Plaintiffs, 24       v. 25  SAP AG, a German corporation, SAP AMERICA, INC., a Delaware corporation, 26  TOMORROWNOW, INC., a Texas corporation, and DOES 1-50, inclusive, 27       Defendants. 28 | F.R.C.P. 16 and Civil L.R. 16-10 Date:   September 4, 2007 Time:   2:00 p.m. Place:  Courtroom 11, Floor 19 Judge:  Honorable Martin J. Jenkins |

Case No. 07-CV-1658 (MJJ)

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   Plaintiffs Oracle Corporation, Oracle USA, Inc. and Oracle International
2   Corporation (collectively, "Oracle" or "Plaintiffs") and Defendants SAP AG, SAP America, Inc.
3   ("SAP America" ) and TomorrowNow, Inc. ("TomorrowNow," and collectively with SAP AG
4   and SAP America, "SAP" or "Defendants," and together with Oracle, the "Parties") jointly
5   submit this Case Management Conference Statement in advance of the September 4, 2007 Case
6   Management Conference.

7       1.      **Jurisdiction And Service**

8   This action arises under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq*., and
9   the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*.  Accordingly, this Court has
10  subject-matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g), 28 U.S.C. § 1331,
11  and 28 U.S.C. § 1338.  This Court has supplemental subject-matter jurisdiction over the pendent
12  state law claims under 28 U.S.C. § 1367.  The parties are not aware of any issues with respect to
13  personal jurisdiction or venue.  All named Defendants have been served and have answered the
14  First Amended Complaint.  Oracle is not currently aware of the names or capacities of any Doe
15  Defendants, but will add and serve any such Defendants promptly upon discovering their
16  identities.  Defendants reserve the right to challenge any such proposed amendment.

17      2.      **Facts**

18          a.      **Oracle's Statement**

19  In late 2006, Oracle discovered a pattern of massive downloads from supposed
20  customers on Oracle's customer support website for its PeopleSoft and J.D. Edwards ("JDE")
21  product lines.  That website, called Customer Connection, is the entry point for Oracle licensed
22  customers with active support agreements to access and download a wide array of support
23  materials related to the customer's licensed software applications.  These materials include
24  program updates, software updates, bug fixes, patches, custom solutions, and instructional
25  documents – all copyrighted by Oracle – across the entire PeopleSoft and JDE family of software
26  products (the "Software and Support Materials").

27  Oracle traced this unusual downloading activity directly to SAP, Oracle's largest
28  competitor in the enterprise software applications industry.  Over the course of several months,

1                                                       Case No. 07-CV-1658 (MJJ)

1  SAP had illegally downloaded over 10,000 copyrighted Software and Support Materials from

2  Oracle to use with its customers and to recruit new ones.  Some of these materials consist of

3  proprietary software code made available only to Oracle's paying customers.  Other materials

4  consist of copyrighted instructional "solution" documents.  In one example detailed in the First

5  Amended Complaint, SAP copied a document solution created by Oracle related to a software

6  fix for the change in daylight savings time, affixed its own logo on the document, and distributed

7  it to its own customers.

8      Oracle filed its original Complaint on March 22, 2007.  After it obtained

9  copyright registrations related to the underlying downloaded Software and Support Materials,

10 Oracle filed the operative First Amended Complaint on June 1, 2007.  The First Amended

11 Complaint alleges ten causes of action against the Defendants:

12          **(1)**    Copyright infringement (17 U.S.C. § 106);

13          **(2)**    Violations of the Computer Fraud and Abuse Act (18 U.S.C. §§
14                     1030(a)(2)(C), (a)(4) & (a)(5));

15          **(3)**    Violations of the Computer Data Access and Fraud Act (California
                       Penal Code § 502);

16          **(4)**    Breach of contract;

17          **(5)**    Intentional interference with prospective economic advantage;

18          **(6)**    Negligent interference with prospective economic advantage;

19          **(7)**    Unfair competition;

20          **(8)**    Trespass to chattels;

21          **(9)**    Unjust enrichment; and

22          **(10)**   For an Accounting.

23 Through these claims, Oracle seeks relief as stated in Section 11 below.

24      On July 2, 2007, the Defendants answered the First Amended Complaint and

25 conducted a number of conference calls related to the Answer.  The Answer admits some of

26 Oracle's allegations and denies others.  For example, the Defendants concede that "certain

27 downloads took place that…may have erroneously exceeded the customer's right of access," and

28 that the Daylight Savings Time solution on their website is "substantially similar and in some

Case No. 07-CV-1658 (MJJ)

1    instances identical to Oracle's DST Solution."    Answer at ¶¶ 2 & 87.

2         SAP has made other admissions through its post-litigation conduct.

3    TomorrowNow's CEO Andrew Nelson responded to Oracle's Complaint by defending the

4    downloading business model as entirely "legal" and "appropriate"; indeed, the highest day of

5    SAP downloading occurred a week after Oracle filed its Complaint.  Subsequently, however,

6    SAP stopped all downloads and has now revealed that it has revamped its policies to permit

7    downloading only at its customer locations, with a TomorrowNow employee to "facilitate" the

8    downloads.  These course corrections have slowed the preservation negotiations and initial

9    discovery process, but also speak to the merits of Oracle's underlying allegations.

10        The evidence of unauthorized downloading detailed in Oracle's First Amended

11   Complaint is likely only the tip of the iceberg.  Oracle's best records cover only a period of a few

12   months, but SAP's own public statements suggest that SAP downloaded Oracle's intellectual

13   property over a period of years.  If true, the actual scope of SAP's unauthorized taking may

14   exceed by many times the numbers reflected in the First Amended Complaint.  Oracle expects

15   difficulty in determining the actual scope of SAP's misconduct, in part because SAP did not have

16   a policy of preserving the records of its access to, and taking from, Oracle's computer systems.

17        Faced with this undeniable evidence of unauthorized taking, much of which it has

18   admitted as inappropriate, in its statement below SAP focuses on proposed discovery restrictions,

19   and urges forced settlement talks and an early trial date.  In doing so, SAP tries to change the

20   subject in two ways with one obvious goal:  to make this case go away without meaningful

21   discovery into what it really did.

22        First, SAP states, without any supporting evidence, that SAP America and SAP

23   AG never received any of the illegally downloaded Software and Support Materials.  Based on

24   this questionable assertion, SAP contends that discovery should focus only on TomorrowNow's

25   misconduct and it makes no allowance for the time-consuming international discovery that will

26   uncover what SAP knew and when it knew it.  However, the underlying assertion is both

27   irrelevant and suspect.  It is irrelevant because, as explained below, whether SAP America and

28   SAP AG received the actual downloaded material or not, they directed, benefited from, and must

3                                              Case No. 07-CV-1658 (MJJ)

1   answer for the conduct of their subsidiary.  It is suspect because it rests on the promise that SAP

2   followed a policy not to share downloaded material – the same type of policy that SAP breached

3   when it downloaded the materials in the first place.

4        This assertion is part of a strategy by corporate parents SAP AG and SAP

5   America to distance themselves from TomorrowNow.  For example, Defendants' Answer states:

6   "TN (not SAP America or SAP AG) employees, acting on behalf of TN's customers,

7   downloaded information from Oracle's support website…."  Further, during a July 2, 2007

8   conference call, SAP AG's CEO, Henning Kagermann, stated: "[W]e believe that SAP did not

9   have access to Oracle materials downloaded by TomorrowNow," and later, "[T]his is something

10  which was done by employees of TomorrowNow and not by employees of SAP."

11       Despite these attempts to dissociate SAP from TomorrowNow, SAP is

12  responsible for the acts of TomorrowNow, a wholly-owned subsidiary, as to which SAP

13  admittedly holds "all the rights and authorities that are commensurate with that 100%

14  ownership."  Answer, ¶ 26.  It now appears that SAP orchestrated a scheme – likely dating at

15  least to SAP AG's acquisition of TomorrowNow in January 2005 – to illegally copy and

16  competitively misuse Oracle's Software and Support Materials.  These illegally downloaded

17  materials allowed SAP to offer cut-rate support services to lure Oracle's current and potential

18  customers over to SAP as part of SAP's well-publicized "Safe Passage" program.  Indeed, as

19  SAP AG's pre-litigation statements make clear, TomorrowNow served as the lynchpin of SAP's

20  "Safe Passage" marketing campaign – designed by SAP AG for the express benefit of SAP AG's

21  business.  For example, SAP America's website promises that "SAP and TomorrowNow can cut

22  your maintenance costs by as much as 50% through 2015," and elsewhere says that "Safe

23  Passage maintenance and support are delivered worldwide through TomorrowNow."

24       SAP AG's recent public statements also confirm that it knew TomorrowNow's

25  business model involved illegal downloading and that SAP AG failed to stop it.  For example,

26  upon SAP AG's acquisition of TomorrowNow, and after its due diligence, SAP AG says it

27  identified a need to implement "extensive" new downloading policies at TomorrowNow –

28  supposedly to outlaw the type of software theft in which TomorrowNow continued to engage.

4

1   Answer, ¶ 1.  At the same time, however, SAP AG made the conscious decision to set up a

2   "firewall" (subsequently clarified to mean just another "policy" to ensure the deliberate absence

3   of any direct network connection between SAP AG and TomorrowNow) so that "SAP

4   employees [did not] come into contact with the support materials [downloaded] by

5   TomorrowNow on behalf of their customers…."  July 2, 2007 SAP Conference Call.  Also at the

6   same time, SAP AG chose not to install any SAP management on site at TomorrowNow.  It now

7   appears that SAP AG did all of these things in order preserve its own deniability, while all along

8   accepting the economic benefits of TomorrowNow's illegal conduct.

9           Given that, by its own admission, SAP violated its own supposed policies

10  regarding downloading Oracle's intellectual property, there is reason to suspect that SAP also

11  violated its "firewall" policy and transmitted Oracle's intellectual property throughout the SAP

12  organization.  Discovery will confirm this further policy breach and what SAP did with these

13  downloaded materials.

14          The second way SAP tries to change the subject is by advocating for an overly

15  restrictive, and short, discovery process, followed by immediate mandatory ADR and a quick

16  trial date (proposed for the exact time frame that SAP knows Oracle's lead trial counsel will be

17  preparing for a two-month trial across the country).  Oracle addresses these issues later, in

18  Sections 8 and 17.

19          SAP's attempts to minimize the issues in this case, and to draw attention away

20  from them, does not change the seriousness of Oracle's allegations.  On the one hand, SAP

21  admits it improperly downloaded Oracle's intellectual property, and reveals that the Department

22  of Justice has opened a criminal investigation into the matter.  On the other hand, SAP wants to

23  sweep the whole affair under the rug by limiting discovery for a few short months to just its

24  TomorrowNow subsidiary, by forcing early settlement talks without adequate discovery, and by

25  asking the Court and Oracle to take its word that SAP America and SAP AG knew nothing about

26  this activity and did not benefit from it.  Oracle is entitled to know what happened, what SAP

27  knew, when SAP knew it, and how much SAP has benefited from its scheme.  This case involves

28  tens, and perhaps hundreds, of thousands of illegally downloaded software and support materials

1  by SAP, directly implicating dozens of SAP employees and hundreds of customers all over the

2  world.  Oracle's allegations deserve careful, serious scrutiny and fair investigation, not the

3  minimalist approach that SAP suggests below.

4         **b.**       **Defendants' Statement**

5         Oracle's statement of "facts" is dramatic but inaccurate.  It ignores that

6  TomorrowNow, on behalf of its customers, had a right to access Oracle's Customer Connection

7  website and to download support materials for the customers.  It ignores that the downloads were

8  performed by TomorrowNow, not SAP America or SAP AG.  It ignores that none of the support

9  materials downloaded by TomorrowNow were provided to SAP America or SAP AG.  This case,

10  in short, is about whether TomorrowNow exceeded its customers' rights in downloading certain

11  materials.  That is not a matter of  "corporate theft on a grand scale", as Oracle says in its

12  complaint, but a matter of contract interpretation.

13         The core facts are less dramatic than presented by Oracle.  Briefly, when

14  customers licensed software applications from PeopleSoft or J.D. Edwards (since acquired by

15  Oracle), the customers also usually purchased service contracts so those companies would

16  support and maintain the applications for an annual fee.  The customers also obtained the right to

17  support materials that are now included on Oracle's Customer Connection website.  "Third party

18  support" companies like TomorrowNow compete with Oracle in providing support and

19  maintenance for legacy PeopleSoft and JDE applications, at a lower price than Oracle charges.

20  Oracle has provided training to employees of third party support companies, including

21  TomorrowNow, even after this case was filed.  And, as Oracle conceded in its Amended

22  Complaint but does not mention above, the companies that provide third party support may

23  access Oracle's website to download support materials on behalf of their customers.

24         It should, then, be a fairly straightforward exercise to resolve this case in the "just,

25  speedy and inexpensive" fashion mandated by Rule 1.  Oracle claims to have identified specific

26  downloads in alleged excess of the customers' rights, even to the level of providing numbers of

27  alleged improper downloads for particular TomorrowNow customers.  Oracle should identify

28  those downloads, provide the contracts and licenses it claims demonstrate that the materials

downloaded were not authorized so that the parties can focus on determining the legality of particular downloads and the harm, if any, to Oracle.  Other issues, such as the copyrightability and registration of the works identified in Oracle's Amended Complaint, can be pursued in parallel, without distracting from this primary focus.  Defendants believe that it is in the interests of all concerned, including customers, for this case to be resolved promptly so that the parties and their customers may focus on their ongoing businesses and continued innovation, without the distraction of unnecessarily burdensome or prolonged litigation.

### c.    Facts In Dispute

Oracle's Statement of Facts in Dispute - As described above, the Defendants' Answer, filed on July 2, 2007, partially admitted certain allegations by Oracle.  Nevertheless, a substantial number of disputed factual issues remain related to the downloading, copying and competitive misuse of Oracle's copyrighted materials, including but not limited to:

- The extent to which the Software and Support Materials were accessed, taken and used "inappropriately" as described by SAP AG's CEO during Conference Calls on July 2-3, 2007 or beyond the scope of any applicable license;

- Whether SAP can avoid being bound by the terms of use and other agreements associated with Oracle's customer support website;

- The extent to which SAP involved customers in the downloading or further use of the Software and Support Materials;

- The extent to which SAP AG and SAP America were involved, directly or indirectly, in accessing, downloading or using any Software and Support Materials;

- The extent to which SAP AG or SAP America knew, before during or after the acquisition of TomorrowNow, that TomorrowNow engaged in illegal downloading of Oracle's Software and Support Materials as part of its "business model";

- The extent of any breach of any SAP or SAP AG policies allegedly put in place to assure that no confidential material of Oracle reached SAP AG or SAP America;

- The extent to which the Defendants' access, downloading and use of Oracle's Software and Support Materials allowed SAP to compete more effectively against Oracle and interfere with Oracle's customer relationships;

- Whether the Defendants had authorization, permission or other right to access Oracle's computer systems, or exceeded any such authorization,

permission or other access right;

- Whether the Defendants intended to defraud Oracle through their access to Oracle's computer system;

- Whether the Defendants knowingly caused the transmission of a program, information, code or command and as a result caused damage to Oracle's computer system;

- Whether the Defendants knowingly and fraudulently accessed and used Oracle's computer services without permission;

- Whether the Defendants knowingly and fraudulently accessed, took, copied or made use of programs, data, or files from Oracle's computer system without permission;

- Whether the Defendants accessed, provided a means of access or assisted in providing a means of accessing Oracle's computer system causing damage to Oracle;

- The extent to which SAP created and used derivative works from Oracle's Software and Support Materials;

- Whether the Defendants had authorization, permission or other right to copy, create derivative works from, distribute, reproduce or publicly display Oracle's Software and Support Materials;

- The extent to which the Defendants controlled, directed, induced or materially contributed to the copying, distribution, public display or creation of derivative works from Oracle's Software and Support Materials;

- Whether the Defendants used Oracle's Software and Support Materials without being the authorized and designated Oracle technical support contact, without a legitimate business purpose or in ways other than in the furtherance of a relationship with Oracle;

- Whether the Defendants interfered in Oracle's expectancy in continuing and advantageous economic relationships with current and prospective purchasers and licensees of Oracle's support services and software;

- The extent to which the Defendants took commercial advantage of Oracle's investment in its Software and Support Materials;

- Whether the Defendants intentionally interfered with Oracle's use or possession of its computer systems, including Customer Connection, causing damage to Oracle's computer systems; and,

- The extent of damages, including punitive damage, owing to Oracle arising from the Defendants' conduct as alleged in the First Amended Complaint.

<u>Defendants' Statement of Facts in Dispute</u> – The factual disputes in this case are fairly summed up as follows:

8

- What, if any, materials were downloaded that went beyond TomorrowNow's customers' rights of access?

- What, if any, harm did Oracle suffer as a result of any improper downloads?

- Did the 44 works as to which Oracle obtained copyright registrations meet the requirements of copyrightability? Were the registrations proper and timely?

Properly focused discovery will provide the parties the opportunity to clarify, narrow and efficiently address the actual factual disputes.

### 3.    Legal Issues In Dispute

- Whether Defendants or any one of them have engaged in copyright infringement;

- Whether Defendants or any one of them have violated the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030(a)(2)(C), (a)(4) & (a)(5));

- Whether Defendants or any one of them have violated the Computer Data Access and Fraud Act (California Penal Code § 502);

- Whether Defendants or any one of them have and if so breached contractual obligations to Oracle;

- Whether Defendants or any one of them intentionally or negligently interfered with Oracle's prospective economic relationships with its current and/or potential customers;

- Whether Defendants' alleged access to Oracle's computer systems through Customer Connection constitutes trespass to chattels;

- Whether Defendants or any one of them have been unjustly enriched, and in what amount, through the activities alleged in the First Amended Complaint;

- Whether Oracle has been damaged, and in what amount, by Defendants' activities alleged in the First Amended Complaint;

- Whether Defendants have any defense to the allegations in the First Amended Complaint, including through any argument that their activities are permitted by any agreement; and,

- Whether the materials as to which Oracle claims copyright protection were properly copyrightable, properly and timely registered, and properly asserted and/or owned by Oracle.

### 4.    Motions

*Motion for Preservation Order*: On April 30, 2007, Oracle filed a Motion for an Interim Preservation Order and a Meet and Confer Schedule for Final Preservation Order. When

9

1  this case was reassigned, the Motion was taken off-calendar.  The parties met and conferred in an

2  attempt to come to an agreed form of Preservation Order over the following months.  Through

3  this process, the parties reached preliminary agreement on a number of topics in the Stipulated

4  Preservation Order relating to pre-litigation evidence, but some outstanding issues remain to be

5  resolved.  The parties anticipate either submitting a stipulated order or a mostly stipulated order

6  with a short list of issues they will ask to Court to resolve.  The parties also are continuing to

7  discuss preservation of post-litigation evidence.

8          *Discovery Motions:*  The parties anticipate potentially significant discovery

9  motion practice.

10          *Summary Judgment Motions:*  Defendants anticipate filing summary judgment or

11  other dispositive motions at the appropriate time.  Oracle will evaluate whether to file a motion

12  for summary judgment or partial summary judgment after the parties have substantially

13  completed discovery.

14      **5.    Amendment Of Pleadings**

15          Oracle filed the operative First Amended Complaint on June 1, 2007.  Defendants

16  answered on July 2, 2007.  The parties have not yet determined whether any further amendment

17  to add parties or claims, including counterclaims, will be necessary or appropriate.  The parties

18  reserve their rights to object to any proposed amendment of parties or claims, including

19  counterclaims.

20      **6.    Evidence Preservation**

21          The parties have exchanged assurances of evidence preservation, and further have

22  engaged in detailed meet and confer discussions regarding evidence preservation efforts.  The

23  parties resolved a number of issues in dispute and, as explained above in Section 4, have reached

24  preliminary agreement on a number of the topics with the hope of finalizing the Stipulated

25  Preservation Order, but some outstanding issues remain to be resolved.  Discussions also

26  continue regarding the proper preservation of evidence related to any ongoing downloading

27  activities.

28

Case No. 07-CV-1658 (MJJ)

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    **7.    Disclosures**

2        The parties exchanged their Initial Disclosures pursuant to Rule 26 of the Federal

3    Rules of Civil Procedure on August 16, 2007.

4    **8.    Discovery**

5        **a.    Discovery Limits**

6        The parties disagree on the limits of discovery.

7            **(1)    Oracle's Proposal On Discovery Limits**

8        This case is extremely complex, with multiple Plaintiffs and multiple Defendants

9    (one of which is overseas, and is to date unwilling to agree to streamlined discovery procedures,

10   including access to their international deponents without going through formal Hague

11   Convention procedures).  The case involves an intricate scheme of unlawful downloading and

12   other copying of works that the Defendants then used to compete against Oracle for its own

13   customers.  To date, Oracle has uncovered over 10,000 unlawful downloads from Defendants.

14   The real number is likely multiples of that.  Further, Oracle has so far uncovered 69 customers of

15   the Defendants, that were implicated in the downloading, and which are necessary targets of

16   discovery related to each of Oracle's claims.  (Discovery may well reveal that SAP has interfered

17   with many more than this initial list of 69 customers; SAP has sought discovery on its entire list

18   of over 300 current and former customers.)  SAP has already served 118 requests for production

19   and Oracle expects that number to expand significantly.  Discovery is complicated by several

20   factors, including the multinational list of party custodians and computer systems and implicated

21   customers, SAP's policy to not keep any records of its access to and downloading from

22   Customer Connection, the massive number of downloads, and the complex nature of the

23   analysis.

24       To prove its claims, Oracle will need discovery from the Defendants and from the

25   customers.

26       Discovery from the Defendants will involve numerous corporate departments

27   within each Defendant, and will involve at least dozens of individuals.  Oracle will require

28   depositions from multiple individuals in various departments within the defendant companies,

Case No. 07-CV-1658 (MJJ)

1    including information technology (responsible for building and maintaining the servers and

2    network used to access Oracle's systems and store and distribute the resulting downloaded

3    material); the sales and marketing departments (who used the downloaded materials or the

4    availability of them to lure customers as part of the Safe Passage program); support engineers

5    (who stored, viewed, used and provided the downloaded materials directly to customers); support

6    developers (who may have used the downloaded materials to prepare derivative works, such as

7    the Daylight Savings Time document); finance personnel (who may have monitored and

8    commented on the success or failure of TomorrowNow and Safe Passage); and the executive and

9    management team at each SAP entity. This discovery will relate, in part, to the complex

10   computer systems used to access Oracle's Software and Support Materials, the records of that

11   activity, and the methods used to store the materials within the SAP computer systems, and then

12   to use the stolen materials to lure customers to SAP and TomorrowNow. Many of these

13   depositions will take place in many foreign locations due to the dispersed nature of the SAP

14   workforce.

15         Discovery from the customers is no less complex. Many of them are large, multi-

16   national corporations, headquartered in various U.S. and foreign jurisdictions. Even if the list

17   remains at 69, it will take a significant amount of time and effort to appropriately focus and take

18   the document and deposition discovery to which Oracle is entitled to gain evidence for its claims.

19   Further, the list could expand as SAP signs new customers. SAP recently informed Oracle that it

20   has moved all of its downloading activities directly to the customer site with TomorrowNow

21   employees to facilitate the downloading. SAP has, therefore, both made information about

22   downloading more difficult to obtain (because it is in the hands of third parties) and made their

23   customers even more central to the case going forward.

24         Consistent with the size and complexity of the case, Oracle requests that the Court

25   expand the discovery limits in this case. In an attempt to balance the need against the rigors and

26   burdens of discovery, Oracle proposes the following:

27         **Depositions**: Oracle proposes an initial total limit of 80 depositions per side,

28   without prejudice to any party to seek leave of court to obtain further depositions if discovery

1  reveals a reasonable need for them.  Oracle's proposal of 80 depositions includes its estimates,

2  based on the information currently available to it, for necessary party and third party depositions,

3  as follows.

4         *Party depositions:*  Oracle currently estimates a need for approximately 30 party

5  depositions from SAP, divided between the various sales and marketing, executive, customer

6  support, software development, information technology, and other departments at each of the

7  three Defendants.

8         *Third party depositions*:  SAP has put at issue over 300 customers through its first

9  round of discovery requests.  Oracle does not currently intend to depose each of them, but is

10  unable without some foundational discovery to know the extent to which any of them may be

11  implicated in SAP's downloading scheme or are the subject of SAP's interference using Oracle's

12  Software and Support Materials.  Oracle, however, has so far identified 69 customers whose

13  credentials SAP used to download Software and Support Materials.  Oracle may need more than

14  one deposition from many of these customers to prove its claims.  For example, SAP may have

15  communicated with executives or internal support personnel in the Safe Passage sales process,

16  but communicated with a different set of people when actually providing Oracle's Software and

17  Support Materials to the customer once it had signed on with SAP, or when it obtained the

18  customer's credentials to access Oracle's systems.  For now, Oracle estimates the need for 50

19  depositions from these customers, in addition to the estimated 30 party depositions, but reserves

20  its right to seek an expanded limit as the case progresses and the facts warrant.

21         Oracle's proposal is based on the understanding that all 30(b)(6) depositions

22  count as one deposition under the limit.

23         **Interrogatories**:  Given the size and scope of the case, Oracle believes that 100

24  interrogatories per side, with the ability of either party to seek leave of court to obtain further

25  interrogatories if necessary, is an appropriate number.  To date, Oracle has served 35 and

26  Defendants have served 15 (many of which have multiple subparts).

27         **Requests For Production And Requests For Admission**:  The parties agreed

28  during the 26(f) Conferences that there should be no limit on Requests for Production or

1   Requests for Admission.

2              **(2)    Defendants' Proposal On Discovery Limits**

3              Oracle's proposal on discovery "limits" would unduly delay and complicate the

4   resolution of this case.  Oracle asserts that dozens of customer depositions are required because

5   TomorrowNow identified approximately 300 current and former customers and asked Oracle to

6   identify any allegedly improper downloads as to those customers.  Oracle is wrong, for two

7   reasons.  First, Oracle claims to be able to identify specific improper downloads by customer;

8   discovery of and related to customers should be limited to customers as to which Oracle is

9   willing to make and can document such an allegation.  Second, and as Oracle knows,

10  TomorrowNow maintains extensive records of the work done for each customer;

11  TomorrowNow's records contain the information Oracle claims to need, and depositions from

12  the customers themselves would be of little, if any, additional benefit sufficient to justify the

13  burden on third parties.

14             This case is properly focused on a few and relatively straightforward issues.

15  Defendants respectfully submit that it would be appropriate to at most double the normal limits

16  on discovery by permitting 20 depositions and 50 interrogatories per side, and that the Court

17  should direct the parties to focus preparation of this case as set forth in section 15, below.  With

18  clear guidance from the Court and appropriate limits on discovery, the parties and their counsel

19  should be able to exercise restraint and focus on the most significant depositions.  Should a party

20  thereafter seek additional depositions, the Court will then have the benefit of a concrete record to

21  help it determine if there is good cause to impose that burden.

22             **b.    Discovery Timing**

23                  **(1)    Oracle's Position**

24             This case will require enough time for discovery to account for the complexity of

25  the underlying key documents and the dispersed nature of the key facts.  SAP's argument that

26  discovery in this case is "typical" raises concerns that SAP does not fully appreciate the gravity

27  of the conduct alleged in Oracle's Complaint.  The parties have both served a first round of

28  written discovery.  SAP has served 118 document requests and Oracle has served 95.  Both sides

have served an initial set of interrogatories. This discovery is largely foundational on both sides. Many of the document requests on both sides necessarily involve voluminous computer logs and other complicated records that show the access to Oracle's computer systems, the IP address of the person accessing the information, the products requested and returned, and the licensed or unlicensed nature of those products. Oracle, for example, has requested the data on the SAP computers used to access Customer Connection, store the downloaded materials, and provide them to its customers.

These records are not susceptible to quick or easy review. They involve terabytes of complicated computer code and log entries that will require forensic experts on both sides to spend time understanding them before additional discovery can efficiently proceed. As an illustration, both sides required the assistance of technical experts just to meaningfully complete the Rule 26(f) meet and confer process. This initial document collection, review, production and analysis will take several months. The parties will then require depositions from each other and from customers in disparate locations around the U.S. and in various foreign jurisdictions, many of which will (unless SAP agrees otherwise) require time-consuming Hague Convention discovery protocols. SAP's position understates these complex and time-consuming international discovery issues.

For these reasons, even limiting discovery to a subset of specific and readily identifiable targets, non-expert discovery could not reasonably conclude in less than 18 months.

(2)     SAP's Position

Oracle overstates the complexity of this case. Even if not expressly focused as proposed by Defendants in paragraph 15, properly limited discovery in this case can take place in several months, not a year and one-half. The parties' fairly thorough, but typical, first rounds of interrogatories and requests for production can be completed in the next three months or so. This will lay the groundwork for depositions and any necessary follow-up written discovery, which could surely be completed in a few months.

c.     Discovery Of Electronically Stored Information

The Parties agree on the format of production for electronically stored

15

information ("ESI").  The Parties agree to produce ESI as .Tiff files with the following additional metadata fields: (1) Beginning and Ending Control Number, (2) Beginning and Ending Attachment Number, (3) Document Type, (4) Date Sent and Received, (5) Date Modified, (6) Date Created, (7) Custodian, (8) Author, (9) Recipient, (10) CC, (11) BCC, (12) Title, and (13) Filename.  The Parties agree that Excel spreadsheets, and similar materials that require native format to be reasonably usable, will be produced in native format.  In addition, if there are additional documents that either party believes needs to be produced in native format for any reason, the parties agree to meet and confer to resolve that issue, and if not resolved, then to brief it to the Court.

### 9.    Class Actions

This case is not a class action.

### 10.    Related Cases

There are no known related cases.

### 11.    Relief

Oracle's Statement – Oracle seeks preliminary and permanent injunctive relief, return of stolen property, impoundment and/or destruction of all infringing materials, damages to be proven at trial, restitution, disgorgement, punitive damages, prejudgment interest, an accounting, fees and costs.  Oracle is currently unaware of the amount of damages.  Despite SAP's apparent belief that Oracle should know every way in which SAP has used illegally downloaded material for competitive gain, the rules permit Oracle to conduct discovery to determine these facts and calculate its damages accordingly.

Defendants' Statement – Oracle claims to be able to identify specific improper downloads, by customer.  Oracle has filed an original and amended complaint, accompanied by substantial publicity, alleging it has been harmed.  Defendants believe that Oracle's unwillingness to say anything in this statement or its Initial Disclosures about its alleged damages, not even identifying any methodologies for determining *if* it has been damaged, is revealing, and violates Oracle's obligations under the rules governing this statement and its Initial Disclosures.

Case No. 07-CV-1658 (MJJ)

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

**12.    Settlement And ADR**

The parties disagree about whether it is useful to pursue an early settlement and whether they should participate in the Court's mandatory ADR program.

Oracle's Position – Oracle believes that it is premature to discuss settlement until it can determine the extent of SAP's illegal taking and misuse of Oracle's intellectual property, and the resulting damage to Oracle. Oracle agrees to participate in mediation at the appropriate time, but Oracle believes that forcing ADR before meaningful discovery and before both parties are ready makes little sense.

Defendants' Position – As with most cases, prompt resolution of this case is in the best interests of all concerned. At a minimum, the Court's ADR process will be a useful forum for Oracle to identify and quantify its alleged harm so that discovery, motions and trial can be appropriately focused. Defendants thus respectfully submit that the parties should be ordered to participate in mediation with an active or retired Magistrate Judge within the next few months, without delaying initial discovery which could be useful to that process.

There have been no ADR efforts to date, and the parties have not yet determined a specific ADR plan for the case.

**13.    Consent To A Magistrate Judge For All Purposes**

Oracle consented to the Magistrate Judge. Defendants objected to this case being tried before a Magistrate Judge.

**14.    Other References**

Because the parties anticipate discovery motion practice on some complex issues, they agree that reference to a Magistrate Judge or Special Master for discovery disputes is appropriate. The parties do not believe that any other references are necessary.

**15.    Narrowing Of Issues**

Oracle's Position – Oracle respectfully submits that it is premature to narrow issues, since discovery has yet to begin in earnest. SAP's suggestions as to focusing discovery are focused on limiting Oracle's claims to the damage caused by SAP's unlawful downloading, but that is only one piece of Oracle's Complaint, and SAP's suggestion would not even work for

17

1   that small part.  SAP ignores all of the cross-use of these materials with other customers, and

2   numerous other classes of information that is only within SAP's possession, custody or control

3   or that of its customers.  Further, numerous other issues remain that SAP ignores, for example

4   SAP's use of those materials to lure additional customers through its Safe Passage program, and

5   SAP's creation and use of derivative materials, similar to the DST solution that SAP admits is

6   substantially similar to Oracle's solution.

7       Defendants' Position – Defendants respectfully submit that discovery and motions

8   in this case should be focused as follows:

9       (a) Oracle should promptly identify the customers as to which it contends

10  TomorrowNow conducted improper downloads, identify the alleged improper downloads, and

11  produce all licenses, contracts and other agreements which relate to the identified customers'

12  right to access the Software and Support Materials at issue in this case.

13      (b) TomorrowNow will provide its database(s) of information showing

14  services provided to those customers and those materials it can identify as having been

15  downloaded for those customers.

16      (c)  The parties will meet and confer to agree on the specific list of

17  allegedly improperly downloaded materials.

18      (d) Oracle will provide a computation of any category of damages it

19  claims and those documents and materials set forth in Rule 26(a)(1)(C) of the Federal Rules of

20  Civil Procedure.

21      (e) Remaining discovery, motion practice and trial preparation will be

22  focused on the alleged improperly downloaded materials, including, for example, any use or

23  transmission of these materials, and Oracle's alleged damages.

24      **16.    Expedited Schedule**

25      Oracle's Position – Oracle respectfully submits that this is not the type of case

26  that can be handled on an expedited basis with streamlined procedures.

27      Defendants' Position – Discovery focused on the issues truly in dispute, coupled

28  with Court-ordered mediation, will help expedite the case.

Case No. 07-CV-1658 (MJJ)

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

**17.     Scheduling**

The parties propose different schedules, separated primarily by a difference of opinion regarding the necessary period for discovery and time for trial.

**a.     Oracle's Proposed Case Schedule**

Oracle respectfully submits that due to the complexity and scope of the issues, the need to analyze voluminous and complex computer records, the multiple parties, the numerous nonparty witnesses, including at least 69 customer witnesses, and the difficulty of obtaining dozens of depositions around the world, the discovery period should be approximately 18 months.  In addition, as SAP is aware, Oracle's trial counsel is unavailable during the early to middle part of 2009 due to a 2 month trial in Delaware scheduled to begin in April 2009. Accordingly, Oracle proposes the following schedule:

Trial – September 25, 2009

Pretrial Conference – September 18, 2009

Settlement Conference – August 18, 2009

Motion Cut-Off – June 12, 2009

Expert Discovery Cut-Off – May 6, 2009

Rebuttal/Supplement Disclosure and Reports – April 16, 2009

Expert Reports Due – April 2, 2009

Expert Designation – March 19, 2009

Non-Expert Discovery Cut-Off – March 5, 2009

**b.     Defendants' Proposed Case Schedule**

Defendants believe that with appropriate focusing of discovery this case can be ready for trial by February 2009, if not earlier (which should then make it possible to accommodate the schedule of Oracle's trial counsel).  Defendants propose the following schedule leading up to their proposed trial date:

Non-Expert Discovery Cut-Off – May 30, 2008

Expert Reports by Party With Burden of Proof – June 27, 2008 (experts will be made available for deposition within three weeks of burden of proof reports on request of

19

1  the opposing party)

2  Rebuttal Expert Reports – August 15, 2008

3  Expert Discovery Cut-Off – September 12, 2008

4  Dispositive Motion Cut-Off – September 30, 2008

5  Motion hearing and pretrial conference dates would be set at the

6  convenience of the Court's calendar.

7  **18.    Trial**

8  All parties have requested a trial by jury on all issues so triable.  It is premature to

9  estimate the length of trial.

10  **19.    Disclosure Of Non-Party Interested Entities Or Persons**

11  **a.    Oracle's Disclosure**

12  Pursuant to Civil L.R. 3-16, the undersigned certifies that the following listed

13  persons, associations of persons, firms, partnerships, corporations (including parent corporations)

14  or other entities (i) have a financial interest in the subject matter in controversy or in a party to

15  the proceeding, or (ii) have a non-financial interest in that subject matter or in a party that could

16  be substantially affected by the outcome of this proceeding:

17  All shareholders of publicly held Oracle Corporation.

18  The members of the Board of Directors of Oracle Corporation:  Larry Ellison, Jeff

19  Henley, Charles Phillips, Safra Catz, Dr. Michael J. Boskin, Jeffrey Berg, Donald L. Lucas, Jack

20  F. Kemp, Hector Garcia-Molina, H. Raymond Bingham, Naomi O. Seligman.

21  Pursuant to Federal Rule of Civil Procedure 7.1(a), the undersigned certifies that

22  Oracle Corporation is a publicly held corporation that wholly owns, through one or more of its

23  non-publicly held wholly-owned subsidiaries, both other Plaintiffs Oracle USA, Inc. and Oracle

24  International Corporation.  No other publicly held corporation owns 10% or more of the stock in

25  either of the Plaintiffs.

26  **b.    Defendants' Disclosure**

27  Defendants timely made their disclosures under Local Rule 3-16 and Rule 7.1(a)

28  of the Federal Rules of Civil Procedure on July 2, 2007 (see Docket Nos. 37, 38).

Case No. 07-CV-1658 (MJJ)

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    **20.    Other Matters Any Party Considers Conducive To The Just, Speedy And Inexpensive Determination Of This Action|**

2    The parties have expressly stipulated out of the privilege log requirements stated

3    in *Burlington Northern v. District Court*, 408 F.3d 1142, 1149 (9th Cir. 2005), and therefore

4    agree that the production of privilege logs within 45 days after the production of a party's

5    documents is reasonable and will be sufficient to preserve the party's privilege objections.  The

6    parties dispute the scope of privilege log requirements with respect to communications with in-

7    house counsel subsequent to filing of the litigation.  The parties agree that communications with

8    outside counsel need not be logged or disclosed.  SAP proposes that communications involving

9    in-house counsel but not outside counsel need not be logged or disclosed unless in-house counsel

10   was acting in a business and not legal capacity.  Oracle proposes that the parties log all

11   communications involving in-house counsel but not outside counsel, and indicate on the

12   privilege log the basis for the asserted privilege.  The parties are not aware of any other such

13   matters at this time.

14

15   DATED:  August 28, 2007

16                                                    BINGHAM McCUTCHEN LLP

17

18                                                    By:    *Christopher B. Hockett*    /23A
                                                            Christopher B. Hockett
19                                                          Attorneys for Plaintiffs
                                                     Oracle Corporation, Oracle International
20   DATED:  August 28, 2007                           Corporation, and Oracle USA, Inc.

21                                                    JONES DAY

22

23                                                    By:    *Robert A. Mittelstaedt*    /23A
                                                            Robert A. Mittelstaedt
24                                                        Attorneys for Defendants
                                                       SAP AG, SAP America, Inc.,
25                                                        and TomorrowNow, Inc.

26

27

28