Pages 1 – 91

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ELIZABETH D. LAPORTE, MAGISTRATE

ORACLE CORPORATION,           )
                              )
              Plaintiff,      )
                              )
       v.                     )   NO. C 07-1658 PJH (EDL)
                              )
SAP AG, ET AL.,               )
                              )
              Defendants.     )
_____)
                                  San Francisco, California
                                  Tuesday, July 1, 2008

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          Bingham, McCutchen LLP
                        Three Embarcadero Center
                        San Francisco, California 94111-4067
                  BY:   GEOFFREY M. HOWARD, ESQ.
                        HOLLY HOUSE, ESQ.
                        ZACHARY J. ALINDER, ESQ.
                        and
                        Oracle Corporate Counsel
                        500 Oracle Parkway
                        M/S 5op7
                        Redwood Shores, California  94065
                  BY:   JENNIFER GLOSS, ESQ.

(Appearances continued, next page)

Dockets.Justia.com

APPEARANCES, CONTINUED:


For Defendants:          Jones Day
                         555 California Street
                         26th Floor
                         San Francisco, California 94104
                    BY:  JASON MCDONNELL, ESQ.
                         MARTHA BOERSCH, ESQ.
                         ELAINE WALLACE, ESQ.
                         and
                         Jones Day
                         717 Texas
                         Suite 3300
                         Houston, Texas 77002-2712
                    BY:  SCOTT W. COWAN, ESQ.


Also Present:            KEVIN HEMEL, ESQ.


Reported By:             BELLE BALL, CSR, RMR, CRR
                         Official Reporter

**TUESDAY, JULY 1, 2008**

                                                          **1:28 P.M.**

                         P R O C E E D I N G S

          **THE CLERK:**  Calling Civil 07-1658, Oracle Corporation

versus SAP AG, et al.  Counsel, please state your appearances

for the Record.

          **MR. MCDONNELL:**  Jason McDonnell for Defendants, Your

Honor.  Also appearing today is Scott Cowan and Martha Boersch.

And also present from our law firm, Jones Day, is Elaine

Wallace, and from the SAP Legal Department is Mr. Kevin Hemel.

          **THE COURT:**  Thank you.

          **MS. HOUSE:**  Holly House from Bingham McCutcheon for

Oracle Corporation.  Also here today, Geoff Howard and Zach

Alinger from Bingham McCutcheon, and in-house counsel, Jennifer

Gloss.

          **THE COURT:**  All right.  Good afternoon.

          Let's start with the objections and move on to the

conference.  And let me give you my tentative thoughts on that,

on the objections.

          First, on the Grand Jury documents, I am inclined to

reach the same conclusion as -- as your former Special Master,

Judge Legge.  I -- I think the threshold question of whether

SAP as -- providing documents in response to Government

requests is even covered by the Grand Jury secrecy rule, which

applies, for example, to Government attorneys, and that's what

1    some of the cases are talking about, where there is an issue of

2    Grand Jury secrecy being violated, potentially.

3            We don't have that here.  If anything, it's akin to a

4    witness, I think.  A non-testifying witness, at least as far as

5    I know.  So we're talking about document provisions.  The

6    original request didn't even call for Grand Jury documents,

7    specifically.

8            Now, I guess Judge Legge modified it to some degree

9    in response to a U.S. Attorney's subpoena, and I don't know if

10   that was specifically a Grand Jury subpoena or what, exactly.

11   But certainly, that wasn't what the original request called

12   for.

13           I also think, you know, the leading case that I would

14   apply from the Ninth Circuit is Dynavac.  And I must say,

15   looking at Page 5 of Defendants' objections, the paragraph that

16   deals with the touchstone -- starts with the Benjamin case and

17   then the rest of the paragraph deals with Dynavac -- somewhat

18   takes the quotations out of context.

19           It quotes Dynavac as saying (As read), "Although

20   disclosure of business" -- well, it summarizes, "Although

21   disclosure of business records independently generated and

22   sought for legitimate purposes for their own sake ordinarily

23   does not compromise the secrecy of Grand Jury proceedings,"

24   which is really the main point of the Dynavac case, then it

25   quotes out, it says, quote, "which documents were subpoenaed by

1   the Grand Jury may disclose the Grand Jury's deliberative

2   process," leaving out the phrase that goes right beforehand,

3   "in the rare and unusual case."  That's a somewhat surprising

4   thing.

5           And then it goes on to make it look as if Dynavac is

6   quoting with approval In re Grand Jury Proceedings, which it

7   does quote, that is, "'when documents are considered in the

8   aggregate in their relationship to one another, make possible

9   inferences about the nature and direction of the Grand Jury

10  inquiry.'"

11          But in fact, the Court led into that, was saying

12  we're aware that other courts have gone in a different

13  direction than we are.

14          And it says -- you know, it's basically citing

15  opposing or somewhat differing views, and says, "We think the

16  concerns seem a bit exaggerated," in the case of a business

17  record -- in the case of business records.

18          So in other words, far from endorsing that principal,

19  it's saying "We think those cases are expressing undue alarm at

20  the mere production of business records."

21          So, I am troubled by that way of discussing the

22  Dynavac case.  Even if arguably the privilege or the secrecy is

23  at issue, I don't think that -- that this is the rare and

24  unusual case where that would happen.

25          But, on top of that, what I'm inclined to do is order

1   any documents that have not already been produced in some other

2   way, but that were produced to these Government agencies be

3   produced.

4           And, that would make it unclear as to what, among all

5   the others, were produced to the Grand Jury.  So if there even

6   were a legitimate issue, I think this would completely take it

7   out of the rare and unusual case.

8           So, those are my thoughts.  Obviously I've given it a

9   lot of thought.  I'm certainly willing to hear argument about

10  it.  And if there's something that changes my mind, I will

11  change my mind.  But I have paid a lot of attention to it.

12          So, Ms. Boersch, is this yours?

13          **MS. BOERSCH:**  Yes, this is mine, Your Honor.

14          Let me just address briefly, with respect to Dynavac,

15  the point from our perspective on Dynavac is that we read

16  Dynavac as adopting the effects test in terms of when you have

17  a request for production of documents produced to the Grand

18  Jury, what test do you apply.

19          **THE COURT:**  Uh-huh.

20          **MS. BOERSCH:**  We think Judge Legge erred in adopting

21  the per se approach, which says that documents which are

22  independently generated can never be documents that are Grand

23  Jury matter or constitute Grand Jury matter.

24          **THE COURT:**  Okay, and I don't -- I mean, I would

25  agree with you that it's not a never test.

1            **MS. BOERSCH:**  Right.  So --

2            **THE COURT:**  However, what about the threshold --

3    well, okay, go ahead.  But you need to get to the threshold

4    issue, too.  But on Dynavac, I really --

5            **MS. BOERSCH:**  Well, I guess I read Dynavac

6    differently.  I think, and I agree, the discussion in Dynavac

7    is fairly complex.

8            But I read Dynavac as saying -- and I think this is

9    the rare case where -- and the other cases that we cited,

10   Admiral Heating and the a few of the other cases, make it clear

11   that when you have a request for documents that identify

12   specific documents and says, "Please give us all these

13   documents," that would not reveal the inner workings of the

14   grand jury, even if those documents had coincidentally been

15   produced to the Grand Jury.

16           Instead, what we are dealing with here is a blanket

17   request for all documents produced to the Grand Jury.

18           **THE COURT:**  Well, that's not what the request was.

19   It was for all documents produced to government agencies.

20           **MS. BOERSCH:**  Right.  But in this context, there is

21   nothing other than all documents produced to the Grand Jury.

22           **THE COURT:**  Well, there was nothing?  Or is it

23   because of what Judge Legge narrowed it to?

24           **MS. BOERSCH:**  Well, it's -- Judge Legge narrowed it

25   in the sense that he said you don't have to produce the

1  subpoena and you don't have to produce any covering letters

2  accompanying the documents.  But other than that, it's just

3  documents produced to a Grand Jury.

4            **THE COURT:**  Uh-huh.

5            **MS. BOERSCH:**  So we're not talking about anything

6  else.  So in effect, that request is for all documents

7  produced to the Grand Jury.

8            And that, under <u>Admiral Heating</u> and some of those

9  other cases, is in fact one of those rare cases where the

10  production in a package of what was produced to the Grand Jury

11  would reveal the direction, nature and scope of the Grand Jury

12  proceedings.

13            **THE COURT:**  What is the status of the Grand Jury

14  proceedings now?

15            **MS. BOERSCH:**  They are ongoing.

16            **THE COURT:**  Uh-huh.

17            **MS. BOERSCH:**  So --

18            **THE COURT:**  And how long have they been going on?

19            **MS. BOERSCH:**  Since -- well, I don't know for sure,

20  but we have been on notice of them since -- we've got the first

21  subpoena in June.

22            **THE COURT:**  And have there been more subpoenas since

23  then?

24            **MS. BOERSCH:**  Yes.

25            **THE COURT:**  So, are we talking about multiple

1    subpoenas here, then?

2            **MS. BOERSCH:**  Yes.  Three, total.

3            **THE COURT:**  Uh-huh.  Well, I think <u>Dynavac</u> actually,

4    I mean, it -- it goes into great detail about the various

5    tests, and I don't think it forthrightly adopts any one of

6    them.  It essentially ducks the question at the end.

7            And it says -- you know, and it is distinguishable in

8    the sense that there, the proceedings weren't ongoing.  And

9    here, they are.

10           **MS. BOERSCH:**  Correct.

11           **THE COURT:**  But, it is on point to the extent,

12   if --if -- if this whole issue applies at all in this context,

13   where we're not talking -- I mean, that was a case where it was

14   the Government was producing -- was producing, right?  And

15   requesting?

16           **MS. BOERSCH:**  It was an IRS summons, right.

17           **THE COURT:**  Yeah.  The IRS was asking -- it was

18   getting the records from the prosecutors, right?  Directly.

19           **MS. BOERSCH:**  Correct.

20           **THE COURT:**  Okay.  So I mean, they're clearly

21   implicated by the Rule 6.

22           **MS. BOERSCH:**  Yeah.  And I don't --

23           **THE COURT:**  And this is not the case here, though.

24   Which category does SAP fall under?

25           **MS. BOERSCH:**  SAP would fall, if anything, under the

witness category, and we agree, where there's no dispute that
Rule 6(e) does not prohibit witnesses from disclosing what
occurs before a Grand Jury.

But that doesn't necessarily mean that the converse
is true, which is that witnesses can be compelled to disclose
what occurred before a Grand Jury.

THE COURT:  No.  Well, I find completely persuasive
the reasoning of that case, which says that makes no sense in
terms of the goal of -- or the alleged goal of protecting Grand
Jury secrecy, that it could be a one-way street like that,
where the witness can use it to, you know, frustrate someone
else's discovery, but they can also voluntarily disclose it.

Well, how does that protect Grand Jury secrecy?  It
doesn't.

MS. BOERSCH:  Well, that case is different, because
in that case, there was not a blanket request for discovery.
And the party in that case was refusing -- there was a request
for a particular document, and the party was refusing to
produce those documents because they had coincidentally been
produced to the Grand Jury.  We're not doing that.

THE COURT:  That is a little bit different, but I
think the basic policy point is exactly the same, though.  I
mean, I agree with you that the context is different.

MS. BOERSCH:  No, I think the policy point is
different, because where you have, as you have here, Oracle's

1    ability to propound to us legitimate discovery requests.

2            And we are complying with those discovery requests,

3    we are producing documents, we are not withholding any

4    particular documents solely on the grounds that it was produced

5    to the Grand Jury.

6            **THE COURT:**  Uh-huh.

7            **MS. BOERSCH:**  So we are not using Rule 6(e) as a

8    shield to avoid producing documents.  We have produced very

9    many, and most, if not all, of what the Grand Jury may have

10   culled over.

11           **THE COURT:**  Well, what if you -- if, as I indicated,

12   I order you to produce anything that you haven't already

13   otherwise produced?

14           **MS. BOERSCH:**  That definitely makes it more

15   palatable.

16           **THE COURT:**  Uh-huh.

17           **MS. BOERSCH:**  Our concern with upholding Judge

18   Legge's ruling, and ruling that Grand Jury secrecy does not

19   apply to a blanket request for all documents produced to the

20   Grand Jury, is that it will allow any litigant in parallel

21   civil proceedings to essentially serve a civil subpoena on any

22   witness or anybody who appears or produces documents to the

23   Grand Jury, to get from that witness what they either said to

24   the Grand Jury or produced to the Grand Jury.

25           And, because there is no threshold test that Judge

1    Legge applied that would compel the party trying to get that

2    information from the witness to show either the relevance of

3    the documents or that they had no other way to get the

4    documents, or any sort of compelling need, or that disclosure

5    of that information would not somehow reveal --

6              **THE COURT:**  Well, but here, okay, you are not

7    claiming that they are not relevant, are you?  I mean, you're

8    not saying the investigation is so differently focused from

9    this case?  I mean, it was instigated in response to this --

10                      (Court and Counsel speaking simultaneously)

11             **MS. BOERSCH:**  -- that's a deduction.

12             **THE COURT:**  That's not true?

13             **MS. BOERSCH:**  That's an assumption that one might

14   draw from the timing of the first subpoena, but --

15             **THE COURT:**  Well, is there anything to suggest

16   otherwise?

17             **MS. BOERSCH:**  Not that I'm aware of.  I mean, all we

18   have is the subpoena.

19             So I can -- you can draw some conclusions, I suppose,

20   from the existence of a subpoena, but the Government hasn't

21   announced, so far as I was aware, what exactly their

22   investigation concerns.

23             There are -- Oracle has made a number of allegations.

24   We don't know if the Government's investigation includes all of

25   those allegations, some portion of those allegations.  We don't

1  know if their investigation is focused on particular

2  individuals or other individuals.

3          **THE COURT:**  But when you say "a number of

4  allegations," you mean any that are not in -- also made in this

5  lawsuit?  They have made a number of allegations in this

6  lawsuit, as well.

7          **MS. BOERSCH:**  Yes.  That's what I'm saying, yeah.

8          **THE COURT:**  And are making even more.

9          **MS. BOERSCH:**  Right, yes.

10         **THE COURT:**  As time marches on.

11         **MS. BOERSCH:**  No, I'm referring to the ones they are

12  making in this.  So we don't know if the Government's

13  investigation includes all of those, some subset of those, more

14  than those.  We just don't know that.  Because the Government

15  hasn't announced it.

16         **THE COURT:**  And you haven't been in some kind of

17  negotiations yet with the Government?

18         **MS. BOERSCH:**  No.  We are not waiving our

19  attorney/client privilege or work product privileges with

20  respect to the Government.  So, no.

21         **THE COURT:**  Uh-huh.  Okay.

22         **MS. BOERSCH:**  The other concern we have is that

23  because of the -- when the Government is investigating, it may

24  ask for -- I'll just give an example -- for e-mails for

25  individuals without regard to any showing of relevance to any

1   particular claim, because they're investigating -- we don't

2   know, but they may be investigating other things.

3           To allow that then to be produced to Oracle what was

4   produced to the Government, which may include information from

5   individual employees at SAP and TomorrowNow, that is not

6   relevant to the lawsuit, that may be private information,

7   there's just no reason that Oracle should have that information

8   that's not in fact relevant to any of their claims.

9       **THE COURT:** Well, but is that in fact the case? Have

10   you looked at --

11       **MS. BOERSCH:** It may be.

12       **THE COURT:** Well, may be, or is?

13       **MS. BOERSCH:** It is.

14       **THE COURT:** You know of specific documents?

15       **MS. BOERSCH:** Because e-mails have been produced

16   wholesale.

17       **THE COURT:** Well, okay. Well, first of all -- and

18   I'll let the other side speak as well -- as I've said, I'm

19   inclined, I -- I agree that in rare and unusual circumstances,

20   it can be the case that asking for everything that was

21   subpoenaed could reveal the inner workings of the Grand Jury.

22   I'm very dubious that that's the case here.

23           In addition, I'm not at all sure the privilege

24   applies -- whatever we want to call -- the secrecy rule applies

25   at all, because we are talking about a witness.

1    But even if -- even if all the things were true, I

2    think that limiting it to documents that were not already

3    produced would put a veil of secrecy over much of it, and make

4    it unclear what actually was produced or subpoenaed, even more

5    so.

6    Then, among that subset, if there are documents that

7    are completely irrelevant -- and I said I think you are not

8    claiming privilege because you are not waiving the privilege in

9    any event, but if they are completely irrelevant, I would allow

10   you to withhold them maybe with some kind of an equivalent of a

11   privilege log or something like that.  In other words, if you

12   did some kind of a wholesale production.

13   And certainly if they were valid -- if they are

14   completely irrelevant, there's no reason to produce them.  I

15   suppose there could be some privacy issues that could be

16   negotiated or handled with redactions or something like that,

17   if -- if appropriate.

18   **MS. BOERSCH:**  There are privacy issues.  And in

19   addition to that, I assume we would be able to make whatever

20   other appropriate objections we may have in the civil context

21   to the production of the documents.  Either that they're not

22   relevant, or they're privileged.

23   **THE COURT:**  Yes.  If you haven't somehow -- I mean, I

24   don't know, I haven't even thought about it, if there's any

25   waiver of privilege involved.  You just said you weren't

1    waiving any privileges with respect to the Government.

2            **MS. BOERSCH:**  Correct.

3            **THE COURT:**  So if that's true, I don't know how you

4    could assert a privilege for something you produced to them.  I

5    don't think you could.  But you might have a privacy objection,

6    possibly, or something like that.  I don't know.

7            And relevancy, I can see your point, although that

8    would mean essentially, I don't know, they'd over-request it or

9    you'd over-produced to the Government, but that is possible, I

10   suppose.

11           **MS. BOERSCH:**  On the threshold issue that the Court

12   raised, whether or not the -- did the rule of Grand Jury

13   secrecy generally applies when you are talking about a witness

14   to the Grand Jury proceedings, and I think the case law is --

15   it's not entirely clear, but I think there's plenty of support

16   in the case law for the notion that there is a general

17   principle of Grand Jury secrecy, which means you can't compel a

18   witness to disclose.

19           **THE COURT:**  Well, I mean, there's -- I think there

20   are cases that go in both directions.  And I don't know that

21   the Ninth Circuit has resolved that, which is what we are

22   talking about.  But certainly, that out-of-district case that I

23   agree with the reasoning of goes the other way.

24           But, in the Ninth Circuit cases I think that you

25   cited, they all didn't involve the situation, they involved the

1    Government turning over documents.  And, which is, of course,

2    it is one of the prohibited.

3           I mean, I don't think this was analyzed sufficiently

4    in the papers.  But -- so I might have missed some cases that

5    are on point.

6           **MS. BOERSCH:**  No, well, the -- there are no -- I'm

7    not aware of any cases in the Ninth Circuit that are on point

8    as to whether or not Rule 6(e), the general rule of Grand Jury

9    secrecy, applies to when you are talking about a witness who's

10   being forced to disclose what happened in front of the Grand

11   Jury.

12          But there's cases from other circuits that say that,

13   certainly.

14          **THE COURT:**  Right.  And cases from other circuits

15   that go the other way, as well.

16          **MS. BOERSCH:**  Well, one.

17          **THE COURT:**  Well, I think that one was extremely

18   persuasive, in my mind.  But, in any event, I think by limiting

19   what I ordered to what I said, that even if I'm wrong on those

20   things, it would still protect the secrecy.

21          And I do think -- as I say, I'm raising this because

22   I hope never to see it again by any party, what I think was not

23   a fair statement of Dynavac, --

24          **MS. BOERSCH:**  Well, Your Honor, I --

25          **THE COURT:**  -- which is the Ninth Circuit case most

on point.  And really, to leave out -- in quoting from it

extensively, to leave out the rare-and-unusual-case

qualification, for example, I mean, it just -- you know.

**MS. BOERSCH:**  Well, Your Honor, I apologize if you

think that we have misled you on that.  My view is that this

is -- this is in fact the rare and unusual case.  And I did not

see that as taking it out of context, by any means.

And I think if you read the Dynavac case, it does in

fact support the notion that there are cases in which the

revelation or a request, a blanket request for what was

produced to a Grand Jury, would reveal the direction and scope

of the Grand Jury.  I think that's the overall thrust of the

case.

And I do not think that -- I apologize if the Court

found it to be misleading, but I certainly didn't mean to

mislead the Court.

**THE COURT:**  I'm not assuming that you did mean to,

but I just want more careful editing in the future of selective

quotations.

I mean, you know, because, I mean, I think it would

have been -- I am not assuming any bad intent, but I'm just

saying, you know, to leave out "in a rare and unusual case,"

the argument should have been "in a rare and unusual case," and

then, "this is such a case, for the following reasons."

I don't think it's a rare and unusual case.  I mean,

1    it's a case that just like in Dynavac, to some -- we think the

2    disclosure of business records independently generated and

3    sought for legitimate purposes wouldn't seriously compromise.

4         Now, I agree there are some factual distinctions with

5    Dynavac.  But anyway, I think that would be the better, the

6    better approach to it.  And so, that's all I'm saying.

7    Because, I mean, we are going to have, I'm afraid, a lot of

8    hearings in this case.

9         You may or may not keep participating, with your

10   expertise in the criminal side of things.

11        **MS. BOERSCH:**  Yeah.  I appreciate the comments, Your

12   Honor.  And I -- once again, I'm sorry if the Court found it to

13   be misleading.

14        **THE COURT:**  Okay.  What would you like to cite?

15        **MS. HOUSE:**  Obviously, we agree with your reading of

16   Dynavac.  And we were also dismayed at the missing language.

17        This is exactly the situation where it's corporate

18   books and records that are being called for.  And it's exactly

19   the case where Dynavac looked at some of the parade of

20   horribles that the Defendants said were going to happen, and

21   said, "We don't think so in the case."  So, we obviously agree

22   with you.

23        What concerns me with your solution, Your Honor, is

24   the timing.  We have a situation here where we feel that we are

25   getting documents way too slowly.  You know that we had that

1    problem when we went before Judge Legge, Judge Legge raised as

2    one of the first things to present to Your Honor.

3          And we have a concern that with this additional layer

4    of review that you have now added, that God knows when we are

5    going to get those documents.  The reality is that the

6    documents that are called for by these subpoenas relate to the

7    allegations of these complaints.

8          **THE COURT:**  Well, I hope you have -- I mean, you

9    should be able to do that relatively quickly, if you have Bates

10    stamped everything you gave to the Government and to Oracle,

11    right?

12          You should be able to just -- I'm not going to -- I

13    don't want the review to separate out all the things you

14    haven't already turned over to take very long, but I don't see

15    why it would.  Because presumably you Bates stamp both

16    productions.

17          **MR. COWAN:**  Yes, Your Honor.  We have Bates stamped

18    both productions.  The problem is there may not be a readily

19    electronic way to say what has been given to them versus what

20    hasn't.

21          I mean, we know substantively, for example, the

22    e-mail example that Ms. Boersch provided to you, where to look.

23    But that process could take a number of weeks to do that.

24          But we're not talking months, we're talking a number

25    of weeks.

1          **THE COURT:**  Well, I would allow one or two weeks.

2     And if you can't do it perfectly, you can't.  I don't think

3     that -- personally, my own view of the law is that none of --

4     that there's no reason to hide any of this.

5          But in case I'm wrong, because there's certainly

6     some, you know, ambiguity and conflicting authorities, I'm

7     allowing some time to do that.  But if you do it imperfectly, I

8     think it's still going to veil somewhat what the production was

9     to the Grand Jury.

10          **MR. COWAN:**  Understood, Your Honor.  And our

11    discussion and our answers to the Court on this obviously are

12    preserving the rights of the objections we have made, because

13    regardless of how the Court rules, we, depending on our client

14    direction, may take further appeal from this.  So I didn't want

15    to --

16          **THE COURT:**  You are entitled to appeal me.  I think

17    Judge Hamilton has made clear to you her views, but you can --

18    I mean, you have that right, and it's perfectly fine with me.

19          **MR. COWAN:**  I just want to make clear that the

20    discussion we are having regarding the answer to the Court

21    wasn't a negotiation process in terms of trying to resolve the

22    dispute.  I mean, obviously we will answer the Court's

23    directive, but I didn't want you to walk away --

24          **THE COURT:**  It's a negotiation about how much time

25    I'm going to give you.

1              MR. COWAN:  Understood.

2              THE COURT:  All right.  So, two weeks.

3              MS. HOUSE:  And especially, as we are talking, we are

4    going to move into some time the issue about their request that

5    they limit discovery.  This is an additional safety net that we

6    see, because we have a hard time believing that anything

7    relevant would have been withheld from the Government, and so

8    provide you another fallback.

9              THE COURT:  Well, you've won this.  So, is there

10   anything else you --

11             MS. HOUSE:  Not on this one.  Thank you.  I'll sit

12   down.

13             THE COURT:  Don't -- yeah, don't jeopardize your win,

14   there.

15             All right.  Now, the second issue is the employee

16   communication discovery.  I agree with Judge Legge that it was

17   extremely overbroad.

18             On the other hand, I'm not certain that the

19   compromise that was reached is sufficient, because as I

20   understand it, those original custodians, their documents

21   weren't culled with this purpose in mind.  So, given that, it

22   would be just a coincidence, if my understanding is correct,

23   that anything turned up.

24             I'm wondering whether we know yet what is going to be

25   yielded by those preexisting custodians, rather than

1    speculating.

2              **MS. HOUSE:**  There are custodians.

3              **THE COURT:**  Right.

4              **MS. HOUSE:**  Do you want to hear from --

5         **THE COURT:**  Well, have you actually now gone through

6    this process that he ordered you to do, and see if there's

7    anything in those custodians' documents that is responsive?

8              **MS. HOUSE:**  If there is responsive materials, we have

9    produced them.  That is how some of materials that they are

10   using as examples of why they need this came to light.

11             But just so you will understand, our understanding is

12   that on a going-forward basis, any custodian that gets named,

13   we would be looking for TomorrowNow-related communications as

14   to any of those custodians.  So that's no different --

15             **THE COURT:**  So the next 100 and whatever --

16             **MS. HOUSE:**  Whatever it is that Oracle's ordered to

17   produce, when we look at those custodians' records, we will

18   look for communications with TomorrowNow as part of that.

19             And that was what Judge Legge ordered.  He wasn't --

20   he was just saying that he understood that's what we were

21   agreeing to do.

22             If they want to designate a particular custodian, and

23   add them to the list because they think that person may or may

24   not have communications with TomorrowNow, we asked them from

25   the beginning to give us the list of who they thought would

1    have had these communications so they could have a limited

2    search.

3           **THE COURT:**  Let met hear from you, first.

4           **MR. MCDONNELL:**  Yes, Your Honor.  In answer to your

5    first question, our normal process of looking for the, quote,

6    hot documents in production, to my knowledge, has not turned up

7    communications between Oracle and TomorrowNow of the type we're

8    looking for in this document request.

9           We have, however, been identifying examples of such

10   communications in our own documents.  Some of those were cited

11   in the briefing.  Additional documents have come to light just

12   recently.  So, we know for certainty there are communications

13   between Oracle and TomorrowNow in the past, that are relevant

14   to the issues in this case.

15          Going back to your point, however, I think Your Honor

16   is spot-on that all we are asking for is that this be treated

17   as a targeted search, and that Oracle do what everyone else has

18   to do, when they get a document request.

19          They stop, think about it, think about whether there

20   are reasonable places to go look for such documents in the

21   company, whether there are logical people to ask the question

22   whether such documents might exist, and where they might be

23   located, and do a reasonable search for those documents.

24          **THE COURT:**  But I agree with Judge Legge, that it was

25   vastly overbroad.  So, so far, you haven't told me any

1    parameters.

2            Secondly, though, more specifically -- I want to get

3    back to that, but what Oracle just represented about they're

4    going to include all the future custodians, was that your

5    understanding?

6            **MR. MCDONNELL:**  Now that they have said it that way,

7    it's certainly implicit in what Judge Legge had ruled.

8            **THE COURT:**  But as I understood the papers, you

9    thought you were being confined to previously, original set of

10   custodians.

11           **MR. MCDONNELL:**  Well, that was a little unclear.  And

12   now that they're making that concession, I think that's

13   helpful.

14           **THE COURT:**  You accept that.  Because that goes a

15   long way, it's a lot better than what my impression was.

16           **MR. MCDONNELL:**  It does, but it's blurring custodian

17   and targeted-search type discovery.

18           **THE COURT:**  Right.  But the problem is "targeted

19   search" to me means something that is a lot more targeted than

20   all communications between TN and Oracle.  That, you are not

21   going to get.

22           So, unless you suggest to me something that's much

23   more targeted, you know, I find that that is -- I totally agree

24   with Judge Legge.  It's overbroad.

25           **MR. MCDONNELL:**  Okay.  What I think is getting lost

1    in this is Judge Legge accepted Oracle's argument that we were

2    asking them to go search 69,000 employees.

3         I thought we were crystal clear.  And if we weren't

4    before, I will be now.  What we agreed to do before Judge Legge

5    ruled, and what we agreed to here today, is that we simply ask

6    Oracle to make reasonable inquiry within the company.  And they

7    would know how to do that, more than we would.

8         **THE COURT:**  Well, I think that's a good point.  And I

9    don't think that it's really fair for Oracle to say, "Well, we

10   asked you to tell us what to do, and we're waiting for that."

11        I agree with you that, you know, that's sort of the

12   bad version of after UL Fonts (Phonetic).  I mean, it doesn't

13   make any sense.

14        **MR. MCDONNELL:**  Exactly.  But -- but -- but having

15   said that it's -- I can't quite tell, and who to ask.  I can

16   suggest departments.  For example, we know that there are --

17   there have been some communications in the past between the

18   support department at Oracle and TomorrowNow.

19        We believe that there is a whole department at Oracle

20   that's involved with competitive intelligence.  They may have

21   made inquiries of TomorrowNow, to find out --

22        **THE COURT:**  Let me throw one other thing out there.

23   I mean, one of the ironies of this is that in theory, you would

24   have equal access to communications with your own people, as

25   them.

1          **MR. MCDONNELL:**  That's true.  But it certainly does

2     not alleviate their obligation to do the same on their end.

3     And we are doing it --

4          **THE COURT:**  That's not really true.  It's a basic

5     rule of discovery, if there's a communication, by definition,

6     there ought to be copies in both places.  Because it was

7     communicated.

8          **MR. MCDONNELL:**  Maybe, maybe not.

9          **THE COURT:**  So if it's as easily found in your own

10    operation as by them, the discovery does relieve the other

11    party of --

12         **MR. MCDONNELL:**  I assure you, we are looking for

13    these documents, as we process custodians.  I have here

14    (Indicating) the handful that were readily at my disposal that

15    I can turn over to Oracle, as additional examples of this kind

16    of discovery, and give them further leads.

17         But discovery is a two-way street.  Knowing that they

18    have these documents is important to us.

19         **THE COURT:**  Well, I think that there should be some

20    additional searching by Oracle, although I think it has to be

21    much more targeted than really has been suggested.  And this is

22    the kind of thing that, really, that you ought to be able to

23    meet and confer about, and come up with something.

24         In other words, I think that beyond the custodians,

25    there's some targeted searching.  And possibly the support and

1    intelligence gathering units, if there is such a thing, at

2    Oracle would be the place to start.  Maybe with whatever you

3    found, you look at people who are similarly situated to those

4    people, or at least look at those people to see if there's

5    anything more.

6            But, I -- you know, I don't think that a huge,

7    major -- you know, giantly disproportionate effort should be

8    made.  If you are not finding any, maybe that's because there

9    wasn't very much of it.  Because, you know, it is a two-way

10   street of communication.

11           **MR. MCDONNELL:**  Sure.

12           **THE COURT:**  Now, true, your side could have lost some

13   things that they kept.  But that is really the only reason for

14   it.  So, therefore, it can't be pushed very far.

15           **MR. MCDONNELL:**  Let's all bear in mind that the

16   absence of such documents could have independent significance

17   as well.

18           So, for example, if there are a handful of documents

19   which I can show that show Oracle openly and knowingly dealing

20   with TomorrowNow, in the way that TomorrowNow is delivering

21   support, and not objecting to it at that time, if there are no

22   follow-on documents that then object, that's significant to us,

23   too.

24           **THE COURT:**  Well, but if that's true, then you should

25   just asks for are there any follow-on documents with respect to

1    this handful, as opposed to, you know, what you did, all

2    communications, which I -- again, I completely agree with Judge

3    Legge, was vastly overbroad.

4         **MR. MCDONNELL:**  Okay.  Let me take you up on your

5    suggestion.  Your suggestion of further meeting and conferring

6    is an excellent one.  We are happy to do that.  We will try to

7    be more concrete with Oracle about what more we think they can

8    and should do.

9         What stuck in our craw was this notion that what they

10   were going to do was limit their production to custodians that

11   they knew darn well had never been selected as --

12        **THE COURT:**  Right.  But I think either that was a

13   misapprehension, or they have changed what they are doing.  But

14   it's going to be all custodians.  Okay.  So, Oracle, all

15   custodians at any time, not just the initial set.

16        Plus, I'm ordering, although I can't define the exact

17   parameters, but some additional targeted search that includes

18   logical places, that will include followup on the particular

19   communications that they found, relevant followup before or

20   after.

21        Is there anything -- maybe look at some of the

22   people, if you found a certain type of person -- a certain sort

23   of salesperson or in a certain sector -- was having these

24   communications, maybe you look at people similarly situated.

25   You know, draw some logical lines around it.

1    I don't think it should be a gigantic, hugely

2  expensive effort.  In anything like this, if you do some

3  looking, and you hit pay dirt, then maybe that would then open

4  the door to more.  But, you know, I think that you should be

5  able to agree that doing something more than -- I mean, I am

6  saying there should be some.  Some more targeted search.  But I

7  think with very specific parameters, which you ought to be able

8  to work out.

9       **MS. HOUSE:**  And we are happy to continue meeting and

10  conferring, Your Honor.  But again, this is the exact sort of

11  thing that is not appropriate for targeted search, saying "Go

12  to the Service Department," which is made of up of thousands of

13  employees.

14       If they have a basis -- you know, the four documents

15  they provided Your Honor is the basis.  If they want us to

16  provide followup inquiry as to those, we're happy to look and

17  see if there's anything related to that.

18       **THE COURT:**  To those, and then you can -- I don't

19  know if there's any pattern on those people.  Is there an

20  intelligence-gathering -- competitive intelligence operation?

21       **MS. HOUSE:**  There is in fact a competitive

22  intelligence.  And as we've already told -- we looked at

23  competitive intelligence.  There is no communication with

24  TomorrowNow in our competitive intelligence group.

25       **THE COURT:**  So, I think it should be limited, which

1    is what I've said.  So, I'm not ordering very much more, but

2    I'm ordering something more.  And I think you ought to work it

3    out.

4              **MS. HOUSE:**  That's fine.

5              **MR. MCDONNELL:**  Thank you, Your Honor.

6              **THE COURT:**  Okay.  Now, let's turn to the case

7    management or discovery management.

8              Now, I'm not quite sure what -- a lot of

9    disagreements are presented.  I think that I can shed some

10   light on sort of general thoughts.  I think the parties, you

11   seem to be contemplating that then there would be motion

12   practice on all of these issues.  I would certainly like to

13   avoid or at least minimize that, to some degree.

14             On the other hand, it's true that I don't have enough

15   information in some cases to really make a firm determination.

16   I mean, for example, on the custodian limits, I do need

17   documentation of the actual costs.

18             So I have been, you know, taking your word for it,

19   but if I'm actually going to impose a limit I will need to have

20   it documented.  On the other hand, I don't know that I need a

21   lot more briefing on that issue.

22             **MR. COWAN:**  Your Honor, if I could address one issue.

23             **THE COURT:**  Yeah.

24             **MR. COWAN:**  In our meet-and-confer process on that,

25   the real question is what do you -- we have been asking Oracle

1    what do they want in terms of documentation.

2            Obviously, we've come up with a calculated cost that

3    is actually slightly in excess of 100,000 per custodian.  You

4    know, there's things as far back as -- if you go into -- how

5    deep you go into our own bills our clients, et cetera, invoices

6    from vendors, those kind of things, or what level of details.

7            So I guess that's the question that we would have for

8    the Court.  We are more than happy to substantiate our claim.

9    The question is, at what level of particularity would you like?

10           **THE COURT:**  What does Oracle want?

11           **MS. HOUSE:**  We -- we are meeting and conferring on

12   what additional information we need.  It may very well be that

13   if they provide whatever materials they give about what the

14   cost is, we won't necessarily attack it.

15           The most important thing for you to understand and

16   that we want to make sure gets briefed to you -- we gave a

17   flavor of it in the discovery conference statement -- is that

18   the cost of production is just one of several factors that

19   needs to be balanced.

20           **THE COURT:**  No, I understand that.  You know, as a

21   matter of fact, I'm extremely familiar with those things.

22           **MS. HOUSE:**  It just got so much attention at the last

23   discovery conference, and I want to make sure that it doesn't

24   get over -- much attention under the law.  It doesn't.

25           There's many times when an expensive production is

ordered where the facts of the case and the issues in the case

or the amount in controversy warrant it.  And in a case with --

you know, relevant discovery shouldn't --

**THE COURT:**  You know what?  I just -- I don't want

any more briefing on that.

**MS. HOUSE:**  Okay.

**THE COURT:**  I don't even want more argument on that.

I'm actually -- it's not that I'm cavalier about it.  It's just

that I have thought about it, I have strong -- I mean, I think,

very well-informed fam- -- a deep familiarity with this.  It's

my job, it has been for ten years, to apply proportionality

analysis.

And when something is costing $16 million for one

piece of discovery in one case, I don't think you could find

another judge in the federal system who wouldn't say that

raises serious questions, even in a very important case with

huge, earth-shaking issues that could affect the future of the

planet and so forth.  So --

**MS. HOUSE:**  I would invite Your Honor, we have

provided them with the second amended complaint today.  We are

waiting for confirmation whether they will allow us to file it

without opposition.

The second amended complaint will be very

illustrative to you of what we have discovered, since the first

one, and will give you more of a scope of what we're talking

1   about here.

2          **THE COURT:**  Again, if this were a case, you know,

3   involving national security, global warming, and some other

4   things, just possibly I could just say, well, you know, $16

5   million for one piece of discovery in the case, that's just --

6   it's not a problem.  You know.

7          And my -- I used to hear the quote, I remember, was

8   it Senator Dirksen?  You know, "A billion here, a billion

9   there, pretty soon you're spending real money."  That used to

10  be repeated in my household.

11         But, you know, that's not what we are talking about.

12  I know this is a very important case between the parties.

13  These are two huge companies, major competitors.  There's --

14  you know, you are alleging massive fraud.

15         Nonetheless, discovery is still just discovery.  It

16  is not the merits of the case.  And I'm not going to let it run

17  up into the hundreds of millions of dollars.  I just -- I find

18  that offensive.  I don't think that our legal system is meant

19  to impose enormous costs in discovering the facts.  I just --

20  you know.

21         So, you really are not going to be able to persuade

22  me that -- that millions and millions of dollars is not

23  something I should take seriously.

24         **MS. HOUSE:**  I'm not saying -- we are paying millions

25  of dollars as well, Your Honor.  And I'm certainly not saying

1     that you should -- we don't take it lightly, nor should you.

2         But it's very important that when you look at all of

3     the elements for 26, --

4         **THE COURT:** I'm aware of all the other elements. I'm

5     very aware of them.

6         **MS. HOUSE:** And we are happy to provide you with any

7     case law that you think would be helpful.

8         **THE COURT:** I don't -- yeah. You know, I really -- I

9     think that I'm extremely familiar with the case law. I -- you

10     know.

11         **MS. HOUSE:** That's fine. We just want to make sure

12     that --

13         **THE COURT:** I'm familiar up to my ears in the case

14     law. You know. And so -- and it isn't all that complicated,

15     you know. It's really not that complicated. And I know what

16     it is. And I still think that Defendants have raised some very

17     strong arguments.

18         And I -- I do not believe -- you know, I think the

19     discovery -- we've got a year to get this case to trial. It's

20     got to be done in a fashion that both does not, you know, just

21     burn up millions and millions and millions of dollars. I mean,

22     it's going to burn up millions, but not tens and tens and tens

23     of millions.

24         And, it's going to be done in time. Otherwise you

25     can't have a trial. You will never get to the merits. So, --

1      **MS. HOUSE:**  Is there anything else that you didn't

2 feel like you got adequate information on in the discovery

3 statement, that you would like us to provide further

4 information on?

5      **THE COURT:**  Well, let's see.  We are talking about

6 the custodians.  I mean, I definitely want -- you know,

7 ideally, you could provide them whatever they want that

8 convinces them that the estimate is solid.  But if it's a

9 question of convincing me, I would normally want a declaration.

10      **MR. COWAN:**  And Your Honor, --

11      **THE COURT:**  Or several declarations, you know?  But

12 that --

13      **MR. COWAN:**  Understood.  And I was the one that stood

14 up in the previous hearing and told the Court that it cost

15 100,000 per custodian.  And I made sure before I said that,

16 originally, that that was true.

17      We have gone back since, and I've made sure that

18 folks in our organization understand it likely would be me that

19 would be the declarant.  And so, we have documented it.

20      The question comes to down to how you would like us

21 to do that.  We're quite familiar with the Court's expertise on

22 electronic discovery.  And certainly --

23      **THE COURT:**  I don't mean that you all have to flatter

24 me.

25      **MR. COWAN:**  No, no, no.

1              THE COURT:  I do know a lot about it, but --

2              MR. COWAN:  No, I understand.  But we can put it in

3    whatever format you want.  What we do want to do, we do want to

4    move things along with this, and we don't want to have

5    iterative submissions on this.  We want to give you what you

6    want the first time, and are prepared to do that.

7              If we get that direction from Oracle or the Court, it

8    really doesn't matter.  We prepare the document.

9              THE COURT:  Can you be specific?  I don't think this

10   needs a whole lot of meeting and conferring.  Why don't you

11   just tell him what you want to see?

12             MS. HOUSE:  And, my understanding is that we are

13   telling them.  But that's a separate meet-and-confer, and we

14   owe them an e-mail on it.  That's not been --

15             THE COURT:  Has someone --

16             MR. COWAN:  The last conversation we had, they asked

17   for additional information from us.  I said, "Tell us what you

18   want."  They said they'd get an e-mail, and that's what we are

19   waiting on.

20             So, I've got a file here with all kinds of --

21             THE COURT:  Well, is there somebody who is not in the

22   room who is writing that e-mail?  Or is there somebody here

23   that can answer that question in real time?

24             MS. HOUSE:  There is an associate who's been

25   responsible for that.  I don't think we need a whole lot of

1    additional backup, Your Honor.  We just want to make sure that

2    it's just part of the whole mix.

3            **THE COURT:**  Okay.  Because, I mean, I am -- you know,

4    I believe in trying to resolve issues, and not having to go

5    back and back over them.  So, you know, if -- if we have more

6    of these, I would like to have answers specific at the time, so

7    we can put that issue to rest.  But, okay.

8            **MS. HOUSE:**  I understand they have an obligation to

9    provide you with a declaration.  They provided us a short

10   e-mail.  If that e-mail is adequate for you, then --

11           **THE COURT:**  Well, I don't know what's in the e-mail.

12   I haven't seen anything.

13           **MR. COWAN:**  I have got a copy of the e-mail if the

14   Court would like that.

15           **THE COURT:**  Okay.

16                       (The Court examines document)

17           **MR. COWAN:**  And we can -- those three components we

18   can break down any -- further, in any number of ways.  That's

19   the -- that's the question.

20           **THE COURT:**  So, you --

21           **MS. HOUSE:**  You have a clear idea of what you think

22   is necessary for demonstrating costs.  If you think that this

23   is an adequate demonstration of costs, then I don't want to

24   intrude on your expertise.

25           **THE COURT:**  I'm not saying that.  I'm saying, if you

1  can be satisfied, yourself, then you don't even have to bring

2  it to my expertise.  Then it's not a fight any more.  Okay?

3          **MS. HOUSE:**  Well, the cost is -- there is a fight in

4  the sense that cost is not the only thing.

5          **THE COURT:**  Right.

6          **MS. HOUSE:**  We are fighting about how much has to be

7  disclosed here.

8          **THE COURT:**  Right.

9          **MS. HOUSE:**  Whether the cost is an issue in that

10  fight is -- is -- depends on whether that is an adequate

11  issue -- demonstration of the costs for you.

12          We are concerned because we see, as was indicated in

13  the discovery conference statement, that we are getting a whole

14  lot of dreck.  There's a lot of stuff coming through the

15  pipeline that they are claiming in their many millions of

16  document hits that shouldn't be here.

17          **THE COURT:**  Okay.  I think that this is not quite

18  enough.  You need to provide some additional background.  I

19  would say you need a declaration.  Probably -- you know, there

20  is a paragraph.  Probably a few pages.

21          **MR. COWAN:**  Okay.

22          **THE COURT:**  And if there's anything that Oracle

23  wants, you know, within reason, they should notify you by

24  e-mail by tomorrow morning.  And you should include that in the

25  declaration.

1              **MR. COWAN:**  Thank you, Your Honor.

2              **THE COURT:**  Okay.  So in terms of custodians --

3              **MS. HOUSE:**  I think we've -- we've told you the

4    number that we came down from since the last discovery

5    conference.

6              **THE COURT:**  Uh-huh.  Uh-huh.  Uh-huh.

7              **MS. HOUSE:**  We have told you that there's been no

8    movement on the other side.

9              **THE COURT:**  Uh-huh.

10             **MS. HOUSE:**  We have told you that coming down to that

11   number is also based on putting into play certain safeguards to

12   protect --

13             **THE COURT:**  Uh-huh.

14             **MS. HOUSE:**  -- because of the very fact that we are

15   getting such a small, you know, percent of the potentially

16   relevant custodians' potentially relevant material.

17             So, part of what we are asking Your Honor to do is to

18   impose those safeguards to make sure that if we are going to

19   be, you know, stuck with a much more limited production of

20   relevant materials and relevant custodians, that we get

21   safeguards to compensate for that.

22             And one of the safeguards is one that you talked

23   about several times, and that we think makes a lot of sense,

24   which is extrapolation.  Particularly in connection with the

25   vast amount, terabytes of data related to the infringing

1   environment.

2           **THE COURT:**  Let's talk about extrapolation.  First of

3   all, the one -- that's the one you want, is infringing

4   environments.  And I understand you're saying that you have

5   produced 100 percent of the infringing environments?  Or what

6   are you saying?

7           **MR. MCDONNELL:**  They either are produced or will be

8   produced in native form.

9           **MR. COWAN:**  Yes, Your Honor.  We have a data

10  warehouse, and we can talk about that separately, where we're

11  making the physical computers available for them to inspect,

12  and tell us which portions, if any, of those environments they

13  want copies of.

14          But yes, we are making those available.

15          **MS. HOUSE:**  But access is not production.  That's

16  sort of a very false impression there.

17          The whole point of giving us access instead of just

18  producing all of the material to begin is with is because the

19  material is so vast and would be so expensive to give us

20  copies, that they requested that we do it this way.

21          So, what we are really in is a staged situation,

22  where we first get to look at this stuff, go through it in a

23  live sort of fashion, and then request copies that they will

24  decide whether or not and when they are going to produce to us.

25  So this is, again, something that is going to take months to

achieve.  And at the end of this, we won't have the entire set.

So, this is a perfect situation where you would be
wanting to take some of that vast amount of material and agree
to extrapolation, because that's the only way that we are going
to be able to adopt this approach and do it within the time
frame of this existing schedule.

So, again, we are getting nothing but push-back on
the safeguards that we are asking for that allows us to have
access to the necessary material.

**THE COURT:**  Okay, all right.  Okay.  I think you are
getting a little overwrought about what is, after all, just a
discovery issue.

I mean, I will -- all right.

**MR. MCDONNELL:**  Would you like me to speak to
extrapolation and sampling?

**THE COURT:**  Yes.

**MR. MCDONNELL:**  We have not refused it.  What we have
said is that it may have a place in this case.  We're mindful
of the Court's suggestion that the parties consider that.
We're mindful of the idea that it might have a place where
there's voluminous data.

But we think the very first step is a specific
proposal about how it would be done so that we can evaluate
whether or not to agree to it.  Because we are talking about a
serious case.

```
1                    THE COURT:  Uh-huh.

2                    MR. MCDONNELL:  And a serious question of doing

3        sampling to look at evidence, as opposed to looking at all of

4        the evidence.

5                    So all we have asked for is that there be concrete

6        proposals, not just theoretical concepts.

7                    THE COURT:  Uh-huh.

8                    MR. MCDONNELL:  And that whatever be done be

9        reasonably fair and mutual, --

10                   THE COURT:  Uh-huh.

11                   MR. MCDONNELL:  -- as well.

12                   THE COURT:  Well, on the environments, how would that

13       be mutual?  I mean, damages might be a different issue, or --

14                   MR. MCDONNELL:  Well, it may be that the results are

15       quite favorable to our way of thinking.  I don't know.

16                   THE COURT:  Well, have you had any discussion about

17       proposals, how you would do this?  Have either side started to

18       talk to your experts about it?  I mean, has there been any

19       development at all?

20                   MR. MCDONNELL:  We have asked.  We have asked them to

21       make a specific proposal for us to consider, since they were

22       the proponent of the concept.

23                   THE COURT:  Well, okay.  I mean, I have some ideas,

24       but I don't know if they are good ones.  And I don't have any

25       experts to talk to.  But I think -- I think the environments
```

1    probably does make sense.

2         You know, you agree on some kind of subset, some kind

3    of random sampling of some percent, I don't know what it is, if

4    it's 10 percent of the universe, if it's 1 percent.  I mean,

5    something that at least looks like it ideally would provide

6    statistical validity.

7         And you agree to the protocol on it, and then you --

8    each side's experts can then draw their own conclusions,

9    perhaps, from that, but could not attack -- neither side could

10   attack whether the sample was adequate to draw conclusions

11   from, or was representative, or things like that.

12        In other words, you can place your own spin on the

13   results to extrapolate, but you couldn't attack whether the

14   fundamental process up to that point that was agreed on was

15   valid.

16        That's a very high-level concept of it, but --

17        **MR. MCDONNELL:**  And, I appreciate that.  But let me

18   tell you, in the interest of candor, what my concern is.

19        My concern is there is a notion in science of a

20   statistically valid sample.  Not everything is samplable, and

21   not every statistical sample is valid.  I don't ever want to be

22   painted into a corner where we are being forced to accept as

23   statistically valid something that is not.

24        And the devil is going to be in the details here,

25   which is why we have got to get a proposal on the table, so

1    that both sides can vet it with their experts and statisticians

2    and industry experts, and make sure that we're not doing

3    something that's sophistry, that could come back to produce an

4    unfair result.

5           So, I'm very open-minded to the process.

6           **THE COURT:**  Well, but the thing is -- and I'm not

7    sure -- I mean, ideally, it would all be statistically valid.

8    I don't know if it was an attempt to reduce the costs of

9    production, that it necessarily would have to be.

10          In other words, I mean, I think that there's some

11   validity to the point they are making, that the reason you're

12   making this whole warehouse accessible to them is it's too

13   voluminous for you to go through, and search, and find what's

14   relevant in the first place.

15          And -- but even if they do it on a wholesale basis,

16   then you have got to review it all.  It's also going to be too

17   expensive for you.  Even if they make the first cut.

18          **MR. MCDONNELL:**  Thereby my open-mindedness to this

19   process.

20          **THE COURT:**  Right.  So, it's got to be something less

21   than 100 percent.

22          **MR. MCDONNELL:**  Again, the devil may very well be in

23   the details.  We're happy to look at a proposal.

24          **THE COURT:**  But I will tell you that the problem with

25   that, that comment, is that we're not choosing between a devil

1    and a non-devil.  We're choosing between different devils.

2              **MR. MCDONNELL:**  Okay.  The lesser --

3              **THE COURT:**  Yeah.  So, you are going to have to find

4    the lesser evil.  And if there isn't a perfect solution, then

5    you are going to have to make an agreement around it.

6              I mean, you know, in other words, you agree on what

7    looks like it's going to be an appropriate sample that is

8    not -- that is less than 100 percent, in order to save time and

9    money on both sides.  And then you are going to all just have

10   to live with the consequences.

11             And, you know, it's like John Ralls, you're under a

12   veil of ignorance.  Nobody will know who it's going to favor,

13   and it shouldn't be skewed to favor anybody.  But the chips

14   will fall where they may.  Which is essentially how real trials

15   operate, even when 100 percent of the evidence comes in.

16             It's just -- you know.

17             **MR. HOWARD:**  Your Honor, since I did the technology

18   tutorial, and there is kind of a missing piece here, and I was

19   hoping to address it briefly, we've talked about the

20   environments.  And the environments are the copies of the

21   software that are resident on the TomorrowNow computers.

22             We also, if you recall, talked about the support

23   materials, the derivative works that are created from those

24   environments.  And so, we're not -- in a sense, we're not

25   talking about either environments or support materials, in and

1    of themselves.  And this is part of what makes this

2    complicated, is we're talking about --

3                        (Audible interruption)

4              **THE COURT:**  Whose -- does somebody have a --

5              **MR. HOWARD:**  That may be mine, Your Honor.

6              **THE COURT:**  Yeah.

7              **MR. HOWARD:**  We are talking about a process.  And the

8    process was done by people.

9              **THE COURT:**  You're talking about the creation of

10   derivative works.

11             **MR. HOWARD:**  The creation of derivative works, using

12   a process that includes several copies of the environments that

13   result in a derivative work, that then goes out to multiple

14   customers.

15             And the people are the one -- this is why the

16   custodians in some ways are so important to us -- the people

17   are the ones that can tell you, "I took three copies of the

18   environment, I used them to create this derivative work.  We

19   see it in documentation, and it went out to this group of

20   customers."

21             So our concern is and a large part of our concern on

22   the TomorrowNow side of the case in restricting custodians is

23   that there are thousands of those derivative works.  And they

24   were each created, and we believe now all of them were created,

25   using some number of copies of these environments.

1          And so, our proposal which we have made,

2     understanding that we are not going to be able to talk to each

3     custodian to document in trial evidence form the process that

4     was gone through for each of those thousand derivative works,

5     we have made a proposal, at least in a skeleton form, which is,

6     let's take some of those derivative works that we see

7     documented, let's understand the process, by deposition and by

8     other means, what was done to create those derivative works

9     using this number of copies from this number of environments,

10    and then we will have something we can extrapolate.

11          Each of those derivative works was created using ten

12    copies of an environment.  And for each of this type of fix, it

13    went out to, on average, this number of clients.  And you get

14    to a point where you can with some precision -- or an expert

15    can -- calculate the number of instances of infringement.

16          But it's because of this human element to the

17    process, that simply inspecting through remote access or adding

18    up or inspecting environments is not going to be the complete

19    solution.

20          So, I wanted to offer that to the Court.  And we have

21    had that discussion in meet-and-confers.

22          **MR. MCDONNELL:**  So, again, we are open-minded to

23    looking at this.  That is the clearest I've ever heard the

24    proposal.

25          And I still don't know which individuals and which

1   files, and how the data would be selected, but we are happy to

2   work with them.

3           **THE COURT:**  Well, I think you should work with them.

4   I mean, obviously, neither side -- I mean, maybe you each get

5   to pick an equal number of what you think are the exemplars.

6           So that you pick the ones that you think just use

7   tons of these things, and replicated them like mad, and you

8   pick the ones that you think are completely innocent or barely,

9   barely used it.  And the average is what comes out.  I mean,

10  you've got to come up with some kind of a fair process.

11          But I think -- I want you to start today, and refine

12  this, talk to your experts.  And it seems to me you ought to be

13  able to do this in a week or something like that.

14          I mean, in other words, what I don't like is just all

15  this -- when you're back here a month later, you still just

16  have not -- you're sort of inching along.  But there's no time

17  for that.  I mean, you know.

18          What I normally do, I'm tempted to do, which is lock

19  you in the jury room now until you come out with a proposal.  I

20  mean, I just -- you know, I just don't think this is --

21  nobody's -- nobody's getting down to brass tacks in the way

22  that I think you have to do.

23          **MR. HOWARD:**  What I might suggest, Your Honor, with

24  the holiday -- and I'm actually in deposition, traveling the

25  next two weeks.  But I think that we've had -- we both are

```
 1   going to need to have our experts with us in having this
 2   discussion.
 3            If the Court would think about maybe three weeks, and
 4   with an expert -- experts involved in that process, then I
 5   think we should come back to you with either a joint proposal
 6   or with our respective proposals, and see if we can make some
 7   progress.
 8            THE COURT:  Well, I think the one week I have
 9   available in July is, what, the week around the twenties?  When
10   is it?
11            THE CLERK:  The week of the 21st, Your Honor.  July
12   21st.
13            THE COURT:  Which is three weeks from now.  Because
14   after that, then I'm gone for a week at the Ninth Circuit
15   conference.
16            So, can you file something by Friday, the 18th?
17            MR. HOWARD:  We will if that's what works for you,
18   Your Honor.
19            THE COURT:  Okay.  But you know, I would like to see
20   you agree on something.  And really, you know, I mean, it ought
21   to just -- you know, I think -- I've given you as many ideas as
22   I can, but I don't know if I'm reinventing the wheel that
23   someone else has already invented somewhere.  I don't know.
24            MR. HOWARD:  The only caution I would raise is we did
25   a deposition last week, and it was really only in that
```

1    deposition -- this is complicated.

2           It was only in that deposition for the first time

3    that we understood, for example, that in the testing process,

4    as separate from the development process, these generic

5    environments were reused over and over again to create these

6    derivative works.  So, this is iterative.

7           And one thing that I would ask the Court to recognize

8    is that we are in some ways late in discovery, but we are also

9    early in discovery.  And we're only now understanding exactly

10   how, in all the different silos that it occurred, these

11   derivative works were created.

12          And so there is some -- there is some uncertainty

13   that we still have in terms of exactly how the protocol would

14   need to look in order to pick up each of these infringing uses.

15   But I think we know more than we did six months ago, and we can

16   take a shot at putting a proposal together.

17          **THE COURT:**  Well, I mean, the proposal can include

18   within reasonable limits, if some new information comes up, you

19   know, adding some later, of further -- you know, further

20   sampling.

21          I mean, that one sounds to me like you're talking

22   about, you know, "We would have been sampling just this type of

23   thing, but now we're also going to sample this."  I mean, it's

24   just adding a new category, but not necessarily a different

25   protocol.

1          **MR. HOWARD:**  It is, although it involves a whole

2     different set of uses and a whole different set of copies of

3     the environments in the overall process from inception to

4     delivery to a customer.

5          **THE COURT:**  Okay.  But I think -- I'm not opposed to

6     reasonable modifications, but the iterative process, it can't

7     be too reiterative, or there just isn't going to be time.  I

8     mean, there's one year.  The Judge has said she's not changing

9     it.

10          And ultimately Oracle -- I mean, I understand the

11     basic principle that, you know, the bigger the crime shouldn't

12     mean the more you get away with it.  On the other hand, there's

13     just going to be a limit to how much you are going to be able

14     to put in front of a judge or a jury.

15          And you're going to have to pick your best shots, and

16     you're not going to be able to -- you know, you are going to

17     have to put in summaries and examples, and that's just the way

18     it's going to have to be.  There's no doubt about it.

19          **MR. HOWARD:**  And as long as we have got the accepted

20     statistical evidence where there can't be this attack because

21     we haven't been able to do it piece by piece, but we've been

22     able to do it by sample, we can put in a compilation --

23          **THE COURT:**  Yeah.

24          **MR. HOWARD:**  And we can say it's everything, I think

25     that that's --

1          THE COURT:  Well, it's going to be fair.  I mean, in

2     other words, it shouldn't make you any better off or worse off

3     than you would have been, but -- and it should be, you know, at

4     least -- with everyone not knowing how it's going to turn out,

5     it should be structured to just give as fair a shot.  And

6     then -- but then, everybody's got to live with the results.

7          And that's why I'm saying what you have to then do is

8     put off-limits certain kind of attacks by each other's experts.

9     I mean, your experts can still reach different conclusions, as

10    they always do, but there's -- certain fundamental validity of

11    this approach will have to be not attacked, because it would be

12    something that's agreed to as a reason to limit discovery,

13    limit the expense, come up with a fair extrapolation, whether

14    it's perfect or not.  Few things in life are.

15          MR. HOWARD:  I think we understand your direction,

16    Your Honor.  Thank you.

17          THE COURT:  Okay.  So let's -- so, I mean, on the

18    number of custodians, I mean, I'm inclined to allow 120.  And

19    that would be the total.  You can reserve as many as you want.

20    I'm -- unlikely, but not impossible that I would increase that.

21    I mean, very unlikely.

22          But there might be, you know, some showing of

23    extremely good cause.  I'm not ruling that out.  But, but you

24    certainly, absolutely can't count on that.  I mean, the idea

25    ought to be that's your budget; figure out how you want to

1     spend it.

2             MR. MCDONNELL:  Very well.

3             MS. HOUSE:  And there's some additional safeguards --

4             THE COURT:  But that's obviously subject to the proof

5     that it is costing what you said it was going to cost.

6             MR. COWAN:  And that was the only question I had,

7     Your Honor.  You said they had a day to get us what -- any

8     additional questions.  When do you want our declaration filed?

9             THE COURT:  When can you get it?

10            MR. COWAN:  Tuesday, Wednesday of next week?

11            THE COURT:  All right.

12            MR. COWAN:  Thank you.

13            MS. HOUSE:  I just -- one of the things that I think

14    you understood is that there have to be additional safeguards.

15            THE COURT:  Right.

16            MS. HOUSE:  We just talked about one.

17            THE COURT:  Yes.

18            MS. HOUSE:  But there's more that are on our list.

19            THE COURT:  I know.  I mean, it's -- we're an hour

20    and ten minutes into the conference, and we've only covered one

21    or two issues in this.  So, I'm going to go through all of

22    them.

23            MS. HOUSE:  Okay.  I just was going to move on to the

24    next safeguard so that we could maybe make comparable progress

25    on that one.

1          **THE COURT:**  Okay.

2          **MS. HOUSE:**  And it was what you called the

3     goose-and-gander one, last time, which is the idea that, look,

4     we have provided this very detailed causation evidence related

5     to customers.  It happens to be conveniently compiled in

6     summary reports.

7              Now, with the situation at hand with the limited

8     amount of custodians, we're not going to be able to get the

9     same type of information from these guys.  And so we need to

10    figure out a way that -- either that's off the table, or if

11    it's on the table, then it's going to have to be on top of the

12    custodians.

13         **THE COURT:**  All right.  You are talking about

14    causation evidence.  The damages causation evidence?

15         **MS. HOUSE:**  Right, exactly.

16         **THE COURT:**  Well, it's not going to be off the table.

17    We made that clear.  So the question is what you are going to

18    produce.

19             Now, they are claiming that -- I want to hear from

20    you -- that Oracle is incorrect, you are doing more than what

21    they say you are.

22         **MR. MCDONNELL:**  We are doing -- let me keep it a

23    thing -- the things that are more difficult than you hope they

24    are.  We are in the process of identifying and collecting

25    documents which we think are comparable to the types of

documents Oracle is referring to, that they have produced, at
least in part.

These would include such things as win/loss reports,
which are summary reports about customers that were won or
lost; customer survey data about what customers thought about
their decision to take a new software product.  There is at
least one electronic customer relations management database
that we're trying to get our arms around and mine for what it's
worth.

And with that data, we are hoping to give exemplars
to Oracle shortly, and tell them that "This is the kind of data
that we think is comparable to what you are producing to us,"
and then continue to talk through the issue, to see if each
side is satisfied with going to those common sources of data,
as opposed to custodial searches.

As a fallback -- and I think this would be mutual --
as a fallback, if necessary, to supplement that kind of
production, we think one approach might be to go, as opposed to
doing full custodial searches where you run all the search
terms on the custodians, try to identify the primary or key
salesperson related to a particular customer sale or
transaction, and then run a limited search that is more of the
old-fashioned go to that person, have that person pull out all
documents relating to communications with a customer about the
customer's decision, and then make that kind of production,

which we think can be both effective and vastly less
time-consuming than these full custodial searches where you
have to download the entire e-mail folder and upload it with a
vendor and so forth.

So we have talked this through with Counsel.  They
are understandably anxious to see the color of our money on
that one, if you will, and see exactly what it is we are
proposing.  We think, a week or two, we should have in their
hands the types of exemplars we are talking about, and hope to
make substantial progress on that.

**THE COURT:**  So in other words, examples of the
win/loss report, of the customer survey data, and the database?

**MR. MCDONNELL:**  Precisely.

**THE COURT:**  And why is it taking so long?

**MR. MCDONNELL:**  It's a big world.  Some of these are
in the language of countries all over the world.

Part of the analysis is, we do believe there needs to
be a limit here, on which customers we're looking at.  I think
Oracle is in agreement with this, but if not, we do need to
settle this.

There are the TomorrowNow customers.  And those are,
as we understand it, all in play.  So Oracle contends that all
of the TomorrowNow customers are relevant.  We have produced
all the TomorrowNow customer contracts.  We will be producing
the lead salespersons for the whole company.

1        **THE COURT:**  Lead --

2        **MR. MCDONNELL:**  The single top-level sales manager,

3    who we believe had something to do with every sale.

4        We've not gotten to the point of deciding whether we

5    have to produce sales custodians beyond that individual, but

6    that will be part of this discussion.

7        **THE COURT:**  But what are you doing with respect to

8    that top sales manager?

9        **MR. MCDONNELL:**  Producing.

10        **THE COURT:**  Producing all documents?

11        **MR. MCDONNELL:**  Full custodial production.  It's on

12    the list.

13        **THE COURT:**  So full custodial on this and every issue

14    that -- on your complete list of search terms, or what?

15        **MR. MCDONNELL:**  Yes.  It's a full custodian

16    production.

17        **THE COURT:**  Okay.

18        **MR. MCDONNELL:**  Bob Geib, G-E-I-B, is his name.

19        Turning from TomorrowNow to the SAP side of the

20    equation is different.  As we understand it, Oracle contends

21    that if a customer took a TomorrowNow sales contract, and then

22    that was used as a springboard to sell that customer an SAP

23    license, that Oracle's going to challenge that SAP license, as

24    a potential item of damage.

25        **THE COURT:**  So it's sort of a convoyed sales --

1            **MR. MCDONNELL:**  Convoyed sale.  They haven't used

2     that term, but that's the general concept.

3            And they've refined it somewhat by saying and there

4     may be old TomorrowNow customers who were customers of

5     TomorrowNow before SAP even acquired TomorrowNow, and they

6     would want to think about that as making argument that that's a

7     similar type of sale.  In other words, there was a TomorrowNow

8     contract, and at some point in time there was also an SAP

9     contract.

10           We're willing to look for that type of data and

11    conduct this discovery plan about that.  Where we draw the

12    line, and we think it's a bright line, is there are going to be

13    customers who are replaced, who left Oracle and went to SAP,

14    who never touched TomorrowNow.  Never had a TomorrowNow

15    contract.  Now, sure, a piece of marketing material may have

16    been waved in front of their face, saying "We have TomorrowNow

17    service too," but they never had a TomorrowNow contract.

18           We are not looking to produce evidence of all those

19    other customers, because they did not have a TomorrowNow

20    contract, and we think that's out of bounds.  As I understand

21    what Oracle's saying, they agree with that.  But I want to make

22    sure that it's clear that that's our position.

23           **THE COURT:**  Okay.  Do you agree with that?

24           **MS. HOUSE:**  We agree that that appears to be a group

25    of customers that wouldn't be relevant.  But we're very

1    frustrated.  They keep saying it's such a limited subset,

2    there's only this many that actually bought SAP applications,

3    there's only this many that upgraded from TomorrowNow.

4         Yet, we have not even been given a list of names yet.

5    So we don't even know the universe that we are bargaining for.

6    Is it 30 customers?  Is it 19, is it 100?

7         That seems like they clearly know who they think the

8    target customers are on top of the TomorrowNow customers.  And

9    yet, everything takes forever.

10        **THE COURT:**  You mean the --

11        **MR. MCDONNELL:**  This is a part of the hearing where I

12   would like to disappear, Your Honor.  It has taken more time.

13   They are entitled to this information.  We are working on it.

14        We know it's -- that this class of customers are more

15   than 20.  We believe --

16        **THE COURT:**  How many is it?

17        **MR. MCDONNELL:**  If I -- based on the best information

18   I have right now, roughly 70.  But even then --

19        **THE COURT:**  Seventy who are in the categories of --

20        **MR. MCDONNELL:**  They had a TomorrowNow contract, and

21   they had a SAP contract.  But there are shades of gray, even

22   with that, which is part of the complexity of it.  There might

23   very well be customers who had a TomorrowNow contract before

24   SAP bought the company, on Product X.

25        And completely independent of that, and much later,

1    without any connection to that TomorrowNow contract or

2    TomorrowNow at all, some other division might have bought an

3    SAP product.  Unrelated to TomorrowNow.  That's a gray area.

4         **THE COURT:**  Why don't you give them a list that

5    includes the black-and-white area and the gray area, and then

6    annotate it with you're not certain about some of these people,

7    so they at least have a starting point.

8         And then, why don't you do it in that order.  Start

9    with the more clearly in the ballpark, black and white, and

10   then after you have done that, get to the gray.  And you can

11   have further discussions.

12        **MR. MCDONNELL:**  That we will do, Your Honor.

13        **THE COURT:**  Are we talking about a majority are in

14   the more clear-cut area?  We are only talking 60 to 70?

15        **MR. MCDONNELL:**  I couldn't tell you truthfully that I

16   know the answer to that.

17        **THE COURT:**  All right.  I mean, it's going to have to

18   be found out.  And really, it's -- you know, unless there's a

19   very complex -- which could be argued each either way, it's in

20   both sides' interest to eliminate the people who are not

21   relevant.  It's just going to waste everybody's time and money.

22   You're equal.  I think you have some overlap in your interest

23   here.

24        **MS. HOUSE:**  Where the safeguard issue comes in, Your

25   Honor, is that insofar as we do that, need to do targeted

searches for the material that we have, as we say, in our

at-risk reports, but that they would then need to go to a sales

custodian to get the specific information about whatever

communications, whatever marketing about TomorrowNow was

provided to that customer, that may or may not have influenced

their decision to purchase.

They want that to be part of the limited 120.  That

will eat up what we have got.  We have got to have a safeguard

so that those -- that's not part of the 120.

**THE COURT:**  All right.

**MR. MCDONNELL:**  We're not saying that.  There's

miscommunication.

We are saying that type of search, that is limited,

the old-fashioned manual type, to go to the sales

representative at SAP and say, "Give us your documents relating

to how this customer made their decision," we're not counting

that against the 120.

I'm sorry if there's been confusion on that point.

So, this is a two-way street.  We are intensely interested in

Oracle information about their customer losses.

**THE COURT:**  Okay.  All right.  So, I think that's an

important clarification.  And I think it should be a two-way

street.

But, on this win/loss customer survey and electronic

relations database, I think you should give them examplars

1    within a week.  I think it shouldn't have taken this long.  And

2    things need to move a lot faster on that.

3           **MR. MCDONNELL:**  Can we say a week from Friday, given

4    the Fourth and the shortened week?

5           **THE COURT:**  All right.  All right.  And then, you

6    know, the faster you can get back to them, you know, start --

7    get that moving, because that ought to cover a lot of ground,

8    if they are what you say they are.

9           Now, there was something about depositions can't even

10   start until November.  I mean, can some depositions start?  In

11   other words, this sort of rolling production, is there going to

12   be the ability to --

13          **MS. HOUSE:**  There are some -- and essentially what's

14   happening is there are people who have been produced that are

15   just now getting produced.

16          What's happened is we said "Hey, wait a second.  With

17   the limited amount of custodians, we've took your advice and

18   said, 'Put these guys at the front of the queue.'"

19          **THE COURT:**  Right.

20          **MS. HOUSE:**  And so as a result of that, we've -- they

21   said "Okay, well, we've stopped the aircraft carrier, and now

22   we're starting it up again."  And so, they are producing now

23   the ones that we actually want.

24          **THE COURT:**  Right.

25          **MS. HOUSE:**  That -- what they are complaining about

1     is that a lot of those individuals happen to have the most

2     documents.

3          **THE COURT:**  Right.

4          **MS. HOUSE:**  So, I -- we have gotten dates, but they

5     have stretched all the way out to the end of Thanksgiving.

6     And, we have to have enough time when they do produce it out

7     the end of the pipe, we have to then look at the material, and

8     then prepare for the deposition.

9          **THE COURT:**  Right.  I'm just wondering whether, in

10    other words, there can be no depositions until Thanksgiving,

11    and then all the depositions start, or whether you could start

12    some depositions of the people whose production's been

13    completed.

14         **MS. HOUSE:**  And we have been doing that.

15         **MR. COWAN:**  And we are, Your Honor.  They sent us

16    notice for the ten that they focused on.  Four or five of them

17    were executive board members, who have a huge quantity of

18    documents, as you might expect, to be reviewed.  A relatively

19    small portion that will be relevant and responsive.  But, we

20    gave them specific lists.

21         When they noticed the depositions, they noticed them

22    for beginning on July 9th.  All the way through December.  And,

23    in two-week steps.  A deposition every two weeks.  We are

24    meeting that notice schedule in terms of time spirit.  We're

25    not meeting the actual dates, as you might expect, because

1    there wasn't any meet-and-confer about the dates.

2          And we are producing -- plan to produce a couple of

3    witnesses in July, a few witnesses in August, several witnesses

4    in September, October, and hope to have them done either by the

5    end of October or before Thanksgiving.  That's what we have

6    communicated to them.  So that's -- we still expect to be on

7    that schedule.  We still expect to be rolling documents out to

8    meet that schedule.

9          As we have explained, as you can imagine, with the

10   quantity of data we're dealing with, every day presents a new

11   technical challenge.  But we work through those, and keep them

12   advised of where we are on those issues.

13         But right now, that's our best estimate.  We are

14   confirming -- as early as this morning, confirmed another

15   deposition for them.

16         **THE COURT:**  Okay, all right.  So, I just wanted to be

17   sure that there wasn't some kind of --

18         **MS. HOUSE:**  But we did caution Your Honor, as part of

19   our observations in the discovery statement, that even with the

20   limited amount of custodians that they're willing to produce,

21   things are going slower than we would like.

22         As you are seeing, things seem to take an awful long

23   time.  And we would hope that we could actually get some

24   minimum number of --

25         **THE COURT:**  Okay, you asked for ten, ten per month.

And you're saying you can't do that because these are the

heaviest --

     **MR. COWAN:** And the real issue, you think about the

document production flow in terms of a pipeline. You don't

measure it in terms of orders for delivery on the pipeline. You

measure it in terms of throughput.

     The throughput on electronic discovery is documents.

You're averaging about 500,000 documents reviewed per month.

That historically has equated to 47, 48, 49,000 per custodian,

which gets you ten custodians.

     After the last hearing, they sent us a list of ten

custodians, and they said, "Okay, give us those custodians in

June." And they happen to be ones that had anywhere from two

to six times the average number of documents.

     So, that's the issue. We're happy to continue to

keep them posted, based on their priority of what we anticipate

our delivery schedule is, based on that throughput of documents

per month. But putting a -- you know, "You will get these" --

     **THE COURT:** So, should we impose

a minimum-documents-per-month production?

     **MR. COWAN:** Yeah. We're fine with living with our

current throughput, which is about 500,000 documents per month

reviewed. And keep in mind, the output of that process is what

it is, based on the review.

     **MS. HOUSE:** This is somewhat circular, though. I

1    mean, one of the things that you've seen, hopefully, is that --

2    you know, they haven't yet employed a search term of things.

3    So if it's taking this long, or if we --

4         **THE COURT:**  Well, let's -- okay.  I'm going to take a

5    break, and then we'll come back, and we'll talk about search

6    terms.

7         And I want everyone -- we've already spent a great

8    deal of time, and we're not through all the issues.  I think we

9    have to proceed in a very orderly, efficient process for the

10   rest of this.

11        **MS. HOUSE:**  Okay.

12        **THE COURT:**  Okay.

13                  (Recess taken from 2:45 to 2:58 p.m.)

14        **THE COURT:**  All right.  Shall we take up search

15   terms?

16        **MR. COWAN:**  Sure.

17        **THE COURT:**  Okay.  So, what is the situation now?

18        There was some disconnect between what each side was

19   characterizing as the hit rate and the percentage of documents,

20   you know, that could be ignored, and therefore culled down, and

21   so forth and so on.  So, where do things stand?

22        **MR. COWAN:**  I think we are still making good progress

23   on that.  The issue I think originally was the different

24   methodologies the parties were using to try to winnow down the

25   search terms, but yet get some efficiency by using those,

1    versus the manual review.

2           As we've discussed, our -- the volume of data that we

3    are looking at and producing is significantly larger.  We have

4    done extensive sampling, we have provided them data.

5    Mr. Alinder and I just spoke in the hall in continuing our

6    meeting and conferring on additional data that he wants from

7    us.  We are going to provide that to him.

8           I would hope within the next week we will have either

9    an agreement or an understanding of precisely what additional

10   information we need to get to an agreement.

11          The real issue, Your Honor, is simply to find that

12   sweet spot, if you will, of how many documents can be

13   eliminated in the review process.

14          In other words, how many documents go into that

15   500,000-document-per-month pipeline.

16          **THE COURT:**  Right.

17          **MR. COWAN:**  And, we are working hard to do that.  In

18   the last meet-and-confer, they acknowledged that we likely,

19   given our data, will never get to zero in terms of the search

20   captures, everything on manual review.

21          We are trying to get something in a reasonable range.

22   We have made significant progress.  We need to keep working

23   together to do that.

24          **THE COURT:**  Okay.

25          **MS. HOUSE:**  Well, Oracle has developed a search term

1    list that's hitting.  We're getting to zero.  So we're going

2    forward with it.  We think it does cut things down.

3           This isn't rocket science.  People use search terms

4    all the time.  They are apparently spending a lot of money on

5    vendors.  And again, you've got to understand that this is

6    slowing things down.  We don't want it to slow things down.

7    And it's increasing costs, apparently.

8           So, while we -- we've actually coached them on how to

9    develop the search term list.

10          **THE COURT:**  Okay.  Well, are you using -- what -- are

11    you using strict search terms?  Or what are you using?

12          **MR. COWAN:**  No, they're connectors that include

13    things, this word, or a portion of this word, and this

14    within -- you know, boolean type searches, that are inclusive

15    and exclusive.  And we are continuing to tweak the terms.

16          The real issue comes not in the -- you know, the

17    parties' relative expertise.  There's two different systems.

18    We have a different system than they have, so it's not --

19          **THE COURT:**  Your system being --

20          **MR. COWAN:**  We are using -- Attenex is the system

21    that they're using.  I think they have a different document

22    review tool and search capability.  And so it takes -- that's

23    where the exchange of information between us and them is coming

24    from, not an education process, if you will.  We know how to do

25    that.

1          **THE COURT:**  Uh-huh.

2          **MR. COWAN:**  But we are working with them and gaining

3     from the information they provided us to do that.  That --

4     again, I think another week or two, and we will be able to do

5     that.  Our client is --

6          **THE COURT:**  Well, I agree that 100 percent is not

7     essential to reach.  I just don't think that's realistic, in

8     most cases.  I'm surprised that you have been able to do that.

9     But I don't know why that is.  I doubt it's just superior

10    expertise, but it might have to do with what documents you

11    actually have, or your search tools, or what.  I don't know.

12         But, given that they have a different set of

13    documents, that doesn't -- one doesn't necessarily imply that

14    they should be able to do the other.  And I think that if it is

15    only eliminating a small percent of documents for review, then

16    I agree that there's a tradeoff there, and it shouldn't be 100

17    -- it doesn't need to be 100 percent.  You know, whether it

18    should be 95 percent, you know, or -- you know, it really

19    depends on what the tradeoff is.

20         So -- and, you know, if you want to get started, I

21    think, you know, this ought to be resolved right away.  I would

22    say it should be resolved by the end of next week.

23         **MR. COWAN:**  I think that's doable, Your Honor.

24         **THE COURT:**  And you ought to reach an agreement.  And

25    I agree that doesn't have to be 100 percent.  I think it should

1    be high, but, you know, if you're not eliminating -- if you're

2    ending up it's only culling two or five percent of the

3    documents, that's -- you know, it's going to be too expensive.

4    Because the real cost, of course, is in review.  And,

5    everybody's costs.  I'm going to have to read this stuff, too.

6    **MR. COWAN:**  We got, from zero, it's up in the small

7    single digits.  And we'd like to keep it there.

8    What we have to get up is the percentage of documents

9    that it reduces, that we don't have to look at.

10    **THE COURT:**  Right.

11    **MR. COWAN:**  And that's what we're working on.

12    **THE COURT:**  Right.  Right.  And that's important.

13    All right, what else do we have to talk about?

14    **MS. HOUSE:**  There's an issue related to the timing of

15    targeted searches.  I think that the parties have agreed that

16    coming up with true targeted searches, and as you indicated,

17    there are certain things that are more amenable to targeted

18    searching than others.

19    When you go to look for board documents, that's an

20    obvious targeted search, because you can go to a repository.

21    If you want summary type of financial information, you go and

22    you look for that type of summary financial information, not to

23    a particular custodian.

24    You know, our frustration with the TN communications

25    is that that's not a targeted search.  And so, the point is

that once we arrive at the truly targeted searches, we want to

make sure that those are also put into the queue.

What we have been getting pushback from is, "Well, if

you want that, then you have to give up this custodian."

Or,"Gosh, we're not going to get you that database that we've

promised to you until at the end of December, you know, pick

what you want."

And, it's a frustrating situation because we're--

part of this is that there was this gap in time when we weren't

getting anything, and now we're being crowded because of

decisions that were made on the other side.

And so, what we would ask is that you put a time

certain for targeted searches to be done.

**MR. COWAN:**  And, and in response, Your Honor, we're

fine with having time proposals and guidelines on that, and I

think the parties could do that without the Court imposing on

it.

We have the production capacity on the custodians

that we've explained, 500,000 documents.  In addition to that,

we have other lawyers and other folks within the client that

are helping us on the targeted collection.  So it's not an

either/or, it's really a priority.  "What do you want first?"

And I think, the way the Court has ordered us to meet

and confer on a number of these issues, and get back to the

Court by the 18th with a specific plan, we can come back on the

1    18th with a plan on timing as well.

2            **THE COURT:**  Okay.  Well, I think you should include

3    timing.  And I do want to set dates.

4            What is Project Blue?

5            **MR. COWAN:**  Project Blue is –– was the project by

6    TomorrowNow to take the environments that they had in-house,

7    the development environments that they had on premises at

8    TomorrowNow, and move those back to the customer location.

9    That was ongoing, after the SAP acquisition, up through the

10   time of the filing of the lawsuit.

11           We have agreed that what –– we're happy to include

12   that in the targeted search.  It's not that we have said we

13   won't include that in the targeted search.  What we've told

14   them is that the bulk of the documents that they are going to

15   get on that issue are already contained in the custodians that

16   have been or will be produced in this case.

17           But we said, "Look, if there's going to be numeric

18   limits on targeted searches and you want to burn one of your

19   targeted searches on that, that's fine."  And we're happy to do

20   that.

21           **THE COURT:**  All right.  So ten each, ten each

22   targeted searches is what –– what I think everybody's agreed

23   on.

24           **MR. COWAN:**  Okay.  Yes.

25           **THE COURT:**  Now, are there any targeted searches that

1    are still in dispute?  I've already addressed the one having to

2    do with communications.

3            MR. COWAN:  To our knowledge, Your Honor, those are

4    the only two that we have listed.

5            THE COURT:  Two.  What's the other?

6            MR. COWAN:  The other, the customer-related

7    communications that you've already dealt with, and the Project

8    Blue that the Court just asked me for.

9            THE COURT:  And Project Blue, you're not objecting

10   to, as long as it counts as one of their ten.

11           MR. COWAN:  (Nods head)

12           THE COURT:  Okay.  So, what about on your side?  Is

13   there something you're objecting to?

14           MS. HOUSE:  I'm having to look at the page here to

15   see where the targeted search discussion is.

16           THE COURT:  I think customer files was at issue.

17           MS. HOUSE:  Yeah.  So, yeah, customer files is sort

18   of the same problem that we have, that we've talked about, in

19   connection with the sales custodians.  I mean, that is

20   different.  That's a huge amount of data.  You don't just go

21   for customer files.

22           They've gotten the contracts for the customers, and

23   that's -- and they have gotten more than that, insofar as the

24   files contain it.  But it's a very overbroad statement,

25   "Customer files."  That would cover just vast reams of data.

1          **THE COURT:**  Okay.  Well, on Page 8 you say that, that

2     it's not a targeted search.  But also, though, in the footnote,

3     that you've done it, that you have given it to them.

4          **MS. HOUSE:**  From the central repositories.  Insofar

5     as there are central repositories, we have given them those

6     customer files.  But you can conceive of "Customer files" would

7     cover much more than that.  Every sales custodian, that is a

8     customer file.

9          **THE COURT:**  So what, if anything, were you looking

10    for other than what's from the central repository?

11         **MR. COWAN:**  Well, given that their targeted searches

12    are limited to a quantity of ten, as Mr. McDonnell mentioned,

13    we would expect targeted searches would include the old-style

14    manual process of going and talking to selected custodians who

15    would have the most knowledge, in conducting specific manual

16    searches of their data, with their involvement.  That's the

17    additional thing we're talking about.

18         **THE COURT:**  What do we mean by "targeted searches"?

19         **MR. COWAN:**  The way we're interpreting that, Your

20    Honor, would be going to look for caches of either electronic

21    or -- in this day and age it's mostly electronic, but

22    electronic or paper documents that exist independent from a

23    custodian.  First and primary source of a targeted search.

24         The other --

25         **THE COURT:**  So normally it would be central

1    repositories.  But you're talking going beyond that.

2         **MR. COWAN:**  Correct.  Because there will be

3    custodians, because of the custodial limits, that would be

4    outside of those custodians that would fall in the limits, who

5    also would need to be queried if they have any responsive

6    documents.

7         **THE COURT:**  Well, something like "customer files"

8    is -- I agree with them, that's overbroad, then.  I mean, you

9    can't conduct -- it's sort of an oxymoron to talk about a

10   targeted search for a customer files.

11        **MR. COWAN:**  It's really the corollary to what they're

12   looking for from us, in terms of the customers they're focused

13   on that Mr. McDonnell just talked about, where you have the

14   TomorrowNow -- the customers that have the contracts that

15   ultimately --

16        **THE COURT:**  Okay.  So, maybe what you need to do is

17   agree on what you're both going to do, the identical,

18   essentially, type of process, although you may have, you know,

19   different sources as it ends, different people, on whatever

20   subset of that 70 or so customers is.

21        And, you know, you probably ought to prioritize them

22   by size.  I mean, if -- I -- you know, I have no idea.  If

23   they're all huge, then they're all worth going after.  If some

24   of them account for tons of business, and others very little,

25   you may either not do them at all, or certainly do them last.

1          So I think with that list, you ought to also put some

2   number about, you know, volume of annual revenue or something

3   like that, that prioritizes in terms of magnitude of dollar --

4   dollar values that are at stake.

5          **MR. COWAN:**  And I think we can do that, and I think

6   it's doable by the 18th, to provide the Court with.  Hopefully

7   with the parties' agreement.

8          **THE COURT:**  So, add that part to that list of, you

9   know, something for the dollar magnitude.  And, then you ought

10  to agree on what you're going to do.

11         I mean, you know, you are going to go to one top

12  salesperson in each company, or, you know, the top ten

13  salespeople or something like that, about, you know, who did

14  what to win over these customers.

15         **MR. COWAN:**  And that's been our big concern on the

16  targeted searches.  We want to make sure not only that they're

17  limited, as the Court has already done, but that the parties

18  are very clear as to what they're doing, and by implication,

19  what they're not doing.

20         **THE COURT:**  Right.

21         **MR. COWAN:**  To do these targeted searches.

22         **THE COURT:**  I think that is what's you -- you know, I

23  think you ought to spell out a written protocol on exactly what

24  you're searching, and why.

25         And, you know, obviously you have different people

1   doing different things at each company, so it's not going to be

2   completely identical.  But the concept ought to be you're

3   making the same degree of effort.

4           **MR. COWAN:**  Correct.  That's fine with us, Your

5   Honor.

6           **THE COURT:**  Is that something -- any thoughts on

7   that?

8           **MS. HOUSE:**  I think that's okay.

9           **THE COURT:**  All right.  So, what else do we have to

10  talk about?

11          **MR. COWAN:**  Your Honor, we briefed the Court on the

12  data warehouse.  I don't know if you need anything more on

13  that.  I'm prepared to discuss that if you would like.

14          **THE COURT:**  Well, I mean, I think it's just --

15  it's -- the problem is, it's just got to get going on it, and

16  see how that works.

17          But I think we talked about the fact that even with

18  that, there's ideally going to be some kind of sampling of

19  that.  Because it -- otherwise, it's just going to be too huge.

20          **MR. COWAN:**  It technically is up and running.  They

21  just need to get on it, drive it, and make sure that it does

22  what it is we have claimed to them that it does, and see if it

23  provides a vehicle.

24          But, hopefully, that will also feed in to the

25  discussions we have between now and the 18th.

1          **MS. HOUSE:**  There was another issue, Your Honor.

2          **THE COURT:**  Uh-huh?

3          **MS. HOUSE:**  That is, as it's pretty apparent because

4    of the way that this conversation has been going, the bulk of

5    the material, the bulk of the discovery -- which isn't

6    surprising -- was coming from Defendants.  In other words,

7    you've stated they have all this.

8          **THE COURT:**  Oh, yeah.  I'm not going to impose

9    unequal limits of some kind.  Judge Hamilton opposed the same,

10   the Federal Rules oppose the same.

11         Now, that doesn't mean that necessarily the result is

12   going to be equal levels of production.  It may not.  But I'm

13   not going to come up with some ratio in advance, based on that

14   argument.

15         **MS. HOUSE:**  Okay.  If we think that they've gone afar

16   in the custodial limits or a -- far afield from what's at issue

17   in the case, we'll bring it up with you.

18         **THE COURT:**  Well, to a limited degree.  There's going

19   to be -- you know, this -- this, our discovery system won't

20   work if, in a big case like this, you fight over everything.

21   It's just not going to work.

22         So you're going to have to choose your battles,

23   you're going to have to cooperate, you're going to have to

24   compromise, both sides.  I mean, this is -- and you're not

25   going to be able to revisit everything constantly.  You're

1  going to have to decide what is worth bringing up with me.

2        And, you know, if anybody falls into the role of the

3  boy who cried wolf, that will not be a good role to be in,

4  because you sort of will use up your credibility.

5        And, so, I'm not going to -- I have no way of

6  assuming in advance, some kind of ratio.  The Federal Rules

7  didn't provide that; Judge Hamilton didn't provide that.  The

8  proportionality principles apply to both sides.

9        If I actually have to decide what's too much that

10  they're asking from Oracle, then, you know, I will need some

11  chapter and verse on exactly how much is at stake among all the

12  other factors.

13        Just being told millions and millions of dollars is

14  at stake gives me nothing to work with.  Just being told

15  100,000 on average per custodian is a lot more specific than

16  that, if it's true.  It has to be backed up, but assuming it's

17  true.

18        So, you know, I'll listen to that, if it's necessary.

19  But, you know, I mean, all of you are going to have to -- have

20  to figure out how to work together, and expedite this.  And it

21  really has to be expedited.

22        But at the same time, you know, this case can't be

23  full employment for the entire planet, or even the continent of

24  India or -- you know, I guess there are some places like that

25  in the United States that have been discovered.

1          But you know, it is -- it is one case among many.

2     It's an important case, a big case, a big business dispute,

3     there's a lot of money at stake.  I'm sure that's true.  But

4     I'm going to be trying to apply the rule of proportionality.

5          **MS. HOUSE:**  Well, one thing we could do that could

6     cut through and expedite it quickly on one issue, which I think

7     you might have gotten a flavor from from the footnote that we

8     provided, is the gross over-designation of Confidential and

9     Highly Confidential.  It's really slowing down our ability to

10    work with our client.

11         **THE COURT:**  Uh-huh.

12         **MS. HOUSE:**  And just the five examples we gave you,

13    that is standard fare.  It seems to be that the presumption is

14    to mark something Highly Confidential or Confidential, and then

15    work backwards, and not apply forwards.

16         And if you could give some instruction --

17         **THE COURT:**  Which footnote is that?

18         **MS. HOUSE:**  I believe it's Footnote 5 or 7.  Let's

19    see.  It's the one that talks about the various documents that

20    have been produced that are utterly irrelevant in this matter,

21    which clearly --

22         **THE COURT:**  Okay, then they have a completing

23    footnote saying they're not all utterly irrelevant.  I haven't

24    seen any of the documents, I haven't read what they are, so

25    that I can actually take sides.

1          I think you're talking about Footnote 7, which --

2     but, so I can't -- I can't really comment on any of those

3     particulars, because you have competing footnotes.

4               **MS. HOUSE:**  Uh-huh.

5               **THE COURT:**  And I think, you know, what the parties

6     don't really fully realize -- and I'll ask you to try to do

7     this before you come back here -- is put yourself in my shoes,

8     instead of your shoes.

9          Coming in here and talking about, you know, Footnote

10    7, about five documents that were outrageous that you

11    characterize one way and you characterize another, I haven't

12    seen any of them.  You know, a judge -- and with a lot of

13    adjectives, you know.  They were very frustrated, and a lot of

14    foot-dragging, or, you know, it's costing too much or whatever.

15    That is not terribly helpful for a judge making a decision.

16    Just -- it just doesn't.

17         I mean, try to -- I -- you know, your role is

18    different than mine.  But if you're going to be persuading me

19    to do something, you have to put yourself in any other judge's

20    shoes.  I don't think I'm speaking from my own -- hopefully not

21    individual bizarre quirks, but just, you know, the way I'm

22    going to have to decide this.

23         I will say, of course, I am extremely against

24    over-designation.  I don't like it, I think it's wrong, I think

25    it's incredibly inefficient, I think parties do it too much.

1  It bothers me a lot.  And if it's proven to me in chapter and

2  verse, I will come down very hard on it.

3          And this may be good examples of it.  I just can't

4  say, because I haven't seen the documents.  I don't understand

5  your arguments about why it really shows where some important

6  executive was on such-and-such a date, and therefore it is

7  relevant.  I mean, I have to get down to that.

8          Whether it's highly confidential or not wasn't the

9  main thrust of this, but that was the last sentence of this

10  single-spaced footnote.  Most of it was focused on whether it

11  was relevant.  If it's not highly confidential, you have got to

12  de-designate it.  And, you know, especially the Highly

13  Confidential designation is just -- you know, causes a huge

14  amount of trouble for both sides.  And shouldn't be.

15          **MR. COWAN:**  We couldn't agree more, Your Honor.  And

16  as you can imagine, we, I think, as of today, are at 2.8

17  million documents.

18          We have a training program for our contract lawyers

19  who are, as you know, the first line of defense, if you will,

20  on terms of reviewing these documents.  And, they are

21  counseled, when we get specific examples like this we go back

22  to the individuals where it looks like totally irrelevant and

23  unresponsive documents were produced, and make sure they

24  understand that can't happen again.  So --

25          **THE COURT:**  Or if they're just getting out their

1    stamp, and stamping --

2                **MR. COWAN:**  Exactly.

3                **THE COURT:**  You know.  And I've seen it in cases,

4    newspaper articles and all the rest.  And I'm very opposed to

5    that.

6                But, if you're saying how am I supposed to -- you

7    know, what we're doing about that, you would have to come up

8    with a concrete proposal about what to do about that.

9                **MR. COWAN:**  In cases where -- particularly with

10   deposition testimony and other documents, they've provided a

11   specific list, these have been over-designated.  We look at

12   them, and we respond.

13               In the past, we have been able to resolve that by

14   agreement.  And I expect we'll be able to do so in the future.

15               **THE COURT:**  Well, I would give priority especially to

16   the highly confidential, because that really makes operation

17   difficult and much more expensive.

18               And, you know, it's -- if it's not documents about,

19   you know, current marketing strategy or financial projections

20   and things like that, I mean, how highly confidential can it

21   be?  You know?

22               And you could redesignate upwards if you really need

23   to, later.  But, I mean, unless there's some huge danger of it,

24   Confidential ought to be good enough.  I don't believe in

25   over-designating Confidential either, but at least it doesn't

1 cause these extra expenses of only showing it to your, you

2 know, outside counsel, and not involving your inside counsel,

3 and all of those sort of things.

4      **MR. COWAN:** There may be one issue on that, if you

5 will just give me one moment to talk to Mr. McDonnell.

6      (Off-the-Record discussion)

7      **MR. COWAN:** Just as a placeholder, Your Honor, there

8 may not be a dispute on this. With respect to highly

9 confidential documents, there is one category that we believe

10 is super highly confidential, which is the board meeting

11 minutes of SAP AG.

12      They requested those. We've talked, we've brought

13 that up in a meet-and-confer with them. And the issue really

14 there is, as you know, traditionally, if there's

15 non-responsive, irrelevant data on a document, but

16 non-privileged in the privilege context, you go ahead and

17 produce the whole document.

18      Board meeting minutes are something that have

19 sensitive information on them, that are highly sensitive, and

20 ordinarily might be labeled as Highly Confidential where their

21 in-house lawyers can see that. That's one category that we may

22 be back to you on.

23      I just -- I didn't want to have this discussion about

24 highly confidential documents without mentioning that.

25 Hopefully we'll resolve it.

1          **THE COURT:**  Well, would you have mutual vulnerability

2    on that issue?  I mean --

3          **MR. COWAN:**  I think so.

4          **THE COURT:**  I would think that you both would have

5    equal concerns about your board minutes.

6          **MR. COWAN:**  Yes.

7          **THE COURT:**  So you ought to be able to resolve that.

8          **MR. COWAN:**  And, we hope so, too.  What we hope to do

9    is redact those for things that are not relevant, not

10   responsive, and produce the relevant and responsive portions.

11   But if we can't resolve that, we'll be back to you on the 18th

12   on that as well.

13         **THE COURT:**  All right.

14         **MS. HOUSE:**  The only other question is you had at one

15   point indicated you thought it might make sense for us to have

16   more regularly-scheduled appointments.

17         Maybe now that you have a sense of the scope, I don't

18   know if you think that's a good idea or not a good idea, but I

19   raise it because you had raised it before, and it may be

20   helpful.

21         **THE COURT:**  I don't know if it's a good idea or not.

22   I mean, what is that one thing?

23         **MR. COWAN:**  Our thought is, you know, depending on

24   how we agendize that and what submissions we provide to you in

25   advance of that, it probably makes sense, at least for the next

1    few months, as you might expect given the level of advocacy on

2    both sides, putting these prehearing submissions together, is

3    time-consuming, involving clients, et cetera.

4           If there's a way to do that with a neutral,

5    non-advocacy style agenda, that would speed-line the process,

6    we would endorse it, at least for the next several months.

7          **THE COURT:**  I mean, I would certainly like to -- I

8    mean, the thing about what I want to be able to do, what I

9    would hope to do, is head off having you file 20 motions, by

10    giving you a lot of feedback and advice like I've been trying

11    do today, so that -- because I don't think there's any reason

12    why all these should turn into full-blown motions.

13          That -- that would be the advantage of something like

14    that, if there is one.

15          **MR. COWAN:**  And the only thing we would caution

16    against, which I think Judge Hamilton took exception to, was

17    with a process we had with Judge White, kind of a standing

18    hearing.

19          **THE COURT:**  Well, that's probably -- well, I think

20    she took exception, I think she thought it made it too easy to

21    you to just proliferate issues.

22          **MR. COWAN:**  Agree --

23          **THE COURT:**  And that's the question.  I would want --

24    I would want a process that reduces the number of issues you

25    bring to me, not amplifies it.  And I think that's what she's

1   concerned about.

2          And ultimately, she's concerned about how many issues

3   you bring to her.  So, I think that's the most important issue

4   that we have to face.  And I guess she's going to be stuck with

5   the Grand Jury.

6          But other than that, hopefully there won't be too

7   many.  And that's certainly more of a legal issue more than --

8   you know, most of these, which are judgment calls, I think.

9          **MR. COWAN:**  We could try it for a couple of months,

10  and if the Court thinks they're productive, then -- then maybe

11  that's --

12         **THE COURT:**  Uh-huh.  All right.  Well, when would you

13  propose to have the next discovery case management, so to

14  speak?

15         **MR. COWAN:**  We already were talking about at least

16  having something on the 21st, where we are going to be

17  reporting back to you.  And then maybe another one --

18         **THE COURT:**  The 21st, though, are we doing that in

19  person or in writing?

20         **MS. HOUSE:**  You had said the 18th for a submission,

21  and I wasn't sure, we didn't have a date selected yet for that.

22         **THE COURT:**  Yeah.  I don't have my calendar in front

23  of me.

24         **MR. COWAN:**  When I said -- the week of the 21st is

25  the --

1          **THE COURT:**  Yeah, uh-huh.

2          I'm going to have to go look at my calendar and see.

3   I don't know.  That's a very busy week.  So --

4                    (A pause in the proceedings)

5          **THE COURT:**  Okay.  I think we said July 24th, Lili,

6   at 2:30?

7          **THE CLERK:**  Yes.

8          **THE COURT:**  And then, if we want to have a further

9   discovery case management or management type of thing,

10  discovery conference like today, but hopefully less

11  adversarial, would be -- what'd I say?  The 28th of August?

12         **THE CLERK:**  Yes, August 28th.

13         **THE COURT:**  And, we can do that at 10:00 a.m., I

14  think?

15         **THE CLERK:**  Yes, Your Honor.

16         **THE COURT:**  Yeah.  Will that work for everybody?

17         **MS. HOUSE:**  That's fine.

18         **MR. COWAN:**  Sure, Your Honor.  So, July 24th at 2:30

19  p.m., and August 28th at 10:00 a.m.

20         **THE COURT:**  All right.  And then, I guess, prepare

21  some kind of a joint statement -- what did I have you do, a

22  week in advance this time?

23         **MS. HOUSE:**  Yes.

24         **MR. COWAN:**  Yes.

25         **THE COURT:**  Yeah.  But the more -- I mean, what I'm

1    looking for is concrete proposals as to how to resolve things

2    fairly and efficiently, and keep the case moving forward.

3            So that's -- that's the tone that I want to establish

4    from everybody.  You may have your disagreements, but that's my

5    goal, on all sides.  All right?

6            **MR. HOWARD:**  Yes.

7            **MS. HOUSE:**  Thank you.

8            **MR. COWAN:**  Thank you.

9            **MR. MCDONNELL:**  Thank you, Your Honor.

10           **THE COURT:**  Thank you.

11                 (Proceedings concluded at 3:31 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in Case No. C 07-1658 PJH (EDL), Oracle v SAP AG, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

Belle Ball, CSR 8785, RMR, CRR

Thursday, July 3, 2008