1  BINGHAM McCUTCHEN LLP
   DONN P. PICKETT (SBN 72257)
2  GEOFFREY M. HOWARD (SBN 157468)
   HOLLY A. HOUSE (SBN 136045)
3  ZACHARY J. ALINDER (SBN 209009)
   BREE HANN (SBN 215695)
4  Three Embarcadero Center
   San Francisco, CA  94111-4067
5  Telephone:  (415) 393-2000
   Facsimile:  (415) 393-2286
6  donn.pickett@bingham.com
   geoff.howard@bingham.com
7  holly.house@bingham.com
   zachary.alinder@bingham.com
8  bree.hann@bingham.com

9  DORIAN DALEY (SBN 129049)
   JENNIFER GLOSS (SBN 154227)
10 500 Oracle Parkway
   M/S 5op7
11 Redwood City, CA  94070
   Telephone:  (650) 506-4846
12 Facsimile:  (650) 506-7114
   dorian.daley@oracle.com
13 jennifer.gloss@oracle.com

14 Attorneys for Plaintiffs
   Oracle Corporation, Oracle USA, Inc.,
15 and Oracle International Corporation

16

17              UNITED STATES DISTRICT COURT

18             NORTHERN DISTRICT OF CALIFORNIA

19                 SAN FRANCISCO DIVISION

| | |
|---|---|
| 20  ORACLE CORPORATION, a Delaware corporation, ORACLE USA, INC., a Colorado | CASE NO.  07-CV-01658 PJH (EDL) |
| 21  corporation, and ORACLE INTERNATIONAL CORPORATION, a California corporation, | SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR: |
| 22                   Plaintiffs, | |
| 23        v. | (1) COPYRIGHT INFRINGEMENT; (2) VIOLATIONS OF THE COMPUTER |
| 24  SAP AG, a German corporation, SAP AMERICA, INC., a Delaware corporation, | FRAUD AND ABUSE ACT; (3) VIOLATIONS OF THE COMPUTER |
| 25  TOMORROWNOW, INC., a Texas corporation, and DOES 1-50, inclusive, | DATA ACCESS AND FRAUD ACT; (4) BREACH OF CONTRACT; |
| 26                   Defendants. | (5) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; |
| 27 | (6) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC |
| 28 | |

ADVANTAGE;
(7) UNFAIR COMPETITION;
(8) TRESPASS TO CHATTELS;
(9) UNJUST ENRICHMENT /
RESTITUTION; and,
(10) AN ACCOUNTING.

DEMAND FOR JURY TRIAL

Plaintiffs Oracle Corporation, Oracle USA, Inc. ("Oracle USA"), and Oracle International Corporation ("OIC") (together "Oracle" or "Plaintiffs") for their Complaint against Defendants SAP AG ("SAP AG"), SAP America, Inc. ("SAP America"), TomorrowNow, Inc. ("TomorrowNow" or "SAP TN"), and Does 1 through 50 (collectively referred to as "SAP" or "Defendants"), allege as follows based on their personal knowledge as for themselves, and on information and belief as to the acts of others:

## I.      INTRODUCTION

1.      This case is about a conspiracy, led by German software conglomerate SAP AG, to engage in and cover-up corporate theft of Oracle intellectual property on the grandest scale.

2.      In mid-December 2004, in response to Oracle's impending acquisition of PeopleSoft, SAP AG CEO Henning Kagermann and the SAP AG executive board of directors "decided to take a strong look at the possibility of offering PSFT support/maintenance services from SAP starting early 2005." Board member Shai Agassi immediately instructed SAP AG's James Mackey to investigate an acquisition of "the leader in this 3rd party support services, a company call[ed] TomorrowNow." Agassi explained: "the idea is to take away the maintenance revenue stream away from ORCL."

3.      The SAP AG board knew it had just days to develop this new service in order to "disrupt the market." Agassi told his team: "Remember the PR value of buying [TomorrowNow] . . .The bragging rights for having more PSFT customers under service than Oracle may be all we need for a momentum swing . . ."

4.      By January 7, 2005, SAP AG executive board members Kagermann,

2

Agassi, Werner Brandt, and Gerd Oswald received a highly confidential document: the "business case" for SAP AG's purchase of TomorrowNow. The document represented SAP AG's negotiations, research and conclusions over the course of the previous three weeks.

5. The presentation made clear that TomorrowNow did not operate legally. It detailed how TomorrowNow relied on "non-production" copies of PeopleSoft software for its "access to PeopleSoft system." Under the heading "Threats," the board was warned that "Access rights to the PeopleSoft software is very likely to be challenged by Oracle and past operating issues [of TomorrowNow] may be a serious liability if Oracle challenges (i.e., offsite production copies and the form of delivery of regulatory updates may be subject to Oracle challenge.)" As a result, the presentation predicted "likely legal action" from Oracle.

6. SAP AG's board ignored these warnings and embraced TomorrowNow's illegal business model for two reasons.

7. First, it decided it could not walk away from the "Opportunity" identified by the January 7 presentation to "distract" Oracle and take the PeopleSoft/JDE customer maintenance revenue and future applications sales Oracle expected to achieve with the PeopleSoft deal.[1]

8. Second, it wrongly predicted Oracle would not sue. The presentation predicted "Oracle's legal challenges to TomorrowNow's ability to provide derivative works/support will require Oracle to also sue its customers – a difficult situation for Oracle."

9. If Oracle did sue, SAP AG's board developed a plan to attempt to insulate SAP AG from the liability it knew TomorrowNow's service model represented. It would blame its customers for signing TomorrowNow's contracts, and leave the TomorrowNow "corporation in existence as a liability shield for any potential claims."

10. With this self-serving plan in place, SAP AG and SAP America bought

[1] "PS," "PSFT" or "PeopleSoft" refers to PeopleSoft, Inc., acquired by Oracle in January 2005. "JDE" refers to J.D. Edwards World Solutions, acquired by PeopleSoft, Inc. in 2003. "SEBL" or "Siebel" refers to Siebel Systems, Inc. acquired by Oracle in September 2005.

3

1    TomorrowNow and converted it to SAP TN just two weeks later, days after Oracle closed on the

2    deal with PeopleSoft.  SAP AG did so knowing, at the SAP AG executive board level, that SAP

3    TN's business model depended on routine, daily cross-use of misappropriated Oracle software

4    applications and downloaded support products.  Moreover, going forward, SAP AG knew that

5    the SAP TN services it exploited to convert Oracle customers relied on SAP TN's tainted

6    development activity to create illegal "SAP TN" software support products.

7    　　　　　11.　　Following the SAP TN acquisition, rather than change the illegal SAP TN

8    business model, SAP instead conspired to leverage the stolen Oracle intellectual property to

9    entice customers to migrate to SAP software applications through SAP's "Safe Passage"

10   program.  SAP further conspired – at the highest levels of all three companies – to cover up the

11   fundamental illegality of that program.  In confidential internal presentations, with instructions to

12   "PLEASE DELETE AFTER READING," SAP dubbed this conspiracy "Project Blue."  Versions

13   of these "Project Blue' presentations, which acknowledged the illegal nature of SAP TN's

14   business, were prepared for the SAP AG executive board of directors as early as June 2005.

15   　　　　　12.　　For years, SAP AG profited from SAP TN's illegal business model,

16   without breathing a word about it to Oracle, SAP AG's existing and prospective customers, or

17   the investing public.  SAP AG and SAP America did not change SAP TN's corrupt business

18   model because they considered SAP TN a crucial element in their plan to undermine Oracle's

19   customer base and brand and to build their own customer base and brand at Oracle's expense.

20   　　　　　　　*　　　　　*　　　　　*　　　　　*

21   　　　　　13.　　Oracle – a leading developer of database and applications software –

22   initially brought this lawsuit after discovering that SAP had engaged in systematic, illegal access

23   to, and taking from Oracle's computerized customer support systems.

24   　　　　　14.　　Oracle now amends its claims because discovery in this case has revealed

25   that the focus of its original claims – SAP's massive illegal downloading of Software and

26   Support Materials from Oracle's password-protected computer systems – is just one element of a

27   larger scheme by SAP to steal and misuse Oracle's intellectual property.  In addition to the

28   illegal downloads, SAP – with the knowledge of members of the SAP AG executive board of

4

1  directors – made thousands of copies of Oracle's underlying software applications on its

2  computer systems.  SAP warehoused Oracle's code in "generic software environments" that it

3  used to service SAP's customers, train employees, create fake "SAP" branded fixes for

4  distribution, and generally to support a business model that was illegal to its core.  SAP

5  continued its illegal use of Oracle's software to develop, test and distribute SAP-branded support

6  products for over a year after Oracle filed this lawsuit.

7        15.    As alleged in Oracle's prior Complaint, in the illicit downloading

8  component of its scheme, SAP through SAP TN, stole thousands of proprietary, copyrighted

9  software products and other confidential materials that Oracle developed to service its own

10  support customers.[2]  SAP gained repeated and unauthorized access, in many cases by use of

11  pretextual customer log-in credentials, to Oracle's proprietary, password-protected customer

12  support website.  From that website, SAP has copied and swept into its servers thousands of

13  copyrighted Oracle Software and Support Materials.  As a result, SAP compiled a massive illegal

14  library of Oracle's copyrighted software code and other materials.  This storehouse of stolen

15  Oracle intellectual property is part of what enables SAP, through SAP TN, to offer cut rate

16  support services to customers who use Oracle software, and to attempt to lure them to SAP's

17  applications software platform and away from Oracle's.

18        16.    Oracle's own records show at least 10,000 illegal downloads by SAP

19  between September 2006 and February 2007.  However, Oracle has now obtained SAP's internal

20  records, which confirm that SAP has spent years systematically taking unauthorized support

21  materials from Oracle's systems, most recently using a dedicated bank of twenty servers in a

22  "download center" and a customized software tool called "Titan."  SAP programmed Titan

23  specifically to ignore any access or use restrictions for any particular customer log-in credential.

24  Instead, SAP designed Titan to gain any form of access with any active log-in credential, and to

25  _____

26  [2] These copyrighted materials, which include program updates, software updates, bug fixes,
27  patches, custom solutions, and instructional documents across the entire PeopleSoft and JDE
   families of software products, are referred to throughout as "Software and Support Materials."

28

1 "scrape" Oracle's website for bug fixes, patches, updates and instruction manuals.  At the time

2 Oracle filed its prior Complaint, Titan and other tools had filled SAP storage vaults with more

3 than *five terabytes* worth of Oracle's Software and Support Materials.  On just one of SAP's

4 servers, Oracle discovered nearly *8 million* downloaded Oracle Software and Support Materials.

5       17.    For years, SAP dumped these materials into a co-mingled, master

6 download library, and "exploded" the software support packages into their constituent objects to

7 facilitate later indexing and searching by product.  SAP accessed these master download libraries

8 as needed when customers needed a fix – regardless of which log-in credential SAP had used to

9 download a particular fix in the library, regardless of whether the customer getting the fix had

10 any license to receive it, and regardless of whether the customer had a support contract with

11 Oracle entitling them to receive that fix.

12       18.    But these downloads of Software and Support Materials, though massive,

13 were just one part of SAP TN's fundamentally illegal business model:

14      • Beginning as early as 2002, SAP TN co-founders Andrew Nelson and Seth

15        Ravin decided that SAP TN would expand its services and, in doing so, would

16        create and keep on its computer systems illegal copies of Oracle's *underlying*

17        *software applications*;

18      • Nelson and Ravin directed SAP TN to warehouse dozens of these copies

19        simply as "generic software environments" and use them as a "sandbox" to

20        service other customers, train its employees, and create phony SAP TN-

21        branded fixes to sell to its customers;

22      • In particular, SAP TN used these generic copies of Oracle software to

23        "develop" (by copying Oracle software or creating illegal derivative works

24        from it) SAP TN-branded "tax and regulatory updates," and deliver them to its

25        customers paying for SAP TN support of each Oracle software release;

26      • In at least hundreds of instances, in a process created by Nelson and Ravin,

27        SAP TN did this by first updating one "generic" environment with the Oracle-

28        authored update code that SAP TN would download from Oracle's systems

6

1    with one customer's log-in credential.  SAP TN would then use software

2    comparison tools to compare this "updated" generic software environment to a

3    generic copy (also obtained from some unidentified customer) of an earlier

4    release of the same software.  SAP TN then copied the differing code and

5    used it to "develop" (again, by creating an illegal derivative work) what it

6    called an SAP TN "retrofit update" in another "generic" environment.  In the

7    course of this development process, SAP TN would normally make at least

8    four, and sometimes many more, generic copies of Oracle's software

9    applications.  In effect, there was no original development at all but merely

10   repeated, illegal copying and use of the Oracle software code;

11   • In at least hundreds of other instances, SAP TN simply used these generic

12   environments copied from customers' Oracle software to develop and test

13   SAP TN "authored" (again, illegally created) updates that it delivered to its

14   customers.  After it bought SAP TN, SAP AG directly assisted in this process

15   using its own software support resources;

16   • In total, SAP TN made thousands of copies of Oracle's software, and

17   distributed thousands of individual fixes, for a fee, through its illegal "generic

18   retrofit" and "direct update" models;

19   • In addition to the code associated with these retrofit software updates, SAP

20   TN provided its customers with stolen Oracle instruction manuals, guides,

21   notes and other support documentation related to the updates.  It did this by

22   "copying and pasting" downloaded Oracle documentation into re-branded

23   SAP TN documentation that was, according to the sworn testimony of SAP

24   TN's third employee, "essentially identical" and "virtually verbatim with

25   small changes" as the Oracle documentation.  SAP TN then distributed these

26   copied documents to its customers with a cover letter signed by its CEO,

27   Andrew Nelson; and,

28   • SAP TN prepared operations manuals to instruct SAP TN employees how to

7

1   download Oracle documentation and alter it to conceal its origin and make it

2   look like SAP TN's.  These instructions mandated specific, but minor changes

3   to Oracle materials, stating for example, "Go to Document Properties and

4   change author to TomorrowNow," or "[w]here the [Oracle] document talks

5   about the appendix, edit so that the TomorrowNow document says

6   'summary.'"

7       19.     The illegal downloads and the illegal software copies are part of an

8   integrated, illegal business model.  Without this stolen intellectual property, SAP TN could not

9   operate.  For example, whenever SAP TN wished to advertise support services for a new Oracle

10  software product, it would need to first obtain a "seed" copy of the software.  It needed this first

11  copy so it could train its employees to support the software and create a generic software

12  environment from which to "recycle" its support efforts and scale them across other customers.

13  For these reasons, SAP TN's internal business plans specify that the first SAP TN customer on a

14  new Oracle software release must contractually agree with SAP TN to provide copies of its

15  Oracle software CDs to SAP TN.

16      20.     SAP AG and SAP America have made repeated false statements about

17  their own involvement in, and benefit from, SAP TN's theft.

18      21.     While admitting that "inappropriate" downloads took place, in a July 3,

19  2007 press conference, SAP AG CEO Henning Kagermann stated that a "firewall" existed

20  between SAP AG and SAP TN that prevented SAP AG from having access to the Oracle

21  software downloaded by SAP TN.  That was not true:

22      • SAP AG and SAP America employees accessed SAP TN's systems

23          through a special link on SAP TN's website;

24      • SAP TN employees accessed SAP AG and SAP America's systems

25          through "SAPnet," an internal network through which SAP AG provided

26          assistance to SAP TN's illegal development efforts;

27      • SAP TN, SAP America and SAP AG employees routinely emailed content

28          and intellectual property among themselves; and,

8

1          • At the time Oracle filed its lawsuit, SAP had before it a detailed roadmap

2              for connecting virtually every piece of the SAP TN network to the SAP

3              AG network.

4          22.    These facts show that, despite Kagermann's public pronouncement, no

5   "firewall" existed between SAP TN and SAP America or SAP AG.  In fact, SAP TN did transmit

6   copyrighted Oracle software code by email to SAP AG – a fact SAP AG has now admitted under

7   oath.

8          23.    Even worse, discovery in this case has revealed that SAP AG and SAP

9   America knew from the start that SAP TN's business depended on this extensive illegal

10  scheme – going far beyond SAP TN's downloading activity – to copy, keep, use and sell

11  Oracle's software as its own.  On December 21, 2004, one of the key members of SAP's due

12  diligence team – a former PeopleSoft employee – reported directly to board member Agassi:  "I

13  am not sure how TomorrowNow gets access to Peoplesoft software, but its [sic] very likely that

14  TomorrowNow is using the software outside the contractual use rights granted to them . . ."  A

15  week later, he reiterated the point:  "The access rights to the PeopleSoft software is very likely to

16  be challenged by Oracle."

17         24.    Undeterred, SAP AG and SAP America initially sought assurances that

18  SAP TN respected Oracle's intellectual property rights.  SAP TN's owners flatly refused to give

19  any such assurances.  Instead, they warned that Oracle likely would sue SAP when it raised SAP

20  TN's profile through the "Safe Passage" program.

21         25.    SAP AG and SAP America bought SAP TN anyway in January 2005.

22         26.    Immediately, because of apparent ongoing concerns about the propriety of

23  keeping and using (and cross-using) thousands of copies of Oracle's software, SAP half-

24  heartedly considered and then tabled "Project Blue."  Project Blue was a codename for a secret

25  project to begin to remove the infringing Oracle software from SAP TN computers and support

26  customers remotely.  "Blue" referred to supporting customers without locally hosting or using

27  the infringing copies of Oracle software.  "Yellow" referred to the status quo – keeping the

28  illegal copies of Oracle software on SAP's computers and using them for general purposes.

9

27.     SAP TN prepared a series of secret "Project Blue" presentations for itself and members of the SAP AG executive board of directors.  These presentations revealed that SAP TN's business fundamentally depended on generic bootleg copies of Oracle's software applications.  Yet SAP still did nothing to stop the theft and instead took steps to expand it into other Oracle products:

- SAP continued to accept the benefits of SAP TN's daily infringement of Oracle's copyrights because, in the words of SAP TN's founder Andrew Nelson, this "strategic investment" would allow SAP TN to "grow in profit while remaining a strategic weapon in SAP's fight against Oracle";

- SAP expanded SAP TN's illegal model to include Oracle's Siebel software just days after Oracle acquired Siebel, and added Oracle's Retek and Hyperion software to its Safe Passage sales program immediately after those acquisitions as well; and,

- In March 2007, SAP AG's executive board was about to approve, or had already approved, the expansion of SAP TN's service offering to Oracle eBusiness Suite customers.  A presentation to executive board member Gerd Oswald stated this expansion would "support SAP's strategy and Board area strategy" and "leverage service as [a] competitive weapon in order to restrict competition."

28.     According to its business model, SAP TN could not have offered Siebel or eBusiness Suite support services, or considered offering Retek and Hyperion support services, without first obtaining illegal "sandbox" copies of that software for testing, research and development.  In authorizing SAP TN to consider and, in the case of Siebel, actually offer these services, SAP AG's executive board of directors had no reason to believe that SAP TN would not likewise engage in illegal acquisition and use of Oracle's software.

29.     Through all of 2006, and into 2007 (and, discovery has revealed, also into 2008 for over a year after Oracle brought this lawsuit), SAP AG did not require SAP TN to remove the illegal Oracle software copies from its systems by implementing Project Blue.

10

1    Rather, SAP AG and SAP America instead allowed SAP TN to expand its offerings to these

2    other Oracle software applications, and to bring in new so-called "Safe Passage" customers who

3    would migrate from Oracle to SAP applications.  SAP AG and SAP America provided leads,

4    helped with and participated in negotiations whenever fruitful, and ran joint marketing

5    campaigns, including a "Zero Dollar" campaign where a customer could "Get [its]

6    PS/JDE/SEBL support [from SAP TN] at NO COST while you migrate to SAP [AG]" to "ensure

7    we move these customer[s] off Oracle completely."

8           30.    Confidential internal SAP communications reveal that SAP may not have

9    won nearly as many customers through its Safe Passage program if it did not have the help of

10    SAP TN's illegal service offering.  For example, in May 2006 during SAP's negotiations with

11    potential customer National Foods Limited, "TomorrowNow was able to give 'substantial teeth'

12    to the SAP license bid, with the offer of combining both JDE and PeopleSoft support and

13    maintenance services for the foreseeable future, whilst they work on the SAP implementation

14    plans."  Many other examples of SAP TN's efforts to win customers for SAP can be found

15    throughout SAP's and SAP TN's records.

16           31.    By early 2007, Project Blue had gone nowhere.  SAP TN objected to

17    giving up the infringing local software copies and engaged in self-described "delay tactics."

18    SAP AG and SAP America refused to give up the software sales SAP TN's illegal activities

19    helped them make.  According to confidential notes from a call with Thomas Ziemen of SAP

20    AG, Andrew Nelson confesses:  "Project Blue - Taking much longer than expected.  Don't feel

21    we can get payroll development in external environments.  Focus on new non-payroll

22    environments.  ***Will provide formal proposal to you [Ziemen] to present to board for review.***"

23    (emphasis supplied).

24           32.    In sum, SAP's "illegal library" of downloaded Oracle Software and

25    Support Materials described in Oracle's original Complaint is just the beginning.  Pursuant to

26    approved corporate protocols, with the knowledge and complicity of members of the SAP AG

27    board of directors, SAP TN has spent years compiling and improperly using Oracle's software

28    applications and downloaded Software and Support Materials.  Despite this knowledge, SAP AG

1 board members have still chosen to assist and enable SAP TN's illegal activities, and to boast on

2 earnings calls about Safe Passage customer wins obtained with SAP TN's assistance. SAP

3 conspired to conceal SAP TN's corrupt business model from Oracle, its customers and the

4 investing public, so that it could continue to pocket the money from these unlawful sales. As

5 explained in further detail below, this theft and cover-up appears to be an essential – and illegal –

6 part of SAP's competitive strategy against Oracle.

7       33. Oracle brings this amended complaint to bring the truth about SAP's

8 actions to light, force a return to fair competition, and redress the harm that SAP has caused by

9 its illegal conduct. SAP's infringement and other illegal, wrongful, and unfair business practices

10 threaten to cause irreparable harm to Oracle, its many employees, customers and shareholders.

11 Oracle has no adequate remedy at law for the harm threatened and caused by these acts.

12 **II.    THE PARTIES**

13       34. Oracle Corporation is a Delaware corporation with its principal place of

14 business in Redwood City, County of San Mateo, State of California. Directly and through its

15 subsidiaries, Oracle Corporation develops and licenses database and applications software

16 programs and provides related services around the world.

17       35. Oracle USA is a Colorado corporation duly authorized to do business in

18 the State of California, with its principal place of business in Redwood City, County of San

19 Mateo, State of California. Oracle USA develops and licenses database and applications

20 software programs and provides related services. Oracle USA is the successor to PeopleSoft

21 USA, Inc. ("PeopleSoft") and JDE.

22       36. OIC is a California corporation duly authorized to do business in the State

23 of California, with its only place of business in Redwood City, County of San Mateo, State of

24 California.

25       37. OIC is the owner of the copyrights at issue in this action. Oracle

26 Corporation and Oracle USA are licensees of the copyrights at issue in this action. Oracle

27 Corporation and Oracle USA are authorized to license to end users the copyrighted computer

28 software programs and other works at issue in this action.

1          38.     SAP AG is a German corporation with its principal place of business in

2  Walldorf, Germany.

3          39.     SAP America is a Delaware corporation with its principal place of

4  business in Newtown Square, Pennsylvania.  SAP America is a wholly-owned subsidiary of SAP

5  AG.

6          40.     SAP TN is a Texas corporation with its principal place of business in

7  Bryan, Texas.  SAP TN is a wholly-owned subsidiary of SAP America.  The corporate

8  relationship of the three named defendants is set forth in the chart below.

9

```
              ┌─────────────────────────────────┐
              │           SAP AG                │
10            │   (German Parent Corporation)   │
              └─────────────────────────────────┘
11                             │
                               │
              ┌─────────────────────────────────┐
12            │         SAP America             │
              │  (Wholly-owned U.S. Subsidiary) │
13            └─────────────────────────────────┘
                               │
14                             │
              ┌─────────────────────────────────┐
              │           SAP TN                │
15            │  (Wholly-owned U.S. Subsidiary) │
              └─────────────────────────────────┘
```

16

17          41.     Oracle is currently unaware of the true names and capacities of Does 1

18  through 50, inclusive, whether individual, partnership, corporation, unincorporated association,

19  or otherwise, and therefore sues these defendants by such fictitious names.  Due to the

20  surreptitious nature of Defendants' actions, and the complicated nature of their scheme, the

21  identities of the Doe Defendants have been concealed from Oracle, preventing Oracle from

22  identifying these Defendants by name.  After discovery, which is necessary to ascertain the true

23  names and capacities of these Defendants, Oracle will amend its complaint to allege the

24  necessary identifying details.

25          42.     Defendants all are doing business in and/or have directed their activities at

26  California, and specifically this judicial district.  By way of example only, SAP America and

27  SAP TN advertise, promote, sell, license, service, and support customers in California and in this

28  judicial district.  SAP AG negotiates and enters into software license and support agreements

1  directly within the United States and, specifically in this judicial district, negotiates certain

2  software-related contracts directly with Oracle that contain provisions by which SAP AG

3  consents to the jurisdiction of California courts and the application of California law.  SAP AG

4  also holds an annual meeting of its Board of Directors in Palo Alto, California, and finances the

5  sales and promotional activities of both SAP America and SAP TN throughout the United States

6  and in California.

7       43.    At all material times, through its 100% ownership of both SAP America

8  and SAP TN, SAP AG had both the right and the authority to control the actions of both

9  corporations.  Similarly, at all material times, through its 100% ownership of SAP TN, SAP

10  America had both the right and authority to control the actions of SAP TN.

11       44.    At all material times, each of the Defendants, including Does 1 through

12  50, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent,

13  affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial

14  assistance to the alleged activities, and in doing the things alleged, each was acting within the

15  scope of such agency, service, employment, partnership, joint venture, representation, affiliation,

16  or conspiracy, and each is legally responsible for the acts and omissions of the others.

17  **III.    JURISDICTION**

18       45.    Oracle's first cause of action arises under the Federal Copyright Act, 17

19  U.S.C. §§ 101 *et seq*., and its second cause of action arises under the Computer Fraud and Abuse

20  Act, 18 U.S.C. §§ 1030 *et seq*.  Accordingly, this Court has subject-matter jurisdiction over this

21  action pursuant to 18 U.S.C. § 1030(g), 28 U.S.C. § 1331, and 28 U.S.C. § 1338.

22       46.    This Court has supplemental subject matter jurisdiction over the pendent

23  state law claims under 28 U.S.C. § 1367, because these claims are so related to Oracle's claims

24  under federal law that they form part of the same case or controversy and derive from a common

25  nucleus of operative facts.

26  **IV.    VENUE**

27       47.    Venue in this district is appropriate, pursuant to 28 U.S.C. § 1391, because

28  a substantial part of the events giving rise to the dispute occurred in this district, a substantial

14

1 part of the property that is the subject of the action is situated in this district, and the Court has

2 personal jurisdiction over each of the parties as alleged throughout this Complaint.

3 **V.      INTRADISTRICT ASSIGNMENT**

4        48.      Assignment is proper in this division under Civil L.R. 3-2 (c) and (d),

5 because a substantial part of the events giving rise to the claims occurred in San Mateo County

6 and a substantial part of the property that is the subject of the action is situated in San Mateo

7 County.

8 **VI.     FACTUAL ALLEGATIONS**

9        **A.      Oracle's Software And Support Materials**

10        49.      Oracle is the world's largest enterprise software company, and the first to

11 receive J.D. Power & Associates' global certification for outstanding service and support based

12 on measuring customer satisfaction worldwide.  Oracle develops, manufactures, markets,

13 distributes, and services software designed to help its customers manage and grow their business

14 operations.  Oracle's software offerings include database, middleware, and applications software

15 programs.

16        50.      As is typical in the enterprise software industry, Oracle does not sell

17 ownership rights to its software or related support products to its customers.  Instead, Oracle's

18 customers purchase licenses that grant them limited rights to use specific Oracle software

19 programs with Oracle retaining all copyright and other intellectual property rights in these works.

20 In addition, licensed customers can, and typically do, purchase some set of technical support

21 services that include the right to obtain upgraded products such as updates, bug fixes, or patches

22 to those software programs the customers have expressly licensed from Oracle and have the right

23 to use for purposes authorized by Oracle.

24        51.      Oracle's license agreements with its customers may vary according to the

25 products licensed, including because the customers originally contracted with PeopleSoft and/or

26 JDE, but all of the relevant license agreements for what is now Oracle software set comparable

27 rules for access to, and use of, that software.  Among other things, those rules prohibit access to,

28 or use of, any portion of the software not expressly licensed to and paid for by the licensee, and

1    any sublicense, disclosure, use, rent, or lease of the software to third parties.

2          52.    Oracle's license agreements define Oracle's confidential information to

3    include, without limitation, Oracle's software, its object and source code, and any associated

4    documentation or service offerings.  Licensees may designate third parties to help maintain

5    Oracle's software, but only subject to the terms of the relevant license agreement between the

6    licensee and Oracle.  Those agreements generally preclude the third party from installing the

7    software on a server, or accessing the source code of the software.  The License Agreements

8    generally prohibit the licensee or any third party from using the software offsite without notice to

9    Oracle, prohibit disclosure to third parties, and prohibit any use other than by the customer for

10   production, backup, archival and in-house disaster recovery purposes.  As defined in one

11   illustrative license agreement, "software" specifically includes the update products made

12   available to customers as part of the support contracts that customers purchased from Oracle.

13         53.    Through its Terms of Use, Oracle also restricts access to the Customer

14   Connection technical support website used by Oracle customers and/or their authorized agents to

15   access and download JDE and PeopleSoft Software and Support Materials licensed to Oracle

16   customers:

17         You agree that access to Customer Connection…will be granted
           only to your designated Oracle technical support contacts and that
18         the Materials [on the support website] may be used solely in
           support of your authorized use of the Oracle Programs for which
19         you hold a supported license from Oracle.  Unless specifically
           provided in your licensing or distribution agreement with Oracle,
20         the Materials may not be used to provide services for or to third
           parties and may not be shared with or accessed by third parties.
21

22         54.    The Terms of Use explicitly describe the confidential nature of the

23   material on Customer Connection: "the information contained in the Materials [available through

24   Customer Connection] is the confidential proprietary information of Oracle.  ***You may not use,***

25   ***disclose, reproduce, transmit, or otherwise copy in any form or by any means the information***

26   ***contained in the Materials for any purpose***, other than to support your authorized use of the

27   Oracle Programs for which you hold a supported license from Oracle, without the prior written

28   permission of Oracle."  (emphasis supplied).

16

1    55.    Access to the secured areas of Customer Connection is also governed by

2  Special Terms of Use.  By using the secured website, the user agrees to accept and comply with

3  these Special Terms of Use.  The Special Terms of Use provide that access is only permitted via

4  the user's "personal username and password" and that all materials on the secured website are

5  confidential and proprietary.  The Special Terms of Use clearly provide that: "Use of such

6  CONFIDENTIAL and PROPRIETARY information and materials for any other purpose is

7  strictly prohibited."

8    56.    Prior to downloading Software and Support Materials from Oracle's

9  support websites, a user must also specifically agree to additional terms of use and restrictions

10  specified in Oracle's Legal Download Agreement:

11          Your username and password are provided to you for your sole use
            in accessing this Server and are confidential information subject to
12          your existing confidentiality agreement with Oracle / PeopleSoft /
            JDEdwards.  If you do not have a confidentiality agreement in
13          effect with Oracle / PeopleSoft / JDEdwards, you are hereby
            notified that your username and password are confidential
14          information and may only be distributed to persons within your
            organization who have a legitimate business purpose for accessing
15          the materials contained on this server in furtherance of your
            relationship with Oracle / PeopleSoft / JDEdwards.

16

17    57.    The Legal Download Agreement also puts the user on notice as to the

18  confidential, proprietary and copyrighted nature of the Software and Support Materials available

19  for download:

20          Any software that is made available to download from this server
            ("Software") is the copyrighted work of Oracle / PeopleSoft /
21          JDEdwards and/or its affiliates or suppliers.  All Software is
            confidential information of Oracle / PeopleSoft / JDEdwards and
22          its use and distribution is governed by the terms of the software
            license agreement that is in effect between you and Oracle /
23          PeopleSoft / JDEdwards ("License Agreement").  The Software is
            part of the Licensed Products under the License Agreement and
24          may only be downloaded if a valid License Agreement is in place
            between you and Oracle / PeopleSoft / JDEdwards.  The Software
25          is made available for downloading solely for use by licensed end
            users according to the License Agreement and any reproduction or
26          redistribution of the Software not in accordance with the License
            Agreement is expressly prohibited.  WITHOUT LIMITING THE
27          FOREGOING, COPYING OR REPRODUCTION OF THE
            SOFTWARE TO ANY OTHER SERVER OR LOCATION FOR
28          FURTHER REPRODUCTION OR REDISTRIBUTION IS

17

1    EXPRESSLY PROHIBITED.

2    58.    The Legal Download Agreement further restricts use of documents

3    downloaded from the website:

> Permission to use Documents (such as white papers, press releases,
> product or upgrade announcements, software action requests,
> datasheets and FAQs) from this server ("Server") is granted,
> provided that (1) the below copyright notice appears in all copies
> and that both the copyright notice and this permission notice
> appear, (2) use of such Documents from this Server is for
> informational and non-commercial or personal use only and will
> not be copied or posted on any network computer or broadcast in
> any media, and (3) no modifications of any Documents are made.
> Use for any other purpose is expressly prohibited.

10    59.    In addition, users accessing specific materials, such as a Software

11    Application Request ("SAR") through the SAR Search Web Application, agree to additional

12    legal restrictions.  These terms notify the user that the software available to download from

13    Oracle is Oracle's copyrighted material.  The terms further provide that the "software is part of

14    the Licensed Products under the License Agreement" and "is made available for downloading

15    solely for use by licensed end users according to the License Agreement.  Any reproduction or

16    redistribution of the Software not in accordance with the License Agreement is expressly

17    prohibited."  To download a SAR, the user must click on a button indicating that it accepts these

18    terms.

19    **B.    Oracle Threatens To Unseat SAP**

20    60.    On January 7, 2005, Oracle completed its acquisition of PeopleSoft to

21    emerge as the second-largest provider of business software applications in the world and the first

22    to rival SAP AG in market share, size, and geographic and product scope.  As SAP America's

23    Vice President of Operations, Richard Knowles, testified on June 23, 2004 at the trial on the

24    Department of Justice's unsuccessful effort to block Oracle's acquisition of PeopleSoft, the

25    combination revitalized Oracle overnight as a competitor in the business software applications

26    business.  SAP AG suddenly found itself in a far different competitive environment than the one

27    in which it had grown comfortable.  As SAP AG reeled, events unfolded at a rapid pace:  eleven

28    days after its announcement, Oracle launched the newly-united company and unveiled, at its

18

1 headquarters with more than 48,000 people joining by Webcast and phone, how the nearly

2 50,000-strong combined workforce of Oracle and PeopleSoft would provide unparalleled

3 innovation and support to 23,000 business applications software customers throughout the world.

4     61.    SAP AG's and SAP America's top executives publicly downplayed the

5 threat that a combined Oracle and PeopleSoft entity would pose to its competitive position for

6 business software applications. SAP AG CEO Henning Kagermann claimed that even with

7 PeopleSoft, Oracle would "not [be] a competitor which could really hurt us." After the merger,

8 he even claimed to wish Oracle "good luck" in competing with SAP AG.

9     62.    But SAP AG had no answer for the business proposition the new Oracle

10 offered. Not only do many SAP AG customers use Oracle's superior database software

11 programs, but now Oracle offered a deeper, broader product line of enterprise applications

12 software programs to compete against SAP AG.

13     63.    Rather than improve its own products and offerings, SAP AG instead

14 considered how to undermine Oracle. One way was to hit at Oracle's customer base – and

15 potentially increase its own – by acquiring and bankrolling a company that claimed the ability to

16 compete with Oracle support and maintenance services on Oracle's own software products,

17 despite not owning any of the software code for, or intellectual property rights to, these same

18 products.

19 **C.    SAP AG's Purchase Of SAP TN And Knowledge Of Its Illegal Business**
20 **       Activities**

21     64.    In the world of enterprise software applications, revenue comes from three

22 basic activities: (a) licenses of the underlying software applications; (b) consulting relating to

23 the implementation and operation of the software; and, (c) support contracts to keep the software

24 updated and upgraded.

25     65.    In December 2004, SAP TN was a small software services company,

26 headquartered in Bryan, Texas and founded by former PeopleSoft software engineers,

27 developers, and support technicians. It claimed to compete with PeopleSoft, JDE, and later,

28 Oracle, by providing low-cost maintenance and support services to PeopleSoft and JDE (and

1  later Siebel) customers running assorted versions of these software programs.  SAP TN claimed

2  that it could cut customer maintenance and support bills in half and give customers a reprieve

3  from software upgrade cycles by allowing customers to remain on older, often outdated, versions

4  of PeopleSoft or JDE software rather than moving to later versions by implementing upgrades

5  that the customers would receive by paying for support services from the software vendors

6  themselves.  As one industry journalist explained, SAP TN promised to offer such cheap support

7  "because it is not investing millions of dollars in research and development for future versions of

8  the software; it instead focuses on simply keeping the software up and running for an annual

9  fee."

10         66.     As described in a glossy spread in a leading industry publication, in

11  December 2004, just weeks before Oracle would close the PeopleSoft acquisition, SAP TN

12  president Andrew Nelson got "the magic phone call" from Jim Mackey, the "front man for SAP

13  AG's mergers and acquisitions strategy."  Mackey made Nelson an offer "he couldn't refuse."

14         67.     To retain full control over every detail of its scheme to lure away

15  customers from Oracle, and to use SAP TN to do it, SAP AG proposed to buy SAP TN outright

16  and make it a wholly-owned – and wholly-beholden – subsidiary.  Acquiring SAP TN was not a

17  mere investment by SAP AG, but a calculated competitive move.  As one industry observer put

18  it, SAP AG bought "another arrow in its quiver to hunt after Oracle's customers."  Aligning with

19  SAP AG made little sense for SAP TN, however, because to the extent SAP AG successfully

20  undermined Oracle by having its customers move from Oracle's software to SAP AG's software,

21  SAP TN would eventually lose its customer base.  So SAP AG had to make the price right – and

22  accept a known risk.

23         68.     The pre-deal negotiations with SAP TN reveal the breadth of SAP AG's

24  knowledge – and its lack of concern – about SAP TN's thefts.  Based on repeated warnings about

25  how SAP TN's business model likely relied on illegal use of Oracle software, SAP America and

26  SAP AG asked for "a representation regarding the infringement of PeopleSoft's intellectual

27  property rights . . . that . . . would survive indefinitely . . . [and] would not be subject to any

28  basket or cap on indemnity."

1    69.    But SAP TN's two shareholders, Seth Ravin and Andrew Nelson, refused

2    to make any representation that SAP TN had respected PeopleSoft's (soon to be Oracle's)

3    intellectual property rights.  Instead, Ravin reminded SAP of "discussions that had been had

4    regarding the increased likelihood of SAP being the subject of a lawsuit as a result of the very

5    public and very aggressive move to offer alternative support to Oracle/PeopleSoft clients."  SAP

6    TN insisted this exposure to legal action by Oracle "is a real risk that must be borne primarily by

7    SAP as a business and strategic investment risk," and threatened to suspend due diligence

8    activities on the deal.

9    70.    In response, SAP AG's Jim Mackey emailed Ravin directly: "Do not let

10   your attorneys shut down the process.  Keep the negotiations and diligence going.  Appropriate

11   compromises will be reached."  In the end, the "appropriate compromise" was that SAP TN

12   offered no assurances whatsoever that it had respected Oracle's intellectual property rights, and

13   instead gave an indemnity from Ravin and Nelson totaling $2 million to cover costs relating to

14   SAP TN's violations of Oracle's intellectual property.  This indemnity term represented a

15   spectacular twenty percent of the total $10 million price SAP AG and SAP America paid for

16   SAP TN.  Thus, SAP AG and SAP America knew or had reason to know – before they even

17   acquired SAP TN – that SAP TN's business model posed a huge potential infringement problem.

18   71.    In barely a month, SAP TN agreed to the deal and cast its lot with SAP

19   AG.  In January 2005, through SAP America, SAP AG acquired SAP TN.  In connection with

20   the SAP TN acquisition, SAP America's CEO, Bill McDermott, crowed "There's nothing that I

21   love more than to win."  But win at what cost?  SAP appears to have taken a short cut to equip

22   itself to support Oracle's software programs at half Oracle's price.  SAP stole much of the

23   Software and Support Materials – and software itself – directly from Oracle.  SAP AG and SAP

24   America knew it – and ignored it – from the start.

25   **C.    SAP's Safe Passage Scheme**

26   72.    When Oracle acquired PeopleSoft, it increased its potency as a competitor

27   to SAP for enterprise applications software and related services.  Industry observers noted this

28   fundamental shift in the competitive landscape.  One industry analyst stated that, "Oracle Corp.

21

1    is developing a 'super set' of applications, combining features from the PeopleSoft and JDE

2    software and its CEO Larry Ellison has been vocal about his intentions to take market share

3    away from SAP.  Oracle said it has thousands of developers building the new application suite,

4    called Project Fusion, aimed at taking market share from No. 1 ranked SAP."  Another mused,

5    "After the acquisition of PeopleSoft earlier this year, Oracle officially became a player on SAP's

6    turf."

7              73.    SAP AG's hasty acquisition of SAP TN was widely perceived as a

8    response to the new competitive threat from Oracle.  SAP's own statements confirmed it.

9              74.    On January 19, 2005, SAP AG's top executives unveiled SAP AG's

10   acquisition of SAP TN as the centerpiece of its new "Safe Passage" scheme.  SAP AG's CEO,

11   Henning Kagermann, identified SAP TN as instrumental to the parent company's "Safe Passage"

12   program, publicly indicating that SAP TN was authorized and intended to implement SAP AG's

13   goals.  SAP advertised its "Safe Passage" program as explicitly designed to transition customers

14   away from Oracle products and onto the SAP software platform.  SAP AG spokesman Bill Wohl

15   vowed that SAP AG would use SAP TN to "keep the pressure on Oracle" by exploiting legacy

16   PeopleSoft customers' perceived unease about Oracle's commitment to supporting legacy

17   PeopleSoft software.

18             75.    As reported in industry publications, SAP TN's services "form[ed] the

19   basis of [SAP AG's] Safe Passage initiative, a program aimed at siphoning off valuable software

20   maintenance revenue from Oracle and persuading Oracle customers to switch software products

21   [to SAP]."  The Senior Vice President and Chief Operating Officer of SAP Asia Pacific, Colin

22   Sampson, admitted that the SAP TN acquisition was "an integral part" of SAP's Safe Passage

23   program, which in turn was part of SAP's "ongoing strategy to compete with Oracle."  And SAP

24   TN certainly knew its role was to achieve SAP AG's and SAP America's ends:  as SAP TN's

25   CEO, Andrew Nelson, stated, "We're owned by SAP.  We want them to be successful."

26             76.    But although SAP America CEO, Bill McDermott, committed to throw "a

27   lot of additional resources" behind SAP TN (which consisted of only 37 employees in total),

28   SAP appeared to focus more on growing the SAP TN sales force rather than investing in or

1 expanding SAP TN's tiny development team. Indeed, SAP TN did not appear to have the

2 development capability to meet the support commitments advertised in the "Safe Passage"

3 brochures at any price, much less the 50% discount promoted by SAP. It certainly did not match

4 Oracle's investment in development resources, or even come close to it. These facts raised

5 questions about how SAP could offer the type of comprehensive technical support services on

6 Oracle programs that customers of enterprise applications typically require.

7      77. Nevertheless, industry observers deemed the "Safe Passage" program

8 "measurably more aggressive," and a sign that "SAP has taken the gloves off."

9      78. After the acquisition, SAP TN's new parent companies directed it to begin

10 to implement a two-phase plan to serve as the centerpiece of the Safe Passage scheme and to

11 increase SAP's enterprise application market share. First, to lure the support business over from

12 Oracle, SAP would offer cut-rate pricing combined with the promise of essentially unlimited

13 future support to former PeopleSoft and JDE support customers. Second, in connection with

14 converting Oracle customers to SAP support (via SAP TN), SAP would aggressively campaign

15 to migrate those customers to an SAP enterprise software platform. As SAP AG Managing

16 Director Alan Sedghi admitted, SAP AG would try to use SAP TN as a means of "speeding-up"

17 the migration of PeopleSoft and JDE users to SAP AG platforms.

18      79. The CEOs stated the proposition more bluntly. In April 2005, SAP

19 America CEO Bill McDermott claimed "The SAP Safe Passage offering gives companies an

20 affordable way to protect their current investments, ease integration with SAP NetWeaver(TM)

21 and begin the process of innovating their businesses today." A month later, at the SAP AG

22 annual meeting, SAP AG CEO Henning Kagermann confirmed: "We worked with [SAP TN] to

23 very quickly set up a comprehensive program for SAP customers running PeopleSoft and JD

24 Edwards solutions."

25      80. SAP implemented Phase One immediately. As reflected on SAP AG's

26 website: "*SAP* offers Safe Passage for PeopleSoft, JD Edwards, and Siebel customers – If

27 Oracle's options have you worried, consider another option: SAP. SAP provides solutions,

28 technology *and maintenance services*." (emphasis supplied) SAP America's website promised

that "*SAP* and TomorrowNow can cut your maintenance costs by as much as 50% through 2015," and elsewhere says that "Safe Passage maintenance and support are delivered worldwide through TomorrowNow." (emphasis supplied). SAP TN's website confirmed its acceptance and undertaking of the SAP-controlled Safe Passage program: "TomorrowNow can also provide our support services as part of the SAP Safe Passage Program."

81.     Beginning in January 2005, SAP sales representatives unleashed a torrent of marketing materials designed to exacerbate and leverage perceived, albeit unfounded, PeopleSoft and JDE customer uncertainty about the prospects for long-term, quality support from Oracle. An April 2005 SAP AG press release apparently aimed to increase perceived doubt among Oracle customers by announcing a "second wave" of "Safe Passage." To exploit the fear it intended to create, SAP AG's "second wave" included "an intensive customer recruitment campaign, offering significantly lower cost maintenance alternatives to Oracle customers running PSFT/JDE solutions" through 70,000 direct mail solicitations to Oracle customers. These lower cost alternatives advertised by SAP AG were to come directly through SAP TN.

82.     To implement Phase Two of its plan (luring Oracle customers to the SAP enterprise software platform), SAP AG did not simply sit back and leave the recruiting of potential Safe Passage customers to SAP TN's sales force. Instead, it took a hands-on approach. It deployed its salespeople to contact potential customers and push them to switch to SAP TN's services. If customers declined to convert to SAP TN, the SAP AG sales personnel would pressure the customers to drop Oracle products outright in favor of SAP AG's suite. To give teeth to these commingled sales efforts, SAP AG offered maintenance support through SAP TN, officially "bundled" with SAP AG enterprise software as a centerpiece of the Safe Passage program.

83.     SAP executives touted the Safe Passage program's limited success in its first year. SAP AG's CEO, Henning Kagermann, promised SAP AG would use SAP TN and the Safe Passage program to "fight for" more customers. By March 2006, SAP AG boasted in a press release that more than 200 customers had signed up for Safe Passage, the program it implemented partly through SAP TN, and which it claimed "offers companies SAP solutions,

24

1   technology, maintenance services, investment protection and a clear road map to the next

2   generation of business software."

3        84.    However, as Oracle continued to take market share and expand its product

4   offerings, including through its September 12, 2005 announcement that it would acquire Siebel

5   Systems, SAP grew more desperate, and more aggressive.  In October 2005, SAP announced it

6   would extend its Safe Passage program to Siebel customers, including apparently instantaneous

7   round the clock support from SAP TN – whose engineers at that time presumably had spent

8   virtually no time to develop Siebel support software products.  As reported on Forbes.com after

9   Oracle's announcement of its impending Siebel acquisition, "SAP AG plans to announce . . . that

10   it will offer technical support for more of rival software maker Oracle Corp.'s own products [the

11   Siebel products] for a far cheaper price."  SAP's "cheaper price" (referred to elsewhere as "cut

12   rate" support) continued at "50 cents on the dollar for maintenance fees," but its services were

13   expanded to support more Oracle product lines and a wider range of customers.  SAP America

14   CEO, Bill McDermott, confirmed that SAP intended to use the Siebel acquisition as another

15   opportunity to lure Oracle customers to SAP stating that SAP is "not distracted by the challenges

16   of integrating multiple code bases, companies and corporate cultures."  It appears that SAP only

17   could offer instantaneous, round the clock Siebel code support, within a few weeks of Oracle's

18   acquisition announcement, because SAP TN surreptitiously had acquired, studied and developed

19   a service model based on illegal copies of Siebel software.  Based on its standard business

20   model, it appears likely that SAP TN did the same thing with Oracle's eBusiness Suite, Hyperion

21   and Retek software.

22        85.    All the while, SAP AG demanded reports detailing implementation of the

23   Safe Passage program and other schemes against Oracle with code-names like "Turn Up The

24   Heat" and the "Oracle Disruption Plan."  SAP AG apparently even gave away free support from

25   SAP TN in efforts to steal Oracle's applications software customers.

26        86.    By July 2006, SAP AG CEO Henning Kagermann conceded that SAP had

27   lost as much as 2% market share to Oracle.  At the same time, curiously, SAP AG continued to

28   tout the success of Safe Passage.  In a July 2006 earnings call, Léo Apotheker, then SAP AG's

President of Customer Solutions and Operations and currently SAP AG's co-CEO, boasted that Safe Passage "continues to do really well," including because SAP AG "extended the program in order to offer it as well to Siebel customers." By extending the Safe Passage program to Siebel customers, and in conjunction with opening new SAP TN offices around the world, Apotheker claimed that SAP now had "a global network of [SAP TN] capabilities" – enough to "gain[] significant traction." The Siebel offering was not the only way SAP AG "expanded" Safe Passage. Notably, it also encouraged the SAP AG and SAP America sales teams to work more closely with SAP TN to jointly sell SAP TN services and SAP AG software applications to current and prospective customers.

87. SAP's April 2007 Annual Report further confirms that SAP has used SAP TN as a tool to try to convert Oracle customers to SAP's software platform. As reflected on pages 187-190 of the Annual Report, SAP TN loses money in every region in which it operates. SAP has no business incentive to tolerate substantial operating losses in its subsidiary without SAP TN providing a significant off-setting benefit. Here, that takes the form of enhanced opportunities for SAP to sell its enterprise software applications to support customers attracted to SAP TN's discount pricing – which is made possible through the theft and use of Oracle's intellectual property.

**D.    A Deal Too Good To Be True**

88. Although SAP put a brave face on its ability to compete with the increasingly potent Oracle applications offerings, some industry analysts wondered whether a small company like SAP TN, even after having expanded its ranks to 150 employees, could actually develop and offer the hundreds of regulatory updates, bug fixes, patches, and other labor-intensive support items that a customer would need to maintain useful, optimally functioning Oracle software, without infringing on Oracle's intellectual property. Oracle, by comparison, maintains a development force of more than 15,000 software and support engineers to create and help implement the code fixes, patches, and updates that comprise the advanced support services required by Oracle's licensed customers.

89. It was not clear how SAP TN could offer, as it did on its website and its

26

other materials, "customized ongoing tax and regulatory updates," "fixes for serious issues,"
"full upgrade script support," and, most remarkably, "30-minute response time, 24x7x365" on
software programs for which it had no intellectual property rights. To compound the puzzle,
SAP continued to offer this comprehensive support to hundreds of customers at the "cut rate" of
50 cents on the dollar, and purported to add full support for an entirely different product line –
Siebel – with a wave of its hand. The economics, and the logic, simply did not add up.

90. Oracle has now solved this puzzle. To stave off the mounting competitive
threat from Oracle and to do so without making the requisite investment, SAP unlawfully
accessed, copied, and wrongfully used Oracle's enterprise software applications and Software
and Support Materials. It did so with the knowledge and consent of the SAP AG executive board
of directors.

### E. SAP's Theft By Downloading

#### 1. SAP TN Compiles A Massive Download Library

91. SAP TN's use of its Titan scraping tool resulted in such high levels of
downloads that Oracle discovered its scheme. In late November 2006, there occurred unusually
heavy download activity on Oracle's password-protected customer support website for its
PeopleSoft and J.D. Edwards ("JDE") product lines. That website, called Customer Connection,
permits licensed Oracle customers with active support agreements to download a wide array of
Software and Support Materials. Oracle has invested billions of dollars in research,
development, and engineering to create these materials. Customers who have contracted for
support with Oracle have log-in credentials to access Customer Connection and download
Software and Support Materials. However, Oracle's support contracts limit customers' access
and download rights to Software and Support Materials pertaining to the customers' licensed
products. Customers have no contractual right to download Software and Support Materials
relating to software programs they have not licensed from Oracle, or for which the customers did
not purchase support rights.

92. The Software and Support Materials are a subset of the technical support
services that Oracle makes available to its customers that have licensed Oracle software

1 programs and purchased the right to receive technical support services related to them. The full

2 suite of technical support services (also known as "support" or "maintenance") generally

3 includes three types of offerings that Oracle, like most other enterprise software vendors, makes

4 available to its licensed customers: (i) telephone or email access to Oracle's support technicians

5 regarding the operation of Oracle's software; (ii) software program code for the customers'

6 licensed software programs which adds new functionality or features to the software (generally

7 referred to as "software updates"), or that addresses errors or "bugs" in the software program

8 (generally referred to as "software patches"); and (iii) "knowledge management" articles that

9 help with problem solving and provide suggestions relating to the customer's use of licensed

10 software programs. Because of the complexity of enterprise software applications and the

11 business environments in which they run, regular software updates and patches and knowledge

12 management articles are critical components of a software maker's support offering.

13            93.      To analyze and improve on its industry leading support services, Oracle

14 asks each customer searching for a solution on Oracle's Customer Connection website to click

15 on a button after each search to indicate whether or not a particular search result helped solve the

16 customer's problem. If the customer selects the "No, continue search" option, the support

17 system responds by offering the customer further options. Oracle regularly compiles this data to

18 assess whether its system helped customers resolve their support issues, with the aim of

19 continually improving the support system for customers.

20            94.      In late 2006, Oracle noticed huge, unexplained spikes in the number of

21 downloads from Customer Connection by one person, a user suspiciously named "TomNow."

22 Oracle also observed anomalies in the number of times customers on the online support website

23 had clicked the "No, continue search" option. These clicks numbered in the thousands for

24 several customers, and Oracle discovered that each response – each answer by users pretending

25 to be the customer – occurred in a matter of seconds or less. Given the extreme speed at which

26 the activity occurred, these clicks could not reflect real responses from any human customers

27 actually reading the solutions they had accessed. Instead, these click patterns showed that the

28 users had employed an automated process to move with lightning speed through the entire library

1   of Software and Support Materials on the Customer Connection website.  And, apparently, to

2   make a copy of them all.

3         95.    Oracle embarked on a time-consuming and costly investigation to assess

4   the damage done to its customer response database and fully understand the sources of the

5   unauthorized downloads.  In the course of this investigation, Oracle discovered a pattern.

6   Frequently, in the month before a customer's Oracle support expired, a user purporting to be that

7   customer, employing the customer's log-in credentials, would access Oracle's system and

8   download large quantities of Software and Support Materials, including dozens, hundreds, or

9   thousands of products beyond the scope of the specific customer's licensed products and

10  permitted access.  Some of these apparent customer users even downloaded materials after their

11  contractual support rights had expired.

12        96.    This systematic theft of Oracle's Software and Support Materials did not

13  originate from any actual customer location.  Rather, the access originated from an internet

14  protocol (IP) address in Bryan, Texas, an SAP America branch office location and home of its

15  wholly-owned subsidiary SAP TN.  SAP TN is a company that purports to provide technical

16  support services on certain versions of Oracle's PeopleSoft, JDE and Siebel software programs.

17  The Bryan, Texas IP address used to access and download Oracle's Software and Support

18  Materials is connected directly to SAP's computer network.  Indeed, Oracle's server logs have

19  recorded access through this same IP address by computers labeled with SAP TN identifiers

20  using SAP TN IP addresses.  When Oracle first noticed that the unlawful access and downloads

21  originated almost exclusively from one IP address in Bryan, Texas, Oracle shut down access to

22  that IP address.  If the access and downloads had been legitimate, the customer or vendor would

23  have called in right away to get its access reinstated.  Instead, a new IP address, also linked to

24  SAP TN, sprouted up almost immediately and the unlawful access and downloading resumed.

25        97.    These SAP TN Bryan, Texas offices, housed the SAP "download center"

26  with twenty or more "download servers" running the Titan program virtually around the clock.

27        98.    In many instances, including the ones described above, SAP TN

28  employees used the log-in IDs of multiple customers, combined with phony user log-in

29

1   information, to gain access to Oracle's system under false pretexts.  Employing these techniques,

2   SAP TN users effectively swept much of the contents of Oracle's system onto SAP TN's servers.

3   These "customer users" supplied user information (such as user name, email address, and phone

4   number) that did not match the customer at all.  In some cases, this user information did not

5   match anything:  it was fake.  For example, some users logged in with the user names of "xx"

6   "ss" "User" and "NULL."  Others used phony email addresses like "test@testyomama.com" and

7   fake phone numbers such as "7777777777" and "123 456 7897."  In other cases, SAP TN

8   blended log-in information from multiple customers with fake information.  For example, one

9   user name connected to an SAP TN IP address appears to have logged in using the credentials of

10  *seven* different customers in a span of just 15 days – all from SAP TN computers in Bryan,

11  Texas.  **All of these customers whose ID's SAP TN appropriated had one critical fact in**

12  **common:  they were, or were just about to become, new customers of SAP TN – SAP AG's**

13  **and SAP America's software support subsidiary whose sole purpose is to compete with**

14  **Oracle.**

15              99.     Although it is now clear that the customers initially identified by Oracle as

16  engaged in the illegal downloads are SAP TN customers, those customers do not appear to have

17  themselves directly engaged in the download activity; rather, the unlawful download activity

18  observed by Oracle and described here originates directly from SAP's computer networks.

19  Oracle's support servers have even received hits from URL addresses in the course of these

20  unlawful downloads with SAP TN directly in the name (e.g. *http://hqitpc01.tomorrownow.com*).

21  Indeed, for many of these downloads, Oracle noticed that SAP TN did not even bother to change

22  the false user information from customer to customer when it logged in.

23              100.    The wholesale nature of this unlawful access and downloading was

24  extreme.  SAP appears to have downloaded virtually *every* file, in *every* library that it could find.

25  SAP's business model required it to continually refresh its collection of Oracle's Software and

26  Support Materials.  As Kathy Williams, Director of Support Services at SAP TN, said in an

27  internal communication to her fellow managers, "How can we support a client that can never

28  upgrade or have access to any fixes beyond what they have now?  George [Lester] and I see this

1    as a very big risk to TomorrowNow?"  To resolve this "risk," and keep itself in business, SAP

2    simply stole Oracle's materials wholesale, and with no regard to whether it or its customers were

3    licensed to the materials it downloaded.  In some instances, SAP would not even bother to wait

4    for negotiations with a prospective customer to conclude – it would use a prospective client's

5    credentials to download materials, then keep these "pre-deal" downloads to use with other

6    customers even if the "prospect" never actually became an SAP customer.  For example, in the

7    case of Canada Lands Company (which never became an SAP customer), SAP TN admits, "they

8    were a prospect and we kept the folder around since the beginning, the downloads were very

9    incomplete and we would look for fixes here for customers like Praxair and Yazaki."

10            **2.**      **SAP TN's Access Was Unauthorized**

11         101.     SAP TN's unauthorized access to, copying of, and use of Software and

12    Support Materials from Oracle's system, and its customers' software releases, violated the terms

13    of the Oracle customers' License Agreements, the Customer Connection Terms of Use, the

14    Customer Connection Special Terms of Use, the Legal Download Agreement, and the SAR legal

15    restrictions.  These terms included agreements:

16                  •    Not to access or use any portion of the Software, including updates,

17                      not expressly licensed and paid for by the Licensee;

18                  •    Not to directly or indirectly, sublicense, relicense, distribute, disclose,

19                      use, rent, or lease the Software or Documentation, or any portion

20                      thereof, for third party use, or third party training;

21                  •    Not to access the customer support system if not the customer's

22                      authorized and designated Oracle technical support contact;

23                  •    Not to use the Materials on the support website except in support of

24                      the customer's authorized use of the Oracle Programs for which the

25                      customer holds a supported license from Oracle;

26                  •    That the customer username and password are for the customer's sole

27                      use in accessing this support server;

28

- That the customer username and password may only be distributed to or used by persons in the customer's organization who have *a legitimate business purpose for accessing the materials contained on the support server in furtherance of the customer's relationship with Oracle*; and,

- That the Materials on the support website are confidential information subject to existing confidentiality agreements.

102.     SAP has intimate familiarity with these important restrictions and conditions relating to Oracle's Software and Support Materials.  SAP AG and SAP America specifically tasked former PeopleSoft employees with the job of investigating and reporting on SAP TN's business model as part of the pre-acquisition due diligence.  SAP TN's management, and a significant number of its employees, formerly worked at PeopleSoft and JDE.  Of SAP TN's ten-member management team, six list prior employment experience with PeopleSoft, JDE, or Oracle, including:  (1) Andrew Nelson, President and CEO; (2) Bob Geib, V.P. North American Sales; (3) Laura Sweetman, V.P. Global J.D. Edwards Support; (4) Mel Gadd, V.P. Quality; (5) Nigel Pullan, V.P. International Sales; and, (6) Shelley Nelson, V.P. Global PeopleSoft Support.  In addition, former PeopleSoft employees who worked for SAP at the time, such as Wade Walden, who is reflected as the person performing many of the downloads at issue, appear to have applied their familiarity with the Customer Connection website to directly participate in and perfect the illegal downloading scheme.  Consistent with this evidence, SAP TN's then Vice President, Nigel Pullan (who has since "resigned"), recently suggested that SAP intentionally targets Oracle's employees to extract their knowledge of Oracle's new products:  "As new releases start to come out, the people that we hire, we make sure that they have skillsets in those new releases."  In short, SAP cannot credibly claim ignorance of Oracle's access rules.

103.     Notwithstanding SAP's knowledge of Oracle's license agreements with its customers, the support website terms of use, and the confidential, proprietary, and copyrighted nature of Oracle's Software and Support Materials, Oracle learned that SAP TN accessed and downloaded the Software and Support Materials when it either had no legitimate basis to access

1    Oracle's restricted website, or in a way that grossly violated the limited access rights it did have.

2    Further, during the period of time between when the customer's support license lapsed and when

3    Oracle decommissioned the customer's password credentials, SAP TN *still* accessed and

4    downloaded Software and Support Materials using the old customer passwords. SAP TN did so

5    despite its knowledge that it had no legal right or legitimate purpose to access Oracle's system *at*

6    *all* after the customer's support license lapsed.

7    104.    SAP TN did not innocently download the Software and Support

8    Materials – the purpose was to copy them from Oracle's Customer Connection support website

9    and store them on SAP TN's servers for later use in marketing and providing support services to

10   Oracle customers. The rate that SAP TN accessed many of these materials – at intervals of just

11   seconds or less – shows that no one reviewed them in real time. Further, the scope of the

12   downloaded Software and Support Materials – across *multiple* libraries in *multiple* lines of

13   business – for customers that had no license to take, or need for, those products, suggests that

14   SAP TN took the Software and Support Materials to stockpile a library to support its present and

15   prospective customers.

16   105.    SAP TN conducted these high-tech raids as the agent and instrumentality

17   of SAP AG and SAP America and as the cornerstone strategy of their highly-publicized "Safe

18   Passage" program. Further, to the extent SAP TN had any legitimate basis to access Oracle's

19   site as a contract consultant for a customer with current licensed support rights, SAP TN

20   committed to abide by the same license obligations and usage terms and conditions described

21   above applicable to licensed customers. Indeed, *anyone* accessing such Software and Support

22   Materials on the Oracle support website must agree to Oracle's terms and conditions, which

23   restrict access to support only for products that a company has licensed, and impose strict

24   confidentiality requirements. SAP TN reviewed and agreed to the terms and conditions on

25   Oracle's support website before proceeding, and therefore committed its theft knowingly and

26   intentionally, and in conscious disregard of Oracle's copyrights and other protected intellectual

27   property, contractual restrictions on the use of its intellectual property, and the integrity of its

28   computer systems.

33

3. **Specific Examples Of SAP TN's Unlawful Customer Downloads**

106.    SAP TN's improper access to, and taking from, Oracle's Customer Connection website is too pervasive, and covers too many individual violations, to comprehensively detail here.  Oracle has uncovered unlicensed downloads linked to SAP TN on behalf of numerous customers, including without limitation, Abbott Laboratories, Abitibi-Consolidated, Inc., Bear, Stearns & Co., Berri Limited, Border Foods, Caterpillar Elphinstone, Distribution & Auto Service, Fuelserv Limited, Grupo Costamex, Helzberg Diamonds, Herbert Waldman, Honeywell International, Interbrew UK, Laird Plastics, Merck & Co., Metro Machine Corp., Mortice Kern Systems, Inc., National Manufacturing, NGC Management Limited, OCE Technologies, B.V., Ronis, S.A., Smithfield Foods, SPX Corporation, Stora Enso, Texas Association of School Boards, VSM Group AB, and Yazaki North America.  By way of example of the nature and extent of SAP's theft,  Oracle sets forth below illustrative instances of SAP TN's illegal conduct regarding several of its customers.

107.    **Honeywell.**  Honeywell International ("Honeywell") is listed on SAP TN's website as a client.  In the approximately three and a half year period before Honeywell switched to SAP TN, it averaged just over 20 downloads of Software and Support Materials per month.  Then, after switching to SAP TN, a user employing Honeywell's log-in ID downloaded at least 7,000 Software and Support Materials in less than two weeks in January 2007.  Most of these excessive downloads came during the course of *four days*, during which "Honeywell" was downloading almost *1800 solutions per day*.  At least 2,000 of the Software and Support Materials taken in this period were solutions that Honeywell was not licensed to take at all.  In one specific library containing solutions for Enterprise One software, "Honeywell" downloaded at least 450 distinct unlicensed solutions on January 16, 2007 and nearly 400 more the next day. These downloads spanned virtually every library in every line of business – far beyond the products to which Honeywell had authorized access as an Oracle customer.  This unlawful downloading even stretched across product families.  Honeywell used and licensed PeopleSoft software applications, but Oracle discovered users downloading JDE products with Honeywell's

34

1 credentials. Oracle subsequently connected many of the illegal downloads to an SAP TN IP

2 address and to SAP TN's employee, Wade Walden – a former PeopleSoft employee now

3 employed by SAP.

4 108. **Merck.** Merck & Company, Inc. ("Merck"), one of the largest

5 pharmaceutical companies in the world, licenses and receives support for many Oracle software

6 products. Merck's support rights for its JDE software products expired on January 1, 2007. In

7 the three months prior to that date, users purporting to be "Merck" logged into the Oracle support

8 system and downloaded at least 5,500 distinct Software and Support Materials for JDE software.

9 At least 2,800 of these downloads related to JDE software products for which Merck had no

10 license. But, the unauthorized downloads did not stop there. Users logging into Oracle's support

11 system with Merck's credentials continued to download Software and Support Materials into

12 March 2007. Many of these "Merck" downloads came directly from an IP address in Bryan,

13 Texas that belongs to SAP TN, and some were traced to a computer with SAP TN's initials in

14 the title, "TN-DL03." In many cases, SAP TN users employed fake identification information to

15 download the Software and Support Materials, using names such as "xx" "ss" and "NULL," and

16 phone numbers such as "4444444444" and "999 999 9999." Neither Merck nor SAP TN had

17 any license, authorization or other right to access and download the 2,800-plus unlicensed

18 Software and Support Materials from Oracle.

19 109. **OCE.** OCE-Technologies B.V. ("OCE") is located in the Netherlands and

20 appears as a customer on SAP TN's website. In the months leading up to the expiration of

21 OCE's support rights for its Oracle products, users employing OCE's credentials downloaded a

22 large number of Oracle products relating to US Payroll, Canadian Payroll, Homebuilder

23 Management, and Real Estate Management – none of which make sense for a European

24 customer supporting its European business. From December of 2006 to January of 2007, SAP

25 TN users logged into Oracle's support system using OCE's credentials (and, in some cases, false

26 user names) and downloaded at least 5,600 distinct Software and Support Materials. These

27 downloads included at least 1,800 distinct items for which OCE had no license. There is little

28 chance that SAP TN intended OCE as the beneficiary of these massive sweeps, since OCE does

35

1    not run many of the software programs to which these downloads relate, and neither OCE nor

2    SAP TN have any license, authorization, or other right to access and download these Software

3    and Support Materials.  Like the other companies, these illegal downloads are associated with the

4    same IP address belonging to SAP TN in Bryan, Texas, including specifically to a computer with

5    SAP TN's initials in the title, "TNL-02."  Similar to the other customer examples, many of these

6    "OCE" users entered phony identification information, such as the name "user" and phone

7    numbers such as "123 456 7897," "9999999999," and even "xxx xxx xxxx."  This systematic

8    sweep of products across numerous licensed and unlicensed Oracle product lines and libraries

9    dramatically exceeded the access for which OCE (and SAP TN acting on its behalf) had any

10   right or authority, and could serve no legitimate or lawful business purpose.

11          110.    **SPX.**  SPX Corporation ("SPX") dropped all Oracle support on December

12   10, 2006 and became an SAP TN customer, listed on SAP TN's website.  For the nine month

13   period prior to October 2006, SPX averaged approximately eleven downloads per month from

14   Oracle's support system.  Then, between October and December 2006, users purporting to

15   represent SPX accessed and downloaded at least 9,000 distinct Oracle Software and Support

16   Materials (far more than SPX could legitimately access or use).  These SPX downloads included

17   at least 1,500 distinct Software and Support Materials for which SPX had no license.  At least

18   200 distinct downloads just on December 9, 2006 were Software and Support Materials related

19   to unlicensed Payroll software.  In some cases, these users logged in using SPX credentials, but

20   used fake identification information like the name "NULL" and phone numbers like

21   "7777777777" and "999 999 9999."  Many of these SPX downloads, like the others, originated

22   from the same IP address belonging to SAP TN, and some were traced to a computer with SAP

23   TN's initials in the title, "tn-wts01."

24          111.    **Metro Machine.**  Metro Machine Corp. ("Metro Machine") dropped all

25   Oracle support effective on January 1, 2007 and switched to SAP TN, as reflected on SAP TN's

26   website.  In the month before Metro Machine dropped its support rights with Oracle, users

27   purporting to represent Metro Machine logged onto Oracle's support servers and downloaded at

28   least 600 distinct Software and Support Materials.  At least 50 of those downloads related to

36

1 software programs that Metro Machine had not licensed from Oracle.  In addition, users logging

2 into Oracle's support system with Metro Machine's credentials continued to download Software

3 and Support Materials into March 2007.  Oracle has traced these illegal and unauthorized

4 downloads to the same SAP TN IP address employed for the other downloads described above.

5      112.    **Yazaki.**  Yazaki North America, Inc. ("Yazaki") is a large supplier of

6 automotive products headquartered in Michigan.  It dropped all Oracle support effective on

7 January 3, 2007.  In the month leading up to the expiration of Yazaki's support rights for its

8 Oracle products, users employing Yazaki's credentials downloaded an enormous number of

9 Oracle Software and Support Materials relating to Canadian Payroll, Homebuilder Management,

10 and Real Estate Management, and many other software products, which make no sense for a U.S.

11 automotive supply company supporting its U.S. business.  In two weeks, from December 15,

12 2006 to December 29, 2006, SAP TN users logged into Oracle's support system using Yazaki's

13 credentials and downloaded at least 11,000 distinct Software and Support Materials.  These

14 downloads included at least 1,500 distinct items for which Yazaki had no license.  There is little

15 chance that SAP TN intended Yazaki as the beneficiary of these massive sweeps, since Yazaki

16 does not run many of the software programs to which these downloads relate, and neither Yazaki

17 nor SAP TN has any license, authorization, or other right to access and download these Software

18 and Support Materials.  Like the other companies, these illegal downloads are associated with the

19 same IP address belonging to SAP TN in Bryan, Texas.  Similar to the other cases, "Yazaki"

20 users entered phony identification information, such as mixing the user ID "Joel_Joyce" with a

21 different user name "Jeff Livermore" and an email address related to a different customer, SPX,

22 "rosbie@spxmks.com," and a phony phone number "4444444444."  This systematic sweep of

23 products across numerous licensed and unlicensed Oracle product lines and libraries

24 substantially exceeded the access for which Yazaki (and SAP TN acting on its behalf) had any

25 right or authority, and could serve no legitimate or lawful business purpose.

26      **F.**    **SAP's Theft By Illegally Copying And Using Oracle Software Applications**

27      113.    The downloads are just a piece of a larger scheme.  For years, dating at

28 least to 2003, SAP TN created thousands of copies of Oracle's actual software applications.

37

1    These software copies included Oracle's PeopleSoft-branded Human Resource Management,

2    Customer Relationship Management, Enterprise Performance Management, Financial Data

3    Management, Portal, and Student Administration product lines, and Oracle's J.D. Edwards

4    branded Distribution, Financials, Human Resources, and Manufacturing product lines.  They

5    appear also to have included Oracle's Siebel and eBusiness Suite software, and may also have

6    included Oracle's Hyperion and Retek software.

7            114.    SAP TN's internal records reveal that it instructed Oracle customers, who

8    were about to switch to SAP TN, how to order CDs containing "all software available and

9    licensed" to them from Oracle, so customers could turn those software applications, in their

10   entirety, over to SAP TN.  SAP TN's detailed instructions even encourage Oracle customers to

11   lie to Oracle by, for example, telling Oracle that SAP TN's offices are a "new 'company'

12   location" where Oracle software should be installed – despite plain language in Oracle's license

13   agreements requiring a customer site to be physically located on property owned or leased by the

14   customer.  SAP TN used these CDs to create local environment copies of Oracle software on

15   SAP TN computers for development, testing, training and research for other customers.  Since

16   Oracle provides customers the ability to load and license additional software from these CDs,

17   SAP TN even undoubtedly copied software from these CDs to which the customer who sent

18   them had no license.

19           115.    Sometimes, SAP TN would not even bother to use the CDs it got from its

20   customers.  Instead, it would simply reuse the same environment over and over again for

21   multiple customers, each time assigning the new copy a customer-specific identifier.  According

22   to SAP TN's corporate witness, it was "just a matter [of] efficiency to have a single source

23   environment to use to create the specific client environments."

24           116.    SAP TN acquired, created and maintained thousands of illegal copies of

25   Oracle's software releases on its internal computer systems and generally treated the software as

26   its own.  SAP TN would "integrate" its stolen downloaded Software and Support Materials into

27   new local software environments it would create, in order to "update" that environment to

28   support the customer.  Thus, the thousands of copies of Oracle software that SAP TN maintained

38

on its systems, apart from the illicit existence and use of the software itself, each may be further tainted by the insertion into it of Software and Support Materials taken with a different customer's log-in credential.

117.    As core parts of its daily business operations, SAP TN engaged in at least the following types of illegal activities with these copies of Oracle's enterprise applications software:

- SAP TN maintained entire copies of Oracle's enterprise software applications on SAP TN's computer systems without authorization or license. SAP TN internal documents indicate it had approximately 250 copies of various Oracle software releases in active use when Oracle filed suit. Another several thousand existed on SAP TN computers in backup form that SAP TN would restore and use for various illegal purposes;

- According to SAP TN's sworn testimony, each of these several thousand software copies may have illegally downloaded software patches or updates contained within them;

- For each particular Oracle software release that it wanted to "support," SAP TN used unauthorized and unlicensed copies of Oracle software to create "generic" or "sandbox" environments;

- In addition to the generic, all-purpose software copies, SAP TN also maintained thousands of copies of Oracle's software releases for the ostensible purpose of supporting the customer who previously had licensed that software. SAP TN has admitted under oath that it constructed some of these software copies with software not licensed by that customer or provided by that customer to SAP TN. It has also admitted it used even these supposedly customer-specific software copies as reference and development tools to support other customers;

- SAP TN used these "generic" and "customer specific" software copies to support multiple customers, with no regard for which customer had originally

39

1          provided the copy of the Oracle software that SAP TN was using;

2      •   SAP TN used these software copies for general development of its SAP-

3          branded fixes, for otherwise supporting other customers, and for general

4          testing, research, and training; and,

5      •   SAP TN did not limit itself to possession of Oracle software provided by SAP

6          TN's active customers.  If an SAP customer left SAP's service, SAP TN

7          considered itself entitled to keep the Oracle software copy provided by that

8          customer on SAP TN computers for "reference" – and did so many times.

9          118.    Each instance of each such use constitutes an illegal, unauthorized use of

10  Oracle's software copy.  This cross-use of the software copies was an essential part of the SAP

11  TN business model, and fundamental to the success of the SAP Safe Passage program.

12          119.    Because SAP TN's assets essentially consist of, and SAP TN generated so

13  many of its support deliverables by using, illegal copies and downloads of Oracle's software, it is

14  unclear that SAP AG could effectively sell any of SAP TN's assets, as it has publicly said it

15  intends to do.  SAP TN's business processes rely on repeated copyright infringement, and its

16  assets consist of thousands of co-mingled illegal downloads and software environments.  Indeed,

17  SAP AG's stated intent to sell SAP TN raises additional questions about whether SAP AG

18  intends to perpetuate its own illegal conduct by selling for profit infringing copies of Oracle's

19  software.

20      **G.    Oracle's Software And Support Materials Are Registered With The**
         **Copyright Office**
21

22          120.    The Software and Support Materials and software applications that SAP

23  TN copied from its customers and downloaded from Oracle's systems included numerous works

24  that are protected under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq*.  These protected

25  works are original works of authorship, owned by Oracle.  Defendants' acts violated Oracle's

26  exclusive rights to reproduce, create derivative works, publish, publicly display, offer for sale,

27  and distribute these works.  Defendants' acts were willful and intentional and constitute both

28  direct and indirect copyright infringement under the Federal Copyright Act, 17 U.S.C. §§ 101 *et*

                                         40

1   *seq.*

2       121.   **The Copyright Registrations.**  With literally thousands of software

3   programs available for licensing, Oracle does not typically obtain copyright registrations on all

4   programs or related Software and Support Materials as it generally does not find itself in the

5   position of having to enforce its copyrights to stop infringement.  However, upon discovering

6   Defendants' mass downloading, Oracle registered copyrights on the Software and Support

7   Materials taken and infringed by SAP TN.

8       122.   The massive nature of the illicit downloads by SAP TN make it impossible

9   to detail comprehensively each copyright violation in this Complaint.  However, Oracle has now

10  obtained from the Register of Copyrights over 40 certificates of registration that cover a wide

11  range of Software and Support Materials taken by SAP TN and software applications copied and

12  used by SAP TN.  These include registrations of a number of Oracle knowledge management

13  solutions, numerous versions of Oracle's JDE software applications, service packs of JDE

14  updates, and specific unlicensed Software and Support Materials taken by SAP TN.

15  Collectively, these registrations cover thousands of unlicensed Software and Support materials

16  unlawfully copied by SAP TN.

17      123.   Examples of SAP's infringement of registered copyrights include the

18  following.  On December 5, 2006, SAP TN used SPX's log-in ID to download a Payroll ESU,

19  JJ13072, for EnterpriseOne software version 8.11 SP1.  Oracle registered this ESU with the

20  United States Copyright Office,  *See* Registration No. TX 6-541-027.  SAP TN used the log-in

21  ID of another customer, Merck, to download an EnterpriseOne 8.12 Blend Management ESU,

22  JK10093, on December 13, 2006.  Oracle also registered this ESU with the Copyright Office.

23  *See* Registration No. TX 6-541-045.  Further, SAP TN logged in on December 18, 2006 using

24  the log-in credentials of Yazaki and downloaded a Customer Relationship Management ESU,

25  PH11676, for EnterpriseOne software version 8.11, which is now registered with the Copyright

26  Office.  *See* Registration No. TX 6-541-035.  SAP TN also used the log-in ID of OCE to

27  download a payroll update for World Software version A7.3, A738217431, on December 21,

28  2006.  Oracle registered this update with the Copyright Office as well.  *See* Registration No. TX

41

1  6-541-043.  None of these customers was licensed to copy these works.  Nor was SAP licensed

2  to copy them in the names of those customers.

3        124.    Oracle also owns preexisting copyright registrations that cover many of

4  the software programs copied by SAP TN to illegally create environments on its own systems.

5        125.    **The DST Solution.**  In at least one instance, SAP TN has also, publicly

6  displayed, distributed, and thereby profited from Oracle's copyrighted Software and Support

7  Materials.  In December 2006, Oracle developed a knowledge solution related to the recent early

8  change to Daylight Savings Time (the "DST Solution"). The DST Solution is a narrative

9  document with specific instructions for how to conform certain Oracle software to the new

10  Daylight Savings Time change.  Oracle fielded more than a thousand service requests from its

11  customers related to the Daylight Savings Time change, and its DST Solution helped resolve

12  more than 750 of them.

13        126.    Oracle traced downloads of the DST Solution to SAP TN's IP address on

14  January 8, 2007 and January 15, 2007.  Oracle also noticed that SAP TN posted a "PeopleSoft

15  Daylight Savings Time solution" on its website.  SAP TN's "solution" is substantially similar in

16  total–and in large part appears to be copied identically from–Oracle's DST Solution.  SAP TN's

17  copied version even includes minor errors in the original DST Solution that Oracle later

18  corrected.  SAP TN's version also substitutes an SAP TN logo in place of the original Oracle

19  logo and copyright notice.  SAP's own internal investigation revealed that "it appears clear" that

20  an SAP TN employee "copied a significant portion" of SAP TN's version of the DST solution

21  from Oracle's solution.

22        127.    Oracle has registered the downloaded version of its DST Solution that

23  SAP TN copied and created derivative works from, and later distributed and publicly displayed,

24  as well as a later version that SAP TN also downloaded shortly before Oracle filed its original

25  Complaint, Registration Nos. TX 6-541-019 and TX 6-541-018.  No customer is licensed to

26  create derivative works from, distribute or publicly display Oracle's Software and Support

27  Materials, and neither is SAP.

28

**H.     Project Blue And Safe Passage:  SAP Adds Ill-Gotten Gains To Its Coffers**

128.     SAP TN claims to have delivered thousands of fixes and more than 1000 tax and regulatory updates to Oracle's former customers.  Not coincidentally, SAP TN has illegally downloaded thousands of fixes and updates from Oracle's restricted customer support website and made and used thousands of copies of Oracle's software applications.  SAP AG and SAP America directed this download and copying scheme, ratified it, never disavowed it, and financially benefited from it – all while pressuring SAP TN to win more customers through Safe Passage.  As one SAP TN employee put it when reporting on the joint "Oracle Disruption Plan" – what SAP internally named the follow-up to its Safe Passage program – "SAP Germany is tracking these leads now and wants to see progress."

129.     Senior management at SAP AG and SAP America knew the details of SAP TN's unlawful activities – and proceeded to hide them for more than two years until Oracle filed this lawsuit.

130.     SAP AG and SAP America knew about and provided guidance concerning SAP TN's illegal downloading activities.  As far back as 2005, SAP AG and SAP America lawyers specifically advised SAP TN to cease downloading Oracle support materials into co-mingled master "libraries."  SAP AG and SAP America advised SAP TN to create customer-specific folders in which to house the downloads for new customers.  But SAP AG and SAP America gave no instruction to break up or stop using the existing, co-mingled download libraries that SAP TN had populated with millions of PeopleSoft-branded Oracle downloads.  And while SAP TN devoted several months to breaking apart the JDE master library into customer-specific folders (without curing its underlying illegality), it apparently received no parallel instruction to sort out the exponentially larger – and more lucrative – PeopleSoft "master" download library.

131.     SAP AG and SAP America also knew about the central role illegal copies of Oracle software releases played in SAP TN's business.

132.     By June 2005, concerned about the risks inherent in their possession and use of Oracle's software applications, the tight familial group leading SAP TN – founder

43

1 Andrew Nelson, his wife Shelley Nelson (who was at the time the Vice President of PeopleSoft

2 Support), and his brother Greg Nelson (who was at the time the Chief Information Officer) – had

3 circulated a highly confidential draft "Blue" presentation with instructions in the subject line to

4 "PLEASE DELETE AFTER READING." In it, Greg Nelson presented a

5 "Feasibility/Cost/Benefit" analysis of "going blue," (discontinuing SAP TN's illegal business

6 model) and concluded that moving SAP TN's model to all remote support would "decrease

7 efficiency" and increase the human capital cost – and reduce the profitability – of SAP TN's

8 business. Most importantly, "If we are all blue [no local software copies available to use] . . .

9 since all Development and testing will be done remotely, ***no sharing or recycling of work***.

10 Require more developer hands in lieu of massive automation." (emphasis supplied).

11        133.    In other words, it would cost SAP TN more to service its customers

12 legally – a prospect SAP TN could not accept. As Greg Nelson cautioned: "When we need a

13 seed environment [a generic, all-purpose software copy for development, research, and training],

14 we need to entice a customer to be Yellow [have possession of the Oracle software on SAP's

15 computers]." The group opposed the move and engaged in admitted "delay tactics" to preserve

16 the efficiencies inherent in the illegal business model.

17        134.    By June 30, 2005, SAP TN had worked up a revised presentation for

18 members of the SAP AG board of directors that stated emphatically: "Yellow is what we do

19 now - In House Hosting." The presentation identified a laundry list of activities that SAP TN

20 performed with its illegal local software copies that it would have to transfer in a remote hosting

21 model, including: marketing, equipment, downloading, primary development, testing, and

22 backup/restore. The presentation raised a series of obstacles to implementing "Project Blue,"

23 including "got to find a way to download from client site." It also again focused on the problem

24 of how SAP TN could generate its copycat updates for its customers running certain versions of

25 Oracle's PeopleSoft-branded Human Resources payroll without keeping generic Oracle

26 environments on its systems.

27        135.    While SAP AG, SAP America and SAP TN debated Project Blue, they

28 each took careful steps to avoid detection. In August 2006, SAP TN prepared for a visit by

44

industry analyst Gartner.  A confidential internal SAP TN memo warned "[r]emind Shelley [Nelson, SAP TN's Vice-President of Support Services] to ***be careful and not talk about client environment and legality*** . . . ."  (emphasis supplied).  A few months later, in connection with creating a document intended to explain to SAP TN customers how SAP TN actually provided its service, SAP TN's Vice-President of JDE Support Services, Laura Sweetman (a former JDE employee experienced with the JDE software), noted that SAP TN's policy of creating "a fix-master demo environment in [SAP TN's] datacenter for every customer" had "IP issues."  SAP TN then abandoned the "Guide to TomorrowNow Support Services" project.

136.     In the meantime, the SAP AG board of directors apparently had no interest in forcing the migration from SAP TN's admittedly illegal local software environment model to a legal hosted one – not when SAP TN was such a crucial part of its plan to lure customers away from Oracle.

- National Foods Limited, May 2006 – "During an intense negotiation period, TomorrowNow was able to give 'substantial teeth' to the SAP license bid, with the offer of combining both JDE and PeopleSoft support and maintenance services for the foreseeable future, whilst they work on the SAP implementation plans."

- Mutual of Omaha, August 2006 – "[T]his quarter we are running a special sales program, jointly sponsored between TN and SAP, and we were able to offer some significant pricing incentives through the SAP/TN 'Turn Up The Heat' Campaign. . . . Specifically, Mutual of Omaha will consider bringing in [SAP] for a Value Engineering study -- a critical step in the SAP sales methodology, and gives them appropriate executive level access.  This is a significant commitment from the customer, and a great example of TomorrowNow creating future software sales pipeline for SAP."

- The Home Depot, October 2006 – SAP "was highly interested in winning away The Home Depot from Oracle."  SAP TN CEO, Andrew Nelson, told SAP America CEO, Bill McDermott, that SAP TN would knock its fees down

45

1    from "$600k per year down to $30k if you tell me you need this" and if

2    McDermott could address Home Depot's concerns about the legality of SAP

3    TN's services.  The price was worth it – the deal would give SAP a

4    "marketing deliverable" to use with other customers.

5    • Direct Energy, October 2006 – "Randy Wheeler, SAP [Account Executive],

6    contacted [SAP TN] mid-August with a prospect running PeopleSoft. . . . Now

7    that we have displaced Oracle, we have effectively created future sales

8    pipeline for SAP."

9    137.    As these examples illustrate, SAP used Oracle's stolen intellectual

10   property to provide maintenance services and unfairly compete against Oracle, thereby illegally

11   winning business and a number of customers from Oracle, and artificially inflating its market

12   share.

13   **I.      Defendants Conspired With And Aided And Abetted Each Other**

14   138.    Defendants willfully, intentionally, and knowingly agreed and conspired

15   with each other to engage in the alleged wrongful conduct, including Defendants' copyright

16   infringement, interference with Oracle's business relationships and other unfair business

17   practices, as well as Defendants' trespass on, and computer fraud concerning the Software and

18   Support Materials.

19   139.    Defendants did the acts alleged pursuant to, and in furtherance of, that

20   agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting

21   the acts of the others.

22   140.    As a direct and proximate result of the acts in furtherance of the

23   conspiracy, Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss

24   of profits from sales to current and potential customers of Oracle support services and licenses

25   for Oracle's software programs.  The wrongful conduct committed pursuant to the conspiracy

26   was a substantial factor in causing this harm.

27   141.    Defendants also had full knowledge of or should have reasonably known

28   of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such

46

1  wrongful conduct, including copyright infringement, interference with Oracle's business

2  relationships and other unfair business practices, as well as Defendants' trespass on, and

3  computer fraud concerning the copyrighted Software and Support Materials, by providing

4  substantial assistance and/or encouraging the others to act.

5  142.  SAP AG and SAP America condoned and encouraged SAP TN's

6  activities, including through the Safe Passage program and Project Blue.  Indeed, despite Project

7  Blue, SAP AG monitored the Safe Passage program closely, "tracking these leads" from

8  Germany, and pushing SAP TN "to see progress."  SAP AG and SAP America account

9  executives repeatedly fed leads to SAP TN sales personnel and worked closely with them

10  throughout the sales and negotiations process, presenting joint service offerings to prospective

11  customers with the goal of creating applications revenue for SAP.  A year after the acquisition of

12  SAP TN, to facilitate the joint sales and marketing process further, SAP AG specifically

13  encouraged – and required – closer cooperation between the sales and marketing teams at SAP

14  AG, SAP America and SAP TN.  Thus, SAP AG and SAP America knew about, permitted,

15  encouraged, directed and profited from SAP TN's wrongful use of these materials.

16  143.  Defendants also aided and abetted the described wrongful conduct of the

17  other Defendants by giving substantial assistance and/or encouragement that, separately

18  considered, was wrongful in and of itself.

19  144.  As a direct and proximate result of the aiding and abetting of these acts,

20  Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits

21  from sales to current and potential customers of Oracle support services and licenses to Oracle

22  software programs.  The wrongful conduct aided and abetted by the Defendants was a substantial

23  factor in causing this harm.

24  145.  Defendants' intentional agreement to commit, and commission of, these

25  wrongful acts, and aiding and abetting of these wrongful acts, was willful, malicious, oppressive,

26  and in conscious disregard of Oracle's rights, and Oracle is therefore entitled to an award of

27  punitive damages to punish their wrongful conduct and deter future wrongful conduct.

28

1                             **First Claim for Relief**

2                             **Copyright Infringement**

3                          (By Oracle Against All Defendants)

4          146.     Oracle incorporates by reference each of the allegations in the preceding

5 paragraphs of this Complaint as though fully set forth here.

6          147.     Oracle owns a valid and enforceable copyright in all of its software

7 applications and Software and Support Materials, which are creative works of original authorship

8 by Oracle.

9          148.     Oracle has complied in all respects with the copyright laws and is the

10 exclusive owner of the copyrights to its software applications and Software and Support

11 Materials, including the rights infringed by Defendants. Oracle has pre-existing, or has obtained

12 from the Register of Copyrights, Certificates of Registration that cover many of the software

13 applications and Software and Support Materials taken and copied by SAP TN.[3] Oracle has also

14 obtained, through transfer agreements, all rights, title, and interest in registered and unregistered

15 copyrights formerly owned by PeopleSoft, Inc. Defendants have infringed Oracle's copyrights

16 in its software applications and Software and Support Materials, including the software

17 applications and Software and Support Materials covered by these certificates. These certificates

18 are identified, dated and numbered as follows:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Shop Floor Control program | March 7, 1995 | TXu 619-303 |
| EDI Interface (6) program | March 7, 1995 | TXu 619-304 |
| Configuration Management program | March 7, 1995 | TXu 619-305 |
| Master Production Scheduling program | March 7, 1995 | TXu 619-306 |
| Capacity Requirements Planning program | March 7, 1995 | TXu 619-307 |
| WorldCASE Development Environment program | March 7, 1995 | TXu 619-308 |
| Equipment Management (5) program | March 7, 1995 | TXu 619-309 |
| General Ledger & Basic Financial program | March 7, 1995 | TXu 619-310 |
| Enterprise Facility Planning program | March 7, 1995 | TXu 619-311 |
| Accounts Receivable program | March 7, 1995 | TXu 619-312 |
| Warehouse Management program | March 7, 1995 | TXu 619-313 |
| Inventory Management program | March 7, 1995 | TXu 619-314 |

---

[3] As discovery progresses, Oracle reserves the right to add additional counts based on copyright registrations for Oracle's Siebel, eBusiness Suite, Hyperion and/or Retek software.

| Description | Date | Registration |
|---|---|---|
| Sales Order Processing/Sales Analysis program | March 7, 1995 | TXu 619-315 |
| Purchase Order Processing program | March 7, 1995 | TXu 619-316 |
| Product Data Management program | March 7, 1995 | TXu 619-317 |
| Financial Reporting (FASTR) program | March 7, 1995 | TXu 619-318 |
| WorldCASE Foundation Environment (3) program | March 7, 1995 | TXu 619-319 |
| Accounts Payable program | March 7, 1995 | TXu 619-320 |
| Financial Modeling, Budgeting & Allocations program | March 7, 1995 | TXu 619-321 |
| PeopleSoft HRMS 7.0 | December 15 1998 | TX 4-792-577 |
| PeopleSoft HRMS 7.5 | December 15, 1998 | TX 4-792-575 |
| PeopleSoft HRMS 8.0 | November 20, 2000 | TX 5-291-440 |
| PeopleSoft 8 HRMS SP1 | March 26, 2001 | TX 5-501-312 |
| PeopleSoft 8.3 HRMS | February 1, 2002 | TX 5-469-032 |
| PeopleSoft 8.8 HRMS | June 11, 2004 | TX 6-093-947 |
| PeopleSoft 8 Customer Relationship Management | September 27, 2001 | TX-5-456-777 |
| PeopleSoft 8.8 Customer Relationship Management | June 11, 2004 | TX 6-015-317 |
| PeopleSoft Financials, Distribution & Manufacturing 7.5 | December 15, 1998 | TX 4-792-574 |
| PeopleSoft 8 Financials and Supply Chain Management: Service Pack 2 | September 27, 2001 | TX-5-456-780 |
| PeopleSoft 8.4 Financials and Supply Chain Management | August 5, 2002 | TX-5-586-247 |
| PeopleSoft 8.8 Enterprise Performance Management | June 11, 2004 | TX-5-993-616 |
| PeopleSoft 8 Student Administration Solutions | November 30, 2001 | TX 5-431-289 |
| PeopleTools 7.5 | November 20, 1998 | TX 4-792-578 |
| PeopleTools 8.0 | September 5, 2000 | TX 5-266-222 |
| PeopleTools 8.10 | September 5, 2000 | TX 5-266-221 |
| PeopleTools 8.4 | August 5, 2002 | TX 5-586-248 |
| Initial release of JD Edwards EnterpriseOne XE | April 26, 2007 | TX 6-541-033 |
| ESU for JD Edwards EnterpriseOne Xe | May 3, 2007 | TX 6-541-051 |
| Cumulative Update 8 for JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-048 |
| Initial release of JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-050 |
| ESU for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-046 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-034 |
| Initial release of JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-049 |
| ESU for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-036 |
| Initial release of JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-038 |
| ESU for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-037 |
| Cumulative Update 2 for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-032 |
| Initial release of JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-028 |
| ESU for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-035 |
| Initial release of JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-040 |
| ESU for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-027 |

| | | |
|---|---|---|
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-039 |
| Initial release of JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-041 |
| ESU for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-045 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-042 |
| Initial release of JD Edwards World A7.3 | April 26, 2007 | TX 6-541-029 |
| Code Change for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-043 |
| Cumulative Update 16 for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-031 |
| Initial release of JD Edwards World A8.1 | April 26, 2007 | TX 6-541-047 |
| Code Change for JD Edwards World A8.1 | April 26, 2007 | TX 6-541-044 |
| Cumulative Update 6 for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-421 |
| Initial release of JD Edwards World A9.1 | April 26, 2007 | TX 6-541-030 |
| ECRM89:  Common Errors on Mobile Sales | April 26, 2007 | TX 6-541-020 |
| EAP WTHD06:  1099 IRS changes for the year 2006 | April 26, 2007 | TX 6-541-023 |
| JD Edwards World -- 1099 Changes for Tax Year 2006 | April 26, 2007 | TX 6-541-026 |
| E1:  1099:  Year 2006 1099 ESUs | April 26, 2007 | TX 6-541-024 |
| Changes to Daylight Savings Time for 2007 (DST) | April 26, 2007 | TX 6-541-025 |
| E1:  07/77:  Quantum for Payroll Tax v.280 | April 26, 2007 | TX 6-541-022 |
| GM--Grants issues resolved by FMS ESA 8.9 Bundle #10-653723 (Oct 06) | April 26, 2007 | TX 6-541-021 |
| PeopleTools Third Party Daylight Saving Time Required Modifications | April 26, 2007 | TX 6-541-019 |
| PeopleTools Third Party Daylight Saving Time Required Modifications (Revised) | April 26, 2007 | TX 6-541-018 |
| PeopleSoft 8.01 & 8.31 Payroll Tax Update 05-F Year-End Processing: Canada | May 2, 2008 | TX 6-838-549 |
| PeopleSoft Payroll 1200457000 - User Documentation | May 2, 2008 | TX 6-838-537 |
| PeopleSoft Application Update Installation Instructions (UPD595817) | May 2, 2008 | TX 6-838-544 |

149.     These registrations generally cover, but are not limited to, numerous versions of Oracle software, including the updates, patches and fixes incorporated in each relevant version, service packs of Oracle updates, patches and fixes, and individual exemplar Software and Support Materials, including certain Oracle knowledge management solutions and certain Oracle updates, patches and fixes, all of which SAP TN copied without a license.  The registrations listed above also cover numerous Oracle software releases that SAP TN copied to create "local customer environments."

1    150.    Oracle also has the following registrations that cover "Current

2  Development Environments" for certain software releases:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Current development environment for JD Edwards EnterpriseOne Xe | April 26, 2007 | TXu1-345-109 |
| Current development environment for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TXu1-345-111 |
| Current development environment for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TXu1-345-112 |
| Current development environment for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TXu1-345-113 |
| Current development environment for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TXu1-345-114 |
| Current development environment for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TXu1-345-115 |
| Current development environment for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TXu1-346-350 |
| Current development environment for JD Edwards World A7.3 | April 26, 2007 | TXu1-345-110 |
| Current development environment for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-422 |

14  Discrete portions of these registered Current Development Environments also contain updates,

15  patches and fixes that SAP TN copied without a license.  Defendants infringed these discrete

16  portions of the registered Current Development Environments by taking without license the

17  Software and Support Materials that are substantially similar to these discrete portions.

18    151.    Through the acts alleged above, Defendants have violated Oracle's

19  exclusive right to reproduce and make copies of its copyrighted Software and Support Materials,

20  including materials covered by the registrations listed above, by:

21  • repeatedly copying entire releases of Oracle's software, and related

22  documentation, to SAP TN's own local systems, without authorization or

23  license, to create "local customer environments";

24  • creating unlicensed works derived from these software copies and related

25  documentation to support SAP TN's other customers;

26  • using these software copies for other improper business purposes,

27  including, without limitation, training employees, troubleshooting,

28

51

1     researching general and specific support issues, and marketing to

2     prospective customers;

3     • "exploding" the source code of certain Software and Support Materials on

4     to SAP TN's local machines in order to catalogue them to facilitate

5     creation of unlicensed works in its own name;

6     • downloading Oracle's copyrighted Software and Support Materials onto

7     its computers in violation of 17 U.S.C. § 106; and,

8     • repeatedly copying, co-mingling and cross-using the downloaded Software

9     and Support materials to populate different customer folders, support other

10     customers, and as a general resource to provide support in the ordinary

11     course of SAP TN's business.

12     152.    Defendants have also violated Oracle's right to control the distribution,

13 creation of derivative works and public display of its copyrighted works by downloading,

14 copying, creating derivative works from and/or distributing Oracle's Software and Support

15 Materials and/or derivative works to Defendants' customers, via posting to its website, by

16 electronic mail, through file transfer protocol, or otherwise, including at least Oracle's DST

17 Solution, in violation of 17 U.S.C. § 106.

18     153.    Defendants were not authorized to copy, download, reproduce, create

19 derivative works from, distribute, or publicly display Oracle's copyrighted software applications

20 and Software and Support Materials except as authorized by and in support of a specific licensed

21 customer, using only (in the case of Software and Support Materials) that licensed customer's

22 log in credentials, and with respect only to Software and Support Materials for which that

23 customer had a current right to have and use.

24     154.    In addition to directly infringing Oracle's copyrights, Defendants have

25 contributorily and/or vicariously infringed Oracle's copyrights in its software applications and

26 Software and Support Materials by controlling, directing, intentionally encouraging, inducing or

27 materially contributing to the copying, distribution, publicly display or creation of derivative

28 works from Oracle's copyrighted software applications and Software and Support Materials.

1    Defendants also obtained a direct financial benefit from the above alleged infringing activities

2    while declining to exercise their right to stop it or limit it.

3        155.    Defendants knew or should have known that copying, distributing, public

4    display of, and creating derivative works of and from Oracle's software applications and

5    Software and Support Materials, which Defendants copied in the name of customers who had no

6    license to copy, distribute, publicly display or create derivative works from those materials,

7    infringed Oracle's copyrights in those materials.

8        156.    Oracle is entitled to damages in an amount to be proven at trial, including

9    profits attributable to the infringement not taken into account in computing actual damages under

10   17 U.S.C. § 504(b).  Oracle is entitled to statutory damages under 17 U.S.C. § 504(c) based on

11   Defendants' infringements – after the dates of copyright registration – of certain copyrighted

12   works used to create SAP TN's "local customer environments" and the subsequent individual

13   further copying and use of each such environment.

14       157.    Defendants' infringement of Oracle's copyrights has also caused Oracle

15   irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such

16   acts.  Oracle's remedy at law is not adequate to compensate it for these inflicted and threatened

17   injuries, entitling Oracle to remedies including injunctive relief as provided by 17 U.S.C. § 502,

18   and an order impounding or destroying any and all infringing materials pursuant to

19   17 U.S.C. § 503.

20                    **Second Claim for Relief**

21            **Violation of Federal Computer Fraud and Abuse Act**

22             **(18 U.S.C. §§ 1030(a)(2)(C), (a)(4) & (a)(5))**

23                 (By Oracle Against All Defendants)

24       158.    Oracle incorporates by reference each of the allegations in the preceding

25   paragraphs of this Complaint as though fully set forth here.

26       159.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C.

27   § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or

28   communication, without authorization or by exceeding authorized access to such a computer, and

1  by obtaining information from such a protected computer.

2        160.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. §

3  1030(a)(4), by knowingly, and with intent to defraud Oracle, accessing a protected computer,

4  without authorization or by exceeding authorized access to such a computer, and by means of

5  such conduct furthered the intended fraud and obtained one or more things of value, including

6  but not limited to Oracle's Software and Support Materials.

7        161.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C.

8  § 1030(a)(5)(A)(i), by knowingly causing the transmission of a program, information, code, or

9  command and as a result intentionally causing damage without authorization to a protected

10  computer owned by Oracle.

11        162.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C.

12  §§ 1030(a)(5)(A)(ii) and (iii) by intentionally accessing a protected computer without

13  authorization, causing damage to Oracle, recklessly or without due regard for their actions.

14        163.    The computer system or systems that Defendants accessed as described

15  above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

16        164.    Oracle has suffered damage and loss by reason of these violations,

17  including, without limitation, harm to Oracle's data, programs, and computer systems and other

18  losses and damage in an amount to be proved at trial, but, in any event, in an amount well over

19  $5000 aggregated over a one-year period.

20        165.    Defendants' unlawful access to and theft from Oracle's computers also

21  have caused Oracle irreparable injury.  Unless restrained and enjoined, Defendants will continue

22  to commit such acts.  Oracle's remedy at law is not adequate to compensate it for these inflicted

23  and threatened injuries, entitling Oracle to remedies including injunctive relief as provided by 18

24  U.S.C. § 1030(g).

25                        **Third Claim for Relief**

26        **Computer Data Access and Fraud Act - Cal. Penal Code § 502**

27                    (By Oracle Against All Defendants)

28        166.    Oracle incorporates by reference the allegations of paragraphs 1 through

54

119, 128 through 145, and 159 through 165 of this Complaint as though fully set forth here.

167.     Defendants have violated California Penal Code § 502(c)(2) by knowingly and fraudulently, and without permission, accessing, taking, copying, and making use of programs, data, and files from Oracle's computers, computer system, and/or computer network.

168.     Defendants have violated California Penal Code § 502(c)(3) by knowingly, fraudulently, and without permission accessing and using Oracle's computer services.

169.     Defendants have violated California Penal Code § 502(c)(6) by knowingly, fraudulently, and without permission providing, or assisting in providing, a means of accessing Oracle's computers, computer system, and/or computer network.

170.     Defendants have violated California Penal Code § 502(c)(7) by knowingly, fraudulently, and without permission accessing, or causing to be accessed, Oracle's computers, computer system, and/or computer network.

171.     Oracle owns the data that comprises the Software and Support Materials obtained by Defendants as alleged above.

172.     As a direct and proximate result of Defendants' unlawful conduct within the meaning of California Penal Code § 502, Defendants have caused damage to Oracle in an amount to be proven at trial.  Oracle is also entitled to recover its reasonable attorneys' fees pursuant to California Penal Code § 502(e).

173.     Oracle is informed and believes that the aforementioned acts of the Defendants were willful and malicious in that Defendants' acts described above were done with the deliberate intent to injure Oracle's business and improve its own.  Oracle is therefore entitled to punitive damages.

174.     Oracle has also suffered irreparable injury from these acts, and due to the continuing threat of such injury, has no adequate remedy at law, entitling Oracle to injunctive relief.

1    **Fourth Claim for Relief**

2    **Breach of Contract**

3    (By Oracle Against All Defendants)

4    175.    Oracle incorporates by reference the allegations of paragraphs 1 through

5    119, 128 through 145, and 159 through 174 of this Complaint as though fully set forth here.

6    176.    Defendants agreed to be bound by the Customer Connection Terms of

7    Use, the Special Terms of Use, the SAR legal restrictions, and/or the Legal Download

8    Agreement when Defendants accessed or downloaded Software and Support Materials from

9    Customer Connection.

10    177.    Oracle has performed all conditions, covenants, and promises required on

11    its part to be performed in accordance with the terms and conditions of the Customer Connection

12    Terms of Use, the Special Terms of Use, the SAR legal restrictions, and the Legal Download

13    Agreement.

14    178.    Defendants have breached the Customer Connection Terms of Use, the

15    Special Terms of Use, the SAR legal restrictions, and/or the Legal Download Agreement by,

16    among other things:

17    •    Accessing or using portions of the Software and Support Materials,  not

18         expressly licensed to and/or paid for by Defendants or the customers in

19         whose name Defendants accessed Customer Connection and took the

20         Software and Support Materials;

21    •    Accessing the content available through Customer Connection, in the form

22         of the Software and Support Materials, without being an authorized and

23         designated Oracle technical support contact;

24    •    Using the Software and Support Materials other than in support of a

25         customer's authorized use of Oracle software for which a customer holds a

26         supported license from Oracle;

27    •    Using the Software and Support Materials without a legitimate business

28         purpose; and,

56

1          • Using the Software and Support Materials in ways other than the

2            furtherance of a relationship with Oracle.

3          179.    As a result of Defendants' breach of the Customer Connection Terms of

4    Use, the Special Terms of Use, the SAR legal restrictions, and the Legal Download Agreement,

5    Defendants have caused damage to Oracle in an amount to be proven at trial.

6                              **Fifth Claim for Relief**

7             **Intentional Interference With Prospective Economic Advantage**

8                         (By Oracle Against All Defendants)

9          180.    Oracle incorporates by reference the allegations of paragraphs 1 through

10   119, 128 through 145, and 159 through 179 of this Complaint as though fully set forth here.

11         181.    Oracle has and had an expectancy in continuing and advantageous

12   economic relationships with current and prospective purchasers and licensees of Oracle's support

13   services and software.

14         182.    These relationships contained the probability of future economic benefit in

15   the form of profitable support service contracts and software licenses.  Had Defendants refrained

16   from engaging in the unlawful and wrongful conduct described in this complaint, there is a

17   substantial probability that Oracle support customers would have initiated, renewed, or expanded

18   support contracts and software licenses with Oracle rather than Defendants.

19         183.    Defendants were aware of these economic relationships and intended to

20   interfere with and disrupt them by wrongfully:

21         • gaining unauthorized access to Oracle's computer systems through

22            Oracle's password-protected Customer Connection support website in

23            violation of the agreements governing such access;

24         • gaining unauthorized access to the Software and Support Materials

25            available on Oracle's computer systems through Customer Connection, in

26            violation of the agreements governing such access, including by using log

27            in credentials of customers with no right or license to the Software and

28            Support Materials taken by Defendants;

- breaching the agreements governing access to, and use of, the website and the Software and Support Materials available through it,

- luring Oracle's current and prospective customers by making promotional and marketing statements regarding Defendants' ability to provide support services for Oracle software that were only possible because of Defendants' improper access to, and taking from, Oracle's computer systems through Customer Connection;

- using information learned through the improper access to, and taking from, Oracle's computer systems through Customer Connection to provide support services to Defendants' customers; and,

- gaining unauthorized access to Oracle's software releases through deceptive representations to Oracle's customers causing them to breach their license agreements with Oracle, copying their software releases wholesale hundreds of times onto Defendants' local systems, and using those copies for various improper purposes, including without limitation to develop unauthorized SAP TN-branded support products for distribution to their customers.

184. Defendants' conduct was wrongful by a measure beyond the fact of the interference itself. Defendants gained unauthorized access to Oracle's computer systems through Oracle's password-protected Customer Connection support website, breached the agreements governing access to, and use of, Customer Connection and the Software and Support Materials available through it, and wrongfully used the property that they found there to advertise their services, and otherwise obtain and retain Oracle's current and prospective clients. Simultaneously, Defendants manipulated Oracle's customers to obtain copies of Oracle software releases, which were then copied to Defendants' own computer systems and used to lure away Oracle's current and prospective clients.

185. This conduct, as alleged above, constitutes violations of numerous state and federal statutes and codes, including, but not limited to, violation of the Federal Computer

58

Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, receipt of stolen property, Cal. Penal Code § 496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11. Defendants' conduct also constitutes trespass to chattels, breach of contract, and unjust enrichment.

186. As a result of Defendants' acts, the above-described relationships have been actually disrupted, causing certain current and prospective support clients to contract with Defendants instead of Oracle for their software support and maintenance and, in some cases, for their enterprise software.

187. As a direct and proximate result of Defendants' actions, Oracle has suffered economic harm, including, but not limited to, loss of profits from sales or licenses to current and potential customers of Oracle support services and enterprise software programs. Defendants' wrongful conduct was a substantial factor in causing this harm.

188. Unless Defendants are restrained by appropriate injunctive relief, their actions are likely to recur and will cause Oracle irreparable injury for which there is no adequate remedy at law.

189. Defendants' interference with Oracle's prospective economic advantage with its current and future customers, as described above, was willful, malicious, oppressive, and in conscious disregard of Oracle's rights, and Oracle is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

### Sixth Claim for Relief

### Negligent Interference With Prospective Economic Advantage

(By Oracle Against All Defendants)

190. Oracle incorporates by reference the allegations of paragraphs 1 through 119, 128 through 145, and 159 through 189 of this Complaint as though fully set forth here.

191. Oracle has and had an expectancy in continuing and advantageous economic relationships with current and prospective purchasers and licensees of Oracle's support

59

1    services and software.

2          192.   These relationships contained the probability of future economic benefit in

3    the form of profitable support service contracts and enterprise software licenses.  Had

4    Defendants refrained from engaging in the unlawful and wrongful conduct described in this

5    complaint, there is a substantial probability that Oracle support customers would have initiated,

6    renewed, or expanded support contracts and enterprise software licenses with Oracle rather than

7    Defendants.

8          193.   Defendants knew or should have known about the economic relationship,

9    described above, and knew or should have known that these relationships would be interfered

10   with and disrupted if Defendants failed to act with reasonable care in their access of Customer

11   Connection and use of Oracle's Software and Support Materials.  Defendants failed to act with

12   reasonable care.  Instead, they:

13          •   gained unauthorized access to Oracle's computer systems through

14              Oracle's password-protected Customer Connection support website in

15              violation of the agreements governing such access;

16          •   gained unauthorized access to the Software and Support Materials

17              available on Oracle's computer systems through Customer Connection, in

18              violation of the agreements governing such access, including by using log

19              in credentials of customers with no right or license to the Software and

20              Support Materials taken by Defendants;

21          •   breached the agreements governing access to, and use of, the website and

22              the Software and Support Materials available through it;

23          •   lured Oracle's current and prospective customers by making promotional

24              and marketing statements regarding Defendants' ability to provide

25              support services for Oracle software that were only possible because of

26              Defendants' improper access to, and taking from, Oracle's computer

27              systems through Customer Connection;

28

60

1          • used information learned through the improper access to, and taking

2            from, Oracle's computer systems through Customer Connection to

3            provide support services to Defendants' customers; and,

4          • gaining unauthorized access to Oracle's software releases through

5            deceptive representations to Oracle's customers causing them to breach

6            their license agreements with Oracle, copying their software releases

7            wholesale hundreds of times onto Defendants' local systems, and using

8            those copies for various improper purposes, including without limitation

9            to develop unauthorized SAP TN-branded support products for

10           distribution to their customers.

11         194.    Defendants' conduct was wrongful by a measure beyond the fact of the

12  interference itself.  Defendants gained unauthorized access to Oracle's computer systems through

13  Oracle's password-protected Customer Connection support website, breached the agreements

14  governing access to, and use of, Customer Connection and the Software and Support Materials

15  available through it, and wrongfully used the property that they found there to advertise their

16  services, and otherwise obtain and retain Oracle's current and prospective clients.

17  Simultaneously, Defendants manipulated Oracle's customers to obtain copies of Oracle software

18  releases, which were then copied to Defendants' own computer systems and used to lure away

19  Oracle's current and prospective clients.

20         195.    This conduct, as alleged above, constitutes violations of numerous state

21  and federal statutes and codes, including, but not limited to, violation of the Federal Computer

22  Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, receipt of stolen property, Cal. Penal Code §

23  496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343,

24  violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access

25  device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-

26  11.  Defendants' conduct also constitutes trespass to chattels, breach of contract, and unjust

27  enrichment.

28         196.    As a result of Defendants' acts, the above-described relationships have

1    been actually disrupted, causing certain current and prospective support clients to contract with

2    Defendants instead of Oracle for their software support and maintenance and, in some cases, for

3    their enterprise software.

4              197.    As a direct and proximate result of Defendants' actions, Oracle has

5    suffered economic harm, including, but not limited to, loss of profits from sales or licenses to

6    current and potential customers of Oracle support services and enterprise software programs.

7    Defendants' wrongful conduct was a substantial factor in causing this harm.

8              198.    Unless Defendants are restrained by appropriate injunctive relief, their

9    actions are likely to recur and will cause Oracle irreparable injury for which there is no adequate

10   remedy at law.

11                              **Seventh Claim for Relief**

12                    **Unfair Competition - Cal. Bus. & Prof. Code § 17200**

13                         (By Oracle Against All Defendants)

14             199.    Oracle incorporates by reference the allegations of paragraphs 1 through

15   119, 128 through 145, and 159 through 198 of this Complaint as though fully set forth here.

16             200.    Defendants have engaged in unlawful business acts or practices by

17   committing acts including computer fraud, trespass, breach of contract, interference with

18   business relationships, and other illegal acts and practices as alleged above, all in an effort to

19   gain unfair competitive advantage over Oracle.

20             201.    These unlawful business acts or practices were committed pursuant to

21   business activity related to providing business applications software and related support and

22   maintenance for that software.

23             202.    The acts and conduct of Defendants constitute fraudulent, unlawful, and

24   unfair competition as defined by California Bus. & Prof. Code §§ 17200, *et seq.*

25             203.    Defendants' conduct constitutes violations of numerous state and federal

26   statutes and codes, including, but not limited to, violation of the Computer Fraud and Abuse Act,

27   18 U.S.C. §§ 1030 *et seq.*, receipt of stolen property, Cal. Penal Code § 496, unauthorized access

28   to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C.

1  § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and

2  violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11.  Defendants' conduct also

3  constitutes trespass to chattels, intentional interference with prospective economic advantage,

4  negligent interference with prospective economic advantage, and unjust enrichment.

5       204.  Defendants have improperly and unlawfully taken commercial advantage

6  of Oracle's investment in its confidential, proprietary, and copyrighted Software and Support

7  Materials and underlying software applications.  In light of Defendants' conduct, it would be

8  inequitable to allow Defendants to retain the benefit of the funds obtained though the

9  unauthorized and unlawful use of Oracle's property.

10       205.  Defendants' unfair business practices have unjustly minimized Oracle's

11  competitive advantage and have caused and are causing Oracle to suffer damages.

12       206.  As a result of such unfair competition, Oracle has also suffered irreparable

13  injury and, unless Defendants are enjoined from such unfair competition, will continue to suffer

14  irreparable injury, whereby Oracle has no adequate remedy at law.

15       207.  Defendants should be compelled to disgorge and/or restore any and all

16  revenues, earnings, profits, compensation, and benefits they may have obtained in violation of

17  California Business & Professions Code § 17200 *et seq*., including, but not limited to, returning

18  any revenue earned from the unlawful and unfair use of Oracle's stolen property, and should be

19  enjoined from further unlawful, unfair, and deceptive business practices.

20  **Eighth Claim for Relief**

21  **Trespass To Chattels**

22  (By Oracle Against All Defendants)

23       208.  Oracle incorporates by reference the allegations of paragraphs 1 through

24  119, 128 through 145, and 159 through 207 of this Complaint as though fully set forth here.

25       209.  At all times mentioned in this Complaint, Oracle had legal title to and

26  actual possession of Customer Connection, its access-restricted internet-based support system,

27  and the Software and Support Materials on that support system, as described above.

28       210.  Defendants intentionally interfered with Oracle's use or possession of both

1   Customer Connection and Oracle's related internal databases and systems, and the Software and

2   Support Materials housed for licensed access through Customer Connection.

3       211.    Defendants' trespass and interference proximately caused damage to

4   Oracle, including, but not limited to, damage to the functionality of Oracle's computer system

5   and data, damage to Oracle's rights to dominion and control over its property, and damage to the

6   confidential nature of the information on Oracle's website.  As a result, Defendants caused

7   Oracle's property to greatly diminish in value and deprived Oracle of the intended use of its

8   computer systems.

9       212.    Oracle is entitled to recover any and all damages it sustained as a result of

10  such trespass, in an amount to be determined at trial.

11      213.    Defendants' trespass interfered with, and damaged, the integrity and

12  functionality of Oracle's computer system and data.  Defendants will continue to commit such

13  acts and other competitors will be encouraged to sweep Oracle's website, potentially to the point

14  of denying effective access to Oracle's customers and preventing Oracle from using its systems

15  and data for their intended purpose.  Defendants' trespass therefore threatens to cause irreparable

16  harm to Oracle, for which Oracle's remedy at law is not adequate to compensate it for the

17  injuries inflicted and threatened.

18                          **Ninth Claim for Relief**

19                        **Unjust Enrichment/Restitution**

20                        (By Oracle Against All Defendants)

21      214.    Oracle incorporates by reference the allegations of paragraphs 1 through

22  119, 128 through 145, and 159 through 213 of this Complaint as though fully set forth here.

23      215.    Defendants unjustly received benefits at the expense of Oracle through

24  their wrongful conduct, including Defendants' breach of the agreements governing access to and

25  use of Customer Connection, interference with Oracle's business relationships and other unfair

26  business practices, as well as Defendants' trespass on, and computer fraud concerning the

27  Software and Support Materials, which took substantial time and money for Oracle to develop.

28  Defendants continue to unjustly retain these benefits at the expense of Oracle.  It would be unjust

64

1   for Defendants to retain any value they obtained as a result of their wrongful conduct.

2          216.    Oracle is entitled to the establishment of a constructive trust consisting of

3   the benefit conferred upon Defendants by the revenues derived from their wrongful conduct at

4   Oracle's expense as alleged above, and all profits derived from that wrongful conduct.  Oracle is

5   further entitled to full restitution of all amounts in which Defendants have been unjustly enriched

6   at Oracle's expense.

7                            **Tenth Claim for Relief**

8                              **An Accounting**

9                        (By Oracle Against All Defendants)

10         217.    Oracle incorporates by reference the allegations of paragraphs 1 through

11  119, 128 through 145, and 159 through 216 of this Complaint as though fully set forth here.

12         218.    Since at least September 2006, Defendants have obtained business through

13  the use of unlawful conduct including, but not limited to:

14                 (a)    Breaching the agreements governing access to or use of Customer

15  Connection;

16                 (b)    Intentionally and/or negligently interfering with Oracle's

17  prospective economic advantage with its existing and potential customers;

18                 (c)    Improperly, willfully, and unlawfully taking commercial advantage

19  of Oracle's investment in its Software and Support Materials, for the purpose of sabotaging

20  Oracle's ability to do business and compete in the market; and,

21                 (d)    Fraudulently accessing and intentionally trespassing on Oracle's

22  password-protected Customer Connection website, without authorization or consent, in

23  furtherance of their unlawful and deceptive scheme as described above.

24         219.    Defendants have received money as a result of their misconduct, at

25  Oracle's expense, and that some or all of such money is rightfully due to Oracle.

26         220.    The amount of money due from Defendants to Oracle is unknown to

27  Oracle and cannot be ascertained without an accounting of the income and gross profits

28  Defendants have obtained through their wrongful and unlawful conduct.  Oracle is entitled,

1    therefore, to a full accounting.

2                            **Prayer For Relief**

3              WHEREFORE, Oracle respectfully prays for the following:

4                    A.      For a preliminary and permanent injunction restraining

5    Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert

6    or participation with any of them, from the following:

7                            (1)      Copying[4], distributing, using, or creating derivative works

8    from Oracle Software and Support Materials or software environments in any way, including for

9    any business purpose, except as otherwise allowed by express license from Oracle or as

10   otherwise set forth below;

11                           (2)      Copying, distributing or storing, or facilitating copying,

12   distribution or storage of, any Oracle Software and Support Materials directly or indirectly from

13   or to any of Defendants' offices, computer systems or networks;

14                           (3)      Using any bot, scraper, spider, or other software tool

15   (including without limitation Titan and its predecessor scripts) to access, copy, distribute or use

16   any Oracle Software and Support Materials in any way, including for any business purpose;

17                           (4)      Facilitating the downloading of any Oracle Software and

18   Support Materials from any Oracle support website for, or on behalf of, any customer who does

19   not have a valid, existing and currently-Oracle-supported software license for the specific

20   materials being downloaded from Oracle entitling that customer to have and use those Software

21   and Support Materials;

22                           (5)      Facilitating the access to, use of, or downloading from any

23   Oracle support website for, or on behalf of, any customer other than by using that specific

24   customer's valid login credentials;

25   _____

26   [4]      As used in this Prayer, "copying" includes downloading from a website or digital storage

27   media.

28

1                        (6)       Facilitating the copying, distribution or use of any Oracle

2  Software and Support Materials for, or on behalf of, any customer who did not have a current,

3  valid, existing software and support license from Oracle entitling that customer to have and use

4  those Software and Support Materials, at the time they were downloaded or obtained by or on

5  behalf of the customer;

6                        (7)       Regardless of the location of any specific Software and

7  Support Materials or software environments, copying, distributing or using Software and Support

8  Materials or any software environments obtained through or for one customer to support a

9  different customer;

10                       (8)       Supporting, maintaining or facilitating the support or

11  maintenance of software for any customer using a copy of any Oracle, J.D. Edwards or

12  PeopleSoft software, including any generic or customer-specific software environments, except

13  to the extent that (i) that customer licensed the software from Oracle, (ii) the customer received

14  the software copy directly from Oracle, (iii) the software environment was created using that

15  customer's software, and, (iv) the software and software environment is maintained exclusively

16  at the customer's physical location;

17                       (9)       Facilitating the copying, distribution or use of, any Oracle

18  Software and Support Materials or any software environment without keeping a record, which

19  Oracle may inspect upon three (3) business days' written notice, that accurately reflects all

20  Software and Support Materials or software environments (a) copied, distributed or used,

21  organized by customer name, (b) the date(s) of the copying, distribution or use, and (c) all other

22  entities involved in the copying, distribution or use, including name of the entity, principal

23  contact, and contact information; and,

24                     (10)     Otherwise engaging in acts of unfair competition, copyright

25  infringement, trespass, computer fraud, and interference with Oracle's business relationships;

26                 B.       That the Court order Defendants to file with the Court and serve on

27  Oracle within thirty (30) days after the service on Defendants of such injunction a report in

28  writing, under oath, setting forth in detail the manner and form in which Defendants have

1    complied with the injunction;

2              C.      For an Order directing Defendants to return Oracle's property,

3    including, without limitation, Oracle's confidential, proprietary, and copyrighted Software and

4    Support Materials, including data, internal documents, and valuable updates, patches, fixes, and

5    other computer code, that Defendants took from Oracle, as set forth in this Complaint;

6              D.      For an order impounding or destroying any and all infringing

7    materials pursuant to 17 U.S.C. § 503;

8              E.      For an Order awarding Oracle punitive damages in a sum to be

9    determined at trial, on the basis of Defendants' willful and deliberate unauthorized computer

10   access, intentional interference with Oracle's prospective economic advantage, aiding and

11   abetting and conspiracy;

12             F.      For restitution and disgorgement of all ill-gotten gains unjustly

13   obtained and retained by Defendants through the acts complained of here;

14             G.      For an Order finding a Constructive Trust for Oracle's benefit,

15   consisting of all revenues received by Defendants from their wrongful conduct which should

16   rightfully have been received by Oracle and all profits derived from that wrongful conduct, and

17   directing Defendants to pay all such sums to Oracle;

18             H.      For damages to be proven at trial;

19             I.      For statutory damages pursuant to 17 U.S.C. § 504;

20             J.      For prejudgment interest;

21             K.      For an accounting;

22             L.      For an Order awarding Oracle its attorneys' fees and costs; and,

23             M.      For an Order awarding Oracle such other and further relief as the

24   Court deems just and proper.

25

26

27

28

DATED: July 28, 2008

BINGHAM McCUTCHEN LLP

By: _____
Geoffrey M. Howard

Attorneys for Plaintiffs
Oracle Corporation, Oracle International
Corporation, and Oracle USA, Inc.

# DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs Oracle Corporation, Oracle International Corporation and Oracle USA, Inc. demand a trial by jury on all issues triable by a jury.

DATED:  July 28, 2008                    BINGHAM McCUTCHEN LLP

By: _____
                                         Geoffrey M. Howard

Attorneys for Plaintiffs
Oracle Corporation, Oracle International
Corporation, and Oracle USA, Inc.