1   Robert A. Mittelstaedt (SBN 060359)
    Jason McDonell (SBN 115084)
2   Elaine Wallace (SBN 197882)
    JONES DAY
3   San Francisco Office
    555 California Street, 26th Floor
4   San Francisco, CA 94104
    Telephone:    (415) 626-3939
5   Facsimile:    (415) 875-5700
    ramittelstaedt@jonesday.com
6   jmcdonell@jonesday.com
    ewallace@jonesday.com
7
    Tharan Gregory Lanier (SBN 138784)
8   Jane L. Froyd (SBN 220776)
    JONES DAY
9   Silicon Valley Office
    1755 Embarcadero Road
10  Palo Alto, CA 94303
    Telephone:    (650) 739-3939
11  Facsimile:    (650) 739-3900
    tglanier@jonesday.com
12  jfroyd@jonesday.com

13  Scott W. Cowan (Admitted *Pro Hac Vice*)
    Joshua L. Fuchs (Admitted *Pro Hac Vice*)
14  JONES DAY
    717 Texas, Suite 3300
15  Houston, TX 77002
    Telephone:    (832) 239-3939
16  Facsimile:    (832) 239-3600
    swcowan@jonesday.com
17  jlfuchs@jonesday.com

18  Attorneys for Defendants
    SAP AG, SAP AMERICA, INC., and
19  TOMORROWNOW, INC.

20              UNITED STATES DISTRICT COURT

21            NORTHERN DISTRICT OF CALIFORNIA

22               SAN FRANCISCO DIVISION

23  ORACLE CORPORATION, et al.,          Case No. 07-CV-1658 PJH (EDL)

24              Plaintiffs,              **DEFENDANTS' OPPOSITION TO**
                                         **PLAINTIFFS' MOTION TO**
25        v.                             **COMPEL PRODUCTION OF**
                                         **CLAWED BACK DOCUMENTS**
    SAP AG, et al.,
26                                       Date: N/A
              Defendants.               Time: N/A
27                                       Courtroom: E, 15th Floor
                                         Judge: Hon. Elizabeth D. LaPorte
28
                                         DEFS. OPP. TO PLS. MOT. TO COMPEL PROD. OF
                                              CLAWED BACK DOCS
                                            Case No. 07-CV-1658 PJH (EDL)

**TABLE OF CONTENTS**

Page

I.    STATEMENT OF ISSUES TO BE DECIDED ................................................................... 1

II.   INTRODUCTION ........................................................................................................... 1

III.  ARGUMENT .................................................................................................................... 3

    A.  Defendants' Production Properly Divides Business and AC Communications ........................................................................................... 3

    B.  Defendants Have Not "Overused" the AC Privilege ............................................. 8

    C.  Defendants Have Neither Implicitly Nor Selectively Waived the AC Privilege ........................................................................................................... 8

        1.  Defendants are Using the AC Privilege Only as a Shield .......................... 9

        2.  Defendants Have Not Selectively Waived the AC Privilege ................... 14

    D.  Oracle's Review of Defendants' Privileged Documents is Highly Improper ....... 19

    E.  Both Parties Agree that the Court's Guidance Will Assist the Process ............... 21

IV.  CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

**Page**

Cases

*Admiral Ins. Co. v. U.S. Dist. Court*
   881 F.2d 1486 (9th Cir. 1989)..................................................................................... 4

*AT&T Corp. v. Microsoft Corp.*
   No. 02-0164 MHP (JL) 2003 U.S. Dist. LEXIS 8710 (N.D. Cal. Apr. 18, 2003)................... 18

*Bittaker v. Woodford*
   331 F.3d 715 (9th Cir. 2003)....................................................................................... 13

*Chevron Corp. v. Pennzoil Co.*
   974 F.2d 1156 (9th Cir. 1992)................................................................................... 9, 13

*In re Fischel*
   557 F.2d 209 (9th Cir. 1977)...................................................................................... 3, 8

*Hearn v. Rhay*
   68 F.R.D. 574 (E.D. Wash. 1975)........................................................................ 9, 13, 14

*National Hotel Co. v. Motley*
   123 S.W.2d 461 (Tex. Civ. App.) 1938 ......................................................................... 9

*Peterson v. Chicago, R. I. & P. Ry. Co.*
   205 U.S. 364 (1907)..................................................................................................... 9

*PostX Corporation v. Secure Data In Motion Inc.*
   No. C 02-04483 SI, 2004 WL 2663518 (Nov. 20, 2004, N.D. Cal.) .................................. 12, 13

*Rambus Inc. v. Samsung Elec. Co.*
   Nos. C-05-02298 RMW and C-05-00334 RMW,
   2007 WL 3444376 (N.D. Cal. Nov. 13, 2007)............................................................. 14

*United States v. Chevron Texaco Corp.*
   241 F. Supp. 2d 1065 (N.D. Cal. 2002) ....................................................................... 5, 6

*United States v. Hodge & Zweig*
   548 F.2d 1347 (9th Cir. 1977)....................................................................................... 3

*Upjohn v. United States*
   449 U.S. 383 (1981)..................................................................................................... 4

**Statutes**

Federal Rule of Civil Procedure
   26(b)(5)(B)............................................................................................................ 19, 20

Federal Rule of Evidence
   501 .......................................................................................................................... 3

**Miscellaneous**

8 WIGMORE EVIDENCE
   § 2292 (McNaughton rev. 1961)................................................................................... 3

# I. STATEMENT OF ISSUES TO BE DECIDED

1. Whether Contested Document Nos. 2, 3 and 4 contain privileged attorney-client communications thereby entitling Defendants to withhold the privileged portions of those documents on that basis.

2. Whether Defendants have implicitly or selectively waived the attorney-client privilege relating to Defendants' in-house counsel's creation and interpretation of the Rules of Engagement thereby requiring production of those portions of Contested Documents 4, 5 and 6 that Defendants are withholding on the basis of the attorney-client privilege.

# II. INTRODUCTION

Defendants SAP AG, SAP America, Inc. (together "SAP"), and TomorrowNow, Inc. ("TN") (collectively "Defendants") oppose Plaintiffs' ("Oracle's") Motion to Compel Production of Clawed Back Documents (Dkt. 136, 137) and request that the Court deny all relief requested in that motion.

Oracle's motion is fatally flawed in at least four ways. First, the motion is self-contradictory. In the first half of the motion, Oracle alleges that Defendants overused the attorney-client ("AC") privilege to withhold documents that it claims are non-privileged business communications that happen to involve in-house attorneys. In the second half of its motion, Oracle cites to several actual non-privileged business communications involving Defendants' in-house attorneys and asserts that Defendants have selectively waived the AC privilege by producing those documents. The irony in Oracle's motion is that the exhibits it incorporates actually prove that Defendants have in fact analyzed and made the fine distinctions between legal and business communications, properly withholding the former and producing the latter.

Second, Oracle asserts, without any relevant context, that Defendants have "overused" the AC privilege. To date, Defendants have produced over 3 million pages of documents and over 19 terabytes of native electronic files. From that almost incomprehensible amount of data, Defendants have so far withheld and logged only 4,235 documents under a claim of privilege. And, of that number, Defendants have only inadvertently produced, clawed back, and withheld 96 documents totaling 538 pages—which includes the duplicates mentioned by Oracle. Defendants

have a very structured document-by-document privilege review process that, while certainly not perfect, complies with the controlling law and is working as well as anyone could reasonably expect given the enormous amount of data that Defendants are reviewing and producing in this case. Oracle's assertion that Defendants have "overused" the AC privilege is not supported by the facts or law.

Third, Oracle's shield and sword argument lacks a sword. It is undisputed that the Rules of Engagement ("ROE")[1] were drafted by lawyers, just as many rules, policies and procedures in large corporations routinely are. However, Defendants have not and will not use as a defense in this case the fact or substance of their lawyers' contemporaneous legal analysis or legal advice relating to the creation, content, implementation, or application of the ROE. Notwithstanding the lawyers' involvement in drafting the ROE, the operative fact is that the rules were adopted by SAP's Executive Board and implemented by TN's and SAP's business executives based on the business decision to create a figurative "firewall" between SAP and TN in an effort to prevent the physical passing from TN to SAP of any Oracle intellectual property that TN handled on behalf of its customers on a daily basis.

Finally, Oracle's motion contains highly improper analysis that is based on a post-claw back review of Defendants' privileged documents, thereby violating the Stipulated Protective Order, this Court's instructions at the May 28, 2008 Discovery Conference, and the Court's related May 29, 2008 Order. Notwithstanding Oracle's complete disregard of this Court's orders and instructions, it simply defies logic that, absent a subsequent judicial review and overruling of the claim of privilege, a party can continue to review and analyze—for any purpose—another party's privileged documents after they have been clawed back.

Nevertheless, rather than force Oracle to first establish a legal basis for this Court's *in camera* review of the five documents at issue, and as part of their continued good faith efforts to

---

[1] There are two versions of the ROE dated March 9, 2005 and March 15, 2006. Given that Oracle did not provide the Court with a copy of the ROE, those two documents have been attached for the Court's review as Exhibits 3 and 4 to the Declaration of Elaine Wallace in Support of Defendants' Opposition to Plaintiffs' Motion to Compel Production of Clawed Back Documents ("Wallace Decl."). And, given that the ROE are confidential, non-public business documents, Defendants have filed with this Opposition a separate Administrative Request to file them under seal.

maintain the proper contours for privilege claims in this case, Defendants voluntarily submitted

those documents *in camera* on the same day Oracle filed its motion.[2] Privilege review—

particularly in light of Oracle's broad allegations and the huge volumes of data at issue—is a

tedious and difficult document-by-document line drawing exercise requiring a myriad of

objective and subjective factual and legal determinations. Against that backdrop, Defendants: (1)

have made all of their privilege claims in good faith; (2) remain willing to carefully reconsider

any document for which their privilege claims are properly challenged; (3) have not waived any

applicable privilege; and (4) in the context of the five documents at issue in Oracle's motion,

welcome this Court's guidance as to where the Court believes the Parties should be drawing the

lines as they continue to make daily privilege determinations as part of their respective rolling

document productions in this case.

## III. ARGUMENT

### A. Defendants' Production Properly Divides Business and AC Communications.

Under Fed. R. Evid. 501, federal law governs the availability and scope of the attorney-

client privilege in nondiversity actions. *See United States v. Hodge & Zweig*, 548 F.2d 1347, 1353

(9th Cir. 1977). The Ninth Circuit has set forth the following essential elements of the attorney-

client privilege:

> 1. Where legal advice of any kind is sought
> 2. from a professional legal adviser in his capacity as such
> 3. the communications relating to that purpose
> 4. made in confidence
> 5. by the client
> 6. are at this instance permanently protected
> 7. from disclosure by himself or by the legal adviser
> 8. unless the protection be waived.

*In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977), *citing* 8 WIGMORE EVIDENCE § 2292 at 554

(McNaughton rev. 1961).

---

[2] For the Court's convenience, references to the Contested Documents in this Motion also
include references to the Bates numbers of those documents, so that the Court can more easily
match the documents that have been lodged for *in camera* review with the arguments and
evidence in support of this Opposition.

When, as here, the client is a corporation, special problems arise in applying the privilege because corporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on behalf of the corporation. *Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1492 (9th Cir. 1989). In *Upjohn v. United States*, 449 U.S. 383 (1981), the Supreme Court rejected the "control group" test, and held that the privilege applies to communications by any corporate employee, regardless of position, when the communications concern matters within the scope of the employee's corporate duties and the employee is aware that the information is being furnished to enable the attorney to provide legal advice to the corporation. *Id*. at 392, 394. The *Upjohn* decision, however, did not establish an all-encompassing test for application of the attorney-client privilege to corporations. *Id.* Rather, each case must be evaluated to determine whether application of the privilege would further its underlying purpose, which is to encourage candid communications between client and counsel. *Id*. at 390-91, 396-97.

The Ninth Circuit has confirmed that "although an expansive application of the attorney-client privilege to corporations may impose severe burdens on discovery and create a broad 'zone of silence' over corporate affairs, ...effective representation by counsel 'depends upon the lawyer being fully informed by the client.'" *Admiral Ins. Co.*, 881 F.2d at 1492, *citing Upjohn*, 449 U.S. at 389, 395 ("*Upjohn* stands for the proposition that the advantages of preserving the privilege outweigh the inescapable disadvantages of the resultant secrecy"). Within the foregoing legal framework and via the following factual analysis, Defendants have met their burden to establish the AC privilege over Contested[3] Document Nos. 1, 2, and 4.

Contested Document # 1 (Howard Decl., Ex. B, which is Bates labeled TN-OR00854803 through TN-OR00854804): This document is not, as Oracle contends, a "self-described business analysis of the SAP AG Board of Directors concerning TN's practice of copying Oracle Software

---

[3] Defendants agree that "Contested" Document # 3, which is attached as Ex. D to the Declaration of Geoffrey M. Howard in Support of Plaintiffs' Motion to Compel Production of Clawed Back Documents ("Howard Decl.") is not privileged, proving that the pre-motion meet and confer process mandated by the Court's July 25th Order worked.

and/or code for storage on its own systems."[4]  The document itself[5] and the Declaration of

Andrew Nelson in Support of Defendants' Response to Plaintiffs' Motion to Compel Production

of Clawed Back Documents ("A. Nelson Decl."), establishes that it is a confidential, internal TN

email that contains: (1) a request by Andrew to Shelley Nelson that she provide him with certain

business information to use as part of his communications with SAP's in-house counsel, Chris

Faye;[6] (2) summaries of information collected and to be collected at the request of, and/or for the

purposes of Andrew's continued communications with Faye regarding his legal advice on the

issues described in the email; (3) a proposed agenda for a call with Faye for purposes of seeking

and obtaining legal advice; and (4) notes from portions of the legal advice that was provided to

TN by Faye.  A. Nelson Decl. at 2:8-18; Faye Decl. at 2:7-26.  The first part of the email (*i.e.*, the

first nine lines below the subject line) is a non-privileged request for business information.  The

remainder of the email reveals the substance of attorney-client communications between TN and

Faye and is privileged on that basis.

The AC privilege protects communications between nonlegal employees in which the

employees discuss or transmit legal advice given by counsel.  *United States v. Chevron Texaco*

*Corp.*, 241 F. Supp. 2d 1065, 1077, 1079 (N.D. Cal. 2002) (evaluating communication between

non-lawyer employees and affirming privilege because it relayed tax advice from the corporate

attorney).  Thus, Contested Document # 1 was properly clawed back under the Stipulated

Protective Order (Dkt. 32) and then reproduced with everything redacted for privilege except the

first nine lines below the subject line.  The redaction of Document # 1 is an example of

---

[4]  Oracle's statement that "SAP AG Board's analysis was passed to TN in the email by SAP attorney Chris Faye" is likewise false.  *See* Oracle's Mot. 3:2-7.  Neither Faye nor anyone at SAP is the author or a recipient (copy or otherwise) of the email.  *See* the Declaration of Christopher Faye in Support of Defendants' Response to Plaintiffs' Motion to Compel Production of Clawed Back Documents ("Faye Decl.") at 2:13-15.

[5]  Because the documents at issue have been lodged for *in camera* inspection, Defendants' Opposition to Oracle's Motion has been carefully crafted to avoid quoting from the privileged documents at issue or otherwise providing detailed descriptions of their substance in order to permit the public filing of this Opposition.

[6]  During all times relevant to the documents at issue in Oracle's motion, there were no in-house lawyers directly employed by TN.  Instead, during the timeframes at issue here, Faye and other in-house lawyers at SAP, provided legal advice and acted as counsel to TN, SAP's wholly-owned subsidiary, through a shared services arrangement between SAP and TN.  Faye Decl. at 2:20-26.

Defendants' good faith efforts to properly draw the lines between business and attorney-client communications.

Contested Document # 2 (Howard Decl., Ex. C, which is Bates labeled TN-OR00164402 through TN-OR00164410):    This document is a nine-page, highly confidential, internal PowerPoint presentation to SAP's management that was clawed back and then reproduced by redacting only eight lines of the third page.  The attached declarations of SAP employees Thomas Ziemen (the author of the overall presentation) and Markus Geng (the author of the redacted portion of the presentation) establish that the eight redacted lines are a high-level summary of the conclusions Geng drafted based on legal advice he sought and obtained from SAP's in-house attorneys Faye and Jochen Scholten relating to the key legal risks of the proposed business strategy reflected elsewhere in the presentation.[7]  Even though Geng, a non-lawyer, drafted the summary of the key legal risks explained to him by SAP's in-house counsel, that does not keep the information from being privileged.  *Chevron Texaco Corp.*, 241 F. Supp. at 1077.

Geng provides additional factual support for Defendants' assertion that the eight redacted lines contain a summary of privileged information by noting that: (1) the portion of the presentation just above the redacted portion indicates that the summary of the legal risks contained in the redacted portion is from a more detailed analysis that can be obtained directly from SAP's in-house counsel under "Attorney-Client Privilege"; and (2) the business advice he sought to include in his risk analysis summary was specifically excepted from that summary.  Geng Decl. at 2:17-27.  Thus, Document # 2 was properly clawed back under the Stipulated Protective Order and then reproduced in its entirety, except the eight redacted lines on the third page.  Again, the very limited redaction of this document further evidences Defendants' good faith efforts to properly divide business and attorney-client communications.

Contested Document # 4 (Howard Decl., Ex. U, which is Bates labeled TN-OR01157057 through TN-OR01157059):    This document is an extended email string between Faye, Andrew

---

[7]    *See* Declaration of Thomas Ziemen in Support of Defendants' Response to Plaintiffs' Motion to Compel Production of Clawed Back Documents ("Ziemen Decl.") at 2:16-20; Declaration of Markus Geng in Support of Defendants' Response to Plaintiffs' Motion to Compel Production of Clawed Back Documents ("Geng Decl.") at 2:17-20; and Faye Decl. at 3:3-11.

Nelson and Greg Nelson, copying in one piece of the string two other SAP in-house lawyers, Jochen Scholten and Robert "Bob" Dillon. Declaration of Gregory Nelson in Support of Defendants' Response to Plaintiffs' Motion to Compel Production of Clawed Back Documents ("G. Nelson Decl.") at 2:7-24; Faye Decl. at 3:12-28. Faye, who had received a prior request for legal advice on the topic that is the subject of the document, initiates the email string by asking Andrew and Greg a follow-up question. *Id.* The string continues with two sets of responses by Andrew and related replies by Faye on the same topic, providing more factual context for the advice sought from Faye. *Id.* Then, the last redacted portion of the string is a request by Greg to Andrew to discuss the earlier portions of the string. The only non-redacted portion of the string is Andrew's reply to Greg simply accepting the offer to discuss the privileged portions of the email.[8]

The remainder of the email string (*i.e.*, 02/22/07 07:14 PM and earlier) is privileged because it involves a direct back-and-forth dialogue between Faye who (in the context of TN's business goals articulated by Andrew in the email) was obtaining additional information regarding, and then providing legal advice and opinions to TN relating to, the physical segregation of TN's and SAP's sales forces. G. Nelson Decl. at 2:7-24; Faye Decl. at 3:12-28. The genesis of the entire email string was based on TN's request for a legal interpretation of, and/or possible amendment to, the ROE to accomplish TN's business goals related to the integration of sales forces. *Id.* In this instance, Faye was dispensing legal, not business, advice. *Id.* The business decisions on this topic were made by TN's and SAP's business managers, with the input of legal advice from SAP's in-house counsel. *Id.* The legal nature of the advice is self-evident from the email (*see, e.g.,* 02/22/27 07:14 PM piece).

The foregoing is more than sufficient to sustain Defendants' burden of establishing the AC privilege for the clawed back portions of Contested Documents 1, 2, and 4. Defendants have

---

[8]     The only reasonably debatable non-privileged piece of the redacted portion is the 02/22/2007 07:52 p.m. email from Greg Nelson to Andrew. The—albeit vague—reference to the subject which Greg is seeking to discuss with Andrew was the basis for redacting that piece. However, in the face of Oracle's unreasonable waiver arguments (such as those raised in the second half of Oracle's motion), the privilege determination exercise becomes even more difficult as Defendants are forced to be very conservative and are constantly aware of the implications of slicing their privilege calls too thin.

established all of the elements required by *In re Fischel* to prove that all three documents are subject to the AC privilege by showing that they involve communications relating to legal advice from a professional legal adviser in his capacity as such, and that they were made in confidence by the client. Moreover, in Sections III.B and III.C, *infra*, Defendants have affirmatively established non-waiver in response to Oracle's assertion of implied and selective waiver of the AC privilege.

**B.    Defendants Have Not "Overused" the AC Privilege.**

Oracle's allegation that Defendants "overused" the AC privilege lacks any substantive merit, (*see, e.g.*, Section III.A, *supra*), and becomes even more specious when considered in light of the tiny fraction[9] of Defendants' production to date that is impacted by Defendants' claim of privilege. To date, Defendants have produced over 3 million pages of documents to Oracle. In addition, Defendants have produced another 19 terabytes of data in its native electronic form. From that huge mass of TN's and SAP's business files, Defendants have only claimed privileged on 4,235 documents.[10] As demonstrated by four of the five contested privileged documents at issue in this motion, many of the 4,235 documents over which Defendants have asserted privilege have been partially produced by redacting only the privileged portions.

**C.    Defendants Have Neither Implicitly Nor Selectively Waived the AC Privilege.**

Oracle asserts that Defendants have waived the AC privilege because Defendants have: (1) "asserted their efforts to institute the Rules of Engagement as a defense, and have produced information related to that effort involving its attorneys"; and (2) "allowed testimony and produc[ed] documents involving" the ROE. Oracle's Mot. at 9.

Everyday, corporations put in place rules, policies and procedures that are drafted and construed by lawyers but serve the business goals of those corporations. The ROE are no different. It is not the law, nor should it be, that the mere allegation of the existence and business

---

[9]  The 96 fully or partially privileged documents that have been clawed back and withheld involves only 538 pages (including the duplicates Oracle mentions), which is a volume that is less than two-tenths of one percent of the 3,000,313 pages produced by Defendants to date.

[10]  Defendants gave Oracle a detailed description of their structured three-tier privilege review process, which was not put in issue by Oracle's Motion. And, in support of this Opposition, Defendants have provided more detail regarding their privilege review process. *See* Wallace Decl. at 2:7-3:12, and Exh. "1" attached thereto.

purpose of a set of corporate rules is enough to pierce the AC privilege related to the contemporaneous legal analysis or legal advice relating to the creation, content, and interpretation of those rules. Corporations must be free to rely on the fact that they have rules in place and that there is a business reason for those rules without simultaneously being held to have waived the AC privilege related to the legal strategy and communications associated with developing those rules. If the law were otherwise, then there would be a significant chilling effect on corporate rulemaking and self-policing.

## 1. **Defendants are Using the AC Privilege Only as a Shield.**

There is no dispute that "the privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). Oracle's reliance on this principle fails, however, because the "sword" Oracle refers to does not exist. Defendants have not and will not use as a defense in this case the fact or substance of their lawyers' contemporaneous legal analysis or legal advice relating to the creation, content and interpretation of the ROE. Thus, no matter how the implied waiver standard is articulated and applied to this case (*i.e.*, either the "*Hearn* test," the "shield and sword doctrine," the "fairness principle," etc.), the result is the same—no waiver. Underpinning all of the relevant jurisprudence regarding implied waiver is the fundamental premise that it is unfair for the party asserting the privilege to simultaneously rely on privileged information to advance its claims or defenses (sword) and withhold that same information from the opposing party under a claim of privilege (shield). In this case, Defendants are using only the shield, not the sword.

Oracle's motion falsely states that Defendants have argued in this case that the ROE "created a firewall to stop TN's liability from bleeding over to SAP." Oracle's Mot. at 1:22-23. Defendants have never made, and will not make such a contention in this case. Whether TN's liability "bleeds over" to SAP is a separate issue[11] from the establishment of a corporate policy

---

[11] Oracle apparently confuses the business purpose of the ROE (*i.e.*, to keep information and data flowing from TN to SAP) with the business reasons SAP had for maintaining TN as a separate corporation. It is undisputed that after the acquisition, SAP's management made the decision to keep TN as a separate corporate entity organized under the laws of Texas. And, for more than 80 years, Texas law has held that there is no legal wrong in maintaining that corporate separateness, even if the sole purpose of that decision was an attempt by SAP to avoid liability for the debts of TN. *Nat'l Hotel Co. v. Motley*, 123 S.W.2d 461, 465 (Tex. Civ. App.—Eastland)

prohibiting the transfer of certain information (*i.e.,* a figurative "firewall") between parent and subsidiary corporations. Defendants' answer to Oracle's First Amended Complaint simply makes the assertion that "upon acquiring TN, SAP AG and SAP America put in place extensive policies to assure that no allegedly proprietary material of Oracle obtained by TN would ever reach SAP AG or SAP America." Defendants' Answer (Dkt. 36) at 2:4-6. The only facts in that assertion are that: (1) the ROE exist; and (2) the business goal of the ROE was to assure that no alleged Oracle proprietary information obtained by TN would reach SAP. There is no dispute that the ROE exist—the facts concerning the existence of the ROE have been fully disclosed to Oracle, including copies of the rules themselves. Likewise, Oracle does not dispute that the business goal of the ROE was to assure that no alleged Oracle proprietary information obtained by TN would reach SAP. Oracle's Mot. at 1:20-21. Even if Oracle were to dispute that factual assertion, the Exhibits attached to Oracle's motion establish that it has been provided with written discovery responses, documents and testimony regarding the existence, business purpose and use of the ROE.[12]

The Exhibits attached to the Howard Declaration offer no further affirmative assertions by Defendants beyond the above-cited portion of Defendants' Answer. Exhibit "A" is Oracle's creation and as explained in Section III.D, *infra*, was prepared in a highly improper manner. It is clearly not an affirmative act by Defendants. The documents produced by Defendants in this case and attached to the Howard Declaration as Exhibits B, C, D, E, F, G, H, I, J, U, V, W, X, and Y,[13]

---

(continued…)

1938, writ dism'd, *citing Peterson v. Chicago, R. I. & P. Ry. Co*., 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841 (1907).

[12] Exhibit K is an excerpt from TN's interrogatory responses, which: (1) reference the factual assertion contained in Defendants' Answer quoted above; (2) state that the "policies and procedures" referred to in the Answer are the ROE; (2) provide the dates when the ROE were reduced to writing and modified; (3) refer to and incorporate the two emails containing the ROE; and (4) provide the names of who was involved in the drafting, review and promulgation of the ROE. Nothing in Exhibit K reveals or otherwise places in issue the substance of Defendants' lawyers' contemporaneous legal analysis or legal advice relating to the creation, content and interpretation of the ROE.

[13] Exhibit L, one of SAP's press releases, is an out of court statement and, just like the documents produced by Defendants in this case, cannot, without more, be construed as an affirmative act by Defendants that places anything "at issue" in this case.

either alone or together, cannot be construed as an "affirmative act" of Defendants that places the substance of those documents at issue in this case. Documents produced in response to discovery requests, without more, advance no position on behalf of the producing party. Oracle's characterizations of Defendants' documents in its Motion also do not constitute an affirmative act by Defendants. Likewise, the clawed-back portions of Exhibits B, C, U, V and W are equally irrelevant in the "shield and sword" analysis and, by virtue of Defendants' clawing portions of those documents back under a claim of privilege, are even further from an "affirmative act" placing their substance in issue.[14]

Notwithstanding Oracle's overwrought depictions of them, the excerpts of Defendants' testimony offered through Arlen Shenkman (a SAP 30(b)(6) witness) and Shelley Nelson (a TN 30(b)(6) witness) and attached as Exhibits M, N, and O to the Howard Declaration offer no additional affirmative assertions by Defendants' relevant to Oracle's Motion beyond that contained in Defendants' Answer. The only statements in the excerpts of Shelley Nelson's testimony that are relevant to the ROE are that: (1) she received the ROE; (2) the ROE was distributed to all TN employees; (3) that she had no input or suggested changes to the ROE before they were adopted; and (4) without a line by line comparison, she was unable to recall all of the differences between the 2005 version of the ROE and the 2006 version. Howard Decl., Ex. M.

The only relevant statements in the excerpted testimony of SAP's Arlen Shenkman regarding the ROE is that: (1) SAP's Executive Board of Directors "came up with" and "dictated" the ROE; (2) the integration of TN into SAP's organization was "essentially governed by" the ROE; (3) there was a desire to have a clear separation between SAP and TN based on the ROE; (4) SAP established the ROE in consultation with legal counsel; (5) the ROE were the basis upon which SAP would handle and operate TN after the acquisition of TN; and (6) two SAP employees meeting with TN in January 2005 were told by Chris Faye, SAP's in-house counsel, to stop the meeting and wait for the roll out of the Rules of Engagement. Howard Decl. Exs. N and O.

---

[14] For the same reasons, Defendants' privilege log relating to clawed back documents, Exhibit Q, and the related claw-back communications (Exhibits R, S and T) are also irrelevant to the shield/sword analysis.

Oracle also attached excerpts from James Mackey's deposition, who testified only in his individual capacity and at Oracle's insistence. Howard Decl., Ex. P. Testimony by a witness under cross examination who is not testifying on a corporate party's behalf should not be construed as an "affirmative act" of that corporate party. Regardless, just like Shelley Nelson and Shenkman, there is nothing contained in the excerpts of Mackey's deposition that supports the contentions in Oracle's Motion. The only relevant statements in the excerpted testimony of Mackey relating to the ROE is that: (1) SAP's Executive Board requested and received legal advice regarding the ROE and the legal team thought it was best to put the procedures in place; (2) the SAP Executive Board made the decision to implement the ROE; and (3) he does not know what the SAP's Executive Board's intent was when they put the ROE in place, but TN and SAP were kept separate. Howard Decl. Ex. P.

As demonstrated in the deposition excerpts attached as Exhibits M through P to the Howard Declaration, Oracle's counsel has continuously engaged in improper cross examination via multiple unsuccessful attempts to invade Defendants' privileged communications containing the legal analysis and legal advice relating to the creation, content, and interpretation of the ROE. Those same exhibits establish that Defendants' counsel continues to be vigilant in protecting the privilege. Neither Shelley Nelson, Shenkman, nor Mackey disclosed the substance of any privileged communications or indicated in any way that Defendants intend to use as a defense in this case the fact or substance of Defendants' lawyers' contemporaneous legal analysis or legal advice relating to the creation, content, and interpretation of the ROE. Oracle's counsel's attempted injection of Defendants' privilege communications in this case—over Defendants' counsel's repeated objections and simultaneous instructions to the witnesses not to reveal privileged communications—cannot as a matter of law and basic fairness form the basis for an implied waiver of the privilege.

In *PostX Corporation v. Secure Data In Motion Inc.*, No. C 02-04483 SI, 2004 WL 2663518 (Nov. 20, 2004, N.D. Cal.)(Illston, J.), the Court rejected the same argument that Oracle makes here. In *PostX*, the plaintiff and counter-defendant in a patent case asserted the *Noerr-Pennington* immunity as an affirmative defense, which the court apparently construed as

tantamount to a claim of good faith. The plaintiff in that case had asserted in an interrogatory response that its claims "'were filed with a proper legal basis and in good faith.'" *Id*. at *15. In depositions, defendant extracted testimony from plaintiff's witnesses that defendant had relied on advice of counsel in filing the action. *Id*. at *16[15] The defendant argued that plaintiff was using privilege as a sword and a shield and had thus waived privilege.

The court soundly rejected the claim of waiver. As Defendants do here, the plaintiff in *PostX* made clear that it would not rely on privileged information in the litigation and would not rely on advice of counsel in support of the *Noerr-Pennington* defense. *Id*. at *19 In this context, the court held that PostX's assertion of good faith did not impliedly waive the privilege. *Id*. The court also rejected the argument that the deposition testimony about the role of counsel resulted in a waiver. The court aptly noted as follows:

> The Court is not persuaded by *Pereira* that the deposition testimony about the role of counsel creates an implied waiver in this case. Indeed, it is difficult to conceive of a patent case in which opposing counsel could not extract the kind of deposition testimony given here and then argue implied waiver of all communications regarding the decision to bring suit.

*Id.* Similarly here, it is Oracle, not Defendants, that is attempting to manufacture a sword by attempting to put the privileged information "at issue" in this case. Just as in *PostX*, that attempt should be rejected here. In any case where it is known that lawyers had advised on a general subject area, a clever attorney is likely to elicit testimony that such advice was given. Such tactics cannot be rewarded with a finding of waiver without destroying the integrity of the privilege and the judicial process.

All of the implied waiver cases that Oracle cites in which the AC privilege was pierced are easily distinguishable. In *Chevron Corp. v. Pennzoil Co.*, the court pierced the privilege because Pennzoil affirmatively claimed that its tax position at issue in that case was reasonable because it was based on the advice of counsel. 974 F.2d at 1162-63. *Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003) involved the prototypical shield/sword situation where a habeas

---

[15] Defendant relied on deposition testimony that: (1) "[A]t the end of the day, [ ] the board depended on advice of counsel"; (2) "[T]he experts that we've brought in [counsel] are extremely qualified [ ] to make that decision"; and (3) "[B]y the time the witness had done his own independent evaluation, he "already had discussions with [the] lawyers, so it is really difficult for me to now separate my independent analysis with advice given to me by the lawyers." *Id*. at *16.

petitioner raises a claim of ineffective assistance of counsel—a fact pattern that is clearly not applicable here.  In *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975), the court correctly held that legal advice the state Attorney General gave the prison official-defendants was germane to the qualified immunity defense they raised and the prisoner-plaintiff's resulting burden of proving malice or unreasonable disregard of clearly established constitutional rights.  *Id*. at 581-82.  *Rambus Inc. v. Samsung Elec. Co.*, Nos. C-05-02298 RMW and C-05-00334 RMW, 2007 WL 3444376 (N.D. Cal. Nov. 13, 2007) is also readily distinguishable.  There, the court found that defendant Samsung put its AC communications at issue by filing counterclaims which:  (1) included fraudulent concealment as a basis to support its equitable tolling arguments thereby placing its subjective knowledge of  plaintiff Rambus' alleged wrongful conduct at issue; and (2) accused Rambus of misusing information misappropriated by a Samsung employee that included some of the very same information Samsung was withholding under a claim of privilege.  *Id*. at *4, *5.  None of the shield and sword situations contained in the foregoing cases exist here.

As demonstrated above, Oracle has failed to point to any affirmative acts by Defendants which put the protected information "at issue" by making it relevant to this case.  Moreover, Defendants have affirmatively demonstrated non-waiver by both showing and expressly stating in this Opposition that they have not and will not use as a defense in this case the fact or substance of their lawyers' contemporaneous legal analysis or legal advice relating to the creation, content, and interpretation of the ROE.  Moreover, Defendants' claim of privilege does not deny Oracle any information that is vital to its defense of Defendants' affirmative assertion that "upon acquiring TN, SAP AG and SAP America put in place extensive policies to assure that no allegedly proprietary material of Oracle obtained by TN would ever reach SAP AG or SAP America."  The exhibits filed in support of Oracle's own motion  along with its assertion that Defendants have "produced hundreds of communications similar to the clawed back documents" (Oracle's Mot. at 7:23-8:1), are evidence that Oracle has not been deprived of information relevant to Defendants' affirmative assertions in this case.

## 2.        Defendants Have Not Selectively Waived the AC Privilege.

Oracle admits that "the fact that legal advice was sought [is] an activity that is not in itself privileged." Oracle's Mot. at 1:14. Likewise, Oracle concedes that business discussions involving in-house lawyers are also not privileged. *Id*. at 1:15, 4:2-17. With these concessions in the first part of Oracle's motion, it would logically follow that Oracle wouldn't be surprised to find in Defendants' documents and testimony considerable amounts of information revealing: (1) the fact that legal advice was sought regarding the ROE; and (2) business communications between Defendants' employees and their in-house counsel regarding the ROE. Yet in the second half of its motion, Oracle bases its claim of "selective" waiver of the AC privilege based on Defendants' production of the very same type of business communications involving in-house counsel that it claims in the first half of its motion Defendants' have not produced.

Even without parsing the unsubstantiated hyperbole or correcting the mischaracterizations of the evidence referenced in Oracle's "Relevant Factual Background" section (Oracle's Mot. at 5:9-8:8), none of Oracle's alleged "facts" establish a selective or total waiver of the AC privilege by Defendants. Whether SAP's executives believed Oracle might sue it as a result of acquiring TN has no relevance to whether Defendants have selectively waived the AC privilege. In all of its arm waving and imputing of improper motive surrounding SAP's acquisition and subsequent integration of TN, Oracle points to no evidence where Defendants have revealed any AC communications. More specifically, the cited documents are confidential, internal communications, there are no privileged attorney-client communications in Exhibits E, F, G, H, I, or J attached to the Howard Declaration.

Likewise, Oracle's citation to the statements in Defendants' Answer that Defendants "respect IP rights" and "have taken and are taking steps to assure that TN's business is conducted" properly is utterly irrelevant to any of the relief Oracle requests. Oracle's Mot. at 6:13-14. Oracle's reference to one of Defendants' Interrogatory Answers (Howard Decl., Ex. K) provides no more information regarding the in-house attorneys' involvement in drafting the ROE than would be found on even the most sparse of privilege logs. Oracle's Mot. at 6:14-16. SAP's public statements in its Press Release (Howard Decl., Ex. L) regarding SAP's business decision to create a figurative "firewall" between TN and SAP to prevent Oracle's proprietary information

from being transmitted from TN to SAP contain no revelation of attorney client communications. Oracle's Mot. at 6:16-18.

Oracle cites the fact that it has "introduced multiple exhibits concerning" the ROE, "which had SAP's attorneys Chris Faye's and Tim Crean's names on the face of the documents" as somehow supporting its waiver argument. *See* Oracle's Mot. at 6:19-7:8. This portion of Oracle's Motion completely ignores—and contradicts—the concessions Oracle made in the first half of its motion that: (1) the fact that legal advice was sought is an activity that is not in itself privileged; and (2) business discussions involving in-house lawyers are also not privileged. *See* Oracle's Mot. at 1:14-15, 4:2-17.

Oracle's recitation of the timing of when Defendants clawed back the documents at issue and inclusion of Defendants' claw back letters in its motion (Howard Decl., Exs. R, S and T) does nothing more than show that when Defendants discovered that they had inadvertently produced privileged documents, they timely clawed them back. Oracle's Mot. at 7:9-21. Oracle does not allege that Defendants' privilege review process is defective or that Defendants have been dilatory in seeking the return of any specific privileged document after being on notice that it had been inadvertently produced. Nor could such an allegation be made regarding the only 96 documents that Defendants have clawed back, especially in the context of Defendants' enormous document production in this case—which is growing daily.

Footnote 5 of Oracle's Motion (at p. 11) states that "the sheer number of times that Defendants have produced the same documents that they now seek to claw back, and the volume of substantially similar documents Defendants have not clawed back, supports a finding of waiver." Defendants have only clawed back and withheld 96 documents, a number that includes duplicates of the same document. That statistic cannot support a finding of waiver. And, the fact that "similar" (*i.e.,* not the same) documents have been produced only shows that Defendants are making appropriate distinctions between legal and business communications related to the ROE.

Oracle also argues that Defendants have inconsistently treated comparable documents. Oracle's Motion at 7:22-8:8. First, the majority of clawed back documents are the type of privileged documents that require a close analysis of their content because the privileged nature

of the document is not readily apparent.  That is why they were "missed" in the initial document

production process.  Second, the fact that there are documents in Defendants' production that are

both "substantially similar" to the clawed back privileged documents and that have not been

clawed back, proves the first point—the clawed back documents look in many ways like non-

privileged documents except they contain attorney client communications.  Again, this is solid

evidence that Defendants are not "overusing" the AC privilege and are actually doing the tedious,

line by line, page-by-page, document-by-document privilege analysis in a good faith attempt to

slice the privilege calls as appropriately and consistently as possible.  That said, "since

Defendants' document review and production first began, a total of 78 lawyers have devoted a

substantial amount of their time for Defendants' document review and production in this case."

*See* July 7, 2008 Declaration of Scott W. Cowan at 6:26-28 (Dkt. 128).  Thus, while every

reasonable effort has been taken to ensure that there is consistency, in a document production of

this size, and given the number of lawyers required for document review in order to keep

discovery moving forward on the schedule established by the Court, there will necessarily be

some variation in the privilege determinations made by the lawyers who are making those calls on

a daily basis.

With the foregoing analysis as the backdrop, the following document-by-document

analysis of Contested Documents 4, 5, and 6 (Howard Decl., Exs. U, V and W) shows both that

they are all AC privileged and that they are not evidence of selective waiver by Defendants of that

privilege.

Contested Document # 4 (Howard Decl., Ex. U, which is Bates labeled TN-OR01157057

through TN-OR01157059):  The privileged nature of this document is established in Section

III.A, *supra.  See also* Greg Nelson Decl. at 2:7-24; Faye Decl. at 3:12-28, which support

Defendants' assertion of the AC privilege over Contested Document # 4.  It is notable that

Oracle's motion contains no discussion of why or how this document supports its claim of

selective waiver.  Thus, the purpose for Oracle's inclusion of the document must simply be to

support the "shield" portion of its implied waiver arguments.  And, Defendants agree that they are

using the AC privilege as a shield to prevent the disclosure of the privileged contents of

2   Contested Document # 4, which is a legitimate exercise of their legal rights.

3         <u>Contested Document # 5 (Howard Decl. Ex. V, which is Bates labeled TN-OR01058166</u>

4   <u>through TN- OR01058170)</u>:  Oracle does not contest the privileged nature of this document.

5   Nonetheless, through the Declarations of Greg Nelson and Chris Faye, Defendants have proved

6   that it is protected by the AC Privilege.  *See* Greg Nelson Decl. at 2:25-3:18, and Faye Decl. at

7   4:1-11.  Communications that relay information to the attorney in a chain from one employee to

8   another employee and then to the attorney are privileged.  *See, e.g, AT&T Corp. v. Microsoft*

9   *Corp.*, No. 02-0164 MHP (JL) 2003 U.S. Dist. LEXIS 8710 (N.D. Cal. Apr. 18, 2003)

10   ("Communications between non-lawyer employees about matters which the parties intend to seek

11   legal advice are likewise cloaked by attorney-client privilege.")  This document is a perfect

12   example of the type of document that would not, at first glance, seem privileged.  But, on a closer

13   look, the lawyer-reviewer will note that "Chris. F" referenced in the first line is Faye, a lawyer,

14   and then will fully understand that the purpose of the entire document is to seek legal advice

15   relating to an amendment to the ROE.  Then, the determination is clear that the entire document is

16   privileged.  Also, like Contested Document # 4, the purpose for Oracle's inclusion of Contested

17   Document # 5 must simply be to support the "shield" portion of its implied waiver arguments.

18   And, as with Contested Document # 4, Defendants agree that they are using the AC privilege as a

19   shield to prevent the disclosure of the privileged contents of Document # 5, which is a legitimate

20   exercise of their legal rights.

21         <u>Contested Document # 6 (Howard Decl., Ex. W, which is Bates labeled TN-OR00868717</u>

22   <u>through TN- OR00868719)</u>:  Oracle does not contest the privileged nature of the portions of this

23   document that have been clawed back, redacted and withheld under the AC privilege.

24   Nonetheless, through the Declarations of Shelley Nelson and Chris Faye, Defendants have proved

25   that the redacted portions are protected by the AC Privilege.[16]  Also, like Contested Documents

26   Nos. 4 and 5, the purpose for Oracle's inclusion of Contested Document # 6 must simply be to

---

27       [16]  *See* Declaration of Shelley Nelson in Support of Defendants' Response to Plaintiffs'
Motion to Compel Production of Clawed Back Documents ("S. Nelson Decl.") at 2:6-28; Faye
28   Decl. at 4:12-22.

support the "shield" portion of its implied waiver arguments.  And, as with Contested Documents Nos. 4 and 5, Defendants agree that they are using the AC privilege as a shield to prevent the disclosure of the privileged portions of Contested Documents # 6, which is a legitimate exercise of their legal rights.

### D.  Oracle's Review of Defendants' Privileged Documents is Highly Improper.

Oracle states that after receiving Defendants' clawback letters, "Oracle promptly took steps to destroy all copies **but one** of each document, **and sequestered the remaining copies**, in compliance with Fed. R. Civ. P. 26(b)(5)(B), with the Protective Order in this matter, and with the Court's instructions at the May 28, 2008 hearing where the procedure for this motion was initially discussed."  Oracle's Mot. at 7:17-21 (emphasis added).  Notably absent from the list of things it claims it was "in compliance with" is paragraph 3 of this Court's May 29, 2008 Order (Dkt. 95), which states unequivocally, "With respect to the inadvertently disclosed document referenced by the parties in the joint discovery statement, **Plaintiff shall return the document to Defendants**, but may refer to the document in the context of a motion to compel."  *Id.* (emphasis added).  There is nothing in this Court's May 29th Order, the hearing transcript of the May 28, 2008 Discovery Conference, or the Stipulated Protective Order (Dkt. 32) that permits Oracle to "retain" or "sequester" Defendants' privileged documents once they have been clawed back.

Paragraph 15 of the Stipulated Protective Order (Dkt 32 at 10:27-11:9) (emphasis added) states:

> The inadvertent production of any Discovery Material shall be without prejudice to any claim that such Discovery Material is privileged or protected from discovery as work-product or by reason of any other applicable privilege or immunity, including without limitation the attorney-client privilege, and **no Party or non-party shall be held to have waived any rights by such inadvertent production**.  If the claim of inadvertent production is made pursuant to this Paragraph with respect to information then in the custody of another Party or non-party, **such Party or non-party shall promptly return to the claiming Party or non-party that material as to which the claim of inadvertent production has been made and <u>all copies</u> thereof**, and the receiving Party or non-party shall not use such information for any purpose other than in connection with a motion to compel.  The Party or non-party returning such material may then move the Court for an order compelling production of the material.

At the May 28, 2008 hearing, the Court reiterated that the Parties need to "live by the Protective Order" which requires the return of clawed back documents. The relevant colloquy at that hearing was:

> p.42    THE COURT:
> 21    But I do think -- **I'm just going to make you**
> 22    **live by the protective order as I see it, which is that**
> 23    **it does require you to return the documents.** It does
> 24    say that you can use such information which is unclear.
> 25    That inclines me to a little more in camera than I might
> p. 43
> 1    otherwise be. Although in general, I agree. My
> 2    philosophy is there should be clawback is meant to be
> 3    clawback.
> 4    MR. HOWARD: The last thing in the world that
> 5    we want to do is run afoul of the Court's views on
> 6    privilege.
> 7    So to be clear, if we are petitioning the
> 8    Court for review of that document, **may we refer to the**
> 9    **contents of that document, <u>if we've given it back</u>**, as
> 10    part of making the case --
> 11    THE COURT: **Yes**.
> 12    MR. HOWARD: -- that it should not have been
> 13    withheld?
> 14    THE COURT: I'm going to let you do that on a
> 15    limited basis

May 28, 2008 Hearing Transcript at 42:21-43:15 (emphasis added).

As noted above, the Court confirmed these instructions in its May 29, 2008 Order. There is nothing in Rule 26(b)(5)(B) that overrides this Court's express instructions and permits Oracle to "retain one copy" of Defendants' clawed back documents in order to review, analyze, and quote from them for purposes of preparing its motion to compel. Oracle's own correspondence dated June 20, 2008 shows that Oracle understood that "all copies of [the clawed back] documents will be destroyed." Wallace Decl., Ex. 2. That same communication confirms that the only "copy" of clawed backed documents that the Parties have agreed can be retained for logistical and cost purposes (*i.e.,* to avoid the expense of creating new production disks) is "a single copy of each document [to] be kept on the original production CDs/DVDs, **which will be referred to for disaster recovery purposes only**." *Id.* (emphasis added).

Oracle asked for and received the Court's guidance that it could, consistent with the Stipulated Protective Order, refer to the information and contents of the clawed back documents

for purposes of filing a motion to compel. However, Oracle never asked for nor received this Court's permission or Defendants' agreement to keep a copy of Defendants' clawed back documents in order to continue to review and analyze them for the purposes of Oracle's motion. Exhibit A to the Howard Declaration makes clear that Oracle kept an additional copy to conduct a detailed review and analysis of at least 49 of Defendants' clawed back documents. That action violated this Courts' orders, the Parties' agreements, and common sense. While Defendants do not seek an Order from this Court sanctioning Oracle or its counsel, they do request that this Court make clear to Oracle that it should immediately return or destroy all copies of Defendants' clawed back documents and refrain from ever again reviewing or analyzing those documents.

**E.     Both Parties Agree that the Court's Guidance Will Assist the Process.**

Discovery in this case has been, and will continue to be, an extremely complex process requiring daily diligence by all Parties and their counsel. To the extent possible, Defendants have cooperated and will continue to cooperate with Oracle in making the discovery process as efficient as possible. The privilege determination process in a case of this size necessarily involves a certain degree of variance—simply by virtue of the fact that, without severely bottlenecking the process, no one single lawyer (or even a small group of lawyers) can make every privilege call on every document in this case. Defendants are respectful of the Court's time in reviewing and deciding this motion and welcome this Court's opinions and guidance as to where the Court believes that the Parties should be drawing the lines as they continue to make daily privilege determinations as part of their respective rolling document productions in this case.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court deny all relief sought by Oracle's motion to compel and enter an order which finds and orders that:

1.     Contested Documents Nos. 2, 3 and 4 contain privileged attorney-client communications thereby entitling Defendants to withhold the privileged portions of those documents on that basis.

2. Defendants have not implicitly or selectively waived the attorney-client privilege relating to Defendants' in-house counsel's creation and interpretation of the Rules of Engagement, and thus have properly withheld the privileged portions of Contested Documents 4, 5 and 6.

3. In the future, no party may access, review or analyze any clawed back document for any purpose in this case unless and until this Court, through the appropriate motion process, finds that the clawed back document is not privileged. Any clawed back document still in any party's possession (other than one copy contained on the original production CDs/DVDs, which shall be held and used for disaster recovery purposes only) shall be immediately returned to the producing party or destroyed.

A proposed order granting the requested relief is lodged herewith. Alternatively, in the event that this Court determines that all or any portion of Oracle's motion has merit and orders the production of all or any portion of any documents Defendants are currently withholding under a claim of privilege, then Defendants respectfully request that this Court make provisions in any such order for a stay of the obligations under that order pending all deadlines for Defendants to object to this Court's order and the District Court to either review or decline to review those objections.

Dated: August 13, 2008

Respectfully submitted,

JONES DAY

By: */s/ Scott W. Cowan*
Scott W. Cowan

Counsel for Defendants
SAP AG, SAP AMERICA, INC., and
TOMORROWNOW, INC.