PAGES 1 - 76

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ELIZABETH D. LAPORTE, MAGISTRATE JUDGE

ORACLE CORPORATION, ET AL.,          )
                                     )
                                     )
            PLAINTIFFS,              )
                                     )
    VS.                              )  NO. C07-1658 PJH (EDL)
                                     )
SAP AG, ET AL.,                      )
                                     )  SAN FRANCISCO, CALIFORNIA
                                     )
            DEFENDANTS.              )  THURSDAY
                                     )  AUGUST 28, 2008
_____)  9:00 O'CLOCK A.M.

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**FOR PLAINTIFFS:**

BINGHAM MCCUTCHEN LLP
THREE EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA  94111-4067
BY:  GEOFFREY M. HOWARD, ESQUIRE AND
     DONN PICKETT, ESQUIRE AND
     HOLLY HOUSE, ATTORNEY AT LAW
262-9212

AND

JENNIFER GLOSS, SENIOR CORPORATE COUNSEL
ORACLE
500 ORACLE PARKWAY
REDWOOD SHORES, CALIFORNIA 940656
650-506-7114

FURTHER APPEARANCES ON NEXT PAGE

**REPORTED BY:**        *KATHERINE WYATT, CSR #9866, RMR*
                    *OFFICIAL REPORTER - U.S. DISTRICT COURT*

KATHERINE WYATT, OFFICIAL REPORTER, CSR, RMR (415) 487-9834

FURTHER APPEARANCES:

FOR DEFENDANTS:

JONES DAY
555 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CALIFORNIA  94104-1500
BY:  JASON MCDONELL, ESQUIRE AND

     ELAINE WALLACE, ATTORNEY AT LAW

AND

JONES DAY
717 TEXAS
SUITE 3300
HOUSTON, TEXAS 77002-2712
BY:  SCOTT W. COWAN, ESQUIRE

AND

JONES DAY
1755 EMBARCADERO ROAD
PALO ALTO, CALIFORNIA 94303

BY:  JANE FROYD, ATTORNEY AT LAW

**P R O C E E D I N G S**

**AUGUST 28, 2008,**                    **9:00 O'CLOCK AM**

      **THE CLERK:** CALLING CIVIL O7-1658, ORACLE CORPORATION VERSUS SAP AG, ET AL.

      COUNSEL PLEASE STATE YOUR APPEARANCES FOR THE RECORD.

      **MR. HOWARD:** GOOD MORNING, YOUR HONOR. GEOFF HOWARD FOR ORACLE. WITH ME JENNIFER GLOSS FROM ORACLE, AND MY PARTNERS HOLLY HOUSE AND DONN PICKETT.

      **THE COURT:** GOOD MORNING.

      **MR. MCDONELL:** GOOD MORNING, YOUR HONOR. JASON MCDONELL FROM JONES DAY FOR DEFENDANTS. ALSO HERE FROM JONES DAY IS SCOTT COWAN, ELAINE WALLACE AND JANE FROYD.

      AND FROM THE SAP LEGAL DEPARTMENT ARE KEVIN HAMEL AND JOHN HICKEY, BOTH OF WHOM HAVE BEEN HERE BEFORE.

      **THE COURT:** ALL RIGHT. GOOD MORNING.

      ALL RIGHT. SO LET'S GO THROUGH THE UPDATE, AND THEN WE WILL ALSO ADDRESS THE MOTION ON THE CLAWED BACK.

      SO WHERE ARE THINGS ON SAMPLING AND EXTRAPOLATION?

      **MR. HOWARD:** THANK YOU, YOUR HONOR. WE HAVE HAD EXTENSIVE DISCUSSIONS, AS REPORTED. THERE IS, I WOULD SAY, BAD NEWS AND GOOD NEWS. THE BAD NEWS IS THAT IN THE EFFORT TO FIND A STATISTICALLY-VALID METHODOLOGY TO SAMPLE THE VAST AMOUNT OF DATA, WE, AT LEAST, CAME TO THE CONCLUSION -- AND I'LL LET MR. COWAN SPEAK FOR HIMSELF, BUT I THINK HE MAY AGREE -- THAT JUST

1    THAT, JUST A STATISTICALLY-VALID SAMPLE AND TO FIND THE FACTS

2    FROM THAT SAMPLE THAT ARE RELEVANT AND THAT WE WOULD WANT TO GET

3    WOULD EFFECTIVELY CONSUME ALL OR MORE OF THE DISCOVERY LIMITS

4    THAT YOUR HONOR HAS SET JUST IN THAT PART OF THE CASE.

5              **THE COURT:**  NOW, WHICH LIMITS WE TALKING ABOUT?

6              **MR. HOWARD:**  WE'RE TALKING ABOUT CUSTODIANS AND

7    HOURS, POTENTIALLY.

8              **THE COURT:**  DID I SET AN HOUR LIMIT?  YOU MEAN THE

9    HOURS IN DEPOSITIONS?

10             **MR. HOWARD:**  JUDGE HAMILTON SET AN HOUR LIMIT FOR

11   DEPOSITIONS.

12             **THE COURT:**  RIGHT.

13             **MR. HOWARD:**  NOBODY WANTS TO GO DOWN THAT ROAD

14   BECAUSE THERE OTHER AREAS OF THE CASE. AND WE'VE BEEN TRYING

15   HARD TO FIND A WORKAROUND FOR THAT. BUT ONCE YOU STEP BACK FROM

16   WHAT WOULD OTHERWISE BE A QUOTE/UNQUOTE "STATISTICALLY-VALID

17   METHODOLOGY," IT DOES CREATE SOME OTHER ISSUES.

18             SO THE DISCUSSIONS OF LATE HAVE FOCUSED ON STILL

19   IDENTIFYING A SET OF FIXES THAT WE'RE GOING TO -- AND DIVIDE

20   THEM UP INTO THE PROPER POPULATIONS, BECAUSE THEY DIFFER BY WHAT

21   RELEASE OF SOFTWARE IT IS; WHAT TIME PERIOD THE FIX WAS BEING

22   DEVELOPED IN, POTENTIALLY.

23             AND THOSE ARE POTENTIAL FILTERS.  AND THEN, TO TAKE

24   TESTIMONY THAT APPLIES TO THE PROCESS BY WHICH THOSE FIXES WERE

25   DEVELOPED AND AGREE THAT THAT TESTIMONY IS GENERALLY APPLICABLE

TO THAT ENTIRE POPULATION OF FIXES.

        **THE COURT:** SO THAT GOES TO THE KIND OF QUALITATIVE SIDE OF THINGS, BUT NOT THE QUANTIFICATION OF IT.

        **MR. HOWARD:** CORRECT. BUT THE QUALITATIVE SIDE OF IT, AT LEAST IN OUR VIEW, IS AMONG THE MOST IMPORTANT BECAUSE IT GETS TO TWO -- THE TWO MOST IMPORTANT ISSUES ARE: HOW MANY ENVIRONMENTS -- HOW MANY COPIES OF ENVIRONMENTS WERE USED IN THE PROCESS OF CREATING A PARTICULAR FIX. AND THERE ISN'T NECESSARILY A DOCUMENT WHICH TELLS YOU THAT. YOU NEED SOMEBODY TO SAY:

        "THIS IS HOW WE DID IT FOR THAT FIX."

        AND THEN, THE SECOND ONE IS WHAT THEY DID WITH THOSE ENVIRONMENTS. THEY TOOK OBJECTS, AND THEY MODIFIED THEM OR WROTE THEM FRESH, AND TO KNOW THAT THAT WAS DONE WITH THESE OBJECTS IN THE PROCESS OF CREATING THAT FIX.

        WE CAN COUNT THE OBJECTS. WE CAN COUNT SORT OF THE ENVIRONMENTS THAT ARE ON THE SYSTEMS NOW, BUT IT'S HARD TO CONNECT THOSE DOTS WITHOUT THAT MISSING PROCESS TESTIMONY PIECE.

        AND THAT'S WHAT WOULD REQUIRE IF YOU HAD EVEN JUST A SAMPLE OF THE POPULATION. YOU WOULD HAVE TO KIND OF DRILL DOWN WITH WITNESSES, POTENTIALLY, TO SAY:

        "THIS IS HOW IT WAS DONE WITH EACH OF THOSE FIXES; WITH EACH OF THOSE OBJECTS WITHIN THOSE FIXES."

        JUST WITHIN THAT SIMPLE IT'S A HUGE AMOUNT OF

1  TESTIMONY.  IT'S A HUGE NUMBER OF DEPOSITIONS, AND IT'S A HUGE

2  NUMBER OF WITNESSES, POTENTIALLY.

3        **THE COURT:**  SO WHAT ARE YOU SAYING?  THAT THE - YOU

4  WOULD BE WILLING TO LIVE WITHOUT A STATISTICALLY-VALID METHOD OF

5  QUANTIFYING IT BECAUSE THAT WOULD JUST CONSUME TOO MANY

6  RESOURCES?  BUT DO YOU THINK YOU CAN WITHIN THE LIMITS THAT ARE

7  HERE ALLOCATE A REASONABLE AMOUNT TO ACHIEVE THAT QUALITATIVE

8  ANALYSIS?

9        **MR. HOWARD:**  THAT'S WHAT WE'RE STILL IN THE PROCESS

10  OF DETERMINING.  AND WHEN I REFERRED TO SOME WRINKLES THAT HAVE

11  ARISEN OUT OF THESE DISCUSSIONS, ONE OF THEM IS WE HAVE SAID

12  FROM THE BEGINNING THAT WE TO NOT REQUIRE -- WE DON'T THINK IT'S

13  NECESSARY TO HAVE A STATISTICALLY-VALID SAMPLE.  AND WE'RE

14  PARTICULARLY CONVINCED OF THAT NOW THAT WE'VE SEEN WHAT THAT

15  WOULD ENTAIL.

16        BUT THERE ARE SOME SIGNIFICANT HURDLES BETWEEN THE

17  PARTIES IF WE WERE TO AGREE ON THIS ALTERNATIVE METHODOLOGY.

18        ONE OF THEM IS -- AND, YOU KNOW, THERE HAVE BEEN

19  GOOD, CANDID DISCUSSIONS ABOUT THIS -- BUT ONE OF THEM IS IF WE

20  ARE TO TAKE THIS TESTIMONY AND DEVELOP THESE FACTS AND APPLY

21  THEM TO THIS POPULATION, THE DEFENDANTS WOULD LIKE THAT -- ARE

22  OPEN TO THAT BEING APPLICABLE TO LIABILITY, BUT THEY ARE MORE

23  RESISTANT, I WOULD SAY, TO HAVING IT APPLY TO DAMAGES.

24        ON OUR SIDE IT'S AN ISSUE FOR US, FIRST OF ALL, NOT

25  KNOWING HOW THAT'S GOING TO COME OUT, BUT WE CAN'T FORECLOSE

1    OURSELVES FROM HAVING FACTS THAT WE DEVELOP IN DISCOVERY -- AND

2    THESE ARE JUST FACTS THAT WE'RE DEVELOPING IN DISCOVERY IN A

3    PARTICULAR WAY -- NOT AVAILABLE TO US FOR A DAMAGES ANALYSIS.

4         SO WHAT WE'RE TRYING TO DO IS AVOID COMING BACK TO

5    YOU OR TO JUDGE HAMILTON TO SAY EVEN FOR THE SAMPLING TECHNIQUE,

6    WHICH WE'RE ONLY TALKING ABOUT BECAUSE OF THE DISCOVERY LIMITS

7    THAT WE HAVE PUT INTO PLACE, THAT EVEN FOR THAT WE NEED MORE

8    DISCOVERY. WE DON'T WANT TO DO THAT.

9         ON THE OTHER HAND, WE MAY GET TO A POINT WHERE WE'VE

10   AGREED ON A METHODOLOGY, BUT WE CAN ONLY GET IT SO FAR AS

11   BETWEEN LIABILITY AND DAMAGES. AND WE MAY BE AT A POINT WHERE WE

12   WOULD NEED SOME FURTHER GUIDANCE FROM THE COURT IN ORDER TO

13   SOLVE THAT PROBLEM.

14        **THE COURT:**  BECAUSE DAMAGES, ESSENTIALLY, EVEN IF YOU

15   JUST GO WITH THE STATUTORY NUMBERS, YOU KNOW, NUMBER OF

16   INCIDENTS TIMES THE STATUTORY PENALTY, YOU NEED THE NUMBER.

17        **MR. HOWARD:**  YOU NEED A NUMBER.

18        **THE COURT:**  RIGHT.

19        **MR. HOWARD:**  AND THAT'S ONE OF THE POINTS OF THE

20   EXERCISE. BUT IT MAY -- IT MAY BE THIS QUANTIFICATION OR SORT OF

21   UNDERSTANDING REALLY WHAT HAPPENED ACROSS THE POPULATION OF

22   MATERIAL THAT WAS SENT TO CUSTOMERS COULD BE RELEVANT IN A

23   NUMBER OF DIFFERENT WAYS TO DAMAGES.

24        THAT'S SOMETHING THAT WE'RE ONLY IN THE BEGINNING

25   STAGES OF STARTING TO THINK ABOUT AS WE UNDERSTAND WHAT HAPPENED

1   AND HOW IT MIGHT ADD UP AS WE GO THROUGH THIS PROCESS.

2           **THE COURT:**  OKAY.

3           **MR. COWAN:**  YOUR HONOR, THERE'S A NUMBER OF THINGS

4   THAT MR. HOWARD SAID THAT I AGREE WITH, A NUMBER THAT I TAKE

5   ISSUE WITH.

6           BUT I THINK TO CUT TO THE CHASE IN TERMS OF WHAT I

7   THINK YOUR INQUIRY IS, GENERALLY SPEAKING, THE CONCEPT OF TAKING

8   EXISTING TESTIMONY AND HAVING THEM IDENTIFY THAT TESTIMONY AND

9   HAVING THEM TELL US HOW THEY WOULD LIKE TO APPLY THAT TESTIMONY

10  THAT MAY BE RELATED TO SPECIFIC PRODUCT IN A SPECIFIC VERSION

11  ACROSS MULTIPLE PRODUCTS AND MULTIPLE VERSIONS, WE'RE FINE WITH

12  THAT CONCEPT AS LONG AS WE KNOW WHAT THAT IS AND CAN GO BACK TO

13  THE WITNESSES AND SAY:

14              "IF YOU WERE TO GO THROUGH THE PROCESS OF

15              GETTING A DEPOSITION ON THESE OTHER PRODUCTS, WOULD

16              YOUR ANSWER BE THE SAME?"

17          AND IF IT IS, WE DON'T WANT TO GO THROUGH THAT

18  EXPENSE, AND THEY DON'T, AND CERTAINLY THE COURT WOULDN'T WANT

19  US TO DO THAT.

20          SAME WOULD HOLD TRUE ON OTHER TYPES OF QUALITATIVE

21  ISSUES WITH RESPECT TO THAT. SO TO THE EXTENT ON THOSE ISSUES

22  THAT MR. HOWARD RAISED I TEND TO AGREE THAT WE SHOULD BE ABLE

23  TO, HOPEFULLY AGAIN, TO GET TO SOME AGREEMENT ON THAT.

24          THE BIGGER STUMBLING BLOCK FOR US REMAINS -- AND I

25  AGREE WITH MR. HOWARD'S CHARACTERIZATION THAT THERE HAVE BEEN

1   VERY CANDID, OPEN DISCUSSIONS ABOUT THIS -- IS ULTIMATELY HOW

2   ARE THOSE, WHETHER THEY ARE EXTRAPOLATED FACTS OR STIPULATED

3   FACTS, HOW ARE THEY GOING TO BE USED AND WHAT ARE THE

4   IMPLICATIONS, BOTH IN TERMS OF LIABILITY AND DAMAGES.

5           WE HAVE EXPLAINED THAT AT SOME POINT, YOU KNOW,

6   LIABILITY IS LIABILITY NO MATTER HOW MANY INSTANCES OF EVIDENCE

7   YOU HAVE TO PROVE OR DISAPPROVE A SPECIFIC POINT.  SO THE

8   QUANTITATIVE ISSUES ASSOCIATED WITH LIABILITY WITHOUT DAMAGE

9   CONSIDERATIONS MAY NOT BE AS CRITICAL OF AN ISSUE.

10          BUT TO THE EXTENT THAT THEY ARE FOCUSED ON DAMAGES

11  ONLY OR THOSE ASPECTS OF LIABILITY THAT ARE KIND OF A MERGER OF

12  LIABILITY AND DAMAGE ANALYSIS, THAT'S WHERE WE TEND TO GET MUCH

13  MORE CRITICAL IN TERMS OF NEEDING TO UNDERSTAND THE METHODOLOGY

14  AND NEEDING TO UNDERSTAND THE IMPLICATIONS OF ANYTHING WE WOULD

15  AGREE TO TO SHORT CIRCUIT THE PROCESS.

16          SO THE ONE ISSUE THAT I THINK IS IMPORTANT TO TAKE

17  ISSUE WITH, WE HAVEN'T THROWN OUT THE POSSIBILITY OF SOME

18  STATISTICALLY-VALID SAMPLING. I AGREE WITH MR. HOWARD IF YOU TRY

19  TO DO THAT FROM A TESTIMONY-BASED STANDPOINT AND TAKE SOME

20  TESTIMONY AND EXTRAPOLATE THAT IN SOME STATISTICALLY-VALID WAY,

21  THE COMPLEXITIES GET UNWORKABLE, I THINK.

22          BUT ON THE NUMERIC SIDE, THINGS THAT CAN BE

23  QUANTIFIED, WE'RE NOT RULING THAT OUT.  SO OUR POSITION REMAINS

24  THAT AS LONG AS WE GET A REASONABLY ACCURATE DEPICTION OF WHAT

25  REALITY IS -- AND WE RECALL THE DISCUSSION FROM THE PREVIOUS

1    HEARING THAT MAY NOT BE KNOWABLE BY EITHER SIDE.  BUT TO THE

2    EXTENT WE HAVE A COMFORT LEVEL THAT IS A METHODOLOGY THAT GETS

3    US TO WHERE WE THINK WE'RE REPRESENTING REALITY, WE'RE OKAY WITH

4    THAT, EVEN IF THAT INVOLVES SOMETHING OTHER THAN A

5    STATISTICALLY-VALID METHOD.

6            BUT IT'S THAT ASSURANCE THAT WE'RE NOT CREATING A NEW

7    REALITY IS WHAT WE'RE CONCERNED ABOUT.

8            THE OTHER COMPONENT OF THAT IS WHATEVER WE DO IN A

9    SHORTHAND WAY WE WANT TO BE ABLE TO HAVE A CORRESPONDING -- IN

10   HELPING THEM ESTABLISH FACTS -- A CORRESPONDING WAY TO DEAL WITH

11   THAT ON THE DEFENSE'S SIDE.

12           **THE COURT:**  IT'S GOT TO BE SYMMETRICAL.

13           **MR. COWAN:**  EXACTLY.  SO IT REALLY COMES BACK TO IN

14   OUR ISSUE WHERE WE'RE LIKELY, IF WE'RE NOT GOING TO REACH AN

15   AGREEMENT AND BRING THINGS TO YOU, IT'S GOING TO BE TRYING TO

16   UNDERSTAND HOW THIS SUMMARIZED EVIDENCE, IF YOU WILL, OR

17   SUMMARIZED FACTS ARE GOING TO BE USED AND WHAT THOSE

18   IMPLICATIONS ARE.

19           WE ARE WORKING IN EARNEST TO DO THAT.  WE'VE HAD --

20   THE PAST TWO MEET AND CONFERS WE'VE HAD ON THIS WE'VE HAD THE

21   EXPERTS INVOLVED.  AND I THINK -- AND I'M HOPEFUL MR. HOWARD

22   WOULD AGREE -- HAVE BEEN EXTREMELY PRODUCTIVE.  AND WE'RE

23   CONTINUING, BECAUSE IT'S IN BOTH PARTIES' BEST INTEREST TO DO

24   THAT.

25           **THE COURT:**  YEAH.  I MEAN, I THINK JUDGE HAMILTON,

1    YOU KNOW, IS GOING TO BE VERY MUCH IN FAVOR OF LIMITS. I FEEL

2    THAT, YOU KNOW, THE NEED FOR THAT KIND OF OUTWEIGHS EVERYTHING

3    ELSE.

4         I MEAN, YOU KNOW, I DON'T THINK -- I MEAN, THE

5    STANDARD, DEPENDING ON WHAT IT IS YOU'RE TRYING TO PROVE, IS NOT

6    NECESSARILY STATISTICAL VALIDLY.  YOU KNOW, IT'S NONSPECULATIVE.

7    IT'S MORE PROBABLE THAN NOT. SO THERE ARE A LOT OF WAYS TO DO

8    IT.

9         SO AS LONG AS IT PASSES THAT TEST, THAT'S GOOD

10   ENOUGH, I THINK.

11        **MR. COWAN:**  AND, AGAIN, IT DEPENDS.   AND WHERE WE --

12   WHERE WE DEPARTED FROM THE LAST DISCUSSIONS WE HAD AT THE

13   HEARING, WHICH I THINK HELPED TREMENDOUSLY, WE GOT OUT OF THE

14   THEORETICAL REALM AND INTO THE ACTUAL REALM.

15        WE HAD SOME WEBEX SESSIONS WHERE WE'RE POINTING TO

16   DOCUMENTS WE'VE PRODUCED, POINTING TO THE SAP'S DATABASE,

17   POINTING TO FIXES THAT HAVE BEEN DELIVERED AND SAYING:

18             "WHICH FACTUAL ATTRIBUTES OF THESE THINGS CAN

19             WE SUMMARIZE IN A MEANINGFUL WAY?"

20        SO ONCE YOU GET INTO THAT LEVEL OF DETAIL, I THINK

21   THE ANSWER IS:  IT DEPENDS.  AND IN SOME INSTANCES I WOULD AGREE

22   WITH YOUR STATEMENT.

23        IN SOME INSTANCES IT REALLY DEPENDS ON HOW IT'S GOING

24   TO BE USED AS TO WHAT COMFORT LEVEL WE WOULD HAVE NOT ONLY IN

25   AGREEING TO IT, BUT WHAT WE BELIEVE WOULD BE ACCEPTABLE UNDER

1   THE LAW.

2           **THE COURT:**  UM-HUM.

3           **MR. HOWARD:**  I WOULD SAY TWO THINGS, YOUR HONOR.  THE

4   FIRST IS AS TO HOW IT WOULD BE USED. YOU KNOW, I DON'T THINK

5   THAT -- THE EXERCISE SHOULD NOT REQUIRE US IN THE COURSE OF

6   GETTING WHAT IS CONCEDEDLY RELEVANT IMPORTANT DISCOVERY ON A

7   LIMITED BASIS, GIVEN WHAT'S OUT THERE, TO GIVE A PROOF CHART OR

8   A CLOSING ARGUMENT OR IDENTIFY, YOU KNOW, HOW THOSE FACTS GET

9   USED AT TRIAL.

10          THAT'S NOT SOMETHING THAT WE SHOULD BE ENGAGED IN

11  WHEN WE'RE JUST IN THE FACT-GATHERING, FACT-TOTALLING STAGE.

12          AND IT WOULD BE -- IT WOULD BE A SERIOUS PROBLEM IF

13  WE WERE TO AGREE TO A PROCESS FOR GETTING FACTS FOR THE SAKE OF

14  EFFICIENCY AND DOING IT IN A WAY THAT WASN'T SPECULATIVE, BUT

15  WHERE THERE WAS STILL SUMMARIES AND GENERALLY-APPLICABLE

16  PRINCIPLES, AND THEN NOT BE ABLE TO USE THOSE FACTS, YOU KNOW,

17  FOR SOME REASON, OR IN SOME MANNER OR FOR SOME PURPOSE AT TRIAL,

18  INCLUDING FOR DAMAGES.

19          WHAT WOULD WE HAVE ACCOMPLISHED THEN?  I MEAN, WE DO

20  NEED TO BE ABLE TO USE THE FACTS THAT WE GATHER AS WE GO THROUGH

21  DISCOVERY. AND IF STATISTICAL VALIDITY IS THE STUMBLING BLOCK TO

22  THAT, THEN I GUESS WE WILL NEED TO DO IT IN A

23  STATISTICALLY-VALID WAY, AND WHATEVER OTHER WAY THE COURT, YOU

24  KNOW, HELPS US GET TO WHERE THOSE FACTS, LIKE ANY OTHER FACTS

25  THAT YOU GET IN DISCOVERY, ARE AVAILABLE FOR USE.

1    **THE COURT:** WELL, I GUESS -- I MEAN, AS THIS IS

2 COMING TO ME IT'S TOO ABSTRACT WHAT YOUR DIFFERENCES ARE FOR ME

3 TO REALLY GIVE ANY GUIDANCE, I THINK.

4    I MEAN, I DON'T KNOW WHAT I COULD SAY. I MEAN, YOU

5 COULD -- YOU KNOW, AT SOME POINT IF WE HAVE TO HAVE YOU BRING IN

6 YOUR EXPERTS AND TALK TO ME, YOU COULD.

7    AT SOME POINT MAYBE I WOULD HAVE TO THINK ABOUT

8 GETTING MY OWN EXPERT, WHICH IS NOT SOMETHING I WOULD LIKE TO

9 DO, AT YOUR EXPENSE. BUT I'D RATHER AVOID THAT.

10    BUT -- SO I DON'T KNOW WHAT I CAN SAY OTHER THAN I

11 THINK IT'S IMPORTANT AND ESSENTIAL.  AND THERE'S BOTH THE ISSUE

12 OF THE LIMITS THAT HAVE TO BE IMPOSED THAT HAVE ALREADY BEEN

13 IMPOSED BY JUDGE HAMILTON.

14    AND THAT ALSO, YOU KNOW, POSSIBLY THERE COULD BE SOME

15 REASON TO TINKER AT THE EDGES.  BUT IF THEY ARE TINKERED WITH IN

16 ANY SIGNIFICANT EFFECT, I MEAN, IT'S JUST NEVER GOING TO GO TO

17 TRIAL.  AND IT SHOULDN'T BE IN ORACLE'S INTEREST FOR THAT.

18    AND IF THE EXPENSES GET OUT OF HAND I'M ALSO GOING TO

19 HAVE TO THINK ABOUT AT WHAT POINT WHAT IT COSTS YOU, TOO. I'M

20 ALREADY APPALLED BY THE AMOUNT OF MONEY THIS IS ALL COSTING.

21 AND, YOU KNOW, SO THOSE ARE THINGS THAT ALL GO THROUGH MY MIND.

22    BUT, YOU KNOW, WHATEVER IS DECIDED HAS TO BE FAIR TO

23 BOTH SIDES. BUT I DON'T KNOW WHAT ELSE I CAN SAY THAN THAT ABOUT

24 THIS ISSUE.

25    **MR. HOWARD:**  I THINK THAT THERE ARE A COUPLE OF

1   THINGS THAT WILL HAPPEN IN THE NEXT WEEK OR SO THAT WILL, I

2   THINK, GET US VERY CLOSE. ONE IS WE'VE BEEN ON A PARALLEL TRACK

3   ENGAGED IN WHAT HAS BEEN CALLED THIS "DATA WAREHOUSE PROJECT,"

4   WHERE WE LOOK AT THEIR SERVERS AND IDENTIFY THINGS TO PRODUCE.

5           AND AS I UNDERSTAND IT, THAT DATA NEEDS TO BE

6   PRODUCED BECAUSE THAT'S THE UNDERLYING DATA THAT WE'RE USING FOR

7   THE BASIS FOR THE EXERCISE. AND AS I UNDERSTAND IT, THAT WILL AT

8   LEAST START TWO WEEKS FROM THE 25TH.  AND WE NEED TO GET THOSE

9   PRODUCTIONS DONE SO THAT OUR EXPERTS CAN SIT DOWN WITH THE

10  UNDERLYING DATA, NOW HAVING SEEN THEM REMOTELY, AND BE ABLE TO

11  COME UP WITH THE TOTALS IN THESE VARIOUS POPULATIONS.

12          THE SECOND IS THAT WE ARE, BETWEEN OURSELVES, I

13  THINK, MORE CONCRETE THAN WE ARE MAYBE RIGHT NOW WITH YOU.  BUT

14  WE'RE TALKING ABOUT SPECIFIC POPULATIONS, SPECIFIC TESTIMONY,

15  HOW WE WOULD DO THAT.

16          I THINK THAT WILL SOLVE THAT ONE WAY OR THE OTHER

17  VERY SHORTLY, AND THAT, YOU KNOW, THEN WE MAY NEED TO COME BACK.

18          **MR. COWAN:**  I AGREE, YOUR HONOR, BECAUSE I THINK THE

19  ISSUE YOU'RE STRUGGLING WITH IS THE SAME ISSUE THAT WE, AS

20  LAWYERS FOR THE PARTIES, AND THE PARTIES HAVE BEEN STRUGGLING

21  WITH AT THE THEORETICAL LEVEL.  AND YOU CANNOT RESOLVE THESE

22  ISSUES UNTIL YOU GET TO APPLY A SPECIFIC FACT AND HOW YOU'RE

23  GOING TO DO IT. AND WE'RE DOING THAT SO --

24          **THE COURT:**  OKAY. ALL RIGHT. SO I THINK THAT COVERS

25  THE FIRST TWO TOPICS, REALLY.

1                 DAMAGES, CAUSATION, AND DOES IT --

2        **MS. HOUSE:** THE DAMAGES CAUSATION PIECE IS THE SORT

3 OF FOLLOW-ON TO THE TWO LAST DISCOVERY CONFERENCES WHERE YOU

4 GAVE TWO ORDERS, SEQUENTIAL ORDERS ABOUT WHEN WE WERE TALKING

5 ABOUT OUR CONCERN ABOUT THE INEQUITY AND THE TYPE OF CAUSAL

6 EVIDENCE THAT WE'VE RECEIVED, AND THE FACT THAT WE STILL HADN'T

7 RECEIVED EVEN THE NAMES OF THE SAP CUSTOMERS, LET ALONE THEIR

8 UNDERLYING DATA.

9        **THE COURT:** SO YOU HAVE GOT SOME OF THAT NOW. WHERE

10 DOES THAT STAND?

11        **MS. HOUSE:** WE'VE GOTTEN AN INITIAL CHART, AND WE'RE

12 DUE SOMETHING ELSE, I THINK, TODAY. IT'S DEFINITELY A START.

13        WHAT WE DON'T HAVE AT THIS POINT, WE JUST LEARNED,

14 WAS THE SERVICE-RELATED REVENUES THAT WOULD BE FOLDED INTO THE

15 MONETARY VALUES.

16        WHAT APPEARS TO HAVE BEEN DONE BY THE DEFENDANTS IS

17 TO PROVIDE US WITH SORT OF THE APPLICATIONS CONTRACTS, WHICH

18 ARE, YOU KNOW, THE SALES OF THE PRODUCTS. BUT, OBVIOUSLY, A BIG

19 PART OF THE REVENUE STREAM ASSOCIATED WITH A CUSTOMER IS THE

20 ONGOING SERVICE REVENUES.

21        AND THAT, AS BEST I CAN UNDERSTAND FROM AN E-MAIL

22 THAT WE GOT YESTERDAY OR THE DAY BEFORE, IS NOT INCLUDED IN THE

23 MATERIAL. AND SO WE HAVE ASKED FOR THAT TO ALSO BE INCLUDED.

24 AND WE HAVE NOT YET RECEIVED A RESPONSE WHETHER THAT WILL OR

25 WILL NOT BE INCLUDED.

1    **MR. MCDONELL:**  OKAY, YOUR HONOR.  I WOULD LIKE TO

2    STEP BACK A LITTLE BIT.  SO THE ISSUE HERE -- BY THE WAY, JASON

3    MCDONELL -- IS:  WHAT DISCOVERY WILL THERE BE OF SAP CONTRACTS?

4         SO WE HAVE TOMORROWNOW, ON THE ONE HAND, THE SERVICE

5    ENTITY BASED IN TEXAS THAT WAS PROVIDING SERVICE AND ONLY

6    SERVICE TO FORMER ORACLE CUSTOMERS.  AND THEN SAP, THE SOFTWARE

7    COMPANY BASED IN GERMANY THAT HAD -- WAS A DIRECT COMPETITOR OF

8    ORACLE.

9         SO WE KNOW THAT ORACLE IS MAKING ISSUE OF THE

10   TOMORROWNOW CUSTOMERS, FOR WHICH TOMORROWNOW IS PROVIDING

11   SERVICE.

12        THEN, THE QUESTION BECAME:  TO WHAT EXTENT WOULD THEY

13   BE ALLOWED TO HAVE SOME DISCOVERY OF SAP CUSTOMERS?

14        **THE COURT:**  WHO ALLEGEDLY DERIVE FROM WHAT

15   TOMORROWNOW IS DOING.

16        **MR. MCDONELL:**  THAT IS ONE WAY OF CHARACTERIZING

17   THEIR ALLEGATION.

18        SO WE HAD ALWAYS TAKEN THE POSITION THAT WE WOULD NOT

19   BLOCK ALL THE DISCOVERY INTO SAP.  BUT THERE HAD TO BE THAT

20   NEXUS, THAT CONNECTION WITH TOMORROWNOW.

21        SO IN THE LAST TWO HEARINGS, AND GOING BACK TO THE

22   CONFERENCE STATEMENT WE FILED WAY BACK IN JUNE, WE WERE VERY

23   CLEAR THAT WHAT WE WERE WILLING TO DO, AS LONG AS IT WAS

24   REASONABLE AND BALANCED AND NARROW, IS WE'D ALLOW FOR DISCOVERY

25   OF SAP CUSTOMER TO THE EXTENT THAT THEY HAD ALSO BEEN A

1    TOMORROWNOW CUSTOMER.

2         IF THE CUSTOMER HAD NEVER BEEN A TOMORROWNOW

3    CUSTOMER, IT WAS OUT-OF-BOUNDS, CLEAR BRIGHT LINE.  AND THAT'S

4    WHAT WE'VE BEEN TALKING ABOUT IN THE LAST TWO HEARINGS.

5         **THE COURT:**  RIGHT.  AND I DIDN'T HEAR ANY

6    DISAGREEMENT ABOUT THAT RIGHT NOW.  I HEARD AS TO THE ONES THAT

7    WERE BOTH TOMORROWNOW, AND THEN SUBSEQUENTLY SAP, WHICH IS A

8    RELATIVELY LIMITED UNIVERSE WELL UNDER A HUNDRED, THAT THEY WANT

9    NOT JUST THE SALES OF APPLICATIONS, BUT THE ONGOING SUPPORT

10   FEES.

11        **MR. MCDONELL:**  AND THAT'S WHAT WE HAD UNDERSTOOD

12   THROUGH TWO HEARINGS AND MANY DISCUSSIONS WITH COUNSEL, AS WELL.

13   AND WE HAVE PRODUCED -- YOU KNOW, WE MADE A GOOD FAITH EFFORT TO

14   FIND THE CUSTOMERS THAT OVERLAPPED WITH TOMORROWNOW AND SAP.

15        YOUR HONOR ORDERED THAT WE PRODUCE THOSE CONTRACTS.

16   WE PRODUCED THEM IN A TIMELY FASHION, AND ANOTHER BATCH IS GOING

17   OUT TODAY.

18        YOUR HONOR SAID THAT -- ORDERED THAT WE USE OUR BEST

19   EFFORTS TO ASSIGN MONETARY VALUES TO THEM. WE THOUGHT THE

20   BEST -- AND THE CONCEPT THERE WAS:  WHAT'S THE GENERAL MAGNITUDE

21   OF THESE CUSTOMER RELATIONSHIPS?  ARE THEY BIG?  ARE THEY

22   LITTLE, CONSEQUENTIAL, INCONSEQUENTIAL?

23        SO WE THOUGHT THE BEST PROCESS FOR THAT IS WE JUST

24   PULL OUT THE BASIC ORIGINAL LICENSE FEE, AND THAT WOULD BE A

25   METRIC OF WHAT THE MAGNITUDE OF THE CUSTOMER RELATIONSHIP WAS.

1        THESE END UP BEING LONG SPREADSHEETS THAT WE PRODUCED

2  TO THEM, BECAUSE THESE ARE CONTRACTS THAT CAN HAVE MANY, MANY

3  APPENDICES AS ADDITIONAL LICENSES GET ADDED ON.  AND IT WAS A

4  BIG DEAL, AND WE WORKED HARD, AND WE'VE DONE IT.

5        SO ALL OF THAT IS PROGRESSING FINE.  IT IS OUR

6  POSITION THAT AMONG THOSE 61 CUSTOMERS, WE ARE GOING TO WHITTLE

7  IT DOWN TO NOTHING. IT'S GOING TO BE OUR GOAL AND ESTABLISH THAT

8  NONE OF THESE ARE THE SOURCE OF LIABILITY. BUT THAT IS WHAT THE

9  DISCOVERY IS GOING TO BE ALL ABOUT GOING FORWARD.  AND I'M SURE

10  THERE WILL BE A TUG OF WAR ABOUT ALL OF THAT.

11        I'M LAYING ALL THAT BACKGROUND BECAUSE WHAT'S

12  HAPPENED IN THE INTERIM, IS IT APPEARS THAT ORACLE IS NOW

13  SHIFTING THE UNIVERSE ALTOGETHER, BECAUSE RIGHT AFTER THE LAST

14  HEARING WHEN WE TALKED ABOUT ALL THESE THINGS THEY SERVED

15  DISCOVERY SAYING THEY WANT DISCOVERY OF ALL OF THE SO-CALLED

16  "SAFE PASSAGE CUSTOMERS" OF SAP.

17        AND I KNOW WE SIT HERE AND THROW TERMS AT YOU.

18        **THE COURT:**  I KNOW I'VE HEARD IT BEFORE, BUT I CAN'T

19  REMEMBER.

20        **MR. MCDONELL:**  SAFE PASSAGE IS A MARKING PROGRAM.  IT

21  IS A MARKETING PROGRAM UNDERTAKEN BY SAP TO TRY TO MARKET ITS

22  GOODS TO ORACLE CUSTOMERS.  TO TRY TO GET ORACLE CUSTOMERS TO

23  COME BUY SAP PRODUCTS. AND IT WAS -- YOU KNOW, IT WAS A

24  WORLDWIDE MARKETING PROGRAM.  AND --

25        **THE COURT:**  DIDN'T NECESSARILY INVOLVE TN.

1          **MR. MCDONELL:** IT DIDN'T NECESSARILY. NOW, TN WAS AN

2     OFFER THAT WENT ALONG WITH SAFE PASSAGE, SO THERE WOULD BE -- IT

3     WOULD BE POSSIBLE THAT A CUSTOMER WOULD TAKE A TOMORROWNOW

4     OFFERING.

5          BUT THE VAST, VAST MAJORITY OF THE SAFE PASSAGE

6     CUSTOMERS NEVER TOOK A TOMORROWNOW CONTRACT AT ALL. AND

7     DEPENDING ON WHAT LIST YOU LOOK AT AND HOW YOU DO THE MATH THERE

8     MAY HAVE BEEN 800 SAFE PASSAGE CUSTOMERS.

9          AND BASED ON WORK THAT WE HAVE DONE SO FAR WE THINK

10    THE GREAT, GREAT MAJORITY OF THOSE HAD NOTHING TO DO WITH

11    TOMORROWNOW. AND THAT IS WHY WE COME BACK TO THE PLACE WE'VE

12    STARTED, WHICH IS WE'RE NOT GOING INTO THAT ENORMOUSLY

13    BURDENSOME DISCOVERY INTO ALL OF THOSE CUSTOMERS. WE'RE DRAWING

14    THAT LINE AT CUSTOMERS WHO ACTUALLY HAD A TOMORROWNOW SERVICE

15    CONTRACT, AS WELL.

16          **THE COURT:** OKAY. WELL, WHAT IS SURPRISING ME IS --

17    I READ THIS STATEMENT CAREFULLY ON PAGES TWO TO THREE. THE ONLY

18    THING I SAW IN DISPUTE WAS THE ONGOING -- WHAT YOU JUST BROUGHT

19    UP, WHICH IS THE ONGOING SUPPORT MAINTENANCE FEES FROM THE 41, I

20    THOUGHT IT WAS, BUT MAYBE IT'S ALSO THE 20 NON-US -- THE 41 US

21    BASED AND THE 20 NON. SO IT'S BETWEEN 41 AND 61, THAT WERE BOTH

22    TOMORROWNOW AND SAP CUSTOMERS.

23          **MR. MCDONELL:** AND WE -- BUT THEY HAVE SERVED THIS ON

24    DISCOVERY. AND WE'VE JUST LAST NIGHT OBJECTED TO IT ON THIS

25    VERY GROUND THAT WE DRAW THAT LINE.

1    **THE COURT:** WELL, LET'S START WITH THE ONES THAT

2    YOU'RE NOT OBJECTING TO ON THAT GROUND.  THE 41 US BASED -- AND

3    I'M NOT TOO CLEAR ABOUT THE NON-US BASED, ARE YOU WILLING TO

4    PROVIDE THE ONGOING SUPPORT MAINTENANCE FEES FOR THOSE?

5    **MR. MCDONELL:** AS TO THOSE, WE BELIEVE IF THAT IS OUR

6    LIMITED UNIVERSE, AND IF WE'RE GOING TO GET MUTUALITY OF

7    DISCOVERY ON THAT POINT, SO IF WE'RE GOING TO GO INTO DISCOVERY

8    AS TO THOSE APPROXIMATELY 60 CUSTOMERS, THE ODDS ARE, YES, WE

9    WOULD PRODUCE, YOU KNOW, REVENUE INFORMATION ABOUT THAT.

10   **THE COURT:** IT SEEMS TO ME YOU SHOULD.

11   **MR. MCDONELL:** WITHOUT ANY ADMISSION ABOUT THE

12   RELEVANCE OR ADMISSION.

13   **THE COURT:** RIGHT.  YOU'RE GOING TO FIGHT ABOUT

14   WHETHER THEY REALLY WERE CONVERTED BECAUSE OF ANYTHING TO DO

15   WITH THE ALLEGED WRONGDOING IN THIS CASE OR NOT.  BUT AT LEAST

16   IT'S A NARROW UNIVERSE, AND IT IS BETTER TO FIGHT ABOUT THAT

17   LATER, I THINK, AND JUST PRODUCE THE MONEY NUMBERS.

18   **MR. MCDONELL:** BUT WE'RE GOING TO WANT TO GET ALL

19   THAT FINANCIAL INFORMATION FROM ORACLE FOR THOSE SAME CUSTOMERS.

20   **THE COURT:** THAT WOULD SEEM PROBABLY RIGHT, BECAUSE

21   YOU'RE TALKING ABOUT:  DID THEY GET CONVERTED, AND HOW MUCH

22   DAMAGE IT DID, AND SO FORTH.

23   **MR. MCDONELL:** BUT THAT SHOULD BE DONE -- SEE, WE

24   KIND OF GOT OFF ON A FUNNY TRACK HERE.

25   THAT DISCOVERY ABOUT THE REVENUE, IT SEEMS TO ME,

1    SHOULD BE PART OF NORMAL DISCOVERY. THEY NOW HAVE A DOCUMENT

2    REQUEST AND AN INTERROGATORY THAT GENERALLY GO TO THESE TYPES OF

3    ISSUES THAT HAVE JUST BEEN SERVED SINCE THE LAST HEARING.

4            THIS WHOLE OTHER BUSINESS ABOUT WHETHER WE WOULD

5    PROVIDE INFORMATION ABOUT THE MONETARY VALUE OF THESE CUSTOMERS

6    AT ALL WAS JUST DONE HERE WITH YOUR HONOR.

7            IT WASN'T A MOTION TO COMPEL ANY PARTICULAR DISCOVERY

8    OR ANYTHING LIKE THAT. IT'S SOMETHING YOUR HONOR WANTED US TO

9    DO, WE AGREED TO DO, ALL WITH A VIEW OF SEEING IF BY DOING THAT

10   WE COULD NARROW DOWN THE 61.

11           **THE COURT:**  RIGHT.  I MEAN, I THINK --

12           **MR. MCDONELL:**  IT'S GOT TO BE LESS THAN 61 IN THERE.

13           **THE COURT:**  I MEAN, I GUESS WHAT I'M TRYING TO DO IS

14   THERE NEEDS TO BE A DISCOVERY PLAN THAT RATHER THAN A PIECEMEAL

15   THING WHERE EACH SIDE JUST STARTS LOBBING IN ADDITIONAL

16   INTERROGATORIES AND DOCUMENT REQUESTS, AND SO ON, ON WHOLE NEW

17   SUBJECTS.  THAT'S NOT WHAT I HAD IN MIND.

18           I HAD IN MIND THAT WE'RE AGREEING ON A DISCOVERY

19   PLAN. I DON'T KNOW. I MEAN, I MIGHT WELL BE INCLINED TO SAY "NO"

20   TO A BROADER EVERYBODY-WHO-WAS-INVOLVED-IN-SAFE-PASSAGE.

21           I MAY NEED TO KNOW MORE ABOUT THAT.  MAYBE THAT'S NOT

22   CORRECT.

23           BUT I HAVE IN MIND THAT THIS -- AND I'VE MADE THIS

24   CLEAR OVER AND OVER -- THIS CASE IS TOO BIG TO CHASE DOWN EVERY

25   POSSIBLE THING.  AND IT WILL NEVER GO TO TRIAL IF THAT HAPPENS.

1      YOU HAVE TO FOCUS ON THE MOST EGREGIOUS AND THE

2  HIGHEST BUCKS PART OF IT. I MEAN, AND THAT IS IN EVERYBODY'S

3  INTEREST.  YOU KNOW, IT DOESN'T MAKE SENSE. I MEAN --

4      **MR. MCDONELL:** SO --

5      **THE COURT:**  SO IT SEEMS TO ME AT FIRST BLUSH THE

6  MOST -- THAT IT'S LITTLE UNLIKELY THAT MARKETING PEOPLE WHO WERE

7  SWITCHED THAT HAD NOTHING TO DO WITH TOMORROWNOW IS REALLY

8  RELEVANT TO THIS CASE. MAYBE I'M WRONG.

9      CERTAINLY AT THE HEART OF THE CASE WOULD BE THE ONES

10  WHO WERE SWITCHED.  AND THOSE ARE THE ONES THAT YOU I WANTED YOU

11  TO GET THAT INFO OUT ABOUT.

12      **MR. MCDONELL:** SO I THINK WHERE WE STAND RIGHT NOW IS

13  WE SERVED THESE OBJECTIONS LAST NIGHT.  WE'VE BEEN AS CLEAR AS

14  WE CAN BE ABOUT WHERE WE THINK THE LINE SHOULD BE DRAWN HERE.

15      I THINK WE HAVE A RESPONSIBILITY TO MEET WITH

16  COUNSEL, CONFER, SEE IF WE CAN'T GET THIS LINE DRAWN IN THE

17  RIGHT PLACE.  IF WE DON'T SETTLE ON IT, CONCEIVABLY THERE WILL

18  BE A MOTION EITHER TO COMPEL OR FOR PROTECTIVE ORDER.

19      BUT I WANTED TO ALERT YOUR HONOR TO THE ISSUE BECAUSE

20  IT DID SEEM LIKE THERE WAS -- THE EARTH WAS SHIFTING BENEATH OUR

21  FEET A LITTLE BIT ON THIS ISSUE WE SPENT A FAIR AMOUNT OF TIME

22  ON.

23      **THE COURT:**  AND ALSO JUST -- I MEAN, AS I MADE CLEAR,

24  TO THE EXTENT I CAN AVOID MOTION PRACTICE AND RESOLVE THINGS

25  MORE QUICKLY AND EXPEDITIOUSLY, THAT'S WHAT I WANT TO DO.

1          **MR. MCDONELL:**  I THINK YOUR GUIDANCE HAS BEEN VERY

2    HELPFUL HERE, YOUR HONOR.

3          **MS. HOUSE:**  IN FACT, THE WHOLE POINT OF THIS IS WE'RE

4    NOW INTO OUR THIRD DISCOVERY CONFERENCE THREE MONTHS LATER ON AN

5    INITIAL ORDER THAT YOU MADE ON A VERY BASIC REQUEST, WHICH IS:

6    GIVE US THE UNDERLYING DATA ON THE SAFE PASSAGE CUSTOMERS.  YOU

7    UNDERSTAND THE WHOLE POINT --

8          **THE COURT:**  THE SAFE PASSAGE CUSTOMERS WHO ARE ALSO

9    FROM TN.

10         **MS. HOUSE:**  EXACTLY.

11         **THE COURT:**  HE'S JUST SAID HE WILL DO THAT.

12         **MS. HOUSE:**  WELL, BUT HE HASN'T.  WE ARE TOO INTO IT.

13   WE DON'T -- WE SAY:

14              "IT MIGHT BE.  THE ODDS ARE."

15         YOU HAVE AN ORDER.

16         **THE COURT:**  NO.  I'M ORDERING THAT.  WELL, NOW, WE

17   DON'T NEED TO FIGHT. I VIEW THAT AS SAYING:

18              "YES, WE WILL." AND I'M ORDERING THAT.

19         **MR. MCDONELL:**  AND IT WILL BE MUTUAL.  THEY WILL

20   PROVIDE COMPARABLE REVENUE AND FINANCIAL INFORMATION FOR THOSE

21   SAME APPROXIMATELY 60 CUSTOMERS.

22         **THE COURT:**  SEEMS LIKE YOU SHOULD.  IS THERE ANY

23   REASON NOT?

24         **MS. HOUSE:**  IF THEY WERE AN ORACLE CUSTOMER AND THEY

25   FIT WITHIN, WE WILL LOOK. WE ACTUALLY HAVE PRODUCED THE CONTRACT

1    AND UNDERLYING DATA. WE'RE SO MUCH FARTHER AHEAD THAN WHAT THEY

2    HAVE DONE.

3            BUT WE WILL LOOK FOR IT.  IF THERE'S ANY IN THOSE 60,

4    WE WILL PRODUCE IT.

5            **MR. MCDONELL:**  BUT SHE'S NOT SAYING SHE WILL -- WE'VE

6    GIVEN HER A SPREADSHEET THAT LAYS OUT THE FINANCIALS.

7            **THE COURT:**  YEAH.  YOU NEED TO PRODUCE THE COMPARABLE

8    INFORMATION.  AND IF YOU'VE ALREADY DONE IT, IDENTIFY IT BY

9    BATES NUMBER.  IF YOU HAVEN'T DONE IT, PRODUCE A COMPARABLE.

10           I DON'T WANT TO BE HAVING SOME MOTION IN HERE WHERE I

11   HAVE TO COMPARE SPREADSHEETS.  BUT I EXPECT YOU TO IN GOOD FAITH

12   PRODUCE AN EQUAL, SIMILAR, VERY LIKE, EQUALLY USEFUL, EQUALLY

13   DETAILED INFORMATION ABOUT THAT SAME UNIVERSE OF 61 CUSTOMERS.

14           **MR. MCDONELL:**  THANK YOU, YOUR HONOR.  WE WILL DO

15   THAT.

16           **THE COURT:**  OKAY.

17           **MR. MCDONELL:**  OKAY.  THANK YOU.

18           **THE COURT:**  ALL RIGHT.  SO TARGETED SEARCHES, WHAT'S

19   HAPPENING WITH THAT?

20           **MS. HOUSE:**  AFTER LISTENING TO YOUR HONOR THE LAST

21   TIME WE HAVE ACTUALLY COME UP WITH AGREED-UPON LANGUAGE.  IT'S

22   CONTAINED IN THE CONFERENCE STATEMENT.

23           WE'VE ALSO AGREED THAT AS OF TOMORROW WE CAN SERVE,

24   BASED ON THESE NOW AGREED-UPON PROCEDURES, THE FIRST THREE

25   TARGETED SEARCHES.

1          THE REASON THAT THAT'S GOING TO BE RELEVANT TO YOU,

2   PERHAPS, IS THAT AT THIS POINT IN TIME THERE HASN'T BEEN THAT

3   EXCHANGE.  AND SOME OF THE UNDERLYING MATERIALS THAT THE

4   DEFENDANTS WANT TO TALK ABOUT IN TERMS OF MOTIONS TO COMPEL ARE

5   GOING TO BE THE SUBJECT OF TARGETED SEARCHES THAT HAVE YET TO BE

6   SERVED.

7          SO IN THE NOTION OF AS WE GET TO THEIR DISCUSSION OF

8   MOTIONS TO COMPEL, I JUST WANT YOU TO UNDERSTAND THAT ONE OF OUR

9   MAIN OBJECTIONS IS THAT IT SEEMS INCREDIBLY PREMATURE WHEN WE

10  HAVEN'T EVEN SERVED THE TARGETED SEARCHES ON EACH OTHER THAT ARE

11  RELEVANT TO THOSE MOTIONS.

12          **THE COURT:**  WELL, LET'S GET TO THAT WHEN WE GET TO

13  IT --

14          **MS. HOUSE:**  OKAY.

15          **THE COURT:**  -- BECAUSE I'M JUST MARCHING THROUGH THE

16  ORDER OF THIS.

17          **MS. HOUSE:**  OKAY.

18          **THE COURT:**  OKAY. DISCOVERY.

19          **MR. COWAN:**  YOUR HONOR, ONE THING ON THE TARGETED

20  SEARCHES, WE AGREE THAT WE HAVE AGREED.

21          AND THE ONLY THING WE WANTED TO NOTE IS THE TENSION

22  ON THAT IN THE LAST HEARING WAS WHETHER THE TARGETED SEARCHES

23  OUGHT TO SPECIFICALLY IDENTIFY THE UNDERLYING DOCUMENT REQUEST

24  TO WHICH THEY RELATED.

25          **THE COURT:**  AND I SAID NO.

1        **MR. COWAN:**  AND YOU IDENTIFIED THE LOGISTICAL

2    PROBLEMS ASSOCIATED THAT. WE HAVE GONE BACK AND RELENTED ON THAT

3    POINT.

4             WE STILL THINK THERE'S IMPORTANCE TO UNDERSTAND AT

5    SOME POINT IN THE PROCESS WHERE THOSE TWO ISSUES DOVETAIL.  BUT

6    WE AGREE FOR THE PURPOSES OF THE PROCEDURE IN THE TARGETED

7    SEARCH PROTOCOL THAT WE'RE NOT TYING THOSE IN THE FORM OF MAKING

8    THE REQUEST, BECAUSE I DIDN'T WANT TO STAND HERE AND SAY WE HAVE

9    AN AGREEMENT, AND HAVE THAT BE SOME OVERARCHING AGREEMENT THAT

10   THE UNDERLYING DOCUMENT REQUESTS ARE NOT IN ANY WAY RELEVANT TO

11   THE TARGETED SEARCHES. WE THINK THEY ARE.  BUT WE'VE AGREED TO

12   THE PROTOCOL UNDER WHICH WE'RE GOING TO DO THAT.

13            **THE COURT:**  ALL RIGHT. SO THEN WE GET TO DISCOVERY

14   TIME RANGES?

15            **MR. HOWARD:**  YES, YOUR HONOR.

16            I THINK SINCE THE LAST TIME WE'VE BEEN IN HERE WE

17   HAVE FILED THE SECOND-AMENDED COMPLAINT.  AND SO THERE ARE NEW

18   ALLEGATIONS IN THERE.  AND THOSE ALLEGATIONS HAVE DIFFERENT

19   IMPLICATIONS.  BUT ONE OF THEM IS THEY REACH BACK BEFORE WHAT

20   HAD BEEN THE PRELIMINARILY AGREED JANUARY, 2004, DISCOVERY

21   CUTOFF, WHICH WAS ALWAYS WITH A MUTUAL RESERVATION OF RIGHTS ON

22   THE TOMORROWNOW SIDE, BECAUSE THERE'S ACTIVITY GOING BACK TO THE

23   VERY BEGINNING OF THE WHAT WAS THE MODEL THAT SAP ENDED UP

24   BUYING.

25            AND IT GOES FORWARD IN TIME BECAUSE IT APPEARS, TWO

1  THINGS. THAT AFTER THE LITIGATION WAS FILED, TOMORROWNOW KEPT

2  DOING IT WITH SAP'S KNOWLEDGE.  AND THAT GOES TO WILLFULNESS AND

3  MANY OTHER IMPORTANT ELEMENTS OF OUR CASE.

4          AND SO WE'VE SAID THAT -- THE PARTIES HAVE SERVED

5  MUTUAL CATEGORIES OF INFORMATION THAT THEY WOULD WANT IN THE

6  PRE-2004 TIME FRAME AND IN THE POST-FILING-OF-LITIGATION TIME

7  FRAME.

8          AND WE'VE NOT YET MET AND CONFERRED ABOUT THOSE. WE

9  HAVE AGREED THAT THOSE SHOULD BE NARROWLY-TAILORED,

10  NARROWLY-FOCUSSED, AND THAT THEY SHOULD NOT BE A REDOING OF FULL

11  SCALE DISCOVERY THAT HAS ALREADY BEEN DONE.

12          AND I THINK THAT'S ABOUT AS FAR AS WE ARE RIGHT NOW.

13          **MR. COWAN:**  YOUR HONOR, I THINK THAT'S GENERALLY

14  ACCURATE.  THE ISSUE, AGAIN, STARTING BEFORE THE JANUARY 1, 2004

15  CUTOFF.  TO THE EXTENT WE GO EARLIER THAN THAT IS RELATED SOLELY

16  TO TOMORROWNOW, BECAUSE SAP DIDN'T PURCHASE TOMORROWNOW UNTIL

17  EARLY 2005.

18          AND WE ARE WILLING TO CONTINUE TO WORK WITH THEM TO

19  FIGURE OUT WHAT SEGMENTS OF THAT PRE-JANUARY 1, '04 TIME FRAME

20  RELATIVE TO TOMORROWNOW THAT WE WILL PRODUCE.  AND WE'RE MAKING

21  PROGRESS ON THAT.

22          POST-LITIGATION, POST-MARCH 22, 2007, WE, LIKEWISE,

23  ARE LOOKING AT WHAT MAKES SENSE TO PRODUCE.  AND SO I THINK

24  WE'RE MAKING PROGRESS ON THAT AND HOPEFULLY CAN COME UP WITH AN

25  AGREED PLAN ON THAT.

1          **THE COURT:** OKAY. ALL RIGHT. AND THEN, THE WHOLLY

2    IRRELEVANT WITHHELD DOCUMENTS. WE'RE TALKING -- THERE'S ABOUT A

3    HUNDRED THAT ARE AT ISSUE?

4          **MS. HOUSE:** LOOKING THROUGH THE NINE THOUSAND ON THE

5    LOG, THOSE ARE THE ONES THAT SEEMED THE MOST OBVIOUS TO US THAT

6    WOULD NOT BE WHOLLY IRRELEVANT. WE'VE BEEN PROMISED AN UPDATE.

7          **MR. COWAN:** YOU WERE PROVIDED IT.

8          **MS. HOUSE:** SORRY?

9          **MR. COWAN:** WE PROVIDED THE LOG --

10         **THE COURT:** OKAY.

11         **MR. COWAN:** -- IS MY UNDERSTANDING.

12         **THE COURT:** OKAY.

13         **MS. HOUSE:** AND THE DOCUMENTS?

14         **THE COURT:** DID YOU TAKE ANY OF THEM OFF OR ARE YOU

15   JUST --

16         **MR. COWAN:** YES, WHAT WE DID IS WE SENT THEM AN

17   E-MAIL SAYING WHILE THERE'S A HUNDRED THINGS THAT THEY HAVE

18   NOTED THAT ARE AT ISSUE, WE DON'T THINK THEY ARE AN ISSUE, BUT

19   IT'S NOT ENOUGH. WE'VE GOT OTHER THINGS TO FIGHT ABOUT. WE

20   WILL AMEND THE LOG.

21         AND TO MY -- AND I HOPE I'M NOT MISTAKEN. IF I AM I

22   WILL MAKE SURE THAT IT GETS DONE POSTHASTE. BUT I BELIEVE WE

23   PROVIDED THEM WITH AN AMENDED LOG ON THAT, SO I DON'T SEE --

24         **THE COURT:** THAT DOESN'T WITHHOLD AS MANY DOCUMENTS?

25         **MR. COWAN:** THAT GIVES THEM THE DOCUMENTS THAT WERE

1   WITHHELD AND REVISES --

2           **THE COURT:**  OKAY.

3           **MR. COWAN:**  -- OR PROVIDES ADDITIONAL DESCRIPTION --

4           **THE COURT:**  ALL RIGHT.

5           **MR. COWAN:**  -- AS APPROPRIATE.

6           **THE COURT:**  OKAY.  AND THEN, THE DEDESIGNATION ISSUE?

7           **MR. COWAN:**  YOUR HONOR, ON THAT POINT, THIS IS THE

8   27,000 DOCUMENTS THAT YOU ASKED US TO GO BACK AND HAVE A PROCESS

9   ON. WE HAVE GONE BACK AND HAVE A PROCESS ON THAT.

10          WE, ACCORDING TO THE ORDER, CAME BACK WITHIN THE TIME

11  LIMIT, WHICH I THINK THE FIRST REPORTING REQUIREMENT WAS ON

12  AUGUST 1ST. WE PROVIDED THEM WITH A PLAN. WE ALSO PROVIDED THEM

13  WITH AN INITIAL SEVERAL THOUSANDS OF ADDRESSING THE

14  DEDESIGNATION.  NOT IN ALL INSTANCES ARE WE MOVING OFF OF HIGHLY

15  CONFIDENTIAL DOWN TO EITHER CONFIDENTIAL OR NOT CONFIDENTIAL.

16          BUT THERE ARE NUMEROUS INSTANCES WHERE WE ARE, IN

17  FACT, REDESIGNATING FROM HIGHLY CONFIDENTIAL TO CONFIDENTIAL.

18  AND IN NUMEROUS INSTANCES WE'RE GOING FROM HIGHLY CONFIDENTIAL

19  ALL THE WAY DOWN TO NOT CONFIDENTIAL AT ALL.

20          AND WE'RE PROVIDING THAT. WE EXPECT TO BE COMPLETE BY

21  SEPTEMBER 19TH.

22          WE ARE DILIGENTLY WORKING ON THAT.  I HAVE A SEPARATE

23  TEAM DEVOTED SOLELY TO THAT AND ARE GIVING THEM WEEKLY UPDATES

24  ON THAT, AND HAVE BEEN DOING SO SINCE AUGUST 1ST.

25          **MR. HOWARD:**  WHICH IS TRUE.  THE FIRST SET WE GOT

KATHERINE WYATT, OFFICIAL REPORTER, CSR, RMR (415) 487-9834

1 CAUSED US GREAT CONCERN BECAUSE 99 PERCENT OF THE DOCUMENTS IN

2 THAT SET REMAINED HIGHLY CONFIDENTIAL.

3 THERE'S BEEN, BY MY COUNT, FOUR DELIVERIES ALL TOLD,

4 AND THE TOTALS NOW STAND AT 54 PERCENT OF THE REVIEWED

5 POPULATION REMAIN HIGHLY CONFIDENTIAL BY OUR COUNT; ABOUT 35

6 PERCENT OF THEM ARE NOW CONFIDENTIAL INSTEAD OF HIGHLY

7 CONFIDENTIAL; ABOUT TEN PERCENT ARE DOWN TO NOT CONFIDENTIAL.

8 SO THAT IS CERTAINLY SUBSTANTIAL PROGRESS. WE, I

9 THINK, CERTAINLY DON'T AGREE THAT ALL 54 PERCENT OF THOSE ARE

10 STILL HIGHLY CONFIDENTIAL, BUT WE'VE MADE PROGRESS.  AND WE WILL

11 RAISE WITH THEM, IF WE HAVE OTHER CONCERNS.

12 THERE IS ONE OTHER CATEGORY WHICH ARE THE TOMORROWNOW

13 DOCUMENTS.  AND WE HAVE HAD A DISCUSSION BASED ON OUR CONTENTION

14 THAT THE WINDING DOWN OF TOMORROWNOW, WHICH WE UNDERSTAND WILL

15 OCCUR BY THE END OF OCTOBER, SHOULD MEAN THAT THE TOMORROWNOW

16 DOCUMENTS DO NOT ANY LONGER FIT WITHIN ANY CATEGORY UNDER THE

17 PROTECTIVE ORDER, BECAUSE IT'S NOT A GOING CONCERN.  THERE ARE

18 NO CURRENT MARKETING PLANS.  THERE ARE NO CURRENT STRATEGIES.

19 IT'S ALL HISTORY. IT'S ALL LEGACY INFORMATION AT THAT

20 POINT. AND GIVEN THE LOGISTICAL TROUBLES THAT CONFIDENTIALITY

21 DESIGNATIONS CAUSE US, WE THINK THAT THOSE DOCUMENTS SHOULD BE

22 NOT CONFIDENTIAL AT ALL.

23 THEY HAVE SAID, AND I THINK WITH JUSTIFICATION, THAT

24 THERE SOME SAP DOCUMENTS IN THAT SET OF TOMORROWNOW DOCUMENTS.

25 SO WE'VE MADE A PROPOSAL TO THEM FOR HOW WE CAN ON A

1 CATEGORICAL BASIS DEDESIGNATE THE TOMORROWNOW POPULATION KEEPING

2 THOSE CONCERNS IN MIND. AND I THINK WE'RE WAITING FOR A

3 RESPONSE.

4        **MR. COWAN:** THEY ARE, YOUR HONOR. AND I WANTED TO

5 USE -- BECAUSE THE BALL IS IN OUR COURT ON THAT POINT. AND I

6 WANTED TO USE THE OPPORTUNITY TO TALK WITH YOU ABOUT THIS AT

7 THIS HEARING BEFORE WE DO RESPOND.

8        WE AGREE WITH THEM THAT THE WINDING DOWN OF

9 TOMORROWNOW'S OPERATIONS -- AND THE PLAN, THE CURRENT PLAN IS TO

10 DO THAT BY OCTOBER 31ST OF THIS YEAR -- WE AGREE THAT THAT HAS

11 AN IMPACT ON WHAT, GOING FORWARD, WHAT WE WOULD DESIGNATE AS

12 CONFIDENTIAL OR HIGHLY CONFIDENTIAL.

13        THERE'S TWO ISSUES HERE. ONE: WE CAN'T AGREE FOR

14 SOME OF THE REASONS THAT MR. HOWARD STATED TO A WHOLESALE

15 DEDESIGNATION.

16        TWO: THE LOGISTICS OF GOING BACK THROUGH NOW WITH A

17 NEW SET OF FACTS THAT DID NOT EXIST AT THE TIME THE ORIGINAL

18 CONFIDENTIALITY DESIGNATIONS WERE MADE --

19        **THE COURT:** YOU MEAN, BECAUSE OF THE AMENDED

20 COMPLAINT OR --

21        **MR. COWAN:** WELL --

22        **THE COURT:** -- NO, BECAUSE OF THE WINDDOWN?

23        **MR. COWAN:** -- THE DECISION TO WIND THE COMPANY DOWN

24 WASN'T MADE UNTIL RELATIVELY RECENTLY.

25        **THE COURT:** OKAY. RIGHT. RIGHT. RIGHT. SO IT

```
1    REQUIRES A REREVIEW.

2              MR. COWAN:  RIGHT.

3              THE COURT:  RIGHT.

4              MR. COWAN:  AND WE ALREADY HAVE SHOWN SUBSTANTIAL --

5    THE TIME IT TAKES TO GO DO THAT FOR 27,000 DOCUMENTS TO DO THAT

6    FOR THE LITERALLY MILLIONS OF PAGES OF DOCUMENTS THAT HAVE BEEN

7    PRODUCED FOR TOMORROWNOW GETS INTO ALL KINDS OF LOGISTICAL

8    ISSUES.

9              ONE OF OUR FIRST PROPOSALS WAS:

10                  "TELL US CATEGORICALLY.  YOU DON'T HAVE TO

11              ONESIE-TWOSIE IT BECAUSE WE DON'T YOU REVEAL YOUR

12              WORK PRODUCT IN YOUR OWN PROCESSES.  BUT TELL US

13              CATEGORICALLY WHAT YOU'RE REALLY WORRIED ABOUT, AND

14              WE CAN FOCUS ON THAT."

15              OR, ALTERNATIVELY, IF WE CAN SET UP SOME SORT OF

16   CONSTRUCT WHERE A LITMUS TEST, IF YOU WILL, IF IT MEETS THESE

17   CRITERIA, THEN IT WILL BE THIS THING.  AND WE'RE WORKING ON

18   MAYBE A WAY TO DO IT THAT WAY.

19             THE COURT:  COULD YOU SCREEN THEM ALL BY WHETHER THEY

20   HAVE THE WORDS "S-A-P" IN THEM?

21             MR. COWAN:  THAT'S THE KIND OF PROPOSAL WE'RE MAKING.

22             THE COURT:  AND SOMETHING THAT HAS A ZERO, YOU TURN

23   THAT SET OVER RIGHT AWAY --

24             MR. COWAN:  IT'S POSSIBLE --

25             THE COURT:  -- WITH A CLAWED BACK, POSSIBLY, IF
```

1    THERE'S SOMETHING HIDDEN IN THERE.

2          **MR. COWAN:** THERE MAY BE WAYS TO DO THAT WITH WHAT WE

3    COULD CALL A KIND OF A SUPER ENHANCED CLAWED BACK PROVISION TO

4    DO THAT.

5          THE PROBLEM IS IS ONCE IT GOES ALL THE WAY DOWN TO

6    NONCONFIDENTIAL THEIR USE OF THOSE DOCUMENTS IS MUCH LESS

7    RESTRICTED AND SO --

8          **THE COURT:** WELL, I MEAN, YEAH. YEAH. WELL, MAYBE AT

9    FIRST YOU DEDESIGNATE THEM DOWN TO REGULAR CONFIDENTIAL.  AND

10   THEN, YOU KNOW, THEN WHEN YOU NEED -- WHEN THAT'S CAUSING A

11   PROBLEM OR YOU COME UP WITH A SECOND TIER PROCESS TO GO FURTHER

12   THAN THAT.

13         **MR. COWAN:** AND I THINK THAT IS THE BIG POINT FOR US

14   BECAUSE WE DON'T HAVE AS MUCH PROBLEM GOING FROM HC, HIGHLY

15   CONFIDENTIAL, DOWN TO CONFIDENTIAL.  THE PROBLEM IS GOING ALL

16   THE WAY TO NONCONFIDENTIAL.

17         AND WHERE WE TAKE ISSUE -- AND WE'RE STILL HOPEFULLY

18   GOING TO RESOLVE THIS AND NOT HAVE TO COME TO YOU FOR A DECISION

19   ON IT -- WE DON'T THINK THE DEFINITION OF "CONFIDENTIAL" IN

20   PARAGRAPH THREE, I BELIEVE, OF THE PROTECTIVE ORDER REQUIRES THE

21   INFORMATION TO RELATE TO A CURRENT OR FURTHER BUSINESS --

22         **THE COURT:** WELL, I DON'T HAVE THE --

23         **MR. COWAN:** RIGHT.  RIGHT.

24         **THE COURT:** -- IN MIND.  BUT, OF COURSE, IN GENERAL,

25   IF SOMETHING -- I MEAN, UNDER THE FEDERAL RULE YOU CAN'T

```
1    PROTECT SOMETHING IF IT DOESN'T HAVE -- FIT WITHIN, YOU KNOW, A
2    TRADE SECRET, ET CETERA, OR COMMERCIAL VALUE.  AND SO, IN
3    GENERAL, IF IT'S NOT AN ONGOING CONCERN IT WOULDN'T, BUT,
4    OBVIOUSLY --
5            MR. COWAN:  RIGHT.  FROM A SEALING ORDER PERSPECTIVE,
6    ET CETERA.
7            THE COURT:  RIGHT.
8            MR. COWAN:  BUT THE ISSUE NOT ONLY ON A
9    DOCUMENT-BY-DOCUMENT BASIS OF HOW CONFIDENTIAL THEY ARE, AS A
10   SET, REGARDLESS OF WHETHER THEY COULD MEET THE STANDARDS UNDER
11   BOTH FEDERAL AND CALIFORNIA LAW TO BE SEALED, THERE STILL IS AN
12   ELEMENT OF CONFIDENTIALITY THAT RELATES TO THAT THAT THE PARTIES
13   HAVE AGREED TO AND THAT THE DISTRICT COURT HAS ORDERED ON THAT.
14           AND SO, YOU KNOW, IT DOESN'T MEAN WE'RE NOT AGREEABLE
15   TO RECONSIDERING THAT, BUT THAT MAY BE A FRICTION POINT.  BUT
16   WE'RE TRYING TO BE REASONABLE, JUDGE. WE DON'T WANT --
17           THE COURT:  YEAH.  I'M NOT SURE ABOUT THAT AS A LEGAL
18   MATTER, THAT IF IT'S NOT CONFIDENTIAL UNDER THE FEDERAL RULES
19   THAT THAT'S STRICTLY A SEALING TEST.  I THINK THOSE TWO THINGS
20   ARE SUPPOSED TO BE CONTIGUOUS.
21           NOW, I DON'T NEED TO LOOK INTO THAT IF I DON'T NEED
22   TO. I MEAN, LET SLEEPING DOGS LIE.  THERE'S ENOUGH AWAKE ONES IN
23   THIS CASE.
24           MR. COWAN:  RIGHT.
25           THE COURT:  WE DON'T NEED TO TAKE ON ANYMORE
```

1    THEORETICAL DISPUTES SO --

2           **MR. COWAN:**  BUT THAT'S HELPFUL.  I MEAN, JUST TO KNOW

3    THAT IN TERMS OF WHAT YOUR -- IN THE ABSTRACT WHAT YOUR THOUGHTS

4    ARE ON THAT.  I THINK THAT WILL GUIDE SOME OF OUR DISCUSSIONS ON

5    THIS.

6           **MR. HOWARD:**  IT'S NOT QUITE THEORETICAL, BECAUSE

7    THAT, WHAT YOU JUST SAID, IS EXACTLY WHAT WE'VE SAID ABOUT THE

8    POPULATION --

9           **THE COURT:**  WELL, I'M PRETTY SURE -- I'M PRETTY SURE

10   THAT'S THE CASE.  NOW, THAT DOESN'T MEAN THAT IT MIGHT, YOU

11   KNOW -- THEORETICALLY, THERE COULD BE A DOCUMENT THAT BY ITSELF

12   DOESN'T SEEM TO SHOW A SECRET, BUT IF YOU PUT A HUNDRED

13   DOCUMENTS TOGETHER, YOU KNOW, MAYBE IN THEORY POSSIBLY THERE

14   COULD BE SOMETHING LIKE THAT, THOUGH.

15          NOT TERRIBLY LIKELY, BUT POSSIBLY.

16          **MR. COWAN:**  UNDERSTOOD.

17          **THE COURT:**  BUT, YOU KNOW.  BUT, I MEAN, I CAN SEE

18   THAT THERE WOULD BE -- OBVIOUSLY, WITH THE RELATIONSHIP BETWEEN

19   THE TWO COMPANIES THERE COULD BE A LOT OF INFORMATION ABOUT SAP

20   PLANS FOR THE FUTURE THAT IS STILL TRADE SECRET, COMMERCIAL

21   VALUE --

22          **MR. COWAN:**  AND THAT'S THE BIGGEST TENSION POINT FOR

23   US.

24          **THE COURT:**  AND I THINK YOU WOULD RECOGNIZE THAT.

25          **MR. HOWARD:**  WE'D RECOGNIZE THAT.  AND OUR PROPOSAL

1   TRIES TO ACCOMMODATE THAT.

2           **THE COURT:**  OKAY.  WELL, IT SOUNDS LIKE YOU CAN COME

3   UP WITH SOMETHING OF THE GUIDANCE.  I HOPE SO.

4           **MR. COWAN:**  WE HOPE SO.

5           **THE COURT:**  AND THE SEARCH TERMS ARE GOING OKAY AT

6   THE MOMENT?

7           **MR. COWAN:**  YES, YOUR HONOR.  WE STILL DO NOT BELIEVE

8   WE NEED ANY COURT INTERVENTION ON THAT.

9           **THE COURT:**  I DON'T SPEAK GERMAN.

10          **MR. COWAN:**  NOR DO I.

11          **THE COURT:**  FRENCH, I COULD TRY.

12          **MR. HOWARD:**  WELL, THAT'S A PERFECT SEGUE INTO THE

13  NEXT SECTION, WHICH IS THE CASE CALENDAR.

14          **THE COURT:**  OKAY.

15          **MR. HOWARD:**  WE DO HAVE A CONCERN, AND WE PUT SOME

16  LANGUAGE IN THERE. THINGS ARE STARTING TO GET PUSHED OUT A BIT.

17  AND THERE ARE SOME SERIOUS LOGISTICAL ISSUES IN HAVING TO GO TO

18  GERMANY TO TAKE DEPOSITIONS, HAVING TO TRANSLATE A SUBSTANTIAL

19  NUMBER OF FOREIGN LANGUAGE DOCUMENTS.

20          WE WANTED TO PUT THIS IN HERE BECAUSE I THINK BY WAY

21  OF REPORT TO YOU YOU SHOULD UNDERSTAND THAT THERE HAS BEEN

22  MOVEMENT IN THE DEPOSITION SCHEDULE. THERE HAVE BEEN BACK AND

23  FORTH ON WHEN DOCUMENTS WILL BE PRODUCED.  AND THERE ARE SORT OF

24  TWO ILLUSTRATIVE ISSUES.

25          ONE IS THAT WE HAVE HAD, I THINK, THREE ATTEMPTS NOW

TO GET A WORKING SET OF GERMAN LANGUAGE DOCUMENTS FOR AN
UPCOMING WITNESS, GERMAN WITNESS, WHO IS ACTUALLY GOING TO BE
DEPOSED HERE.  BUT AT SOME POINT, THE DEPOSITION SCHEDULE GETS
THREATENED.  AND, ULTIMATELY, THE CASE SCHEDULE GETS THREATENED
IF WE DON'T HAVE TIME TO TRANSLATE AND PROCESS.

AND THE SECOND ILLUSTRATION IS THAT, YOU KNOW,
THERE'S AT LEAST ONE WITNESS, THE CEO, MR. KAGERMANN, WHO
CONDUCTS ALL OF HIS BUSINESS IN ENGLISH, READS CRITICAL
DOCUMENTS, INCLUDING THE ONE TO BUY TOMORROWNOW IN ENGLISH, HAS
EARNING CALLS IN ENGLISH, BUT THERE'S AN INSISTENCE FOR REASONS
WE DON'T KNOW THAT HE HAS TO TESTIFY IN GERMAN, WHICH OCCUPIES
DOUBLE THE TIME.  WE HAVE TO FLY INTERPRETERS OVER.

IT'S BOGGING DOWN OUR ABILITY TO GET THROUGH THE
DEPOSITIONS THAT WE HAVE AND THE HOURS THAT WE HAVE ALLOTTED AND
MOVE ON TO THE OTHER PARTS OF THE CASE. AND WE HAVE ASKED THEM
TO RECONSIDER THAT AND ALSO TO COMMIT TO SPECIFIC DATES BY WHICH
DOCUMENTS WILL BE PRODUCED, PARTICULARLY FOREIGN LANGUAGE ONES.
AND WE'VE GOT TO GET THROUGH IT.

THERE'S NOTHING WE'RE ASKING YOUR HONOR FOR AT THIS
POINT, BUT I WANT TO REPORT THAT IT'S AN ISSUE OF GROWING
CONCERN.

**MR. COWAN:**  LET ME ADDRESS THIS ISSUE IN THE REVERSE
ORDER.  I'LL START WITH THE LAST POINT.

THEY HAVE ASKED US WHEN THEY ASKED FOR THE
DEPOSITIONS WHETHER ANY OF THE GERMAN -- THE GERMAN CITIZENS,

1  THEIR NATIVE LANGUAGE IS GERMAN, WOULD CHOOSE TO CONDUCT THEIR

2  DEPOSITION IN GERMAN.

3         SOME OF THOSE INDIVIDUALS HAVE ELECTED TO DO THAT AND

4  SOME HAVE NOT.

5         MR. KAGERMANN, THE CEO, WE ACKNOWLEDGE THAT HE SPEAKS

6  ENGLISH AND HAS A CERTAIN FLUENCY IN ENGLISH.  BUT THERE'S A

7  DIFFERENT CONSIDERATION WHEN YOU LOOK AT A GENTLEMAN WHO IS A

8  HIGH LEVEL EXECUTIVE, THE CEO, CO-CEO OF SAP AG, THE ULTIMATE

9  PARENT COMPANY HERE, PROVIDING TESTIMONY UNDER OATH IN LIGHT OF

10 THEIR ALLEGATIONS.

11        AND HE HAS THE RIGHT, WE BELIEVE, TO ELECT WHATEVER

12 LANGUAGE HE FEELS MOST COMFORTABLE IN.  AND WE DO NOT THINK IT'S

13 UNREASONABLE FOR HIM TO CHOOSE HIS NATIVE LANGUAGE TO DO THAT

14 IN, GIVEN THE ALLEGATIONS IN THIS CASE AND --

15        **THE COURT:**  YEAH.  WELL, I TELL YOU, I WOULD PROBABLY

16 NOT OVERRULE THAT, BECAUSE, I MEAN, OTHERWISE -- I MEAN, FORCE

17 HIM TO TESTIFY IN ENGLISH.  I'D HAVE TO HAVE AN EVIDENTIARY

18 HEARING, SEE HOW GOOD HIS ENGLISH IS. AND IT WOULD HAVE TO BE

19 EXTREMELY GOOD FOR THIS KIND OF THING.

20        BUT THAT BEING SAID, YOU KNOW, IT'S A LOT OF EXTRA

21 TIME AND EXPENSE AND TROUBLE FOR ORACLE AND I MIGHT CUT THEM

22 SOME SLACK IN SOME WAYS, MAYBE SOME EXTRA HOURS.

23        **MR. COWAN:**  AND THEY HAVE ASKED FOR THE POSSIBILITY

24 OF THAT, AND WE HAVE NOT EVEN FORECLOSED THE FACT THAT WE WOULD

25 AGREE TO THAT. AND WE --

1    **THE COURT:** WELL, I THINK YOU PROBABLY SHOULD IF IT'S

2 GOING TO TAKE A LOT MORE TIME, AND IF VERY ARGUABLY HE IS

3 BILINGUAL.

4    **MR. HOWARD:** WELL, I MEAN, IF EVERYTHING IS

5 TRANSLATED IT'S DOUBLE TIME. THERE'S TWO DAYS SET ASIDE INSTEAD

6 OF ONE.  IT'S DOUBLE THE TIME.

7    **MR. COWAN:** AND WE'VE TOLD THEM -- AND I THINK THE

8 BEST WAY, AND HOPEFULLY YOUR HONOR AGREES -- LET'S SEE HOW THE

9 FIRST GERMAN DEPOSITIONS GO AND SEE WHAT -- SEE IF WE CAN REACH

10 AN AGREEMENT:  YEAH, IT IS, YOU KNOW, A ONE-TO-ONE INCREASE, A

11 DOUBLING.  MAYBE IT'S A HALF AGAIN.  WE WILL FIND OUT.

12    **THE COURT:** WELL, I'LL SAY IT PROBABLY IS CLOSE TO

13 DOUBLE.

14    **MR. COWAN:** IT MAY BE.

15    **THE COURT:** IT VERY LIKELY IS.  I THINK THAT'S

16 PROBABLY A FAIR ASSUMPTION THAT IT WOULD BE DOUBLE.

17    **MR. COWAN:** OKAY. AND THE OTHER POINT HE RAISED WITH

18 RESPECT TO DEPOSITION SCHEDULING, WE TOLD THE COURT BACK APRIL

19 OR MAY THAT WE INTENDED TO HAVE THESE DEPOSITIONS DONE BY

20 THANKSGIVING.  WE ARE STILL ON TRACK TO DO THAT.

21    AND I RECALL TELLING THE COURT BACK THEN THAT WHILE

22 THEY HAD PROPOSED A SCHEDULE OF LIKE ONE DEPOSITION EVERY TWO OR

23 THREE WEEKS BACK THEN UP THROUGH, EVEN INCLUDING, DECEMBER THAT

24 WE'D HOPED EVEN THOUGH SOME DEPOSITIONS MAY BE BUNCHED TOGETHER,

25 WHICH MAKES SENSE NOW THAT WE'RE TRAVELING TO EUROPE TO DO SOME

1   OF THOSE, THAT WE HOPE TO GET THEM COMPLETED BY THANKSGIVING.

2           THAT IS STILL OUR GOAL.  IT IS STILL A VERY REALISTIC

3   GOAL.

4           **THE COURT:**  I MEAN, I DO THINK IT'S LEGITIMATE TO

5   HAVE AN ACTUAL DEADLINE FOR THE DOCUMENTS THAT IS AT SET

6   INTERVAL IN ADVANCE OF THE DEPOSITION.

7           **MR. COWAN:**  AND SO FAR WE'VE BEEN WORKING WITH THEM

8   AND GIVING THEM -- TELLING THEM WHEN WE EXPECT TO PRODUCE IT.

9   WE HAVE BEEN FAIRLY CLOSE ON MOST OF THE DOCUMENT PRODUCTIONS OF

10  WHICH WITNESSES THEY WERE GOING TO GET ON WHAT DAYS.

11          AND WE'VE BEEN DELIVERING FOR THE MOST PART ACCORDING

12  TO OUR PROMISES.  THE ONE FOR INSTANCE THAT HE GAVE WAS A MAJOR

13  TECHNICAL PROBLEM WE HAD WITH ONE WITNESS' DOCUMENTS.  THE FILE

14  THAT WAS ORIGINALLY TAKEN TO GET SOME OF HIS E-MAILS WAS

15  CORRUPTED, AND IT DIDN'T PRINT OUT ALL THE E-MAILS.

16          WE DISCOVERED IT.  WE ACTUALLY DISCOVERED IT AT THE

17  TIME WE PRODUCED IT.  WE NOTED THAT TO THEM.  AND WE'VE BEEN

18  WORKING TO CORRECT THAT.

19          WE CORRECTED ALL BUT -- I THINK WE'RE DOWN TO A

20  HUNDRED DOCUMENTS THAT WE'RE TALKING ABOUT TRYING TO GET THOSE

21  THINGS TO THEM.

22          **THE COURT:**  WELL, YOU'RE NOT ASKING ME TO ORDER

23  ANYTHING, SO I'M NOT ORDERING ANYTHING.  BUT I DO AGREE THAT

24  THERE OUGHT TO BE A DROP-DEAD INTERVAL BEFORE A DEPOSITION. I

25  DON'T KNOW WHETHER IT SHOULD BE TWO WEEKS OR WHETHER IT SHOULD

1   BE -- SHOULD BE LONGER IF IT INVOLVES GERMAN DOCUMENTS, AND THAT

2   THAT HAS TO BE ADHERED TO.

3           **MR. COWAN:** AND JUST SO YOU KNOW TO MAKE SURE YOU

4   UNDERSTAND THE FLAVOR OF THIS, WE'RE NOT DUMPING HUGE CACHES OF

5   DOCUMENTS ON THEM AT THE LAST MINUTE AND SAYING:

6               "YOU HAVE A WEEK TO REVIEW IT. THIS IS THE ONLY

7               TIME WE'LL GIVE IT."

8           THERE'S A LOT OF GIVE AND TAKE ON THAT. AND AS WE'VE

9   ALREADY TALKED ABOUT EXTENSIVELY, THE MACHINE WE HAVE IN PLACE

10  TO PRODUCE DOCUMENTS.

11          WE HAVE BOTH OUR FRANKFURT AND OUR MUNICH OFFICES

12  INVOLVED IN DOCUMENT REVIEW. WE HAVE GERMAN LANGUAGE REVIEWERS

13  HERE IN THE U.S., MANY THAT ARE INVOLVED BOTH AT JONES DAY AND

14  CONTRACT LAWYERS. AND WE'RE PROCESSING THESE THINGS AS QUICKLY

15  AS WE POSSIBLY CAN.

16          **THE COURT:** OKAY. AND HAVE YOU GOT DATES FOR MR.

17  OSWALD AND MR. WORD?

18          **MR. HOWARD:** JUST YESTERDAY.

19          **MR. COWAN:** YES.

20          **MR. HOWARD:** WE HAVE DATES. AND ONE OF THEM, I

21  THINK, REQUIRES SOMEBODY TO FLY ON THANKSGIVING. BUT WE WILL

22  WORK WITH THEM ON THOSE DATES. AND I DON'T KNOW THAT THOSE WILL

23  WORK PERFECTLY, BUT WE WILL TRY AND SORT IT OUT.

24          YOU KNOW, AGAIN, I DO THINK IT TAKES A WEEK TO GO TO

25  GERMANY, AND THEY ARE BORED.

**THE COURT:**  ARE ANY OF THESE PEOPLE COMING TO THE U.S. FOR ANY REASON?

**MR. COWAN:**  WE CURRENTLY HAVE ONE INDIVIDUAL WHO IS A GERMAN CITIZEN WHO HAS AGREED TO COME TO HOUSTON TO HAVE HIS DEPOSITION.

WE'VE ALSO BROUGHT ON TOMORROWNOW SIDE LESLIE LOFTUS (PHONETIC), WHO WAS AN EXECUTIVE OF TOMORROWNOW WHO LIVES IN THE U.K. TO SAN FRANCISCO.  WE'RE NOT BEING UNREASONABLE HERE.

THEY HAVE ASKED FOR THE DEPOSITIONS OF THE HIGHEST LEVEL EXECUTIVES OF OUR PARENT COMPANY THAT THEY WORK IN GERMANY. THEY ARE GOING TO HAVE TO GO TO GERMANY TO DO MOST OF THOSE DEPOSITIONS TO KEEP FROM DISRUPTING THE BUSINESS.

**MR. HOWARD:**  YOUR HONOR, THEY HOLD THEIR BOARD MEETINGS IN PALO ALTO.

**THE COURT:**  WHO, SAP?

**MR. COWAN:**  SURE.

**MR. HOWARD:**  THE SAME SAP EXECUTIVES HOLD THEIR BOARD MEETINGS IN PALO ALTO.

**MR. COWAN:**  THEY HOLD SOME MEETINGS IN PALO ALTO.

**THE COURT:**  WELL, DO THEY HAVE ANY MEETINGS SCHEDULED IN PALO ALTO BETWEEN NOW AND THANKSGIVING?

**MR. COWAN:**  THE ANSWER IS:  I DON'T KNOW, BUT WE CAN FIND THAT OUT.

**THE COURT:**  I THINK YOU SHOULD FIND THAT OUT.  AND IF THEY DO, I THINK THE PRESUMPTION OUGHT TO BE THE DEPOSITION

1    OUGHT TO BE HERE.

2             **MR. COWAN:**  IF THEY ARE GOING TO BE HERE ANYWAY.

3             **THE COURT:**  YES.

4             **MR. COWAN:**  IF THEY ARE GOING TO BE IN THE U.S.

5    ANYWAY.

6             **THE COURT:**  EXACTLY.

7             **MR. COWAN:**  OKAY.

8             **THE COURT:**  THAT'S WHAT I'M SAYING. YEAH.  YEAH. IT

9    JUST DOESN'T MAKE SENSE FOR EVERYBODY TO SPEND ALL THAT EXTRA

10   TIME, IF THEY ARE HERE ANYWAY AND THEY WERE ALREADY PLANNING TO

11   BE HERE.

12            **MR. COWAN:**  THE ONLY --

13            **THE COURT:**  I MEAN, THERE MIGHT BE AN EXCEPTION TO

14   THAT.  I'M NOT SAYING, YOU KNOW -- THE CEO OF THE WHOLE COMPANY,

15   HIS EVERY MINUTE MAY BE ACCOUNTED FOR.

16            **MR. COWAN:**  THAT'S THE PROBLEM.

17            **THE COURT:**  I UNDERSTAND THAT.

18            **MR. COWAN:**  THAT'S THE PROBLEM.

19            **THE COURT:**  ON THE OTHER HAND, YOU SHOULD AT LEAST

20   LOOK AT THAT, IF YOU'RE GOING TO BE HERE.

21            **MR. COWAN:**  WE UNDERSTAND IT'S A FACTOR, YOUR HONOR.

22   I'M CONCERNED ABOUT -- YOU KNOW, WHATEVER YOUR HONOR ORDERS WE

23   WILL DO OUR BEST TO HOPEFULLY COMPLY WITH. BUT YOU'RE TALKING

24   ABOUT THE EXECUTIVE BOARD OF DIRECTORS OF SAP AG.

25            THEY HAVE ASKED FOR FIVE OF THOSE PEOPLE, FOUR OF

1  WHOM ARE ACTIVE.  ONE GENTLEMAN LIVES HERE IN PALO ALTO, BUT

2  HE'S NOT -- HE'S NO LONGER AN EMPLOYEE, SO THERE'S SOME

3  LOGISTICAL ISSUES OF JUST GETTING THINGS COORDINATED WITH HIM.

4         **THE COURT:**  OKAY.  WELL, I'M NOT MAKING ANY RULINGS

5  NOW.

6         **MR. COWAN:**  OKAY.

7         **THE COURT:**  I AM JUST SAYING FIND OUT IF THEY ARE

8  GOING TO BE HERE AND WHETHER FOR ANY OF THEM, EVEN IF IT'S ONE

9  OF THEM, IT'S PRACTICAL TO DO.  IT'S A LOT EASIER, I THINK.

10         **MR. HOWARD:**  THANK YOU, YOUR HONOR.

11         **THE COURT:**  OKAY.  NOW, ANTICIPATED MOTION TO COMPEL.

12         I THINK IT'S YOU.  YOU ARE THE ONE WHO IS

13  ANTICIPATING.

14         **MR. MCDONELL:**  YOUR HONOR, WE HAVE THREE

15  NARROWLY-DEFINED MOTIONS TO COMPEL ON THREE DIFFERENT ISSUES,

16  ALL OF WHICH ARISE OUT OF DOCUMENT REQUESTS THAT WERE SERVED

17  OVER A YEAR AGO.

18         WE HAVE MET AND CONFERRED TILL WE'RE BLUE IN OUR

19  COLLECTIVE FACES. WE HAVE REACHED IMPASSE ON THESE ISSUES BOTH

20  BEFORE AND AFTER THE TERM "TARGETED SEARCHES" WAS EVERY COINED

21  BY US IN THIS PROCEEDING.

22         ORACLE HAS MADE IT VERY CLEAR THAT THE ANSWER IS: NO,

23  THEY WILL NOT PRODUCE THESE PARTICULAR --

24         (ALARM SOUNDS.)

25         **THE COURT:**  IT'S A TEST.

1        **MR. HOWARD:** I THINK THAT'S YOUR ANSWER.

2        **MR. COWAN:** TIME'S UP.

3        **MR. MCDONELL:** RED LIGHT.

4        THEY HAVE BEEN CRYSTAL CLEAR THAT THEY WILL NOT

5   PRODUCE TO US THESE PARTICULAR CLASSES OF INFORMATION.

6        WE BELIEVE WE NEED THEM. WE'RE PREPARED TO MAKE A

7   MOTION AND LET YOUR HONOR RULE ON IT.

8        THEIR GENERAL RESPONSE TO THAT IS:

9            "WELL, THEY ARE ROUGHLY WITHIN THE AMBIT OF

10           SOMETHING THAT NOW COULD BE A TARGETED SEARCH, SO YOU

11           SHOULD NOW START ANEW WITH THE TARGETED SEARCH

12           PROCESS THAT IS EXPECTED TO KICK OFF AFTER THIS

13           HEARING, AND WAIT FOR THAT PROCESS TO ROLL OUT."

14       WELL, THESE ISSUES ARE JOINED IN RIGHT NOW.  WE'RE

15   NOT GOING TO PUT THESE SPECIFIC ISSUES IN OUR TARGETED SEARCHES.

16   WE'RE DONE, AND WE'RE READY TO MOVE.

17       **THE COURT:** WELL, YOU'RE SAYING THAT YOU DON'T

18   BELIEVE THAT THE TARGETED SEARCHES ARE REQUESTING THOSE

19   DOCUMENTS OR --

20       **MR. MCDONELL:** THE DOCUMENT REQUESTS THEMSELVES

21   REQUESTED THE DOCUMENTS --

22       **THE COURT:** RIGHT.

23       **MR. MCDONELL:** -- OVER A YEAR AGO.

24       **THE COURT:** RIGHT.

25       **MR. MCDONELL:** WE'VE MET AND CONFERRED, MET AND

1    CONFERRED --

2             **THE COURT:**  RIGHT.

3             **MR. MCDONELL:**  -- AND THEY REFUSED TO GIVE THEM TO

4    US. IT'S RIPE FOR A MOTION TO COMPEL.

5             WE SHOULD JUST MAKE THE MOTION.

6             **THE COURT:**  OKAY.  AND WHAT IS -- TELL ME MORE ABOUT

7    THESE MOTIONS.

8             **MR. MCDONELL:**  THERE ARE THREE ISSUES.

9             **THE COURT:**  IT'S NOT ONE.  IT'S THREE, APPARENTLY.

10            **MR. MCDONELL:**  THERE ARE THREE ISSUES.  ONE IS ON

11   FINANCIAL INFORMATION THAT WILL BE USED BY EXPERTS FOR DAMAGES.

12   AND IT'S FUNDAMENTAL, LOW LEVEL DETAILED FINANCIAL INFORMATION,

13   INCLUDING THE CHART OF ACCOUNTS, WHICH IS SIMPLY A LISTING OF

14   THE FORMAL ACCOUNTING ACCOUNTS OF ORACLE CORPORATION AND ITS

15   SUBSIDIARIES THAT GIVE YOU THE BLUE PRINT OF WHAT THE ACCOUNTS

16   ARE CALLED.  AND THE OTHER CATEGORIES OF DOCUMENTS ARE ALL

17   VARIATIONS ON A THEME OF GENERAL LEDGER INFORMATION, WHICH

18   ACCOUNTANT WILL TELL YOU IS THE FUNDAMENTAL BUILDING BLOCK OF

19   THE FINANCIAL REPORTING AND RECORDKEEPING OF THE COMPANY.

20            THEY HAVE GIVEN US CERTAIN FINANCIAL INFORMATION.

21   THEY HAVE PROMISED US OTHERS.  BUT OUR EXPERT IS BOUND AND

22   DETERMINED THAT HE'S GOING TO NEED THOSE FUNDAMENTAL BUILDING

23   BLOCKS TO DEVELOP WHATEVER ANALYSIS HE'S GOING TO DEVELOP ON

24   DAMAGES.

25            SECONDLY IS ON THE SUBJECT OF THIRD-PARTY SUPPORT. SO

1    TOMORROWNOW WAS A THIRD-PARTY SUPPORT COMPANY.  THERE ARE OTHER

2    THIRD-PARTY SUPPORT COMPANIES.  WE'VE MADE ANY NUMBER OF

3    ARGUMENTS ABOUT WHY THAT IS RELEVANT, INCLUDING THE POSSIBILITY

4    THAT THIRD-PARTY SUPPORT COULD BE RELEVANT TO THE ISSUE OF

5    CAUSATION OF DAMAGES SO THAT IF A CUSTOMER WAS BOUND AND

6    DETERMINED TO LEAVE ORACLE NO MATTER WHAT, THEY MIGHT NOT ONLY

7    HAVE GONE TO TOMORROWNOW, BUT THEY MIGHT HAVE GONE TO SOME OTHER

8    THIRD-PARTY SUPPORT PROVIDER.

9              AND IF WE CAN ESTABLISH THAT THIS CUSTOMER WOULD HAVE

10   LEFT ORACLE TO SOME THIRD-PARTY SUPPORT PROVIDER, NO MATTER

11   WHAT, WE WILL ARGUE THERE'S A BREAK IN THE CAUSAL LINK.

12             ORACLE, AFTER MUCH FIGHTING AND ARGUING, HAS NOW

13   AGREED TO PRODUCE A 30 (B) (6) WITNESS ON A LIMITED ISSUE OF WHO

14   ARE THE THIRD-PARTY SUPPORT PROVIDERS THAT ARE COMPLETELY

15   INDEPENDENT FROM ORACLE, HAVE NO RELATIONSHIP WITH ORACLE?

16             WE HAVE ASKED FOR OR WE'VE ASKED FOR AT LEAST A

17   FOUNDATIONAL DEPOSITION SO WE CAN EXPLORE AND UNDERSTAND MORE

18   ABOUT THE SO-CALLED ORACLE PARTNERS, WHICH ARE COMPANIES, AS WE

19   UNDERSTAND IT, THAT DO HAVE SOME KIND OF RELATIONSHIP WITH

20   ORACLE AND PROVIDE SUPPORT AND ALL KINDS OF OTHER SERVICES FOR

21   ORACLE CUSTOMERS.

22             THEY HAVE SAID ABSOLUTELY NO ON THE ORACLE PARTNER

23   PROGRAM, NOT EVEN A FOUNDATIONAL DEPOSITION WHICH WE COULD USE

24   AS A SPRINGBOARD TO THEN SAY:

25             "OKAY.  WE'VE ESTABLISHED MORE CLEARLY THAT THIS

1    IS AN APPROPRIATE FIELD FOR DISCOVERY.  SO WE NEED

2    NOW DOCUMENTS OR OTHER DEPOSITIONS ON THE PARTNERSHIP

3    PROGRAM."

4    THE ISSUE IS JOINED.

5    AND THEN, LASTLY, IS THE SUBJECT OF -- A LITTLE MORE

6    ESOTERIC -- ON COPYRIGHT LAW.  BUT, GENERALLY SPEAKING, WE'RE

7    SEEKING MORE DISCOVERY ON WHAT IS COVERED BY ORACLE'S COPYRIGHT

8    REGISTRATIONS; WHAT IS THE OWNERSHIP EVIDENCE OF THE UNDERLYING

9    COPYRIGHTED MATERIAL AND THE SUBJECT OF DERIVATIVE WORKS.

10    THESE ARE RELATIVELY COMPLICATED ISSUES.  WE COULD GO

11    INTO THEM NOW, BUT THEY KNOW WHAT WE'RE TALKING ABOUT.

12    **THE COURT:**  OKAY.

13    **MS. HOUSE:**  GOING IN THE ORDER THAT HE RAISED THEM,

14    ON THE FINANCIAL MATERIALS, WE HAVE ASKED AND WE HAVE YET TO

15    HEAR ANYTHING OTHER THAN:

16    "WE GENERALLY NEED THIS STUFF."

17    THE UNDERLYING CHART OF ACCOUNTS TYPE OF DETAIL -- I

18    DON'T KNOW HOW STEEPED YOU ARE IN THIS TYPE OF --

19    **THE COURT:**  NOT LATELY.

20    **MS. HOUSE:**  WELL, BE GLAD.

21    **THE COURT:**  I'VE OCCASIONALLY BEEN STEEPED IN IT, BUT

22    I DO MY BEST TO DIG MY WAY OUT.

23    **MS. HOUSE:**  THERE ARE -- WITHIN ORACLE, THERE'S 80

24    DIFFERENT GENERAL LEDGERS, WHICH ARE LIKE DIFFERENT SETS OF

25    BOOKS THAT ARE KEPT.  SO WHEN YOU'RE ASKING FOR A GENERAL LEDGER

1    YOU'RE ASKING FOR AN ENORMOUS SET OF BOOKS.

2            IT'S EVERY LITTLE LINE ITEM DETAIL FOR ALL THE

3    COMPANIES, ALL THE SUBSIDIARIES, EVERYTHING ABOUT ORACLE AT A

4    VERY MINUTE LEVEL.

5            THEY ROLL UP INTO A CONSOLIDATED LEDGER. WE'VE

6    PROVIDED ALL THE CONSOLIDATED SUMMARY RELATED DATA.  WE HAVE

7    EXHAUSTIVE DATA THAT WE HAVE PROVIDED THEM THAT IS WHAT WE USE

8    TO, FOR INSTANCE, FIGURE OUT WHAT PROFIT MARGINS AND OTHER

9    THINGS ARE.

10           EACH OF THESE SET OF BOOKS HAS THEIR OWN UNIQUE CHART

11   OF ACCOUNTS. SO IF YOU THINK ABOUT EACH OF THOSE GENERAL LEDGERS

12   OF EIGHTY, THEY EACH HAVE THEIR OWN SEPARATE CHART OF ACCOUNTS

13   WHICH ARE VOLUMINOUS.  A SINGLE GENERAL LEDGER, FOR INSTANCE,

14   HOLDS TRANSACTIONS FOR MULTIPLE MONTHS, QUARTERS, YEARS.

15           AND I'VE BEEN TOLD THAT THE U.S. GENERAL LEDGER, FOR

16   INSTANCE, HAS APPROXIMATELY 90,000 ACTIVE ACCOUNT COMBINATIONS

17   WITH BALANCES.

18           THE KIND OF DETAIL THAT THEY ARE ASKING FOR THAT

19   WE'VE SAID:

20                "TELL US WHY YOU NEED TO GET THIS MUCH IN THE

21                WEEDS.  YOU DON'T NEED IT.  WE DON'T USE IT.  YOU

22                DON'T USE IT AT SAP.  NOBODY USES THAT LEVEL OF

23                DETAIL.  IT WON'T TELL YOU ABOUT A PARTICULAR

24                CUSTOMER."

25           **THE COURT:**  OKAY. THIS IS -- YOU'RE ARGUING THE

1    MOTION.

2            **MS. HOUSE:**  RIGHT.

3            **THE COURT:**  I JUST WANTED TO GET A GENERAL IDEA OF

4    WHAT WE'RE TALKING ABOUT IN NO MORE DETAIL THAN HE JUST GAVE ME,

5    WHICH IS A LOT LESS DETAILED.

6            AND, SECONDLY, WHY YOU'RE OPPOSED TO SETTING A

7    SCHEDULE.  THAT'S THE MORE IMPORTANT THING.

8            **MS. HOUSE:**  WELL, THE FINANCIAL DATA IS ONE OF THE

9    ONES WHERE WE THINK TARGETED SEARCHES -- AND WE'VE BOTH AGREED

10   THE TARGET SEARCHES ARE THE MOST APPROPRIATE MEANS OF GETTING AT

11   FINANCIAL DATA, AS OPPOSED TO GOING WITH CUSTODIANS.

12           AS AN ONGOING BASIS WE HAVE BEEN DOING TARGETED

13   SEARCHES TO PRODUCE VOLUMINOUS FINANCIAL INFORMATION TO THEM.

14   AND WE'RE EXPECTING TO GET TOMORROW ANOTHER TARGETED SEARCH

15   REQUEST FOR YET MORE FINANCIAL DATA.

16           THE IDEA THAT WE'RE GOING TO HAVE A MOTION TO COMPEL

17   ON THE ADEQUACY OF THE FINANCIAL DATA THAT WE HAVE AGREED OR

18   HAVEN'T AGREED TO PRODUCE WHEN WE HAVEN'T EVEN GOTTEN TO THE

19   TARGETED SEARCH AND HAVE MEET AND CONFER ON THAT, WHEN THERE

20   HASN'T BEEN 30 (B) (6) ON THE PERSON FROM OUR FINANCE DEPARTMENT

21   SEEMS INCREDIBLY PREMATURE TO US.  AND WE'RE A LITTLE

22   SUSPICIOUS, BECAUSE IT SEEMS TO BE COMING AT EXACTLY THE TIME

23   THAT WE'RE SUDDENLY OFF IN GERMANY THAT WE MAY BE FACING A

24   MOTION RELATED TO THE SECOND-AMENDED COMPLAINT.

25           THERE'S ABSOLUTELY NO REASON THIS HAS TO HAPPEN NOW.

1    IN FACT, THERE'S A LOT OF GOOD REASON FOR YOU TO WAIT UNTIL THE

2    TARGETED SEARCH BACK AND FORTH IS GONE, UNTIL THE 30 (B) (6) HAS

3    BEEN TAKEN, AND SO THAT YOU HAVE THE FULL RECORD TO UNDERSTAND

4    WHETHER OR NOT WHAT THEY SEEK IS ACTUALLY NECESSARY.

5              **THE COURT:**  OKAY.  SO THAT'S FINANCIAL.  WHAT ABOUT

6    THE COPYRIGHT?

7              **MS. HOUSE:**  DO YOU WANT COPYRIGHT OR DO YOU WANT THE

8    PARTNER ONE NEXT?

9              **THE COURT:**  THE PARTNER IS FINE.

10             **MS. HOUSE:**  THE PARTNER IS ONE THAT WAS ALREADY

11   BEFORE JUDGE LEGGE.  THEY HAVE ARGUED THIS, AND THEY HAVE LOST

12   IT.  AND HERE WE GO AGAIN.  THERE'S A REASON THEY LOST THIS.

13   BECAUSE AS YOU UNDERSTAND, THERE'S PLENTY AT ISSUE IN THIS CASE

14   THAT'S ACTUALLY RELEVANT.

15             THE DIFFERENCE BETWEEN A PARTNER, WHO IS SOMEBODY WHO

16   SELLS ORACLE MATERIALS, WHO HAS A PARTNER RELATIONSHIP, WHO IS

17   NOT AN INDEPENDENT COMPETITOR, WE DON'T SUPPORT ANY INDEPENDENT

18   COMPETITORS.  THE NOTION THAT SOMEHOW WE'RE GOING TO OPEN UP A

19   WHOLE NEW VEIN OF DISCOVERY INTO OUR PARTNERSHIP PROGRAM, IN

20   OTHER WORDS, THE PEOPLE WHO AREN'T OFFICIALLY ORACLE COMPANY,

21   BUT PARTNERS THAT WE DEAL WITH TO PROVIDE A VARIETY OF SERVICES,

22   WHETHER IT'S RESELLING THE PRODUCT OR WHETHER IT'S PROVIDING

23   SERVICE TO ORACLE CUSTOMERS WITH A PARTNER AGREEMENT WITH ORACLE

24   WHERE THEY ARE NOT OUR COMPETITORS, THAT'S AN ENTIRE NEW VEIN OF

25   DISCOVERY.

1    IT'S A VEIN THAT JUDGE LEGGE SAID:

2         "NO THANKS.  WE'VE GOT PLENTY TO DO IN THIS

3    CASE."

4         AND WE'VE AGREED.  IF THERE'S ANYTHING RELATED TO

5    TRULY INDEPENDENT COMPANIES, AKIN TO THE TOMORROWNOW MODEL,

6    WE'RE PROVIDING THAT KIND OF DATA.

7         **THE COURT:**  OKAY.  ALL RIGHT.

8         AND COPYRIGHT?

9         **MR. MCDONELL:**  ON COPYRIGHT, YOUR HONOR, WE SHOULDN'T

10   GLOSS OVER IT, BECAUSE WHAT THEY WANT ARE THE NAMES AND THE

11   EMPLOYMENT AGREEMENTS OF THOUSANDS AND THOUSANDS OF DEVELOPERS

12   WHO OVER THE YEARS AND OVER THE DECADES HAVE CONTRIBUTED TO THE

13   DEVELOPMENT OF PRODUCTS WHICH THERE IS NO DISPUTE AND THERE'S A

14   PRESUMPTION IN COPYRIGHT LAW THAT ORACLE OWNS THEM.

15        **THE COURT:**  OKAY.  WELL, IS THE COPYRIGHT ONE RIPE

16   FOR -- SEEMS LIKE THAT'S A STRAIGHTFORWARD ISSUE OF ITS OWN.

17        **MR. HOWARD:**  WITH TWO EXCEPTIONS. THERE IS ALSO A 30

18   (B) (6) ON COPYRIGHT.  AND FOR THE SAME REASONS THAT MS. HOUSE

19   GAVE THAT I WON'T REPEAT WE THINK IT MAKES SENSE FOR THAT 30 (B)

20   (6) TO GO FORWARD.

21        **THE COURT:**  WHEN IS THAT?

22        **MR. HOWARD:**  WE OFFERED IT IN SEPTEMBER.  THEY HAVE

23   NOW ASKED FOR IT TO BE IN OCTOBER.  WE OFFERED IT ON ACTUALLY

24   TOMORROW, AUGUST 29TH.  THEY HAVE ASKED FOR IT TO BE IN OCTOBER.

25        **THE COURT:**  ALL RIGHT.  WELL, AS TO THE COPYRIGHT ONE

1    IT SEEMS TO ME YOU OUGHT TO TAKE THE 30 (B) (6), AND THEN --

2    BECAUSE IT MIGHT NARROW THE MOTION, AND THEN BRING THE MOTION.

3            **MR. MCDONELL:**  THE PROBLEM WITH THAT, YOUR HONOR, IS

4    THIS ISSUE IS NOT GOING TO GO AWAY. WE HAVE TALKED AND TALKED

5    AND TALKED ABOUT THIS ISSUE. THE ANSWER THEY GIVE IS "NO," THEY

6    WON'T PRODUCE THE INFORMATION WE'RE SEEKING.

7            **THE COURT:**  BUT THE ONLY QUESTION IS WOULD YOU KNOW

8    MORE WHICH WOULD REFINE WHAT YOU'RE SEEKING BASED ON THE 30 (B)

9    (6)?  WHAT IS THE 30 (B) (6) ABOUT?

10           **MR. MCDONELL:**  MAY I ASK MS. WALLACE TO ADDRESS THIS?

11           **THE COURT:**  YES.

12           **MS. WALLACE:**  YES, YOUR HONOR.  ACTUALLY, A PART OF

13   THE PROBLEM IS THAT SOME OF THE 30 (B) (6) TOPICS WOULD ACTUALLY

14   BE THE SUBJECT OF THE MOTION.

15           FOR EXAMPLE, ONE OF THE 30 (B) (6) TOPICS CONCERNS

16   THE DIFFERENCE BETWEEN THE ADDITIONAL MATERIAL IN THE

17   REGISTRATIONS AT ISSUE IN THE COMPLAINT AND THE UNDERLYING

18   WORKS. THAT ALL OF THE REGISTRATIONS IN THE COMPLAINT, OR AT

19   LEAST MOST OF THEM, ARE REGISTERED AS DERIVATIVE WORKS, MEANING

20   THEY HAVE BEEN DERIVED FROM SOME PREEXISTING WORK.

21           IT'S CRITICALLY IMPORTANT FOR US, BOTH FROM A

22   LIABILITY AND DAMAGES STANDPOINT, THAT WE UNDERSTAND VARIOUS

23   THINGS ABOUT THE UNDERLYING WORK, THE DELTA BETWEEN THE NEW

24   ADDITIONAL MATERIAL AND THE UNDERLYING WORK, WHAT IS THE

25   UNDERLYING WORK COMPRISED OF, WHAT'S THE NEW WORK COMPRISED OF?

1  AND VERY BASIC DETAILS ORACLE HAS NOT PROVIDED ABOUT THE

2  UNDERLYING WORK, SUCH AS THE NAME OF THE WORK, IS IT REGISTERED,

3  WHEN WAS IT FIRST PUBLISHED?

4          THESE ARE ALL ISSUES THAT GO TO WHETHER, IN FACT,

5  ORACLE IS ENTITLED TO THAT PRESUMPTION THAT MR. HOWARD SAYS IT'S

6  ENTITLED TO.  THAT ACTUALLY IS AN ISSUE THAT WILL BE IN DISPUTE.

7          IT DEPENDS WHAT THOSE UNDERLYING WORKS ARE AND

8  WHAT -- THAT IS ONE OF THE TOPICS AT ISSUE IN THE 30 (B) (6)

9  NOTICE.

10         **THE COURT:**  OKAY.  ARE YOU OBJECTING TO THE 30 (B)

11  (6) NOTICE?

12         **MR. HOWARD:**  YOUR HONOR, I AM, I HAVE TO SAY,

13  MYSTIFIED BY THAT.

14         WE ARE PUTTING UP ONE OF OUR IN-HOUSE LAWYERS AT

15  ORACLE ON THE TOPIC OF THE REGISTRATIONS THAT WE FILED AND THE

16  REGISTRATIONS THAT ARE AT ISSUE IN THIS CASE.

17         THEY SAID -- AND THE ONE TOPIC WE OBJECTED TO WAS

18  THIS, WHAT MS. WALLACE JUST SAID: THE DIFFERENCE BETWEEN THE

19  DERIVATIVE WORKS AND THE ORIGINAL WORKS.

20         WE SAID TO THEM:

21              "A LAWYER'S NOT THE RIGHT PERSON, SO YOU'RE NOT

22              GOING TO GET THAT THROUGH HIM. BUT IF THAT'S WHAT YOU

23              WANT, WE WILL PUT UP A SERIES OF DEVELOPERS.  AND

24              IT'S GOING TO BE SEVERAL, BECAUSE THERE ARE DIFFERENT

25              SOFTWARE PRODUCTS WITH DIFFERENT DEVELOPER TEAMS

1            WORKING ON THEM. AND YOU CAN ASK, YOU KNOW, 'WHAT'S

2            THE DIFFERENCE IN THIS REGISTERED WORK THAT IS

3            IDENTIFIED AS A DERIVIATIVE WORK?"

4            **THE COURT:** TO ME THAT --

5            **MR. HOWARD:** SO WE'VE SAID: "YES."

6            **THE COURT:** SO CAN I -- CAN I?

7            **MR. HOWARD:** YES.

8            **THE COURT:** THAT DOES NOT SOUND LIKE AN OBJECTION TO

9 THE TOPIC OF A 30 (B) (6). THAT SOUNDS LIKE YOU'RE JUST SAYING

10 AS A PRACTICAL MATTER IT WILL TAKE MORE THAN ONE WITNESS.

11            **MR. HOWARD:** AND WE'VE ASKED --

12            **THE COURT:** IS THAT CORRECT?

13            **MR. HOWARD:** YES, THAT'S CORRECT.

14            **THE COURT:** BECAUSE IT'S NOT AN OBJECTION IN MY --

15            **MR. HOWARD:** IT'S NOT AN OBJECTION.

16            **THE COURT:** IT WOULDN'T BE AN OBJECTION.

17            **MR. HOWARD:** WE HAVE OFFERED WITNESSES, AND WE

18 HAVEN'T HEARD BACK.

19            **MS. WALLACE:** MY UNDERSTANDING IS THAT, IN FACT,

20 ORACLE HAS OBJECTED ON THE GROUND THAT IT CALLS FOR EXPERT

21 TESTIMONY.

22            **THE COURT:** OKAY.

23            **MS. WALLACE:** I'VE NOT SEEN AN OFFER OF --

24            **THE COURT:** OKAY. WELL, THIS IS MY RULING: IF YOU

25 HAVE OBJECTED TO ANY TOPIC ON ANY GROUNDS THEN I'M NOT DELAYING

1    THE MOTION ON THE COPYRIGHT ELEMENT FROM GOING FORWARD.

2            IF YOU WITHDRAW THOSE OBJECTIONS AND PRODUCE

3    WITNESSES ON THOSE TOPICS, I WILL DELAY ANY MOTION UNTIL AFTER

4    YOU'VE HAD A 30 (B) (6).

5            **MR. HOWARD:**  YOUR HONOR, THE TOPICS, WE DO HAVE SOME

6    OBJECTIONS TO THE TOPICS BECAUSE THEY ARE TERRIBLY OVERBROAD.

7    BUT WE HAVE OFFERED WITNESSES ON THE SUBJECT --

8            **THE COURT:**  I'M NOT GOING TO GET INTO ANY MORE

9    DETAIL.  YOU'RE GOING TO MEET AND CONFER WITH THAT GUIDANCE.  MY

10   POINT BEING THAT I THINK THE COPYRIGHT THING IS SOMETHING THAT

11   IS A VALID MOTION THAT SHOULD GO FORWARD.

12           HOWEVER, TO THE EXTENT -- AND IF YOU ARE OBJECTING --

13   AND THAT'S PART OF THE MOTION -- IF YOU'RE OBJECTING TO

14   SUBSTANCE OF WHAT THEY ARE SEEKING AND THAT'S PART OF THE MOTION

15   THERE'S NO REASON TO DELAY THE MOTION.

16           IF YOU'RE ALLOWING FULLY A 30 (B) (6) ON THE SAME

17   THINGS THAT WOULD BE BRIEFED, THEN I WANT TO HAVE THE DEPOSITION

18   GO FORWARD FIRST, BECAUSE IT MAY AT LEAST NARROW THE DISPUTE,

19   AND I CAN'T DRAW THAT LINE WITHOUT -- I MEAN, NOBODY HAS

20   PRESENTED ME ANYTHING.

21           **MR. HOWARD:**  OKAY.

22           **THE COURT:**  OKAY, NOW AS TO --

23           **MS. WALLACE:**  YOUR HONOR, MAY I?

24           **THE COURT:**  YOU KNOW, THIS IS WELL OVER THE HOUR YOU

25   ASKED FOR ALREADY NOW.

1          **MS. WALLACE:**  THERE WAS ONE OTHER COPYRIGHT-RELATED

2     ISSUE THAT I WAS HOPING WE COULD GET SOME GUIDANCE FROM THE

3     COURT, BECAUSE IT MAY AVOID -- MAY AVOID US HAVING TO INCLUDE IT

4     IN A MOTION OR SERVE ADDITIONAL REQUESTS.

5          **THE COURT:**  ALL RIGHT, IF IT'S BRIEF.  AND WE STILL

6     HAVE TO DISCUSS THE FINANCIAL DOCUMENTS AND THIRD-PARTY SUPPORT,

7     WHICH WE HAVEN'T GOTTEN TO.

8          **MS. WALLACE:**  I'LL MAKE IT VERY BRIEF.  ESSENTIALLY,

9     ORACLE JUST FILED A SECOND-AMENDED COMPLAINT.  AND IN THAT

10    COMPLAINT THERE ARE ADDITIONAL COPYRIGHT REGISTRATIONS.

11         WE HAVE ORACLE AT LEAST FOR THE MATERIALS THAT IT HAS

12    AGREED TO PRODUCE FOR THE REGISTRATIONS IDENTIFIED IN THE

13    FIRST-AMENDED COMPLAINT TO SUPPLEMENT ITS PRODUCTION SO THAT WE

14    HAVE THE SAME MATERIALS FOR THE NEW REGISTRATIONS IN THE

15    SECOND-AMENDED COMPLAINT.

16         **MR. HOWARD:**  WE'RE GOING TO PRODUCE THOSE, YOUR

17    HONOR.

18         **THE COURT:**  YOU ARE GOING TO PRODUCE THEM.

19         **MR. HOWARD:**  YES.

20         **THE COURT:**  SO WHEN?

21         **MR. HOWARD:**  WE ARE EXPECTING TO HAVE A SUPPLEMENTAL

22    PRODUCTION SOMETIME IN THE NEXT COUPLE OF WEEKS.  AND WE'RE

23    GOING TO INCLUDE THEM IN THAT PRODUCTION WHICH WILL HAVE SOME

24    OTHER COPYRIGHT-RELATED MATERIALS IN IT.

25         **THE COURT:**  ALL RIGHT. THAT'S FINE. OKAY.  SO LET'S

1  GO BACK TO THE FINANCIAL DOCUMENTS.  I MEAN, I -- YOU KNOW,

2  AGAIN, IF THERE'S GOING TO BE ACTUAL PRODUCTION OF FINANCIAL

3  DOCUMENTS IN THE TARGETED SEARCHES, I'D BE INCLINED TO HOLD OFF

4  ON THE MOTION FOR A SHORT WHILE.

5  **MR. MCDONELL:**  THESE DOCUMENTS THEY WILL NOT PRODUCE.

6  IF THEY SAY THEY WILL EVEN CONSIDER PRODUCING THEM, THAT'S A

7  DIFFERENT ISSUE.

8  **THE COURT:**  IT'S SORT OF THE SAME RULING I DID

9  BEFORE.  IN OTHER WORDS, IF YOU'RE GOING TO SAY TO THE TARGETED

10  SEARCHES:

11          "WE WON'T PRODUCE WHAT WE SAID WE'RE NOT GOING

12          TO PRODUCE IN RESPONSE TO THIS," THERE'S NO REASON TO

13  WAIT.

14  **MS. HOUSE:**  ON THE BASIC LEVEL, AT THE WEEDS LEVEL

15  THAT I WAS DESCRIBING TO YOU, WE STILL HAVE NOT GOTTEN A SINGLE

16  PIECE OF CORRESPONDENCE THAT EXPLAINS --

17  **THE COURT:**  WELL, THEN, YOU CAN FILE THAT MOTION.

18  **MR. MCDONELL:**  OKAY.

19  **THE COURT:**  BUT, YOU KNOW, SOUNDS TO ME FROM THE

20  DESCRIPTION THAT THIS IS GOING TO BE -- CALL FOR THE USUAL

21  SOLOMAN-LIKE RULING BY ME, WHICH IS THAT YOU'VE PROBABLY ASKED

22  FOR TOO MUCH AND THEY ARE PROBABLY GIVING YOU TOO LITTLE.

23          AND I'M SORT OF, YOU KNOW -- NOT EVERY ASPECT OF

24  ORACLE'S OPERATIONS ARE PROBABLY RELEVANT TO YOU.  SO IF YOU'RE

25  ASKING FOR EVERYTHING THEY HAVE IN GRANULAR DETAIL, EVERY

1   DEPARTMENT, THAT WOULD SEEM TO BE TOO MUCH. THAT MAY NOT BE WHAT

2   YOU'RE ASKING FOR.  I DON'T KNOW.

3          **MR. MCDONELL:**  IT'S GOING TO BE AN ELECTRONIC REPORT

4   THAT CAN BE READ ELECTRONICALLY.

5          BUT, YOUR HONOR, WE WILL TAKE YOUR COMMENTS --

6          **THE COURT:**  AND IF IT'S TOO BURDENSOME, I EITHER

7   WON'T ALLOW IT, OR I'LL SHIFT THE COST OF IT.

8          **MR. MCDONELL:**  WE UNDERSTAND.

9          **THE COURT:**  YES.  BUT --

10          **MS. HOUSE:**  COULD WE ALSO ASK FOR YOUR GUIDANCE THAT

11  WE COULD WORK ON A MUTUALLY-CONVENIENT SCHEDULE THAT TAKES INTO

12  ACCOUNT THE UPCOMING DEPOSITIONS AND THE TRAVEL AND ALL OF THE

13  OTHER THINGS THAT ARE BEING --

14          **THE COURT:**  WELL, YOU OUGHT TO TAKE THAT INTO

15  ACCOUNT.  AND I'LL HAVE TO LOOK AT MY OWN SCHEDULE, FRANKLY.  I

16  MEAN, I'M GOING TO BE IN TRIAL PROBABLY FOR THE ENTIRE MONTH OF

17  OCTOBER.  SO IT IS GOING TO BE A DIFFICULT MONTH FOR ME.

18          **MR. MCDONELL:**  WE WERE GOING TO SUGGEST A FILING ON

19  SEPTEMBER 19, YOUR HONOR.

20          **THE COURT:**  FOR A DATE OF 35 DAYS AFTER THAT?  THAT'S

21  THE USUAL MOTIONS SCHEDULE.

22          **MR. MCDONELL:**  THAT WOULD BE, ALTHOUGH IN THE MOTION

23  WE'VE JUST RESPONDED TO, IT WAS ON A MUCH MORE ACCELERATED --

24          **THE COURT:**  I DON'T HAVE IN MIND A SCHEDULE RIGHT

25  NOW.  YOU CAN -- YOU CAN PROPOSE ONE, AND I WILL DISPOSE

1  ACCORDING TO WHAT WILL WORK FOR MY SCHEDULE.  I JUST CAN'T -- I

2  WANT YOU TO MEET AND CONFER.  IF YOU CAN'T AGREE, YOU CAN

3  PROPOSE COMPETING SCHEDULES AND I'LL DECIDE WHAT SCHEDULE --

4        **MR. MCDONELL:**  BY LETTER TO YOUR HONOR?

5        **THE COURT:**  THAT'S FINE.

6        **MR. MCDONELL:**  AND THEN, THE OTHER PIECE OF THIS THE

7  MOTION WOULD ALSO TAKE INTO ACCOUNT THE FOUNDATIONAL 30 (B) (6)

8  ON THE PARTNERSHIP PROGRAM.

9        **THE COURT:**  THAT MAY END UP BEING ON THIS -- OKAY.

10  SO WE'VE TALKED ABOUT FINANCIAL.  WE'VE TALKED ABOUT --

11        **MR. MCDONELL:**  COPYRIGHT.

12        **THE COURT:**  -- COPYRIGHT.  AND WHAT DID WE SAY ABOUT

13  THIS PART?

14        **MR. MCDONELL:**  I THINK WE DIDN'T SAY, BUT I'M

15  INFERRING THAT WOULD BE TREATED THE SAME AS FINANCIAL, THAT WE

16  WOULD MOVE AND PROPOSE A SCHEDULE.

17        **THE COURT:**  YEAH. I MEAN, IF YOU'RE MAKING -- I MEAN,

18  I WILL SAY THAT, YOU KNOW, ON THIRD-PARTY SUPPORT AT FIRST BLUSH

19  I WOULD TEND TO THINK THAT PARTNERS WITH ORACLE DON'T SEEM

20  VERY -- DON'T SEEM SIGNIFICANTLY RELEVANT TO OPEN IT UP.  I

21  MEAN, IF THEY ARE ORACLE PARTNERS, BY DEFINITION, THEY ARE

22  GIVING THEM PERMISSION TO DO THINGS.

23        AND WHEREAS, THE ONES THAT ARE IN A SIMILAR POSITION

24  TO TOMORROWNOW DO SEEM TO BE. AND DID JUDGE LEGGE ALREADY RULE

25  ON THIS?

1      **MR. MCDONELL:**  HE DENIED IT WITHOUT PREJUDICE SUBJECT

2  TO OUR MAKING A FURTHER FOUNDATIONAL SHOWING.

3          **THE COURT:**  ALL RIGHT.

4      **MR. MCDONELL:**  AND IF THEY DON'T GIVE US ANY

5  INFORMATION ABOUT THE PARTNERSHIP PROGRAM, WE ARE HAMSTRUNG IN

6  OUR ABILITY TO MAKE THAT --

7          **THE COURT:**  WELL, ISN'T THERE A CERTAIN AMOUNT THAT

8  IS PUBLIC ON THAT?

9      **MR. MCDONELL:**  THERE IS.  THERE IS.  AND WE WILL

10  CERTAINLY INCLUDE THAT.

11          **THE COURT:**  I MEAN, YOU KNOW, I WOULD -- I MEAN, AND

12  IF THERE'S SOME, YOU KNOW, READILY ACCESSIBLE SAMPLE AGREEMENTS

13  ABOUT -- THAT ARE NONPUBLIC THAT YOU CAN GIVE TO THEM THAT GIVES

14  THEM JUST A LITTLE MORE DETAIL ABOUT IT WITHOUT GOING INTO

15  EXCRUCIATING DETAIL ABOUT ALL THE PARTNERS AND HOW IT ACTUALLY

16  WORKS AND HOW MUCH MONEY THEY MAKE, BUT JUST THE STRUCTURE OF

17  IT, YOU OUGHT TO JUST GIVE IT TO THEM.  AND MAYBE THAT WILL HELP

18  YOU ASSESS WHETHER IT IS OR ISN'T RELEVANT.

19          I'M DUBIOUS ABOUT WHETHER IT'S RELEVANT.  I'LL TELL

20  YOU THAT RIGHT NOW.

21          **MR. MCDONELL:**  THAT WILL BE OUR BURDEN ON THE MOTION,

22  YOUR HONOR.

23          **THE COURT:**  SO, I MEAN, YOU KNOW, I THINK OVER THE

24  YEARS I'VE HEARD ABOUT IT IN SOME CONTEXT OR ANOTHER.  I CAN'T

25  REMEMBER WHAT.  AND IT DOES SEEM LIKE A COMPLETELY DIFFERENT

1 THING. AND THAT THE RELEVANCE WOULD BE -- IF THERE IS ANY --

2 WOULD BE OUTWEIGHED BY THE BURDENSOME.

3        **MR. MCDONELL:** I WON'T ARGUE THE MOTION NOW.

4        **THE COURT:** OKAY. OBVIOUSLY, I COULD CHANGE MY MIND,

5 YOU KNOW, DEPENDING ON WHAT THE SHOWING WAS. SO I WON'T

6 PRECLUDE YOU FROM ARGUING THAT. BUT YOU SHOULD THINK ABOUT

7 WHETHER THERE'S SOME STEP SHORT OF THAT, YOU KNOW.

8        OKAY.

9        **MR. MCDONELL:** OKAY.

10        **THE COURT:** SO NOW LET'S GO TO THIS MOTION ABOUT THE

11 CLAWED BACKED DOCUMENTS. I HAVE LOOKED AT THE DOCUMENTS THAT

12 WERE SUBMITTED.

13        I DO AGREE THAT UNDER THE PROTECTIVE ORDER THAT WAS

14 ENTERED INTO, I DON'T THINK ORACLE SHOULD HAVE KEPT THE COPIES.

15 I DON'T -- I MEAN, I JUST DON'T THINK THAT'S THE PLAIN LANGUAGE

16 OF IT.

17        **MR. PICKETT:** I THINK WE WERE EXACTLY PERMITTED TO

18 KEEP A COPY UNDER THE PLAIN LANGUAGE FOR PURPOSES OF DISASTER

19 RECOVERY.

20        **THE COURT:** WELL, I DON'T THINK SO. I MEAN, I'M NOT

21 ISSUING ANY SANCTIONS OR ANYTHING LIKE THAT. BUT READING THE

22 ORDER, IT DOESN'T SEEM TO PERMIT KEEPING COPIES. IT SAYS:

23        "GIVE THEM BACK," I THINK.

24        **MR. PICKETT:** THERE'S A SPECIFIC --

25        **THE COURT:** I DON'T HAVE THE EXACT LANGUAGE IN FRONT

1  OF ME.  CAN YOU --

2          **MR. PICKETT:**  THERE'S A SPECIFIC PARAGRAPH IN THAT.

3          **MR. COWAN:**  NOT IN THE ORDER, YOUR HONOR.

4          **MR. PICKETT:**  IT'S IN THE --

5          **MR. COWAN:**  THE PARTIES HAD A SEPARATE AGREEMENT --

6          **THE COURT:**  THE AGREEMENT.

7          **MR. COWAN:**  FOR LOGISTICAL PURPOSES, RATHER THAN

8  GOING TO THE EXPENSE OF HAVING OUR EXPERTS CREATE NEW CD'S THAT

9  HAVE THOUSANDS AND THOUSANDS OF DOCUMENTS --

10         **THE COURT:**  RIGHT.

11         **MR. COWAN:**  -- THAT WE WOULDN'T YANK BACK THE ONES,

12  ERASE THE THING OFF AND SEND THEM NEW CD'S.

13         WE SAID:

14             "YOU CAN KEEP THOSE FOR DISASTER RECOVERY

15             PURPOSES.  DON'T LOOK AT THEM."

16         THAT'S WHAT THE PARTIES AGREED.  THAT IS THE ONLY

17  AGREEMENT.

18         **THE COURT:**  BUT THERE WAS NO DISASTER RECOVERY HERE.

19         **MR. COWAN:**  THERE WAS ANALYSIS OF THE DOCUMENTS.

20         **MR. PICKETT:**  NO, BUT THERE'S WHAT I WOULD SAY IS A

21  COMPLETELY INCONSISTENT PROVISION THAT SAYS YOU CAN USE THE

22  DOCUMENTS IN CONNECTION WITH ANY CLAWED BACK MOTION.

23         **THE COURT:**  WELL, TO ME --

24         **MR. PICKETT:**  BUT USE --

25         **THE COURT:**  YEAH.  YEAH.  YEAH.  I GUESS I WOULD

1  RECONCILE THOSE.  I THINK THEY ARE IN SOME TENSION.  BUT I THINK

2  IT MEANT YOU HAD TO GIVE IT BACK AND THEN ASK THEM TO FILE THEM

3  UNDER SEAL.

4          **MR. PICKETT:**  WE DID.

5          **THE COURT:**  WELL, BUT, YEAH.  YOU KEPT AND ANALYZED

6  THE COPIES.  I DON'T THINK THAT WAS CONTEMPLATED BY THE

7  AGREEMENT.  I DON'T THINK THE AGREEMENT MAYBE MADE TOTAL SENSE

8  BUT --

9          **MR. PICKETT:**  JUST FOR CLARIFICATION, IN CASE THIS

10 COMES UP AGAIN, ARE WE PERMITTED TO TAKE NOTES FROM THE

11 DOCUMENTS AT ANY POINT?

12         **THE COURT:**  I DON'T KNOW WHAT SHOULD BE THE RIGHT

13 STANDARD.

14         **MR. PICKETT:**  BECAUSE OTHERWISE --

15         **THE COURT:**  I THINK WHAT YOU AGREED TO IN THE PAST IS

16 NO. AND I'M NOT TOTALLY UP ON WHAT -- I MEAN, I'VE SEEN THERE'S

17 SOME A.B.A. OPINIONS AND THINGS LIKE THIS.  AND I DON'T HAVE A

18 CLEAR UNDERSTANDING IN MY OWN MIND OF WHAT THE RIGHT PROCEDURE

19 IS.

20         THIS IS COMING UP MORE AND MORE.  AND I'VE HAD VERY,

21 YOU KNOW, HEATED ARGUMENTS ABOUT IT.  AND I'M NOT REALLY SURE.

22         **MR. PICKETT:**  IT'S A TOUGH ISSUE, I AGREE.

23         **THE COURT:**  YEAH.  I'M REALLY NOT SURE ABOUT IT.  BUT

24 I JUST THINK THE PLAIN LANGUAGE OF THE AGREEMENT SAYS:

25         "NO, YOU CAN'T."

1    NOW, THAT DOESN'T MEAN MAYBE THE AGREEMENT SHOULDN'T

2  BE REVISED.  I DON'T KNOW WHAT THE RIGHT ANSWER IS, AND I'M NOT

3  PREPARED TO ADDRESS IT TODAY, AND I HOPE I'M NOT GOING TO HAVE

4  TO.

5    **MR. PICKETT:**  OKAY.

6    **THE COURT:**  IF I DO, IT'S GOING TO TAKE TREMENDOUS

7  AMOUNT OF TIME, AND I WILL HAVE TO DEVOTE A LOT OF RESOURCES TO

8  THAT AS OPPOSED TO SOME OF THE OTHER ISSUES YOU HAVE, BECAUSE I

9  THINK IT'S A VERY TRICKY THEORETICAL ISSUE.

10    **MR. PICKETT:**  RIGHT.   I DON'T THINK EITHER PARTY

11  WANTS THAT, AND WE WILL TRY TO WORK OUT ANY PROCEDURES SO WE --

12    **MR. COWAN:**  I JUST WANT TO MAKE SURE WHAT THE COURT'S

13  CURRENT DIRECTIVE IS.

14    **THE COURT:**  MY CURRENT DIRECTIVE IS THAT IF THERE'S A

15  CLAWED BACK -- THAT UNDER THE CLAWED BACK YOU HAVE TO GIVE BACK

16  ALL YOUR COPIES EXCEPT FOR THIS DISASTER RECOVERY COPY, WHICH IS

17  NOT FOR PURPOSES FOR USING IN A MOTION.

18    WHAT THE RIGHT ANSWER IS -- I THINK THAT'S JUST WHAT

19  IT SAYS. I DON'T KNOW WHAT THE BEST APPROACH IS.  I DON'T KNOW

20  THE RIGHT ANSWER.

21    WHETHER IT'S LIKE, YOU KNOW, ACCORDING TO WHAT I

22  READ, THAT STATE SECRETS CASE, WHERE, YOU KNOW, YOU CAN'T EVEN

23  USE YOUR RECOLLECTION, OR WHETHER YOU CAN USE YOUR RECOLLECTION,

24  WHETHER YOU TAKE NOTES, I DON'T KNOW WHAT THE RIGHT STANDARD IS.

25  BUT I'M SAYING "NO" TO ANY KEEPING OR NOTES OR READING AT THIS

1  POINT.

2         I THINK THAT IS ONE OF THE MOST CONSERVATIVE

3  INTERPRETATION OF A.B.A. VIEW.  I DON'T KNOW IF THAT IS THE

4  RIGHT ONE.  IT'S NOT THE ONLY ONE.  THERE'S A LOT OF

5  CONTROVERSY.  I DON'T KNOW WHAT THE RIGHT ANSWER IS, SO I'M NOT

6  CASTING ANY ETHICAL ASPERSIONS ON ANYBODY FOR THAT REASON.  I'M

7  JUST TRYING TO ENFORCE WHAT I READ THE PLAIN LANGUAGE OF THE

8  AGREEMENT IS.

9         **MR. COWAN:**  AND NOR DID WE, YOUR HONOR, THAT'S WHY WE

10  DIDN'T ASK FOR ANY SANCTIONS.

11         **MR. PICKETT:**  RIGHT, BECAUSE -- NOT TO DEBATE -- AT

12  THE MAY 28TH HEARING THERE WAS LANGUAGE THAT SAID WE COULD REFER

13  TO THE CONTENTS OF THE DOCUMENTS --

14         **THE COURT:**  YEAH, SO I'M NOT --

15         **MR. PICKETT:**  -- AND GIVE IT BACK.  SO IT'S TOUGH.

16         **THE COURT:**  I'M JUST --

17         **MR. PICKETT:**  SO IT'S A TOUGH ISSUE.

18         **THE COURT:**  THE AGREEMENT IS SOMEWHAT UNCLEAR WHY --

19  WHAT IT CONTEMPLATES BY THAT.

20         **MR. PICKETT:**  RIGHT.

21         **THE COURT:**  BUT, ANYWAY, I AM RULING ON THAT.  YOU

22  GUYS DID SUBMIT IT, AND I'VE LOOKED AT THE DOCUMENTS, AND I'M

23  READY TO RULE ON THEM, SO --

24         **MR. PICKETT:**  WOULD YOU LIKE SOME ARGUMENT ON IT

25  OR --

1          **THE COURT:**  WELL, YOU CAN ARGUE.  I JUST, YOU KNOW --

2    AND I KNOW YOU CAME ALL THE WAY HERE TO ARGUE.  THERE'S JUST A

3    LIMITED AMOUNT -- I MEAN, I THINK I'VE LOOKED AT IT ALL. I JUST

4    DON'T BUY THE IDEA THAT THEY HAVE USED THE SWORD AND THE SHIELD

5    REALLY.

6          YOU HAVE THE ACTUAL -- JUMPING TO THAT LAST POINT,

7    WHAT IS IT CALLED, THE --

8          **MR. COWAN:**  THE RULES OF ENGAGEMENT?

9          **THE COURT:**  YES, THE RULES OF ENGAGEMENT.

10          **MR. PICKETT:**  ROE.

11          **THE COURT:**  OKAY.  YOU'VE ACTUALLY BEEN PROVIDED

12    THEM, RIGHT, THE RULES OF ENGAGEMENT. BUT WHAT YOU'RE SAYING IS

13    YOU SHOULD BE ABLE TO INQUIRE INTO THE LEGAL ADVICE THAT LED TO

14    THEM.

15          **MR. PICKETT:**  RIGHT.  AND I CAN ADDRESS THE SWORD AND

16    THE SHIELD ISSUE IN MAYBE TWO MINUTES, IF THAT WILL HELP.

17          **THE COURT:**  OKAY.

18          **MR. PICKETT:**  THAT'S ONE OF TWO BASES ON WHICH WE'RE

19    SEEKING FOUR, FIVE AND SIX DOCUMENTS.

20          TO BEGIN, THE ANALYSIS BEGINS WITH SAP'S INCONSISTENT

21    CHARACTERIZATIONS OF WHAT THE RULES OF ENGAGEMENT MEAN, WHAT

22    THEIR ORIGINS WERE, WHAT THEIR PURPOSE WAS.

23          ON THE ONE HAND, THEY SAY IN THEIR OPPOSITION TWICE

24    AT PAGE TWO AND NINE THAT THE RULES OF ENGAGEMENT WERE, QUOTE:

25          "A BUSINESS DECISION TO CREATE A FIGURATIVE

1    FIREWALL BETWEEN IT AND TOMORROWNOW," CLOSE QUOTE.

2    BUSINESS DECISION.

3    BUT AT THE SAME TIME, PAGE NINE, NOTE 11, FOOTNOTE 11

4    SAYS, QUOTE:

5    "THE SOLE PURPOSE OF THAT DECISION WAS AN

6    ATTEMPT BY SAP TO AVOID LIABILITY FOR THE DEBTS OF

7    TOMORROWNOW WHICH PRESUMABLY INCLUDE ANY LIABILITY

8    FOR COPYRIGHT INFRINGEMENT."

9    SO YOU LOOK ELSEWHERE, WHAT'S GOING ON ELSEWHERE.

10   THEY SAY AT PAGE TEN THAT THE BUSINESS GOAL OF THE RULES OF

11   ENGAGEMENT, QUOTE:

12   "WAS TO ASSURE THAT NO ALLEGED ORACLE

13   PROPRIETARY INFORMATION OBTAINED BY TOMORROWNOW WOULD

14   REACH SAP, THAT THAT WAS A BUSINESS GOAL."

15   BUT THAT REALLY BEGS THE QUESTION.  WHY DID THEY DO

16   THAT?  DID THEY DO THAT TO LIMIT LIABILITY?  DID THEY DO THAT

17   FOR SOME OTHER REASON?  IF THAT WASN'T THE REASON, WHAT WAS THE

18   BUSINESS REASON?

19   AND LISTEN TO WHAT THEIR 30 (B) (6) WITNESS SAYS

20   ABOUT THAT.  I DID THAT DEPOSITION. I ASKED THE WITNESS, MR.

21   SHENKMAN, I SAID:

22   "WHY DID THE BOARD OF SAP SET UP THE RULES OF

23   ENGAGEMENT?"

24   SIMPLE QUESTION.

25   AND THE ANSWER WAS, QUOTE:

1          "THEY WERE DONE IN CONSULTATION WITH LEGAL

2      COUNSEL."

3          SO HE'S SAYING THERE WAS A LEGAL REASON TO DO IT,

4  NOT A BUSINESS REASON TO DO IT. AND YET, OF COURSE, ON THIS

5  MOTION THEY SAY THAT THEY WILL NEVER MAKE THE CONTENTION THAT IT

6  HAD A LEGAL REASON.  THEY MAKE THIS PROMISE, YOU KNOW, THAT

7  LEGAL IS OUT OF IT.

8          BUT THAT'S NOT WHAT THE SAP WITNESSES SAY.

9          THE ONLY OTHER WITNESS WE'VE ASKED ABOUT THAT,

10  MR. MACKEY, TESTIFIED THAT THE RULES OF ENGAGEMENT WERE PUT IN

11  PLACE TO PREVENT LIABILITY FROM BLEEDING OVER FROM TOMORROWNOW

12  TO SAP.

13          THAT IS USING THOSE RULES OF ENGAGEMENT IN A WAY

14  IMBUED WITH ALL THE LAWYER INVOLVEMENT AND SO FORTH THAT IS

15  UNFAIR TO US, BECAUSE THEY ARE GIVING US DIFFERENT ANSWERS.  BUT

16  SOME OF THEIR ANSWERS IMPLICATE THE LAWYERS AND IMPLICATE THE

17  LAWYERS' DECISIONS.

18          ONE LAST COMMENT ON THAT. THEY DO PROMISE THAT THEY

19  HAVE NOT AND WILL NOT USE AS A DEFENSE IN THE CASE THE FACT OR

20  SUBSTANCE OF THEIR LAWYERS' CONTEMPORANEOUS LEGAL ANALYSIS OR

21  LEGAL ADVICE.

22          BUT IT'S -- FIRST OF ALL, IT'S TOO LATE, BECAUSE THEY

23  HAVE ALREADY SAID THE LAWYERS WERE THE REASON, THE 30 (B) (6)

24  WITNESS SAID THE LAWYERS WERE THE REASON THE BOARD ADOPTED IT.

25          TWO:  THE LAWYERS WERE CLEARLY INVOLVED AT A LOT OF

1   DIFFERENT STAGES, SO IT IS DIFFICULT TO UNDERSTAND HOW THEY ARE

2   GOING TO SAY:

3                    "WE HAD THIS BUSINESS PURPOSE FOR DOING THIS,"

4           WHATEVER THAT MAY MEAN, ASIDE FROM LIABILITY.

5           AND FINALLY AND MOST IMPORTANTLY, IT DEPRIVES ORACLE

6   OF A KEY -- AT LEAST ONE KEY ARGUMENT.  WE'RE SEEKING, AMONG

7   OTHER THINGS, PUNITIVE DAMAGES.

8           AND WE MAY LIKELY PORTRAY THIS CREATION OF A FIREWALL

9   AS PART OF A DELIBERATE PLOT TO PRETEND IN BAD FAITH THAT THEY

10  WERE TRYING TO PROTECT ORACLE'S IP RIGHTS AND WERE KEEPING THIS

11  SEPARATE TO PROTECT ORACLE WHEN, IN FACT, THEY KNEW THAT

12  TOMORROWNOW WAS OPERATING ILLEGALLY.  AND THAT THEY, SAP, THAT

13  SAP WOULD BE LIABLE FOR THAT ACTIVITY KNOWING THAT IT PERMITTED

14  THAT ACTIVITY AND COULDN'T, IN FACT, PROTECT ITSELF THROUGH A

15  FIREWALL.

16          SO WE'RE TRYING TO GET AT THAT INFORMATION FOR THAT

17  REASON.

18          **THE COURT:**  BUT TO ME THAT LAST ARGUMENT WOULD

19  REQUIRE A CRIME FRAUD EXCEPTION.

20          **MR. PICKETT:**  WELL, WE'RE NOT DOING THAT YET.

21          **THE COURT:**  AND IF YOU'RE NOT GOING THAT FAR, I DON'T

22  THINK THAT -- YES, OF COURSE, YOU WOULD LIKE TO HAVE PUNITIVE

23  DAMAGES, BUT YOU DON'T NORMALLY GET TO HAVE THE LAWYERS RAT ON

24  THEIR CLIENTS TO PROVE IT, UNLESS YOU PROVE CRIME OF FRAUD.

25          SO, YOU KNOW, BUT -- SO I TAKE IT YOU'RE TRYING TO

DRAW A LINE BETWEEN SAYING:

"PROOF OF THE PUDDING IS THE POLICY ITSELF, NOT WHY WE ADOPTED IT." I MEAN, I THINK YOU ARE SOMEWHAT INCONSISTENT AS THE BUSINESS ISN'T LEGAL. BUT THE FACT IS, I MEAN, BOARDS MAKE BIG DECISIONS ALL THE TIME WITH ADVICE OF COUNSEL.

AND THE DECISION, THE RESULT OF THE DECISION, THE POLICY ITSELF CAN BE REVEALED AND DISCUSSED AND USED IN THE LITIGATION WITHOUT TRANSLATING INTO OPENING, WAIVING THE PRIVILEGE IN ANY WAY.

AND I DON'T THINK THIS IS THE KIND OF THING LIKE IN A PATENT CASE WHERE YOU RELY ON THE ADVICE OF COUNSEL:

"THEY TOLD US WE WEREN'T INFRINGING."

INSTEAD, THEY ARE RELYING ON THEY HAD THIS FIREWALL. IT EITHER IS A POTEMKIN VILLAGE, WHICH IS, YOU KNOW, FULL OF HOLES AND, YOU KNOW, TO MIX A LOT OF METAPHORS, THAT IT'S NO GOOD, AND YOU PROVE THAT -- AND SOUNDS LIKE YOU THINK YOU CAN -- AND THAT IS THE BAD FAITH. THIS WAS A BIG PHONY THING THAT WAS. YOU KNOW. NEVER GOING TO WORK. AND THEY KNEW IT.

BUT YOU DON'T NEED THE LAWYERS' ASSISTANCE -- YOU'RE NOT ENTITLED TO LAWYERS' ASSISTANCE TO DO THAT.

IT SEEMS TO ME THE APPROPRIATE TIME TO MAKE SURE THAT THEY DON'T BLEED THAT DEFENSE OVER IS A MOTION IN LIMINE. I MEAN, I THINK YOU WILL HAVE TO LIVE BY THE RESTRICTIONS.

ULTIMATELY, JUDGE HAMILTON IS GOING TO HAVE TO DECIDE

1  IF THERE IS A GRAY AREA.  PRESUMABLY, SHE WILL DECIDE, BECAUSE I

2  THINK IT'S A MOTION-IN-LIMINE-TYPE ARGUMENT.

3  　　　　　BUT THE MINUTE YOU TRY GOING BEYOND THAT AND SAY --

4  LIKE IF THEY SAY:

5  　　　　　　　"WELL, YOU KNOW, THIS POLICY WAS NO GOOD.  THIS

6  　　　　　　　FIREWALL WAS FULL OF HOLES," AND YOU SAY:

7  　　　　　　　"WELL, BUT WE ADOPTED IT IN GOOD FAITH BECAUSE

8  　　　　　　　OUR LAWYERS TOLD US IT WOULD WORK," YOU CAN'T SAY

9  THAT.  YOU'RE NOT GOING TO BE ABLE TO SAY ANYTHING LIKE THAT.

10  　　　　　AND I'M SURE THEY ARE GOING TO JUMP DOWN YOUR THROAT

11  THE MINUTE YOU TRY, AND YOU PROBABLY SHOULDN'T GET AWAY WITH

12  THAT. BUT TO ME THAT'S THE ANSWER.

13  　　　　　**MR. PICKETT:**  THANK YOU.

14  　　　　　**THE COURT:**  OKAY. AND AS TO THE DOCUMENTS

15  THEMSELVES --

16  　　　　　**MR. PICKETT:**  JUST ONE --

17  　　　　　**THE COURT:**  YES.  OKAY.

18  　　　　　**MR. PICKETT:**  YOU'RE ALSO RULING ON THE SELECTIVE

19  WAIVER ISSUE, WHICH I KNOW IS A VERY SLIPPERY ISSUE.

20  　　　　　**THE COURT:**  YEAH, I DON'T SEE A SELECTIVE WAIVER,

21  EITHER.  BUT I'M GOING THROUGH THE DOCUMENTS.

22  　　　　　**MR. PICKETT:**  I KNOW IT'S A DIFFICULT ISSUE, AND I

23  WONDER THERE MAY NOT BE ENOUGH DATA POINTS.  AND I KNOW THE

24  CONCERN ABOUT TIME.  WE MAY OR MAY NOT BRING BACK SOME MORE DATA

25  POINTS TO YOU AT SOME POINT.

**THE COURT:** WELL, I DID READ EVERYTHING IN THE
MOTION, AND I WASN'T CONVINCED BY IT. SO --

**MR. PICKETT:** I UNDERSTAND. I'M TALKING ABOUT THE
NUMBER OF EXAMPLES WHERE THEY HAVE WAIVED IT.

**THE COURT:** YEAH, I HAD --

**MR. PICKETT:** WE HAD AN EXAMPLE OF EXHIBIT X, WHICH
COMPARED TO EXHIBIT FOUR.

**THE COURT:** WELL, I HAD --

**MR. PICKETT:** THEY ARE ON THE SAME TOPICS, AND
EXHIBIT X WAS PRODUCED, EVEN THOUGH IT'S TO THE LAWYER.

**THE COURT:** I JUST NEED TO WARN YOU YOU WILL BE
AGAINST VERY BIG HEADWINDS. IN MY OPINION IN MAJOR DISCOVERY
CASES LIKE THIS THAT HAVE LOTS AND LOTS OF DOCUMENTS AND
REASONABLE EFFORTS HAVE BEEN TAKEN AND KNOWING, AS I DO --
PROBABLY IN SOME WAYS MORE INTIMATELY. I CAN'T HIRE A TEAM OF
PEOPLE IN INDIA TO WORK 24/7. I HAVE TO REVIEW THE ACTUAL
DOCUMENTS AND DRAW THE LINES. I KNOW HOW HARD THAT IS.

**MR. PICKETT:** OKAY.

**THE COURT:** AND I SEE OVER AND OVER IN TEN YEARS
EXCELLENT LAWYERS TRYING VERY HARD, BEING INCONSISTENT WITH EACH
OTHER. SO I'M NOT --

**MR. PICKETT:** FAIR ENOUGH.

**THE COURT:** I THINK YOU HAVE TO CUT SOME SLACK. AND I
THINK YOU'LL WANT THAT SLACK CUT FOR YOU IN SOME CASES PROBABLY.
THIS ONE. I MEAN, IT IS JUST A VERY DIFFICULT TASK.

1    SO I AM, IN GENERAL -- AND I SAID THIS BEFORE -- I AM

2    VERY, VERY SUPPORTIVE OF CLAWED BACK. I AM VERY RELUCTANT TO

3    FIND WAIVER.

4         **MR. PICKETT:**  I UNDERSTAND.

5         **THE COURT:**  I JUST THINK IT'S TOO HARD. YOU KNOW, I

6    THINK WE'RE TALKING ABOUT A PROFESSIONAL STANDARD THAT IS

7    IMPOSSIBLE TO MEET AND LITIGATION IS JUST NOT GOING TO BE ABLE

8    TO PROCEED ON THAT BASIS, SO THAT'S MY PHILOSOPHY.

9         **MR. PICKETT:**  I UNDERSTAND.

10        **THE COURT:**  SO ON THE ACTUAL LINE DRAWING HERE, I --

11   YOU KNOW, A LOT OF THIS IS CLOSE CALLS. I WOULD -- IN GENERAL, I

12   FIND MOST OF IT PROPERLY REDACTED.

13        BUT ON THE FIRST DOCUMENT, THE FIRST PAGE,

14   TNOROO854803, ALTHOUGH IT DOES START WITH BACK TO CHRISTOPHER

15   FAYE, WHO IS A LAWYER, I THINK ALL THE INFORMATION ON THAT PAGE

16   IS NOT -- IT JUST DOES NOT SEEM TO ME THAT IT REALLY IS

17   LAWYER-DRIVEN INFORMATION, AND I DON'T REALLY THINK THAT MR.

18   NELSON CAN REMEMBER THAT SUFFICIENTLY TO CONVINCE ME THAT THAT

19   IS WHAT IT WAS.  SO I WOULD UNREDACT THAT PAGE AND UP TO THE

20   NEXT PAGE, THE FIRST LINE, WHICH I THINK IS PART OF THE SAME

21   THING.

22        ON THE OTHER HAND, EVERYTHING AFTER THE FIRST LINE OF

23   THAT PAGE, WHICH ENDS IN 804, THEN, THE SECOND PAGE OF THAT

24   DOCUMENT, I THINK DOES CONCERN AGENDA OF DISCUSSIONS WITH A

25   LAWYER, AND I THINK THAT'S PROPERLY REDACTED.

1    NOW, AGAIN, I THINK THAT'S A CLOSE CALL, BUT THAT'S

2    HOW I WOULD CALL IT.

3    ON THE REST OF IT I THINK IT WAS ALL PROPERLY

4    REDACTED. SO THAT'S MY CALL.  IF THERE'S ANYTHING ELSE SIMILAR

5    AND INCLUDING THE ONE THAT YOU DEDESIGNATED, OBVIOUSLY THOSE

6    SIMILAR THINGS SHOULD BE DEDESIGNATED, AS WELL.

7    **MR. COWAN:**  UNDERSTOOD, YOUR HONOR.

8    **MR. PICKETT:**  THAT'S DOCUMENT ONE.  THERE WERE TWO

9    OTHERS THAT WE HAD REQUESTED SOME GUIDANCE ON.

10    **THE COURT:**  WELL, THE OTHERS, I'M SAYING I LOOKED AT

11    THEM ALL LAST NIGHT, AND I THINK THEY ARE ALL PROPERLY REDACTED.

12    **MR. PICKETT:**  GOT IT. OKAY.

13    **THE COURT:**  OKAY. SO, I THINK WE'RE DONE.

14    **MR. COWAN:**  YES, WE ARE.

15    **MS. HOUSE:**  YES.  THANK YOU, YOUR HONOR.

16    **MR. COWAN:**  THANK YOU, YOUR HONOR.

17    **MS. HOUSE:**  WE HAD ASKED FOR HAVING ANOTHER --

18    BECAUSE OF YOUR SCHEDULE AND HOW HARD IT IS, AND WE DO THINK

19    THEY HAVE PROVEN TO BE VERY VALUABLE CONFERENCES.

20    **THE COURT:**  GOOD.

21    **MS. HOUSE:**  SO WE PROPOSED IN THE OPENING OF THE

22    CONFERENCE SOME DATES THAT WORKED FOR US.

23    **THE COURT:**  I FORGOT THAT.

24    **MS. HOUSE:**  IF YOU WANT TO WORK WITH YOUR CALENDAR --

25    **THE COURT:**  HAVE WE LOOKED AT THOSE?

1              I THINK WE BETTER LOOK AT THEM.

2              **MS. HOUSE:**  GREAT.  I THINK IT'S WORKING WELL TO GET

3  TOGETHER.

4              **THE COURT:**  I AGREE WITH YOU, SO I WILL DO THAT.

5              **MR. HOWARD:**  THANK YOU, YOUR HONOR.

6              (THEREUPON, THIS HEARING WAS CONCLUDED.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF REPORTER

2            I, KATHERINE WYATT, THE UNDERSIGNED, HEREBY CERTIFY

3    THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED

4    SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED BY ME INTO

5    TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE

6    RECORD OF SAID PROCEEDINGS.

7            I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR

8    ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING

9    PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE

10   OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

11           THE FEE CHARGED AND THE PAGE FORMAT FOR THE

12   TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL

13   CONFERENCE.

14           IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS

15   4TH DAY OF SEPTEMBER, 2008.

16

17

18

19

20       S/S KATHY WYATT

21

22

23

24

25
```