1   BINGHAM McCUTCHEN LLP
    DONN P. PICKETT (SBN 72257)
2   GEOFFREY M. HOWARD (SBN 157468)
    HOLLY A. HOUSE (SBN 136045)
3   ZACHARY J. ALINDER (SBN 209009)
    BREE HANN (SBN 215695)
4   Three Embarcadero Center
    San Francisco, CA 94111-4067
5   Telephone: (415) 393-2000
    Facsimile: (415) 393-2286
6   donn.pickett@bingham.com
    geoff.howard@bingham.com
7   holly.house@bingham.com
    zachary.alinder@bingham.com
8   bree.hann@bingham.com

9   DORIAN DALEY (SBN 129049)
    JENNIFER GLOSS (SBN 154227)
10   500 Oracle Parkway
    M/S 5op7
11   Redwood City, CA 94070
    Telephone: (650) 506-4846
12   Facsimile: (650) 506-7114
    dorian.daley@oracle.com
13   jennifer.gloss@oracle.com

14   Attorneys for Plaintiffs
    Oracle USA, Inc., Oracle International Corp., Oracle
15   Systems Corp., Oracle EMEA Ltd., and J.D. Edwards
    Europe Ltd.
16

17            UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19            SAN FRANCISCO DIVISION

| | |
|---|---|
| 20   ORACLE USA, INC., a Colorado corporation, | CASE NO. 07-CV-01658 PJH (EDL) |
| 21   ORACLE INTERNATIONAL CORPORATION, a California corporation, ORACLE SYSTEMS | THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE |
| 22   CORPORATION, a Delaware corporation, ORACLE EMEA LIMITED, an Irish private | RELIEF FOR: |
| 23   limited company, and J.D. EDWARDS EUROPE LIMITED, an Irish private limited company, | (1) COPYRIGHT INFRINGEMENT; |
| 24           Plaintiffs, | (2) VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT; |
| 25      v. | (3) VIOLATIONS OF THE COMPUTER DATA ACCESS AND FRAUD ACT; |
| 26   SAP AG, a German corporation, SAP AMERICA, INC., a Delaware corporation, | (4) BREACH OF CONTRACT; (5) INTENTIONAL INTERFERENCE |
| 27   TOMORROWNOW, INC., a Texas corporation, and DOES 1-50, inclusive, | WITH PROSPECTIVE ECONOMIC ADVANTAGE; |
| 28 | (6) NEGLIGENT INTERFERENCE |

Dockets.Justia.com

WITH PROSPECTIVE ECONOMIC
ADVANTAGE;
(7) UNFAIR COMPETITION;
(8) TRESPASS TO CHATTELS;
(9) UNJUST ENRICHMENT /
RESTITUTION; and,
(10) AN ACCOUNTING.

DEMAND FOR JURY TRIAL

Defendants.

Plaintiffs Oracle USA, Inc. ("Oracle USA"), Oracle International Corporation ("OIC"), Oracle Systems Corporation ("OSC"), Oracle EMEA Limited ("OEMEA"), and J.D. Edwards Europe Limited ("JDEE") (together "Oracle" or "Plaintiffs") for their Complaint against Defendants SAP AG ("SAP AG"), SAP America, Inc. ("SAP America"), TomorrowNow, Inc. ("TomorrowNow" or "SAP TN"), and Does 1 through 50 (collectively referred to as "SAP" or "Defendants"), allege as follows based on their personal knowledge as for themselves, and on information and belief as to the acts of others:

I.      INTRODUCTION

1.      This case is about a conspiracy, led by German software conglomerate SAP AG, to engage in and cover-up corporate theft of Oracle intellectual property on the grandest scale.

2.      In mid-December 2004, in response to Oracle's impending acquisition of PeopleSoft, SAP AG CEO Henning Kagermann and the SAP AG executive board of directors "decided to take a strong look at the possibility of offering PSFT support/maintenance services from SAP starting early 2005."  Board member Shai Agassi immediately instructed SAP AG's James Mackey to investigate an acquisition of "the leader in this 3rd party support services, a company call[ed] TomorrowNow."  Agassi explained: "the idea is to take away the maintenance revenue stream away from ORCL."

3.      The SAP AG board knew it had just days to develop this new service in order to "disrupt the market."  Agassi told his team: "Remember the PR value of buying [TomorrowNow] . . .The bragging rights for having more PSFT customers under service than

2

1    Oracle may be all we need for a momentum swing . . ."

2          4.      By January 7, 2005, SAP AG executive board members Kagermann,

3    Agassi, Werner Brandt, and Gerd Oswald received a highly confidential document:  the

4    "business case" for SAP AG's purchase of TomorrowNow.  The document represented SAP

5    AG's negotiations, research and conclusions over the course of the previous three weeks.

6          5.      The presentation made clear that TomorrowNow did not operate legally.

7    It detailed how TomorrowNow relied on "non-production" copies of PeopleSoft software for its

8    "access to PeopleSoft system."  Under the heading "Threats," the board was warned that "Access

9    rights to the PeopleSoft software is very likely to be challenged by Oracle and past operating

10   issues [of TomorrowNow] may be a serious liability if Oracle challenges (i.e., offsite production

11   copies and the form of delivery of regulatory updates may be subject to Oracle challenge.)"  As a

12   result, the presentation predicted "likely legal action" from Oracle.

13         6.      SAP AG's board ignored these warnings and embraced TomorrowNow's

14   illegal business model for two reasons.

15         7.      First, it decided it could not walk away from the "Opportunity" identified

16   by the January 7 presentation to "distract" Oracle and take the PeopleSoft/JDE customer

17   maintenance revenue and future applications sales Oracle expected to achieve with the

18   PeopleSoft deal.[1]

19         8.      Second, it wrongly predicted Oracle would not sue.  The presentation

20   predicted "Oracle's legal challenges to TomorrowNow's ability to provide derivative

21   works/support will require Oracle to also sue its customers – a difficult situation for Oracle."

22         9.      If Oracle did sue, SAP AG's board developed a plan to attempt to insulate

23   _____

24   [1]       "PS," "PSFT" or "PeopleSoft" refers either to PeopleSoft, Inc. acquired by Oracle in
25   January 2005, or to PeopleSoft-branded enterprise software applications, whether offered by
     PeopleSoft or Oracle.  "JDE" or "J.D. Edwards" refers either to J.D. Edwards & Co., acquired by
26   PeopleSoft, Inc. in 2003, or to J.D. Edwards-branded enterprise software applications, whether
     offered by J.D. Edwards, PeopleSoft or Oracle.  "SEBL" or "Siebel" refers either to Siebel
27   Systems, Inc. acquired by Oracle in September 2005, or to Siebel-branded enterprise software
     applications, whether offered by Siebel or Oracle.

28

3

1  SAP AG from the liability it knew TomorrowNow's service model represented.  It would blame

2  its customers for signing TomorrowNow's contracts, and leave the TomorrowNow "corporation

3  in existence as a liability shield for any potential claims."

4         10.    With this self-serving plan in place, SAP AG and SAP America bought

5  TomorrowNow and converted it to SAP TN just two weeks later, days after Oracle closed on the

6  deal with PeopleSoft.  SAP AG did so knowing, at the SAP AG executive board level, that SAP

7  TN's business model depended on routine, daily cross-use of misappropriated Oracle software

8  applications and downloaded support products.  Moreover, going forward, SAP AG knew that

9  the SAP TN services it exploited to convert Oracle customers relied on SAP TN's tainted

10  development activity to create illegal "SAP TN" software support products.

11         11.    Following the SAP TN acquisition, rather than change the illegal SAP TN

12  business model, SAP instead conspired to leverage the stolen Oracle intellectual property to

13  entice customers to migrate to SAP software applications through SAP's "Safe Passage"

14  program.  SAP further conspired – at the highest levels of all three companies – to cover up the

15  fundamental illegality of that program.  In confidential internal presentations, with instructions to

16  "PLEASE DELETE AFTER READING," SAP dubbed this conspiracy "Project Blue."  Versions

17  of these "Project Blue' presentations, which acknowledged the illegal nature of SAP TN's

18  business, were prepared for the SAP AG executive board of directors as early as June 2005.

19         12.    For years, SAP AG profited from SAP TN's illegal business model,

20  without breathing a word about it to Oracle, SAP AG's existing and prospective customers, or

21  the investing public.  SAP AG and SAP America did not change SAP TN's corrupt business

22  model because they considered SAP TN a crucial element in their plan to undermine Oracle's

23  customer base and brand and to build their own customer base and brand at Oracle's expense.

24                 *             *             *             *

25         13.    Oracle – a leading developer of database and applications software –

26  initially brought this lawsuit after discovering that SAP had engaged in systematic, illegal access

27  to, and taking from Oracle's computerized customer support systems.

28         14.    Oracle now amends its claims because discovery in this case has revealed

4

1   that the focus of its original claims – SAP's massive illegal downloading of Software and

2   Support Materials from Oracle's password-protected computer systems – is just one element of a

3   larger scheme by SAP to steal and misuse Oracle's intellectual property.  In addition to the

4   illegal downloads, SAP – with the knowledge of members of the SAP AG executive board of

5   directors – made thousands of copies of Oracle's underlying software applications on its

6   computer systems.  SAP warehoused Oracle's code in "generic software environments" that it

7   used to service SAP's customers, train employees, create fake "SAP" branded fixes for

8   distribution, and generally to support a business model that was illegal to its core.  SAP

9   continued its illegal use of Oracle's software to develop, test and distribute SAP-branded support

10  products for over a year after Oracle filed this lawsuit.

11          15.     As alleged in Oracle's prior Complaint, in the illicit downloading

12  component of its scheme, SAP through SAP TN, stole thousands of proprietary, copyrighted

13  software products and other confidential materials that Oracle developed to service its own

14  support customers.[2]  SAP gained repeated and unauthorized access, in many cases by use of

15  pretextual customer log-in credentials, to Oracle's proprietary, password-protected customer

16  support website.  From that website, SAP has copied and swept into its servers thousands of

17  copyrighted Oracle Software and Support Materials.  As a result, SAP compiled a massive illegal

18  library of Oracle's copyrighted software code and other materials.  This storehouse of stolen

19  Oracle intellectual property is part of what enables SAP, through SAP TN, to offer cut rate

20  support services to customers who use Oracle software, and to attempt to lure them to SAP's

21  applications software platform and away from Oracle's.

22          16.     Oracle's own records show at least 10,000 illegal downloads by SAP

23  between September 2006 and February 2007.  However, Oracle has now obtained SAP's internal

24  records, which confirm that SAP has spent years systematically taking unauthorized support

---

[2] These copyrighted materials, which include program updates, software updates, bug fixes,
patches, custom solutions, and instructional documents across the entire PeopleSoft and JDE
families of software products, are referred to throughout as "Software and Support Materials."

materials from Oracle's systems, most recently using a dedicated bank of twenty servers in a "download center" and a customized software tool called "Titan." SAP programmed Titan specifically to ignore any access or use restrictions for any particular customer log-in credential. Instead, SAP designed Titan to gain any form of access with any active log-in credential, and to "scrape" Oracle's website for bug fixes, patches, updates and instruction manuals. At the time Oracle filed its prior Complaint, Titan and other tools had filled SAP storage vaults with more than *five terabytes* worth of Oracle's Software and Support Materials. On just one of SAP's servers, Oracle discovered nearly *8 million* downloaded Oracle Software and Support Materials.

17. For years, SAP dumped these materials into a co-mingled, master download library, and "exploded" the software support packages into their constituent objects to facilitate later indexing and searching by product. SAP accessed these master download libraries as needed when customers needed a fix – regardless of which log-in credential SAP had used to download a particular fix in the library, regardless of whether the customer getting the fix had any license to receive it, and regardless of whether the customer had a support contract with Oracle entitling them to receive that fix.

18. But these downloads of Software and Support Materials, though massive, were just one part of SAP TN's fundamentally illegal business model:

- Beginning as early as 2002, SAP TN co-founders Andrew Nelson and Seth Ravin decided that SAP TN would expand its services and, in doing so, would create and keep on its computer systems illegal copies of Oracle's ***underlying software applications***;

- Nelson and Ravin directed SAP TN to warehouse dozens of these copies simply as "generic software environments" and use them as a "sandbox" to service other customers, train its employees, and create phony SAP TN-branded fixes to sell to its customers;

- In particular, SAP TN used these generic copies of Oracle software to "develop" (by copying Oracle software or creating illegal derivative works from it) SAP TN-branded "tax and regulatory updates," and deliver them to its

6

1    customers paying for SAP TN support of each Oracle software release;

2    • In at least hundreds of instances, in a process created by Nelson and Ravin,
3    SAP TN did this by first updating one "generic" environment with the Oracle-
4    authored update code that SAP TN would download from Oracle's systems
5    with one customer's log-in credential. SAP TN would then use software
6    comparison tools to compare this "updated" generic software environment to a
7    generic copy (also obtained from some unidentified customer) of an earlier
8    release of the same software. SAP TN then copied the differing code and
9    used it to "develop" (again, by creating an illegal derivative work) what it
10   called an SAP TN "retrofit update" in another "generic" environment. In the
11   course of this development process, SAP TN would normally make at least
12   four, and sometimes many more, generic copies of Oracle's software
13   applications. In effect, there was no original development at all but merely
14   repeated, illegal copying and use of the Oracle software code;

15   • In at least hundreds of other instances, SAP TN simply used these generic
16   environments copied from customers' Oracle software to develop and test
17   SAP TN "authored" (again, illegally created) updates that it delivered to its
18   customers. After it bought SAP TN, SAP AG directly assisted in this process
19   using its own software support resources;

20   • In total, SAP TN made thousands of copies of Oracle's software, and
21   distributed thousands of individual fixes, for a fee, through its illegal "generic
22   retrofit" and "direct update" models;

23   • In addition to the code associated with these retrofit software updates, SAP
24   TN provided its customers with stolen Oracle instruction manuals, guides,
25   notes and other support documentation related to the updates. It did this by
26   "copying and pasting" downloaded Oracle documentation into re-branded
27   SAP TN documentation that was, according to the sworn testimony of SAP
28   TN's third employee, "essentially identical" and "virtually verbatim with

7

1       small changes" as the Oracle documentation. SAP TN then distributed these

2       copied documents to its customers with a cover letter signed by its CEO,

3       Andrew Nelson; and,

4     • SAP TN prepared operations manuals to instruct SAP TN employees how to

5       download Oracle documentation and alter it to conceal its origin and make it

6       look like SAP TN's. These instructions mandated specific, but minor changes

7       to Oracle materials, stating for example, "Go to Document Properties and

8       change author to TomorrowNow," or "[w]here the [Oracle] document talks

9       about the appendix, edit so that the TomorrowNow document says

10       'summary.'"

11     19. The illegal downloads and the illegal software copies are part of an

12 integrated, illegal business model. Without this stolen intellectual property, SAP TN could not

13 operate. For example, whenever SAP TN wished to advertise support services for a new Oracle

14 software product, it would need to first obtain a "seed" copy of the software. It needed this first

15 copy so it could train its employees to support the software and create a generic software

16 environment from which to "recycle" its support efforts and scale them across other customers.

17 For these reasons, SAP TN's internal business plans specify that the first SAP TN customer on a

18 new Oracle software release must contractually agree with SAP TN to provide copies of its

19 Oracle software CDs to SAP TN.

20     20. SAP AG and SAP America have made repeated false statements about

21 their own involvement in, and benefit from, SAP TN's theft.

22     21. While admitting that "inappropriate" downloads took place, in a July 3,

23 2007 press conference, SAP AG CEO Henning Kagermann stated that a "firewall" existed

24 between SAP AG and SAP TN that prevented SAP AG from having access to the Oracle

25 software downloaded by SAP TN. That was not true:

26     • SAP AG and SAP America employees accessed SAP TN's systems

27       through a special link on SAP TN's website;

28

- SAP TN employees accessed SAP AG and SAP America's systems through "SAPnet," an internal network through which SAP AG provided assistance to SAP TN's illegal development efforts;

- SAP TN, SAP America and SAP AG employees routinely emailed content and intellectual property among themselves; and,

- At the time Oracle filed its lawsuit, SAP had before it a detailed roadmap for connecting virtually every piece of the SAP TN network to the SAP AG network.

22. These facts show that, despite Kagermann's public pronouncement, no "firewall" existed between SAP TN and SAP America or SAP AG. In fact, SAP TN did transmit copyrighted Oracle software code by email to SAP AG – a fact SAP AG has now admitted under oath.

23. Even worse, discovery in this case has revealed that SAP AG and SAP America knew from the start that SAP TN's business depended on this extensive illegal scheme – going far beyond SAP TN's downloading activity – to copy, keep, use and sell Oracle's software as its own. On December 21, 2004, one of the key members of SAP's due diligence team – a former PeopleSoft employee – reported directly to board member Agassi: "I am not sure how TomorrowNow gets access to Peoplesoft software, but its [sic] very likely that TomorrowNow is using the software outside the contractual use rights granted to them . . ." A week later, he reiterated the point: "The access rights to the PeopleSoft software is very likely to be challenged by Oracle."

24. Undeterred, SAP AG and SAP America initially sought assurances that SAP TN respected Oracle's intellectual property rights. SAP TN's owners flatly refused to give any such assurances. Instead, they warned that Oracle likely would sue SAP when it raised SAP TN's profile through the "Safe Passage" program.

25. SAP AG and SAP America bought SAP TN anyway in January 2005.

26. Immediately, because of apparent ongoing concerns about the propriety of keeping and using (and cross-using) thousands of copies of Oracle's software, SAP half-

9

heartedly considered and then tabled "Project Blue." Project Blue was a codename for a secret

project to begin to remove the infringing Oracle software from SAP TN computers and support

customers remotely. "Blue" referred to supporting customers without locally hosting or using

the infringing copies of Oracle software. "Yellow" referred to the status quo – keeping the

illegal copies of Oracle software on SAP's computers and using them for general purposes.

          27. SAP TN prepared a series of secret "Project Blue" presentations for itself

and members of the SAP AG executive board of directors. These presentations revealed that

SAP TN's business fundamentally depended on generic bootleg copies of Oracle's software

applications. Yet SAP still did nothing to stop the theft and instead took steps to expand it into

other Oracle products:

- SAP continued to accept the benefits of SAP TN's daily infringement of Oracle's copyrights because, in the words of SAP TN's founder Andrew Nelson, this "strategic investment" would allow SAP TN to "grow in profit while remaining a strategic weapon in SAP's fight against Oracle";

- SAP expanded SAP TN's illegal model to include Oracle's Siebel software just days after Oracle acquired Siebel, and added Oracle's Retek and Hyperion software to its Safe Passage sales program immediately after those acquisitions as well; and,

- In March 2007, SAP AG's executive board was about to approve, or had already approved, the expansion of SAP TN's service offering to Oracle eBusiness Suite customers. A presentation to executive board member Gerd Oswald stated this expansion would "support SAP's strategy and Board area strategy" and "leverage service as [a] competitive weapon in order to restrict competition."

          28. According to its business model, SAP TN could not have offered Siebel or

eBusiness Suite support services, or considered offering Retek and Hyperion support services,

without first obtaining illegal "sandbox" copies of that software for testing, research and

development. In authorizing SAP TN to consider and, in the case of Siebel, actually offer these

10

1  services, SAP AG's executive board of directors had no reason to believe that SAP TN would

2  not likewise engage in illegal acquisition and use of Oracle's software.

3      29.  Through all of 2006, and into 2007 (and, discovery has revealed, also into

4  2008 for over a year after Oracle brought this lawsuit), SAP AG did not require SAP TN to

5  remove the illegal Oracle software copies from its systems by implementing Project Blue.

6  Rather, SAP AG and SAP America instead allowed SAP TN to expand its offerings to these

7  other Oracle software applications, and to bring in new so-called "Safe Passage" customers who

8  would migrate from Oracle to SAP applications.  SAP AG and SAP America provided leads,

9  helped with and participated in negotiations whenever fruitful, and ran joint marketing

10  campaigns, including a "Zero Dollar" campaign where a customer could "Get [its]

11  PS/JDE/SEBL support [from SAP TN] at NO COST while you migrate to SAP [AG]" to "ensure

12  we move these customer[s] off Oracle completely."

13      30.  Confidential internal SAP communications reveal that SAP may not have

14  won nearly as many customers through its Safe Passage program if it did not have the help of

15  SAP TN's illegal service offering.  For example, in May 2006 during SAP's negotiations with

16  potential customer National Foods Limited, "TomorrowNow was able to give 'substantial teeth'

17  to the SAP license bid, with the offer of combining both JDE and PeopleSoft support and

18  maintenance services for the foreseeable future, whilst they work on the SAP implementation

19  plans."  Many other examples of SAP TN's efforts to win customers for SAP can be found

20  throughout SAP's and SAP TN's records.

21      31.  By early 2007, Project Blue had gone nowhere.  SAP TN objected to

22  giving up the infringing local software copies and engaged in self-described "delay tactics."

23  SAP AG and SAP America refused to give up the software sales SAP TN's illegal activities

24  helped them make.  According to confidential notes from a call with Thomas Ziemen of SAP

25  AG, Andrew Nelson confesses: "Project Blue - Taking much longer than expected.  Don't feel

26  we can get payroll development in external environments.  Focus on new non-payroll

27  environments.  ***Will provide formal proposal to you [Ziemen] to present to board for review.***"

28  (emphasis supplied).

11

32.     In sum, SAP's "illegal library" of downloaded Oracle Software and Support Materials described in Oracle's original Complaint is just the beginning. Pursuant to approved corporate protocols, with the knowledge and complicity of members of the SAP AG board of directors, SAP TN has spent years compiling and improperly using Oracle's software applications and downloaded Software and Support Materials. Despite this knowledge, SAP AG board members have still chosen to assist and enable SAP TN's illegal activities, and to boast on earnings calls about Safe Passage customer wins obtained with SAP TN's assistance. SAP conspired to conceal SAP TN's corrupt business model from Oracle, its customers and the investing public, so that it could continue to pocket the money from these unlawful sales. As explained in further detail below, this theft and cover-up appears to be an essential – and illegal – part of SAP's competitive strategy against Oracle.

33.     Oracle brings this amended complaint to bring the truth about SAP's actions to light, force a return to fair competition, and redress the harm that SAP has caused by its illegal conduct. SAP's infringement and other illegal, wrongful, and unfair business practices threaten to cause irreparable harm to Oracle, its many employees, customers and shareholders. Oracle has no adequate remedy at law for the harm threatened and caused by these acts.

## II.     THE PARTIES

34.     Oracle USA is a Colorado corporation duly authorized to do business in the State of California, with its principal place of business in Redwood City, County of San Mateo, State of California. Oracle USA develops and licenses certain intellectual property, including copyrighted enterprise software programs, and provides related services. Oracle USA is the successor to PeopleSoft USA, Inc. ("PeopleSoft") and a successor in interest to certain PeopleSoft and J.D. Edwards entities.

35.     OIC is a California corporation duly authorized to do business in the State of California, with its only place of business in Redwood City, County of San Mateo, State of California. OIC owns and licenses certain intellectual property, including copyrighted enterprise software programs used around the world. Intellectual property rights formerly held by certain PeopleSoft and J.D. Edwards entities were transferred to OIC as part of the acquisition of

12

1  PeopleSoft by Oracle.  OIC is the owner of the copyrights at issue in this action.

2          36.     OSC is a Delaware corporation with its principal place of business in

3  Redwood City, County of San Mateo, California.  Through its subsidiaries, OSC develops and

4  licenses certain intellectual property, including copyrighted enterprise software programs, and

5  provides related services around the world.  OSC is a successor in interest to certain PeopleSoft

6  and J.D. Edwards entities.

7          37.     OEMEA is an Irish private limited company with its principal place of

8  business in Dublin, Ireland.  Directly and through its subsidiaries, OEMEA licenses certain

9  intellectual property, including copyrighted enterprise applications software programs used

10 around the world, and provides related services.  OEMEA is a successor in interest to certain

11 PeopleSoft and J.D. Edwards entities.

12         38.     JDEE is a nonresident Irish private limited company whose directors meet

13 in Redwood City, County of San Mateo, State of California.  JDEE licenses certain intellectual

14 property, including enterprise software programs used around the world.

15         39.     SAP AG is a German corporation with its principal place of business in

16 Walldorf, Germany.

17         40.     SAP America is a Delaware corporation with its principal place of

18 business in Newtown Square, Pennsylvania.  SAP America is a wholly-owned subsidiary of SAP

19 AG.

20         41.     SAP TN is a Texas corporation with its principal place of business in

21 Bryan, Texas.  SAP TN is a wholly-owned subsidiary of SAP America.  The corporate

22 relationship of the three named defendants is set forth in the chart below.

23

24

25

26

27

28

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
┌─────────────────────────────────────┐
│            SAP AG                     │
│    (German Parent Corporation)        │
└─────────────────────────────────────┘
                  │
┌─────────────────────────────────────┐
│          SAP America                  │
│   (Wholly-owned U.S. Subsidiary)      │
└─────────────────────────────────────┘
                  │
┌─────────────────────────────────────┐
│             SAP TN                    │
│   (Wholly-owned U.S. Subsidiary)      │
└─────────────────────────────────────┘
```

42.     Oracle is currently unaware of the true names and capacities of Does 1 through 50, inclusive, whether individual, partnership, corporation, unincorporated association, or otherwise, and therefore sues these defendants by such fictitious names. Due to the surreptitious nature of Defendants' actions, and the complicated nature of their scheme, the identities of the Doe Defendants have been concealed from Oracle, preventing Oracle from identifying these Defendants by name. After discovery, which is necessary to ascertain the true names and capacities of these Defendants, Oracle will amend its complaint to allege the necessary identifying details.

43.     Defendants all are doing business in and/or have directed their activities at California, and specifically this judicial district. By way of example only, SAP America and SAP TN advertise, promote, sell, license, service, and support customers in California and in this judicial district. SAP AG negotiates and enters into software license and support agreements directly within the United States and, specifically in this judicial district, negotiates certain software-related contracts directly with Oracle that contain provisions by which SAP AG consents to the jurisdiction of California courts and the application of California law. SAP AG also holds an annual meeting of its Board of Directors in Palo Alto, California, and finances the sales and promotional activities of both SAP America and SAP TN throughout the United States and in California.

44.     At all material times, through its 100% ownership of both SAP America

14

and SAP TN, SAP AG had both the right and the authority to control the actions of both corporations. Similarly, at all material times, through its 100% ownership of SAP TN, SAP America had both the right and authority to control the actions of SAP TN.

45. At all material times, each of the Defendants, including Does 1 through 50, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial assistance to the alleged activities, and in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

**III. JURISDICTION**

46. Oracle's first cause of action arises under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and its second cause of action arises under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.* Accordingly, this Court has subject-matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g), 28 U.S.C. § 1331, and 28 U.S.C. § 1338.

47. This Court has supplemental subject matter jurisdiction over the pendent state law claims and parties under 28 U.S.C. § 1367, because these claims are so related to Oracle's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

**IV. VENUE**

48. Venue in this district is appropriate, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the dispute occurred in this district, a substantial part of the property that is the subject of the action is situated in this district, and the Court has personal jurisdiction over each of the parties as alleged throughout this Complaint.

**V. INTRADISTRICT ASSIGNMENT**

49. Assignment is proper in this division under Civil L.R. 3-2 (c) and (d), because a substantial part of the events giving rise to the claims occurred in San Mateo County and a substantial part of the property that is the subject of the action is situated in San Mateo County.

15

1    VI.    FACTUAL ALLEGATIONS

2         A.    Oracle's Software And Support Materials

3              50.    Oracle is the world's largest enterprise software company, and the first to

4    receive J.D. Power & Associates' global certification for outstanding service and support based

5    on measuring customer satisfaction worldwide.  Oracle develops, manufactures, markets,

6    distributes, and services software designed to help its customers manage and grow their business

7    operations.  Oracle's software offerings include database, middleware, and applications software

8    programs.

9              51.    As is typical in the enterprise software industry, Oracle does not sell

10   ownership rights to its software or related support products to its customers.  Instead, Oracle's

11   customers purchase licenses that grant them limited rights to use specific Oracle software

12   programs with Oracle retaining all copyright and other intellectual property rights in these works.

13   In addition, licensed customers can, and typically do, purchase some set of technical support

14   services that include the right to obtain upgraded products such as updates, bug fixes, or patches

15   to those software programs the customers have expressly licensed from Oracle and have the right

16   to use for purposes authorized by Oracle.

17             52.    Oracle's license agreements with its customers may vary according to the

18   products licensed, including because the customers originally contracted with PeopleSoft and/or

19   JDE, but all of the relevant license agreements for what is now Oracle software set comparable

20   rules for access to, and use of, that software.  Among other things, those rules prohibit access to,

21   or use of, any portion of the software not expressly licensed to and paid for by the licensee, and

22   any sublicense, disclosure, use, rent, or lease of the software to third parties.

23             53.    Oracle's license agreements define Oracle's confidential information to

24   include, without limitation, Oracle's software, its object and source code, and any associated

25   documentation or service offerings.  Licensees may designate third parties to help maintain

26   Oracle's software, but only subject to the terms of the relevant license agreement between the

27   licensee and Oracle.  Those agreements generally preclude the third party from installing the

28   software on a server, or accessing the source code of the software.  The License Agreements

16

1  generally prohibit the licensee or any third party from using the software offsite without notice to

2  Oracle, prohibit disclosure to third parties, and prohibit any use other than by the customer for

3  production, backup, archival and in-house disaster recovery purposes.  As defined in one

4  illustrative license agreement, "software" specifically includes the update products made

5  available to customers as part of the support contracts that customers purchased from Oracle.

6        54.    Through its Terms of Use, Oracle also restricts access to the Customer

7  Connection technical support website used by Oracle customers and/or their authorized agents to

8  access and download JDE and PeopleSoft Software and Support Materials licensed to Oracle

9  customers:

10        You agree that access to Customer Connection…will be granted
    only to your designated Oracle technical support contacts and that
11  the Materials [on the support website] may be used solely in
    support of your authorized use of the Oracle Programs for which
12  you hold a supported license from Oracle.  Unless specifically
    provided in your licensing or distribution agreement with Oracle,
13  the Materials may not be used to provide services for or to third
    parties and may not be shared with or accessed by third parties.

14

15        55.    The Terms of Use explicitly describe the confidential nature of the

16  material on Customer Connection: "the information contained in the Materials [available through

17  Customer Connection] is the confidential proprietary information of Oracle. ***You may not use,***

18  ***disclose, reproduce, transmit, or otherwise copy in any form or by any means the information***

19  ***contained in the Materials for any purpose***, other than to support your authorized use of the

20  Oracle Programs for which you hold a supported license from Oracle, without the prior written

21  permission of Oracle."  (emphasis supplied).

22        56.    Access to the secured areas of Customer Connection is also governed by

23  Special Terms of Use.  By using the secured website, the user agrees to accept and comply with

24  these Special Terms of Use.  The Special Terms of Use provide that access is only permitted via

25  the user's "personal username and password" and that all materials on the secured website are

26  confidential and proprietary.  The Special Terms of Use clearly provide that: "Use of such

27  CONFIDENTIAL and PROPRIETARY information and materials for any other purpose is

28  strictly prohibited."

17

57.     Prior to downloading Software and Support Materials from Oracle's support websites, a user must also specifically agree to additional terms of use and restrictions specified in Oracle's Legal Download Agreement:

> Your username and password are provided to you for your sole use in accessing this Server and are confidential information subject to your existing confidentiality agreement with Oracle / PeopleSoft / JDEdwards. If you do not have a confidentiality agreement in effect with Oracle / PeopleSoft / JDEdwards, you are hereby notified that your username and password are confidential information and may only be distributed to persons within your organization who have a legitimate business purpose for accessing the materials contained on this server in furtherance of your relationship with Oracle / PeopleSoft / JDEdwards.

58.     The Legal Download Agreement also puts the user on notice as to the confidential, proprietary and copyrighted nature of the Software and Support Materials available for download:

> Any software that is made available to download from this server ("Software") is the copyrighted work of Oracle / PeopleSoft / JDEdwards and/or its affiliates or suppliers. All Software is confidential information of Oracle / PeopleSoft / JDEdwards and its use and distribution is governed by the terms of the software license agreement that is in effect between you and Oracle / PeopleSoft / JDEdwards ("License Agreement"). The Software is part of the Licensed Products under the License Agreement and may only be downloaded if a valid License Agreement is in place between you and Oracle / PeopleSoft / JDEdwards. The Software is made available for downloading solely for use by licensed end users according to the License Agreement and any reproduction or redistribution of the Software not in accordance with the License Agreement is expressly prohibited. WITHOUT LIMITING THE FOREGOING, COPYING OR REPRODUCTION OF THE SOFTWARE TO ANY OTHER SERVER OR LOCATION FOR FURTHER REPRODUCTION OR REDISTRIBUTION IS EXPRESSLY PROHIBITED.

59.     The Legal Download Agreement further restricts use of documents downloaded from the website:

> Permission to use Documents (such as white papers, press releases, product or upgrade announcements, software action requests, datasheets and FAQs) from this server ("Server") is granted, provided that (1) the below copyright notice appears in all copies and that both the copyright notice and this permission notice appear, (2) use of such Documents from this Server is for informational and non-commercial or personal use only and will

18

not be copied or posted on any network computer or broadcast in
any media, and (3) no modifications of any Documents are made.
Use for any other purpose is expressly prohibited.

60.     In addition, users accessing specific materials, such as a Software

Application Request ("SAR") through the SAR Search Web Application, agree to additional

legal restrictions.  These terms notify the user that the software available to download from

Oracle is Oracle's copyrighted material.  The terms further provide that the "software is part of

the Licensed Products under the License Agreement" and "is made available for downloading

solely for use by licensed end users according to the License Agreement.  Any reproduction or

redistribution of the Software not in accordance with the License Agreement is expressly

prohibited."  To download a SAR, the user must click on a button indicating that it accepts these

terms.

**B.      Oracle Threatens To Unseat SAP**

61.     On January 7, 2005, Oracle completed its acquisition of PeopleSoft to

emerge as the second-largest provider of business software applications in the world and the first

to rival SAP AG in market share, size, and geographic and product scope.  As SAP America's

Vice President of Operations, Richard Knowles, testified on June 23, 2004 at the trial on the

Department of Justice's unsuccessful effort to block Oracle's acquisition of PeopleSoft, the

combination revitalized Oracle overnight as a competitor in the business software applications

business.  SAP AG suddenly found itself in a far different competitive environment than the one

in which it had grown comfortable.  As SAP AG reeled, events unfolded at a rapid pace:  eleven

days after its announcement, Oracle launched the newly-united company and unveiled, at its

headquarters with more than 48,000 people joining by Webcast and phone, how the nearly

50,000-strong combined workforce of Oracle and PeopleSoft would provide unparalleled

innovation and support to 23,000 business applications software customers throughout the world.

62.     SAP AG's and SAP America's top executives publicly downplayed the

threat that a combined Oracle and PeopleSoft entity would pose to its competitive position for

business software applications.  SAP AG CEO Henning Kagermann claimed that even with

19

PeopleSoft, Oracle would "not [be] a competitor which could really hurt us." After the merger,

he even claimed to wish Oracle "good luck" in competing with SAP AG.

63.     But SAP AG had no answer for the business proposition the new Oracle

offered. Not only do many SAP AG customers use Oracle's superior database software

programs, but now Oracle offered a deeper, broader product line of enterprise applications

software programs to compete against SAP AG.

64.     Rather than improve its own products and offerings, SAP AG instead

considered how to undermine Oracle. One way was to hit at Oracle's customer base – and

potentially increase its own – by acquiring and bankrolling a company that claimed the ability to

compete with Oracle support and maintenance services on Oracle's own software products,

despite not owning any of the software code for, or intellectual property rights to, these same

products.

**C.     SAP AG's Purchase Of SAP TN And Knowledge Of Its Illegal Business Activities**

65.     In the world of enterprise software applications, revenue comes from three

basic activities: (a) licenses of the underlying software applications; (b) consulting relating to

the implementation and operation of the software; and, (c) support contracts to keep the software

updated and upgraded.

66.     In December 2004, SAP TN was a small software services company,

headquartered in Bryan, Texas and founded by former PeopleSoft software engineers,

developers, and support technicians. It claimed to compete with PeopleSoft, JDE, and later,

Oracle, by providing low-cost maintenance and support services to PeopleSoft and JDE (and

later Siebel) customers running assorted versions of these software programs. SAP TN claimed

that it could cut customer maintenance and support bills in half and give customers a reprieve

from software upgrade cycles by allowing customers to remain on older, often outdated, versions

of PeopleSoft or JDE software rather than moving to later versions by implementing upgrades

that the customers would receive by paying for support services from the software vendors

themselves. As one industry journalist explained, SAP TN promised to offer such cheap support

20

1 "because it is not investing millions of dollars in research and development for future versions of

2 the software; it instead focuses on simply keeping the software up and running for an annual

3 fee."

4        67.     As described in a glossy spread in a leading industry publication, in

5 December 2004, just weeks before Oracle would close the PeopleSoft acquisition, SAP TN

6 president Andrew Nelson got "the magic phone call" from Jim Mackey, the "front man for SAP

7 AG's mergers and acquisitions strategy." Mackey made Nelson an offer "he couldn't refuse."

8        68.     To retain full control over every detail of its scheme to lure away

9 customers from Oracle, and to use SAP TN to do it, SAP AG proposed to buy SAP TN outright

10 and make it a wholly-owned – and wholly-beholden – subsidiary. Acquiring SAP TN was not a

11 mere investment by SAP AG, but a calculated competitive move. As one industry observer put

12 it, SAP AG bought "another arrow in its quiver to hunt after Oracle's customers." Aligning with

13 SAP AG made little sense for SAP TN, however, because to the extent SAP AG successfully

14 undermined Oracle by having its customers move from Oracle's software to SAP AG's software,

15 SAP TN would eventually lose its customer base. So SAP AG had to make the price right – and

16 accept a known risk.

17        69.     The pre-deal negotiations with SAP TN reveal the breadth of SAP AG's

18 knowledge – and its lack of concern – about SAP TN's thefts. Based on repeated warnings about

19 how SAP TN's business model likely relied on illegal use of Oracle software, SAP America and

20 SAP AG asked for "a representation regarding the infringement of PeopleSoft's intellectual

21 property rights . . . that . . . would survive indefinitely . . . [and] would not be subject to any

22 basket or cap on indemnity."

23        70.     But SAP TN's two shareholders, Seth Ravin and Andrew Nelson, refused

24 to make any representation that SAP TN had respected PeopleSoft's (soon to be Oracle's)

25 intellectual property rights. Instead, Ravin reminded SAP of "discussions that were had

26 regarding the increased likelihood of SAP being the subject of a lawsuit as a result of the very

27 public and very aggressive move to offer alternative support to Oracle/PeopleSoft clients." SAP

28 TN insisted this exposure to legal action by Oracle "is a real risk that must be borne primarily by

SAP as a business and strategic investment risk," and threatened to suspend due diligence activities on the deal.

71.     In response, SAP AG's Jim Mackey emailed Ravin directly: "Do not let your attorneys shut down the process.  Keep the negotiations and diligence going.  Appropriate compromises will be reached."  In the end, the "appropriate compromise" was that SAP TN offered no assurances whatsoever that it had respected Oracle's intellectual property rights, and instead gave an indemnity from Ravin and Nelson totaling $2 million to cover costs relating to SAP TN's violations of Oracle's intellectual property.  This indemnity term represented a spectacular twenty percent of the total $10 million price SAP AG and SAP America paid for SAP TN.  Thus, SAP AG and SAP America knew or had reason to know – before they even acquired SAP TN – that SAP TN's business model posed a huge potential infringement problem.

72.     In barely a month, SAP TN agreed to the deal and cast its lot with SAP AG.  In January 2005, through SAP America, SAP AG acquired SAP TN.  In connection with the SAP TN acquisition, SAP America's CEO, Bill McDermott, crowed "There's nothing that I love more than to win."  But win at what cost?  SAP appears to have taken a short cut to equip itself to support Oracle's software programs at half Oracle's price.  SAP stole much of the Software and Support Materials – and software itself – directly from Oracle.  SAP AG and SAP America knew it – and ignored it – from the start.

**C.     SAP's Safe Passage Scheme**

73.     When Oracle acquired PeopleSoft, it increased its potency as a competitor to SAP for enterprise applications software and related services.  Industry observers noted this fundamental shift in the competitive landscape.  One industry analyst stated that, "Oracle Corp. is developing a 'super set' of applications, combining features from the PeopleSoft and JDE software and its CEO Larry Ellison has been vocal about his intentions to take market share away from SAP.  Oracle said it has thousands of developers building the new application suite, called Project Fusion, aimed at taking market share from No. 1 ranked SAP."  Another mused, "After the acquisition of PeopleSoft earlier this year, Oracle officially became a player on SAP's turf."

74. SAP AG's hasty acquisition of SAP TN was widely perceived as a response to the new competitive threat from Oracle. SAP's own statements confirmed it.

75. On January 19, 2005, SAP AG's top executives unveiled SAP AG's acquisition of SAP TN as the centerpiece of its new "Safe Passage" scheme. SAP AG's CEO, Henning Kagermann, identified SAP TN as instrumental to the parent company's "Safe Passage" program, publicly indicating that SAP TN was authorized and intended to implement SAP AG's goals. SAP advertised its "Safe Passage" program as explicitly designed to transition customers away from Oracle products and onto the SAP software platform. SAP AG spokesman Bill Wohl vowed that SAP AG would use SAP TN to "keep the pressure on Oracle" by exploiting legacy PeopleSoft customers' perceived unease about Oracle's commitment to supporting legacy PeopleSoft software.

76. As reported in industry publications, SAP TN's services "form[ed] the basis of [SAP AG's] Safe Passage initiative, a program aimed at siphoning off valuable software maintenance revenue from Oracle and persuading Oracle customers to switch software products [to SAP]." The Senior Vice President and Chief Operating Officer of SAP Asia Pacific, Colin Sampson, admitted that the SAP TN acquisition was "an integral part" of SAP's Safe Passage program, which in turn was part of SAP's "ongoing strategy to compete with Oracle." And SAP TN certainly knew its role was to achieve SAP AG's and SAP America's ends: as SAP TN's CEO, Andrew Nelson, stated, "We're owned by SAP. We want them to be successful."

77. But although SAP America CEO, Bill McDermott, committed to throw "a lot of additional resources" behind SAP TN (which consisted of only 37 employees in total), SAP appeared to focus more on growing the SAP TN sales force rather than investing in or expanding SAP TN's tiny development team. Indeed, SAP TN did not appear to have the development capability to meet the support commitments advertised in the "Safe Passage" brochures at any price, much less the 50% discount promoted by SAP. It certainly did not match Oracle's investment in development resources, or even come close to it. These facts raised questions about how SAP could offer the type of comprehensive technical support services on Oracle programs that customers of enterprise applications typically require.

23

1    78.    Nevertheless, industry observers deemed the "Safe Passage" program

2    "measurably more aggressive," and a sign that "SAP has taken the gloves off."

3    79.    After the acquisition, SAP TN's new parent companies directed it to begin

4    to implement a two-phase plan to serve as the centerpiece of the Safe Passage scheme and to

5    increase SAP's enterprise application market share.  First, to lure the support business over from

6    Oracle, SAP would offer cut-rate pricing combined with the promise of essentially unlimited

7    future support to former PeopleSoft and JDE support customers.  Second, in connection with

8    converting Oracle customers to SAP support (via SAP TN), SAP would aggressively campaign

9    to migrate those customers to an SAP enterprise software platform.  As SAP AG Managing

10   Director Alan Sedghi admitted, SAP AG would try to use SAP TN as a means of "speeding-up"

11   the migration of PeopleSoft and JDE users to SAP AG platforms.

12   80.    The CEOs stated the proposition more bluntly.  In April 2005, SAP

13   America CEO Bill McDermott claimed "The SAP Safe Passage offering gives companies an

14   affordable way to protect their current investments, ease integration with SAP NetWeaver(TM)

15   and begin the process of innovating their businesses today."  A month later, at the SAP AG

16   annual meeting, SAP AG CEO Henning Kagermann confirmed: "We worked with [SAP TN] to

17   very quickly set up a comprehensive program for SAP customers running PeopleSoft and JD

18   Edwards solutions."

19   81.    SAP implemented Phase One immediately.  As reflected on SAP AG's

20   website:  "*SAP* offers Safe Passage for PeopleSoft, JD Edwards, and Siebel customers – If

21   Oracle's options have you worried, consider another option:  SAP.  SAP provides solutions,

22   technology *and maintenance services*."  (emphasis supplied)  SAP America's website promised

23   that "*SAP* and TomorrowNow can cut your maintenance costs by as much as 50% through

24   2015," and elsewhere says that "Safe Passage maintenance and support are delivered worldwide

25   through TomorrowNow."  (emphasis supplied).  SAP TN's website confirmed its acceptance and

26   undertaking of the SAP-controlled Safe Passage program:  "TomorrowNow can also provide our

27   support services as part of the SAP Safe Passage Program."

28   82.    Beginning in January 2005, SAP sales representatives unleashed a torrent

24

1  of marketing materials designed to exacerbate and leverage perceived, albeit unfounded,

2  PeopleSoft and JDE customer uncertainty about the prospects for long-term, quality support

3  from Oracle.  An April 2005 SAP AG press release apparently aimed to increase perceived doubt

4  among Oracle customers by announcing a "second wave" of "Safe Passage."  To exploit the fear

5  it intended to create, SAP AG's "second wave" included "an intensive customer recruitment

6  campaign, offering significantly lower cost maintenance alternatives to Oracle customers

7  running PSFT/JDE solutions" through 70,000 direct mail solicitations to Oracle customers.

8  These lower cost alternatives advertised by SAP AG were to come directly through SAP TN.

9         83.     To implement Phase Two of its plan (luring Oracle customers to the SAP

10  enterprise software platform), SAP AG did not simply sit back and leave the recruiting of

11  potential Safe Passage customers to SAP TN's sales force.  Instead, it took a hands-on approach.

12  It deployed its salespeople to contact potential customers and push them to switch to SAP TN's

13  services.  If customers declined to convert to SAP TN, the SAP AG sales personnel would

14  pressure the customers to drop Oracle products outright in favor of SAP AG's suite.  To give

15  teeth to these commingled sales efforts, SAP AG offered maintenance support through SAP TN,

16  officially "bundled" with SAP AG enterprise software as a centerpiece of the Safe Passage

17  program.

18         84.     SAP executives touted the Safe Passage program's limited success in its

19  first year.  SAP AG's CEO, Henning Kagermann, promised SAP AG would use SAP TN and the

20  Safe Passage program to "fight for" more customers.  By March 2006, SAP AG boasted in a

21  press release that more than 200 customers had signed up for Safe Passage, the program it

22  implemented partly through SAP TN, and which it claimed "offers companies SAP solutions,

23  technology, maintenance services, investment protection and a clear road map to the next

24  generation of business software."

25         85.     However, as Oracle continued to take market share and expand its product

26  offerings, including through its September 12, 2005 announcement that it would acquire Siebel

27  Systems, SAP grew more desperate, and more aggressive.  In October 2005, SAP announced it

28  would extend its Safe Passage program to Siebel customers, including apparently instantaneous

1  round the clock support from SAP TN – whose engineers at that time presumably had spent

2  virtually no time to develop Siebel support software products.  As reported on Forbes.com after

3  Oracle's announcement of its impending Siebel acquisition, "SAP AG plans to announce . . . that

4  it will offer technical support for more of rival software maker Oracle Corp.'s own products [the

5  Siebel products] for a far cheaper price."  SAP's "cheaper price" (referred to elsewhere as "cut

6  rate" support) continued at "50 cents on the dollar for maintenance fees," but its services were

7  expanded to support more Oracle product lines and a wider range of customers.  SAP America

8  CEO, Bill McDermott, confirmed that SAP intended to use the Siebel acquisition as another

9  opportunity to lure Oracle customers to SAP stating that SAP is "not distracted by the challenges

10  of integrating multiple code bases, companies and corporate cultures."  It appears that SAP only

11  could offer instantaneous, round the clock Siebel code support, within a few weeks of Oracle's

12  acquisition announcement, because SAP TN surreptitiously had acquired, studied and developed

13  a service model based on illegal copies of Siebel software.  Based on its standard business

14  model, it appears likely that SAP TN did the same thing with Oracle's eBusiness Suite, Hyperion

15  and Retek software.

16          86.     All the while, SAP AG demanded reports detailing implementation of the

17  Safe Passage program and other schemes against Oracle with code-names like "Turn Up The

18  Heat" and the "Oracle Disruption Plan."  SAP AG apparently even gave away free support from

19  SAP TN in efforts to steal Oracle's applications software customers.

20          87.     By July 2006, SAP AG CEO Henning Kagermann conceded that SAP had

21  lost as much as 2% market share to Oracle.  At the same time, curiously, SAP AG continued to

22  tout the success of Safe Passage.  In a July 2006 earnings call, Léo Apotheker, then SAP AG's

23  President of Customer Solutions and Operations and currently SAP AG's co-CEO, boasted that

24  Safe Passage "continues to do really well," including because SAP AG "extended the program in

25  order to offer it as well to Siebel customers."  By extending the Safe Passage program to Siebel

26  customers, and in conjunction with opening new SAP TN offices around the world, Apotheker

27  claimed that SAP now had "a global network of [SAP TN] capabilities" – enough to "gain[]

28  significant traction."  The Siebel offering was not the only way SAP AG "expanded" Safe

26

1 Passage. Notably, it also encouraged the SAP AG and SAP America sales teams to work more

2 closely with SAP TN to jointly sell SAP TN services and SAP AG software applications to

3 current and prospective customers.

4        88.     SAP's April 2007 Annual Report further confirms that SAP has used SAP

5 TN as a tool to try to convert Oracle customers to SAP's software platform. As reflected on

6 pages 187-190 of the Annual Report, SAP TN loses money in every region in which it operates.

7 SAP has no business incentive to tolerate substantial operating losses in its subsidiary without

8 SAP TN providing a significant off-setting benefit. Here, that takes the form of enhanced

9 opportunities for SAP to sell its enterprise software applications to support customers attracted to

10 SAP TN's discount pricing – which is made possible through the theft and use of Oracle's

11 intellectual property.

12     **D.**     **A Deal Too Good To Be True**

13        89.     Although SAP put a brave face on its ability to compete with the

14 increasingly potent Oracle applications offerings, some industry analysts wondered whether a

15 small company like SAP TN, even after having expanded its ranks to 150 employees, could

16 actually develop and offer the hundreds of regulatory updates, bug fixes, patches, and other

17 labor-intensive support items that a customer would need to maintain useful, optimally

18 functioning Oracle software, without infringing on Oracle's intellectual property. Oracle, by

19 comparison, maintains a development force of more than 15,000 software and support engineers

20 to create and help implement the code fixes, patches, and updates that comprise the advanced

21 support services required by Oracle's licensed customers.

22        90.     It was not clear how SAP TN could offer, as it did on its website and its

23 other materials, "customized ongoing tax and regulatory updates," "fixes for serious issues,"

24 "full upgrade script support," and, most remarkably, "30-minute response time, 24x7x365" on

25 software programs for which it had no intellectual property rights. To compound the puzzle,

26 SAP continued to offer this comprehensive support to hundreds of customers at the "cut rate" of

27 50 cents on the dollar, and purported to add full support for an entirely different product line –

28 Siebel – with a wave of its hand. The economics, and the logic, simply did not add up.

1    91.    Oracle has now solved this puzzle.  To stave off the mounting competitive

2  threat from Oracle and to do so without making the requisite investment, SAP unlawfully

3  accessed, copied, and wrongfully used Oracle's enterprise software applications and Software

4  and Support Materials.  It did so with the knowledge and consent of the SAP AG executive board

5  of directors.

6      **E.     SAP's Theft By Downloading**

7          **1.     SAP TN Compiles A Massive Download Library**

8    92.    SAP TN's use of its Titan scraping tool resulted in such high levels of

9  downloads that Oracle discovered its scheme.  In late November 2006, there occurred unusually

10  heavy download activity on Oracle's password-protected customer support website for its

11  PeopleSoft and J.D. Edwards ("JDE") product lines.  That website, called Customer Connection,

12  permits licensed Oracle customers with active support agreements to download a wide array of

13  Software and Support Materials.  Oracle has invested billions of dollars in research,

14  development, and engineering to create these materials.  Customers who have contracted for

15  support with Oracle have log-in credentials to access Customer Connection and download

16  Software and Support Materials.  However, Oracle's support contracts limit customers' access

17  and download rights to Software and Support Materials pertaining to the customers' licensed

18  products.  Customers have no contractual right to download Software and Support Materials

19  relating to software programs they have not licensed from Oracle, or for which the customers did

20  not purchase support rights.

21    93.    The Software and Support Materials are a subset of the technical support

22  services that Oracle makes available to its customers that have licensed Oracle software

23  programs and purchased the right to receive technical support services related to them.  The full

24  suite of technical support services (also known as "support" or "maintenance") generally

25  includes three types of offerings that Oracle, like most other enterprise software vendors, makes

26  available to its licensed customers:  (i) telephone or email access to Oracle's support technicians

27  regarding the operation of Oracle's software; (ii) software program code for the customers'

28  licensed software programs which adds new functionality or features to the software (generally

1   referred to as "software updates"), or that addresses errors or "bugs" in the software program

2   (generally referred to as "software patches"); and (iii) "knowledge management" articles that

3   help with problem solving and provide suggestions relating to the customer's use of licensed

4   software programs.  Because of the complexity of enterprise software applications and the

5   business environments in which they run, regular software updates and patches and knowledge

6   management articles are critical components of a software maker's support offering.

7            94.     To analyze and improve on its industry leading support services, Oracle

8   asks each customer searching for a solution on Oracle's Customer Connection website to click

9   on a button after each search to indicate whether or not a particular search result helped solve the

10   customer's problem.  If the customer selects the "No, continue search" option, the support

11   system responds by offering the customer further options.  Oracle regularly compiles this data to

12   assess whether its system helped customers resolve their support issues, with the aim of

13   continually improving the support system for customers.

14           95.     In late 2006, Oracle noticed huge, unexplained spikes in the number of

15   downloads from Customer Connection by one person, a user suspiciously named "TomNow."

16   Oracle also observed anomalies in the number of times customers on the online support website

17   had clicked the "No, continue search" option.  These clicks numbered in the thousands for

18   several customers, and Oracle discovered that each response – each answer by users pretending

19   to be the customer – occurred in a matter of seconds or less.  Given the extreme speed at which

20   the activity occurred, these clicks could not reflect real responses from any human customers

21   actually reading the solutions they had accessed.  Instead, these click patterns showed that the

22   users had employed an automated process to move with lightning speed through the entire library

23   of Software and Support Materials on the Customer Connection website.  And, apparently, to

24   make a copy of them all.

25           96.     Oracle embarked on a time-consuming and costly investigation to assess

26   the damage done to its customer response database and fully understand the sources of the

27   unauthorized downloads.  In the course of this investigation, Oracle discovered a pattern.

28   Frequently, in the month before a customer's Oracle support expired, a user purporting to be that

29

1  customer, employing the customer's log-in credentials, would access Oracle's system and

2  download large quantities of Software and Support Materials, including dozens, hundreds, or

3  thousands of products beyond the scope of the specific customer's licensed products and

4  permitted access. Some of these apparent customer users even downloaded materials after their

5  contractual support rights had expired.

6          97.     This systematic theft of Oracle's Software and Support Materials did not

7  originate from any actual customer location. Rather, the access originated from an internet

8  protocol (IP) address in Bryan, Texas, an SAP America branch office location and home of its

9  wholly-owned subsidiary SAP TN. SAP TN is a company that purports to provide technical

10  support services on certain versions of Oracle's PeopleSoft, JDE and Siebel software programs.

11  The Bryan, Texas IP address used to access and download Oracle's Software and Support

12  Materials is connected directly to SAP's computer network. Indeed, Oracle's server logs have

13  recorded access through this same IP address by computers labeled with SAP TN identifiers

14  using SAP TN IP addresses. When Oracle first noticed that the unlawful access and downloads

15  originated almost exclusively from one IP address in Bryan, Texas, Oracle shut down access to

16  that IP address. If the access and downloads had been legitimate, the customer or vendor would

17  have called in right away to get its access reinstated. Instead, a new IP address, also linked to

18  SAP TN, sprouted up almost immediately and the unlawful access and downloading resumed.

19          98.     These SAP TN Bryan, Texas offices, housed the SAP "download center"

20  with twenty or more "download servers" running the Titan program virtually around the clock.

21          99.     In many instances, including the ones described above, SAP TN

22  employees used the log-in IDs of multiple customers, combined with phony user log-in

23  information, to gain access to Oracle's system under false pretexts. Employing these techniques,

24  SAP TN users effectively swept much of the contents of Oracle's system onto SAP TN's servers.

25  These "customer users" supplied user information (such as user name, email address, and phone

26  number) that did not match the customer at all. In some cases, this user information did not

27  match anything: it was fake. For example, some users logged in with the user names of "xx"

28  "ss" "User" and "NULL." Others used phony email addresses like "test@testyomama.com" and

                                              30

1  fake phone numbers such as "7777777777" and "123 456 7897." In other cases, SAP TN

2  blended log-in information from multiple customers with fake information. For example, one

3  user name connected to an SAP TN IP address appears to have logged in using the credentials of

4  *seven* different customers in a span of just 15 days – all from SAP TN computers in Bryan,

5  Texas. **All of these customers whose ID's SAP TN appropriated had one critical fact in**

6  **common: they were, or were just about to become, new customers of SAP TN – SAP AG's**

7  **and SAP America's software support subsidiary whose sole purpose is to compete with**

8  **Oracle.**

9         100.    Although it is now clear that the customers initially identified by Oracle as

10  engaged in the illegal downloads are SAP TN customers, those customers do not appear to have

11  themselves directly engaged in the download activity; rather, the unlawful download activity

12  observed by Oracle and described here originates directly from SAP's computer networks.

13  Oracle's support servers have even received hits from URL addresses in the course of these

14  unlawful downloads with SAP TN directly in the name (e.g. *http://hqitpc01.tomorrownow.com*).

15  Indeed, for many of these downloads, Oracle noticed that SAP TN did not even bother to change

16  the false user information from customer to customer when it logged in.

17         101.    The wholesale nature of this unlawful access and downloading was

18  extreme. SAP appears to have downloaded virtually *every* file, in *every* library that it could find.

19  SAP's business model required it to continually refresh its collection of Oracle's Software and

20  Support Materials. As Kathy Williams, Director of Support Services at SAP TN, said in an

21  internal communication to her fellow managers, "How can we support a client that can never

22  upgrade or have access to any fixes beyond what they have now? George [Lester] and I see this

23  as a very big risk to TomorrowNow?" To resolve this "risk," and keep itself in business, SAP

24  simply stole Oracle's materials wholesale, and with no regard to whether it or its customers were

25  licensed to the materials it downloaded. In some instances, SAP would not even bother to wait

26  for negotiations with a prospective customer to conclude – it would use a prospective client's

27  credentials to download materials, then keep these "pre-deal" downloads to use with other

28  customers even if the "prospect" never actually became an SAP customer. For example, in the

31

case of Canada Lands Company (which never became an SAP customer), SAP TN admits, "they were a prospect and we kept the folder around since the beginning, the downloads were very incomplete and we would look for fixes here for customers like Praxair and Yazaki."

### 2. SAP TN's Access Was Unauthorized

102. SAP TN's unauthorized access to, copying of, and use of Software and Support Materials from Oracle's system, and its customers' software releases, violated the terms of the Oracle customers' License Agreements, the Customer Connection Terms of Use, the Customer Connection Special Terms of Use, the Legal Download Agreement, and the SAR legal restrictions. These terms included agreements:

- Not to access or use any portion of the Software, including updates, not expressly licensed and paid for by the Licensee;

- Not to directly or indirectly, sublicense, relicense, distribute, disclose, use, rent, or lease the Software or Documentation, or any portion thereof, for third party use, or third party training;

- Not to access the customer support system if not the customer's authorized and designated Oracle technical support contact;

- Not to use the Materials on the support website except in support of the customer's authorized use of the Oracle Programs for which the customer holds a supported license from Oracle;

- That the customer username and password are for the customer's sole use in accessing this support server;

- That the customer username and password may only be distributed to or used by persons in the customer's organization who have *a legitimate business purpose for accessing the materials contained on the support server in furtherance of the customer's relationship with Oracle*; and,

- That the Materials on the support website are confidential information subject to existing confidentiality agreements.

32

103.     SAP has intimate familiarity with these important restrictions and conditions relating to Oracle's Software and Support Materials.  SAP AG and SAP America specifically tasked former PeopleSoft employees with the job of investigating and reporting on SAP TN's business model as part of the pre-acquisition due diligence.  SAP TN's management, and a significant number of its employees, formerly worked at PeopleSoft and JDE.  Of SAP TN's ten-member management team, six list prior employment experience with PeopleSoft, JDE, or Oracle, including:  (1) Andrew Nelson, President and CEO; (2) Bob Geib, V.P. North American Sales; (3) Laura Sweetman, V.P. Global J.D. Edwards Support; (4) Mel Gadd, V.P. Quality; (5) Nigel Pullan, V.P. International Sales; and, (6) Shelley Nelson, V.P. Global PeopleSoft Support.  In addition, former PeopleSoft employees who worked for SAP at the time, such as Wade Walden, who is reflected as the person performing many of the downloads at issue, appear to have applied their familiarity with the Customer Connection website to directly participate in and perfect the illegal downloading scheme.  Consistent with this evidence, SAP TN's then Vice President, Nigel Pullan (who has since "resigned"), recently suggested that SAP intentionally targets Oracle's employees to extract their knowledge of Oracle's new products:  "As new releases start to come out, the people that we hire, we make sure that they have skillsets in those new releases."  In short, SAP cannot credibly claim ignorance of Oracle's access rules.

104.     Notwithstanding SAP's knowledge of Oracle's license agreements with its customers, the support website terms of use, and the confidential, proprietary, and copyrighted nature of Oracle's Software and Support Materials, Oracle learned that SAP TN accessed and downloaded the Software and Support Materials when it either had no legitimate basis to access Oracle's restricted website, or in a way that grossly violated the limited access rights it did have.  Further, during the period of time between when the customer's support license lapsed and when Oracle decommissioned the customer's password credentials, SAP TN *still* accessed and downloaded Software and Support Materials using the old customer passwords.  SAP TN did so despite its knowledge that it had no legal right or legitimate purpose to access Oracle's system *at all* after the customer's support license lapsed.

105.     SAP TN did not innocently download the Software and Support

33

1 Materials – the purpose was to copy them from Oracle's Customer Connection support website
2 and store them on SAP TN's servers for later use in marketing and providing support services to
3 Oracle customers. The rate that SAP TN accessed many of these materials – at intervals of just
4 seconds or less – shows that no one reviewed them in real time. Further, the scope of the
5 downloaded Software and Support Materials – across *multiple* libraries in *multiple* lines of
6 business – for customers that had no license to take, or need for, those products, suggests that
7 SAP TN took the Software and Support Materials to stockpile a library to support its present and
8 prospective customers.

9      106.    SAP TN conducted these high-tech raids as the agent and instrumentality
10 of SAP AG and SAP America and as the cornerstone strategy of their highly-publicized "Safe
11 Passage" program. Further, to the extent SAP TN had any legitimate basis to access Oracle's
12 site as a contract consultant for a customer with current licensed support rights, SAP TN
13 committed to abide by the same license obligations and usage terms and conditions described
14 above applicable to licensed customers. Indeed, *anyone* accessing such Software and Support
15 Materials on the Oracle support website must agree to Oracle's terms and conditions, which
16 restrict access to support only for products that a company has licensed, and impose strict
17 confidentiality requirements. SAP TN reviewed and agreed to the terms and conditions on
18 Oracle's support website before proceeding, and therefore committed its theft knowingly and
19 intentionally, and in conscious disregard of Oracle's copyrights and other protected intellectual
20 property, contractual restrictions on the use of its intellectual property, and the integrity of its
21 computer systems.

22      **3.**    **Specific Examples Of SAP TN's Unlawful Customer**
23             **Downloads**

24      107.    SAP TN's improper access to, and taking from, Oracle's Customer
25 Connection website is too pervasive, and covers too many individual violations, to
26 comprehensively detail here. Oracle has uncovered unlicensed downloads linked to SAP TN on
27 behalf of numerous customers, including without limitation, Abbott Laboratories, Abitibi-
28 Consolidated, Inc., Bear, Stearns & Co., Berri Limited, Border Foods, Caterpillar Elphinstone,

34

1    Distribution & Auto Service, Fuelserv Limited, Grupo Costamex, Helzberg Diamonds, Herbert

2    Waldman, Honeywell International, Interbrew UK, Laird Plastics, Merck & Co., Metro Machine

3    Corp., Mortice Kern Systems, Inc., National Manufacturing, NGC Management Limited, OCE

4    Technologies, B.V., Ronis, S.A., Smithfield Foods, SPX Corporation, Stora Enso, Texas

5    Association of School Boards, VSM Group AB, and Yazaki North America.  By way of example

6    of the nature and extent of SAP's theft,  Oracle sets forth below illustrative instances of SAP

7    TN's illegal conduct regarding several of its customers.

8         108.   **Honeywell.**  Honeywell International ("Honeywell") is listed on SAP

9    TN's website as a client.  In the approximately three and a half year period before Honeywell

10   switched to SAP TN, it averaged just over 20 downloads of Software and Support Materials per

11   month.  Then, after switching to SAP TN, a user employing Honeywell's log-in ID downloaded

12   at least 7,000 Software and Support Materials in less than two weeks in January 2007.  Most of

13   these excessive downloads came during the course of *four days*, during which "Honeywell" was

14   downloading almost *1800 solutions per day*.  At least 2,000 of the Software and Support

15   Materials taken in this period were solutions that Honeywell was not licensed to take at all.  In

16   one specific library containing solutions for Enterprise One software, "Honeywell" downloaded

17   at least 450 distinct unlicensed solutions on January 16, 2007 and nearly 400 more the next day.

18   These downloads spanned virtually every library in every line of business – far beyond the

19   products to which Honeywell had authorized access as an Oracle customer.  This unlawful

20   downloading even stretched across product families.  Honeywell used and licensed PeopleSoft

21   software applications, but Oracle discovered users downloading JDE products with Honeywell's

22   credentials.  Oracle subsequently connected many of the illegal downloads to an SAP TN IP

23   address and to SAP TN's employee, Wade Walden – a former PeopleSoft employee now

24   employed by SAP.

25         109.   **Merck.**  Merck & Company, Inc. ("Merck"), one of the largest

26   pharmaceutical companies in the world, licenses and receives support for many Oracle software

27   products.  Merck's support rights for its JDE software products expired on January 1, 2007.  In

28   the three months prior to that date, users purporting to be "Merck" logged into the Oracle support

35

1   system and downloaded at least 5,500 distinct Software and Support Materials for JDE software.

2   At least 2,800 of these downloads related to JDE software products for which Merck had no

3   license.  But, the unauthorized downloads did not stop there.  Users logging into Oracle's support

4   system with Merck's credentials continued to download Software and Support Materials into

5   March 2007.  Many of these "Merck" downloads came directly from an IP address in Bryan,

6   Texas that belongs to SAP TN, and some were traced to a computer with SAP TN's initials in

7   the title, "TN-DL03."  In many cases, SAP TN users employed fake identification information to

8   download the Software and Support Materials, using names such as "xx" "ss" and "NULL," and

9   phone numbers such as "4444444444" and "999 999 9999."  Neither Merck nor SAP TN had

10  any license, authorization or other right to access and download the 2,800-plus unlicensed

11  Software and Support Materials from Oracle.

12          110.    **OCE.**  OCE-Technologies B.V. ("OCE") is located in the Netherlands and

13  appears as a customer on SAP TN's website.  In the months leading up to the expiration of

14  OCE's support rights for its Oracle products, users employing OCE's credentials downloaded a

15  large number of Oracle products relating to US Payroll, Canadian Payroll, Homebuilder

16  Management, and Real Estate Management – none of which make sense for a European

17  customer supporting its European business.  From December of 2006 to January of 2007, SAP

18  TN users logged into Oracle's support system using OCE's credentials (and, in some cases, false

19  user names) and downloaded at least 5,600 distinct Software and Support Materials.  These

20  downloads included at least 1,800 distinct items for which OCE had no license.  There is little

21  chance that SAP TN intended OCE as the beneficiary of these massive sweeps, since OCE does

22  not run many of the software programs to which these downloads relate, and neither OCE nor

23  SAP TN have any license, authorization, or other right to access and download these Software

24  and Support Materials.  Like the other companies, these illegal downloads are associated with the

25  same IP address belonging to SAP TN in Bryan, Texas, including specifically to a computer with

26  SAP TN's initials in the title, "TNL-02."  Similar to the other customer examples, many of these

27  "OCE" users entered phony identification information, such as the name "user" and phone

28  numbers such as "123 456 7897," "9999999999," and even "xxx xxx xxxx."  This systematic

36

1  sweep of products across numerous licensed and unlicensed Oracle product lines and libraries

2  dramatically exceeded the access for which OCE (and SAP TN acting on its behalf) had any

3  right or authority, and could serve no legitimate or lawful business purpose.

4  111.  **SPX.**  SPX Corporation ("SPX") dropped all Oracle support on December

5  10, 2006 and became an SAP TN customer, listed on SAP TN's website.  For the nine month

6  period prior to October 2006, SPX averaged approximately eleven downloads per month from

7  Oracle's support system.  Then, between October and December 2006, users purporting to

8  represent SPX accessed and downloaded at least 9,000 distinct Oracle Software and Support

9  Materials (far more than SPX could legitimately access or use).  These SPX downloads included

10  at least 1,500 distinct Software and Support Materials for which SPX had no license.  At least

11  200 distinct downloads just on December 9, 2006 were Software and Support Materials related

12  to unlicensed Payroll software.  In some cases, these users logged in using SPX credentials, but

13  used fake identification information like the name "NULL" and phone numbers like

14  "7777777777" and "999 999 9999."  Many of these SPX downloads, like the others, originated

15  from the same IP address belonging to SAP TN, and some were traced to a computer with SAP

16  TN's initials in the title, "tn-wts01."

17  112.  **Metro Machine.**  Metro Machine Corp. ("Metro Machine") dropped all

18  Oracle support effective on January 1, 2007 and switched to SAP TN, as reflected on SAP TN's

19  website.  In the month before Metro Machine dropped its support rights with Oracle, users

20  purporting to represent Metro Machine logged onto Oracle's support servers and downloaded at

21  least 600 distinct Software and Support Materials.  At least 50 of those downloads related to

22  software programs that Metro Machine had not licensed from Oracle.  In addition, users logging

23  into Oracle's support system with Metro Machine's credentials continued to download Software

24  and Support Materials into March 2007.  Oracle has traced these illegal and unauthorized

25  downloads to the same SAP TN IP address employed for the other downloads described above.

26  113.  **Yazaki.**  Yazaki North America, Inc. ("Yazaki") is a large supplier of

27  automotive products headquartered in Michigan.  It dropped all Oracle support effective on

28  January 3, 2007.  In the month leading up to the expiration of Yazaki's support rights for its

37

1   Oracle products, users employing Yazaki's credentials downloaded an enormous number of

2   Oracle Software and Support Materials relating to Canadian Payroll, Homebuilder Management,

3   and Real Estate Management, and many other software products, which make no sense for a U.S.

4   automotive supply company supporting its U.S. business.  In two weeks, from December 15,

5   2006 to December 29, 2006, SAP TN users logged into Oracle's support system using Yazaki's

6   credentials and downloaded at least 11,000 distinct Software and Support Materials.  These

7   downloads included at least 1,500 distinct items for which Yazaki had no license.  There is little

8   chance that SAP TN intended Yazaki as the beneficiary of these massive sweeps, since Yazaki

9   does not run many of the software programs to which these downloads relate, and neither Yazaki

10  nor SAP TN has any license, authorization, or other right to access and download these Software

11  and Support Materials.  Like the other companies, these illegal downloads are associated with the

12  same IP address belonging to SAP TN in Bryan, Texas.  Similar to the other cases, "Yazaki"

13  users entered phony identification information, such as mixing the user ID "Joel_Joyce" with a

14  different user name "Jeff Livermore" and an email address related to a different customer, SPX,

15  "rosbie@spxmks.com," and a phony phone number "4444444444."  This systematic sweep of

16  products across numerous licensed and unlicensed Oracle product lines and libraries

17  substantially exceeded the access for which Yazaki (and SAP TN acting on its behalf) had any

18  right or authority, and could serve no legitimate or lawful business purpose.

19  **F.     SAP's Theft By Illegally Copying And Using Oracle Software Applications**

20          114.    The downloads are just a piece of a larger scheme.  For years, dating at

21  least to 2003, SAP TN created thousands of copies of Oracle's actual software applications.

22  These software copies included Oracle's PeopleSoft-branded Human Resource Management,

23  Customer Relationship Management, Enterprise Performance Management, Financial Data

24  Management, Portal, and Student Administration product lines, and Oracle's J.D. Edwards

25  branded Distribution, Financials, Human Resources, and Manufacturing product lines.  They

26  appear also to have included Oracle's Siebel and eBusiness Suite software, and may also have

27  included Oracle's Hyperion and Retek software.

28          115.    SAP TN's internal records reveal that it instructed Oracle customers, who

38

were about to switch to SAP TN, how to order CDs containing "all software available and licensed" to them from Oracle, so customers could turn those software applications, in their entirety, over to SAP TN. SAP TN's detailed instructions even encourage Oracle customers to lie to Oracle by, for example, telling Oracle that SAP TN's offices are a "new 'company' location" where Oracle software should be installed – despite plain language in Oracle's license agreements requiring a customer site to be physically located on property owned or leased by the customer. SAP TN used these CDs to create local environment copies of Oracle software on SAP TN computers for development, testing, training and research for other customers. Since Oracle provides customers the ability to load and license additional software from these CDs, SAP TN even undoubtedly copied software from these CDs to which the customer who sent them had no license.

116. Sometimes, SAP TN would not even bother to use the CDs it got from its customers. Instead, it would simply reuse the same environment over and over again for multiple customers, each time assigning the new copy a customer-specific identifier. According to SAP TN's corporate witness, it was "just a matter [of] efficiency to have a single source environment to use to create the specific client environments."

117. SAP TN acquired, created and maintained thousands of illegal copies of Oracle's software releases on its internal computer systems and generally treated the software as its own. SAP TN would "integrate" its stolen downloaded Software and Support Materials into new local software environments it would create, in order to "update" that environment to support the customer. Thus, the thousands of copies of Oracle software that SAP TN maintained on its systems, apart from the illicit existence and use of the software itself, each may be further tainted by the insertion into it of Software and Support Materials taken with a different customer's log-in credential.

118. As core parts of its daily business operations, SAP TN engaged in at least the following types of illegal activities with these copies of Oracle's enterprise applications software:

- SAP TN maintained entire copies of Oracle's enterprise software applications

39

1    on SAP TN's computer systems without authorization or license.  SAP TN
2    internal documents indicate it had approximately 250 copies of various Oracle
3    software releases in active use when Oracle filed suit.  Another several
4    thousand existed on SAP TN computers in backup form that SAP TN would
5    restore and use for various illegal purposes;

6    • According to SAP TN's sworn testimony, each of these several thousand
7    software copies may have illegally downloaded software patches or updates
8    contained within them;

9    • For each particular Oracle software release that it wanted to "support," SAP
10   TN used unauthorized and unlicensed copies of Oracle software to create
11   "generic" or "sandbox" environments;

12   • In addition to the generic, all-purpose software copies, SAP TN also
13   maintained thousands of copies of Oracle's software releases for the
14   ostensible purpose of supporting the customer who previously had licensed
15   that software.  SAP TN has admitted under oath that it constructed some of
16   these software copies with software not licensed by that customer or provided
17   by that customer to SAP TN.  It has also admitted it used even these
18   supposedly customer-specific software copies as reference and development
19   tools to support other customers;

20   • SAP TN used these "generic" and "customer specific" software copies to
21   support multiple customers, with no regard for which customer had originally
22   provided the copy of the Oracle software that SAP TN was using;

23   • SAP TN used these software copies for general development of its SAP-
24   branded fixes, for otherwise supporting other customers, and for general
25   testing, research, and training; and,

26   • SAP TN did not limit itself to possession of Oracle software provided by SAP
27   TN's active customers.  If an SAP customer left SAP's service, SAP TN
28   considered itself entitled to keep the Oracle software copy provided by that

40

1        customer on SAP TN computers for "reference" – and did so many times.

2        119.     Each instance of each such use constitutes an illegal, unauthorized use of

3 Oracle's software copy. This cross-use of the software copies was an essential part of the SAP

4 TN business model, and fundamental to the success of the SAP Safe Passage program.

5        120.     Because SAP TN's assets essentially consist of, and SAP TN generated so

6 many of its support deliverables by using, illegal copies and downloads of Oracle's software, it is

7 unclear that SAP AG could effectively sell any of SAP TN's assets, as it has publicly said it

8 intends to do. SAP TN's business processes rely on repeated copyright infringement, and its

9 assets consist of thousands of co-mingled illegal downloads and software environments. Indeed,

10 SAP AG's stated intent to sell SAP TN raises additional questions about whether SAP AG

11 intends to perpetuate its own illegal conduct by selling for profit infringing copies of Oracle's

12 software.

13 **G.     Oracle's Software And Support Materials Are Registered With The**

14 **Copyright Office**

15        121.     The Software and Support Materials and software applications that SAP

16 TN copied from its customers and downloaded from Oracle's systems included numerous works

17 that are protected under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.* These protected

18 works are original works of authorship, owned by Oracle. Defendants' acts violated Oracle's

19 exclusive rights to reproduce, create derivative works, publish, publicly display, offer for sale,

20 and distribute these works. Defendants' acts were willful and intentional and constitute both

21 direct and indirect copyright infringement under the Federal Copyright Act, 17 U.S.C. §§ 101 *et*

22 *seq.*

23        122.     **The Copyright Registrations.** With literally thousands of software

24 programs available for licensing, Oracle does not typically obtain copyright registrations on all

25 programs or related Software and Support Materials as it generally does not find itself in the

26 position of having to enforce its copyrights to stop infringement. However, upon discovering

27 Defendants' mass downloading, Oracle registered copyrights on the Software and Support

28 Materials taken and infringed by SAP TN.

1      123.    The massive nature of the illicit downloads by SAP TN make it impossible

2    to detail comprehensively each copyright violation in this Complaint.  However, Oracle has now

3    obtained from the Register of Copyrights over 40 certificates of registration that cover a wide

4    range of Software and Support Materials taken by SAP TN and software applications copied and

5    used by SAP TN.  These include registrations of a number of Oracle knowledge management

6    solutions, numerous versions of Oracle's JDE software applications, service packs of JDE

7    updates, and specific unlicensed Software and Support Materials taken by SAP TN.

8    Collectively, these registrations cover thousands of unlicensed Software and Support materials

9    unlawfully copied by SAP TN.

10      124.    Examples of SAP's infringement of registered copyrights include the

11   following.  On December 5, 2006, SAP TN used SPX's log-in ID to download a Payroll ESU,

12   JJ13072, for EnterpriseOne software version 8.11 SP1.  Oracle registered this ESU with the

13   United States Copyright Office,  *See* Registration No. TX 6-541-027.  SAP TN used the log-in

14   ID of another customer, Merck, to download an EnterpriseOne 8.12 Blend Management ESU,

15   JK10093, on December 13, 2006.  Oracle also registered this ESU with the Copyright Office.

16   *See* Registration No. TX 6-541-045.  Further, SAP TN logged in on December 18, 2006 using

17   the log-in credentials of Yazaki and downloaded a Customer Relationship Management ESU,

18   PH11676, for EnterpriseOne software version 8.11, which is now registered with the Copyright

19   Office.  *See* Registration No. TX 6-541-035.  SAP TN also used the log-in ID of OCE to

20   download a payroll update for World Software version A7.3, A738217431, on December 21,

21   2006.  Oracle registered this update with the Copyright Office as well.  *See* Registration No. TX

22   6-541-043.  None of these customers was licensed to copy these works.  Nor was SAP licensed

23   to copy them in the names of those customers.

24      125.    Oracle also owns preexisting copyright registrations that cover many of

25   the software programs copied by SAP TN to illegally create environments on its own systems.

26      126.    **The DST Solution.**  In at least one instance, SAP TN has also, publicly

27   displayed, distributed, and thereby profited from Oracle's copyrighted Software and Support

28   Materials.  In December 2006, Oracle developed a knowledge solution related to the recent early

42

1  change to Daylight Savings Time (the "DST Solution"). The DST Solution is a narrative

2  document with specific instructions for how to conform certain Oracle software to the new

3  Daylight Savings Time change.  Oracle fielded more than a thousand service requests from its

4  customers related to the Daylight Savings Time change, and its DST Solution helped resolve

5  more than 750 of them.

6  127.  Oracle traced downloads of the DST Solution to SAP TN's IP address on

7  January 8, 2007 and January 15, 2007.  Oracle also noticed that SAP TN posted a "PeopleSoft

8  Daylight Savings Time solution" on its website.  SAP TN's "solution" is substantially similar in

9  total–and in large part appears to be copied identically from–Oracle's DST Solution.  SAP TN's

10  copied version even includes minor errors in the original DST Solution that Oracle later

11  corrected.  SAP TN's version also substitutes an SAP TN logo in place of the original Oracle

12  logo and copyright notice.  SAP's own internal investigation revealed that "it appears clear" that

13  an SAP TN employee "copied a significant portion" of SAP TN's version of the DST solution

14  from Oracle's solution.

15  128.  Oracle has registered the downloaded version of its DST Solution that

16  SAP TN copied and created derivative works from, and later distributed and publicly displayed,

17  as well as a later version that SAP TN also downloaded shortly before Oracle filed its original

18  Complaint, Registration Nos. TX 6-541-019 and TX 6-541-018.  No customer is licensed to

19  create derivative works from, distribute or publicly display Oracle's Software and Support

20  Materials, and neither is SAP.

21  **H.  Project Blue And Safe Passage:  SAP Adds Ill-Gotten Gains To Its Coffers**

22  129.  SAP TN claims to have delivered thousands of fixes and more than 1000

23  tax and regulatory updates to Oracle's former customers.  Not coincidentally, SAP TN has

24  illegally downloaded thousands of fixes and updates from Oracle's restricted customer support

25  website and made and used thousands of copies of Oracle's software applications.  SAP AG and

26  SAP America directed this download and copying scheme, ratified it, never disavowed it, and

27  financially benefited from it – all while pressuring SAP TN to win more customers through Safe

28  Passage.  As one SAP TN employee put it when reporting on the joint "Oracle Disruption Plan"

43

1    – what SAP internally named the follow-up to its Safe Passage program – "SAP Germany is

2    tracking these leads now and wants to see progress."

3           130.    Senior management at SAP AG and SAP America knew the details of

4    SAP TN's unlawful activities – and proceeded to hide them for more than two years until Oracle

5    filed this lawsuit.

6           131.    SAP AG and SAP America knew about and provided guidance concerning

7    SAP TN's illegal downloading activities.  As far back as 2005, SAP AG and SAP America

8    lawyers specifically advised SAP TN to cease downloading Oracle support materials into co-

9    mingled master "libraries."  SAP AG and SAP America advised SAP TN to create customer-

10   specific folders in which to house the downloads for new customers.  But SAP AG and SAP

11   America gave no instruction to break up or stop using the existing, co-mingled download

12   libraries that SAP TN had populated with millions of PeopleSoft-branded Oracle downloads.

13   And while SAP TN devoted several months to breaking apart the JDE master library into

14   customer-specific folders (without curing its underlying illegality), it apparently received no

15   parallel instruction to sort out the exponentially larger – and more lucrative – PeopleSoft

16   "master" download library.

17          132.    SAP AG and SAP America also knew about the central role illegal copies

18   of Oracle software releases played in SAP TN's business.

19          133.    By June 2005, concerned about the risks inherent in their possession and

20   use of Oracle's software applications, the tight familial group leading SAP TN – founder

21   Andrew Nelson, his wife Shelley Nelson (who was at the time the Vice President of PeopleSoft

22   Support), and his brother Greg Nelson (who was at the time the Chief Information Officer) – had

23   circulated a highly confidential draft "Blue" presentation with instructions in the subject line to

24   "PLEASE DELETE AFTER READING."  In it, Greg Nelson presented a

25   "Feasibility/Cost/Benefit" analysis of "going blue," (discontinuing SAP TN's illegal business

26   model) and concluded that moving SAP TN's model to all remote support would "decrease

27   efficiency" and increase the human capital cost – and reduce the profitability – of SAP TN's

28   business.  Most importantly, "If we are all blue [no local software copies available to use] . . .

44

1    since all Development and testing will be done remotely, ***no sharing or recycling of work***.

2    Require more developer hands in lieu of massive automation." (emphasis supplied).

3        134.    In other words, it would cost SAP TN more to service its customers

4    legally – a prospect SAP TN could not accept.  As Greg Nelson cautioned: "When we need a

5    seed environment [a generic, all-purpose software copy for development, research, and training],

6    we need to entice a customer to be Yellow [have possession of the Oracle software on SAP's

7    computers]."  The group opposed the move and engaged in admitted "delay tactics" to preserve

8    the efficiencies inherent in the illegal business model.

9        135.    By June 30, 2005, SAP TN had worked up a revised presentation for

10    members of the SAP AG board of directors that stated emphatically:  "Yellow is what we do

11    now - In House Hosting."  The presentation identified a laundry list of activities that SAP TN

12    performed with its illegal local software copies that it would have to transfer in a remote hosting

13    model, including:  marketing, equipment, downloading, primary development, testing, and

14    backup/restore.  The presentation raised a series of obstacles to implementing "Project Blue,"

15    including "got to find a way to download from client site."  It also again focused on the problem

16    of how SAP TN could generate its copycat updates for its customers running certain versions of

17    Oracle's PeopleSoft-branded Human Resources payroll without keeping generic Oracle

18    environments on its systems.

19        136.    While SAP AG, SAP America and SAP TN debated Project Blue, they

20    each took careful steps to avoid detection.  In August 2006, SAP TN prepared for a visit by

21    industry analyst Gartner.  A confidential internal SAP TN memo warned "[r]emind Shelley

22    [Nelson, SAP TN's Vice-President of Support Services] to ***be careful and not talk about client***

23    ***environment and legality*** . . . ."  (emphasis supplied).  A few months later, in connection with

24    creating a document intended to explain to SAP TN customers how SAP TN actually provided

25    its service, SAP TN's Vice-President of JDE Support Services, Laura Sweetman (a former JDE

26    employee experienced with the JDE software), noted that SAP TN's policy of creating "a fix-

27    master demo environment in [SAP TN's] datacenter for every customer" had "IP issues."  SAP

28    TN then abandoned the "Guide to TomorrowNow Support Services" project.

45

1          137.    In the meantime, the SAP AG board of directors apparently had no interest

2  in forcing the migration from SAP TN's admittedly illegal local software environment model to

3  a legal hosted one – not when SAP TN was such a crucial part of its plan to lure customers away

4  from Oracle.

5        &bull;   National Foods Limited, May 2006 – "During an intense negotiation period,

6             TomorrowNow was able to give 'substantial teeth' to the SAP license bid,

7             with the offer of combining both JDE and PeopleSoft support and

8             maintenance services for the foreseeable future, whilst they work on the SAP

9             implementation plans."

10        &bull;   Mutual of Omaha, August 2006 – "[T]his quarter we are running a special

11             sales program, jointly sponsored between TN and SAP, and we were able to

12             offer some significant pricing incentives through the SAP/TN 'Turn Up The

13             Heat' Campaign. . . . Specifically, Mutual of Omaha will consider bringing in

14             [SAP] for a Value Engineering study -- a critical step in the SAP sales

15             methodology, and gives them appropriate executive level access.  This is a

16             significant commitment from the customer, and a great example of

17             TomorrowNow creating future software sales pipeline for SAP."

18        &bull;   The Home Depot, October 2006 – SAP "was highly interested in winning

19             away The Home Depot from Oracle."  SAP TN CEO, Andrew Nelson, told

20             SAP America CEO, Bill McDermott, that SAP TN would knock its fees down

21             from "$600k per year down to $30k if you tell me you need this" and if

22             McDermott could address Home Depot's concerns about the legality of SAP

23             TN's services.  The price was worth it – the deal would give SAP a

24             "marketing deliverable" to use with other customers.

25        &bull;   Direct Energy, October 2006 – "Randy Wheeler, SAP [Account Executive],

26             contacted [SAP TN] mid-August with a prospect running PeopleSoft. . . . Now

27             that we have displaced Oracle, we have effectively created future sales

28             pipeline for SAP."

138.     As these examples illustrate, SAP used Oracle's stolen intellectual property to provide maintenance services and unfairly compete against Oracle, thereby illegally winning business and a number of customers from Oracle, and artificially inflating its market share.

**I.     Defendants Conspired With And Aided And Abetted Each Other**

139.     Defendants willfully, intentionally, and knowingly agreed and conspired with each other to engage in the alleged wrongful conduct, including Defendants' copyright infringement, interference with Oracle's business relationships and other unfair business practices, as well as Defendants' trespass on, and computer fraud concerning the Software and Support Materials.

140.     Defendants did the acts alleged pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

141.     As a direct and proximate result of the acts in furtherance of the conspiracy, Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of Oracle support services and licenses for Oracle's software programs.  The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

142.     Defendants also had full knowledge of or should have reasonably known of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such wrongful conduct, including copyright infringement, interference with Oracle's business relationships and other unfair business practices, as well as Defendants' trespass on, and computer fraud concerning the copyrighted Software and Support Materials, by providing substantial assistance and/or encouraging the others to act.

143.     SAP AG and SAP America condoned and encouraged SAP TN's activities, including through the Safe Passage program and Project Blue.  Indeed, despite Project Blue, SAP AG monitored the Safe Passage program closely, "tracking these leads" from Germany, and pushing SAP TN "to see progress."  SAP AG and SAP America account

47

1  executives repeatedly fed leads to SAP TN sales personnel and worked closely with them

2  throughout the sales and negotiations process, presenting joint service offerings to prospective

3  customers with the goal of creating applications revenue for SAP.  A year after the acquisition of

4  SAP TN, to facilitate the joint sales and marketing process further, SAP AG specifically

5  encouraged – and required – closer cooperation between the sales and marketing teams at SAP

6  AG, SAP America and SAP TN.  Thus, SAP AG and SAP America knew about, permitted,

7  encouraged, directed and profited from SAP TN's wrongful use of these materials.

8       144.  Defendants also aided and abetted the described wrongful conduct of the

9  other Defendants by giving substantial assistance and/or encouragement that, separately

10  considered, was wrongful in and of itself.

11       145.  As a direct and proximate result of the aiding and abetting of these acts,

12  Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits

13  from sales to current and potential customers of Oracle support services and licenses to Oracle

14  software programs.  The wrongful conduct aided and abetted by the Defendants was a substantial

15  factor in causing this harm.

16       146.  Defendants' intentional agreement to commit, and commission of, these

17  wrongful acts, and aiding and abetting of these wrongful acts, was willful, malicious, oppressive,

18  and in conscious disregard of Oracle's rights, and Oracle is therefore entitled to an award of

19  punitive damages to punish their wrongful conduct and deter future wrongful conduct.

20  **First Claim for Relief**

21  **Copyright Infringement**

22  (By OIC, OSC and JDEE Against All Defendants)

23       147.  OIC, OSC and JDEE incorporate by reference each of the allegations in

24  the preceding paragraphs of this Complaint as though fully set forth here.

25       148.  OIC owns a valid and enforceable copyright in all of its software

26  applications and Software and Support Materials, which are creative works of original

27  authorship. OIC has pre-existing, or has obtained from the Register of Copyrights, Certificates of

28  Registration that cover many of the software applications and Software and Support Materials

48

1    taken and copied by SAP TN.[3]

2           149.    OIC has also obtained, through transfer agreements, all rights, title, and

3 interest in registered and unregistered copyrights formerly owned by certain PeopleSoft and J.D.

4 Edwards entities.

5           150.    OSC is the successor-in-interest to previous owners of certain copyrights

6 at issue in this case.

7           151.    JDEE is an exclusive licensee of certain copyrights at issue in this case.

8           152.    OIC, JDEE and OSC's predecessors-in-interest owned one or more

9 exclusive rights in certain copyrights at issue in this case at a point in time during which

10 Defendants infringed those exclusive rights.

11           153.    Defendants have infringed copyrights in Oracle software applications and

12 Software and Support Materials, including the software applications and Software and Support

13 Materials covered by these certificates. These certificates are identified, dated and numbered as

14 follows:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Shop Floor Control program | March 7, 1995 | TXu 619-303 |
| EDI Interface (6) program | March 7, 1995 | TXu 619-304 |
| Configuration Management program | March 7, 1995 | TXu 619-305 |
| Master Production Scheduling program | March 7, 1995 | TXu 619-306 |
| Capacity Requirements Planning program | March 7, 1995 | TXu 619-307 |
| WorldCASE Development Environment program | March 7, 1995 | TXu 619-308 |
| Equipment Management (5) program | March 7, 1995 | TXu 619-309 |
| General Ledger & Basic Financial program | March 7, 1995 | TXu 619-310 |
| Enterprise Facility Planning program | March 7, 1995 | TXu 619-311 |
| Accounts Receivable program | March 7, 1995 | TXu 619-312 |
| Warehouse Management program | March 7, 1995 | TXu 619-313 |
| Inventory Management program | March 7, 1995 | TXu 619-314 |
| Sales Order Processing/Sales Analysis program | March 7, 1995 | TXu 619-315 |
| Purchase Order Processing program | March 7, 1995 | TXu 619-316 |
| Product Data Management program | March 7, 1995 | TXu 619-317 |
| Financial Reporting (FASTR) program | March 7, 1995 | TXu 619-318 |
| WorldCASE Foundation Environment (3) program | March 7, 1995 | TXu 619-319 |
| Accounts Payable program | March 7, 1995 | TXu 619-320 |

26 _____

27 [3] As discovery progresses, Oracle reserves the right to add additional counts based on copyright
registrations for Siebel, eBusiness Suite, Hyperion and/or Retek software.

28

| | | |
|---|---|---|
| Financial Modeling, Budgeting & Allocations program | March 7, 1995 | TXu 619-321 |
| PeopleSoft HRMS 7.0 | December 15 1998 | TX 4-792-577 |
| PeopleSoft HRMS 7.5 | December 15, 1998 | TX 4-792-575 |
| PeopleSoft HRMS 8.0 | November 20, 2000 | TX 5-291-440 |
| PeopleSoft 8 HRMS SP1 | March 26, 2001 | TX 5-501-312 |
| PeopleSoft 8.3 HRMS | February 1, 2002 | TX 5-469-032 |
| PeopleSoft 8.8 HRMS | June 11, 2004 | TX 6-093-947 |
| PeopleSoft 8 Customer Relationship Management | September 27, 2001 | TX-5-456-777 |
| PeopleSoft 8.8 Customer Relationship Management | June 11, 2004 | TX 6-015-317 |
| PeopleSoft Financials, Distribution & Manufacturing 7.5 | December 15, 1998 | TX 4-792-574 |
| PeopleSoft 8 Financials and Supply Chain Management: Service Pack 2 | September 27, 2001 | TX-5-456-780 |
| PeopleSoft 8.4 Financials and Supply Chain Management | August 5, 2002 | TX-5-586-247 |
| PeopleSoft 8.8 Enterprise Performance Management | June 11, 2004 | TX-5-993-616 |
| PeopleSoft 8 Student Administration Solutions | November 30, 2001 | TX 5-431-289 |
| PeopleTools 7.5 | November 20, 1998 | TX 4-792-578 |
| PeopleTools 8.0 | September 5, 2000 | TX 5-266-222 |
| PeopleTools 8.10 | September 5, 2000 | TX 5-266-221 |
| PeopleTools 8.4 | August 5, 2002 | TX 5-586-248 |
| Initial release of JD Edwards EnterpriseOne XE | April 26, 2007 | TX 6-541-033 |
| ESU for JD Edwards EnterpriseOne Xe | May 3, 2007 | TX 6-541-051 |
| Cumulative Update 8 for JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-048 |
| Initial release of JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-050 |
| ESU for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-046 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-034 |
| Initial release of JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-049 |
| ESU for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-036 |
| Initial release of JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-038 |
| ESU for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-037 |
| Cumulative Update 2 for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-032 |
| Initial release of JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-028 |
| ESU for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-035 |
| Initial release of JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-040 |
| ESU for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-027 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-039 |
| Initial release of JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-041 |
| ESU for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-045 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-042 |

| | | |
|---|---|---|
| Initial release of JD Edwards World A7.3 | April 26, 2007 | TX 6-541-029 |
| Code Change for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-043 |
| Cumulative Update 16 for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-031 |
| Initial release of JD Edwards World A8.1 | April 26, 2007 | TX 6-541-047 |
| Code Change for JD Edwards World A8.1 | April 26, 2007 | TX 6-541-044 |
| Cumulative Update 6 for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-421 |
| Initial release of JD Edwards World A9.1 | April 26, 2007 | TX 6-541-030 |
| ECRM89:  Common Errors on Mobile Sales | April 26, 2007 | TX 6-541-020 |
| EAP WTHD06:  1099 IRS changes for the year 2006 | April 26, 2007 | TX 6-541-023 |
| JD Edwards World -- 1099 Changes for Tax Year 2006 | April 26, 2007 | TX 6-541-026 |
| E1:  1099:  Year 2006 1099 ESUs | April 26, 2007 | TX 6-541-024 |
| Changes to Daylight Savings Time for 2007 (DST) | April 26, 2007 | TX 6-541-025 |
| E1:  07/77:  Quantum for Payroll Tax v.280 | April 26, 2007 | TX 6-541-022 |
| GM--Grants issues resolved by FMS ESA 8.9 Bundle #10-653723 (Oct 06) | April 26, 2007 | TX 6-541-021 |
| PeopleTools Third Party Daylight Saving Time Required Modifications | April 26, 2007 | TX 6-541-019 |
| PeopleTools Third Party Daylight Saving Time Required Modifications (Revised) | April 26, 2007 | TX 6-541-018 |
| PeopleSoft 8.01 & 8.31 Payroll Tax Update 05-F Year-End Processing: Canada | May 2, 2008 | TX 6-838-549 |
| PeopleSoft Payroll 1200457000 - User Documentation | May 2, 2008 | TX 6-838-537 |
| PeopleSoft Application Update Installation Instructions (UPD595817) | May 2, 2008 | TX 6-838-544 |

154.    These registrations generally cover, but are not limited to, numerous versions of Oracle software, including the updates, patches and fixes incorporated in each relevant version, service packs of Oracle updates, patches and fixes, and individual exemplar Software and Support Materials, including certain Oracle knowledge management solutions and certain Oracle updates, patches and fixes, all of which SAP TN copied without a license.  The registrations listed above also cover numerous Oracle software releases that SAP TN copied to create "local customer environments."

155.    OIC also has the following registrations that cover "Current Development Environments" for certain software releases:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Current development environment for JD Edwards EnterpriseOne Xe | April 26, 2007 | TXu1-345-109 |

51

| | | |
|---|---|---|
| Current development environment for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TXu1-345-111 |
| Current development environment for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TXu1-345-112 |
| Current development environment for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TXu1-345-113 |
| Current development environment for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TXu1-345-114 |
| Current development environment for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TXu1-345-115 |
| Current development environment for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TXu1-346-350 |
| Current development environment for JD Edwards World A7.3 | April 26, 2007 | TXu1-345-110 |
| Current development environment for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-422 |

Discrete portions of these registered Current Development Environments also contain updates, patches and fixes that SAP TN copied without a license. Defendants infringed these discrete portions of the registered Current Development Environments by taking without license the Software and Support Materials that are substantially similar to these discrete portions.

156. Through the acts alleged above, Defendants have violated the exclusive rights of OIC, JDEE and OSC's predecessors-in-interest to reproduce and make copies of its copyrighted Software and Support Materials, including materials covered by the registrations listed above, by:

- repeatedly copying entire releases of Oracle's software, and related documentation, to SAP TN's own local systems, without authorization or license, to create "local customer environments";
- creating unlicensed works derived from these software copies and related documentation to support SAP TN's other customers;
- using these software copies for other improper business purposes, including, without limitation, training employees, troubleshooting, researching general and specific support issues, and marketing to prospective customers;

52

1      • "exploding" the source code of certain Software and Support Materials on

2        to SAP TN's local machines in order to catalogue them to facilitate

3        creation of unlicensed works in its own name;

4      • downloading Oracle's copyrighted Software and Support Materials onto

5        its computers in violation of 17 U.S.C. § 106; and,

6      • repeatedly copying, co-mingling and cross-using the downloaded Software

7        and Support materials to populate different customer folders, support other

8        customers, and as a general resource to provide support in the ordinary

9        course of SAP TN's business.

10     157.    Defendants have also violated the exclusive rights of OIC, JDEE and

11 OSC's predecessors-in-interest to control the distribution, creation of derivative works and

12 public display of copyrighted works by downloading, copying, creating derivative works from

13 and/or distributing Oracle's Software and Support Materials and/or derivative works to

14 Defendants' customers, via posting to its website, by electronic mail, through file transfer

15 protocol, or otherwise, including at least Oracle's DST Solution, in violation of 17 U.S.C. § 106.

16     158.    Defendants were not authorized to copy, download, reproduce, create

17 derivative works from, distribute, or publicly display Oracle's copyrighted software applications

18 and Software and Support Materials except as authorized by and in support of a specific licensed

19 customer, using only (in the case of Software and Support Materials) that licensed customer's

20 log in credentials, and with respect only to Software and Support Materials for which that

21 customer had a current right to have and use.

22     159.    In addition to directly infringing the exclusive rights of OIC, JDEE and

23 OSC's predecessors-in-interest, Defendants have contributorily and/or vicariously infringed the

24 exclusive rights of OIC, JDEE and OSC's predecessors-in-interest in Oracle software

25 applications and Software and Support Materials by controlling, directing, intentionally

26 encouraging, inducing or materially contributing to the copying, distribution, publicly display or

27 creation of derivative works from Oracle's copyrighted software applications and Software and

28 Support Materials.  Defendants also obtained a direct financial benefit from the above alleged

1   infringing activities while declining to exercise their right to stop it or limit it.

2       160.    Defendants knew or should have known that copying, distributing, public

3   display of, and creating derivative works of and from Oracle's software applications and

4   Software and Support Materials, which Defendants copied in the name of customers who had no

5   license to copy, distribute, publicly display or create derivative works from those materials,

6   infringed the exclusive rights of OIC, JDEE and OSC's predecessors-in-interest in those

7   materials.

8       161.    OIC, JDEE and OSC are entitled to damages in an amount to be proven at

9   trial, including profits attributable to the infringement not taken into account in computing actual

10  damages under 17 U.S.C. § 504(b).  OIC, JDEE and OSC are entitled to statutory damages under

11  17 U.S.C. § 504(c) based on Defendants' infringements – after the dates of copyright registration

12  – of certain copyrighted works used to create SAP TN's "local customer environments" and the

13  subsequent individual further copying and use of each such environment.

14      162.    Defendants' infringement of the exclusive rights of OIC, JDEE and OSC's

15  predecessors-in-interest has also caused OIC, JDEE and OSC irreparable injury.  Unless

16  restrained and enjoined, Defendants will continue to commit such acts.  OIC's, JDEE's and

17  OSC's remedies at law are not adequate to compensate them for these inflicted and threatened

18  injuries, entitling OIC, JDEE and OSC to remedies including injunctive relief as provided by 17

19  U.S.C. § 502, and an order impounding or destroying any and all infringing materials pursuant to

20  17 U.S.C. § 503.

21              **Second Claim for Relief**

22          **Violation of Federal Computer Fraud and Abuse Act**

23          **(18 U.S.C. §§ 1030(a)(2)(C), (a)(4) & (a)(5))**

24              (By Oracle USA and OIC Against All Defendants)

25      163.    Oracle USA and OIC incorporate by reference each of the allegations in

26  the preceding paragraphs of this Complaint as though fully set forth here.

27      164.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C.

28  § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or

                                    54

communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.

165. Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), by knowingly, and with intent to defraud Oracle USA or OIC, accessing a protected computer, without authorization or by exceeding authorized access to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but not limited to Oracle's Software and Support Materials.

166. Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(i), by knowingly causing the transmission of a program, information, code, or command and as a result intentionally causing damage without authorization to a protected computer owned by Oracle USA.

167. Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(5)(A)(ii) and (iii) by intentionally accessing a protected computer without authorization, causing damage to Oracle USA or OIC, recklessly or without due regard for their actions.

168. The computer system or systems that Defendants accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

169. Oracle USA and OIC have suffered damage and loss by reason of these violations, including, without limitation, harm to Oracle USA's and OIC's data, programs, and computer systems, and other losses and damage in an amount to be proved at trial, but, in any event, in an amount well over $5000 aggregated over a one-year period.

170. Defendants' unlawful access to and theft from Oracle USA's computers have caused Oracle USA and OIC irreparable injury. Unless restrained and enjoined, Defendants will continue to commit such acts. Oracle USA's, and OIC's remedies at law are not adequate to compensate them for these inflicted and threatened injuries, entitling Oracle USA and OIC to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

## Third Claim for Relief

### Computer Data Access and Fraud Act - Cal. Penal Code § 502

(By Oracle USA and OIC Against All Defendants)

171.    Oracle USA and OIC incorporate by reference the allegations of paragraphs 1 through 120, 129 through 146, and 163 through 170 of this Complaint as though fully set forth here.

172.    Defendants have violated California Penal Code § 502(c)(2) by knowingly and fraudulently, and without permission, accessing, taking, copying, and making use of programs, data, and files from Oracle USA's  computers, computer systems, and/or computer networks.

173.    Defendants have violated California Penal Code § 502(c)(3) by knowingly, fraudulently, and without permission accessing and using Oracle USA's  computer services.

174.    Defendants have violated California Penal Code § 502(c)(6) by knowingly, fraudulently, and without permission providing, or assisting in providing, a means of accessing Oracle USA's computers, computer systems, and/or computer networks.

175.    Defendants have violated California Penal Code § 502(c)(7) by knowingly, fraudulently, and without permission accessing, or causing to be accessed, Oracle USA's computers, computer systems, and/or computer networks.

176.    Oracle USA or OIC own certain data that comprises Software and Support Materials obtained by Defendants as alleged above.

177.    As a direct and proximate result of Defendants' unlawful conduct within the meaning of California Penal Code § 502, Defendants have caused damage to Oracle USA and OIC  in an amount to be proven at trial.  Oracle USA and OIC are also entitled to recover their reasonable attorneys' fees pursuant to California Penal Code § 502(e).

178.    Oracle USA and OIC are informed and believe that the aforementioned acts of the Defendants were willful and malicious in that Defendants' acts described above were done with the deliberate intent to injure Oracle USA's and OIC's business and improve its own.

56

1    Oracle USA and OIC  are therefore entitled to punitive damages.

2              179.    Oracle USA and OIC have also suffered irreparable injury from these acts,

3    and due to the continuing threat of such injury, have no adequate remedy at law, entitling Oracle

4    USA and OIC  to injunctive relief.

5                                          **Fourth Claim for Relief**

6                                          **Breach of Contract**

7                                (By Oracle USA Against All Defendants)

8              180.    Oracle USA incorporates by reference the allegations of paragraphs 1

9    through 120, 129 through 146, and 163 through 179 of this Complaint as though fully set forth

10   here.

11             181.    Defendants agreed to be bound by the Customer Connection Terms of

12   Use, the Special Terms of Use, the SAR legal restrictions, and/or the Legal Download

13   Agreement when Defendants accessed or downloaded Software and Support Materials from

14   Customer Connection.

15             182.    Oracle USA has performed all conditions, covenants, and promises

16   required on its part to be performed in accordance with the terms and conditions of the Customer

17   Connection Terms of Use, the Special Terms of Use, the SAR legal restrictions, and the Legal

18   Download Agreement.

19             183.    Defendants have breached the Customer Connection Terms of Use, the

20   Special Terms of Use, the SAR legal restrictions, and/or the Legal Download Agreement by,

21   among other things:

22             •    Accessing or using portions of the Software and Support Materials,  not

23                  expressly licensed to and/or paid for by Defendants or the customers in

24                  whose name Defendants accessed Customer Connection and took the

25                  Software and Support Materials;

26             •    Accessing the content available through Customer Connection, in the form

27                  of the Software and Support Materials, without being an authorized and

28                  designated Oracle technical support contact;

                                          57

- Using the Software and Support Materials other than in support of a customer's authorized use of Oracle software for which a customer holds a supported license from Oracle;

- Using the Software and Support Materials without a legitimate business purpose; and,

- Using the Software and Support Materials in ways other than the furtherance of a relationship with Oracle.

184. As a result of Defendants' breach of the Customer Connection Terms of Use, the Special Terms of Use, the SAR legal restrictions, and the Legal Download Agreement, Defendants have caused damage to Oracle USA in an amount to be proven at trial.

**Fifth Claim for Relief**

**Intentional Interference With Prospective Economic Advantage**

(By Oracle USA, OIC, and OEMEA Against All Defendants)

185. Oracle USA, OIC and OEMEA incorporate by reference the allegations of paragraphs 1 through 120, 129 through 146, and 163 through 184 of this Complaint as though fully set forth here.

186. Oracle USA, OIC and OEMEA have and had an expectancy in continuing and advantageous economic relationships with current and prospective purchasers and licensees of Oracle's support services and software, which are conducted through Oracle USA, OIC and OEMEA.

187. These relationships contained the probability of future economic benefit in the form of profitable support service contracts and software licenses. Had Defendants refrained from engaging in the unlawful and wrongful conduct described in this complaint, there is a substantial probability that support customers of Oracle USA, OIC and OEMEA would have initiated, renewed, or expanded support contracts and software licenses with those Oracle entities, rather than with Defendants.

188. Defendants were aware of these economic relationships and intended to interfere with and disrupt them by wrongfully:

58

1          •  gaining unauthorized access to Oracle USA's computer systems through
2             Oracle's password-protected Customer Connection support website in
3             violation of the agreements governing such access;
4          •  gaining unauthorized access to the Software and Support Materials
5             available on Oracle USA's computer systems through Customer
6             Connection, in violation of the agreements governing such access,
7             including by using log in credentials of customers with no right or license
8             to the Software and Support Materials taken by Defendants;
9          •  breaching the agreements governing access to, and use of, the website and
10            the Software and Support Materials available through it,
11         •  luring Oracle USA's, OIC's and OEMEA's current and prospective
12            customers by making promotional and marketing statements regarding
13            Defendants' ability to provide support services for Oracle software that
14            were only possible because of Defendants' improper access to, and taking
15            from, Oracle USA's computer systems through Customer Connection;
16         •  using information learned through the improper access to, and taking
17            from, Oracle USA's computer systems through Customer Connection to
18            provide support services to Defendants' customers; and,
19         •  gaining unauthorized access to Oracle's software releases through
20            deceptive representations to Oracle USA's, OIC's and OEMEA's
21            customers, causing customers to breach their license agreements with
22            Oracle, copying their software releases wholesale hundreds of times onto
23            Defendants' local systems, and using those copies for various improper
24            purposes, including without limitation to develop unauthorized SAP TN-
25            branded support products for distribution to their customers.
26         189.    Defendants' conduct was wrongful by a measure beyond the fact of the
27  interference itself.  Defendants gained unauthorized access to Oracle USA's  computer systems
28  through Oracle USA's password-protected Customer Connection support website, breached the

59

1  agreements governing access to, and use of, Customer Connection and the Software and Support

2  Materials available through Customer Connection, and wrongfully used the property that they

3  found there to advertise their services, and otherwise obtain and retain the current and

4  prospective clients of Oracle USA, OIC and OEMEA.  Simultaneously, Defendants manipulated

5  those customers to obtain copies of Oracle software releases, which were then copied to

6  Defendants' own computer systems and used to lure away current and prospective clients of

7  Oracle USA, OIC and OEMEA.

8          190.    This conduct, as alleged above, constitutes violations of numerous state

9  and federal statutes and codes, including, but not limited to, violation of the Federal Computer

10  Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., receipt of stolen property, Cal. Penal Code §

11  496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343,

12  violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access

13  device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-

14  11.  Defendants' conduct also constitutes trespass to chattels, breach of contract, and unjust

15  enrichment.

16          191.    As a result of Defendants' acts, the above-described relationships have

17  been actually disrupted, causing certain current and prospective support clients to contract with

18  Defendants instead of with Oracle USA, OIC and OEMEA for those clients' software support

19  and maintenance and, in some cases, for their enterprise software.

20          192.    As a direct and proximate result of Defendants' actions, Oracle USA, OIC

21  and OEMEA have suffered economic harm, including, but not limited to, loss of profits from

22  sales or licenses to current and potential customers of support services and enterprise software

23  programs.  Defendants' wrongful conduct was a substantial factor in causing this harm.

24          193.    Unless Defendants are restrained by appropriate injunctive relief, their

25  actions are likely to recur and will cause Oracle USA, OIC and OEMEA irreparable injury for

26  which there is no adequate remedy at law.

27          194.    Defendants' interference with Oracle USA's, OIC's and OEMEA's

28  prospective economic advantage with its current and future customers, as described above, was

60

willful, malicious, oppressive, and in conscious disregard of Oracle USA's, OIC's and OEMEA's rights, and Oracle USA, OIC and OEMEA are therefore entitled to an award of punitive damages to punish Defendants' wrongful conduct and deter future wrongful conduct.

### Sixth Claim for Relief

### Negligent Interference With Prospective Economic Advantage

(By Oracle USA, OIC and OEMEA Against All Defendants)

195.    Oracle USA, OIC and OEMEA incorporate by reference the allegations of paragraphs 1 through 120, 129 through 146, and 163 through 194 of this Complaint as though fully set forth here.

196.    Oracle USA, OIC and OEMEA have and had an expectancy in continuing and advantageous economic relationships with current and prospective purchasers and licensees of Oracle's support services and software, which are conducted through Oracle USA, OIC and OEMEA.

197.    These relationships contained the probability of future economic benefit in the form of profitable support service contracts and enterprise software licenses.  Had Defendants refrained from engaging in the unlawful and wrongful conduct described in this complaint, there is a substantial probability that the support customers of Oracle USA, OIC and OEMEA would have initiated, renewed, or expanded support contracts and enterprise software licenses with Oracle USA, OIC and OEMEA, rather than with Defendants.

198.    Defendants knew or should have known about the economic relationship, described above, and knew or should have known that these relationships would be interfered with and disrupted if Defendants failed to act with reasonable care in their access of Customer Connection and use of Oracle's Software and Support Materials.  Defendants failed to act with reasonable care.  Instead, they:

- gained unauthorized access to Oracle USA's computer systems through Oracle USA's password-protected Customer Connection support website in violation of the agreements governing such access;

1 • gained unauthorized access to the Software and Support Materials

2 available on Oracle USA's computer systems through Customer

3 Connection, in violation of the agreements governing such access,

4 including by using log in credentials of customers with no right or license

5 to the Software and Support Materials taken by Defendants;

6 • breached the agreements governing access to, and use of, the website and

7 the Software and Support Materials available through it;

8 • lured Oracle USA's, OIC's and OEMEA's current and prospective

9 customers by making promotional and marketing statements regarding

10 Defendants' ability to provide support services for Oracle software that

11 were only possible because of Defendants' improper access to, and taking

12 from, Oracle USA's computer systems through Customer Connection;

13 • used information learned through the improper access to, and taking

14 from, Oracle USA's computer systems through Customer Connection to

15 provide support services to Defendants' customers; and,

16 • gaining unauthorized access to Oracle's software releases through

17 deceptive representations to Oracle USA's, OIC's and OEMEA's

18 customers, causing those customers to breach their license agreements

19 with Oracle, copying their software releases wholesale hundreds of times

20 onto Defendants' local systems, and using those copies for various

21 improper purposes, including without limitation to develop unauthorized

22 SAP TN-branded support products for distribution to their customers.

23 199. Defendants' conduct was wrongful by a measure beyond the fact of the

24 interference itself. Defendants gained unauthorized access to Oracle USA's computer systems

25 through Oracle USA's password-protected Customer Connection support website, breached the

26 agreements governing access to, and use of, Customer Connection and the Software and Support

27 Materials available through it, and wrongfully used the property that they found there to

28 advertise their services, and otherwise obtain and retain Oracle USA's, OIC's and OEMEA's

62

1    current and prospective clients.  Simultaneously, Defendants manipulated Oracle's customers to

2    obtain copies of Oracle software releases, which were then copied to Defendants' own computer

3    systems and used to lure away Oracle USA's, OIC's and OEMEA's current and prospective

4    clients.

5              200.    This conduct, as alleged above, constitutes violations of numerous state

6    and federal statutes and codes, including, but not limited to, violation of the Federal Computer

7    Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., receipt of stolen property, Cal. Penal Code §

8    496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343,

9    violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access

10   device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-

11   11.  Defendants' conduct also constitutes trespass to chattels, breach of contract, and unjust

12   enrichment.

13             201.    As a result of Defendants' acts, the above-described relationships have

14   been actually disrupted, causing certain current and prospective support clients to contract with

15   Defendants instead of Oracle USA, OIC and OEMEA for their software support and

16   maintenance and, in some cases, for their enterprise software.

17             202.    As a direct and proximate result of Defendants' actions, Oracle USA, OIC,

18   and OEMEA have suffered economic harm, including, but not limited to, loss of profits from

19   sales or licenses to current and potential customers of support services and enterprise software

20   programs.  Defendants' wrongful conduct was a substantial factor in causing this harm.

21             203.    Unless Defendants are restrained by appropriate injunctive relief, their

22   actions are likely to recur and will cause Oracle USA, OIC and OEMEA irreparable injury for

23   which there is no adequate remedy at law.

24                                **Seventh Claim for Relief**

25                **Unfair Competition - Cal. Bus. & Prof. Code § 17200**

26                (By Oracle USA, OIC, and OEMEA Against All Defendants)

27             204.    Oracle USA, OIC, and OEMEA incorporate by reference the allegations

28   of paragraphs 1 through 120, 129 through 146, and 163 through 203 of this Complaint as though

                                         63

1    fully set forth here.

2              205.    Defendants have engaged in unlawful business acts or practices by

3    committing acts including computer fraud, trespass, breach of contract, interference with

4    business relationships, and other illegal acts and practices as alleged above, all in an effort to

5    gain unfair competitive advantage over Oracle USA, OIC and OEMEA.

6              206.    These unlawful business acts or practices were committed pursuant to

7    business activity related to providing business applications software and related support and

8    maintenance for that software.

9              207.    The acts and conduct of Defendants constitute fraudulent, unlawful, and

10    unfair competition as defined by California Bus. & Prof. Code §§ 17200, *et seq.*

11              208.    Defendants' conduct constitutes violations of numerous state and federal

12    statutes and codes, including, but not limited to, violation of the Computer Fraud and Abuse Act,

13    18 U.S.C. §§ 1030 *et seq.*, receipt of stolen property, Cal. Penal Code § 496, unauthorized access

14    to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C.

15    § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and

16    violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11.  Defendants' conduct also

17    constitutes trespass to chattels, intentional interference with prospective economic advantage,

18    negligent interference with prospective economic advantage, and unjust enrichment.

19              209.    Defendants have improperly and unlawfully taken commercial advantage

20    of Oracle USA's, OIC's and OEMEA's investments in their confidential, proprietary, and

21    copyrighted Software and Support Materials and underlying software applications.  In light of

22    Defendants' conduct, it would be inequitable to allow Defendants to retain the benefit of the

23    funds obtained though the unauthorized and unlawful use of that property.

24              210.    Defendants' unfair business practices have unjustly minimized Oracle

25    USA's, OIC's and OEMEA's competitive advantages and have caused and are causing Oracle

26    USA, OIC and OEMEA to suffer damages.

27              211.    As a result of such unfair competition, Oracle USA, OIC and OEMEA

28    have also suffered irreparable injury and, unless Defendants are enjoined from such unfair

competition, will continue to suffer irreparable injury, whereby Oracle USA, OIC and OEMEA have no adequate remedy at law.

212.     Defendants should be compelled to disgorge and/or restore any and all revenues, earnings, profits, compensation, and benefits they may have obtained in violation of California Business & Professions Code § 17200 *et seq.*, including, but not limited to, returning any revenue earned from the unlawful and unfair use of Oracle USA's, OIC's and OEMEA's stolen property, and should be enjoined from further unlawful, unfair, and deceptive business practices.

## Eighth Claim for Relief

### Trespass To Chattels

(By Oracle USA Against All Defendants)

213.     Oracle USA incorporates by reference the allegations of paragraphs 1 through 120, 129 through 146, and 163 through 212 of this Complaint as though fully set forth here.

214.     At all times mentioned in this Complaint, Oracle USA had legal title or license to and actual possession of Customer Connection, its access-restricted internet-based support systems, and the copies of Software and Support Materials on those support systems, as described above.

215.     Defendants intentionally interfered with Oracle USA's use or possession of both Customer Connection and Oracle's related internal databases and systems, and the copies of Software and Support Materials housed for licensed access through Customer Connection.

216.     Defendants' trespass and interference proximately caused damage to Oracle, including, but not limited to, damage to the functionality of Oracle USA's  computer systems and data, damage to Oracle USA's rights to dominion and control over its property, and damage to the confidential nature of the information on Oracle USA's websites.  As a result, Defendants caused Oracle USA's property to greatly diminish in value and deprived Oracle USA of the intended uses of its computer systems.

217.     Oracle USA  is entitled to recover any and all damages it sustained as a

1    result of such trespass, in an amount to be determined at trial.

2    218.    Defendants' trespass interfered with, and damaged, the integrity and

3    functionality of Oracle USA's computer systems and data.  Defendants will continue to commit

4    such acts and other competitors will be encouraged to sweep Oracle USA's websites, potentially

5    to the point of denying effective access to  customers and preventing Oracle USA from using its

6    systems and data for their intended purpose.  Defendants' trespass therefore threatens to cause

7    irreparable harm to Oracle USA, for which Oracle USA's  remedy at law is not adequate to

8    compensate it for the injuries inflicted and threatened.

9                                    **Ninth Claim for Relief**

10                                    **Unjust Enrichment/Restitution**

11                        (By Oracle USA, OIC and OEMEA Against All Defendants)

12    219.    Oracle USA, OIC and OEMEA incorporate by reference the allegations of

13    paragraphs 1 through 120, 129 through 146, and 163 through 218 of this Complaint as though

14    fully set forth here.

15    220.    Defendants unjustly received benefits at the expense of Oracle USA, OIC,

16    and OEMEA through Defendants' wrongful conduct, including Defendants' breach of the

17    agreements governing access to and use of Customer Connection, interference with Oracle

18    USA's, OIC's and OEMEA's business relationships and other unfair business practices, as well

19    as Defendants' trespass on, and computer fraud concerning the Software and Support Materials,

20    which took substantial time and money for Oracle entities including Oracle USA, OIC and

21    OEMEA to develop.  Defendants continue to unjustly retain these benefits at the expense of

22    Oracle USA, OIC and OEMEA.  It would be unjust for Defendants to retain any value they

23    obtained as a result of their wrongful conduct.

24    221.    Oracle USA, OIC and OEMEA are entitled to the establishment of a

25    constructive trust consisting of the benefit conferred upon Defendants by the revenues derived

26    from their wrongful conduct at the expense of Oracle entities including Oracle USA, OIC and

27    OEMEA as alleged above, and all profits derived from that wrongful conduct.  Oracle USA, OIC

28    and OEMEA are further entitled to full restitution of all amounts in which Defendants have been

66

1    unjustly enriched at Oracle USA's, OIC's and OEMEA's expense.

2                              **Tenth Claim for Relief**

3                                  **An Accounting**

4                  (By Oracle USA, OIC and OEMEA Against All Defendants)

5          222.   Oracle USA, OIC and OEMEA incorporate by reference the allegations of

6    paragraphs 1 through 120, 129 through 146, and 163 through 221 of this Complaint as though

7    fully set forth here.

8          223.   Since at least September 2006, Defendants have obtained business through

9    the use of unlawful conduct including, but not limited to:

10                 (a)    Breaching the agreements governing access to or use of Customer

11   Connection;

12                 (b)    Intentionally and/or negligently interfering with Oracle USA's,

13   OIC's and OEMEA's prospective economic advantage with its existing and potential customers;

14                 (c)    Improperly, willfully, and unlawfully taking commercial advantage

15   of the investment in its Software and Support Materials by Oracle entities including Oracle USA,

16   OIC and OEMEA, for the purpose of sabotaging Oracle USA's, OIC's and OEMEA's ability to

17   do business and compete in the market; and,

18                 (d)    Fraudulently accessing and intentionally trespassing on Oracle

19   USA's password-protected Customer Connection website, without authorization or consent, in

20   furtherance of their unlawful and deceptive scheme as described above.

21         224.   Defendants have received money as a result of their misconduct, at the

22   expense of Oracle USA, OIC and OEMEA, and some or all of such money is rightfully due to

23   Oracle USA, OIC and OEMEA.

24         225.   The amount of money due from Defendants to Oracle USA, OIC and

25   OEMEA is unknown to Oracle USA, OIC and OEMEA, and cannot be ascertained without an

26   accounting of the income and gross profits Defendants have obtained through their wrongful and

27   unlawful conduct.  Oracle USA, OIC and OEMEA are entitled, therefore, to a full accounting.

28

**Prayer For Relief**

WHEREFORE, Oracle respectfully prays for the following:

A. For a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them, from the following:

(1) Copying[4], distributing, using, or creating derivative works from Oracle Software and Support Materials or software environments in any way, including for any business purpose, except as otherwise allowed by express license from Oracle or as otherwise set forth below;

(2) Copying, distributing or storing, or facilitating copying, distribution or storage of, any Oracle Software and Support Materials directly or indirectly from or to any of Defendants' offices, computer systems or networks;

(3) Using any bot, scraper, spider, or other software tool (including without limitation Titan and its predecessor scripts) to access, copy, distribute or use any Oracle Software and Support Materials in any way, including for any business purpose;

(4) Facilitating the downloading of any Oracle Software and Support Materials from any Oracle support website for, or on behalf of, any customer who does not have a valid, existing and currently-Oracle-supported software license for the specific materials being downloaded from Oracle entitling that customer to have and use those Software and Support Materials;

(5) Facilitating the access to, use of, or downloading from any Oracle support website for, or on behalf of, any customer other than by using that specific customer's valid login credentials;

(6) Facilitating the copying, distribution or use of any Oracle

---

[4] As used in this Prayer, "copying" includes downloading from a website or digital storage media.

1  Software and Support Materials for, or on behalf of, any customer who did not have a current,

2  valid, existing software and support license from Oracle entitling that customer to have and use

3  those Software and Support Materials, at the time they were downloaded or obtained by or on

4  behalf of the customer;

5        (7)    Regardless of the location of any specific Software and

6  Support Materials or software environments, copying, distributing or using Software and Support

7  Materials or any software environments obtained through or for one customer to support a

8  different customer;

9        (8)    Supporting, maintaining or facilitating the support or

10  maintenance of software for any customer using a copy of any Oracle, J.D. Edwards or

11  PeopleSoft software, including any generic or customer-specific software environments, except

12  to the extent that (i) that customer licensed the software from Oracle, (ii) the customer received

13  the software copy directly from Oracle, (iii) the software environment was created using that

14  customer's software, and, (iv) the software and software environment is maintained exclusively

15  at the customer's physical location;

16        (9)    Facilitating the copying, distribution or use of, any Oracle

17  Software and Support Materials or any software environment without keeping a record, which

18  Oracle may inspect upon three (3) business days' written notice, that accurately reflects all

19  Software and Support Materials or software environments (a) copied, distributed or used,

20  organized by customer name, (b) the date(s) of the copying, distribution or use, and (c) all other

21  entities involved in the copying, distribution or use, including name of the entity, principal

22  contact, and contact information; and,

23        (10)    Otherwise engaging in acts of unfair competition, copyright

24  infringement, trespass, computer fraud, and interference with Oracle's business relationships;

25        B.    That the Court order Defendants to file with the Court and serve on

26  Oracle within thirty (30) days after the service on Defendants of such injunction a report in

27  writing, under oath, setting forth in detail the manner and form in which Defendants have

28  complied with the injunction;

1          C.      For an Order directing Defendants to return Oracle's property,

2 including, without limitation, Oracle's confidential, proprietary, and copyrighted Software and

3 Support Materials, including data, internal documents, and valuable updates, patches, fixes, and

4 other computer code, that Defendants took from Oracle, as set forth in this Complaint;

5          D.      For an order impounding or destroying any and all infringing

6 materials pursuant to 17 U.S.C. § 503;

7          E.      For an Order awarding Oracle punitive damages in a sum to be

8 determined at trial, on the basis of Defendants' willful and deliberate unauthorized computer

9 access, intentional interference with Oracle's prospective economic advantage, aiding and

10 abetting and conspiracy;

11          F.      For restitution and disgorgement of all ill-gotten gains unjustly

12 obtained and retained by Defendants through the acts complained of here;

13          G.      For an Order finding a Constructive Trust for Oracle's benefit,

14 consisting of all revenues received by Defendants from their wrongful conduct which should

15 rightfully have been received by Oracle and all profits derived from that wrongful conduct, and

16 directing Defendants to pay all such sums to Oracle;

17          H.      For damages to be proven at trial;

18          I.      For statutory damages pursuant to 17 U.S.C. § 504;

19          J.      For prejudgment interest;

20          K.      For an accounting;

21          L.      For an Order awarding Oracle its attorneys' fees and costs; and,

22          M.      For an Order awarding Oracle such other and further relief as the

23 Court deems just and proper.

24

25

26

27

28

DATED: October 8, 2008

BINGHAM McCUTCHEN LLP

By: _____
Geoffrey M. Howard

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International
Corp., Oracle Systems Corp., Oracle EMEA
Ltd., and J.D. Edwards Europe Ltd.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs Oracle USA, Inc., Oracle International Corp., Oracle Systems Corp., Oracle EMEA Ltd., and J.D. Edwards Europe Ltd. demand a trial by jury on all issues triable by a jury.

DATED:  October 8, 2008                BINGHAM McCUTCHEN LLP


By: _____
        Geoffrey M. Howard

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International
Corp., Oracle Systems Corp., Oracle EMEA
Ltd., and J.D. Edwards Europe Ltd.