# Exhibit J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---------------------------------x
ORACLE CORPORATION, a Delaware        :
corporation; ORACLE USA, INC.,
a Colorado corporation; and           :
ORACLE INTERNATIONAL
CORPORATION, a California             :
corporation,
                                      :
        Plaintiffs,           No. 07-CV-1658
                              :   (PJH) (EDL)
  vs.
                                      :
SAP AG, a German corporation;
SAP AMERICA INC., a Delaware          :
corporation; TOMORROWNOW, INC.,
a Texas corporation; and DOES         :
1-50, inclusive,
                                      :
        Defendants.
---------------------------------x

September 25, 2008
9:14 a.m.

HIGHLY CONFIDENTIAL
VOLUME 1

Videotaped Deposition of HENNING KAGERMANN, held at the offices of BINGHAM McCUTCHEN LLP, 399 Park Avenue, New York, New York, before Frank J. Bas, a Registered Professional Reporter and Notary Public of the State of New York.

## Page 206

```
                    HIGHLY CONFIDENTIAL - H. KAGERMANN
17:30:11   2   products, as it says here on the page that we
17:30:14   3   were looking at?
17:30:17   4       A.   I don't know, but it's not likely.
17:30:44   5       Q.   Somebody was considering it, as
17:30:49   6   reflected here, weren't they?
17:30:54   7       A.   That's possible.
17:30:56   8       Q.   Let's turn to the page 48542,
17:31:03   9   entitled Take Their Key People Or Distract Them.
17:31:08  10            What's the org mapping project, if
17:31:10  11   you know?
17:31:13  12       A.   I don't know.
17:31:19  13       Q.   Are you aware of a program by the
17:31:24  14   Apollo group to identify key people in Oracle's
17:31:28  15   business to hire?
17:31:30  16       A.   No.
17:31:48  17       Q.   Are you aware of a strategy to hire
17:31:51  18   key database account executives and pay them to
17:31:54  19   sit on a shelf or act as a recruiter for IBM?
17:31:59  20       A.   No.
17:32:18  21       Q.   SAP -- withdrawn.
17:32:26  22            The last heading here is to, it
17:32:31  23   says, "Provide targeted disinformation campaign
17:32:34  24   to disrupt Oracle."
17:32:35  25            Are you aware of such a strategy?
```

## Page 207

```
                    HIGHLY CONFIDENTIAL - H. KAGERMANN
17:32:40   2       A.   No.
17:32:42   3       Q.   Would you consider that the high
17:32:46   4   road?
17:32:46   5       A.   No.
17:32:50   6       Q.   Would you consider it in compliance
17:32:53   7   with the SAP code of ethics?
17:32:55   8       A.   No.
17:33:03   9       Q.   Would you consider it consistent
17:33:06  10   with the effort to be perceived as a trusted
17:33:09  11   advisor?
17:33:11  12       A.   It doesn't have much to do with
17:33:33  13   that.
17:33:33  14       Q.   Turning to the last page, titled
17:33:42  15   Attack On Political Front.
17:33:45  16            Do you see that?
17:33:46  17       A.   Yes.
17:33:46  18       Q.   It says: "Execute on existing
17:33:49  19   political campaign - we know what we need to
17:33:52  20   do."
17:33:53  21            Does that refresh your recollection
17:33:54  22   that there was, in fact, a political campaign
17:33:58  23   against Oracle under way in July of 2006?
17:34:01  24       A.   No.
17:34:13  25       Q.   Does SAP have lobbyists in
```

## Page 208

```
                    HIGHLY CONFIDENTIAL - H. KAGERMANN
17:34:20   2   Washington to advocate on its behalf?
17:34:22   3       A.   Yes.
17:34:30   4       Q.   And how about in California?
17:34:34   5       A.   I don't know.
17:34:35   6       Q.   Did SAP adopt the strategy of
17:34:40   7   attacking Oracle on the Hill by attacking Larry
17:34:45   8   Ellison, as reflected here on Page 48543?
17:34:58   9            MR. LANIER:  Object.  That
17:34:58  10   mischaracterizes and assumes facts not in
17:35:00  11   evidence.
17:35:01  12       A.   I don't think -- I don't think so.
17:35:07  13   I don't know anything about it.
17:35:09  14       Q.   Did the board discuss a strategy of
17:35:11  15   attacking Oracle by using the insider trading
17:35:16  16   settlement in the case involving Mr. Ellison?
17:35:21  17       A.   I don't think so.
17:35:40  18       Q.   Let's do one more short document,
17:35:46  19   and then let's finish for the day, if that's
17:35:49  20   okay.
17:35:58  21            MR. HOWARD:  Let's mark as Exhibit
17:35:59  22   420 the minutes of an executive board
17:36:04  23   off-site meeting, preliminary minutes,
17:36:07  24   dated July 28-29, 2006.
17:36:10  25              ---
```

## Page 209

```
                    HIGHLY CONFIDENTIAL - H. KAGERMANN
17:36:10   2            (Plaintiffs' Exhibit 420 was marked
17:36:10   3   for identification.)
17:36:26   4              ---
17:36:26   5   BY MR. HOWARD:
17:36:34   6       Q.   Mr. Kagermann, Exhibit 420 is a
17:36:41   7   document entitled Preliminary Minutes in a form
17:36:44   8   that we saw before of a board meeting, July
17:36:47   9   28-29, 2006.
17:36:49  10            Are you familiar with this document?
17:37:04  11       A.   I'm familiar with the form of the
17:37:15  12   document.
17:37:16  13       Q.   All right.  And do you recall an
17:37:19  14   off-site board meeting in July of 2006 that had
17:37:23  15   as one of its topics SAP versus Oracle?
17:37:26  16       A.   I don't recall it, but I also cannot
17:37:45  17   rule it out.
17:37:46  18       Q.   All right.  Well, let's see if
17:37:48  19   reading the minutes can refresh your
17:37:51  20   recollection.  Again, we're left with only the
17:37:53  21   part that's been unredacted, but there's a title
17:37:56  22   of SAP versus Oracle, Where do we Stand, and it
17:38:00  23   says:  "The executive board agreed that we have
17:38:03  24   a set of assets that we can attack them with and
17:38:06  25   need to put more emphasis on the GTM of these
```

## Page 210

```
17:38:10   1    HIGHLY CONFIDENTIAL - H. KAGERMANN
17:38:10   2    assets."
17:38:11   3           Do you see that?
17:38:13   4    A.  Yes.
17:38:13   5    Q.  And GTM refers to go-to-market?
17:38:17   6    A.  Yes.
17:38:18   7    Q.  Referring to the deployment of these
17:38:20   8    assets against Oracle.  Is that accurate?
17:38:24   9    A.  Yes.
17:38:32  10    Q.  And TomorrowNow is identified as one
17:38:36  11    of those assets?
17:38:38  12    A.  That's what it looks like, according
17:38:49  13    to this form.
17:38:50  14    Q.  What do you recall about the
17:38:51  15    discussion?
17:38:53  16    A.  I don't recall it.
17:39:00  17    Q.  Do you recall a discussion about
17:39:04  18    aggressively positioning TomorrowNow in the
17:39:05  19    market?
17:39:07  20    A.  That's possible.
17:39:18  21    Q.  Do you remember?
17:39:22  22    A.  I don't -- I can't recall
17:39:28  23    specifically, no.
17:39:29  24    Q.  What other assets were discussed by
17:39:33  25    the board that SAP had to go to market with in
```

## Page 211

```
           1    HIGHLY CONFIDENTIAL - H. KAGERMANN
17:39:40   2    the SAP versus Oracle battle?
17:40:01   3           MR. LANIER:  Object; it calls for
17:40:03   4    speculation.  Lacks foundation.
17:40:06   5    A.  I would have to speculate.
17:40:12   6    Q.  I don't want you to speculate, but
17:40:15   7    would it potentially refresh your recollection
17:40:16   8    if you were able to see what's behind the
17:40:18   9    redactions on this page?
17:40:22  10    A.  Not necessarily.
17:40:32  11    Q.  And did SAP, after July 2006,
17:40:41  12    aggressively position TomorrowNow in the market?
17:40:54  13    A.  It's a matter of opinion.
17:41:14  14    Personally, I think that we did not position it
17:41:18  15    aggressively.
17:41:22  16           MR. HOWARD:  I am going to request a
17:41:23  17    production of an unredacted version of this
17:41:28  18    set of board minutes, so that I can
17:41:30  19    complete my questioning of this witness on
17:41:31  20    this topic, by tomorrow morning.
17:41:31  21           ---
17:41:31  22           (Request for Production)
17:41:33  23           ---
17:41:33  24           MR. LANIER:  Your request is
17:41:35  25    refused.  This was an issue litigated in
```

## Page 212

```
           1    HIGHLY CONFIDENTIAL - H. KAGERMANN
17:41:36   2    front of Magistrate Judge LaPorte.  You
17:41:39   3    tried it.  You lost.  It's done.
17:41:40   4           MR. HOWARD:  I don't think so.  So
17:41:42   5    we'll be back after further motion to the
17:41:44   6    Court to complete the questioning.
17:41:46   7           MR. LANIER:  We disagree that we'll
17:41:48   8    be back, but that's your position.  I
17:41:50   9    acknowledge it.
17:41:51  10           MR. HOWARD:  Why don't we stop there
17:41:52  11    and reconvene in the morning.
17:41:53  12           MR. LANIER:  Let's see how much
17:41:55  13    record time -- I want to make sure that we
17:41:57  14    have got at least our seven done today.
17:41:59  15    What's our record time so far?
17:42:01  16           THE VIDEO OPERATOR:  One second.
17:42:02  17    I've got to do the math in my head.  We're
17:42:05  18    at 1:55 --
17:42:11  19           MR. LANIER:  Okay.
17:42:12  20           THE VIDEO OPERATOR:  1:53 or '5.  I
17:42:14  21    have to check it out.
17:42:15  22           MR. LANIER:  That's fine.  Thank
17:42:16  23    you.
17:42:16  24           MR. HOWARD:  I don't understand the
17:42:18  25    reference to 1:50.
```

## Page 213

```
           1    HIGHLY CONFIDENTIAL - H. KAGERMANN
17:42:19   2           MR. LANIER:  That's on top of the
17:42:21   3    five -- however many hours we've already
17:42:24   4    done.
17:42:24   5           THE VIDEOGRAPHER:  I'm sorry.  We're
17:42:25   6    at 6:53.
17:42:25   7           MR. HOWARD:  We're at 6:53?
17:42:27   8           THE VIDEO OPERATOR:  Yes.
17:42:28   9           MR. HOWARD:  Do you want to do seven
17:42:29  10    more minutes?
17:42:30  11           MR. LANIER:  That's up to you.
17:42:30  12           MR. HOWARD:  I'm happy to do it.
17:42:30  13           MR. LANIER:  Well, let's do seven
17:42:35  14    more minutes.
17:42:35  15           MR. HOWARD:  All right.  But if we
17:42:36  16    start, then I want to finish whatever I
17:42:37  17    start and not cut off in the middle.
17:42:39  18           MR. LANIER:  That's fine with us.
17:42:43  19           THE VIDEO OPERATOR:  It's actually
17:42:43  20    6:55.
17:42:43  21           MR. HOWARD:  6:55.  All right.
17:43:19  22    Let's mark as Exhibit 421 a document
17:43:21  23    entitled Oracle Competitive Update, dated
17:43:25  24    July 25, 2006.
17:43:36  25           ---
```

```
                    C E R T I F I C A T E

STATE OF NEW YORK    )
                     : ss.
COUNTY OF NEW YORK   )
```

I, FRANK J. BAS, a Notary Public within and for the State of New York, do hereby certify:

That HENNING KAGERMANN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of September 2008.

*Frank J. Bas*
FRANK J. BAS, RPR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

------------------------------x
ORACLE CORPORATION, a Delaware :
corporation; ORACLE USA, INC.,
a Colorado corporation; and :
ORACLE INTERNATIONAL
CORPORATION, a California :
corporation,
                                            :
        Plaintiffs,      No. 07-CV-1658
                             :  (PJH) (EDL)
   vs.
                                           :
SAP AG, a German corporation;
SAP AMERICA INC., a Delaware :
corporation; TOMORROWNOW, INC.,
a Texas corporation; and DOES :
1-50, inclusive,
                                            :
        Defendants.
------------------------------x

                     September 26, 2008
                     9:07 a.m.

             HIGHLY CONFIDENTIAL
                  VOLUME 2

       Videotaped Deposition of HENNING KAGERMANN, held at the offices of BINGHAM McCUTCHEN LLP, 399 Park Avenue, New York, New York, before Frank J. Bas, a Registered Professional Reporter and Notary Public of the State of New York.

### Page 271

```
10:38:48   1    HIGHLY CONFIDENTIAL - H. KAGERMANN
10:39:00   2    A.  It looks like the minutes of a board
10:39:01   3    meeting.
10:39:03   4    Q.  Am I correct that the date is
10:39:10   5    January 14, 2005?
10:39:14   6    A.  That's what it says on the document.
10:39:15   7    Q.  And do you have any reason to doubt
10:39:16   8    that?
10:39:19   9    A.  No.
10:39:22  10    Q.  And your name is on the front page?
10:39:24  11    A.  Yes.
10:39:26  12    Q.  And do you know why that is?
10:39:40  13    A.  Probably because I usually
10:39:44  14    distribute the minutes of the board meetings.
10:39:48  15    Q.  And would this be a document then
10:39:51  16    that you would distribute out to the rest of the
10:39:59  17    executive board?
10:40:02  18    A.  That's how it usually works.
10:40:04  19    Q.  And do you review the document
10:40:07  20    before you distribute it out to the rest of the
10:40:08  21    executive board?
10:40:14  22    A.  Yes.
10:40:17  23    Q.  And is one of the purposes of that
10:40:20  24    review to make sure that it's an accurate
           25    reflection of what transpired at the meeting?
```

### Page 272

```
            1    HIGHLY CONFIDENTIAL - H. KAGERMANN
10:40:23    2    A.  Specifically it is to have the
10:40:53    3    decisions complete in the minutes.
10:40:59    4    Q.  To make sure I understand, before
10:41:02    5    circulating the minutes to the board, you review
10:41:04    6    them to make sure that they reflect the
10:41:06    7    decisions that were made by the board at that
10:41:08    8    meeting?
10:41:30    9    A.  Yes.
10:41:30   10    Q.  And also to make sure that those
10:41:34   11    decisions are accurately reflected in the
10:41:35   12    minutes?
10:41:36   13    A.  At least from my view.
10:41:51   14    Q.  Now I'm going to go back in time a
10:42:09   15    few days now.  You can put that down.
10:42:21   16    MR. LANIER:  Mr. Kagermann, he said
10:42:23   17    you could put it down.  You can put it back
10:42:25   18    on the stack.
10:42:26   19    MR. HOWARD:  I am going to mark as
10:42:27   20    Exhibit 426 an e-mail from Mr. Agassi to
10:42:32   21    Mr. Mackey and Mr. Shenkman.
10:42:45   22    ---
10:42:45   23    (Plaintiffs' Exhibit 426 was marked
10:42:45   24    for identification.)
10:42:51   25    ---
```

### Page 273

```
            1    HIGHLY CONFIDENTIAL - H. KAGERMANN
10:42:51    2    BY MR. HOWARD:
10:42:58    3    Q.  Now, I'm showing this to you so you
10:43:03    4    can see what Mr. Agassi wrote, because he
10:43:07    5    reports something attributed to you that I want
10:43:11    6    to ask you about.  He writes on January 6th, a
10:43:31    7    week before Mr. Mackey's e-mail announcing the
10:43:34    8    beginning of legal due diligence that, quote,
10:43:38    9    "Henning sees legal as a show-stopper."
10:43:42   10    Do you see that?
10:43:46   11    A.  Yes.
10:43:47   12    Q.  Did you, as of January 6, see legal
10:43:50   13    as a show-stopper on the TomorrowNow deal?
10:44:08   14    A.  I don't recall.
10:44:10   15    Q.  Do you recall any discussion with
10:44:13   16    Mr. Agassi to the effect that legal concerns
10:44:19   17    would prevent the board from approving the
10:44:23   18    TomorrowNow acquisition?
10:44:40   19    MR. LANIER:  Mr. Kagermann, you may
10:44:42   20    answer that question as to any discussions
10:44:44   21    you had with Mr. Agassi with no lawyers
10:44:46   22    involved or where you were not discussing
10:44:48   23    things lawyers told you.  If you had
10:44:51   24    independent discussions you may answer it,
10:44:52   25    but I instruct you not to answer the
```

### Page 274

```
            1    HIGHLY CONFIDENTIAL - H. KAGERMANN
10:44:55    2    question if your only discussions with him
10:44:58    3    were with lawyers or were discussing things
10:44:59    4    lawyers told you, the basis being the
10:45:04    5    attorney-client privilege.
10:45:05    6    Go ahead.
10:45:07    7    A.  I don't recall any specific talk.
10:45:13    8    Q.  Did you tell Mr. Agassi that legal
10:45:19    9    was a show-stopper?
10:45:29   10    A.  I don't recall that.
10:45:32   11    Q.  Do you recall any discussion with
10:45:37   12    Mr. Agassi in the January 6, 2005, time frame, a
10:45:44   13    week before the beginning of legal due
10:45:48   14    diligence, to the effect that legal concerns
10:45:50   15    would block the TomorrowNow acquisition?
10:46:16   16    MR. LANIER:  Object; assumes facts
10:46:17   17    not in evidence.
10:46:18   18    Mr. Kagermann, the same instruction
10:46:20   19    to you I just gave.
10:46:22   20    A.  I don't recall.
10:46:23   21    Q.  Do you have any reason to doubt the
10:46:38   22    accuracy of Mr. Agassi's comment here in his
10:46:42   23    January 6, 2005, e-mail?
10:46:45   24    A.  No.
10:47:35   25    MR. HOWARD:  I am going to mark as
```

**Page 275**

```
10:47:37   1    HIGHLY CONFIDENTIAL - H. KAGERMANN
10:47:37   2    Exhibit 427 an e-mail from Mr. Shenkman to
10:47:44   3    Mr. Kagermann and others attaching the
10:47:47   4    business case for TomorrowNow. And I've
10:47:54   5    made one modification to this document,
10:47:55   6    which is I've had some of the language
10:47:59   7    which is very hard to read on the
10:48:01   8    PowerPoint typed onto a fresh page.
10:48:13   9                    ---
10:48:13  10        (Plaintiffs' Exhibit 427 was marked
10:48:13  11    for identification.)
10:48:25  12                    ---
10:48:25  13        MR. LANIER: So while Mr. Kagermann
10:48:26  14    is looking at it, to make sure I understand
10:48:28  15    it, for the record, taking, for example,
10:48:29  16    Page 91838 -- I'm not sure how they
10:48:39  17    correspond.  how do the pages here
10:48:42  18    correspond to the pages of the PowerPoint?
10:48:43  19    Just so we can follow along and so the
10:48:45  20    record's clear.
10:48:46  21        MR. HOWARD: There's I think three
10:48:47  22    pages that people have found difficult to
10:48:49  23    read, and there's -- at the back of the
10:48:52  24    document there are three pages where the
10:48:55  25    language on those pages has been
```

**Page 276**

```
           1    HIGHLY CONFIDENTIAL - H. KAGERMANN
10:48:57   2    re-created. So perhaps Mr. Kagermann, if
10:49:00   3    he's familiar with the document, can read
10:49:02   4    the document without the benefit of that
10:49:04   5    additional clarifying work. But I wasn't
10:49:08   6    able to, so I created it.
10:49:09   7        MR. LANIER: I'm not objecting to
10:49:11   8    it, as long as it's clear on the record
10:49:12   9    what it is.
10:49:13  10        And one other logistical point.  I
10:49:15  11    notice that you have Shenkman 249 behind my
10:49:18  12    copy of this.
10:49:22  13        MR. HOWARD: Yeah.  That should not
10:49:24  14    be the case. Oh, let's see. Shenkman 220
10:49:28  15    or Shenkman 249?
10:49:30  16        MR. LANIER: No, Shenkman 249
10:49:32  17    (indicating). That was behind my copy of
10:49:34  18    it. I don't know about --
10:49:38  19        MR. HOWARD: Is it -- Oh. Do you
10:49:39  20    also have Shenkman 220 at the back?
10:49:43  21        MR. LANIER: No, I do not.  I
10:49:45  22    have -- the copy you handed me -- actually,
10:49:48  23    let me just look at the witness's copy so
10:49:50  24    we're clear on the record.
10:49:51  25        Mr. Kagermann, can I have that for a
```

**Page 277**

```
           1    HIGHLY CONFIDENTIAL - H. KAGERMANN
10:49:52   2    moment? Thank you.
10:49:53   3        So Mr. Kagermann's copy has the
10:49:56   4    e-mail from Shenkman to them. It's got the
10:50:00   5    business case. It has those pages you
10:50:01   6    mentioned. It's got -- Shenkman 249 is
10:50:04   7    what it looks like it's got.
10:50:05   8        MR. HOWARD: Shenkman 249 should not
10:50:07   9    be part of that. So it's a separate --
10:50:09  10        MR. LANIER: And it has Shenkman
10:50:13  11    220 --
10:50:14  12        MR. HOWARD: Shenkman 249 and 220
10:50:16  13    should not be part of that exhibit.
10:50:18  14        MR. LANIER: Okay. I've taken them
10:50:19  15    out of the witness's copy, and I'm handing
10:50:21  16    it back to him.
10:50:22  17        MR. HOWARD: Thank you.
10:50:26  18        MR. LANIER: Do you have 249 in
10:50:27  19    there as well? I'm also getting it from
10:50:30  20    the interpreter.
10:50:32  21        MR. HOWARD: Thank you.
10:50:33  22        For the record, Shenkman Exhibit 249
10:50:34  23    and Exhibit 220 are -- is a separate
10:50:37  24    transmission of the same document. There
10:50:39  25    are some pages that are clearer on each of
```

**Page 278**

```
           1    HIGHLY CONFIDENTIAL - H. KAGERMANN
10:50:41   2    them, but let's go with the one that I have
10:50:43   3    marked as Exhibit 427, which is
10:50:45   4    Mr. Shenkman's transmission to the board of
10:50:47   5    the business case on January 7, 2005.
10:50:51   6    BY MR. HOWARD:
10:50:51   7        Q.  And with all of that behind us,
10:50:53   8    Mr. Kagermann, is this an e-mail with an
10:50:57   9    attached business case that you received from
10:50:58  10    Mr. Shenkman on January 7, 2005?
10:51:14  11        A.  According to which I see here, yes.
10:51:19  12        Q.  Is this the document you referred to
10:51:22  13    earlier that was the document presented to the
10:51:24  14    board identifying certain risks with the
10:51:27  15    acquisition of TomorrowNow?
10:51:44  16        A.  It looks like this is the business
10:51:51  17    case that is usually presented.
10:51:55  18        Q.  And is this the document you
10:51:57  19    referred to earlier that the board received
10:51:59  20    identifying certain risks associated with the
10:52:03  21    TomorrowNow acquisition?
10:52:05  22        A.  I referred to a business case
10:52:39  23    which -- because we always prepared a business
10:52:40  24    case, and it always includes risks.
10:52:43  25        Q.  And is this that document?
```

Page 279

HIGHLY CONFIDENTIAL - H. KAGERMANN

10:52:46 2  A.  It looks like -- it looks like it.
10:52:57 3  Q.  All right. Mr. Shenkman -- turning
10:53:01 4  to the first page of Exhibit 427, which is
10:53:04 5  Mr. Shenkman's cover e-mail. Is this an e-mail
10:53:11 6  from Mr. Shenkman to the executive board?
10:53:21 7  A.  No.
10:53:22 8  Q.  He says that he is requesting -- "we
10:53:27 9  are requesting authorization to proceed with due
10:53:31 10 diligence and to extend a nonbinding offer to
10:53:33 11 the Company."
10:53:37 12     Do you see that?
10:53:41 13 A.  Yes.
10:53:41 14 Q.  Did the board provide that
10:53:45 15 authorization that was requested?
10:53:50 16 A.  I assume so.
10:54:03 17 Q.  And is the nonbinding offer he's
10:54:06 18 referring to here the term sheet that we saw
10:54:10 19 previously circulated by Mr. Mackey on January
10:54:13 20 13?
10:54:14 21 A.  I don't know.
10:54:32 22 Q.  Mr. Shenkman writes: "We do have
10:54:36 23 concerns, but we recommend proceeding with the
10:54:38 24 meetings scheduled for next week at FKOM with
10:54:41 25 the CEO and President of TomorrowNow."

Page 280

HIGHLY CONFIDENTIAL - H. KAGERMANN

10:54:47 2  A.  I see it.
10:54:47 3  Q.  What did you understand were the
10:54:49 4  concerns that the SAP team had regarding the
10:54:53 5  TomorrowNow acquisition at that point?
10:55:09 6      MR. LANIER: Mr. Kagermann, I
10:55:11 7  instruct you in your answer not to include
10:55:13 8  any concerns that may or may not have been
10:55:16 9  expressed by lawyers inside or outside.
10:55:18 10 But if there were others expressed by
10:55:21 11 non-lawyers, you may go ahead and answer.
10:55:23 12     The basis for the instruction is the
10:55:24 13 attorney-client privilege and the doctrine
10:55:26 14 of work product immunity.
10:55:31 15 A.  I don't recall any details.
10:55:32 16 Q.  Had you had any discussions with any
10:55:38 17 lawyers by January 7, 2005, regarding the
10:55:41 18 TomorrowNow acquisition?
10:55:53 19     MR. LANIER: Mr. Kagermann, you may
10:55:56 20 answer that question yes or no.
10:56:01 21 A.  Do you mean me, personally?
10:56:03 22 Q.  Yes.
10:56:06 23 A.  I don't recall any such talks.
10:56:11 24 Q.  Do you know whether any other
10:56:14 25 members of the SAP team involved in the

Page 281

HIGHLY CONFIDENTIAL - H. KAGERMANN

10:56:19 2  TomorrowNow acquisition, such as Mr. Agassi, had
10:56:22 3  had any discussions with lawyers regarding the
10:56:24 4  TomorrowNow acquisition?
10:56:26 5  A.  I don't know.
10:56:45 6  Q.  What action did the board take --
10:56:58 7  what happened after Mr. Shenkman sent this
10:57:02 8  document in order to provide the authorization
10:57:05 9  that he requests in his e-mail?
10:57:28 10     MR. LANIER: Mr. Kagermann, before
10:57:29 11 you answer -- I'm just thinking about it.
10:57:31 12 In answering your question you may provide
10:57:33 13 steps that happened. If there's any legal
10:57:35 14 communications involved, you may not
10:57:37 15 disclose the content of those
10:57:38 16 communications.
10:57:40 17     Go ahead.
10:57:43 18 A.  I could only guess.
10:57:46 19 Q.  Was there a meeting?
10:57:48 20 A.  I don't recall.
10:57:52 21 Q.  Was there a conference call?
10:57:54 22 A.  I don't recall.
10:57:58 23 Q.  Was there e-mail discussion?
10:58:02 24 A.  I don't think so.
10:58:06 25 Q.  How was the authorization

Page 282

HIGHLY CONFIDENTIAL - H. KAGERMANN

10:58:09 2  communicated?
10:58:11 3  A.  I don't recall.
10:58:16 4  Q.  Did you review this business case
10:58:18 5  when you received it?
10:58:19 6  A.  I think so.
10:58:25 7  Q.  Did you review it carefully?
10:58:28 8  A.  I don't recall any longer.
10:58:45 9  Q.  Did you discuss it with anybody?
10:58:46 10 A.  That's possible.
10:58:51 11 Q.  Do you recall discussing it with
10:58:53 12 anybody?
10:58:53 13 A.  No.
10:58:58 14 Q.  When you reviewed this business
10:59:05 15 case, did you have concerns about the
10:59:11 16 acquisition of TomorrowNow?
10:59:13 17 A.  It's possible.
10:59:25 18 Q.  Do you remember whether you did or
10:59:26 19 not?
10:59:27 20 A.  No.
10:59:32 21 Q.  Other than authorizing the team to
10:59:52 22 proceed with due diligence and extend an
10:59:55 23 nonbinding offer to the company, did you or the
11:00:00 24 board take any other action after receipt of
11:00:04 25 this business case?

14 (Pages 279 to 282)