UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PHYLLIS J. HAMILTON, JUDGE


ORACLE USA, INC., et al.,          )
                                   )
              Plaintiffs,          )
                                   )
    v.                             )          NO. 07-CV-01658 PJH
                                   )
SAP AG et al.,                     )
                                   )
              Defendants.          )
_____)

                                   San Francisco, California
                                   Wednesday, November 26, 2008



                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs          Bingham McCutchen LLP
                        Three Embarcadero Center
                        San Francisco, CA 94111-4067
                   BY:  **GEOFFREY M. HOWARD**
                        **Attorney at Law**
                        JOHN POLITO
                        Attorney at Law
                        ANTHONY FALZONE
                        Attorney at Law

For Defendants          Jones Day
                        Silicon Valley Office
                        1755 Embarcadero Road
                        Palo Alto, CA 94303
                   BY:  **THARAN GREGORY LANIER**
                        **Attorney at Law**


Reported By:            **CHRISTINE TRISKA, CSR, RPR**
                        Pro-Tem Reporter

Dockets.Justia.com

1    Wednesday, November 26, 2008

2                                            9:20 A.M.

3                        P R O C E E D I N G S

4         THE CLERK:  Calling Civil Case 07 dash 1658, Oracle et

5    al. versus SAP AG, et al.

6         MR. HOWARD:  Good morning, your Honor.

7         THE COURT:  Good morning.  Your appearance.

8         MR. HOWARD:  I was waiting for my colleague.

9         Jeff Howard on behalf of Oracle, your Honor.

10        MR. LANIER:  Good morning, your Honor.  Gregory Lanier

11   of Jones Day for the Defendants.

12        THE COURT:  Good morning.  All right.  This matter is

13   on for hearing on the motion to dismiss filed by SAP.

14        I do have some questions.  I guess the way that

15   we'll do it is we'll start first with the copyright

16   infringement allegations and then perhaps -- then the

17   preemption argument.  Those are the more difficult of the

18   issues, I think, that are raised.  The breach of contract and

19   the unjust enrichment are not terribly problematic.  So let's

20   start first, then, with the copyright infringement

21   allegations.

22        I'm a little unclear about the appropriate way to

23   analyze this motion.  It's purportedly brought under both

24   12(b)(1) and 12(b)(6).  The arguments aren't entirely clear

25   to me why it should be viewed as -- I mean the result could

1  very well be different depending upon the standard the Court

2  imposes.  It's not entirely clear to me that it's appropriate

3  to look at the merits at this particular stage.

4         But I think the more troubling aspect of the case is

5  it's not -- the Complaint isn't very clear, and it's not clear

6  to me whether or not either of the two organizations, entities

7  that are at issue in this portion of the motion, that's JDEE and

8  OSC, whether or not they were either owners -- actual owners of

9  copyrights that are asserted or exclusive licensees of the

10 copyrights.  And even though you've kind of made different

11 arguments, it seems to me the ownership issue comes into play

12 with respect to either one of these entities.

13        So whether or not we look at the extraterritorial

14 activity of JDEE or the standard or capacity of OSC, it seems

15 to me that the Complaint isn't entirely clear.

16        What's not clear is -- because there are multiple

17 plaintiffs and multiple defendants it's not clear to me which

18 plaintiffs are asserting which claims against which particular

19 Defendants.

20        Are all the plaintiffs asserting all the claims

21 against all the defendants, and do they all have equivalent

22 status?  That's not clear at all.  So that's a difficulty I'm

23 having with the copyright issue.

24        MR. LANIER:  Your Honor, then, if I may, first

25 touching on the ownership question and then circling back,

1  because it gets to the question of whether this is a 12(b)(1) or

2  12(b)(6) and whether it even matters at this stage, it's

3  important to look at the two different parties, JDEE and OSC,

4  separately, because they were in a different position.  That's

5  why we split our motion as to them.

6       OSC is not now and never has been an owner or

7  exclusive licensee of any of the copyrights at issue.

8  There's no dispute about that fact.  It is not now an owner.

9  It is not now an exclusive licensee.  It has never been an

10 owner and it has never been an exclusive licensee.  So the

11 only -- so from our perspective that ends it.

12      17 U.S.C. 501(b) makes it very clear that only the

13 owner or exclusive licensee may bring suit.  Then there's a

14 related question of, if I'm the owner today may I reach back

15 and assert claims based on conduct that occurred before I

16 became an owner?  That's a different issue.

17      They are trying to conflate these issues for

18 reasons I'll explain in a moment.  But the core point as to

19 OSC is that it is now not and never has been an owner, and

20 there's no dispute about that.  In fact, the allegations in

21 Plaintiffs' Complaint are that OSC is a successor-in-interest

22 to parties that have been owners.  That's, then, where the

23 issue comes about potentially reaching back.

24      What Plaintiffs allege, and as a matter of fact we

25 don't disagree with them, is that OSC is a successor-in-interest

1 to some of the corporations that were collapsed together to form

2 the current Oracle Corporation.

3          One brief word of background, your Honor.  You may

4 recall that though this is *Oracle versus SAP*, the software

5 that's at issue here was developed by other companies, for

6 the most part PeopleSoft and JD Edwards.  Oracle acquired

7 those companies in early 2005 around the time that SAP

8 acquired the TomorrowNow company.  Over the years,

9 principally in 2005, Oracle then took steps to organize its

10 corporate ownership together.  So OSC is a result of that.

11 Nothing untoward about that.  That is normal in the course of

12 mergers and acquisitions.

13          OSC is the result of transferring non-IP assets -- no

14 intellectual property -- but assets to form what's now called

15 OSC.  And how it became Oracle Corporation to OSC I don't think

16 matters for purposes of this motion.

17          But the core point for OSC and why it's a 12(b)(6)

18 motion is that it is not now and never has been an owner or

19 exclusive licensee of any copyright interests.  So from our

20 perspective it simply does not have standing.

21          Plaintiffs argue that because it is a

22 successor-in-interest -- I'm sorry, your Honor.

23          THE COURT:  Standing is more a jurisdictional

24 question.

25          MR. LANIER:  Standing for -- copyright standing is

1   typically treated as an issue to be resolved on 12(b)(6), your

2   Honor.  All the cases that we put before your Honor treat

3   copyright standing as a 12(b)(6) issue.  That's why there's a

4   little bit different issue with JDEE, where it's a question of

5   JDEE purports to be an exclusive licensee, and it's a question

6   of where its rights exist.  That's typically treated as a

7   jurisdiction question, whereas copyright standing is to be

8   treated under 12(b)(6).  And the parties agree the issue is ripe

9   for resolution.

10          THE COURT:  More as an element of the claim.

11          MR. LANIER:  Exactly right, your Honor.  It's an

12   element of 17 U.S.C. 501(b), an owner or exclusive licensee may

13   bring suit -- only an owner or exclusive licensee.

14          So what Oracle does in its opposition to the motion

15   on OSC is to say, "Well, it's a successor-in-interest,

16   therefore it acquired the right to sue for past infringement

17   when it acquired all these other assets, and as a result it

18   can sue."

19          The response to that, your Honor, is -- in addition to

20   the cases that are in our papers -- is 17 U.S.C. 501(b) -- only

21   an owner or exclusive licensee may initiate suit.  It's right

22   there in the statute.  It's very clear.  Oracle Systems

23   Corporation, OSC is not an owner or exclusive licensee.

24          So the question of whether it could reach back to

25   file suit based on pre-existing infringement is irrelevant,

1  because it can't file suit for copyright infringement.  It

2  doesn't have standing.

3          It's important to note that Oracle International

4  Corporation --

5          THE COURT:  But as the successor-in-interest didn't it

6  acquire such standing?

7          MR. LANIER:  It did not, your Honor, for two reasons.

8          Before the creation -- or the transfer or the

9  creation of the current OSC -- and it had a different name at

10 the time -- all of the intellectual property rights of the

11 pre-existing companies were transferred to Oracle

12 International Corporation, OIC.  That's one of the named

13 Plaintiffs on the copyright claim.  We are not challenging

14 its standing or the Court's subject matter jurisdiction on

15 its claims.  OIC remains in the case.  OIC took transfer of

16 all the IP interests of the companies that then became OSC.

17         What's missing is an express assignment of the

18 right to sue for past causes of action.  No one received that

19 assignment.  And here's the -- two of the cases -- I'm sorry,

20 your Honor.

21         THE COURT:  Why is it critical that that kind of

22 express assignment have been made?

23         MR. LANIER:  Because the law of this circuit as

24 applied in this district in the *Co-opportunities* case, relying

25 on the *De Silva* case, makes it very clear that there cannot be a

suit for infringement prior to the time one takes ownership or becomes an exclusive licensee of an express, written assignment.

The reason for that is in the statute, your Honor, because the statute U.S.C. 17 501 (b) not only says that only an owner or exclusive licensee may file a suit, it says may file suit for infringement that occurred while it was an owner. So the law is -- again the *Co-opportunities* and *De Silva* cases are the key cases, and they are in our papers -- requires an express assignment.

Now, part of the confusion may be that something is missing here. There is no express assignment of the right to sue for past infringement to Oracle International Corp., OIC. That's the party that we don't challenge its standing at this point. It's in the case. It owns the copyrights today. It didn't receive an assignment for the right to sue for past infringement. JDDE did not -- we'll turn to JDDE in a moment. OSC did not. So we don't know if anyone received an assignment for the right to sue for past infringement, but OSC did not.

Plaintiffs' opposition concedes that point and argues that it got the assignment by virtue -- by operation of law by virtue of acquiring the companies that had held that right. And again, your Honor, I would point to the *Co-opportunities* and *De Silva* cases that expressly hold even in the case of what they called a quote, "family", closed

```
1  quote of companies that the assignment must be expressed and

2  it must be in writing.  So OSC doesn't have standing.

3          But your Honor, from our perspective all of that --

4  that argument is irrelevant, because 17 U.S.C. 501(b) says

5  only an owner or exclusive licensee may initiate a suit, and

6  there is no dispute or complaint -- the allegations of the

7  Complaint are crystal clear:  OSC is not a current owner or

8  exclusive licensee.  It is a successor-in-interest to such

9  entities.

10          So that's the issue with OSC.  It's typically treated

11  on 12(b)(6).  There's no dispute about that in this case, and

12  that's how the case is treated.  It's a matter of standing as an

13  element of the claim.

14          The JDDE issue -- I'm prepared to turn to that, your

15  Honor.

16          THE COURT:  Sure.

17          MR. LANIER:  Thank you.  JDEE is slightly different,

18  and that's because JDEE is a party to a contract, which we put

19  on the record before your Honor.  It's Exhibit One to the Lanier

20  Declaration.

21          JDEE is an exclusive licensee today, at present.

22  And that's in -- you'll see paragraph 6.2 of Lanier

23  Exhibit One, and that's the -- I've forgotten the name.  I

24  think it's a research and cooperation agreement.  But Lanier

25  Exhibit One, paragraph 6.2.
```

1    But it's worth -- I'll draw your Honor's attention

2 to one specific provision to that paragraph to point out, as

3 we point out in our papers, that JDEE has a right -- has an

4 exclusive -- and then there are a variety of other words --

5 license in the countries set forth in Exhibit A.  And

6 Exhibit A provides that JDEE has its exclusive right in the

7 countries that are colloquially called EMEA, Europe, Middle

8 East and Africa.

9    It does not have any rights in the United States.

10 There's no dispute about that fact.  Its rights are as set

11 forth in paragraph 6.2.

12    It's also, if your Honor is going to study this a

13 little after, worth looking at paragraphs 6.1.1 and 6.1.2 of

14 that same agreement, Lanier Exhibit One.  And those

15 specifically provide that the reason for this structure --

16 6.1.1 makes it very clear that the reason for the structure

17 is in order to assure enforcement of intellectual property

18 rights.  So the parties to this agreement had this issue in

19 mind.

20    So now here's what's not disputed, and then we get to

21 the fight.  What's not disputed is that JDEE is a party to this

22 agreement, and it has the exclusive license set forth in 6.2,

23 and that exclusive license gives it limited rights but exclusive

24 rights in EMEA, outside the United States.

25    Now, why it is a question of jurisdiction as

1  opposed to standing, your Honor, is because JDEE has an

2  exclusive license.  So it meets -- on the surface of it it

3  meets the first -- the first element is 17 U.S.C. Section 501

4  (b).  It is an owner or exclusive licensee today.

5        The point, though, is that JDEE does not have any

6  rights in the United States.  And it's important to make a

7  distinction here.  This -- our argument is not that if you hold

8  the U.S. rights -- and let's take a scenario.  Let's say just

9  hypothetically for argument JDEE held U.S. rights, and I

10  import -- I copy some of its software and I export it to France.

11        Our argument is not that that action is beyond the

12  jurisdiction of this Court.  There are other challenges to

13  the damage claim.  That is not our argument, because in that

14  scenario JDEE has U.S. rights.  They have a right that's

15  recognized under the U.S. copyright.  They can come before

16  your Honor and say, "I've got a complaint.  I want this

17  relief," and then we can argue over the damages and

18  everything else, whether it's copyrightable and all that

19  stuff.

20        This is different.  JDEE has no rights in the United

21  States.  Therefore, as the *Allarcom* and *L.A. News* cases -- it's

22  useful to contrast, compare those two cases -- make clear it

23  has -- its rights cannot be infringed in the United States.  If

24  its rights cannot be infringed in the United States no active

25  infringement can be completed in the United States, its claims

1  are beyond the reach of this Court.  It's an issue of

2  extraterritoriality, which as the *Silver* and *Sybersounds* cases

3  make it clear, there's 80 years of jurisprudence, the Copyright

4  Act does not apply extraterritorially.

5          And it's worth for a moment touching on the *Allarcom*

6  and *L.A. News* cases that are -- again, that are in our papers,

7  your Honor.  Both of those -- they give you the opposite sides

8  of the same story.  They get to the same principle.

9          In *L.A. News* the plaintiff there had rights --

10 worldwide rights, therefore they had rights within the United

11 States.  And somebody took some videotapes -- copyrighted

12 videotapes and exported them, and they said, "We've got a

13 copyright complaint."  The defendants said, "No.  That's

14 extraterritorial.  You sent it out of the country.  Your

15 damages happened there."  And there the court said, "Well,

16 no, because they had rights in the United States."

17         The question was not the locus of the conduct.  It

18 was the locus of the rights.  That's the issue -- U.S.

19 rights.

20         *Allarcom* --

21         THE COURT:  The copyrights, though, are U.S.

22 copyrights.

23         MR. LANIER:  Correct.

24         THE COURT:  There's no dispute about that.

25         MR. LANIER:  Absolutely right.

1          THE COURT:  And the agreement permits JDEE to

2    distribute outside of the United States.

3          MR. LANIER:  The agreement -- there's two points --

4    you're absolutely right.  There's two points to follow up on on

5    that vein.

6          The agreement doesn't just say, "I give you, JDEE,

7    U.S. copyrights."  It says, "I give you the rights to all

8    this intellectual property" -- it could be patent rights,

9    trademark rights, know-how, et cetera, et cetera.  So it gets

10   a variety of intellectual property rights.  And JDEE is

11   conferred one and only one right, which is the right to

12   distribute and to make some changes to distribute in EMEA,

13   outside the United States.

14         So yes, your Honor, there's no question that for

15   purposes of this case we are talking about matters that they

16   claim to be covered by the U.S. copyrights.  There will be

17   fights about that later for this motion.  U.S. copyrights are

18   at issue.

19         But the question is not, where did the conduct

20   occur, which is why all of the pages and pages about who shot

21   John and who did what where is irrelevant to this motion.

22   It's not where the conduct occurred.  It's not even for this

23   motion where the harm occurred.  It's where the rights exist.

24   And JDEE has no rights in the United States.  It may not come

25   before this Court on a copyright claim.

1        And a final note, your Honor, I mentioned that the

2   issue about, is this 12(b)(1)?  Is it 12(b)(6)?  Is it

3   jurisdictional or is it not?

4        From our perspective two things are important:  The

5   first is that the issue doesn't matter.  They concede the

6   issue is ripe.  It's ready for resolution.  The only impact

7   it might have on the Court's ruling is whether you consider

8   all of that other evidence, which is irrelevant on the merits

9   anyway.

10       But the other point is that it is verbally treated

11  as a question of subject matter jurisdiction.  The *Arbaugh*

12  case dealt with Title VII issues, where the number of

13  employees of the companies -- I'm sure your Honor is

14  familiar -- the number of employees of the company is an

15  aspect of the claim.

16       And in that case the Supreme Court and Justice

17  Ginsburg held that that issue was not a question of

18  jurisdiction.  It was a question -- or it was not a question

19  of jurisdiction.  It was a question of the element of the

20  claim.

21       And critically the procedural posture was very

22  different.  In *Arbaugh*, this issue was coming up after a jury

23  verdict where a 12(b)(6) motion would have been too late

24  anyway.  So it really mattered what the outcome was there.

25       Here, though, all the cases treat territoriality as

a question of jurisdiction, rights or rights under the

Copyright Act, and even cases subsequent to *Arbaugh*, cases

decided the same year but subsequent to *Arbaugh* in this

district, the *Williams* case, for example, treat the question

of territoriality as a question of jurisdiction.  So it

arises under 12(b)(1).

Regardless, your Honor, from our perspective again,

it doesn't matter whether it's 12(b)(1) or 12(b)(6).  It is

ripe and appropriate for resolution on this motion.  We

brought one motion that asserted theories up -- two different

theories under 12, but separated it out as to the two

different parts.

THE COURT:  All right.  So you're essentially relying

on 12(b)(6) for OSC and 12(b)(1) for JDEE?

MR. LANIER:  That's correct, your Honor.

THE COURT:  All right.  Your response?

MR. HOWARD:  Good morning, your Honor.

Let me start with the question that you started

with, which is why the three Plaintiffs, and then I'll

respond to Mr. Lanier.  I think Mr. Lanier actually covered

it.

A plaintiff has standing if it is the owner or the

exclusive licensee.  OIC is the owner, and so it is a proper

plaintiff.  It exclusively licensed certain of its copyrights

to JDEE, and so as the exclusive licensee, JDEE is also a

proper copyright plaintiff.  And there's been no challenge to JDEE's standing before the Court.

OSC -- and I'm going to start with OSC because Mr. Lanier did -- OSC has standing as the successor-in-interest to owners of accrued, preexisting claims for copyright infringement.  In their papers and here today there is looseness with which Section 501 is being described.

What 501 says is that, "An owner or exclusive licensee may" -- and now I'm quoting -- "institute an action for infringement of that particular right committed while he or she is the owner of it."

So OSC's predecessors-in-interest -- there's three companies -- were owners of a right under a copyright between 2002 and 2005.

We have alleged that those rights held by those entities were infringed during that time period, in other words, in the language of 501 while they were the owners of it.

THE COURT:  But clearly not while OSC was an owner, because they succeeded in interest after the copyright alleged infringement occurred.

MR. HOWARD:  Exactly right.  So there's no dispute that there was a claim for copyright infringement that was held by the predecessors-in-interest right up until 2005; right?

Then what happens in 2005 is that those

1 predecessors-in-interest transfer their ownership in the

2 copyrights to OIC, but they do not transfer their ownership of

3 the claims that had arisen and which had given them standing in

4 the pre-2005 time period.

5      THE COURT:  Would they still have standing under that

6 agreement?  I mean, either -- I don't quite understand your

7 argument.  Either they retain the express right to sue, in which

8 case they would no longer be owners as of the date this suit was

9 filed, or they transferred it and OSC would be the owner.

10      I don't see how all three could possibly be in the

11 same position.

12      MR. HOWARD:  Well, in fact -- well, no.  The cases

13 distinguish -- and Mr. Nimmer distinguishes in his treatise

14 between the ownership of the right and the ability to bring a

15 claim for infringement of the right while the entity owned it.

16      And so, for example, the *Silvers* case, Ninth

17 Circuit case, distinguishes between the conveyance of a

18 copyright and the conveyance of a right to recover for

19 infringement of that copyright.

20      That case approvingly cites the *ABKCO* case, and the

21 language of that case is "that the assignor," which in this

22 case are the predecessors-in-interest to OSC:

23         -- "the assignor retains the right to

24         bring actions accruing during its

25         ownership of the right even if the actions

1          are brought subsequent to assignment."

2          That's a quote.

3          So --

4          THE COURT:  So if the assignor retains the rights, how

5   does that qualify OSC as a successor-in-interest in having the

6   same rights?  I don't understand how both can be in the same

7   standing.

8          MR. HOWARD:  So let me then, please, get to that

9   point, because I wanted to first establish that -- and I don't

10  think there's any dispute about it -- that the

11  predecessor-in-interest retained the right to sue even after

12  they transferred the copyrights to OIC.

13         So we're now in March 2005.  OIC holds the

14  copyrights, and the predecessors-in-interest have retained

15  the right to sue.  The only question then to your Honor's

16  question is -- the only question is what happened to that

17  right to sue when the predecessors-in-interest merge into OSC

18  and cease to exist?  Does the claim just evaporate into thin

19  air?

20         That's what Mr. Lanier is suggesting; that there is

21  a claim for infringement, that there is an infringer, and

22  that there is an action that can be brought, and that simply

23  by the result of merger that claim just evaporates into thin

24  air and suddenly nobody has it.

25         THE COURT:  Do you disagree that it has to be

1  expressly transferred or retained?

2          MR. HOWARD:  Yes and no.  Let me explain that.

3          I agree that it has to be expressly transferred when

4  the transferor continues to exist.  Mr. Lanier cited the

5  *Co-opportunities* case to your Honor.  In the *Co-opportunities*

6  case the ownership was transferred but not the right to sue.

7  Judge Patel then allowed the assignor subsequently three years

8  later to make a second assignment solely of the right to sue,

9  and then the assignee was held to have the ability to bring that

10 preexisting claim.

11         The crucial difference there and the crucial

12 difference in the *De Silva* case that was also cited to your

13 Honor is that somebody was there to make that second

14 assignment.

15         Here there is no prior entity.  They have -- the

16 agreements that have been provided to your Court say they have

17 ceased to exist.  So everything that is about them, everything

18 that they have has been merged into OSC.

19         And it would defeat justice for sure -- and it

20 certainly isn't part of merger law -- that the claims that

21 *ABKCO* and *Co-opportunities* and *Silvers* and *Nimmer* and

22 everybody say, the claims that still existed because they had

23 accrued at the time that those entities owned the copyrights,

24 it would defeat justice to say that they just disappeared.

25 Of course they don't.  They continue with the person who

1 succeeds to those entities.

2          So it's not a case --

3          THE COURT:  And what do -- which of the cases

4 specifically says that?

5          MR. HOWARD:  Your Honor, no case has been cited to you

6 by either side where the transferring entity has ceased to

7 exist.  But that is the dispositive factual difference.

8          If it is true that the assignor retains the right

9 to sue, then there's -- then that right is there.  And the

10 distinction between *Co-opportunities* and *De Silva*, where

11 somebody is there, a corporation or a sole proprietor is

12 there who can sign the caption and bring the claim into you

13 for resolution, the difference between those cases and this

14 one is that now nobody has that if it's not OSC.  And of

15 course it has to be OSC because they've acquired everything.

16          THE COURT:  Such result could have been avoided

17 obviously by having express conveyance at the time of the

18 merger; correct?

19          MR. HOWARD:  I suppose that if we wanted to put

20 ourselves back into the *Co-opportunities* time period we could

21 have done that, but it's different.  There is no reason to do

22 that because a merger is everything.  There's no question as

23 there is when the transferor continues to exist.  There is no

24 question that something has been retained.  Nothing has been

25 retained.  In a merger nothing gets left by the wayside because

1  everything that is held by that entity passes through to the

2  successor-in-interest.

3         The same can't be said for the cases where that

4  entity or sole proprietor continues to exist.  Then the

5  question has to be asked: Did they actually transfer the

6  right to sue in addition to the copyright?

7         THE COURT:  All right.  Let's move on.

8         Did you want to respond?

9         MR. LANIER:  All of that still doesn't matter because

10 17 U.S.C. 501(b) says:  "The legal or beneficial owner of an

11 exclusive right under a copyright," and it goes from there.

12        So the person that may come before your Honor and

13 seek redress under the copyright laws must be a legal or

14 beneficial owner.  There is no question that at the present

15 time OSC is neither a legal or beneficial owner of an

16 exclusive right.  It's not the owner.  It's not the exclusive

17 licensee.

18        All of the cases that permit someone to reach back

19 and say, "I have the right to sue for past infringement,"

20 involves someone who's an owner or exclusive licensee.  The

21 reason the law permits that is because I might own the

22 copyrights -- I might exclusively license them to your Honor.

23 Either of us could sue my colleague over there.  Then the

24 question is who gets to sue for the old stuff?  That's

25 where -- that's where you might have -- that's why you need

1  to do these assignments.

2        But in this circumstance the dispositive fact

3  that's admitted in the Complaint itself is that OSC is not

4  the legal or beneficial owner at the present time.  It does

5  not have standing, period.

6        MR. HOWARD:  Your Honor, may I just say one other

7  thing?

8        If that -- that statement ignores *Nimmer*, which

9  cites *ABKCO*.  *Nimmer* says:

10              "Absent retroactive grant to the

11              infringer only the grantor, not the

12              grantee, has standing to sue for pre-grant

13              infringement."

14       So it just isn't the case that you have to

15  currently at the time you bring your suit be the owner of the

16  copyright.  *Nimmer* is clear, *ABKCO* is clear, and *Silvers* is

17  clear.  You can bring a claim if you were the owner, in the

18  words of 501, "at the time it accrued."

19       Here when the merger into OSC happened nobody knew

20  about these claims.

21       THE COURT:  Okay.  All right.  We need to move on.

22       MR. HOWARD:  So I'll address the JDEE issue next.

23       Your Honor's exactly right.  JDEE has a U.S. right.

24  It is a U.S. copyright that has been exclusively licensed to it,

25  and that is a U.S. right.  It's not a European right; it's a

U.S. right.

The question, then, is not what the geographic scope of that right is -- and it's much broader than what Mr. Lanier said.  He said there's only one and only one right, which is distribution.  That's not so.  The right is to modify, develop, reproduce, make, have made, sell -- all of the rights that go with the U.S. copyright.

The law is very clear.  It is not the geographic scope of that right.  It is the location of the conduct.  It is the location where the regulated conduct occurs.

Mr. Lanier has overruled the Ninth Circuit's affirmance of your Honor in the *Blazevska* case, where you held that it's the location of the conduct that matters when you're looking at the extraterritorial bar to a statute.

Here we have alleged the conduct that violates the U.S. right and the scope of the license I just read.  That conduct was copying in the United States, in Texas, of U.S. rights that were exclusively licensed to JDEE, and then the exploitation of that infringing act into JDEE's territory.

And if there was any doubt about it under *Blazevska*, under *Massey* on which your Honor also relied in that decision, as we pointed out in our opposition, and which got no response in the reply and no response now, the Congress has just amended the Copyright Act, and it has made clear in Section 602 that the exportation of infringement is

1  actionable in the United States.  And that is all that we

2  have alleged here.

3          There was copying that infringed JDEE's rights --

4  their U.S. rights.  It was exported into Europe, where JDEE

5  has the exclusive license to distribute.  That conduct that

6  we have alleged is infringing occurred in the United States,

7  and it is actionable, and I don't think there can be any

8  question about that.

9          If your Honor would like me to address the 12(b)(1)

10  versus 12(b)(6) issue I'm certainly happy to do that as well.

11  It was brought under 12(b)(1).  It's not brought under 12(b)(6).

12  It is not properly brought under 12(b)(1), which I think is

13  sufficient at this point to deny the motion.

14          The *Arbaugh* case sets forth -- the U.S. Supreme

15  Court sets forth a bright line rule.  That's the language of

16  the Supreme Court.  And the bright line rule is that unless

17  Congress in a federal statute has specifically made

18  extraterritoriality a jurisdictional issue, then it's not.

19  It is a criteria, an element of the claim that's properly

20  treated under 12(b)(6).  So the motion is not proper under

21  12(b)(1).

22          The *Litecubes* case, which is a federal circuit

23  case, applies *Arbaugh* to the Copyright Act and properly so,

24  because the Copyright Act, as did the Title VII in *Arbaugh*

25  does not have that statement of Congressional intent.

1          Mr. Lanier refers to the *Williams* case, which was

2    Judge Breyer's affirmance of Magistrate James's report, and

3    in that case I just wanted to point out to your Honor there's

4    no mention at all of *Arbaugh*, and in fact the reference by

5    Judge Breyer to Judge James occurred prior to the *Arbaugh*

6    decision.  Judge James issued her OSC prior to the *Arbaugh*

7    decision, and I think it's fairly clear from the decision

8    that neither the parties nor the court were considering

9    *Arbaugh* at the time of that decision.

10          THE COURT:  All right.  We need to move along to the

11   preemption argument.  All right.

12          I'm a little unclear about what's in dispute.  I

13   mean, it seems to me that the -- I mean, the Defendants'

14   argument is that the state claims for the most part are

15   preempted by the Copyright Act.

16          There is a statement, however, in each of the

17   various different arguments that to the extent that each

18   claim relies upon the Copyright Acts, that they are

19   preempted, but to the extent that there are other

20   allegations, and the other allegations are kind of these

21   misrepresentation, fraud, deceit claims, that there isn't.

22   So it seems to me you all are in agreement.

23          I am not sure that I can articulate, because I'm

24   not sure you all have articulated exactly what the something

25   extra is with respect to each of the claims.

1          MR. LANIER:  Thank you, your Honor.

2          I think we are in agreement -- and it's important

3    to start there and then to point out why -- if we are in

4    agreement why do we even need to have this motion?  That

5    thought probably crossed your Honor's mind.

6          We are in agreement -- parties agree that to the

7    extent the various state law claims are based on conduct of

8    acts of alleged copyright infringement they are preempted by

9    the copyright laws.

10          THE COURT:  Right.

11          MR. LANIER:  Now, as all of the decisions before your

12   Honor have pointed out -- well, one other point we're in

13   agreement on -- in fact, they are so much in agreement on it

14   that in the Third Amended Complaint Plaintiffs tell you that

15   they actually carved those allegations out of those various

16   different claims.

17          'Cause if you look at the incorporation paragraph

18   at the beginning of every state law cause of action where it

19   says, "We rely on these paragraphs," they chop out the

20   allegation, the specific paragraphs that assert the cause of

21   action for copyright infringement.  So they are so much in

22   agreement with us that they say they did it.

23          The problem, and why we had to bring the motion, is

24   that isn't actually what happened, because each and every one

25   of the state law claims is based on paragraphs that allege

1   acts of copyright infringement, even if they are not

2   expressly based on the claim of copyright infringement.

3           Let me just give your Honor a couple of examples.

4   Paragraph 19, which is incorporated into every one of the

5   state law claims, alleges illegal downloading and illegal

6   copying.  Paragraph 101, which is incorporated into every one

7   of the state law claims, further describes illegal

8   downloading.  Paragraph 114, which is incorporated in one of

9   them says "thousands of copies."  Paragraph 118 of the Third

10  Amended Complaint, which is also incorporated into those

11  state law claims -- it's the basis of those claims -- talks

12  about impermissible copying and the creation of derivative

13  works.

14          So each and every one of the state law claims is

15  based on acts of alleged copyright infringement and is

16  preempted.

17          Now, why this issue is always tricky and troublesome

18  is because you can't just rely on broad labels -- preempted,

19  therefore the whole claim goes.  You have to, unfortunately,

20  look at the specific conduct alleged.

21          Every case that has been put in front of your Honor

22  dives down into, what facts do they allege?  Do they allege that

23  you copied?  Okay.  That's preempted.  Do you allege that they

24  did something that is not protected by the copyright laws?

25  That's not preempted.

1          And in our reply brief we try to do some of that

2    work for your Honor by -- your Honor may recall in our reply

3    brief we've actually taken the allegations that they relied

4    on in their various state law claims and done

5    strike-throughs, and we think this stuff is covered by the

6    copyright laws.  So I won't repeat all that here.  It's in

7    our reply brief, your Honor.

8          The important point is this:  Labels don't decide

9    the issue.  They agreed with us on all of these points.  They

10   agreed that you need to go claim by claim, conduct by conduct

11   and decide, is this preempted or not?  Because as your Honor

12   knows, a state law claim could attack a broad swath of

13   activity.

14         Fundamentally this case is about two things:  It's

15   about whether TomorrowNow was properly on those Plaintiffs'

16   computers, and there's a variety of claims in the case not at

17   issue here -- Computer Fraud and Abuse Act, California CDAC,

18   trespass to chattels -- that aren't at issue here.

19         The other thing that this case is about is

20   copyright infringement.  What was done with the software that

21   shouldn't have been done?

22         Those claims are covered by the Copyright Act and

23   they are prohibited.  We've tried in our reply brief to say,

24   "This stuff is prohibited."  Their biggest argument in

25   response is to say, "well, use."  We don't say -- we say not

only that you copied and created derivative works and

distributed, which are all rights unequivocally covered by

the Copyright Act, but you also "used" the software. That's

different. That's not preempted by the copyright laws.

That's wrong for two reasons, your Honor, and the

*Altera* case, which is in the papers, is key here. In *Altera*

the Ninth Circuit considered the preemption argument

involving software, and the Ninth Circuit actually found no

preemption. But it's important to look at why it did.

In *Altera* what the Ninth Circuit did is said you

have to make this distinction -- distinguish between copying

the software. That's an act of copyright infringement. If I

make a copy and I give it your Honor, that's an act of

copyright infringement if I don't have permission to do it.

But if I take the software and I run the software to

run my business -- I take some PeopleSoft financials and I run

my business based on that and I don't pay for it, that's not

covered by the copyright laws -- my copying, my distribution, my

derivative works are.

So in *Altera* what the Ninth Circuit distinguished

between was copying or other copyright-related activities

with the software and use of its output. Those types of

claims are not preempted. They are legitimately different.

But everything -- and again we touched upon this in

our reply papers, your Honor -- everything that Plaintiffs

1  say is extra and different is one of two things:  It's either

2  access to computers -- and we do not claim that those claims

3  are preempted by the copyright laws.  That's not our motion,

4  never has been -- or it's a use.  And they say, "It's use,

5  therefore it's different."  But you have to look behind the

6  label of "use" just like the Ninth Circuit did in *Altera* and

7  say, what does use mean?  And if use is copying, if it's

8  creating a derivative work, if it's distributing, or the

9  other rights protected by the copyright laws then that's

10  preempted.

11        So it's unfortunately a preemption issue that this

12  many state law claims creates an incredible amount of work

13  for the Court.  We've tried to do some of that in our reply

14  paragraphs with a strike-through.

15        The core point is that it's a fact-specific

16  analysis, not a label-specific analysis.  And in view of the

17  Court's time -- and I know you have another matter -- I can

18  stop here, and I could of course go on.  We'll stop here.

19        THE COURT:  All right.

20        MR. HOWARD:  Thank you, your Honor.  I certainly agree

21  that it's a fact-specific analysis, and that's why this simply

22  isn't proper in a 12(b)(6) motion.

23        Your Honor made some remarks when we first appeared

24  before you about the length of our Complaint.  But let me say

25  that even the length of our Complaint can't begin to capture

1   what happened over several years where software is being used

2   every single day by many different people.

3         Our allegations are summaries of conduct that

4   occurred. And in some of those -- in some of those -- and

5   they are -- and that conduct occurs pursuant to hundreds of

6   different customer license agreements, some of them with

7   varying terms that affect how that software can be used.

8         So what -- really what the Defendants are asking you

9   to do is to give an advisory opinion, or to grant summary

10   judgment based on facts that differ according to the day,

11   according to the person, according to the year, according to the

12   software, and according to the license agreement. And I just

13   don't think that is the thing that the Court should be doing now

14   on a 12(b)(6) motion.

15         And the reason that's critical is that there are

16   instances, as we have alleged, where software was copied or

17   distributed or derivative works were made. Those are the

18   things that Section 106 reserves exclusively to the Copyright

19   Act.

20         But the law is clear that where there are contractual

21   restrictions that restrict the use of that software, or where

22   there has been a misrepresentation that is used in the course of

23   unfair competition or used in the course of interference, then

24   that is not preempted by the Copyright Act.

25         And so in each of these instances with each of

1 these allegations both are true.  And we will prove that both

2 are true depending on the day, depending on the year,

3 depending on the release of the software, depending on the

4 license agreement at issue.

5          And we have -- specifically with respect to the

6 interference claim we have pointed you to many cases where

7 there is a copyright allegation, and there is use of that

8 same copied software in ways that are not contemplated as a

9 specific restriction under 106, and where those claims are

10 allowed to proceed.  They are routinely allowed to proceed.

11          And so let me conclude by positing sort of two

12 different scenarios.  In Scenario One, there is a copy which is

13 made, and its a violation of 106, and that copy is then used in

14 ways that violate the applicable license agreements, which is

15 what the *National Car Rental* case said was improper, what the

16 *ProCD* case said was improper, what *Meridian*, *Summit* -- all of

17 these cases say:  You can't do it if it's a right that's

18 separate and apart from a private contractual right, separate

19 and apart from the rights under 106.

20          But there is a whole other category -- there's a

21 second category of claims where that copy that I used as my

22 predicate, that copy is not a violation of 106.  So simply the

23 word "copy" doesn't mean anything, because it may be a licensed

24 copy.

25          And we've even said in our Complaint that there

were instances where the access to Customer Connection may

have been properly within the scope of the customers'

agreement, or the copy may, depending on the license

agreement -- may have been properly offered -- not a 106

violation, but then just as in the *National Car Rental* case,

just as in the *Summit* case, you take that copy and you use

it.  And that use is an interference, and it gives rise to

inducement of breach as in *Altera*, and breach as in *National*

*Car Rental* and *Summit* and *Meridian* and all of those other

cases.

So depending on the factual scenario those all

should be allowed to proceed.

THE COURT:  All right.  Let's move onto the breach of

contract.

The difficulty that I have with this, it seems to

me that this is the essence of the lawsuit about whether or

not the clickwrap agreements are binding agreements between

your client and Oracle or whether they only apply to

customers.  That seems to me to be the heart of the

agreement, and it's -- I'm very reluctant on a 12(b)(6)

motion to grant the relief that you're seeking.

MR. LANIER:  May I, your Honor?

We agree with you completely.  This is -- this

issue, this breach of contract gets to the crux of the case,

and it points out the central tension that affects every

1  aspect of their pleading and conduct of the discovery of this

2  case, because Plaintiffs are, to be cliche, trying to have

3  their cake and eat it too.

4          They are trying to say, "You can get on our systems

5  but you can't get on our systems."  That's really what

6  they're saying there.  And I would draw your Honor's

7  attention again with limited time to look at page 21 of their

8  opposition brief, lines 23 to 24, and that's really

9  instructive of the problem.  And that's where they say:  The

10 Defendants accepted the agreement by clicking an "I agree"

11 but then promptly violated it by accessing the website.

12         It can't be both.  If you can click "I agree," if

13 you're an intended offeree who can accept this contract and

14 get on the website, then you can't properly violate it by

15 getting on the website.

16         And to address your Honor's concern, we understand

17 that.  And I hate to say this on behalf of my clients, but

18 there's a remedy.  If our clients didn't belong to the

19 website there's a remedy.  It's pled in this case.  There's a

20 CFAA claim.  There's a CDAC claim.  There's a

21 trespass-to-chattels claim.  Congress and the state of

22 California have gone to a lot of trouble to figure out, what

23 are the remedies that are available if people get on their

24 computers without the right to be there?  And those claims

25 are in this case.  Now, we have other issues with them.

1  We'll talk about damages -- not leaving them without those

2  remedies, though.

3          But the key point is, they chose a person to assert

4  a claim for breach of contract.  It's fundamentally at

5  tension with their entire case, and those contracts, if your

6  Honor reads them -- and I draw the Court's attention -- they

7  are all attached to the Lanier Declaration -- each and every

8  one specifically contemplates an ongoing relationship with

9  Oracle -- each and every one of them.

10          And we put language in our papers -- I could reread

11  them.  I won't do it.  They are in front of the Court --

12  every one of those contracts says, "You, the customer" -- but

13  it's not just those words.  Let's not rely on labels.

14          THE COURT:  But is it really just a matter of clicking

15  and getting on?  Isn't it the use to which the software is put

16  that's at issue and not just the accessing of it?

17          MR. LANIER:  Exactly.  And that's why we have to get

18  back to the use, your Honor.

19          The use.  What's the use?  Is it downloading it?

20  It's a copy.  Is it taking that copy and giving it to someone

21  who doesn't have a right to it?  That's a copy -- that's a

22  copyright infringement.  Is it tweaking that software,

23  modifying it in some way so then I can give it to someone

24  else?  That's creating a derivative work.  It's a copy.

25          So the non-preempted things that could be the

1 subject of the breach of contract claim all relate to access

2 to computers -- all of them.

3          And again, there are claims specifically in the

4 case for that, but fundamentally it's important to

5 remember -- these are not contracts we came up with.  These

6 aren't contracts that resulted from TomorrowNow and Oracle

7 sitting down and coming up with some agreement, and we're now

8 saying, "Ah-ha, there's a technicality.  We can't get on."

9          TomorrowNow got to those computers in the course of

10 providing service to its customers.  Every one of those

11 agreements -- every one of them says, "We have another

12 agreement with you.  Your use is in furtherance of our

13 continuing relationship subject to that agreement.  Don't do

14 things that violate that agreement."

15          There is no further agreement between TomorrowNow

16 and them.  So the point is, TomorrowNow is not the intended

17 offeree.  If somebody reached those agreements it was the

18 people who gave TomorrowNow permission to go there.  But that

19 doesn't mean they're without a remedy if the access was

20 improper.  They've pled their argument.  That's all I have.

21          THE COURT:  I think that's a pretty good argument.

22          MR. HOWARD:  Your Honor, their breach of contract

23 claim relates to one agreement.

24          THE COURT:  Well, I'd like to you respond to counsel's

25 argument that what Oracle is attempting to do is to have it both

1 ways.  Either you have permission, because you're a party to the

2 contractual agreement, in which case using the software wouldn't

3 be a breach of contract although it might be something else, or

4 you are not a party to the agreement, in which case you have

5 something other than a breach of contract.

6         MR. HOWARD:  Sure.  I'd be happy to address that.  And

7 again it gets back to the idea that there is a wide variety of

8 factual scenarios that are at issue here.

9         We say in the Complaint that in some instances under

10 some license agreements that customers have with Oracle

11 Defendants could go onto Customer Connection, the website, and

12 download things.

13         When they do that they agree to use those downloads

14 in a particular way.  And in fact they agree not to cross-use

15 them for other customers other than the one whose credentials

16 were used to download these particular items.

17         So simply accessing in that situation simply creates a

18 contract which then can be breached down the road, and which was

19 breached down the road by the cross-use of those materials in

20 support, for example, of other customers.

21         Let me give you a very concrete example.

22         THE COURT:  Just so I understand, in some instances

23 the accessing is not a breach of any kind of contractual

24 agreement, and, in fact, is a permissible act on the part of the

25 Defendant.

1          MR. HOWARD:  We say that in the Complaint.  That's

2 right, your Honor.

3          THE COURT:  But under some other instances they are

4 not permitted to do so?

5          MR. HOWARD:  Exactly right, your Honor.  And so the

6 access to the website -- and please keep in mind, your Honor,

7 that the materials available to download from the website are

8 only one component of the software that's at issue in the case.

9 They are the support materials -- the patches and the bug fixes

10 and the documentation for the ongoing support of the underlying

11 software.

12          They also copied the underlying software not by

13 going onto the website but by acquiring it from their clients

14 and putting it up on their systems.  So we're talking about

15 just these downloads now and the contract that governs the

16 access to and use of those downloads.

17          So they have a client.  Let's say it's Merck.  Merck

18 is issued a password credential to get onto the website by

19 Oracle.  Merck gives that password credential to defendants.

20 Merck has a license to Software A but not Software B.  So Merck

21 is entitled to -- and they give the password depending on the

22 license agreement to defendants -- defendants may be entitled to

23 go onto the website with that credential, take their patches for

24 Software A but not Software B; right?

25          So when they go on and they download both for

1  Software A and for Software B, both are true.  They are there

2  properly -- under this hypothetical and for purposes of this

3  argument properly to download for A.  They are not there --

4  they do not have permission, they do not have access, and

5  they have breached immediately the access agreement to

6  download for Software B.

7        They did this repeatedly to the tune of 8 million

8  files.  Some of those files were downloaded using credentials

9  for which the customer was licensed.  Millions of them were

10 downloaded using credentials for which the customer was not

11 licensed.

12       Now, we have Software A patches and Software B

13 patches.  They are all put on the local computer at the

14 defendant's place of business, and they have one thing in

15 common:  Both are subject to the contractual use restrictions

16 that were agreed to when they were downloaded, which is they

17 will not be -- among other things, they will not be used to

18 support other customers.

19       Both were used to support other customers.  So

20 regardless of whether there was permission to download the

21 patches for Software A, the breach now, then, occurs

22 subsequently when those are used to go support a customer

23 that's not Merck.  And so at that point the agreement that "I

24 will only use this for the customer whose credentials I was

25 using" is breached.

1          Now -- so there's different ways this breach occurs.
2    And in the Software B case, where the download is of -- in the
3    first instance, in breach of the terms of use materials for
4    which that customer is not licensed California law, code says
5    that if in bad faith you know that you don't have that
6    permission you are directly liable.  You are liable as a
7    principal.  And that's exactly what he have alleged.
8          THE COURT:  Okay.  All right.  And lastly, the unjust
9    enrichment.
10          MR. LANIER:  Your Honor, may I have one sentence on
11    that breach of contract?
12          Look behind the word "use," because all of the
13    things that Mr. Howard alleges are -- these are the other
14    things that were then later the breach of contract are
15    copying: cross-use is copying, providing it to someone else
16    and using it for someone else -- it's a copy.  This is
17    software.  It's copying.
18          The only non-preempted claims that could be subject
19    to breach of contract are access claims for which there's a
20    remedy, but nothing else, your Honor.
21          MR. HOWARD:  That just isn't true, your Honor.  We've
22    alleged research, training --
23          THE COURT:  I don't want to hear anymore.
24          All right.  Unjust enrichment.  I'm not so sure
25    there's any real dispute.  You both agree that unjust

1  enrichment is not necessarily a separate cause of action.

2  It's really a theory of recovery.

3         Clearly, the -- Oracle's entitled to plead both

4  contract and unjust enrichment, which is synonymous with

5  restitution as an alternative theory.  I don't believe

6  there's any dispute that Oracle could not prevail or at least

7  could not recover under both theories.  Either there's

8  contract and tort, or there is unjust enrichment restitution,

9  but there's not both.

10        Is there any dispute to that?

11        MR. LANIER:  There's no dispute as to anything your

12  Honor just said.  We agree with all that.  But I would draw your

13  Honor's attention later to paragraph 220.  That's the core

14  paragraph on the unjust enrichment claim.

15        So what paragraph 220 establishes is that Oracle

16  has not pled in the alternative.  They've not pled

17  alternatively.  They've pled cumulatively.  That's what

18  they've done here.  They have pled that based on breach of

19  the agreements, based on interference, based on a trespass,

20  based on computer fraud, based on our legal claims we get

21  this additional remedy.  And they most clearly here do not

22  plead in the alternative, as an alternative to a claim for

23  breach of contract, as an alternative to a tort claim.

24        THE COURT:  That can be cured relatively easily.

25        MR. HOWARD:  Yeah, your Honor, I'm not even sure --

1 this is a standard form of pleading.  You're not -- there is

2 a -- they have said that the contract is unenforceable, and so

3 in that instance the unjust enrichment claim stands in its

4 stead.

5       To your Honor's question, I think there is an

6 agreement that nobody's entitled to double recovery.  The

7 question is whether the theory --

8       THE COURT:  Recovery under both a straight theory of

9 breach of contract and unjust enrichment.

10       MR. HOWARD:  For the same acts.

11       THE COURT:  For the same acts.

12       MR. HOWARD:  For the same acts.  So there may be acts

13 for which -- you know, they've said they're going to challenge a

14 whole bunch of things.  There may be acts for which your Honor

15 decides there is no contract or tort recovery, but we will still

16 have an unjust enrichment recovery.  We agree with that.

17       MR. LANIER:  And we agree with your Honor, this could

18 be -- this can be cured -- this is one that can be cured by

19 amendment, but this is not alternative pleading.  This is

20 cumulative pleading.  As they pled they are seeking an

21 additional remedy, not an alternative remedy.  That can be cured

22 by amendment.

23       MR. HOWARD:  Your Honor, I'm not sure that there is a

24 rule that says you have to say that it's in the alternative, and

25 I'm not sure that it necessarily is the case that it's only in

1  the alternative where we've alleged, as we are allowed to, that

2  there's the receipt of a benefit and there's the unjust

3  enrichment of the benefit.

4          That is -- in many ways there are alternative

5  theories that run through his Complaint as there are in any

6  other, and it depends on how the case proceeds whether and

7  which of those is going to proceed at trial.

8          But I think to say that it's purely an alternative

9  at this point -- it's not necessary.  But if that's the

10  Court's view I don't think it needs to be expressly stated in

11  the Complaint.

12          THE COURT:  I'll decide.  I kind of think that you

13  haven't really clearly pled restitution.  I'm not sure I

14  understand this particular claim in its entirety, but I'll take

15  another look at it.  I'll spend a little more time on the case

16  before we issue anything.

17          The difficulty -- I think that you've made some

18  very good arguments.  The real difficulty is that so many of

19  the arguments go to the heart of the dispute, and I'm not

20  sure that I'm comfortable at this juncture of the case -- it

21  seems more appropriate that some of the arguments you've

22  raised should be raised on a dispositive position, although

23  you all have submitted a lot of evidence on the 12(b)(1)

24  issues so there probably is sufficient evidence on a couple

25  of those.

1          But one of the other difficulties is, as was just

2  raised by counsel in the discussion on the breach of

3  contract, and that is that there are so many variations.

4          The Complaint is dense and very difficult to

5  follow.  I mean, you all have been living with this case for

6  years, and you probably know all the various different

7  permutations.  So I'm not sure that I understand -- well, I'm

8  sure I don't understand every way in which Oracle is alleging

9  that the agreements were abused and all the other various

10  ways in which they are arguing their intellectual property

11  was violated by a whole host of conduct.  It's not just one

12  act -- one contract, one act.

13          So I'm not sure that I understand it all enough to

14  give you the kind of relief you're seeking on all of these,

15  although I think there are a couple I can easily resolve -- a

16  couple of issues that can be resolved.

17          In any event, though, I'll take the matter under

18  submission.

19          MR. LANIER:  Very well.  Happy Thanksgiving, your

20  Honor.

21          MR. HOWARD:  Happy Thanksgiving.

22          MR. LANIER:  Thank you.  Your Honor.

23                    (End time: 10:22 a.m.)

24

25

## CERTIFICATE OF REPORTER

I, CHRISTINE TRISKA, Pro-Tem Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in 07-CV-01658 PJH, Oracle Corporation et al., v. SAP AG et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/S/ CHRISTINE TRISKA____ _____

Christine Triska, CSR 12826, RPR

Tuesday, December 9th, 2008