BINGHAM McCUTCHEN LLP
DONN P. PICKETT (SBN 72257)
GEOFFREY M. HOWARD (SBN 157468)
HOLLY A. HOUSE (SBN 136045)
ZACHARY J. ALINDER (SBN 209009)
BREE HANN (SBN 215695)
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: (415) 393-2000
Facsimile: (415) 393-2286
donn.pickett@bingham.com
geoff.howard@bingham.com
holly.house@bingham.com
zachary.alinder@bingham.com
bree.hann@bingham.com

DORIAN DALEY (SBN 129049)
JENNIFER GLOSS (SBN 154227)
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone: (650) 506-4846
Facsimile: (650) 506-7114
dorian.daley@oracle.com
jennifer.gloss@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International Corporation, and
Oracle EMEA Limited

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE USA, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>SAP AG, *et al.*,<br><br>Defendants. | CASE NO. 07-CV-01658 PJH (EDL)<br><br>**DECLARATION OF ZACHARY J. ALINDER IN SUPPORT OF ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY CONCERNING THIRD PARTY SUPPORT PROVIDED BY ORACLE'S PARTNERS**<br><br>Date: February 10, 2009<br>Time: 2 p.m.<br>Place: Courtroom E, 15th Floor<br>Judge: Hon. Elizabeth D. Laporte |

I, Zachary J. Alinder, declare as follows:

1. I am an attorney licensed to practice law in the State of California and am a partner at Bingham McCutchen LLP, counsel of record for plaintiffs Oracle USA, Inc., Oracle International Corporation and Oracle EMEA Ltd. (collectively, "Oracle"). I have personal knowledge of the facts stated within this Declaration and could testify competently to them if required.

2. Following service of Oracle's Responses to TomorrowNow's First Set of Requests for Production of Documents and Oracle's Responses to TomorrowNow's First Set of Interrogatories, the parties met and conferred. I was involved in those conferences. Initially, during these meet and confer discussions, Defendants took the position that Oracle's responses to certain of their requests should include Oracle's Partners, similar to CedarCrestone. Oracle disagreed, and in response to Defendants' overbroad discovery requests, Oracle properly objected and limited its responses to relevant information concerning independent third party support providers, like SAP TN. Though, for example, Oracle's policies towards other third party competitors are also at-best tangential to what Defendants did here, Oracle nonetheless agreed to produce information on that topic. Following several weeks of meet and confer discussions, Defendants agreed that Oracle could limit certain discovery to these independent support providers (confirmed in a December 12, 2007 and January 4, 2008 meet and confer correspondence). During a meet and confer session on January 10, 2008 that I was involved in, Defendants switched course and demanded that Oracle identify and produce information about Oracle's Partners as well.

3. Attached as Exhibit 1 is a true and correct copy of the relevant excerpted pages from Defendants' Letter Brief in Support of their First Motion to Compel, dated January 28, 2008, including pages 1, 3-6 and 9. Attached as Exhibit 2 is a true and correct copy of the relevant excerpted pages from Oracle's Letter Brief in Opposition to Defendants' First Motion to Compel, dated February 7, 2008, including pages 1, 4-8 and 13.

4. Attached as Exhibit 3 is a true and correct copy of certain relevant pages from the unofficial transcript of the August 28, 2008 Discovery Conference, including pages 60-

1   62 of that transcript, transcribed from an audio CD from the Court.

2        5.     Oracle served CedarCrestone with a subpoena *duces tecum* on October 31,

3   2008.  This was one of several subpoenas served on the companies that Defendants had

4   identified as having received information from them in connection with the potential purchase of

5   SAP TN.  The intended scope of the subpoena was to be limited to (i) CedarCrestone's

6   consideration of investment in, and possible acquisition of, TomorrowNow, including due

7   diligence documents, communications concerning such due diligence documents, and (ii) any

8   representations that were made in connection with negotiations between Defendants and

9   CedarCrestone, particularly relating to any liability issues.  We mistakenly included in that

10   subpoena other topics relating to the provision of software support for Oracle products by

11   CedarCrestone, having served roughly 100 third party subpoenas.  Even so, the subpoena did not

12   seek "partner" information from CedarCrestone.  Further, I have been informed by my partner,

13   Geoff Howard, that when queried by Defendants about the scope of the subpoena, Mr. Howard

14   explained to Defendants' counsel on a conference call shortly after Oracle withdrew the

15   subpoena (referred to in paragraph 15 of the McDonell Declaration in support of the motion)

16   about the mistake and indicated that Oracle had intended the subpoena to only cover the two

17   acquisition-related topics described above.  On January 9th, my colleague, Lucia MacDonald,

18   sent CedarCrestone's counsel a corrected subpoena limited to the acquisition topics and

19   requested that CedarCrestone accept service of the corrected subpoena.

20        6.     Attached as Exhibit 4 is a true and correct copy of the Oracle website page

21   related to CedarCrestone located at <http://solutions.oracle.com/partners/cedarcrestone>

22   containing the following excerpt: "CedarCrestone is the largest, dedicated PeopleSoft Enterprise

23   Systems Integrator….With 24 PeopleSoft Enterprise applications in production, CedarCrestone

24   invests heavily in the vision of Oracle."

25        7.     Attached as Exhibit 5 is a true and correct copy of a CedarCrestone

26   website page located at <http://www.cedarcrestone.com/about-corporate.php> stating that

27   CedarCrestone "provid[es] consulting, technology, and managed services for full life-cycle

28   solutions designed to optimize Oracle applications."

1    8.    Attached as Exhibit 6 is a true and correct copy of certain relevant pages

2 from the unofficial transcript of the January 8, 2009 Discovery Conference, including pages 54-

3 55 of that transcript, transcribed from an audio CD from the Court.

4    9.    Attached as Exhibit 7 is a true and correct copy of the website page

5 located at <http://www.sap.com/usa/ecosystem/partners/partnerwithsap/index.epx>, which

6 describes SAP's substantial partner network, including nine different broad categories of

7 partners.  Attached as Exhibit 8 is a true and correct copy of the website page located at

8 <http://www.sap.com/usa/ecosystem/customers/directories/technology/ oracle/index.epx>, which

9 discusses SAP's partnership with Oracle.

10    I declare under penalty of perjury under the laws of the United States that the

11 foregoing facts are true and correct, and that this Declaration was executed on January 23, 2009,

12 in San Francisco, California.

13

14                                          Zachary J. Alinder

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 • FACSIMILE: 415-875-5700

Direct Number: (415) 875-5820
jmcdonell@JonesDay.com

January 28, 2008

**HIGHLY CONFIDENTIAL INFORMATION – ATTORNEYS' EYES ONLY**

**VIA EMAIL AND HAND DELIVERY**

Hon. Charles A. Legge (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

      **Re:**    ***Oracle Corporation, et al. v. SAP AG, et al.***
              **Defendant's Motion to Compel No. 1**

Dear Judge Legge:

    Pursuant to the Stipulation Re Special Discovery Master Hearing and Briefing Procedures, TommorowNow, Inc. ("TN") submits this first motion to compel.[1]

## INTRODUCTION

    "Third-party support" companies like TN compete with Oracle in providing support for PeopleSoft and JDE applications at lower prices than Oracle charges. Oracle is well-aware of the third-party support market and, in fact, has provided training to employees of third-party support companies, including TN, even after this case was filed. And, as Oracle conceded in its First Amended Complaint (the "Complaint"), the companies that provide third-party support may access Customer Connection to download SSMs on behalf of their customers.

---

2. **Third-Party Support (Requests Nos. 29-34 & 39-40, Interrogatory No. 9)**

TN's Document Requests Nos. 29-34, 39 and 40 and Interrogatory No. 9 seek information concerning third-party support of Oracle's products. In response to Interrogatory No. 9, Oracle identified five companies (including TN and Rimini Street) that provide third-party support. Oracle concedes that there are other companies that support its products, but has refused to identify them on the fuzzy ground that they are "partners" with Oracle and not "pure play" third-party support providers. For the same reasons that Oracle agreed to identify the pure-play support providers, Oracle should identify *all* third parties that support the Oracle products that are at issue in this case.[5] The fact that Oracle's so-called "partners" perform functions in addition to third-party support is irrelevant and does not immunize Oracle from discovery into those support activities.

---

[5] Publicly available sources indicate that Oracle has failed to identify at least the following companies that support its products: Systime, U. S. Internetworking, Legacy Mode, CederCrestone, Optimum Solutions, Conexus Partners, Klee Associates, and Ciber, Inc.

The case of Rimini Street illustrates the importance of this discovery. Based on an interview with Rimini Street's CEO published shortly after Oracle filed this lawsuit, an industry analyst noted that Rimini Street provides "nearly identical services as TN." He wrote that Oracle's security on its customer support website is extremely lax, allowing "anyone with a user ID to download any and all materials on the site, even those that Oracle is claiming in the lawsuit were outside of a particular customer's license rights." The article goes on to point out that "Oracle does not appear to immediately disable user IDs and access to Oracle's customer portal upon expiration of a customer's support contract" and that such "poor information security and lack of access controls might be a defense for SAP in this lawsuit." Given this backdrop, defendants are naturally interested in Oracle's activities in connection with the third-party support market.

Requests 30-31 seek documents relating to Oracle's communications with Rimini Street concerning third-party support, including communications regarding defendants. In response, Oracle is only willing to produce communications between Oracle and Rimini Street *about* SAP TN and the allegations of the Complaint.[6] That is an artificial limitation and prevents defendants from learning Oracle's policies and practices with respect to this similarly situated third-party support provider.

Requests Nos. 32-34 seek documents relating to Oracle's position on the proper methods of providing third-party support, including communications with third parties and industry analysts. In response, Oracle is only willing to produce "policies regarding the propriety of SAP TN providing third-party support or maintenance for legacy J.D. Edwards and PeopleSoft software applications . . ." and communications with industry analysts discussing TN. *Id.*, pp. 4-5. Again, that is a very narrow response and effectively conceals from discovery Oracle's third-party support policies and practices.

Request No. 39 seeks documents relating to Oracle's denial of access to its online services (*e.g.*, the Customer Connection website) to customers or third-party support providers based on conduct. Oracle has refused to produce such documents, except as to the Identified Customers.[7] Request No. 40 seeks documents relating to any occasions on which Oracle has granted access to any Oracle online service to a third-party support provider for the purpose of providing third-party support or maintenance services. Oracle has only agreed to produce any such express written agreements.

All of these discovery requests relating to third-party support are appropriate because they may shed light on the meaning and scope of Oracle's license agreements and, to the extent that Oracle has approved of or acquiesced in similar activities by other third-party support vendors, it could support defenses based on acquiescence, abandonment and consent.

The interpretation of Oracle's licenses is squarely at issue. Because those agreements are rife with ambiguities, extrinsic evidence is relevant and discoverable. For example, one of Oracle's form license agreements provides that access to Oracle's "software" may be given to employees of the customer as well as to "independent contractors engaged by Customer who

---

[6] Letter, Alinder to McDonell, January 4, 2008 [erroneously dated "January 4, 2007"], p. 4.

[7] Oracle's limitation to the Identified Customers is inappropriate for the reasons set forth in connection with the discussion of that issue, above.

require access to the Software to perform their tasks . . . ." Elsewhere, the same agreement provides that "Customer shall not, or cause anyone else to . . . copy the Documentation or Software except to the extent necessary for Customer's archival needs and to support the Users." On the strength of these provisions, it would appear that TN, as an "independent contractor" that was supporting the customer's "Users" acted within its customer's rights in accessing SSMs. Yet Oracle claims that TN acted outside the scope of the license agreements and infringed its copyrights by accessing such material. While not all of the JD Edwards and PeopleSoft licenses are identical, many of them appear to be form agreements that were only modestly customized. Accordingly, Oracle's course of conduct with respect to these agreements could be probative of their meaning.

"Relevant parol evidence is always admissible to assist in the determination of what the words used in the contract mean." *See, e.g., Cibrio Petroleum Products, Inc. v. Sohio Alaska Petroleum Co.,* 602 F.Supp. 1520, 1545-1546 (D.C.N.Y. 1985) (summarizing "hornbook law"). In determining the admissibility of a party's business relationship with a third-party, courts have found that "a party's business transactions with third parties is relevant to prove the meaning of a contract in appropriate cases." *Id.* at 1551 (reviewing party's contracts with non-parties because of similarity in the contracts) (citing J. Weinstein & M. Berger, *Weinstein's Evidence,* 406(03) at 406-18 (1982)). In *Cibrio,* the court also surveyed other Circuits and concluded they were in agreement as to the admissibility of such evidence. Additionally, the D.C. Circuit, in an opinion by then-Judge Scalia, held:

> "While the interpretation given to the same contract by one of the parties in its dealings with third parties is not similarly persuasive [as the interpretation given to it by the parties], in a case such as this *it has some weight-as demonstrating the past interpretation of at least one of the parties, and also suggesting the reasonableness of the interpretation since it has been accepted by others."*

*Tymshare, Inc. v. Covell,* 727 F.2d 1145 (D.C. Cir. 1984) (constructing an ambiguous sales commission contract, in part, by referencing one party's application of similar contracts with third parties) (emphasis added).[8]

---

[8] Evidence treaties are in accord. For example, *McCormick on Evidence* § 198 (6th Ed. 2006) explains what an "appropriate case" may be for purposes of reviewing business agreements with third parties:

> "It seems clear that contracts of a party with third persons may show the party's customary practice and course of dealing and thus supply useful insights into the terms of the present agreement. Indeed, even if there are but one or two such contracts, they may be useful evidence. When, in a certain kind of transaction, a business has adopted a particular mode of handling a bargaining topic or standardized feature, such as warranty, discount or the like, it is often easier for it to cast a new contract in the same mold than it is to work out a new one. Moreover, some practices become so accepted in an industry that they may shape the meaning of most contracts in that field. As to these, evidence in the form of contracts or transactions involving neither of the parties may nevertheless be probative of the commercial relationship that exists between the parties.

*Id.* (citations omitted). *See also* J. Weinstein & M. Berger, *Weinstein's Evidence,* 406(03) at 406-18 (1982).

The third-party support market is also relevant to the issue of damages. Oracle alleges that it lost customers as a result of improper downloads and "cross-use" of its intellectual property. That puts into issue the extent to which Oracle lost business to other third-party service providers and derivatively how those companies were doing business. It would be misleading and artificial for Oracle to pretend that it only lost customers to TN and only because of the allegedly excessive downloading by TN. Evidence that Oracle lost business to other third-party support providers will be directly relevant to prevent Oracle from taking that misleading position. It is also relevant to determine whether Oracle would have lost some or all of those customers to some other support vendor regardless of whether TN was in business

Under the Copyright Act, actual damages represent the injury to the market value of the copyrighted work at the time of infringement. 4 *Nimmer on Copyright* § 14.02(a) at 14-13 to 14-14. In appropriate circumstances, this amount is computed by determining what profits would have accrued to plaintiff *but for* the infringement. *Nimmer* §14.02(a)(1) at 14-14. Therefore, a plaintiff bears the burden of proving a *causal connection* between the infringement and actual damages, a requirement which is "akin to tort principles of causation and damages." *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004).[9] Thus, evidence that TN's customers could have or would have left Oracle with or without TN's activities presents a defense and discovery must be permitted into that area.

In searching for responsive documents, Oracle should be required, among other things, to search files related to *United States v. Oracle*, 31 F. Supp. 2d 1098 (N.D. Cal. 2004), which was the action by the Department of Justice seeking to prevent Oracle's acquisition of PeopleSoft on antitrust grounds. It stands to reason that Oracle would have collected and created documents concerning the market for third-party support in connection with that matter.

---

[9] In *Polar Bear*, plaintiff granted defendant a license to use their video footage of extreme kayakers. Defendant exceeded the scope of the license, and plaintiff brought a §504(b) action. Plaintiff argued that but for defendant's infringement, it would have earned the necessary funds to produce other outdoor adventure videos which would have yielded profits. The court rejected this theory of liability as "too pie-in-the-sky" and found that plaintiffs failed to establish a legally sufficient causal link between infringement and damages.

### CONCLUSION

For the foregoing reasons, TN's motion to compel should be granted.

Very truly yours,

Jason McDonell

cc:    Christopher B. Hockett, Esq. (via email)
       Geoffrey Howard, Esq. (via email)
       Zachary Alinder, Esq. (via email)
       Holly House, Esq. (via email)
       Bree Hann, Esq. (via email)

**EXHIBIT 2**

# BINGHAM

Christopher B. Hockett
Direct Phone: 415.393.2612
Direct Fax: 415.393.2286
chris.hockett@bingham.com

February 7, 2008

**Via Hand Delivery**

**Contains Information Designated Confidential Pursuant to Protective Order**

Hon. Charles A. Legge (Ret.)
JAMS
Two Embarcadero Center
San Francisco, CA 94111

Re:   *Oracle Corp., et al. v. SAP AG, et al.*: **Oracle's Opposition to Defendants'
      Motion to Compel No. 1**

Dear Judge Legge:

Plaintiffs Oracle Corporation, et al. ("Oracle") submit this letter brief in opposition to
Defendants' January 28, 2008 motion to compel.

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington


Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA
94111-4067

T 415.393.2000
F 415.393.2286
bingham.com

> **C.     Defendants' Requests For Third-Party Support Information Are Overbroad, Unrelated To A Claim Or Defense, And Unduly Burdensome (Requests 29-34 & 39-40, Interrog. 9)**

Defendants next seek to compel information relating to "all" third-party support for Oracle products. Through this discovery, Defendants are again attempting to maximize discovery burdens on Oracle by reaching far beyond the elements of any claim or defense. Nothing in this case relates to the "market" for third-party support. This case is about Defendants' unlawful access to, and downloading from, Oracle's password-protected website and their use of those downloaded materials.

Oracle's relationships with other third-party support providers, including the companies with whom Oracle may contract to provide support for its customers, have nothing to do with Oracle's copyright and theft allegations or any defenses to those claims. *Nugget Hydroelectric v. PG&E*, 981 F.2d 429, 438-39 (9th Cir. 1992) (upholding denial of broad discovery as to PG&E's relationships with other private power suppliers, because only a fraction would be relevant to the claim). When confronted with Defendants' overbroad discovery requests, Oracle properly objected, and limited its responses to the SSMs and other topics at issue in the litigation. *See, e.g., Surfvivor Media*, 406 F.3d 625, 629 & 635 (9th Cir. 2005) (proper to limit request for discovery on all of defendant's product types to only those product types affirmatively identified by plaintiff in trademark case). Such limitations give life to Rule 26(b)'s requirement that discovery be "reasonably calculated to lead to the discovery of admissible evidence."

> **1.     Oracle Properly Limited Or Objected To Each Request**

> **a.     Partner Documents (Request 29 and Interrog. 9)**

Request 29 and Interrogatory 9 seek identification of all companies that provide third-party support for any Oracle product referred to in the Complaint or at issue in this litigation. None of this information relates to whether Defendants stole Oracle's copyrighted software, or any conceivable defense to those allegations. However, in an effort to forestall motion practice, Oracle did respond with information about independent "third-party support" companies with business models similar to SAP TN -- as opposed to third parties that enter into Oracle partner agreements and *pay Oracle* for the right to provide support.[3]

Through several weeks of meet and confer correspondence and discussions, Defendants agreed to this limitation, which Oracle confirmed in its January 4th meet and confer letter. On January 10th, Defendants reversed course and demanded that Oracle also identify and produce information about Oracle's *partners* that provide support, such as Accenture. Defendants have provided no rationale for extending discovery to companies that partner with Oracle, rather than

---

[3]     Moreover, most of these partners are located in remote areas outside of the United States, where it makes less sense for Oracle to provide support – and which makes these partners even less relevant.

compete directly with Oracle, like SAP TN does. *In re Fontaine*, 402 F. Supp. 1219, 1221 (E.D.N.Y.1975) (discovery standard "is not so liberal as to allow a party 'to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.'"). Defendants say only that "Rimini Street illustrates the importance of this discovery." Motion at p. 4. They then discuss an interview with Rimini Street's CEO.

This example does not help Defendants' position, since Rimini Street is within the category of third-party vendors about which Oracle did in fact agree to produce certain information. More to the point, as discussed further below in part b., Oracle's conduct with, views about, and information regarding Rimini Street – or any other third-party support provider – do not relate to any claim or defense in this case. This case is about Defendants' theft and misuse of Oracle's intellectual property. The Court should reject Defendants' invitation to broaden discovery to areas that would not logically lead to the discovery of admissible evidence, such as Oracle's relationships with its "partners."

> **b.** **Information About Rimini Street Is Not Related To A Claim Or Defense (Requests 30-31)**

Requests 30-31 seek all documents relating to Oracle's communications with SAP TN's competitor, Rimini Street. This is a fishing expedition by Defendants in the hopes that they can uncover information to support their continuing public relations campaign against Oracle, framing this lawsuit as, in SAP CEO Henning Kagermann's words, nothing more than an attempt "to limit customer choices by trying to discredit their competition." While Oracle agrees that Defendants are entitled to compete fairly with Oracle, they cannot do so by stealing Oracle's intellectual property. And that is what this case is about. Accordingly, none of the requested Rimini Street materials relate to the allegations that Oracle has made in the Complaint, nor could they support Defendants' defenses. Although it had no obligation to do so, to avoid motion practice, Oracle agreed during meet and confer to produce communications between Oracle and Rimini Street about SAP TN and the allegations of Oracle's Complaint. Defendants now object to this offer on the ground that it prevents them from "learning Oracle's policies and practices with respect to this similarly situated third-party support provider." That is a non sequitur. Even if Oracle had policies and procedures specific to Rimini Street (it does not), whether Oracle treats Rimini Street differently than SAP TN has no relevance to the claims here and does not support any defense that Defendants could mount.

Defendants have also suggested that Oracle's conduct with Rimini Street may support an estoppel or waiver defense. These arguments fail as a matter of law. *See, e.g., Paramount Pictures Corp. v. Carol Publishing Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998) ("Extending the doctrine of estoppel so that a defendant may rely on a plaintiff's conduct toward another party is both unsupported by law and pernicious as a matter of policy."); *see also Capitol Records, Inc. v. Naxos of America, Inc.*, 372 F.3d 471, 484 (2d Cir. 2004) ("[F]ailure to pursue third-party infringers has regularly been rejected as a defense to copyright infringement or as an indication of abandonment."); *Novell, Inc. v. Weird Stuff, Inc.*, 0094 WL 16458729, n. 15 & 17 (N.D. Cal. 1993) (holding acquiescence/estoppel theory as to third parties not a defense to copyright infringement). Defendants cannot justify any additional Rimini Street discovery and the Court should deny their motion on this subject.

> **c.** **Oracle's Third-Party Support Policies Do Not Relate To A Claim Or Defense (Requests 32-34)**

Similar to the requests regarding Rimini Street, none of these three requests relates to any claim or defense. Defendants claim in their motion that Oracle's discovery limitations "conceal[] from

discovery Oracle's third-party support policies and practices." Oracle's actions with other third parties cannot form the basis for a defense to Oracle's specific allegations that Defendants downloaded unlicensed SSMs and misused them as part of Defendants' competition with Oracle. Despite the lack of relevance, Oracle again offered far more than the law requires.

Request 32 seeks "Oracle's position regarding the propriety of providing third-party support or maintenance for Oracle products or the permissible methods for doing so." The only documents that would show "Oracle's position" on the propriety of SAP TN's support methods are any part of the customer license agreements that may address a customer's rights or limitations regarding third-party support and Oracle policies regarding the propriety of SAP TN's use of the SSMs, including any Terms of Use provided on Oracle's support website. Oracle has agreed to search for and produce these documents. Oracle should be required to go no further.

Request 33 seeks communications between "Oracle and any third party, including customers, industry and other analysts, and third-party support or maintenance vendors concerning permissible methods of third-party support." A request for communications between *any* third party and Oracle – a company with over 69,000 employees – is overbroad and unduly burdensome on its face. And, as discussed above, Oracle already agreed to produce the customer contracts and Oracle policies concerning the propriety of SAP TN providing third-party support. Oracle also agreed to produce documents relating to customer negotiations and relevant communications in the customer contract files. For the reasons discussed above in section b., documents concerning other third-party support vendors cannot support Oracle's claims or Defendants' defenses here. Nevertheless, in meet and confer, Oracle also agreed to produce communications between Oracle and industry analysts discussing SAP TN – based on its understanding that Defendants would produce equivalent materials from their files. Defendants are entitled to no more.

Finally, Request 34 seeks communications between "Oracle and industry or other analysts concerning TN." This duplicates Request 33, as to which Oracle already agreed to provide communications with industry analysts discussing SAP TN. Defendants do not even attempt to explain how any analyst communications are relevant here (they are not), but regardless, Defendants should receive no more than Oracle has already offered.

    **d.**    **Denials And Grants Of Access To Oracle Online Support Services (Requests 39-40)**

Request 39 seeks all documents relating to any occasions on which Oracle has denied access to *any* Oracle website to *any* Oracle customer or third-party support provider. Oracle properly limited production pursuant to this request to the 69 customers whose credentials Oracle has determined Defendants improperly used to download SSMs, rather than "all" customers, as discussed above, in Section B. Expanding this request to "all" of Oracle's thousands of customers is certainly invasive, unduly burdensome and harassing. Further, Oracle has numerous websites. Defendants do not even attempt to explain how documents unrelated to the Oracle's customer support website – Customer Connection – could be relevant here (they are not). At base, Oracle's conduct with its own customers – including occasions on which Oracle has denied website access to its thousands of customers – has nothing to do with what Defendants may properly download. Therefore, this request seeks discovery unrelated to a claim or defense and imposes an unreasonable burden on Oracle – unless or until Oracle or Defendants can determine which additional customers beyond the initial 69 are relevant to this case.

Request 40 seeks all documents relating to any occasions on which Oracle has granted access to any Oracle website to a third-party support provider. Defendants do not even attempt to support

the relevance of this overbroad request. They cannot. As discussed above in Section b., documents broadly relating to third-party support do not relate to the claims or defenses here. Nevertheless, Oracle agreed to provide documents relating to occasions on which it has entered into an express, written agreement with a third-party support provider relating to access to Customer Connection (the Oracle website at issue in this litigation). Oracle's response is more than sufficient here.

2.    **Defendants' New Arguments Regarding Parol Evidence, Cross-Use and Copyright Damages Do Not Justify Broad Third-Party Support Discovery**

Despite months of meet and confer on these subjects, Defendants argue in their motion for the first time that this third-party support discovery is justified (a) as "parol evidence," (b) because of "cross-use" allegations, or (c) as copyright damages discovery. Even though Defendants never made these arguments to Oracle, none of them withstands any scrutiny.

First, Defendants assert that broad third-party support discovery would help them interpret Oracle's customer contracts. This parol evidence argument makes no sense and is unsupported by the law. Defendants claim that an independent contractor provision in an unidentified "form agreement" contradicts "claims that TN acted outside the scope of the license agreements...." Motion at p. 4-5. Nothing could be further from the truth. Oracle alleges that Defendants went beyond the customer license agreements by accessing and copying SSMs that the customer itself, let alone an independent contractor servicing that customer, was never licensed to receive. Further, Defendants' argument is therefore nonsensical. Defendants have already admitted to copying unlicensed support materials for their customers, <u>according to their own records</u>. In any event, as discussed above, Oracle is already providing documents relating to the customer contracts and third-party support. In sum, no discovery can be justified on parol evidence grounds, but even if that were not the case, it would be cumulative or duplicative of that which Oracle has already agreed to produce.

Neither of Defendants' case citations – *Cibro Petroleum* and *Tymshare* – supports their "parol evidence" argument. Both stand for the unremarkable proposition that, when interpreting an ambiguous contract, a court may give "some weight" to parol evidence concerning the contracting parties' course of dealings. *See Cibro Petroleum Prods., Inc. v. Sohio Alaska Petroleum Co.*, 602 F. Supp. 1520, 1546 (D.C.N.Y. 1985) (allowing extrinsic evidence with respect to specific, ambiguous contract language capable of contradictory interpretations); *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1151-52 (D.C. Cir. 1984) (giving "some weight" to prior dealings that employer had with another employee in interpreting the reasonableness of employer's conduct with plaintiff). It does not follow, however, that parol evidence concerning Oracle's relationship with unspecified third-party support vendors is relevant to interpreting Oracle's contracts with its own customers. Their parol evidence argument is baseless.

Neither can Defendants justify their overbroad third-party support requests as damages discovery. Their first damages discovery theory is that damages from their theft of Oracle's intellectual property and cross-use of those materials "puts into issue the extent to which Oracle lost business to other third-party service providers and derivatively how those companies were doing business." First, Oracle has never claimed, contrary to Defendants' assertion, that it has only lost customers to SAP TN. But, whether another third-party support provider took customers from Oracle is irrelevant to the claims and defenses here (*see* Section b. above). The issue here is whether Defendants acquired customers by offering stolen intellectual property and support services provided through the use of that stolen intellectual property. Whether Oracle lost customers to other third-party support providers has nothing to do with this case.

Defendants have no legal support for spinning their own unlawful acts into a need for market research into their competitors. There is none.

Defendants' second damages argument is that third-party support information is relevant to damages under 17 U.S.C. § 504. This argument is similarly unsupported by the law. Under 17 U.S.C. § 504(a), a party suing for copyright infringement may elect either statutory damages, § 504(a)(2), or "the copyright owner's actual damages and any additional profits of the infringer." 17 U.S.C. § 504(a)(1). Here, Oracle has claimed actual damages and the infringer's profits. To do so, Oracle "is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." § 504(b). Nowhere in § 504(b) is an infringer presented with the opportunity to reduce damages by a showing of the copyright holder's inevitable losses. Defendants' speculation that customers would have left Oracle regardless of their unlawful acts is not a defense to any of the claims here. And even if it were, that would at most support discovery concerning the customers that Defendants took using Oracle's support materials – discovery that Oracle has agreed to provide.

In short, none of Defendants' newly-conceived theories of relevance has any merit.

### 3. Defendants' Request To Search Files Related To Oracle's 2004 Antitrust Case Is An Unreasonable Fishing Expedition

Finally, the Court should reject Defendants' suggestion that Oracle search files related to *United States v. Oracle*, 31 F. Supp. 2d 1098 (N.D. Cal. 2004). The investigation of Oracle's acquisition of PeopleSoft by the Department of Justice does not relate in any way to the allegations of infringement and theft here. First, there is no basis to disregard the Parties' agreement to limit discovery to documents created on or after January 1, 2004. Second, Defendants' speculation that relevant documents may exist in the files of an antitrust lawsuit decided four years ago does not justify compelling any discovery. And Defendants provide no justification beyond that rank speculation. Regardless, as discussed above in sections b. and c., documents concerning the "market" for third-party support are not relevant to any claims or defenses here. This request is a thinly-veiled attempt to distract from Defendants' own admitted intellectual property theft and to make Oracle waste time and effort searching irrelevant files (time that Oracle does not have to waste, due to the expedited discovery schedule argued for by Defendants). This request is improper. The motion to compel should be denied.

### III. CONCLUSION

For the foregoing reasons, Oracle respectfully requests that Your Honor deny Defendants' motion to compel.

Sincerely yours,

Christopher B. Hockett

cc: Robert Mittelstaedt (via email only)
Jason McDonell (via email only)
Greg Lanier (via email only)
Scott Cowan (via email only)
Joshua Fuchs (via email only)

**EXHIBIT 3**

PAGES 1 - 76

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ELIZABETH D. LAPORTE, MAGISTRATE JUDGE

ORACLE CORPORATION, ET AL.,    )
                               )
                               )
        PLAINTIFFS,            )
                               )
VS.                            )   NO. C07-1658 PJH (EDL)
                               )
SAP AG, ET AL.,               )
                               )   SAN FRANCISCO, CALIFORNIA
        DEFENDANTS.           )   THURSDAY
                               )   AUGUST 28, 2008
_____)  9:00 O'CLOCK A.M.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:

BINGHAM MCCUTCHEN LLP

THREE EMBARCADERO CENTER

SAN FRANCISCO, CALIFORNIA  94111-4067

BY: GEOFFREY M. HOWARD, ESQUIRE AND

    DONN PICKETT, ESQUIRE AND

    HOLLY HOUSE, ATTORNEY AT LAW

262-9212

AND

JENNIFER GLOSS, SENIOR CORPORATE COUNSEL

ORACLE

500 ORACLE PARKWAY

REDWOOD SHORES, CALIFORNIA 940656

650-506-7114

FURTHER APPEARANCES ON NEXT PAGE

REPORTED BY:    KATHERINE WYATT, CSR #9866, RMR

        OFFICIAL REPORTER - U.S. DISTRICT COURT

---

FURTHER APPEARANCES:

FOR DEFENDANTS:

JONES DAY

555 CALIFORNIA STREET

26TH FLOOR

SAN FRANCISCO, CALIFORNIA  94104-1500

BY: JASON MCDONELL, ESQUIRE AND

    ELAINE WALLACE, ATTORNEY AT LAW

AND

JONES DAY

717 TEXAS

SUITE 3300

HOUSTON, TEXAS 77002-2712

BY: SCOTT W. COWAN, ESQUIRE

AND

JONES DAY

1755 EMBARCADERO ROAD

PALO ALTO, CALIFORNIA 94303

BY: JANE FROYD, ATTORNEY AT LAW

---

3

1           P R O C E E D I N G S

2

3   AUGUST 28, 2008,        9:00 O'CLOCK AM

4           THE CLERK:  CALLING CIVIL 07-1658, ORACLE CORPORATION

5   VERSUS SAP AG, ET AL.

6           COUNSEL PLEASE STATE YOUR APPEARANCES FOR THE RECORD.

7           MR. HOWARD:  GOOD MORNING, YOUR HONOR.  GEOFF HOWARD

8   FOR ORACLE.  WITH ME JENNIFER GLOSS FROM ORACLE, AND MY PARTNERS

9   HOLLY HOUSE AND DONN PICKETT.

10          THE COURT:  GOOD MORNING.

11          MR. MCDONELL:  GOOD MORNING, YOUR HONOR.  JASON

12  MCDONELL FROM JONES DAY FOR DEFENDANTS.  ALSO HERE FROM JONES

13  DAY IS SCOTT COWAN, ELAINE WALLACE AND JANE FROYD.

14          AND FROM THE SAP LEGAL DEPARTMENT ARE KEVIN HAMEL AND

15  JOHN HICKEY, BOTH OF WHOM HAVE BEEN HERE BEFORE.

16          THE COURT:  ALL RIGHT.  GOOD MORNING.

17          ALL RIGHT.  SO LET'S GO THROUGH THE UPDATE, AND THEN

18  WE WILL ALSO ADDRESS THE MOTION ON THE CLAWED BACK.

19          SO WHERE ARE THINGS ON SAMPLING AND EXTRAPOLATION?

20          MR. HOWARD:  THANK YOU, YOUR HONOR.  WE HAVE HAD

21  EXTENSIVE DISCUSSIONS, AS REPORTED.  THERE IS, I WOULD SAY, BAD

22  NEWS AND GOOD NEWS.  THE BAD NEWS IS THAT IN THE EFFORT TO FIND

23  A STATISTICALLY-VALID METHODOLOGY TO SAMPLE THE VAST AMOUNT OF

24  DATA, WE, AT LEAST, CAME TO THE CONCLUSION -- AND I'LL LET MR.

25  COWAN SPEAK FOR HIMSELF, BUT I THINK HE MAY AGREE -- THAT JUST

---

4

1   THAT, JUST A STATISTICALLY-VALID SAMPLE AND TO FIND THE FACTS

2   FROM THAT SAMPLE THAT ARE RELEVANT AND THAT WE WOULD WANT TO GET

3   WOULD EFFECTIVELY CONSUME ALL OR MORE OF THE DISCOVERY LIMITS

4   THAT YOUR HONOR HAS SET JUST IN THAT PART OF THE CASE.

5           THE COURT:  NOW, WHICH LIMITS WE TALKING ABOUT?

6           MR. HOWARD:  WE'RE TALKING ABOUT CUSTODIANS AND

7   HOURS, POTENTIALLY.

8           THE COURT:  DID I SET AN HOUR LIMIT?  YOU MEAN THE

9   HOURS IN DEPOSITIONS?

10          MR. HOWARD:  JUDGE HAMILTON SET AN HOUR LIMIT FOR

11  DEPOSITIONS.

12          THE COURT:  RIGHT.

13          MR. HOWARD:  NOBODY WANTS TO GO DOWN THAT ROAD

14  BECAUSE THERE OTHER AREAS OF THE CASE.  AND WE'VE BEEN TRYING

15  HARD TO FIND A WORKAROUND FOR THAT.  BUT ONCE YOU STEP BACK FROM

16  WHAT WOULD OTHERWISE BE A QUOTE/UNQUOTE "STATISTICALLY-VALID

17  METHODOLOGY," IT DOES CREATE SOME OTHER ISSUES.

18          SO THE DISCUSSIONS OF LATE HAVE FOCUSED ON STILL

19  IDENTIFYING A SET OF FIXES THAT WE'RE GOING TO -- AND DIVIDE

20  THEM UP INTO THE PROPER POPULATIONS, BECAUSE THEY DIFFER BY WHAT

21  RELEASE OF SOFTWARE IT IS; WHAT TIME PERIOD THE FIX WAS BEING

22  DEVELOPED IN, POTENTIALLY.

23          AND THOSE ARE POTENTIAL FILTERS.  AND THEN, TO TAKE

24  TESTIMONY THAT APPLIES TO THE PROCESS BY WHICH THOSE FIXES WERE

25  DEVELOPED AND AGREE THAT THAT TESTIMONY IS GENERALLY APPLICABLE

---

57

1    MS. WALLACE: THERE WAS ONE OTHER COPYRIGHT-RELATED
2    ISSUE THAT I WAS HOPING WE COULD GET SOME GUIDANCE FROM THE
3    COURT, BECAUSE IT MAY AVOID -- MAY AVOID US HAVING TO INCLUDE IT
4    IN A MOTION OR SERVE ADDITIONAL REQUESTS.
5    THE COURT: ALL RIGHT, IF IT'S BRIEF. AND WE STILL
6    HAVE TO DISCUSS THE FINANCIAL DOCUMENTS AND THIRD-PARTY SUPPORT,
7    WHICH WE HAVEN'T GOTTEN TO.
8    MS. WALLACE: I'LL MAKE IT VERY BRIEF. ESSENTIALLY,
9    ORACLE JUST FILED A SECOND-AMENDED COMPLAINT. AND IN THAT
10   COMPLAINT THERE ARE ADDITIONAL COPYRIGHT REGISTRATIONS.
11   WE HAVE ORACLE AT LEAST FOR THE MATERIALS THAT IT HAS
12   AGREED TO PRODUCE FOR THE REGISTRATIONS IDENTIFIED IN THE
13   FIRST-AMENDED COMPLAINT TO SUPPLEMENT ITS PRODUCTION SO THAT WE
14   HAVE THE SAME MATERIALS FOR THE NEW REGISTRATIONS IN THE
15   SECOND-AMENDED COMPLAINT.
16   MR. HOWARD: WE'RE GOING TO PRODUCE THOSE, YOUR
17   HONOR.
18   THE COURT: YOU ARE GOING TO PRODUCE THEM.
19   MR. HOWARD: YES.
20   THE COURT: SO WHEN?
21   MR. HOWARD: WE ARE EXPECTING TO HAVE A SUPPLEMENTAL
22   PRODUCTION SOMETIME IN THE NEXT COUPLE OF WEEKS. AND WE'RE
23   GOING TO INCLUDE THEM IN THAT PRODUCTION WHICH WILL HAVE SOME
24   OTHER COPYRIGHT-RELATED MATERIALS IN IT.
25   THE COURT: ALL RIGHT. THAT'S FINE. OKAY. SO LET'S

58

1    GO BACK TO THE FINANCIAL DOCUMENTS. I MEAN, I -- YOU KNOW,
2    AGAIN, IF THERE'S GOING TO BE ACTUAL PRODUCTION OF FINANCIAL
3    DOCUMENTS IN THE TARGETED SEARCHES, I'D BE INCLINED TO HOLD OFF
4    ON THE MOTION FOR A SHORT WHILE.
5    MR. MCDONELL: THESE DOCUMENTS THEY WILL NOT PRODUCE.
6    IF THEY SAY THEY WILL EVEN CONSIDER PRODUCING THEM, THAT'S A
7    DIFFERENT ISSUE.
8    THE COURT: IT'S SORT OF THE SAME RULING I DID
9    BEFORE. IN OTHER WORDS, IF YOU'RE GOING TO SAY TO THE TARGETED
10   SEARCHES:
11   "WE WON'T PRODUCE WHAT WE SAID WE'RE NOT GOING
12   TO PRODUCE IN RESPONSE TO THIS," THERE'S NO REASON TO
13   WAIT.
14   MS. HOUSE: ON THE BASIC LEVEL, AT THE WEEDS LEVEL
15   THAT I WAS DESCRIBING TO YOU, WE STILL HAVE NOT GOTTEN A SINGLE
16   PIECE OF CORRESPONDENCE THAT EXPLAINS --
17   THE COURT: WELL, THEN, YOU CAN FILE THAT MOTION.
18   MR. MCDONELL: OKAY.
19   THE COURT: BUT, YOU KNOW, SOUNDS TO ME FROM THE
20   DESCRIPTION THAT THIS IS GOING TO BE -- CALL FOR THE USUAL
21   SOLOMAN-LIKE RULING BY ME, WHICH IS THAT YOU'VE PROBABLY ASKED
22   FOR TOO MUCH AND THEY ARE PROBABLY GIVING YOU TOO LITTLE.
23   AND I'M SORT OF, YOU KNOW -- NOT EVERY ASPECT OF
24   ORACLE'S OPERATIONS ARE PROBABLY RELEVANT TO YOU. SO IF YOU'RE
25   ASKING FOR EVERYTHING THEY HAVE IN GRANULAR DETAIL, EVERY

59

1    DEPARTMENT, THAT WOULD SEEM TO BE TOO MUCH. THAT MAY NOT BE WHAT
2    YOU'RE ASKING FOR. I DON'T KNOW.
3    MR. MCDONELL: IT'S GOING TO BE AN ELECTRONIC REPORT
4    THAT CAN BE READ ELECTRONICALLY.
5    BUT, YOUR HONOR, WE WILL TAKE YOUR COMMENTS --
6    THE COURT: AND IF IT'S TOO BURDENSOME, I EITHER
7    WON'T ALLOW IT, OR I'LL SHIFT THE COST OF IT.
8    MR. MCDONELL: WE UNDERSTAND.
9    THE COURT: YES. BUT --
10   MS. HOUSE: COULD WE ALSO ASK FOR YOUR GUIDANCE THAT
11   WE COULD WORK ON A MUTUALLY-CONVENIENT SCHEDULE THAT TAKES INTO
12   ACCOUNT THE UPCOMING DEPOSITIONS AND THE TRAVEL AND ALL OF THE
13   OTHER THINGS THAT ARE BEING --
14   THE COURT: WELL, YOU OUGHT TO TAKE THAT INTO
15   ACCOUNT. AND I'LL HAVE TO LOOK AT MY OWN SCHEDULE, FRANKLY. I
16   MEAN, I'M GOING TO BE IN TRIAL PROBABLY FOR THE ENTIRE MONTH OF
17   OCTOBER. SO IT IS GOING TO BE A DIFFICULT MONTH FOR ME.
18   MR. MCDONELL: WE WERE GOING TO SUGGEST A FILING ON
19   SEPTEMBER 19, YOUR HONOR.
20   THE COURT: FOR A DATE OF 35 DAYS AFTER THAT? THAT'S
21   THE USUAL MOTIONS SCHEDULE.
22   MR. MCDONELL: THAT WOULD BE, ALTHOUGH IN THE MOTION
23   WE'VE JUST RESPONDED TO, IT WAS ON A MUCH MORE ACCELERATED --
24   THE COURT: I DON'T HAVE IN MIND A SCHEDULE RIGHT
25   NOW. YOU CAN -- YOU CAN PROPOSE ONE, AND I WILL DISPOSE

60

1    ACCORDING TO WHAT WILL WORK FOR MY SCHEDULE. I JUST CAN'T -- I
2    WANT YOU TO MEET AND CONFER. IF YOU CAN'T AGREE, YOU CAN
3    PROPOSE COMPETING SCHEDULES AND I'LL DECIDE WHAT SCHEDULE --
4    MR. MCDONELL: BY LETTER TO YOUR HONOR?
5    THE COURT: THAT'S FINE.
6    MR. MCDONELL: AND THEN, THE OTHER PIECE OF THIS THE
7    MOTION WOULD ALSO TAKE INTO ACCOUNT THE FOUNDATIONAL 30 (B) (6)
8    ON THE PARTNERSHIP PROGRAM.
9    THE COURT: THAT MAY END UP BEING ON THIS -- OKAY.
10   SO WE'VE TALKED ABOUT FINANCIAL. WE'VE TALKED ABOUT --
11   MR. MCDONELL: COPYRIGHT.
12   THE COURT: -- COPYRIGHT. AND WHAT DID WE SAY ABOUT
13   THIS PART?
14   MR. MCDONELL: I THINK WE DIDN'T SAY, BUT I'M
15   INFERRING THAT WOULD BE TREATED THE SAME AS FINANCIAL, THAT WE
16   WOULD MOVE AND PROPOSE A SCHEDULE.
17   THE COURT: YEAH. I MEAN, IF YOU'RE MAKING -- I MEAN,
18   I WILL SAY THAT, YOU KNOW, ON THIRD-PARTY SUPPORT AT FIRST BLUSH
19   I WOULD TEND TO THINK THAT PARTNERS WITH ORACLE DON'T SEEM
20   VERY -- DON'T SEEM SIGNIFICANTLY RELEVANT TO OPEN IT UP. I
21   MEAN, IF THEY ARE ORACLE PARTNERS, BY DEFINITION, THEY ARE
22   GIVING THEM PERMISSION TO DO THINGS.
23   AND WHEREAS, THE ONES THAT ARE IN A SIMILAR POSITION
24   TO TOMORROWNOW DO SEEM TO BE. AND DID JUDGE LEGGE ALREADY RULE
25   ON THIS?

61

1  MR. MCDONELL: HE DENIED IT WITHOUT PREJUDICE SUBJECT

2  TO OUR MAKING A FURTHER FOUNDATIONAL SHOWING.

3  THE COURT: ALL RIGHT.

4  MR. MCDONELL: AND IF THEY DON'T GIVE US ANY

5  INFORMATION ABOUT THE PARTNERSHIP PROGRAM, WE ARE HAMSTRUNG IN

6  OUR ABILITY TO MAKE THAT --

7  THE COURT: WELL, ISN'T THERE A CERTAIN AMOUNT THAT

8  IS PUBLIC ON THAT?

9  MR. MCDONELL: THERE IS. THERE IS. AND WE WILL

10  CERTAINLY INCLUDE THAT.

11  THE COURT: I MEAN, YOU KNOW, I WOULD -- I MEAN, AND

12  IF THERE'S SOME, YOU KNOW, READILY ACCESSIBLE SAMPLE AGREEMENTS

13  ABOUT -- THAT ARE NONPUBLIC THAT YOU CAN GIVE TO THEM THAT GIVES

14  THEM JUST A LITTLE MORE DETAIL ABOUT IT WITHOUT GOING INTO

15  EXCRUCIATING DETAIL ABOUT ALL THE PARTNERS AND HOW IT ACTUALLY

16  WORKS AND HOW MUCH MONEY THEY MAKE, BUT JUST THE STRUCTURE OF

17  IT, YOU OUGHT TO JUST GIVE IT TO THEM. AND MAYBE THAT WILL HELP

18  YOU ASSESS WHETHER IT IS OR ISN'T RELEVANT.

19  I'M DUBIOUS ABOUT WHETHER IT'S RELEVANT. I'LL TELL

20  YOU THAT RIGHT NOW.

21  MR. MCDONELL: THAT WILL BE OUR BURDEN ON THE MOTION,

22  YOUR HONOR.

23  THE COURT: SO, I MEAN, YOU KNOW, I THINK OVER THE

24  YEARS I'VE HEARD ABOUT IT IN SOME CONTEXT OR ANOTHER. I CAN'T

25  REMEMBER WHAT. AND IT DOES SEEM LIKE A COMPLETELY DIFFERENT

62

1  THING. AND THAT THE RELEVANCE WOULD BE -- IF THERE IS ANY --

2  WOULD BE OUTWEIGHED BY THE BURDENSOME.

3  MR. MCDONELL: I WON'T ARGUE THE MOTION NOW.

4  THE COURT: OKAY. OBVIOUSLY, I COULD CHANGE MY MIND,

5  YOU KNOW, DEPENDING ON WHAT THE SHOWING WAS. SO I WON'T

6  PRECLUDE YOU FROM ARGUING THAT. BUT YOU SHOULD THINK ABOUT

7  WHETHER THERE'S SOME STEP SHORT OF THAT, YOU KNOW.

8  OKAY.

9  MR. MCDONELL: OKAY.

10  THE COURT: SO NOW LET'S GO TO THIS MOTION ABOUT THE

11  CLAWED BACKED DOCUMENTS. I HAVE LOOKED AT THE DOCUMENTS THAT

12  WERE SUBMITTED.

13  I DO AGREE THAT UNDER THE PROTECTIVE ORDER THAT WAS

14  ENTERED INTO, I DON'T THINK ORACLE SHOULD HAVE KEPT THE COPIES.

15  I DON'T -- I MEAN, I JUST DON'T THINK THAT'S THE PLAIN LANGUAGE

16  OF IT.

17  MR. PICKETT: I THINK WE WERE EXACTLY PERMITTED TO

18  KEEP A COPY UNDER THE PLAIN LANGUAGE FOR PURPOSES OF DISASTER

19  RECOVERY.

20  THE COURT: WELL, I DON'T THINK SO. I MEAN, I'M NOT

21  ISSUING ANY SANCTIONS OR ANYTHING LIKE THAT. BUT READING THE

22  ORDER, IT DOESN'T SEEM TO PERMIT KEEPING COPIES. IT SAYS:

23  "GIVE THEM BACK," I THINK.

24  MR. PICKETT: THERE'S A SPECIFIC --

25  THE COURT: I DON'T HAVE THE EXACT LANGUAGE IN FRONT

63

1  OF ME. CAN YOU --

2  MR. PICKETT: THERE'S A SPECIFIC PARAGRAPH IN THAT.

3  MR. COWAN: NOT IN THE ORDER, YOUR HONOR.

4  MR. PICKETT: IT'S IN THE --

5  MR. COWAN: THE PARTIES HAD A SEPARATE AGREEMENT --

6  THE COURT: THE AGREEMENT.

7  MR. COWAN: FOR LOGISTICAL PURPOSES, RATHER THAN

8  GOING TO THE EXPENSE OF HAVING OUR EXPERTS CREATE NEW CD'S THAT

9  HAVE THOUSANDS AND THOUSANDS OF DOCUMENTS --

10  THE COURT: RIGHT.

11  MR. COWAN: -- THAT WE WOULDN'T YANK BACK THE ONES,

12  ERASE THE THING OFF AND SEND THEM NEW CD'S.

13  WE SAID:

14  "YOU CAN KEEP THOSE FOR DISASTER RECOVERY

15  PURPOSES. DON'T LOOK AT THEM."

16  THAT'S WHAT THE PARTIES AGREED. THAT IS THE ONLY

17  AGREEMENT.

18  THE COURT: BUT THERE WAS NO DISASTER RECOVERY HERE.

19  MR. COWAN: THERE WAS ANALYSIS OF THE DOCUMENTS.

20  MR. PICKETT: NO, BUT THERE'S WHAT I WOULD SAY IS A

21  COMPLETELY INCONSISTENT PROVISION THAT SAYS YOU CAN USE THE

22  DOCUMENTS IN CONNECTION WITH ANY CLAWED BACK MOTION.

23  THE COURT: WELL, TO ME --

24  MR. PICKETT: BUT USE --

25  THE COURT: YEAH. YEAH. YEAH. I GUESS I WOULD

64

1  RECONCILE THOSE. I THINK THEY ARE IN SOME TENSION. BUT I THINK

2  IT MEANT YOU HAD TO GIVE IT BACK AND THEN ASK THEM TO FILE THEM

3  UNDER SEAL.

4  MR. PICKETT: WE DID.

5  THE COURT: WELL, BUT, YEAH. YOU KEPT AND ANALYZED

6  THE COPIES. I DON'T THINK THAT WAS CONTEMPLATED BY THE

7  AGREEMENT. I DON'T THINK THE AGREEMENT MAYBE MADE TOTAL SENSE

8  BUT --

9  MR. PICKETT: JUST FOR CLARIFICATION, IN CASE THIS

10  COMES UP AGAIN, ARE WE PERMITTED TO TAKE NOTES FROM THE

11  DOCUMENTS AT ANY POINT?

12  THE COURT: I DON'T KNOW WHAT SHOULD BE THE RIGHT

13  STANDARD.

14  MR. PICKETT: BECAUSE OTHERWISE --

15  THE COURT: I THINK WHAT YOU AGREED TO IN THE PAST IS

16  NO. AND IM NOT TOTALLY UP ON WHAT -- I MEAN, I'VE SEEN THERE'S

17  SOME A.B.A. OPINIONS AND THINGS LIKE THIS. AND I DON'T HAVE A

18  CLEAR UNDERSTANDING IN MY OWN MIND OF WHAT THE RIGHT PROCEDURE

19  IS.

20  THIS IS COMING UP MORE AND MORE. AND I'VE HAD VERY,

21  YOU KNOW, HEATED ARGUMENTS ABOUT IT. AND I'M NOT REALLY SURE.

22  MR. PICKETT: IT'S A TOUGH ISSUE, I AGREE.

23  THE COURT: YEAH. IM REALLY NOT SURE ABOUT IT. BUT

24  I JUST THINK THE PLAIN LANGUAGE OF THE AGREEMENT SAYS:

25  "NO, YOU CAN'T."

77

1            CERTIFICATE OF REPORTER

2        I, KATHERINE WYATT, THE UNDERSIGNED, HEREBY CERTIFY

3   THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED

4   SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED BY ME INTO

5   TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE

6   RECORD OF SAID PROCEEDINGS.

7        I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR

8   ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING

9   PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE

10  OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

11        THE FEE CHARGED AND THE PAGE FORMAT FOR THE

12  TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL

13  CONFERENCE.

14        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS

15  4TH DAY OF SEPTEMBER, 2008.

16

17

18

19

20        S/S KATHY WYATT

21

22

23

24

25

**EXHIBIT 4**



**SOLUTIONS CATALOG HOME**

**SEARCH FOR PARTNERS**

Advanced Search

**BROWSE PARTNERS**

**FOR PARTNERS**

Manage Your Profile

Get Help

**ORACLE.COM**

**ORACLE PARTNERNETWORK**

English

# CedarCrestone, Inc.

**Partner Summary**

CedarCrestone provides Oracle's PeopleSoft Enterprise consulting, hosting, and managed services for the deployment, management, and optimization of Human Capital Management (HCM), Financial Management (FMS), and Campus Solutions (CS).

**Partner Profile**

CedarCrestone, a Certified Advantage Partner of Oracle Corporation, is the proud recipient of Oracle's 2007 "PeopleSoft Solution" Titan Award. This is the second Titan Award CedarCrestone received, the first being in 2005 for "PeopleSoft Partner of the Year." CedarCrestone is the largest, dedicated PeopleSoft Enterprise Systems Integrator, with extensive expertise in Oracle technology and PeopleSoft Enterprise applications. With 24 PeopleSoft Enterprise applications in production, CedarCrestone invests heavily in the vision of Oracle.

The Managed Services division of CedarCrestone hosts nearly 40 PeopleSoft Enterprise clients on Oracle database technology with diverse industry credentials, superior service levels, and a focus on customer service and success.

CedarCrestone assessed the potential benefits and risks of offshoring business in 2003, resulting in the opening of an India business unit in Hyderabad in March of 2004. Investments have been made to ensure that the India facilities are modern and well equipped with secure connectivity from Hyderabad to the CedarCrestone Managed Services Center. While US resources sleep, India personnel work through the night to ensure client systems are being supported, maintained and

http://www.cedarcrestone.com

Phone (primary): 1 866 8273786

1255 Alderman Drive

Alpharetta

Georgia

Zip/Postal Code: 30005

United States

Partner Profile

Contact Partner

**Solution Profiles**

▶ **PeopleSoft Enterprise Consulting**

PeopleSoft Enterprise Consulting services which include Implementations, Upgrade, eApps & Portals - with complementary services available from the CedarCrestone Managed Service Center. more...

▶ **PeopleSoft Enterprise Hosting**

CedarCrestone's Managed Services Center offers a state-of-the-art application Hosting solution to provide an alternative to acquiring, maintaining, and monitoring a PeopleSoft infrastructure. more...

monitored 24x7 consistent with the service level agreements.
Today, CedarCrestone's India operation delivers strategic services to customers across Commercial, Higher Education, and Public Sector Industries.

### Partner Information

| | |
|---|---|
| ▸ Partner Category/Type: | Systems Integrator (SI) |
| ▸ Secondary Category: | Hosting Service Provider |
| ▸ Tertiary Category: | Management Consultancy |
| ▸ Sell to Small and Medium Business (SMB)?: | Yes |
| ▸ Partner Membership Level: | Certified Advantage |
| ▸ Partner Membership Location: | United States |
| ▸ Main Office (HQ) Location: | United States |
| ▸ Public or Private Company: | Private |
| ▸ Year Company Founded: | 1995 |
| ▸ Number of Employees: | 501 - 1000 |

CedarCrestone and Oracle's history of collaborating to deliver real client success is long, diverse, and multi-faceted.  A few examples of our partnership in action follow:

### What Oracle and CedarCrestone, Inc. are Doing
▸ Oracle and CedarCrestone "Tour de HCM"
▸ CedarCrestone 2007 - 2008 HR Systems Survey: HR Technologies, Service Delivery Approaches, and Metrics
▸ PeopleSoft Hosting Solution

### Oracle and CedarCrestone, Inc. in the News
▸ Oracle's PeopleSoft Partner of the Year 2007
▸ Economic Justification for PeopleSoft Hosting

**CedarCrestone, Inc. Collateral**

▸ Distinguishing Features: Enabling HRIS Transformation (IHRIM.link, January 2008)

▸ Product Reviews: PeopleSoft Hosting Solution

▸ Distinguishing Features: Oracle Names CedarCrestone as Recipient of "PeopleSoft Solution" 2007 Titan Award

*The partners listed in the Oracle PartnerNetwork (OPN) Solutions Catalog are part of the Oracle PartnerNetwork Program, however Oracle does not endorse any of the partners or their software, solutions, services or training listed on this site. **Oracle disclaims any and all liability arising out of your use of the partners, software, solutions, services and training listed on the site. All software, solutions, services and training are provided "as is" and without warranty, unless provided by the authoring partner.***

✉ E-mail this page

🖶 Print this page

**ORACLE IS THE INFORMATION COMPANY**

About Oracle | 🔲 | Careers | Contact OPN | Site Maps | Legal Notices | Terms of Use | Your Privacy Rights

**EXHIBIT 5**





**About >**

- Corporate
- Partners
- Recognition

### Corporate



CedarCrestone delivers real client success by providing consulting, technology, and managed services for full life-cycle solutions designed to optimize Oracle applications. Our depth and breadth of capabilities makes us **Your.One.Partner.**

### Company Strategy

As we've surveyed the enterprise application landscape in recent years, we've noticed a growing gap between what clients need and what solution providers are able to provide. No longer do clients simply need implementation or upgrade services. They need ways to optimize the ongoing maintenance of their applications. Further, they need to determine how next generation technology can bring their business to the next level. The bottom line is they need a more holistic solution to not only serve them today, but advance their mission in the future.

Despite these changing needs the solution provider community has in many ways failed to keep up. As we see it, the solution provider community has become what we call barbelled. On the one end of the barbell we find the Global SIs. It's true that the Global SIs have the breadth of capabilities to provide holistic solutions. However, unless a client is of significant size and willing to spend millions of dollars, these providers just are not interested. On the other end of the barbell we find the niche providers. These organizations are generally very good at what they do. However, due to their size and lack of investment resources, they can only provide a part of the answer.

CedarCrestone has bridged the gap. With a 25 year history of delivering client success, CedarCrestone's strategy is to better serve our clients by investing in our core capabilities based on market insight, client needs, industry trends and Oracle's strategic direction. This strategy has led us to a holistic solution set that combines industry based consulting, top tier managed services, and advanced technology services. It is the combination of these capabilities that allow us to provide unique, differentiated solutions to our clients.

Headquartered in Atlanta, Georgia, CedarCrestone was formed in 2005 when Cedar Enterprise Solutions (founded in 1981) and Crestone International (founded in 1995) merged to create a powerhouse of PeopleSoft expertise, addressing the most complex of business requirements. Subsequently, CedarCrestone strategically invested in building out capabilities in Oracle's E-Business Suite and Fusion Technologies as well as our off-shore delivery model. Today we are an organization uniquely qualified to serve the most challenging needs of Oracle Enterprise Application customers.

And we are humbled by the fact that the market experts have taken notice. CedarCrestone is a recognized leader in delivering enterprise solutions by such authorities as Gartner in their ERP Services Magic Quadrant; by VAR Business in their 500 Top Solution Providers; and by Oracle as an award winning, top-tier, Certified Advantage Partner. In fact, our relationship with Oracle has never been stronger, including:

- **Recent Awards**
  - **2008 Oracle Titan Award** for "The SOA and Integration Solution" which acknowledges an Oracle partner that has shown exemplary demonstration of their Service Oriented Architecture (SOA) through a customized and unique solution
  - **2008 Oracle Excellence Award** which recognizes organizations for innovative deployments of Oracle Fusion Middleware with Oracle Applications
  - **2007 Oracle Titan Award** for "PeopleSoft Solution" acknowledges an Oracle partner who has shown exemplary demonstration of their PeopleSoft Enterprise expertise through a customized and unique solution ensuring measured customer ROI and clear satisfaction
  - **2007 Oracle Titan Award** Honorable Mention for "Applications Momentum" given to a partner with a proven track record in promoting Oracle's "go-to-market" strategies
  - **2007 Oracle Excellence Award** for "SOA Suite Solutions" recognizes organizations for their success in extending the business value of Oracle Applications with Fusion Middleware
  - **2005 Oracle Titan Award** for "PeopleSoft Partner of the Year"
- **Active Programs and Recognition**
  - 2008 Oracle Fusion Validation Program
  - Oracle Fusion Middleware Ace Director Program
  - Customer Advisory Board for Oracle SOA Suite
  - Oracle Partner Advisory Program
  - Oracle Partner Leadership Program

More important to us though is the trust given to us by our clients. Over the past 2 years we have worked with over 300 clients. It's an honor that so many have believed in our strategy, our capabilities and our consultants. And it's living up to these high expectations that drive us each day to bring better solutions to our clients so that they can reach their objectives.

**Portfolio of Services**

CedarCrestone offers clients a broad range of fully integrated services which include consulting, technology and managed services. Individually, our service offerings are world class. In combination, they are unparalleled for the market we serve and make us **Your.One.Partner.**

Our clients demand more than experienced consultants; quite simply, that's now the required ante to get to the table. Our clients are looking for consultants who understand their business and the unique challenges associated with their industry. CedarCrestone delivers. Our consultants not only have the requisite application experience, but they've also worked in our client's industry, many times in the same roles as our client's users. In this way, we bring differentiated value to our clients with such service offerings as follows.

| Applications Consulting Services | Strategy and Value Analytics Services |
|---|---|
| ▪ Preview | ▪ Business Case Development/ Return on Investment Analysis |
| ▪ Implementation | ▪ Business Process Improvement |
| ▪ Upgrade/Upgrade Lab | ▪ Change Management |
| ▪ Extending the Enterprise | ▪ HR Effectiveness Assessment |
| ▪ Training | ▪ Workforce Metrics and Analytics Assessment |
| ▪ Remote development | ▪ Workforce Technology Assessment and Strategy |

Often times our clients are looking for more effective and efficient ways to manage the ongoing support of their enterprise application. They're looking for ways to meet the needs of their organization (always available, lightning response times, highly secure, quick problem resolution, and recovery from disaster) while staying within a budget. CedarCrestone delivers. Our managed services, found below, are backed by a Service Level Agreement (SLA) which aligns our performance commitment to your organizational needs. Further, unlike other providers in the industry, if we fail to deliver on those commitments we have penalties with real teeth. And finally, our pricing allows our client's to enjoy ongoing budget stability for maintenance operations.

### Managed Services

- Host
- Manage
- Maintain
- Upgrade Lab
- Develop

Technology has changed the way businesses operate. And advances in technology will bring additional changes in the coming years. Our clients are looking for ways to take advantage of the new technology while protecting their current technology investments. CedarCrestone delivers. Our technology services, listed below, help clients navigate the complex and sometimes confusing technology landscape.

### Technical Solutions

- Database Administration
- Installation and Configuration
- Integration Technologies and Development
- Technology Assessment
- Technical Upgrades
- PIA Administration

CedarCrestone fully embraces the evolution of Oracle's technology and understands the importance of its adoption for Oracle's application client base. Oracle's SOA Suite is the recommended platform for getting started with Fusion Middleware. CedarCrestone has years of experience and knowledge of implementing SOA for their current clients. With this experience we are able to have clients rapidly achieving the benefits of deploying SOA in their environment.

### Fusion Middleware

- Service Oriented Architecture (SOA) Suite Services and Solutions

- SOA Suite Composite Application Development
- SOA Suite Training

Webmaster | Legal | Privacy | Sitemap

Copyright © 2008 CedarCrestone, Inc. All rights reserved.
Oracle and PeopleSoft are registered trademarks of Oracle Corporation and/or its affiliates.

**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MAGISTRATE JUDGE ELIZABETH D. LAPORTE


ORACLE CORPORATION, a Delaware )   Case No. C07-1658
Corporation; ORACLE, USA, INC.,)   (PJH)
a Colorado corporation; and    )
ORACLE INTERNATIONAL          )
CORPORATION, a California       )
corporation,                )
                        )
           Plaintiffs,   )
                        )
      vs.              )   FURTHER DISCOVERY
                        )   CONFERENCE
                        )
SAP AG, a German corporation;  )
SAP AMERICA, INC., a Delaware  )
corporation; TOMORROWNOW, INC.,)
a Texas corporation; and DOES  )
1-50, Inclusive,          )
                        )
          Defendants.   )
_____ )


January 8, 2009

TRANSCRIPT OF AUDIO RECORDING OF DISCOVERY CONFERENCE


TRANSCRIBED BY:  FREDDIE REPPOND

1   of support, that the terms and conditions of that kind
2   of relationship and what is paid in consideration for
3   that right is directly relevant to an analysis of
4   damages in this case. The theory of the Plaintiffs'
5   case is that TomorrowNow did this kind of work without
6   an express agreement with Oracle. If we know how much
7   a third-party partner pays for that right, it's
8   relevant to damages.
9         Secondly, it's related to causation of
10  damages. If there are companies like Cedar Crestone,
11  who have now told us in this letter from their lawyer
12  that they provide support much the way TomorrowNow
13  does, that are available to support customers of Oracle
14  and indeed some customers that just left TomorrowNow
15  because TomorrowNow shut its doors have gone to Cedar
16  Crestone. That helps us to break the causal link that
17  it was just TomorrowNow's activities that caused a
18  customer to leave Oracle. We now see that customers
19  were going to leave Oracle anyway. They could have
20  gone to Cedar Crestone --
21        THE COURT: Well, that seems to me a little
22  farther fetched. In other words, if there's an issue
23  of reasonable royalties or the equivalent, there might
24  be a relationship to damages. But Oracle can choose to
25  have partners that it authorizes to use its IP; and

1   that's completely different from somebody ripping it
2   off. And I don't really think it's the same at all.
3   So that -- but, you know, I think that we are just
4   going to have brief it. But that one does not grab me
5   very much in the first instance.
6         Okay. Then there's this chart of accounts.
7         MR. MCDONELL: Another issue we've talked
8   about time and again, but it seems like it's at
9   loggerheads. I am prepared to file a motion. It all
10  has to do with Oracle's alleged profit margins. So we
11  believe that one of their measures of damages that
12  they're reserving to right to pursue is lost profits.
13        THE COURT: Is that true? I mean is that
14  being preserved -- the right to pursue that?
15        MS. HOUSE: Absolutely. But --
16        MR. MCDONELL: And then we have taken the
17  deposition -- a 30(b)(6) -- of an Oracle witness and
18  asked that witness whether Oracle was to give us their
19  profit margins on their work for PeopleSoft and JD
20  Edwards support. And she said, No, we can't do that.
21  Our expert very much wants now to get to the underlying
22  data to see what expenses seem like that would be
23  relevant to the revenues that pertain to service and
24  try to build his own profit model or analysis. And we
25  have nothing from them that would allow him to do that.

1         So the motion is we get the chart of accounts,
2   which is a list of the types of accounts they have, but
3   we don't want all 80,000 but the general ledger
4   accounts at this time. But we do want that basic
5   blueprint of what the accounts are. Then we will look
6   at them. Then we'll make a follow-up request for the
7   general ledger information that we think is most
8   pertinent for the type of analysis that needs to be
9   done.
10        THE COURT: Okay.
11        MS. HOUSE: We are happy to -- I don't want to
12  take more of your time. We will be ready to oppose
13  this. It's another way I think is going to be akin to
14  just it's a needle-in-a-haystack type of request --
15        THE COURT: Well, they are absolutely entitled
16  to some profit data if you're going to go after lost
17  profits.
18        MS. HOUSE: And they have been given it.
19  They've been given it the way Oracle keeps it, which is
20  exactly the same way SAP keeps it, which is that profit
21  margins are rolled up by lines of business. They're
22  not kept on a product-by-product basis.
23        THE COURT: Well, we'll just have to see, but
24  I mean I would err on the side of giving them what they
25  think they need to have their expert analyze the

1   profits, not what Oracle thinks they need. And as long
2   as it's not completely disproportionate. But, you
3   know, you're seeking millions and millions of dollars
4   for them and you're not giving up on the lost-profit
5   theory and they have the right to challenge it. So
6   exactly how you keep it and how complicated -- I don't
7   know why you wouldn't at least give them the chart of
8   accounts if it's true that that's essentially a list of
9   what you've got. I don't see that -- that's not very
10  burdensome.
11        MS. HOUSE: Hopefully we can convince you when
12  we --
13        THE COURT: Well, I don't know. But, again, I
14  would urge you to -- you might as well disclose what
15  you've got in terms of chart of accounts, because it
16  would be much more concrete for me to look at that and
17  say, Well, why should you get this and not that if they
18  think they should get this and you say, no, they
19  shouldn't. Why?
20        MS. HOUSE: The charts of accounts -- I think
21  this came up before [inaudible]
22        THE COURT: I don't remember.
23        MS. HOUSE: Charts of accounts are extremely
24  voluminous. There's different charts of account for
25  different Oracle entities. They have -- from the

Page 66

```
 1    pretty full calendar.
 2         THE COURT:  Yeah, that's very full.  No, I
 3    wouldn't want -- yeah -- I don't want to -- right.  I
 4    want to put you on the 13th; and I think it's the
 5    afternoon --
 6         MR. COWAN:  What about the following week?
 7    That may give us more time.
 8         THE COURT:  I'm gone; and that's the reason.
 9    That's why I am moving it -- otherwise, I have to move
10    it quite a bit later.
11         MR. HOWARD:  I think the 13th is fine.
12         THE COURT:  Yeah, but if you want to, for
13    example, file about everything else on the 9th and then
14    just on the stipulation issue closer to the 13th,
15    that's all right.
16         MR. HOWARD:  Why don't we just try and file on
17    the 9th?
18         THE COURT:  Okay.
19         MR. HOWARD:  And we'll do our best to get it
20    wrapped up by then.
21         THE COURT:  Okay.  That's fine.  All right.
22    And if you need to put something supplemental about the
23    stipulation -- and the stipulation, obviously, the more
24    concrete I know about what your issues are, the more I
25    might possibly be able to be helpful, but --
```

Page 67

```
 1         MR. HOWARD:  I think our goal would be to
 2    actually give you a stipulation.
 3         THE COURT:  Well, that would be best,
 4    obviously.
 5         MR. HOWARD:  So you see what it looks like and
 6    you have some flesh on the bones here and maybe two.
 7         THE COURT:  So.  All right.  Thank you.
 8         MS. HOUSE:  [inaudible]
 9         THE COURT:  Yeah.  Thank you.
10         THE CLERK:  Court's in recess.
11              [END OF AUDIO]
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 68

```
 1     STATE OF CALIFORNIA    )
       COUNTY OF SAN FRANCISCO )
 2
 3          CERTIFICATE OF REPORTER/TRANSCRIBER
 4     I, the undersigned, a Shorthand Reporter and
 5  licensed Notary Public, do hereby certify that the above
 6  referenced recording was transcribed by me and that this
 7  transcript is a true record of that recording.
 8     IN WITNESS WHEREOF I have hereunto set my hand
 9  on this 16th day of January, 2009.
10
11  _____
12     FREDDIE REPPOND
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Merrill Legal Solutions
(800) 869-9132

**EXHIBIT 7**

 **United States**

## SAP PARTNERS

PARTNERING WITH SAP – INNOVATION THROUGH COLLABORATION

### Getting the Most from Your Partnership with SAP

The combined expertise, experience, and insights of the SAP ecosystem and partner network lead to better solutions for our customers. As an SAP partner, you can tap into resources that will help you grow and maximize business results. When you join our partner network, you gain access to more than 30 years of experience spanning 25 industry segments.

Benefits of becoming an SAP partner include:

- Access and exposure to SAP's customer base
- Entry into a collaborative environment where partners support one another and work toward greater customer success
- Access to our partner-only portals for product, marketing, sales, and competitive information
- Sales and marketing assistance
- Technical support
- Participation in SAP events
- SAP Referral Program – Many kinds of partners and organizations, even those who do not have a direct relationship with SAP, can earn substantial referral fees through our SAP Referral Program.

Partnering with SAP puts the strength of one of the most successful, respected software brands behind you. After joining one of SAP's nine partner categories, you'll interact with many professionals globally in our ecosystem.

Our channel manager program ensures that each partner receives appropriate SAP support resources, including sales, marketing, and business planning assistance, specific business opportunities, online collaboration tools, and technical support. We are dedicated to ensuring that our partners have tools and information to succeed.

### Partner Categories

- Business process outsourcing (BPO) providers – Deliver business process services based on SAP solutions, including human resources, procurement, finance, and accounting processes, to companies who want to outsource them
- Channel partners – Capitalize on the expanding small and midsize enterprise (SME) market by utilizing our broad portfolio of SME partnering opportunities that are designed to empower you. We have the programs and opportunities that fit your capabilities and business.
- Content partners – Integrate data, intellectual property, or information services with SAP solutions

**PARTNER SPOTLIGHT: ATos ORigin**

SAP global services partner and hosting partner, Atos Origin is also a technology partner for the Olympics games.

 Find out more.

**APPLY FOR PARTNERSHIP**

Check out the SAP partnership and certification application.



**INTEGRATION AND CERTIFICATION**

SAP Integration and Certification Centers (SAP ICCs) help vendors integrate their software with SAP solutions seamlessly.

 Read how.

**SAP PARTNERSHIP: TICKET TO SAP EVENTS**

SAP participates in and hosts events worldwide that include partners. Participate, exhibit, sponsor, advertise, and network.

 Get the details.

- Education partners – Work with SAP to deliver high-quality, professional training for SAP solutions and technology
- Hosting partners – Offer a portfolio of hosting services for SAP Business Suite applications and the SAP NetWeaver technology platform, including application management services
- Service partners – Help SAP customers design, implement, and integrate SAP solutions; optimize business processes; and provide strategic business consultation
- Software solution partners – Develop applications integrated with SAP solutions and have passed SAP's certification or validation process. These third-party software vendors' applications extend and add value to SAP solutions across industries and business processes
- Support partners – Ensure that customers receive the best possible support throughout the life cycle of SAP solutions
- Technology partners – Provide infrastructure for SAP solutions, including hardware platforms, databases, storage systems, networks, and mobile devices

Whether you're looking to increase your customer base, develop your market, or collaborate with other industry leaders, becoming an active partner in the SAP ecosystem is your first step toward success.

**Want to learn more?** Contact SAP for more information.

Investors | Careers | Inside Access | Communities | Education and Training | ASUG | Contact SAP
Copyright/Trademark | Privacy | Impressum | Using SAP.com | Text-Only View | Full-Page View

Questions or comments about the Web site?
Contact the webmaster@sap.com.

**EXHIBIT 8**



# TECHNOLOGY PARTNERS

## ORACLE AND SAP

### Alliance Overview

Oracle databases are available for SAP applications on all major operating systems, including Windows, Linux, and Unix. Oracle and SAP have long-term agreements to ensure continued development, optimization, and support of Oracle database technology under the SAP software for mutual, large-enterprise customer base.

### Key Customer Benefits

Offering best-of-breed and optimized database technology for SAP products, Oracle features utilized by SAP software include:

- **Oracle Database 10g and Real Application Clusters (RAC)** – Designed as the first database for grid computing, it is the most flexible and cost-effective way to manage enterprise information. The database cuts management costs, while providing quality of service and performance enhancements. Oracle Database 10g significantly reduces costs of managing the IT environment with a simplified installation, greatly reduced configuration and management requirements, and automatic performance diagnosis and SQL tuning.
- **Oracle Advanced Security** – Provides robust encryption solutions to safeguard sensitive data and address regulatory compliance requirements. With transparent data encryption, you get protection against unauthorized access to sensitive data at the operating system level or through theft of hardware or backup media.
- **Oracle Partitioning** – Enables tables and indexes to be split into smaller, more manageable components and is a key requirement for any large database with high- performance and high-availability requirements.
- **Oracle Data Guard** – Provides disaster recovery for the Oracle database and helps SAP customers increase availability and data consistency plus reduce downtime and adds a superior level of data protection.
- **Oracle Data Mining Connector 2.0** – Provides SAP customers with advanced analytics embedded in the Oracle 10g database. Data and business analysts benefit from the wide range of state-of-the-art data mining functionality that is exposed through the SAP data mining framework.

### Capabilities and Industry Expertise

Oracle and SAP have developed capabilities and expertise by coordinating a global support process for the following:

- Proactive risk mitigation for introduction of new products with the goal to reduce the amount of support related assistance requests
- Single, consistent service relationship with a dedicated long-term team of Oracle technical analysts who provide queue management and direct customer contact to SAP customers using Oracle databases

### Alliance Focus Areas

- The Oracle databse development team onsite in St.Leon Rot, Germany , manages and executes joint Oracle/SAP database integration projects.
- The Oracle Global Technology Centers for SAP in Germany and the United States provide presales support.
- The Oracle database support teams are onsite at SAP support centers in Tokyo , Japan ; Palo Alto , California , USA ; and St.Leon Rot/Walldorf, Germany.

### Oracle/SAP References

Read details about Oracle databases for deploying SAP software.

## Oracle/SAP Knowledge Corner

Oracle Real Application Clusters (RAC) software has become the clustering technology of choice for a growing number of SAP customers. Using SAP applications with Oracle RAC provides high availability, scalability, and cost reduction. The following documents provide best practices on how to migrate an existing single-instance SAP installation to a multiple-instance Oracle RAC cluster-database configuration:

- SAP Customers Depend on Oracle Real Application Clusters for High Availabilityand Scalability
- Configuration of SAP NetWeaver for Oracle Database 10g Real Application Clusters
- SAP NetWeaver/Oracle Database 10gR2 RAC on Windows 2003. A Best Practices Guide
- Providing High Availability for SAP Resources
- SAP Note – Oracle License Scope: Required Oracle Options (740897)
- SAP Note – Oracle RAC Support in the SAP Environment (527843)

## Contact

Oracle for SAP Global Technology Center in Walldorf Germany
Altrottstr. 31. 69190 Walldorf, Germany
+49 6227 8398-120

**Want to learn more?** Contact the SAP sales office nearest you.

Investors | Careers | Inside Access | Communities | Education and Training | ASUG | Contact SAP
Copyright/Trademark | Privacy | Impressum | Using SAP.com | Text-Only View | Full-Page View

Questions or comments about the Web site?
Contact the webmaster@sap.com.