1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3       BEFORE THE HONORABLE ELIZABETH D. LAPORTE, MAGISTRATE JUDGE

 4       ----------------------------)
                                      )
 5       ORACLE CORPORATION, *et al.*,  )
                                      )
 6                      Plaintiffs,  )
                                      )
 7          v.                       )         No. C 07-1658 (EDL)
                                      )
 8       SAP AG, *et al.*,             )
                                      )
 9                      Defendants.  )         San Francisco, California
                                      )         Tuesday, February 10, 2009
10       ----------------------------)            (50 pages)

11

12                        TRANSCRIPT OF PROCEEDINGS

13       APPEARANCES:

14       For Plaintiffs:        Bingham, McCutchen, LLP
                                Three Embarcadero Center
15                              Promenade Level
                                San Francisco, California 94111
16                        BY:   GEOFFREY M. HOWARD
                                ZACHARY J. ALINDER
17                              HOLLY A. HOUSE

18       For Defendants:        Jones Day
                                555 California Street
19                              26th Floor
                                San Francisco, California 94104
20                        BY:   JASON S. MCDONELL
                                SCOTT W. COWAN
21                              ELAINE WALLACE

22       Also Present:          Jennifer Gloss
                                Oracle USA, Inc.
23
                                Lisa Buccino
24                              SAP AG

25

Dockets.Justia.com

1    Tuesday, February 10, 2009

2                                                    (2:11 p.m.)

3         DEPUTY CLERK:  Calling case Civil 07-1658, Oracle

4    Corporation versus SAP AG, et al.

5         Counsel, please state your appearances for the record.

6         MR. HOWARD:  Geoff Howard for Bingham, McCutchen, and

7    with me, Zach Alinder, Holly House; and Jennifer Gloss from

8    Oracle.

9         MR. McDONELL:  Jason McDonell for defendants, along

10   with my partner, Scott Cowan; Elaine Wallace; and Lisa Buccino

11   from SAP.

12        THE COURT:  Thank you.

13        I've got two motions.  Why don't we start with the

14   plaintiffs' motion, and let me give you some tentative thoughts

15   on that.

16        The issue, of course, is the discovery of the use of

17   Hyperion, Retek and E-Business Suite products.  The Siebel

18   issue is not specifically part of this motion, as I understand

19   it, although there is an ongoing, somewhat, dispute on that.

20        MR. HOWARD:  It's percolating, but we've achieved some

21   compromise, and we're going to do some foundational discovery

22   and only come back to you if it's necessary.

23        MR. COWAN:  That's correct.

24        THE COURT:  It seems to me that Oracle raises some

25   questions about how where the declarations may be more

equivocal, or in Oracle's view, anyway, carefully phrased such that it still is wondering whether in preparing to potentially support these three products, SAP did anything wrong, and similar to the sort of things that it is known to have done, at least in Oracle's view, with the main products that were already part of the suit from the beginning.

I do tend to think that the good cause standard applies. It's not -- I tend to be persuaded by SAP. It really is sort of a suspicion still, albeit not a suspicion, you know, out of thin air -- an extrapolation regarding business model, and -- but particularly in the good cause then standard, being considered in conjunction with the fact that it's plainly less important than some of the other things insofar as I think it's not really genuinely disputed, it was -- never actually supported these products.

So we're talking about, if I am correct, understanding what was done in terms of considering offering support for these products. And the declarations themselves -- I mean, I think I would like to focus on exactly what's wrong with them in Oracle's view, and what -- why that's not so, etc., in SAP's view.

The -- then there is, if it does seem like there is good cause and there's relevance, the question does become burden.

Now, you know, there's a certain -- I don't really

want to engage in a tit-for-tat, but both sides raised

burdensome arguments without putting in any declarations about

them in the competing motions.  But in terms of this motion,

it's not clear how much of a burden would it be.  But -- so

that's something I would want to get nailed down.

But one possibility is that I would order a somewhat

more detailed declaration to the extent that there seem to be

any loopholes in this, and then see what comes up with that.

And, you know, it either might open the door to more or it

might slam the door, in my view.

So some of the things that I'm focusing on that I want

answered during this hearing:  One is the declaration is

that -- this is Mr. Nelson -- never provided direct third-party

support.  So is there something indirect that Oracle's

suspicious about or that could be clarified?

Is there anything wrong with, from Oracle's viewpoint,

with using materials that were available to the general public?

In Paragraph 3, Mr. Nelson says, "To my knowledge, other than

materials that were available to the general public (i.e.,

through the Internet or other publicly available means), no one

at TN downloaded or otherwise accessed...."

The terms "proprietary software" or "confidential

support", I don't know that that's particularly equivocal, and

I'm not necessarily concerned by the fact that somebody in a

deposition, someone else said they weren't sure what that

1  meant, but if there's some genuine issue, some gray area in

2  that, maybe that needs to be clarified.

3          The, "to my knowledge", I mean, of course, that is

4  what you want from a declarant.  On the other hand, if there's

5  somebody else who has knowledge that he doesn't, maybe another

6  possibility I'm open to is the idea of a request for admission

7  or something which has to be answered in a way that's not

8  limited to any one person's knowledge, albeit the president and

9  CEO -- if you have to pick one person, that's about as good as

10  you can get.

11          So -- so those are the kind of issues that I'm

12  concerned with.

13          Let me see if there are -- I guess another one, in

14  Mr. Ziemen's declaration, there's the "to my knowledge".  Then

15  there's "didn't access proprietary software confidential

16  support for any purpose relating to SAP's consideration of TN

17  providing third-party support."

18          I don't know that Oracle's concerned about any other

19  reason, and if so, what it would be, and whether that needs to

20  be addressed.

21          So those are the kind of issues -- in other words, I

22  think that it's really true that there was no improper

23  activity, and that's being stated unequivocally by people who

24  would know, in a declaration under oath, etc., that may be

25  sufficient.  But to the extent that there's some loopholes

1    here, that may not be.

2             MR. HOWARD:  May I start, your Honor?

3             THE COURT:  Yes.

4             MR. HOWARD:  Thank you for that.  It's very helpful.

5             Let me first say that I think that the issues that

6    you've identified are very much along the lines of what we

7    asked for when we got the declaration initially as a proffer

8    and it wasn't satisfactory, so we don't disagree with much of

9    that.  But I do want to first focus on the factual predicate,

10   because I think we're not completely on the same page there.

11   And this is why:

12            They have asserted that they did not use these

13   products to support the customers running the software.  And

14   your Honor, I think, rightly focuses on the language in the

15   declarations that focuses on direct support and third party

16   support.

17            We have two concerns with that assertion.  The first

18   is that there are indications, and they are inferences, but

19   there are indications that they may have provided that support

20   because that's what the Safe Passage program was about.  It was

21   about luring customers over to the SAP side of the ledger,

22   where it was safe, they could safely run their Legacy software

23   while they waited to migrate to SAP software.  And there is no

24   safety in Safe Passage unless you know that your software is

25   going to be supported while you're off support with Oracle.  So

1    it is true they've asserted that they didn't support it.  But

2    we feel like we need to test that, and that is in particular

3    why the lack of foundation to the knowledge of these particular

4    declarants becomes an issue.

5         THE COURT:  What kind of foundation would you like to

6    see?

7         MR. HOWARD:  For example, they're not purporting to

8    know, any of them, what was done, what was represented to the

9    customers who came over as part of this several hundred million

10   dollar Safe Passage program, which lists customers with Retek

11   and Hyperion software running on them.  None of them are

12   purporting to know what was said to those customers to get them

13   over, which is a separate thing from actually supporting them,

14   and what was done with them once they're there.  That's point

15   Number 1.

16        THE COURT:  Uh-huh.  Well, okay.  And when we get

17   to -- I mean, that's where I'm thinking that maybe there has to

18   be some -- you know, I don't necessarily think the first step

19   should be a 30(b)(6) deposition where some live human body has

20   to answer those, but I think it may be that some degree of

21   foundation.  I mean, as I say, I think starting with the

22   president and so on is about as good as you can get if you're

23   going to talk with one person.  And I'm not -- if it's a

24   question of what was actually done -- in other words, if they

25   promised to support this stuff and then they didn't do it, I

mean, yeah, maybe you have some attenuated claim about that, but I mean, really, that's not the main gravamen and a reason to expand the scope of the suit. It's whether they actually have products to get ready to do it and then actually do it.

MR. HOWARD: I agree, subject to my second and final point on this issue, which is the reason why the direct qualifier is potentially problematic. And I was interested to see that in Judge Hamilton's -- I think the Fossleman case, she called direct an evasive qualifier for a similar reason. It's possible that support was not provided directly to those customers, but the software was nevertheless used in order to achieve assurance or comfort or a mechanism for how they were going to accomplish the migration of those customers that they had gotten into Safe Passage over to SAP software.

Because again, that's the point of it. And you have to know that you're going to be able to transfer what they're running on one piece of software over to your piece of software. That entire activity, which we know was exactly the point of Safe Passage, I feel is not addressed at all in the way that these declarations have been phrased.

THE COURT: Okay. Can you explain that again? Remembering how much of a layperson I am and what that would mean.

MR. HOWARD: Sure. Remember the old days of WordPerfect?

1          THE COURT:  More or less.  Because the old days are

2    still present in one place.

3          MR. HOWARD:  The federal courts.

4          THE COURT:  They live on here in amber.  It's the

5    place.

6          MR. HOWARD:  Well, let's just say that there was a,

7    movement to migrate the courts from WordPerfect to Microsoft

8    Word, which everybody else uses.

9          THE COURT:  What a novel idea.

10          MR. HOWARD:  And let's just say you had a lot of

11    documents that you were concerned about whether this is, you

12    know, there are some conversions here between these two

13    programs.  Not a perfect example.  But let's say you were

14    concerned about whether you were going to be able to get your

15    documents out of WordPerfect over to Word.  You would sure want

16    to know, you would sure want to be able to put those two pieces

17    of software side by side and know that you're going to be able

18    to map everything over as part of an enterprised switchover.

19          THE COURT:  Maybe that's why we haven't done it.

20          MR. HOWARD:  But that's why you have to have the

21    software.  So that is very concerning, and I -- it defies logic

22    a little bit that these very sophisticated customers would move

23    into the Safe Passage program without having some

24    representation or road map and SAP not having the basis to give

25    the assurance of that road map before they move over into that

1    column.

2            So those are the things, and I -- you know, it would

3    certainly be my preference to test those through

4    cross-examination for some of the reasons that we're going

5    through here, but I understand that the Court may want to

6    proceed incrementally in there.

7            So that's the factual -- I think that's the comment on

8    the factual issue.

9            THE COURT:  Uh-huh.

10           MR. HOWARD:  With respect to the answers, I think that

11   the one that was most directed at us is the publicly-available

12   issue.

13           THE COURT:  Right.

14           MR. HOWARD:  And, you know, nothing's been said as

15   to -- and this is part of the problem again with the

16   declaration:  Typically testimony, to be admissible, would have

17   a factual foundation to show that it does have, does come from

18   a basis of knowledge.  This is another area among the others

19   that you listed, Where, where did it come from?  How did they

20   get it?  What exactly was it?

21           THE COURT:  Get what?

22           MR. HOWARD:  The software that they've said that they

23   used.  This is the problem now, that it is now I think pretty

24   well-established, and Mr. Cowan will correct me if I'm wrong,

25   but I believe that these declarations establish they had the

1  software, and they were using it.  To develop these business

2  cases, at least.

3       THE COURT:  From your knowledge, and I will ask him,

4  of course, but what is publicly available?  I've never tried to

5  find out myself, so I really don't know.

6       MR. HOWARD:  I think that there are -- I don't know,

7  with respect to these specific software lines because we don't

8  know what it is that they are going to claim was publicly

9  available.  Typically, none of it is.  And there is -- one of

10  the reasons that we've been here.

11       THE COURT:  Well, you can go buy it, I suppose.

12       MR. HOWARD:  But that's the issue.  I mean, what they

13  consider publicly available in their business model is what we

14  claim is copyright infringement in this case.  What they claim

15  was publicly available through Oracle's password protected

16  website is what we claim they took in violation of the Computer

17  Fraud and Abuse Act.  So their label, their conclusion about

18  what's, quote-unquote, "publicly available" we may very well

19  not agree with.

20       THE COURT:  So from your point of view, password

21  protected, some customer who's paid money, gets a password and

22  then can attain access to certain things?

23       MR. HOWARD:  That's right.  And in other cases, you

24  know, there are agreements, we've talked about click-through

25  agreements, for example, on the site where you would go in and

1  you have agree, I am licensed.  You know, is that publicly

2  available?  Maybe they considered it was, and that's an issue

3  we're fighting about, but that is exactly what we would say is

4  violative of the various claims that we've brought.

5           THE COURT:  Okay.  Counsel?

6           MR. COWAN:  Your Honor, a couple of issues to address.

7  The first part of your comments -- and I'll go directly to the

8  declarations because you focused on those first.

9           A couple of things.  One, the, to my knowledge

10 qualifier, Mr. Nelson left TomorrowNow in November of 2007.  So

11 I think some of that is a product of that.  Mr. Nelson would

12 have to speak.  We did work with him to get these declarations

13 put together, him and his counsel, but these declarations

14 contain his and his counsel's input into that.

15          So, you know, the question as to what Mr. Nelson meant

16 by direct I think can be dealt with real easily.  They can ask

17 him when they depose him later this month.

18          THE COURT:  They're going to depose him anyway.

19          MR. COWAN:  They're going to depose him anyway.  They

20 originally asked for one day, we've offered two now, on the

21 26th and 25th of this month.  So they're free to question

22 Mr. Nelson about anything, what he meant when he signed this

23 declaration.  They haven't deposed him yet.

24          THE COURT:  So when is that going to be?

25          MR. COWAN:  I believe it's -- February 25 and 26 are

1  the two dates that we were talking about right now.

2          MR. HOWARD:  The scheduling is up in the air, but one

3  thing that is certain is he will be deposed.

4          MR. COWAN:  And he hasn't been yet.

5          MR. HOWARD:  Correct.

6          MR. COWAN:  So that's that point.  So I don't want to

7  venture off and try to interpret beyond what's in these

8  documents.

9          THE COURT:  Let me ask you this:  At his deposition,

10 are you willing to have him questioned about anything in his

11 declaration?

12         MR. COWAN:  Absolutely.

13         THE COURT:  And what is the basis for his knowledge?

14 What does he mean by direct?  Does he know of anything

15 indirect?  You know, what does he mean by available to the

16 general public, etc.?

17         MR. COWAN:  Absolutely, your Honor.  And we haven't

18 limited their ability to question any witness on these three

19 products.

20         THE COURT:  Except you're not putting up a -- you're

21 refusing a 30(b)(6) witness.

22         MR. COWAN:  We're refusing to prepare and present a

23 30(b)(6) witness because of the burdens associated.  To do that

24 we would need to go look for and find all the documents that we

25 haven't produced in this case that would relate to these

products, and a huge effort to go find anybody who had ever

touched on it to make sure, from a company's standpoint, we

know what the answers to those 30(b)(6) questions are with some

degree of certainty.  And that's part of the reason why these

declarations don't have that granularity is because that's our

big point, because it's burdensome to require us, in light of

the fact that TomorrowNow never supported these three software

lines, to go and spend the time to investigate what TomorrowNow

did when it considered providing service for these three lines

and what SAP did when it considered TomorrowNow providing

service for these three lines.

        THE COURT:  Well, go on and --

        MR. COWAN:  As to Mr. Ziemen's declaration --

        THE COURT:  Is he going to be deposed, too?

        MR. COWAN:  He's already been deposed for two days,

but -- he was deposed in September, when they could have asked

him questions about Hyperion and Retek and E-BS, and they did

ask him some questions.  They did not, oddly enough, ask him a

lot of the questions they have now that they want us to put

forward in a declaration.  So -- and a comment what general

public or publicly available means.  I think it says available

to the general public.

        THE COURT:  That makes a question about this website

issue.

        MR. COWAN:  Again, that's something they can ask

1    Mr. Nelson and get his knowledge on, on that.

2            THE COURT:  I would think Ziemen, if he's already been

3    deposed, ought to supplement his declaration on these questions

4    too.  I mean, you know, I think it should be transparent, in

5    other words, I don't think -- you know, I think that it should

6    be, Your witnesses should have to be pinned down in detail

7    under oath that there's really no "there" there.  All right?  I

8    mean, they can't eliminate perhaps the possibility that some

9    rogue person somewhere did something, but I don't think that's

10   enough to justify a lot of discovery.  But, on the other hand,

11   the kinds of suspicions that Oracle's raising, the declarations

12   and the -- in the case of Mr. Nelson at deposition ought to

13   nail those things down.

14           Now, if for example, let's say they were too high

15   level to know anything about it, which would tend to kind of go

16   against Oracle's theory, then I think -- because how could you

17   really tag SAP with it either -- but, you know, if there was

18   say one person totally in charge of the migration and what do

19   we do and what should we look at at Oracle, that might be

20   someone that, you know, you should have a declaration from.

21           On the other hand, I don't think you should have to,

22   you know, investigate, you know, thousands of employees about

23   events that were a long time ago if there's really, you know,

24   there's really no smoke, so there's no fire.

25           MR. COWAN:  Well, a couple of comments on that, your

Honor.  One is:  I agree with you that whatever is said regarding these three products needs to come from the witnesses' mouths instead of suspicions by Oracle or my characterization of what I believe to be true, neither of which are relevant.  So with respect to that, I think the issue then becomes:  How do you scope that, right?  In terms of keeping the burden reasonable in light of what we do know.  But still allow Oracle to take what discovery they think they need to take in the context of the timeframes that are set up and the limits that are in place.

THE COURT:  I mean, I agree generally that they're only suspicions.  On the other hand, they're not unreasonable, and that's why I said I think good cause is probably the standard.  But they're not unreasonable suspicions.  And so I think that -- and of course, you know, in our system, each side is an advocate, and so they're going to be looking and being concerned that there is something, you know, being artfully worded that's keeping them from something that they really would like to know.

That also means as a judge you can't let that say, therefore, Open, Sesame, because it could be an ill-founded suspicion, even though it appears reasonable from the advocate's point of view.  But you're also paid to make reasonable arguments to keep your client from, you know, paying any more damages than they need to.

1          So I mean, I'm looking at it both ways.

2          MR. COWAN:  Right.  And I think the other thing that

3     we need to be, in deciding the scope that we need to go back

4     and look at, that Oracle hasn't addressed, and that you haven't

5     raised yet, is the ownership of these products that are at

6     issue.  And what copyrights are out there that relate to these

7     products.  There has been substantial motion practice before

8     Judge Hamilton on this very issue related to the PeopleSoft and

9     J.D. Edwards product.  One motion to dismiss that we prevailed

10    on showing that two of the plaintiffs weren't entitled to bring

11    the claims they were bringing in this case.  And so that's --

12         THE COURT:  I guess -- see, I don't know anything

13    about that issue at this point.  But it's a question in my mind

14    of, you know, what order do things get done in.  It doesn't

15    really matter from a discovery point of view if one of the --

16    if any one of the plaintiffs has a right to raise these issues.

17    It doesn't matter to me that the others don't.  Right?  I mean,

18    the fact that Oracle acquired these companies would suggest

19    that they acquired at least some copyrights in there.

20         MR. COWAN:  I think the question is:  Who is Oracle?

21    Because it's a number of different companies, and we have no

22    assurances nor any representations from the plaintiffs in this

23    case that they, in fact, are the ones that own the property

24    interest they are seeking to protect.  They use the term

25    "Oracle" broadly, but we haven't seen that.

1        But again --

2        THE COURT:  I guess what I'm saying is, it kind of --

3   maybe I'm naive, but it would surprise me if Oracle paid lots

4   of money to acquire these companies and doesn't own at least

5   one of the entities in this suit that have a right to bring it.

6   And I don't think the motion practice of the details of that

7   should be in front of me.  If you really have a genuine basis

8   to think that they have no business enforcing any of these IP

9   rights, I suppose then I should require some kind of threshold

10  showing on Oracle.  But I find that -- it seems to be contrary

11  to common sense.

12       But not everything follows common sense.  I'm aware of

13  that.

14       MR. COWAN:  I think that's why I brought it up.  If

15  the Court is inclined to order us to go forward and do more

16  than what we've done on these issues, I think, from, you know,

17  an incremental basis, a step for plaintiffs would be -- is to

18  establish who owns these products, what is the products, what

19  specifically other than just identifying the product by name

20  they owned.  Whether we had more information regarding the

21  alleged copyright and the copyright registrations they're

22  seeking to protect, because the footnote in their moving papers

23  and the footnote in their second amended complaint acknowledges

24  they haven't brought any specific copyright claims on these

25  products until they can do further discovery to determine what

1  that is.

2          THE COURT:  Right.  They haven't.  But I mean, again,

3  which is the cart and which is the horse?  I mean, I said that

4  that's the reason I tend to say it has to be good cause.  But I

5  think there is enough good cause to close some of the loopholes

6  that may be in the declarations.

7          And do you want to respond on that?

8          MR. HOWARD:  On that point, your Honor, I was about to

9  use the cart and the horse as well.  We're just trying to find

10  out some of the foundational facts here.  We're perfectly

11  prepared to make whatever showing is required if we get to the

12  point of establishing that these are -- I mean, there are at

13  least in one of these acquisitions $3.3 billion at stake.  So

14  it's not an insignificant issue.  It's a fairly significant

15  issue to us.  These are products that haven't been the subject

16  of discovery.

17          THE COURT:  But I mean -- I guess what's being said is

18  is it possible that Oracle has -- all the Oracle plaintiffs in

19  this case don't have copyrights in any of the software at

20  issue?

21          MR. HOWARD:  I don't think that's possible.  I don't.

22  But --

23          THE COURT:  Well, you would hope that they got

24  something for the $3 billion.

25          MR. COWAN:  My question is:  Who is "they"?

1          MR. HOWARD:  You would think --

2          THE COURT:  Although everything that's been done in

3    the past is being called into question now.

4          MR. HOWARD:  Your Honor, I was going to go back to the

5    30(b)(6) point, because I just -- it was just an idea that I

6    had.  There was a discussion about Mr. Ziemen, and we've

7    provided Mr. Ziemen's testimony in -- it's part of Exhibit 2,

8    to Ms. Jones' declaration, was filed with the reply.  The point

9    of it is, though:  He doesn't know anything.  He says, I don't

10   know.  I don't recall.  Who is this person?  I don't know.

11         So we did ask enough questions, we felt, to

12   establish -- it starts on Page 34.

13         THE COURT:  See, I'm looking at -- this is the opening

14   declaration.

15         MR. HOWARD:  It's the reply declaration of Ms. Jeong.

16         MR. COWAN:  Exhibit A to the reply, your Honor.

17         THE COURT:  Okay, I see.

18         MR. HOWARD:  And there's several pages put in there

19   because defendants made the point in their opposition, Yeah,

20   you guys have asked these questions, and so we wanted to

21   provide the Court with the actual testimony, and this is it.

22   And what we established is that he can't remember anything,

23   which is a habit that permeates a lot of their witnesses.  But

24   that's also what happens when you don't have documents.

25         And so the suggestion I was going to make, since

Mr. Nelson's being deposed and since there's a representation

that he's the knowledgeable person about these issues, you

know, why don't they produce his documents on these issues so

that we can have an informed examination and he -- you know,

because there may be things that he can genuinely say he

doesn't remember.  But if we really want to get to the truth of

it in an incremental way and a contained way, why don't they

produce these documents on this software that's responsive and

why doesn't he then be the 30(b)(6), and we would be willing to

put off his deposition for some reasonable period of time to

allow that to happen so that we can have an organized, informed

opportunity to explore the issues that have been raised with

respect to his declaration and that are in our motion?

        THE COURT:  Well, I guess -- what would it take?  What

are, quote, his "documents"?

        MR. COWAN:  I don't know the answer to that, your

Honor.  But that may be something we could do before he's

currently scheduled to be deposed.

        THE COURT:  I think that if there is, you know, a

manageable universe of his documents that he can look at, he

should refresh himself.  On the other hand, I don't know if

that's the case or not since he's not there any more.

        MR. COWAN:  Right.

        THE COURT:  What I'm not willing to order at this

point is a wholesale examination of all your documents that

1    would be required for a good 30(b)(6) deposition.  And so --

2    and if he's only looking at his own documents, I don't think

3    that's a exactly a 30(b)(6), either.  But I think the

4    suggestion -- why don't you look into it -- that he look into

5    his own documents and refresh himself.  Then, if at his

6    deposition he can't remember anything on these very subjects

7    and really has no basis for knowledge other than amnesia, which

8    is a lack of knowledge, then that might open the door to some

9    more searching.

10           But I do think the standard is good cause.  I think

11   that essentially -- and it's also the proportionality issue,

12   even though nobody -- and the same thing is true of the second

13   set of motions, second motion and set of papers.  Nobody really

14   demonstrated the burden.  I would imagine the wider the search,

15   the more burdensome it's going to be, and the idea that they

16   look for everything that they have, we're nowhere near that.

17           MR. COWAN:  Let me address that, your Honor.  Part of

18   it I think was, rightly or wrongly, an assumption that this

19   court -- you -- have been fairly intimately involved in the

20   history of where we are to this point in term of what the

21   parties disputes have been, etc.

22           THE COURT:  Yeah, and I'm reluctant to widen it.  I

23   mean, that's correct.

24           MR. COWAN:  So that's why we didn't go into greater

25   detail on that.  Because we assumed the Court had a basis of

1  knowledge on where we are with respect to all the other things

2  that are going on in this case on discovery.

3        THE COURT:  That's why I'm very reluctant.  And I

4  mean, strictly speaking, I'm really not widening discovery very

5  much.  I'm just saying that I think if it can be done at a

6  relatively low cost to sort of close what appear to be possibly

7  loopholes -- they may not be loopholes, but the

8  direct/indirect -- those sort of things that we've just

9  discussed....

10        MR. COWAN:  Maybe there's other witnesses.  We went to

11  Mr. Nelson for the reasons you've indicated.  And Mr. Ziemen on

12  this issue went to him because they attached documents from

13  him, and used those documents as proof.  Their proof.  "Proof",

14  in quotes.

15        THE COURT:  Right.  I agree with you that I think it's

16  only suspicion at this point.  I do think that it's not pled as

17  something specific, and on top of that, I'm still looking at --

18  even if that weren't the case and I was wrong with the

19  standard, I think I'd still be looking at the proportionality

20  and the considerations and the case management, essentially,

21  which is that this case is going to trial, it's already got a

22  huge amount of issues in it that are very -- you know,

23  everybody's as concerned as am I in keeping the train running

24  down the track.  So, you know, adding cars to it, etc., slowing

25  it down, I mean, that's a concern.

1            But I -- so that's what I'm suggesting, okay.  At his

2     deposition, look into whether he can refresh himself with his

3     own documents.

4            MR. COWAN:  Okay.

5            THE COURT:  Find out at his deposition what the basis

6     of his knowledge is:  Direct, indirect, publicly available,

7     etc.

8            A supplemental declaration of Ziemen on the same

9     questions.

10           And basically, I think, you know, use the arguments

11    that Oracle has raised about what they are saying is ambiguous

12    as your guide of amplification.  And certainly if it's

13    something like, I think it ought to be, explained, I mean, if

14    what is the definition of publicly available as used in those

15    declarations?  You know, if it was accessing a password

16    protected website and the click-through isn't, you've got to

17    say so, and you all have to fight about whether that's legal or

18    illegal.

19           But I do think in terms of proportionality analysis,

20    though, I don't think there's any reason to believe at this

21    point that it was ever done or offered.  Maybe because this

22    litigation was in the offering or filed.  I think someone's

23    mentioned that.  Then I really don't think it should be a big

24    focus of the case or very much expenditure of time and money.

25           MR. COWAN:  One point, your Honor:  In terms of

1    supplementing Mr. Ziemen's declaration, if we find in light of

2    Mr. Howard's documents they already questioned him and he says

3    he doesn't know, he doesn't know, he doesn't know, if in going

4    back to him and others at our client we find another person who

5    may have more knowledge, I assume the Court wouldn't oppose us

6    finding another declarant besides Mr. Ziemen?

7         THE COURT:  I think that's fine.  I mean, I think if

8    there's another declarant who was -- especially who was, you

9    know, involved in this issue about really vetting whether to do

10   this or support or not do it, and deciding what to access and

11   whatnot to, that would be fine.

12        MR. COWAN:  Okay.  Because that may make more sense.

13   Again, I need to go back and study the testimony, talk to my

14   client, talk to the witnesses.

15        THE COURT:  But what I am trying to do is to avoid --

16   I mean, I am mostly denying the motion in the sense that, you

17   know, unless -- I mean, I still think there's, you know, at

18   most, a tiny bit of smoke, you know, not enough to indicate a

19   fire, that would open the door to a lot of expensive discovery

20   on what I think so far are more suspicions than anything else.

21        But I would like to see a little more to allay the

22   suspicions.  And if it then becomes suspicions that I don't

23   think, you know, have any real foundation with this additional

24   discovery, then that's the end of it.

25        On the other hand, if it turns out there's a can of

1    worms that gets uncovered, well then, that may justify more.

2            MR. COWAN:  One final comment, your Honor.  I think

3    it's important to get Mr. Nelson up and deposed as soon as

4    possible on this issue.

5            THE COURT:  I think you should go ahead with the

6    deposition as scheduled.

7            MR. COWAN:  Okay.

8            MR. HOWARD:  Well, your Honor, there are other issues

9    around that schedule, but we'll work it out as soon as we can.

10   We want to take him.

11           THE COURT:  I'm not taking a position on whether you

12   have other issues.  But I am saying I don't think this is a

13   reason to delay the deposition.

14           MR. HOWARD:  Understood.  But I do think that in the

15   course of determining whether he can be refreshed and whether

16   there's documents they can produce, we're just talking about

17   searching for E-BS -- E-Business Suite -- Retek, Hyperion, and

18   trying to determine what they did.  And that's just, if what

19   they say is true, that they didn't do anything, then that just

20   shouldn't take very much time.

21           THE COURT:  I agree.

22           MR. COWAN:  I understand the Court has ordered us to

23   go look for his documents that relate to these three software

24   applications, and if they haven't been produced, produce those

25   before his deposition?

THE COURT:  Unless there's some reason that turns out to be much harder than it appears to.  But I assume you've segregated these documents in the past for other reasons.

MR. COWAN:  And we just got done producing a number for him on extending timeframes, and that's one of the issues that Mr. Howard's alluding to, and we may be back to you if we haven't resolved that in the next couple of days when we talk to you on Friday.

THE COURT:  And I haven't looked at anything about Friday yet.  Sufficient unto the day, as they say.  All right.  So I think that takes care of this motion.  So it's essentially granted in part; denied in part.  Okay.

MR. HOWARD:  Thank you, your Honor.

MR. COWAN:  One thing, before I forget:  Last night when we filed our joint discovery conference statement towards the end -- these processes are always, it takes till the final hour of the day they're due -- I was actually on the plane coming out late last night when we decided to attach something on the D designation proposal.  There's an Exhibit C that I needed to look at to make sure it's the right one.  I have done that today.  We filed it today.  I have the chamber's copy here.

MR. HOWARD:  We've seen it, your Honor.

THE COURT:  That's fine.

MR. COWAN:  There's extra copies.

1          THE COURT:  Thank you.

2          So let's talk about the third party support by Oracle

3     partners.  I guess in some ways this is an issue that's

4     morphed -- I mean, it's now CedarCrestone, the original Oracle

5     subpoena became the spring with regard to revisiting this

6     issue, as opening the door.  Then Oracle cut back the scope of

7     that subpoena, trying to close the door.  But really, it seems

8     to me this is boiling down to CedarCrestone being an example of

9     something you want to get into.

10          MR. McDONELL:  Absolutely, your Honor.  I don't think

11    for one minute that we needed the fact of Oracle serving a

12    subpoena on CedarCrestone to revisit this issue.  We know the

13    history.  This was raised with Judge Legge a year ago.  He

14    looked at it, I believe -- with all due respect -- very quickly

15    along with many, many other issues at a time when he was

16    disinclined to focus on damages discovery at all.  He did the

17    prudent thing:  Denied without prejudice, explicitly, and said,

18    Make a further showing on down the line.

19          We have made that further showing to a fare-thee-well.

20    Unlike the argument you've just heard that was rife with

21    suspicion and guesswork, we have absolutely rock solid evidence

22    that this is a pertinent area of inquiry, including documents

23    which were submitted to the Court that show, contradicting

24    Oracle's argument, that CedarCrestone is not a competitor of

25    Oracle and therefore not to be analyzed the way these other

1   third party support providers like TomorrowNow, Remney Street,

2   Versitek, and some others.  We know from the documentary

3   evidence in the case that CedarCrestone is, and has been, a

4   competitor of Oracle, and I'm referring as an example to

5   Exhibit 4 to my reply declarations, which, I can summarize for

6   you quickly, is an internal Oracle document that tracks -- it's

7   got some redactions because for confidentiality purposes we

8   redacted out the identities of customers.

9           THE COURT:  I have your declaration.  But maybe you

10  can show me where you are.

11          MR. McDONELL:  Certainly.

12          (Pause in proceedings)

13          MR. McDONELL:  Presenting your Honor with Exhibit 4.

14  It's a discovery document produced by Oracle in which they

15  track the risk they have of losing their support customers to

16  third parties.  So if you'll look at the column headings,

17  you'll see one sort of near the middle of the page.  It says,

18  Third party name, in the top column.

19          THE COURT:  Uh-huh.

20          MR. McDONELL:  That third party is CedarCrestone.  The

21  notes in the immediate column to the right are identified as

22  notes from customer.  Customer name is blanked out.  And

23  there's some discussion there which appears on its face to be

24  the customer's statement as to why they're leaving Oracle and

25  going to CedarCrestone.  And I'll read in relevant part, quote,

1  the customer speaking:

2          To that end, we will be looking to not be under

3  maintenance with Oracle, but instead contract with

4  CedarCrestone for ongoing support.  So switching out Oracle

5  support for CedarCrestone.  And then in the third column from

6  the right, third, last column, the current stage, Oracle tracks

7  this customer is lost.  So here's a customer that was thinking

8  of Oracle or CedarCrestone for support.  Chose CedarCrestone

9  and was lost by Oracle.

10         Squarely contradicts the notion that CedarCrestone is

11  this Oracle partner that lives only to drive customers to

12  Oracle.

13         THE COURT:  Let me suggest to both of you:  This is

14  how I look at it.  But I'd like to be educated further.  I see,

15  my guess, but it is a guess, is that Oracle makes the most

16  money when it services the customers itself directly and has

17  ongoing support.  It makes the least money and perhaps loses

18  money when it has a completely independent third party

19  providing those services, and maybe also cross-selling

20  non-Oracle products instead of cross-selling Oracle products.

21  Somewhere in between is the CedarCrestone authorized partner.

22         And probably just the way -- you know, if they can't

23  keep the world strictly to being Oracle only, then they're

24  better off having some partners that they do get a fee from,

25  that they do have some control over what they do.  And that

1   provide, you know, some -- at least they probably try to keep

2   them cross-selling, and give them awards and things when they

3   do.  As opposed to deferred it.

4          And so they're still making some money but probably

5   not as much as when they keep it totally in the house.  So I

6   view the totally independent third parties as the most relevant

7   to damages.  But I view the in-between authorized partners as

8   maybe having some relevance, but not as much.

9          MR. McDONELL:  And let's assume that profile you just

10  described is the reality, and we would need the discovery to

11  see what the actual economics are.  It's square on relevant to

12  damages because we believe that one of the theories of Oracle's

13  damages claim will be when they lost a customer to TomorrowNow,

14  that lost -- that customer was lost forever, and Oracle lost

15  their revenue stream forever.  If it's true that the customer

16  then migrated back to CedarCrestone, Oracle gets a piece of the

17  revenue stream back through that vehicle.  That would reduce

18  the amount of claim damages.

19         So that's the type of thing we need to explore to

20  understand what the economics are.

21         MR. ALINDER:  Your Honor, can I address that

22  foundational issue that you're discussing right now?  And to

23  suggest that it's actually a little more complicated than sort

24  of this three-tier model that we're talking about right now.

25         So, you're correct in that Oracle has, you know,

partners who provide many different types of services.  Now,
CedarCrestone, unfortunately, is just not one of those ones
where they provide support or we license them to provide
support.  In fact, no partner, and I think the Kelly
declaration I think establishes this in detail, and I'd be
interested to hear what additional information SAP would like
to see in a declaration along these lines, but I think it
establishes that there are no partners that support customers
like TomorrowNow.  And that the license agreements that Oracle
has with partners just simply do not even take into account
this type of support.

In fact, I think the last two paragraphs:  "I am not
aware of any license with any Partner that would allow that
partner to copy Oracle's application software and support
materials to create their own fixes, patches..." etc.

"Oracle has no licensed support Partners for
PeopleSoft, J.D. Edwards or Siebel applications -- including
CedarCrestone.  Nor has Oracle licensed any Partner to provide
support for any de-supported release of PeopleSoft,
J.D. Edwards or Siebel applications -- including
CedarCrestone."

MR. McDONELL:  So here's my dilemma, your Honor:  We
have and we've put into the record as Exhibit 1 to my reply
declaration statements from CedarCrestone's own website, and
I'd be happy to locate that for you.

1           THE COURT:  I know you quoted it in your brief.  It

2     seemed to be somewhat to the contrary.

3           MR. McDONELL:  I'm looking at it.  It says in the

4     upper right-hand corner --

5           THE COURT:  Page?

6           MR. McDONELL:  It's Exhibit 1, Page 4.  We put page

7     numbers in the lower right-hand corner.

8           In the upper right-hand corner, Oracle certified

9     advantage partner.  Immediately beneath that.  Oracle partner

10    network.

11          THE COURT:  Yes.

12          MR. McDONELL:  Some kind of award winner.  And then

13    under the heading in the main body of the document it reads,

14    "CedarCrestone managed services, maintained, offers clients a

15    solution for providing ongoing tax and regulatory support for

16    unsupported PeopleSoft applications."

17          Now, you just heard Mr. Alinder say that Oracle

18    partners don't support unsupported applications.  Here, in

19    black and white, it says that CedarCrestone, the Oracle

20    partner, does support unsupported applications.

21          MR. ALINDER:  And I think I can explain this conundrum

22    pretty easily.

23          THE COURT:  Go ahead.

24          MR. ALINDER:  The conundrum that Mr. McDonell is

25    setting forth here really is of just the fact that Oracle

1   licensed certain partners to do certain activity.  Oracle does

2   not license them to do things like this.  That he is reading

3   off of CedarCrestone.  What they do independently of Oracle,

4   not in partnership of Oracle, Oracle does not have knowledge

5   really about those other than, you know, bits and pieces that

6   it hears from customers.  And indeed --

7           THE COURT:  So they're rogue partners, essentially?

8           MR. ALINDER:  Well, no.  I guess what we would say is

9   there are third parties that we believe can provide support

10  legitimately.  We don't have a license agreement to license

11  them to do that support, like CedarCrestone supporting

12  de-supported releases.  As the Kelly declaration says

13  conclusively, we don't license that.  We don't license that

14  work.  And so the idea that they would be able to get the

15  discovery from us about that just makes no sense.

16          THE COURT:  But you're also preventing from getting it

17  from CedarCrestone.

18          MR. ALINDER:  Well, that's not exactly true.  So what

19  we would say is:  Go, fine, get your discovery from

20  CedarCrestone about how CedarCrestone supports customers.  If

21  you want to talk about the things that they do outside of our

22  partnership agreement, fine.  The thing that we think is

23  irrelevant is the partnership agreement which doesn't have

24  anything to do with these things that they're talking about on

25  their website.

1          MR. McDONELL:  Your Honor, they're defining this so

2    narrowly now.  We asked them in interrogatories that are in the

3    record of this motion to identify the third party companies

4    that support Oracle products, PeopleSoft in particular.  They

5    answered that interrogatory and did not identify CedarCrestone.

6    Before Judge Legge we said, Gee, we don't think you've

7    identified everybody.  How about we get a list of names?  How

8    about CedarCrestone, who's on the list?  No, no, no.  Cedars

9    Crestone's a partner, so you can't have any discovery of them.

10   So then months go by and we're flailing away at this, and now

11   finally they open the door with CedarCrestone again.  We run

12   through that door as quickly as we can, we serve CedarCrestone

13   with a subpoena.  They object.  CedarCrestone objects.

14   CedarCrestone seems to be taking Oracle's lead on the whole

15   thing.  And Oracle says, Don't push on CedarCrestone, let's

16   just bring a motion before Judge Laporte about whether Oracle

17   has to give you any discovery on this.

18          Your Honor, this has been enough of a runaround that

19   it should really end right now.  We need a meaningful

20   disclosure from Oracle along the lines that we've asked for.

21   It is narrowly focused.  They don't want to admit that.  But it

22   is.  We've carefully made our discovery requests in the forum

23   for documents of documents sufficient to show, which should by

24   definition eliminate burdens.  We've asked for one 30(b)(6)

25   that's of a foundational nature, and I'm sure there'll be a tug

1    of war of how much the witness needs to know.  But we're not

2    expecting a witness for a single 30(b)(6) deposition to know

3    all the details.  We want to know the general lay of the land.

4    There are other companies just like CedarCrestone that Oracle

5    knows darn well are, you know, supporting third -- providing

6    third-party support but not doing it through the partnership

7    agreement that they're not telling us about like they didn't

8    tell us about CedarCrestone.

9         THE COURT:  I'll have to say, this is a morph, to me,

10   from how I understood the motion.  It seems to me as if you're

11   saying CedarCrestone is a hybrid.  They do some things that are

12   authorized by a license; they do other things that are not

13   authorized that you don't know about.

14        MR. ALINDER:  What I'm saying is, they've put into the

15   record bits and pieces from CedarCrestone's website which

16   suggests that CedarCrestone does other things.  I think they

17   have to go talk to CedarCrestone about that, the activities

18   outside of a partnership agreement.

19        THE COURT:  So it's Oracle to subpoena CedarCrestone

20   as to support they give to Oracle products that is not under

21   their partnership agreement?

22        MR. ALINDER:  I think that's fair game.  I think the

23   partnership is just completely off.

24        THE COURT:  So maybe instead of being a three-tier,

25   this is a four-, or the middle tier is a hybrid.  But do you --

1  you know, you talk about everybody has to have something called

2  a worldwide license, right?

3          MR. ALINDER:  Partner agreement.

4          THE COURT:  Yeah.  Worldwide partner agreement.  And I

5  think you said SAP is part of that.

6          MR. ALINDER:  They are.

7          THE COURT:  Do you have a copy of that?

8          MR. McDONELL:  It's in the database industry.  It's

9  not this same support industry.  It has to do with different

10 types of products.  Than I think they may have put some

11 reference to it if these papers.  Different animal, your Honor.

12 We're trying to find out what the industry standards are to

13 support PeopleSoft and J.D. Edwards' software applications.

14         THE COURT:  Well, I think as to PeopleSoft and

15 J.D. Edwards -- let's start with just the license itself.  Is

16 there a standard license?  Or a standard partnership agreement?

17         MR. ALINDER:  There's usually a standard license

18 agreement.  I think there are addendums.

19         THE COURT:  What is the objection to providing that

20 standard license agreement?

21         MR. ALINDER:  I think the problem is, their hook for

22 getting discovery is we need it for a hypothetical damages

23 model.  Right?

24         THE COURT:  Right.  And I will tell you that my

25 general view is that first of all, I would think, you know, I

myself would tend to phase discovery and not allow very much damages discovery until, you know, at the very first instance. So I think that that could well be what Judge Legge's thinking was.

I find the causation argument, the secondary argument by SAP, just as I have before, not very convincing and sort of baffling. It might be that, you know, you should just -- maybe you should be asking for a list of where -- of TomorrowNow customers who went to Oracle partners. You know, maybe that's something you already have. But -- I mean, it might factor into damage analysis.

But as far as the issue of damages analysis and what is a reasonable royalty, it seems to me you're asking me to rule ultimately that that shouldn't come into evidence as opposed to whether they should get some discovery on it because as I see it, it's a benchmark. It's one -- you make some very strong arguments that it's for doing a much smaller subset of things, and probably in exchange for paying a fee, that Oracle agrees of to have done, and so, you know, you'd have some pretty strong arguments that that was much too low for a reasonable royalty, but what -- should they have that not at all? They probably should have it.

MR. ALINDER: Can I address that?

THE COURT: And if you wish to address that, too.

MS. GLOSS: I was also concerned that some of the

1  questions you were asking him about Oracle's business practices

2  might not be within his knowledge.  And there seems to be some

3  misunderstanding going on.  I'd be happy to try to clarify some

4  of that.

5  THE COURT:  That's fine.

6  MS. GLOSS:  Oracle's partner program has a couple of

7  components.  We have partners who resell our licenses.  And we

8  have partners who are -- who intern to partnership agreements

9  pursuant to which they act as third-party consultants,

10  typically implementing and modifying the customer system.

11  THE COURT:  So that ladder would be more similar to

12  what we're talking about with TomorrowNow.

13  MS. GLOSS:  It is more similar to what we're talking

14  about with TomorrowNow.  And part of what TomorrowNow argued

15  early on was that they were trying to step into the shoes of

16  the customer and just act as a third-party consultant.  It's

17  just they didn't do that.  These customers, presumably, can

18  provide consult -- I'm sorry, these partners, can provide

19  consulting services for a customer under these agreements.

20  Aside from the database world, in the U.S. and Colleen

21  Kelly's declaration addresses this, in the U.S., we do not have

22  partners who we enter into contracts with, partnership

23  agreements with, allowing them to provide technical support

24  services to our customers in the U.S.

25  THE COURT:  Right.  Well, actually, I did want to get

1    to -- I think -- I didn't have a response about the U.S.,

2    non-U.S. issue.  Or maybe I did, but I didn't fully understand

3    it.  Because I don't think -- I'm not clear that the case is

4    limited to what's going on in the United States.

5            MR. McDONELL:  It is not, in terms of the claims.  Now

6    ultimately, the legal rulings that we may get will establish

7    that it is limited.  But as of today, there are extra-U.S.

8    claims.

9            Putting that aside, your Honor, we've also put into

10   evidence that CedarCrestone put available on its website to

11   have U.S.-based customers.  So again, I don't know --

12          THE COURT:  It could have you as base customers that

13   it's not providing any services to regarding Oracle products, I

14   suppose.

15          MS. GLOSS:  We have an issue with the definition of

16   "support", though.  Technical support services in the industry

17   generally refers to telephone support, updates, upgrades,

18   regulatory tax updates.  And to the extent you need to use our

19   intellectual property, our copyrights in order to achieve that,

20   you have to be properly licensed for either -- you have to

21   really stand in the shoes of the customer and do only what that

22   customer is entitled to do.  Only for that customer.  Or you

23   have to be properly licensed with Oracle.

24          As I indicated, as Ms. Kelly indicated, in the U.S.,

25   at least, we don't license partners to provide that kind of

1  support using our software.  And so therefore we don't get a

2  fee for it either.

3          MR. McDONELL:  But overseas, apparently they do.

4          MS. GLOSS:  I can address that, too.

5          But CedarCrestone, to address CedarCrestone, we don't

6  know why they put on their website what they put on their

7  website.  And if a customer tells us they are leaving to go to

8  CedarCrestone, for quote-unquote support, that doesn't mean

9  it's exactly the same kind of support that Oracle can provide

10 and that SAP was providing.  And so what's on CedarCrestone's

11 website is not something that Oracle's in a position to vouch

12 for.

13         THE COURT:  Right.  No, I understand that.  But --

14 well, I think I --

15         MR. ALINDER:  I think the small bit of, I guess,

16 relevance that we can take from both sides' discussion, there

17 are support customers that are -- sorry, support partners that

18 are overseas.  And that's also in the Kelly declaration.  And

19 this is a very small percentage.  Even those support partners

20 do not provide support, are not licensed to provide support in

21 the same way that TomorrowNow does.

22         THE COURT:  But what I tried to say, and I may take a

23 recess in a minute because I think -- I don't really feel like

24 any fog is lifting.  I feel the other way around, that it's

25 coming in.

What I tried to say was, from my perspective, and I'm the one who is got to decide this, your position that you took in your papers is too extreme. Because it's not directly relevant to damages and it's not -- the same royalty wouldn't be charged. Therefore, they have no business knowing what you do for this more or less more limited partnership thing. I agree with that. Because I think that that's the question for the trial judge. She might keep it out altogether; she might let an expert use that, their expert, as one of a number of factors, saying, you know, yes, they charge a 5 percent license fee for allowing these, and if they allowed, you know, if they also allowed us to duplicate their software and so forth, they would charge 10 percent. Things along those lines. So I think it's possible that they could use some basic information as a benchmark.

On the other hand, I don't want it to be a terribly burdensome undertaking because I don't think it's extremely strong evidence, because very clearly there's a big difference between a competitor and someone like CedarCrestone, which may have some competitive aspect, but it also definitely has some positive benefit, and Oracle is benefiting from that more than they benefit from a TomorrowNow type of operation.

MR. ALINDER: Your Honor, maybe I can offer a middle position, which is that we provide the CedarCrestone agreement and they get a chance to look at it.

1          THE COURT:  Right.

2          MR. ALINDER:  And they get to test what's stated in

3    the declaration.  And if there's some part as well of the

4    declaration that they think is ambiguous, similar to what was

5    discussed for the first motion, that they don't feel there is,

6    you know, it's been directly stated, we'll be happy to address,

7    you know, that issue.

8          THE COURT:  Well, that's why I asked you, the

9    CedarCrestone is -- that's fine, and if there's some master

10   agreement, which I assume is the same, or the same except for

11   some addendum or maybe something like that, I think you ought

12   to provide it and/or tell them that.

13          I think, in other words, CedarCrestone has become sort

14   of an example.

15          MR. ALINDER:  I agree your Honor, and to the extent

16   you'd rather have a form agreement, for example, I think we

17   could do that still.

18          THE COURT:  Maybe a form agreement and the

19   CedarCrestone agreement, because then they could look at the

20   CedarCrestone agreement in the website.  I think you now have

21   the green light to get from CedarCrestone what is not

22   authorized by Oracle.  Not necessarily forbidden by Oracle, but

23   not specifically authorized.

24          MR. McDONELL:  And then there's one other piece of

25   this, your Honor.  Now that this has morphed before our very

1    eyes from a pure partner to a partner that also does completely

2    independent third-party support, I think we're going to need

3    some discovery of Oracle about what they know about other of

4    their partners that have that split personality.  Because this

5    has been hidden from us.  It's -- by Oracle.  They've never

6    disclosed that CedarCrestone had this dual role.  And

7    therefore, the list we've been working with from Oracle about

8    the third-party support players is necessarily incomplete.

9          So -- we can maybe meet and confer about that issue,

10   but I do think we're going to need some discovery from Oracle

11   about which of its partners also do independent third party

12   support.

13         MR. ALINDER:  And your Honor, I'm -- sure, we're happy

14   to meet and confer about that.  One thing to say that we

15   haven't provided that discovery when the first thing they

16   received was something that Oracle had turned over that said

17   that a customer had left to go to CedarCrestone.  So it's not

18   there to say that we haven't been providing that.

19         THE COURT:  I don't know what -- I'm not influenced by

20   that at all.  One way or another.  But is there anything in the

21   Kelly declaration that you are quarreling with?

22         MR. McDONELL:  To the extent -- yes, to the extent

23   that we've identified that it contradicts CedarCrestone's own

24   statements about what it does.  But again, it's a bunch of

25   conclusionary statements from a witness that I can't

cross-examine.

THE COURT:  But you heard what I did.  I -- in the first motion, I'm not allowing cross-examination necessarily, but I am allowing amplification of the declaration to eliminate some of the conclusoriness, or what might be partial disclosure, rather.  So if there's something on here, I would allow her to amplify the disclosures.

I would state generally, this appears to be a little bit more detailed.  I wondered, Paragraph 5, Oracle has no license support partners.  That's in the present tense.  I don't know that it goes back.  Perhaps that was just an oversight.  But you know, the relevant time period extends somewhere back.  So if that's a recent development, that might not cover the bases.

MR. McDONELL:  Let me say, for example, Paragraph 3, second sentence:  Oracle contracts with only a small percentage of its partners to provide support services on PeopleSoft, J.D. Edwards applications.  That's what I want to know:  Who are they?

THE COURT:  And I think there's nothing wrong with providing a list of those people.  I think --

MR. McDONELL:  Probably don't want to get me started, your Honor, but they say they don't do the support over in the U.S. but they do overseas.  Where?  Who?  What?  Where?

THE COURT:  In other words --

                MR. ALINDER:  Those limited overseas partners, though,
really they don't provide support anywhere similar to what
TomorrowNow did.  They get a telephone call in, and then they
tell Oracle that it came in.  And Oracle provides the support.
They're essentially the conduit.

                MR. McDONELL:  When do they get paid?

                THE COURT:  All right.  Who gets paid?  You mean what
do they pay?

                MR. McDONELL:  What does a third party get paid?  Is
Oracle going to claim the full lost profit for that lost
customer?  How does the fact that part of the profit, the
alleged lost profit, went to the partner factor into this?  We
need to know who these partners are.

                THE COURT:  I'll order that you give the list, the
partners which are within a small percentage and give a little
more detail of what they do and who pays whom.  Okay?  But
beyond that, I mean, if there's a whole lot of different
pricing structures and things like that and it's complicated,
I'm not ready to say you should get that.  I don't think it's
irrelevant.  It's pretty attenuated.  So -- okay, as I was
trying to indicate, I think just like in an antitrust case,
there's stuff that's clearly in the same market and some stuff
that's somewhat attenuated, and exactly where you draw the
line, I don't have enough information to make, but if -- for
discovery purposes, I think you should get some basic

1    information along those lines.

2          MR. McDONELL:  In addition, you're ordering that they

3    produce the CedarCrestone agreement and the form agreement.

4          THE COURT:  Right.  And will those have the fee

5    schedule in there, or maybe I should ask you that.

6          MS. GLOSS:  I'm not sure I will know all the answers

7    with certainty until I go back and look.  The question is:

8    Which form agreement?  The form agreement -- we have

9    partnership agreements for reselling.  We have partnership

10   agreements for consulting.  And then we have the non-U.S.

11   agreements that are aimed at the countries where we generally

12   don't have the language ability to answer the questions.

13         MR. ALINDER:  Those are the overseas.

14         MS. GLOSS:  Those are the three form agreements I'm

15   aware of right now.

16         THE COURT:  The reselling doesn't seem to be relevant.

17         MR. McDONELL:  As a standard, it's not.  But any kind

18   of support service -- unless they're selling licenses.

19         THE COURT:  But I think the second and third are.

20         MS. GLOSS:  So our form consulting agreement and our

21   form --

22         THE COURT:  Overseas.

23         MS. GLOSS:  Overseas agreement.

24         THE COURT:  Yes.

25         MR. McDONELL:  And any and all -- I don't know if

1    there's more than one with CedarCrestone, I assume it's one,

2    but if it's been renewed and revised, I'd like to see it.

3              THE COURT:  In the relevant time period.

4              MR. McDONELL:  2002 to 2008.

5              THE COURT:  That's it.  I mean, I do -- I think it has

6    some relevance.  I don't think it has a whole lot of relevance.

7    That's what I'm trying to say.

8              MR. McDONELL:  Your, Honor I've done a poor job of

9    explaining to your Honor the relevance to this causation.

10             THE COURT:  The art of the apology and the taking:  It

11   was my mistake, is done now.

12             MR. HOWARD:  He's been watching the A Rod interview

13   this morning.

14             THE COURT:  I missed that one.  We probably got to a

15   new high or low on that score.

16             MR. McDONELL:  I will sit down and cut myself off now.

17   But your Honor, one day, will be --

18             THE COURT:  No, I see it has some relevance to

19   damages.  But you know -- and maybe it's the whole way this

20   issue has sort of come up.  But I mean, it's possible to -- you

21   know, I can see some relevance for your finding out, possibly.

22   But it really wasn't the gravamen of this, so I wasn't certain

23   about that, like which ones TomorrowNow shut down.  Who did

24   those people go to?  If they want back to Oracle, if they went

25   back to Partner, if they went back to the unknown.  That might

1  be fair discovery, because, you know, if your damages are --

2  unless you're saying they ended with the shutting down of

3  TomorrowNow.

4        MR. ALINDER:  And we're providing that discovery, your

5  Honor.  The document he was talking about was the third-party

6  risk analysis document that talks about where people went.

7        THE COURT:  And I think that's fine.  I think the --

8  but I think it was pretty convoluted the way the argument came

9  up in the context of this motion.

10        In terms of what is a reasonable royalty, if you're

11  really pursuing that -- I mean, I would tend to think that

12  head-to-head competitors, if this lawsuit is any indication,

13  would not be licensing each another, willingly.  But if that

14  really is being pursued, then, you know, I think they're

15  entitled to at least discovery to make sure that it's sort of

16  the range.  I think it's a very strong argument that any

17  royalty would have to be a lot higher to a licensed partner,

18  both because of the scope of it and who it would be going to.

19        MR. ALINDER:  And I think when they see the form

20  agreements, they'll be satisfied that it's not --

21        THE COURT:  Quite possibly.  And now apparently

22  there's this area where the partner may also be doing some

23  unauthorized things that are not necessarily forbidden, the way

24  you're saying that SAP was doing things that were illegal, but

25  are not necessarily necessarily known to Oracle, and certainly

1    not part of the scope of the agreement.

2            MR. ALINDER:  Right, and to the extent they are doing

3    something forbidden -- you know, we don't know that, but, you

4    know, if they take discovery and find out, then I'm sure we'll

5    be happy.

6            THE COURT:  You may yank those awards back.

7            MR. ALINDER:  Right.

8            THE COURT:  Former holder of....

9            All right.

10           MR. ALINDER:  Thank you, your Honor.

11           MR. McDONELL:  Thank you, your Honor.

12           MR. HOWARD:  Thank you.

13           (Adjourned)

14                            oOo

15

16

17                   CERTIFICATE OF REPORTER

18

19           I, Connie Kuhl, Official Reporter for the United
     States Court, Northern District of California, hereby certify
     that the foregoing proceedings were reported by me, a certified
20   shorthand reporter, and were thereafter transcribed under my
     direction into written form.

21

22   _____

23                   Connie Kuhl, RMR, CRR
                   Wednesday, February 11, 2009

24

25