Robert A. Mittelstaedt (SBN 060359)
Jason McDonell (SBN 115084)
Elaine Wallace (SBN 197882)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:  (415) 626-3939
Facsimile:  (415) 875-5700
ramittelstaedt@jonesday.com;
jmcdonell@jonesday.com; ewallace@jonesday.com

Tharan Gregory Lanier (SBN 138784)
Jane L. Froyd (SBN 220776)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone:  (650) 739-3939
Facsimile:  (650) 739-3900
tglanier@jonesday.com; jfroyd@jonesday.com

Scott W. Cowan (Admitted Pro Hac Vice)
Joshua L. Fuchs (Admitted Pro Hac Vice)
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600
swcowan@jonesday.com; jlfuchs@jonesday.com

Attorneys for Defendants
SAP AG, SAP AMERICA, INC., and
TOMORROWNOW, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE USA, INC., et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>SAP AG, et al.,<br><br>　　　　　Defendants. | Case No. 07-CV-1658 PJH (EDL)<br><br>**DECLARATION OF STEPHEN K. CLARKE IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 37(c) AND 16(f)**<br><br>**REDACTED**<br><br>Date: August 18, 2009<br>Time: TBD<br>Courtroom: E, 15th Floor<br>Judge: Hon. Elizabeth D. Laporte |

I, Stephen K. Clarke, declare as follows:

1. I have personal knowledge of the matters discussed herein.

**A.    Background and Qualifications.**

2. I am a Certified Public Accountant (Accredited in Business Valuation) in the State of Arizona; a Certified Fraud Examiner; and a Chartered Accountant in England & Wales. A copy of my resume is attached as Exhibit A. I have been engaged as a testifying economic damages expert in dozens of intellectual property disputes over the last 20 years. Such disputes have related to copyrights, patents, trade secrets, trade dress and unfair competition, and have involved aggregate claims well in excess of $100 billion (prior to this matter). I have provided testimony as an economic expert in many venues including Federal and State Courts, arbitration panels, and bankruptcy hearings in the United States, and the Crown Courts in Great Britain. I have valued over $20 billion worth of businesses in the same 20 year period. My degree is in Management Sciences from the University of Manchester in England. I taught economics at Arizona State University for several years.

3. In December 2007, I was retained by Defendants to address Plaintiffs' alleged damages. I have been working on this case since then.

4. To date, my work has focused on the analysis of Plaintiffs' alleged lost profits, Defendants' alleged unjust enrichment and reasonable royalty.

5. Although it is not yet certain how Plaintiffs will quantify their alleged damages for trial purposes, until recently it had appeared their claim was to consist of the following elements:

   a. Lost profits relating to support revenue for approximately 346 customers that contracted with TomorrowNow, Inc. ("TN") to support their Oracle software applications ("TN Customers").

   b. Unjust enrichment of SAP from former Oracle customers who were receiving support from TN but which also elected to purchase software and support from SAP.

   c. Reasonable royalties.

6. In their recently filed Supplemental and Amended Initial Disclosures ("Supplement") Plaintiffs set out certain expanded damages claims.

7. This declaration summarizes the work I have done assessing Plaintiffs' alleged damages to date and the work that would be necessary to evaluate Plaintiffs' expanded damages claims.

**B.** <u>**Work to Date Regarding Plaintiffs' Damages Claims**</u>**.**

8. In order to evaluate Plaintiffs' original claims for lost profits, unjust enrichment and reasonable royalty, I have been analyzing the documents provided by the parties related to the TN Customers as well as a subset of those customers that also bought software and services from SAP.

9. My work to date has been time-consuming for a number of reasons:

a. Analysis of Plaintiffs' claims requires consideration of a wide range of information from a variety of sources including: publicly available and non-public financial and other information, sales and marketing records, business management reports and analyses, correspondence, customer contracts, and more. I also needed a general overview of the products at issue in the case.

b. Because typical Oracle and SAP customers tend to be large entities with complex information technology purchase histories, and because of the vast differences in their individual fact patterns, I have had to do a customer-by-customer analysis.

10. The documentary evidence produced to date is enormous, comprising 1.6 million documents and 8.9 million pages of information. A detailed breakdown of the documents provided to me so far is as follows (Note: all figures are approximate as I am frequently provided additional documents):

    a. Plaintiff documents (100,000 documents - 485,000 pages).

    b. SAP documents (140,000 documents - 787,000 pages).

    c. TN documents (1,262,000 documents - 6,918,000 pages).

    d. Third party subpoena documents (97,000 documents - 687,000 pages).

11. Included with, or in addition to, the above documents are the following:

    a. Oracle contract files for the TN Customers (some of which appear to be incomplete - 92,000 pages).

      b.      SAP contract files for the relevant customers (22,000 pages).

      c.      Contract files for the TN Customers (7,000 pages).

      d.      65 customer productions (these are customers of one or more of the parties).

      e.      Oracle customer-specific files known as Analytics Contracts, Analytics License Reports, and OKI3 reports (2,000 files with what I estimate to be 300 MB of data).

      f.      Oracle customer tracking files known as "risk" reports/analyses (1500 files with what I estimate to be 600 MB of data).

      g.      Customer-specific financial reports produced by TN and SAP.

      h.      Accounting, marketing and sales documents related to the parties' sales of support services.

      i.      98 deposition transcripts (20,000 pages).

12.    In addition to the documents produced in discovery, there is a substantial body of publicly available information for virtually all of these customers, much of which may be relevant to my damages analysis. For example, publicly available data such as the following could be relevant, depending on the circumstances:

      a.      Bankruptcy filings.

      b.      Press releases.

      c.      Financial statements, including annual reports, SEC filings, etc.

      d.      Analyst reports.

      e.      Trade press.

      f.      Press releases from one or more of the parties

**C.    Expanded Damages Claim Regarding "Lost, diminished, or delayed current and prospective customer revenues and profits."**

13.    In the Supplement, Plaintiffs set out their expanded damages claims. Based on the Supplement and Plaintiffs' Second Amended and Supplemental Responses and Objections to Defendant TomorrowNow, Inc.'s First Set of Interrogatories dated May 22, 2009, I understand that Plaintiffs are claiming:

1    a.   Current and future lost profits related to the loss of the TN Customers.

2    b.   Current and future lost profits related to entities that may have become a Plaintiff customer but for the alleged actions. (Note: it is not clear whether Plaintiffs are limiting their "potential" customers to those that may have become a customer in the past but did not do so, or are including those that may have become a customer in the future and will not do so).

   c.   Discounts and price reductions to customers that Oracle retained (in other words, Oracle customers that never became TN customers).

   d.   Unjust enrichment related to revenues and profits SAP generated as a result of the alleged actions.

   e.   Reasonable royalty.

14. To respond to such claims I need sufficient documentary evidence to allow me to determine whether the revenues and profits generated from licenses and support during the relevant period were reduced, by how much the revenues and profits were reduced, and why they were reduced. I will also have to quantify the revenues and profits Plaintiffs would have generated from the "potential" customers and analyze why they did not become Plaintiff customers.

15. I will also need to know specifically: which entities Plaintiffs are claiming they would have added as customers but for the alleged actions; which entities Plaintiffs are claiming they discounted licenses and/or support for; the amount of any alleged discounts; and the reason Oracle allowed any alleged discounts.

16. If I am to respond to Plaintiffs' claims, Plaintiffs will have to provide the pertinent documents long before I learn Plaintiffs' specific damages methodologies (which will presumably be when I receive Plaintiffs' damages expert report).

17. I cannot provide a precise estimate of the number of additional documents needed to quantify the extended damages claims. However, whatever method Oracle uses to quantify its damages arising from such claims, at a minimum the following documents would be needed for each customer (for potential customers some of these documents will not exist or be relevant):

1    a.   Detailed accounting information (general ledgers and subsidiary ledgers) sufficient to show the license and support revenues and profits by year and by product line from 2004 through the present. Plaintiffs have yet to produce any general ledger information.

   b.   Detailed price calculations performed at the time of sale by the sales and/or marketing departments, including any senior executive inputs to the pricing decision.

   c.   Emails, correspondence, executive reports, presentations, etc. sufficient to determine whether the price discounts for each customer were as a result of the alleged actions (as opposed to unrelated factors).

   d.   Contracts and OKI3 Contract Details.

   e.   Analytics Contracts Reports.

   f.   Analytics License Reports for all customers that licensed an Oracle product during the relevant period.[1]

   g.   Details of the "lost" potential customers including: company/entity name, size of deal discussed, correspondence (emails and letters), meeting agendas and notes, proposals, bids, and all CRM entries.

18.   While it is impossible to precisely estimate how many documents would be required to perform the damages analysis for such claims, it is likely it would be many millions of pages and dozens of depositions of relevant people (if they can even be located).

**D.   Expanded Damages Claims for "Harmed current and prospective customer relationships, even where they did not result in a customer support contract or software licensing."**

19.   In a claim that is somewhat repetitive of those made in Section C above, Plaintiffs seek to expand their damages claims to include alleged damages arising out of "Harmed current and prospective customer relationships, even where they did not result in a loss of a customer support contract or software licensing." Based on the interrogatory response referenced above, I am going to assume Plaintiffs are claiming lost profits for entities that were never lost by Oracle (i.e., retained customers) and entities that never became Oracle customers.

---

[1] Contracts and OKI3 Contract Details, Analytics Contracts Reports and Analytics License Reports could assist in determining which products a customer received and the price paid for the products; pricing/purchase analysis cannot be performed on broad generalized data.

20. In addition to the information needed to complete the analysis outlined above in response to Plaintiffs' initial and expanded claims I will need to gather sufficient documentary evidence to allow me to determine whether the revenues and profits that might have been generated from potential customers were reduced during the relevant period, by how much such revenues and profits were reduced and why the revenues and profits were reduced (if they were).

21. I will need the pertinent documents long before learning Plaintiffs' specific damages methodologies if I am to respond to Plaintiffs' claims.

22. Whatever method Oracle uses to quantify its damages arising from such claims, I will likely need the following documents:

    a. All documents related to the unspecified customers Plaintiffs add to the TN Customers already at issue including:

        i. Contracts and OKI3 Contract Details, Analytics Contracts Reports, and Analytics License Reports for all customers that licensed an Oracle product during the relevant period. Such documents are needed to determine: how much the revenues and profits Plaintiffs generated from such licensing activities were affected by the alleged actions; which products a customer received; and the price paid for the purchased products and services.

        ii. Documents that show license purchasing patterns over the customer's lifetime on PeopleSoft, JD Edwards and Siebel software (preferably over a long period but at least from 2002 to the present time). Such documents would have to include enough detail to show, by customer, the initial license purchases, subsequent purchases, termination of software licenses, and paid upgrades to new software.

        iii. Analyses, reports, and other documentation that show the details of up-selling initiatives undertaken by Oracle. Such documents would show details such as the strategies of the up-selling initiatives, details of target customers (could be by industry, geography, company size, product pillar, release number, etc.), specific applications/modules, penetration rates, average customer spend, etc.

    b. Documents related to the entities which never became Oracle customers (in addition to the TN Customers):

    i. Market and customer studies that demonstrate how Oracle's and SAP's sales and losses changed to quantify whether, after SAP's acquisition of TN, Oracle's ██████████████████████████████████████ (as suggested on page 27 of Mr. Ellison's deposition).

    ii. Reports that quantify Oracle's "win rate" from 2002 to the present day to determine whether Oracle's "win rate" declined during the period January 2005 to October 2008, when SAP owned TN, and to determine whether Oracle's "win rate" was affected by the TN wind-down in October 2008.

    iii. Detailed sales correspondence with the prospective customers including any Requests For Proposal and responsive Oracle/PeopleSoft/JD Edwards/Siebel proposals made, internal emails, customer files and meeting notes regarding offers made or to be made including pricing, deliverables, timetables, implementation contracts and other consulting contracts.

    iv. Analyses, reports, and other documentation that show the average value of a new Oracle/PeopleSoft/JD Edwards/Siebel customer. Any such analysis should include the underlying assumptions upon which the analysis is based.

  c. Detailed accounting information (general ledgers and subsidiary ledgers) sufficient to show the expenses incurred to generate any license and support revenue identified above that was lost as a result of the alleged actions.

  23. It will also be necessary to analyze each customer's motives for choosing Oracle or SAP (or other entity) as their ERP vendor, and determine whether they reduced their purchase of licenses and support from Oracle as a result of the alleged actions. It is impossible at this stage to be certain what documents and testimony might lead to evidence of such damages but it would likely include millions of pages of documents and extensive deposition testimony (if the relevant people can be located). At a minimum, I would need to review the following additional documents:

1       a.      Industry publications, reports, articles, etc. to determine the prevalence of factors other than TN that contributed to customers selecting software other than Oracle after its acquisition of PeopleSoft and Siebel. Other factors to be investigated include:

　　　　　i.      Public reaction to Oracle's hostile takeover of PeopleSoft and acquisition of Siebel.

　　　　　ii.     Uncertainty in the marketplace about whether Oracle would discontinue support on PeopleSoft, JD Edwards and Siebel products.

　　　　　iii.    Uncertainty in the marketplace about overall PeopleSoft/JD Edwards and Siebel product direction.

　　　　　iv.     Uncertainty in the marketplace about Oracle's plans for "Fusion" products.

　　　　　v.      Uncertainty in the marketplace about Oracle's continuation of PeopleSoft's support policy that allegedly forced customers who did not want to upgrade to seek outside services to attain tax/regulatory updates.

　　　　　vi.     Uncertainty in the marketplace about Oracle's continuation of PeopleSoft's pricing policies.

　　b.      All internal writings (emails, letters, reports and analyses) related to the market response to Oracle's acquisition of PeopleSoft, JD Edwards and Siebel.

　　c.      Information on each potential customer "lost" by Oracle that would describe the motives supporting the customer's decision not to purchase Oracle software. Such documentation would include email correspondence, notes, reports, presentations, spreadsheets, customer files, proposals, and information in Oracle's possession (such as notes, summaries of customer meetings, summaries of telephone calls with customers, etc.) as well as information the chosen vendor and the customer have in their possession .

　　d.      Customer depositions.

　　e.      Press releases, industry publications, articles, transcripts of analyst meetings, etc. that discuss Oracle, SAP and other vendor win-rates and reasons the win-rates may have changed over time.

1  **E.     Expanded Claims Regarding "…abandonment of PeopleSoft customer contract step-up renewal price escalations, the early adoption and generous terms of Oracle's Lifetime Support and Applications Unlimited programs and additional spends on customer support enhancements."**

24.     The Supplement also states Plaintiffs may seek to expand their damages claims to include alleged damages arising out of "…the abandonment of the PeopleSoft customer contract step-up renewal price escalations, the early adoption and generous terms of Oracle's Lifetime Support and Applications Unlimited programs and additional spends on customer support enhancements."

25.     To respond to such claims I will have to analyze enough documentary evidence to determine whether revenues and profits related to the stated items decreased, by how much revenues and profits decreased, and why revenues and profits decreased including:

   a.     Documents related to "The abandonment of existing PeopleSoft customer contract step-up renewal price escalations":

      i.     Detailed accounting information and pricing policies sufficient to show, for each customer at issue, the revenues that would have been generated under the "existing PeopleSoft customer contract step-up renewal price escalations" as well as the revenues actually generated for each allegedly affected customer.

      ii.    Customer-specific pricing calculations sufficient to show how pricing compared to "Then-Current" pricing.

      iii.   Emails, reports, presentations, etc., including any executive involvement, of the implementation of new pricing policies to be able to determine the degree to which any new policies were related to the alleged actions.

      iv.    Public statements, press releases, announcements, transcripts of industry analyst meetings; press conferences; and all other pronouncements relating to existing and proposed PeopleSoft pricing structures.

   b.     Documents related to "the early adoption and generous terms of Oracle's Lifetime Support and Applications Unlimited programs and additional spends on customer support enhancements":

          i.      The original plan that Oracle had in place to support PeopleSoft and JD Edwards customers and when, how, and why that plan changed. Documentation may include email correspondence, plans, reports, presentations, analyses, and executive involvement.

          ii.      The original timeline under which Oracle had planned to implement Lifetime Support and Applications Unlimited and when, how, and why that timeline changed. Documentation may include email correspondence, plans, reports, presentations, analyses, and executive involvement.

          iii.      Analyses performed by Oracle that quantify the threat to Oracle's support revenues had Oracle not implemented Lifetime Support and Applications Unlimited. Documentation may include break-even analyses, return on investment analyses, other financial analyses, reports, presentations, email correspondence, and executive involvement.

          iv.      Detailed accounting information sufficient to show the support costs of the original support plan.

          v.      Detailed accounting information sufficient to show the support costs under any subsequent plans and timelines.

          vi.      Detailed accounting information sufficient to show the cost of any customer support enhancements Oracle implemented.

**F.**    **Plaintiffs Have Not Produced Information Sufficient to Evaluate the Expanded Damages Claims.**

26.    Plaintiffs have not produced the information necessary to do the various analyses that would be necessary to calculate damages under the expanded damages claims. A letter from Zachary Alinder, Esq. to Elaine Wallace, Esq. dated May 22, 2009 lists numerous documents that Mr. Alinder states are "…related to license revenue." These documents are insufficient to determine the customers included in the expanded damages claims because the documents are either broad, generalized reports (e.g. quarterly financial reference books, SEC filings, board packages, etc.), or they contain select customer-specific information (e.g. at-risk reports) for customers not specified by Plaintiffs to be included or excluded from its damages claim. Some of the categories of documents are unclear and further clarification from Plaintiffs may be needed.

1  27.  [REDACTED]

2-8  [REDACTED]

### G. Estimated Cost of Evaluating Plaintiffs' Expanded Damages Claims.

28. I estimate the cost to Defendants of my work to date in evaluating and preparing to respond to Plaintiffs' claims for lost profits, unjust enrichment, and reasonable royalty on the existing claims to be approximately $4.4 million in expert fees and costs. I also estimate this amount will increase by $4 million through trial.

29. Based on the volume of discovery necessary to deal with the expanded damages claims and the analysis related to such discovery outlined above, the fees and costs to Defendants to respond to Plaintiffs' expanded damages claims would not be less than an additional $5 million and may well exceed that amount substantially depending on Plaintiffs' damages approach and methodologies.

30. Assuming the pace and quality of discovery in the case continues as it has to date, and given the personnel currently assisting me, I do not believe an analysis of Plaintiffs' expanded claims can be completed within the schedule for expert discovery set by the Court. If the expanded claims have to be incorporated into my damages analysis, I will need an additional year over and above the extension of time already granted by the Court. Even if I were to increase the number of personnel from the current levels, I have to review and analyze a large portion of the data myself in order to form the opinions I will render in this case.

/ /

/ /

/ /

1 | I declare under penalty of perjury under the laws of the United States and the State of
2 | California that the foregoing is true and correct.
3 | Executed this of 13th of July 2009 in Phoenix, Arizona.

Stephen K. Clarke