1   Pages 1 - 69

2                   UNITED STATES DISTRICT COURT

3                NORTHERN DISTRICT OF CALIFORNIA

4           BEFORE THE HONORABLE ELIZABETH D. LAPORTE

5   ORACLE USA, INC., et al.        )
                                   )

6              Plaintiffs,     )
                                   )

7           vs.               )NO. C 07-1658 PJH (EDL)
                                   )

8                                )
  SAP AG, et al.,            )

9                                )SAN FRANCISCO, CALIFORNIA
             Defendants.     )Tuesday, August 19, 2009

10                                 )10:49 a.m.

11   _____)

12               **TRANSCRIPT OF PROCEEDINGS**
               **(HEARING ON MOTIONS)**

13   **APPEARANCES:**

14   **For Plaintiffs:**
                  **BINGHAM, McCUTCHEN, LLP**

15                  Three Embarcadero Center
                 San Francisco, CA 94111

16                  (415)393-2485
                 BY:  **HOLLY HOUSE, ESQ.**

17                  and  **GEOFFREY M. HOWARD, ESQ.**
                 and  **NITIN JINDAL, ESQ.**

18                  and  **ZACHARY J. ALINDER, ESQ.**

19   **For Defendants:**
                  **JONES DAY**

20                  555 California Street - 26th Floor
                 San Francisco, CA 94104

21                  (415)626-3939
                 BY:  **JASON McDONELL, ESQ.**

22                  and  **ELAINE WALLACE, ESQ.**
                 and  **PATRICK R. DELAHUNTY, ESQ.**

23                  **LAURIE PAIGE BURNS, Paralegal**

24   *Reported by:*   *MARGARET "MARGO" GURULE, CSR #12976*
               *PRO TEM COURT REPORTER*,  *USDC*

25

PDF created with pdfFactory trial version www.pdffactory.com

1          August 19, 2009; 10:49 a.m.; Courtroom E, 15th Floor

2              LILI M. HARRELL - Courtroom Deputy

3                          o0o

4                    **P R O C E E D I N G S**

5          **THE CLERK:**  Please be seated.  Calling Civil 07-1658.

6     Oracle USA, Incorporated, et al. vs. SAP AG, et al.

7          Counsel, please state your appearances for the

8     record.

9          **MS. HOUSE:**  Good morning, your Honor.  Holly House,

10    Geoff Howard, Zach Alinder, and Nitin Jindal from Bingham,

11    McCutchen for the plaintiffs.

12         **THE COURT:**  Good morning.

13         **MR. McDONELL:**  Good morning, your Honor.  Jason

14    McDonell, Elaine Wallace, Patrick Delahunty from Jones, Day for

15    defendants.  Also present, our paralegal, Laurie Paige Burns.

16         **THE COURT:**  Good morning.

17         **MR. McDONELL:**  Good morning.

18         **THE COURT:**  All right.  Well, let's start with the

19    motion to compel.  I will note that I seem to be thinking alike

20    with Judge Hamilton.  I read her recent order noting the tone

21    of the papers.  This is not what judges like to see.  And I --

22    I guess it's hard for a judge to put -- to see how you all

23    can't see what it would be like to read those things day after

24    day.  And of course, it's not just your case, it's other cases,

25    too -- and how -- I was just talking just coincidentally on

PDF created with pdfFactory trial version www.pdffactory.com

1    another matter altogether, checking with Judge White, and he

2    tells people it's like static; that it totally interferes with

3    hearing the message.  Because I think you can't imagine how the

4    judge's brain just shuts down, you know, just the way when I

5    see it clearly.  I assume the opposite, but also it doesn't

6    tell me anything.  So it interferes with the message, and I

7    just -- all judges seem to think the same way, and yet it

8    doesn't -- it seems that you're not alone, sadly, in this

9    respect.  In fact, that order could have described some other

10   motions that I was reading around the same time.  But you've

11   got to understand that that only makes it seem worse, you know.

12           So I mean, I don't know if it was in this case that I

13   was noticing or a different case.  I think it was another case.

14   But, for example, to say the other side lied or conveniently --

15   just to say "inconsistent positions" would get the point

16   across.  You know, that's plenty.  Or just not even using that

17   adjective.  Just say, "On day one, they said X.  On day two,

18   they said not X."  You know, it's much more persuasive.

19           Anyway, it seems like elementary to us, and it's

20   funny how we all seem to have the same thoughts.  I guess where

21   you sit is where you stand, but you've got to remember who your

22   audience is.

23           **MR. McDONELL:**  Your Honor, we took Judge Hamilton's

24   comments very seriously, as do we take yours, and message

25   received.

3

1          **MR. ALINDER:**  And we appreciate it.

2          **THE COURT:**  But I don't know what it is.  I mean, is

3    it just because it's litigation.  I mean, obviously, you're all

4    spending days and night, and you know, lots of money and lots

5    of time.  There is a lot at stake.  And nonetheless, is that

6    the reason for this?

7          **MR. ALINDER:**  Well, we appreciate the guidance, your

8    Honor.  I think we both can take heart in that.

9          **MR. McDONELL:**  Well said, Mr. Alinder.

10          **THE COURT:**  All right.  Well, let's turn to the

11    merits.

12          On this motion to compel of the financial

13    information, it seems as though there have been some narrowing

14    of the issues, and I want to make sure I understand what it is.

15    There were some documents that your side said you needed to get

16    to see to what extent they satisfied your concerns.

17          **MR. McDONELL:**  Yes, your Honor.

18          **THE COURT:**  I don't know if that has been able to be

19    processed yet.

20          **MR. McDONELL:**  There is some progress.  There is a

21    pending new offer from the plaintiffs to provide more financial

22    information.  We're not quite there yet, but I think getting

23    close.

24          And what I would like to do, because I think it's

25    helpful to the process, without taking too much time of your

4

1    Honor's, is to find, once again, you know, verbally what we see

2    as the problem and the gaps; then turn to what they have

3    offered; and then make a suggestion of how we might go to the

4    next step.

5              So if I might, your Honor, I brought a chart that

6    does come --

7              **THE COURT:**  -- which I can't see.

8              **MR. McDONELL:**  Yeah, but I --

9              **THE COURT:**  I mean, I see that there are boxes,

10   but --

11             **MR. McDONELL:**  It is a big-picture chart, and as I

12   walk through it, you won't need to read all the little --

13             **MR. ALINDER:**  And your Honor, we've requested that

14   the information on this chart be maintained in confidence.

15   It's derived from confidential and highly-confidential

16   inter-entity agreements from Oracle.  And we don't see anybody

17   in the courtroom that we don't recognize at this point, but

18   should someone walk in, we would request that the Court be

19   sealed.

20             **THE COURT:**  I probably wouldn't do that.  I mean, I

21   would -- to me, it's very drastic to actually seal the

22   courtroom, so let's see if -- hopefully that won't be

23   necessary.

24             **MR. McDONELL:**  If it comes to that, your Honor, I

25   will cease using the chart, because it's being used to

PDF created with pdfFactory trial version www.pdffactory.com

1    illustrate a fairly basic point.  So if I may --

2         **MS. HOUSE:**  And one last thing, if indeed this does

3    turn out to be something that requires some sealing of the

4    transcript, we would also request the opportunity to designate

5    certain portions of the transcript that we feel have

6    highly-confidential or confidential information.

7         **THE COURT:**  Well, potentially we're not there yet.

8         **MS. HOUSE:**  Okay.

9         **MR. McDONELL:**  So your Honor, the problem that we're

10   addressing with this motion is the plaintiff's claim that they

11   have lost profits as a result of copyright infringing

12   activities.  As we've gotten into the discovery, and as we've

13   said fairly well, we have been seeking information sufficient

14   to show the profits allegedly lost from the copyrighted

15   information from day one.

16        The discovery we have thus far shows that Oracle has

17   a fairly elaborate corporate structure of which three of the

18   companies are actually the plaintiffs in the case.  And you

19   don't need to read all of these, but there is Oracle USA, there

20   is Oracle International Corporation, which we understand to be

21   the only entity that owns copyrights, that has the actual

22   copyrights that are at issue in the case, and as such the only

23   entity that can bring an action for copyright infringement.

24   And then over here on the far side, we have Oracle EMEA, which

25   is, generally speaking, overseas entities that are

6

1    subsidiaries.   Generally speaking, Oracle USA is United

2    States-based.

3             What we have -- what we believe we have learned is

4    that this plaintiff entity that owns the copyrights, Oracle

5    International, does not license the copyrighted works directly

6    to customers, but instead licenses it through, in this case,

7    one, two, three affiliates, and then those affiliates, even

8    through other entities, actually sell the copyrighted programs

9    and support contracts to the end users.

10            So the question then becomes if, as is alleged, there

11   is an infringement of the copyrighted works sold by, let's say

12   in this case Oracle France to a customer in France, and some

13   money is paid up this chain, what is the profit that Oracle

14   International has lost?  How does one go through and find the

15   monies paid to Oracle France and then remitted up the chain and

16   up the chain and up the chain and up the chain?

17            So we've been seeking that kind of information all

18   along.  And what we find, after all these months, is that we

19   don't have any of the financial records of Oracle International

20   Corporation or of any of these entities along the way.  We

21   don't have their general ledgers or their financial statements

22   or anything.

23            We have some high-level financial information that

24   pertains to the overall Oracle enterprise, but there is no way

25   that we have to get the granularity to say, "Okay.  When Oracle

PDF created with pdfFactory trial version www.pdffactory.com

1   France sold that Oracle product that Oracle now claims to have

2   been infringed by TomorrowNow, what was the financial

3   consequence of that as it rippled through this structure?"

4           So that's what we're after, and we've gone through

5   that with -- you know, since -- we asked for it one way, and

6   then we hear, "Well, that's impossible."  We asked for it

7   another way, and they said, "Well, that's not quite right

8   either."  But we do need to get this information.

9           So among the other things we did is we noticed the

10  deposition of the copyright owner, Oracle International.  And

11  in the notice we said, "Okay, we need a witness to tell us

12  about the payments received by this entity, Oracle

13  International, in connection with the alleged registered works,

14  including the sources of those payments, how the rates are

15  calculated," so on and so forth.

16          What we thought we would get and we hoped to get was

17  a witness who would come in, big picture, just like you went

18  into a meeting with someone who was actually trying to

19  elucidate the situation that would say, "Okay.  Here's what

20  happens.  OIC owns the copyrights.  They enter into relations

21  with this company, this company, this company.  When this

22  company sells Program X, y dollars are paid.  Those Y dollars

23  are recorded with the following records.  Those records are

24  maintained somewhere.  Then they pay X percent up here and Y

25  percent there," et cetera, et cetera, et cetera.  And we were

8

1    hoping that would all become clear and we would know precisely

2    how it all works, and an overview would have been quite helpful

3    to have kind of put this all into context.

4            What we got was a witness, a bright enough person --

5    no doubt about it -- that came with stacks of intercompany

6    agreements.  But the deposition, as I think about it, was void

7    ab initio.  I'm not sure that actually works in this context.

8            But what we asked her right out of the box was:

9            "Did you try to figure out what the economic

10   consequences are, what the royalty payments are with respect to

11   the sales of these products that are the registered works in

12   the complaint?"

13           Those are the copyrighted works from which all those

14   damages allegedly spring.

15           And her answer is, "No."

16           She doesn't know about the registered works.  She

17   didn't look at them.  She doesn't know how they relate to

18   anything, really.

19           **THE COURT:**  But according to Oracle, as I understand

20   it, their answer is that the way it's done is not by individual

21   registered works, but by families.  And she could have

22   testified about the families.  And then, you know, you would

23   have other source to map, What's in the family, what registered

24   works are within the families?

25           Now, I don't know whether that, you know, would be

PDF created with pdfFactory trial version www.pdffactory.com

1   workable because I don't know whether the families include some

2   that are asserted and some that aren't.  So --

3           **MR. McDONELL:**  But they undoubtedly do.  But she

4   didn't say that.  I mean, the problem is we just got off on the

5   wrong track in that deposition altogether.  And what I would

6   have expected her to say, had she been prepared as we expected

7   is:

8           Okay.  Look at the complaint.  And I, you know, I

9   showed her the complaint.  It's got a list of registered works

10  which are products, software and support materials.

11          And she'd say, "See there, if Oracle France sold that

12  product on line 1 there, the customer would have paid some

13  dollar amount to Oracle France for that product."

14          A record must exist of that payment.  There must be a

15  record of the customer's payment.

16          **THE COURT:**  Well, I mean, there doesn't have to be.

17  Oracle -- you know, for purposes of those legal exercises that

18  we're all engaged in, you know, the divying up is relevant.

19  But for purposes of running a business, it probably doesn't

20  matter at all if these things are batched essentially and they

21  can't trace particular profit to a particular work.  They want

22  to know, overall, what the revenue is.

23          So I think that's part of the problem is:  How is

24  this going to be done?  On the other hand, they are bringing

25  this lawsuit, and you have a right to defend yourself.  So it's

PDF created with pdfFactory trial version www.pdffactory.com

1   got to be done in such a way that you can do that.

2           **MR. McDONELL:**  Right.  So again, what I would have

3   expected is for that witness to explain just that, that when a

4   payment is made to Oracle France or to OEMEA, what the record

5   is of it.  If that payment is bundled with other payments and

6   then divided up through some process, she could have explained

7   that.  And then we would have had some insight into the flow of

8   funds as well as how the relevant costs are allocated at the

9   same time.

10          **THE COURT:**  Um-hum.

11          **MR. McDONELL:**  But again, the deposition was just,

12  you know, void from the start because she said -- she made no

13  effort to understand what the registered works were that are

14  actually at issue in this case.

15          **THE COURT:**  And do you -- I mean, do you need to

16  know, of the three entities -- well, only one's profits matter,

17  right?  Oracle International?

18          **MR. McDONELL:**  Oracle EMEA is a plaintiff.

19          **THE COURT:**  Right.

20          **MR. McDONELL:**  So we need to know their financial

21  information, as well.  But on the copyright claims, you're

22  right.  Only Oracle International has standing to bring those

23  claims.  There are other claims that are at --

24          **THE COURT:**  So what is the cure for this?

25          **MR. McDONELL:**  Okay.  So here's what I believe the

PDF created with pdfFactory trial version www.pdffactory.com

1    cure is:

2          First of all, the current offer from the plaintiffs

3    with respect to financial information is that they will

4    provide -- they will produce the product profitability reports

5    and --

6          **THE COURT:**  These are the ones that go to senior

7    management?

8          **MR. McDONELL:**  Yes.  And those are the ones that we

9    said, in our hyperbolic way, they said didn't exist and then

10   did exist, and we want them.  And they have agreed to reproduce

11   them, and then they are also offering to produce quarterly

12   income statements, balance sheets and trial balances, which are

13   all known financial reports, for the three plaintiff entities

14   and for OIC and OEMEA, it's from June 1 to October 30 -- or

15   June 1, '05 to October 31, '08.  And for Oracle USA, which is

16   the PeopleSoft entity with the new name, it goes back to

17   January 1, '02.

18          So they have offered to produce those, and they have

19   also offered to produce similar reports for up to three of

20   these other entities for a one-year period so we can see what

21   kind of detail they give.

22          **THE COURT:**  The other entities that are involved in

23   the chain --

24          **MR. McDONELL:**  Yeah, so we can see what kind of

25   information --

                                                                    12

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. ALINDER:**  Basically the country-specific entities

2    that they've been talking about.

3          **MR. McDONELL:**  Yes, what information we get there.

4    And then we'll look at those reports, but then we would very

5    much like to do a 30(b)(6) deposition on those reports and

6    examine the witness on what the reports all mean.  Because at

7    this point, it's still betting on the draw here.  We don't know

8    what the reports are going to look like.  They're represented

9    to be quite detailed, but the proof is in the pudding.  And

10   then we will look at those and take the deposition of a

11   knowledgable person about what the reports are and what's

12   behind the reports.

13          And the purpose of that deposition will be able to --

14   will be to confirm or deny whether the alleged loss profits of

15   these three plaintiff entities can be determined from those

16   records.  And we will examine the witness and either be

17   convinced that yes, it's doable; we can determine the alleged

18   lost profits from the works at issue here, or you can't.  If we

19   believe you can't, even at that point, we reserve our right to

20   come back to your Honor and say, Okay, we've gone through a

21   whole 'nother cycle now, and we're not at all convinced that we

22   have the information right now.

23          But this is a major, at least interim concession on

24   our part because we will, for the moment, get off of the idea

25   that we've got to drill down to the general ledger level

13

1    detail, which is -- I think everybody agrees that, at the

2    general ledger level, all the detail is there and burden is the

3    only issue.

4         THE COURT:  Right.  And I mean, as to burden, really,

5    it looked like what your response was, "Well, at least they

6    should produce the trial balances," which seems to be what this

7    offer was all about.

8         MR. McDONELL:  Yeah.  The other major concession here

9    is what we had asked for, when getting off the general ledger

10   idea, is we wanted trial balances for all of the entities that

11   basically had received revenues that are now being accused of

12   being gotten by infringement.  So, for example, if Oracle

13   France had revenues that are at issue in the case because that

14   software product was serviced by TomorrowNow and it's at issue,

15   we wanted trial balances for all the entities in that loop so

16   we could, we hoped, would see the flow of those funds and be

17   able to get the level of granularity to actually do an economic

18   study to see what the real flow of lost profits, if any, was.

19        But for present purposes, because they're indicating

20   that the financial statements including the trial balances of

21   the three plaintiff entities are very detailed, we will take a

22   look at those.  But we do want to do a deposition of someone

23   who can explain those reports and either convince us that yes,

24   now we have the raw materials from which to calculate the

25   alleged lost profits, or we don't.

14

1           Then the one other piece of it is --

2           **THE COURT:**  And the deposition has not been agreed

3    to?

4           **MR. McDONELL:**  It has not because --

5           **MR. ALINDER:**  It hasn't been discussed.  This is the

6    first time they have brought that up.

7           **MR. McDONELL:**  It has not been discussed.

8           **THE COURT:**  All right.

9           **MR. McDONELL:**  Then the other thing we would want is

10   what we're asking for in the motion itself is that the witness

11   who is presented to testify about the royalty payments or the

12   payments to OIC, Oracle International, on behalf of these

13   registered works, is being offered again as a result of the

14   expansion of the complaint and to see the line of products.

15          We would ask that we be given leave to examine her

16   further on the three topics that were subject of the original

17   deposition notice.  And we will do our best to meet the

18   plaintiffs halfway and try to examine that witness with a

19   thought in mind that she can speak about families of products.

20   And if we say, Okay.  Assuming that this registered work is

21   part of the PeopleSoft family of products, how then do the

22   revenues and profits flow through these entities?  Then maybe

23   we would have a somewhat complete picture.

24          But right now, we don't.  My thought is she's being

25   presented again anyway.  We should be allowed to go beyond just

                                                            15

1   the Siebel line of products and try to make that deposition a

2   meaningful one.

3           **THE COURT:**  Okay.  Thank you.

4           **MR. ALINDER:**  Thank you, your Honor.  This is a

5   slightly different motion than what I think we were expecting

6   to being opposing here.

7           **THE COURT:**  Right.  But I have to say that I'm glad.

8   I mean, I think that the problem is this motion was filed

9   before a lot of the briefing occurred, before the last hearing.

10  You know, I need to have practical suggestions from you all, as

11  opposed to, "Let's see if she'll go for the whole thing, hook,

12  line and sinker, we'll throw it all at her and let her figure

13  out how to pick and choose among this," without my having any

14  experts, any accountants.

15          So I think this is much more helpful to me, even at

16  the cost of an evolution, as opposed to being stuck in the

17  prehistoric stage where we were previously.

18          **MR. ALINDER:**  And we appreciate that.  We've

19  continued to meet and confer throughout the entire briefing

20  period and even proposed this final offer on August 4th.  So

21  it's not -- the parties certainly understand your position.

22          **THE COURT:**  I think that's good.  I must say that I

23  am troubled that these profitability reports going to top

24  management -- I mean, if they're good enough for Larry Ellison,

25  they're good enough to give the other side, whether they're

                                                              16

PDF created with pdfFactory trial version www.pdffactory.com

1   perfect or not -- were not given a long time ago.  I mean,

2   Judge Hamilton made it absolutely clear that damages discovery

3   was open, and I certainly have made it clear that, in that

4   view, that was very important.

5           **MR. ALINDER:**  Right.  And to that, your Honor, those

6   types of reports were not specifically requested.  We told

7   them, and I think the declaration of Ms. Guner points out

8   pretty directly, the types of reports that they requested were

9   not available -- are not available to be generated sort of

10  through our systems.  The ones that Mr. Ellison and Mr. Rottler

11  testified are very ad hoc reports that were created just for

12  them.  They weren't these sort of, you know,

13  automatically-generated reports.

14          **THE COURT:**  But ad hoc reports generated for them how

15  frequently?  How often have they been created?

16          **MR. ALINDER:**  That is unclear.  The testimony is that

17  some of them were created quarterly.  But it's unclear what

18  time period and how many of those were actually created.  But

19  nevertheless, when they brought this up finally, we agreed to

20  produce it the day after they brought it up.

21          **THE COURT:**  Well, I would view it quite differently

22  than that --

23          **MR. ALINDER:**  Well, and we're also producing --

24          **THE COURT:**  -- that you all should have known about

25  those reports and discussed it openly with them and

17

PDF created with pdfFactory trial version www.pdffactory.com

1  investigated it.  And particularly when you're saying, we can't

2  give you this; we can't give you that.  And I'm saying, "You

3  need to give them a lot," over and over.  To then wait until

4  they found those things out, when this is your client, I don't

5  agree with that at all.

6         MR. ALINDER:  Well, and what we've decided to do,

7  your Honor, is we're giving them the backup.  We're giving them

8  the data so they can look behind any of the reports that were

9  produced.  And to be clear, we weren't withholding any reports.

10 They know about reports because we produced them.

11        We produced them in the form of all the custodial

12 productions.  So Mr. Rottler's productions and Mr. Ellison's

13 productions, they were produced.  It's just there is no, you

14 know, body of these things that's sitting out there that we can

15 go and easily get to.

16        So to say that we were withholding --

17        THE COURT:  So they had those reports somewhere?

18        MR. ALINDER:  They've had them.  They were in the

19 custodial productions.

20        Now, we were thinking they wanted us to get, you

21 know, some sort of report that could be created automatically,

22 and that just wasn't possible to do.  We've given them now --

23 we're giving them, on Friday and today, the data, essentially,

24 that's behind that.  And you know, they are perfectly willing

25 to review that, in addition to the ones we have given them in

18

1    the custodial productions, and I think --

2              THE COURT:  Well, just to clear this up, have you had

3    these all along in the custodial productions, but you just

4    didn't know what you had?

5              MR. McDONELL:  No.  As we said in our brief, we

6    located at least one, and there may have been more than one, at

7    some point along the time, and we asked people about them.  And

8    the witnesses we asked, until we got to Mr. Rottler, said they

9    didn't know where they came from or how they were generated.

10   So it kind of got cloudy at that point.

11             It was not until we got to Mr. Rottler that he

12   testified very clearly that it's a quarterly report that he

13   receives and it should be readily available.

14             THE COURT:  So you had them, but you didn't know what

15   it was or how it was generated?  Is that --

16             MR. McDONELL:  That's in part true, and we certainly

17   did not have a comprehensive set of them.  What we had -- for

18   example, there would be a large PowerPoint presentation on many

19   issues and there might be one slide within it that had some

20   line items that appeared to talk about profit/profitability.

21   And I recall asking Mr. Guner, for example, their 30(b)(6)

22   witness, on this issue what that came from, and she said she

23   didn't know.  Only later did we find out that her group

24   prepares them.

25             THE COURT:  Well, I mean, is it the problem that your

PDF created with pdfFactory trial version www.pdffactory.com

1  side, on Oracle, that outside counsel were not kicking this far

2  enough -- or inside counsel -- far enough up in the chain to

3  the people who actually know the answers?

4         MR. ALINDER:  I just don't think they asked the right

5  question, your Honor.  I mean, really, we weren't -- we had

6  produced these reports within them so they could find them.

7  They were out there.

8         THE COURT:  I guess I'm saying -- no, but then they

9  about them and got incorrect answers.  And I guess what my

10  point being:  This is not a game of, until you ask exactly the

11  magically-worded, correct question, there is no gotcha at all.

12         MR. ALINDER:  I agree, your Honor.

13         THE COURT:  In fact -- and that's what I'm hearing.

14  And I have, over and over -- and certainly that gotcha does not

15  apply to the judge.  But you need to -- you know, this is --

16  that's what the whole process is about.

17         If you're going to tell the other side, "Well, no, we

18  can't give you what you want," then you've got to give them

19  something that is going to get them in a position where they

20  can defend against massive damage requests.  And I've said that

21  all along.  So I am saying I see a failure here.  I'm not being

22  asked and I don't wish to and I'm not going to order sanctions

23  about this issue.  Nobody has asked me to, and that's not the

24  issue.  But I am concerned that I see a failure of the process

25  here.  It's something that shouldn't have happened.

PDF created with pdfFactory trial version www.pdffactory.com

1      **MR. ALINDER:**  Okay.  I apologize that you see that,

2  your Honor.  Maybe I didn't explain it clearly enough, because

3  I sincerely do not believe there was a failure in the process.

4          I believe Ms. Guner testified correctly, actually.

5  It just was to a question that either she didn't understand

6  what they were looking for or they weren't asking exactly

7  correctly.

8      **THE COURT:**  But see, they weren't asking exactly

9  correctly.  My point is:  It's not just, you know, what in the

10  deposition a careful witness says exactly.  You're supposed to

11  be figuring out how to get them meaningful information relating

12  to your many millions, if not billions, in lost profits claim.

13  And so it's not a game of gotcha or a game where you say,

14  "Well, you didn't ask exactly the right question; therefore

15  we're not going to tell you that we have quarterly reports.

16      **MR. ALINDER:**  Right, right.

17      **THE COURT:**  Now, I'm giving you the benefit of the

18  doubt you didn't know it, either, and I guess the reason is

19  nobody talked to Larry Ellison or to this other guy.  But you

20  know, when you're talking about the kind of claims here, I

21  think it does have to be kicked up to that level.  So I don't

22  know if that's what happened.

23      **MR. ALINDER:**  At the time, your Honor, we were

24  talking about it in terms of things that you could find in --

25  you know, and run a report on and things like that.  We weren't

PDF created with pdfFactory trial version www.pdffactory.com

1    thinking about it in these terms that they are now in.  And

2    once they were raised in those terms and it came to light, we

3    said, "We're more than happy to produce those types of things."

4          THE COURT:  Okay.  Anyway, let's move on.  We have a

5    lot to cover.

6          All right.  So now you've heard what they are

7    proposing.

8          MR. HOWARD:  Your Honor, I'm here to address Ms.

9    Kishore's testimony, which I think is the part that we haven't

10   responded yet to in terms of a description of the problem and

11   the offer.  So whenever you're ready to get to that part, I'm

12   prepared to address it.

13         THE COURT:  Well, I'm not sure where I am.  I'm just

14   asking -- he's put forward a proposal that's accepting yours,

15   at least on an interim basis, and asking for a fuller

16   30(b)(6) -- a 30(b)(6) on that and also expansion on the

17   30(b)(6) that has been provided.

18         MR. HOWARD:  I believe where we were is that, without

19   accepting the descriptions and the characterizations, it

20   appears that the parties are agreed with respect to the

21   production of those reports, production of the underlying data.

22   We're prepared to agree to the offer we've heard here this

23   morning to put a 30(b)(6) up on those reports.  And I believe

24   what remains is the request that Ms. Kishore be put back up for

25   more testimony.  And so if that's where we were and I'm right

22

1   about that, I'm prepared to address it.

2           **THE COURT:**  Okay.  As long as you've accepted that,

3   that's good.  Go ahead, then.

4           **MR. ALINDER:**  Okay.  My turn.  Right, three inches of

5   paper on a motion to amend is what she said, your Honor.

6           **THE COURT:**  Three inches doesn't begin to describe

7   it.  All right.

8           **MR. ALINDER:**  So, your Honor, Ms. Kishore, I defended

9   her.  She spent days prepared for her deposition.  This is the

10  binder she brought with her of the inter-entity agreements that

11  lead to this chart that she was prepared to testify about.

12  This, if I may hand it up, is the response to Interrogatory 13,

13  and I have turned it to page 10 where your Honor will see that

14  the registered works which begin with the TX numbers in the

15  second column are associated in that interrogatory response

16  with the families, the product families.

17          **THE COURT:**  You mean the name is the family -- like

18  PeopleSoft.

19          **MR. ALINDER:**  PeopleSoft HRMS 7.0, et cetera, and so

20  that's the mapping that was being referred to in the brief and

21  we cited to the docket number.

22          **THE COURT:**  All right.

23          **MR. ALINDER:**  Ms. Kishore was fully prepared to give

24  all of the information that Mr. McDonell described as having

25  wanted with respect to the licensing of that software, which,

PDF created with pdfFactory trial version www.pdffactory.com

1   by definition, included these various registered works.  And

2   when she was asked those questions, she did give those answers.

3            I don't think anything that Mr. McDonell said that

4   they wanted here has been provided to the Court in the form of

5   a question and answer that she wasn't able to answer except

6   when the question was, "Tell me about specific registered

7   works," which --

8            **THE COURT:**  Right.  Well --

9            **MR. ALINDER:**  -- so the records aren't kept that way.

10  So the question is:  Should they get another bite at that

11  apple?  And I leave that to your Honor, I guess.

12           It's complicated material.  It was an enormous effort

13  to prepare her and to put her up.  And she was prepared, I

14  think, to give all of those answers.  But I do understand that

15  they didn't get what they wanted.  I have my own views about

16  that.  But we're prepared to defer to the Court's judgment on

17  that.

18           **THE COURT:**  All right.

19           **MR. McDONELL:**  First, your Honor, this Interrogatory

20  Number 13 is really beside the point.  What 13 does is it takes

21  the registered works that are listed in the complaint.  At that

22  time, we were looking at the third-amended complaint, which had

23  a table of the registered works, which are the things allegedly

24  infringed.

25           What Interrogatory 13 does is it drills down into all

PDF created with pdfFactory trial version www.pdffactory.com

1   of the minutia of modules that might be part and parcel of the

2   product that is the alleged registered work.

3         We never needed Ms. Kishore to review any of that, to

4   go down and understand, you know, what modules were part and

5   parcel of the registered works.  What we needed her to tell us

6   is, here in the complaint, Oracle is alleging this registered

7   work, which is an Oracle product, was infringed.

8         How do the payments flow from that?  How does OIC get

9   paid in connection with that product?  That's what we needed

10  her to say.  And we got --

11        THE COURT:  Okay.  Okay.  What I don't understand is,

12  I'm looking at 13.  Okay?  What is the family?  Is the family

13  PeopleSoft HRMS 7.0?

14        MR. HOWARD:  The highest level family would be

15  PeopleSoft.  And the way that the inter-entity agreements work

16  is they license PeopleSoft.

17        THE COURT:  A hundred percent of PeopleSoft?

18        MR. HOWARD:  PeopleSoft.  Right, a hundred percent of

19  PeopleSoft over a given time period, a hundred percent of JDE

20  for a given time period --

21        THE COURT:  For a flat fee or not distinguished

22  within that family, "the family" being the every PeopleSoft

23  product?  Within that, there is no distinction about subsets of

24  money and what's paid for what?  Is that it?

25        MR. HOWARD:  Right.  The answer is yes.  It's a

PDF created with pdfFactory trial version www.pdffactory.com

1    little more complicated because there are distinctions by

2    geography and by time period.

3              **THE COURT:**  But not by registered work?

4              **MR. HOWARD:**  But not by registered work, exactly.

5    And payments are not made for registered works.  Customers

6    license modules or software, and that's how the money flows,

7    and that's how the agreements read is --

8              **THE COURT:**  So how is your expert, in general terms,

9    going to allocate them to the registered works?

10             **MR. HOWARD:**  Well, we don't agree that there is a

11   registered work by registered work showing that the lost

12   profits claim is a customer lost profits claim.  So software is

13   licensed to customers; customers pay money.  They got those

14   customers through the acts that we allege, which if we prove,

15   then the failure of Oracle to receive the payments from those

16   customers on the software that lines up with the registered

17   works is -- that's a very over-simplified version of a lost

18   profits claim.

19             **THE COURT:**  But the key language there, I think,

20   they're going to say is, "Lines up with the registered works."

21             **MR. McDONELL:**  Exactly, your Honor.  Thank you.

22             **THE COURT:**  I saw some body language there.

23             **MR. HOWARD:**  Right, right.  I felt it.  So the

24   notice, your Honor -- well, I mean, that is sort of the core of

25   the debate here because the notice says, In connection with

26

PDF created with pdfFactory trial version www.pdffactory.com

1    registered works.   What is your licensing in connection with

2    registered works?   What is your cost-sharing in connection with

3    registered works?

4           And the answer to that is that registered works

5    themselves are not contemplated within the stack of

6    inter-entity licensing agreements and cost-sharing agreements

7    that are the basis of this chart.   That is the software.

8           **THE COURT:**  Well, okay.

9           **MR. HOWARD:**   And Interrogatory 13 tells you if you

10   ask about PeopleSoft HRMS, then you know about TX 4792577.

11          **THE COURT:**   Well, it seems to me -- let me just say

12   this, see if this is enough guidance for you.   I think she

13   should sit for a further deposition.   But I think that -- I

14   don't want to see any gamesmanship about it on either side.

15          She should be -- now that you have this

16   clarification, you should just use this for fact-finding about

17   how the money flows.   And it doesn't flow by registered works,

18   and that's that.

19          On the other hand, I don't know want to see you using

20   it as some kind of tricking her into some kind of semantic game

21   that, therefore, it's not up to her -- you should find out the

22   facts.   You know, whether, in the end, that gives you grip for

23   some legal argument, that's for Judge Hamilton, presumably.

24   It's not to trick the witness into some kind of, you know,

25   convoluted explanation that -- you know, their profit theory --

27

1    your lost profit theory may very well divide it.  It will,

2    presumably, require some allocation, unless you can say it's

3    sort of the analogy to convey sales.  While true that we

4    couldn't directly say how much of that money was for registered

5    versus non-copyrighted material, but all of it was sold as a

6    package, and but for the registered works, we wouldn't have

7    gotten any of that.  That presumably -- or a theory of that

8    nature.

9         **MR. HOWARD:**  Right, but that's the expert's

10   testimony.  It couldn't possibly be Ms. Kishore's testimony.

11        **THE COURT:**  No, it couldn't.

12        **MR. McDONELL:**  Right.  But what we don't need is for

13   Ms. Kishore to just come in, sit down with this binder of

14   inter-company agreements and, as we ask her a question, start

15   flipping through it as she did in her first deposition.  We

16   need plain-English overview of what the records are that will

17   bear on the question of the profits, if any, received by these

18   Oracle entities in connection with these registered works.

19        **THE COURT:**  Well, and I don't know how the payment is

20   structured.  In other words, they may not give 10 percent of

21   whatever profits we kicked up the chain.  It may be so much

22   more bulk arrangement.

23        **MR. McDONELL:**  But there are records.  I mean, we

24   know there are records, and she needs to be --

25        **THE COURT:**  Fine.

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. McDONELL:**  She or another witness.  She may not

2    be the right person.

3          **THE COURT:**  True.

4          **MR. McDONELL:**  Well, she's not an accountant.

5          **THE COURT:**  You know, it's now 11:25, and we've got a

6    lot of ground still to cover.  So I don't know what more to

7    say.  I thought some of your points about her not being

8    prepared were well taken, others were not.  I thought you

9    exaggerated the degree of lack of preparation on the defense

10   side.  But I did feel like part of the problem was that the way

11   this is structured is not by registered work.  That is not how

12   it's structured.  So I want to find out how it is structured.

13   That's not the way it's structured?  What is the way?  That's

14   what she's supposed to testify about.

15         **MR. HOWARD:**  And if I may just respond to the last

16   point, your Honor, I hope it is clear that this is incredibly

17   complex material.  These are 66 agreements.  There is now more

18   of them.  And in many, many cases, if the question is:  How

19   does the money flow? there is nothing she can do except just

20   point them to the provision in the agreement and read it, which

21   is how they were able to construct this chart.

22         **THE COURT:**  And then I wondered whether, you know,

23   interrogatories are not a better way to do that than a

24   30(b)(6), and I've expressed this before.  So I don't know what

25   the answer is.  I can't give you any more guidance than that.

29

1          **MR. McDONELL:**  Your Honor, the -- thank you for the

2   guidance.  The other piece of this, though, is we are

3   interested in how the royalty rates are set, and I don't -- I'm

4   not satisfied that she was able to give us meaningful

5   information.

6          **THE COURT:**  Are there royalty rates?

7          **MR. HOWARD:**  As to that, what she testified was, your

8   Honor, that they were set on advice of counsel and she -- this

9   is the part of their motion that we said was calling for

10  privileged information.  She -- they retained Baker & McKenzie.

11  Baker & McKenzie gave legal advice in response to their

12  request, and that was how the rates were set.

13          She was able to say what the rates are.  She's able

14  to show them where the rates are.  But the rates are set

15  through a privileged communication and response to legal advice

16  involving Baker & McKenzie.

17          **THE COURT:**  Presumably, it's all intercompany

18  accounting, and in the end, it doesn't matter from a business

19  point of view, necessarily.  But this goes to things like taxes

20  and so forth?

21          **MR. HOWARD:**  A complicated set of laws and

22  regulations that inform and guide how you have to set these

23  rates.  And so it's not a -- it's not a formula.  It's a

24  function of legal analysis and legal advice, and that's what

25  she testified to.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  Well, is any part of it a business

2    decision?

3          **MR. HOWARD:**  I think the final decision, which is

4    prepared to say, This is the final decision, this is what the

5    rate is.  But the basis for that is legal advice, as she

6    testified, from Baker & McKenzie.

7          **MR. McDONELL:**  It's just difficult to believe that a

8    fundamental business decision like setting pricing is legal

9    advice.

10         **THE COURT:**  Well, except -- I mean, to the extent

11   that this is all a shell game with lots of different companies

12   so that it doesn't matter in the end that profits go ultimately

13   to the same place, you know, it's an allocation that may be

14   designed for all sorts of regulatory reasons.  That, I can

15   understand may be the case.  I think whatever business

16   decisions are made, you're entitled to, but you're not entitled

17   to whatever the legal advice is.

18         **MR. McDONELL:**  I don't disagree with legal advice is

19   legal advice.  I remain incredulous that the decision on how to

20   set an inter-company price is done by outside counsel and not

21   be people running the business.

22         **THE COURT:**  It does seem strange, unless it really

23   doesn't matter, you know, that all these entities, the profits

24   end up in the same pocket in the end.

25         **MR. McDONELL:**  But they don't, and only three of them

31

PDF created with pdfFactory trial version www.pdffactory.com

1  are the plaintiffs in this case, your Honor.

2        **MR. HOWARD:**  I think the point is that this is, you

3  know, the rate structure is an international rate structure

4  that is affected by multiple sets of regulations and multiple

5  sets of laws, and it shouldn't be too surprising that you need

6  legal assistance to --

7        **THE COURT:**  It's not surprising you need legal

8  assistance.  It's surprising to say 100 percent of the decision

9  of what is rates is based on legal advice from outside counsel.

10  That part is surprising.  But if that's the testimony, I don't

11  know what else to say.  But that is kind of hard to believe.

12        **MR. HOWARD:**  That was her testimony, your Honor.

13        **MR. McDONELL:**  Your Honor, in the supplemental

14  deposition, could we have another 15 minutes to voir dire the

15  witness on that issue?  Because I think it needs to be fleshed

16  out a little bit more.  I'm not satisfied with -- you know,

17  what happened at the deposition all happened very quickly,

18  realtime.  Now that this issue is in focus, I would like to be

19  able to examine her one more time on whether there is

20  non-privileged information that relates to --

21        **THE COURT:**  Well, I think that's fine.  You may.

22  Yes, you may.  But remain clear you're not asking for

23  anything -- is there anything -- it really comes down to the

24  version of:  Is there anything other than Baker & McKenzie that

25  goes into the decision, any business rationale for this price?

                                                              32

PDF created with pdfFactory trial version www.pdffactory.com

1    That, I think, you're entitled to have.

2           If the answer is no, it's all regulatory, tax

3    avoidance, transfer price, what have you, I mean, that's an

4    interesting commentary on how international business is done,

5    but I --

6           **MR. McDONELL:**  The lawyers are doing it.  Your Honor,

7    there is quite a bit we have covered here today, and thank you

8    for your guidance.  Would it be helpful if I attempted a draft

9    order and presented it to Counsel?  And if we're unable to

10   agree, we'll present that --

11          **THE COURT:**  I hope you're able to agree because I

12   don't think I can, you know, really give any more guidance.

13   And I do -- I am sympathetic, as Oracle knows, with a notion

14   that I don't want some poor human being to just be memorizing a

15   lot of facts that would be better done in a declaration or

16   interrogatories.

17          **MR. McDONELL:**  Understood, your Honor.

18          **MR. HOWARD:**  The only other request I was going to

19   make, your Honor, and we accept the decision to have her come

20   back is to ask for some reasonable time limitation on that

21   testimony, given that we're treading over ground that could

22   have been covered in the first day.

23          **THE COURT:**  Well, I mean, I think there was a failure

24   of the meeting of the minds for whatever reason, but I do agree

25   there should be some time limit.

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. McDONELL:  Half a day?

2           THE COURT:  So three and a half hours?

3           MR. HOWARD:  That's acceptable, your Honor.

4           MR. McDONELL:  Yes.  And while we're talking about

5    time limits, can we put some time limits on the production of

6    the documents that they have now agreed to produce and the

7    financial records?

8           MR. HOWARD:  That's not me, your Honor.  I thought

9    they were being produced very shortly.

10          MR. McDONELL:  Two weeks ago, they suggested four to

11   six weeks, which would mean four weeks.

12          MR. ALINDER:  Yeah, I think we can do it in four

13   weeks, your Honor.

14          THE COURT:  Four weeks from now.  Okay.

15          MR. McDONELL:  Thank you, your honor.

16          MR. ALINDER:  Should we say four weeks from the date

17   of the order, in other words, your Honor?

18          THE COURT:  No, four weeks from today.

19          MR. McDONELL:  Thank you.

20          THE COURT:  Okay.  So does that take care of the

21   motion to compel?

22          MR. McDONELL:  It does, your Honor.

23          THE COURT:  So we're onto the sanctions motion?

24          MR. McDONELL:  Yes, Your Honor.

25          THE COURT:  Okay.  New cast.

34

PDF created with pdfFactory trial version www.pdffactory.com

1          **MS. HOUSE:**  Tag team.

2          **THE COURT:**  All right.  Well, I guess -- has there

3     been any progress on this?

4          **MS. WALLACE:**  Your Honor, no.

5          **THE COURT:**  Not surprising.  I guess I'm wondering

6     what, if any, the substantial justification is on Oracle's side

7     for coming up with information, really an expansion of the

8     theory.  Albeit there was placeholders in the complaint, yes,

9     and the vague, you know, answer to one interrogatory.  But when

10    it came to actual data, actual discovery for two years, there

11    was nothing except about losses related to losing TM customers

12    and support revenue -- losing customers to TM and the support

13    revenue that was lost from there.  And then in, arguably, April

14    and certainly May, a change expanding the theory, and early on,

15    my being told that additional information was irrelevant.  So

16    what is the explanation for suddenly belatedly coming up with

17    this?

18         **MS. HOUSE:**  Well, I guess we disagree that it was

19    suddenly and belatedly.  The way that the production has worked

20    in this case is with main custodians.  And so when we produce

21    documents from custodians is after a particular custodian has

22    been named, there are particular materials that have been gone

23    through and then it's produced.  And the custodians that had

24    the information -- and indeed, at this point, there has been

25    much production related to the Apps Unlimited program, the

PDF created with pdfFactory trial version www.pdffactory.com

1   Lifetime Support program and the PeopleSoft Contractual Uplift

2   programs, in addition to the discounts which, as a whole --

3   there has been a ton of material that was actually produced.

4   But it was produced as that particular custodian was identified

5   and their materials were produced.

6          So it's not surprising that it wasn't all produced

7   way up front all at the same time.  And indeed when those

8   particular individual's productions were given, they were then

9   queried about the very things that they talked about in their

10  deposition.

11         So the notion that this was somehow an about face

12  doesn't take account of the fact that there has been

13  significant volume of production.  Just by doing a word search,

14  there is something like 6,000-plus documents already produced;

15  80 particular exhibits used that had Lifetime Support,

16  Applications Unlimited or the customer -- PeopleSoft uplifting

17  amendment in them.  So the notion that this was sprung is kind

18  of not -- it's not fair.  It's just the way that this occurred.

19         Now, it's true that neither side has regularly

20  updated their responses.  On both sides, when we hit the prior

21  deadline, we both, on that day, did significant updating of

22  both of our -- you know, of our responses, and indeed, we've

23  gotten --

24         **THE COURT:**  That day being what?

25         **MS. HOUSE:**  The day that was 28 days --

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  But when was that?

2          **MS. HOUSE:**  That was the May 22nd date.

3          **THE COURT:**  Okay.

4          **MS. HOUSE:**  And so on that date, we got significant

5     volume of new information from them.  They got updates from us,

6     as well.

7          **THE COURT:**  Well, I'm talking about, for example, the

8     initial disclosures, and then June 24, 2008, the joint

9     discovery conference statement in which you resisted the amount

10    of discovery they wanted and said, "Oracle's relevant

11    information custodians are essentially limited to its copyright

12    registrations, its relevant customer licenses and the revenue

13    streams reasonably associated with its customers who left for

14    SAP TM, and similar.  Objections saying, That's all that's

15    relevant.  You know, answer to RFPs that are support and

16    maintenance services, you know, related to illegal downloads.

17    I mean, that has been -- you know, I have -- I was here.  I

18    have been here for a long time, it's hard to believe, on this

19    case.  And that's consistent with my understanding that Oracle

20    has been pushing back and saying, "That is what's relevant."

21         So then to turn around and say, "No, actually, that's

22    just the tip of the iceberg."  I mean, not even, "Oh, there's a

23    few other things that are relevant, too, but that that pales in

24    comparison to the real damages"?  I mean, that's extraordinary.

25         **MS. HOUSE:**  I don't think that's actually what -- I

PDF created with pdfFactory trial version www.pdffactory.com

1   mean, again, remember, there is some hyperbole that we have to

2   deal with on the other side which is simply not true.

3         **THE COURT:**  Well, "tip of the iceberg," I think I'm

4   quoting the hyperbole of the chief executive officer.  Larry

5   Ellison, isn't he the one who said "tip of the iceberg"?

6         **MS. HOUSE:**  Well, we already talked about it.

7         **THE COURT:**  So I wasn't taking it as -- I mean, I was

8   taking it as what he said.

9         **MS. HOUSE:**  Well, one thing I think you need to

10  understand and that we said in our opposition that

11  Mr. Ellison's testimony where he was talking about essentially

12  the wealth of customers, potential customers that might have

13  been dissuaded because of what happened.  We've said

14  specifically in our opposition, that's what not what we're

15  going to be seeking.  That is his testimony.  They were welcome

16  to do it.  But that is a strawman.  That is not something that

17  he was going to end up doing.

18        **THE COURT:**  Let me say one thing.  I don't think you

19  were very specific.  You've said you're not going to quantify

20  certain things.  I found it very vague to follow exactly what

21  you were and weren't.  And when you say you're not going to

22  quantify, does that mean you're going to seek a sum for good

23  will, but you're not going to base it on a quantified damages

24  study, or does it mean you're not seeking any damages for that?

25  So I found that not very clear.

                                                              38

PDF created with pdfFactory trial version www.pdffactory.com

1          **MS. HOUSE:**  I'm sorry if that was confusing.  I'm

2     happy to clarify that.  The damages that we're going to be

3     seeking have been, I think, actually pretty clear.

4          We are going to obviously be seeking a hypothetical

5     license damages, assuming they don't manage to get those kicked

6     out at the end of the month.  We are going to be seeking lost

7     profits related to customers that actually were lost, and

8     again, this is from the beginning.  And also customers whom we

9     had to discount to keep.  That has also been in from the

10    beginning.

11         **THE COURT:**  Well, I don't think it has been because I

12    just asked you, what about, for example, that statement to me

13    in the joint discovery statement that the relevant information

14    is limited to the revenue streams reasonably associated with

15    the customers who left for SAP TM.  That is not the customers

16    who stayed but had to be discounted.  Those two things are

17    different.

18         **MS. HOUSE:**  Well, I apologize if there was some

19    misstatement in that discovery conference.  But if you look at

20    the complaints, if you look at the interrogatory answers, if

21    you look at the production, which is, again, you know, a big

22    part of what this is, we have, from the beginning, said that,

23    obviously, if you have to discount to keep somebody, if you

24    have to, you know, reduce what you would have otherwise done

25    specifically because of TomorrowNow, and indeed this OSO -- OSS

PDF created with pdfFactory trial version www.pdffactory.com

1  info database material was produced last year.  All you have to

2  do is run the name "TomorrowNow" against that, and you come up

3  with every single pricing discount.  And indeed, they queried

4  customers -- I mean queried Oracle witnesses about those

5  discounts using those pricing exception spreadsheets.

6          So the notion that the discounts have not been in,

7  literally, you can go to the first complaint, the first

8  interrogatory response.  All of that -- and the productions

9  themselves -- and discounting has been in from the beginning.

10         And the notion that we're a year and a half from

11  trial, we are six months from the fact discovery cutoff.  Last

12  week Judge Hamilton allowed us to amend to add completely new

13  claims in which there has been no discovery, let alone damages

14  discovery, and there is damages associated with that new claim.

15         **THE COURT:**  But that was the reason for the

16  amendment, not reopening things in the past.  I think that's a

17  red herring, in a sense.  I mean, so is that an open sesame for

18  everything else being agreed to?

19         **MS. HOUSE:**  No.  But as you sat here and heard the

20  last motion to compel, which was ours, we're still talking

21  about getting liability discovery on the basic PeopleSoft and

22  JD Edwards liability.  That's not -- that's old news, too.

23         The idea that somehow there has been a stop put in

24  place as of any date that the amendment occurred, she -- Judge

25  Hamilton specifically said in her order that she had envisioned

PDF created with pdfFactory trial version www.pdffactory.com

1    that every -- that the fact discovery cutoff was going to

2    change the date for the amendment deadline; that essentially,

3    when you push out the dates, everybody understands you push out

4    the dates.  And there was absolutely no qualification of the

5    rescheduling order that said, "Okay, pencils down on everything

6    that's occurred before."

7             **THE COURT:**  I'm not sure you understand Judge

8    Hamilton's thinking very well on that.

9             **MS. HOUSE:**  But I mean, if you look at that order, it

10   specifically said that she understood that the standard 90

11   day --

12            **THE COURT:**  I have looked at the order, so I think I

13   understand the order.

14            **MS. HOUSE:**  You probably do.

15            **THE COURT:**  Right.  I think so.  And I have looked at

16   it.  All right.  Well --

17            **MS. HOUSE:**  But as you know, discovery --

18            **THE COURT:**  So going back to -- would you clarify

19   exactly what Oracle is or is not going to do --

20            **MS. HOUSE:**  Okay.

21            **THE COURT:**  -- that's stated I thought in a way that

22   I couldn't really understand it in the briefs as to what it is

23   quantifying and what it isn't and what damages it is seeking

24   and what it isn't?

25            **MS. HOUSE:**  It is quantifying the lost customers, the

PDF created with pdfFactory trial version www.pdffactory.com

1    ones who went away, the ones on the list that keeps changing

2    from the defendants.  We're quantifying the customers to whom

3    it gave discounts on which it's already produced the underlying

4    pricing discussions data and has already produced many of the

5    underlying customer contracts to check against those discounts.

6    It is potentially going to quantify the cost of having to incur

7    certain programs that it incurred specifically to respond to

8    the TomorrowNow threat.

9          **THE COURT:**  You mean start -- change their ways to

10   give more things free or longer, et cetera?

11         **MS. HOUSE:**  Right.  So, for instance, there were one

12   example that Mr. Roberts testified about in which there has

13   been already many exhibits on, asked about at depositions, many

14   production materials is the Lifetime Support program which was

15   a program that Oracle adopted with certain terms and certain

16   lengths that extended out the time frame available for

17   PeopleSoft and JD Edwards and then subsequently other Oracle

18   applications to stay on support and not have to upgrade, which

19   has certain costs associated with it.  So if you had a time

20   frame --

21         **THE COURT:**  Okay.  And change occurred before this

22   lawsuit was filed, I think.

23         **MS. HOUSE:**  That change occurred as a result of

24   the -- partially as a result of the TomorrowNow acquisition.

25         **THE COURT:**  Right.  But did it occur before the

PDF created with pdfFactory trial version www.pdffactory.com

1    lawsuit was filed?

2            **MS. HOUSE:**  Yes.

3            **THE COURT:**  Okay.  And what else are you going to

4    quantify?  That's potentially.  So that's undecided?

5            **MS. HOUSE:**  Right.  I mean, what's happening is, you

6    know, we have an expert report that's due in November.  They're

7    diligently working to see what they can and cannot comfortably

8    feel good about quantifying, and we're producing materials, any

9    materials in support.  And that's the way -- that's what we're

10   doing.

11           **THE COURT:**  Okay.  And what aren't you quantifying?

12           **MS. HOUSE:**  The testimony that you talked about from

13   Mr. Ellison, anything on goodwill, the notion that there are a

14   host of unnamed potential customers out there who we weren't

15   able to reach or who were sort of kept at bay by virtue of the

16   actions of SAP and TomorrowNow.  That's what he was talking

17   about "the tip of the iceberg."

18           While Mr. Ellison testified to it and obviously

19   strongly believes it, it is a very difficult thing to quantify.

20           **THE COURT:**  So you're not quantifying, but are you

21   seeking damages at this time?

22           **MS. HOUSE:**  No, no.  And that -- and then the other

23   program again that we talked about, Mr. Gurgin testified to,

24   which has already been questioned on and production related to

25   has to do with the uplift program.  There -- PeopleSoft

PDF created with pdfFactory trial version www.pdffactory.com

1   customers had contractual obligations to pay certain percentage

2   increases under their contracts.  It was something that, as a

3   matter of contract, that they were required to do.

4        Mr. Rottler testified and there have been documents

5   produced that talk about essentially an abandonment of that

6   which would made X amount of money.  The idea is that she would

7   bring those particular customers up to list price over time

8   under their contracts and that they abandoned contractual

9   rights in favor of what's called an inflationary uplift.  And

10  that inflationary uplift generated less profit for Oracle than

11  what they would have earned if they had stuck with that

12  particular contractual uplift.  And that's a delta that is

13  causally linked to the actions of defendants.

14        Again, have we formally decided that we are going to

15  quantify that?  It hasn't yet been decided.  We're in the

16  process of making those kind of determinations working with our

17  experts to see if they can comfortably get to that place.  But

18  it was revealed in Mr. Rottler's testimony.  It's part of the

19  production.

20            **THE COURT:**  His testimony was when?

21            **MS. HOUSE:**  His testimony was in April.

22            **THE COURT:**  All right.  Okay.  I would like to hear

23  some response.

24            **MS. WALLACE:**  Yes, your Honor.

25            **THE COURT:**  One of the points that Oracle is making,

44

PDF created with pdfFactory trial version www.pdffactory.com

1    as I understand it, is that they have been giving you the

2    documents that show all these things all along.

3            **MS. WALLACE:**  Yeah.  And I think we've outlined I

4    think in detail in our papers what we believe the state of the

5    record to be.  And so I just would just like to highlight for

6    you some of the things in the papers that illustrate why that

7    is not the case.

8            Ms. House started by talking about custodian

9    productions.  Oracle's search-term list which Oracle developed

10   and which both parties agreed to has never included the name of

11   any non-TomorrowNow customer because both sides have worked on

12   the premise that non-TomorrowNow customers are not included.

13           **THE COURT:**  So let me ask you is that correct?  I

14   mean, you didn't disagree with that point, as I understand it

15   in your papers?

16           **MS. HOUSE:**  No.  But it's defeated by the fact that

17   the discounted customers are -- they were produced because

18   they're caught by the other search term name which is

19   TomorrowNow.  So when you have -- when you did the search of

20   the OSS info database, which is the one that talks about

21   pricing exceptions, any time there was an exception that was

22   mentioned, TomorrowNow, whether it was ever accepted by a

23   customer, granted or not, that was produced.  So that swept in

24   all of the discounted customers.

25           So even though the search term for those customers

PDF created with pdfFactory trial version www.pdffactory.com

1    wasn't in there, they were caught up in different productions.

2            **THE COURT:**  But what was the reason that it wasn't in

3    there?  Wasn't the reason that, all along, you were focusing on

4    the customer lost to TomorrowNow?

5            **MR. ALINDER:**  Your Honor, the search terms were

6    developed by both parties back and forth over a period of

7    almost a year.

8            **THE COURT:**  Right.

9            **MR. ALINDER:**  I was heavily involved in that process.

10           **THE COURT:**  Yes.  So both parties, fine.  So I

11   think --

12           **MR. ALINDER:**  And they could have added any of those

13   people.  We would have listened to that.

14           **THE COURT:**  That makes no sense, what you're saying.

15   Why should they add something that you've said is not part of

16   this, is not the thrust?  I mean, you're saying to me in the

17   discovery conference statement that the thrust is lost --

18   customers lost to TomorrowNow.  I mean, why should they then

19   come up with some other search term?  I mean, if you were going

20   to claim this, why shouldn't you have said, well, I think you

21   better put some other things in there, too, because we're going

22   to -- we think our damages include, X, Y and Z?  I mean, that's

23   a weird way of pointing the finger at them.

24           **MS. HOUSE:**  And I'm not pointing the finger.

25           **MR. McDONELL:**  Your Honor, how many attorneys is

                                                                    46

PDF created with pdfFactory trial version www.pdffactory.com

1    Ms. Wallace going to have to debate here?

2          **MS. HOUSE:**  He just stood up because he was the

3    search term guide.  Thank God I didn't have to do that.

4          But the thing that's different -- we wouldn't have

5    had -- the list of customer names was developed because -- and

6    it's ever changing.  It was developed because it came from

7    TomorrowNow.  And it was an easy list identified because you

8    just simply look at all the customers that they have, and there

9    is your list.  This list of discounted customers can only be

10   identified by looking at the discount -- the OSS info discount

11   database.

12         **THE COURT:**  Well, I mean, I suppose you could have

13   used the term "discount."

14         **MS. HOUSE:**  That's not how it's captured.

15         **THE COURT:**  Or whatever the word is.  What is the

16   secret word for discount, then?

17         **MS. HOUSE:**  It's actually -- the way we did it, it's

18   a discounted -- you look at the search -- the database is only

19   that related to discount.  So if you search just in that

20   database, you're already narrowing it down to discounts.  And

21   so then when we did a search for "TomorrowNow," you capture

22   every discount that has to do with TomorrowNow.

23         **THE COURT:**  What is your response?

24         **MS. WALLACE:**  Your Honor, if TomorrowNow was the only

25   relevant search term, we wouldn't have a thousand-word search

47

1  term.  And it may be true when you're searching the OSS info

2  database, but it would sweep out all of the relevant documents.

3  But that database has never been produced to us.  It has never

4  been produced to us in searchable form.  Oracle has extracted

5  information from that database and produced selected

6  information to us.  None of it, as far as we are aware,

7  specifically directed at non-TomorrowNow customers.

8          The search terms are used to search e-mails, all

9  kinds of documents.  And obviously there are documents that we

10  get that relate to particular customers who are on the

11  search-term lists because they're TomorrowNow customers that

12  don't have the term TomorrowNow in them.  And we get those

13  because they have the name of the TomorrowNow customer.

14          We don't get those for non-TomorrowNow customers

15  because they're not on the list.  And they're not on the list

16  because of the positions that Oracle took early in the

17  litigation.  Not only that.  Even if they had been produced to

18  us, we didn't know until Mr. Rottler's deposition that they

19  were even planning to pursue claims for customers that were

20  retained, and we didn't know until this motion was filed and

21  Oracle actually started producing contract files for these

22  discounted customers who they were.

23          So we've lost two years of time that we could have

24  been analyzing these customers, but the customers have never

25  been identified to us because Oracle has maintained

PDF created with pdfFactory trial version www.pdffactory.com

1   consistently they were not relevant.

2          And search terms is just the beginning.  No customer

3   contract files were produced for non-TomorrowNow customers

4   until this motion arose.  No customer-specific financial

5   reports were produced for non-TomorrowNow customers until this

6   motion arose.

7          In November of 2008, when the parties agreed, at

8   Oracle's request, to expand the relevant discovery time frame,

9   the parties defined TomorrowNow customers, relevant customers,

10  to be TomorrowNow customers.  This has been a consistent

11  premise of both parties based on Oracle's position that

12  non-TomorrowNow customers were not relevant.

13         The only time we became aware they were relevant was

14  during Mr. Rottler's deposition when he laid out this theory,

15  and only subsequent to that point has Oracle produced the

16  information relevant to these customers or identified them.

17  And one thing that --

18         **THE COURT:**  Okay.  And their argument is also that

19  that's harmless even if it were true because you've got lots of

20  time now to deal with that?

21         **MS. WALLACE:**  And my next point was going to be that

22  one thing that Ms. House has not addressed and I feel that

23  their papers don't addresses is they have identified at least

24  50 to 100, or say they intentionally identified 50 to 100

25  discount customers.  And we're not talking here the 10,000

PDF created with pdfFactory trial version www.pdffactory.com

1   customers they say were impacted by these policies that were

2   implemented prior to this lawsuit, which are also

3   non-TomorrowNow customers.  We're talking here just about the

4   50 to 100 discount customers.  That's a 25 to 30 percent

5   increase in the number of relevant customers for this lawsuit.

6          THE COURT:  Okay.  So the number of TomorrowNow

7   converted customers to TomorrowNow is how many?

8          MS. WALLACE:  358.  So if they add another 50 to 100,

9   it's roughly 25 to 30 percent.

10         Now, you heard Mr. Howard explain how their damages

11  theory is revenued by customers.  That's how they're going to

12  focus it.  For our damages expert, that's a 25 to 30 percent

13  increase.  It takes no less time to analyze a discount customer

14  than it does to analyze another customer.  You still have to

15  look at the entire contract file for the customer.  You have to

16  look at all the supporting documentation as to why a discount

17  was given.  And according to our damages expert, that's not the

18  only relevant universe of information.

19         You have to look at what Oracle was doing in terms of

20  discounts to other customers to determine whether TomorrowNow

21  was really the cause of the discount.  And it's taken us two

22  years, and we're nowhere near complete, just to analyze the

23  customers that Oracle put at issue in the case from the outset.

24  There is just no time under the current schedule to add 25 to

25  30 percent more customers, and that's just one aspect of these

PDF created with pdfFactory trial version www.pdffactory.com

1   new damage theories.

2          As to the Applications Unlimited and the other

3   policies Ms. House referred to, they're talking about an impact

4   on all 10,000 customers.  And according to their own papers,

5   even though these policies were adopted back in 2005-2006, the

6   impact of that is only now subject to intense investigation,

7   and the documents are currently being gathered.

8          We asked for this kind of information two years ago.

9   If there was an impact as a result of TomorrowNow, Oracle knew

10  it before it filed this lawsuit.  And so to come now in 2009

11  and say that this is now relevant and that we have time to

12  analyze, it's just not realistic.

13         **THE COURT:**  Now, is there one other category of

14  damages -- I'm not sure -- that has to do -- well, let me ask

15  it specifically -- that has to do with customers that were

16  identified as converted to TomorrowNow customers, but there is

17  an issue of not only loss support revenue but we could have

18  sold -- upsold those customers other products?

19         **MS. WALLACE:**  That's right.

20         **THE COURT:**  Now, that would seem to be a much more

21  limited expansion, if it is an expansion.  In other words, it's

22  the same customers that you've already had?  The search terms

23  are the same?

24         **MS. WALLACE:**  The search terms are the same.  It's

25  the same customers.  But we're talking essentially whether the

PDF created with pdfFactory trial version www.pdffactory.com

1   loss profits relate only to lost support revenue when the

2   customer migrated to TomorrowNow or lost license revenue for

3   what Oracle refers to as cross-selling, upsell opportunities.

4          It's a more limited expansion in the sense that it's

5   the same customers you're dealing with.  It's actually a very

6   substantial expansion when you're talking about the kind of

7   analysis that needs to be done to determine what those lost

8   opportunities were.

9          And again, Oracle limited its discovery from the

10  outset to products supported by TomorrowNow.  By definition, we

11  were talking at that time about PeopleSoft and JD Edwards

12  products and now Siebel products.  We were not talking about

13  all of the other products that Oracle's executives now claim

14  would have been licensed to these customers had they stayed.

15  In fact, Oracle specifically refused to provide discovery on

16  any of those products and specifically took the position that

17  other products were not relevant.

18          **THE COURT:**  And where did they do that?

19          **MS. WALLACE:**  In the RFP responses that we have cited

20  in our brief.  I can give you the page number cites if you need

21  those.

22          So the RFP responses are discussed on pages 6 through

23  8, and you'll see if you look at the responses to RFP number

24  17-107 on page 6 --

25          **THE COURT:**  Um-hum.

PDF created with pdfFactory trial version www.pdffactory.com

1          **MS. WALLACE:**  -- they limit -- subject to their

2    objections, they limit production to Oracle's revenues, cost

3    and profit margins for support or maintenance services -- so

4    not for lost license revenues -- relating to Legacy, PeopleSoft

5    and JD Edwards enterprise software applications for which

6    Oracle has alleged the defendant downloaded software which is

7    important to Oracle systems.  So that, by definition, is

8    PeopleSoft and JD Edwards products supported by TomorrowNow

9    because clearly TomorrowNow would only be downloading for

10   products that it is supporting.  So not lost license revenue

11   and not lost license revenue for any other product.

12          And these limitations have affected -- again, they

13   have been a premise of discovery from the outset.  So, for

14   example, when we asked Oracle to produce pricing information

15   which would be very key to calculating lost profits from

16   alleged lost license sales, Oracle limited its production --

17   and this is on page 10 of the brief -- to price list incentive

18   policies to, quote, the products at issue in the litigation,

19   which would be the three product lines that we're now talking

20   about:  JD Edwards, PeopleSoft and Siebel.  So there may be, as

21   Oracle contends, some incidental production of pricing

22   information for other products.

23          **THE COURT:**  Really?  I'm sorry.  Just before you

24   started that, what page did you just refer to?

25          **MS. WALLACE:**  At page 10, and it's line 5.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  Um-hum.

2          **MS. WALLACE:**  So the issue with lost license revenue

3     is not only that Oracle has always maintained from the outset

4     in its RFP responses that lost license revenue was not

5     relevant.  It's also limited discovery to the product lines

6     supported by TomorrowNow.

7          And it was not only Mr. Ellison who used the term

8     "tip of the iceberg," but also Mr. Rottler.  And I believe that

9     if you look at their testimony, they were not just talking

10    about potential customers.  In fact, I recall Mr. Ellison

11    specifically testified something to the effect of if you have a

12    $1 million PeopleSoft customer, the profit doesn't stop there.

13    That's potentially a $10 million dollar customer because of all

14    the costs and upsale opportunities.

15         **THE COURT:**  Okay.  What about the argument that none

16    of that is going to be quantified; it's just going to be

17    general goodwill damage testimony?

18         **MS. WALLACE:**  Well, if I understand what Ms. House

19    said, she said they would be quantifying lost profits from lost

20    customers.  But she wasn't specific on whether that's lost

21    profit just for license revenue or also for license revenue.

22    If Oracle does not plan to quantify lost license revenue for

23    the 358 TomorrowNow customers, then maybe we don't have a

24    problem.  But my understanding, based on their papers, is that

25    they plan to quantify both lost support revenue and lost

PDF created with pdfFactory trial version www.pdffactory.com

1   license revenue.

2           **THE COURT:**  Is that correct?

3           **MS. HOUSE:**  It is correct.  You know, if you go back

4   to the original complaint and every iteration of the

5   complaint --

6           **THE COURT:**  Right.  I agree that the complaint makes

7   general, very general, vague and the kind of things that would

8   never suffice for discovery.  Therefore, initial disclosures

9   are updated which require calculations of damages.  And

10  actually, it doesn't say you can claim damages without

11  calculating them.

12          **MS. HOUSE:**  Cross-selling and upselling are all of

13  those --

14          **THE COURT:**  I'm sorry?  I was just interrupted, I

15  think, wasn't I?

16          **MS. HOUSE:**  I'm sorry.

17          **THE COURT:**  My point is yes, the complaint does

18  mention these things.  The question is whether that's enough.

19  Is that a sufficient placeholder?  Because the complaint is not

20  discovery, it's an allegation.  We're talking about discovery

21  now.  I mean, that's what Rule 37 is about.  It's not about

22  what's in the complaint.

23          **MS. HOUSE:**  If you look at the initial disclosures,

24  if you look at the interrogatory responses, cross-sell and

25  upsell, the idea that you're losing not only lost support

PDF created with pdfFactory trial version www.pdffactory.com

1    revenues, but lost maintenance application sales has been in
2    this case from the beginning.

3            **THE COURT:**  Okay.  Why the limitations and all of the
4    details she just gave about the RFP responses, et cetera?  Why
5    did Oracle then refuse to produce those things?

6            **MS. HOUSE:**  Well, one of the things that you're
7    getting is you're getting quotes from the very earliest
8    discovery responses.  You're not getting the actual reference
9    to the productions.  You're not getting the excessive meet and
10   confers.

11           One thing that we didn't do with our RFPs -- and they
12   didn't either -- is when you evolve your answer and you produce
13   and you do meet and confers, as we've done incessantly in this
14   case, we didn't go back and do RFPs -- and in fact, the Federal
15   Rules don't require you to do so because it's kind of perceived
16   as makework.  They know they have gotten stuff.

17           If you have produced a volume of material, if you
18   have had your witnesses queried about it in deposition and
19   testified about it, the notion that you're then going to go
20   back in a case of this volume and then update all of your RFPs
21   to reflect the actual production, it's not required and it
22   wasn't something that we did.

23           We did, however, update our interrogatory responses.
24   In the February interrogatory responses that they served on us,
25   we made it abundantly clear that all of this was in play.  They

56

PDF created with pdfFactory trial version www.pdffactory.com

1    sent those in February.  So the idea, again, that we hid the

2    ball or that we changed course just isn't in keeping with the

3    actual production and the pipeline and what has been said in

4    deposition.

5                But your Honor's movement towards, Okay, maybe you

6    think we didn't do enough.  We sure felt like we were doing a

7    lot.  But we're still six months out from the end of fact

8    discovery.  We're a year and a half out from trial.  We are --

9    their expert report isn't even due until next -- the end of the

10   next February.  What they're asking for is the most extreme

11   sanction that you can possibly give, a sanction that in various

12   other --

13               **THE COURT:**  The most extreme sanction?

14               **MS. HOUSE:**  Yeah, that you're going to cut out --

15               **THE COURT:**  I mean, I've heard of terminating

16   sanctions.  I think most people think that's an extreme

17   sanction, or not allowing you to put on any damages evidence.

18   I think that's the most -- that's not as extreme as

19   terminating, but it's getting closer.  So I think that's not

20   the most extreme.

21               **MS. HOUSE:**  Among the most extreme.  And certainly in

22   terms of this case, where you're basically trying to let the

23   facts out, let the merits be the things that make the

24   determination, let whatever liability, when we finally get that

25   exposed in its entirety, come out and let the damages that

57

PDF created with pdfFactory trial version www.pdffactory.com

1    are -- that flow from that liability be compensated for, what

2    they are asking for is a significant sanction and a sanction

3    that is truly unprecedented in all of the case law that we've

4    provided to you.  There are literally --

5              **THE COURT:**  Were any of those cases similar in scope

6    and had more than two years going on, other than SPX, which cut

7    in their favor?  Were any of those cases similar to this case?

8              **MS. HOUSE:**  I could go back and try -- I did not

9    quantify the amount of time, but there were literally dozens.

10             **THE COURT:**  I don't think any of them were seeking

11   millions of dollars in damages, the kind of megabyte, gigabyte,

12   et cetera, that has already been produced here, the kind of

13   painstaking process that, certainly from the Court's point of

14   view, the Court has been involved in for an extremely long

15   period of time, that you ignore all of that?

16             You have Judge Hamilton saying, No, I'm not going to

17   limit damages discovery.  Damage discovery starts now.  You

18   know, I think that was very clear what she meant by that.  She

19   didn't mean to wait until your expert reports.

20             **MS. HOUSE:**  I don't think we are saying that, your

21   Honor.  In fact, it seems to have triggered this with the

22   candor of our supplementation on May 22nd.

23             **THE COURT:**  Well, the question is whether that was

24   timely.  But on the other hand, she's making the point that

25   there is still a lot of time left.  I would not characterize it

PDF created with pdfFactory trial version www.pdffactory.com

1    as among the "most extreme sanction" but it's certainly a

2    serious sanction.  It's not trivial.

3             So what about all of that?

4             **MS. WALLACE:**  May I, your Honor, before I get to

5    that, address some of the other issues that Ms. House just

6    raised?  As far as the placeholder in the complaint goes and

7    the first response to Interrogatory Number 5, you know, the

8    placeholder in the complaint was not lost on us.  That's why we

9    served the RFPs that were referenced on page 7 of 3 which

10   specifically quotes the language of the component.

11            **THE COURT:**  I understand that.

12            **MS. WALLACE:**  And of course, as you know, the

13   response we got back was, We are limiting it to support

14   revenue.  Now, if -- and Ms. House made reference to meet and

15   confer communication, et cetera.

16            **THE COURT:**  And supplementations.

17            **MS. WALLACE:**  Yeah.  If there had been anything, any

18   written statement in which Oracle had changed its position, the

19   position it took in these RFPs, it would have been in Oracle's

20   papers, and it's not because there was none.

21            **MS. HOUSE:**  It is.

22            **MS. WALLACE:**  And as far as the production goes, I

23   realize that this is somewhat of a credibility contest for the

24   Court with Oracle saying it's produced this stuff and we saying

25   it hasn't and it's very hard for the Court to resolve something

PDF created with pdfFactory trial version www.pdffactory.com

1    like that particularly given the scope of the productions on

2    both sides.  But are a couple of things that the Court can look

3    at to resolve that.  One is the May 22nd letter that

4    accompanied Oracle's supplemental disclosure on May 22nd in

5    which they state that they are now collecting this information

6    and will produce it, and their damages expert statement that's

7    submitted in support of their opposition, stating that "We have

8    now directed Oracle personnel to gather this information."

9           You know, on May 22nd, when they provided the

10   supplemental disclosure, that was just one month before their

11   expert report was due under the original schedule.  They

12   surely -- if this had been in the case from the outset, if both

13   sides had been on the -- working on the premise that lost

14   license revenue was at issue, they surely knew one month before

15   their damages expert report what was going to be covered in

16   that analysis, and were in a position to produce it.  And they

17   didn't and they still haven't because it has not been at issue.

18          Oracle has finally focused its attention on damages

19   two years into the case.  And just as we predicted at the

20   outset, the scope of the damage claims here are so extensive

21   that if damages wasn't a focus from the outset, there would be

22   prejudice to defendants that could not be cured.

23          **THE COURT:**  All right.  What about their argument

24   that, nonetheless, the cases, according to them, don't justify

25   this kind of sanction?

PDF created with pdfFactory trial version www.pdffactory.com

1        **MS. WALLACE:**  Well, I think if the sanction is

2   appropriately tailored -- because we're not seeking to preclude

3   lost profits altogether.  What we are doing is we've taken the

4   position that Oracle took at the outset, and that is how we

5   have focused our damages analysis.  You've seen our damages

6   expert declaration.  We've talked about how many hours and how

7   many millions of dollars it's taken to do the damages analysis

8   for the theories that we believe are legitimately in the case.

9   We're not asking to preclude Oracle from any other damage

10  theory or even from lost profit.

11        We're asking -- Oracle essentially should be estopped

12  from, at this late stage of the case, when it is beyond our

13  expert's capability to analyze the information that needs to be

14  analyzed for these additional lost profits claimed, Oracle

15  should be estopped from now trying to get them into the case,

16  and that is an appropriately tailored sanction.

17        **THE COURT:**  All right.  Briefly, because it's now

18  after 12:00.

19        **MS. HOUSE:**  Your Honor, whether it's beyond his

20  capability, he doesn't know yet.  That's speculative.  If,

21  after we end up and he ends you saying, Well, I couldn't

22  possibly have done this, there is ample time and it fits better

23  with all of the case law to complain, look, this was sprung on

24  us, we couldn't possibly do it.  But to give sanctions of this

25  kind on the hypothesis that they may not be able to do it in

PDF created with pdfFactory trial version www.pdffactory.com

1   time, is -- it's just unprecedented.

2        **THE COURT:**  Well, actually, I think that's a

3   misstatement.  The burden is on you to show harmlessness, not

4   on them.

5        **MS. HOUSE:**  Either way, your Honor, I think we have

6   shown harmlessness.  There is time.  We don't know yet whether

7   or not Mr. Clarke has to do the worrying about all the things

8   that he says has to happen.  We think that is hyperbolic; that

9   he's overstated it.

10        **THE COURT:**  And I think that the brief also misstated

11   the *Network Appliance* case by Judge Patel.  I mean, I think

12   those were, you know, inaccurate.

13        **MS. HOUSE:**  Well, *Network Appliance*, we feel is very

14   relevant here, and certainly the language in that case is very

15   relevant.

16        **THE COURT:**  Especially including the language deleted

17   and as explained in the reply brief that was left out.  I think

18   that mischaracterized the case.

19        And you know, I have to say, you know, if judges

20   don't point that out, those sort of things out, I don't know if

21   it encourages it.  But I think it was not correct and I think

22   saying that you've put the burden on the wrong party on

23   harmlessness, those are errors that a firm like yours shouldn't

24   make, or attempts to.  I mean, I hope they're just inadvertent

25   errors and not an attempt to mislead the Court.

PDF created with pdfFactory trial version www.pdffactory.com

1          **MS. HOUSE:**  They certainly were not.

2          **THE COURT:**  I'm not assuming they were.

3          **MS. HOUSE:**  And one of the things that she pointed

4     out was that she decided that she said that bad faith was a

5     required showing that she didn't --

6          **THE COURT:**  Only when it was tantamount to

7     terminating a complete severe sanction.

8          **MS. HOUSE:**  Right.

9          **THE COURT:**  I don't have the case in front of me, but

10    it was not correct, and really I thought not a fair reading of

11    the case.  And it was sort of obvious to me the minute I looked

12    it, and my law clerk, as well.  I mean, it's not a difficult

13    case to follow.

14         **MS. HOUSE:**  She said that mere negligent conduct in

15    discovery is insufficient to impose the severe penalty of

16    exclusionary sanctions; that exclusionary sanctions based on

17    alleged discovery violations are generally improper absent

18    undue prejudice to the opposing side; that the touchstone of

19    the prejudice inquiry is whether a discovery violation

20    threatens to interfere with the rightful decision of the case

21    or impairs the moving party's ability to go to trial -- which

22    is a year and a half from now; and that delayed production of

23    documents is rarely sufficient to meet the standard.

24         **THE COURT:**  She said, "The preclusion of evidence is

25    among the most severe under certain circumstances and it's

63

PDF created with pdfFactory trial version www.pdffactory.com

1    tantamount to dismissal of the plaintiff's claim for entry of

2    default.  Under those circumstances, mere negligent conduct is

3    insufficient.  So when it's tantamount to dismissal, entry of

4    default, i.e., terminating sanctions, under those

5    circumstances, mere negligence is insufficient.  That, to me,

6    is quite different from saying you can't impose any kind of

7    exclusionary sanctions that don't amount to terminating with

8    mere negligence.  Those are -- I mean, to me, that really is

9    not a fair characterization.  And the circumstances refer to

10   when it's tantamount to dismissal of claims or entry of default

11   judgment.  Those are terminating sanctions.  Those are the most

12   severe.  That's when they're most severe.

13        **MS. HOUSE:**  Well, it feels like it to us, your Honor,

14   because this is significant in terms us --

15        **THE COURT:**  It's not a subjective test on how it

16   feels.  It's whether or not it's tantamount to dismissal or

17   not.

18        Now, I made a point.  You're arguing with me that I'm

19   wrong and you're right.  I actually think you've just repeated

20   an inaccurate characterization test of the case.

21        But I don't think there is anything more to be said.

22   You know, I don't know want to beat a dead horse, but that's

23   what the case says.  And it's not whether it feels terrible and

24   you really don't want it to happen.  Is it equivalent to a

25   terminating sanction or not?

PDF created with pdfFactory trial version www.pdffactory.com

1          Now, if I were to grant all the relief they ask for,

2    is this equivalent to a terminating sanctions?

3          **MS. HOUSE:**  It's equivalent to denying Oracle a vast

4    amount of the damage form which they suffered from their

5    liability, yes.

6          **THE COURT:**  Is it equivalent to a terminating

7    sanction?  "Yes" or "no"?

8          **MS. HOUSE:**  It is not equivalent to a terminating

9    sanction, but it severely guts our damages, which is why we're

10   bringing it.

11         **THE COURT:**  Okay.  Well, I understand that there is a

12   lot of money at stake and that it would affect the damages

13   available, but that is not the same as a terminating sanction.

14         All right.  Well, let's -- you know, that's a

15   deviation, but again, I'm just troubled by -- I mean, I

16   really -- you know, Judge Hamilton addressed eloquently the

17   issue of the civility in the tone.  And I don't really like

18   trying to correct parties about whether they cite cases

19   correctly or not.

20         But I feel, on the other hand, if judges don't do it

21   from time to time, then it encourages bad behavior or sloppy or

22   negligent or whatever you want to call it.

23         Now, I'm not imposing any sanctions.  We're not

24   talking about this.  I'm not going to repeat this outside this

25   room.  This is not meant to be, you know, some kind of painful

PDF created with pdfFactory trial version www.pdffactory.com

1    process.  I just feel, though, that I do have to give some

2    feedback when I see things that I don't want to see again, and

3    I think other judges won't want to, either.  But that's not the

4    most important issue.

5            So anything further on the merits?  I think we have

6    covered a lot of it.

7            **MS. WALLACE:**  Unless your Honor has any other

8    questions on the prejudice evidence, then we have nothing

9    further.

10           **THE COURT:**  Okay.  Anything further?

11           **MS. HOUSE:**  Other than we really do think that the

12   prejudice element which is essential here hasn't been met,

13   given the amount of time that there remains, and that, indeed,

14   that some of what Mr. Clarke is complaining about, we don't

15   believe is going to bear out but that the appropriate time to

16   assess whether there was actual undue prejudice would be at the

17   point when they actually respond to the damages.

18           **THE COURT:**  Well, let me ask one other question.

19   Another issue that is raised is whether or not, if I were to be

20   inclined to think that the kind of sanctions that are requested

21   were warranted, would this be in the form of an R & R or a

22   normal Rule 37 discovery ruling?

23           I would say that, you know, Judge Hamilton, I think,

24   in general -- you know, her general philosophy, that she would

25   prefer as much as possible that I not issue R & R's.  I'm not

PDF created with pdfFactory trial version www.pdffactory.com

1  aware of any case that would require such an R & R, or did I

2  see one in the papers.  But I just thought we should also have

3  a brief discussion on that.

4          **MS. HOUSE:**  I think that one of the cases that was

5  cited to your Honor was your own case, which was the *Keithly*

6  case.

7          **THE COURT:**  Well, I can figure that one out.

8          **MS. HOUSE:**  But the case they didn't cite you --

9  there were a variety of sanctions motions in that case, you

10 probably remember.  And one of the decodings that you had in a

11 subsequent *Keithly* decision -- not the one that they cited to

12 you -- was that motions that involved determination of the

13 merits of the case or that do not involve a collateral matter

14 or that are critical in shaping the nature of litigation are

15 generally considered dispositive, and you cited the *Boskoff*

16 case, and that was in the context of dispositive motions

17 clearly are in the province of Judge Hamilton.  So if you were

18 to do anything, it would have to be in the matter of a report

19 and recommendation and not in the form of an order itself

20 because of the fact that it is akin to a dispositive motion.

21          **THE COURT:**  All right.  And your view on that?

22          **MS. WALLACE:**  I think Ms. House is correct, that if

23 it were dispositive, then it would be the province of Judge

24 Hamilton.  But I think it's clearly not dispositive because

25 what we're talking about is just one portion of one measure of

PDF created with pdfFactory trial version www.pdffactory.com

1    damages.  We're not talking about disposing of any type of

2    action or even any measure of damages.  And I think as we laid

3    out in our reply brief, both the statute and Ninth Circuit case

4    law make clear that these kinds of admissions are generally

5    non-dispositive and I believe this one is also.

6            **THE COURT:**  All right.  Okay.  Submitted?

7            **MS. WALLACE:**  Yes.

8            **THE COURT:**  All right.  Thank you.  Off the record.

9            **THE CLERK:**  Court is in recess.

10       *(Proceedings concluded at 12:19 p.m.)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

68

PDF created with pdfFactory trial version www.pdffactory.com

CERTIFICATE OF REPORTER

1

2      I, the undersigned, hereby certify that the foregoing

3  proceedings were reported by me, a certified shorthand

4  reporter, and were thereafter transcribed under my direction

5  into typewriting; that the foregoing is a full, complete and

6  true record of said proceedings.

7      I further certify that I am not of counsel or

8  attorney for either or any of the parties in the foregoing

9  proceedings and caption named, or in any way interested in the

10 outcome of the cause named in said caption.

11     The fee charged and the page format for the

12 transcript conform to the regulations of the judicial

13 conference.

14     Furthermore, I certify the invoice does not contain

15 charges for the court reporter's certification page.

16     IN WITNESS WHEREOF, I have hereunto set my hand this

17 20th day of August 2009.

18

19

20 MARGARET "MARGO" GURULE, CSR

21

22

23

24

25

69