# EXHIBIT K

Dockets.Justia.com

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
MULTITHERM CORPORATION
v.
John C. FUHR and Paratherm Corporation.
**Civ. A. No. 89-6151.**

July 24, 1991.

Leo A. Hackett, Media, Pa., for plaintiff.

Anthony D. Reagoso, Reagoso and Rothbart,
Joseph T. Mallon, Dunn, Haase, Sullivan, Mallon,
Cherner & Broadt, Media, Pa., for defendants.

*OPINION AND ORDER*

VanARTSDALEN, Senior District Judge.

***1** The parties in this case are competitors in the
heat transfer fluid industry. Plaintiff, Multitherm
Corporation (Multitherm) instituted this action by
filing a complaint purporting to set forth causes of
action for copyright infringement, trademark in-
fringement, violations of the Racketeer Influenced
and Corrupt Organizations Act (RICO), 18 U.S.C. §
1961 et seq., as well as pendent state law claims for
breach of contract, conversion, fraud, interference
with contractual relations, and defamation. Defend-
ants, John C. Fuhr and Paratherm Corporation
(Paratherm) have filed a counterclaim, asserting
claims for interference with contractual relations,
defamation, disparagement, and fraud. Prior to trial,
Multitherm dropped its RICO, defamation and
fraud claims, and Fuhr and Paratherm dropped their
fraud claim.

The case was tried without a jury. This opinion
constitutes my findings of fact and conclusions of
law pursuant to Rule 52(a) of the Federal Rules of

Civil Procedure.

*I. FINDINGS OF FACT*

1. Plaintiff Multitherm Corporation is a
Pennsylvania corporation formed in 1980 by Nel-
son Jacobs and Edward Mort. At the time of its
formation, Mr. Jacobs and Mr. Mort owned equal
shares in the corporation.

2. Multitherm is engaged in the business of selling
heat transfer fluids. Heat transfer fluids are petro-
leum based products used in various heating applic-
ations.

3. Multitherm purchases the fluids from a number
of suppliers, and resells them under the name of
Multitherm Corporation to its customers under the
product names "PG-1" and "IG-2."

4. Prior to incorporating Multitherm, Mr. Jacobs
and Mr. Mort had tests and analyses performed on
these fluids to determine various physical proper-
ties and characteristics of the fluids such as density,
flash point, fire point, auto-ignition and pour point.
Multitherm prepared charts and graphs to depict the
physical properties and characteristics of the fluids.

5. The results of the tests and analyses and the
graphs and charts developed by Multitherm were
incorporated into its copyrighted sales and technical
brochures or bulletins.

6. Mr. Mort was primarily responsible for oversee-
ing the operations of Multitherm from 1980 until
the latter part of 1987, when he became seriously
ill. Mr. Mort died in January of 1988. Mr. Jacobs
was primarily responsible for the supervision of a
related corporation known as Coil Company during
the same period of time.

7. Multitherm hired defendant John C. Fuhr in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

March of 1986. Mr. Fuhr was primarily responsible for sales and marketing. There is some dispute as to what exactly Mr. Fuhr's title at Multitherm was; however, it is clear that he was responsible for sales and sales promotion including development and issuance of sales and technical brochures. Mr. Fuhr was aware of the customers of Multitherm, the pricing policies of Multitherm, the products sold by Multitherm, and the prices paid by Multitherm.

8. In May of 1988, Multitherm issued a sales and technical bulletin entitled "Multitherm PG-1." The bulletin contained information about the product Multitherm PG-1 regarding flash point, pour point, fire point, and auto-ignition point as well as the charts and graphs prepared by Multitherm. The bulletin was issued with the copyright insignia printed on it, but the copyright designation was not registered until May 4, 1989. The copyright for the revised Multitherm PG-1 bulletin was registered on September 22, 1989.

**\*2** 9. In August of 1988 Multitherm issued a sales and technical bulletin entitled "Multitherm IG-2." The bulletin contained information about the product Multitherm IG-2 regarding flash point, fire point, density, viscosity, and auto-ignition point as well as charts and graphs prepared by Multitherm. The bulletin was issued with the copyright insignia printed on it, but the copyright designation was not registered until May 4, 1989. The copyright for the revised Multitherm IG-2 bulletin was registered on March 14, 1990.

10. Defendant John Fuhr was involved in the assembling of the information for the Multitherm bulletins, the layout of the bulletins and the wording of the bulletins. Mr. Fuhr worked with James Macaroni, a graphic designer, in preparing the Multitherm bulletins.

11. The Multitherm bulletins contain Multitherm's logo, which consists of a stylized capital "M" with vertical lines running through it. Multitherm has used this logo since the inception of the company in 1980. The logo was registered as a trademark of the Multitherm Corporation on November 7, 1989.

12. The name "Multitherm" was registered as a trademark of the Multitherm Corporation on October 31, 1989. The name "Multitherm PG-1" became a registered trademark of the Multitherm Corporation on October 31, 1989. The name "Multitherm IG-2" became a registered trademark of the Multitherm Corporation on November 7, 1989. Multitherm has used the trade names "Multitherm," "IG-2" and "PG-1" since 1982.

13. In February of 1988, Multitherm sent a sample of its heat transfer fluid to General Electric Company (General Electric) to be tested for use as an Electrical Discharge Machining (EDM) fluid. In March of 1988, General Electric approved Multitherm PG-1 for use as an EDM fluid.

14. EDM fluids are used in a process that involves the reconditioning of jet engine blades. Many major oil companies and chemical companies sell fluids for use as EDM fluids; however, General Electric's approval of PG-1 as an EDM fluid, was the first time that General Electric had approved a "white" petroleum-based fluid for use as an EDM fluid.

15. Mr. Fuhr was the individual primarily responsible for obtaining the approval of Multitherm PG-1 as an EDM fluid.

16. Prior to Mr. Fuhr's resignation, Multitherm sold approximately eight barrels or drums of its PG-1 product to General Electric for use as an EDM fluid.

17. In August of 1988, Robert Sorenson was hired by Multitherm as a product manager. In August of 1988, Mr. Sorenson questioned Mr. Fuhr about the advisability of registering the copyrights for the Multitherm PG-1 and Multitherm IG-2 bulletins. Mr. Fuhr advised Mr. Sorenson that registration was not necessary and that the printed copyright

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

designation was sufficient.

18. On August 16, 1988, Mr. Fuhr had articles of incorporation drafted and prepared for Paratherm Corporation (Paratherm). The articles of incorporation for Paratherm Corporation were issued by the Commonwealth of Pennsylvania on September 15, 1988.

**\*3** 19. On November 30, 1988, Ronald Peterson, the director of property operations at the Anaheim Hilton Hotel and Towers (the Anaheim Hilton), contacted Multitherm by telephone, and requested a price quotation for the purchase of 45 drums of heat transfer fluid. The telephone call was received by Cathy Craddock, an employee of Multitherm. Later that same day, Mr. Fuhr telephoned Mr. Peterson from Multitherm's warehouse and informed Mr. Peterson that he would no longer be able to service Mr. Peterson's account, that it was his last day at Multitherm, and that he was starting his own business. Mr. Fuhr did not inform Mr. Peterson of the nature of his new business. Mr. Peterson asked Mr. Fuhr to contact him after he (Fuhr) had relocated.

20. At approximately 5:00 p.m. on November 30, 1988, Mr. Fuhr submitted his resignation to Mr. Jacobs, president of Multitherm, effective immediately. On December 1, 1988, Mr. Fuhr commenced the operation of Paratherm Corporation. Mr. Fuhr has acted as chief executive officer of Paratherm since that time.

21. Paratherm is also in the business of selling petroleum-based heat transfer fluids. Since the time it commenced operations, Paratherm has purchased fluids from some of the same suppliers as Multitherm and resold them as heat transfer fluids under the product names "Paratherm HE" and "Paratherm NF." The fluids sold by Paratherm are essentially the same products as Multitherm PG-1 and Multitherm IG-2.

22. On December 1, 1988, Mr. Fuhr contacted Mr.

Peterson and informed him that Paratherm was in the same business as Multitherm, the sale of heat transfer fluids, and provided him with information about the fluids he was selling. Mr. Peterson asked Mr. Fuhr for a price quotation on Paratherm's products and for documentation on those products. As a result of this conversation, Mr. Fuhr sent Mr. Peterson a letter by facsimile transmission, along with certain technical information. The technical information sent by Mr. Fuhr to Mr. Peterson may have been a Paratherm bulletin, describing one of Paratherm's products.

23. On December 2, 1988, Mr. Peterson placed an order on behalf of the Anaheim Hilton with Paratherm for the purchase of 45 drums of heat transfer fluid at a total price of $15,313.00 ($13,725.00 product and $1,588.00 shipping).

24. At the time Mr. Peterson contacted Multitherm, he was seeking information on fluid prices because the Anaheim Hilton was undergoing a system clean out of one of its thermal fluid systems. A system clean out involves the draining and replacement of all of the heat transfer fluid in a given system. Generally, customers do not mix heat transfer fluids from different companies in a system; however, when a system is cleaned out, it is more common to switch to a different company's heat transfer fluid. Mr. Peterson chose to switch to Paratherm's product because Paratherm offered a four year warranty on its product and Multitherm did not. He has continued to purchase from Paratherm because he has been happy with the service Mr. Fuhr has provided. Individuals other than employees of the Anaheim Hilton and employees of Multitherm knew that the hotel was undergoing a system clean out of one of its thermal fluid systems.

**\*4** 25. Sometime after Mr. Fuhr resigned from Multitherm, General Electric contacted him at Paratherm and requested information about Paratherm's products and their potential for use as an EDM fluid. In response Mr. Fuhr, operating as Paratherm,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

sent a letter dated March 10, 1989 to William Logedon of General Electric concerning the use of Paratherm NF as an EDM fluid. In that letter, Mr. Fuhr stated "[y]ou had mentioned the Multitherm PG-1 fluid. As you'll recall, I had done the preliminary technical work with GE while I was at Multitherm. The NF fluid is manufactured from the same base feedstock." Mr. Fuhr, acting as Paratherm, also sent a letter dated April 11, 1989, to Robert McCracken of General Electric, in which he stated that Paratherm NF is manufactured from the same base feedstock as Multitherm PG-1.

26. Paratherm has sold $69,000.00 worth of Paratherm NF to General Electric for use as an EDM fluid.

27. In December of 1988 Paratherm issued sales and technical bulletins for its Paratherm HE and Paratherm NF products. Between December of 1988 and March of 1989, Paratherm distributed copies of its Paratherm NF and Paratherm HE bulletins dated December 1988 to prospective customers, including customers of Multitherm.

28. In February of 1989, Paratherm issued a second set of sales and technical bulletins for its Paratherm NF and Paratherm HE products. Between March of 1989 and June of 1990, Paratherm distributed copies of its Paratherm NF and Paratherm HE bulletins dated February 1989 to prospective customers, including former customers of Multitherm.

29. In June of 1990, Paratherm issued a third set of Paratherm NF and Paratherm HE bulletins. Paratherm has distributed copies of its bulletins dated June 1990 to customers and prospective customers.

30. Multitherm's PG-1 bulletin contains textual material in the following order under the headings: "Non-Fouling," "Non-Toxic," "Reduced Heat User Costs," "Low Pumping Cost," "System Corrosion," "Quality Control," "Fluid Analysis," "Warranty," "Fluid Storage," "Fluid Disposal," "System Clean-

ing," and "Filling Tips." The bulletin also contains a table set off in a box labeled "Highlights" at the top of the first page, which lists important features of the fluid. It also contains a table labeled "Typical Fluid Properties," which sets forth the physical properties of the fluid discussed in the bulletin, as well as tables concerning vapor pressure and thermal expansion. The bulletin also contains graphs depicting absolute viscosity, thermal conductivity, specific heat, density, tubing film coefficient, tubing pressure drop, steam pressure, piping film coefficient, and piping pressure drop. In addition, the bulletin includes a list of several formulae under the heading "Useful Formulae"; a viscosity conversion chart, a glossary, a list of some of the industries that specify Multitherm heat transfer fluids, and a schematic sketch of typical heat transfer applications.

**\*5** 31. Multitherm's IG-2 bulletin is similar to its PG-1 bulletin. It contains textual material in the following order under the headings: "Lowest Pumping Cost," "Efficient Heat Transfer," "Reduced Heat User Costs," "Operating Safety," "System Corrosion," "Quality Control," "Fluid Analysis," "Warranty," "Fluid Storage," "Fluid Disposal," "System Cleaning," "Filling Tips," and "Technical Advice." It also contains a highlights table, a typical fluid properties table, a vapor pressure table and a thermal expansion table. The IG-2 bulletin also contains a table labeled "Typical Comparisons," which compares the IG-2 product to the fluids of several competitors. The IG-2 bulletin also contains graphs for absolute viscosity, thermal conductivity, specific heat, density, tubing film coefficient, tubing pressure drop, steam pressure, piping film coefficient and piping pressure drop. It also contains the "Useful Formulae," viscosity conversion, and glossary sections, as well as the list of industries that specify Multitherm heat transfer fluids and the schematic sketch.

32. The December 1988 Paratherm NF bulletin is almost identical to the Multitherm PG-1 bulletin. It

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

contains textual material in the same order, under the same headings as the PG-1 bulletin. Moreover, the language contained in these textual sections is identical to that employed in the PG-1 bulletin except that "NF" is substituted for "PG-1." The NF bulletin also contains a typical fluid properties table, setting forth the same information in the same order as the PG-1 typical fluid properties table, and a table at the top of the first page setting forth the same information contained in the PG-1 highlights table. The NF bulletin does not contain any of the other tables or graphs contained in the PG-1 bulletin.

33. The December 1988 Paratherm HE bulletin is almost identical to the Multitherm IG-2 bulletin. It contains the same textual material in the same order, under the same headings, and employs identical language, except for the substitution of "HE" for "IG-2." The HE bulletin includes a table on the top of the first page setting forth the same information as the IG-2 highlights table, and contains a typical comparisons table and a typical fluid properties table, which set forth the same information in the same order as the corresponding tables of the IG-2 bulletin, except that "HE" is substituted for "IG-2." The HE bulletin does not contain any of the other tables of graphs contained in the IG-2 bulletin.

34. The February 1989 Paratherm NF bulletin is very similar to the Multitherm PG-1 bulletin. It discusses the same topics in the same order, but some of the headings are changed slightly. Specifically, "Reduced Heat User Costs" was changed to "Low Heat User Costs," "Low Pumping Cost" was changed to "Pumping Cost," "Technical Advice" was changed to "Technical Assistance," "Fluid Storage" was changed to "Storing the Fluid," "System Cleaning" was changed to "Pre-cleaning the System," and "Filling Tips" was changed to "Charging the System." In addition, the language employed in the February 1989 Paratherm NF bulletin is not an exact duplicate of the language of the Multitherm PG-1 bulletin; however, the Paratherm

NF bulletin is clearly a paraphrase of the Multitherm PG-1 bulletin. The February 1989 Paratherm NF bulletin also contains graphs depicting piping film coefficient, piping pressure drop, absolute viscosity, thermal conductivity, specific heat, density, tubing film coefficient, tubing pressure drop and steam pressure. The graphs depict the various physical properties and characteristics of the fluid over the same range of coordinates as do the graphs contained in the Multitherm PG-1 bulletin, and appear to be substantially similar to the Multitherm PG-1 graphs. The NF bulletin also contains vapor pressure and thermal expansion charts. A highlights table and a typical fluid properties table are also included on the first page of the NF bulletin. The typical properties table contains the same information in the same order as the corresponding table in the PG-1 bulletin.

**\*6** 35. The February 1989 Paratherm HE bulletin is very similar to the Multitherm IG-2 bulletin. It discusses the same topics in the same order, but with slightly altered headings. Specifically, "Lowest Pumping Cost" was changed to "Pumping Cost," "Efficient Heat Transfer" was changed to "Fluid Efficiency," "Reduced Heat User Costs" was changed to "Lower Heat User Costs," "Operating Safety" was changed to "Safety in Operation," "Technical Advice" was changed to "Technical Assistance," "Fluid Storage" was changed to "Storing the Fluid' " "System Cleaning was changed to "Pre-Cleaning the System," and "Filling Tips" was changed to "Charging the System." The language of the February 1989 Paratherm HE bulletin, although not an exact duplicate of the Multitherm IG-2 bulletin, is clearly a paraphrase of the language of the IG-2 bulletin. The February 1989 Paratherm HE bulletin also contains graphs depicting piping film coefficient, piping pressure drop, absolute viscosity, thermal conductivity, specific heat, density, tubing film coefficient, tubing pressure drop and steam pressure. The graphs depict the various physical properties and characteristics of the fluid over

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

the same range of coordinates as do the graphs in the Multitherm IG-2 bulletin, and appear to be substantially similar to the Multitherm IG-2 graphs. The Paratherm HE bulletin also contains a vapor pressure and a thermal expansion chart, as well as a useful formulae, viscosity conversion and glossary section. A highlights table, a typical comparisons table and a typical fluid properties table are also included on the first page of the Paratherm HE bulletin. The typical comparisons table and the typical fluid properties table contain the same information in the same order as the corresponding tables in the IG-2 bulletin, except that HE is substituted for IG-2 in the typical comparisons table.

36. The June 1990 Paratherm Bulletins are much less similar to Multitherm's PG-1 and IG-2 bulletins than are the December 1988 and February 1989 Paratherm bulletins.

37. Both Multitherm's PG-1 bulletin and the June 1990 Paratherm NF bulletin contain sections discussing fluid fouling, fluid toxicity, system corrosion, fluid storage, efficiency, quality control, vapor pressure, system cleaning, fluid disposal, fluid analysis, quality control, and technical assistance. The Paratherm NF bulletin discusses these topics in different order, using different headings and substantially different wording than the Multitherm PG-1 bulletin. The Paratherm bulletin also discusses environmental safety which the Multitherm bulletin does not. Both the PG-1 bulletin and the June 1990 NF bulletin contain typical fluid properties tables. The Paratherm table is different from the Multitherm table, in that it uses the phrases "physical properties," "electrical properties" and optical properties" instead of "physical characteristics," "electrical characteristics" and "optical characteristics." The Paratherm NF table also presents the information in different order from the Multitherm PG-1 table, and contains several items not included in the Multitherm PG-1 table; specifically, vapor pressure, coefficient of thermal expansion and heat of vaporization. The June 1990 Paratherm

NF bulletin contains a typical comparisons table, the Multitherm PG-1 bulletin does not. The June 1990 Paratherm NF bulletin contains graphs depicting absolute viscosity, specific heat, thermal conductivity, density, tubing film coefficient, piping pressure drop, piping film coefficient, and tubing pressure drop. These graphs are not presented in the same order as those in the Multitherm PG-1 bulletin. The Paratherm NF graphs depict the various physical properties and characteristics of the fluid over the same range of coordinates as do the corresponding graphs in the Multitherm PG-1 bulletin. The NF graphs are similar but not identical to the PG-1 graphs. The June 1990 Paratherm NF bulletin also contains sections labeled "formulae," "terminology" and "viscosity conversion." These sections set forth substantially the same information as that contained in the "useful formulae," glossary, and viscosity conversion sections of the Multitherm PG-1 bulletin; however, the information is not set forth in the same order as is that in the PG-1 bulletin, nor is it placed in the same location within the bulletin.

**\*7** 38. Both Multitherm's IG-2 bulletin and the June 1990 Paratherm HE contain sections discussing pumping efficiency, thermal efficiency, operating safety, quality control, fluid disposal, fluid storage, system cleaning, system charging, fluid analysis and technical assistance. The June 1990 HE bulletin discusses these topics in different order, using different headings, and substantially different wording than the IG-2 bulletin. The HE bulletin also discusses environmental safety, which the Multitherm bulletin does not. The IG-2 bulletin contains a highlights table, the June 1990 HE bulletin does not. Both the IG-2 bulletin and the HE bulletin contain typical properties tables. The HE typical properties table contains all the information contained in the IG-2 typical properties table, but also contains several entries not contained in the IG-2 table; specifically, vapor pressure, coefficient of thermal expansion, heat of vaporization, API gravity, specific

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

gravity, viscosity, color, corrosivity, total sulphur, total acid number, aniline point, dielectric strength, and refractive index. The HE table also presents the information in different order from the IG-2 table, and is formatted in a different manner. Both the IG-2 bulletin and the June 1990 HE bulletin contain typical comparisons tables, but the HE table is much more extensive than the IG-2 table, in that it compares the fluids of more competitors, using more points of comparison than the IG-2 table. It is also located in a different section of the bulletin, than is the IG-2 table. Both the IG-2 bulletin and the HE bulletin contain graphs depicting absolute viscosity, thermal conductivity, density, specific heat, tubing film coefficient, tubing pressure drop, piping pressure drop and piping film coefficient. The graphs in the HE bulletin are not presented in the same order as are the graphs in the IG-2 bulletin. The graphs in the HE bulletin depict the various physical properties over the same range of coordinates as do the IG-2 graphs. The HE graphs are similar, but not identical to the IG-2 graphs. The HE bulletin also contains sections labeled "formulae," "nomenclature," and "viscosity." These sections contain some of the same information contained in the "useful formulae," "viscosity conversion," and "glossary" sections of the IG-2 bulletin. The information is not set forth in the same order, nor is it located in the same place in the bulletin.

39. In December of 1988, Paratherm Corporation began and continued thereafter the use of a logo consisting of a capital letter "P" with horizontal lines running through the letter.

40. Many companies in the heat transfer industry use logos that incorporate lines in some way. The lines typically represent the transfer of heat. A number of other competitors in the transfer fluid industry incorporate "therm" in their name. Other competitor's employing the name "therm" include Dowtherm, Texatherm, Mobiltherm, Syltherm and Therminol.

*8 41. Many companies in the heat transfer fluid industry issue sales and technical bulletins for their products. The bulletins of other companies also discuss efficiency, vapor pressure, fouling, toxicity and technical assistance. The bulletins of other companies in the industry also contain charts and tables displaying the physical properties of their products. The bulletins of other companies in the industry also contain graphs depicting viscosity, density, thermal conductivity, specific heat, piping pressure drop, tubing pressure drop, tubing film coefficient and piping film coefficient.

42. The December 1988 and February 1989 bulletins have been discontinued and are no longer in use.

43. Multitherm Corporation had gross sales for the

fiscal year ending June 30, 1986 of $291,000.00,

fiscal year ending June 30, 1987 of $383,000.00,

fiscal year ending June 30, 1988 of $663,000.00,

fiscal year ending June 30, 1989 of $834,000.00,

fiscal year ending June 30, 1990 of $628,000.00,

and projected sales for the fiscal year ending June 30, 1991 of $569,000.00. The percentage cost of sales for the relevant sale period of time were for 1986 38.1%, for 1987 38.1%, for 1988 38.1%, for 1989 38.5% and for 1990 42.5%.

44. Paratherm had gross sales for the fiscal year 1989 of $273,000.00 and for 1990 of $679,000.00. During the period January 1989 through December of 1990, Paratherm had gross profits on sales to non-Multitherm customers[FN1] of $412,983.00.

45. Sales and technical bulletins are important marketing tools in the heat transfer fluid industry; however, the sales personnel are also important. The technical data contained in the bulletins are of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

primary importance to purchasers of heat transfer fluids.

46. The individuals responsible for purchases of heat transfer fluids are primarily engineers and senior mechanics.

47. After Mr. Fuhr left Multitherm, telephone calls and letters for Mr. Fuhr were received at Multitherm

48. The Thomas Register is a directory of various industrial businesses. After Mr. Fuhr resigned from Multitherm, his name continued to appear for some period of time as a representative of Multitherm in Multitherm's advertisement in the Thomas Register. Mr. Fuhr was not responsible for the inclusion of his name in the Multitherm advertisement.

49. In the time since Mr. Fuhr left Multitherm, a number of other key employees have also left the company.

50. After this lawsuit was initiated, Mr. Jacobs, as acting president of Multitherm, sent a letter dated November 15, 1989, by facsimile transmission, to W. Lanier, Vice President of Hotel Engineering for the Marriot Corporation, stating that Multitherm had filed a complaint against Mr. Fuhr and Paratherm. The letter informed Mr. Lanier that the complaint involves "trademarks, copyrights, theft and fiduciary duties."

51. Sometime after this lawsuit was initiated, Multitherm, through its counsel, circulated a "discovery questionnaire" to customers and suppliers of both Multitherm and Paratherm, asking for information about contacts between such customers and suppliers and Mr. Fuhr and Paratherm.

## II. DISCUSSION

*9 As was noted above, Multitherm's remaining claims seek to recover for alleged copyright in-

fringement, trademark infringement, breach of contract, conversion, and interference with contractual relations. In their counterclaim, defendants seek to recover for intentional interference with contractual relations, defamation and disparagement. I will address these claims seriatim.

### A. Copyright Infringement

### 1. Liability

To prevail on a claim of copyright infringement, a plaintiff must prove that it owned the copyrighted material and that the copyrighted material was copied by the defendant. *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 290 (3d Cir.1991); *Masquerade Novelty, Inc. v. Unique Industries, Inc.,* 912 F.2d 663, 667 (3d Cir.1990); *Whelan Associates v. Jaslow Dental Laboratory,* 797 F.2d 1222, 1231 (3d Cir.1986), *cert. denied,* 479 U.S. 1031 (1987).

A certificate of registration issued by the United States Copyright Office constitutes prima facie evidence of the validity and ownership of copyrighted material. *Ford Motor Co.* at 290-291; *Andrien v. Southern Ocean County Chamber of Commerce,* 927 F.2d 132, 134 (3d Cir.1991). This presumption of validity is, however, rebuttable. *Educational Testing Services v. Katzman,* 793 F.2d 533, 538 (3d Cir.1986).

The copyrights for the Multitherm PG-1 and the Multitherm IG-2 bulletins have both been registered and certificates of registration have been issued for those documents. The defendants apparently do not challenge the validity of the copyrights and, in any case, I find that the PG-1 and IG-2 copyrights are valid. Under the copyright statute:

Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 102(a). Thus the two primary requirements that a work must satisfy in order to be afforded copyright protection are that it must be an "original work of authorship" and it must be "fixed in a tangible medium of expression." 17 U.S.C. § 102(a); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1247 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033 (1984). The test for originality has a "low threshold" and requires only that the work "be the product of independent creation" and that the author must have "contribute[d] more than a trivial variation of a previous work." *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 489-90 (2d Cir.), *cert. denied,* 429 U.S. 857 (1976).

The Multitherm bulletins consist of textual material, graphs and tables. Under the standard outlined above, the textual material is clearly copyrightable. The tables and the graphs, however, present a more difficult question. The factual information contained within the tables and charts cannot be copyrighted. Copyright protection "does not extend to facts or to true events, even if they are discovered through original research." *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 49 (2d Cir.), *cert. denied,* 476 U.S. 1159 (1986). The tables and graphs as a whole, however, would appear to be copyrightable as compilations of factual material. Compilations of facts may generally be copyrighted. *Feist Publications v. Rural Telephone Service Co.,* 499 U.S. 340, 111 S.Ct. 1282, 1287 (1991). In a compilation, it is the choice of "which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers" that provides the requisite originality necessary for copyright protection. *Id.* at 1289. The copyright protection in a compilation of facts is limited however. It is only the format, the selection and the arrangement that is protected, not the facts themselves.[FN2] Moreover, the bulletins as a whole are clearly copyrightable compilations of factual mater-

ial and textual material that is copyrightable in its own right.

**\*10** In addition to showing ownership of a valid copyright, Multitherm must also show copying on the part of the defendants. "[C]opying is an essential element of copyright infringement." *Educational Testing Services,* 793 F.2d at 538. Copying refers to the act of infringing upon any of a copyright owner's exclusive rights, including the rights to reproduce and distribute copyrighted works. *Ford Motor Co.,* 930 F.Supp. at 291. Because it is frequently difficult to prove copying by direct evidence, it may be proved inferentially " 'by showing that the defendant had access to the allegedly infringed work, ... that the allegedly infringing work is substantially similar to the copyrighted work,' and ... that one of the rights guaranteed to copyright owners ... is implicated." *Id.* (quoting *Whelan Associates v. Jaslow Dental Laboratory,* 797 F.2d at 1232).

In this case there is no question that Mr. Fuhr had access to the Multitherm bulletins that were allegedly infringed upon. He testified that he was responsible, at least in part, for their production. Substantial similarity presents a more difficult question. As one commentator has noted 'the determination of the extent of similarity which will constitute a *substantial* and hence infringing similarity presents one of the most difficult questions in copyright law, and one which is least susceptible of helpful generalizations." 3 M. Nimmer, *Nimmer on Copyright* § 13.03[A] at 13-23 (1991 ed.) (emphasis in original).

The substantial similarity determination has been divided into two tests. The first test requires the fact finder to determine "whether there is sufficient similarity between the two works in question to conclude that the alleged infringer used the copyrighted work in making his own." *Whelan Associates,* 797 F.2d at 1232. Expert testimony and visual comparison of the two works are typically

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

employed in making this determination. *Ford Motor Co.,* 930 F.2d at 291; *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 907 (3d Cir.), *cert. denied,* 423 U.S. 863 (1975). This test has been termed the "extrinsic" test. *Whelan Associates,* 797 F.2d at 1232 (quoting *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp,* 562 F.2d 1157, 1164-64 (9th Cir.1977)). The second, or "intrinsic test," focuses on whether, "from a lay perspective, the copying was an unlawful appropriation of the copyrighted work." *Whelan Associates,* 797 F.2d at 1232. Unlawful appropriation is the "taking of the independent work of the copyright owner which is entitled to the statutory protection." *Ford Motor Co.,* 930 F.2d at 291; *Universal Athletic Sales Co.,* 511 F.2d at 908. In making this determination, a number of factors are relevant, including "the relationship between creativity and independent effort,[FN3] 'the nature of the protected material, and the setting in which it appears.' " *Ford Motor Co.* at 291 (quoting *Universal Athletic Sales Co.* at 908).[FN4]

**\*11** The December 1988 and February 1989 Paratherm bulletins satisfy both the extrinsic and intrinsic test of substantial similarity with respect to the copyrighted Multitherm bulletins. As was noted in the Findings of Fact, a comparison between the December 1988 bulletins and the Multitherm bulletins reveals that the headings, arrangement of materials, and language employed are almost identical. In fact, with respect to the text of the bulletins, the only difference is the substitution of "NF" for "PG-1" and "HE" for "IG-2." The extrinsic copying test is thus satisfied, and I conclude that the Multitherm bulletins were used in preparing the Paratherm bulletins. Multitherm has also met the requirements of the intrinsic test. Where, as here, the allegedly infringing work repeats the language of the original work almost verbatim, I can only conclude that the December 1988 Paratherm bulletins unlawfully appropriated the copyrighted material of the Multitherm bulletins.

I find that the February 1989 Paratherm bulletins also infringe upon the Multitherm bulletins. The language of the Multitherm bulletins is not repeated verbatim in the February 1989 Paratherm bulletins; however, the Paratherm bulletins discuss the same topics, in the same order, under the same or very similar headings as the Multitherm bulletins. Moreover, the language of the February 1989 Paratherm bulletins clearly paraphrases the language of the Multitherm bulletins. The fact that defendant has paraphrased, rather than literally copied another work does not preclude a finding of substantial similarity. *Salinger v. Random House, Inc.,* 811 F.2d 90, 97 (2d Cir.), *cert. denied,* 484 U.S. 890 (1987); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d at 1167; *Donald v. Zack Meyer's T.V. Sales & Service,* 426 F.2d 1027, 1030 (5th Cir.1970), *cert. denied,* 400 U.S. 992 (1971); 3 *Nimmer, supra,* § 13.03[A] at 13-25.

Moreover, the Paratherm bulletins include tables displaying typical properties, fluid highlights and typical comparisons, containing the same information, in the same order, located in the same place, as the corresponding tables in the Multitherm bulletins. In addition, the Paratherm bulletins contain the same graphs, some of which are displayed in the same order as the Multitherm bulletins. Specifically, both the Multitherm and February 1989 Paratherm bulletins contain a page on which graphs depicting absolute viscosity, thermal conductivity, specific heat, density, tubing film coefficient, tubing pressure drop, steam pressure, vapor pressure and thermal expansion are displayed, in the same order, in the same location on the page as in Multitherm's bulletins. The February 1989 Paratherm bulletins paraphrase extensively the Multitherm bulletins and are substantially similar in structure to the Multitherm bulletins in that they discuss the same topics, in the same order, under the same or similar headings and include the same tables and graphs in the same order and location within the bulletin. I therefore conclude that the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

February 1989 Paratherm bulletins are copied from the Multitherm bulletins and unlawfully appropriated the copyrighted elements of the Multitherm bulletins and thus infringe upon the copyrighted Multitherm bulletins.

**\*12** The June 1990 Paratherm bulletins present a closer question. Unlike the December 1988 and February 1989 bulletins, the language employed in the June 1990 bulletins is not a verbatim copy of that contained in the Multitherm bulletins, nor does it appear to be a paraphrase of the Multitherm bulletins. The June 1990 Paratherm bulletins do discuss the same topics, although in different order and under different headings, as the Multitherm bulletins; however, it should be remembered that the Paratherm bulletins and the Multitherm bulletins are concerned with what are identical or virtually identical products. Moreover, both companies attempt to sell their products to the same types of customers for the same types of uses. It is thus not surprising that the bulletins contain similarities, and the fact that they discuss the same topics in somewhat similar language should not therefore give rise to the inference that the June 1990 Paratherm bulletins were necessarily copied from the Multitherm bulletins. It should be noted that the bulletins of other competitors also discuss many of the same topics discussed in the Paratherm and Multitherm bulletins. I therefore find that there is not sufficient similarity between the language of the June 1990 bulletins and the Multitherm bulletins to conclude that the language of the Paratherm bulletins was copied from the Multitherm bulletins.

The June 1990 Paratherm bulletins do contain typical properties and typical comparisons tables which include the same information as that contained in the Multitherm bulletins. However, unlike the earlier Paratherm bulletins, the tables in the June 1990 bulletins are much more extensive than the Multitherm tables, the factual information that is the same is included in different order, and the tables are placed in a different location within the

bulletin. In addition, although the Paratherm bulletins contain the same graphs as the Multitherm bulletins, they are included in different order, and in a different location within the bulletin. As was noted above, the facts contained within the tables and graphs are not copyrightable. Multitherm is only entitled to copyright protection in its selection and arrangement of the facts contained in the tables and graphs. I find that the arrangement of facts in the June 1990 Paratherm bulletins are not sufficiently similar to the Multitherm bulletins to constitute infringement. This finding applies to both the tables and graphs as compilations in their own right, and to the bulletins as a compilation of textual and factual material as a whole.[FN5]

### 2. Damages

Although I find that the December 1988 and February 1989 Paratherm bulletins infringed upon Multitherm's copyrighted bulletins, I conclude that Multitherm has not proved any damages as a result of the infringement. Under the copyright statute, a copyright owner who prevails in an infringement action:

is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages.

**\*13** 17 U.S.C. § 504(b). Although the statute itself does not define "actual damages," as a general rule "the primary measure of recovery is the extent to which the market value of the copyrighted work has been injured or destroyed by the infringement." *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.,* 807 F.2d 1110, 1118 (2d Cir.1986); 3 Nimmer, *supra,* § 14.02[A] at 14-6. Typically, actual damages are considered to be equal to the profits that the plaintiff would have made but for the infringement. *Fitzgerald Publishing Co. Inc.,* at

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

1118; *Manufacturers Technologies Inc. v. Cams, Inc.,* 728 F.Supp. 75, 80 (D.Conn.1989); 3 Nimmer, *supra,* § 14.02 [A] at 14-7-14-8. Determining actual damages in a case such as this, "where the value of the copyrighted work resides not in its intrinsic value but rather ... in its tendency to promote sales of other products" is particularly difficult. 3 Nimmer, *supra,* § 14.02[A] at 14-12.

At trial, Multitherm introduced an income projection analysis, allegedly prepared in 1984. It contends that the entire difference between its projected earnings and its actual earnings is attributable to the wrongful acts of Fuhr and Paratherm, and that this difference constitutes the appropriate measure of actual damages. I do not agree. In proving actual damages, a copyright holder must establish "with reasonable probability the existence of a causal connection between the infringement and the loss of revenue." *Harper & Row v. Nation Enterprises,* 471 U.S. 539, 567 (1985). "Although uncertainty as to the amount of damages will not preclude recovery, uncertainty as to the fact of damages may." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d 505, 513 (9th Cir.1985), *cert. denied, ---* U.S. ----, 110 S.Ct. 1321 (1990). An award of actual damages cannot be based on claims that are too speculative. *Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 471 (2d Cir.1985). Moreover, a trial court may reject a proffered measure of damages as too speculative. *Frank Music Corp.* at 513. In this case, Multitherm has not established with any degree of certainty that any loss of revenue can be attributed to the infringement. Multitherm has not demonstrated that it lost any sales as a result of the infringing material. Its evidence establishes only that its actual sales were less than its projected sales, and that some of its former customers now purchase heat transfer fluids from Paratherm. There was conflicting testimony as to the importance of the bulletins with regard to the eventual sale of heat transfer fluid. Both sides agree, however, that they play some role. Multitherm has not, however, established a causal link between the alleged lost sales or loss of customers and the infringing bulletins. In fact, Ronald Peterson, the only former Multitherm customer whose testimony Multitherm presented, testified that he switched from Multitherm to Paratherm products because Fuhr offered him a warranty and because Fuhr provided better service. In addition, I find that circumstances occurring after the projected income statement was prepared have rendered the figures contained therein unreliable and speculative as a measure of damages. Specifically, Mr. Jacobs conceded that the death of Edward Mort, the former president of Multitherm, had a significant detrimental effect on the performance of the company, but the projected sales figures were not adjusted to reflect that fact. Moreover, there is evidence suggesting that any losses experienced by Multitherm are largely, if not wholly, the result of the death of Mr. Mort and the loss of key employees. In addition to Mr. Fuhr, the individual primarily responsible for Multitherm's sales growth, several other key employees also left the company.

**\*14** In cases such as this, where the actual losses are difficult to determine due to the nature of the work infringed, statutory damages are of particular value in fashioning the appropriate remedy. However, statutory damages are not available "for any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412(2). Multitherm did not register the copyrights for its PG-1 and IG-2 bulletins until May 4, 1989, far more than three months after the first publication of those bulletins, and after the publication of both the December 1988 and February 1989 Paratherm bulletins. Multitherm is therefore precluded from recovering statutory damages.FN6

Another possible measure of damages in this case is the "value of use" approach employed by the Seventh Circuit Court of Appeals in *Deltak, Inc. v. Ad-*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

*vanced Systems, Inc.,* 767 F.2d 357 (7th Cir.1985). That case involved two competitors in the dataprocessing training business. The defendant distributed a marketing pamphlet that infringed upon a pamphlet produced by the plaintiff. As in this case, the infringing sales pamphlet was distributed by the defendant without charge. *Id.* at 358-59. *Deltak* was also similar to this case in that statutory damages were not recoverable and the plaintiff had been unable to prove any actual damages. *Id.* at 359. Rather than award no damages, the Seventh Circuit held that the plaintiff was entitled to recover the value of the use of the infringing materials, that is, the amount of acquisition costs saved by the defendant by infringement rather than purchase. *Id.* at 361. According to the court, the defendant saved itself what a willing buyer would have been reasonably required to pay for the work. *Id.* at 362-63.

Such an approach is not possible here, however, as there is absolutely no evidence as to the reasonable value of the bulletins in question. Moreover, it is not at all clear that the copyright statute allows for damages measured in this fashion. *See Business Trends Analysts v. Fredonia Group, Inc.,* 887 F.2d 399, 407 (2d Cir.1989) (declining to follow *Deltak* ); 3 Nimmer, *supra,* § 14.02[A] at 14-16 (questioning *Deltak* and suggesting that Congress deliberately excluded recovery of statutory damages as penalty for failure to register).

In addition to the recovery of actual damages, copyright owners are entitled to recover an infringer's profits attributable to the infringement to the extent that such profits are not taken into account in computing actual damages. 17 U.S.C. § 504(b). In establishing the infringer's profits, a plaintiff need only present proof of the infringer's gross revenue. The burden then shifts to the defendant to prove deductible expenses and the elements of profit attributable to factors other than the copyrighted work. *Id.* However, "[a] court may deny recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement." *Frank*

*Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d at 517, accord, *Konor Enterprises, Inc. v. Eagle Publications, Inc.,* 878 F.2d 138 (4th Cir.1989); 3 Nimmer, *supra,* § 14.03[A] at 14-25.

**\*15** In this case, the determination of the infringer's profits presents the same difficulties as the calculation of actual damages. In a typical infringement action the defendant has earned profit by selling or performing the infringing work. Here, the copyrighted material had little or no intrinsic value in its own right, but rather was used to sell something else. "Although the statute imposes upon the infringer the burden of showing 'the elements of profit attributable to factors other than the copyrighted work,' nonetheless where it is clear, as it is in this case, that not all of the profits are attributable to the infringing material, the copyright owner is not entitled to recover all of those profits merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements." *Cream Records, Inc. v. Joseph Schlitz Brewing Co.,* 754 F.2d 826, 828 (9th Cir.1985) (per curiam) (citations omitted). Where an infringer's profits are not entirely due to the infringement, "and the evidence suggests some division which may rationally be used as a springboard it is the duty of the court to make some apportionment." *Id.* (quoting *Orgel v. Clark Boardman Co.,* 301 F.2d 119, 121 (2d Cir.1962)). As Judge Learned Hand stated in an oft-cited copyright opinion:

[W]e are resolved to avoid the one certainly unjust course of giving the plaintiffs everything, because the defendants cannot with certainty compute their own share. In cases where plaintiffs fail to prove their damages exactly, we often make the best estimate we can, even though it is really no more than a guess. ( *Pieczonka v. Pullman Co.,* 2 Cir., 102 F.2d 432, 434), and under the guise of resolving all doubts against the defendants we will not deny the one fact that stands undoubted.

*Sheldon v Metro-Goldwyn-Mayer Pictures Corp.,* 106 F.2d 45, 51 (2d Cir.1939), *aff'd,* 309 U.S. 390

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

(1940).

Not surprisingly the parties disagree as to the role played by the bulletins in the sale of heat transfer fluids. Multitherm contends that the bulletins play a substantial role, Fuhr testified that the bulletins alone are of little value in making sales.[FN7] Recognizing that any determination as to the percentage of sales attributable to the bulletins is necessarily somewhat arbitrary, based on the testimony of Mr. Fuhr and Mr. Peterson, the only customer who testified as to the relevancy of the bulletins, I conclude that ten percent of Paratherm's total sales effort may be attributed to the bulletins and the remainder to Mr. Fuhr's salesmanship. In reaching this conclusion, I rely on Mr. Fuhr's testimony that bulletins alone are insufficient to make sales, Mr. Peterson's testimony that he did not rely on the bulletins, but rather purchased Paratherm's product because Mr. Fuhr offered him a warranty and because he believed Mr. Fuhr provided good service, and on the evidence that Multitherm's sales increased substantially while Mr. Fuhr was employed there, and declined after he left.

**\*16** At trial, the parties proceeded on the assumption that only profits on sales to non-Multitherm customers would be recoverable as infringer's profits. This position was undoubtedly based on the perception that sales to Multitherm customers constituted actual damages. However, because I find that Multitherm has not proved any actual damages, it would appear that all of Paratherm's profits attributable to the infringement would be subject to recovery under the language of section 504(b). Multitherm introduced evidence establishing that Paratherm's gross profit for 1989 was $168,000 (gross sales of $274,000 less cost of goods sold of $106,000) and $403,000 for 1990 (gross sales of $673,000 less cost of goods sold of $270,000). Because I find that the June 1990 Paratherm bulletins do not infringe upon Multitherm's bulletins and that none of the infringing bulletins were distributed after June of 1990, Multitherm is not entitled to re-

cover any of Paratherm's profits for the period after June of 1990. In the absence of any other evidence I will prorate the 1990 profit figures for the six month period during which the infringing bulletins were in use to arrive at a 1990 profit figure of $201,500.00. Adding this to the 1989 figure, I find that Paratherm's profits for the period during which the infringing bulletins were in use amount to $369,500.00. Paratherm has offered no evidence as to any deductible expenses. Ten percent of this figure, the amount I find to be attributable to the infringement, is $36,950.00. Multitherm is thus entitled to an award in that amount.

I realize that this measure of damages is imprecise; however, courts are not expected to calculate with mathematical precision an apportionment of profits. Only a "reasonable and just apportionment" is required. *Abend v. MCA, Inc.,* 863 F.2d 1465, 1480 (9th Cir.1988), *aff'd sub nom. Stewart v. Abend,* 495 U.S. 207, 110 S.Ct. 1750 (1990); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d at 518.

Finally, Multitherm also seeks a permanent injunction against future use of the December 1988 and February 1989 bulletins. Although the statute authorizes permanent injunctive relief, 17 U.S.C. § 502, such a remedy is typically appropriate only where there is a substantial likelihood of further infringement. *Broadcast Music, Inc. v. Golden Horse Inn Corp.,* 709 F.Supp. 580, 581 (E.D.Pa.1989); *accord, Walt Disney Co. v. Powell,* 897 F.2d 565, 567 (D.C.Cir.1990). Paratherm has voluntarily ceased using the December 1988 and February 1989 bulletins. Multitherm has not presented any evidence that future use of those infringing bulletins is likely. Permanent injunctive relief is therefore unnecessary. *Broadcast Music* at 581.

*B. Trademark Infringement*

Multitherm contends that Paratherm's use of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

name "Paratherm," in conjunction with the logo consisting of a capital letter "P" with horizontal lines running through it, infringes upon Multi-therm's registered trademarks in the name "Multitherm" and its logo consisting of a capital "M" with vertical lines running through it. The Lanham Act provides for a civil action to remedy the unauthorized use of a federally registered trade mark that "is likely to cause confusion, or cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a); *Eagle's Eye, Inc. v. Ambler Fashion Shop,* 627 F.Supp. 856, 858 (E.D.Pa.1985). To establish trademark infringement, the plaintiff must show that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks is likely to cause confusion concerning the origin of the goods or services." *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d at 291; *accord, Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990).

**\*17** There is no challenge to the validity or to the plaintiff's ownership of the marks in question in this case. The issue is whether or not there is any likelihood of confusion. A plaintiff need not prove actual confusion to prevail in a trademark infringement action, but need only show that there is a likelihood of confusion. *Ford Motor Co.* at 292; *Opticians Association of America,* at 195. A likelihood of confusion exists when a consumer viewing the mark "would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Scott's Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978). The likelihood of confusion determination involves the consideration of a number of factors, including:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owners mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a

purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship off the goods in the minds of the public because of the similarity of functions; (10) other facts suggesting that the consuming public might expect the product owner to manufacture a product in the defendant's market.

*Scott Paper Co.,* 589 F.2d at 1229, *accord, Ford Motor Co.* at 293.

The first of these factors is considered to be the most important. *Ford Motor Co.* at 293. The Third Circuit has stated that "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.' " *Opticians Association of America,* 920 F.2d at 195 (quoting 2 McCarthy, Trademarks and Unfair Competition at § 23:7)). In addition, in analyzing the possibility of confusion, the court should view the marks "from the perspective of an ordinary consumer of the goods or services." *Ford Motor Co.* at 293 (quoting *Dominion Bankshares Corp. v. Devon Holding Co., Inc.,* 690 F.Supp. 338, 345 (E.D.Pa.1988)). The degree of care expected from consumers will vary depending on the relevant buyer class. "Professional buyers, or consumers of very expensive goods, will be held to a higher standard of care than others." *Ford Motor Co.* at 293.

In this case, there is obviously some degree of similarity between the marks in question. Both logos consist of capital letters with lines running through them, and both names contain the suffix "therm." The marks are not, however, identical. The letters chosen for the logo are different. The lines are also different in that Multitherm's logo uses vertical lines and Paratherm's logo uses horizontal lines.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

The prefixes of the names are also obviously different.

Paratherm has used its marks for over two years. No evidence of actual confusion in the marketplace was presented. Multitherm did present evidence that telephone calls and letters were received for Mr. Fuhr at Multitherm after Mr. Fuhr left the company, but I find that these are attributable to the fact that Mr. Fuhr's name continued to appear in Multitherm's listing in the Thomas Register, and not to any confusion caused by the respective marks. In addition, I find that the relevant buying class consists of engineers and senior level mechanics who are purchasing a product that is critical to the performance of expensive heat transfer systems. Such a buying class may reasonably be expected to exercise a greater degree of caution than less sophisticated or casual purchasers.

**\*18** Moreover, the evidence in this case reveals that many competitors in the heat transfer fluid industry use the term 'therm' in some portion of their name. Lined logos are also widely used throughout all aspects of the heating and cooling industry. The use of lines apparently represents the transfer of heat. Other competitors in the heat transfer fluid industry have combined the use of the term 'therm' and lined logos. For example, Monsanto Company markets a heat transfer fluid under the trade name "Therminol" in conjunction with a logo consisting of a capital letter "T" with horizontal lines running through it.

In sum, given the differences between the marks, the absence of evidence of actual confusion, the relative sophistication of the buying class and the widespread use of similar names and logos in the industry, Multitherm has not carried its burden of demonstrating likelihood of confusion. It is clear that purchasers of heat transfer fluids typically choose among products with similar names and logos. Based on the evidence presented, there is no reason to believe they will be confused by Para-

therm's marks. Accordingly, I conclude that trademark infringement has not been established.

*C. State Law Claims*

*1. Theft of Trade Secrets*

Multitherm contends that Paratherm's sale of its NF fluid to General Electric for use as an EDM fluid constituted theft of a trade secret of Multitherm, and that Paratherm must therefore disgorge its profits on such sales. Specifically, Multitherm argues that the knowledge that General Electric was using a heat transfer fluid as an EDM fluid constituted a trade secret, and that Paratherm made use of this trade secret in selling its NF fluid to General Electric. I do not agree.

Federal courts exercising pendent jurisdiction over trade secrets claims are required to apply state law. *SI Handling Systems, Inc. v. Heisley.,* 753 F.2d 1244, 1255 (3d Cir.1985); *Rohm and Haas Co. v. Adco Chemical Co.,* 689 F.2d 424, 428-29 (3d Cir.1982). In this case there is no dispute that the law of the forum state, Pennsylvania, applies.

Under Pennsylvania law, to establish a right to protection against the misuse of a trade secret, the plaintiff bears the burden of demonstrating "that it held a trade secret and that the defendant ... misappropriated it in violation of a confidential relationship." *Fidelity Fund, Inc. v. Di Santo,* 347 Pa.Super. 112, 121, 500 A.2d 431, 436 (1985), *accord, Spring Steels, Inc. v. Molloy,* 400 Pa. 354, 360, 162 A.2d 370, 372 (1960). Pennsylvania has adopted the definition of a trade secret set forth in the Restatement of Torts § 757 comment b. (1939). *SI Handling Systems,* at 1255; *Felmlee v. Lockett,* 466 Pa. 1, 9, 351 A.2d 273, 277 (1976); *Van Welding Products Co. v. General Welding and Fabricating Co.,* 419 Pa. 248, 258-59, 213 A.2d 769, 775 (1965). That definition provides:

A trade secret may consist of any formula, pattern,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

**\*19** A trade secret need only be novel "to the extent necessary to show that the alleged secret is not a matter of public knowledge.... A trade secret may be no more than a slight mechanical advance over common knowledge and practice in the art." *Anaconda Co. v. Metric Tool & Die Co.,* 485 F.Supp. 410, 422 (E.D.Pa.1980), *accord, SI Handling Systems* at 1255. Although an employee may not profit by use of an employer's trade secret, a trade secret does not include "[a] man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment ... the right to use and expand these powers remains his property." *SI Handling Systems* at 1255 (quoting *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 35, 38 A.2d 33, 34 (1944). *See also, Felmlee,* at 8, 351 A.2d at 276; *Van Products Co.* at 260, 213 A.2d at 776; *Spring Steels, Inc. v. Molloy,* 400 Pa. at 362-63, 162 A.2d at 373; *Oberg Industries, Inc. v. Finney,* 382 Pa.Super. 525, 529, 555 A.2d 1324, 1326 (1989).

The Third Circuit has articulated a number of relevant factors to consider in determining whether given information constitutes a trade secret. They are:

(1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*SI Handling Systems* at 1256.

General Electric's approval of Multitherm's PG-1 fluid for use as an EDM fluid was the first time that General Electric had approved a "white" petroleum-based fluid for use as an EDM fluid. It is this knowledge that Multitherm claims is a trade secret. The knowledge that General Electric had approved a white petroleum based fluid arguably constitutes "a compilation of information" used by Multitherm in its business, and it undoubtedly gave Multitherm "an advantage over competitors who did not know or use it." Restatement of Torts, § 757, comment b. Nevertheless, courts have consistently denied trade secret protection to information that could be obtained by legitimate means by competitors. *See SI Handling Systems* at 1257; *Van Products Co.,* at 261, 213 A.2d at 776; *Tyson Metal Products, Inc. v. McCann,* 376 Pa.Super. 461, 467-68, 546 A.2d 119, 121-22 (1988).

In *SI Handling Systems,* the court held that knowledge of the identity of alternate suppliers of certain parts was not protectable as a trade secret, as that knowledge was "already in the hands of third parties," the suppliers, "who have every incentive, and every right, to disclose it to their customers." *Id.,* 753 F.2d at 1257. The court stated that to prevent the defendants from using such information would "put an undue burden on the innocent vendors, as well as place an artificial constraint on the free market." In *Van Products Co.,* the Pennsylvania Supreme Court held that "intimate knowledge of the need use and demand" for a product, as well as "material sources and costs" could not be trade secrets. *Id.* at 261; 213 F.2d at 776. In *Tyson Metal Products,* knowledge of price lists was held not to be a trade secret, because the information could be obtained by legitimate means, namely, by contacting the suppliers directly. *Id.* at 467, 546 A.2d at 122.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

**\*20** In this case, the information that General Electric had approved the use of a white petroleum-based fluid for use as an EDM fluid was obviously in the hands of a third party-General Electric itself. General Electric had every right to contact other heat transfer fluid suppliers to seek alternate sources for its EDM process, and that is, in fact, what occurred in this case. Multitherm has not established, or even alleged, that competitors could not obtain information about which products General Electric had approved for use as an EDM fluid by simply contacting General Electric and asking. *See Tyson Metal Products* at 467, 541 A.2d at 122. Mr. Fuhr testified, and Multitherm has produced no evidence to the contrary, that General Electric contacted him seeking information about Paratherm's products and their possible use as an EDM fluid. It is true that Mr. Fuhr did inform General Electric that Paratherm NF was manufactured from the same base feedstock as Multitherm PG-1; however, I do not understand Multitherm to be contending that this information was a trade secret. This is clearly the sort of knowledge obtained in the course of employment that a person is entitled to make use of after leaving that employment.

Apart from the fact that the information in question was in the hands of a third party, there is also no evidence that Multitherm made efforts to guard the secrecy of the information. Moreover, even if the information constituted a trade secret, the fact that General Electric contacted Mr. Fuhr undercuts Multitherm's claim that Mr. Fuhr improperly misappropriated such information.

*2. Breach of Fiduciary Duty*

Multitherm contends that Mr. Fuhr breached his fiduciary duty to the company by diverting the sale of fluid to the Anaheim Hilton to Paratherm. The facts do not support this claim. Mr. Fuhr testified that Mr. Peterson of the Anaheim Hilton contacted Multitherm on November 30, 1988, the last day Mr.

Fuhr was employed by Multitherm, seeking a price quotation on heat transfer fluid. According to Mr. Fuhr, he informed Mr. Peterson that he would no longer be able to service Mr. Peterson's account because he was leaving Multitherm and starting his own business. He did not inform Mr. Peterson of the nature of his new business at that time. This testimony is corroborated by the testimony of Mr. Peterson, and I find it credible. Moreover, Mr. Peterson testified that Mr. Fuhr did not at that time, or thereafter, suggest that Mr. Peterson should not place an order with Multitherm.

Absent an agreement between an employer and an employee to the contrary, an employee is free to compete in business with his former employer after his service has been terminated. *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* 415 Pa. 276, 279, 203 A.2d 469, 471 (1964); *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 626, 136 A.2d 838, 844 (1957).* Moreover, an individual may solicit a former employer's customers and divert business from a former employer, so long as no confidential information is used. *Carl A. Colteryahn Dairy* at 280, 203 A.2d at 471; *Spring Steels, Inc. v. Molloy,* 400 Pa. at 359, 162 A.2d at 372-73; *Gilbert v. Otterson,* 379 Pa.Super. 481, 490, 550 A.2d 550, 554-55 (1988), *alloc. denied,* 522 Pa. 596, 562 A.2d 320 (1989). In addition, in engaging in such solicitation, the former employee may exploit personal customer contacts. *Carl A. Colteryahn Dairy* at 282, 203 A.2d at 472; *Spring Steels* at 363, 162 A.2d at 375.

**\*21** There is no doubt that as an employee and agent of Multitherm, Mr. Fuhr was under a duty to act solely for the benefit of Multitherm in all matters within the scope of his agency while he was so employed. *SHV Coal Inc. v. Continental Grain Co.,* 376 Pa.Super. 241, 248-49, 545 A.2d 917, 921 (1988), *reversed on other grounds,* 526 Pa. 489, 587 A.2d 702 (1991). However, Mr. Fuhr was free to solicit the business of the Anaheim Hilton after he left the employ of Multitherm as long as he used

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

no confidential information in doing so. While it is possible that under certain circumstances, the fact that the Anaheim Hilton was seeking to purchase heat transfer fluid might be a confidential information, that is not the case here.[FN8] Testimony at trial established that other persons knew that the Anaheim Hilton was undergoing a system clean-out and would need to purchase new fluid. There is no evidence that Mr. Fuhr influenced the Anaheim Hilton not to purchase from Multitherm while he was a Multitherm employee, or that he solicited the Anaheim Hilton's business for Paratherm while he was a Multitherm employee. All the evidence shows is that Mr. Fuhr contacted Mr. Peterson and informed him that he would no longer be able to service the Anaheim Hilton account and that he was going into business for himself. This was not improper. *See Gilbert v. Otterson* at 490, n. 2, 550 A.2d at 554, n. 2 (defendants actions in telling customers of employer of intention to terminate employment and go into business for himself without evidence of actual solicitation while employed by former employer not improper). This is not a case in which the defendant set out to divert business from his employer, while he was being paid by the employer to acquire that business. *See, e.g., SHV Coal, Inc. v. Continental Grain Co.* at 249, 545 A.2d at 921. If Multitherm wanted to prevent Mr. Fuhr from soliciting its customers after he left the company, it should have protected itself with a restrictive covenant. In the absence of such an agreement, Mr. Fuhr was free to solicit the business of the Anaheim Hilton, and will not be held liable for so doing.

Multitherm also contends that Mr. Fuhr breached his fiduciary duty to the company by failing to register the copyrights for the Multitherm PG-1 and IG-2 bulletins, and that Multitherm should therefore be able to recover the statutory damages to which it would have been entitled, if the copyrights had been registered. As was noted above, Multitherm has cited no authority for the proposition that a corporate official has a fiduciary duty to register the copyright of all copyrightable documents produced by the corporation, and I decline to imply any such duty in this case.

*3. Interference with Contractual Relations*

Although not argued in its post trial submissions, Multitherm's complaint alleges that Mr. Fuhr and Paratherm interfered both with existing and prospective contractual relations of Multitherm. Pennsylvania recognizes both interference with existing contractual relations and interference with prospective contractual relations as distinct branches of the tort of interference with contract. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 925 (3d Cir.1990), *cert. denied sub nom. Independence Blue Cross v. U.S. Healthcare, Inc.,* --- U.S. ----, 111 S.Ct. 50 (1990).

**\*22** With respect to existing contractual relations, a defendant may be held liable for "intentionally and improperly interfer[ing] with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Adler, Barish, Daniels, Leven and Creskoff v. Epstein,* 482 Pa. 416, 431, 393 A.2d 1175, 1183 (1978), *cert. denied,* 442 U.S. 907 (1979) (quoting Restatement (Second) of Torts § 766 (tentative draft)). In the instant case, Multitherm offered no evidence that Mr. Fuhr or Paratherm induced any third party not to perform an existing contract with Multitherm, or that any existing contract was not in fact performed. The defendants are therefore entitled to judgment on this claim. *See Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 208, 412 A.2d 466, 471 (1979).

To prevail on a claim of interference with prospective contractual relations, the plaintiff must prove "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

and (4) the occasioning of actual damage resulting from the defendants conduct." *U.S. Healthcare,* 898 F.2d at 925, *accord, Thompson Coal Co.* at 208, 412 A.2d at 471. If a contract "concerns a matter over which two persons compete for the business of a third person, the inducement not to enter into a contract ... is not improper so long as 'the actor does not employ wrongful means and his action does not create or continue an unlawful restraint of trade.' " *Pino v. Prudential Insurance Co. of America,* 689 F.Supp. 1358, 1362 (E.D.Pa.1988) (quoting Restatement (Second) of Torts, § 768(1), (1)(b), (c) (1979)), *accord, Gilbert v. Otterson,* 379 Pa.Super. at 489, 550 A.2d at 554.

Assuming, arguendo, that Multitherm has established a prospective contractual relation with the Anaheim Hilton, as was discussed above, the defendants were free to compete for the business of the Anaheim Hilton, and Multitherm has not established that the defendants employed any wrongful means in so competing. This is also true with respect to any other former Multitherm customer that switched to Paratherm. Accordingly, the defendants are also entitled to a judgment on this claim.

### 4. Conversion

The complaint in this action alleges that Mr. Fuhr and Paratherm converted money and other property of Multitherm. Conversion is "an act of willful interference with the dominion or control over a chattel done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession." *Baram v. Farugia,* 606 F.2d 42, 43 (3d Cir.1979) (applying Pennsylvania law). At trial, Mr. Sorenson alleged that Mr. Fuhr removed certain files from Multitherm's facilities; however, the only proof offered that Mr. Fuhr converted those files was testimony that those files can no longer be located. In addition, Mr. Jacobs alleged that Mr. Fuhr removed certain Multitherm files from Edward Mort's home after Mr. Mort's memori-

al service. Mrs. Mordt, testified that after her husband's memorial service, she asked Mr. Fuhr to review some files of the company and that Mr. Fuhr took some documents with him, and subsequently mailed them back to her. Although it is possible that these facts could support a conversion claim, Multitherm has not offered any evidence as to what documents, files or information, if any, Mr. Fuhr and Paratherm converted, and how Paratherm benefitted or Multitherm was harmed as a result. In sum, it has not established that any conversion occurred.

**\*23** Finally, in its supplemental proposed conclusions of law, Multitherm contends for the first time that the defendants' actions "in adopting almost word for word" Multitherm's sales bulletins constituted tortious conversion of Multitherm's property. Although Multitherm undoubtedly has a propriety interest in its bulletins that may be the subject of conversion, its claim that the acts of the defendant constituted tortious conversion of those rights are preempted by the Copyright Act.

A state cause of action is preempted if the work in which rights are claimed falls within the subject matter of copyright and if the state law creates "legal or equitable rights that are equivalent to any exclusive rights within the general scope of copyright as defined by section 106 of the Act." 17 U.S.C. § 301(a); *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 199-200 (2d Cir.1983), *reversed on other grounds,* 471 U.S. 539 (1985); *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 650 F.Supp. 838, 848-49 (D.Mass.1986).

As was discussed above, there is no question that the works at issue here fall within the subject matter of copyright. Section 106 of the copyright act protects, inter alia, the rights to reproduce and distribute the copyrighted work, 17 U.S.C. § 106. Multitherm's conversion action seeks to protect those same rights. Multitherm's conversion claims based on unauthorized copying are thus preempted.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

### D. The CounterClaim

In their counterclaim, the defendants assert claims for intentional interference with contractual relations, fraud, defamation and disparagement. As was noted above, prior to trial, the fraud claim was dropped.

### 1. Intentional Interference with Contractual Relations

Mr. Fuhr and Paratherm premise their intentional interference with contractual relations claim on a letter sent by Mr. Jacobs to the Marriot Corporation, and on a discovery questionnaire sent out in the course of this litigation to customers and suppliers of Paratherm. According to the complaint, Multitherm interfered with both existing and prospective contracts. The letter to the Marriot Corporation advises the Marriot Corporation that Multitherm instituted this action against Paratherm, and that "the complaint involves trademarks, copyrights, theft and fiduciary duties." The letter also states that Marriot may be requested to provide information relevant to the litigation. The discovery questionnaire informs the recipient that litigation between Multitherm and Paratherm has been instituted and asks for certain information regarding contacts between the recipient and Paratherm or Mr. Fuhr prior to December 1, 1988; when the recipient first learned Mr. Fuhr had left Multitherm and founded Paratherm; the nature of any communications between Fuhr or Paratherm and the recipient; and information concerning the receipt of Paratherm bulletins and newsletters.

Paratherm and Mr. Fuhr have not sustained their claims premised on interference with existing contracts. They have failed to establish that any existing contract rights were injured as a result of the actions of Multitherm. *See Thompson Coal Co. v. Pike Coal Co,* 488 Pa. at 208, 412 A.2d at 471.

**\*24** Paratherm and Mr. Fuhr have also failed to es-

tablish the necessary elements of a claim for interference with prospective contractual relations. In order to prevail on such a claim, it is necessary to prove the existence of a prospective contractual relation. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d at 925; *Thompson Coal Co.* at 208, 412 A.2d at 471. A prospective contractual relation has been defined as "something less than a contractual right, something more than a mere hope." *Thompson Coal Co.* at 209, 412 A.2d at 471. "In short, it is 'a reasonable probability' that contractual relations will be realized." *U.S. Healthcare* at 925 (quoting *Thompson Coal Co.* at 209, 412 A.2d at 471). Paratherm and Mr. Fuhr have not established that any prospective contractual relations were not realized as a result of the alleged interference of Multitherm. The evidence establishes only that Paratherm has not sold as much to the Marriot Corporation and to some of the customers who received the questionnaire as it had in the past. There has been no proof, however, that there was a reasonable probability of future contractual relations that were not realized as a result of the actions of Multitherm.[FN9] The mere fact that parties have reached contractual agreements in the past does not alone establish a reasonable probability that they will do so in the future. *See Thompson Coal Co.* at 209-10, 412 A.2d at 471-72.

Moreover, even if it is assumed that the volume of Paratherm's sales to the various customers in question would not have changed but for the actions of Multitherm, and that prospective contractual relations thus existed, Paratherm has not adequately established that Multitherm's actions were improper. In order to recover for interference with prospective contractual relations, the interference must be improper. *U.S. Healthcare* at 925; *Thompson Coal Co.* at 208, 412 A.2d at 471. In determining the propriety of an actors conduct, the following factors are relevant:

(a) The nature of the actor's conduct,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

(b) The actor's motive

(c) The interests of the other with which the actor's conduct interferes

(d) The interests sought to be advanced by the actor,

(e) The proximity or remoteness of the actor's conduct to the interference and

(f) relations between the parties.

*U.S. Healthcare* at 925 (quoting Restatement (Second) of Torts, § 766), *accord, Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. at 433, 393 A.2d at 1183.

In the instant case, it is apparent that Multitherm did not overtly attempt to persuade third parties not to deal with Paratherm. In addition, Paratherm and Mr. Fuhr have not demonstrated that Multitherm's purported motive, the need to gather information for litigation, was not the true motive. There was certainly nothing improper about such a motive. I therefore conclude that Multitherm's actions were not improper.

### 2. Defamation

**\*25** Mr. Fuhr and Paratherm also base their defamation claim on the letter to the Marriot Corporation and the discovery questionnaire. Under Pennsylvania law, a person seeking to recover for defamation bears the burden of proving:

1) the defamatory character of the communication;

2) its publication by the defendant;

3) its application to the plaintiff;

4) an understanding by the reader or listener of its defamatory meaning;

5) an understanding by the reader or listener of an intent by the defendant that the statement refer to the plaintiff;

6) special harm resulting to the plaintiff from its publication; and

7) abuse of a conditionally privileged occasion.

*U.S. Healthcare* at 923; *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072, 1077-78 (3d Cir.), *cert. denied,* 474 U.S. 864 (1985); *Pino v. Prudential Insurance Co. of America,* 689 F.Supp. at 1365; *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 441-42, 273 A.2d 899, 904 (1971); *Agriss v. Roadway Express, Inc.,* 334 Pa.Super. 295, 304, 483 A.2d 456, 461 (1984).

A defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *U.S. Healthcare* at 923 (quoting *Birl v. Philadelphia Electric Co.,* 402 Pa. 297, 303, 167 A.2d 472, 475 (1960)). It is for the court to determine whether the statement in question is capable of defamatory meaning. If the court so decides, it is for the jury to decide if it was so understood by the reader or listener. *U.S. Healthcare* at 923; *Corabi* at 442, 273 A.2d at 904; *Agriss* at 305, 483 A.2d at 461. In determining whether a statement is capable of defamatory meaning, it must be considered in context. *Baker v. Lafayette College,* 516 Pa. 291, 296, 532 A.2d 399, 402 (1987).

The letter from Mr. Jacobs to the Marriot Corporation cannot serve as the basis for the defamation claim. The allegedly defamatory statement contained within the letter refers to the filing of the complaint in this action, and reads as follows: "[t]he complaint involves trademarks, copyrights, theft and fiduciary duties." Multitherm did file a complaint in this action involving those issues. The statement is thus not false, and cannot be defamat-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

ory. *U.S. Healthcare* at 923; *Lowenschuss v. West Publishing Co.,* 542 F.2d 180, 184 (3d Cir.1976) (truth is usually an absolute defense to defamation action).[FN10] Paratherm and Fuhr contend however that the use of the word "theft" is defamatory. Multitherm has alternatively argued that the word "theft" refers to the theft of its copyrights, or the conversion claim. Paratherm argues in response that the court should disregard the explanation that "theft" refers to copyright theft because it is inconsistent with earlier explanations, and that the use of the word "theft" in reference to the conversion claims is defamatory because at the time the complaint was filed, Multitherm had no reasonable grounds to believe Mr. Fuhr misappropriated any of its property. I do not agree. Although I found that Multitherm failed to sustain its burden of proof on its conversion claims, I do not find that at the time the letter was written that Multitherm had no reasonable grounds to believe that a conversion had occurred. It is undisputed that Multitherm has been unable to locate certain files since Mr. Fuhr left the company and that Mr. Fuhr did take possession, at least temporarily, of certain Multitherm documents located at Mr. Mort's home. I do not find that Multitherm's conversion claims were so wholly groundless so as to render Mr. Jacob's description of the complaint as one involving theft to be defamatory.

**\*26** With regard to the discovery questionnaire, it is clear that it does not make any defamatory statements on its face. The questionnaire states that it is being used as part of an attempt to resolve outstanding issues in this litigation, and asks for certain information regarding contacts with Mr. Fuhr and Paratherm. Nonetheless, there are questions contained within the questionnaire that are capable of defamatory construction. Specifically, the questionnaire asks whether the recipient was ever contacted by Mr. Fuhr or a Paratherm representative and told that Paratherm is a successor to Multitherm or that Multitherm was going out of business. It also asks for information concerning communica-

tions from Mr. Fuhr or Paratherm prior to December 1, 1988, while Mr. Fuhr was still employed by Multitherm. The implication of these questions is that Mr. Fuhr was involved in some wrongdoing or breach of trust with respect to his prior employer.

Although I find that the discovery questionnaire is capable of defamatory meaning, as the finder of fact, I conclude that Mr. Fuhr and Paratherm have not met their burden of establishing that the questionnaire was understood by its recipients as having a defamatory meaning. In fact, Mr. Segal, the only recipient of the questionnaire who testified, stated that the questionnaire had no effect on him at all. In the absence of any evidence as to an understanding by the readers of the defamatory meaning of the questionnaire, a required element under Pennsylvania law, *U.S. Healthcare* at 923; *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1280 (3d Cir.1979); *Corabi* at 442, 273 A.2d at 904, I conclude that Mr. Fuhr and Paratherm are not entitled to recover on their defamation claim. *See Keddie v. Pennsylvania State University,* 412 F.Supp. 1264, 1277 (M.D.Pa.1976).

### 3. Disparagement

A claim for commercial disparagement seeks to recover for a statement "intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality ... if the matter is so understood by its recipient." *Menefee v. Columbia Broadcasting System, Inc.,* 458 Pa. 46, 54, 329 A.2d 216, 220 (1974). A commercial disparagement action is intended to compensate the plaintiff for statements impugning the quality of his goods which have reduced their marketability. *U.S. Healthcare* at 924. In order to recover, the plaintiff must show, "1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; 2) that no privilege attaches to the statement; and 3)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

that the plaintiff suffered a direct pecuniary loss as the result of the disparagement." *Id.*

In this case, Mr. Fuhr and Paratherm have not demonstrated that Multitherm has made any disparaging statements about their goods or services. They are therefore not entitled to recover for disparagement.

*III. CONCLUSIONS OF LAW*

**\*27** 1. This court has jurisdiction over the subject matter and personal jurisdiction over the parties. Venue in this district is proper.

2. Multitherm is the sole owner of the registered copyrights to the Multitherm PG-1 and Multitherm IG-2 sales and technical bulletins; registrations TX2-527-721 and TX2-627-720. The copyrights are valid.

3. The two sets of Paratherm sales and technical bulletins published in December of 1988 and February of 1989, respectively, infringed upon Multitherm's copyrights. The set of Paratherm sales and technical bulletins published in June of 1990 do not infringe upon Multitherm's copyrights. Multitherm has not proven any actual damages resulting from the defendants' use of the infringing bulletins. The profits attributable to the defendants' use of the infringing bulletins were $36,950.00. John C. Fuhr and Paratherm Corporation are jointly and severally liable.

4. Multitherm owns valid and legally protectable trademarks in the trade name "Multitherm" and in the logo consisting of a capital "M" with vertical lines running through it.

5. Paratherm's trade name "Paratherm" and its logo consisting of a capital "P" with horizontal lines running though it are not confusingly similar to Multitherm's registered trademarks in the trade name "Multitherm" and the logo consisting of a capital

"M" with vertical lines running through it.

6. The knowledge that the General Electric Company had approved Multitherm's PG-1 product for use as an EDM fluid does not constitute a legally protectable trade secret.

7. Defendant John C. Fuhr did not breach any fiduciary duty owed to Multitherm by selling to the Anaheim Hilton Hotel and Towers after he left Multitherm's employ. Multitherm has not proven by a preponderance of the evidence that Mr. Fuhr breached any fiduciary duty owed to Multitherm while he was employed by Multitherm.

8. Multitherm has not proven by a preponderance of the evidence that Mr. Fuhr or Paratherm interfered with any of its existing or prospective contract rights.

9. Multitherm has not proven by a preponderance of the evidence that Mr. Fuhr or Paratherm tortiously converted any property of Multitherm. To the extent that Multitherm's conversion claim is premised on the copying and distribution of its copyrighted materials, it is preempted by the Copyright Act, 17 U.S.C. § 101, et seq.

10. Mr. Fuhr and Paratherm have not proven by preponderance of the evidence that Multitherm interfered with any of their existing or prospective contract rights.

11. The letter dated November 15, 1989, sent by Nelson Jacobs to the Marriot Corporation did not defame Mr. Fuhr or Paratherm.

12. Mr. Fuhr and Paratherm have not proven by a preponderance of the evidence that any recipient of the discovery questionnaire circulated by Multitherm understood it to have a defamatory meaning.

13. Mr. Fuhr and Paratherm have not proven by a preponderance of the evidence that Multitherm ever made any statements disparaging their goods or ser-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

vices.

**\*28** To the extent that the "Discussion" portion of this opinion makes findings of fact and conclusions of law not expressly set forth under those respective headings in this opinion, the same shall be deemed to be additional findings of fact and/or conclusions of law to the same extent as if expressly set forth under those portions of the opinion.

An order follows.

*ORDER AND FINAL JUDGMENT*

For the reasons set forth in the Discussion and upon the Findings of Fact and Conclusions of Law filed with the opinion accompanying this Order, it is ORDERED as follows:

1. Judgment is entered in favor of the plaintiff, Multitherm Corporation, and against the defendants, John C. Fuhr and Paratherm Corporation, on Count VII (being the copyright count) of the Amended Complaint jointly and severally in the sum of $36,950.00.

2. Judgment is entered in favor of the defendants, John C. Fuhr and Paratherm Corporation, and against the plaintiff, Multitherm Corporation, on all the remaining counts of the Amended Complaint.

3. Judgment is entered in favor of the plaintiff, Multitherm Corporation, and against the defendants, John C. Fuhr and Paratherm Corporation, on all counts of the Amended Counterclaim.

> FN1. Multitherm's expert's report on damages used this term to refer to customers of Paratherm that were not and had never been customers of Multitherm.

> FN2. There is some question as to whether the graphs are copyrightable, even as compilations of fact. When the subject matter

at issue can only be expressed in a limited number of ways, "the expression will be found to merge into the idea." *Educational Testing Services v. Katzman,* 793 F.2d at 539. "When the idea and the expression coincide, then the expression will not be protected in order to prevent creation of a monopoly on the underlying 'art.' " *Id.* In this case, it would appear that there are very few ways to depict, for example, the absolute viscosity of a fluid over a given range of temperatures by means of a graph consisting of two axes. I do not understand Multitherm to be contending that its use of graphs consisting of two axes are copyrightable expressions of facts such as absolute viscosity.

> FN3. The court in *Ford Motor Co.* explained this factor by stating that "the greater the level of creativity and originality, the less the level of independent effort that need be shown. Or conversely, where independent effort is great, a lower level of creativity will be accepted." *Id.* at 291 n. 16.

> FN4. I note that the efficacy of this two part test has been questioned where, as here, the finder of fact is the same person for each step. *See Whelan Associates,* 797 F.2d at 1232.

> FN5. As was noted above, there may be some question as to whether the graphs themselves constitute copyrightable expressions or compilations of fact. I need not decide this question, however, as I find Mr. Fuhr's testimony that he did not copy the graphs contained in the Paratherm bulletins, but rather calculated the relevant figures and produced the graphs independently to be credible.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)
**(Cite as: 1991 WL 146233 (E.D.Pa.))**

FN6. Multitherm argues that Mr. Fuhr breached his fiduciary duty by failing to register the PG-1 and IG-2 bulletins while he was employed by Multitherm, and that therefore, the failure to register its copyrights, should not preclude Multitherm from recovering statutory damages, as Mr. Fuhr would thereby benefit from his breach of fiduciary duty. However, I am unpersuaded by this argument, as Multitherm has cited no authority for the proposition that a corporate official has a duty to register the copyright of any document that might be copyrightable or that the statutory prerequisite of registration may be excused in cases where the failure to register is itself a breach of fiduciary duty by the infringer.

FN7. By way of anecdotal evidence, Mr. Fuhr testified that a recent targeted mailing of sales bulletins that was not accompanied by personal contacts produced no sales or responses.

FN8. Multitherm does not appear to be contending that its customer lists in general, or the knowledge that the Anaheim Hilton was a Multitherm customer, were confidential information or trade secrets, and in any case it is clear that they were not. Multitherm published the names of most, if not all, of its major customers in its sales material, and there is no evidence that Multitherm made any attempts to keep the names of its customers secret.

FN9. In fact, Morton Segal of Pioneer Oil, a supplier of both Multitherm and Paratherm, and the only recipient of the discovery questionnaire whose testimony was presented, testified that the questionnaire had no effect whatsoever on his opinion of Paratherm or on his contractual dealings

with Paratherm.

FN10. Mr. Fuhr and Paratherm do not contend that the complaint itself was defamatory, only that Mr. Jacob's description of the complaint was defamatory.

E.D.Pa.,1991.
Multitherm Corp. v. Fuhr
Not Reported in F.Supp., 1991 WL 146233 (E.D.Pa.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.