BINGHAM MCCUTCHEN LLP
DONN P. PICKETT (SBN 72257)
GEOFFREY M. HOWARD (SBN 157468)
HOLLY A. HOUSE (SBN 136045)
ZACHARY J. ALINDER (SBN 209009)
BREE HANN (SBN 215695)
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone:  415.393.2000
Facsimile:  415.393.2286
donn.pickett@bingham.com
geoff.howard@bingham.com
holly.house@bingham.com
zachary.alinder@bingham.com
bree.hann@bingham.com

DORIAN DALEY (SBN 129049)
JENNIFER GLOSS (SBN 154227)
500 Oracle Parkway, M/S 5op7
Redwood city, CA  94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
jennifer.gloss@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International Corporation,
Oracle EMEA Limited, and Siebel Systems, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ORACLE USA, INC., *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>SAP AG, *et al.*,<br><br>    Defendants. | Case No. 07-CV-01658 PJH (EDL)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFFS' HYPOTHETICAL [FAIR MARKET VALUE] LICENSE DAMAGES**<br><br>**[REDACTED]**<br><br>Date:          October 28, 2009<br>Time:        9:00 am<br>Place:       TBD<br>Judge:      Hon. Phyllis J. Hamilton |

Case No. 07-CV-01658 PJH (EDL)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING PLAINTIFFS' FAIR MARKET VALUE LICENSE DAMAGES

Dockets.Justia.com

1

<u>TABLE OF CONTENTS</u>

2                                                                                     <u>Page</u>

3   I.     INTRODUCTION ........................................................................................... 1

4   II.    ORACLE MAY PRESENT A CLAIM FOR THE FAIR MARKET VALUE OF
       THE INFRINGED WORKS ......................................................................... 2

5          A.     The Ninth Circuit Endorses A Fair Market Value Retroactive License Fee
              As One Measure Of Copyright Damages ......................................... 2

6          B.     Oracle Need Not Establish A Precise Value For The Rights Infringed ................ 4

7          C.     Oracle Need Not Prove That It and SAP Would Have Successfully
              Negotiated A License ...................................................................... 5

8
           D.     The Absence Of A Prior License Does Not Preclude Fair Market Value
9              License Fees As Actual Damages ....................................................... 8

10         E.     The Value SAP Gained And The Costs It Saved By Misappropriating
              Oracle's Copyrights Are Also Proper Measures Of Oracle's Actual
              Damages ........................................................................................... 9

11
           F.     Oracle Will Present Evidence To Establish The Fair Market Value Of The
12             Copyrights SAP Infringed And The Value Of Them To SAP ........................... 14

13                1.     Oracle's Expert Will Use Established Valuation Methodology
                     Based on Accepted Metrics .................................................. 14

14                2.     Oracle's Damages Expert Has Ample Relevant and Credible
                     Evidence To Support Significant License Fees ...................... 16

15                3.     Testimony From Oracle Executives Supports, Not Undercuts,
                     Oracle's Other Evidence Of Fair Market Value ..................... 20

16         G.     SAP Is Not Entitled to Any Requested Relief As a Matter of Law and
              Triable Issues Bar Summary Judgment ............................................. 23

17  III.   CONCLUSION ......................................................................................... 25

18

19

20

21

22

23

24

25

26

27

28

i

Case No. 07-CV-01658 PJH (EDL)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING PLAINTIFFS' FAIR MARKET VALUE LICENSE DAMAGES

1

2

**<u>TABLE OF AUTHORITIES</u>**

3
                                                                          **Page(s)**

**CASES**

4

5
*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................ 22, 23

6
*Bruce v. Weekly World News, Inc.*,
7
    310 F.3d 25 (1st Cir. 2002) ..................................................................... 16

8
*Business Trends Analysts, Inc. v. Freedonia Group, Inc.*,
9
    887 F.2d 399 (2d Cir. 1989)............................................................. 6, 11, 12

10
*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................... 23

11
*Coalition for a Sustainable Delta v. Koch*,
12
    2009 U.S. Dist. LEXIS 63847 (E.D. Cal. July 16, 2009) ......................... 10

13
*Deltak, Inc. v. Advanced Systems, Inc*.,
14
    767 F.2d 357 (7th Cir. 1985)................................................................ passim

15
*Encyclopedia Brown Prods v. Home Box Office, Inc.,.,*
    25 F. Supp. 2d 395 (S.D.N.Y. 1998)......................................................... 12

16
*Fournier v. McCann Erikson*,
17
    242 F. Supp. 2d 318 (S.D.N.Y. 2003)....................................................... 16

18
*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    772 F.2d 505 (9th Cir. 1985), *aff'd in part, rev'd in part*, 886 F.2d 1545 (9th. 1989) . 3, 4, 5, 7
19

20
*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified*, 446 F.2d 295 (2d Cir. 1971),
21
    *cert. denied*, 404 U.S. 870 (1971) ........................................................ 8, 15

22
*Getaped.com, Inc. v. Cangemi*,
    188 F. Supp. 2d 398 (S.D.N.Y. 2002)................................................. 6, 7, 16
23

24
*Harper & Row v. Nation Enters.*,
    471 U.S. 539 (1985) ................................................................................... 4

25
*Holabird v. Physicians Management of Indiana, Inc*.,
26
    1995 U.S. Dist. LEXIS 5442 (N.D. Ill. Apr. 20, 1995) ........................... 13

27
*In re Michaelson*,
    511 F.2d 882 (9th Cir. 1975)..................................................................... 10

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING PLAINTIFFS' FAIR MARKET VALUE LICENSE DAMAGES

1
2      *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*,
       2009 U.S. Dist. LEXIS 9875 (N.D. Cal. Jan. 28, 2009) ........................... 24

3      *Jarvis v. K2 Inc.*,
       486 F.3d 526 (9th Cir. 2007) ...................................................... 2, 3, 4, 15
4
       *Mackie v. Rieser*,
5      296 F.3d 909 (9th Cir. 2002) ...................................................... 3, 4, 5

6      *Marobie-Fl v. Nat'l Ass'n of Fire Equip. Distribs.*,
       2002 U.S. Dist. LEXIS 2350 (N.D. Ill. Feb. 2, 2002) ........................... 16
7
8      *McRoberts Software, Inc. v. Media 100, Inc.*,
       329 F.3d 557 (7th Cir. 2003) ...................................................... passim
9
       *Medtronic Sofamor Danek USA, Inc. v. Globus Medical, Inc.*,
10     2009 U.S. Dist. LEXIS 61332 (E.D. Pa. July 16, 2009) ........................... 8

11     *Multitherm Corp. v. Fuhr*,
       1991 U.S. Dist. LEXIS 10475 (E.D.Pa. July 24, 1991) ........................... 12
12
13     *NGV Gaming, Ltd. v. Harrah's Operating Co.*,
       2009 U.S. Dist. LEXIS 71307 (N.D. Cal. Aug. 13, 2009) ........................... 24
14
15     *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
       210 F.3d 1099 (9th Cir. 2000) ...................................................... 23

16     *Northwest Airlines, Inc. v. American Airlines, Inc.*,
       870 F. Supp. 1504 (D. Minn. 1994) ...................................................... 13
17
18     *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*,
       513 F.2d 151 (8th Cir. 1975) ...................................................... 13
19
       *Ocean Atl. Woodland Corp. v. DRH Cambridge Homes, Inc.*,
20     262 F. Supp. 2d 923 (N.D. Ill. 2003) ...................................................... 13

21     *On Davis v. The Gap*,
       246 F.3d 152 (2d Cir. 2001) ...................................................... passim
22
       *Polar Bear Prods., Inc. v. Timex Corp.*,
23     384 F.3d 700 (9th Cir. 2004) ...................................................... passim

24     *Quinn v. City of Detroit*,
       23 F. Supp. 2d 741 (E.D. Mich. 1998) ...................................................... 12
25
26     *Roeslin v. District of Columbia*,
       921 F. Supp. 793 (D.D.C. 1995) ...................................................... 13
27
       *Rosco, Inc. v. Mirror Lite Co.*,
28     626 F. Supp.2d 319 (E.D.N.Y. 2009) ...................................................... 8

ii

*Schnapper v. Foley*,
   667 F.2d 102 (D.C. Cir. 1981) ................................................................ 8

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*,
   562 F.2d 1157 (9th Cir. 1977)............................................................. 2, 9

*Sony Corporation of America v. Universal City Studios*,
   464 U.S. 417 (1984) ................................................................................ 9

*Steven Greenberg Photography v. Matt Garrett's of Brockton, Inc.*,
   816 F. Supp. 46 (D. Mass 1992) ........................................................... 6

*Stewart v. Abend*,
   495 U.S. 207 (1990)................................................................................ 8

*Thoroughbred Software Int'l, Inc. v. Dice Corp.*,
   488 F.3d 352, 359-360 (6th Cir. 2007) ................................................ 12

*Thorton v. J Jargon Co.*,
   580 F. Supp. 2d 1261 (M.D. Fla. 2008) ......................................... 16, 24

*University Computing Co. v. Lykes-Youngstown Corp.*,
   504 F.2d 518 (5th Cir. 1974)................................................................. 9

*West Coast Homebuilders v. Aventis Cropscience*,
   2009 U.S. Dist. LEXIS 74460 (N.D. Cal. Aug. 21, 2009).................... 24

### STATUTES

17 U.S.C. § 504(b) .......................................................................... 2, 5, 13

### RULES

Fed. R. Civ. P. 56(c)............................................................................. 22

### OTHER AUTHORITIES

4 *Nimmer on Copyright*
   § 14.02[B][1] at 14-22 ...................................................... 9, 10, 12, 16

G. Smith and R. Parr, *Intellectual Property Valuation, Exploitation, and Infringement
   Damages* (2005 Ed.) ........................................................................... 14

iii

1   **I.    INTRODUCTION**

2              Defendants' motion fails for a multitude of reasons, each of which is

3   independently sufficient to deny it:

4        •   Ninth Circuit law allows a victim of infringement to present damages evidence based

5            on a variety of analyses, including a fair market value fee for the rights

6            misappropriated based on a hypothetical license.  That has been clear Ninth Circuit

7            law for over thirty years and is embodied in the Ninth Circuit's Model Jury

8            Instructions.

9        •   Defendants' contention that Oracle must prove the parties would have successfully

10           negotiated a license is not the law.  The fair market value license fee measure of

11           damages is an objective test of what a willing buyer would have been reasonably

12           required to pay a willing seller for the stolen work.  That is a jury issue bounded only

13           by the limits of undue speculation and plaintiff's evidence.  Indeed, the law favors the

14           victim in this analysis.

15       •   The parties' status as competitors and the absence of prior license grants of the rights

16           infringed by plaintiff does not bar use of a fair market value license fee damages

17           analysis.  Rather, those facts tend to increase the level of damages.  Moreover,

18           Defendants' assertion that the parties would never agree is belied by the fact that

19           Oracle and SAP have successfully negotiated a significant ongoing license that allows

20           SAP to compete with Oracle in selling Oracle's database products.

21       •   The fair market value license fee measure of damages involves consideration of a

22           large number of factors, one of which is the cost and risk avoided by the defendant

23           who misappropriates works, rather than develop them at its own expense.

24           Defendants' motion also improperly seeks to limit consideration of this factor in the

25           analysis.

26       •   The entire damages exercise is heavily fact-driven.  In countless ways Defendants'

27           motion raises disputed issues that prevent summary disposition.

28       •   The motion is premature.  Oracle's damages expert is still receiving evidence,

                                                  1

1    considering it and will render his opinion, based on a fair market value measure of

2    damages and other measures, in his November 16, 2009 report.  A part of Oracle's

3    opposition is its expert's declaration describing his work to date, which among other

4    things highlights the factual nature of the damages inquiry.

5            Based on the clear Ninth Circuit law and the overwhelming factual issues raised

6    by Defendants' untimely motion, the Court should deny the motion.

7    **II.    ORACLE MAY PRESENT A CLAIM FOR THE FAIR MARKET
            VALUE OF THE INFRINGED WORKS**
8
            **A.    The Ninth Circuit Endorses A Fair Market Value Retroactive
9                   License Fee As One Measure Of Copyright Damages**

10           A copyright owner whose exclusive rights are infringed may seek its actual

11   damages.  *See* 17 U.S.C. § 504(b).  While lost profits can be one measure of actual damages, the

12   Ninth Circuit law that Defendants themselves cite confirms that Oracle alternatively may pursue,

13   as actual copyright infringement damages, the fair market value of the Oracle copyrights that

14   Defendants infringed at the time they infringed.  Indeed, this has been the law of this Circuit for

15   more than thirty years.  *See* Defendants' Motion for Partial Summary Judgment Regarding

16   Plaintiffs' Hypothetical License Damages Claim ("MSJ") at 7:9-24, citing *Polar Bear Prods.,*

17   *Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) (confirming "the value of use of the

18   copyrighted work to the infringer" as among the actual damages available and upholding jury

19   award of license where plaintiff's expert provided credible evidence in support of awarded

20   amount); *Jarvis v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007) (noting the Ninth Circuit's history

21   of allowing fair market value of license amount as damages for copyright infringement "in

22   situations where the infringer *could* [not "would"] have bargained with the copyright owner to

23   purchase the right to use the work" and noting that the test is "'what a willing buyer would have

24   been reasonably required to pay to a willing seller for plaintiff's work'" (quoting *Frank Music*

25   *Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985), *aff'd in part, rev'd in*

26   *part*, 886 F.2d 1545 (9th. 1989)) (emphasis supplied)); *Frank Music Corp.*, 772 F.2d at 513

27   (further noting that the Ninth Circuit test under *Sid & Marty Krofft Television Productions, Inc.*

28   *v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977) "seeks to approximate what a reasonable

2

1   market price would have been at the time of the infringement"); *Mackie v. Rieser,* 296 F.3d 909,

2   917 (9th Cir. 2002) (quoting and citing *Frank Music Corp.,* 772 F.2d at 512 and *Sid & Marty-*

3   *Krofft Television Prods, Inc.*, 562 F.2d at 1174) (quotations and citations omitted):

> We have previously defined the phrase "actual damages" as the
> extent to which the market value of a copyrighted work has been
> injured or destroyed by an infringement.   determine the work's
> "market value" at the time of the infringement, we have endorsed a
> hypothetical approach: what a willing buyer would have been
> reasonably required to pay a willing seller for [the owner's] work.

8   *See also* Ninth Circuit Model Civil Jury Instruction 17.23 (Copyright Damages - Actual

9   Damages) (2007) ("The reduction of the fair market value of the copyrighted work is the amount

10   a willing buyer would have been reasonably required to pay a willing seller at the time of the

11   infringement for the actual use made by the defendant of the plaintiff's work.").  The fair market

12   value of the rights infringed is likewise endorsed as a measure of actual copyright damages by

13   other Circuits.  *See* n. 3 below.

14          The fair market value license form of actual damages makes good sense:  where

15   an infringer takes for free what it would have otherwise had to license from the copyright owner,

16   the infringer has deprived the copyright owner of the licensing fee the owner would have been

17   entitled to charge the infringer; the fair license fee approximates the value of the theft.  *See*

18   *Frank Music*, 772 F.2d at 513 (market value license approach "seeks to approximate what a

19   reasonable market price would have been at the time of the infringement"); *see also On Davis v.*

20   *The Gap*, 246 F.3d 152, 166 (2d Cir. 2001) ("[T]he defendant has surreptitiously taken a

21   valuable right, for which plaintiff could have charged a reasonable fee.  Plaintiff's revenue is

22   thus smaller than it would have been if defendant had paid for what he took. . . .").[1]

23   --------------------------------------

24   [1] SAP's attempt to use causation to deny Oracle the right to seek fair market value damages, MSJ
     at 8:11-9:7, is unsupported and illogical.  An infringer who takes for free what it otherwise

25   would have had to pay for automatically deprives the copyright owner of the fair market value of
     the rights the infringer misappropriated.  That loss occurs at the time of infringement, and all that

26   remains is valuation.  *See Polar Bear*, 384 F.3d at 709 (infringer must pay fair market value of
     rights it misappropriated, as determined by the jury).  Moreover, the cases SAP relies on to

27   suggest an additional burden of showing causation impose none here.  *Jarvis* does not mention,
     much less impose, any such requirement in its discussion of fair market value damages.  *See*

28                                          (Footnote Continued on Next Page.)

3

1   **B.      Oracle Need Not Establish A Precise Value For The Rights
                Infringed**

2

3          Oracle is not required to establish fair market value with precision.  Rather, it

4   need only present evidence sufficient to allow the jury to assess fair market value without "undue

5   speculation."  *Polar Bear*, 384 F.3d at 709 (infringer must accept jury's determination of fair

6   market value "unless it exceeds the range of the reasonable market value"); *see McRoberts*

7   *Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 567 (7th Cir. 2003) (copyright owner "was not

8   required to establish the actual value [of rights infringed]; it was required only to provide

9   sufficient evidence of the value so that the jury did not have to resort to undue speculation in

10  estimating actual damages.").  The Second Circuit has stressed the need to "favor victims of

11  [copyright] infringement" in assessing awarding damages and to "broadly construe" available

12  damages.  *On Davis*, 246 F.3d at 164.  It explains how this standard protects defendants while

13  allowing plaintiffs the ability to secure payment for their valuable rights:

14          We recognize that awarding the copyright owner the lost license
             fee can risk abuse. . . .  The law therefore exacts that the amount of
15          damages may not be based on 'undue speculation.'  [Citation
             omitted.]  *The question is not what the owner would have charged,*
16          *but rather what is the fair market value*.  In order to make out his
             claim that he has suffered actual damage because of the infringer's
17          failure to pay the fee, the owner must show that the thing taken had
             a fair market value.  But if the plaintiff owner has done so, and the
18          defendant is thus protected against an unrealistically exaggerated
             claim, we can see little reason not to consider the market value of
19          the uncollected license fee as an element of 'actual damages' under
             § 504(b).

20  _____

    (Footnote Continued from Previous Page.)

21
    *Jarvis*, 486 F.3d at 533-35.  *Polar Bear* and *Mackie* do discuss causation, but only as to
22  infringer's profits – an altogether different measure of damages not tied to a fair market value
    hypothesis.  *See Polar Bear*, 384 F.3d at 708, 710-11 (plaintiff can also recover infringer's direct
23  and indirect profits as measured by "infringer's gross revenue" minus "deductible expenses and
    the elements of profits attributable to factors other than the copyrighted work"; causation is a
24  particular issue for infringer's profits "because the amount of profits attributable to the
    infringement in an indirect profits case is not always clear [so] 'we have held that a copyright
25  holder must establish the existence of a causal link before indirect profits damages can be
    recovered'") (citing *Mackie*, 296 F.3d at 914).  The portion of *Frank Music* SAP cites does not
26  even mention causation, and that case imposes no addition causation burden either.  *See Frank
    Music*, 772 F.2d at 514 n.8.  *Harper & Row* considers causation only in the context of fair use
27  analysis (certainly not at issue here) and rejects the Court of Appeals' unduly restrictive
    causation requirement.  *See Harper & Row v. Nation Enters.*, 471 U.S. 539, 567 (1985).

28

4

1   *On Davis*, 246 F.3d at 166 (emphasis added).  As shown below, Oracle's fair market value

2   analysis will meet this standard.

3        **C.**      **Oracle Need Not Prove That It and SAP Would Have**
                  **Successfully Negotiated A License**

4

5       Defendants' entire motion rests on the false premise that Oracle must show it

6   would have licensed SAP to use the copyrights it infringed – and that Defendants would have

7   agreed to the terms.  MSJ at 7:5-7, 9:11-13, 9:27-10:2, & 11:7-11.  Besides being wrong on the

8   law, arguing that summary judgment should be granted because the parties undoubtedly will

9   disagree at trial about the appropriate terms and amounts of the fair market value license inverts

10   the summary judgment standard requiring no material factual dispute.  *See* Section II.G below.

11   Moreover, to adopt SAP's argument would remove protection from the very class of plaintiffs –

12   competitors – most vulnerable to infringement.

13       The Copyright Act nowhere excludes competitors from those who can seek

14   approved forms of actual damages.  Instead, it provides the same measures of damages for all

15   copyright owners, whether they compete with an infringer or not, and whether they have licensed

16   their work or not.  *See* 17 U.S.C. § 504(b).  The Ninth Circuit also does not remotely restrict

17   those who can seek actual damages in the form of a reasonable license fee to non-competitors,

18   including in the two Ninth Circuit cases – *Polar Bear* and *Frank Music* – Defendants cite in

19   support.[2]  Indeed, the Ninth Circuit's "market value approach is an objective, not a subjective,

20   analysis." *Mackie*, 296 F.3d 917.  Thus, any purportedly unreasonable or unsupported opinion of

21   any Oracle executive – or of any SAP executive – about what the license amount should be "has

22   no place in this calculus." *Id.* (upholding trial court's rejection of plaintiff's 'hurt feelings' over

23   the nature of the infringement as relevant to determining the market value of the license that

24  ————————————————

25  [2] Page 711 of *Polar Bear*, which Defendants cite as purported support at MSJ 9:13, deals only
     with the infringer's profits form of damages and says nothing about the requirements for the lost

26   license fee alternative measure of actual damages.  Defendants' only other Ninth Circuit cites,
     MSJ 10:1 (citing *Polar Bear*, 384 F.3d at 708 and *Frank Music*, 772 F.2d at 514), do not

27   expressly or impliedly say anything restricting reasonable license fee damages to non-
     competitors.

28

1    reasonably should have been paid by defendant for its use of the work it infringed).

2             Courts in other Circuits confirm the test is objective and why.  The Second Circuit

3    explains:

> 4  [W]hether the infringer might in fact have negotiated with the owner or purchased at the owner's price is irrelevant to the purpose of the test. . . .  The hypothesis of a negotiation between a willing buyer and a willing seller simply seeks to determine the fair market value of a valuable right that the infringer has illegally taken from the owner.  The usefulness of the test does not depend on whether the copyright infringer was in fact himself willing to negotiate for a license.  The honest purchaser is hypothesized solely as a tool for determining the fair market value of what was illegally taken.

9    *On Davis*, 246 F.3d at 171-172 (quoting II Paul Goldstein, *Copyright* § 12.1.1.1, at 12:13 (2d. ed.

10    2000).[3]

11             Indeed, courts faced with infringement claims between competitors have allowed

12    them, and have found that the competitive relationship between the owner and infringer may

13    *enhance* the fair market value of the license.  *See Getaped*, 188 F.Supp.2d at 405-06 (reversing

14    damages award because copyright owner "would not be willing to let a direct competitor use an

15    exact duplicate of its site for such a small fee"); *see also Deltak, Inc. v. Advanced Systems, Inc.*,

16

_____

17

18    [3] SAP relies heavily on the Second Circuit's decision in *Business Trends Analysts, Inc. v.*
*Freedonia Group, Inc.*, 887 F.2d 399 (2d Cir. 1989), to support its hypothesis that competitors

19    are ineligible for fair market value as a measure of actual copyright infringement damages.  But *Business Trends* focused on the infringers' profits measure of copyright damages.  *Id.* at 405.

20    Moreover, as set forth above, the Second Circuit later expressly adopted "the fair market value of a license covering the defendant's infringing use" as a measure of actual damages for copyright

21    infringement.  *On Davis*, 246 F.3d at 172.  That holding has been applied to competitors and non-competitors alike.  *See Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 404-06

22    (S.D.N.Y. 2002) ("[P]ermitting recovery of a reasonable license fee is appropriate even where plaintiff cannot show that defendant would have been willing to negotiate a license to use

23    plaintiff's copyrighted work, or where the plaintiff cannot plausibly argue that it would have been willing to license defendant's use.").  The Seventh Circuit likewise has held that the

24    defendant's estimation of plaintiff's subjective "interest or ability" in connection with the

25    hypothesized license "is irrelevant" because defendant "infringed [plaintiff's] copyright . . . without permission from [plaintiff] and [plaintiff] may lawfully seek damages resulting from this

26    infringement."  *McRoberts Software*, 329 F.3d at 567.  First Circuit courts also use the Ninth

27    Circuit's objective value of use test.  *See, e.g., Steven Greenberg Photography v. Matt Garrett's of Brockton,, Inc.*, 816 F. Supp. 46, 49 (D. Mass 1992).

28

6

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING PLAINTIFFS' FAIR MARKET VALUE LICENSE DAMAGES

1    767 F.2d 357, 358, 361 (7th Cir. 1985) (in case involving direct competitors, endorsed a "value

2    of use" measure "equal to the acquisition cost saved by infringement instead of purchase");

3    *McRoberts*, 329 F.3d at 567 (affirming actual damages award against competing supplier of

4    character generation software based on fair market value of misappropriated work).

5              Given this clear law, the fact that Oracle's executives and SAP's executives have

6    attested in deposition to different views on the value of a potential license[4] for what Defendants

7    infringed does not somehow remove a market value license from the basket of available

8    damages.  Indeed, their material and significant disputes bar summary judgment.  *See* Section

9    II.G. below.  Moreover, if Defendants were right, then *every* contested license damages amount

10   would be thrown out, and the infringers most benefited from taking – competitors – would be

11   able to escape paying their victims what the market dictates they should.  The Ninth Circuit has

12   rejected such a result:

13              Having taken the copyrighted material, [Defendant] is in no better
              position to haggle over the license fee than an ordinary thief and
14            must accept the jury's valuation unless it exceeds the range of the
              reasonable market value.

15   *Polar Bear*, 384 F.3d at 709.[5]  Oracle's license valuation at trial will rely on relevant facts and

16   will not exceed a reasonable fair market value.  *See* Section II.F below.  The Court should reject

17   _____

18   [4] The testimony on which SAP relies is irrelevant to the question of the reasonable market value
     for licenses allowing Defendants to infringe only as much, how, and as long as they actually did.
19   Critically, no Oracle or SAP executive has yet been examined on the appropriate damages
     license terms in this case and resulting license amounts as those have yet to be presented by
20   Oracle's technical and damages experts.  Rather, the testimony of the Oracle executives
     Defendants cite was in response to their counsel's inexact queries at deposition focused on a
21   hypothetical factual scenario for the fair market value licenses that bears little relation to the
     relevant facts and to what Oracle's damages expert will rely on for his valuation analysis.  *See*
22   Section II.F.3 below.

23   [5] Note, however, that the Ninth Circuit explicitly endorses Oracle's damages expert's
     consideration of reasonable, relevant evidence from the parties when arriving at the fair market
24   value of the license damages award.  *See Polar Bear*, 384 F.3d at 709 ("Common sense dictates
     that an expert may confer with the copyright holder and that the background data may be
25   factored into calculations of actual damages."); *Frank Music*, 772 F.2d 514 ("'*Credible*
     testimony by the owner . . . regarding its value can provide an adequate evidentiary basis for an
26   award of damages'") (emphasis supplied; quoting *Runge v. Lee*, 441 F.2d 579, 582 (9th Cir.),
     *cert denied*, 404 U.S. 887 (1971)).  *See also Getaped*, 188 F. Supp. 2d at 406 (rejecting
27   inappropriately low licensing fee because "[plaintiff] would not be willing to let a direct
     competitor use an exact duplicate of its site for such a small fee").

28

                                              7

1    Defendants' efforts to avoid jury consideration of it – especially now, before the analysis is even

2    completed and presented in an expert report.  *See* Section II.G below.

3         **D.    The Absence Of A Prior License Does Not Preclude Fair
              Market Value License Fees As Actual Damages**
4

5              As an apparent fallback to its argument that Oracle cannot seek license damages

6    from its competitor, SAP implies that Oracle cannot seek license damages because it has never

7    before licensed what Defendants infringed.  Although SAP devotes considerable attention to

8    cases where reasonable license fees were awarded to owners who had previously licensed what

9    the defendant infringed (MSJ at 14:7-16:19), it cites no authority – let alone Ninth Circuit

10   authority – that requires Oracle previously to have licensed the intellectual property Defendants

11   took in order to seek a reasonable fair market value license fee for that infringement.  Indeed,

12   under the law, the right *not* to license is as important as the right to license.  *See, e.g., Stewart v.*

13   *Abend* , 495 U.S. 207, 228-29 (1990) ("this Court has held that a copyright owner has the

14   capacity arbitrarily to refuse to license one who seeks to exploit the work."); *Schnapper v. Foley*,

15   667 F.2d 102, 114 (D.C. Cir. 1981) (except for limited instances not relevant here, Copyright Act

16   gives "copyright holder the liberty not to license rights in his work").  It defies logic that

17   exercising the right to *not* license could be used to deny an otherwise legitimate measure of

18   recovery.

19             Moreover, under the seminal case on the factors relevant to determining a

20   reasonable royalty amount for patent infringement, the fact Oracle *does not* license the infringed

21   material actually supports a *higher* license fee.  *See, e.g., Georgia-Pacific Corp. v. U.S. Plywood*

22   *Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.

23   1971), *cert. denied*, 404 U.S. 870 (1971) (Factor 4 considers "The licensor's established policy

24   and marketing program to maintain his patent monopoly by not licensing others to use the

25   invention or by granting licenses under special conditions designed to preserve that monopoly.");

26   *see also Medtronic Sofamor Danek USA, Inc. v. Globus Medical, Inc.,* 2009 U.S. Dist. LEXIS

27   61332 at *58 (E.D. Pa. July 16, 2009) (plaintiff's policy of refusing to license what was taken

28   "weighs in favor of a higher royalty rate"); *Rosco, Inc. v. Mirror Lite Co*., 626 F. Supp.2d 319,

8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING PLAINTIFFS' FAIR MARKET VALUE LICENSE DAMAGES

1    332 (E.D.N.Y. 2009) (same).[6]

2              In addition, the fair market value licensing model for copyright infringement

3    damages applies when there are no easy benchmarks (such as licenses of the same material to the

4    same defendant or to others).  *See, e.g., On Davis*, 246 F.3d at 166 (reaching this conclusion in

5    allowing defendant's saved costs as a measure of the fair market value of a license:  "To rule that

6    the owner's loss of the fair market value of the license fees he might have exacted of the

7    defendant do not constitute 'actual damages' would mean in such circumstances an infringer

8    may steal with impunity.  We see no reason why this should be so.").  *See also* Section II.E

9    below.

10             Ultimately, SAP's suggestions that copyright owners who compete with

11   infringers, who have not licensed their works previously, or who do not agree on the fair market

12   value amount are ineligible for a well-established measure of damages misapprehend both the

13   law and the purpose of the fair market value analysis.  The point of that analysis is to evaluate

14   the value of the rights that were misappropriated on an objective basis and then require the

15   infringer to pay that fair market value.  Whether or not SAP could have ever obtained those

16   rights lawfully is irrelevant.

17        **E.    The Value SAP Gained And The Costs It Saved By**
             **Misappropriating Oracle's Copyrights Are Also Proper**
18           **Measures Of Oracle's Actual Damages**

19             SAP argues that evidence about what it saved in time and money by not having to

20   _____

21   [6] While these cases arose in the context of patent rights, their reasoning applies equally to
     copyrights.  *Krofft*, 562 F.2d at 1174 n.20 (comparing value of use for copyright infringement
22   and reasonable royalty for patent infringement); *University Computing Co. v. Lykes-Youngstown
     Corp.*, 504 F.2d 518, 535 (5th Cir. 1974) (noting patent infringement cases are used by analogy
23   to determine the damages for copyright infringement); *see also* 4 *Nimmer on Copyright*
     (Matthew Bender, Rev. Ed.) ("*Nimmer*") at § 14.02[B][1] at 14-22 ("[T]he similarities between
24   this [patent] reasonable royalty rule and . . . [the] value of use theory are apparent."); *see
     generally Sony Corporation of America v. Universal City Studios*, 464 U.S. 417, 435, 439 (1984)
25   (patent law is an appropriate source of guidance for novel copyright issues).  Moreover, that
     "copyright law does not recognize any royalty floor for recovery of compensatory damages,"
26   MSJ 10:28-11:1, is irrelevant because, as confirmed above, nothing in the Copyright Act or
     Ninth Circuit law precludes Oracle from seeking just such damages for Defendants' copyright
27   infringement.

28

9

1  develop the massive amount of material it infringed should not be considered in the licensing

2  amount calculus.  MSJ at 16:24-20:4.  SAP is wrong on the law, and its argument amounts to an

3  improper request for an advisory opinion from this Court.[7]

4            The point of measuring the fair market value of any license fee is to determine the

5  reasonable value of the rights the infringer misappropriated.  *See* Section II.A above.  The "value

6  of use" to the infringer will presumably bear a relation to the fair market value of the rights.

7  That fair market value represents the amount of money the infringer saved by not acquiring the

8  rights legally, which equates to the amount it would have had to pay the copyright owner to

9  acquire the rights lawfully.  *See Deltak*, 767 F.2d at 361 ("the value of use. . . is not, of course,

10  identical to the profits it generates"; instead each of the copies infringed "had a value of use to

11  [defendant] equal to the acquisition cost saved by infringement instead of purchase, which

12  [defendant] was then free to put to other uses.").[8]

13            SAP asserts that the Ninth Circuit in *Polar Bear* rejected the Seventh Circuit's

14

15  [7] Defendants brought this motion to address the availability of the hypothetical license measure

16  of copyright damages between competitors.  MSJ at 1:28-2:9.  Asking the Court to also
    determine the appropriateness of considering saved acquisition costs in calculating the license

17  value is improper – particularly where those costs are the subject of another expert analysis not
    completed and not available for consideration.  *See Coalition for a Sustainable Delta v. Koch*,

18  2009 U.S. Dist. LEXIS 63847 at *20-23 (E.D. Cal. July 16, 2009) (denying without prejudice
    motion for partial summary judgment because the inquiry did "not require application of

19  undisputed facts established in this case to the law"); *In re Michaelson,* 511 F.2d 882, 893 (9th
    Cir. 1975) ("This Court does not intend to and cannot, issue an advisory opinion on a

20  hypothetical fact situation.").

21  [8] The evidence will show that Defendants ultimately used TomorrowNow as a loss leader and
    that their forecasted profits did not therefore match the limited profits earned.  *See, e.g.,*

22  Declaration of Paul Meyer ("Meyer Decl.") at ¶44 and Exs. 55, 57, 63, 64.  Restricting plaintiff's
    damages to defendant's profits in this situation is improper.  *See* 4 *Nimmer* § 14.02 [B][1] at 14-

23  21 (in analyzing *Deltak* acknowledging "To deny recovery because ASI's marketing campaign
    failed is to allow ASI to use Deltak's property risk free – if use of the infringing pamphlet fails to

24  generate revenue by bringing over customers from Deltak then there is no cost to ASI, while if it
    succeed ASI risks at most disgorging its wrongful gains.  Under the 1909 Act, the Supreme

25  Court limned the inadequacies of such a weak disincentive against purloining copyrighted
    material:  '[A] rule of liability which merely takes away the profits from an infringement would

26  offer little discouragement to infringers. . . .  Even for uninjurious and unprofitable invasions of
    copyright the court may, if it deems just, impose a liability within statutory limits to sanction and

27  vindicate statutory policy.'" (*quoting F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S.
    228, 233 (1952)).

28

1    endorsement in *Deltak* of "saved acquisition costs" as a component of actual damages.  *See* MSJ

2    at 18:27-19:8.  That is wrong.  *Polar Bear* considered *Deltak* only in the context of determining

3    the infringer's profits – a separate component of copyright damages with a completely different

4    measurement methodology unrelated to the fair market valuation at issue in this motion.  *See*

5    *Polar Bear*, 384 F.3d at 715 (citing *Deltak* as example of courts' rejection of claims for

6    infringer's profits based on enhanced goodwill); *see also* n.1 above.  *Polar Bear* cites in passing

7    and without analysis the district court decision in *Deltak* in support of the notion that recovery of

8    indirect profits resulting from enhanced goodwill to the infringer are generally unavailable.  *See*

9    *id.*  It does not refer to or discuss Judge Posner's decision concerning avoided costs as a measure

10   of actual damages.  *See id.*  Accordingly, *Polar Bear* does not suggest, much less hold, saved

11   acquisition costs may not be considered when setting value of use damages.  To the contrary,

12   *Polar Bear* explicitly allows Oracle to present the jury in this case with facts to "consider either a

13   hypothetical lost license fee or the value of the infringing use to the infringer to determine actual

14   damages, provided the amount is not based on 'undue speculation.'"  *Id.*, 384 F.3d at 708-09

15   (quoting *McRoberts Software*, 329 F.3d at 566).  As set forth below, Oracle has ample credible

16   evidence to do so.

17          SAP also asserts that other courts have rejected saved acquisition costs as a

18   component of actual copyright damages.  MSJ at 17:19-18:1, 19:9-27.  That is also wrong.  Like

19   *Polar Bear*, *Business Trends* considered acquisition costs only with respect to calculating

20   infringer's profits.  *See Business Trends*, 887 F.2d at 404-06.  The Second Circuit has since

21   limited the *Business Trends* holding to that issue, explaining that case does not apply to actual

22   damages analysis.  *See On Davis*, 246 F.3d at 163 ("Whatever comments we made about 'actual

23   damages' [in *Business Trends*] were dicta.").  Moreover, SAP's argument that *Deltak's*

24   endorsement of defendant's saved costs as a measure of value of use is "an unauthorized

25   departure from the exclusive remedies permitted by the Copyright Act" and that Congress "left

26   open the possibility that a plaintiff who failed to meet the standards set out for obtaining

27   statutory damages may be foreclosed from seeking a remedy," MSJ 18:8-26, was likewise made

28   in *Business Trends*, 887 F.2d at 406, and explicitly rejected by the Second Circuit in its

1   subsequent *On Davis* decision.  246 F.3d at 166, 171-172.[9]  In endorsing this measure of

2   recovery, the Second Circuit stressed the need to "favor victims of [copyright] infringement" in

3   assessing awarding damages and to "broadly construe" available damages.  *Id.* at 164.

4           The cases Defendants cite purportedly "expressing doubt" about *Deltak*'s "saved

5   acquisition cost" metric for value of use damages, MSJ 19:12-22, are equally outdated and

6   factually distinguishable.  *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 751 (E.D. Mich. 1998)

7   rejected plaintiff's avoided costs analysis because of lack of evidence in support.  Moreover, the

8   only authority cited for the court's observation that *Deltak*'s rationale had been criticized was

9   *Business Trends*; however, as explained above, that very analysis was subsequently rejected by

10  the Second Circuit in *On Davis* (which had not been decided at the time).  In *Multitherm Corp. v.*

11  *Fuhr*, 1991 U.S. Dist. LEXIS 10475 at *41-42 (E.D.Pa. July 24, 1991), the parties were

12  competitors yet the court had no problem applying the retroactive license approach or the saved

13  costs analysis; it simply rejected it for lack of proof.  It also predates *On Davis*, so its cite to

14  *Business Trends* as the only case questioning *Deltak* is likewise moot.  *Encyclopedia Brown*

15  *Prods.*, 25 F. Supp. 2d 395 (S.D.N.Y. 1998), also pre-dates *On Davis*.  Moreover, the court

16  concluded *Business Trends* did not preclude the victim of infringement from seeking actual

17  damages in the form of a reasonable license fee, *id.* at 400, and was not presented with and did

18  not opine on the question of the validity of saved costs as an appropriate measure for that license.

19  Finally, Defendants cite the overturned lower court opinion in the *Thoroughbred Software Int'l,*

20  *Inc. v. Dice Corp.* case, MSJ 19:16-22, which itself only discusses *Business Trends*' rejection of

21  a reasonable license fee and does not even discuss *Deltak*'s saved costs test for such a license;

22  moreover, the Sixth Circuit opinion in the case, 488 F.3d 352, 359-360 (6th Cir. 2007), citing *On*

23  *Davis*' rationale for needing to "charg[e] the illegal taker with the reasonable cost of what he

24  took," reversed the lower court and awarded license fees for unused infringing copies even

25  _____

26  [9] Even *Nimmer*, whose initial analysis was the basis of the *Business Trends* analysis, recognizes
27  this reversal of course by the Second Circuit and the rejection of the very statutory analysis
    Defendants reiterate here.  4 *Nimmer* § 14.02[B][3] at 14-27.

28

1    where defendant made no profit from those copies.

2            In reality, those courts that have considered *Deltak*'s holding in the context of

3    actual damages have consistently followed it.  *See Nucor Corp. v. Tennessee Forging Steel*

4    *Service, Inc.*, 513 F.2d 151, 152-53 (8th Cir. 1975) ("The issue of whether the use of the

5    [plaintiff's architectural] plans proximately resulted in lower manufacturing costs to the

6    defendants was properly put to the jury on the second trial."); *Ocean Atl. Woodland Corp. v.*

7    *DRH Cambridge Homes, Inc.*, 262 F. Supp. 2d 923, 928 (N.D.  Ill. 2003) (finding proper

8    infringement damages could include "either the amount [plaintiff] paid for the acquisition of the

9    [infringed materials] in the first place . . . or the value of use or the saved acquisition cost to

10   [defendant] and perhaps the other defendants if used by them.  Value of use of infringing work in

11   terms of saved acquisition costs amounts to no more than a determination of what a willing buyer

12   would have been reasonably required to pay a willing seller for [the infringed materials].");

13   *Roeslin v. District of Columbia*, 921 F. Supp. 793, 799 (D.D.C. 1995) (allowing as measure for

14   infringer's profits under 17 U.S.C. § 504(b) the "[c]osts that the defendant did not incur because

15   it infringed a copyright"); *Holabird v. Physicians Management of Indiana, Inc*., 1995 U.S. Dist.

16   LEXIS 5442 at *8-9 (N.D. Ill. Apr. 20, 1995) ("[a]ccording to *Deltak,* the value of use to the

17   infringer in terms of saved acquisition costs is equal (except for marginal production costs) to the

18   copyright owner's lost profits from avoided sales to the infringer.  If there is uncertainty in this

19   calculation, the court in *Deltak* reminded the defendant infringer that it 'cannot expect to pay the

20   same price in damages as it might have paid after freely negotiated bargaining, or there would be

21   no reason scrupulously to obey the copyright law.' [citation omitted]"); *Northwest Airlines, Inc.*

22   *v. American Airlines, Inc*., 870 F. Supp. 1504, 1512 (D. Minn. 1994) ("[a]ctual damages and lost

23   profits under 17 U.S.C. § 504(b) can be demonstrated in several ways, but all require that the

24   copyright owner show either that it suffered a loss or that the infringer gained some benefit.").

25           As much as SAP would like to avoid having Oracle's damages expert and the jury

26   consider the fair market value of the benefits SAP gained in not having to take the time to locate

27   and spend the resources to develop the voluminous materials Defendants took from Oracle, there

28   is no authority that precludes such evidence.  To the contrary, there is ample authority

1   recognizing its relevance to the fair market value calculus.  The Court should reject SAP's efforts

2   to avoid a full and fair accounting of Oracle's damages.

3   **F.      Oracle Will Present Evidence To Establish The Fair Market
            Value Of The Copyrights SAP Infringed And The Value Of
4           Them To SAP**

5           **1.      Oracle's Expert Will Use Established Valuation
                    Methodology Based on Accepted Metrics**

6           As he is creating and finalizing the portions of his damages analysis setting forth

7   the reasonable license fees for Defendants' infringement of Oracle's PeopleSoft, J.D. Edwards,

8   Siebel and database-related copyrights, Oracle's damages expert is arriving at the fair market

9   value for such licenses using accepted principles of intellectual property valuation as well as the

10  guidance of relevant legal authorities and treatises.  Meyer Decl. ¶¶ 9-13.  There are well-

11  established, and widely accepted techniques for the valuation of intangible assets, including

12  intellectual property:  Cost Approach, Market Approach and Income Approach.[10]  The Cost

13  Approach measures the market value of intellectual property based on the cost to replace the

14  future service capability; the Cost Approach does not directly consider the future economic

15  benefits of the assets.  Smith & Parr, *IP Valuation, Exploitation, and Infringement Damages* at

16  156.  The Market Approach involves determining the fair market value of intellectual property

17  based upon what others have agreed upon in recent sales, licenses or other comparable arm's

18  length transactions related to similar assets.  *Id.* at 169.  Using the Income Approach, the market

19  value of the intellectual property is determined based on the value of the future economic

20  benefits that are expected to be generated by the asset.  *Id.* at 185.  The Relief-from-Royalty

21  Approach is a variation of the Income Approach.  Using this approach, intellectual property is

22  valued based on the present value of the royalties that the property owner is relieved from paying

23  as a result of owning the asset.  *Id.* at 194.  In the valuation of intellectual property, it is common

24  to analyze the fair market value using a combination of these valuation approaches.  *Id.* at 155;

25  _____

26  [10] *See* G. Smith and R. Parr, *Intellectual Property Valuation, Exploitation, and Infringement
    Damages* (2005 Ed.) ("Smith & Parr, *IP Valuation, Exploitation, and Infringement Damages*") at
27  148-154.

28

1    Meyer Decl. ¶11.

2            Oracle's damages expert has done exactly this type of valuation in many other

3    cases. The methodology employed and the factors he will consider have been accepted by the

4    courts, including to determine the fair market value for copyright licenses.  Meyer Decl. ¶13.

5            As set forth in more detail below, in arriving at his fair market value figures,

6    Oracle's damages expert is considering, among other things, evidence on the nature, scope, terms

7    and duration of the licenses at issue based on what Defendants actually did, any existing relevant

8    benchmark license fees including what Defendants have paid to license or acquire comparable

9    material, that Oracle doesn't license the infringed material to others to use in competition against

10   it, but keeps it exclusive for its own proprietary use, the fact that Oracle and SAP are fierce

11   competitors in the area in which the infringed material was used, the importance of the infringed

12   material to the parties' anticipated financial success, sales and profits at the time of infringement,

13   the utility and benefit to Defendants of the infringed material, and the costs they avoided by

14   infringement.  *See* Meyer Decl. ¶¶16-47.

15           These are the very factors courts routinely consider in setting reasonable license

16   fees for infringed material – be it copyright or patent infringement.  *See, e.g.*, *Georgia-Pacific*,

17   318 F. Supp. at 1120 (listing these among the "comprehensive list of evidentiary facts relevant,

18   in general, to the determination of the amount of a reasonable royalty for a patent license . . .

19   drawn from a conspectus of the [then] leading cases."); *Polar Bear*, 384 F.3d at 708, 709

20   (endorsing, *e.g*., consideration of "the value of the infringing use to the [copyright] infringer to

21   determine actual damages" and expert's consultation with plaintiff's principals in arriving at

22   reasonable license fee); *Jarvis*, 486 F.3d at 534 (citing with approval court's consideration of

23   plaintiff's damages expert's analysis, defendant's assessment of worth of copyright, and prior

24   compensation for comparable works); *On Davis*, 246 F.3d at 166 n.5, 167-69 (considering actual

25   use made by infringer of copyrighted material and endorsing importance of broad view of actual

26   damages to allow for fair market value and listing cases considering customary or established

27   license rates, prior agreement of the parties, nature and extent of use, term of license); *McRoberts*

28   *Software*, 329 F.3d at 566-67 (endorsing consideration of how much it cost for another to

1   develop comparable source code, defendant's entry into several multi-million dollar software

2   deals of comparable import, relevant market shares, nature and extent of actual use of infringed

3   copyrights, prior benchmark licensing agreements of the parties with others, relevant actual and

4   projected sales); *Bruce v. Weekly World News, Inc.*, 310 F.3d 25, 29-30 (1st Cir. 2002) ("[p]roof

5   of industry practice inarguably is crucial to the estimation of actual damages"); *Deltak*, 767 F.2d

6   at 361 (endorsing consideration of cost defendant avoided by infringing copyrights rather than

7   independently developing what it infringed); *Getaped*, 188 F.Supp.2d at 404, 406 (recognizing

8   the value of [the] copyrighted work" can lie "in its tendency to promote the sales of other

9   products" and that fact that use is by competitor should yield higher license fee); *Fournier v.*

10   *McCann Erikson*, 242 F. Supp. 2d 318, 337 (S.D.N.Y. 2003) (endorsing consideration of licenses

11   for comparable copyrighted works, customary licensing practices in the industry, prior

12   negotiations between the parties); *Marobie-Fl v. Nat'l Ass'n of Fire Equip. Distribs.,* 2002 U.S.

13   Dist. LEXIS 2350 at *5-7 (N.D. Ill. Feb. 2, 2002) (endorsing as relevant evidence the nature and

14   extent of use of copyrighted relevant works by defendant, market practices regarding

15   accessibility and lack of charge for such works, and the commercial relationship between

16   parties); *Thorton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1276 (M.D. Fla. 2008) (endorsing

17   "evidence of benchmark licenses, that is, what licensors have paid for the use of similar work.");

18   *see also* 4 *Nimmer* § 14.02[A][3] at 14-19 & 14-20 (In arriving at copyright damages, "the courts

19   make the best possible appraisal of the value, looking if necessary to such additional factors as

20   inherent value of the work and utility value" and "special value of the work to the plaintiff.").

21          **2.      Oracle's Damages Expert Has Ample Relevant and**
                      **Credible Evidence To Support Significant License Fees**
22

23          Oracle's damages expert has ample credible evidence to support the significant

24   amounts Oracle will claim as fair market value license fees for the Oracle software infringed by

25   Defendants and that Oracle is seeking, and Oracle will provide him additional evidence relevant

26   to valuing the Siebel and database fair market value licenses.  While that analysis is incomplete,

27   and amounts of the licenses have not yet been determined, Oracle's damages expert has already

28   spent considerable time and effort amassing and considering this relevant evidence.  *See* Meyer

16

Decl. ¶¶16-47.  For instance:

- Oracle's damages expert will determine the scope, terms and duration of Defendants' actual uses of the infringed PeopleSoft, J.D. Edwards, Siebel and database software by reference, in part, to the expert reports and conclusions of Oracle's technical experts.  Meyer Decl. ¶19.  At this point, the best proxy for that evidence is found in Oracle's detailed and lengthy Fourth Amended Complaint.  *See, e.g.,* Fourth Amended Complaint for Damages and Injunctive Relief (Docket No. 418) at pages 6-8, 14-15 .[11]

- Oracle's damages expert will rely on the fact that Oracle spent billions of dollars acquiring the companies whose copyrighted materials Defendants so widely infringed.  Meyer Decl. ¶¶25, 34.  Specifically, Oracle paid $11.1 billion for PeopleSoft – an acquisition that Oracle publically kicked off *the day before* Oracle's "hypothetical" license with SAP, its largest rival for the very business of the customers Oracle just acquired, would have begun.  *See id.* at Exs. 9, 15-16, 53.  Oracle acquired Siebel in January 2006 for $6.1 billion.  *Id.* at Exs. 17-18.

- Oracle's expert will also rely on evidence of Oracle's multi-billion dollar service and sales forecasts for the PeopleSoft and Siebel customer bases it was acquiring, as well as the customer retention assumptions before SAP's interference through TomorrowNow.  Meyer Decl. ¶34, Exs. 29, 30.

- Oracle's damages expert will also consider evidence from both Oracle and SAP on their revenue growth history and expectations for support customers.  *See, e.g.,* Meyer Decl. ¶¶30, 34-35 and Exs. 18, 22, 26- 30, 35-37.

- Oracle's expert will also consider the valuations by Oracle of the PeopleSoft and Siebel tangible and intangible assets acquired.  Meyer Decl. ¶34.  For instance, the PeopleSoft intangible assets (which included goodwill, technology, maintenance contracts and customer relationships) were valued at $9.9 billion.  *Id.* & Exs. 15-16.  Similarly, $4.1 billion of the purchase price for Siebel was attributed to intangible assets that included goodwill and the customer relationships and ongoing agreements.  *Id.* & Exs. 17-18.

- Oracle's damages expert will also rely on Oracle's significant investment in research and development of the copyrighted materials at issue, as well as historical research and development investments made by PeopleSoft and Siebel prior to their acquisitions by Oracle.  Meyer Decl. ¶34.  For example, between 2001 and 2003 PeopleSoft's annual research and development investments ranged from $299 million to $433 million.  *Id.* at Ex. 31.  Similarly, Siebel's research and development investments for 2002 through 2004 ranged from $299 million to $368 million.  *Id.* at Ex. 32.  And, post-acquisition, Oracle itself invested hundreds of millions in the acquired products and support materials that Defendants infringed.  *Id.* at Ex. 33.

---

[11] For purposes of this motion, Defendants are not challenging their actual infringement, so Oracle has not submitted the voluminous evidence and admissions of that here.

- Insofar as Oracle presents other expert analysis of how much Defendants would have had to spend to independently develop what they infringed, and how much time was saved by infringing rather than developing, Oracle's damages expert will also consider that.  Meyer Decl. ¶46.  Oracle's damages expert will also consider the evidence on what portions of the infringed materials Defendants could not have developed independently, and what they could have done through non-infringing work-arounds.  *Id.*

- Oracle's damages expert will also rely on the almost billion dollar forecast of service and sales revenues SAP calculated in connection with its acquisition of TomorrowNow for just the first three years of ownership.  Meyer Decl. ¶44, Ex. 25.  He also relies on the testimony of Shai Agassi, Former SAP CTO and Executive Board Member, that, as a result of the TomorrowNow acquisition he believes SAP could have done better than 50% and could have won approximately 60% of Oracle's PeopleSoft business).  *Id.* ¶ 44 at Ex. 12.  *See also*  Ex. 54 (SAP forecasted that TomorrowNow would be providing maintenance service to 500 customers in 2005 and up to 4,000 customers by 2009).

- Oracle's damages expert is also relying on SAP admissions of the time it saved by acquiring TomorrowNow rather than developing or acquiring an alternative means to service Oracle's acquired PeopleSoft customer base, as well as the acknowledged difficulties of an alternative solution given personnel and knowledge resources constraints for developing the ability to provide such service.  Meyer Decl. ¶¶ 40e, 42, Exs. 11, 26, 47-53.

- Oracle's expert will also rely on documentary and testimonial evidence (including from SAP board members) that TomorrowNow was the cornerstone of SAP's Safe Passage sales campaign, and that TomorrowNow's 50% or less support pricing was designed to be a loss leader to drive PeopleSoft, J.D. Edwards and Siebel customers away from Oracle and into purchasing SAP applications and related support services.  Meyer Decl. ¶44 at, *e.g.*, Ex. 26 (SAP's January 16, 2005 presentation titled "Safe Passage: Winning Customers and Markets from Oracle-PeopleSoft-J.D. Edwards" states:  "Our goal is to convert the majority of the PeopleSoft and J.D. Edwards customer base to SAP and contain Oracle's potential growth in the next generation applications market.").  *See also* Exs. 11, 13, 43, 55-59, 60, 61, 63, 64, 65.

- Oracle's expert will also consider evidence demonstrating the importance of the TomorrowNow acquisition to SAP not related to SAP's revenue, including as a public relations coup, as a disrupter of Oracle's momentum in gaining share of the applications market, as siphon off Oracle's maintenance revenue used for R&D funding, and as something that might "force Oracle to change its behavior or plans around pricing or position" and as a source of continued "Fear, Uncertainty and Doubt."  *See* Meyer Decl. ¶45.  Indeed the SAP board presentation recommending the TomorrowNow acquisition confirms "TomorrowNow is a strategic investment and serves as a strategic weapon against Oracle" and serves the additional benefits of taking revenue away

18

from Oracle and creating a pre-pipeline of future SAP revenue. *Id.* at Ex.58; *see also* Exs. 7, 50, 61, 62, 67, 68, 69, 70, 72, 73 (these include contemporaneous emails and testimony of SAP board members crowing about PR benefits of acquisition of Tomorrow Now, its likely major impact on Oracle's share price and how it could adversely impact Oracle's Fusion product strategy and cause Oracle "pain").

- Oracle's damages expert will also consider SAP documents and testimony demonstrating how concerned SAP was because of Oracle's subsequent acquisition of Siebel, and how it intended to use TomorrowNow to disrupt Oracle's further momentum into the applications market. Meyer Decl. ¶45 & at Exs.27-28. For example, SAP Executive Board Member and Co-CEO Henning Kagermann testified that SAP's TomorrowNow acquisition strategy was to "interrupt Oracle's acquired maintenance income stream, making it difficult for them to invest in development of their fusion platform." *Id.* ¶45 & Ex. 7.

- Oracle's expert will also consider the testimony and documentary evidence from SAP about the grand expectations it had for TomorrowNow's service of Siebel software as an enabler for future SAP license revenue. Meyer Decl. ¶22 at Ex.14.

- Oracle's damages expert will also consider the amount SAP paid to acquire TomorrowNow (which SAP knew did not itself own any intellectual property) as well as the large amounts SAP has paid to license or acquire comparably important intellectual property. Meyer Decl. ¶40-41, Exs. 10, 42, 43, 46, 47.

- Oracle's expert will also consider the fact that Oracle has never licensed any of the material infringed to a competitor, or to anyone for use in the manner in which Defendants infringed it, and thus Oracle places high value on its proprietary rights to the infringed material. *See* Meyer Decl. ¶¶25-28.

- Oracle's expert will also question Oracle's executives in connection with the final version of the fair market "value of use" licenses – for PeopleSoft/JDE, Siebel and database – and, if relevant and substantiated, will consider that information in setting amounts for those licenses. Meyer Decl. ¶38. As set forth above, n. 5, the Ninth Circuit recognizes that it is only "common sense." *Polar Bear*, 384 F.3d at 709.

- Finally, at trial, Oracle's damages expert will also consider any relevant, reliable additional evidence SAP puts into evidence on the value of the licenses. Meyer Decl. ¶15 , fn.9.

Undoubtedly there will be additional relevant evidence Oracle's experts will consider: for instance, the Siebel and database discovery relevant to Oracle's recent amendments has only now gotten underway. *See* August 14, 2009 Order Granting Motion for Leave to File

1  Amended Complaint (Docket No. 414).[12]  Moreover, it can be expected that Defendants will

2  proffer different evidence or different interpretations of the evidence.  Regardless, even this

3  limited snapshot of the record confirms Oracle's license damages will have adequate factual

4  support to be presented to the jury.

5          **3.      Testimony From Oracle Executives Supports, Not Undercuts, Oracle's Other Evidence Of Fair Market Value**

6

7          SAP asks the Court to ignore all of this evidence on the theory that Oracle

8  executives "would not have granted SAP a license because Oracle was not interested in handing

9  over its multi-billion dollar share of the applications market, acquired after great expense and

10  effort, to its biggest competitor" and/or that the billions Oracle would have charged for such a

11  license "would have been 'prohibitively expensive' to SAP."  MSJ at 2:13-17.  Even if that

12  testimony did establish the parties would not have been able to reach an actual agreement on a

13  license, it would not disqualify Oracle from recovering the fair market value of the rights SAP

14  misappropriated.  *See* Section II.C, above.  But the testimony SAP relies on says no such thing.

15          First, SAP *never asked* Oracle executives about the particular licenses that

16  Oracle's damages expert will value here – licenses that grant rights only for the uses and duration

17  that Defendants infringed Oracle's Peoplesoft, J.D. Edwards, Siebel and database copyrights.

18  *See* Declaration of Tharan Greg Lanier ISO Defendants' Motion for Partial Summary Judgment

19  Regarding Plaintiffs' Hypothetical License Damages Claim ("Lanier Decl.") at Ex. A (Catz

20  Deposition ), Ex. B (Phillips Deposition), Ex. C (Ellison Deposition).  Further, none of the

21  Oracle executives was asked about how they would value licenses for Defendants' use of

22  Oracle's copyrighted database material that was recently added to the Fourth Amended

23  _____

24  [12] Other relevant evidence to the hypothetical license is also outstanding.  For instance,
25  Defendants have thus far refused production of SAP's research and development costs, which are
    relevant to proving their avoided costs.  Further, Oracle continues to seek supplemental
26  production of profit margins and any assignments of value per customer, which will evidence
    SAP's reasonable expectations as to customers they could lure away through TomorrowNow.
27  Declaration of Holly A. House ("House Decl.") ¶2.  Oracle also has recently asked for
    production of SAP's largest value license deals, which may provide reasonable benchmarks.  *Id.*

28

1   Complaint, and only Mr. Ellison was asked about the Siebel software line (before Oracle had

2   added those claims or served subsequent discovery) in relation to this retroactive license

3   questioning.  *See* Lanier Decl. at Exs. A, B & C.  Instead, SAP asked broad questions that had no

4   more than a superficial relationship to the corresponding licenses for Defendants' actual

5   infringement of the PeopleSoft and J.D. Edwards copyrights.  *Id.*

6           Second, contrary to Defendants' assertions that Oracle would not have

7   "entertained" any licensing proposal (MSJ at 4:14-17), the testimony shows that – even on

8   SAP's overly broad and unbounded description of the retroactive licenses at issue – Oracle

9   would have considered licensing its intellectual property to SAP at the right price.

10          Specifically, Mr. Ellison testified that his understanding that the hypothetical

11  license about which he was being questioned would be the equivalent of Oracle selling all of its

12  applications software business to SAP and "saying goodbye to the applications business

13  forever."  Lanier Decl., Ex. C at 80:18-19; *see also* Declaration of Larry Ellison ("Ellison Decl.")

14  at ¶¶3-4.  Those are obviously not the rights that would have been licensed.  However, even on

15  that understanding, Mr. Ellison testified that Oracle *would* "have talked [with SAP] about a

16  license agreement" and that there is "some price" at which Oracle would agree to the deal.  *See*

17  Lanier Decl., Ex. C at 75:23-24 & 80:13-14.

18          Ms. Catz likewise testified that her understanding of the hypothetical license she

19  was being asked about would have been one in which Oracle gave SAP the equivalent of the

20  whole PeopleSoft "customer base and the technology" that Oracle had fought hard and spent

21  over 12.6 billion dollars to acquire.  *Id.,* Ex. A at 159:10-23; *see also* Declaration of Safra Catz

22  ("Catz Decl.") at ¶4.  And again, even on this overbroad hypothetical, she stated that Oracle

23  would "look at the business plan and the business deal and just have to see how much – what

24  they're offering" and that the value of the license "would depend on how much impact it would

25  have on the business we just spent all that money on."  Lanier Decl., Ex. A at 25:1-3, 27:9-13 &

26  161:3-5.

27          The testimony of Mr. Phillips followed the same pattern.  Again, SAP asked him

28  about a broad hypothetical license of PeopleSoft materials that would be "perpetual" and would

                                            21

1    "last forever." *Id.* Ex. B at 120:3-6. And again, he testified that Oracle would analyze and

2    model numerous factors to determine what a reasonable license value would be for that license,

3    and would sell it "[i]f the price was right. We're businessmen; if they're willing to pay it, and

4    we could get that money up front rather than working on it over the next 20 years, sure, there

5    would be some circumstances under which it makes sense." *Id.*, Ex. B at 120:7-14.[13]

6            Finally, the declarations of Larry Ellison and Safra Catz, submitted in support of

7    this Opposition, confirm that when they are questioned about the licenses that Oracle's damages

8    expert is actually valuing – limited to exactly what Defendants did for the duration that they did

9    it – they, and the Oracle board, will consider the very factors that Oracle's damages expert is

10   considering in providing any opinions on fair market value. *See* Ellison Decl.. ¶¶4-7; Catz Decl.,

11   ¶¶3-5. Mr. Ellison further notes that, though fierce competitors, Oracle and SAP have for years

12   engaged in successful license negotiations that allow SAP to license and provide first line

13   support on Oracle's database software for a significant fee to Oracle (

14                                            ). Ellison Decl. ¶7; *cf.* House Decl., Ex. A at 48:12-49:6 (SAP's

15   co-founder, Mr. Plattner, agreed that though SAP and Oracle were "competitors" they did sit

16   down and negotiate a "fair price" that was "decided by the market price" for the database

17   license). Mr. Ellison further explains that, given SAP's reported market cap of 48.5 billion

18   Euros in 2005 when Oracle acquired PeopleSoft and 51.0 billion Euros in 2006 when Oracle

19   acquired Siebel, licenses in excess of a billion dollars would not have been prohibitively

20

21   [13] The testimony of SAP's co-founder, Hasso Plattner, that SAP submits in support of its
     argument that SAP and Oracle would not have agreed on a license deal similarly fails to reflect
22   what the actual retroactive license would have been. MSJ 4:28-5:23. Instead, Mr. Plattner's
     testimony reveals that he – like Oracle's executives – was never questioned about the value of
23   licenses for the exact uses and duration that Defendants used Oracle's Peoplesoft, J.D. Edwards,
     Siebel and database software. *Id.*; *see* Lanier Decl., Ex. D. Even so, Mr. Plattner similarly
24   agreed that "return on investment" in the intellectual property being licensed could be a factor in
     determining the license value. House Decl., Ex. A at 47:19-24 (Plattner Depo.). Further, Mr.
25   Plattner testified that he would look to the "market price" if SAP were negotiating a hypothetical
     license for use of its software, and that if he could not prevent customers from migrating over to
26   a hypothetical licensee, then he would be "happy" to get a license for maintenance revenue "for
     the residual amount of time they're using my software." *Id.* at 62:7-64:4 & 68:23-69-6. So,
27   contrary to SAP's argument, the testimony of SAP's co-founder likewise supports the fair market
     value analysis required to be performed for the retroactive licenses at issue.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING PLAINTIFFS' FAIR MARKET VALUE LICENSE DAMAGES

1    expensive to SAP – particularly given the potential financial and strategic benefits from access to

2    Oracle's just-acquired copyrights.  Ellison Decl. ¶6.  Even though the law does not require

3    Oracle prove the parties would have agreed on, or that SAP would have voluntarily paid, the fair

4    market value of what SAP took, these facts undermine SAP's argument that the parties never

5    could have agreed, and that SAP could not afford the retroactive licenses.

6        **G.      SAP Is Not Entitled to Any Requested Relief As a Matter of
                   Law and Triable Issues Bar Summary Judgment**

7

8             The burdens that SAP must overcome to successfully secure summary judgment

9    are well known.  Summary judgment may not be granted unless the Court determines that there

10   is no genuine issue of material fact, and that SAP is entitled to judgment as a matter of law.  *See*

11   Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The Court

12   must resolve all ambiguities and draw all inferences in favor of Oracle.  *See id.* at 255.  SAP

13   bears the initial burden of informing the Court of the legal basis for its motion, and of identifying

14   those portions of the pleadings and discovery responses that demonstrate the absence of a

15   genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Nissan Fire*

16   *& Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Even where SAP does not

17   have the ultimate burden of persuasion at trial, it nonetheless holds both the initial burden of

18   production and the ultimate burden of persuasion on a motion for summary judgment.  *Nissan*,

19   210 F.3d at 1102 (citing 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane,

20   Federal Practice and Procedure § 2727 (3d ed.1998)).  SAP has not carried its burdens here. [14]

21            Very few of the cases cited in Defendants' motion even involve a summary

22   judgment attack.  Each supports denial here.  The Second Circuit in *On Davis* vacated the district

23   court's grant of summary judgment against plaintiff's ability to seek a fair market value license

24   as actual damages for copyright infringement, because plaintiff made some showing that "the

_____

26   [14] In fact, if the Court sustains Oracle's Objections to Defendants' Evidence, Defendants have
27   not even met their initial burden of production identifying the absence of a genuine material
     issue of fact, let alone their burden of persuasion.  *See* Plaintiffs' Objections to Evidence Filed in
     Support of Defendants' Motion for Partial Summary Judgment.

28

1  thing taken had a fair market value." *On Davis*, 246 F.3d at 166.  The Court also noted that, if

2  the plaintiff presented more evidence at trial on fair market value, the jury could award a higher

3  license fee. *Id.* at 161.  In *McRoberts Software,* 2001 U.S. Dist. LEXIS 16794 *44-45 (S.D. Ind.

4  Aug. 17, 2001), the Court rejected a summary judgment attack on the availability of actual

5  damages through "lost royalties or licensing fees that [plaintiff] would have earned from

6  [defendant] if [defendant] had paid for the unauthorized use of [plaintiff's] copyrighted

7  software" because "copyright law recognizes that damages are often difficult to prove with

8  precision, and grants the Court discretion in determining damages, based upon the particular

9  facts of the case.  Therefore, it is premature for the Court to make a ruling at this time with

10 regard to actual damages."  The only other case cited by Defendants that involved a summary

11 judgment attack on "a retroactive license fee measured by what the plaintiff would have earned

12 by licensing the infringing use to the defendant" rejected it for utter failure of proof.  *Thornton v.*

13 *J. Jargon Co.*, 580 F. Supp. 2d 1261, 1276-78 (M.D. Fla. 2008).  Using just these cases as a

14 guide, Oracle has more than fended off SAP's summary judgment attack.

15            Moreover, in this District, it is well settled that attacking damages availability on

16 summary judgment must be rejected where, as here, the plaintiff provides "a reasonable basis"

17 for the measure of damages at trial, or where there is "conflicting evidence" on the facts

18 supporting the damages approach. *See, e.g., Intelligraphics, Inc. v. Marvell Semiconductor, Inc.,*

19 2009 U.S. Dist. LEXIS 9875, at *61 (N.D. Cal. Jan. 28, 2009) (J. Spero) (rejecting defendant's

20 argument "that it is entitled to summary judgment as to [plaintiff's] request for lost profits

21 damages because [plaintiff] has not presented any evidence concerning the sales of [the products

22 at issue] . . . and therefore, its estimates of lost sales are speculative" where plaintiff's expert

23 provided a methodology based on sales of different products; even though defendant put in

24 evidence undermining the reasonableness of the analysis: "In light of the conflicting evidence,

25 the Court cannot say, as a matter of law, that [plaintiff] will be unable to prove its lost sales with

26 reasonable certainty at trial.  Accordingly, the Court concludes that [defendant] is not entitled to

27 summary judgment as to [plaintiff's] lost profits on the grounds that they are speculative."); *see*

28 *also West Coast Homebuilders v. Aventis Cropscience,* 2009 U.S. Dist. LEXIS 74460, at *26-27

1    (N.D. Cal. Aug. 21, 2009) (J. Illston) (denying in part a motion for summary judgment brought

2    "on the ground that plaintiff's damages are so uncertain and speculative as to be unrecoverable

3    as a matter of law" because attacks on "various conclusions reached by plaintiff's expert – such

4    as contending that he made a number of unsupported assumptions . . . – those issues go to the

5    weight rather than the admissibility of plaintiff's evidence of damage.  As such, there are factual

6    issues inappropriate for summary judgment."); *NGV Gaming, Ltd. v. Harrah's Operating Co.,*

7    2009 U.S. Dist. LEXIS 71307 (N.D. Cal. Aug. 13, 2009) (J. Conti) (denying defendant's motion

8    for summary judgment seeking to dismiss a claim for failure to meet the damages element

9    because "the Court cannot say, as a matter of law, that [plaintiff] has not been harmed by

10   [defendant's] conduct. . . .  There are too many questions of fact here for the Court to make a

11   determination regarding this element. . . .").

12            The wealth of facts Oracle cites supporting its expert's ability to make fair market

13   valuations of the licenses for the use Defendants made of – and the value Defendants enjoyed

14   from – Oracle's PeopleSoft, J.D. Edwards, Siebel and database copyrighted software remove the

15   possibility of dismissal for lack of evidence or based on claims of undue speculation.  The

16   disputed facts, including, *e.g.*, about how Oracle's and SAP's executives would value the

17   licenses for Defendants' actual use, are irrelevant under the objective fair market value test of a

18   willing seller and willing buyer.  Moreover, the dispute itself removes this from issues resolvable

19   at summary judgment.

20   **III.    CONCLUSION**

21            Oracle does not seek "hypothetical damages" for SAP's infringement, but rather

22   actual damages measured by the fair market value of the rights SAP misappropriated.  The Ninth

23   Circuit recognizes and embraces calculating such damages exactly as Oracle is doing:  by

24   assessing the fair market value for licenses permitting the specific uses SAP made of Oracle's

25   intellectual property based on credible evidence of that value.  Oracle has produced ample

26   evidence supporting such valuation through the declaration of its damages expert and others.

27   SAP has presented no basis under the law or the facts for allowing it to avoid paying damages

28   equal to the value of the rights it misappropriated, and its motion must be denied.

1   DATED:  September 23, 2009

2
                                        Bingham McCutchen LLP
3

4

5                                       By:_____/s/ Holly A. House_____
                                                        Holly A. House
6                                              Attorneys for Plaintiffs
                                         Oracle USA, Inc., Oracle International
7                                        Corporation, Oracle EMEA Limited, and Siebel
                                                    Systems, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28