BINGHAM McCUTCHEN LLP
DONN P. PICKETT (SBN 72257)
GEOFFREY M. HOWARD (SBN 157468)
HOLLY A. HOUSE (SBN 136045)
ZACHARY J. ALINDER (SBN 209009)
BREE HANN (SBN 215695)
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone:  (415) 393-2000
Facsimile:   (415) 393-2286
donn.pickett@bingham.com
geoff.howard@bingham.com
holly.house@bingham.com
zachary.alinder@bingham.com
bree.hann@bingham.com

DORIAN DALEY (SBN 129049)
JENNIFER GLOSS (SBN 154227)
500 Oracle Parkway, M/S 5op7
Redwood City, CA  94070
Telephone:  (650) 506-4846
Facsimile:   (650) 506-7114
dorian.daley@oracle.com
jennifer.gloss@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International Corp., Oracle EMEA Ltd., and Siebel Systems, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE USA, INC., *et al.*,<br><br>                Plaintiffs,<br>       v.<br><br>SAP AG, *et al.*,<br><br>                Defendants. | CASE NO.  07-CV-01658 PJH (EDL)<br><br>**DECLARATION OF LARRY ELLISON IN SUPPORT OF ORACLE'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFFS' HYPOTHETICAL LICENSE DAMAGES CLAIM**<br><br>**[REDACTED]**<br><br>Date: October 28, 2008<br>Time: 9:00 a.m.<br>Courtroom: TBD<br>Judge: Hon. Phyllis J. Hamilton |

Case No. 07-CV-1658 (PJH)

DECLARATION OF LARRY ELLISON

I, Lawrence J. Ellison, declare as follows:

1. I am the Chief Executive Officer of Plaintiff Oracle USA, Inc. ("Oracle"). I have personal knowledge of the facts set forth in this declaration and would competently testify to them if called upon to do so.

2. I understand that for purposes of damages in this case, any retroactive "hypothetical" license award can only cover the exact scope and duration of the infringement by Defendants. I do not have access to all highly confidential information in this case due to the Protective Order limitations, so I do not know the full nature, scope, terms and duration of Defendants' actual use of Oracle's intellectual property. I have not received any analysis regarding a retroactive license by Oracle's damages experts in this case and so have no details concerning the "hypothetical" license damages model and parameters.

3. During my May 5, 2009 deposition, Counsel for Defendants, Mr. Lanier, asked me a series of questions regarding a hypothetical license negotiation between Oracle and SAP/TomorrowNow that would have occurred in January 2005. Mr. Lanier did not ask me to assume any limitations on that license. I assumed that the hypothetical license that he referred to would have been for SAP – not just TomorrowNow – to take all of Oracle's intellectual property and between 70 and 100% of Oracle's share of the business software applications market. That is why I testified at the time: "So the thought process is, we're moving all of our IP. They've got a license to the PeopleSoft/JD Edwards IP. All of it." And, that is why I testified that my understanding of such a license meant that Oracle "would have been saying good-bye to the applications business forever." Even under those extreme circumstances, as I stated at my deposition, "we would still discuss the license" with SAP to see if it would make business sense.

4. Limitations on the nature, scope, terms and duration of the licensing proposal – including the specific Oracle software to be licensed, to whom, for what uses, and for how long – would be critical information for me to attempt to estimate the terms and cost of any such license. At my deposition, I either was not provided with any factual limitations on the proposed license to consider in providing my testimony about the possibility and price of the license. The factual assumptions I made based on the broad questions asked were in fact

1
Case No. 07-CV-1658 (PJH)

DECLARATION OF LARRY ELLISON

1  different from what I understand to be the necessary inquiry in determining a hypothetical
2  license value, which is to focus on the actual use by SAP's subsidiary, TomorrowNow, for a
3  finite time period, of certain specified Oracle intellectual property, with specific results in the
4  marketplace.  For example, Mr. Lanier did not ask me to assume any limit on the time period of
5  the proposed license that would match the time period that TomorrowNow actually operated as
6  part of SAP.  He did not ask me about a simultaneous license for TomorrowNow's operations
7  relating to Oracle's database software.  Mr. Lanier also did not explain or ask me to assume that
8  the license would involve limited use and access by TomorrowNow alone, and would have not
9  allowed SAP or TomorrowNow to openly market their access to and use of Oracle's intellectual
10 property as part of a competitive service offering.  My responses during my deposition would
11 have been different if any or all of these factual limitations had been explained. (I do not intend
12 to say that the illustrative list of limiting facts above is comprehensive, but they illustrate how
13 different factual scenarios would affect how I would consider the final license terms in a
14 negotiation.)  In particular, taking into account the types of factual differences described above, I
15 would not have assumed that Oracle's license to SAP would have resulted in Oracle selling all of
16 its intellectual property and 70 to 100% of its share of the business applications software market
17 to SAP.  Though my estimation of the fair market value of a more limited license would still be
18 considerable, it would have been significantly lower than my estimation during my deposition
19 based on selling Oracle's entire share of the business applications software market to SAP.
20         5.      When presented with the final parameters of licenses for the actual
21 infringement by Defendants of Oracle's copyrighted materials from Oracle's damages experts, I
22 will analyze those parameters rigorously before opining on what I believe the fair value would
23 be.  Among the things I would consider are exactly what intellectual property was being
24 licensed, to whom, how it was used, SAP/TomorrowNow access to the software, the limitations
25 on SAP's ability to communicate to customers about the license, Oracle's expected profit from
26 using the software in the absence of any such licenses, what Oracle expected to lose in business
27 from granting such a license, how much Oracle had spent developing or acquiring the material to
28 be licensed, how much time and cost Defendants could avoid by licensing the material when they

1  did, the value Oracle would forgo by relinquishing exclusive control over the software, Oracle's
2  competitive relationship with SAP, and any potential adverse impact on the competitive
3  positions of the companies by virtue of the license.

4    6.    Given SAP's reported market cap of 48.5 billion Euros in 2005 when
5  Oracle acquired PeopleSoft and 51.0 billion Euros in 2006 when Oracle acquired Siebel, and the
6  potential financial and strategic benefits to SAP of its subsidiary having immediate access to
7  Oracle's acquired intellectual property to compete against Oracle – particularly as Oracle was
8  trying to secure its newly-acquired PeopleSoft and then Siebel customer bases – I do not believe
9  that licenses in excess of $1 billion dollars would have been prohibitively expensive for SAP.

10    7.    Even though Oracle and SAP compete aggressively in the marketplace,
11  Oracle has successfully engaged in license negotiations with SAP in the past, and has an
12  agreement with SAP that allows SAP to license and provide first-line support on Oracle's
13  database software. Through this license, in addition to competing with Oracle for enterprise
14  software applications customers, Oracle and SAP also compete with each other to sell Oracle
15  database licenses. Through SAP's sales of databases from Oracle competitors IBM and
16  Microsoft, and SAP's efforts to sell its own database technology to customers, SAP has made no
17  secret of its desire and plans to undermine Oracle's market share and product revenue from sales
18  of Oracle's database technology. Moreover, while the purpose and allowed uses under Oracle's
19  database reseller license agreement with SAP are very different from the illegal conduct that
20  Oracle alleges SAP engaged in here, this history shows that Oracle and SAP have sat across the
21  table from one another in the past and negotiated a significant licensing arrangement. ▉
22  ▉
23  ▉

24    I declare under penalty of perjury that the foregoing is true and correct and that
25  this declaration was executed on September 22, 2009 at Redwood Shores, California.
26
27  _____
    Lawrence J. Ellison
28

Case No. 07-CV-1658 (PJH)

DECLARATION OF LARRY ELLISON