1  BINGHAM McCUTCHEN LLP
   DONN P. PICKETT (SBN 72257)
2  GEOFFREY M. HOWARD (SBN 157468)
   HOLLY A. HOUSE (SBN 136045)
3  ZACHARY J. ALINDER (SBN 209009)
   BREE HANN (SBN 215695)
4  Three Embarcadero Center
   San Francisco, CA 94111-4067
5  Telephone: (415) 393-2000
   Facsimile: (415) 393-2286
6  donn.pickett@bingham.com
   geoff.howard@bingham.com
7  holly.house@bingham.com
   zachary.alinder@bingham.com
8  bree.hann@bingham.com

9  DORIAN DALEY (SBN 129049)
   JENNIFER GLOSS (SBN 154227)
10 500 Oracle Parkway, M/S 5op7
   Redwood City, CA 94070
11 Telephone: (650) 506-4846
   Facsimile: (650) 506-7114
12 dorian.daley@oracle.com
   jennifer.gloss@oracle.com

13

14 Attorneys for Plaintiffs
   Oracle USA, Inc., Oracle International Corp., Oracle
15 EMEA Ltd., and Siebel Systems, Inc.

16            UNITED STATES DISTRICT COURT

17           NORTHERN DISTRICT OF CALIFORNIA

18                  OAKLAND DIVISION

19 ORACLE USA, INC., et al.,            CASE NO. 07-CV-01658 PJH (EDL)

20        Plaintiffs,                   **DECLARATION OF PAUL K.
                                        MEYER IN SUPPORT OF
21     v.                              ORACLE'S OPPOSITION TO
                                        DEFENDANTS' MOTION FOR
22 SAP AG, et al.,                      PARTIAL SUMMARY JUDGMENT
                                        REGARDING PLAINTIFFS'
23        Defendants.                   HYPOTHETICAL LICENSE
                                        DAMAGES CLAIM**

24                                      **[REDACTED]**

25                                      Date: October 28, 2008
                                        Time: 9:00 a.m.
26                                      Courtroom: TBD
                                        Judge: Hon. Phyllis J. Hamilton
27

28
                                        Case No. 07-CV-1658 (PJH)

                    DECLARATION OF PAUL K. MEYER

Dockets.Justia.com

I, Paul K. Meyer, declare as follows:

1.       I am over the age of 18 and competent to testify to the facts stated in this declaration.  All statements made in this declaration are based upon my personal knowledge and belief.  If called and sworn as a witness, I could and would competently testify as to such matters.

2.       I am a Managing Director at Navigant Consulting, Inc. ("NCI") and co-leader of NCI's national intellectual property practice.  NCI is a national business, economic, financial and damages consulting company that provides services to government agencies, corporations and counsel.  NCI has approximately 1,900 professionals in over thirty five offices throughout the United States, Canada, Europe and China.

## I.       BACKGROUND AND EXPERIENCE

3.       I am a Certified Public Accountant (CPA), Certified Fraud Examiner (CFE), Certified in Financial Forensics (CFF) and accredited in business valuation (CPA-ABV).  I am a Consulting Professor at Stanford University in the Graduate School of Engineering, where I have been teaching a course covering accounting, quantitative methods and financial issues for over fifteen years.  I am also a member of the Advisory Board for the McIntire School of Commerce at the University of Virginia.  I graduated from the University of Virginia in 1979.  I lecture on intellectual property valuation, including at the Sedona Patent Conference, the USC Intellectual Property Institute, the Licensing Executive Society and Law Seminars International.

4.       I have over twenty five years of experience consulting on financial, accounting, economic and damages matters.  I am experienced in financial, economic, damage, and accounting matters related to the scope of our work, analysis and study on this matter.  I have consulted on numerous intellectual property infringement, misappropriation, valuation and licensing-related matters.  I have analyzed hundreds of claims for lost profits and other financial and economic impacts, and have analyzed and determined reasonable royalty rates.  I have testified in over two hundred depositions and approximately seventy trials and major arbitrations, including over thirty jury trials.

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

5. My curriculum vitae is included as ATTACHMENT A to this Declaration. A listing of cases in which I have testified as an expert witness at trial, arbitration and/or deposition during the last four years is included as ATTACHMENT B to this Declaration. My hourly billing rate on this matter is $600. I have no publications during the last ten years. NCI's work on this matter was performed by me or under my supervision.

## II. RETENTION AND ASSIGNMENT

6. Oracle retained NCI to address economic and damage issues related to its litigation with Defendants SAP AG, SAP America, Inc., and TomorrowNow, Inc. (collectively referred to herein as "SAP" or "Defendants").[1] My analyses of Oracle's damages in this matter are on-going; I have not yet reached conclusions, nor have I reviewed all of the documentation and information that has been produced by the parties in this matter. I understand that fact discovery is ongoing.

7. The purpose of this Declaration is to address issues related to Defendants' request for partial summary judgment precluding Oracle USA, Inc., Oracle International Corporation, Oracle EMEA, Ltd. and Siebel Systems Inc. (collectively referred to herein as "Oracle" or "Plaintiffs") from pursuing an award of actual damages on its copyright infringement claim in the form of a hypothetical license for the fair market value of the copyrighted materials infringed. Defendants make this request in their Motion for Partial Summary Judgment Regarding Plaintiffs' Hypothetical License Damages Claim, dated August 26, 2009 ("Defendants' Motion").

8. I submit this Declaration in support of Oracle's Opposition to Defendants' Motion for Partial Summary Judgment Regarding Plaintiffs' Hypothetical License Damages Claim ("Plaintiffs' Opposition"). I make the following statements based on my personal

---

[1] *Oracle Corporation, et al. v. SAP AG et al.*, Complaint In Case No. 07-01658 dated March 22, 2007; *Oracle USA, Inc. et al v. SAP AG et al*, Fourth Amended Complaint In Case No. 07-01658 dated August 18, 2009 ("Fourth Amended Complaint").

knowledge and expertise and, if called as a witness, would be prepared to testify competently about them.  The bases for my opinions and materials relied upon are referenced herein.

### III.    COPYRIGHT DAMAGE REMEDIES

9.    I understand that in matters of copyright infringement, a plaintiff's available damages remedies include the plaintiff's actual damages, as well as the disgorgement of the infringer's profits, to the extent they are not taken into account in the computation of plaintiff's actual damages.  In the alternative, the plaintiff may seek statutory damages.  *See* Exh. 1 (A true and correct copy of *Nimmer on Copyrights*, August 2009, Volume 4, Chapter 14 "Infringement Actions – Remedies"), at §14.01[A] and 14.01[B] (14-5, 14-6 and 14-9).  A plaintiff's actual damages resulting from copyright infringement can be measured in alternate ways:  "Actual damages are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement[2] or by the value of the use of the copyrighted work to the infringer."  *See Polar Bear Prods, Inc. v. Timex Corp.,* 384 F.3d 700, 708 (9th Cir. 2004) (quoting *McRoberts Software, Inc. v. Media 100, Inc.,* 329 F.3d 557, 566 (7th Cir. 2003)).  *See also* Exh. 1 (Nimmer), at §14.02 (14-13 and 14-20.1 through 14-31).  *See also* Defendants' Motion, at III.B.1, citing *Polar Bear Prods, Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004); *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985); and *Jarvis v. K-2, Inc.*, 486 F.3d 526, 533 (9th Cir. 2007).  One articulation of  the "value of use" measure of damages is explained as:

> "It amounts to a determination of what a willing buyer would have been
> reasonably required to pay to a willing seller for plaintiff's work.  That is a
> different measure than the determination of defendant's actual profits from the
> infringement.  An author might license the use of his copyright either for a
> lump sum based on the reasonable value of the work or for a royalty derived

---

[2] I understand Defendants' Motion does not concern the lost profits measure of Oracle's actual damages.

3

DECLARATION OF PAUL K. MEYER

1      from the licensee's profits, or for a combination of both."[3]

2            10.     I understand that courts, including the Ninth Circuit, have held that the

3 actual damages for the defendant's "value of use" may be determined on the basis of a fair

4 market value license fee paid for use of the plaintiff's work.[4] *See* Plaintiffs' Opposition, at §II.A,

5 citing *Polar Bear Prods, Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004); *Jarvis v. K-2,*

6 *Inc.*, 486 F.3d 526, 533 (9th Cir. 2007); *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002);

7 *Frank Music Corp. v. Metro-Goldwyn-Mayer*, 772 F.2d 505, 512 (9th Cir. 1985); and *Sid &*

8 *Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1174 (9th Cir. 1977).

9 The Ninth Circuit Model Civil Jury Instruction 17.23 on Copyright Damages states, "The

10 reduction in the fair market value of the copyrighted work is the amount a willing buyer would

11 have been reasonably required to pay a willing seller at the time of the infringement for the

12 actual use made by the defendant of the plaintiff's work." *See* Plaintiffs' Opposition, at §II.A.

13 As noted in *Nimmer on Copyrights*, the similarities between the "value of use" theory of

14 copyright damages and the reasonable royalty rule in patent law are apparent. *See* Exh. 1

15 (Nimmer), at §14.02[B][1] (14-22).

16            11.     What SAP would have been reasonably required to pay Oracle for its use

17 of the infringed PeopleSoft/J.D. Edwards, Siebel and Oracle database copyrighted software and

18 _____

19 [3] *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1174 (9th Cir. 1977).
20 The decision of the U.S. Court of Appeals for the Ninth Circuit acknowledges, "This same distinction is recognized in patent cases." *Id*. n.20.

21 [4] Relevant case law may refer to the standard of measurement as the "fair market value" or "market
22 value," which can be terms of art in the context of valuation of particular assets, and with respect to financial reporting. For purposes of my analysis, references to "fair market value" throughout this
23 declaration refer to the amount at which property would exchange between a willing buyer and willing seller, in an arm's length transaction, neither being under compulsion, and each having reasonable
24 knowledge of the relevant facts. This definition is consistent with guidance of the American Institute of Certified Public Accountants (AICPA) and relevant treatises on the valuation of intellectual property.
25 *See, e.g.,* Exh. 2 (A true and correct copy of excerpts from the June 2007 AICPA Statement on Standards for Valuation Services No. 1, "Valuation of a Business, Business Ownership Interest, Security, or
26 Intangible Asset"), at 44; *see also* Exh. 3 (A true and correct copy of excerpts from *Intellectual Property, Valuation, Exploitation, and Infringement Damages*, by Gordon V. Smith and Russell L. Parr. 2005
27 Edition), at 143.

28

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

software support materials ("copyrighted materials at issue") can be determined based on the fair market value of those copyrighted materials at the time of infringement.  There are well established, and widely accepted techniques for the valuation of intangible assets, including intellectual property such as the copyrighted software and software support materials at issue; namely, the Cost Approach, Market Approach and Income Approach.  *See* Exh. 3 (*Intellectual Property, Valuation, Exploitation, and Infringement Damages*, by Gordon V. Smith and Russell L. Parr., 2005 Edition), at 148-154.  The Cost Approach measures the market value of intellectual property based on the cost to replace the future service capability of the copyrighted asset; the Cost Approach does not directly consider the future economic benefits of the assets.  *See* Exh. 3 (Intellectual Property, Valuation, Exploitation, and Infringement Damages), at 156.  The Market Approach involves determining the fair market value of intellectual property based on a comparison to what others have agreed upon in arm's-length transactions involving similar assets.  *See* Exh. 3 (Intellectual Property, Valuation, Exploitation, and Infringement Damages), at 169.  Using the Income Approach, the fair market value of the intellectual property is determined based on the value of the future economic benefits that are expected to be generated by the asset.  *See* Exh. 3 (Intellectual Property, Valuation, Exploitation, and Infringement Damages), at 185.  A variation of the Income Approach is the Relief-from-Royalty Approach, whereby intellectual property is valued based on the present value of the royalties that the property owner is relieved from paying as a result of owning the asset.[5]  *See* Exh. 3 (Intellectual Property, Valuation, Exploitation, and Infringement Damages), at 194.  In the valuation of intellectual property, it is common to consider analysis of the fair market value under multiple valuation approaches.  *See* Exh. 3 (Intellectual Property, Valuation, Exploitation, and Infringement Damages), at 155 ("The analyst should consider using all three for every property because a comparison of their values may confirm the conclusions or highlight inconsistencies that should be investigated").

12.     In the context of hypothesizing a fair market value negotiation, the

---

[5] I refer to the Relief-from-Royalty Approach and the Income Approach collectively as the "Income Approach."

application of the traditional valuation methodologies explained above involves the evaluation of a variety of relevant economic and other factors, which are also addressed, for the most part, in litigation settings under the well-known patent case of *Georgia-Pacific Corp. v. U.S. Plywood Corp.* ("*Georgia-Pacific*").[6]  *Georgia-Pacific* provides for a collection of factors to be considered when determining a reasonable royalty under a hypothetical negotiation framework ("*Georgia-Pacific* factors").  Those same economic and other factors are relevant to this case in the determination of what SAP would reasonably pay Oracle, as of the time of infringement, for SAP's use of Oracle's copyrighted materials at issue.  *See* Plaintiffs' Opposition, at II.F.1 (citing *Polar Bear Prods., Inc. v. Timex, Corp.*, 384 F.3d 708, 709 (9th Cir. 2004); *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007); *On Davis v. The Gap*, 246 F.3d 166, 167-69 (2d Cir. 2001); *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566-67 (7th Cir. 2003); *Bruce v. Weekly World News, Inc.*, 310 F.3d 25, 29-30 (1st Cir. 2002); *Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357, 361 (7th Cir. 1985); *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 404, 406 (S.D.N.Y. 2002); *Fournier v. McCann Erikson*, 242 F. Supp. 2d 318, 337 (S.D.N.Y. 2003); *Marobie-Fl v. Nat'l Ass'n of Fire Equip. Distribs.*, 2002 U.S. Dist. LEXIS 2350 at *5-7 (N.D. Ill. 2002); and *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1276 (M.D. Fla. 2008).

13.     I have employed the above-mentioned valuation methodologies throughout my twenty five years of experience in consulting on financial, accounting, economic and damages matters, and specifically as it relates to the valuation of intellectual property and related financial damages.  I have testified at trial, arbitration and deposition on the determination of financial damages using valuation techniques including the determination of reasonable royalties in the context of a hypothetical negotiation based on the evaluation of economic and other factors, including the *Georgia-Pacific* factors.  I have offered expert witness testimony on the valuation of intellectual property, including copyrighted works, after considering and using the Cost, Market and Income valuation approaches.  I have analyzed, and

---

[6] *Georgia-Pacific Corp. v. United States Plywood Corp.* 318 F. Supp. 1116 (S.D.N.Y. 1970).

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

testified to, the value of damages for copyright infringement based on the framework of a hypothetical license negotiation.  My testimony has been accepted by courts.  *See*, e.g., Exh. 4 (A true and correct copy of excerpts from the transcript of proceedings before Judge Steeh on February 14, 2005 and the associated Order in *Compuware Corp. v. IBM Corp.*, case no. 2:02-cv-70906-GCS (E.D. Mich.)), at 36:15-39:22 (denying IBM's Motion in Limine to exclude evidence and my testimony related to value of use copyright damages).[7]

14.     I am in the process of analyzing and measuring Oracle's financial and economic damages in this matter.  My on-going analysis includes the determination of Oracle's damages as measured by SAP's "value of use" of the copyrighted materials at issue.  I am analyzing and developing opinions as to the fair market value of the copyrighted materials at issue using widely accepted valuation methodologies, including a determination of the fair market value based the framework of a hypothetical negotiation between Oracle and SAP.  In my opinion, there is extensive relevant evidence to support the determination of the fair market value of Oracle's copyrighted materials at issue using accepted valuation methodologies, including the evaluation of relevant economic and other factors to determine what SAP would reasonably have been willing to pay, and what Oracle reasonably would have accepted, to license the infringed intellectual property.

15.     The evidence cited throughout this Declaration represents examples of the evidence that I may cite in support of my opinions and is not intended to be an exhaustive list of all available evidence and data that may form the bases of my opinions.[8]  To date, the majority of my analysis has been focused on SAP's infringement of copyrighted materials related to Oracle's PeopleSoft and J.D. Edwards software applications.  I understand that discovery is on-going, and

---

[7] The *Compuware v. IBM* case also involved allegations of software copyright infringement by a defendant company that was a significant competitor to the plaintiff in that case.

[8] The accompanying Declarations of Holly House and Safra Catz authenticate sources I cite herein that was either produced by the parties in this action or came from transcripts of depositions in this action.  I authenticate the other sources cited herein (*e.g.*, valuation treatises, publically available materials such as SAP, Oracle and PeopleSoft SEC filings, and news articles).

1   that discovery related to alleged infringement of software and/or software support materials

2   related to Oracle's Siebel and database products has recently begun.  To the extent that additional

3   information becomes available, I will consider and/or rely on that information in forming my

4   opinions, as appropriate.[9]

## IV.   ANALYSIS OF ECONOMIC FACTORS RELEVANT TO THE DETERMINATION OF FAIR MARKET VALUE

7   16.   Due to differences in the timing of the first infringing activity, I anticipate

8   determining the fair market value of the PeopleSoft/J.D. Edwards, Siebel and Oracle database

9   copyrighted materials at issue on the basis of separate hypothetical license negotiations between

10   Oracle and SAP.[10]   Certain economic considerations of my analysis pertain to all of the

11   respective negotiations, while others relate to the specific facts and circumstances of the

12   copyrighted material subject to the particular license negotiation.

13   17.   Economic and other factors relevant to the analysis of the hypothetical

14   license negotiations between Oracle and SAP as it relates to the PeopleSoft/J.D. Edwards, Siebel

15   and Oracle database copyrighted materials include: (A) the nature, scope and duration of the

---

17   [9] To the extent that Defendants or Defendants' experts introduce additional reliable, relevant and

18   instructive evidence after the submission of my Expert Report, I will take that evidence into consideration at that time.

19   [10] For instance, I understand the following facts and legal sources are relevant to the timing of the license

20   for Defendants' use of the infringed PeopleSoft and J.D. Edwards materials.  I understand that TomorrowNow had been servicing PeopleSoft customers prior to Oracle's acquisition of PeopleSoft and

21   that the allegations are that TomorrowNow had been infringing PeopleSoft copyrighted materials prior to the acquisition.  However, I also understand that, as a matter of law, SAP would have had to negotiate

22   with Oracle concerning a hypothetical license allowing TomorrowNow to use the PeopleSoft intellectual property because SAP purchased TomorrowNow and non-exclusive copyright licenses are personal and

23   non-assignable without the consent of the licensor (in this case, Oracle – PeopleSoft's successor in interest).  *See, e.g., Everex Sys., Inc. v. Cadtrak Corp.* (*In re CFLC Inc.*), 89 F. 3d 673 (9th Cir. 1996);

24   *SQL Solutions, Inc. v. Oracle Corp.,* 1991 U.S. Dist. LEXIS 21097 (N.D. Cal. 1991).  I understand that Defendants did not start servicing J.D Edwards customers until after TomorrowNow was acquired by

25   SAP, so that would have required a new license with Oracle at the time of SAP's acquisition of TomorrowNow.  The Siebel hypothetical negotiation would commence at the time Defendants began

26   infringing Siebel copyrighted material, which I understand occurred after Oracle's 2006 acquisition of Siebel.  The timing of the Oracle database license will depend on when Defendants began infringing

27   Oracle's database copyrights, which I understand is the subject of ongoing discovery.

1    hypothetical license;[11] (B) the past licensing practices of the parties for similar intellectual

2    property, or lack thereof;[12] (C) the nature of the commercial relationship of the parties;[13] and (D)

3    market and financial considerations that would impact the parties' respective negotiating

4    positions.[14]  Evaluation of these factors is relevant to the determination of the fair market value

5    of the copyrighted materials at issue upon considering the Cost, Market or Income valuation

6    approaches (although specific factors may be relevant to certain approaches more than others),

7    and is consistent with the determination of the fair market value under the *Georgia-Pacific*

8    framework for determining the outcome of a hypothetical license negotiation.  As explained in

9    detail below, there is sufficient evidence to allow me to analyze these relevant economic and

10   other factors as they relate to the determination of the outcome of hypothetical negotiations

11   between Oracle and SAP.

12           **A.      Nature, Scope and Duration of the Hypothetical License**

13                 18.      Analysis of the nature, scope and duration of the hypothetical license is

14   relevant to the determination of the specific terms of the license being negotiated, as they relate

15   to, for example, the extent of intellectual property covered by the license, the permitted use of

16   the property by SAP, permitted geographic regions of use by SAP, and the duration of the

17   license, among others.  For purposes of my analysis, the terms of the contemplated hypothetical

18   licenses will be premised on SAP's actual infringement of the copyrighted materials at issue, and

19   its actual plans and objectives for the use of the copyrighted materials at issue.

20                 19.      I understand that Oracle's technical experts are analyzing, and will offer

21   opinions as to, SAP's theft and use of the copyrighted materials at issue.  Along with any

22   relevant documents, testimony and discovery responses, I will rely upon the opinions of those

23   ---

[11] The consideration and analysis of this factor is consistent with *Georgia-Pacific* factors 3 and 7.

24

[12] The consideration and analysis of this factor is consistent with *Georgia-Pacific* factors 1, 2 and 4.

25

[13] The consideration and analysis of this factor is consistent with *Georgia-Pacific* factor 5.

26

[14] The consideration and analysis of this factor is consistent with *Georgia-Pacific* factors 6, and 8 through

27   13.

28

experts in determining the nature and scope of the intellectual property to be included in the hypothetical license negotiations, as appropriate.[15]   To date, my understanding of SAP's theft and use of the infringed intellectual property is based on information contained in Oracle's Fourth Amended Complaint, in which Oracle makes allegations including, but not limited to:

    a.    Defendants illegally downloaded, copied and stored on its servers, Oracle copyrighted materials, which enabled it to offer services to Oracle software customers at cut rates, and to lure customers away from Oracle's software platform to SAP.  *See* Exh. 5 (Fourth Amended Complaint), at 6:3-6 and 8-13;

    b.    Defendants repeatedly downloaded copyrighted or confidential Oracle software and support materials from Oracle's proprietary, password-protected customer support website, including at least 10,000 illegal downloads of Oracle software and software support materials between September 2006 and February 2007, alone.  *See* Exh. 5 (Fourth Amended Complaint), at 6:6-9 and 14-15;

    c.    Over a period of years, Defendants systematically took unauthorized materials from Oracle's systems, including through the use of a dedicated bank of servers in a "download center" and a customized software tool developed by Defendants called "Titan." *See* Exh. 5 (Fourth Amended Complaint), at 6:15-18;

    d.    Defendants stored on its systems more than five terabytes of Oracle software and software support materials. More than 8 million downloaded Oracle software and software support materials were found on just one of SAP's servers.  *See* Exh. 5 (Fourth Amended Complaint), at 6:21-7:1;

    e.     Defendants maintained "generic" and "retrofit update" environments containing copies of Oracle's software applications, from which it made thousands of copies of Oracle's software, and distributed thousands of individual "fixes" to its TomorrowNow customers.  *See* Exh. 5 (Fourth Amended Complaint), at 7:19-8:3

---

[15] The consideration of testimony of qualified experts is consistent with *Georgia-Pacific* factor 14.

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

1    and 8:21-23;

2       f.    Defendants "copied and pasted" and re-branded Oracle documentation that was

3             "essentially identical" and "virtually verbatim with small changes."  *See* Exh. 5

4             (Fourth Amended Complaint), at 8:24-9:4; and,

5       g.    Defendants supported approximately 40% of its TomorrowNow customer base by

6             using Oracle database software in a manner for which it did not have a license.  *See*

7             Exh. 5 (Fourth Amended Complaint), at 42:28-43:3.

8       20.    Evidence that I have evaluated to date informs the geographic scope of the

9    hypothetical licenses at issue.[16]  For example, the following confirm that Defendants used the

10   copyrighted materials at issue to service customers throughout the world (expansion beyond

11   North America occurred shortly after SAP's acquisition of TomorrowNow):

12      a.    A February 23, 2005 presentation to the SAP Board indicates the expansion of TN

13            in Europe and Asia was "to be finalized by early-March."  *See* Exh. 6 (Excerpts

14            from a February 23, 2005 SAP presentation "Clear Sailing - Oracle Competitive

15            Program SAP Board Update," SAP-OR 00299519-533 [Kagermann Exhibit 414]),

16            at SAP-OR 00299525.

17      b.    Henning Kagermann, SAP Executive Board Member and Co-CEO, testified to

18            SAP's immediate plan to expand TN services into Europe and Asia.  *See* Exh. 7

19            (Excerpts from the deposition of Henning Kagermann, dated September 25, 2008),

20            at 138:22-25.

21      c.    Excel files produced by SAP showing TomorrowNow accounts receivable data by

22            customer indicate that revenue was received by TomorrowNow entities in the

23            United States ("TN US"), Netherlands ("TN NL"), United Kingdom ("TN UK"),

24            Singapore ("TN SG") and Australia ("TN AU").  *See* Exh. 8 (Excerpts from the

---

25   [16] Given that it is alleged that Defendants' unauthorized use of the Oracle database software involved the
26   servicing of its TomorrowNow customers (*See* Exh. 5 (Fourth Amended Complaint), at 42:28-43:3), I
      expect that the hypothetical license for that database software would be similar in scope to the licenses
27   related to Oracle's PeopleSoft, J.D. Edwards and Siebel copyrighted materials.

28

11

1    native file TN Customer Report-revised.xls, TN-OR 06125333).

2        21.    The hypothetical licenses granted by Oracle to SAP for PeopleSoft/J.D.

3    Edwards, Siebel and Oracle database copyrighted materials would be non-exclusive, as Oracle

4    would continue to provide software and software support to its own customers using those

5    materials.  For example, at the time of Oracle's acquisition of PeopleSoft, Larry Ellison

6    confirmed that it would continue to support PeopleSoft products.  *See* Exh. 9 (Excerpts from a

7    January 18, 2005 Video Presentation "Oracle and PeopleSoft – Better Together," ORCL

8    00223497-531 [Ellison Exhibit 400]), at ORCL 00223501 ("We said at the beginning we'd

9    support the PeopleSoft product for a decade, for ten years, and we intend to do that.").  Oracle

10    continued to support PeopleSoft and J.D. Edwards products throughout the term of the

11    PeopleSoft/J.D. Edwards hypothetical license at issue.

12        22.    I understand the hypothetical licenses would expire in October 2008,

13    coinciding with SAP's reported cessation of TomorrowNow's operations.  *See* Exh. 10 (True and

14    correct excerpts from SAP's publically filed Annual Report for the fiscal year ending December

15    31, 2008), at 173.  However, there is evidence to suggest that in each hypothetical negotiation,

16    Oracle and SAP would consider the financial implications of periods well into the future, and

17    potentially into perpetuity, of entering into such a license.  SAP's own documents, as well as

18    deposition testimony of SAP senior executives and board members, acknowledge that SAP's

19    intention was not simply to receive revenue from the provision of TomorrowNow support

20    services, but it was rather to use its TomorrowNow offering to drive the conversion of Oracle's

21    application customers over to SAP.  In other words, SAP's objective was (and likewise Oracle's

22    expectation would be) that some portion of TomorrowNow's customers obtained through

23    October 2008 would switch to the SAP software platform, causing Oracle to lose license and

24    maintenance revenue into the future.  Relevant evidence in the record includes, but is not limited

25    to:

26        a.    "Step 3" of SAP's "PeopleSoft 1-2-3" plan was to "Upgrade PeopleSoft customers

27           to mySAP ERP."  *See* Exh. 11 (January 5, 2005 SAP email with attached document

28           "PeopleSoft 1-2-3 01 05 05.doc," SAP-OR 00004991-5007 [Shenkman Exhibit

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

225]), at SAP-OR 00005003.

b. A statement in SAP's "PeopleSoft 1-2-3" plan that, "Freezing a PeopleSoft customer 'forever' is not an end goal for SAP. SAP ultimately wants to sell more software and upgrade a customer to mySAP." *See* Exh. 11 (PeopleSoft 1-2-3), at SAP-OR 00004997.

c. Testimony of Shai Agassi, Former SAP CTO and Executive Board Member, that SAP's Executive Board was more interested in the number of customers converted to SAP than the TomorrowNow maintenance revenues achieved. *See* Exh. 12 (Excerpts from the deposition of Shai Agassi, dated January 5, 2009), at 310:17-24.

d. Testimony of Leo Apotheker, SAP Executive Board Member and Co-CEO, stating, "the acquisition of TomorrowNow was meant to facilitate the movement of customers who so desired to moved away from PeopleSoft – from PeopleSoft software in that particular case to SAP." *See* Exh. 13 (Excerpts from the deposition of Leo Apotheker, dated October 2, 2008), at 83:15-22.

e. A statement in a SAP "Business Case" for providing Siebel support through TomorrowNow that, "The Maintenance offering – a key part of the Safe Passage program and provided by TomorrowNow – can be used as an enabler for future license revenue, to grow maintenance contract volume take away from Oracle and to generate additional maintenance revenue for SAP." *See* Exh. 14 (Excerpts from an October 2005 SAP presentation "Business Case: TomorrowNow – Siebel", TN-OR 00995250-259 [Ziemen Exhibit 472]), at TN-OR 0099254.

23. In negotiating a reasonable license fee for the copyrighted materials at issue, both Oracle and SAP would consider the long term financial effects of Oracle losing, and SAP gaining, application customers and associated downstream revenues.

**B. Past Licensing Practices of the Parties for Similar Intellectual Property, or Lack Thereof**

24. The consideration of economic and other factors related to the past license practices of the parties includes the identification and analysis of previous comparable license

13

and asset acquisition transactions entered into by Oracle or SAP for similar intellectual property, or lack thereof. In addition, consideration should be given to Oracle's historical policies and practices to protect its copyrights.

25.     As it relates to the PeopleSoft/J.D. Edwards and Siebel copyrighted materials at issue, I am not aware of any instances where Oracle has previously licensed the copyrighted materials that are comparable to the contemplated hypothetical licenses with SAP. Likewise, I am not aware of license fees paid by SAP for use of copyrighted material that is comparable to the PeopleSoft/J.D. Edwards and Siebel intellectual property at issue in this case. However, as explained further below in section D.1 "Evidence of Oracle's Negotiating Perspective," the price that Oracle paid to acquire intellectual property in its acquisitions of PeopleSoft and Siebel is indicative, in part, of the significant value that Oracle attributes to the copyrighted property at issue. For example:

a.     Oracle paid $11.1 billion to acquire PeopleSoft in December 2004, $3.4 billion of which was attributed to acquired technology, maintenance contracts and customer relationships.  *See* Exh. 15 (A true and correct copy of excerpts from Oracle's publically filed Annual Report for the fiscal year ended May 31, 2005), at 72-74; and Exh. 16 (Excerpts from the Standard & Poor's Report "Oracle Corporation: Estimation of the Fair Value of Certain Assets and Liabilities of PeopleSoft, Inc. as of December 28, 2004," ORCL 00313160-253), at ORCL 00313204.

b.     Oracle paid $6.1 billion to acquire Siebel in January 2006, $1.6 billion of which was attributed to acquired technology, maintenance contracts and customer relationships.  *See* Exh. 17 (A true and correct copy of excerpts from Oracle's publically filed Annual Report for the fiscal year ended May 31, 2006), at 75-76; and Exh. 18 (Excerpts from the Duff & Phelps report "Estimation of the Fair Value of Certain Assets and Liabilities of Siebel Systems, Inc. as of January 31, 2006," ORCL 00312747-819), at ORCL 00312782.

26.     In addition, there is sufficient evidence produced by SAP, as well as information available in the public domain, to determine the fair market value that SAP

1  reasonably would have been willing to pay for its use of the copyrighted materials at issue (see

2  section D.2 "Evidence of SAP's Negotiating Perspective").

3         27.    In determining the fair market value that Oracle reasonably could be

4  expected to accept from SAP for a license to the copyrighted materials at issue, I will take into

5  consideration that Oracle has not previously licensed the copyrighted materials at issue for use

6  by a competitor such as SAP.

7         28.    There is sufficient evidence in the record for me to rely upon in the

8  evaluation of Oracle's policies and practices to protect its copyrighted materials at issue.  For

9  example:

10      a.    I understand Oracle's license agreements with its PeopleSoft/J.D. Edwards and

11          Siebel customers prohibit access to, or use of, any portion of the software not

12          expressly licensed to and paid for by the licensee, including any sublicense to third

13          parties.  *See* Exh. 5 (Fourth Amended Complaint), at 17:6-11.

14      b.    I understand third parties designated to help maintain a customer's Oracle software

15          are subject to the terms of the underlying license agreement, and those terms

16          generally preclude the third party from installing the software on a server, or

17          accessing the source code of the software.  *See* Exh. 5 (Fourth Amended

18          Complaint), at 17:14-17.

19      c.    I understand the terms of Use of Oracle's Customer Connection website restrict

20          access to, and use of, Oracle's copyrighted software and software support materials.

21          *See* Exh. 5 (Fourth Amended Complaint), at 17:23-18:19.

22      d.    SAP current and former senior executives have acknowledged the importance of

23          protecting intellectual property rights.  While at SAP, Shai Agassi, Former SAP

24          CTO and Executive Board Member, was quoted as saying, "I work for an IP

25          company, and we believe in the importance of investors owing the IP they create.

26          At SAP, we believe that without the ability to protect IP, most companies will no

27          longer invest so much of their current revenues in future product innovation."  *See*

28          Exh. 12 (Agassi Depo.), at 27:4-15.  *See also* Exh. 19 (Excerpts from the deposition

of Werner Brandt, dated November 12, 2008), at 46:8-21 (acknowledging that SAP vigorously protects its intellectual property).  In July 2007, when admitting that inappropriate downloading had occurred, Henning Kagermann, SAP CEO, said, "Even a single inappropriate download is unacceptable from my perspective."  *See* Exh. 20 (A true and correct copy of the publically available article, "SAP admits inappropriate downloads in Oracle case," Reuters, July 4, 2007).

29.    I understand that Oracle and SAP have an existing agreement whereby SAP is an authorized reseller of Oracle's database products.  *See* Declaration of Larry Ellison, at ¶ 7.  With respect to Oracle's allegation of database software infringement, I will review the terms of that agreement, and any other relevant agreements between the parties, as it relates to restrictions on SAP's licensed use of Oracle's database software.  I will also consider the different types of licenses Oracle grants to its database customers or other third parties related to access and use of database material that have been produced in this action, as well as Oracle's customary terms, limitations and restrictions in those license agreements.  I understand that discovery has just begun as it relates to Oracle's database copyright infringement allegations.  In forming my opinions, I will incorporate additional relevant discovery of the parties as documents and information become available.

**C.    Nature of the Commercial Relationship Between Oracle and SAP**

30.    There is extensive evidence in the record with which to assess the highly competitive nature of the relationship between Oracle and SAP in the software applications business, and specifically the increase in competition between Oracle and SAP and SAP's escalating concerns as a result of Oracle's acquisitions of PeopleSoft and Siebel.  This competition includes SAP's targeting of PeopleSoft and Siebel customers during the period of Oracle's acquisitions.  Relevant evidence that I will take into consideration in forming my opinions includes, but is not limited to:

a.    Prior to its December 2004 acquisition of PeopleSoft, Oracle was one-third the size of SAP based on enterprise application software revenues.  *See* Exh. 21 (Excerpt

from an October 2004 IDC Report "Market Analysis – Worldwide Enterprise Applications 2004-2008 Forecast and Analysis," ORCL 00313337-84), at ORCL 00313349.

b.  Industry analyst reports, forecasts and analyses for the enterprise applications market identify Oracle and SAP as significant competitors.  For example, *see* Exh. 16 (S&P PeopleSoft Valuation Report), at ORCL 00313171-172 ("With the acquisition of PeopleSoft, Oracle will effectively increase its overall market share to 27.0%, making the combined entity a more viable competitor to SAP," citing AMR Research data); and Exh. 18 (Duff & Phelps Siebel Valuation Report), at ORCL 00312759 (explaining that at the end of 2004, Siebel, Oracle and SAP were the top 3 players in the CRM market, and that as a newly combined entity, Oracle/Siebel surpassed SAP by 0.1% in market share).

c.  Deposition testimony of Oracle senior executives identifying SAP as its most significant competitor in enterprise applications. *See* Exh. 22 (Excerpts from the deposition of Safra Catz, dated March 27, 2009), at 19:10-25.

d.  Deposition testimony of SAP senior executives identifying Oracle as its main competitor, and highlighting the adverse impact on SAP of Oracle's PeopleSoft and Siebel acquisitions. *See* Exh. 13 (Apotheker Depo.), at 58:10-17 and 76:22-77:1. (stating that Oracle is SAP's "largest competitor," and "Oracle has become a significantly larger competitor than it was before it started all of these acquisitions.");  and Exh. 7 (Kagermann Depo.), at 151:19-25 (agreeing with the statement that "Through its acquisitions, Oracle has emerged as the number-one competitor for SAP").

e.  A February 2005 SAP presentation stating, "Market consolidation has changed the competitive landscape.  Oracle is positioning itself to aggressively challenge SAP for leadership in business software solutions," and "Internal pressure at SAP is high to 'take on Oracle' in response to public provocation from Oracle."  *See* Exh. 23 (February 3, 2005 SAP email with excerpts of an attached SAP presentation "Clear

17

Sailing: Positioning SAP for the Market Leadership Battle, Communications Recommendations, Sylt Discussion Slides," SAP-OR 00126416 and SAP-OR 00147894-919 [included in Kagermann Exhibit 413]), at SAP-OR 00147896.

f.  A November 2005 SAP presentation stating, "Through its acquisitions, Oracle has emerged as the number-one competitor for SAP.  While Oracle faces significant challenges such as aligning its different product lines ("Project Fusion"), the company remains a formidable competitor."  *See* Exh. 24 (Excerpts from a November 2005 SAP "Sun Tzu 2006" presentation "Shaping the Future – IT-Powered Business Innovation – SAP's Midterm Strategy," KAGERMANN_TEMP 000001-85 [Kagermann Exhibit 415]), at KAGERMANN_TEMP 000058.

g.  Numerous SAP documents indicating that its purchase of TomorrowNow was part of its competitive strategy to "take on Oracle."  *See* Exh. 25 (Excerpts from a December 23, 2004 SAP presentation "A Roadmap for PSFT Customers to SAP," SAP-OR00253278-301 [Ziemen Exhibit 447]), at SAP-OR 00243280-282 (showing the offering of third party PeopleSoft service as a "Solution" for the "PeopleSoft Attack Program"); Exh. 26 (Excerpts from a January 16, 2005 SAP presentation "Safe Passage: Winning Customers and Markets from Oracle-PeopleSoft-J.D. Edwards," SAP-OR 00092046-70 [Shenkman Exhibit 236]), at SAP-OR 00092050 (stating SAP's goal was to "convert the majority of the PeopleSoft and J.D. Edwards customer base to SAP and contain Oracle's potential growth in the next generation application market," and that its offering of PeopleSoft and J.D. Edwards support will allow SAP to "siphon off the cash flow that Oracle needs to build or acquire it's next generation applications");   and Exh. 11 (PeopleSoft 1-2-3), at SAP-OR 00004998 (stating that SAP's efforts may "force Oracle to change its behavior or plans around pricing or positioning").

h.  SAP internal documents indicating Oracle's acquisition of Siebel would threaten SAP's position in the CRM market as a result of its acquisition of Siebel.  *See* Exh. 27 (Excerpts from an October 24, 2005 SAP presentation "CRM Review II," SAP-

18

1   OR 00164521-58 [Kagermann Exhibit 439]), at SAP-OR 00164527

2   (acknowledging SAP's "competitive edge diminished by 40% post-SEBL

3   acquisition."); and Exh. 28 (November 8, 2005 SAP email with excerpts from an

4   attached presentation "Oracle's Impact on the SAP Market and the Apollo

5   Response," SAP-OR 00042102-130 [Apotheker Exhibit 497]), at SAP-OR

6   00042116 ("We lose our position as the number one player in the CRM market"

7   after Oracle's Siebel acquisition).

8   **D.    Market and Financial Considerations Impacting the
            Respective Negotiating Positions of Oracle and SAP**

9          31.    Market-related and financial considerations relevant to the determination

10  of the fair market value of the copyrighted materials at issue include: the value to Oracle of the

11  copyrighted materials in generating sales of its other products; Oracle's significant investment in

12  its intellectual property, which would be financially compromised and devalued upon licensing

13  to SAP; the effect of selling the infringed copyrighted materials on sales of SAP's other

14  products; and the extent to which SAP planned to use and has made use of the copyrighted

15  materials at issue.  Additional relevant financial considerations include: the profitability and

16  commercial success of Oracle and SAP products embodying the copyrighted materials at issue;

17  the portion of the profit or selling price customary to allow for the use of the copyrighted

18  materials at issue; and the relative profit contribution of the copyrighted materials at issue as

19  distinguished from non-copyrighted elements added by SAP, if any.

20         32.    There is extensive evidence produced in discovery in this case, as well as

21  available in the public domain, from which I am able to analyze market and financial factors that

22  Oracle and SAP reasonably would have considered in their license negotiations for the

23  copyrighted materials at issue.

24         **1.    *Evidence of Oracle's Negotiating Perspective***

25         33.    Market-related and financial factors that Oracle would take into

26  consideration in determining what it would reasonably accept for granting a license to SAP for

27  the copyrighted materials at issue include: (1) Oracle's significant investments in the acquisition

28

19

DECLARATION OF PAUL K. MEYER

and development of the copyrighted materials at issue; (2) the value of Oracle's maintenance contracts and customer relationships in the generation of future revenue from sales of other Oracle products; (3) the losses or additional costs that Oracle would anticipate to incur as a result of competing with SAP for sales related to the copyrighted materials at issue; (4) the historic profitability of Oracle's sales of licenses and support services; and (5) the opinions of relevant Oracle personnel as to the amount of a license fee that it would be willing to accept for granting a license to SAP under the terms of the contemplated hypothetical licenses.  As explained below, there is sufficient evidence to analyze, and form opinions on, these market and financial considerations from Oracle's perspective.

34.     Evidence of Oracle's significant investment in the copyrighted materials in suit are found in, as examples:

a.     Oracle paid $11.1 billion to acquire PeopleSoft in December 2004, $3.4 billion of which was attributed to acquired technology, maintenance contracts and customer relationships, and $6.5 billion of which was attributed to goodwill (for a total of $9.9 billion allocated to goodwill and other intangible assets), as shown in Oracle's publicly filed financial statements, and in the independent valuation performed by Standard & Poor's.  *See* Exh. 15 (Oracle 2005 Annual Report), at 72-74; and Exh. 16 (S&P PeopleSoft Valuation Report), at ORCL 00313204.

b.     Oracle's multi-billion dollar sales and income forecast for PeopleSoft at the time of the acquisition, including relevant revenue, customer retention and expense assumptions upon which the forecast is based.  *See* Exh. 29 (Worksheet labeled "PeopleSoft Operating Model" of Oracle's "Project Spice" financial model prepared at the time of its acquisition of PeopleSoft, ORCL00313255).

c.     Oracle paid $6.1 billion to acquire Siebel in January 2006, $1.6 billion of which was attributed to acquired technology, maintenance contracts and customer relationships, and $2.5 billion of which was attributed to goodwill (for a total of $4.1 billion allocated to goodwill and other intangible assets), as shown in Oracle's publicly filed financial statements, and in the independent valuation performed by

DECLARATION OF PAUL K. MEYER

Duff & Phelps.  *See* Exh. 17 (Oracle 2006 Annual Report), at 75-76; and Exh. 18 (Duff & Phelps Siebel Valuation Report), at ORCL 00312782.

d.  Oracle's multi-billion dollar sales and income forecast for Siebel at the time of the acquisition, including relevant revenue and expense assumptions upon which the forecast is based.  *See* Exh. 30 (Worksheet labeled "Sierra-Input" of Oracle's "Project Sierra" financial model prepared at the time of its acquisition of Siebel, ORCL00312843).

e.  I will also review information related to Oracle's significant investment in research and development of the copyrighted materials at issue, as well as research and development investments made by PeopleSoft and Siebel prior to their acquisitions by Oracle. *See*, e.g., Exh. 31 (Excerpts from the PeopleSoft, Inc. Form 10-K for the fiscal year ended December 31, 2003), at 9 and F-17 through F-18 (PeopleSoft annual R&D investments for 2001 through 2003 ranged from $299 million to $433 million.  PeopleSoft paid approximately $2 billion to acquire J.D. Edwards in July and August 2003); Exh. 32 (Excerpts from the Siebel Systems, Inc. Form 10-K for the fiscal year ended December 31, 2004), at 9 (Siebel annual R&D investments for 2002 through 2004 ranged from $299 million to $368 million); and Exh. 33 (Excerpts from Oracle's "FY08 Applications Development Budget Request," ORCL 00545983-609), at ORCL 00545985 (showing hundreds of millions of annual operating expense related to its Applications Unlimited program for its PeopleSoft, J.D. Edwards and Siebel product lines).

35.  Evidence of the value of the acquired PeopleSoft and Siebel customer relationships as it relates to potential future revenues, including opportunities for additional sales to those customers of other Oracle products ("cross-sell" and "up-sell" opportunities), and benefits thereof, includes, but is not limited to:

a.  Testimony of Safra Catz, Oracle Co-President, that the PeopleSoft acquisition would provide Oracle with "a much larger customer base and a much larger maintenance base so we could spend more on R&D and so that we could sell more

21

1   to this larger customer base of our other products.  And so that we could take

2   advantage of the fact that scale in our business improves the operating performance

3   of the company … you have an installed base of customers who are paying you

4   maintenance, and thus you have a lot more money you can direct towards R&D."

5   *See* Exh. 22 (Catz Depo.), at 77:20-79:2.

6       b.   Ms. Catz's testimony that Oracle's goals for the Siebel acquisition included

7          obtaining Siebel's customer base and being able to sell them other Oracle products.

8          *See* Exh. 22 (Catz Depo.), at 83:18-84:3.

9       c.   Statements by Charles Phillips, Oracle Co-President, cited in an investor

10         presentation: "We are retaining [PeopleSoft's] very valuable maintenance revenue,

11         again that's the real revenue stream behind this that makes this transaction work for

12         us."  *See* Exh. 34 (Excerpts from a December 2004 Oracle investor presentation

13         "PeopleSoft," ORCL 00312888-939), at ORCL 00312930.

14      d.   Mr. Phillips' testimony of the magnitude of potential lost future sales if Oracle loses

15         a customer.  *See* Exh. 35 (Excerpts from the deposition of Charles Phillips, dated

16         April 17, 2009), at 17:8-18:11 (". . .for every customer we lost, there's ten times

17         that in license revenue that we could have sold over the years as they continue to

18         standardize on our footprint").[17]  Mr. Philips' also testified that the goal of the

19         PeopleSoft acquisition was to achieve scale in Oracle's core ERP business and to

20  ───────────────

21  [17] I am relying on this form of Oracle executive management testimony not to quantify the lost profits

22  associated with lost cross-sell and up-sell opportunities to the specific list of lost TomorrowNow customers (which I understand Magistrate Laporte has disallowed per her September 17, 2009 lost profits

23  damages preclusion order), but as input for the considerations that would inform and be relevant to Oracle's reasonable fair market value negotiations of hypothetical licenses structured to allow Defendants

24  to use the allegedly infringed materials.  I understand that Defendants specifically did not seek preclusion of this measure of Oracle's copyright damages in that motion.  *See* Defendants' July 14, 2009 Motion for

25  Sanctions Pursuant to Fed. R. Civ. P. 37(c) and 16(f) at 13 n.9 ("This motion is limited to what Oracle characterizes as its lost profits claims, and does not extend to its 'infringers' profits/unjust enrichment

26  claims, its hypothetical license theory, or alleged damage to computer systems or data.  Defendants do not concede that any of these other damages categories or theories are proper or timely, but will address those

27  by separate motion if necessary.  For example, Oracle's hypothetical license theory will be the subject of Defendants' Rule 56 motion to be filed on August 26th.").

28

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

close the gap between Oracle and SAP.  *See* Exh. 35 (Phillips Depo.), at 36:25-37:14.

e.   Testimony of Larry Ellison, Oracle CEO, that losing a customer to SAP equates to losing that customer for ten to twenty years.  *See* Exh. 36 (Excerpts from the deposition of Larry Ellison, dated May 5, 2009), at 12:2-13:4.

f.   Testimony of Jesper Andersen, Former Oracle SVP of Applications Strategy: "I got to believe, you know, for every customer that TomorrowNow took away from Oracle, we would have expected to make not only decades of maintenance, but obviously, like you do with most customers, you up-sell additional applications, technology, services, whatever it is."  *See* Exh. 37 (Excerpts from the deposition of Jesper Andersen, dated June 10, 2009), at 259:19-24.

g.   Evidence that Oracle's acquisition of Siebel was expected to provide a valuable customer base with cross-selling opportunities and industry expertise in customer centric applications.  *See* Exh. 18 (Duff & Phelps Siebel Valuation Report), at ORCL 00312756.

h.   I will also consider Oracle's revenue growth history and expectations for support customers.

36.   Evidence of losses or additional costs that Oracle would have anticipated due to enhanced competition with SAP for sales of support services for Oracle's PeopleSoft/J.D. Edwards and Siebel software products includes, but is not limited to:

a.   Testimony of Oracle executives that absent competition from SAP and TomorrowNow, its maintenance cancellation rates would have been lower.  For example, *see* Exh. 38 (Excerpts from the deposition of Juan Jones, April 24, 2009), at 208:17-209:5 ("Undoubtedly our cancellation rate would have been lower, our renewal rate would have been, I believe, significantly higher and we would not have had the opportunity cost of having to work in very – an overwhelming workload against TomorrowNow competition, when they were offering the same thing for half the price.").

DECLARATION OF PAUL K. MEYER

b.   Testimony of Shai Agassi, Former SAP CTO and Executive Board Member, stating that he did not believe that Oracle's anticipated PeopleSoft/J.D. Edwards attrition rates were realistic "Because [he] thought [SAP would] be able to offer a better proposition by offering PeopleSoft and J.D. Edwards in particular customers to move over to SAP". *See* Exh. 12 (Agassi Depo.), at 192:13-193:19.

c.   Documents and information related to Oracle's actual PeopleSoft/J.D. Edwards and Siebel maintenance renewal rates and the adverse impact of SAP's TomorrowNow activity on them. *See* Exh. 39 (Excerpts from the deposition of Juergen Rottler, dated May 13, 2009), at 235:24-236:12 and 273:9-274:24 (that the renewal rates of companies acquired by Oracle generally improve over time, and that he would have expected that two years after the acquisition, the PeopleSoft cancellation rates would have been in line with Oracle averages of 2% to 3%); Exh. 40 (Actual PeopleSoft cancellation rates for Q3 2004 through Q3 2007 found in the native file "psoft cancellation rates 4-3-07.xls", ORCL 00103577) and Exh. 41 (Excerpts from January 19, 2007 Oracle presentation "Implications of Maintenance Cancellations on Applications Product Strategy," ORCL 00285572-589), at ORCL 00285577-579 and 583 (showing that maintenance revenue is important to profitability, and showing PeopleSoft and J.D. Edwards higher cancellation rates). *See also* Exh. 29 (Project Spice Model) for PeopleSoft renewal/attrition rates prior to its acquisition by Oracle, as well as Oracle's forecast customer attrition rates at the time of the acquisition.

d.   Oracle's reasonable expectations of the change in its business environment if SAP, its largest competitor and a company with significant resources, were able to offer competitive, credible service to Oracle's customers using Oracle's intellectual property.  For example, as a result of TomorrowNow offering support services to Oracle software customers, Oracle experienced increased pricing pressure and bargaining power from its customers, and spent significant amounts of time responding to customer requests. *See* Exh. 39 (Rottler Depo.), at 43:2-8

24

1   (TomorrowNow became a frequent reason for customers to ask for pricing

2   exceptions).

3       37.     I will review and consider Oracle's historical relevant profit margins and

4   incremental costs related to its license and support revenues, as reported in Oracle's public

5   financial statements, as well as based on Oracle's entity financial statements and/or product line

6   profit reports that I understand have been, or will be, produced.

7       38.     I will also interview relevant Oracle senior executives to obtain their input

8   and positions on what license fee amounts they believe Oracle would be reasonably willing to

9   accept for granting licenses to SAP for its use of Oracle's PeopleSoft/J.D. Edwards, Siebel and

10   Oracle database related materials under the specific terms of the contemplated hypothetical

11   negotiations.

12      **2.      *Evidence of SAP's Negotiating Perspective***

13      39.     In determining what SAP would reasonably be willing to pay for a license

14   to the copyrighted materials at issue, SAP would consider market and financial factors,

15   including: (1) SAP's willingness to invest significant capital resources to expand its product

16   offerings or gain access to additional customers; (2) the amount SAP was willing to pay and

17   actually paid in its acquisition of TomorrowNow and the nature of the assets acquired; (3) the

18   timing with which SAP wanted to gain access to the copyrighted materials at issue; (4) SAP's

19   expectations of how its offering of support services to Oracle's newly acquired customers would

20   drive increased maintenance revenue, as well as increased sales and profits of its own

21   applications and other products; (5) the importance to SAP of obtaining access to the copyrighted

22   materials at issue in terms of public relations and marketing and sales benefits, and as a means to

23   disrupt Oracle's market momentum around the time of its acquisitions, and adversely impact

24   Oracle's business; (6) the cost and time that SAP would have had to incur to independently

25   develop the copyrighted materials at issue, if possible, and the risks associated with unsuccessful

26   efforts; (7) SAP's use of the copyrighted materials at issue; and (8) the portion of SAP's profits

27   that should be credited to the copyrighted materials at issue, as distinguished from non-

28   copyrighted elements added by SAP, if any.  As explained below, there is sufficient information

1   to analyze, and form opinions on, these market and financial considerations from SAP's

2   perspective

3       40.     Evidence of SAP's willingness to commit significant capital resources to

4   expand its product portfolio and gain access to additional customers, and intellectual property

5   needed to service them, includes, but is not limited to:

6       a.  From 2005 to 2007, SAP acquired 18 companies for a total consideration of

7           approximately €1.3 billion in net cash. *See* Exh. 42 (A true and correct copy of

8           excerpts from SAP's publically filed December 31, 2007 Annual Report), at 143-

9           145; and Exh. 43 (A true and correct copy of excerpts from SAP's publically filed

10          December 31, 2005 Annual Report), at 106.

11

12

13

14

15

16

17

18      c.  According to Henning Kagermann, SAP Executive Board Member and Co-CEO,

19          SAP's acquisition of Business Objects was "in keeping with SAP's stated strategy

20          to double [its] addressable market by 2010." *See* Exh. 45 (October 7, 2007 SAP

21          publically issued Press Release "SAP to Acquire Business Objects in Friendly

22          Takeover; Combined Companies to Accelerate Leadership for Business User

23          Applications").

24      d.  Testimony of SAP senior executives about the importance of downstream

25          maintenance revenue to fund its research and development efforts. For example,

26          *see* Exh. 19 (Brandt Depo.), at 50:20-24.

27      e.  Acknowledgement in SAP's "PeopleSoft 1-2-3" plan that, "Expertise and access to

28          PeopleSoft systems are significant barriers to providing PeopleSoft support." *See*

                                    26                          Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

Exh. 11 (PeopleSoft 1-2-3), at SAP-OR 00004999.

41.     I understand from discovery that SAP paid $10 million to acquire TomorrowNow.  However, discovery also reveals that this purchase price is not indicative of the amount that SAP would have been willing to pay Oracle to acquire the copyrighted materials at issue.  SAP's due diligence information and other documents produced in this case indicate that SAP was not acquiring any intellectual property in its acquisition of TomorrowNow.[18]  *See* Exh. 46 (Excerpts from SAP Corporate Finance: Purchase Price Allocation as of July 19, 2005 induced by the Acquisition of TomorrowNow, Inc., dated April 4, 2005, SAP-OR 00005574-589), at SAP-OR 00005589 (SAP's TomorrowNow purchase price allocation for intangible assets indicates no value for software applications and software and support materials); and Exh. 47 (January 13, 2005 SAP email Re: TomorrowNow, SAP-OR 00187024-25 [Brandt Exhibit 514]), at SAP-OR 00187024 (indicating that the TomorrowNow acquisition should be structured as a ". . . stock purchase agreement since no intellectual property is being acquired.").

42.     Evidence in the record indicates that the timing and speed with which SAP could obtain the ability to service Oracle's PeopleSoft/J.D. Edwards customers was of great importance to SAP.  Evidence includes, but is not limited to:

a.     A December 13, 2004 SAP Executive Board decision (one day after the announcement of Oracle's definitive merger agreement with PeopleSoft) to pursue offering support services for PeopleSoft software in early 2005 in order to "take away the maintenance revenue stream" from Oracle.  *See* Exh. 48 (December 13, 2004 SAP email Re: TomorrowNow, SAP-OR 00004915 [Shenkman Exhibit 208]).

b.     A December 16, 2004 email from Jim Mackey, SAP Vice President of Corporate Finance, to Andrew Nelson, Co-Founder of TomorrowNow, explaining that the SAP Executive Board requested to "accelerate the pace of our talks . . . to have you and your company join SAP through an acquisition as quickly as may be feasible . .

---

[18] Additionally, there is sufficient evidence available indicating that the value to SAP of acquiring TomorrowNow far exceeded the cost of acquisition.

. so we can close a transaction as early as possible in January."  *See* Exh. 49 (December 16, 2004 SAP email Re: Confidential, SAP-OR 00091570-572 [Shenkman Exhibit 209]), at SAP 00091571.

c.   Evidence of SAP's consideration of "build or buy" alternatives, and the importance of a "short term win/ramp."  *See* Exh. 50 (December 28, 2004 SAP email Re: TomorrowNow Meeting Summary – Dec 28 04, SAP-OR 00004973-4974 [Shenkman Exhibit 217]), at SAP-OR 00004974.

d.   Acknowledgement in the SAP's "Business Case" for TomorrowNow that the short time to market was a strength of the business plan.  *See* Exh. 51 (Excerpts from a January 7, 2005 SAP presentation "Business Case – TomorrowNow, Inc.," SAP-OR 00004763-71 [Shenkman Exhibit 220]), at SAP-OR 00004768.

e.   SAP email communications, documents and deposition testimony indicating SAP's desire to announce its acquisition of TomorrowNow at the same time as Oracle's announcement of its strategy for the PeopleSoft acquisition.  For example, *See* Exh. 47 (1/13/05 SAP Email), at SAP-OR 00187025 (stating that the agreement with TomorrowNow needed to be finalized so that the Board could make a press release on January 19, 2005, ". . . the day after Oracle announces its plans for PeopleSoft on the 18th.");  Exh. 26 (1/16/05 Safe Passage Presentation), at SAP-OR 00092050 (acknowledging a "Key Tactic" to "Announce a dramatic, market changing PeopleSoft and J.D. Edwards support and upgrade offering in January, just as Oracle announces their new strategy."); Exh. 52 (Excerpts from the deposition of Arlen Shenkman, dated June 4, 2008), at 33:2-6 (explaining the reason for the speed of the acquisition of TomorrowNow was "To attempt to announce a transaction as close as we could to the Oracle – Oracle closing of the PeopleSoft transaction."); and Exh. 53 (January 4-5, 2005 SAP executive email chain commenting on an analysis of the value of the TomorrowNow deal to SAP by TomorrowNow CFO Nam Bui , SAP-OR 00002890-892 [Ziemen Exhibit 448]), at SAP-OR 00002890-91 (Mr. Bui writes: "[W]e left our meeting feeling positive that we could help SAP

take advantage of the new enterprise software market dynamics by increasing and accelerating defection rates from Oracle/PeopleSoft to SAP. SAP would have the ability to offer Oracle/Peoplesoft customers the ability to get off Oracle/PeopleSoft maintenance with TomorrowNow Support Services, and then be very well positioned with an existing lower-risk SAP relationship to begin positioning a special SAP migration program that might be attractive to a number of TomorrowNow clients. . . . We also believe that, should TomorrowNow and SAP reach agreement on a deal quickly, SAP would be in a position to announce its program and leverage TomorrowNow as a fully-proven model with blue-chip clients right in synch with Oracle's planned, very public official launch of the combined Oracle-PeopleSoft organization, strategy and product plans on January 18, 2004. The SAP and TomorrowNow play would be an immediate and serious challenge to Oracle, not a proposed challenge to be fulfilled and proven out some years down the road." Werner Brandt, SAP Executive Board Member and CFO, comments, "TomorrowNow's thoughts on our rational for an acquisition are fairly presented.").

f.   As noted above, SAP acknowledged, "Expertise and access to PeopleSoft systems are significant barriers to providing PeopleSoft support," and identified that "Access to Peoplesoft systems to create and deliver software fixes" was a "Challenge" of its PeopleSoft 1-2-3 plan. *See* Exh. 11 (PeopleSoft 1-2-3), at SAP-OR 00004999. *See also* Exh. 51 (1/7/05 TomorrowNow Business Case), at SAP-OR 00004786 (indicating a "threat" of Oracle challenging the access rights to PeopleSoft software).

43.   Documents produced by SAP indicate its expectations of the number of PeopleSoft/J.D. Edwards customers that TomorrowNow would service after it was acquired by SAP. SAP forecasted that TommorowNow would be providing maintenance service to 500 customers in 2005 and up to 4,000 customers by 2009. *See* Exh. 54 (Excerpts from a January 25, 2005 SAP presentation "TomorrowNow Integration Meeting," SAP-OR 00009794-819 [Ziemen

29

1    Exhibit 455]), at SAP-OR 00009817.

2            44.    There is significant evidence in the record of SAP's expectations of how

3    its offering of support services to Oracle's customers through its acquisition of TomorrowNow

4    and access to Oracle's intellectual property, would drive increased sales of its own applications

5    and other products.  Relevant evidence includes, but is not limited to:

6        a.    Extensive evidence of the importance of TomorrowNow's service offerings to

7            SAP's "Safe Passage" program, which was targeted to take customers away from

8            Oracle.  *See* Exh. 55 (Excerpts from the deposition of Thomas Gene ("Terry")

9            Hurst, dated April 30, 2008), at 97:7-13; Exh. 56 (Excerpts from the deposition of

10           Thomas Gene ("Terry") Hurst, dated September 10, 2009), at 502:7-22; Exh. 57

11           (Excerpts from the deposition of Gerhard Oswald, dated December 11, 2008), at

12           294:5-10 (confirming that "up until the eve of Oracle's lawsuit, TomorrowNow was

13           integral to SAP's efforts to attack Oracle");  Exh. 58 (Excerpts from a December 1,

14           2006 SAP presentation "SAP TomorrowNow Acquisition Monitoring Status

15           Update," SAP-OR 00001541-48 [Ziemen Exhibit 450]), at SAP-OR 00001542

16           (stating, "TomorrowNow is a strategic investment and serves as a strategic weapon

17           against Oracle."); Exh. 43 (SAP 2005 Annual Report), at 2 and 66 ("In cooperation

18           with TomorrowNow, we signed nearly 200 customers for our Safe Passage

19           program," and "To support its Safe Passage program, early in 2005 SAP acquired

20           TomorrowNow, Inc.");  Exh. 59 (January 19, 2005 SAP Press Release "SAP

21           Provides Safe Passage For Its Customers Running PeopleSoft and JD Edwards

22           Solutions," [Hurst Exhibit 154]), at 1 (noting that TomorrowNow was acquired to

23           provide the offering of maintenance and support for the PeopleSoft and J.D.

24           Edwards products under the Safe Passage program); and Exh. 11 (PeopleSoft 1-2-

25           3), at SAP-OR 00005002 ("Integrating and selling existing xApps to PeopleSoft

26           provides SAP an immediate revenue opportunity, particularly to customers who

27           chose to engage with SAP for software maintenance on their PeopleSoft systems").

28       b.    Numerous SAP documents, as well as deposition testimony of SAP senior

DECLARATION OF PAUL K. MEYER

executives and board members affirming SAP's goal was "to convert the majority of the PeopleSoft and J.D. Edwards customer base to SAP," and to get TomorrowNow customers to move away from PeopleSoft and become SAP customers.  For example, *see* Exh. 26 (1/16/05 Safe Passage Presentation), at SAP-OR 00092050; Exh. 60 (Excerpts from the deposition of Gerhard Oswald, dated December 10, 2008), at 89:1-9 and 94:8-11; and Exh. 13 (Apotheker Depo.), at 83:15-22.  *See* Exh. 56 (Hurst 9/10/09 Depo.), at 502:7-22, for explanation of SAP's similar intent as it relates to Siebel.

c.    A contemporaneous SAP document dated December 2004 showing a projected business opportunity of obtaining maintenance, "cross-sell" and "up-switch" revenue from PeopleSoft customers valued at $897 million for the period of 2005 to 2008, alone. *See* Exh. 25 (12/23/04 Roadmap Presentation), at SAP-OR 00253288.

d.    Stated goals of SAP to convert 50% of Oracle's PeopleSoft and J.D. Edwards installations to SAP.  *See* Exh. 61 (Excerpts from a January 20, 2005 SAP presentation "Safe Passage: Winning Customers and Markets From Oracle-PeopleSoft-J.D. Edwards," SAP-OR 00299495-518 [Oswald Exhibit 595]), at SAP-OR 00299500.

e.    Testimony of Shai Agassi, Former SAP CTO and Executive Board Member, that SAP could have done better than 50% and could have won approximately 60% of Oracle's PeopleSoft business.  *See* Exh. 12 (Agassi Depo.), at 311:12-312:14.

f.    Statements of Andrew Nelson, TomorrowNow Co-Founder, that $1 of TomorrowNow revenue equates to $10 of future SAP license pipeline.  *See* Exh. 62 (March 26, 2006 SAP email Re: TN Standalone deals to Safe Passage, TN-OR 00609470-471 [Nelson Exhibit 1018]), at TN-OR 00609470.

g.    Statements in SAP documents, and confirmed by deposition testimony, that "TomorrowNow is a strategic investment and serves as a strategic weapon against Oracle," as well as providing benefits by taking away revenue from Oracle and creating a pre-pipeline of future SAP revenue.  *See* Exh. 57 (Oswald 12/11/08

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

1    Depo.), at 278:1-20; and Exh. 63 (July 28, 2006 SAP email Re: Q1 Oracle

2    Disruption Plan, SAP-OR 00156241-242 [Ziemen Exhibit 454]), at SAP-OR

3    00156242.

4    h.    Testimony of SAP senior executives that TomorrowNow's Siebel maintenance

5    offering could be used as an enabler for future SAP license revenue.  *See* Exh. 57

6    (Oswald 12/11/08 Depo.), at 288:17-290:1. *See also* Exh. 14 (10/05 Siebel Business

7    Case Presentation), at TN-OR 0099254.

8    i.    The fact that SAP was willing to offer TomorrowNow service for free in order to

9    attract more customers to its Safe Passage program.  *See* Exh. 63 (7/28/06 SAP

10    Email), at SAP-OR 00156242 (describing the prospective offer of the first year of

11    TomorrowNow maintenance for free); and Exh. 64 (SAP document "Safe Passage

12    with TomorrowNow Support – SAP AE FAQ's – Regarding TomorrowNow

13    Support Services," TN-OR 00003204-205 [Hurst Exhibit 153]), at TN-OR

14    00003205 (describes SAP's "Sunset for Safe Passage" program, where "Under the

15    Safe Passage program SAP offers TomorrowNow Support Services at NO COST as

16    part of the SAP Safe Passage license transaction.").  Terry Hurst, SAP Director of

17    Competitive Programs, confirmed that this offering was made starting in 2006.  *See*

18    Exh. 55 (Hurst 4/30/08 Depo.), at 209:12-210:11.

19    j.    Reported statements of Henning Kagermann that as of October 2005,

20    "TomorrowNow has been 'instrumental' in the success of a program that has

21    already lured nearly two dozen Oracle customers to SAP."  *See* Exh. 65 ("SAP's

22    End Run Around Oracle – Its TomorrowNow unit is siphoning service revenue

23    from its archrival," BusinessWeek, October 24, 2005).

24    k.    Statements in a SAP March 2007 "AE Hot Topics Briefing: Using TomorrowNow

25    to help you replace Oracle," that "TomorrowNow saves its clients 50% off their

26    maintenance fees year after year.  That quickly adds up to huge savings that they

27    can use to purchase SAP, which improves your ability to win deals."  *See* Exh. 66

28    (Excerpts from a March 1, 2007 SAP WebEx presentation "AE Hot Topics

Case No. 07-CV-1658 (PJH)

Briefing: Using TomorrowNow to help you replace Oracle," TN-OR 00412503,

at 9.

45.     There is also evidence in the record demonstrating the importance of the

TomorrowNow acquisition (and the timing of the acquisition) to SAP in terms of public relations

and marketing and sales benefits, and as a means to disrupt Oracle's market momentum,

adversely impact Oracle's business, and create continued Fear, Uncertainty and Doubt ("FUD")

in the marketplace.  For example, relevant evidence includes, but is not limited to:

a.   A statement of Shai Agassi, SAP Former Board Member, describing SAP's

announcement of its acquisition of TomorrowNow as, "The press release on this

deal will be the cheapest advertising we have ever got . . . And ORCL's share price

will probably go down by 10% that same minute . . .".  *See* Exh. 67 (January 6,

2005 SAP email Re: TNow, SAP-OR 00503908-909 [Agassi Exhibit 734]), at SAP-

OR 00503908.

b.   A statement of Mr. Agassi: "Remember the PR value of buying [TomorrowNow] . .

. The bragging rights for having more PSFT customers under service than Oracle

may be all we need for a momentum swing . . ." *See* Exh. 68 (December 23, 2004

SAP email Re: TomorrowNow Financials (Confidential), SAP-OR 00004970-72 [

Shenkman Exhibit 213]), at SAP-OR 00004970.

c.   Testimony of Henning Kagermann, SAP Executive Board Member and Co-CEO,

that the TomorrowNow acquisition strategy was to "interrupt Oracle's acquired

maintenance income stream, making it difficult for them to invest in development

of their fusion platform." *See* Exh. 7 (Kagermann Depo.), at 121:17-24.

d.   Testimony of Arlen Shenkman, SAP VP of Corporate Finance, that for the

acquisition of TomorrowNow "the main driver was the PR benefit."  *See* Exh. 69

(Excerpts from the deposition of Arlen Shenkman, dated June 5, 2008), at 336:7-13.

e.   SAP's stated goals of the acquisition of TomorrowNow: to "Disrupt Oracle's ability

to pay for the [PeopleSoft] acquisition out of cash flow.  Shrink [Oracle's] share of

the application market.  Discredit [Oracle's] efforts to create a next-generation

33

application platform."  *See* Exh. 61 (1/20/05 Safe Passage Presentation), at SAP-OR 00299500.

    f.    SAP email communications stating that by acquiring TomorrowNow, "SAP could create a good level of market disruption and force a reaction by Oracle – Oracle has no good options, there seems to be an opportunity here that is worth pursuing in some form."  *See* Exh. 50 (12/28/04 SAP Email), at SAP-OR 00004974.

    g.    A "Key Performance Indicator" used to track the performance of TomorrowNow was the amount of revenue "taken from Oracle".  For example, *see* Exh. 70 (Excerpts from a SAP presentation "Business Case TomorrowNow 2006," SAP-OR 00136760-68 [Oswald Exhibit 608]), at SAP-OR 00136765; and Exh. 71 (Excerpts from a SAP presentation "Supervisory Board Meeting – TomorrowNow Status Update, February 2007," SAP-OR 00141570-581 [Kagermann Exhibit 436]), at SAP-OR 00141578 ("Major KPI for TomorrowNow is the Annual Loss in Contract Volume for Oracle.").

    h.    Statements of Andrew Nelson, TomorrowNow Co-Founder, that $1 of TomorrowNow revenue equates to $18 of "originally expected Oracle revenue from their misguided acquisition."  *See* Exh. 62 (3/26/06 SAP Email), at TN-OR 00609470.

    i.    Statements in a March 2007 SAP WebEx presentation: "Why use TomorrowNow? . . . Divorce the customer from Oracle . . .Take Oracle out of incumbent vendor position."  *See* Exh. 66 (SAP WebEx presentation), at 8.

    j.    TomorrowNow estimations that it would capture 15% of the Oracle's PeopleSoft/J.D. Edwards customer base, resulting in taking away $1.1 billion in revenue from Oracle.  *See* Exh. 72 (April 25, 2006 email from Lon Fiala to Andrew Nelson Re: Working Financial Impact Notes, TN-OR 00591548 [Nelson Exhibit 1019]).

    k.    Statements by Leo Apotheker, SAP Executive Board Member and Co-CEO in March 2005 acknowledging that TomorrowNow is used as a tool to "inflict some

pain on [O]racle." *See* Exh. 73 (March 9, 2005 SAP email Re: Tomorrow now, SAP-OR 00382809-810 [Tseng Exhibit 590]), at SAP-OR 00382810 ("Retek deal is in danger and I'm really pissed . . . we need to inflict some pain on oracle.  Is there a chance to close a few TN deals in the next coming days, at extraordinary conditions?").

l.    Evidence that SAP was particularly concerned about Oracle's acquisition of Siebel and the impact that would have on its position in the CRM market.  *See* Exh. 27 (10/24/05 CRM Review II Presentation), at SAP-OR 00164527 (acknowledging SAP's "competitive edge diminished by 40% post-SEBL acquisition."); and  Exh. 28 (11/05 Oracle's Impact on the SAP Market Presentation), at SAP-OR 00042116 ("We lose our position as the number one player in the CRM market" after Oracle's Siebel acquisition).

46.    I understand that Oracle technical experts may analyze and provide opinions as to whether or not SAP would have been able to independently develop the copyrighted materials at issue, what it would have cost SAP to independently develop the copyrighted materials at issue, the amount of time that development would have taken, and what work-arounds may have been available to SAP.  This information is further evidence of the fair market value to SAP of licenses for what it did not develop itself.  I will incorporate the opinion testimony of Oracle technical experts in forming my opinions, as appropriate.[19]

47.    SAP's use of Oracle's copyrighted software and software support materials, and evidence of the benefit inuring to SAP as a result of its use, is, in part, evident in the volume and nature of SAP's alleged illegal downloads, which are addressed above.

48.    I am not aware of any significant non-copyrighted elements, processes, features or improvements that were added by SAP in its delivery of TomorrowNow support services to Oracle's PeopleSoft/J.D. Edwards and Siebel customers.  If additional information

---

[19] The consideration of testimony of qualified experts is consistent with *Georgia-Pacific* factor 14.

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

1   becomes available, I will incorporate that information into my analysis.

2   **V.     CONCLUSION**

3        49.    The economic and other factors discussed above are relevant to the

4   determination of the fair market value of the copyrighted materials at issue after considering and

5   using traditional Cost, Market and Income valuation approaches.  As demonstrated in the sample

6   of evidence described in the sections above, there is sufficient relevant and instructive evidence

7   available in this case to make a determination of the fair market value that Oracle would

8   reasonably accept from SAP, and that SAP would reasonably be willing to pay, for licenses to

9   the infringed copyrighted materials at issue.

10       I declare under penalty of perjury that the foregoing is true and correct and that

11   this declaration was executed on September 23, 2009 at San Francisco, California.

12

13                                       Paul K. Meyer

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 07-CV-1658 (PJH)

DECLARATION OF PAUL K. MEYER

A/73152296.1/2021039-0000324170