# EXHIBIT C

Dockets.Justia.com

Pages 1 - 91

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ELIZABETH D. LAPORTE, MAGISTRATE

ORACLE CORPORATION,              )
                                 )
            Plaintiff,           )
                                 )
    v.                           )  NO. C 07-1658 PJH (EDL)
                                 )
SAP AG, ET AL.,                  )
                                 )
            Defendants.          )
_____)

San Francisco, California
Tuesday, July 1, 2008

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          Bingham, McCutchen LLP
                        Three Embarcadero Center
                        San Francisco, California 94111-4067
                    BY: GEOFFREY M. HOWARD, ESQ.
                        HOLLY HOUSE, ESQ.
                        ZACHARY J. ALINDER, ESQ.
                        and
                        Oracle Corporate Counsel
                        500 Oracle Parkway
                        M/S 5op7
                        Redwood Shores, California  94065
                    BY: JENNIFER GLOSS, ESQ.

(Appearances continued, next page)

Belle Ball, CSR, RMR, CRR  (415) 373-2529
Official Reporter, U. S. District Court

1   which we think can be both effective and vastly less
2   time-consuming than these full custodial searches where you
3   have to download the entire e-mail folder and upload it with a
4   vendor and so forth.
5   So we have talked this through with Counsel.  They
6   are understandably anxious to see the color of our money on
7   that one, if you will, and see exactly what it is we are
8   proposing.  We think, a week or two, we should have in their
9   hands the types of exemplars we are talking about, and hope to
10  make substantial progress on that.
11  **THE COURT:**  So in other words, examples of the
12  win/loss report, of the customer survey data, and the database?
13  **MR. MCDONNELL:**  Precisely.
14  **THE COURT:**  And why is it taking so long?
15  **MR. MCDONNELL:**  It's a big world.  Some of these are
16  in the language of countries all over the world.
17  Part of the analysis is, we do believe there needs to
18  be a limit here, on which customers we're looking at.  I think
19  Oracle is in agreement with this, but if not, we do need to
20  settle this.
21  There are the TomorrowNow customers.  And those are,
22  as we understand it, all in play.  So Oracle contends that all
23  of the TomorrowNow customers are relevant.  We have produced
24  all the TomorrowNow customer contracts.  We will be producing
25  the lead salespersons for the whole company.

```
1              THE COURT:  Lead --
2              MR. MCDONNELL:  The single top-level sales manager,
3    who we believe had something to do with every sale.
4              We've not gotten to the point of deciding whether we
5    have to produce sales custodians beyond that individual, but
6    that will be part of this discussion.
7              THE COURT:  But what are you doing with respect to
8    that top sales manager?
9              MR. MCDONNELL:  Producing.
10             THE COURT:  Producing all documents?
11             MR. MCDONNELL:  Full custodial production.  It's on
12   the list.
13             THE COURT:  So full custodial on this and every issue
14   that -- on your complete list of search terms, or what?
15             MR. MCDONNELL:  Yes.  It's a full custodian
16   production.
17             THE COURT:  Okay.
18             MR. MCDONNELL:  Bob Geib, G-E-I-B, is his name.
19             Turning from TomorrowNow to the SAP side of the
20   equation is different.  As we understand it, Oracle contends
21   that if a customer took a TomorrowNow sales contract, and then
22   that was used as a springboard to sell that customer an SAP
23   license, that Oracle's going to challenge that SAP license, as
24   a potential item of damage.
25             THE COURT:  So it's sort of a convoyed sales --
```

```
 1            MR. MCDONNELL:  Convoyed sale.  They haven't used
 2   that term, but that's the general concept.
 3            And they've refined it somewhat by saying and there
 4   may be old TomorrowNow customers who were customers of
 5   TomorrowNow before SAP even acquired TomorrowNow, and they
 6   would want to think about that as making argument that that's a
 7   similar type of sale.  In other words, there was a TomorrowNow
 8   contract, and at some point in time there was also an SAP
 9   contract.
10            We're willing to look for that type of data and
11   conduct this discovery plan about that.  Where we draw the
12   line, and we think it's a bright line, is there are going to be
13   customers who are replaced, who left Oracle and went to SAP,
14   who never touched TomorrowNow.  Never had a TomorrowNow
15   contract.  Now, sure, a piece of marketing material may have
16   been waved in front of their face, saying "We have TomorrowNow
17   service too," but they never had a TomorrowNow contract.
18            We are not looking to produce evidence of all those
19   other customers, because they did not have a TomorrowNow
20   contract, and we think that's out of bounds.  As I understand
21   what Oracle's saying, they agree with that.  But I want to make
22   sure that it's clear that that's our position.
23            THE COURT:  Okay.  Do you agree with that?
24            MS. HOUSE:  We agree that that appears to be a group
25   of customers that wouldn't be relevant.  But we're very
```

```
 1   frustrated.  They keep saying it's such a limited subset,
 2   there's only this many that actually bought SAP applications,
 3   there's only this many that upgraded from TomorrowNow.
 4               Yet, we have not even been given a list of names yet.
 5   So we don't even know the universe that we are bargaining for.
 6   Is it 30 customers?  Is it 19, is it 100?
 7               That seems like they clearly know who they think the
 8   target customers are on top of the TomorrowNow customers.  And
 9   yet, everything takes forever.
10          THE COURT:  You mean the --
11          MR. MCDONNELL:  This is a part of the hearing where I
12   would like to disappear, Your Honor.  It has taken more time.
13   They are entitled to this information.  We are working on it.
14               We know it's - that this class of customers are more
15   than 20.  We believe --
16          THE COURT:  How many is it?
17          MR. MCDONNELL:  If I -- based on the best information
18   I have right now, roughly 70.  But even then --
19          THE COURT:  Seventy who are in the categories of --
20          MR. MCDONNELL:  They had a TomorrowNow contract, and
21   they had a SAP contract.  But there are shades of gray, even
22   with that, which is part of the complexity of it.  There might
23   very well be customers who had a TomorrowNow contract before
24   SAP bought the company, on Product X.
25               And completely independent of that, and much later,
```

Belle Ball, CSR, RMR, CRR   (415) 373-2529
Official Reporter, U. S. District Court

```
 1   without any connection to that TomorrowNow contract or
 2   TomorrowNow at all, some other division might have bought an
 3   SAP product.  Unrelated to TomorrowNow.  That's a gray area.
 4           THE COURT:  Why don't you give them a list that
 5   includes the black-and-white area and the gray area, and then
 6   annotate it with you're not certain about some of these people,
 7   so they at least have a starting point.
 8           And then, why don't you do it in that order.  Start
 9   with the more clearly in the ballpark, black and white, and
10   then after you have done that, get to the gray.  And you can
11   have further discussions.
12           MR. MCDONNELL:  That we will do, Your Honor.
13           THE COURT:  Are we talking about a majority are in
14   the more clear-cut area?  We are only talking 60 to 70?
15           MR. MCDONNELL:  I couldn't tell you truthfully that I
16   know the answer to that.
17           THE COURT:  All right.  I mean, it's going to have to
18   be found out.  And really, it's -- you know, unless there's a
19   very complex -- which could be argued each either way, it's in
20   both sides' interest to eliminate the people who are not
21   relevant.  It's just going to waste everybody's time and money.
22   You're equal.  I think you have some overlap in your interest
23   here.
24           MS. HOUSE:  Where the safeguard issue comes in, Your
25   Honor, is that insofar as we do that, need to do targeted
```

1   searches for the material that we have, as we say, in our
2   at-risk reports, but that they would then need to go to a sales
3   custodian to get the specific information about whatever
4   communications, whatever marketing about TomorrowNow was
5   provided to that customer, that may or may not have influenced
6   their decision to purchase.
7           They want that to be part of the limited 120.  That
8   will eat up what we have got.  We have got to have a safeguard
9   so that those -- that's not part of the 120.
10          **THE COURT:**  All right.
11          **MR. MCDONNELL:**  We're not saying that.  There's
12  miscommunication.
13          We are saying that type of search, that is limited,
14  the old-fashioned manual type, to go to the sales
15  representative at SAP and say, "Give us your documents relating
16  to how this customer made their decision," we're not counting
17  that against the 120.
18          I'm sorry if there's been confusion on that point.
19  So, this is a two-way street.  We are intensely interested in
20  Oracle information about their customer losses.
21          **THE COURT:**  Okay.  All right.  So, I think that's an
22  important clarification.  And I think it should be a two-way
23  street.
24          But, on this win/loss customer survey and electronic
25  relations database, I think you should give them examplars

Belle Ball, CSR, RMR, CRR   (415) 373-2529
Official Reporter, U. S. District Court

1   within a week.  I think it shouldn't have taken this long.  And
2   things need to move a lot faster on that.
3           **MR. MCDONNELL:**  Can we say a week from Friday, given
4   the Fourth and the shortened week?
5           **THE COURT:**  All right.  All right.  And then, you
6   know, the faster you can get back to them, you know, start --
7   get that moving, because that ought to cover a lot of ground,
8   if they are what you say they are.
9           Now, there was something about depositions can't even
10  start until November.  I mean, can some depositions start?  In
11  other words, this sort of rolling production, is there going to
12  be the ability to --
13          **MS. HOUSE:**  There are some -- and essentially what's
14  happening is there are people who have been produced that are
15  just now getting produced.
16          What's happened is we said "Hey, wait a second.  With
17  the limited amount of custodians, we've took your advice and
18  said, 'Put these guys at the front of the queue.'"
19          **THE COURT:**  Right.
20          **MS. HOUSE:**  And so as a result of that, we've -- they
21  said "Okay, well, we've stopped the aircraft carrier, and now
22  we're starting it up again."  And so, they are producing now
23  the ones that we actually want.
24          **THE COURT:**  Right.
25          **MS. HOUSE:**  That -- what they are complaining about

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in Case No. C 07-1658 PJH (EDL), Oracle v SAP AG, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

---

Belle Ball, CSR 8785, RMR, CRR

Thursday, July 3, 2008