# EXHIBIT F

Dockets.Justia.com

# JONES DAY

555 CALIFORNIA STREET, 26TH FLOOR · SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 626-3939 · FACSIMILE: (415) 875-5700

Direct Number:  (415) 875-5820
jmcdonell@jonesday.com

October 2, 2009

Ms. Bree Hann                                                              **VIA E-MAIL**
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067

Re:  Response to your September 11, 2009 Meet and Confer Letter

Dear Bree:

This letter responds to your letter to Scott Cowan dated September 11, 2009.  For everyone's convenience, the substantive content of your letter is copied below in blue font, followed by Defendants' response to each portion of your letter.  As we informed Judge Laporte during the September 30, 2009 Discovery Conference, Defendants remain willing to continue the meet and confer process on these issues.  Given that Plaintiffs' have been granted permission to file a motion to compel on some, but not all, of the issues contained in your September 11, 2009 letter, please let us know as soon as possible what days and times you are available for a follow-up telephone conference.  All of Defendants' responses below are made subject to, and without waiving any of Defendants' objections to the discovery requests at issue in your September 11, 2009 letter.

## I.   TECHNICAL INTERROGATORIES FROM THIRD/FOURTH SET OF INTERROGATORIES

ATLANTA · BEIJING · BRUSSELS · CHICAGO · CLEVELAND · COLUMBUS · DALLAS · DUBAI · FRANKFURT · HONG KONG · HOUSTON
IRVINE · LONDON · LOS ANGELES · MADRID · MEXICO CITY · MILAN · MOSCOW · MUNICH · NEW DELHI · NEW YORK · PARIS
PITTSBURGH · SAN DIEGO · SAN FRANCISCO · SHANGHAI · SILICON VALLEY · SINGAPORE · SYDNEY · TAIPEI · TOKYO · WASHINGTON

JONES DAY

Bree Hann
October 2, 2009
Page 8

## IV.    DAMAGES-RELATED DISCOVERY

### Hann's September 11, 2009 Letter

Defendants have repeatedly refused to respond to Interrogatories, RFPs, and Targeted Search requests seeking data important to proving Oracle's hypothetical license and infringers' profits measures of damages.

Despite Defendants' repeated refusals to provide this key information, which is described in detail below, their arguments in their recent Motion for Partial Summary Judgment on Plaintiffs' Hypothetical License Damages Claim ("MSJ") affirmatively inject Defendants' state of mind, expectations, and experiences related to possible retroactive license valuations into the damages analysis. The MSJ relies on what SAP purportedly would have been willing to do or not do in regards to a hypothetical license. See, e.g. MSJ at 13:5-9 ("Even assuming that Oracle and SAP would have been willing to negotiate a license, such negotiations would not have resulted in

HUI-118809v2

JONES DAY

Bree Hann
October 2, 2009
Page 9

a license. Based on both Oracle and SAP executive testimony, it is clear that neither side would have agreed on a license because they would have had vastly different views as to the basis of the negotiation. This disconnect demonstrates that there never would have been the requisite "meeting of the minds."); MSJ 13:21-23 ("Mr. Planner's testimony evidences that SAP would have viewed the negotiation as simply one for the right to service Oracle's customers; indeed, SAP would have expected to get a bargain because TN would have been "doing [Oracle's] job" for it."). While the valuation is objective, the parties' opinions are relevant and, per Defendants' own motion, they can no longer refuse to grant Plaintiffs discovery on issues that would inform the valuation of any retroactive license. Among that yet-to-be produced information are Defendants' licensing practices, benchmark licenses Defendant has entered into, and Defendants' profits, costs, and research and development expenses.

Further, Defendants explicitly acknowledge in their MSJ that Oracle is entitled to seek infringers' profits, stating: "In addition to actual damages, a copyright owner is also entitled to recover 'any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."...To establish the infringer's profits, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." MSJ at 7:25-8:2. See also id. at 8:6-8:8 ("Infringer's profits are analyzed from the infringer's point of view. If the infringer has earned a profit, it must disgorge the profit so that it does not benefit from its wrongdoing.").

This acknowledgement of infringers' profits raises two related issues for purposes of discovery. First, Oracle is entitled to discovery necessary to show SAP's revenues and costs related to the infringement, which Defendants have previously refused to provide. In addition, if Defendants intend to "introduce evidence of deductible expenses and the elements of profit attributable to factors other than the copyrighted work," they cannot refuse to produce this same information in response to Oracle's document requests and interrogatories as described below. See also RFP 60 from Oracle's First Set of Requests for Production (requesting all documents which Defendants will rely on or introduce at trial). Indeed, Oracle needs to be able to test any such claims -- not just accept Defendants' assertions.

Oracle will seek redress from the Court if Defendants do not take the following steps to reverse their prior refusals and provide Oracle with the data and information necessary to prove its case:

**Defendants' Response**

Plaintiffs continue to seek damages-related discovery to which Defendants have already provided appropriate responses and objections. Indeed, some of the issues Plaintiffs identify in their letter have already been resolved through the meet and confer process. To the extent the

JONES DAY

Bree Hann
October 2, 2009
Page 10

parties disagree on a particular response, Plaintiffs' latest letter provides no new information or reason for Defendants to reconsider their position on these topics; it simply rehashes Plaintiffs' previous arguments, which Defendants have addressed on multiple occasions, including in Jane Froyd's June 11, 2009 e-mail to Bree Hann as well as our June 16, 2009 letter to you. Nevertheless, Defendants' address in turn each of the issues Plaintiffs have identified in their letter.

In your letter, you reiterate Plaintiffs' request for information relating to SAP's intellectual property, arguing that such information is relevant to a hypothetical license theory of damages. However, Defendants have explained to Plaintiffs on multiple occasions that SAP's licensing practices, valuation of its own IP, and SAP's application sales and renewal rates have no bearing on a hypothetical license negotiation for *Plaintiffs'* applications. Plaintiffs' mischaracterizations of Defendants' Motion for Partial Summary Judgment ("Motion") do not justify departure from Defendants' previously articulated position.

Specifically, Plaintiffs' attempt to justify their requests for discovery relating to SAP's licensing practices, valuation of its own IP, and application sales and renewal rates by stating that Defendants' Motion places at issue "the valuation of any retroactive license." Plaintiffs also suggest that Defendants have put at issue the hypothetical negotiators' states of mind about the basis for a hypothetical license, and thus Plaintiffs are now entitled to know what SAP's state of mind was as to the *price* of the hypothetical license. However, as we have repeatedly explained to you and as Defendants' Motion itself makes clear, the amount of a hypothetical license is irrelevant to Defendants' Motion. Rather, Defendants' Motion attacks the very availability in this case of actual damages in the form of a hypothetical license, which is determined by analyzing whether, but for the alleged infringement, the parties would have agreed to a license. The quoted portions of Defendants' Motion demonstrate that because the hypothetical negotiators' bases for negotiating a license (regardless of price) would have been fundamentally and incompatibly different, the parties never would have agreed to a license. As a result, it is entirely inaccurate, and even illogical, that Defendants' Motion justifies discovery related to the valuation of a hypothetical license. Furthermore, as again discussed in detail below, SAP's licensing practices, valuation of its own IP, and application sales and renewal rates not only are irrelevant to Defendants' Motion, but also are irrelevant to Plaintiffs' damages case.

### Hann's September 11, 2009 Letter

*Retroactive Licenses Discovery:* Several interrogatories from Oracle's Fourth/Third Set of Interrogatories seek information relevant to the fair market valuation of retroactive licenses for the material infringed. Interrogatory 78 asks Defendants to "Identify with particularity all licenses, contracts, or agreements between SAP AG, SAP America or any affiliated entity or subsidiary and any independent (non-affiliated, non-partner) software support service provider for SAP-branded software applications." Interrogatories 114-118 seek data related to inter-entity

JONES DAY

Bree Hann
October 2, 2009
Page 11

licensing, consideration/royalties, and related issues. Defendants objected to several of these interrogatories on the basis that the value of their intellectual property is not at issue in this litigation. Not so. The answers to these interrogatories could provide potential benchmarks and could be used to establish Defendants' reasonable expectations regarding licensing fees. Defendants must promptly provide Oracle with the information requested in all of these interrogatories.

For the same reasons, Defendants must also produce documents responsive to RFP 141 from Oracle's Third Set of Requests for Production, seeking production of "all Documents relating to each agreement identified in....Defendants' Responses to Interrogatories Nos. 114 through 117 including, but not limited to, `all Documents relating to each agreement's provisions relating to consideration, royalties, taxes, costs, licenses, transfer fees, and ownership of Intellectual Property and all Communications relating to such Documents.'

Oracle also requests production of SAP's five highest dollar value licenses entered into or in effect in the last five years as additional benchmarks relevant to retroactive license valuation. Oracle believes this information is encompassed by prior discovery requests, however will it will propound a further request for these documents if Defendants refuse production.

Further, Defendants must produce R&D data responsive sub-part (j) of Oracle's First Targeted Search Request, which requests documents regarding "SAP's and TN's research and development costs associated with the development of support products (both TN support products and SAP support products for SAP applications)." We also want that R&D information for SAP's applications because, as it turns out, Defendants did not just infringe Oracle's support materials but its underlying applications. This information is directly relevant to SAP's claim that it would have expected a "bargain" on a hypothetical license as it would inform what SAP's reasonable expectation would have been given the amount it spends on it's own research and development. Moreover, it is highly probative of the costs SAP avoided by continuing TN's infringement rather than developing itself the material it infringed which is directly relevant to the fair market value of any retroactive license. While SAP's second supplemental responses to Oracle's First Targeted Search Requests intimate that SAP may produce some documents responsive to sub-part (j), Oracle requests a comprehensive production of the information described above, along with an explanation of where this appears in Defendants' production.

Defendants also read Interrogatory 69 incorrectly and offer too narrow of a response - the Interrogatory seeks projections about customers generally, and not just at the time the deal is signed. Thus, Defendants must also supplement this response to provide greater detail. RFP 26 from Oracle's Second Set of Requests for Production also seeks information related to per-customer value. Defendants objected to RFP 26 and have refused to produce responsive documents. Documents responsive to RFP 26 must be promptly produced as they also bear on

Bree Hann
October 2, 2009
Page 12

what would have been reasonable for SAP to expect which informs the reasonable valuation of any retroactive license.

Finally, Defendants still have not produced the application sales close rates and support renewal rates promised in response to Oracle's June 30th motion to compel. See Jane Froyd's July 13th, 2009 email to Amy Donnelly and Amy Donnelly's September 4th email to Defendants. Related information is also sought through Interrogatory 77 from Oracle's Fourth/Third Set of Interrogatories. Defendants must promptly provide this data.

**Defendants' Response**

Interrogatory No. 78 from Plaintiffs' Fourth Set of Interrogatories to TomorrowNow and Third Set of Interrogatories to SAP

Interrogatory No. 78 asks Defendants to "[i]dentify with particularity all licenses, contracts, or agreements between SAP AG, SAP America or any affiliated entity or subsidiary and any independent (non-affiliated, non-partner) software support service provider for SAP-branded software applications, including without limitation the dates, parties, and subject matter of the licenses, contracts, or agreements."

As we have told you on many occasions, Defendants continue to believe that this interrogatory is overbroad, unduly burdensome and seeks information that is not relevant to any aspect of the case, including Defendants' pending Motion. However, in connection with the parties' agreement with respect to Plaintiffs' June 30, 2009 Motion to Compel, Defendants informed Plaintiffs by e-mail on July 13, 2009 that "SAP has not entered into any licenses with independent (non-affiliated, non-partner) software support services providers for SAP-branded software applications." Defendants will update their response to Interrogatory No. 78 with this information.

Interrogatory Nos. 114 through 118 from Plaintiffs' Fourth Set of Interrogatories to TN and Third Set of Interrogatories to SAP and RFP. No. 141 from Plaintiffs' Third Set of Requests for Production of Documents

Interrogatory Nos. 114 through 118 and RFP No. 141 seek data related to the ownership, licensing, and profitability of SAP's intellectual property. Specifically, the interrogatories ask Defendants to:

- "Identify each legal entity that owns each copyright in SAP IP that is registered with the United States Copyright Office and listed on Exhibit E" (Interrogatory No. 114);

- "For each copyright registration listed on Exhibit E that is registered with the United States Copyright Office and related to SAP IP, Identify all legal entities that have an

HUI-118809v2

Bree Hann
October 2, 2009
Page 13

exclusive license related to that SAP IP and describe the scope of the license" (Interrogatory No. 115);

- "For each entity identified in the response to Interrogatory No. 115, [to] Identify the parties to each such license, sublicense, or similar agreement, the date and titles of each such agreement, the Bates-number(s) of each such agreement, if applicable, and the SAP IP covered by the agreement" (Interrogatory No. 116);

- "For each agreement identified in the response to Interrogatory No. 116, state the amount of any related transfer payment, royalty, or license fee, or any other amount of consideration to be paid under the agreement related to licensing each SAP IP" (Interrogatory No. 117); and

- "For every SAP entity registered to do business in the United States that owns, licenses, or sublicenses SAP IP, or is a licensee or sublicense of SAP IP, explain, in as much detail as possible, that entity's policies, procedures, and practice regarding how to categorize, track, organize, allocate, or report profits and losses and/or revenue, expenses, cash inflows, and cash outflows, including but not limited to whether it tracks costs and profit margins by product or copyright registration" (Interrogatory No. 118).

Likewise, RFP No. 141 asks seeks production of "All Documents relating to each agreement identified in, referred to by, or incorporated into Defendants' Responses to Interrogatories Nos. 114 through 117 from Plaintiffs' Fourth Set of Interrogatories to Defendant TomorrowNow, Inc. and Third Set of Interrogatories to Defendants SAP AG and SAP America, Inc., including, but not limited to, all Documents relating to each agreement's provisions relating to consideration, royalties, taxes, costs, licenses, transfer fees, and ownership of Intellectual Property and all Communications relating to such Documents."

    As we have explained to you on multiple occasions, including in Jane Froyd's June 11, 2009 e-mail to Bree Hann and our June 16, 2009 letter to you, information regarding SAP's licensing practices or valuations of its own IP is irrelevant, not only to Plaintiffs' damages case in general, but also to Defendants' pending Motion. Rather than providing clarification or new information as to why such material is relevant, you simply restate in your latest letter that discovery regarding SAP's IP "could provide potential benchmarks and could be used to establish Defendants' reasonable expectations regarding licensing fees." However, as we pointed out to you, Plaintiffs have consistently resisted discovery regarding PeopleSoft's partner relationships (*e.g.*, with NetCustomer and CedarCrestone) on the basis that such discovery is irrelevant and cannot plausibly claim that information about SAP's licensing practices and valuation of its own IP is relevant. The price at which Plaintiffs license to their partners will inform the price of a hypothetical license for Plaintiffs' IP; the ways in which SAP valued non-Oracle IP that SAP paid for or sold will not. As we have told you, there is simply no connection

JONES DAY

Bree Hann
October 2, 2009
Page 14

between the price of non-Oracle IP and the price of Plaintiffs' claimed hypothetical license with SAP or TN.

For the reasons stated above, Defendants continue to deny the relevance of the information sought by this request. Because Plaintiffs have failed to provide a reason to do otherwise, Defendants intend to stand on their objections to this request. Of course, if Plaintiffs have any other basis beyond those which they have already articulated to Defendants, then Defendants are willing to reconsider their position on this issue.

<u>Plaintiffs Informal Request for SAP's Five Highest Dollar Value Licenses</u>

In your latest letter, you request "production of SAP's five highest dollar value licenses entered into or in effect in the last five years as additional benchmarks relevant to retroactive license valuation."

This new request for discovery is overbroad, unduly burdensome, vague and ambiguous, and seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence. As a preliminary matter, it is unclear what is meant by SAP's "five highest dollar value licenses." It is also unclear how SAP's "five highest dollar licenses" for unidentified subjects has any bearing whatsoever on the issues in this case. Certainly, as explained above, SAP's own licensing practices are irrelevant to Plaintiffs' damages case. Thus, Defendants do not intend to produce any information in response to this request. Of course, if Plaintiffs have any other basis beyond those which they have already articulated to Defendants for seeking this information (and then are willing to rephrase the request in such a way that would moot Defendants' objections), then Defendants are willing to reconsider their position on this issue.

<u>R&D Data Responsive to sub-part (j) of Oracle's First Targeted Search Request</u>

This Targeted Search Request seeks "SAP's and TN's research and development costs associated with the development of support products (both TN support products and SAP support products for SAP applications)." In my October 9, 2008 letter, I confirmed our discussions in meet and confer on this subject, specifically, that what Plaintiffs were asking Defendants to look for was "general high level information." I also confirmed Defendants understanding that Plaintiffs have refused to provide any detailed expense information. In fact, Defendants have produced extensive financial information of TN including, without limitation, its general ledger and QuickBooks. Defendants have produced records showing every expense item TN has paid. Defendants have also answered interrogatories on the subject of TN's research and development efforts including Interrogatory No. 74 of Plaintiffs' Fourth Set of Interrogatories to Defendant TomorrowNow, Inc. and Third Set of Interrogatories to Defendants SAP AG and SAP America, Inc.

HUI-118809v2

JONES DAY

Bree Hann
October 2, 2009
Page 15

In addition, Defendants have produced a report at Bates SAP-OR00603613 that provides
general high level information regarding SAP research and developments expenses for the years
2000 through 2008. Plaintiffs state that you "also want the information for SAP's applications
because, as it turns out, Defendants did not just infringe Oracle's support materials, but its
underlying applications." Although Plaintiffs' Targeted Search request did not seek information
concerning R&D expenses for SAP applications, Defendants note that the information on the
report Defendants produced at Bates SAP-OR00603613 includes R&D costs generally and, as
such, would include R&D on what Plaintiffs appear to be calling "support products" as well as
on applications. Based upon a reasonable search, we have not located a central repository of
information at SAP that has reports that separately track R&D expenses for "support products"
and for "applications."

Plaintiffs argue that SAP's R&D expenses are "probative of the costs that SAP avoided
by continuing TN's infringement rather than developing itself the material it infringed which is
directly relevant to the fair market value of any retroactive license." First, even if there were any
merit to Plaintiffs' "retroactive license" theory (the availability of which Defendants dispute), it
is improbable and illogical that SAP's R&D expenses for its *own* intellectual property would
inform a hypothetical negotiation for *Plaintiffs'* intellectual property. Second, as more than one
of Defendants' witnesses has told you, even the amount Plaintiffs might have paid to develop
their intellectual property should not inform the price of a hypothetical license. *See* June 2, 2009
Deposition of Hasso Plattner, 65:19-66:21 ("[T]he history of the development of cost [sic] at GM
is not relevant to the price GM can charge for a car now."). Furthermore, despite Plaintiffs' claim
that R&D expenses are relevant to a hypothetical license negotiation, Defendants remind
Plaintiffs that, as confirmed by my October 9 letter, Plaintiffs refused to produce their R&D
information to Defendants.

In short, Defendants disagree that R&D information is relevant to Plaintiffs' hypothetical
license theory. To the extent that Plaintiffs intend to seek disgorgement of alleged infringer's
profits, Defendants have already produced the high-level information Plaintiffs have requested,
as described above. In addition, Defendants will, of course, produce any other R&D information
upon which its damage expert(s) will rely for their opinions. However, since those opinions are
rebuttal opinions, Defendants' ability to determine what is relevant for that purpose is necessarily
limited by the scope of Plaintiffs' damage claims as reflected in the opinions of its own damages
expert(s). In light of this background, Defendants are willing to discuss this issue further,
including whether any additional *mutual* productions of R&D financial information should be
made by the parties at this time.

JONES DAY

Bree Hann
October 2, 2009
Page 16

> Interrogatory No. 69 from Plaintiffs' Fourth Set of Interrogatories to TN and Third Set of
> Interrogatories to SAP and RFP No. 26 from Plaintiffs' Second Set of Requests for
> Production

We have stated: "SAP is in the business of developing, marketing, selling, implementing, and supporting enterprise software applications. The main sources of revenue are software, support, consulting, and education. Software revenue primarily comes from selling perpetual licenses to customers. While signing up a new customer for software license, SAP does not have an established process for calculating the value of the current and any potential future revenue streams for any length of time. The deal structure on the current deal is solely based on customer requirement for solutions and a negotiated price." You have argued that we incorrectly interpreted this Interrogatory and have asked us to supplement. Defendants agree to reanalyze this Interrogatory in light of the comments in your September 11 letter and in context with our future meet and confer discussions on this issue. Afterwards, Defendants will consider whether a supplemental response is warranted.

> Application Sales Close Rates and Support Renewal Rates and Interrogatory No. 77 from
> Plaintiffs' Fourth Set of Interrogatories to TN and Third Set of Interrogatories

Your letter also requests that Defendants produce application sales close rates and support renewal rates pursuant to the parties' July 13, 2009 agreement regarding Plaintiffs' June 30, 2009 Motion to Compel. Defendants believe these requests have been fulfilled.

On August 26, 2009, Defendants produced documents sufficient to show SAP's support renewal rates based on the available reporting at SAP (albeit the information SAP tracks may be different than you expected to find based on Oracle's practices). *See* SAP (Disc) 186, SAP-OR 00782752. On September 11, 2009, at Plaintiffs' request, we provided further explanation as to how these documents show SAP's support renewal rates for the relevant period. *See* 9/11/09 E-Mail from Jason McDonell to Amy Donnelly. With this additional clarification, we believe Defendants have fulfilled their obligation in responding to Plaintiffs' request.

In that same September 11, 2009 e-mail, we informed you that Defendants believe they may have now located data sufficient to show SAP's application sales close rate for the relevant period. Defendants produced these documents on September 18, 2009. In addition, Defendants agree to supplement their response to Interrogatory No. 77 from Oracle's Fourth/Third Set of Interrogatories.

## Hann's September 11, 2009 Letter

*Infringers' Profits:* Oracle's Fourth/Third Set of Interrogatories also includes several requests important to proving Infringers' Profits. Interrogatories 79 and 80 seek specific information regarding SAP's profit calculations, which is clearly relevant to the Infringers'

JONES DAY

Bree Hann
October 2, 2009
Page 17

Profits measure of damages. Similarly, Oracle requests that Defendants finally provide a
comprehensive production responsive to sub-part (k) of Oracle's First Targeted Search Request
(asking for "SAP's profit margins for service and applications sales and Documents explaining
how they are calculated"). In order to evaluate its infringer's profits claims, Oracle requests this
information with the same level of detail as Oracle is providing to Defendants for Defendants to
evaluate Oracle's lost profits claim. Thus, at a minimum, Oracle requests detailed income
statement, balance sheet, and trial balance information for any SAP entity that controls the
selling of software licenses and any SAP entity that bears any costs that Defendants plan to apply
to Oracle's showing of infringer's revenues in order to arrive at infringer's profits.

        In addition, Interrogatories 70 through 73 seek financial information necessary to
understand SAP's infringer's profits. Specifically, Interrogatory 70 asks Defendants to
"[d]escribe, as much detail as possible, the differences between the two [referenced] reports."
Defendants' vague explanations are not sufficient. Oracle expects Defendants to provide a
sufficient explanation so that Oracle can reconcile each discrepancy between the two reports.
Oracle considers any further response that does not explain each numerical difference as
deficient. Oracle further expects the same type of detailed explanation for Interrogatories 71, 72,
and 73. Oracle is entitled to this information to evaluate its infringer's profits claim, and Oracle
does not understand how Defendants can provide that information outside of a written
Interrogatory response. Please supplement your responses accordingly.

**Defendants' Response**

        Interrogatory Nos. 79 and 80 from Plaintiffs' Fourth Set of Interrogatories to TN and
        Third Set of Interrogatories to SAP and Targeted Search Request 1(k)

        We agree to supplement Defendants' responses to Interrogatories Nos. 79 and 80 from
Oracle's Fourth/Third Set.  Sub-part (k) of Oracle's First Targeted Search Request (seeking SAP
profit margins) was also addressed in our meet and confer in October of last year and I
confirmed in my October 9, 2008 letter the Parties' agreement that Defendants were to look for
"general high level information."  And, as I recall, it was Plaintiffs' suggestion that this be
limited to general high level information.  In response, we produced the report at Bates SAP-
OR00603613 that provides profit margin information including support margin information.

        In your September 11 letter Plaintiffs request, for the first time, production of "detailed
income statement, balance sheet, and trial balance information for any SAP entity that controls
the selling of software licenses and any SAP entity that bears any costs that Defendants plan to
apply to Plaintiffs' showing of infringer's revenues in order to arrive at infringer's profits."
Please bear in mind that Plaintiffs have not yet attempted to make any "showing of infringer's
revenues" and Plaintiffs have not disclosed which revenues Defendants need to consider for

JONES DAY

Bree Hann
October 2, 2009
Page 18

purposes of identifying the offsetting costs. If Plaintiffs will identify the revenues they plan to claim are infringer's revenues, Defendants will be in a better position to respond.

Given the lack of specificity of Plaintiffs' damages claims to date, it appears to Defendants that Plaintiffs do not intend to attempt to make any such showing until their damages expert(s) provide their report(s) and that the determination of the appropriate costs to apply would also be a matter of expert and rebuttal expert opinion. Nevertheless, Defendants are willing to discuss with Plaintiffs which particular classes of documents Plaintiffs now seek above and beyond the information Plaintiffs previously agreed to accept. And, Defendants will work with Plaintiffs in good faith to determine if that information can and should be produced in response to Plaintiffs' targeted search request 1(k).

>   Interrogatory Nos. 70 through 73 from Plaintiffs' Fourth Set of Interrogatories to TN and Third Set of Interrogatories to SAP

Defendants disagree that Defendants have failed to provide a sufficient explanation of what Plaintiffs refer to as "discrepancies" between the two reports. As explained in Defendants' responses, the numerical differences between the two reports are a result of the fact that the reports are created using different exchange rates. As Defendants also explained, the reports were created for different purposes, one for external reporting purposes and the other for internal budgeting purposes. As a result, some items appear on one report but not the other, and vice versa. To the extent Defendants' responses have not made that sufficiently clear, Defendants will agree to supplement the particular responses related to this issue to provide additional detail. This supplementation will include identification of the accounts that appear in one report but not the other and identification of inter-company accounts. However, Defendants will not agree to provide a line-by-line "explanation of the nature of the revenue or expense and the amount of the inter-allocation" for each inter-company account over a period of multiple years, as these particular interrogatories request. That is an unreasonable and unduly burdensome request. If you would like to propose a narrower, more reasonable request, Defendants are willing to consider it.

We remain prepared to meet and confer on all of these issues and look forward to your response letting us know what day(s) and time(s) you are available for a follow-up telephone conference.

Very truly yours,


/s/ Jason McDonell

JONES DAY

Bree Hann
October 2, 2009
Page 19


cc (by email):  Geoffrey Howard
                Holly House
                Zachary Alinder
                Jennifer Gloss
                Elaine Wallace
                Josh Fuchs
                Scott Cowan
                Jane Froyd
                Greg Lanier