# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ORACLE CORPORATION, a             )
Delaware corporation, ORACLE      )
USA, INC., a Colorado             )
corporation, and ORACLE           )
INTERNATIONAL CORPORATION, a      )
California corporation,           )
                                  )
            Plaintiffs,           )
                                  )
      vs.                         )  No. 07-CV-1658 (PJH)
                                  )
SAP AG, a German corporation,     )
SAP AMERICA, INC., a Delaware     )
corporation, TOMORROWNOW,         )
INC., a Texas corporation, and    )
DOES 1-50, inclusive,             )
                                  )
            Defendants.           )
_____)

VIDEOTAPED DEPOSITION OF

CHARLES PHILLIPS

_____

FRIDAY, APRIL 17, 2009


HIGHLY  CONFIDENTIAL - ATTORNEYS' EYES ONLY


REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

(1-418649)


Merrill Legal Solutions
(800) 869-9132

9d75cce5-eca2-4ef4-af65-aa831585f3d9

CHARLES PHILLIPS          April 17, 2009
HIGHLY   CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

```
10:28:02    11      competitive language is normal.
10:28:05    12              MR. LANIER:  Q.  The next story is titled,
10:28:09    13      "Why Oracle Loves a Fight."  It's down toward the
10:28:12    14      bottom of the first page.  And the -- I'm not sure
10:28:16    15      of the journalistic term, maybe the tagline, I don't
10:28:19    16      know, says:
10:28:20    17              In the middle of the battle with rival
10:28:22    18          SAP for retail-software specialist Retek,
10:28:25    19          President Charles Phillips admits, quote, "we
10:28:29    20          always need an enemy," close quote.
10:28:31    21              Do you see that?
10:28:32    22          A.  Yes.
10:28:32    23          Q.  Did you say that, "we always need an
10:28:34    24      enemy"?
10:28:34    25          A.  Probably did.
```

Merrill Legal Solutions
(800) 869-9132

9d75cce5-eca2-4ef4-af65-aa831585f3d9

```
                    CHARLES PHILLIPS      April 17, 2009
            HIGHLY  CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

Page 58

```
10:28:35    1           Q.   Did you say it in reference to SAP?
10:28:37    2           A.   I said it -- I'm assuming it was a
10:28:42    3    reference to SAP.
10:28:43    4           Q.   Why does Oracle always need an enemy?
10:28:50    5           A.   It was a reference to, having a focused
10:29:01    6    competitor gets the competitive juices flowing.
10:29:06    7           Q.   On the second page of this same exhibit, so
10:29:09    8    it's page -113, about 40 percent down the page,
10:29:15    9    there's a question and answer.
10:29:17   10                "Question:  SAP certainly -- has
10:29:21   11    certainly become enemy number one for Oracle.
10:29:23   12                "Answer:  Yeah, well, we always need an
10:29:25   13    enemy."
10:29:26   14                Do you see that?
10:29:28   15           A.   Yeah.
10:29:29   16           Q.   Do you recall that specific dialogue?
10:29:34   17           A.   Well, now that I see it here.  I mean, I
10:29:36   18    wouldn't have 2 minutes ago, but yes.
```

CHARLES PHILLIPS          April 17, 2009
HIGHLY  CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 95

```
11:27:07   3           MR. LANIER:  Q.  So Mr. Phillips, this
11:27:08   4      email says it's from Charles Phillips to Charles
11:27:14   5      Phillips, and it's dated April 25, 2006.
11:27:18   6           I'm going to ask you about the first
11:27:19   7      paragraph.  Look at as much of this as you want to.
11:27:22   8      My first question is going to be, do you remember
11:27:24   9      it; and the second question is going to be, why did
11:27:26  10      you write it to yourself, if you remember?
11:27:28  11           A.  I do remember it.  This is a broad
11:27:33  12      organizational announcement, and was sent out on my
11:27:37  13      behalf to a distribution list, and I'm on the
11:27:40  14      distribution list.
11:27:41  15           Q.  Okay.  Do you recall the distribution list?
11:27:46  16           A.  I don't, yeah, remember exactly.  Probably
11:27:49  17      the Global Sales.
11:27:52  18           Q.  Okay.  The first -- so your assistant or
11:27:56  19      somebody sent this for you, so that's why it's from
11:27:59  20      you; and you got it because whatever the
11:28:01  21      distribution list was, you're a member of that list.
11:28:04  22      Is that correct?
11:28:05  23           A.  Right.
11:28:06  24           Q.  The first paragraph says:  "Oracle Apps" --
11:28:09  25      actually, let me back up.
```

Merrill Legal Solutions
(800) 869-9132

9d75cce5-eca2-4ef4-af65-aa831585f3d9

CHARLES PHILLIPS April 17, 2009
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 96

```
11:28:11   1              Do you recall writing the substance of this
11:28:13   2      email?
11:28:22   3           A.   Yes.
11:28:23   4           Q.   First paragraph says:  "Oracle Apps
11:28:26   5      Development has committed to new versions of all of
11:28:29   6      our existing applications on an ongoing basis well
11:28:32   7      beyond Fusion."
11:28:34   8              Do you see that sentence?
11:28:35   9           A.   Yes.
11:28:40  10           Q.   Was this a new commitment?
11:28:44  11           A.   It was a formal documentation and packaging
11:28:48  12      of things we had already been saying, but we needed
11:28:51  13      to productize it in a message so people could focus
11:28:58  14      on it.
11:28:58  15           Q.   Why did you need to do that?
11:29:00  16           A.   Because our main competitor, SAP, was out
11:29:06  17      telling customers that the products wouldn't be
11:29:10  18      supported, or they wouldn't continue, there would be
11:29:12  19      no new enhancements -- all the things, you know,
11:29:16  20      they obviously were saying that weren't helpful.
11:29:20  21      And so we wanted to respond.
```

Merrill Legal Solutions
(800) 869-9132

9d75cce5-eca2-4ef4-af65-aa831585f3d9

CHARLES PHILLIPS       April 17, 2009
HIGHLY  CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

```
12:50:57    9              MR. LANIER:  Q.  Who at Oracle is
12:50:59   10    responsible, ultimately, for deciding whether Oracle
12:51:02   11    will license its intellectual property to some other
12:51:06   12    company?
12:51:12   13         A.  Well, a lot of people involved in
12:51:14   14    recommending things.  But ultimately, anything
12:51:18   15    significant Larry would have to approve.
12:51:22   16         Q.  Back in January of 2005, when SAP bought
12:51:25   17    TomorrowNow, had SAP come to Oracle and said, we'd
12:51:30   18    like a license for TomorrowNow to do what it does,
12:51:33   19    who would have made the decision for Oracle, whether
12:51:36   20    or not to grant that license?
12:51:41   21         A.  That probably would have required Board
12:51:43   22    approval.
12:51:47   23         Q.  Do you know anything about what price or
12:51:51   24    pricing methodology would have been required in that
12:51:55   25    scenario?
```

CHARLES PHILLIPS          April 17, 2009
HIGHLY  CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 118

```
12:51:55   1              MS. HOUSE:  Calls for speculation.
12:52:04   2              THE WITNESS:  Not outside of what we've
12:52:06   3    already discussed with attorneys.  We've talked
12:52:08   4    about that.
12:52:09   5              MR. LANIER:  Q.  Okay.  As you sit here
12:52:11   6    today -- well, I'll ask a different question, then
12:52:15   7    I'll come back to that one.
12:52:16   8              Would you have been involved, back in
12:52:18   9    January of 2005, with the consideration of whether
12:52:21  10    or not to grant such a license, a license to SAP?
12:52:26  11         A.   Yes.
12:52:28  12         Q.   Don't tell me anything you've discussed
12:52:30  13    with the lawyers.
12:52:31  14              What areas or aspects of that decision
12:52:33  15    would you have made a contribution to?
12:52:38  16         A.   Look at the impact on our business by
12:52:46  17    granting a competitor intellectual property, by not
12:52:50  18    having those customers directly ourselves, lost
12:52:55  19    license sales, and kind of reflect the point of view
12:52:58  20    of what does it mean for ongoing future sales for
12:53:01  21    the field if we do this.  And if we do do this, we
12:53:09  22    better get enough to replace the lost sales that
12:53:11  23    we're going to give up.
12:53:14  24         Q.   And how would you have calculated how much
12:53:15  25    that was?
```

CHARLES PHILLIPS          April 17, 2009
HIGHLY  CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 119

```
12:53:17    1            MS. HOUSE:  Calls for speculation.
12:53:21    2            THE WITNESS:  I probably would have modeled
12:53:23    3    the number of customers leaving, the -- looking at
12:53:27    4    the growing size of the -- our product portfolio and
12:53:31    5    all the cross-sell and up-sell we could have
12:53:33    6    obtained over that -- in perpetuity, because you
12:53:37    7    have to go out many, many years, because this is an
12:53:39    8    ongoing thing, not just 3 or 5 years, but the next
12:53:43    9    20 years.  Model in the related support revenue that
12:53:46   10    you get after you sell the license, model in the
12:53:49   11    relationship benefit for future acquisitions, now
12:53:52   12    that we have a great relationship, and they're
12:53:55   13    standardizing our projects we can make other
12:53:57   14    acquisitions and do the same thing with.  So try to
12:54:00   15    model all that potential in and make sure that
12:54:05   16    whatever we're getting is greater than that.
12:54:08   17            MR. LANIER:  Q.  As you sit here today, do
12:54:09   18    you have any idea how big the number would be
12:54:11   19    following the methodology you just described?
12:54:19   20        A.  I -- I've only looked at kind of through
12:54:26   21    today, I guess.  I didn't look forward for the next
12:54:29   22    whatever years.  But that's where I came up with the
12:54:31   23    3 or 4 billion dollar number, just looking at the
12:54:35   24    license sales we could have had historically the
12:54:37   25    last 3 last 3 or 4 years.  But going forward, it
```

```
12:54:41    1    would be a much bigger number.
12:54:43    2        Q.  Bigger than 3 or 4 billion.
12:54:45    3        A.  Yes.  Because these are perpetual licenses
12:54:47    4    that last forever, which means the customers
12:54:49    5    constantly add on to what they have.  It's an
12:54:51    6    ongoing stream.
12:54:53    7        Q.  Assuming a price much bigger than 3 or 4
12:54:57    8    billion, would you have recommended granting such a
12:54:59    9    license?
12:55:00   10        A.  If the price was right.  We're businessmen;
12:55:03   11    if they're willing to pay it, and we could get that
12:55:06   12    money up front rather than working on it over the
12:55:10   13    next 20 years, sure, there would be some
12:55:14   14    circumstances under which it makes sense.
12:55:16   15        Q.  Would you have recommended it?
12:55:19   16        A.  If the price was right.
12:55:20   17        Q.  Would SAP have agreed to that price?
12:55:25   18        A.  Have to ask them that.  I don't know.
```

CHARLES PHILLIPS     April 17, 2009
HIGHLY  CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 13:41:43 | 1 | THE VIDEO OPERATOR: Okay. This marks the |
| 13:41:44 | 2 | ends of Tape No. 2 in the deposition of Charles |
| 13:41:46 | 3 | Phillips. Going off the record, the time is 1:41. |
| 13:41:50 | 4 | (Recess from 1:41 p.m.) |
| 13:42:02 | 5 | --o0o-- |
| 13:42:02 | 6 | I declare under penalty of perjury that |
| 13:42:02 | 7 | the foregoing is true and correct. Subscribed at |
| 13:42:02 | 8 | _____, California, this ___ day of |
| 13:42:02 | 9 | _____ 2009. |
| 13:42:02 | 10 | |
| 13:42:02 | 11 | _____ |
| 13:42:02 | 12 | CHARLES PHILLIPS |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

150

```
 1                    CERTIFICATE OF REPORTER
 2            I, HOLLY THUMAN, a Certified Shorthand
 3   Reporter, hereby certify that the witness in the
 4   foregoing deposition was by me duly sworn to tell the
 5   truth, the whole truth, and nothing but the truth in the
 6   within-entitled cause; that said deposition was taken
 7   down in shorthand by me, a disinterested person, at the
 8   time and place therein stated, and that the testimony of
 9   the said witness was thereafter reduced to typewriting,
10   by computer, under my direction and supervision;
11            That before completion of the deposition,
12   review of the transcript [X] was [ ] was not requested.
13   If requested, any changes made by the deponent (and
14   provided to the reporter) during the period allowed are
15   appended hereto.
16            I further certify that I am not of counsel or
17   attorney for either or any of the parties to the said
18   deposition, nor in any way interested in the event of
19   this cause, and that I am not related to any of the
20   parties thereto.
21
22            DATED April 27, 2009
23
24            _____
25            HOLLY THUMAN, CSR No. 6834
```