# EXHIBIT J

Dockets.Justia.com

# BINGHAM

Zachary J. Alinder
Direct Phone:  (415) 393-2226
Direct Fax:     (415) 393-2286
zachary.alinder@bingham.com

October 13, 2009

**Via Electronic Mail and U.S. Mail**

Scott W. Cowan, Esq.
Jones Day
717 Texas, Suite 3300
Houston, TX  77002-2745

Jason McDonell, Esq.
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104-1500

Re:  *Oracle, et al. v. SAP AG, et al.*

Dear Counsel:

This letter responds to the recent supplementation of Defendants' response to Interrogatory No. 13 in Oracle's First Set of Interrogatories.

In particular, the "Siebel Supplemental Response to Interrogatory No. 13" and the "Fourth Supplemental Response to Interrogatory Response No. 13" claim that since Defendants contend that Oracle has not provided mapping information "in a manner that permits an electronic 'download to product' comparison," it is "not possible for TomorrowNow to evaluate the appropriateness of each download it made on behalf of" its customers.  That argument, guised in the form of an interrogatory response, is belied by the facts, including Defendants' own representations to the Court and in their deposition testimony.

Not only do Defendants have sufficient information from Oracle to do a download to product comparison for purposes of determining whether a download was licensed, but Defendants already admittedly have done this analysis for certain downloads to show that they were not "appropriate" or legal – as Defendants confirmed in their Answer and their CEO's contemporaneous press statements. That Defendants would try to claim that they "cannot" perform this licensing analysis is particularly odd, since Defendants have not once to date attempted to depose a single Oracle witness concerning the downloads, the licensing related to those downloads, or mapping of the two.  In contrast, any time Defendants have requested that Oracle provide any technical help related to Customer Connection,

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA
94111-4067

T 415.393.2000
F 415.393.2286
bingham.com

Scott Cowan, Esq.
October 13, 2009
Page 2

the back-end servers that fed into Customer Connection, or downloading, including the access and inspection of Customer Connection itself by Defendants on January 3-4, 2008, Oracle has provided that. *See, e.g.,* April 20, 2009 email to Laurie Charrington.

Defendants' strategy to disclaim sufficient mapping information appears driven by Defendants' own admitted inability to determine which customer credential was used to download any particular Oracle support product, because they did not keep accurate (or any) records. It seems that Defendants, therefore, cannot determine that any of the 8 million-plus downloads that they copied were licensed. Since license is an affirmative defense, that means that Defendants cannot meet their burden with respect to any downloads on their systems. That aside, Defendants have admitted on more than one occasion that if they did know the credential for the customer, they could do the mapping from the download to the license agreement for that customer. Defendants first did so in their investigation prior to filing their Answer. Defendants' Answer to First Amended Complaint ¶ 73. They next did so in their own "download audit" process. *See, e.g.,* Sept. 3, 2009 Deposition of Shelley Nelson at 565:9-566:3, 570:17-571:2. Defendants also demonstrated their ability to do this mapping in their presentation to Judge Laporte at the August 4, 2009 Discovery Conference. *See* Tr. at 16:1-22:21 & Exhibits Presented By Mr. Cowan At That Hearing. Despite having this information at their disposal, Defendants now have to live with their blatant refusal, over two and a half years in the making, to do any work necessary to determine whether any of their downloads were actually licensed, including preclusion of any such purported evidence.

Despite the fact that Defendants have not shown (and apparently cannot show) that any of their 8 million-plus downloads were actually licensed copies, Oracle has provided more than sufficient documents for Defendants to map downloads to specific Oracle applications software on the license agreements that Oracle produced for all of the TomorrowNow customers and all of the SAP/TN overlap customers. Indeed, Oracle has produced more download, mapping and licensing information to Defendants than it had when it first analyzed Defendants' illegal downloading – the conclusions of which are reflected in each of Oracle's Complaints, including the operative Fourth Amended Complaint.

These include:

- The production of Oracle's license agreements, support renewals, and customer reports for the customers Defendants stole from Oracle. *See, e.g.,* ORCL0000001 - ORCL00007714, ORCL0007395 - ORCL00007714, ORCL00016644 - ORCL00025552, ORCL00035411 -

Scott Cowan, Esq.
October 13, 2009
Page 3

ORCL00025552, ORCL00034511 - ORCL00043795, ORCL00043796 -
ORCL00051949, ORCL00079746 - ORCL00086978, ORCL00090231 -
ORCL00103575, ORCL00139148 - ORCL00147888, ORCL00147889 -
ORCL00159820, ORCL00372975 - ORCL00381654, and
ORCL00512382 - ORCL513775;

- The production of Oracle's logs showing Defendants' illegal access to and
  downloading of Oracle's support materials (which Defendants could use
  to analyze their access and downloading using particular customer
  credentials to compare with licensing, despite the poor recordkeeping on
  their own download server). *See, e.g.,* ORCL00009434, ORCL00009435;

- The production of Oracle's Customer Connection back-end database
  servers and PeopleSoft C1 support tables, showing which support
  materials relate to which software applications. *See, e.g.,* ORCL00485842
  - ORCL00485842;

- The inspection and access to Customer Connection open to Defendants at
  any time since first provided to Defendants on January 3-4, 2008,
  including the production of the support materials that Defendants' counsel
  downloaded during those sessions, which Defendants could have used to
  map downloads to licensed products as well. *See* ORCL00016413 -
  ORCL00016639; and,

- The production of the mapping and system code documents produced both
  in Oracle's document production in early 2008 and detailed in Oracle's
  response to Defendants' Interrogatory No. 7 and its incorporated Exhibit.
  *See* ORCL00016397 - ORCL00016412; Oracle's September 18, 2009
  Third Amended and  Supplemental Responses and Objections to
  Defendant TomorrowNow, Inc.'s First Set of Interrogatories.

That this mapping cannot easily be accomplished in an automated or electronic
fashion is neither Oracle's fault nor an excuse for Defendants to claim it cannot be
done at all.  Defendants, like Oracle, must take the evidence as it is, not disclaim
it for not being in the form they would like it to be.

In short, for years, Defendants have had more than sufficient information to prove
that any of their downloads were actually licensed.  Defendants' problems of
tying downloads to actual customer credentials and beyond that their purported
ignorance for how to do this mapping "electronically" despite being the self-
reported largest business applications software company in the world are – at best
– problems of their own making.  Accordingly, Defendants will simply have to

Scott Cowan, Esq.
October 13, 2009
Page 4

live with their failures of proof, including preclusion of any attempt by
Defendants to present evidence to the contrary at this point.

Sincerely yours,

Zachary J. Alinder

cc:    Geoff Howard
       Holly House
       Bree Hann

# EXHIBIT K

Exhibit K – Filed Under Seal

# EXHIBIT L

# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 • FACSIMILE: 415-875-5700

Direct Number:  (415) 875-5820
jmcdonell@JonesDay.com

November 19, 2007

**HIGHLY CONFIDENTIAL INFORMATION – ATTORNEYS' EYES ONLY**

**VIA EMAIL**

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA  94111-4067

**Re:**   *Oracle Corporation, et al. v. SAP AG, et al.*

Dear Counsel:

Following up on our discussions of November 16, 2007, this letter addresses deficiencies in Plaintiffs' responses to TomorrowNow, Inc.'s ("TN") first sets of document requests and interrogatories.  In accordance with the suggestion Scott Cowan made and Judge Legge appeared to endorse in our call last week, we have grouped issues in an effort to get to the heart of the matters in dispute.

We have tentatively agreed to meet and confer by conference call on these issues on Wednesday, November 22 at 11:00 a.m.

## Access to Customer Connection

In response to Requests Nos. 52 and 118, concerning our access to the Customer Connection website, you have agreed that Oracle will provide Jones Day and Defendants experts' access to Customer Connection from their offices and from their laptops in remote locations.  This will take place via a VNC code, accessing a computer at Bingham's offices, on which Customer Connection will be active.  Further, this access will be designated "Highly Confidential" under the projective order.  While this is not our preferred method, we have agreed initially to try your proposal.  We reserve our right to object to these restrictions if they prove too onerous or otherwise are objectionable.  When and how can we commence this process?

## Mapping of Products and
## Software and Support Materials

We continue to ask for information and documents that map the Oracle products at issue in this case to the Software and Support Materials available on Customer Connection to which Oracle believes a licensee of these products is entitled.  This information is responsive to Interrogatories Nos. 4 and 7 as well as Requests Nos. 44-47.  On both of the last meet and confer calls, Zac indicated that he is discussing this with your client and that he will get back to us

**JONES DAY**

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
November 19, 2007
Page 2

shortly. We expect clear guidance on this issue on our next meet and confer call, followed by a timely production of responsive documents.

## Termination Policies

Request No. 48 seeks documents relating to Oracle's policies and procedures for terminating customers' access to Customer Connection after the customers' maintenance end date has passed. Oracle has improperly limited its agreement to produce documents to those relating to Identified Customers' access. Please confirm that, in accordance with our agreement to no longer limit responses to the 69 customers identified in the draft preservation order, you will now fully respond to these requests.

## Audit Rights

Requests Nos. 49 and 50 seek discovery of Oracle's rights, policies and practices with respect to audits of its customers' access to, or Downloads from, Customer Connection, any associated Software and Support Materials, and any similar Oracle support websites. Oracle has refused to produce such documents, except for Identified Customers. Please confirm that, in accordance with our agreement to no longer limit responses to the 69 customers identified in the draft preservation order, you will now fully respond to these requests.

## Electronic Software Updates ("ESUs") and Software Application Requests ("SARs")

Request No. 51 seeks Documents sufficient to show all Electronic Software Updates ("ESUs") and Software Application Requests ("SARs") relating to the Software and Support Materials, and the system code for each such SAR and ESU. Oracle has improperly limited its agreement to produce to Software and Support Materials allegedly downloaded by Defendants only.

## Contacts with TN Employees

Requests Nos. 25 and 26 seek documents relating to communications between Oracle, or anyone acting on its behalf, and any current or former TN employees and affiliated entities concerning TN, SAP America, or SAP AG. Request No. 27 seeks documents reflecting the terms of employment with Oracle for TN employees who formerly worked for Oracle. Oracle has refused to produce any documents in response to these requests.

## Third Party Support

Requests Nos. 29-34 seek documents concerning third party support of Oracle's products. They seek, among other information, the identity of entities that have provided third party support (No. 29), communications with Rimini Street and its employees (Nos. 30, 31), Oracle's position on the proper methods of providing third party maintenance (Nos. 32, 33), and Oracle's communications with industry analysts concerning TN (No. 34). Oracle has refused to produce any documents in response to these requests.

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
November 19, 2007
Page 3

Request No. 39 seeks documents relating to Oracle's denial of access to its websites, FTP sites, or other online services to customers or third-party support vendors based on conduct. Oracle has refused to produce such documents, except as to Identified Customers. Please confirm that, in accordance with our agreement to no longer limit responses to the 69 customers identified in the draft preservation order, you will now fully respond to these requests.

Request No. 40 seeks documents relating to any occasions on which Oracle has granted access to any Oracle website, FTP site, or other online service to a third-party support or maintenance vendor for the purpose of providing third-party support or maintenance services. Oracle has only agreed to produce any such express written agreements.

### Oracle and Affiliated Support of SAP Products

Request No. 41 seeks documents concerning support or maintenance services Oracle, or anyone acting on its behalf, offers for any other company's products, including policies, practices, and procedures with respect to downloads, online support sites and customer log-in credentials in connection with such services. Oracle has refused to produce any documents in response to this request.

### Copyright

Request No. 61 seeks documents that have any tendency to support or refute any of the facts set forth in the federal copyright registrations for Oracle's alleged Registered Works. Oracle has refused to produce any documents in response to this request.

Request No. 63 seeks copies of each of the Registered Works. Oracle has agreed to meet and confer "to determine an appropriate way for defendants' counsel to inspect the registered current development environments." Please advise us of any proposal you have in this regard.

Request No. 87 seeks documents relating to the licenses referred to in ¶ 20 the Complaint (*i.e.*, the alleged licenses from OIC to Oracle Corporation and Oracle USA). In response, Oracle has agreed only to produce the product licenses themselves. The validity of these licenses is an issue in this case, and Defendants are entitled to broad discovery into that issue. Thus, any documents that may bear on the validity (*e.g.*, disputes concerning validity, etc.) must be produced.

### Customer Complaints

Request No. 64 seeks documents relating to customer complaints about Oracle's support or maintenance services for products referred to in the Complaint or at issue in this litigation, including complaints about the cost of such support or maintenance, the length of time it takes Oracle to respond to customer requests or resolve customer problems, Oracle's failure to provide adequate support or maintenance or the prospects of Oracle providing long-term, quality support, and the "software upgrade cycles" referenced in ¶ 47 of the Complaint. Oracle has limited its response to documents related to Identified Customers for products allegedly downloaded by Defendants. Please confirm that, in accordance with our agreement to no longer limit responses

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
November 19, 2007
Page 4

to the 69 customers identified in the draft preservation order, you will now fully respond to these requests.

### Damages

Several of TN's discovery requests bear on the subject of damages.  In response to many of those requests, Oracle has asserted that "Oracle will provide its damages analysis during the damages and expert discovery stages of this litigation."  *See, e.g.*, Oracle Response to Request No. 70.  During our call on November 16, you conceded that there is no separate "damages stage" of discovery in this litigation, and that there is no special limitation on damages discovery at this time.

Requests Nos. 67 and 68 seek Oracle's financial information for products and services other than those referred to in the Complaint, including for Named Customers and TN Customers for products other than those referred to in the Complaint.  Oracle has refused to produce and documents in response to these requests.

Request No. 70 seeks documents relating to any alleged loss of revenues or profits by Oracle as a result of the conduct alleged in the Complaint. Oracle has refused to produce any documents, claiming that it will provide its damages analysis during the damages and expert discovery stages of this litigation.

Request No. 71 seeks documents relating to Oracle's fees for support and maintenance of the Oracle products referred to in the Complaint, including documents concerning how those fees are set and any relationship between the price of a product and the amount Oracle charges for support and maintenance of that product.  Oracle has refused to produce documents, except for documents showing service terms with Identified Customers.  Please confirm that, in accordance with our agreement to no longer limit responses to the 69 customers identified in the draft preservation order, you will now fully respond to these requests.

Request No. 79 seeks documents relating to the allegation that "Oracle has invested billions of dollars in research, development, and engineering," as alleged in ¶ 3 of the Complaint. In response, Oracle has made a general reference to its public SEC filings only, without identifying any particular filing or any specific information.

In response to Request No. 101 (documents relating to the alleged cost of the investigation) and Request No. 107 (documents relating to the allegation in ¶ 92 of the Complaint that "Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of Oracle support services and licenses for Oracle's software programs"), Oracle has stated that it will produce analysis during damages phase and expert discovery.

Interrogatory No. 5 requests information about how Oracle believes any activity alleged in the Complaint has damaged it, including how Oracle was damaged by each allegedly improper download and, if Oracle claims to have lost any customer as a result of any activity alleged in the Complaint, all facts and inferences upon which Oracle bases that claim for each customer allegedly lost.  In response, Oracle makes the conclusory assertion that it has lost the Named

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
November 19, 2007
Page 5

Customers as a result of the activity alleged in the Complaint, but provides no supporting information.  Oracle should supplement this response with all information it has, including any information from the Named Customers.

### Oracle's Acquisitions, Etc.

Several requests go directly to allegations Oracle has made about its acquisitions and related matters, including Request No. 75 (documents relating to the effect of Oracle's acquisition of PeopleSoft on Oracle's ability to compete in the "business software applications business," as alleged in ¶ 43 of the Complaint), Request No. 82 (the "competitive threat from Oracle" referred to in ¶13 of the Complaint) and Request No. 83 (whether TN had the "development capability to meet the support commitments as advertised in the 'Safe Passage'" program, as alleged in ¶ 13 of the Complaint), Request No. 84 (TN's development capability, as referred to in ¶13 of the Complaint), Request No. 90 ("the threat that a combined Oracle and PeopleSoft entity would pose to its competitive position for business software applications," as alleged in ¶ 44 of the Complaint).

Oracle has only agreed to produce documents from the files of "already identified custodians" for Requests Nos. 75, 83, 84 and 90.  Oracle has not identified those custodians nor has it provided any reason to believe they would be the appropriate custodians for which to limit this search.

In response to Request No. 82, Oracle has limited its response to documents relating to SAP's acquisition of TN.

Similarly, Request No. 97 seeks documents relating to the allegation that "Oracle continued to take market share and expand its product offerings, including through its September 12, 2005 announcement that it would acquire Siebel Systems," as alleged in paragraph 57 of the Complaint.  In response, Oracle has only agreed to produce the documents relied upon for allegation.

### Project Fusion

Request No. 81 seeks documents relating to "Project Fusion," referred to in paragraph 12 of the Complaint as "aimed at taking market share from No. 1 ranked SAP," or to "Off SAP."  In response, Oracle has refused to produce any documents.

### Safe Passage

Request No. 92 seeks documents relating to the "Safe Passage" program referred to in the Complaint and Request No. 93 seeks documents relating to the allegation that "SAP TN's new parent companies directed it to begin to implement a two-phase plan to increase SAP's enterprise application market share," as alleged in paragraph 51 of the Complaint.

Here again, Oracle has only agreed to produce documents from the files of "already identified custodians," but has neither identified those custodians nor provided any reason to believe they would be the appropriate custodians for which to limit this search.

JONES DAY

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
November 19, 2007
Page 6

### Document Retention Policies

Request No. 76 seeks documents relating to Oracle's document retention policies, practices, and procedures, including those relating to electronic data retention, preservation, and destruction, and the retention, preservation, and destruction of paper documents. In response, Oracle has only agreed to produce "the current iteration of its document retention policy and schedule relevant to the information at issue in this litigation."

### Organization Charts

Request No. 77 seeks documents sufficient to show Oracle's organizational structure, including the names of, and relationships among, groups or departments within Oracle, the names of, and relationships among, employment positions at Oracle, and the identities of the persons who hold, or have held, those positions.

Oracle has only agreed to produce documents from the files of "already identified custodians," but has neither identified those custodians nor provided any reason to believe they would be the appropriate custodians for which to limit this search.

Very truly yours,

Jason McDonell

cc:     Christopher B. Hockett, Esq. (via email)
        Bree Hann, Esq. (via email)

SFI-574022v1

# EXHIBIT M

# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 • FACSIMILE: 415-875-5700

Direct Number:  (415) 875-5820
jmcdonell@JonesDay.com

December 12, 2007

**HIGHLY CONFIDENTIAL INFORMATION – ATTORNEYS' EYES ONLY**

**VIA EMAIL**

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA  94111-4067

**Re:**   *Oracle Corporation, et al. v. SAP AG, et al.*

Dear Counsel:

This follows up on our telephone discussions of November 16 and 21 and December 7, and on my letter of November 19 and your November 27 response thereto.

My November 19 letter set forth certain deficiencies in Plaintiffs' responses to TomorrowNow, Inc.'s ("TN") first sets of document requests and interrogatories.  Your November 27 response letter begins with three "preliminary issues," to which I reply as follows:

First, your suggestion that my November 19 letter raised certain issues "for the first time" is misleading and beside the point.  Virtually all of the issues I raised derive directly from Plaintiffs' written responses to TN's discovery requests and therefore they were not new issues as of the date of my letter.  Your implication that Defendants agreed to work through all discovery issues at once is baseless.  I am unaware of any such agreement, and you have not identified one.  Your suggestion that you might attempt to back out of agreements concerning discovery that you have previously made is unproductive at best.  For now, I can only encourage you to honor those agreements and Defendants reserve all rights to seek appropriate remedies should you not do so.

Second, my letter identified the deficiencies in Oracle's discovery responses without extensive discussion of the bases for our belief that our discovery requests are appropriate and should be enforced.  I did so to provide an outline of the issues for discussion on November 21 and believe that it was helpful to have sent you the letter in advance of that call.  Per your request, in this letter I include more detail on the reasons the discovery we seek must be permitted.

Third, your characterization of the "agreement" with respect to the 69 customers identified in the draft preservation order (the so-called "Identified Customers") on page two of your letter (*i.e.*, "Oracle agreed to exchange the license agreements for all TomorrowNow customers in exchange for the full Notes Database, the associated customer file server data and the related customer on-boarding documents") clashes with your assertion in that same paragraph that "Oracle is entitled to discovery on, and SAP is obligated to produce information regarding,

JONES DAY

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 2

SAP'S access to, and use of, Oracle's SSMs across SAPs *entire customer base*" (emphasis added).  Therein lays the tension.  We have produced the SAS database and are in the process of producing the associated file server data and the related on-boarding documents and Plaintiffs need to produce the licenses.  If Plaintiffs want the remainder of our production to be as to all customers, then Plaintiffs need to make their production relate to those same customers.  Otherwise, we are back to the same double standard with respect to this issue as before.[1]

In the following sections, per your request, I have included more discussion of the reasons the information and documents we seek must be produced.[2]

1.      **Access to Customer Connection (Requests Nos. 52 & 118)**

In response to Requests Nos. 52 and 118, Plaintiffs previously agreed to provide Jones Day and Defendants' consultants with access to Customer Connection from their offices and from their laptops in remote locations.  This will take place via a VNC code, accessing a computer at Bingham's offices, on which Customer Connection will be active.  Further, this access will be designated "Highly Confidential" under the protective order.  While this was not our preferred method, we agreed initially to try your proposal and reserved our right to object to these restrictions if they prove too onerous or otherwise are objectionable.

In your November 27 letter, you proposed restrictions that are not acceptable.  For example, the limitation to four hours per week after the first week is unreasonable.  In our December 7 call, Geoff Howard suggested that we try the access for the first week, with each side reserving rights as to what is ultimately appropriate and adequate, and that we revisit the issue thereafter.  This is acceptable.

We also made clear that this access will be confidential attorney work product, and you agreed that there would be no effort by Plaintiffs to use our access to Customer Connection as a means to access our work product.

2.      **Mapping of Products and Software and Support Materials (Requests Nos. 44-47)**

We continue to ask for information and documents that map the Oracle products at issue in this case to the Software and Support Materials ("SSM") available on Customer Connection to which Oracle believes a licensee of these products is entitled.  This information is responsive to Interrogatories Nos. 4 and 7 as well as Requests Nos. 44-47.

---

[1] The Complaint alleges a scheme to lure away as much of Oracle's customer base as possible, as well as future customers.  *See, e.g.*, ¶¶ 2, 16, 46, 49, 55, 133.  This includes allegedly releasing "a torrent of marketing materials designed to exacerbate and leverage" perceived but unfounded customer uncertainty (¶ 54) and deploying sales people to pressure customers to switch to TN (¶ 55).  Presumably these allegations form part of the basis for Oracle's unfair competition and interference claims.  Oracle can't have it both ways, *i.e.*, allege in its Complaint a broad unlawful scheme that includes far beyond just downloads but then try to limit discovery to customers for whom TN allegedly downloaded.  In other words, Oracle cannot, for example, allege that the perceived customer uncertainty was "unfounded" and then refuse to turn over documents about its customers.

[2] This is not an exhaustive discussion, but rather is sufficient to justify the discovery sought.  We reserve the right to supplement as appropriate.

**JONES DAY**

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 3

During our November 21 call and in your November 27 letter you stated that you were working on this issue and expected to have something to us soon. This is a very high priority for us, so I would appreciate it if you would either produce the information forthwith or let me know by email when we can expect it to be produced.

### 3.   Termination Policies (Request No. 48)

Request No. 48 seeks documents relating to Oracle's policies and procedures for terminating customers' access to Customer Connection after the customers' maintenance end date has passed. Oracle has improperly limited its agreement to produce documents to those relating to Identified Customers.

We believe the requested documents are relevant to the interpretation of customer agreements, causation of damages, mitigation of damages, acquiescence,[3] consent[4] and to Plaintiffs' broad allegations that customers have no rights to download or access other than as limited by contracts.[5] For example, there may be evidence that Oracle knowingly permitted customers to access Customer Connection after the maintenance end dates had passed. Oracle has claimed "damage to the confidential nature of the information on Oracle's website."[6] The extent to which Oracle has protected the alleged confidentiality of that information is thus at issue. There is no basis to limit this discovery to the Identified Customers, as Oracle may have abandoned its alleged rights by widely permitting access to others. Moreover, if the evidence shows that Oracle permitted other customers and/or third party service providers to access Customer Connection after the termination date, then this may show that such access was not the cause of customers going to TN.

You have agreed to consult further with your client on this request and we await your final response.

### 4.   Audit Rights (Requests Nos. 49-50)

Requests Nos. 49 and 50 seek discovery of Oracle's rights, policies and practices with respect to audits of its customers' access to, or Downloads from, Customer Connection, any associated SSMs, and any similar Oracle support websites. Oracle has refused to produce such documents, except those related to Identified Customers.

This discovery is appropriate for the same reasons as discussed in the preceding section concerning Termination Policies. Thus, we disagree with your assertion that "whether and how Oracle audits its customers' access to Customer Connection has nothing to do with SAP's illegal access to, downloading of, and misuse of Oracle's SSM's." Among other things, we need all

---

[3] Acquiescence in allegedly infringing acts may result in abandonment, which constitutes a defense to a copyright infringement claim. *See, e.g.*, 4 Nimmer on Copyright, sec. 13.07.

[4] *See, e.g.*, Answer to First Amended Complaint, Sixteenth Affirmative Defense.

[5] *See, e.g.*, First Amended Complaint, ¶ 3.

[6] *See* Plaintiffs' Amended and Supplemental Responses and Objections to Defendant TomorrowNow, Inc.'s First Set of Interrogatories, p. 20.

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 4

documents showing whether Oracle was aware of downloads by any customers that were allegedly beyond the scope of the customers' contractual rights and Oracle's responses in such situations. The production should also include any documents reflecting any auditing or monitoring of usage by customers and/or third party support vendors of passwords to access SSMs.

### 5. Electronic Software Updates ("ESUs") and Software Application Requests ("SARs") (Request No. 51)

Request No. 51 seeks Documents sufficient to show all Electronic Software Updates ("ESUs") and Software Application Requests ("SARs") relating to the Software and Support Materials, and the system code for each such SAR and ESU. Oracle has improperly limited its agreement to produce to SSMs allegedly downloaded by Defendants only.

The type of data this request seeks includes, but is not limited to, the underlying data used by Change Assistant to link ESUs and SARs to particular system codes, as we have discussed at length with you. More specifically, as we have explained, it appears that such capabilities in Change Assistant allow users of that software to specify system codes as a means to download ESUs and SARs that Oracle believes are linked to those system codes. It appears that Change Assistant's search capabilities by system codes has to be enabled in the software by some internal or external reference to an Oracle generated table or other database which "maps" the ESRs and SARs to particular system codes. While we cannot be sure without seeing the data, it is possible that Oracle's production of that table or database could satisfy Request No. 51.

### 6. Contacts with TN Employees (Requests Nos. 25-27)

Requests Nos. 25 and 26 seek documents relating to communications between Oracle, or anyone acting on its behalf, and any current or former TN employees and affiliated entities concerning TN, SAP America, or SAP AG. Request No. 27 seeks documents reflecting the terms of employment with Oracle for TN employees who formerly worked for Oracle. Oracle has refused to produce any documents in response to these requests.

Requests Nos. 25 and 26 are appropriate for the reasons discussed in the section concerning Termination Policies, above. It most certainly is relevant if Oracle employees were aware of conduct by Defendants that Plaintiffs now allege to be inappropriate. Oracle also seems to claim that TN was mining for Oracle employees to get information about Oracle. For example, Oracle alleges in the Complaint that "SAP intentionally targets Oracle's employees to extract their knowledge of Oracle's new products."[7]

Your objection seems primarily to be one of burden, in that you do not want search for the files of "low-level Oracle employees around the globe" to locate the evidence concerning TN. In order to address that concern, we are willing to narrow the request (at this time) to documents relating to communications concerning TN. We will reserve the right to seek the other documents at a later time, if necessary. By thus limiting the requests to communications with or concerning the employees of a single third party (*i.e.*, TN), they are reasonably focused. In fact,

---

[7]  First Amended Complaint, ¶ 71.

JONES DAY

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 5

Oracle itself is seeking in discovery the identification of all former Oracle employees who worked for SAP or TN, and we will produce identifying information for TN employees.

Documents in response to Request No. 27 should be produced so TN can evaluate the restrictions, if any, that Oracle believes it has imposed on its former employees. Your suggestion that we try to get these documents from the employees themselves is not a valid excuse. Many employees may no longer work for TN and, in any case, the fact that Defendants may have other means of locating the documents does not relieve Plaintiffs of their duty to produce them. Indeed, it should be relatively easy for Oracle to locate and produce these documents.

### 7.    Third Party Support (Requests Nos. 29-34 & 39-40)

Requests Nos. 29-34, 39 and 40 seek documents concerning third party support of Oracle's products. In response to Request No. 29, you have identified the universe of third party support providers in your response to Interrogatory No. 9, and that will suffice for now.

Requests 30-34 seek, among other information, Oracle's communications with Rimini Street and its employees (Nos. 30, 31), Oracle's position on the proper methods of providing third party maintenance (Nos. 32, 33), and Oracle's communications with industry analysts concerning TN (No. 34). This discovery is appropriate for the same reasons as discussed in the preceding section concerning Termination Policies. To the extent that Oracle has acquiesced in similar activities by other third party support vendors, it could support defenses based on acquiescence, abandonment and consent.

The third party support market is relevant to the issue of alleged damages. Oracle alleges that it lost customers as a result of allegedly improper downloads, etc. That puts into issue the extent to which Oracle lost business to other third party services and derivatively how those companies were doing business. Defendants need full discovery to determine whether the customers alleged to have been inappropriately acquired by TN would have selected a different third party vendor if TN was unavailable. In such a circumstance, Oracle would have lost the revenue in any event. Moreover, Oracle's activities and knowledge concerning third party support are relevant, as Oracle may in fact retain customers for its database or other products by virtue of such organizations. Customers that would otherwise leave Oracle altogether may be retained by Oracle for some purposes if they are able to get support elsewhere. Thus, far from causing damage to Oracle, such third party support activities may increase Oracle's revenues.

In response to Requests Nos. 30-31, you have tentatively agreed to produce Oracle's communications with Rimini Street "regarding TomorrowNow or Oracle's specific allegations about TomorrowNow in the litigation." That is insufficient. We need full responses to these requests.

In searching for responsive documents, we expect that Oracle will thoroughly search files related to *United States v. Oracle* concerning Oracle's acquisition of PeopleSoft. It stands to reason that Oracle would have collected and created documents concerning the market for third party support in connection with that matter.

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 6

Request No. 39 seeks documents relating to Oracle's denial of access to its websites, FTP sites, or other online services to customers or third-party support vendors based on conduct. Oracle has refused to produce such documents, except as to Identified Customers. Request No. 40 seeks documents relating to any occasions on which Oracle has granted access to any Oracle website, FTP site, or other online service to a third-party support or maintenance vendor for the purpose of providing third-party support or maintenance services. Oracle has only agreed to produce any such express written agreements. Requests 39 and 40 are appropriate for the reasons discussed in the preceding section concerning Termination Policies. Your limitation to Identified Customers is inappropriate for the reasons set forth in connection with the discussion of that issue, above.

## 8.    Oracle and Affiliated Support of SAP Products (Request No. 41)

Request No. 41 seeks documents concerning support or maintenance services Oracle, or anyone acting on its behalf (including Systime), offers for any other company's products, including policies, practices, and procedures with respect to downloads, online support sites and customer log-in credentials in connection with such services. Oracle has refused to produce any documents in response to this request. This request is appropriate for the reasons set forth in connection with the discussions of Termination Policies and Third Party Support, above.

## 9.    Copyright (Requests Nos. 61, 63 & 87)

Request No. 61 seeks documents that have any tendency to support or refute any of the facts set forth in the federal copyright registrations for Oracle's alleged Registered Works. Oracle has refused to produce any documents in response to this request. This is a very finite request. If, for example, Oracle has documents that undermine any representation it made to the Copyright Office in connection with its copyright applications, they must be produced.

Request No. 63 seeks copies of each of the Registered Works. Oracle has agreed to meet and confer "to determine an appropriate way for defendants' counsel to inspect the registered current development environments." Please advise us of any proposal you have in this regard. We do not understand why Plaintiffs do not simply produce this material on CDs.

Request No. 87 seeks documents relating to the licenses referred to in ¶ 20 the Complaint (*i.e.*, the alleged licenses from OIC to Oracle Corporation and Oracle USA). In response, Oracle has agreed only to produce the product licenses themselves. The ownership and validity of these licenses is an issue in this case, and Defendants are entitled to discovery into that issue. Thus, any documents that may bear on the validity (*e.g.*, disputes concerning validity, mistakes in the inter-company licensing, etc.) must be produced. We believe that it is not unlikely that the alleged licensing was not handled in the way you have alleged.

## 10.    Customer Complaints (Request No. 64)

Request No. 64 seeks documents relating to customer complaints about Oracle's support or maintenance services for products referred to in the Complaint or at issue in this litigation, including complaints about the cost of such support or maintenance, the length of time it takes Oracle to respond to customer requests or resolve customer problems, Oracle's failure to provide

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 7

adequate support or maintenance or the prospects of Oracle providing long-term, quality support, and the "software upgrade cycles" referenced in ¶ 47 of the Complaint. Oracle has limited its response to documents related to Identified Customers for products allegedly unlawfully downloaded by Defendants.

These documents are relevant to the issue of damages, including the issue of the causation of damages. To the extent that Oracle alleges that it has lost sales as a result of the actions of Defendants, Defendants should be given broad discovery of the reasons that Oracle loses customers. These documents may show that Oracle would have lost some or all of the alleged lost sales because of poor service or other customer complaints. Documents showing complaints about service by customers other than the Identified Customers will help Defendants identify and understand the types of problems that may have caused customers to leave Oracle. In addition, such documents might show that Oracle benefits from third party maintenance, *i.e.*, by retaining customers for its other database and software products.[8]

In this regard, we suspect that Oracle maintains a customer relations management ("CRM") system, one component of which is a database of Oracle's customer communications. Oracle should produce all documents, including those in any CRM database, that reflect customer communications about its service and support. This should include all Oracle products, as customers may have left Oracle due to dissatisfaction with Oracle products that are not specifically at issue in this case.

**11.     Damages (Requests Nos. 65-68, 70-71, 79, 101, 107 and Interrogatory No. 5)**

In your letter, you resist discovery on damages issues on grounds that "the law does not require Oracle to prematurely state all the bases for its damages." We strongly believe that substantial productive discovery into damages issues can and should occur immediately. Postponing this discovery to the "expert phase" of discovery is not workable.

Request No. 65 seeks documents containing basic Oracle financial information for support and maintenance services *for the products* referred to in the Complaint or at issue in this litigation. Request No. 66 seeks similar documents *for the Named Customers and the TN Customers*. In response to both of these requests, Oracle has agreed to produce documents "sufficient to show Oracle's revenues, costs and profit margins for support or maintenance services" relating to "applications for which Oracle has alleged that Defendants downloaded Software and Support Materials from Oracle's systems . . . ."

We do not agree that Oracle can limit its production to information concerning applications that are subject of the alleged Downloads. The alleged Downloads are only part of Oracle's Complaint and Oracle also makes allegations concerning cross-use. Accordingly, Defendants are entitled to discovery of this information for all families of products allegedly at issue in this case, both for downloads and cross-use allegations. Our request is that Oracle produce such information for *all* JD Edwards and PeopleSoft products.

---

[8] As discussed in fn. 1, above, Oracle cannot allege in its complaint that perceived customer uncertainty was "unfounded" but refuse to turn over documents relating to communications with customers.

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 8

Requests Nos. 67 and 68 seek Oracle's financial information for products and services *other* than those referred to in the Complaint, including for Named Customers and TN Customers for products other than those referred to in the Complaint. If Oracle produces the requested documents in response to Requests Nos. 65 and 66, as discussed in the preceding paragraph, we are willing to postpone our efforts to compel compliance with this request for now.

In response to Request No. 70 (documents relating to any alleged loss of revenues or profits by Oracle as a result of the conduct alleged in the Complaint), Request No. 101 (documents relating to the alleged cost of the investigation) and Request No. 107 (documents relating to the allegation in ¶ 92 of the Complaint that "Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of Oracle support services and licenses for Oracle's software programs"), Oracle continues to refuse production until the "expert discovery phase." This refusal is unjustified. The cost of the investigation should be readily discernable. Moreover, even if Oracle does not yet have every document that may relate to is alleged losses, it most certainly has some of them and they must be produced.

Request No. 71 seeks documents relating to Oracle's fees for support and maintenance of the Oracle products referred to in the Complaint or at issue in the litigation, including documents concerning how those fees are set and any relationship between the price of a product and the amount Oracle charges for support and maintenance of that product. In its written response, Oracle has refused to produce documents, except for documents showing service terms with Identified Customers. For reasons stated above, the limitation to Identified Customers is not acceptable or fair. Your November 27 letter suggests that such documents will be provided, but not until the "expert discovery phase." There is no reason to wait for that phase, as these documents should exist and be readily identifiable now.

Request No. 79 seeks documents relating to the allegation that "Oracle has invested billions of dollars in research, development, and engineering," as alleged in ¶ 3 of the Complaint. In response, Oracle has made a general reference to its public SEC filings only, without identifying any particular filing or any specific information. If you plan to rely on any particular SEC filings to support this allegation, such documents must be produced. If you choose to produce no other documents in response to this request, then Oracle should be barred from offering any others into evidence at any time.

Interrogatory No. 5 requests information about how Oracle believes any activity alleged in the Complaint has damaged it, including how Oracle was damaged by each allegedly improper download and, if Oracle claims to have lost any customer as a result of any activity alleged in the Complaint, all facts and inferences upon which Oracle bases that claim for each customer allegedly lost. In response, Oracle asserts that "as a minimum and without limitation Oracle has lost the Named Customers as a result of activity alleged in the First Amended Complaint," but provides no supporting information. In your November 27 letter, you again claim that discovery into damages is "premature" and propose to answer it with Oracle's expert damages reports when due. Again, we believe that much of the information Oracle will rely on for its damages case is known and available to Oracle and should be produced. For example, if Oracle believes it has lost certain profit margins as a result of the activities alleged, it should produce the supporting

**JONES DAY**

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 9

documents.  Oracle has information about TN's customers and, if Oracle believes that it has lost any revenue or profits from any such customer, it should produce the supporting evidence.

**12.      Oracle's Acquisitions, Etc. (Requests Nos. 75, 82-84, 90 & 97)**

Several requests go directly to allegations Oracle has made about its acquisitions and related matters, including Request No. 75 (documents relating to the effect of Oracle's acquisition of PeopleSoft on Oracle's ability to compete in the "business software applications business," as alleged in ¶ 43 of the Complaint), Request No. 82 (the "competitive threat from Oracle" referred to in ¶13 of the Complaint), Request No. 83 (whether TN had the "development capability to meet the support commitments as advertised in the 'Safe Passage'" program, as alleged in ¶ 13 of the Complaint), Request No. 84 (TN's development capability, as referred to in ¶13 of the Complaint), and Request No. 90 ("the threat that a combined Oracle and PeopleSoft entity would pose to its competitive position for business software applications," as alleged in ¶ 44 of the Complaint).

Oracle has only agreed to produce documents from the files of "already identified custodians" for Requests Nos. 75, 83, 84 and 90.  Oracle has not identified those custodians nor has it provided any reason to believe they would be the appropriate custodians for which to limit this search.  In your letter, you suggest that you would be "willing to consider" and exchange of lists of custodians.  That offer misses the point.  The point is that Oracle has elected to limit its search for responsive documents to a group of custodians for which there is no reason to believe they are likely to have the responsive documents.  Defendants have not followed such a nonsensical approach.  A search should be done of the appropriate custodians and files.

In response to Request No. 82, Oracle has limited its response to documents relating to SAP's acquisition of TN.  We are willing to review those documents before deciding whether to insist on production of other documents.

Similarly, Request No. 97 seeks documents relating to the allegation that "Oracle continued to take market share and expand its product offerings, including through its September 12, 2005 announcement that it would acquire Siebel Systems," as alleged in paragraph 57 of the Complaint.  In response, Oracle has only agreed to produce the documents relied upon for allegation.  Again, we are willing to review those documents before deciding whether to insist on production of other documents.

**13.      Project Fusion (Request No. 81)**

Request No. 81 seeks documents relating to "Project Fusion," referred to in paragraph 12 of the Complaint as "aimed at taking market share from No. 1 ranked SAP," or to "Off SAP."  In response, Oracle has refused to produce any documents.  Oracle made this an issue in the complaint, and now claims the request is overbroad.  What does Oracle propose that would be less burdensome?

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 10

### 14.     Safe Passage (Requests Nos. 92-93)

Request No. 92 seeks documents relating to the "Safe Passage" program referred to in the Complaint and Request No. 93 seeks documents relating to the allegation that "SAP TN's new parent companies directed it to begin to implement a two-phase plan to increase SAP's enterprise application market share," as alleged in paragraph 51 of the Complaint.

Here again, Oracle has only agreed to produce documents from the files of "already identified custodians," but has neither identified those custodians nor provided any reason to believe they would be the appropriate custodians for which to limit this search.  Oracle has made these issues in its complaint and must produce discovery from the custodians likely to have responsive documents, whether or not they are otherwise identified.

### 15.     Document Retention Policies (Request No. 76)

Request No. 76 seeks documents relating to Oracle's document retention policies, practices, and procedures, including those relating to electronic data retention, preservation, and destruction, and the retention, preservation, and destruction of paper documents.  In response, Oracle has only agreed to produce "the current iteration of its document retention policy and schedule relevant to the information at issue in this litigation."  In your letter, you profess not to understand the relevance of this request.  This is a relatively standard request, the purpose which is to help us determine the location and existence of discoverable evidence.  Oracle should produce all policies applicable to the time period referenced in its complaint back to January 2004.

### 16.     Organization Charts (Request No. 77)

Request No. 77 seeks documents sufficient to show Oracle's organizational structure, including the names of, and relationships among, groups or departments within Oracle, the names of, and relationships among, employment positions at Oracle, and the identities of the persons who hold, or have held, those positions.

Oracle has only agreed to produce documents from the files of "already identified custodians," but has neither identified those custodians nor provided any reason to believe they would be the appropriate custodians for which to limit this search.

JONES DAY

Geoffrey M. Howard, Esq.
Zachary J. Alinder, Esq.
December 12, 2007
Page 11

Defendants reasonably need Oracle's organization charts for people who touch on allegations in this case.  Oracle has made these issues in its complaint and must produce discovery from the custodians likely to have responsive documents, whether or not they are otherwise "already identified custodians."

Very truly yours,

Jason McDonell

cc:    Christopher B. Hockett, Esq. (via email)
       Bree Hann, Esq. (via email)

SFI-574594v1

# EXHIBIT N

# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 • FACSIMILE: 415-875-5700

Direct Number:  (415) 875-5820
jmcdonell@JonesDay.com

January 28, 2008

**CONFIDENTIAL INFORMATION DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**VIA EMAIL AND HAND DELIVERY**

Hon. Charles A. Legge (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA  94111

> **Re:**   *Oracle Corporation, et al. v. SAP AG, et al.*
> **Defendant's Motion to Compel No. 1**

Dear Judge Legge:

Pursuant to the Stipulation Re Special Discovery Master Hearing and Briefing Procedures, TommorowNow, Inc. ("TN") submits this first motion to compel.[1]

## INTRODUCTION

This case is about whether TN exceeded its customers' rights in downloading certain allegedly copyrighted "Software and Support Materials" ("SSMs").  That is not a matter of "corporate theft on a grand scale," as Oracle says, but a matter of contract interpretation.

The basic facts are less dramatic than presented by Oracle.  Briefly, when customers licensed "enterprise software" applications from PeopleSoft or J.D. Edwards (now part of Oracle), they typically also purchased service contracts for annual fees.  Pursuant to those contracts, the customers obtained the right to SSMs that are available on Oracle's "Customer Connection" website.  Oracle, however, does not make it easy for its customers to determine what they have rights to use.  As noted by one industry analyst, Oracle ships "new versions of the licensed software as well as software that a customer is not authorized to use, with full rights to download such software . . . As Oracle renames and rebundles its software products, it is often difficult to know which products were originally licensed."

"Third-party support" companies like TN compete with Oracle in providing support for PeopleSoft and JDE applications at lower prices than Oracle charges.  Oracle is well-aware of the third-party support market and, in fact, has provided training to employees of third-party support companies, including TN, even after this case was filed.  And, as Oracle conceded in its First Amended Complaint (the "Complaint"), the companies that provide third-party support may access Customer Connection to download SSMs on behalf of their customers.

---

[1] This motion addresses four categories of discovery.  Defendants have numerous other categories of discovery for which they plan to move to compel in subsequent scheduled hearings.

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MENLO PARK • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**JONES DAY**

Hon. Charles A. Legge (Ret.)
January 28, 2008
Page 2

In the Complaint, Oracle claims to have identified specific downloads in excess of the customers' rights, even to the level of providing numbers of alleged improper downloads for particular TN customers. In its Answer, TN admitted that on some occasions, materials were downloaded beyond those that, according to TN's records, related to applications licensed to the particular customer on whose behalf the downloads were made. Answer, ¶ 15. Defendants do not, however, have sufficient information from which they can determine which downloads Oracle believes are associated with which of its products. Thus, since the day discovery commenced, defendants have been trying to get Oracle to: (1) identify those downloads and produce information sufficient to permit defendants to understand what Oracle claims was improperly downloaded; (2) disclose information concerning Oracle's practices with respect to third-party support providers; (3) substantiate its alleged copyrights; and (4) identify the harm, if any, to Oracle. Oracle has frustrated defendants' efforts at every turn, thus necessitating this motion and a likely series of motions to follow.

<u>**ARGUMENT**</u>

1.    **Identification of Software and Support Materials ("SSMs") Related to Oracle's Products (RFPs Nos. 44-47, Interrogatories Nos. 4 & 7)**

In light of Oracle's allegations that TN downloaded SSMs in excess of its customers' rights under Oracle licenses, it is critical that Oracle identify the SSMs those customers were entitled to download. Accordingly, defendants served discovery requesting information and documents identifying which SSMs the licensees of various Oracle software products were entitled to download. This information is requested by Interrogatories Nos. 4 and 7 as well as Document Requests Nos. 44-47. For example, Interrogatory No. 7 provides:

> "For each TN Customer . . . identify with specificity each item of Software and Support Materials that the customer is currently, or has been in the past, entitled to Download and the basis for that entitlement, including any and all Customer Contracts conferring that right."

Oracle has agreed to produce the customer licenses for all TN customers and has given defendants limited access to Customer Connection, but that discovery does not provide the necessary information.[2] In fact, defendants cannot discern from the licenses and Customer Connection exactly which downloads Oracle contends are related to which products. Moreover, even if defendants could do so, they would be within their discovery rights to require Oracle to state its information on this subject in order to determine whether the parties have the same understanding of the basic facts.

In fact, Oracle has admitted that "there is no document that will provide the information . . . requested in any meaningful way."[3] As a result, Oracle proposed a compromise pursuant to which it would produce a spreadsheet that maps the SSMs to the products. *Id.* The catch is that Oracle conditioned its willingness to provide the spreadsheet on defendants' waiver of their

---

[2] On January 25, 2008, Oracle produced some documents that purport to represent mapping information, but which in fact are inadequate.

[3] *See* Letter, Alinder to McDonell, January 4, 2008, p. 2.

JONES DAY

Hon. Charles A. Legge (Ret.)
January 28, 2008
Page 3

rights to take follow-up discovery about the issue. *Id.* Defendants understandably rejected those conditions.

Importantly, however, Oracle's offer to produce a spreadsheet that maps the SSMs to its enterprise software products is a flat out admission that it has the information being requested and the ability to answer Interrogatory No. 7. There is no point in prolonging this debate: Oracle should be ordered to provide the documents from which defendants will be able to determine which downloads relate to which products. In addition, Oracle should be required to provide an answer to Interrogatory No. 7 that, at a minimum, clearly explains the method by which the produced documents can be used to determine which downloads relate to which TN customers.

Another issue is whether Oracle must produce this discovery with respect to *all* of TN's customers or whether it may limit its responses to the sixty-nine customers that it has specifically identified by name as being the subject of allegedly excessive downloading (the "Identified Customers"). Oracle cannot have it both ways. When it suits its purposes, Oracle argues that its claims range beyond those Identified Customers. For example, in demanding that TN produce information concerning *all* of its customers, not just the Identified Customers, Oracle argued:

> "Oracle's Complaint alleges that SAP used its acquisition of TomorrowNow and the stolen Oracle intellectual property to unfairly compete for and interfere with customer relationships. Those customers are not limited to the customers' names that Oracle has uncovered during the course of its investigation."[4]

In response – and in reasonable expectation of reciprocity on the scope of discovery – TN produced to Oracle its entire customer database (the so-called "SAS database"). The SAS database includes extensive information about TN's work for and interactions with *all* of its customers and is not limited to the sixty-nine Identified Customers. Accordingly, Oracle's objection to providing discovery beyond the Identified Customers should be overruled.

## 2. Third-Party Support (Requests Nos. 29-34 & 39-40, Interrogatory No. 9)

TN's Document Requests Nos. 29-34, 39 and 40 and Interrogatory No. 9 seek information concerning third-party support of Oracle's products. In response to Interrogatory No. 9, Oracle identified five companies (including TN and Rimini Street) that provide third-party support. Oracle concedes that there are other companies that support its products, but has refused to identify them on the fuzzy ground that they are "partners" with Oracle and not "pure play" third-party support providers. For the same reasons that Oracle agreed to identify the pure-play support providers, Oracle should identify *all* third parties that support the Oracle products that are at issue in this case.[5] The fact that Oracle's so-called "partners" perform functions in addition to third-party support is irrelevant and does not immunize Oracle from discovery into those support activities.

---

[4] *See* Letter, Alinder to Lanier, October 9, 2007, p. 2.

[5] Publicly available sources indicate that Oracle has failed to identify at least the following companies that support its products: Systime, U. S. Internetworking, Legacy Mode, CederCrestone, Optimum Solutions, Conexus Partners, Klee Associates, and Ciber, Inc.

**JONES DAY**

Hon. Charles A. Legge (Ret.)
January 28, 2008
Page 4

The case of Rimini Street illustrates the importance of this discovery. Based on an interview with Rimini Street's CEO published shortly after Oracle filed this lawsuit, an industry analyst noted that Rimini Street provides "nearly identical services as TN." He wrote that Oracle's security on its customer support website is extremely lax, allowing "anyone with a user ID to download any and all materials on the site, even those that Oracle is claiming in the lawsuit were outside of a particular customer's license rights." The article goes on to point out that "Oracle does not appear to immediately disable user IDs and access to Oracle's customer portal upon expiration of a customer's support contract" and that such "poor information security and lack of access controls might be a defense for SAP in this lawsuit." Given this backdrop, defendants are naturally interested in Oracle's activities in connection with the third-party support market.

Requests 30-31 seek documents relating to Oracle's communications with Rimini Street concerning third-party support, including communications regarding defendants. In response, Oracle is only willing to produce communications between Oracle and Rimini Street *about* SAP TN and the allegations of the Complaint.[6] That is an artificial limitation and prevents defendants from learning Oracle's policies and practices with respect to this similarly situated third-party support provider.

Requests Nos. 32-34 seek documents relating to Oracle's position on the proper methods of providing third-party support, including communications with third parties and industry analysts. In response, Oracle is only willing to produce "policies regarding the propriety of SAP TN providing third-party support or maintenance for legacy J.D. Edwards and PeopleSoft software applications . . ." and communications with industry analysts discussing TN. *Id.*, pp. 4-5. Again, that is a very narrow response and effectively conceals from discovery Oracle's third-party support policies and practices.

Request No. 39 seeks documents relating to Oracle's denial of access to its online services (*e.g.*, the Customer Connection website) to customers or third-party support providers based on conduct. Oracle has refused to produce such documents, except as to the Identified Customers.[7] Request No. 40 seeks documents relating to any occasions on which Oracle has granted access to any Oracle online service to a third-party support provider for the purpose of providing third-party support or maintenance services. Oracle has only agreed to produce any such express written agreements.

All of these discovery requests relating to third-party support are appropriate because they may shed light on the meaning and scope of Oracle's license agreements and, to the extent that Oracle has approved of or acquiesced in similar activities by other third-party support vendors, it could support defenses based on acquiescence, abandonment and consent.

The interpretation of Oracle's licenses is squarely at issue. Because those agreements are rife with ambiguities, extrinsic evidence is relevant and discoverable. For example, one of Oracle's form license agreements provides that access to Oracle's "software" may be given to employees of the customer as well as to "independent contractors engaged by Customer who

---

[6] Letter, Alinder to McDonell, January 4, 2008 [erroneously dated "January 4, 2007"], p. 4.

[7] Oracle's limitation to the Identified Customers is inappropriate for the reasons set forth in connection with the discussion of that issue, above.

JONES DAY

Hon. Charles A. Legge (Ret.)
January 28, 2008
Page 5

require access to the Software to perform their tasks . . . ."  Elsewhere, the same agreement
provides that "Customer shall not, or cause anyone else to . . . copy the Documentation or
Software except to the extent necessary for Customer's archival needs and to support the Users."
On the strength of these provisions, it would appear that TN, as an "independent contractor" that
was supporting the customer's "Users" acted within its customer's rights in accessing SSMs.
Yet Oracle claims that TN acted outside the scope of the license agreements and infringed its
copyrights by accessing such material.  While not all of the JD Edwards and PeopleSoft licenses
are identical, many of them appear to be form agreements that were only modestly customized.
Accordingly, Oracle's course of conduct with respect to these agreements could be probative of
their meaning.

"Relevant parol evidence is always admissible to assist in the determination of what the words
used in the contract mean."  *See, e.g., Cibrio Petroleum Products, Inc. v. Sohio Alaska Petroleum Co.,*
602 F.Supp. 1520, 1545-1546 (D.C.N.Y. 1985) (summarizing "hornbook law").  In determining the
admissibility of a party's business relationship with a third-party, courts have found that "a party's
business transactions with third parties is relevant to prove the meaning of a contract in appropriate
cases."  *Id.* at 1551 (reviewing party's contracts with non-parties because of similarity in the contracts)
(citing J. Weinstein & M. Berger, *Weinstein's Evidence,* 406(03) at 406-18 (1982)).  In *Cibrio,* the
court also surveyed other Circuits and concluded they were in agreement as to the admissibility of
such evidence.  Additionally, the D.C. Circuit, in an opinion by then-Judge Scalia, held:

"While the interpretation given to the same contract by one of the parties in its dealings
with third parties is not similarly persuasive [as the interpretation given to it by the
parties], in a case such as this *it has some weight-as demonstrating the past interpretation
of at least one of the parties, and also suggesting the reasonableness of the interpretation
since it has been accepted by others."*

*Tymshare, Inc. v. Covell,* 727 F.2d 1145 (D.C. Cir. 1984) (constructing an ambiguous sales
commission contract, in part, by referencing one party's application of similar contracts with
third parties) (emphasis added).[8]

---

[8] Evidence treaties are in accord.  For example, *McCormick on Evidence* § 198 (6th Ed. 2006) explains what an
"appropriate case" may be for purposes of reviewing business agreements with third parties:

"It seems clear that contracts of a party with third persons may show the party's customary
practice and course of dealing and thus supply useful insights into the terms of the present
agreement. Indeed, even if there are but one or two such contracts, they may be useful evidence.
When, in a certain kind of transaction, a business has adopted a particular mode of handling a
bargaining topic or standardized feature, such as warranty, discount or the like, it is often easier
for it to cast a new contract in the same mold than it is to work out a new one. Moreover, some
practices become so accepted in an industry that they may shape the meaning of most contracts in
that field. As to these, evidence in the form of contracts or transactions involving neither of the
parties may nevertheless be probative of the commercial relationship that exists between the
parties.

*Id.* (citations omitted).  *See also* J. Weinstein & M. Berger, *Weinstein's Evidence,* 406(03) at 406-18 (1982).

**JONES DAY**

Hon. Charles A. Legge (Ret.)
January 28, 2008
Page 6

The third-party support market is also relevant to the issue of damages. Oracle alleges that it lost customers as a result of improper downloads and "cross-use" of its intellectual property. That puts into issue the extent to which Oracle lost business to other third-party service providers and derivatively how those companies were doing business. It would be misleading and artificial for Oracle to pretend that it only lost customers to TN and only because of the allegedly excessive downloading by TN. Evidence that Oracle lost business to other third-party support providers will be directly relevant to prevent Oracle from taking that misleading position. It is also relevant to determine whether Oracle would have lost some or all of those customers to some other support vendor regardless of whether TN was in business

Under the Copyright Act, actual damages represent the injury to the market value of the copyrighted work at the time of infringement. 4 *Nimmer on Copyright* § 14.02(a) at 14-13 to 14-14. In appropriate circumstances, this amount is computed by determining what profits would have accrued to plaintiff *but for* the infringement. *Nimmer* §14.02(a)(1) at 14-14. Therefore, a plaintiff bears the burden of proving a *causal connection* between the infringement and actual damages, a requirement which is "akin to tort principles of causation and damages." *Polar Bear Productions, Inc. v. Timex Corp.,* 384 F.3d 700, 708 (9th Cir. 2004).[9] Thus, evidence that TN's customers could have or would have left Oracle with or without TN's activities presents a defense and discovery must be permitted into that area.

In searching for responsive documents, Oracle should be required, among other things, to search files related to *United States v. Oracle*, 31 F. Supp. 2d 1098 (N.D. Cal. 2004), which was the action by the Department of Justice seeking to prevent Oracle's acquisition of PeopleSoft on antitrust grounds. It stands to reason that Oracle would have collected and created documents concerning the market for third-party support in connection with that matter.

### 3.      Copyrights (Requests Nos. 61, 63 & 87)

At its core, this is a copyright case premised on Oracle's "registered copyrights on the Software and Support Materials" allegedly infringed by TN. *See, e.g.*, Complaint, ¶ 83. Oracle has failed to produce discovery that will permit defendants to test the *bona fides* of Oracle's copyright claims.

Request No. 61 seeks documents that have any tendency to support or refute any of the facts set forth in the federal copyright registrations for Oracle's alleged Registered Works. Oracle has refused to produce any documents in response to this request. This is a very finite request. If, for example, Oracle has documents that question the validity of its copyrights or contradict any representation it made to the Copyright Office in connection with its copyright applications, they are indisputably relevant and important, and Oracle has no legitimate basis to resist their production.

---

[9] In *Polar Bear,* plaintiff granted defendant a license to use their video footage of extreme kayakers. Defendant exceeded the scope of the license, and plaintiff brought a §504(b) action. Plaintiff argued that but for defendant's infringement, it would have earned the necessary funds to produce other outdoor adventure videos which would have yielded profits. The court rejected this theory of liability as "too pie-in-the-sky" and found that plaintiffs failed to establish a legally sufficient causal link between infringement and damages.

Hon. Charles A. Legge (Ret.)
January 28, 2008
Page 7

Request No. 63 seeks copies of each of the Registered Works. Oracle has agreed to meet and confer "to determine an appropriate way for defendants' counsel to inspect the registered current development environments," and has suggested that defendants may have to go to Denver, Colorado to inspect the alleged Registered Works. This is an unacceptable delaying tactic. This is a copyright case and the allegedly copyrighted works should be produced to defendants forthwith.

Request No. 87 seeks documents relating to the inter-affiliate licenses referred to in ¶ 20 of the Complaint (*i.e.*, the alleged licenses of the copyrights from the alleged owner, Oracle International Corporation, to Oracle Corporation and Oracle USA). In response, Oracle has agreed only to produce the licenses themselves and "records sufficient to show ownership of the relevant intellectual property and transfer of that ownership to Oracle."[10] To date, however, no such documents have been produced. Oracle should be ordered to produce these documents by a date certain. The ownership and validity of these licenses is an issue in this case, and defendants are entitled to full discovery into that issue. Thus, any documents that may bear on the validity (*e.g.*, disputes concerning validity, mistakes in the inter-affiliate licensing, etc.) must be produced.

### 4.      Damages (Requests Nos. 65-66, 70-71, 79, 101, 107 and Interrogatory No. 5)

Plaintiffs have stonewalled discovery into their alleged damages on grounds that "the law does not require Oracle to prematurely state all the bases for its damages." We strongly believe that substantial productive discovery into damages issues must occur immediately. Postponing this discovery would prejudice defendants and the defense damages expert, in light of the non-expert discovery cutoff of July 25, 2008 and the schedule for expert discovery.[11]

Oracle has identified the types of its alleged damages as including: (1) "lost profits from sales or licenses to current and potential customers of Oracle support services and software programs;" (2) "diminution of Oracle's competitive advantage;" (3) "harm to Oracle's data, programs, and computer systems … including their functionality;" (4) "loss of the . . . benefits that SAP obtained from the unlawful . . . use" of its stolen property; (5) damage to its right to "dominion and control" over its property; (6) damage to "confidential nature of the information Oracle's website;" (7) "diminution in value of Oracle's stolen property;" (8) "deprivation of the intended use of Oracle's computer systems;" and (9) "irreparable harm."[12]

Despite defendants' diligent efforts, however, Oracle has produced little or no discovery documenting the fact or amount of its alleged damages.

Request No. 65 seeks documents reflecting revenues, costs and profits for support and maintenance services *for the products* referred to in the Complaint or at issue in this litigation. Request No. 66 seeks similar documents *for the Named Customers and the TN Customers*. In response to both of these requests, Oracle has agreed to produce documents "sufficient to show Oracle's revenues, costs and profit margins for support or maintenance services" relating to

---

[10] Letter, Alinder to McDonell, January 4, 2008 [erroneously dated "January 4, 2007"], p. 6.

[11] The parties must designate experts by August 8, 2008, expert reports are due August 15, 2008, rebuttal reports are due August 29, 2008 and the expert discovery cutoff is September 12, 2008. *See* Pretrial Order, September 25, 2007, p. 1.

[12] *See* Oracle's Response to TN Interrogatory No. 5.

Hon. Charles A. Legge (Ret.)
January 28, 2008
Page 8

"applications for which Oracle has alleged that defendants downloaded Software and Support Materials from Oracle's systems . . . ." In effect, Oracle is limiting its responses to the Identified Customers and refusing to provide information for all of TN's customers. Moreover, other than production of its license agreements with the Identified customers, Oracle has produced *nothing* in response to these requests.

For the reasons discussed above concerning Oracle's attempt to limit discovery to the Identified Customers, Oracle cannot limit its production to information concerning applications that are subject of the alleged downloads. Oracle's Complaint is not limited to alleged unauthorized downloads. It also makes allegations concerning alleged improper "cross-use" of downloads, whether or not the initial download was authorized. Accordingly, defendants are entitled to discovery of this information for all families of products allegedly at issue in this case, both for downloads and cross-use allegations. Our request is that Oracle produce such information for *all* JD Edwards and PeopleSoft products.[13]

Requests Nos. 67 and 68 seek Oracle's financial information for products and services *other* than those referred to in the Complaint, including for all TN Customers for products other than those referred to in the Complaint. If Oracle produces the requested documents in response to Requests Nos. 65 and 66, as discussed in the preceding paragraph, we are willing to postpone our efforts to compel compliance with Requests 67 and 68 for now and will reserve rights to seek that discovery later, if and as necessary.

Oracle continues to refuse production until the "expert discovery phase" in response to Request No. 70 (documents relating to any alleged loss of revenues or profits by Oracle as a result of the conduct alleged in the Complaint), Request No. 101 (documents relating to the alleged cost of Oracle's investigation) and Request No. 107 (documents relating to the allegation in ¶ 92 of the Complaint that "Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of Oracle support services and licenses for Oracle's software programs"). These refusals are unjustified. For example, the cost of the investigation should be readily discernable, and Oracle has recently indicated that it will produce such documents as are currently available. Even if Oracle does not yet have every document that may relate to is alleged losses, it most certainly has some of them and they must be produced. Again, other than license agreement for the Identified Customers, Oracle has *produced* nothing in response to these requests.

Request No. 71 seeks documents relating to Oracle's fees for support and maintenance of the Oracle products referred to in the Complaint or at issue in the litigation, including documents concerning how those fees are set and any relationship between the price of a product and the amount Oracle charges for support and maintenance of that product. In its written response, Oracle has refused to produce documents, except for documents showing service terms with Identified Customers. For reasons stated above, the limitation to Identified Customers is not acceptable or fair. Oracle has suggested that such documents will be provided, but not until the "expert discovery phase." There is no reason to wait for that phase, as these documents should exist and be readily identifiable now.

---

[13] Of course, Defendants do not know how Oracle maintains its financial records. At the hearing on this motion, we will be prepared to discuss the types of documents that a large corporation like Oracle likely maintains and should be ordered to produce.

JONES DAY

Hon. Charles A. Legge (Ret.)
January 28, 2008
Page 9

Request No. 79 seeks documents relating to the allegation that "Oracle has invested billions of dollars in research, development, and engineering," as alleged in ¶ 3 of the Complaint. In response, Oracle has made a general reference to its public SEC filings only, without identifying any particular filing or any specific information.  If Oracle plans to rely on any particular SEC filings to support this allegation, such documents must be produced.  If Oracle chooses to produce no other documents in response to this request, then Oracle should be barred from offering any others into evidence at any time.

Interrogatory No. 5 requests information about how Oracle believes any activity alleged in the Complaint has damaged it, including how Oracle was damaged by each allegedly improper download and, if Oracle claims to have lost any customer as a result of any activity alleged in the Complaint, all facts and inferences upon which Oracle bases that claim for each customer allegedly lost.  In response, Oracle asserts that "as a minimum and without limitation Oracle has lost the Named Customers as a result of activity alleged in the First Amended Complaint," but provides no supporting details.  Oracle again claims that discovery into damages is "premature" and propose to answer it with Oracle's expert damages reports when due.  Again, we believe that much of the information Oracle will rely on for its damages case is known and available to Oracle and should be produced.  For example, if Oracle believes it has lost certain profit margins as a result of the activities alleged, it should produce the supporting documents.  Oracle has information about TN's customers and, if Oracle believes that it has lost any revenue or profits from any such customer, it should produce the supporting evidence.

<u>CONCLUSION</u>

For the foregoing reasons, TN's motion to compel should be granted.

Very truly yours,

Jason McDonell

cc:    Christopher B. Hockett, Esq. (via email)
       Geoffrey Howard, Esq. (via email)
       Zachary Alinder, Esq. (via email)
       Holly House, Esq. (via email)
       Bree Hann, Esq. (via email)

# EXHIBIT O

# JONES DAY

555 CALIFORNIA STREET, 26TH FLOOR • SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE: (415) 626-3939 • FACSIMILE: (415) 875-5700

Direct Number:  (415) 875-5820
jmcdonell@jonesday.com

June 16, 2009

Ms. Holly House                                                   Via E-Mail
Ms. Bree Hann
Ms. Amy Donnelly
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA  94111-4067

Re:    Case No. 07-CV-1658; *Oracle USA, Inc., et al. v. SAP AG, et al*;
       U. S. District Court, Northern District of California, San Francisco Division

Dear Counsel,

This letter responds to Amy Donnelly's June 5, 2009 letter and Bree Hann's May 22, 2009 e-mail regarding alleged issues relating to Defendants' responses to Plaintiffs' Interrogatories, Requests for Production ("RFPs"), and Targeted Search Requests.  This letter also addresses certain statements in Holly House's June 12 letter to Elaine Wallace, although we will respond more fully to that letter via separate correspondence as it relates to discrete disputes for which Defendants have already received permission to file a motion from Judge Laporte.  We are prepared to meet and confer to discuss these matters further to the extent necessary.

## I.    HOLLY HOUSE'S JUNE 12, 2009 LETTER

Page one of Ms. House's letter purports to summarize Defendants' complaint and the scope of relief Defendants intend to seek and then concludes with the incorrect statement "Oracle understands that is the totality of Defendants' complaint and the totality of the relief it intends to seek [from Judge Laporte at the August 4, 2009 hearing].  We have explained numerous times both verbally and in writing what Defendants' complaints are and what relief we intend to seek at the August 4th hearing (*see e.g.*, Elaine Wallace's May 19, 2009 letter to Geoff Howard; Defendants' objections to Plaintiffs' Fourth Targeted Search Request; Jason McDonell's description of the issues at the May 26 Discovery Conference; and Elaine Wallace's June 4, 2009 letter to Holly House).  We have continually explained that limiting Safe Passage discovery is not the totality of the relief Defendants seek.

Placing reasonable limits on Safe Passage discovery is one part of the expected motion that will be heard on August 4 though it is the only issue that is addressed at all in Holly House's June 12 letter.  Another part of the contemplated motion, which Ms. House's June 12 letter does not address, is Plaintiffs' attempt to extend their damages claims to customers that never left Oracle at all  (*i.e.*, customers that are neither part of the 346 TomorrowNow customers or the

June 16, 2009
Page 2

subset of 81 Safe Passage customers).  Plaintiffs have refused discovery on these additional
customers, which Oracle retained, but only now claims Oracle was forced to give discounts to
certain of those customers as a result as of TomorrowNow's activities.  It is simply too late for
Plaintiffs now to attempt to provide and seek discovery on any customers other than the 346 that
Oracle alleges were lost to TomorrowNow.  That is the Rule 37 preclusion part of the
contemplated motion, not Safe Passage.  With respect to Oracle's broadened Safe Passage
discovery, Defendants intend to seek a protective order under Rule 26 in an effort to place
reasonable limits on Safe Passage discovery and avoid unduly burdensome and irrelevant
discovery on that topic.  The Safe Passage issue is discussed in further detail below in response
to Bree Hann's May 22, 2009 email.

As noted above, we continue to analyze Ms. House's June 12 letter and will further
respond via separate correspondence.  And, in considering that response we will take into
account Amy Donnelly's June 12, 2009 email relating to Ms. House's June 12 letter and Bree
Hann's May 22 email.  In the interim, we provide the following response to Ms. Hann's May 22
email as it was originally sent.

## II.   BREE HANN'S MAY 22, 2009 E-MAIL

In Ms. Hann's May 22, 2009 e-mail, Plaintiffs request that Defendants produce all
documents pertaining to Safe Passage, "regardless of whether the customers held TomorrowNow
contracts," in response to RFP Nos. 13 through 18 in Plaintiffs' Second Set of Requests for
Production of Documents and Plaintiffs' recent targeted search request.

As you know, Defendants plan to file a discovery motion to prevent Plaintiffs from
broadening discovery to include information about SAP customers that did not also have an
agreement with TomorrowNow.  The basis for this motion was described to Plaintiffs in the
discussions with Judge Laporte at the May 26 discovery conference, our telephonic meet and
confer on June 4, 2009 regarding Defendants' anticipated damages motion, and in Elaine
Wallace's letter to Holly House immediately following the June 4, 2009 meet and confer.  As we
have explained, Plaintiffs conceded to the Court almost a year ago that SAP customers that did
not also have an agreement with TomorrowNow are not relevant to the alleged damages in this
case.  *See, e.g.*, July 1, 2008 Discovery Conference Tr., at 59.  Not only are these customers
irrelevant, but Defendants have relied on this limitation in conducting their discovery, damages
analysis, and case preparation; indeed, this limitation led to the substantial effort that went into
compiling the list of 81, on which both sides have relied to determine the scope of relevant
discovery and to which Plaintiffs have never objected.  Plaintiffs' attempt to broaden damages
discovery, and presumably their damages claim, to encompass SAP customers beyond the list of
81 comes too late.  Such a broadening of discovery would immensely and unworkably expand
the scope of discovery and seriously prejudice Defendants, even under the extended case
schedule.  In short, Plaintiffs' request for information related to Safe Passage beyond the list of
81 is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of

JONES DAY

June 16, 2009
Page 3

admissible evidence because it seeks at the eleventh hour enormous volumes of information that
Plaintiffs conceded was irrelevant over a year ago and that Plaintiffs have refused to produce in
kind.  Defendants further address each of the RFPs identified in Ms. Hann's May 22, 2009 e-
mail as follows:

### RFP No. 13

RFP No. 13 seeks "Summary sales and profit numbers for (a) all SAP TN Customers
since its inception, (b) all Safe Passage deals; (c) all Safe Passage deals for which SAP TN was a
component (i.e., those for which SAP TN did, does, or will provide software support services on
Oracle-branded software applications to a Customer), and (d) all SAP sales or licenses to any
SAP TN Customer after the acquisition of SAP TN."

Defendants have already provided summary sales and profit numbers for TomorrowNow
customers and have provided customer specific financial reports for the SAP customers that are
on the list of 81 that include the sales information for those customers.  As previously agreed,
Defendants searched for and produced general high level information regarding SAP's profit
margins.  *See* SAP-OR 00603613.  Subject to the parties' resolution of the dispute regarding the
number of remaining targeted search requests, and in conjunction with our ongoing discussions
about profitability information that Defendants still need from Oracle, Defendants are happy to
meet and confer on this issue and consider additional, more specific requests Oracle may have in
connection with this issue.  However, for the reasons described above, Defendants maintain that
SAP customers that did not also have an agreement with TomorrowNow are irrelevant for this
purpose.

### RFP No. 14

RFP No. 14 seeks "Customer-specific sales reports, comparable to TN-OR00130333 and
TN-OR00979779, for (a) all SAP TN Customers since its inception, (b) all Safe Passage deals;
(c) all Safe Passage deals for which SAP TN was a component (i.e., those for which SAP TN
did, does, or will provide software support services on Oracle-branded software applications to a
Customer), and (d) all SAP sales or licenses to any SAP TN Customer after the acquisition of
SAP TN."

Defendants have already provided customer-specific sales reports for TomorrowNow
customers and for the list of 81, and to the extent that there are any ongoing adjustment to that
list, Defendants will update those reports accordingly.  However, for the reasons described
above, Defendants will not produce customer-specific sales reports for SAP customers that did
not also have an agreement with TomorrowNow.

### RFP No. 15

JONES DAY

June 16, 2009
Page 4

RFP No. 15 seeks "All Documents relating to reports, summaries, or compilations, with kinds of data comparable to that found in TN-OR00130333 and TN-OR00979779, listing Safe Passage Customers after January 15, 2005 and identifying components of those Safe Passage deals (e.g., SAP TN service, integration services, migration services, applications sales) and revenues and term lengths associated with those components."

Plaintiffs' request for "all documents relating to" is overly broad and unduly burdensome. One of the purposes of the parties' agreement to produce customer-specific financial reports was to avoid the unreasonable burden of producing "all documents relating to" the information contained in such reports.

Defendants have already produced customer-specific reports for the TomorrowNow customers and the list of 81. Additionally, to the extent that the request seeks information about TomorrowNow customers and the list of 81, and to the extent that Defendants have found documents responsive to this request in the data of requested custodians and in those central repositories reviewed in response to Plaintiffs' targeted search requests, Defendants have produced these documents. However, for the reasons described above, Defendants will not produce such information for SAP customers that did not also have an agreement with TomorrowNow, except to the extent that such information has been produced in response to other, non-objectionable, requests.

## RFP No. 16

RFP No. 16 seeks "For all Safe Passage deals, including but not limited to those for which SAP TN was a component, all Documents relating to any discussions, Communications about, or other evidence that SAP TN was not relevant to the Customer's decision to buy or license other goods or services from SAP AG or SAP America."

To the extent that this request seeks information about TomorrowNow customers' reasons for purchasing or licensing goods or services from SAP AG or SAP America, and to the extent that Defendants have found documents responsive to this request in the data of requested custodians and in those central repositories reviewed in response to Plaintiffs' targeted search requests, Defendants have produced these documents. But for the reasons described above, Defendants will not produce such information for Safe Passage deals for which TomorrowNow was not a component, except to the extent that such information has been produced in response to other, non-objectionable, requests.

## RFP No. 17

RFP No. 17 seeks "All Documents relating to quantifications, analyses, or Communications about actual or projected revenue lost by Oracle because of SAP TN's actions, offerings, or deals or because of any aspect of the Safe Passage program."

June 16, 2009
Page 5

To the extent that this request seeks quantifications, analyses, or communications about actual or projected revenue lost by Oracle due to TomorrowNow's conduct or the Safe Passage program as it relates to the list of 81, and to the extent that Defendants have found documents responsive to this request in the data of requested custodians and in those central repositories reviewed in response to Plaintiffs' targeted search requests, Defendants have produced these documents. However, for the reasons described above, Defendants will not produce such information related to "any aspect of the Safe Passage program" beyond the list of 81, except to the extent that such information has been produced in response to other, non-objectionable, requests.

**RFP No. 18**

RFP No. 18 seeks "Pro-formas and forecasts (and any assumptions, analyses, and financial back-up) for sales, revenue, and profits for (a) any aspect of the Safe Passage program, (b) SAP TN's expected contributions to the Safe Passage program (including anticipated service revenues and assistance in driving application sales), and (c) SAP TN's software support services for any Oracle-branded software applications (including without limitation PeopleSoft, JD Edwards, eBusiness Suite, Retek, and Hyperion) and any follow-on sales or licenses (e.g., future applications sales or licenses) projected in connection with SAP TN's offering of such software support services."

To the extent that this request seeks information related to TomorrowNow or the Safe Passage program as it relates to the list of 81, and to the extent that Defendants have found documents responsive to this request in the data of requested custodians and in those central repositories reviewed in response to Plaintiffs' targeted search requests, Defendants have produced these documents. However, for the reasons described above, Defendants will not produce information related to "any aspect of the Safe Passage program" beyond the list of 81. (Furthermore, pursuant to the Court's recent order related to the case schedule extension, Defendants have not and will not produce information related to eBusiness Suite, Retek, and Hyperion.)

**III.   AMY DONNELLY'S JUNE 5, 2009 LETTER**

In Ms. Donnelly's June 5, 2009 letter, Plaintiffs identify a number of alleged issues relating to Defendants' discovery responses, including Defendants' responses to Plaintiffs' requests for information relating to SAP's sales and renewal rates, SAP's licensing practices and valuation of its own intellectual property, as well as other various responses. Defendants address each of these alleged issues below:

June 16, 2009
Page 6

### A.   Requests for Information Relating to SAP's Sales and Renewal Rates

RFP Nos. 21 and 22 in Plaintiffs' Second Set of Requests for Production of Documents seek information relating to SAP's historic applications sales and contract renewal rates. Specifically, RFP. No. 21 seeks "All Documents relating to SAP AG or SAP America's historic applications sales pipeline close rates, including percent closed, time to close, and factors driving closure" and RFP No. 22 seeks "All Documents relating to SAP AG or SAP America's historic service contract and application license renewal rate, including percent renewed and factors driving renewal." Ms. Donnelly's letter provides some clarification regarding Plaintiffs' reasons for requesting this data.

Defendants continue to object to these requests as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that they seek information about SAP customers that did not also have an agreement with TomorrowNow and products other than those that directly competed with the products supported by TomorrowNow. Furthermore, as explained in detail in section II. B. *infra*, Defendants also dispute that the sales and renewal rates for *SAP* applications have any bearing on a hypothetical license negotiation for *Oracle* applications or on Defendants' upcoming summary judgment motion.

However, Defendants are willing to meet and confer with Plaintiffs regarding production of documents responsive to RFP Nos. 21 and 22, limited to information regarding TomorrowNow customers and the list of 81.

### B.   Requests for Information Relating to SAP's IP

RFP Nos. 23 and 27 in Plaintiffs' Second Set of Requests for Production of Documents, as well as Targeted Search Request 1(l) generally seek information regarding SAP's licensing practices and valuation of its own IP or the IP of companies it has acquired. In Ms. Donnelly's letter, Plaintiffs contend that this information is relevant to Plaintiffs' reasonable royalty theory of damages.

However, as we have explained to you on multiple occasions, including in Jane Froyd's June 11, 2009 e-mail to Bree Hann, information regarding SAP's licensing practices or valuations of its own IP is irrelevant, not only to Plaintiffs' damages case in general, but also to Defendants' forthcoming summary judgment motion. The price at which Oracle licenses Oracle IP to its partners is far more likely to inform the price of a hypothetical license for Oracle's IP than are the ways in which SAP valued *non-Oracle* IP that SAP paid for or sold. There is simply no connection between the price of non-Oracle IP and the price to which Oracle and SAP would have agreed to license Oracle's products to SAP or TomorrowNow for their use in connection with TomorrowNow's service to former Oracle customers and other activities alleged in Oracle's complaint and discovery responses. Having consistently resisted discovery regarding

June 16, 2009
Page 7

PeopleSoft's partner relationships (e.g., with NetCustomer and CedarCrestone), including relevant software licenses of Oracle IP, on the basis that such discovery is irrelevant, Plaintiffs cannot now claim that information about SAP's licensing practices and valuation of its own IP is relevant.

Furthermore, information about SAP's licensing practices and valuation of its own IP are unrelated to Defendants' summary judgment motion. In Ms. Donnelly's letter, Plaintiffs state that SAP's licensing practices and the value it assigns to its IP are relevant as benchmarks for valuing Oracle's IP, and thus relevant to the price SAP would have paid to license Oracle's IP. However, as we have informed you, Defendants' initial motion will attack Plaintiffs' legal entitlement to pursue their reasonable royalty theory of damages, not the potential amount of a hypothetical license. Whatever claimed value that SAP's license practices and valuation of IP may have to determining the price of a hypothetical license (which value we dispute), these subjects do not bear on the preliminary matter of whether Plaintiffs may pursue a reasonable royalty theory of damages, whether called a "hypothetical license" or by some other name; thus, they have no relevance to Defendants' motion.

Finally, your claim that information about SAP IP valuation is relevant to an alleged "hypothetical license" is contradicted by the undisputed testimony from Oracle's CEO and his chief lieutenants about how Oracle would go about determining the value of a license and how they achieved the astronomical numbers that Plaintiffs will apparently seek. The alleged harm to Oracle was the basis of all their calculations, not SAP's IP or licensing practices. Because SAP's licensing practices and valuation of its own IP are not relevant to the issues in this case or Defendant's summary judgment motion, this information is not the type that requires prioritization or expedited production as you claim.

In light of the above, Defendants further address each of the discovery requests seeking information regarding SAP's licensing practices and valuation of its IP as follows.

### RFP No. 23

RFP No. 23 seeks "All Documents relating to licenses, contracts, or agreements between SAP AG or SAP America and any independent (non-affiliated, non-partner) software support service provider for SAP-branded software applications or to any license Defendants deem comparable to the type of license that would have been required between Oracle and SAP TN for the type of activities engaged in by Defendants."

For the reasons stated above, Defendants continue to deny the relevance of the information sought by this request, both to Plaintiffs' damages theory and to Defendants' summary judgment motion. Because Plaintiffs have failed to provide a reason to do otherwise, Defendants stand on their objections to this request.

June 16, 2009
Page 8

### RFP No. 27 and Targeted Search Request 1(l)

RFP No. 27 seeks "All Documents related to the allocation of the purchase price for Business Objects, including the determination of the fair value in accordance with FAS 141 and 142 of the identified intangible assets acquired." Similarly, Targeted Search Request 1(l) seeks "Documents showing SAP's valuation of the intellectual property of any company it has acquired (including, but not limited to, Business Objects)." In Ms. Donnelly's letter, Plaintiffs state that Defendants' allocation of the purchase price for Business Objects and SAP's valuation of its acquired companies' intellectual property is relevant because "it provides a demonstration of how, when not in litigation, Defendants independently value acquired intellectual property."

However, as discussed above, the way in which Defendants value non-Oracle IP has no bearing on how Defendants and Plaintiffs would have valued Oracle IP, and has even less of a connection to the price upon which the parties would have agreed to license Oracle IP to Defendants. Furthermore, "how . . . Defendants independently value acquired intellectual property" is irrelevant to Defendants' summary judgment motion, which will attack Plaintiffs' legal entitlement to pursue its reasonable royalty theory of damages, not the potential amount of a reasonable royalty.

As Plaintiffs have failed to demonstrate why this discovery is relevant to the case or to Defendants' motion for summary judgment, Defendants continue to stand on their objections to these requests.

### C.     Miscellaneous Requests for Information

Defendants respond to the additional concerns raised in Ms. Donnelly's letter as follows.

### Interrogatory No. 7 from Oracle Corporation's Third Set of Interrogatories to TomorrowNow, Inc.

Interrogatory No. 7 asks TomorrowNow to "Describe all ways that Seth Ravin, George Lester, or Beth Lester were involved in the development of SAP TN's Business Model as it existed in December 2004, including as that model related to the use of Local Environments and downloading of Software and Support Materials."

To provide background for its response, TomorrowNow stated: "TomorrowNow customers utilizing the retrofit support model were contractually obligated to continue to pay maintenance fees to PeopleSoft for the newer releases while receiving retrofit services from TomorrowNow." In Ms. Donnelly's letter, Plaintiffs claim that this statement is false, citing the fact that Bear Stearns received retrofit updates pursuant to a TomorrowNow agreement that you claim contains no such "contractual obligation." Defendants deny that this portion of TomorrowNow's response is false or that it requires supplement or amendment. However, in the

June 16, 2009
Page 9

spirit of cooperation, Defendants will supplement the response. Defendants, however, decline Plaintiffs' request that Defendants supplement their response to Interrogatory No. 7 "to include this and all other such instances" in which TomorrowNow customers received retrofit updates, as this information is not responsive to Interrogatory No. 7.

### Interrogatory No. 13 from Oracle Corp.'s First Set of Interrogatories

Interrogatory No. 13 asks defendant TomorrowNow to "Describe in as much detail as possible all Software and Support Materials that 'have been downloaded beyond those that, according to TN's records, related to applications licensed to the particular customer on whose behalf the downloads were made,' as alleged in ¶ 15 of Your Answer, including but not limited to Identifying the 'record' You referenced in making Your determination."

As Ms. Donnelly notes in her letter, Defendants have made clear that they do not have the ability to map each of the specific downloads to each of the specific products due to Plaintiffs' failure to provide relevant information regarding product-to-download mapping. Further, contrary to the mischaracterization in Ms. Donnelly's letter, it was *Plaintiffs* who represented to the Court they do not have the ability post-download to determine which downloads relate to which products. *See* February 13, 2008 Discovery Conference Tr., at 28:17-24, 32:20-34:20. Thus, if Plaintiffs have no effective way to map the downloaded artifacts to a particular licensed product after the artifact has been downloaded, it is logically consistent for Defendants to maintain that same position—especially when Defendants have been seeking from Plaintiffs from the outset of this case the data that would permit such a mapping exercise. And, even if the underlying data exists and Plaintiffs agreed to produce it, the burden of the mapping exercise would be at best equal, and most likely less burdensome for Plaintiffs as they are the creators owners of the source data needed to conduct the mapping.

Plaintiffs are the only entities that would have the underlying data that would permit both parties to analyze and then take a position regarding which licensed products any given download relates to. Plaintiffs have not produced that data and has represented to Judge Legge that they do not have that data. Given that Plaintiffs are in control of the relevant software and support materials that were made available on CustomerConnection and via Plaintiffs' other facilities, it is not unreasonable to expect that Plaintiffs would have maintained an appropriate dataset that the parties in this case could use to perform the mapping exercise that Plaintiffs now contend Defendants are required to do.

Defendants have provided to Plaintiffs the location of the relevant downloads, access to the downloads themselves, hard drives containing the downloads and relevant metadata, and information regarding the customers on whose behalf the downloads were conducted. Because Plaintiffs continue to withhold information necessary to map the downloads to specific products (*see* Plaintiffs' Second Amended and Supplemental Responses and Objections to TomorrowNow, Inc.'s First Set of Interrogatories, Response to Interrogatory No. 7), because

June 16, 2009
Page 10

Plaintiffs are the only parties in a position to provide the underlying data that must be used to perform any reasonably effective mapping exercise, because Plaintiffs either do not have or have refused to provide such data, and because even if they produced the data it would be more burdensome for Defendants, rather than Plaintiffs to conduct the mapping exercise, Defendants stand on their objections to this request.

### **Interrogatory No. 14 from Oracle USA's Second Set of Interrogatories**

Interrogatory No. 14 asks TomorrowNow: "For each local environment Identified in Your responses to Interrogatories 12 and 13, Identify all Customers who received support based on the Use of that environment, and a detailed description of that support (such as, for example, the retrofit tax updates testified to by Shelley Nelson (Shelley Nelson Dep. at 32: 19-34: 13 (Oct. 30, 2007)) including, where applicable, Identification of the name, number, version or other Identifying information of the product provided as part of the support."

As Ms. Donnelly notes in her letter, we have explained that it is impossible and unreasonable to expect TomorrowNow to provide a detailed description of the support provided with each local environment. In response, you claim that Catherine Hyde testified that she had performed this type of analysis for various environments and that she is capable of providing the type of response to Interrogatory No. 14 that Plaintiffs appear to seek.

As a general matter, although Ms. Hyde—along with many other TomorrowNow witnesses identified in Defendants' response—provided detailed testimony regarding the use of TomorrowNow's local environments, Ms. Hyde never testified that she had identified or was able to identify *all* customers who received support based on use of each environment (or any environment for that matter) in addition to "a detailed description of that support." To provide the testimony that she actually gave, Ms. Hyde undertook the substantial task of researching the SAS database and the BakTrak database, reviewing previous testimony, and interviewing individual developers. *See* April 1, 2008 Rule 30(b)(6) Deposition of Catherine Hyde, 8:23-9:14.

Plaintiffs' request improperly asks Defendants to chronicle daily events that took place over the course of six years and to summarize massive quantities of business records to which Plaintiffs now have equal access—the exact type of task to which Plaintiffs have objected in many of their responses to Defendants' discovery requests. *See, e.g.*, Plaintiffs' Second Amended and Supplemental Responses and Objections to TomorrowNow, Inc.'s First Set of Interrogatories, Responses to Interrogatory Nos. 1 ("Oracle further objects to the extent the Interrogatory purports to require Oracle to create a compilation, abstract, or summary from business records that Oracle has already produced or will produce and to summarize the documents and testimony provided on this subject, including by Oracle's 30B6 witness on this topic; Oracle cannot and will not and is not required to do so and incorporates all such evidence by reference into this supplemented answer"), 2 (same), 3 ("Oracle further objects to the extent

June 16, 2009
Page 11

that supplementation would require Oracle to summarize the documents and testimony provided on this subject; Oracle cannot and will not and is not required to do so and incorporates all such evidence by reference into this supplemented answer"), 4 (same) 5 ("Oracle further objects to the extent that supplementation would require Oracle to summarize the documents and testimony provided on this subject, including, e.g., the deposition testimony of Mr. Ellison, Mr. Phillips, Ms. Catz, Mr. Rottler, Mr. Jones, Mr. Cummins, Ms. Ransom, Ms. Lyskawa and Ms. Shippy; Oracle cannot and will not and is not required to do so and incorporates all such evidence by reference into this supplemented answer"), 6-7 (same type of objections), 9-13 (same type of objections); *see also* Plaintiffs' Responses and Objections to TomorrowNow, Inc.'s Fifth Set of Interrogatories, Responses to Interrogatory Nos. 33 (same type of objections), 38 (same type of objections).

Regardless of the equality of the burden with respect to this issue, it is completely implausible that this task (at least at the level of detail Plaintiffs seek to force Defendants to respond) could be completed within the time remaining for discovery, and even less plausible that it could be completed by a single person, as Plaintiffs suggest. Having provided Plaintiffs with the data and easy-to-use tools necessary to perform this analysis as well as detailed testimony that represents Defendants' already extensive efforts to provide Plaintiffs with information about the use of TomorrowNow's local environments, Defendants have more than satisfied their burden of responding to this request.

### RFP No. 16 from Plaintiffs' First Set of Requests for Production to TN

RFP No. 16 seeks "All Communications within SAP TN, or between You and SAP AG, SAP America, Your Customers, or Your potential future customers, relating to Your Business Model, including without limitation all Communications relating to Your prices, services, and abilities to provide software support services for PeopleSoft and JD Edwards software applications." Ms. Donnelly's letter requests that Defendants confirm that, in response to this request, Defendants have searched for and produced all audio recordings or written transcripts of TomorrowNow's customer "roundtable" sessions.

Defendants are currently reviewing Plaintiffs' request that Defendants confirm that they have searched for and produced all audio recordings or written transcripts of TomorrowNow's customer "roundtable" sessions. When that review is complete, we will respond separately on this particular request.

### RFP No. 11 from Plaintiffs' First Set of Requests for Production to TN

RFP No. 11 seeks "All Documents relating to the 'organizational setup which keeps a clear firewall between TomorrowNow's operation and SAP,' as described by SAP AG CEO Henning Kagermann on July 3, 2007 at an SAP AG press conference call, and to the 'extensive policies' put in place by SAP AG and SAP America at the time of Your acquisition to 'assure

June 16, 2009
Page 12

that no allegedly confidential material of Oracle obtained by TN on behalf of its customers would reach SAP AG or SAP America,' as alleged in paragraph I of your Answer."

As Ms. Donnelly's letter acknowledges, Defendants already have supplemented their response to this request. As you know, Defendants identified the Rules of Engagement as the extensive polices put in place by SAP AG and SAP America to assure no allegedly confidential material of Oracle obtained by TN on behalf of its customers would reach SAP AG or SAP America. Defendants' response further identified the location of these Rules in Defendants' production. To the extent the parties disagree about the definition of "extensive," such disagreement goes not to the sufficiency of Defendants' response and instead is simply a semantic dispute.

### RFP No. 1 from Plaintiffs' Second Set of Requests for Production of Documents to All Defendants

RFP No. 1 seeks "All Documents relating to Project Blue (and any related or predecessor or successor proposals, programs, plans, or projects) including without limitation Communications, meeting notes, projections, financial analyses, models, valuations, memoranda, correspondence, agreements, proposals, and presentations." Ms. Donnelly's letter requests that Defendants produce a written version of the 2007 directive from the SAP Executive Board to TomorrowNow to remove vendor intellectual property from TomorrowNow's systems, explain where it appears on Defendants' privilege log, or confirm that no such writing exists or that it was destroyed.

Defendants are currently reviewing Plaintiffs' request that Defendants either produce the written version of the 2007 directive, explain where it appears on Defendants' privilege log, or definitively confirm that no such writing (draft or final) exists. When that review is complete, we will respond separately on this particular request.

### RFP No. 28 from Plaintiffs' Second Set of Requests for Production of Documents

RFP No. 28 seeks "All Documents constituting security measures or means for SAP AG or SAP America's customer-facing websites or portals, including without limitation security or protection methods, credential requirements, monitoring policies or procedures, and enforcement policies or procedures."

As we repeatedly have explained to Plaintiffs, SAP's security measures are irrelevant to the issues in this case, including the issue of whether Plaintiffs adequately protected their intellectual property. Ms. Donnelly's letter provides no reason to believe otherwise. Plaintiffs state that the security measures Defendants implement to protect their customer-facing websites are relevant to determining whether Plaintiffs' security measures were sufficient by comparison. This is inaccurate. Plaintiffs have put the value of their intellectual property at issue in this case,

JONES DAY

June 16, 2009
Page 13

and the ways in which Plaintiffs purported to protect that intellectual property (or failed to do so) are directly relevant to assessing that value and the credibility of Plaintiffs' claims. By contrast, there are no similar contentions in this case regarding the value of SAP's intellectual property; accordingly, the manner in which SAP guarded its intellectual property has no relevance in this case.

Because Plaintiffs have provided no reason to do otherwise, Defendants continue to stand on their objections to this request.

If you have any questions or wish to meet and confer further regarding the above, please do not hesitate to contact me.

Very truly yours,

/s/ Jason McDonell

Jason McDonell

cc:    Donn Pickett                                           VIA E-MAIL
       Zachary J. Alinder                                     VIA E-MAIL
       Geoff Howard                                           VIA E-MAIL

SFI-612688v1