1   BINGHAM MCCUTCHEN LLP
    DONN P. PICKETT (SBN 72257)
2   GEOFFREY M. HOWARD (SBN 157468)
    HOLLY A. HOUSE (SBN 136045)
3   ZACHARY J. ALINDER (SBN 209009)
    BREE HANN (SBN 215695)
4   Three Embarcadero Center
    San Francisco, CA  94111-4067
5   Telephone:  415.393.2000
    Facsimile:  415.393.2286
6   donn.pickett@bingham.com
    geoff.howard@bingham.com
7   holly.house@bingham.com
    zachary.alinder@bingham.com
8   bree.hann@bingham.com

9   DORIAN DALEY (SBN 129049)
    JENNIFER GLOSS (SBN 154227)
10  500 Oracle Parkway, M/S 5op7
    Redwood City, CA 94070
11  Telephone:  650.506.4846
    Facsimile:  650.506.7144
12  dorian.daley@oracle.com
    jennifer.gloss@oracle.com
13
    Attorneys for Plaintiffs
14  Oracle USA, Inc., Oracle International Corporation,
    Oracle EMEA Limited, and Siebel Systems, Inc.
15

16              UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18                   OAKLAND DIVISION

19

20  ORACLE USA, INC., *et al.*,              No. 07-CV-01658 PJH (EDL)

21          Plaintiffs,                      **ORACLE'S MOTION TO MODIFY**
        v.                                   **THE PROTECTIVE ORDER AND**
22                                           **TO COMPEL DEPOSITION**
    SAP AG, *et al.*,                        **TESTIMONY AND FURTHER**
23                                           **RESPONSES TO REQUESTS FOR**
            Defendants.                      **ADMISSIONS**
24
                                             Date:     January 26, 2010
25                                           Time:     9:00 a.m.
                                             Place:    E, 15th Floor
26                                           Judge:    Hon. Elizabeth D. Laporte

27

28

---

MEMORANDUM IN SUPPORT OF ORACLE'S MOTION TO MODIFY THE PROTECTIVE ORDER AND
TO COMPEL, CASE NO. 07-CV-01658 PJH (EDL)

Dockets.Justia.com

1

<u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3  NOTICE OF MOTION AND MOTION ........................................................................... 1

4  RELIEF SOUGHT .......................................................................................................... 1

   MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 2

5  I.   INTRODUCTION .............................................................................................. 2

6  II.  THE COURT SHOULD MODIFY THE PROTECTIVE ORDER ..................... 4

7       A.   Ninth Circuit Case Law Strongly Favors Modification ......................... 4

        B.   Modification Of The Protective Order Is Appropriate Here .................. 6

8  III. THE COURT SHOULD ORDER ADDITIONAL DEPOSITION TIME FOR
        DEFENDANT WITNESS SCOTT TRAINOR ................................................... 9
9
        A.   Trainor's Deposition, The Un-Clawed Back Document, And The Court's
10           Guidance At The Discovery Conference ............................................... 9

11      B.   Defendants' Numerous Instructions Not To Answer Were Improper ............... 13

12  IV. THE COURT SHOULD ORDER FURTHER RESPONSES TO ORACLE'S
        REQUESTS FOR ADMISSION, OR ALTERNATIVELY DEEM THEM
        ADMITTED ...................................................................................................... 19
13
        A.   RFAs, Second Set, Nos. 496-680, Third Set, Nos. 13-50 .................... 19
14
        B.   RFAs, Set No. 3, Nos. 13-50, Set No. 5, 4-63, 130-62 ...................... 27

15  V.  CONCLUSION ................................................................................................ 30

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Adolph Coors Co. v. American Insurance Co.*,
    164 F.R.D. 507 (D. Colo. 1993)                                    22

*Beckman Indus., Inc. v. International Ins. Co.*,
    966 F.2d 470 (9th Cir. 1992)                                    4, 5

*CBS Interactive, Inc. v. Etilize, Inc.*,
    257 F.R.D. 195 (N.D. Cal. 2009)                                 5, 8

*Conoco Inc. v. United States Dep't. of Justice*,
    687 F.2d 724 (3rd Cir.1982)                                       10

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
    331 F.3d 1122 (9th Cir. 2003)                               2, 4, 7, 8

*In re Dynamic Random Access Memory Antitrust Litig.*,
    No. 02-1486, 2008 WL 4191780 (N.D. Cal. Sept. 10, 2008) (Hamilton, J.)    5

*In re Grand Jury Investigation*,
    974 F.2d 1068 (9th Cir. 1992)                                    13

*In re Grand Jury Subpoena (Mark Tork/Torrf Environmental Management)*,
    357 F.3d 900 (9th Cir. 2004)                                     13

*In re Jenoptik AG*,
    109 F.3d 721 (Fed. Cir. 1997)                                     6

*United States v. ChevronTexaco Corp.*,
    241 F. Supp. 2d 1065 (N.D. Cal. 2002)                         11, 16

*Verizon California, Inc. v. Ronald A. Katz Tech. Licensing, L.P.*,
    214 F.R.D. 583 (C.D. Cal. 2003)                                 6, 8

*Weil v. Investment/Indicators, Research and Management, Inc.*,
    647 F.2d 18 (9th Cir. 1981)                                      10

**RULES**

California Rule of Professional Conduct 3-310(E)                 12, 13, 16

Fed. R. Civ. P. 26                                                   7

Fed. R. Civ. P. 36                                               passim

MEMORANDUM IN SUPPORT OF ORACLE'S MOTION TO MODIFY THE PROTECTIVE ORDER AND
TO COMPEL, CASE NO. 07-CV-01658 PJH (EDL)

1    **NOTICE OF MOTION AND MOTION**

2         PLEASE TAKE NOTICE THAT on January 26, 2010 at 9:00 a.m., or as soon

3    thereafter as the matter maybe heard, in the United States District Court, Northern District of

4    California, located at 450 Golden Gate Ave., San Francisco, CA, Courtroom E, 15th Floor,

5    before the Hon. Elizabeth D. Laporte, Plaintiffs Oracle USA, Inc., Oracle International

6    Corporation, Oracle EMEA Limited, and Siebel Systems, Inc. (collectively, "Oracle" or

7    "Plaintiffs") will move for a modification of the protective order and for an order compelling

8    Defendants to provide deposition testimony and further responses to requests for admission, as

9    specified in the accompanying memorandum of points and authorities.  This motion is based on

10   this notice of motion and motion, the accompanying memorandum of points and authorities, the

11   accompanying declaration of Chad Russell and attached exhibits, and upon such other matters

12   presented to the Court at the time of the hearing.

13   **RELIEF SOUGHT**

14        Pursuant to Fed. R. Civ. Proc. 26 and 37,[1] Plaintiffs seek (1) a modification of the

15   protective order in this action to allow Discovery Material to be used in litigation between the

16   parties in Europe; (2) an order compelling Defendants to produce Scott Trainor for an additional

17   half day of deposition and overruling certain instructions not to testify, as enumerated in

18   Plaintiffs' accompanying memorandum of points and authorities; (3) an order requiring

19   Defendants to produce two documents, listed in the accompanying memorandum of points and

20   authorities, for *in camera* inspection by the Court to determine if Defendants' redactions were

21   proper; and (4) an order compelling supplemental responses to Plaintiffs' Requests for

22   Admission Set No. 2, Nos. 496-680, Set No. 3, Nos. 13-50, and Set No. 5, Nos. 4-63, 130-62, or

23   alternatively deeming those requests for admission admitted.

24   _____

25   [1] Pursuant to Fed. R. Civ. Proc. 37(a)(1) and Civil L.R. 37-1, Oracle's counsel affirms that they
26   have conferred with opposing counsel in a good faith effort to reach agreement about these
     matters.  *See* Declaration of Chad Russell in Support of Oracle's Motion to Modify the
27   Protective Order and to Compel Deposition Testimony and Further Responses to Requests for
     Admissions ("Russell Decl.") at ¶¶ 2-13.

28

1

1 <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2 **I.     INTRODUCTION**

3          Pursuant to the Court's instructions at the November 17, 2009 discovery

4 conference, Oracle submits this memorandum of points and authorities in support of their motion

5 to modify the protective order and to compel further deposition testimony and responses to

6 requests for admissions.  Oracle's motion covers three issues:

7          **Modifying the protective order.**  In December 2008, Judge Hamilton dismissed

8 J.D. Edwards Europe Ltd. ("JDEE") as a Plaintiff in this case, holding that its copyright

9 infringement claims were extraterritorial and thus could not be brought in a U.S. court.  *See*

10 Order Granting Motion to Dismiss in Part and Denying It in Part (Dec. 15, 2008) (Dkt. 224) at 5-

11 6.  JDEE's copyright infringement claims were based on the same basic set of facts as the other

12 Plaintiffs' infringement claims that remain in this case, *see* Third Amended Complaint ¶ 38 (Dkt.

13 182); the only difference is the Court's determination that for JDEE, certain of the infringement

14 at issue occurred outside the U.S.

15          Oracle now moves to amend the protective order to allow it to use discovery

16 materials obtained in this action to sue Defendants in Europe, where these non-U.S. claims may

17 properly be asserted.  Ninth Circuit case law "strongly favors access to discovery materials to

18 meet the needs of parties engaged in collateral litigation."  *Foltz v. State Farm Mut. Auto. Ins.*

19 *Co.*, 331 F.3d 1122, 1131 (9th Cir. 2003).  "Allowing the fruits of one litigation to facilitate

20 preparation in other cases advances the interests of judicial economy by avoiding the wasteful

21 duplication of discovery."  *Id.*  Here, the discovery taken in this action is directly relevant to the

22 claims Oracle may assert against Defendants in Europe, and any confidentiality concerns

23 Defendants may have can be accommodated by maintaining the non-disclosure and

24 confidentiality obligations in the existing protective order.  Under Ninth Circuit precedent, this

25 motion should be granted and the protective order modified.

26          **Scope of Defendant Witness Scott Trainor's Testimony.**  Oracle also moves to

27 reopen the deposition of Defendant witness Scott Trainor for an additional half day of testimony.

28 As Oracle explained at the November discovery conference, Defendants improperly instructed

1   Trainor not to testify on numerous occasions based on meritless privilege and work product

2   claims.  Contrary to the Court's guidance at the discovery conference, Defendants have

3   continued to refuse to withdraw their instructions or make Trainor available for further

4   deposition, necessitating this motion to compel.  Oracle also seeks *in camera* review of two

5   Trainor documents to determine whether Defendants have redacted them properly.[2]

6           **Requests for Admission.**  Oracle propounded a series of Requests for Admission

7   ("RFAs") to Defendants related to the numerous fixes and updates that Defendant

8   TomorrowNow, Inc. ("SAP TN") generated for customers using Oracle's software.  These RFAs

9   were necessary because Oracle's earlier attempts to negotiate a stipulation concerning SAP TN's

10  general business process based on Defendants' 30(b)(6) deposition testimony were not

11  successful.  As the Court is aware, Oracle alleges that SAP TN provided thousands of fixes and

12  updates to customers that infringed Oracle's copyrights, among other claims.  Oracle had sought,

13  and the Court had encouraged the parties to develop, a stipulation concerning the process by

14  which SAP TN developed those fixes and updates to streamline the presentation of evidence at

15  trial.  SAP TN's unwillingness to enter into an appropriate stipulation forced Oracle to seek

16  specific admissions about the steps involved in generating specific fixes and updates, again in an

17  effort to facilitate the presentation of evidence concerning SAP TN's business model.  However,

18  Defendants refused to answer nearly all of these RFAs, claiming that terms such as "copy,"

19  "fix," "update," and "generic environment," though defined in the RFAs and used regularly by

20  Defendants' employees both on the job and in depositions, were too vague to understand.

21          Defendants denied other RFAs concerning SAP TN's business processes on the

22  ground that the necessary information was not "readily obtainable."  However, when Oracle

---

24  [2] Oracle has also contended that Defendant witness Georg Schraeder's testimony as a Rule
25  30(b)(6) witness was inadequate, as the witness lacked adequate information to testify on behalf
    of SAP concerning the subjects in the Rule 30(b)(6) deposition notice concerning SAP's
    knowledge of SAP TN's use of Oracle database software.  In the parties' meet and confer, Oracle
26  offered to accept written responses to a list of questions that Schraeder was unable to answer.
    Defendants agreed to provide those responses by December 23, 2009.  Accordingly, at this time
27  Oracle does not raise Schraeder's deposition in this motion to compel.  However, Oracle reserves
    the right to move to compel if Defendants' written responses are inadequate.

28

3

1    asked Defendants to then separately *admit* this same information was not "readily obtainable" –

2    to close Defendants off from introducing evidence at trial which they have refused to provide

3    now – Defendants denied those requests as well.  Defendants have essentially refused to provide

4    Oracle with meaningful written discovery on how SAP TN developed the fixes and updates it

5    delivered to customers based on unsupportable and contradictory objections.  Either the

6    information is readily obtainable or it is not; Defendants cannot have it both ways.  The Court

7    should order Defendants to amend their responses to these RFAs or deem them admitted.  Fed.

8    R. Civ. P. 36(a)(4).

9    **II.**      **THE COURT SHOULD MODIFY THE PROTECTIVE ORDER**

10        **A.**    **Ninth Circuit Case Law Strongly Favors Modification**

11        At the November 17, 2009 discovery conference, the Court indicated it was

12    inclined to grant Oracle's request to modify the protective order.  *See* Russell Decl., ¶ 3 & Ex. A

13    at 68:4-6 ("I would think of granting your request.  In other words, I – I don't really see any

14    harm to letting this be used.").  Such a ruling would accord with Ninth Circuit precedent, which

15    "strongly favors access to discovery materials to meet the needs of parties engaged in collateral

16    litigation."  *Foltz*, 331 F.3d at 1131.  Indeed, under Ninth Circuit law, "[w]here reasonable

17    restrictions on collateral disclosure will continue to protect an affected party's legitimate

18    interests in privacy," a request to modify a protective order to allow discovery to be used in

19    collateral litigation "should generally be granted."  *Id*. (citing *Beckman Indus., Inc. v.*

20    *International Ins. Co*., 966 F.2d 470, 475 (9th Cir. 1992)).

21        *Foltz* sets forth a two-step inquiry for courts in deciding whether to modify a

22    protective order to allow discovery materials to be used in collateral litigation.  First, the party

23    seeking the modification "must demonstrate the relevance of the protected discovery to the

24    collateral proceedings and its general discoverability therein."  *Id*. at 1132.  That means that "the

25    court that entered the protective order should satisfy itself that the protected discovery is

26    sufficiently relevant to the collateral litigation that a substantial amount of duplicative discovery

27    will be avoided by modifying the protective order."  *Id*.  The relevance determination does not

28    require a ruling by a European court that the discovery in this action would be relevant to a

1    lawsuit in Europe:  "No circuits require the collateral litigant to obtain a relevance determination

2    from the court overseeing the collateral litigation prior to requesting the modification of a

3    protective order from the court that issued the order."  *Id*.  Rather, once the district court makes

4    "only a rough estimate of relevance," the "only issue it determines is whether the protective

5    order will bar . . . access to the discovery already conducted."  *Id*. at 1132-33.

6             Second, the district court "must consider other factors in addition to the relevance

7    of the protected discovery to the collateral litigation.  In particular, it must weigh the

8    countervailing reliance interest of the party opposing modification against the policy of avoiding

9    duplicative discovery."  *Id*.  "However, '[r]eliance will be less with a blanket [protective] order,

10   because it is by nature overinclusive."  *Id*. (quoting *Beckman*, 966 F.2d at 475).  "[A] party

11   seeking protection of the court via a blanket protective order typically does not make the 'good

12   cause' showing required by Rule 26(c) with respect to any particular document.  Thus, reliance

13   on a blanket protective order . . . without more, will not justify a refusal to modify."  *Id*.  Instead,

14   "'[a]ny legitimate interest . . . in continued secrecy as against the public at large can be

15   accommodated'" by placing in the modified protective order "'the same restrictions on use and

16   disclosure contained in the original protective order.'"  *Id*. (quoting *United Nuclear Corp. v.*

17   *Cranford Ins. Co.*, 905 F.2d 1424, 1428 (10th Cir. 1990)).

18            Courts applying Ninth Circuit law have liberally modified protective orders to

19   allow discovery materials to be used in collateral proceedings, whether by parties to the original

20   case or by parties to the collateral proceeding that intervened in the original case to seek

21   modification of the protective order.  *E.g., In re Dynamic Random Access Memory Antitrust*

22   *Litig.*, No. 02-1486, 2008 WL 4191780, *2-3 (N.D. Cal. Sept. 10, 2008) (Hamilton, J.)

23   (modifying protective order so that the prohibited "use" of discovery materials in California

24   antitrust actions would not prohibit use of those materials by plaintiffs in two securities cases

25   filed in Idaho because "the same illegal price-fixing conspiracy that is at the center of the DRAM

26   MDL litigation [is] squarely at the heart of the collateral action complaints"); *CBS Interactive,*

27   *Inc. v. Etilize, Inc.*, 257 F.R.D. 195, 205-06 (N.D. Cal. 2009) (modifying protective order to

28   allow plaintiff to use discovery obtained in federal patent infringement case to pursue trade

1  secret misappropriation claims against the same defendant in state court); *Verizon California,*

2  *Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 214 F.R.D. 583 (C.D. Cal. 2003).

3          The Federal Circuit's decision in *In re Jenoptik AG*, 109 F.3d 721 (Fed. Cir.

4  1997), in which the court applied Ninth Circuit law, is illustrative.  Plaintiff Therma-Wave sued

5  Defendant Jenoptik in California for patent infringement.  *Id.* at 722.  In addition, "[i]n Germany,

6  Therma-Wave brought an action for infringement of a German counterpart of one of the patents

7  at issue in the California action."  Therma-Wave requested the district court in the California

8  action to modify the protective order to allow deposition testimony obtained in discovery to be

9  used in the German court.  The district court granted the motion.  *Id.*  Jenoptik then petitioned the

10  Federal Court for a writ of mandamus, and the Court of Appeals applied Ninth Circuit law to

11  review the propriety of the district court's order.  *Id.* at 723 ("The Ninth Circuit, whose law we

12  applied in this petition, has considered whether it is appropriate for a district court to modify a

13  protective order to permit confidential materials to be used in a different proceeding.").  The

14  Federal Circuit denied the writ petition, noting that "'Ninth Circuit precedent strongly favors

15  disclosure to meet the needs of parties in pending litigation.'"  *Id.* (quoting *Beckman*, 966 F.2d at

16  475).  Because the plaintiff agreed to be bound by the disclosure restrictions in the protective

17  order concerning the discovery to be used in the German court, and the district court requested

18  that the German court "continue to treat the documents as confidential," "the district court did all

19  that it could."  *Id.*

20      **B.**    **Modification Of The Protective Order Is Appropriate Here**

21          Under these precedents, the Court should modify the protective order to allow the

22  parties to use discovery materials produced in this case in litigation between the parties in

23  Europe.  First, the relevance requirement is plainly satisfied.  As the Court is aware, Oracle

24  originally attempted to assert in *this* case some of the claims it must now bring in Europe.

25  Specifically, Oracle's Third Amended Complaint added J.D. Edwards Europe Ltd. ("JDEE") as a

26  plaintiff, alleging that "JDEE is a nonresident Irish private limited company" that "licenses

27  certain intellectual property, including enterprise software programs used around the world."

28  Third Amended Complaint ¶ 38 (Dkt. 182).  JDEE joined in the cause of action for copyright

6

1    infringement, alleging all the same facts the other Plaintiffs did.  *Id*. ¶¶ 147-62.  The Court

2    dismissed JDEE from the case on the ground that "the only right in U.S. copyrights that JDEE

3    possesses is the right to distribute some of the software products outside of the U.S.," so "the

4    only infringement that could have occurred as to JDEE would be infringement of its right to

5    distribute extraterritorially."  Order Granting Motion to Dismiss in Part and Denying It in Part

6    (Dec. 15, 2008) (Dkt. 224) at 6.  Because "[f]ederal copyright laws do not have extraterritorial

7    application," the Court reasoned that it lacked jurisdiction over JDEE's claim.  *Id*. at 5-6.

8           JDEE can cure this jurisdictional defect by refiling its claims in Europe under

9    European law.  It remains true, however, that the *facts* giving rise to those claims are the same, or

10   heavily overlap with, the facts giving rise to the other Plaintiffs' claims in this case.  Oracle has

11   broadly alleged "a conspiracy, led by German software conglomerate SAP AG, to engage in and

12   cover-up corporate theft of Oracle intellectual property on the grandest scale."  Fourth Amended

13   Complaint ¶ 1 (Dkt. 418).  The only distinction the Court drew between JDEE and the other

14   Plaintiffs concerned where the specific acts of infringement occurred – inside or outside the U.S.

15   Given the near identity of JDEE's claims to the ones presently asserted in this case, it is clear

16   that "the protected discovery is sufficiently relevant to the collateral litigation that a substantial

17   amount of duplicative discovery will be avoided by modifying the protective order."  *Foltz*, 331

18   F.3d at 1132.

19          Second, Defendants' reliance interest in the current prohibition in the protective

20   order from using discovery materials for collateral litigation is minimal because the order is a

21   "blanket" protective order in the sense in which the Ninth Circuit uses that term.  Under the

22   protective order in this case, the producing party designates discovery material as confidential or

23   highly confidential and does not have to file a motion pursuant to Federal Rule of Civil

24   Procedure 26(c) on a document-by-document basis to have the Court determine that the material

25   is confidential.  Protective Order ¶ 6 (June 7, 2007) (Dkt. 32).  To be sure, the protective order

26   prescribes standards the parties are to follow in making their confidentiality designations, *see id.*

27   ¶¶ 3-4, and indiscriminate designations are inconsistent with the terms of the order.  However,

28   under Ninth Circuit law, this is still considered a blanket protective order because the "party

                                             7

1   seeking the protection of the court . . . does not make the 'good cause' showing required by Rule

2   26(c) with respect to any particular document." *Foltz*, 331 F.3d at 1133.  "[T]he protective order

3   allows a party or a non-party producing or disclosing a particular document to initially determine

4   whether such item is confidential without court intervention.  As such, the protective order is

5   akin to a blanket protective order . . . 'as the party resisting disclosure generally has not made a

6   particularized showing of good cause with respect to any individual document.'"  *Verizon*

7   *California*, 214 F.R.D. at 586 (quoting *San Jose Mercury News, Inc. v. United States District*

8   *Court – Northern District*, 187 F.3d 1096, 1103 (9th Cir. 1999)).  Indeed, the "blanket" nature of

9   the protective order here is evidenced by the hundreds of thousands of pages of SAP TN

10  documents and testimony which Defendants continue to maintain are "confidential" or "highly

11  confidential," even though SAP TN is no longer in business.

12          The protective order in this case is therefore similar to the ones in *CBS*

13  *Interactive*, 257 F.R.D. at 200, and *Verizon California*, 214 F.R.D. at 584, which likewise

14  allowed the parties to designate certain discovery materials as confidential or highly confidential.

15  In both cases the courts deemed those to be blanket protective orders under Ninth Circuit law

16  because the parties – not the Court – made the initial confidentiality designations.  And in both

17  cases the courts found that the reliance interests were too minimal to oppose modification to

18  allow discovery materials to be used in collateral litigation.  *CBS Interactive*, 257 F.R.D. at 206

19  ("Mere reliance on a blanket protective order does not justify a refusal to modify it when a

20  reasonable request for disclosure has been made."); *Verizon California*, 214 F.R.D. at 586.

21          Moreover, Defendants' reliance interest, minimal as it is, can be easily

22  accommodated.  The Ninth Circuit has instructed that the disclosing party's privacy interests can

23  be accommodated by placing in the modified protective order "'the same restrictions on use and

24  disclosure contained in the original protective order.'"  *Foltz*, 331 F.3d at 1133 (quoting *United*

25  *Nuclear Corp.*, 905 F.2d at 1428).  Oracle's proposed order granting the present motion does

26  exactly that.  The proposed order states: "For purposes of paragraphs 8, 9, 10, 11, 12 and 14 of

27  the June 7, 2007 Protective Order, the terms 'this Action' and 'this litigation' shall include

28  litigation in Europe between the Parties or their affiliates arising out of similar factual

8

1  allegations." [Proposed] Order Granting Oracle's Motion to Modify the Protective Order and to

2  Compel Deposition Testimony and Responses to Requests for Admissions, submitted herewith.

3  That modification simply alters the permitted uses of Discovery Material to cover European

4  litigation while preserving all the other restrictions on use and disclosure that are in the

5  protective order as it exists now, satisfying Ninth Circuit precedent.

6        Accordingly, the Court should modify the protective order to allow Oracle to use

7  discovery materials in related European litigation between the parties.

8  **III.    THE COURT SHOULD ORDER ADDITIONAL DEPOSITION TIME FOR
       DEFENDANT WITNESS SCOTT TRAINOR**

9

10       **A.    Trainor's Deposition, The Un-Clawed Back Document, And
             The Court's Guidance At The Discovery Conference**

11       On October 13, 2009, Oracle deposed Scott Trainor, former in-house counsel for

12 PeopleSoft and current in-house counsel for SAP.  *See* Russell Decl., ¶ 14 & Ex. H at 9:10-18,

13 22:15-23:4, 24:11-26:21 (describing his job history).  While at SAP, Trainor drafted SAP TN's

14 form support services agreement and negotiated contracts between SAP TN and its customers.

15 *Id*. at 17:18-21, 60:8-10; 65:16-66:4; 71:23-72:18; Russell Decl., ¶ 27 & Ex. U.[3]  It appears that

16 SAP was using Trainor – who had engaged in confidential and privileged communications and

17 analyses regarding the meaning of the PeopleSoft license agreements while he was at PeopleSoft

18 – to persuade customers that handing over copies of their PeopleSoft software to SAP TN did not

19 violate their PeopleSoft license agreements.  *See, e.g.*, Russell Decl., ¶ 24 & Ex. R at SAP-

20 OR00682292 (Section 9A) (Trainor telling customer Waste Management, "Our rights to use the

21 PeopleSoft software come entirely by way of the WM license with PeopleSoft.").  Accordingly,

22 Oracle attempted to depose Trainor about how he negotiated contract terms with prospective

23 _____

24 [3] Defendants clawed-back and redacted the document cited here – TN-OR00852363 – after
   Trainor's deposition, on October 21, 2009.  Russell Decl., ¶ 5 & Ex. C.  The unredacted portions
25 show Trainor on an email about SAP TN's "AGREEMENT DRAFT FOR REVIEW."  *Id.*
   Oracle believes the redactions are improper.  However, Oracle does not have access to clawed-
26 back and redacted portions of the document and is not permitted to have taken notes or
   reference the substance in any way per Court order.  Oracle therefore requests that the Court
27 require Defendants to provide it in unredacted form for *in camera* review to determine if the
   redactions are proper given Trainor's other testimony cited in this Motion.

28

9

1    SAP TN customers and how he maintained his ethical obligations to PeopleSoft.

2            During the deposition, two privilege-related issues arose, which Oracle described

3    to the Court in the last discovery conference statement.  *See* Joint Discovery Conference

4    Statement (Nov. 12, 2009) (Dkt. 548) at 23-25.  For both of these issues, Defendants have the

5    burden to show that the privileges they are claiming apply.  *Weil v. Investment/Indicators,*

6    *Research and Management, Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) ("As with all evidentiary

7    privileges, the burden of proving that the attorney-client privilege applies rests not with the party

8    contesting the privilege, but with the party asserting it."); *Conoco Inc. v. United States Dep't. of*

9    *Justice*, 687 F.2d 724, 730 (3rd Cir.1982) ("The burden of demonstrating that a document is

10   protected as work-product rests with the party asserting the doctrine.").

11           The first privilege issue concerned Exhibit 1683, an email exchange with Trainor

12   concerning SAP TN's ability to obtain PeopleSoft and J.D. Edwards software from customers

13   through the customers' license agreements.  When Oracle introduced Exhibit 1683 at the

14   deposition, Defendants clawed it back and prevented further questioning about the document.

15   Russell Decl., ¶ 14 & Ex. H at 151:25-152:7.  Then, a month later, pursuant to a letter from

16   Oracle calling the clawback improper, Defendants returned Exhibit 1683 – undoing the clawback

17   – but they refused to make Trainor available for additional questions about the exhibit.  Russell

18   Decl., ¶ 7 & Ex. E.  Defendants asserted:  "[W]e believe that a further deposition of Mr. Trainor

19   is not warranted.  There is virtually no likelihood that any material additional testimony would be

20   elicited in such a deposition."  *Id.*[4]

21           Defendants' position is unsupportable.  They blocked the questioning of an

22   important witness by invoking the attorney-client privilege, later determined (again) the

23   document at issue was not privileged, but are still trying to block the questioning, now without

24   any basis at all.  Moreover, Defendants' assertion that Exhibit 1683 does not warrant additional

25   _____

26   [4] Subsequently, Defendants agreed by email to produce Trainor again "concerning Ex. 1683,"
     but only if Oracle would waive its other issues related to Trainor's deposition.  Russell Decl., ¶
27   10 & Ex. G.  That is an unreasonable condition to attach to allowing deposition testimony that
     Defendants are plainly obligated to provide.

28

1   questions is untrue.  The Exhibit (which has now been produced again) is an email chain from

2   SAP TN's vice president of sales, Bob Geib, who asked an SAP employee, Mia Lee, to have "a

3   discussion" with a prospective customer "about the 'rights' that a customer has under their

4   PeopleSoft/J.D. Edwards agreement that ALLOWS them to have TomorrowNow perform

5   services on JDE."  Russell Decl., ¶ 25 & Ex. S at SAP-OR00677720 (all caps in original).  When

6   Lee replied that she was "coming into this midstream," Geib told her "you'll probably want to do

7   a short briefing w/Scott Trainor to understand the positioning.  It's not really a 'contract'

8   discussion from a negotiations perspective, but a 'based upon my experience' conversation

9   where we address the rights and terms of the J.D. Edwards license that makes TN consulting

10   possible."  *Id*. at SAP-OR00677719.  Lee then followed up by forwarding the email exchange to

11   Trainor, in a passage that Defendants have redacted.  *Id*.[5]  However, the non-redacted parts of the

12   email chain, quoted in the preceding sentences, make clear that it relates precisely to Oracle's

13   concern that Trainor was using his experience as a former PeopleSoft employee to opine

14   (adversely to PeopleSoft's successor's interests) on what the license agreements allowed.

15         The second privilege issue that arose at Trainor's deposition was that Defendants

16   gave a series of improper instructions not to testify that have no basis in the attorney-client

17   privilege or attorney work product doctrine.  Oracle provided an example of one such improper

18   instruction in the last discovery conference statement.  *See* Joint Discovery Conference

19   Statement (Nov. 12, 2009) (Dkt. 548) at 24:

20         Q.  Let's turn to page 5 of the document.  Under -- and this is -- actually, if you go back
           to page 4, you'll see the title is, paragraph 9, "Indemnity."
21         A.  Yes.
          Q.  And that goes on for several paragraphs.  Do you see that?
22         A.  I do.

23   _____

24   [5] This is the second document which Oracle asks that Defendants provide in unredacted form for

25   *in camera* review by the Court.  Given the unredacted portion of the document, the history of
    production of the document, and the burden on Defendants to prove privilege, such review is
26   appropriate.  For a full explanation of the history of the production of this document, see the
    Russell Decl. at ¶ 8.  As a legal matter, the unredacted content of the document indicates that Lee
27   was asking Trainor for business advice, not legal advice.  *See United States v. ChevronTexaco
    Corp.*, 241 F. Supp. 2d 1065, 1075-76 (N.D. Cal. 2002).

28

1   Q. There's a bracket right after the title which begins page 5 of the agreement: We do
    not have access to the terms of the PeopleSoft license. We therefore need this protection.
2   Were those your words?
    A. I don't know.
3   Q. Were they SAP or TomorrowNow words?
    A. I --
4   MR. McDONELL: Lack of foundation, calls for speculation. Don't disclose privileged
    information.
5   THE WITNESS: I can't tell from this redline who said it.
    MR. PICKETT: Q. Well, this was a redline that you sent to their outside counsel for
6   purposes of negotiating the agreement. True?
    A. Yes.
7   . . .
    Q. Now, is it true that you did not have access to the terms of PeopleSoft licenses?
8   A. Yes.
    Q. You had worked with them for some time when you worked as an attorney for
9   PeopleSoft. True?
    A. True.
10  Q. And so did you compartmentalize that -- your experience?
    MR. McDONELL: Calls for mental impressions of an attorney. I'll instruct you not to
11  answer on work product grounds.
    MR. PICKETT: Q. Did you take any steps to avoid relying on your memory of the
12  PeopleSoft licenses in negotiating the terms of these licenses
    with TomorrowNow customers?
13  MR. McDONELL: Same objection, same instruction not to answer.

14  Russell Decl., ¶ 14 & Ex. H at 111:19-112:19, 113:6-23.

15           Defendants' privilege instructions were improper. As a former in-house attorney

16  for PeopleSoft, Trainor was ethically obligated not to use confidential information he gained in

17  the course of his representation of PeopleSoft *adversely* to PeopleSoft. California Rule of

18  Professional Conduct 3-310(E) states: "A member shall not, without the informed written

19  consent of the client *or former client*, accept employment *adverse* to the client *or former client*

20  where, by reason of the representation of the client or former client, *the member has obtained*

21  *confidential information material to the employment*." (emphasis added). Here, Trainor testified

22  that during his time at PeopleSoft his work as an attorney involved the PeopleSoft license

23  agreements (Russell Decl., ¶ 14 & Ex. H at 113:10-12); that during his time at SAP he did *not*

24  have access to the PeopleSoft license agreements (*id.* at 113:6-9, 132:22-133:1); and that at SAP

25  he negotiated contracts with SAP TN's customers (*id.* at 17:18-21, 60:8-10). All of Trainor's

26  work in negotiating contracts with prospective SAP TN customers was adverse to PeopleSoft's

27  successor – Oracle – because the whole point of that effort was to take Oracle's customers. *Id.* at

28  44:19-45:14. Oracle is entitled to ask how, if at all, Trainor complied with California Rule of

1  Professional Conduct 3-310(E) concerning the confidential information he learned while at

2  PeopleSoft concerning the terms of PeopleSoft's license agreements.

3        Moreover, Oracle's questions did not ask about communications Trainor had with

4  a client, *see In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (the

5  "essential elements" of a claim of attorney-client privilege are that legal advice is sought "from a

6  professional legal advisor in his capacity as such . . . by the client"), nor about work product he

7  developed in anticipation of litigation.  *See In re Grand Jury Subpoena (Mark Tork/Torrf*

8  *Environmental Management)*, 357 F.3d 900, 907 (9th Cir. 2004) ("'to qualify for protection

9  against discovery under Rule 26(b)(3), documents must have two characteristics:  (1) they must

10  be 'prepared in anticipation of litigation or for trial,' and (2) they must be prepared 'by or for

11  another party or by or for that other party's representative'") (quoting *In re California Pub. Utils.*

12  *Comm'n*, 892 F.2d 778, 780-81 (9th Cir. 1989)).  Rather, Oracle asked about the steps Trainor

13  took to comply with his ethical obligations.  There was no basis for Defendants to instruct him

14  not to answer.

15        At the November 17, 2009 discovery conference, the Court told Defendants that

16  their instructions were improper.  The Court stated that "particularly the did you take any steps

17  or whatever the question was – what steps did you take, if any, to try to avoid using things that

18  you learned before?  I would probably overrule on the objection for that.  Now, I don't know

19  what the other ones are, but I mean I just – I just think that those questions have to be answered."

20  Russell Decl., ¶ 3 & Ex. A at 59:21-60:2.  In light of the Court's guidance, Oracle asked

21  Defendants to withdraw their objections and permit Trainor to testify.  In a December 1, 2009

22  email, Defendants stated they would not withdraw these instructions not to testify, despite the

23  Court's guidance, thus forcing Oracle to bring this motion.  Russell Decl., ¶ 10 & Ex. G.

24      **B.**    **Defendants' Numerous Instructions Not To Answer Were Improper**

25        In addition to the example cited above, Defendants gave other baseless privilege

26  instructions throughout Trainor's deposition.  The Court should overrule those objections and

27  order Trainor to be made available to testify on these matters.

28        **Communications with Prospective Customers.**  Oracle questioned Trainor

1  about Exhibit 1681, which contained a draft contract sent from Trainor to a prospective customer

2  (who eventually signed with SAP TN) in which the redlines show him telling the customer that it

3  was to the customer's "advantage" to give SAP TN access to PeopleSoft software.  *See* Russell

4  Decl., ¶ 24 & Ex. R at SAP-OR00682290 (Section 4D).

5      Q.  Do you deny that you were telling Waste Management that it was to their
        advantage to provide access to software?
6      MR. McDONELL:  Vague and ambiguous, lack of foundation, asked and answered.
       THE WITNESS:  I don't recall if I drafted this, first of all.  And second of all, as I read
7      this, I don't believe it coincides with what you just concluded.
       Q.  Why not?
8      …
       THE WITNESS:  That's not how I read the "you don't want us accessing."
9      Q.  How did you read it?
       MR. McDONELL:  Same objections and same instruction to you not to disclose
10     privileged information.
       THE WITNESS:  I feel like I'm going into where I'm drawing legal conclusions as I
11     interpret this.
       MR. McDONELL:  Okay.  So I instruct you not to disclose your mental legal analysis.
12

13  Russell Decl., ¶ 14 & Ex. H at 109:7-16, 111:1-11.

14      Defendants' instruction not to answer has no merit.  Oracle handed Trainor a

15  document he sent *to the customer* and asked him *what he was telling the customer*.  There was no

16  attorney-client relationship between SAP TN and its customers.  Nor can Trainor's

17  communications with customers be described as attorney work product in anticipation of

18  litigation.[6]

19      **Misrepresentations to Customers.**  For the same exhibit, Oracle also asked

20  Trainor about another of his redlines claiming that SAP TN's rights to use PeopleSoft software

21  derive from the customer's license with PeopleSoft (now Oracle).  Oracle asked Trainor if the

22  representation he made to the customer was true, and Defendants instructed him not to answer:

23      Q.  If you take a look at paragraph 9A of the agreement, "TomorrowNow Indemnity,"
        there's a bracket that states:  This will need to be different from the license.  ***Our rights***
24      ***to use the PeopleSoft software come entirely by way of the Waste Management license***
        ***with PeopleSoft.***  Is it true that you were conveying to Waste Management the position

25  _____

26  [6] Oracle asked Defendants in meet and confer to specify the litigation that any of the multiple
    "work product" claims were supposedly prepared in anticipation of.  Russell Decl., ¶ 6 & Ex. D.
27  Defendants declined to identify any such litigation.  *Id.* at ¶ 7 & Ex. E.

28

MEMORANDUM IN SUPPORT OF ORACLE'S MOTION TO MODIFY THE PROTECTIVE ORDER AND
TO COMPEL, CASE NO. 07-CV-01658 PJH (EDL)

1     that TomorrowNow's rights to use the PeopleSoft software come entirely by way of the Waste Management license with PeopleSoft?

2     MR. McDONELL:  The document speaks for itself.

    THE WITNESS:  I don't recall drafting this.  However, that -- what you recited is what

3     the document represents, yes.

    …

4     Q.  Was that a true statement so far as you knew?

    MR. McDONELL:  I have -- hold on for a second.  Calls for a legal conclusion and legal

5     analysis.  I'll instruct you not to answer.

    Q.  So you can't tell me whether it's true or not?

6     MR. McDONELL:  I've instructed you not to answer on grounds of work product.  You're asking him to sit here and do legal analysis.

7     Q.  To your knowledge, did SAP or TomorrowNow ever misrepresent facts to customers during negotiation of terms?

8     MR. McDONELL:  I instruct you not to answer.  It's argumentative, calling for legal conclusions and work product and potential attorney-client.  And it's argumentative.  I've

9     already said that.

10   Russell Decl., ¶ 14 & Ex. H at 113:24-114:14, 114:24-115:17 (emphasis supplied).

11         Again, those instructions not to answer were improper.  Communications between

12   SAP TN and its customers are not privileged.  Whether SAP TN was misrepresenting facts to its

13   customers in the communications is not privileged either, because Oracle was still not asking

14   about communications between an attorney and a client.  In addition, the work product doctrine

15   is inapplicable.  There is no showing that any misrepresentations by SAP TN to prospective

16   customers were prepared in anticipation of litigation, and indeed Defendants refused to identify

17   any such litigation or otherwise explain their claim of work product during the meet and confer.

18   Whether SAP TN misrepresented facts to customers during the negotiation of contract terms is

19   just a factual question that could be asked of any witness who dealt with customers.  Trainor's

20   status as an attorney does not relieve him of the obligation to answer the same questions any

21   percipient witness would have to answer.

22         **Indemnification Policy.**  Oracle asked Trainor about Exhibit 1684, a non-

23   privileged PowerPoint sales presentation given by Trainor and SAP TN's head of sales at

24   training sessions they conducted for SAP salespeople.  Russell Decl., ¶ 26 & Ex. T; *id.*, ¶ 14 &

25   Ex. H at 157:1-10.  Oracle asked Trainor about the accuracy of the presentation:

26     Q.  Turning to Exhibit 1684, page ending -861, under the indemnification provision, it reads, "Key term -- no removing this."  Was that true, that this was a key term for SAP,

27     and it would not negotiate this term away?

    MR. McDONELL:  Instruct not to answer on the grounds of attorney-client and work

28     product.

1    Russell Decl., ¶ 14 & Ex. H at 166:7-23.

2           Defendants' instruction not to answer had no merit.  Defendants are not claiming

3    privilege over the actual *communication* between Trainor and others at SAP TN (nor could they)

4    – they intentionally produced the PowerPoint slides and allowed them to be used as a deposition

5    exhibit without objection.  This is because the statement that the indemnification provision was a

6    key term in contract negotiations was business advice to the SAP TN sales team; nothing in the

7    PowerPoint purported to give legal advice about the effect of such a provision.  *See United States*

8    *v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1075-76 (N.D. Cal. 2002) ("In-house counsel

9    may be involved intimately in the corporation's day to day business activities and frequently

10   serve as integral players in business decisions or activities.  Accordingly, communications

11   involving in-house counsel might well pertain to business rather than legal matters.  The

12   privilege does not protect an attorney's business advice.").  In any event, the question Oracle

13   asked at the deposition was simply whether the business advice Trainor gave was true, i.e.,

14   whether it was an accurate description of SAP's business practices.  That is also just a question

15   about business practices and facts, not privileged communications or work product.

16           **Compliance with ethical obligations.**  Oracle asked Trainor questions about

17   Exhibit 1181, an email from SAP TN salesperson Spencer Phillips to Raytheon, a prospective

18   customer, that related a non-privileged conversation Phillips had with Trainor.  Russell Decl., ¶

19   23 & Ex. Q; *id.*, ¶ 14 & Ex. H at 129:20-22.  Phillips stated in the email that Trainor informed

20   him what the specific language was in the PeopleSoft license agreements concerning third party

21   access to PeopleSoft software.  *Id*.  As discussed above, this raises an ethical concern due to

22   Trainor's prior employment as counsel for PeopleSoft.  Trainor admitted in his deposition that

23   when he had this conversation with Phillips in 2005 he was employed by SAP and did not have

24   any access to PeopleSoft licensing agreements.  Russell Decl., ¶ 14 & Ex. H at 132:22-133:1.

25   So, it would appear that Trainor provided this information about the content of the licensing

26   agreement based on his prior work as PeopleSoft's in-house counsel.  Because he was now using

27   that information to help SAP TN convert customers from PeopleSoft's successor, Oracle, it

28   would appear that Trainor had violated California Rule of Professional Conduct 3-310(E).  So,

16

1   Oracle asked Trainor point blank if he violated the rule, and Defendants improperly instructed

2   him to not answer:

3        Q.  You understand that you have certain ethical obligations as an attorney in the State of
            California.  Correct?
4        MR. McDONELL:  Calls for a legal conclusion.
         THE WITNESS:  I do.
5        Q.  And you understood that you have the obligation to keep information you learned
            from a former -- a client strictly confidential.  True?
6        MR. McDONELL:  Depends on the circumstances.  It calls for a legal conclusion.
            Object to the form of the question.
7        MS. PHILLIPS:  Overbroad.
         THE WITNESS:  I do.
8        Q.  And if you revealed this type of information to Mr. Phillips, that violated your ethical
            obligation.  True?
9        MR. McDONELL:  Object to the form of the question, and I'm going to instruct you not
            to answer on the grounds of attorney work product and privilege.
10       Q.  Is this information confidential?
         MR. McDONELL:  Vague and ambiguous, overbroad, calls for a legal conclusion, calls
11          for a legal analysis by an attorney of a legal issue collaterally related to the case.  I'm
            going to instruct you not to answer.
12       Q.  Is it private?  Is it confidential?  That's not a privilege issue.
         MR. McDONELL:  Same objections.  Same instruction.
13       MR. PICKETT:  On what ground?
         MR. McDONELL:  Privilege, work product.

14

15  Russell Decl., ¶ 14 & Ex. H at 136:3-137:12.

16       Q.  If you did convey it, would you have felt comfortable conveying it, the portion that I
            just read?
17       MR. McDONELL:  Instruct you not to answer.  Grounds of attorney-client, attorney
            work product, it's unduly argumentative, I object to the form of the question.

18

19  *Id*. at 139:7-13.

20          Those privilege instructions do not have merit.  Oracle is entitled to ask whether

21  its predecessor's former counsel complied with his ethical obligations toward PeopleSoft.  And

22  his compliance, or lack thereof, is not an inquiry into an attorney-client communication or work

23  product.  If attorneys could not be asked if they believed their conduct complied with ethical

24  rules, how would the State Bar conduct disciplinary hearings?  And again, Defendants have

25  refused to provide any authority or explanation for this claim, which is their burden.

26          **Willfulness of copyright infringement.**  Oracle also asked Trainor some

27  foundational questions concerning whether SAP or SAP TN took any steps to determine if their

28

1   access to software amounted to copyright infringement:

2       Q.  Did SAP or TomorrowNow take any steps to determine whether a particular
        customer's allowance of access to software constituted copyright infringement?
3       MR. McDONELL:  Instruct you not to answer on grounds of legal -- privilege and work
        product.
4       MR. PICKETT:  It's take any steps.  It's not what they did.
        MR. McDONELL:  Stand by my instruction.
5       Q.  Did TomorrowNow or SAP ever analyze in connection with a negotiation of a
        contract the general topic of a customer's rights to provide access to software?
6       MR. McDONELL:  Instruct you not to answer on the grounds of attorney-client privilege
        and work product.
7

8   Russell Decl., ¶ 14 & Ex. H at 115:21-116:11.

9           Defendants' instructions not to answer came too early and were too sweeping.

10  Oracle is entitled to ask *whether* Defendants took any steps to determine if their conduct

11  constituted copyright infringement, and *whether* Defendants ever analyzed in the context of a

12  contract negotiation the general topic of a customer's ability to provide access to software.  If the

13  answers are "no," there is nothing privileged or work product to protect – and the testimony

14  would be directly relevant to the willfulness of Defendants' conduct.  If the answers are "yes,"

15  Oracle can follow up by asking other foundational questions, such as whether SAP's legal

16  department was involved; whether there were some steps not done at the direction of legal;

17  whether any of SAP's steps or analyses were shared with customers, in which case the privilege

18  would be waived; and so on.  Furthermore, Oracle has already asked the same foundational

19  questions of other attorney witnesses in the case and Defendants allowed the questioning.  *See,*

20  *e.g.*, Russell Decl., ¶ 16 & Ex. J at 24:6-26:17.  Yet this time Defendants improperly shut down

21  these foundational questions.

22          Accordingly, for the reasons described above, Oracle asks that the Court review *in*

23  *camera* the two documents in question, overrule Defendants' instructions not to answer, and

24  order Trainor to return for another half day of deposition to answer the questions outlined above,

25  as well as reasonable follow up questions, and to testify concerning the content of Exhibit 1683

26  and any content of the two documents which the Court deems were improperly redacted.

27

28

MEMORANDUM IN SUPPORT OF ORACLE'S MOTION TO MODIFY THE PROTECTIVE ORDER AND
TO COMPEL, CASE NO. 07-CV-01658 PJH (EDL)

IV.   **THE COURT SHOULD ORDER FURTHER RESPONSES TO ORACLE'S REQUESTS FOR ADMISSION, OR ALTERNATIVELY DEEM THEM ADMITTED**

A.   **RFAs, Second Set, Nos. 496-680, Third Set, Nos. 13-50**

Oracle's Requests for Admissions ("RFAs") 496-680 (in Set No. 2) and 13-50 (in Set No. 3) asked Defendants certain basic facts about SAP TN's business processes – essentially, to admit the extent to which SAP TN generated fixes or updates by copying Oracle updates, cross-using customer software, and using local generic environments.  These RFAs go to the heart of SAP TN's business model and Oracle's core allegations that the model – indeed, the entire way SAP TN did business – was illegal.

But rather than answer these RFAs, Defendants objected to the terms "copy," "fix," "update," and "generic environment" and instead provided evasive narrative responses that do not actually answer what Oracle asked.  After three months of meeting and conferring about Defendants' inadequate responses, including multiple offers by Oracle to redefine these terms to avoid any possible confusion, Defendants have, with one exception noted below, refused to amend their responses to address Oracle's concerns, necessitating this motion to compel.  Below Oracle explains how these four terms – "copy," "fix," "update," and "generic environment" – were defined.  Then, because Defendants' responses to each of these 223 RFAs were all evasive in the same way, and because the Court has asked that the Parties address issues such as these involving multiple discovery requests by topic, Oracle provides examples of Defendants non-responsive answers, rather than going through all 223 RFAs individually.

**"Copy."**  Oracle defined the term "copy" in its RFAs as follows:  "'Copy' in the noun form shall mean a copy, duplication, clone, backup, download, restore, and/or a compressed copy, and in the verb form shall mean to copy, duplicate, clone, backup, download, and/or restore."  Russell Decl., ¶ 28 & Ex. V at pp. 1-2.

With that definition, Oracle propounded numerous RFAs concerning whether SAP TN developed fixes and updates by using a "copy" of an Oracle update.  For example:

**AMENDED REQUEST FOR ADMISSION NO. 501:**

Admit that for the majority of Fixes or Updates listed in the first

19

1                     two columns of Exhibit A, TN acquired a Copy of a tax Update
                    published by PeopleSoft or Oracle by Downloading it from
2                     Customer Connection to use in Developing the Fix or Update.

3   Russell Decl., ¶ 29 & Ex. W at p. 290.

4                   Defendants globally objected to the definition of the term "copy" on the following

5   grounds: "Defendants object to the definition of 'Copy' as being overly broad, unduly

6   burdensome, vague, and not reasonably calculated to lead to the discovery of admissible

7   evidence to the extent it purports to encompass anything beyond the term as defined under U.S.

8   copyright law.  Defendants further object to Plaintiffs' use of the term 'copy' in these requests as

9   improperly shifting the burden of proof to Defendants."  *Id.* at p. 3.

10                  With that objection, and several others, Defendants then gave the following

11   response to RFA 501:

12                     ADMITTED on the following qualified basis:  TomorrowNow
                    reasonably believes that for the majority of the objects (meaning at
13                     least one object more than half of the total objects) associated with
                    the master bundle records referenced in the first two columns of
14                     Exhibit A, TomorrowNow employees acquired a tax update posted
                    by PeopleSoft by downloading that tax update from Customer
15                     Connection to use in connection with the development of the
                    object. To the extent not admitted, this request is DENIED.
16

17   *Id*. at 292.

18                  That response, and the other responses where Defendants use the same approach,

19   is evasive.  Defendants state that "TomorrowNow employees acquired a tax update posted by

20   PeopleSoft by downloading that tax update from Customer Connection to use in connection with

21   the development of the object," but what Oracle asked was whether SAP TN acquired a "copy"

22   of a tax update.  Defendants' answer carefully dances around the question, never answering

23   whether SAP TN acquired a "copy."  In a case about "copying," that matters.

24                  Worse, the last sentence of Defendants' response states that "[t]o the extent not

25   admitted, this request is DENIED,"  This suggests that Defendants are in effect denying any

26   "copying" happened, since that is what Oracle asked, yet a "download" is clearly a "copy," and

27   Defendants conceded as much during meet and confer.  Russell Decl., ¶ 11.

28                  Oracle is suing Defendants for copyright infringement, among other claims.

20

1   Thus, whether SAP TN acquired a "copy" of an Oracle or PeopleSoft update as part of the

2   process of creating fixes is central to Oracle's claims.  Defendants are refusing to admit whether

3   they acquired a "copy" of an update precisely because they do not want the jury to see that

4   admission in writing.

5            Defendants' objections to the definition of the term "copy" are without merit and

6   their answers are non-responsive.  Their objections that the defined term "copy" is "overly broad,

7   unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible

8   evidence" or that "Plaintiffs' use of the term 'copy' in these requests . . . improperly shift[s] the

9   burden of proof to Defendants" (Russell Decl., ¶ 29 & Ex. W at p. 3) do not make any sense.

10  SAP TN employees regularly used the word "copy" in their own documents to describe the

11  company's business processes.  For example, in an April 24, 2007 email, SAP TN manager Rod

12  Russell explained to SAP TN developer Edward Tong some of the steps involved in developing

13  a fix:  "Here is a summary of what needs to be done . . . *Copy* the program from that client's

14  source group into the fix folder you created."  Russell Decl., ¶ 20 & Ex. N at TN-OR01623777

15  (emphasis supplied).  A June 16, 2008 SAP TN document listed the steps involved in testing the

16  delivery of individual fixes.  One step was:  "Apply Fix:  1) *Copy* PAY003.sqr from

17  \Development Staging\CSS HRMS 8.SSI\PY07JUN\Individual Fixes\TN-

18  1214062594\SQR\Spurce1 folder to \h881COHM\sqr folder."  Russell Decl., ¶ 21 & Ex. O at

19  SAS-TN-OR-01823633-OR-00177 (emphasis supplied).  When Oracle uses a common word

20  such as "copy," goes further and defines it in the RFAs to include other common synonyms, and

21  when Defendants themselves use that word regularly to describe their own conduct, it is not

22  legitimate for them to claim they do not understand what it means in response to a discovery

23  request.

24           Moreover, Oracle is entitled to ask Defendants to admit they used a "copy" of an

25  update, even though the word "copy" may have legal significance.  Fed. R. Civ. Proc.

26  36(a)(1)(A) ("A party may serve on any other party a written request to admit . . . facts, the

27  application of law to fact, or opinions about either").  Defendants are not entitled to assert a

28  series of make-weight objections and then avoid answering the central thrust of the RFA.  *Cf.*

1    *Adolph Coors Co. v. American Insurance Co.*, 164 F.R.D. 507, 518 (D. Colo. 1993) (in

2    responding to discovery requests, a responding party is "obligated" "to put the collective heads

3    of its lawyers and agents together, . . . to give those requests a reasonable construction").

4            Federal Rule of Civil Procedure 36 provides that "[i]f a matter is not admitted, the

5    answer must specifically deny it or state in detail why the answering party cannot truthfully

6    admit or deny it.  A denial must fairly respond to the substance of the matter; and when good

7    faith requires that a party qualify an answer or deny only a part of a matter, the answer must

8    specify the part admitted and qualify or deny the rest."  Fed. R. Civ. Proc. 36 (a)(4).  Defendants'

9    answers do not satisfy Rule 36 because they stop short of admitting that SAP TN made *copies* of

10   Oracle or PeopleSoft updates, but at the same time do not (and cannot) deny that either.

11           At the parties' final meet and confer on this issue on December 3, 2009,

12   Defendants agreed that they would withdraw their objections to the term "copy" if Oracle

13   changed the definition of "copy" to refer only to the word's "plain meaning."  However, they

14   conditioned that "withdrawal" on Oracle's agreeing to reduce the number of RFAs to which

15   Defendants would amend their responses to no more than 100.  Russell Decl., ¶ 13.  Defendants'

16   offer of withdrawal reveals they are not actually confused about the meaning of the term "copy,"

17   as defined in the RFAs, and they realize they have not answered the key part of the RFAs.

18   Moreover, the alleged burden of now having to amend their responses is self-inflicted.  Oracle

19   did not ask Defendants to submit paragraph-long evasions of straightforward questions.  All of

20   the RFAs used the same definition of the term "copy," so all of Defendants' non-responsive

21   answers present the same issue, namely that Defendants refused to state whether they used a

22   copy.  There is no logical basis for Defendants to amend their responses to some subset of RFAs

23   that used the term "copy" but not others.  Moreover, Defendants' alternative suggestion of not

24   amending *any* responses and simply sending a letter stating that they withdraw their objection to

25   the term "copy" is an even worse solution.  Defendants' counsel stated that the jury typically

26   does not even see objections and is only shown the substantive responses, *id*. at ¶ 13, so a letter

27   from Defendants withdrawing an objection the jury does not see would accomplish nothing.

28           Oracle defined the word "copy" in a straightforward manner in its RFAs.  Oracle

1    would also be willing to accept the dictionary definition of the term (as it has told Defendants).

2    *See, e.g.*, http://dictionary.reference.com/browse/copy ("an imitation, reproduction, or transcript

3    of an original").  But it is unreasonable for Defendants to provide *no* substantive response to

4    many of Oracle's legitimate RFAs based on a contrived argument that they do not know what the

5    word "copy" means.

6           Under Rule 36, "[o]n finding that an answer does not comply with this rule, the

7    court may order either that the matter is admitted or that an amended answer be served."  Fed. R.

8    Civ. Proc. 36(a)(6).  Oracle requests that the Court either deem these RFAs admitted or order

9    Defendants to serve amended responses.

10          **"Fix" and "Update."**  Oracle defined the term "fix" to mean "any software

11   application patch, fix, code change, or update, including bug fixes, tax or regulatory updates or

12   bundles, their constituent discrete units of code, data files, or any other instructional

13   documentation or item."  Russell Decl., ¶ 28 & Ex. V at p. 2-3.  Oracle defined the term "update"

14   to mean "any software application patch, fix, or update, including bug fixes, tax or regulatory

15   updates or bundles, their constituent discrete units of code, data files, or any other instructional

16   documentation or item."  *Id*. at p. 5.  These terms are no strangers to Defendants – SAP TN's

17   business was to provide fixes and updates to customers using its local environments, and there

18   are records of thousands of such fixes and updates.  *See, e.g.*, Russell Decl., ¶ 19 & Ex. M at

19   24:7-25 (Shelley Nelson, SAP TN VP and 30(b)(6) deponent, testifying, "[t]he environments

20   generally are used for support of client cases and reactive and proactive development of bug

21   fixes or regulatory changes for the clients.").[7]

22

23   [7] For the purposes of this motion, Oracle can logistically only provide a few examples, but
     literally every SAP TN technical witness, including 30(b)(6) witnesses, have testified that
24   environments were used to create "fixes" or "updates."  *See also* Russell Decl., ¶ 17 & Ex. K at
     23:6-13 (Rule 30(b)(6) deposition of Catherine Hyde – "Q: And those individual fixes are
25   created, authored by TomorrowNow using a particular environment?  A:  Or environments.");
     *id.*, ¶ 18 & Ex. L at 21:8-20 (Rule 30(b)(6) Deposition of Rod Russell – "[T]he particular fix
26   would be developed on our client environments and then tested and then published.").
     Defendants' counsels' new and recent claims, such as that fixes do not actually exist, are without
27   merit and contradicted by the client's testimony.  Russell Decl., ¶ 12.

28

1       With those definitions, Oracle asked Defendants to admit certain facts about how

2   SAP TN developed fixes and updates.  One such example Request asked:

3       **REQUEST FOR ADMISSION NO. 597:**

4           Admit that for some Fixes or Updates listed in Exhibit B, TN
            Developed the Fix or Update once per "source group" (as the term
5           is used in Requests Nos. 576-579), in part by using a Local
            Environment installed from media originally provided by one
6           Customer within the source group.

7   Russell Decl., ¶ 29 & Ex. W at p. 578.

8       Defendants globally objected to the definition of the term "fix" as being "overly

9   broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of

10  admissible evidence to the extent it includes Master Fix records as included in the SAS

11  database."  *Id.* at p. 5.  They also objected to the term "update" as "overly broad, unduly

12  burdensome, vague, and not reasonably calculated to lead to the discovery of admissible

13  evidence to the extent it includes "fix," a term to which Defendants object above."  *Id.* at p. 7.

14      Defendants then responded to every RFA that asked about fixes or updates by not

15  admitting or denying anything about fixes or updates but instead discussing a different concept –

16  "objects."  For example, after asserting objections to RFA 597, Defendants provided the

17  following response:

18          ADMITTED on the following qualified basis:  Some of the objects
            (meaning more than one object) associated with the master fix
19          records referenced in Exhibit B were developed once for a specific
            group of customers within a release level in part by using
20          environment components installed from media provided by a
            specific TomorrowNow customer within that specific group.  To
21          the extent not admitted, this request is DENIED.

22  *Id.* at p. 581.

23      Oracle did not ask about "objects" that were "associated" with a fix.  Oracle asked

24  about the fixes and updates listed in Exhibit B to the RFAs.  And Oracle had a good reason to

25  ask that.  Exhibit B is a list of fixes and updates that SAP TN provided to customers.  Russell

26  Decl., ¶ 28 & Ex. V.  Oracle was asking Defendants to admit the extent to which SAP TN

27  developed those fixes for multiple customers by using media that had been licensed for only one

28  customer.  Defendants' response refuses to address that request and does not say anything about

24

1   the fixes or updates that Oracle asked about.  Defendants' answer instead talks about "objects"

2   that are supposedly "associated" with fixes, omitting any explanation of the relationship between

3   "objects" and "fixes," or what the vague word "associated" means, such that it is impossible for

4   the reader to discern any connection between what Oracle asked and what Defendants answered.

5   And the last sentence of Defendants' evasive answer – "To the extent not admitted, this request

6   is DENIED." – is likely to mislead a jury because it might sound like Defendants are denying

7   part of the RFA when in fact they have simply refused to answer it.[8]

8              As was the case with the term "copy," Defendants' objections were without merit,

9   and their answers did not satisfy the requirements of Rule 36.  The Court should order

10  Defendants to amend their responses to RFAs 496-680 or deem them admitted.

11             **"Generic environment."**  Oracle defined the term "generic environment" to

12  mean "any Local Environment that was both named without reference to any specific Customer

13  and used to support more than one customer."  Russell Decl., ¶ 28 & Ex. V at p. 3.  With that

14  definition, Oracle asked Defendants to admit certain facts about how SAP TN developed fixes

15  and updates using generic environments.  For example,

16             <u>**AMENDED REQUEST FOR ADMISSION NO. 542:**</u>

17             Admit that in order to generate some Fixes or Updates listed in the
            first two columns of Exhibit A, part of TN's process was to
18          compare Fix Objects in a Copy of one of its Generic Environments
            with Fix Objects in a different Copy of one of its Generic
19          Environments for an earlier release.

20  Russell Decl., ¶ 29 & Ex. W at p. 415.

21             Defendants globally objected to the term "generic environment" as follows:

22             Defendants object to the definition of "Generic Environment" as
            being overly broad, unduly burdensome, vague, and not reasonably
23

---

24  [8] The Fixes and Updates listed on Exhibit B are not the names of the actual fixes delivered to

25  customers.  Exhibit B lists the "Master" generic fixes that TomorrowNow then copied out and
    named for each customer.  So, for example, CSS-TN-0102085972 on Exhibit B (the first entry)

26  was actually named WMI-TN-0102085972 when it was sent to customer Waste Management
    (WMI = Waste Management, Inc.).  Russell Decl., ¶ 28 & Ex. V.  Oracle offered to amend

27  Exhibit B to specifically name each final deliverable sent to Defendants' customers, but
    Defendants said doing so would not change their answers.  Russell Decl. ¶ 12.

28

1    calculated to lead to the discovery of admissible evidence.
     Defendants further object that the term "generic environment" is
2    misleading to the extent that it includes HR751CSS as an example,
     as Defendants deny that HR751CSS is a generic environment.
3    Defendants further object to the definition of "Generic
     Environment" to the extent it incorporates the overly broad, unduly
4    burdensome, and vague term "Environment," to which Defendants
     object above.

5

6    *Id*. at p. 5.

7           With that objection, Defendants then responded to every RFA that asked about

8    "generic environments" by rephrasing their answer in terms of "one environment specific to

9    TomorrowNow's retrofit support of specific TomorrowNow customers," without ever explaining

10   what that meant or if it was the same or different from a generic environment.  For example, in

11   response to RFA 542 (above), Defendants said:

12          ADMITTED on the following qualified basis:  For some of the
            objects (meaning more than one) associated with the master bundle
13          records referenced in the first two columns of Exhibit A, one step
            in the process for generating the object was to compare the object
14          in one environment specific to TomorrowNow's retrofit support of
            specific TomorrowNow customers to the same named object in an
15          earlier release environment specific to TomorrowNow's retrofit
            support of specific TomorrowNow customers.  To the extent not
16          admitted, this request is DENIED.

17   *Id*. at p. 416.

18          That answer is evasive.  Did SAP TN generate the referenced fixes or updates by

19   comparing objects in generic environments, or not?  That was the question.  But the answer does

20   not say.  Indeed, there is no connection at all between what Oracle asked and what Defendants

21   said in their answer.  Moreover, the last sentence of the answer – "To the extent not admitted,

22   this request is DENIED." – suggests that some part of the RFA has been denied, when in reality

23   Defendants did not answer what was asked.

24          Defendants' objections to the definition of the term "generic environment" on the

25   ground that it is vague, or that it is misleading to describe environments as "generic," do not

26   have merit.  Defendants themselves used the term "generic environment" internally and in their

27   pleadings before this Court.  In their answer to Oracle's Fourth Amended Complaint, Defendants

28   stated:  "Defendants further admit that TN kept copies of certain of its customers' 'Oracle'

26

1    software applications on its systems and that certain development environments TN used to

2    service certain customers *were described internally as 'generic environments.'*"  Answer to

3    Fourth Amended Complaint (Aug. 26, 2009) (Dkt. 437) ¶ 19 (emphasis added).  Defendants'

4    witnesses testified that HR751CSS was a "generic environment."  *See, e.g.*, Russell Decl., ¶ 15

5    & Ex. I at 44:19-25 ("Q.  When we use the term 'database HR751CSS,' is that the same as an

6    environment?  A. Yes.  Q. So this is a continuing example of using a generic environment to

7    support multiple customers; is that right?  A. Yes."); *see also id*. at 27:14-28:5; 29:18-31:5

8    (testifying generally about SAP TN's use of generic environments).  Defendants also referred to

9    environments as "generic" in their day-to-day work.  *See, e.g.*, Russell Decl., ¶ 22 & Ex. P at

10   TN-OR01182811 (Beth Lester email to Shelley Nelson, SAP TN VP, stating, "[o]f course we

11   have some generic environment at all of these levels that I guess we can use in a pinch.").  Thus,

12   whether or not Defendants want to take a litigation position that certain environments were or

13   were not generic, Oracle has defined the term "generic environment" in a sufficiently specific

14   and appropriate way that Defendants cannot legitimately refuse to respond to these requests.

15          Accordingly, Defendants' answers do not satisfy the requirements of Rule 36.

16   The Court should order Defendants to amend their responses to these RFAs or deem them

17   admitted.  *See* Fed. R. Civ. Proc. 36(a)(6).

18          **B.      RFAs, Set No. 3, Nos. 13-50, Set No. 5, 4-63, 130-62**

19          Oracle propounded a series of RFAs asking Defendants to admit that portions of

20   specific fixes identified according to specific SAP TN customers were in fact developed or tested

21   using local or generic customer environments.  Here, as opposed to the RFAs above, Oracle

22   asked about "fix objects" – defined as a "discrete unit of code that can contain functions . . ." –

23   and  Oracle attached a spreadsheet (entitled "Exhibit D") that listed details about 33,186 such fix

24   objects generated by Defendants.  Russell Decl., ¶ 30 & Ex. X at pp. 2-3 and Exhibit D (to the

25   RFAs).  Oracle then asked Defendants to admit how those fix objects were created.  Russell

26   Decl., ¶ 31 & Ex. Y at RFAs Nos. 13-50.  Similarly, in a different sequence of RFAs, Oracle also

27   asked Defendants to admit that certain files were downloaded from Oracle's websites.  Russell

28   Decl., ¶ 32 & Ex. Z at RFAs Nos. 4-33.  As an example of a "fix object" RFA:

1    **REQUEST NO. 13:**

2    For each item 1-33186 on Exhibit D, admit that a Copy of the
     listed Fix Object was Created using a Local Environment.

3

4    Russell Decl., ¶ 31 & Ex. Y at p. 15-16.

5    For all such requests, Defendants refused to answer and asserted that "the

6    information sought" was not "tracked, recorded, or maintained by TomorrowNow in a 'readily

7    obtainable manner.'"  *Id*.  Specifically, after objecting to the RFA, Defendants responded:

8    **RESPONSE TO REQUEST NO. 13:**

9    Subject to the General Objections and Responses and these
     specific objections, after a reasonable inquiry and based on
10   Defendants' understanding of these questions, Defendants lack
     sufficient information to respond to these requests as the
11   information sought was not tracked, recorded, or maintained by
     TomorrowNow in a "readily obtainable manner."  On this basis,
12   therefore, these requests are DENIED.

13   *Id*.  Defendants' responses to these RFAs are doubly problematic.  First, Defendants did not

14   answer Oracle's questions about how the fix objects were created.  Second, Defendants'

15   responses were evasive.  If it is feasible to determine how the referenced fix objects were

16   created, Oracle is entitled to know how they were created.  If it is not feasible, then Defendants

17   should say that directly and be bound by that answer.  It is not fair for Defendants to refuse to

18   undertake that analysis in response to Oracle's discovery requests, then walk into Court on the

19   first day of trial with a lengthy analysis of how those fix objects were created.  That defeats the

20   purpose of discovery.

21   Accordingly, Oracle propounded another series of RFAs asking Defendants to

22   admit, based on their refusals, that they "do not have reasonable access to any readily obtainable

23   information" that would show the fix objects were *not* created in the way that Oracle believes.

24   Russell Decl., ¶ 32 & Ex. Z at RFAs Nos. 34-63, 130-62.  For example, following up on RFA 13

25   listed above, Oracle asked:

26   **REQUEST NO. 130:**

27   For each item 1-33,186 on Exhibit D to Oracle's Third Set of
     Requests for Admission, admit that Defendants do not have
28   reasonable access to any readily obtainable information indicating

28

1        that a Copy of the listed Fix Object was not created using a Local
         Environment.

2

3    *Id*. at p. 120.  Oracle's concerns were validated when Defendants contradicted their prior RFA

4    responses and denied this as well.  For example, after objecting to RFA 130, Defendants stated:

5            DENIED.  Defendants have reasonable access to TomorrowNow's
             records and other information relating to each item 1-33,186 on
6            Exhibit D to Oracle's Third Set of Requests for Admission.
             However, given the quantity of the items 1-33,186 on Exhibit D to
7            Oracle's Third Set of Requests for Admission, there is no readily
             obtainable way to review TomorrowNow's records and other
8            information to determine for each listed item whether a copy of
             each listed fix object was not created using a local environment.
9            Defendants have not undertaken the extreme burden of evaluating
             each item and have objected on that basis because the requested
10           information is as equally accessible to Plaintiffs as it is to
             Defendants.

11

12   *Id*. at p. 121.

13           That answer is non-responsive.  Oracle did not vaguely ask Defendants to admit

14   that they lack "records and other information," whatever that means, about the fix objects listed

15   in Exhibit D, which is what the first sentence of the answer talks about.  Oracle asked whether

16   Defendants have reasonable access to any readily obtainable information *indicating a particular*

17   *thing* – here, that a copy of the fix object was not created using a local environment.  Part way

18   through their paragraph-long answer, which follows an outright "DENIED," Defendants suggest

19   they do not have that information, but the last sentence then qualifies that assertion by claiming

20   that the requested information is "as equally accessible to Plaintiffs as it is to Defendants," which

21   sidesteps Oracle's question, which asked *whether* the information was readily obtainable.

22           Defendants cannot have it both ways.  Oracle identified 33,186 fix objects and

23   asked Defendants how they were created.  If Defendants do not have reasonable access to any

24   readily obtainable information that would answer those questions, they must state so directly.

25   Fed. R. Civ. Proc. 36(a)(4).  Conversely, if Defendants do have reasonable access to readily

26   obtainable information, then they must answer Oracle's RFAs concerning how the fix objects

27   were created.  Right now Defendants have blocked Oracle from this important discovery,

28   refusing to admit how the fix objects were created, and whether certain files are downloads from

                                           29

1    Oracle, and at the same time refusing to say they cannot do so.

2            Accordingly, the Court should order Defendants to substantively answer RFAs

3    Nos. 13-50 in Set Three and 4-33 in Set Five, which asked how the fix objects were created and

4    whether certain files were downloads, or to admit without qualification RFAs 34-63 and 130-62

5    in Set Five, which asked them to admit they lack reasonable access to readily obtainable

6    information that would allow them to answer the former RFAs.

7    **V.    CONCLUSION**

8            For the foregoing reasons, the Court should modify the protective order to allow

9    discovery in this case to be used in related European litigation; should order Scott Trainor's

10   deposition to be reopened; should review the two referenced redacted documents *in camera* to

11   determine whether the redactions are proper; and should order Defendants to respond to Oracle's

12   RFAs concerning downloads and their business processes for developing fixes and objects.

13

14   DATED:  December 11, 2009          Bingham McCutchen LLP

15

16

                                        By:_____ /s/ Geoffrey M. Howard_____
17                                              Geoffrey M. Howard
                                        Attorneys for Plaintiffs Oracle USA, Inc.,
18                                      Oracle International Corporation, Oracle EMEA
                                        Limited, and Siebel Systems, Inc.
19

20

21

22

23

24

25

26

27

28