Exhibit E

Dockets.Justia.com

# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 • FACSIMILE: 415-875-5700

Direct Number: (415) 875-5820
jmcdonell@jonesday.com

November 13, 2009

VIA E-MAIL & U.S. MAIL

Chad Russell, Esq.
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067

Re: *Oracle USA, Inc., et al. v. SAP AG, et al.*

Dear Chad:

This letter responds to your November 3, 2009 letter.

### Exhibit 1683

For purposes of clarity, I will note that I understand Exhibit 1683 to be SAP-OR00677719 - SAP-OR00677725. It was clawed back during Mr. Trainor's deposition, along with SAP-00677727 – SAP-OR00677735. Contrary to your assertion, the two documents do not contain "the exact same content," nor is the history of their production identical.

The content of SAP-OR00677719 and SAP-OR00677727 are identical beginning with (chronologically) Shelly Adam's email to Scott McGrath on May 1, 2006 through Bob Geib's email to Mia Lee on May 11, 2006 (the "Shared Portion"). Thereafter, the email traffic diverges and the remainder of the documents differ. For example, SAP-OR00677719 contains three unique emails, beginning with (chronologically) Mia Lee's email to Scott Trainor on May 11, 2006 through to Mia Lee's email to Scott Trainor on May 11, 2006 at 1:42 pm (the "Unique Portion of SAP-OR00677719"). Similarly, SAP-OR00677727 contains six unique emails, beginning with (chronologically) Mia Lee's email on May 11, 2006 at 12:55 pm to Bob Geib through to Scott McGrath's email to John Youri (the "Unique Portion of SAP-OR00677727").

Defendants initially produced SAP-OR00677719 and SAP-OR00677727 on March 13, 2009 ("March 13 SAP-OR00677719" and "March 13 SAP-OR00677727"). On August 31, 2009, Defendants informed Plaintiffs that we had removed portions of the redactions in March 13 SAP-OR00677727 and produced a second version of SAP-OR00677727 ("August 31 SAP-OR00677727"). During Scott Trainor's deposition, Plaintiffs introduced March 13 SAP-OR00677719, and I indicated that we needed to confer with Mr. Trainor because of privilege concerns. We then asserted that March 13 SAP-OR00677719 was an inadvertent production of privileged communications and clawed it back. After you drew our attention to the possibility that August 31 SAP-OR00677727 may pose a similar concern, we clawed it back in an abundance of caution. After clawing back both documents, we produced new versions on

JONES DAY

Chad Russell, Esq.
November 13, 2009
Page 2

October 21, reflecting a revised set of redactions ("October 21 SAP-OR00677719" and "October 21 SAP-OR00677727").

    The history of these documents' production reflects a good faith effort by Defendants to produce versions with minimal redactions. The effort to do so involved close calls. Both documents reflect an extended dialogue between multiple persons, some of whom were not attorneys, some of whom were attorneys acting within a business capacity during the exchange, and some of whom were attorneys acting within a legal capacity. Moreover, matters became somewhat more complicated as a result of the fact that Mr. Trainor has his own individual counsel. Under the totality of circumstances, we believe that our position as set forth in the October 21 production was reasonable and appropriate.

    Nevertheless, in order to resolve this matter, Defendants will agree to limit the claims of privilege to those reflected in August 31 SAP-OR00677727. In regard to SAP-OR00677719, for the reasons discussed above, we will produce a version of the document that redacts the Shared Portion in a manner consistent with August 31 SAP-OR00677727. But because the Unique Portion of SAP-OR00677719 was not part of the analysis involved in the production of August 31, 2009, we will stand on the redactions we asserted for the Unique Portion, as reflected in October 21 SAP-OR00677719. Thus, we will produce a version of SAP-OR00677719 with redactions on the Shared Portion that are consistent with August 31 SAP-OR00677727, and with redactions on the Unique Portion that are consistent with October 21 SAP-OR00677719.

    This agreement is strictly limited to these documents and should not be construed as having any other effect on privileges related to any other evidence, all of which rights are reserved. ==Moreover, in light of this limited supplemental production, we believe that a further deposition of Mr. Trainor is not warranted. There is virtually no likelihood that any material additional testimony would be elicited in such a deposition.== Nonetheless, we are willing to continue to confer with you on this issue if you have further views that you wish to offer for our consideration.

**Instructions not to Answer**

    I will address each exchange raised by your letter in turn:

Exchange 1

```
                              109
     7  MR. PICKETT:  Q.  Do you deny that you were
     8  telling Waste Management that it was to their
     9  advantage to provide access to software?
    10          MR. McDONELL:  Vague and ambiguous, lack of
    11  foundation, asked and answered.
    12          THE WITNESS:  I don't recall if I drafted
    13  this, first of all.  And second of all, as I read
```

JONES DAY

Chad Russell, Esq.
November 13, 2009
Page 3

    14  this, I don't believe it coincides with what you
    15  just concluded.
    16       MR. PICKETT:  Q.  Why not?
    17       MR. McDONELL:  Okay.  Assumes facts not in
    18  evidence.  Same objections.  And don't disclose
    19  privileged information, and don't speculate about
    20  it.
    21       THE WITNESS:  Could you repeat the way he
    22  characterized it, please, his last sentence?  Not
    23  the why not, but the one before?
    24       MR. PICKETT:  Actually, I don't think
    25  that's proper.
    1       What I'm doing is -- you're a lawyer, but
    2  you're not a lawyer -- you're a witness.
    3       MS. PHILLIPS:  He's asking you for the
    4  question, that's all.
    5       MR. McDONELL:  He wants to hear the
    6  question.
    7       MR. PICKETT:  He's not asking for the
    8  question.  He's asking for something else.  My
    9  question came back from his answer.  And his answer
    10  was -- you said, I don't recall if I drafted this,
    11  first of all; and second of all, as I read this, I
    12  don't believe it coincides with what you just
    13  concluded.
    14       And what I said was that it was -- you were
    15  conveying to Waste Management that it was to their
    16  advantage to allow access to the software.
    17    Q.  So I want to know why you don't think that
    18  coincides.
    19       MR. McDONELL:  It assumes facts not in
    20  evidence, it's vague and ambiguous, lack of
    21  foundation, and don't disclose your privileged legal
    22  analysis.
    23       MS. PHILLIPS:  And if you want to hear the
    24  question back, you're free to do that.  Everybody
    25  else has it on the screen.
    1       THE WITNESS:  That's not how I read the
    2  "you don't want us accessing."
    3       MR. PICKETT:  Q.  How did you read it?
    4       MR. McDONELL:  Same objections and same
    5  instruction to you not to disclose privileged

```
 6   information.
 7        THE WITNESS:  I feel like I'm going into
 8   where I'm drawing legal conclusions as I interpret
 9   this.
10        MR. McDONELL:  Okay.  So I instruct you not
11   to disclose your mental legal analysis.
```

   In this exchange, Oracle asked a current SAP attorney to interpret language within a contract that had been exchanged between TomorrowNow and a (at the time) potential customer. We allowed foundational questions into whether he drafted portions of the exchanged contract, but when asked "how did you [a current SAP attorney] read it," we instructed him not to answer because the question called for a legal analysis, the mental impression of an attorney, and invaded privileged work product.  Moreover, before the instruction, the witness stated: "I feel like I'm going into where I'm drawing legal conclusions as I interpret this." We stand on those instructions.

   Exchange 2
```
                            113
10   Q.  You had worked with them for some time when
11   you worked as an attorney for PeopleSoft.  True?
12   A.  True.
13   Q.  And so did you compartmentalize that --
14   your experience?
15        MR. McDONELL:  Calls for mental impressions
16   of an attorney.  I'll instruct you not to answer on
17   work product grounds.
```

   In this exchange, Oracle asked a current SAP attorney how he used (or did not use) information gained from a former client, or, if "compartmentalize" is understood in another manner, Oracle asked how he mentally stored or organized what he learned from a former client. These are different questions than the more limited foundation question of whether he disclosed the information gained from a former client.  We instructed him not to answer because it called for the mental impression of an attorney and potentially invaded privileged work product.  We stand on those instructions.

   Exchange 3
```
                            113
18        MR. PICKETT:  Q.  Did you take any steps to
19   avoid relying on your memory of the PeopleSoft
20   licenses in negotiating the terms of these licenses
21   with TomorrowNow customers?
22        MR. McDONELL:  Same objection, same
```

Chad Russell, Esq.
November 13, 2009
Page 5

    23  instruction not to answer.

In this exchange, Oracle asked a current SAP attorney whether he did anything to "avoid relying on" information he learned from a former client. This is a broader question than asking if he disclosed confidential information of a former client. Thus, if answered, the question could reveal the mental impression of an attorney and invade privileged work product. We stand on those instructions.

    Exchange 4

                         113
  24       MR. PICKETT:  Q.  If you take a look at
  25  paragraph 9A of the agreement, "TomorrowNow
   1  Indemnity," there's a bracket that states:  This
   2  will need to be different from the license.  Our
   3  rights to use the PeopleSoft software come entirely
   4  by way of the Waste Management license with
   5  PeopleSoft.
   6       Is it true that you were conveying to Waste
   7  Management the position that TomorrowNow's rights to
   8  use the PeopleSoft software come entirely by way of
   9  the Waste Management license with PeopleSoft?
  10       MR. McDONELL:  The document speaks for
  11  itself.
  12       THE WITNESS:  I don't recall drafting this.
  13  However, that -- what you recited is what the
  14  document represents, yes.
  15       MR. PICKETT:  Q.  Was that SAP's position?
  16       MR. McDONELL:  Document speaks for itself.
  17       THE WITNESS:  Was that --
  18       MR. McDONELL:  By position, do you mean,
  19  was that what SAP conveyed to the customer?
  20       MR. PICKETT:  Q.  Yes.  Was that your
  21  position to the customer?
  22    A.  It appears -- yes, it appears that in this
  23  document, that's the position we took.
  24    Q.  Was that a true statement so far as you
  25  knew?
   1       MR. McDONELL:  I have -- hold on for a
   2  second.
   3       Calls for a legal conclusion and legal
   4  analysis.  I'll instruct you not to answer.
   5       MR. PICKETT:  Q.  So you can't tell me

```
 6  whether it's true or not?
 7       MR. McDONELL:  I've instructed you not to
 8  answer on grounds of work product.  You're asking
 9  him to sit here and do legal analysis.
10       MR. PICKETT:  Q.  To your knowledge, did
11  SAP or TomorrowNow ever misrepresent facts to
12  customers during negotiation of terms?
13       MR. McDONELL:  I instruct you not to
14  answer.  It's argumentative, calling for legal
15  conclusions and work product and potential
16  attorney-client.  And it's argumentative.  I've
17  already said that.
```

In this exchange, Oracle asked a current SAP attorney to analyze and opine on two propositions: (1) whether "TomorrowNow's rights to use the PeopleSoft software come entirely by way of the Waste Management license with PeopleSoft" and (2) whether TomorrowNow misrepresented facts to customers. These questions not only call for a legal conclusion, but they call for legal analysis and work product about issues at the heart of this case. We instructed him not to answer because it called for legal conclusions, invaded privileged work product, and asked him to potentially reveal privileged attorney-client communications. We stand on those objections.

Exchange 5

```
                              115
21  MR. PICKETT:  Q.  Did SAP or TomorrowNow
22  take any steps to determine whether a particular
23  customer's allowance of access to software
24  constituted copyright infringement?
25       MR. McDONELL:  Instruct you not to answer
 1  on grounds of legal -- privilege and work product.
 2       MR. PICKETT:  It's take any steps.  It's
 3  not what they did.
 4       MR. McDONELL:  Stand by my instruction.
 5       MR. PICKETT:  Q.  Did TomorrowNow or SAP
 6  ever analyze in connection with a negotiation of a
 7  contract the general topic of a customer's rights to
 8  provide access to software?
 9       MR. McDONELL:  Instruct you not to answer
10  on the grounds of attorney-client privilege and work
11  product.
```

Chad Russell, Esq.
November 13, 2009
Page 7

In this exchange, Oracle asked a current SAP attorney to disclose whether SAP or TomorrowNow took any steps "to determine whether a particular customer's allowance of access to software constituted copyright infringement." The questions in this exchange, posed to an SAP attorney, ask about work done by TomorrowNow or SAP "in connection with" specific instances of potential copyright infringement and specific instances of customer negotiations, rather than asking broad foundation questions. Answering them, that is, confirming whether such steps were taken or were not taken for a "particular customer[]," would have invaded privileged work product, and could have revealed privileged communications. We stand on those objections.

Exchange 6

```
                            136
 3   MR. PICKETT: Q. You understand that you
 4   have certain ethical obligations as an attorney in
 5   the State of California. Correct?
 6       MR. McDONELL: Calls for a legal
 7   conclusion.
 8       THE WITNESS: I do.
 9       MR. PICKETT: Q. And you understood that
10   you have the obligation to keep information you
11   learned from a former -- a client strictly
12   confidential. True?
13       MR. McDONELL: Depends on the
14   circumstances. It calls for a legal conclusion.
15   Object to the form of the question.
16       MS. PHILLIPS: Overbroad.
17       THE WITNESS: I do.
18       MR. PICKETT: Q. And if you revealed this
19   type of information to Mr. Phillips, that violated
20   your ethical obligation. True?
21       MR. McDONELL: Object to the form of the
22   question, and I'm going to instruct you not to
23   answer on the grounds of attorney work product and
24   privilege.
25       MR. PICKETT: Q. Is this information
 1   confidential?
 2       MR. McDONELL: Vague and ambiguous,
 3   overbroad, calls for a legal conclusion, calls for a
 4   legal analysis by an attorney of a legal issue
 5   collaterally related to the case.
 6       I'm going to instruct you not to answer.
 7       MR. PICKETT: Q. Is it private? Is it
```

Chad Russell, Esq.
November 13, 2009
Page 8

```
 8   confidential?  That's not a privilege issue.
 9         MR. McDONELL:  Same objections.  Same
10   instruction.
11         MR. PICKETT:  On what ground?
12         MR. McDONELL:  Privilege, work product.
```

This exchange asked a current SAP attorney to analyze a hypothetical and conclude whether, under the facts as posed in the hypothetical, he had violated any ethical duties. The answer to that hypothetical could potentially impact this case. Moreover, it called for a legal conclusion collaterally related to this case, invades privilege work product, and asked him to reveal privileged attorney-client communications. We stand on our objections.

Exchange 7

```
                          139
 7   MR. PICKETT:  Q.  If you did convey it,
 8   would you have felt comfortable conveying it, the
 9   portion that I just read?
10         MR. McDONELL:  Instruct you not to answer.
11   Grounds of attorney-client, attorney work product.
12   It's unduly argumentative.  I object to the form of
13   the question.
```

This exchange asked a current SAP attorney a hypothetical about whether he would have been "comfortable" conveying certain information. It did not include a foundation question, which had previously been asked, and which we allowed to be answered (*i.e.*, did he convey the information at issue). The hypothetical is further colored by the suggestion by Oracle, posed immediately prior to the hypothetical, that conveying such information was "wrong." Answering this hypothetical calls for a legal conclusion, invades privileged work product, and potentially reveals privileged attorney client communications. We stand on those objections.

Exchange 8

```
                          166
17         MR. PICKETT:  Q.  Turning to Exhibit 1684,
18   page ending -861, under the indemnification
19   provision, it reads, "Key term -- no removing this."
20         Was that true, that this was a key term for
21   SAP, and it would not negotiate this term away?
22         MR. McDONELL:  Instruct not to answer on
23   the grounds of attorney-client and work product.
```

In this exchange, Oracle asked a current SAP attorney to interpret language within a contract. Specifically, Oracle asked him what value (*i.e.*, was it a "key term") the term had

JONES DAY

Chad Russell, Esq.
November 13, 2009
Page 9

within SAP during contract negotiations. We instructed him not to answer because it would potentially reveal privileged attorney client communications and invaded privileged work product. We stand on those objections.

Again, we are willing to meet and confer on all of these issues and to consider any responses you may have to this letter.

Very truly yours,

Jason McDonell

cc:   Geoffrey M. Howard
      Zachary J. Alinder
      Holly House
      Bree Hann
      Scott W. Cowan
      Greg Lanier
      Elaine Wallace
      Joshua L. Fuchs
      Jane Froyd

SFI-623193v1