BINGHAM McCUTCHEN LLP
DONN P. PICKETT (SBN 72257)
GEOFFREY M. HOWARD (SBN 157468)
HOLLY A. HOUSE (SBN 136045)
ZACHARY J. ALINDER (SBN 209009)
BREE HANN (SBN 215695)
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone:  (415) 393-2000
Facsimile:  (415) 393-2286
donn.pickett@bingham.com
geoff.howard@bingham.com
holly.house@bingham.com
zachary.alinder@bingham.com
bree.hann@bingham.com

DORIAN DALEY (SBN 129049)
JENNIFER GLOSS (SBN 154227)
500 Oracle Parkway, M/S 5op7
Redwood City, CA  94070
Telephone:  (650) 506-4846
Facsimile:  (650) 506-7114
dorian.daley@oracle.com
jennifer.gloss@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International Corporation,
Oracle EMEA Limited, and Siebel Systems, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE USA, INC., *et al.*, | CASE NO.  07-CV-01658 PJH (EDL) |
| Plaintiffs, | **ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL** |
| v. | |
| SAP AG, *et al.*, | |
| Defendants. | Date: January 26, 2010<br>Time: 2 p.m.<br>Place: Courtroom E, 15th Floor<br>Judge: Hon. Elizabeth D. Laporte |

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................. 1

II.  SAP'S THREE TOPICS ARE EACH PROCEDURALLY DEFECTIVE ....................... 2

A.   Each of SAP's Topics Differs From What It Told the Court and the Court
Required of It ............................................................................................ 2

B.   None of SAP's Three New Topics Should Be Before the Court ......................... 3

1.   The First Topic Re "Mapping" Is Old and Overbroad .............................. 3

2.   SAP Concedes That Its Second Topic Is Contrary to the Parties'
Agreement ...................................................................................... 4

3.   The Post-Litigation Custodian Topic Is Not Related to Siebel or to
New Claims, as SAP Promised ............................................................ 5

III. THE COURT ALSO SHOULD DENY EACH OF SAP'S THREE TOPICS FOR
MULTIPLE SUBSTANTIVE REASONS ................................................................ 5

A.   A Complete Review of the Facts Demonstrates That the Relief SAP Seeks
Re Mapping Is Inappropriate ....................................................................... 5

1.   Relevant Chronology of Events ........................................................... 7

a.   August 2006-March 22, 2007:  SAP Creates Its Own
Mapping Spreadsheets From Customer Connection and
Oracle Investigates Downloads ................................................... 8

b.   September 2007-March 2008:  Early Discovery and Judge
Legge's Rulings Regarding Mapping ............................................. 9

c.   April 2008-February 2009:  Oracle Produces the Customer
Connection Databases ............................................................... 14

d.   March 2009-December 3, 2009:  Oracle Provides Technical
Help but SAP Takes No Discovery ............................................... 15

e.   December 4, 2009:  Mr. Rice Confirms Oracle Had
Produced Complete Mapping Information ...................................... 16

2.   The Court Should Deny SAP's Motion for Further Mapping
Information for Any of Five Reasons .................................................... 18

a.   SAP Knew When It Filed This Motion That It Had the Data
It Says Oracle Withheld ............................................................. 18

b.   SAP's Own Failures to Accept or Pursue More Discovery
Preclude Relief on This Issue ..................................................... 20

c.   SAP's Own Contrary Statements and Positions Preclude
Relief on This Issue .................................................................. 21

d.   SAP Has Suffered No Prejudice .................................................. 22

e.   SAP's Requested Relief Invades Oracle's Work Product
and Is Unnecessary, Inappropriate, and Unduly
Burdensome ........................................................................... 22

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

# TABLE OF CONTENTS
(continued)

Page

1.  The Unproduced Documents Are Protected Work Product .............................................................. 23

2.  There Is No Justification for Invading Oracle's Work Product .......................................................... 23

3.  Mr. Rice's Spreadsheets Were Produced in a Timely Manner as Part of Expert Discovery................... 24

4.  Beyond the Inappropriate Request for Relief Invading Work Product, SAP's Requests for Relief Are Unnecessary and Unduly Burdensome .................... 25

B.  The Court Should Deny SAP's Motion for Discovery of Irrelevant Documents Maintained by Folger Levin.............................................. 25

C.  The Court Should Deny SAP's Motion to Compel Production of Post-Litigation Documents ...................................................................... 28

1.  SAP Long Ago Abandoned Its Improper Request for Post-Litigation Custodians .............................................................. 28

2.  The Request for Post-Litigation Custodians Was Not Proper per the Expanded Discovery Timeline Agreement Either ............................. 29

3.  SAP's Request For Post-Litigation Custodians Is Unduly Burdensome ...................................................... 30

IV.  CONCLUSION ........................................................................ 30

Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1

## TABLE OF AUTHORITIES

2

Page

3

4

**CASES**

5

*Fletcher v. Union Pacific R.R. Co.*,
   194 F.R.D. 666 (S.D. Cal. 2000) ........................................................................... 24

6

7

*Hickman v. Taylor*,
   329 U.S. 495 (1947) ............................................................................................. 25

8

*In re Vioxx Products Liability Litigation*,
   No. MDL 1657, 2007 WL 854251 (E.D. La. Mar. 6, 2007) .................................... 23

9

10

*Khalil v. Transunion, LLC*,
   No. 08-10303, 2008 WL 4642857 (E.D. Mich. Oct. 20, 2008) .............................. 29

11

12

*U.S. v. Estrada-Lucas*,
   651 F.2d 1261 (9th Cir. 1980) .............................................................................. 22

13

14

*Wixon v. Wyndham Resort Dev. Corp.*,
   No. C 07-2361-JSW, 2009 U.S. Dist. LEXIS 86337 (N.D. Cal. Sept. 21, 2009) .................. 25

15

*Wixon v. Wyndham Resort Dev. Corp.*,
   No. C 07-2361-JSW, 2009 U.S. Dist. LEXIS 86349 (N.D. Cal. July 17, 2009) ............. 24, 25

16

**OTHER AUTHORITIES**

17

Fed. R. Civ. P. 26(a)(2) ........................................................................................... 24

18

Fed. R. Civ. P. 26(b)(2)(C)(iii) ................................................................................ 25

19

Fed. R. Civ. P. 26(b)(3) ...................................................................................... 23, 25

20

Fed. R. Civ. P. 26(b)(3)(A)(ii) ................................................................................. 23

21

22

Fed. R. Civ. P. 45(c)(3)(A)(iv) ................................................................................ 25

23

24

25

26

27

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

A/73257332.5/2021039-0000324170

1    **I.      INTRODUCTION**

2           The motion filed by Defendants SAP AG, SAP America, Inc., and TomorrowNow, Inc.

3    (collectively, "SAP") should be denied on both procedural and substantive grounds.  The Court

4    should deny it on procedural grounds because SAP has violated the Court's requirement that the

5    Parties' final motions to compel should include only three discrete topics, and because the first

6    topic is overbroad (it combines multiple old discovery requests on tangentially-related issues

7    already the subject of past motions, such as Oracle's communications with its customers (RFP

8    45)).  On November 17, the Court required the Parties to identify two narrow topics for a final

9    motion to compel, with a third to be identified later.  SAP identified its first two topics as related

10   to:  (1) Siebel and discovery on new claims, and (2) pre-2005 financial information.  SAP's

11   actual motion relates to three different topics.  Each topic either violates the Court's rules

12   regarding scope, contradicts SAP's representations to the Court about the topics on which it

13   would move, or both.

14          The Court also should deny each of SAP's three new topics for a long series of

15   substantive reasons.  On the first topic, mis-described by SAP as relating to a single "mapping"

16   topic, SAP confuses two very different concepts, and omits important history that Oracle sets

17   forth below.  The confusion arises when SAP says Oracle has "consistently maintained

18   throughout this case that any download-to-product mapping that can be done has to be done

19   manually, on a file-by-file basis."  Motion at 4.  Oracle has "maintained" just the opposite, and

20   has produced huge volumes of electronic data and documents to facilitate the automation by SAP

21   of "download-to-product" mapping (data which SAP already had and knew how to generate,

22   despite its contention now that it received it only in November 2009).  The quotes from Oracle

23   that SAP cites go to a different issue:  there is no automated way to do "download-to-contract"

24   mapping, which involves the analysis of whether an individual download taken by SAP is

25   licensed to a specific customer.  This distinction becomes clear through the history of these

26   issues omitted by SAP, history which includes SAP's own creation, in February 2007, of similar

27   spreadsheets from the same source (Customer Connection), and its request for, and receipt of, the

28   underlying Customer Connection databases from which Oracle generated the very spreadsheet

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1    SAP claims it did not receive until November 16, 2009.  All told, this "mapping" topic fails for

2    at least five reasons, including that SAP had the information at least two years ago, refused

3    Oracle's offers for more, and now seeks protected work product SAP knew how to create itself

4    as far back as February 2007.

5        The second topic, related to the Folger Levin files, untimely seeks irrelevant material,

6    such as a five-year old motion *in limine* regarding Larry Ellison's "character."  The Court should

7    deny the third topic, post-litigation custodians, because SAP abandoned it, made statements to

8    Oracle and the Court that directly contradict it, and because SAP's delay has increased the undue

9    burden to collect and produce the information.

10   **II.    SAP'S THREE TOPICS ARE EACH PROCEDURALLY
         DEFECTIVE**

11

12       **A.    Each of SAP's Topics Differs From What It Told the Court
                 and the Court Required of It**

13       At the November 17 Discovery Conference, the Parties discussed the topics and scope of

14   this Motion with the Court.  The Court required each side to identify two topics, in part to make

15   sure that those topics were sufficiently discrete and fair to both sides in terms of scope:

16               So, as you know, I like to know a fair amount about the dispute
                 before I decide it in a formal way.  And, if I am going to do that,
17               there is going to be a limited number of things I will decide,
                 because I can't decide them all in time.
18

19   Declaration of Zachary J. Alinder in Support of Oracle's Opposition to Motion to Compel

20   ("Alinder Decl."), Ex. A at 52:23-53:2; *see also id.* at 54:8-9.  The Court also gave specific

21   guidance as to the permissible scope of the topics, responding to one of SAP's "topics" relating

22   to "new claims":  "I won't entertain a matter in that amorphous state" and further noting, "you'll

23   have to narrow it beyond that or I will just say no."  *Id.* at 63:17-18, 67:9-10.

24       The Parties identified on the record two of a maximum three issues for their final motion

25   to compel, and agreed that on December 4, each side would identify one final discrete issue to

26   the other for inclusion in the motion.  *See id.* at 53:9-16, 58:16-19.  At the hearing, SAP

27   identified its first motion topic as: "[Siebel] and the new claims-related discovery . . . The things

28   that they added in the fourth amended complaint."  *Id.* at 63:12-14.  SAP then identified its

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1    second motion topic as: "pre-2005 damages-related discovery." *Id*. at 63:25-64:1.

2          Without seeking leave from the Court or meeting and conferring with Oracle, SAP then

3    identified three different "topics" on December 4: (1) a request for Oracle to review and certify

4    its entire production relating to six different requests, labeled "mapping," but in reality covering

5    topics ranging from customer communications, to SAP customer license issues, to documents

6    "sufficient to show" the link between SARs and ESUs; (2) a request for production of pleadings

7    and transcripts identified in an index of documents related to the 2003 PeopleSoft/Oracle case

8    that are maintained by Folger Levin; and (3) a request for "updated production[s]" from six

9    Oracle employees.  *See id.*, Ex. B.  Oracle objected to SAP's topics, and asked SAP to

10   reconsider, but SAP refused.  *See id.*, ¶4.  In light of SAP's disregard for the Court's instructions,

11   the Court should require SAP to choose one topic between its second and third to pursue, and

12   should not allow SAP to pursue the first, as it is too amorphous.

13         **B.      None of SAP's Three New Topics Should Be Before the Court**

14                **1.      The First Topic re "Mapping" Is Old and Overbroad**

15         The Court should reject SAP's first "topic" re "mapping" on **three** procedural grounds.

16         **First**, it bears no relation to SAP's counsel's promised "placeholder for those things that

17   are still hanging that we can't articulate the nature of the problem yet, if any."  *Id.*, Ex. A at

18   53:17-19.  The Parties both identified "mapping" as an issue (and had it decided) years ago.

19         **Second**, the topic is too broad in its scope and requested relief.  The discovery requests

20   for which SAP seeks relief (RFPs 44-45, 47, and 51 and Interrogatory 7), are not one topic.

21   Defendants' Motion to Compel ("Motion") at 3.  For example, RFP 51 ("Documents sufficient to

22   show all Electronic Software Updates (ESUs) and Software Application Requests (SARs)

23   relating to the Software and Support Materials, and the system code for each such SAR and

24   ESU") focuses on download-to-product mapping, while others, such as Interrogatory 7 ("For

25   each TN Customer and Named Customer . . .") and RFP 44 ("All Documents from which a TN

26   Customer or Named Customer can determine. . .") focus on determining whether a download is

27   licensed to a particular customer, *i.e.*, download-to-contract mapping.  *See* Declaration of Scott

28   Cowan in Support of Defendants' Motion to Compel ("Cowan Decl.") at Appendices 1-5.  Other

1   requests barely relate to any kind of effort to determine the license status of any download.  For

2   example, RFP 45 ("All Documents relating to Communications between Oracle and an TN

3   Customer or Named Customer concerning which Software and Support Materials the customer is

4   entitled to access or Download") focuses on Oracle's communications with its customers, and

5   RFP 47 ("All Documents relating to which Software and Support Materials any TN Customer or

6   Named Customer is, or was at any time, entitled to access or Download") addresses issues of

7   access beyond just downloading.  *See* Cowan Decl. at Appendices 2, 3.  Despite SAP's attempt

8   to group these various types of requests together, they involve different issues.  Further, RFPs

9   44, 45, and 47 and Interrogatory 7 were the subject of SAP's very first motion to compel in this

10  action, decided by Judge Legge.  *See* Alinder Decl., Ex. C at 12:3-7.

11          **Third**, SAP did not identify Interrogatory No. 7 as included in this "topic" even in the

12  Parties' mutual exchange on December 4.  *See* Alinder Decl., Ex. B.  Oracle learned that SAP

13  considered this an issue when Oracle received SAP's Motion.

14          Because the discovery requests listed by SAP show that only RFP 51 specifically

15  addresses download-to-product mapping, Oracle focuses below on that issue in the space

16  available.  Had Oracle known, and the Court approved, this broad collection of discovery

17  responses within a single topic, Oracle would have requested additional space to address them.

18  To the extent the Court is willing to entertain SAP's Motion, even after past motion practice on

19  these other requests, Oracle respectfully requests a further opportunity to brief any other issues

20  the Court believes should be addressed.

21                      **2.      SAP Concedes That Its Second Topic Is Contrary to the
                                  Parties' Agreement**

22

23          SAP concedes that the second topic it disclosed to the Court – pre-2005 financial

24  information – was "resolved."  Motion at 2.  SAP substituted the Folger Levin topic, and

25  justified doing so on the grounds that the topic was "discussed" at the November 17 Discovery

26  Conference.  *Id.*  That is true but irrelevant.  The Parties discussed numerous topics at the

27  hearing, but agreed to leave **one** open topic, and to work to resolve the other two.  SAP, like

28  Oracle, had one open topic.  Oracle would have liked to have an additional issue in its motion to

4

1  compel as well, but abided by the agreement and its representations at the November 17

2  Discovery Conference, and also undertook to avoid motion practice by resolving one of the

3  issues on which SAP said it would move.  Since the equally-undisclosed topic re "mapping" is

4  impermissibly overbroad (among other defects), at a minimum the Court should require SAP to

5  use its open topic on this topic or the next, and decline to consider the mapping topic.

### 3. The Post-Litigation Custodian Topic Is Not Related to Siebel or to New Claims, as SAP Promised

8  SAP contends that its topic of post-litigation custodian document productions relates to

9  its first disclosed topic, because it relates to Oracle's "[Fourth Amended Complaint], Plaintiffs'

10  expanded claims, and Siebel issues."  Motion at 1-2.  That is wrong.  This new topic only relates

11  to Oracle's Fourth Amended Complaint in the sense that **every** issue in the case is now included

12  in the Fourth Amended Complaint.  SAP's attempt to connect its post-litigation document

13  request to Oracle's new claims through the Parties' Expanded Discovery Timeline Agreement is

14  inappropriate because (1) that Agreement does not relate to the Fourth Amended Complaint or to

15  Siebel issues, and (2) the Parties reached that agreement in November 2008, a half-year before

16  the Parties began negotiating the filing of Oracle's Fourth Amended Complaint.  *See* Declaration

17  of Jason McDonell in Support of Motion to Compel ("McDonnell Decl."), Ex. J.

18  SAP's Motion further proves the point.  SAP identifies the subject matter areas for which

19  it believes these employee documents are relevant – (a) TomorrowNow/SAP customers,

20  (b) damages causation and mitigation, and (c) TomorrowNow business model documents.  *See*

21  Motion at 19-20; *see also* McDonell Declaration, Ex. J.  None of those three topics first appeared

22  in the Fourth Amended Complaint, nor are they specific to Siebel.

## III. THE COURT ALSO SHOULD DENY EACH OF SAP'S THREE TOPICS FOR MULTIPLE SUBSTANTIVE REASONS

### A. A Complete Review of the Facts Demonstrates That the Relief SAP Seeks re Mapping Is Inappropriate

26  At the November 17, 2009 Discovery Conference, Oracle objected to SAP's nine-topic

27  Rule 30(b)(6) deposition notice related to these downloading allegations.  In discussing the

28  overbreadth of this notice, the Court observed that downloading had been an original issue in the

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1    case, and indicated that SAP should have taken such broad discovery on that topic sooner.  *See*

2    Alinder Decl., Ex. A at 22:6-12, 25:2-24, 27:14-28:10.  The Court then granted SAP 25 hours of

3    final deposition discovery, and left the division to SAP (subject to Oracle's objections).  *See id.*

4    at 28:3-9.  SAP then voluntarily **cancelled** the downloading deposition (to use its time on other

5    topics) and filed this Motion instead, the ultimate thrust of which is to preclude Oracle from

6    introducing evidence of SAP's illegal downloading at trial.

7          As part of this second effort to recover from not taking downloading discovery, SAP's

8    Motion confuses two important issues:  download-to-product mapping, which means associating

9    a download with its corresponding Oracle product, and download-to-contract mapping, which

10   means actually looking at the individual contracts to determine whether a specific download

11   related to a specific customer was licensed.  Oracle has always agreed that download-to-product

12   mapping information exists in electronic form and, as shown below, has produced everything to

13   SAP it has requested and that it needed on that topic.  The statements by Oracle that SAP says

14   are misleading relate to a different issue than the one SAP complains about in its Motion – they

15   relate to download-to-contract mapping, which cannot be automated and which Oracle did not

16   automate.  Those statements by Oracle, selected by SAP out of context, are as true today as they

17   were when Oracle made them:  Oracle did the hard, time-consuming work of matching up

18   downloads to individual customer contracts to determine licensed status, and SAP will have to

19   do it too.  In addition to this basic confusion between the two types of mapping, SAP's Motion

20   fails for at least **five** additional substantive reasons, each of which independently warrants denial:

21         1.  Since as early as February 2007, and no later than January 2008, SAP has had the
             **same download-to-product data** reflected by the spreadsheets identified in
22           SAP's Motion.  SAP used its own former JD Edwards employees to generate its
             own similar spreadsheets from the same source (Customer Connection) long ago,
23           and it had those same databases in its physical possession in February 2009.

24         2.  SAP is estopped by its own failures to take or accept more discovery than it did,
             including its rejection of Oracle's offer to produce work product spreadsheets in
25           January 2008 and its failure to pursue the engineer assistance Judge Legge
             ordered (which SAP's experienced JD Edwards employees did not need anyway).
26

27         3.  SAP is estopped from the argument it now makes by its own contrary statements,
             failures to disclose what it already had, and positions about what it already had
28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1    and what it needed.

2        4.   SAP has suffered no prejudice.

3        5.   Any download-to-product material SAP now seeks beyond what Oracle has
              already provided is work product and SAP cannot justify invading that protection.
4             Accordingly, the relief SAP seeks is unrelated and disproportionate to the requests
5             it made.

6        Oracle has provided the Court with the Declaration of Buffy Ransom and the exhibits

7   attached to it, including the same PowerPoint slides Oracle presented to Judge Legge and SAP at

8   the Parties' first motion to compel hearing on February 13, 2008.  Declaration of Buffy Ransom

9   in Support of Oracle's Opposition to Motion to Compel ("Ransom Decl.").  Ms. Ransom

10  describes the meaning of mapping, as it relates to the system codes found in the licensed portions

11  of JD Edwards software, and the support products related to that software.  Ransom Decl., ¶¶3-9.

12  She explains the difference between mapping **downloads to products** (download-to-product),

13  and mapping **downloads to specific customer contracts** (download-to-contract).  *Id.*  Oracle

14  also provides the prior Declaration of Jason Rice, provided to SAP and the Court on March 14,

15  2008, which gives background regarding the Customer Connection databases discussed at length

16  below.  *See* Alinder Decl., Ex. D.  These databases contain within them all of the system codes

17  associated with all of the downloads and related product information available on Customer

18  Connection at the time Oracle copied them.  As the discussions regarding mapping trace back to

19  the beginning of the case, it is necessary, with this backdrop in mind, to set forth a far more

20  detailed record than what SAP included in its Motion.  After doing so, Oracle then returns to the

21  five substantive reasons why the Court should deny the Motion.

22            **1.    Relevant Chronology of Events**

23        Footnote 8 of SAP's Motion supposedly supports the argument heading that SAP has

24  "continuously sought all electronic download-to-product mapping in Plaintiffs' possession."  The

25  footnote hints at a story not told by SAP's Motion.  The first three dates on which SAP says it

26  sought download-to-product mapping information are November 19, 2007, December 12, 2007,

27  and January 28, 2008.  However, the next date identified by SAP is not until June 16, 2009 (and

28  SAP did not request anything then, as explained below).  This gap is telling, but the history is

7

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1  even worse for SAP.

2              a.        **August 2006-March 22, 2007:  SAP Creates Its**
3                        **Own Mapping Spreadsheets From Customer**
                         **Connection and Oracle Investigates Downloads**

4          Prior to its Complaint, Oracle identified massive downloads from Customer Connection

5  originating from a TomorrowNow IP address.  Oracle undertook a time-consuming analysis of

6  its download logs to isolate the downloads, and the credentials used to take them, and then to

7  determine which ones were unlicensed.  *See* Ransom Decl., ¶3.  There is no automated way to do

8  this download-to-contract analysis.  *See id.*, ¶¶3-10.  Oracle laid out the non-privileged factual

9  details and conclusions of the investigation in its Complaints and interrogatory responses.  *See,*

10  *e.g.*, Fourth Amended Complaint ("FAC") ¶¶ 97-100, Dkt. No. 418; *see also* Alinder Decl., ¶7 &

11  Ex. E (investigation directed by counsel, including creating certain spreadsheets that correlated

12  system codes from the JD Edwards downloads to JD Edwards products); *see also* Cowan Decl.,

13  Ex. C (Interrogatory No. 7).

14          SAP, unbeknownst to Oracle, also used Customer Connection to generate very similar

15  spreadsheets in the same time period.  Attached as Exhibit F to the Alinder Declaration (and

16  submitted in full on CD due to its size as Exhibit G), are excerpts from a 3,500+ page document

17  created in February 2007 (according to the metadata), just days apart from the Jason Rice

18  spreadsheet SAP says Oracle improperly withheld.  SAP produced this spreadsheet from the files

19  of SAP's former Director for North American Support Services, Mark Kreutz, an experienced

20  former JD Edwards and Oracle employee, and one of seven employees SAP retained as a paid

21  litigation consultant after it shut down TomorrowNow in October 2008.  Alinder Decl., ¶¶9, 13

22  & Ex. H.  SAP produced this 2007 spreadsheet in February 2009 (labeling it "minor clean-up"),

23  more than a year after the initial Kreutz document production (and his deposition), and three

24  days after Oracle produced the Customer Connection databases.  Alinder Decl., ¶9.

25          The February 2007 Kreutz document was apparently created using access to Customer

26  Connection, and contains detailed information linking downloads to their related products.  Rice

27  Decl., ¶ 6.  Indeed, the first ESU on the Kreutz document is the same as the first one on the Rice

28  Spreadsheet, and contains virtually the same SAR, Object, and system code information.  *See*

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1   Alinder Decl., ¶11 & Ex. LL at 216:17-218:11.

2       At a minimum, the Kreutz document and others like it from SAP's files evidence detailed

3   knowledge about how to use Customer Connection to generate exactly the type of spreadsheet

4   that SAP complains about in this Motion.  SAP employees have admitted as much in deposition.

5   Keith Shankle, another former SAP employee, who reported up to Mr. Kreutz, created a

6   "master" SAR spreadsheet to catalogue all the SARs on Customer Connection and index them by

7   system code:

8           Q. Did you populate a spreadsheet with every SAR available from
            Customer Connection for certain JD Edwards World subsets?

9           A. Yes.

10          Q. How did you do that?

11          A. I used the Customer Connection to get that information.

12  Alinder Decl., Ex. I at 79:14-20, 114:4-17.  A later version of the spreadsheet Shankle was

13  referring to above shows that between August 2006 and February 2007, Shankle scoured

14  Customer Connection to collect and index system code and product information for SARs across

15  20 different update levels for both major releases of JDE World software, making more than

16  27,000 mapping determinations.  *Id.* at ¶12 & Exs. K and L.

17                  **b.      September 2007-March 2008:  Early Discovery
                            and Judge Legge's Rulings Regarding Mapping**

18

19      Beginning on September 21, 2007, with its initial production of customer contracts,

20  Oracle began producing mapping information that would enable SAP to perform the same type

21  of download-to-contract mapping analysis that Oracle performed prior to filing the Complaint.

22  *See*, *e.g.*, Alinder Decl., ¶ 15.  The Parties met and conferred regarding SAP's request for

23  download-to-product mapping information.  *See, e.g., id.*, Ex. N & ¶16.  Throughout these

24  discussions, Oracle made clear that it did have, and could create, spreadsheets to link system

25  codes to products – **and offered to provide them**, as explained below.  *See id.*, Ex. N at 2-3 &

26  ¶16.  SAP did not disclose that it already had similar ones.

27      On November 19, 2007, SAP asked for "information and documents that map the Oracle

28  products at issue in this case to the Software and Support Materials available on Customer

9

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1    Connection to which Oracle believes a licensee of these products is entitled."  Cowan Decl., Ex.

2    L.  On November 27, 2007, Oracle responded (in relation to RFPs 44-47):  "As discussed on

3    November 16, 2007, we have collected documents that tie together system codes and the

4    software modules for the JD Edwards SSMs that TomorrowNow downloaded on behalf of its

5    customers.  We'll review these documents and will produce them as soon as reasonably possible

6    in a meta-data scrubbed native form for word tables and excel files . . . ."  Alinder Decl., Ex. O at

7    2. (The Parties use "SSM" to refer to the software and support materials available on Oracle's

8    support websites.)

9           In the same letter, Oracle separately responded to SAP's complaint about the RFP 51

10   response:  "SAP is also not entitled to SAR and ESU information unrelated to the SSMs that it

11   took, unless it contends that it took every available SAR and ESU improperly (which may well

12   be the case, but Oracle has not yet made that allegation)."  *See id.*, Ex. O at 4.  This was a key

13   point.  Oracle did not, at that time, know what SAP had on its systems because Oracle did not yet

14   have that discovery from SAP.

15          Oracle produced certain pre-existing spreadsheets and related documents that provided

16   download-to-product mapping SAP had requested.  *See* Alinder Decl., ¶15 & Ex. P.  Oracle did

17   not produce other, work product spreadsheets with download-to-product information (such as the

18   one SAP identifies in its Motion) because it did not want to risk any waiver argument.  *See*

19   *id.*, ¶15.  On January 4, 2008, Oracle explained by letter to SAP that Oracle had granted SAP

20   access to Customer Connection, which provided "the product mapping information."  *Id.*, Ex. N

21   at 2-3.  Through that access, as evidenced by the February 2007 Kreutz document that SAP

22   produced in February 2009 and confirmed by Kreutz's Rule 30(6)(6) testimony and in the Rice

23   Declaration, SAP could have recreated, at that time in January 2008, an index of system codes

24   and ESUs, exactly like the spreadsheet created by Jason Rice and produced with Oracle's Expert

25   Report.  *See id.*, ¶¶9-12, 45 & Exs. F, G, I, K, L, LL, and SS; Rice Decl., ¶¶3, 5-6.

26          But Oracle went even further:  it offered to create "spreadsheets that link the system

27   codes for the JD Edwards SSMs to the licensed support product" provided SAP would agree to

28   three conditions:  "if you agree that you will not (1) claim that Oracle has waived any privileged

10                                               Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1  or immunity, including but not limited to work product protection; (2) request any other data that

2  Oracle has compiled in the process of creating the system code mapping we will produce, or (3)

3  attempt to depose any Oracle consulting expert or attorney regarding the preparation of the

4  system code documents."  Alinder Decl., Ex. N at 2-3.  Oracle did not make up these conditions.

5  It took them, almost verbatim, from a similar offer made by SAP in October 2007, and accepted

6  by Oracle, prior to SAP's production of a work product TomorrowNow network topology map.

7  *See* Alinder Decl. Ex. Q.

8      SAP rejected Oracle's offer on January 24, 2008.  *See id.*, Ex. R.  This response affirmed

9  Oracle's concerns about creating or producing work product, which it otherwise had no

10  obligation to do (see below, Section (III)(A)(2)(e)).  Instead, on January 25, 2008, Oracle

11  produced detailed pre-existing spreadsheets (*i.e.*, not ones created at the direction of counsel or

12  experts related to the litigation) that it had located showing how the system codes for the JD

13  Edwards downloads related to software licensed by customers in their license contracts.  *See*

14  *id.*, ¶15 & Ex. P.  These spreadsheets contain electronic download-to-product information similar

15  to the information contained in the spreadsheets that are the subject of SAP's Motion (and found

16  in SAP's own files).  *See id.*, ¶18.

17      At the ensuing February 13, 2008 hearing, from which SAP selectively quotes in its

18  Motion, SAP acknowledged Oracle's production of download-to-product information, and said

19  so to Judge Legge:  "**So what Oracle has provided us is the link between the system code and**

20  **the licensed product**."  Alinder Decl., Ex. C at 27:3-4.  Thus, that hearing did **not** focus on

21  whether Oracle had produced adequate download-to-product mapping, because SAP counsel

22  confirmed that Oracle had produced that information.  Rather, the "mapping" focus of that

23  proceeding related to SAP's ability to automate the determination of whether the specific

24  downloads on its system were licensed (*i.e.,* download-to-contract mapping).[1]  *See id.* at 15:21-

25

26  [1] While the quotes contained in this Opposition identify some key points made during the
27  February 13, 2008 hearing, Oracle encourages the Court to review the relevant portion of the
    hearing transcript as a whole (provided as Exhibit C to the Alinder Declaration).

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

25.  Mr. Cowan reiterated:  "Really, the issue is what data do they have in their possession that will speed the analysis of the TomorrowNow downloaded files, **to allow us to segregate those things that our customers are rightfully entitled to under their licenses**, and those things that we both agree they shouldn't have under their licenses."  *Id.* at 22:25-23:5 (emphasis supplied). Judge Legge verified this key point "in English":

> LEGGE:  In English, what you want is a mapping system which relates the subfiles, as I recall them here, to the products, **and to the contracts**.  Is that right?
>
> MR. COWAN:  Correct.

*Id.* at 32:20-24 (emphasis supplied).  Judge Legge **then** asked Oracle "Do you have, presently existing, any mapping device or program or code which would eliminate the necessity for doing it [*i.e.,* mapping downloads to products to **contracts**] one by one?" to which Oracle responded "The answer to that, Your Honor, is: 'Not that we have been able to generate so far.'  We're still working on it, because we have the same interest in this that they do."  *Id.* at 33:6-12.  That was true then, and is true now.  There still is no automated program that will tie a customer's license agreement to any particular download.

Judge Legge's Order further confirmed these points:  "Defendants want more detail in the mapping information, primarily to relate the information directly to defendants' sub-files, and the connections between the sub-files, the products **and the contract**. . . ." and recommended "that Oracle be directed, at its expense, to send an engineer . . . to the premises of defendants to work with one of defendants' engineers to see if a method of access can be developed."  Cowan Decl., Ex. E at 4:3-16 (emphasis supplied).  Judge Legge also ruled that it is SAP's burden to determine the licensed status of each download because license is an affirmative defense.  *See id.*, Ex. E & Ex. S at 119:15-25.  Oracle prepared to send its engineer as Judge Legge had instructed.  *See id.*, ¶23 & Ex. W at 6.

On February 19, 2008, SAP filed another motion to compel, seeking:  (1) the source code for "Change Assistant" and (2) Customer Connection's underlying databases.  *See* Alinder Decl.,

Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

Ex. U.[2]  In that motion, SAP said (in language not disclosed or referenced by the timeline in footnote 8):  "Moreover, the databases that Change Assistant uses to perform its search and retrieval functions will provide part of the data defendants continue to seek regarding the mapping of all downloadable software and support materials to all of the licensed products that are implicated by Oracle's claims in this case."  *Id.* at 7.

As described in Oracle's responding papers, these databases comprised 1.2 Terabytes of data, from "at least nine separate databases" and "approximately 65 million individual records."  Alinder Decl., Ex. T at 8.  Oracle disagreed that production was necessary or appropriate because Oracle had already "allowed Defendants unfettered access to inspect Customer Connection with a special log-in credential, and even allowed them to download SSMs using the Change Assistant tool."[3]  *Id.* at 8.  Nevertheless, Oracle agreed to produce these databases related to this further request for "mapping" information as a compromise to resolve the request for Change Assistant, its source code, and the Customer Connection databases.  *See id.*

Dissatisfied with this proposal, SAP continued to press for the Change Assistant source code, in a further round of briefing to Judge Legge.  Alinder Decl., Ex. V.  Oracle again explained the necessity of matching downloads to individual contracts to determine whether the download was licensed.  *Id.*, Ex. W at 3.  Oracle reiterated its offer to produce these databases, but continued to object to producing the source code.  *See id.*  With its brief, Oracle **also submitted a declaration from Jason Rice** explaining the nature of the Customer Connection databases and the function of Change Assistant to search them by system code.  *See* Alinder Decl., Ex. D at ¶¶4-5.  SAP never sought to depose Jason Rice after receiving this declaration, and only ever sought to depose him related to communications between him and Oracle's experts as disclosed in Oracle's November 16, 2009 Expert Reports.  *See* Alinder Decl., ¶28.  Oracle

---

[2] Change Assistant was a tool developed by Oracle for its customers to facilitate downloading of SSMs, including from Customer Connection.  SAP used Change Assistant as one means of downloading from Oracle prior to the lawsuit, and as part of the 2008 access provided by Oracle.
[3] After two days of this access, SAP requested no further access to Customer Connection for almost two years, and not until less than a month before the close of discovery.  *See* November 10, 2009 Joint Discovery Conference Statement at 34, Dkt. No. 547.

Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1    also reiterated that it was "prepared to sit down with one of its engineers at SAP's offices to

2    examine those files and assist in the [download-to-contract] mapping exercise" pursuant to Judge

3    Legge's February 22, 2008 Order. *See id.*, Ex. W at 6.

4         On March 19, 2008, Judge Legge denied the request for Change Assistant source code,

5    and agreed with Oracle's proposed compromise of producing the Customer Connection

6    databases, along with the engineer assistance. *See id.*, Ex. X (the Report and Recommendation

7    as to that issue became final on April 9, 2008). From that time until the nine-topic Rule 30(b)(6)

8    deposition notice discussed with the Court on November 17, 2009, SAP did not ever make

9    another **request** for any mapping information.

10              c.       **April 2008-February 2009:  Oracle Produces the**
                         **Customer Connection Databases**
11

12        After the March 19, 2008 Order, Oracle set about the time-consuming task of producing

13   the Customer Connection databases. *See* Alinder Decl., ¶30. According to Oracle's records and

14   recollection, SAP never asked about the status of the production. *See id.* By December 2008,

15   Oracle had a set of the databases it was preparing for production, told SAP so, and further

16   informed SAP that the databases also addressed certain pending copyright discovery issues. *See*

17   *id.*, ¶30 & Exs. Y and Z. To Oracle's surprise, SAP requested that Oracle prioritize other

18   productions over the Customer Connection databases it had requested, including on January 30,

19   2009, stating: "Also, it appears from a number of your emails that the production of the

20   Customer Connection database is slowing down Oracle's production of other documents. We are

21   still not clear why Oracle is prioritizing production of that database over [custodial] documents

22   that we have actually requested." *Id.*, Ex. AA.

23        Oracle produced the databases on February 9, 2009, and reminded SAP on February 13,

24   2009 that "the Customer Connection databases on drives labeled, ORCL062 and ORCL063 . . .

25   contain large amounts of descriptive information concerning Oracle's software and support

26   materials, including unregistered works." *Id.*, Ex. BB. The timing compares favorably to SAP's

27   own production of its downloaded SSMs (a necessary piece of the mapping exercise, according

28   to Mr. Cowan at the February 13, 2009 hearing: "I think you need a combination of both,

14

1   because you need the Oracle data that Mr. Howard has just presented to you – and we don't

2   dispute any of the things he just said, in terms of the type of data and what it means."). *Id*., Ex. C

3   at 22:20-24.  SAP began that process in mid-2007 and did not produce them until October 29,

4   2008 (approximately twice as long as it took Oracle to produce the Customer Connection

5   databases).  *See id*., Ex. CC at ¶15.

#### d.   March 2009-December 3, 2009:  Oracle Provides Technical Help but SAP Takes No Discovery

It was not until March 9, 2009, that SAP raised concerns about accessing the databases.

*See* Alinder Decl., ¶36.  Oracle responded on March 20, 2009 with further assistance.  *See id*.

On April 3, SAP requested assistance from Oracle in restoring the databases, which Oracle

provided including by emails dated April 14 and 20.  *See id*., ¶36 & Exs. DD and EE.  After SAP

agreed that doing so would not waive work product, Oracle created a thirteen-page technical

instructional document with step-by-step instructions of how to restore and access the "Update

Center" database (one of the Customer Connection databases).  *See id*., ¶36 & Ex. EE.  Mr. Rice

confirmed during his deposition these databases were a primary source of the data that SAP

complains of in this Motion.  *Cf. id.*, Ex. EE & Ex. FF at 119:7-9 (both discussing the Update

Center databases).  Oracle explained that these instructions "should be self-explanatory for your

experts, but if you have questions, please let me know."  *See id.*, Ex. EE.  SAP never responded

with further questions.  *See id*., ¶36.

In May 2009, Oracle conformed its Interrogatory No. 7 response to reflect the earlier-

provided Customer Connection databases and download-to-product electronic data provided in

early 2008.  *See* Cowan Decl., Ex. C.  SAP incorrectly states it then requested additional

mapping information in June 2009.  *See* Motion at 12 n.8.  The truth is that SAP merely **_asserted_**

that it did not have the mapping information it needed in connection with *Oracle's* motion to

compel further responses to Interrogatories 13 and 14 (which requested SAP to support its

statements that it had taken "inappropriate" downloads from Oracle and to identify them).  *See*

Cowan Decl., Ex. O at 9.

Despite having long had all the download-to-product mapping information and data, as

15

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1   described above, SAP maintained otherwise in its supplemental responses, ordered by the Court

2   and served on September 23, 2009. *See* Alinder Decl., Ex. GG. Surprised, Oracle responded on

3   October 13 by again detailing all of the "mapping" information, including the electronic

4   spreadsheets produced in February 2008, that SAP had in its possession. *See* Cowan Decl., Ex. J

5   at 2 ("Oracle has produced more download, mapping and licensing information to Defendants

6   than it had when it first analyzed Defendants' illegal downloading . . . .").

7       SAP did not respond to Oracle until November 2, 2009, when it served the nine-part Rule

8   30(b)(6) deposition notice on "mapping" topics. *See* Alinder Decl., ¶39 & Ex. HH. At the

9   November 17, 2009 Discovery Conference, the Court recommended that SAP seek information

10  on a more informal basis than its deposition notice, and Oracle agreed to provide it. *See id.*, Ex.

11  A at 28:6-10. SAP did not proceed with its "mapping" deposition, using its allotted deposition

12  hours examining other witnesses and on other Rule 30(b)(6) topics, and never requested any

13  further "mapping" information from Oracle prior to its Motion. *See id.*, ¶19.

14              **e.      December 4, 2009:  Mr. Rice Confirms Oracle
                          Had Produced Complete Mapping Information**

15

16      All this brings us to Jason Rice's deposition on December 4. The only basis that SAP

17  presents in support of its serious claim that Oracle has been withholding "critical" mapping

    documents is that deposition and related spreadsheets created by Mr. Rice that were produced

18  with Oracle's Expert Report. Motion at 4.

19

20      Mr. Rice is an Oracle software engineer who assisted Oracle's attorneys with technical

21  issues during the investigation leading up to the filing of the Complaint and with technical

    requests from Oracle's technical expert, Kevin Mandia. *See* Alinder Decl., ¶37. Though omitted

22  from SAP's papers, at his deposition, Mr. Rice confirmed what the chronology above reveals –

23  SAP has had this same data in its possession for almost a year, and could have queried that data

24  (and did) to create the same spreadsheets that SAP cites in its Motion.

25

26      Mr. Rice explained: "Off the top of my head, we provided the SAR system database, we

    provided the Update Center database, and then we provided every single EnterpriseOne database

27  that was listed at the point of time of collection, which would have been Xe, ERP 8, 8.9, 8.10,

28

                                                16                        Case No. 07-CV-01658 PJH (EDL)

                    ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

8.11, 8.11SP1, 8.12." *Id.*, Ex. FF at 112:6-11; *see also id.*, Ex. DD (April 14 email from Alinder to Charrington confirming the same). Mr. Rice confirmed what SAP's own Kreutz and Shankle spreadsheets prove, and which SAP knew, that the databases could be accessed to create these same types of spreadsheets:

- "Q. And what did you validate? A. I validated more or less the same table information that you could do the queries similar to what I did to produce these types of documents." *Id.*, Ex. FF at 110:20-23.

- "A. You could run queries to get the same data back, yes. Q. The same data that you had done – A. That created these artifacts that we discussed today." *Id.* at 117:4-8.

- "Q. This [Exhibit] was taken out of what database? A. The – That would be the Update Center database." *Id.* at 119:7-9.

The heart of SAP's Motion is the contention that Mr. Rice's spreadsheets represent "substantial and critical portions of [Oracle's] mapping information [that] were not produced by Plaintiffs" until Oracle's expert reports were produced. Motion at 8. SAP accuses Oracle of withholding these spreadsheets and at the same time "consistently maintain[ing] throughout this case that any download-to-product mapping that can be done has to be done manually, on a file-by-file basis." *See id.* at 4. Neither of those statements is true. As the chronology above shows, and Mr. Rice's testimony confirms, Oracle has actually always maintained the **opposite**, disclosing and providing to SAP, beginning in January 2008, multiple sources of electronic data to map downloads to products. SAP knew prior to its Motion that it had all of these data sources, including the databases Mr. Rice used to generate the spreadsheets that SAP cites in the Motion.

SAP's real problem, as described by SAP counsel and confirmed by Judge Legge, is its inability to easily map the individual downloads on SAP's systems to individual customer license agreements, in part because SAP did not keep track of what credentials it used to take any of the 9 million downloads on its systems. Alinder Decl., ¶¶40-47 & Exs. II-NN. **That** is what Oracle has "consistently maintained" it cannot provide. Oracle has explained many times, and reiterates again now, that this license mapping can be done, but there is no existing automated way to do it to Oracle's knowledge. *See id.*, ¶48; *see also* Ransom Decl., ¶¶3-10.

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

### 2.     The Court Should Deny SAP's Motion for Further Mapping Information for Any of Five Reasons

Having set forth the detailed record of relevant events preceding SAP's Motion, Oracle returns to the five distinct substantive reasons that SAP's Motion fails.

#### a.     SAP Knew When It Filed This Motion That It Had the Data It Says Oracle Withheld

SAP had all of the necessary mapping information in its possession in at least *seven* different forms.  SAP knew all of this before filing this Motion.

**First**, SAP's Motion claims that the "critical" information it lacked was an "electronic spreadsheet showing which system codes relate to each ESU, SAR, and object that is available for downloading would be very useful in that exercise."  Motion at 5.  SAP's own documents, data, and Rule 30(b)(6) testimony disprove this contention.  SAP created that mapping data itself, as part of its regular business practices, at least as early as February 2007, before Oracle filed its Complaint and before Jason Rice created the earliest spreadsheet for Oracle's investigation cited in SAP's Motion.  *See* Alinder Decl., ¶¶9-12, 45 & Exs. F, G, I, K, L, LL, and SS; Rice Decl., ¶¶3, 5-6.

Not only did SAP have at least 37 former JD Edwards employees, who likely knew which system codes related to which products, but it hired Mark Kreutz, a former longtime JD Edwards employee and former Director of North American Support Services at TomorrowNow, to be its litigation consultant during this case.  Alinder Decl., ¶¶ 13-14 & Ex. H; Rice Decl., ¶¶5-6.  Mr. Kreutz maintained his own "massive" Customer Connection spreadsheet – to use SAP's term – that lists SARs, ESUs, and Objects almost identical to the Rice Spreadsheet that SAP complains about, and testified that he understood and maintained instructional documents about how Customer Connection and system code mapping worked.  *See* Alinder Decl., ¶¶9-11, 45 & Exs. F, G, LL, and SS.  Indeed, the first ESU on the Kreutz document is the same as the first one on the Rice Spreadsheet, and contains similar information about SARs and Objects that tie to system codes.  *See id.*, ¶11.  The Shankle documents and testimony reveal the same knowledge regarding how to compile electronic download-to-product mapping spreadsheets from Customer

18

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1    Connection.  *See id.*, ¶12 & Exs. I, K, and L.

2         That SAP claims now that it had no idea this was possible from Customer Connection is

3    belied by its documents, its testimony, and experience.  The fact is that knowing how the system

4    codes related to the JD Edwards products was the job of over 30 experienced TomorrowNow

5    employees, and as Shankle testified, was basic and obvious to them:  "The system codes are

6    standard system codes in the JD Edwards software.  It's the basis of how the software was

7    originally designed."  Alinder Decl., Ex. I at 114:11-13.  Accordingly, SAP's own documents

8    and testimony expose the fundamental flaw of its Motion – before Oracle even filed its

9    Complaint, SAP had the very "mapping" information that it claims surprised it at the December

10   4, 2009 deposition, it had former JDE employee experts as employees and litigation consultants

11   to explain this to it, and it had access to Customer Connection where all of this data resided.

12        **Second**, SAP had litigation access to all of the mapping information available on

13   Customer Connection starting on January 3-4, 2008.  *See id.*, ¶49.  For example, the Customer

14   Connection website classifies all of the JD Edwards support materials by software release and

15   product version.  *See* Ransom Decl., ¶6.  Those support materials can be searched and

16   downloaded by system code.  *See id.*; *see also* Rice Decl., ¶3.  Oracle told SAP this by letter on

17   January 4, 2008.  *See* Alinder Decl., Ex. N.  SAP could have accessed, inspected, and

18   downloaded any support materials, including all ESUs or SARs.  *See* Sections III(A)(2)(b)-(c),

19   above.

20        **Third**, in January 2008, Oracle produced to SAP extensive pre-existing spreadsheets

21   with download-to-product mapping information.  *See* Section III(A)(1)(b), above.

22        **Fourth**, Oracle served detailed interrogatory responses explaining Oracle's own process

23   for mapping downloads to customer licenses.  Oracle also explained this process to SAP and

24   Judge Legge, using the PowerPoint slides attached as Exhibit A to the Ransom Declaration at the

25   February 2008 motion to compel hearing.[4]  *See* Alinder Decl., ¶50.  Oracle also identified, on

26   _____

27   [4] *See* Ransom Decl., ¶¶3-9 for a description of these slides and the process for mapping
     downloads to customer licenses.

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1   September 21, 2007, the employees that had been involved in the process should SAP have

2   wanted to depose them (SAP declined to use any of its 450 deposition hours this way).  *See id.*,

3   Ex. E.

4        **Fifth**, Oracle has produced the customer license agreements, support renewal

5   information, and customer website terms of use, which Oracle had used to evaluate licensing of

6   the downloads that SAP took as reflected in Oracle's log files.[5]  *See id.*, ¶15.

7        **Sixth**, Oracle has produced its log files showing the downloading activity Oracle can

8   identify from its own records.  *See id.*

9        **Seventh**, at SAP's request, Oracle produced the underlying 65-million record Customer

10  Connection databases on February 6, 2009.  *See id.*, ¶52.  SAP knew about the mapping

11  information in these databases from multiple sources, and (though omitted from SAP's Motion)

12  received further confirmation from Jason Rice on December 4, 2009.  *See* Sections III(A)(1)(c)-

13  (e), above.  With these databases, SAP can create any spreadsheet it chooses and has access to

14  the JD Edwards mapping data available through Customer Connection, even though Customer

15  Connection is no longer available for live access.  *See* Alinder Decl., Ex. II at 117:4-8.

16           **b.      SAP's Own Failures to Accept or Pursue More
                         Discovery Preclude Relief on This Issue**
17

18       SAP is also estopped by at least *seven* of its own discovery decisions.  **First**, SAP

19  rejected Oracle's offer to produce additional, work product, spreadsheets in January 2008.  *See*

20  Section III(A)(1)(b), above.  **Second**, SAP abandoned its inspection of Customer Connection,

21  which SAP knew had product mapping information, after just two days in January 2008, and did

22  not request further access until November 2009 (which Oracle promptly provided).  *See* Section

23  III(A)(1)(d), above; *see also* Alinder Decl., ¶49.  **Third**, SAP failed to take advantage of the

24  assistance of an Oracle engineer to help develop a mapping solution, as ordered by Judge Legge.

25  *See* Section III(A)(1)(b), above.  **Fourth**, SAP asked Oracle to not prioritize the production of

26  ───────────────

27  [5] In addition to these sources of licensing information, SAP has additional customer licensing
    information at its disposal in the customer-specific financial reports supplementing the customer
    contract production.  *See* Alinder Decl., ¶51.

28

Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

the very Customer Connection databases it had requested.  *See* Alinder Decl., Ex CC.  **Fifth**, SAP failed to depose any of the Oracle employees knowledgeable about the technical details of downloads or Customer Connection until the last day of discovery (and only then on the supposed ground of communications with experts).  *See id.*, ¶28.  SAP had Jason Rice's declaration describing the Customer Connection databases in March 2008, it had his name from Oracle's interrogatory responses in September 2007, and it had ample opportunity to take Rule 30(b)(6) or individual deposition testimony to explore any or all of these issues.  *See id.*, Exs. D & E.  **Sixth**, SAP voluntarily withdrew its Rule 30(b)(6) "mapping" deposition notice, set for December 1, 2009, after the Court suggested that SAP obtain download information informally instead.  *See id.*, ¶19.  **Seventh**, SAP ignored this suggestion and (again) did not pursue the suggested informal exchange.  *See id.*

**c.      SAP's Own Contrary Statements and Positions Preclude Relief on This Issue**

SAP's Motion also takes at least **four** positions that contradict what it has said, done, and not done.

**First**, SAP had in its possession detailed electronic spreadsheets that map system codes to SARs and ESUs, created from Customer Connection by JD Edwards experts who SAP later retained as litigation consultants.  *See* Section III(A)(1)(a), above.  SAP never disclosed or produced these spreadsheets prior to the relevant depositions, and never asked Oracle to confirm their accuracy or to send the engineer ordered by Judge Legge to evaluate them.

**Second**, SAP engaged in a similar mapping exercise before it filed its Answer, as part of its investigation, and has objected to producing any documents generated through that process on work product grounds.  *See* Alinder Decl., Ex. OO.  Indeed, the Parties stipulated that they would not list on privilege logs documents created after Oracle filed its Complaint.  To the extent SAP now changes course and wants to throw open the gates to work product created by each side in its own investigation, a position contrary to the stipulation and all of SAP's discovery responses, then SAP must produce its own privilege log and the review, certification, and production must go both ways.  Oracle submits that such an exercise makes no sense in this case and at this late

21

1    date.

2          **Third**, SAP contends that it need not disclose work product relied upon by experts until

3    expert reports, which is what Oracle did here.  *See* Alinder Decl., ¶54; *see also* Stipulation

4    Regarding Expert Discovery, Dkt. No. 275, at 1.

5          **Fourth**, Judge Legge has ruled, SAP has accepted, and it is now law of the case that it is

6    SAP's burden to do its own time-consuming download-to-contract mapping.  *See* Cowan Decl.,

7    Ex. E at 3-4; Alinder Decl., Ex. S at 119:15-25; *U.S. v. Estrada-Lucas*, 651 F.2d 1261, 1263-64

8    (9th Cir. 1980) ("A decision of law in a case, once made, becomes the 'law of the case,' and

9    should not be changed absent clear error in the original ruling or a change in the relevant

10   circumstances.").  As SAP said in opposing Oracle's motion to compel, "[Oracle] can do that

11   [analysis] as easy as we could . . . The data is there." *See, e.g.,* Alinder Decl., Ex. PP at 24:18-22.

12                    **d.      SAP Has Suffered No Prejudice**

13         SAP has suffered no prejudice for **two** reasons.  **First**, to the extent it seeks download-to-

14   product mapping information, it had that, as shown above.  **Second**, other than the credentials

15   reflected on the logs Oracle has produced, SAP has admitted it cannot do a full download-to-

16   contract analysis for the downloads on its systems regardless of what Oracle provides because it

17   does not have, and cannot re-create, the customer credential used for any given download on its

18   system.  *See id*., ¶40 & Ex. II, Ex. JJ at 43:10-19 and Ex. KK at 570:17-571:2.  Further, SAP has

19   also admitted to huge volumes of downloads that exceed the contract rights of the customers

20   whose credentials it used.  *See id*., ¶44 & Ex. JJ at 45:16-25, 123:18-124:1, Ex. KK at 578:12-16,

21   583:2-6, Ex. LL at 171:2-11, Ex. MM at 138:12-22 and Ex. NN at 72:18-75:9.  Thus, SAP's

22   license analysis, which is its affirmative burden, could not get off the ground because it cannot

23   map most of its 9 million downloads to a customer license, either in a manual or automated way.

24                    **e.      SAP's Requested Relief Invades Oracle's Work**
                              **Product and Is Unnecessary, Inappropriate, and**
25                            **Unduly Burdensome**

26         SAP's failure to take downloading discovery does not justify access to Oracle's pre-trial

27   work product or other unnecessary, inappropriate, untimely, and unduly burdensome relief.  It

28   also does not justify the serious, incorrect accusations leveled by the Motion.

                                         22

### 1.   The Unproduced Documents Are Protected Work Product

The spreadsheets put together by Jason Rice as part of Oracle's investigation, other than those relied upon by Oracle's experts and produced, are protected work product.  *See* Alinder Decl., ¶¶7 & 56.  SAP provides no justification for invading that protection.

Federal law protects against the discovery of documents prepared "in anticipation of litigation or for trial by or for another party or its representative."  Fed. R. Civ. P. 26(b)(3).  As explained in Section III(A)(1)(a) above, the documents that SAP highlights are spreadsheets that Mr. Rice created at the direction of counsel for the purposes of filing the Complaints in this Action.  SAP has made no challenge to Oracle's assertion that the spreadsheets are work product, instead surmising that Mr. Rice's spreadsheets may contain "facts" relevant to mapping (Motion, p. 12) – an assertion that, even if true, does not change the work product nature of the spreadsheets.  Those "facts" were selected for compilation into the spreadsheets at counsel's direction.  *See* Alinder Decl., ¶56.  Thus, they were properly withheld by Oracle and, as SAP recognizes, were timely and accurately described on Oracle's privilege logs, which SAP has had since May 8, 2008.  *See* Cowan Decl., Ex. K.

### 2.   There Is No Justification for Invading Oracle's Work Product

SAP can only overcome Oracle's legitimate claim to work product protection if it shows "that [it has] substantial need for the materials to prepare [its] case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  Putting "substantial need" aside, the simple fact that SAP has currently, and has had since before Oracle filed its Complaint, the ability to obtain its own "substantial equivalent" by simply doing the analysis itself, including with the assistance of its own litigation consultants or with the Oracle engineer ordered by Judge Legge, destroys any claim by SAP to Oracle's work product.  *See In re Vioxx Products Liability Litigation*, No. MDL 1657, 2007 WL 854251, at*6  (E.D. La. Mar. 6, 2007) ("[Party] cannot rely on [other party's] investigation . . . when they have had access to the same materials by 'other means,' namely in the course of discovery.").  SAP has not only had the ability to obtain the "substantial equivalent" to Mr. Rice's spreadsheets, but it had the ability to obtain the *exact* equivalent by using materials produced long ago by Oracle.

Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

SAP's desire to piggyback on Oracle's work product does not justify invading that protection. *See Fletcher v. Union Pacific R.R. Co.*, 194 F.R.D. 666, 671 (S.D. Cal. 2000) ("[M]ere[] expense or inconvenience" does not create undue hardship for a party seeking discovery of work product).

### 3. Mr. Rice's Spreadsheets Were Produced in a Timely Manner as Part of Expert Discovery

SAP claims that the Rice spreadsheets produced as part of Oracle's expert backup materials should have been produced long before the experts relied on them and before the expert reports were produced. Under SAP's reasoning, Oracle should have produced its work product documents prior to learning whether or not its experts would rely on these documents, and after SAP refused to agree, in January 2008, that production would not constitute waiver. That makes no sense. Given that those spreadsheets were work product, they would never have been produced had they not been relied upon by Oracle's expert witness. Once they were relied upon by Oracle's testifying expert, the Parties' own stipulation, the Federal Rules of Civil Procedure, and applicable case law dictated that they be produced along with the expert report.[6] *Wixon v. Wyndham Resort Dev. Corp.*, No. C 07-2361-JSW, 2009 U.S. Dist. LEXIS 86349, at *21-22 (N.D. Cal. July 17, 2009), *adopted in part, rejected in part*, 2009 U.S. Dist. LEXIS 86337 (N.D. Cal. Sept. 21, 2009) ("The timing of that production is dictated by *Rule 26(a)(2)(B)*, which specifies 'that disclosure must be accompanied by a written report' containing 'the data or other information considered by the witness.'") (emphasis in original); *see also* Fed. R. Civ. P. 26(a)(2).

*Wixon* is on point. In *Wixon*, the defendant produced, along with its expert report, documents that it previously withheld as work product. Like SAP, the plaintiff argued that the

---

[6] Stipulation Regarding Expert Discovery (Dkt. No. 275) requires that the Parties produce: (1) "communications or documents on which experts intend to rely or that form the basis for any part of that expert's opinion" and (2) "documents provided to experts (including, without limitation, publications and documents produced in discovery), other than those generated for the purpose of the litigation and/or for the purpose of communicating with the expert, that were considered by the expert in formulating his or her opinion (whether or not they support the opinion)."

Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1  defendant should have produced these documents months earlier, prior to the "fact discovery"

2  cut-off date.  The Special Master held, and Judge White affirmed, that because the disclosure of

3  expert opinion was timely under Rule 26(a)(2), "to the extent the documents produced [with the

4  Expert Report] were attorney work-product, their production was also timely under the rule." *Id.*

5  at *22; *see also Wixon v. Wyndham Resort Dev. Corp.*, No. C 07-2361-JSW, 2009 U.S. Dist.

6  LEXIS 86337, at *14 (N.D. Cal. Sept. 21, 2009) (affirming that documents "qualified as work-

7  product and, thus, were produced in a timely fashion when [the party] produced them in

8  connection with [its Expert] Report.").

9       The spreadsheets that Mr. Rice created, and that Oracle's experts relied upon, were

10  timely produced along with the expert reports.  The source data was produced long ago.  Any

11  materials that continue to be withheld are properly withheld as work product not relied upon by

12  the experts.  *See* Fed R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

13       **4.    Beyond the Inappropriate Request for Relief Invading Work Product,
            SAP's Requests for Relief Are Unnecessary and Unduly Burdensome**

14       Courts may deny a motion to compel on the ground that the discovery sought would

15  impose an "undue burden" on the responding party (*see* Fed. R. Civ. P. 45(c)(3)(A)(iv)) or that

16  its benefits are outweighed by its burdens.  Fed. R. Civ. P. 26(b)(2)(C)(iii).  In this instance, on

17  top of an order compelling production of documents and a supplemental interrogatory response,

18  SAP also seeks additional, illogical information that would be enormously burdensome for

19  Oracle to provide.  For example, SAP asks that Oracle identify by Bates number "documents

20  Plaintiffs contend they have produced that are **responsive or otherwise related** to RFP Nos. 44,

21  45, 47 and 51 and Int. No. 7" (emphasis supplied), and then ask for detailed date and author

22  information, among other things.  Motion at 3.  Providing this level of detail for each document

23  responsive or "related" to the discovery requests at issue is akin to creating a "super-privilege

24  log" for potentially thousands upon thousands of non-privileged documents – obviously a labor-

25  intensive, and perhaps unprecedented, task.  *See* Declaration of Martha Jeong in Support of

26  Opposition to Motion to Compel ("Jeong Decl."), ¶3.

27       **B.    The Court Should Deny SAP's Motion for Discovery of
                Irrelevant Documents Maintained by Folger Levin**

28

1    On September 22, 2009, SAP sought to open a new vein of irrelevant and burdensome

2    discovery, seeking production of the entire case file of Folger Levin for the case brought by

3    PeopleSoft against Oracle in the Alameda Superior Court in 2003.  Despite the Court's

4    skepticism about this request at the last Discovery Conference, SAP has now moved to compel

5    production.  SAP's Motion on this topic fails for **three** reasons (apart from the procedural bar

6    discussed above):  (1) the requests come too late; (2) the material is unnecessary for SAP's stated

7    purpose; and (3) the materials are almost entirely irrelevant.

8        **First**, the request comes too late, consistent with the Court's reasoning on SAP's own

9    motion to preclude Oracle's damages theories.  *See* Rule 37 Order, Dkt. No. 482, at 19:28-20:1

10   ("the parties should be focusing on streamlining this already very large case for trial."); *see also*

11   *id.* at 19:17-20:1.  If the Court would not allow damage theories it ruled emerged in May 2009

12   into the case, new discovery initiated in September must also be too late.

13       **Second**, the materials are unnecessary to show that fear, uncertainty, and doubt ("FUD")

14   drove PeopleSoft support customers to TomorrowNow.  The portion of PeopleSoft's publicly-

15   filed Second Amended Complaint that SAP quotes in support of its Motion alleges that Oracle's

16   tender offer was designed to "cripple PeopleSoft's ability to sell its software."  Motion at 14.

17   PeopleSoft's allegation was **not** that Oracle was trying to cripple PeopleSoft's ability to **service**

18   its customer base – the one area in which TomorrowNow did compete with PeopleSoft.  Thus, on

19   its face, the supposed allegations have no relevance in this case.  In addition, SAP's only stated

20   need for these materials is to prove the existence FUD from the tender offer.  This need, if it is a

21   credible one, can be met by Oracle's concessions and the publicly-available pleadings and press.

22   As the Court noted, SAP has access to Oracle's and PeopleSoft's 2003 allegations in publicly-

23   available pleadings and press coverage.  Moreover, "Oracle [does] not dispute that FUD existed

24   in the marketplace (including from SAP) about how the acquisition might impact the PeopleSoft

25   base."  November 10, 2009 Joint Discovery Conference Statement, Dkt. No. 547, at 13:11-13.

26       **Third**, most items on SAP's list are overbroad and irrelevant.  At best, its request is a

27   fishing expedition.  On November 17, 2009, the Court signaled to SAP that the Folger Levin

28   files did not seem particularly relevant:

Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

> [T]he fact that the lawsuit was filed and that it lasted a certain amount of time and it had some – and what was public knowledge – probably newspapers and things like that, when we used to have newspapers, you know, that's what's relevant to having an impact.  But the specifics of, you know, exactly what was said at any particular time and certainly things that weren't made public, I don't see how they would have – they're so tangentially related to damages.

Alinder Decl., Ex. A at 29:20-30:4.  While the Court gave SAP the right to look at the Folger Levin pleading index, *id.* at 35:20-36:2, it cautioned that any request would need to be "sufficiently relevant to go to a lot of trouble."  *Id.* at 36:9-10.  Though SAP has reduced its request, its list still suffers from the same overbreadth and relevance defects.  For example, SAP requests that Oracle produce:  (1) motions *in limine* on a variety of irrelevant issues, including Larry Ellison's character and reputation, post-merger lay-offs, the California Unfair Competition Law, and whether customer hearsay is permitted at trial (McDonell Decl. Ex. I,  items 18-20, 25, 42-53, and 56-59); (2) every interrogatory response, without limitation (*id.*, items 5-17 and 21-24); (3) all deposition transcripts in Folger Levin's possession from the 2003 Alameda Action, without regard to subject matter; and (4) every aspect of every motion for summary judgment (*id.*, items 30-41, 54-55, and 60-64).

None of these is necessary for SAP to achieve its stated goal:  to show that FUD drove PeopleSoft support customers to TomorrowNow.  To confirm the point, Oracle has undertaken the burden of combing through the materials.  Oracle's review confirmed that any FUD referenced in the documents is based upon publicly-available information such as press releases, news media, analyst notes, and pleadings.  *See* Declaration of Lucia MacDonald in Support of Oracle's Opposition to Motion to Compel ("MacDonald Decl."), ¶¶2, 4.[7]

For these reasons, the Court should reject SAP's late request to delve into Folger Levin's files on the 2003 *PeopleSoft v. Oracle* case.  If the Court does not reject SAP's request in total,

---

[7] SAP has refused to limit its request to references to the 350 customers it argued in its Rule 37 motion were the only customers and revenues at issue.  However, Oracle's review revealed that only six of the 64 items on SAP's list referenced any of the 350 customers whose lost revenue is at issue here.  MacDonald Decl., ¶3.

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

1  Oracle requests that production be limited to those portions of the items on SAP's wish list that

2  specifically reference any of the TN/SAP customers about which SAP has sought to limit

3  Oracle's lost profits damages.

**C.    The Court Should Deny SAP's Motion to Compel Production
        of Post-Litigation Documents**

4

5          SAP's Motion to Compel the re-collection, review, and production of documents for six

6  custodians fails for **three** reasons (apart from the procedural bar discussed above).

7

**1.    SAP Long Ago Abandoned Its Improper Request for
        Post-Litigation Custodians**

8

9          SAP first sought the production of post-litigation documents for eleven Oracle

10  employees, including Oracle's three most senior executives, by email on May 20, 2009.  *See*

11  Alinder Decl., Ex. QQ.  Oracle promptly objected to this request on May 26, 2009, and the

12  Parties met and conferred on June 4, 2009.  *See id.*, ¶58.  During that session, Oracle stated that it

13  did not see how SAP's request fit within the defined document categories that were the subject of

14  the Expanded Discovery Timeline Agreement, pursuant to which SAP had made the request.  *See*

15  *id.*  SAP could not articulate a basis for seeking these particular custodians during that meet and

16  confer, and stated that it would provide that further explanation by email.  *See id.*  It never did.

17  *See id.*  Rather, SAP resurfaced the issue for the first time over five months later, on the

18  afternoon of November 17, 2009.  At that time, it still did not provide the further explanation that

19  it had promised in June.  *See* McDonell Decl., ¶15.

20          Between May and November, SAP had numerous opportunities to raise this issue with

21  Oracle and the Court.  SAP did not raise this issue during any of the innumerable discovery meet

22  and confer conferences, emails, and letters between the Parties between June 4 and November

23  17, 2009.  *See* Alinder Decl., ¶59.  After the June 4, 2009 meet and confer, the Parties filed four

24  joint discovery conference statements and, with the Court, held four discovery conferences.  *See*

25  *id.*  On each of those occasions, the Parties were supposed to raise all outstanding discovery

26  disputes for prompt resolution.  *See id.*  SAP never raised this issue.  *See id.*

27          To the contrary, in advance of the September 30, 2009 Discovery Conference, SAP raised

28  concerns that it had about specific custodians.  *See* September 23, 2009 Joint Discovery

1    Conference Statement, Dkt. No. 493, at 9:12-25.  **This list did not include the post-litigation**

2    **production issue at all.**  Oracle responded with specific details about its production status.  *Id.*

3    at 9:26-10:23.  SAP's counsel then stated at the September 30, 2009 Discovery Conference that

4    SAP was *satisfied* with the state of Oracle's custodian production and pace and that it believed

5    all custodial production could and should be completed by the close of fact discovery.  Alinder

6    Decl., Ex. RR at 35:9-36:1.  Courts have rejected comparable late motions to compel with less

7    evidence of waiver.  *See Khalil v. Transunion, LLC*, No. 08-10303, 2008 WL 4642857, at *2-3

8    (E.D. Mich. Oct. 20, 2008) (rejecting motion to compel where defendant objected and plaintiff

9    abandoned the request).

10          In *Khalil*, the court held that the "plaintiff did not have a good faith basis to believe that

11   the discovery requests made in May, 2008, were viable when the present motion was filed and,

12   therefore, the motion was not 'substantially justified' within the meaning of Rule 37(a)(5)(B)"

13   and ordered sanctions.  *Id*. at *3.  SAP has had many more opportunities to raise this issue than

14   the plaintiff in *Khalil*, but failed to do so until **after** the final discovery conference had passed,

15   and after affirmatively stating that Oracle's custodial productions were satisfactory.  *See* Alinder

16   Decl., ¶¶58-59 & Ex. RR at 35:9-36:1.  As in *Khalil*, Oracle had appropriately concluded that

17   SAP had abandoned this request and that it was no longer viable.  *See id*. at ¶61.

18                  2.      **The Request for Post-Litigation Custodians Was Not**
                           **Proper per the Expanded Discovery Timeline**
19                         **Agreement Either**

20          In addition, the stated basis for SAP's request, that the documents are called for under the

21   Parties' Expanded Timeline Discovery Agreement (McDonell Decl., Ex. J), is factually

22   incorrect.  The Parties intended that Agreement to set forth a list of subject matter areas for

23   document discovery outside the previously-agreed time scope.  *See* Alinder Decl., ¶62.  No part

24   of that Agreement states that "the parties are **permitted** to request documents for the expanded

25   time period for 'key custodians,'" as SAP states.  Motion at 17 (emphasis supplied); *see*

26   McDonell Decl., Ex. J.  Oracle did not send SAP a similar list of post-litigation "key

27   custodians."  *See* Alinder Decl., ¶62.  Rather, Oracle did as the agreement contemplated and

28   produced several categories of post-litigation documents up to October 31, 2008 and pre-2004

1   data for 10 key custodians.  *See* Jeong Decl., ¶4.  That was satisfactory to SAP for six months up

2   until November 17.  Even if the request was timely and easily done (it is not), SAP has not

3   shown the custodians are "key," that they meet the criteria of the Expanded Timeline Discovery

4   Agreement, or that this is anything other than another fishing expedition.

5           **3.      SAP's Request for Post-Litigation Custodians Is Unduly**
                       **Burdensome**
6

7           Oracle would be prejudiced by having to do this production now.  Since most of the data

8   for these six custodians was collected as far back as April 2007, a full re-collection is necessary

9   for the expanded time period of March 22, 2007 to October 31, 2008.  *See* Jeong Decl., ¶¶5-7.  It

10  was SAP's own estimation, as previously represented to the Court, that the cost of production

11  has "averaged around $100,000 per custodian."  June 24, 2008 Joint Discovery Conference

12  Statement, Dkt. No. 102, at 14:15-20.  Oracle can only estimate how many additional documents

13  this requested review would require, but conservatively, Oracle estimates that it would cost at

14  least $125,000 to collect, process, and review documents for these six custodians for the post-

15  litigation time period using the applicable search terms, based on an estimated 29,000 document

16  count.  It would require nearly 500 hours of Bingham McCutchen time and would take

17  approximately six weeks from the time of the interview to production.  *See* Jeong Decl., ¶8.  SAP

18  cannot justify imposing this burden.  As SAP noted during a recent discovery conference, it is

19  expensive to keep the discovery machinery in place long after the discovery cut-off and once that

20  machinery is dismantled, the "ability to produce things rapidly, particularly [inaudible]

21  custodians or other kinds of issues, become seriously hampered . . . ."  Alinder Decl., Ex. RR at

22  36:5-21.  At the time, the Court instructed that leading up to the December 4 discovery cut-off:

23  "I would expect 99.99999 to be done.  And if it's not done, it's probably just too late."  *Id.* at

24  37:15-17.  Each of SAP's requests here is "just too late."

25  **IV.    CONCLUSION**

26          Based on the foregoing, Oracle respectfully requests that the Court deny each aspect of

27  SAP's Motion to Compel.

28

1    DATED:  January 5, 2010                BINGHAM McCUTCHEN LLP

2

3
                                    By:  _____/s/ Geoffrey M. Howard_____
4                                          Geoffrey M. Howard
                                            Attorneys for Plaintiffs
5                                   Oracle USA, Inc., Oracle International
                                    Corporation, Oracle EMEA Limited, and
6                                          Siebel Systems, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 07-CV-01658 PJH (EDL)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL