Robert A. Mittelstaedt (SBN 060359)
Jason McDonell (SBN 115084)
Elaine Wallace (SBN 197882)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700
ramittelstaedt@jonesday.com
jmcdonell@jonesday.com
ewallace@jonesday.com

Tharan Gregory Lanier (SBN 138784)
Jane L. Froyd (SBN 220776)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:     (650) 739-3939
Facsimile:     (650) 739-3900
tglanier@jonesday.com
jfroyd@jonesday.com

Scott W. Cowan (Admitted *Pro Hac Vice*)
Joshua L. Fuchs (Admitted *Pro Hac Vice*)
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone:     (832) 239-3939
Facsimile:     (832) 239-3600
swcowan@jonesday.com
jlfuchs@jonesday.com

Attorneys for Defendants
SAP AG, SAP AMERICA, INC., and
TOMORROWNOW, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE USA, INC., et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>SAP AG, et al.,<br><br>                    Defendants. | Case No. 07-CV-1658 PJH (EDL)<br><br>**DEFENDANTS' OPPOSITION TO ORACLE'S MOTION TO MODIFY THE PROTECTIVE ORDER AND TO COMPEL DEPOSITION TESTIMONY AND FURTHER RESPONSES TO REQUESTS FOR ADMISSION**<br><br>Date:  January 26, 2010; Time:  9:00 am<br>Courtroom:  E, 15th Floor<br>Judge:  Hon. Elizabeth D. Laporte |

**TABLE OF CONTENTS**

Page

I.   UNDER THE PROPER STANDARD FOR EXPORTING U.S. DISCOVERY, ORACLE'S MOTION TO MODIFY SHOULD BE DENIED. ......................................... 1

    A.   Oracle's Request to Modify the Protective Order does not Satisfy the Threshold Requirements Under Section 1782. ........................................ 1

    B.   There is not Sufficient Information to Evaluate Oracle's Request. ........................ 3

    C.   The Authority Cited by Oracle is Inapposite. ........................................ 5

    D.   The Cases Cited by Oracle Dictate Denying the Proposed Modification. .............. 5

II.  DEFENDANTS' INSTRUCTIONS TO SCOTT TRAINOR AND REDACTION OF THE TWO DOCUMENTS WERE PROPER. ................................................. 6

    A.   Further Testimony is not Warranted. ................................................ 8

        1.   All of the Withheld Testimony is Privileged. ................................. 9

        2.   The Questions at Issue in Oracle's Motion are Improper. ....................... 11

    B.   Defendants' Redactions are Proper. ................................................. 16

        1.   Exhibit 1683 is Properly Redacted. ........................................... 16

        2.   TN-OR00852363 is Properly Redacted. ...................................... 17

III. TO THE EXTENT REASONABLY POSSIBLE, AND WITHOUT WAIVING THEIR PROPER OBJECTIONS, DEFENDANTS HAVE FULLY RESPONDED TO ORACLE'S REQUESTS FOR ADMISSION. .................................................. 18

    A.   Oracle's Definitions of "Copy," "Fix," "Update," and "Generic Environment" are Improper. ........................................................... 18

        1.   Defendants Answered Where Reasonably Possible. .......................... 19

        2.   Oracle's RFAs are Improper Because They are not "Simple, Direct, and Limited to Singular Facts." ........................................... 19

        3.   Oracle's Definition of the Term "Copy" is Overly Broad and Vague. ......................................................................... 20

        4.   Where Reasonably Possible, Defendants Precisely and Accurately Responded to RFAs Containing the Terms "Update" and "Fix." .............. 21

        5.   Defendants Precisely and Accurately Responded to RFAs Containing the Term "Generic Environment." ......................................... 23

    B.   RFAs Nos. 13-50 in Set No. 3 and 4-63 and 130-162 in Set No. 5 Are Unduly Burdensome. .............................................................. 24

        1.   There is no Legal Basis to Support Oracle's Request that this Court Shift the Burden to Defendants to Analyze Information that is Equally Accessible to Both Parties. ........................................... 25

        2.   Brief Description of RFAs and Defendants' Objections and Responses. .................................................................. 25

        3.   Rule 26(b)(2)(C) Requires that Oracle's Requests be Limited and that Defendants' Objections be Sustained. .................................. 27

            a.   Interrogatory 14. ............................................................. 27

            b.   Interrogatory 11. ............................................................. 28

        4.   Defendants do not Seek to "Have It Both Ways" as Oracle Asserts. ....... 29

IV.  CONCLUSION ......................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Asea, Inc. v. S. Pac. Transp. Co.*,
669 F.2d 1242 (9th Cir. 1981) ................................................................................................. 19

*CBS Interactive, Inc. v. Etilize, Inc.*,
257 F.R.D. 195 (N.D. Cal. 2009) ............................................................................................ 5, 6

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
331 F.3d 1122 (9th Cir. 2003) ................................................................................................. 5, 6

*Hickman v. Taylor*,
329 U.S. 495 (1947) ............................................................................................................ 10, 11

*In re Application of Microsoft Corp.*,
428 F. Supp. 2d 188 (S.D.N.Y. 2006) ......................................................................................... 4

*In re Babcock Borsig AG*,
583 F. Supp. 2d 233 (D. Mass. 2008) .......................................................................................... 3

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. M 02-1486 PJH, 2008 WL 4191780 (N.D. Cal. Sept. 10, 2008) ..................................... 5, 6

*In re Intel Corp. Microprocessor Antitrust Litig.*,
No. 05-17171-JJF, 2008 WL 4861544 (D. Del. Nov. 7, 2008) .............................................. 2, 3

*In re Jenoptik AG*,
109 F.3d 721 (Fed. Cir. 1997) ..................................................................................................... 5

*In re Letter of Request from Crown Prosecution Service*,
870 F.2d 686 (D.C. Cir. 1989) ..................................................................................................... 2

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ...................................................................................................... 1, 2, 3, 5

*Pastrana v. Local 9509, Commc'ns Workers*,
No. 06cv1779 W, 2007 U.S. Dist. LEXIS 73219 (S.D. Cal. Sept. 28, 2007) ........................... 10

*Rondberg v. McCoy*,
No. 09-CV-1672-H, 2009 U.S. Dist. LEXIS 118869 (S.D. Cal. Dec. 21, 2009) ...................... 13

*Safeco of Am. v. Rawstron*,
181 F.R.D 441 (C.D. Cal. 1998) ......................................................................................... 19, 25

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,
376 F.3d 79 (2d Cir. 2004) ........................................................................................................... 3

*Shelton v. American Motors Corp.*,
805 F.2d 1323 (8th Cir. 1986) .................................................................................................... 10

*Sony Computer Entm't Am., Inc. v. Great Am. Ins. Co.*,
229 F.R.D. 632 (N.D. Cal. 2005) .................................................................................. 10, 13, 14

*Tardiff v. County of Knox*,
246 F.R.D. 66 (D. Me. 2007) ............................................................................................. passim

*United States v. Chevron*,
241 F. Supp. 2d 1065 (N.D. Cal. 2002) ......................................................................... 9, 11, 17

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) .................................................................................................................... 10

**TABLE OF AUTHORITIES**
(continued)

*Verizon California Inc. v. Ronald A. Katz Tech. Licensing, L.P.,*
     214 F.R.D. 583 (C.D. Cal. 2003) ............................................................................................. 5, 6

**Statutes**

28 U.S.C. § 1782 ................................................................................................................... 1, 2, 3

**Rules**

Fed. R. Civ. P. 1 .................................................................................................................... 25
Fed. R. Civ. P. 26(b)(2)(C) ................................................................................................... 25
Fed. R. Civ. P. 26(b)(5) ........................................................................................................ 16
Fed. R. Civ. P. 33(d) ............................................................................................................. 28
Fed. R. Civ. P. 36 ................................................................................................... 19, 20, 23, 25
Fed. R. Civ. P. 36(a)(2) ......................................................................................................... 25
Fed. R. Civ. P. 36(a)(3) ......................................................................................................... 25
Fed. R. Civ. P. 36(a)(4) ............................................................................................... 19, 25

For the following reasons, Oracle's Motion to Modify the Protective Order and to Compel Deposition Testimony and Further Responses to Requests for Admissions ("Motion" or "Mot.") should be denied.

## I.   UNDER THE PROPER STANDARD FOR EXPORTING U.S. DISCOVERY, ORACLE'S MOTION TO MODIFY SHOULD BE DENIED.

Oracle's request that the Court modify the protective order to permit use of Defendants' confidential business information in some unspecified and, as yet, un-filed litigation outside the United States should be denied.  Oracle's Motion is based on cases modifying a protective order to allow discovery to be used in another U.S. jurisdiction, *see* Mot. at 5-6, when the authority that actually governs exportation of U.S. discovery for use in foreign litigation is 28 U.S.C. § 1782 ("Section 1782").  In a seminal decision, the Supreme Court defined the statutory prerequisites of Section 1782 and set forth discretionary factors for courts to consider when deciding whether to grant such a request.  *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004) ("Intel").  Oracle fails to mention, let alone apply, the proper analytical framework discussed in *Intel*.  When the proper analysis is applied, it is evident that Oracle has not met the threshold requirement that the foreign proceeding be "within reasonable contemplation."

Further, because Oracle has not identified any specifics about its proposed foreign litigation, it is impossible to evaluate the remaining discretionary factors under *Intel* or the risk that Defendants' confidential information will not be adequately protected if the motion is granted. This concern is especially great because Oracle wants to send the confidential information outside the United States where it is beyond this Court's jurisdiction to enforce compliance with its orders.

Finally, not only is the authority on which Oracle relies inapposite, none of the cases cited by Oracle permit the broad, unfettered release of confidential information that Oracle seeks. Indeed, in the cited cases, the courts imposed restrictions upon the use of the discovery.  Thus, even under Oracle's own authorities, such a broad modification is not permitted.

### A.   Oracle's Request to Modify the Protective Order does not Satisfy the Threshold Requirements Under Section 1782.

Section 1782 and the discretionary factors set forth in the *Intel* case govern this Court's

DEFS' OPP. TO ORACLE'S MOT.
TO MODIFY AND COMPEL
Case No. 07-CV-1658 PJH (EDL)

1    consideration of Oracle's request to modify the protective order, not the inapposite authority

2    Oracle cites. Section 1782 contains three threshold requirements for obtaining discovery to assist

3    in foreign litigation: (a) that the discovery is found in the district where the application is made;

4    (b) that the information sought is "for use in a proceeding in a foreign or international tribunal";

5    and (c) that the petitioner is an "interested person" in the foreign proceeding. 28 U.S.C. § 1782.

6         To satisfy the second requirement, the foreign proceeding need not be pending, but it must

7    be "within reasonable contemplation." *Intel*, 542 U.S. at 259. Since *Intel*, courts have had little

8    opportunity to clarify the meaning of "reasonable contemplation" because, unlike this case, in the

9    vast majority of Section 1782 cases, the foreign proceeding has actually been initiated. *See In re*

10   *Intel Corp. Microprocessor Antitrust Litig.*, No. 05-17171-JJF, 2008 WL 4861544, at *12 (D. Del.

11   Nov. 7, 2008). However, in *Crown Prosecution*—the case approved by the Supreme Court in

12   *Intel*—the D.C. Circuit considered the meaning of "reasonable contemplation" and concluded that

13   it turned on whether there was "sufficient indication that a proceeding in court would eventuate in

14   which the evidence gathered could be weighed impartially." *In re Letter of Request from Crown*

15   *Prosecution Service*, 870 F.2d 686, 691 (D.C. Cir. 1989). The court emphasized, however, that to

16   guard against abuse of Section 1782, the district court must insist on reliable indications of the

17   likelihood that proceedings will be instituted within a reasonable time. *See id.* at 692.

18        Here, Oracle has provided no reliable indications that a foreign proceeding will be

19   instituted within a reasonable time. Indeed, Oracle has not even asserted that it will file a foreign

20   case; nor has it indicated when or where such a case might be filed. Instead, Oracle vaguely

21   states that it "*may* assert [claims] against Defendants in Europe." Mot. at 2 (emphasis added).

22   Oracle's noncommittal speculations fall well short of establishing that a foreign proceeding will

23   be instituted within a reasonable time.

24        This case is much like *Intel Corp. Microprocessor Antitrust Litigation*. *See* 2008 WL

25   4861544, at *12. In that case, a French consumer advocacy group ("QC") sought discovery under

26   Section 1782, arguing that it intended to bring some foreign litigation somewhere against AMD

27   and Intel. Following the analysis in *Crown Prosecution*, the special master concluded that QC's

28   proposed litigation was not "within reasonable contemplation." Just as in this case, QC had "not

1  provided even the barest of 'reliable indicators' that any proceeding can or will be instituted

2  within a reasonable period." *Id.*; *see also In re Babcock Borsig AG*, 583 F. Supp. 2d 233, 240 (D.

3  Mass. 2008) (denying Section 1782 request because, *inter alia*, the petitioner had not yet

4  instituted arbitration proceedings in the foreign venue). Oracle's assertions that it might bring a

5  foreign action are insufficient and do not justify the modification sought.

6  **B.      There is not Sufficient Information to Evaluate Oracle's Request.**

7       Even had Oracle satisfied Section 1782's statutory requirements—and it has not—the

8  district court is not required to grant Oracle's request. *See Intel*, 542 U.S. at 264 ("[A] district

9  court is not required to grant a § 1782(a) discovery application simply because it has the authority

10 to do so."). To assist lower courts exercise their discretion, *Intel* identified four factors to

11 consider when determining whether discovery should proceed under Section 1782: (1) whether

12 the producing party is a participant in the foreign proceeding; (2) whether the foreign tribunal

13 would be receptive to U.S. federal-court judicial assistance; (3) whether the request conceals an

14 attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or

15 the United States; and (4) the burden to the producing party. *See id.* at 264-65.

16      The suggested *Intel* factors are not an exhaustive list of issues a court should consider

17 when exercising its discretion. *See id.* at 247 (characterizing the discretionary factors as

18 suggested considerations). Indeed, the Supreme Court noted that there may be other issues that

19 bear consideration. For example, the district court may impose conditions or restrictions as it

20 deems appropriate. *See id.* at 260-61. The district court may also need to consider international

21 comity and parity among the parties as they "may be important as touchstones for a district

22 court's exercise of discretion in particular cases." *Id.* at 261.

23      Oracle's failure to initiate a foreign proceeding, or at least disclose the details of its

24 proposed foreign litigation, before requesting modification of the protective order makes it

25 impossible for the Court to exercise its discretion under Section 1782. For example, the second

26 *Intel* factor considers whether the foreign forum would be receptive to the discovery sought by

27 Oracle. Some foreign jurisdictions object to the use of U.S. discovery. *See, e.g., Schmitz v.*

28 *Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84-85 (2d Cir. 2004) (denying Section 1782

1  request because German government was "obviously unreceptive to the judicial assistance of an

2  American federal court"); *In re Application of Microsoft Corp.*, 428 F. Supp. 2d 188, 194

3  (S.D.N.Y. 2006) (denying request because European Commission stated it opposed the discovery

4  sought by Microsoft, and it was not receptive to U.S. judicial assistance).  Moreover, this factor

5  cannot be analyzed because Oracle has not disclosed where it intends to file suit.

6          For the same reason, the third *Intel* factor, which considers whether Oracle's request

7  would circumvent foreign proof-gathering restrictions, cannot be evaluated.  Without knowing

8  what forum Oracle will choose, Defendants and the Court cannot even begin to identify whether

9  any foreign proof-gathering restrictions may be implicated.

10         Further, the risk that Defendants' confidential business information will be improperly

11  disclosed warrants denying Oracle's request to modify the protective order.  Oracle claims that

12  the proposed modification "simply alters the permitted uses of Discovery Material to cover

13  European litigation while preserving all other restrictions on use and disclosure that are in the

14  protective order as it exists now."  Mot. at 9.  Oracle's proposal is not so simple.  If its request is

15  granted, Oracle could send Defendants' confidential business information outside the country to

16  be used as it deems fit, for any purpose related to its nebulous "European litigation."  Oracle

17  proposes no limits on the use of this information and offers no proposal to give Defendants

18  advance notice of its intent to use specific documents.[1]  Indeed, Oracle's request is tantamount to

19  a blank check.  Because Oracle has not identified the forum in which it intends to bring suit, this

20  Court cannot fully consider the risk that Defendants' confidential information may be improperly

21  disclosed.  However, one thing is certain: once the documents leave the country, they will be

22  beyond this Court's reach to enforce the terms of the protective order.  Defendants' legitimate

23  concern over the disclosure of their confidential information in Oracle's as-yet-unidentified

24  European forum justifies denying Oracle's proposed modification of the protective order.

25

26         [1] Defendants strongly oppose Oracle's request to modify the protective order.  If, however, this Court decides to modify the protective order, such modifications should include, at a

27  minimum, a provision requiring Oracle to give Defendants at least five business days' advance notice before any documents are used for the proposed foreign litigation to allow Defendants an

28  opportunity to file a motion challenging Oracle's proposed use of the documents overseas.

- 4 -

1

### C.   The Authority Cited by Oracle is Inapposite.

2         Oracle's reliance on *Foltz, CBS Interactive, DRAM Antitrust Litigation*, and *Verizon* is

3   misplaced.  In each of these cases, the movant sought to modify a protective order to allow U.S.

4   discovery for use in another U.S. litigation.[2]  Only one case Oracle cites, *In re Jenoptik AG*,

5   involved a request to modify a protective order so that U.S. discovery could be used in a foreign

6   proceeding.  *See* 109 F.3d 721, 722 (Fed. Cir. 1997).  However, *Jenoptik* was decided in 1997,

7   years before the *Intel* court ruled on the scope of federal district court authority to assist litigants

8   in using U.S. evidence in a foreign tribunal.  *See Intel*, 542 U.S. at 246.  In determining whether

9   to provide assistance to foreign litigants, courts should now apply the guidelines set forth in *Intel*.

10  *Jenoptik*, a pre-*Intel* Federal Circuit case, is not binding on this Court, and to the extent *Jenoptik*

11  conflicts with *Intel, Intel* controls.

12        Any attempt by Oracle to argue that *Intel*, which involved a petition to obtain discovery,

13  does not apply to requests to modify a protective order (the issue in *Jenoptik*) should be rejected.

14  This is a distinction without a difference.  It makes no logical sense to use one set of factors to

15  decide a petition to obtain discovery for use overseas and a different set of factors to modify a

16  protective order to allow discovery already in hand to be used overseas.  The result is the same: if

17  the request is granted, discovery obtained in the U.S. will be sent outside the U.S. to assist foreign

18  litigants.  And because this confidential information is being sent to locations outside the

19  protective reach of the U.S. courts, a proper analysis under *Intel* fully considers the possible

20  ramifications *before* the use is permitted overseas.

21

### D.   The Cases Cited by Oracle Dictate Denying the Proposed Modification.

22        Not only are the cases cited by Oracle inapposite, none of them permit the broad,

23  unfettered release of confidential information that Oracle seeks.  In *Foltz*, the Ninth Circuit

24

---

25  [2] *See Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1127 (9th Cir. 2003)
    (seeking discovery from federal case for use in state court action); *CBS Interactive, Inc. v. Etilize,*

26  *Inc.*, 257 F.R.D. 195, 200 (N.D. Cal. 2009) (same); *In re Dynamic Random Access Memory
    (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2008 WL 4191780, at *1 (N.D. Cal. Sept. 10, 2008)

27  (seeking discovery from federal antitrust case for use in federal securities actions); *Verizon
    California Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 214 F.R.D. 583, 584 (C.D. Cal 2003)

28  (seeking discovery from patent infringement suit in California for use in patent infringement suit
    in Pennsylvania).

1    explained that a showing of relevance is required before a protective order can be modified to

2    "prevent[] collateral litigants from gaining access to discovery materials merely to subvert

3    limitations on discovery in another proceeding." 331 F.3d at 1132. As with the *Intel* factors, this

4    Court cannot determine whether Oracle's proposed use would subvert limitations on discovery in

5    the foreign forum because Oracle has not yet identified the location of that forum. Nonetheless,

6    given that discovery is generally limited in European litigation, there is a great concern that

7    Oracle's proposed modification might circumvent or subvert those foreign limitations.

8         Further, none of the cases cited by Oracle permit the unrestricted use of the discovery that

9    Oracle seeks in this case. In *Foltz*, the case was remanded to the district court to make the

10   required relevance determination before modifying the protective order. *See id.* at 1138. In

11   *Verizon*, the discovery was restricted only for use in pursuing modification of a judgment in the

12   collateral litigation. *See* 214 F.R.D. at 586-87. In *CBS Interactive*, the movant was allowed to

13   use the discovery only to the extent necessary to prepare and file its collateral litigation. *See* 257

14   F.R.D. at 206. And in *DRAM Antitrust Litigation*, the court did not allow direct access to the

15   confidential documents, but rather indicated it would allow access "only after the collateral courts

16   have decided upon the proper scope of discovery [in the collateral cases]." 2008 WL 4191780, at

17   *3. Oracle's request for unrestricted access to Defendants' confidential information for use

18   overseas is improper and should not be permitted.

19   **II.    DEFENDANTS' INSTRUCTIONS TO SCOTT TRAINOR AND REDACTION OF
            THE TWO DOCUMENTS WERE PROPER.**

20

21        Oracle's request for relief regarding the deposition of Scott Trainor seeks little more than

22   what Oracle has already obtained. To the extent it seeks more, that information is privileged.

23   Arguing to the contrary, Oracle makes broad assertions regarding improper "block[ing]" of topics

24   Oracle dubs "important." Mot. at 9-11. For example, Oracle asserts that it "*attempted* to depose

25   Trainor" on two topics: "negotiate[ing] contract terms with prospective customers and

26   maintain[ing] his ethical obligations to PeopleSoft." Mot. at 9-10 (emphasis added). That is

27   misleading. Oracle not only attempted to depose Mr. Trainor on these two topics, it questioned

28   him at length, and he repeatedly provided answers, on both topics:

SVI-76256v1

- 6 -

DEFS' OPP. TO ORACLE'S MOT.
TO MODIFY AND COMPEL
Case No. 07-CV-1658 PJH (EDL)

Q. What did you do to ensure that you maintained all of PeopleSoft's information that you had learned during your tenure as an attorney there in confidence? . . .

A. Okay. I simply didn't disclose it. The information that I had that was confidential, I didn't disclose. …

Q. Did you reveal to anyone at TomorrowNow or SAP information that you had learned at PeopleSoft that you did not consider was confidential or privileged? . . .

A. No. Not to my recollection.

Q. So you just walled everything off that you had learned at PeopleSoft, whether it was confidential or privileged or not. Is that right? . . .

A. Without -- yes. On that general question, yes, without a more specific -- not to my recollection did I disclose it.

*See* Declaration of Jason McDonell in Support of Defendants' Opposition to Oracle's Motion to Modify and to Compel ("McDonell Decl.") ¶ 1, Ex. 1 (Tr. at 11:10-13:11).

Q. And when you started working with TomorrowNow, did that trigger any thoughts on your part that your prior work for PeopleSoft was implicated? . . .

A. It was the similar thought that I had when I went -- when I went to SAP, that there was confidential information that I needed to protect.

Q. Did you take any steps to ensure that you kept all confidential information secure? . . .

A. I simply ensured that I did not disclose that information in conversations.

Q. By self-policing your comments? . . .

A. Yes.

Q. And to your recollection, that worked? . . .

A. Yeah. As I have said, I did not disclose that information.

*Id.* ¶ 1, Ex. 1 (Tr. at 29:8-30:16).

Q. And you represented TomorrowNow in connection with negotiations with potential customers and talked about the downloading from Customer Connection. True? . . .

A. To be precise, yes, I represented them.

The second part, I don't recall having that -- and the second part being, about Customer Connection.

Q. Did you ever advise anyone at TomorrowNow or SAP on the general subject matter of software licenses? . . .

A. Yes. . . .

Q.  Did you ever utilize the information you developed at PeopleSoft regarding the terms of the PeopleSoft licenses? . . .

A.  I had a general understanding of the marketplace.  I did not specifically use any knowledge that I gained while working at PeopleSoft.

*Id.* ¶ 1, Ex. 1  (Tr. at 52:17-53:23).

Notwithstanding these examples and others throughout the deposition,[3] Oracle moves to compel further testimony and *in camera* review of two documents.  *See* D.I. 570-1 at 2.  For the reasons discussed below, and because of the testimony Oracle has already obtained from Mr. Trainor on the topics at issue in Oracle's motion, the requested relief should be denied.[4]

## A.     <u>Further Testimony is not Warranted.</u>

Scott Trainor is a lawyer licensed in California and was in-house counsel for PeopleSoft before joining SAP, where he is currently in-house counsel.[5]  At both PeopleSoft and SAP, he was involved in privileged attorney-client communications and generated protected work product for his respective employers.  At the outset of Mr. Trainor's October 13, 2009 deposition, which covered time periods implicating both parties' privileged information, Oracle strictly instructed Mr. Trainor not to reveal PeopleSoft's privileged information.  *See* McDonell Decl. ¶1, Ex. 1 (Tr. at 20:3-11).  Likewise, Defendants' counsel instructed Mr. Trainor not to reveal Defendants' privileged information, and Mr. Trainor's own counsel provided similar admonitions for any information over which Mr. Trainor personally held a privilege.  *See, e.g., id.* at (Tr. at 11:19-24 and 56:1-2).

---

[3] *See* McDonell Decl. ¶ 1, Ex. 1 (Tr. at 12:3-13:11; 15:19-16:21; 17:18-23; 27:7-28:18; 29:8-30:16; 79:19-80:6) (multiple *additional* examples of similar questions).

[4] Oracle broadly asks the Court to compel not only further testimony about Exhibit 1683 and responses to certain questions Mr. Trainor was instructed not to answer, but also "reasonable follow up questions."  Mot. at 18.  This final request for relief is improper.  The Court should not compel Trainor to answer questions that have not been asked.  *See Tardiff v. County of Knox*, 246 F.R.D. 66, 67 (D. Me. 2007) (limiting judicial review to questions asked at a deposition of plaintiffs' counsel and declining to review whether to compel answers to unasked questions in "areas of inquiry").  If, however, the Court grants the Motion, Defendants seek guidance from the Court limiting the follow-up questions.  Such guidance will help prevent further dispute or requests for judicial review.

[5] *See* Declaration of Chad Russell in Support of Oracle's Motion to Modify and to Compel ("Russell Decl.") ¶ 14, Ex. H at 9:10-18, 22:15-23:4, 24:11-26:21 (employment); *See* Declaration of Scott Trainor in Support of Defendants' Opposition to Oracle's Motion to Modify and to Compel ("Trainor Decl.") ¶ 1 (licensed in California).

It should not be surprising that Mr. Trainor's deposition involved numerous efforts by both parties' counsel and the witness to prevent inadvertent disclosure of privileged information, given that Mr. Trainor is a lawyer and acted in that capacity for both PeopleSoft and Defendants and because Oracle alleges that Mr. Trainor improperly shared PeopleSoft confidential information with Defendants.  Furthermore, in the context of this particular deposition, it should also not be surprising that there was some difficult line-drawing done in the interest of preserving the privileged status of the protected information.[6]

In determining whether further testimony is warranted, the only issue before the Court is whether the questions at issue called for the disclosure of protected information.[7]  Oracle moves to compel Mr. Trainor to answer ten questions that can be bundled into six groups.  *See* Mot. at 11-18.  Through this response, Defendants have met their burden of establishing that either the attorney-client privilege and/or work product doctrine is applicable in each instance.  *See United States v. Chevron,* 241 F. Supp. 2d 1065, 1069 (N.D. Cal. 2002) (placing burden for attorney-client privilege), *id.* at 1080-81 (work product).  Where Defendants concede that there is unprotected information responsive to certain questions at issue, the testimony Oracle seeks is cumulative, not material, and thus does not warrant further examination.

### 1.    All of the Withheld Testimony is Privileged.

Defendants hold the attorney-client privilege over some of Mr. Trainor's communications at SAP.  For example, while at SAP, TomorrowNow ("TN") was one of his clients.  *See*

---

[6] Moreover, the liberal clawback provisions in the Stipulated Protective Order that allow "clawing back" testimony were not designed with this particular "lawyer as a witness" scenario in mind, and thus would have been neither particularly easy to implement nor practically effective in protecting the privileged information placed at issue by Oracle's motion.  *See* D.I. 32.

[7] Defendants have offered to present Mr. Trainor again to testify about Exhibit 1683.  *See* Russell Decl. ¶ 25, Ex. S.  With regard to TN-OR00852363, Oracle's request to depose him on the redacted sections suffers from two procedural defects.  First, Oracle's motion is the first time Oracle has challenged the redactions.  *See* McDonell Decl. ¶ 2.  Second, that document was not introduced, let alone clawed back, during the deposition of Mr. Trainor; its only relationship to the deposition is that Defendants announced its clawback in the same letter that announced the clawback of Exhibit 1683 and a number of other documents wholly unrelated to the deposition. *See* Russell Decl. ¶ 5, Ex. C (Exhibit 1683 is identified by its Bates number, SAP-OR00677719). Oracle's inclusion of this document in its Motion to Compel is an attempt to circumvent this Court's limitation of issues for review.  Moreover, Oracle should not be allowed to compel testimony that it never sought in the first place.

1   McDonell Decl. ¶ 1, Ex. 1(Tr. at 52:17-52:3).  Where, as here, the client is a corporation, the

2   attorney-client privilege may attach to communications with any corporate employee when those

3   communications relate to the scope of the employee's corporate duties and the employee is aware

4   that the information is being furnished to enable the attorney to provide legal advice to the

5   corporation.  *See Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981).  Challenges to the

6   privilege must be evaluated on a case-by-case basis.  *See id*. at 396.

7          Mr. Trainor was asked during the deposition to generate protected work product for

8   anticipated and actual litigation matters and to disclose work product he had previously

9   generated.  First, he was asked about the legal analysis of potential claims between Defendants

10   and Defendants' customers.  Second, he was asked to analyze hypothetical legal questions about

11   his own alleged exposure to a claim of a professional ethics violation.  Finally, several lines of

12   questions at issue effectively asked Mr. Trainor to perform an extemporaneous legal analysis

13   about the application of law to facts pertinent to the case at bar.

14          Protected work product "is reflected, of course, in interviews, statements, memoranda,

15   correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and

16   intangible ways . . . ."  *Hickman v. Taylor,* 329 U.S. 495, 511 (1947).[8]  In-house counsel can

17   generate protected work product in a pending case.  *See, e.g., Shelton v. American Motors Corp*.,

18   805 F.2d 1323, 1325 (8th Cir. 1986) (reversing district court's imposition of sanctions upon

19   defendant for instructing in-house counsel not to answer deposition questions on the basis of

20   protected work product).  Asking an in-house attorney to do legal analysis or provide mental

21   impressions in a deposition reaches for protected work product.  *See Sony Computer Entm't Am.,*

22   *Inc. v. Great Am. Ins. Co.,* 229 F.R.D. 632, 635 (N.D. Cal. 2005) (holding that a party may not

23   ask opposing in-house counsel "individual understandings" to explain the legal obligations

24   created by the insurance policy issued by the deposing party "since that would contain mental

25   impressions protected by the work product privilege").  Protected work product is discoverable

26   _____

27          [8] In contrast to the attorney-client privilege, Mr. Trainor *and* his employers, PeopleSoft
     and SAP, hold the privilege for the work product he generated while in their employ.  *See, e.g.,*
28   *Pastrana v. Local 9509, Commc'ns Workers*, No. 06cv1779 W, 2007 U.S. Dist. LEXIS 73219, at
     *12 n.6 (S.D. Cal. Sept. 28, 2007).

1    only when the moving party demonstrates an "otherwise unsatisfiable need" for it. *Chevron,* 241

2    F. Supp. 2d at 1081.  Significantly, Oracle does not argue or demonstrate that it has such a need.

3    It merely asserts that Mr. Trainor has no relevant protected work product. *See, e.g.,* Mot. at 14-

4    15.  Oracle, however, cannot compel Mr. Trainor to analyze the facts of this case and offer his

5    opinion on their legal significance—that is a job that Oracle's own counsel can do. *See Hickman,*

6    329 U.S. at 516 (Jackson, J., concurring) (doctrine prevents one side from "perform[ing] its

7    functions . . . on wits borrowed from the adversary").

8                    **2.    The Questions at Issue in Oracle's Motion are Improper.**

9            *First Group of Improper Questions ("Compartmentalize") (Mot. at 11-12).*  Oracle asked

10   Mr. Trainor what "steps" he took to avoid relying on his memory of PeopleSoft's license

11   agreements and whether he "compartmentalize[d]" his PeopleSoft experience.  Mot. at 11-12.  In

12   substance, these broad and vague questions are essentially the same.

13           Oracle's earlier, and repeated, questions on this topic created some confusion.  For

14   example, before posing these questions, Oracle had *already* examined Mr. Trainor on the subject

15   of what he did to maintain PeopleSoft's confidences, how he used information he learned at

16   PeopleSoft, and how he had complied with his ethical obligations. *See, e.g., infra* pp. 7-8.

17   Oracle's use of the term "compartmentalize" apparently then sought greater detail about what

18   confidential information Mr. Trainor knew and how he mentally organized it.  Understood this

19   way, the question reaches for information protected by the attorney work product doctrine. *See*

20   *Hickman,* 329 U.S. at 511 (mental impressions are protected); *Tardiff,* 246 F.R.D. at 70-74

21   (upholding instructions not to answer a multitude of questions when questions posed to attorney

22   called for protected work product and moving party had not demonstrated need for information).[9]

23   In order to answer this question with any more detail than he already provided, Mr. Trainor would

24   have to disclose information that is privileged and confidential to both PeopleSoft and SAP.

25   Trainor Decl. at ¶ 2.  Such a response would run afoul of the very instruction that Plaintiffs'

26   _____

27           [9] Oracle misreads the exchange by arguing that the attorney-client privilege cannot support
     an instruction not to answer. *See* Mot. at 12, 14 (similar misreading of the "Communications with
     Prospective Customers" questions).  It may or it may not; this is why Defendants *cautioned*
28   Trainor not to reveal privileged information rather than *instructing* him not to answer. *See id.*

1   counsel gave him at the outset of the deposition.  *See* McDonell Decl. ¶ 1, Ex. 1 (Tr. at 20:3-11).

2   Thus, if such detail is compelled, then Defendants request guidance from the Court that Mr.

3   Trainor can provide answers without risk of being accused by Oracle of disclosing too much.  If,

4   however, Defendants' understanding of this exchange is wrong, and Oracle was simply asking Mr.

5   Trainor if or how he used his knowledge of PeopleSoft practices while working for SAP, then that

6   question has already been repeatedly answered.  *See, e.g., infra* pp. 7-8.

7       *Second Group of Improper Questions ("Communications with Prospective Customers")*

8   *(Mot. at 13).*  Oracle asked Mr. Trainor to analyze a note in a draft contract provided to a

9   prospective customer (Waste Management), which states "think this is to WM's advantage

10  because you don't want us accessing production and testing development environment."  Russell

11  Decl. ¶ 24, Ex. R.  In response, Mr. Trainor testified that he did not recall if he wrote the note.

12  *See* Mot. at 14.  Oracle nevertheless persisted in asking him to analyze the note, specifically

13  asking him, "How did you read it?"  *Id.*  In response, Mr. Trainor testified "I feel like I'm going

14  into where I'm drawing legal conclusions as I interpret this," at which point defense counsel

15  instructed him not to disclose his mental legal analysis.  *Id.*

16      Mr. Trainor and Oracle appear to have been talking past each other in this exchange.  At

17  the time of the deposition, Mr. Trainor understood the question as asking him to explain why TN

18  represented this to Waste Management, which he believed would require him to provide legal

19  analysis.  Trainor Decl. ¶ 3.  Oracle now reads the transcript as asking for Mr. Trainor's factual

20  understanding of the phrase "you don't want us accessing" at the time the document at issue was

21  created (as opposed to his interpretation of that phrase at the time of the deposition).  Mot. at 13.

22  If Oracle was truly seeking his contemporaneous understanding of the phrase, then Defendants

23  withdraw the instruction.  However, re-deposing Mr. Trainor simply to answer this question is

24  unlikely to yield any material information because Mr. Trainor already testified that he did not

25  recall if he wrote the note, and the note largely speaks for itself.

26      *Third Group of Improper Questions ("Misrepresentations to Customers") (Mot at 15).*

27  Oracle asked Mr. Trainor about the position that TN took with customers regarding Oracle's

28  intellectual property and, specifically, if TN's rights to use PeopleSoft software depended on the

1   customers' licenses with PeopleSoft.  *See* Mot. at 14-15.  Mr. Trainor confirmed what Oracle

2   already knew from prior discovery, acknowledging that TN took this position with customers.

3   *See* McDonell Decl. ¶ 1, Ex. 1 (Tr. at 114:15-23).  Indeed, Mr. Trainor reiterated Oracle's public

4   allegations in the Fourth Amended Complaint: the rights to use its intellectual property are

5   governed by the contracts with its customers.  D.I. 348 at ¶¶ 51-53.  However, the current dispute

6   about this group of questions stems from Oracle's counsel's use of that answer to ask Mr. Trainor,

7   an SAP attorney, argumentative questions that call for legal analysis of Oracle's core allegations.

8   *See, e.g.,* D.I. 348 at ¶¶ 193, 203 (alleging "deceptive representations").  Specifically, Oracle

9   asked if this legal position was "a true statement" so far as Mr. Trainor knew.  *See* Mot. at 15.  In

10  that line of questions, Oracle asked Mr. Trainor if "SAP or TomorrowNow ever misrepresent[ed]

11  facts to customers during negotiation of terms?"  *Id.*  Since both questions call for

12  contemporaneous legal analysis by an SAP in-house lawyer, Mr. Trainor was instructed not to

13  answer.  *See* Mot. at 15; Trainor Decl. ¶ 5.

14      The work product instructions to these questions are proper.  There is a dispositive

15  difference between Oracle asking Mr. Trainor if either (a) TN ever represented a certain fact or (b)

16  TN ever made a "misrepresentation."  The first is an example of a question seeking a non-

17  privileged fact, while the second is an example of a question seeking the legal analysis of an in-

18  house counsel in the case at bar.[10]  Because Oracle's questions sought legal analysis rather than

19  facts, Oracle has no basis on which to compel Mr. Trainor to answer.  *See Tardiff,* 246 F.R.D. at

20  70-71, 73-74; *Sony Computer,* 229 F.R.D. at 635.

21      Both questions also raise attorney-client privilege issues.  The "true statement" question

22  asks Mr. Trainor to confirm if "TomorrowNow's rights to use the PeopleSoft software come

23  entirely by way of the Waste Management license with PeopleSoft."  That is, it asks him to testify

24  about the specifics of PeopleSoft's confidential licenses.  At other points in the deposition, Oracle

25  asked Mr. Trainor to explain his non-confidential, non-privileged understanding of PeopleSoft's

26  licenses, and he did.  *See* McDonell Decl. ¶ 1, Ex. 1 (Tr. at 53:21-54:19).  If the "true statement"

---

27      [10] *Cf., e.g., Rondberg v. McCoy*, No. 09-CV-1672-H, 2009 U.S. Dist. LEXIS 118869, at
    *18-19 (S.D. Cal. Dec. 21, 2009) (describing elements of intentional and negligent

28  misrepresentation).

DEFS' OPP. TO ORACLE'S MOT.
TO MODIFY AND COMPEL
Case No. 07-CV-1658 PJH (EDL)

1  question asks him to repeat that answer, the Motion seeks cumulative testimony.  Conversely, if

2  Oracle seeks a more detailed answer, then Mr. Trainor is being asked to reveal PeopleSoft or

3  Defendants' privileged information.  *See* Trainor Decl. at ¶ 4.  Thus, if the Court compels such an

4  answer, Defendants' seek guidance from the Court that Mr. Trainor may reveal privileged

5  PeopleSoft information as needed.  With regard to the second question, *i.e.* "misrepresentations,"

6  if the Court compels an answer based only on what non-privileged facts Mr. Trainor knows (as

7  opposed to separately analyzing the facts and forming his own opinion), the result will be

8  uninformative.

9        *Fourth Group of Improper Questions ("Indemnification Policy") (Mot. at 15).*  Oracle's

10  fourth group of improper questions focuses on a non-privileged, internal statement by TN and

11  SAP: namely, that TN's indemnification provision was a "Key term -- no removing this."  After

12  Oracle asked Mr. Trainor if TN and SAP adopted this position, it then pushed further and asked if

13  this position was "true."  Mot. at 15.  In effect, Oracle asked Mr. Trainor to provide legal analysis

14  and advice regarding language in a TN contract.  Specifically, Oracle asked him what value the

15  indemnification clause had within TN and SAP during contract negotiations, *i.e.*, whether it was a

16  "key term."  *Id.*  Had Mr. Trainor answered (either with a "yes," "no," or anything else), he would

17  have revealed how SAP attorneys, including himself, evaluated the language of TN's contracts,

18  which in turn would have revealed privileged work product and/or attorney-client

19  communications because he had privileged and confidential communications with TN employees

20  about this subject matter.  *See* Trainor Decl. ¶ 6.  Thus, the instructions were proper.  *See Tardiff*,

21  246 F.R.D. 66; *Sony Computer,* 229 F.R.D. at 635.

22        *Fifth Group of Improper Questions ("Compliance with ethical obligations") (Mot. at 16).*

23  In this group of questions, Oracle attempted to conduct a real-time legal debate with Mr. Trainor

24  about whether certain hypothetical scenarios would have violated his ethical duties.  *See* Mot.

25  at 17.  In response to the questioning, Mr. Trainor acknowledged his ethical duties and his

26  obligation to respect the confidential information of a prior client.  *See id.*  Oracle then followed

27  up with two hypothetical questions.  First, "if" Mr. Trainor had disclosed "information [he]

28  learned from a former -- client [PeopleSoft]" to a TN employee, whether that would have

1  constituted an ethical violation.  *See id.*  Oracle then probed further, asking whether Mr. Trainor

2  would have "felt comfortable" if he had conveyed certain information to a TN employee; that

3  question was colored by Oracle's suggestion, posed immediately prior, that conveying such

4  information was "wrong."  *See* McDonell Decl. ¶ 1, Ex. 1 (Tr. at 137:23-25).  Here, Oracle did

5  nothing less than ask Mr. Trainor to conduct a live legal analysis that, assuming certain

6  hypothetical facts were true, would result in Mr. Trainor providing a legal opinion in response to

7  a legal ethics question relating to his duties as a lawyer to his former client.[11]

8        As an initial matter, Mr. Trainor had his own personal counsel prior to and at the

9  deposition who had given him legal advise on this subject matter.  Trainor Decl. ¶ 7.  He is unable

10  to answer these questions without disclosing privileged information.  *Id.*

11        Moreover, to the extent that Oracle seeks a legal analysis regarding whether certain facts

12  evidence any ethical violation, Oracle must turn to its current counsel, not Mr. Trainor.  *See*

13  *Tardiff*, 246 F.R.D. at 71, 77 (upholding instruction given to an attorney in a deposition not to

14  answer whether the attorney violated the Professional Rules of Responsibility).  In arguing to the

15  contrary, Oracle's Motion improperly conflates factual questions about what actions Mr. Trainor

16  took (as they relate to his knowledge about PeopleSoft licenses) with questions requiring an

17  application of law to non-privileged facts.  *See* Mot. at 17 (asserting "Oracle is entitled to ask

18  whether its predecessor's former counsel complied with his legal ethical obligations toward

19  PeopleSoft").  Oracle's argument fails.  Answering either question would invade privileged work

20  product and reveal privileged attorney-client communications; thus, the instructions not to answer

21  were proper.  *See Tardiff*, 246 F.R.D. at 70-71, 73-74 (work product); Trainor Decl. ¶ 7 (attorney-

22  client privileged communications).

23        *Sixth Group of Improper Questions ("Willfulness of copyright infringement") (Mot. at 17).*

24  Oracle asked whether "SAP or TomorrowNow [took] any steps to determine whether a particular

25  customer's allowance of access to software constituted copyright infringement" and whether

26  "TomorrowNow or SAP ever analyze[d] in connection with a negotiation of a contract the

27  _____

28        [11] As noted above, the instruction here did not prohibit Oracle from gathering non-
privileged facts about Trainor.  *See, e.g., infra* pp. 7-8.

1   general topic of a customer's rights to provide access to software."  Mot. at 18.[12]  Oracle's motion

2   concedes that instructions not to answer are appropriate with respect to this topic and limits its

3   complaint to the contention that "Defendants' instructions not to answer came too early and were

4   too sweeping."  *Id.*

5          These questions, however, are not foundational questions.  They seek information about

6   potential legal analysis performed for TN or SAP "in connection with" possible specific instances

7   of potential "copyright infringement" and specific instances of customer negotiations, rather than

8   asking for general foundational information.  *Id.*  That is a degree of detail beyond that required

9   by Federal Rule of Civil Procedure 26(b)(5).  By comparison, the appropriate foundational

10  information is contained in paragraph 7 of the Trainor Declaration.  By asking if advice in a

11  general subject matter was ever given or received in a specific context, Oracle is reaching for

12  privileged information.  *See Tardiff*, 246 F.R.D. 66 (work product); Trainor Decl. ¶ 8 (privilege).

13         **B.     Defendants' Redactions are Proper.**

14         Oracle seeks *in camera* review of two documents, Deposition Exhibit 1683 and TN-

15  OR00852363.  As noted above, the inclusion of TN-OR00852363 in Oracle's motion is

16  inappropriate.  It was neither introduced in Mr. Trainor's deposition nor clawed-back as a result

17  of it.  *See* McDonell Decl. ¶ 2.  Moreover, Oracle failed to follow proper procedure by first

18  establishing a legal basis for this Court's *in camera* review of the two documents.

19  Notwithstanding these omissions, and as part of Defendants' continued good faith efforts to

20  maintain the proper contours for privilege claims in this case, Defendants agree to submit both

21  documents for *in camera* review so that the Court can determine whether the redactions are

22  proper.

23         **1.     Exhibit 1683 is Properly Redacted.**

24         Deposition Exhibit 1683 is a string of e-mails between SAP and TN employees.[13]

_____

25         [12] Questions answered by other deponents, *e.g.,* Chris Faye, are inapposite.  *See* Russell
    Decl. ¶ 16, Ex. J.  The questions to Mr. Faye were more general than those posed to Mr. Trainor;
26  they were not in regard to a "particular customer[]" or "in connection with a negotiation of a
    contract."  *Id.*

27         [13] Oracle also seeks additional testimony from Mr. Trainor regarding Exhibit 1683.  Any
28  additional examination regarding Exhibit 1683 would be cumulative and is not warranted at this
    late date.  While it is true that Exhibit 1683 was clawed back during the deposition and then

1   *See* Russell Decl. ¶ 25, Ex. S.  It reflects a dialogue between multiple persons, some of whom

2   were not attorneys, some of whom were attorneys acting within a business capacity during the

3   exchange, and some of whom were attorneys acting within a legal capacity.  *See* McDonell Decl.

4   ¶ 3.  Given the various roles of the authors and recipients of the document (some of whom are not

5   obvious from the face of the document), Defendants' document review process resulted in three

6   differently-redacted versions being produced.  *See* Russell Decl. ¶ 7, Ex. E.  Ultimately, after

7   Exhibit 1683 was used in Mr. Trainor's deposition and was then subjected to additional scrutiny,

8   Defendants revised their document production in a way that resulted in only one redaction of that

9   document and its counterparts.  *See id.* ¶ 25, Ex. S.  Specifically, portions of an e-mail from Mia

10  Lee to Mr. Trainor are redacted, and that portion reflects a communication from Ms. Lee seeking

11  legal advice from Mr. Trainor.  *See* Declaration of Mia Lee in Support of Defendants' Opposition

12  to Oracle's Motion to Modify and to Compel ("Lee Decl.") ¶ 1.  Thus, the one redaction in

13  Exhibit 1683 is appropriate.  *See Chevron,* 241 F. Supp. 2d at 1076 ( "It is clear that

14  communications between corporate personnel and their in-house counsel made for the purpose of

15  securing legal advice are protected by the privilege").

16              **2.      TN-OR00852363 is Properly Redacted.**

17          This document is an e-mail from Bob Geib, TN's Vice President of Sales, to other

18  executives at TN and Mr. Trainor.  It reflects comments by Mr. Geib regarding changes made to

19  the TN Support Services Agreement, which was a form agreement for TN customers.  *See* Trainor

20  Decl. ¶ 9.  The redacted portions reflect the content of legal communications from Mr. Trainor to

21  Mr. Geib and requests for legal advice from Mr. Geib to Mr. Trainor.  *See id.*  Thus, the

22  redactions are appropriate.  *See Chevron,* 241 F. Supp. 2d at 1076  ("It is clear that

23

24  ─────────────────

    (continued…)

25  produced again after the deposition, the general subjects contained in that document were covered
    at length during the deposition.  *Compare* Russell Decl. ¶ 25, Ex. S *with* McDonell Decl. ¶ 1,
26  Ex. 1.  Defendants nevertheless offered to present Mr. Trainor for further examination on Exhibit
    1683.  *See* Russell Decl. ¶ 10, Ex. G.  That offer remains open.  *See* McDonell Decl. ¶ 3.  For the
27  sake of efficiency, Defendants insisted that the related issues be resolved first so the deposition
    would not be fragmented, with an initial examination of Exhibit 1683 and then possible additional
28  examination on other issues.  *See* Russell Decl. ¶ 10, Ex. G.

communications between corporate personnel and their in-house counsel made for the purpose of securing legal advice are protected by the privilege.").

### III. TO THE EXTENT REASONABLY POSSIBLE, AND WITHOUT WAIVING THEIR PROPER OBJECTIONS, DEFENDANTS HAVE FULLY RESPONDED TO ORACLE'S REQUESTS FOR ADMISSION.

Oracle seeks amended responses to 316 of Plaintiffs' 1,315 requests for admissions ("RFAs"). *See* Declaration of Joshua L. Fuchs in Support of Defendants' Opposition to Oracle's Motion to Modify and to Compel ("Fuchs Decl.") ¶¶ 2-3. Subject to Defendants' timely and proper objections, Defendants have responded to Oracle's complex, compound, and unduly burdensome requests, and Part IV of Oracle's motion should be denied.

### A. Oracle's Definitions of "Copy," "Fix," "Update," and "Generic Environment" are Improper.

Oracle's Requests for Admission ("RFA") Nos. 496-680 in Set No. 2 and 13-50 in Set No. 3 do not, as Oracle suggests, present a series of basic facts about TN's business process.[14] *See* Mot. at 19-20 and 24-25. Instead, these 223 RFAs are complicated, detailed requests seeking information about technical conduct that varied greatly, took place over several years, and involved numerous employees, business operations, and thousands of varying objects.[15] Moreover, Oracle readily admits that each of the "thirty-two" requests contained in RFAs 13-44 from Set No. 3 actually contain separate sub-requests relating to 33,186 separate objects, which totals 1,061,952 individual requests for admission (*i.e.*, 32 x 33,186). *See infra* pp. 24-30. In answering the RFAs at issue, Defendants did their best to deal with Oracle's complicated, compound requests by providing precise, accurate answers that were intended to be subject to only a single interpretation.

---

[14] Oracle's grouping of RFAs 496-680 and 13-50 is misplaced. RFAs 496-680 are directed at whether certain types of conduct always happened, happened the majority of the time, happened sometimes, or happened at least once. In contrast, RFAs 13-50 request admissions about the specific scoping, developing, and testing conduct for all objects that TN has a systematic record of attempting to deliver to its customers. *See infra* pp. 24-30. Because of the burden issue discussed in detail below, TN did not provide substantive answers to RFAs 13-50, while TN did provide detailed substantive answers to RFAs 496-680.

[15] With respect to PeopleSoft application software, an "object" is a broad term referring to one of a variety of things used in running the software, including code (such as SQR, SQC, and COBOL files), data files, data mover script files, project files, and things known as "online objects" (such as fields, records, pages, menus, etc.).

### 1. Defendants Answered Where Reasonably Possible.

As Oracle acknowledges, the 223 RFAs at issue stem from the parties' inability to reach a factual stipulation regarding the exact steps taken to scope, develop, test, and deliver objects to TN's PeopleSoft HRMS payroll customers. *See* Mot. at 3; Fuchs Decl. ¶¶ 11-12. Each of RFAs 496-680 asks Defendants to admit, in some form, each sentence contained in Oracle's last proposed stipulation. Oracle seeks either a stipulation or admission regarding wide-ranging conduct that took place over numerous years and that was very technical in nature. In response to some of Defendants' concerns raised during the stipulation negotiations, Oracle drafted RFAs 496-680 in a way that allowed Defendants to answer on a continuum of whether the conduct at issue occurred always, a majority of the time, sometimes, or at least once. Defendants responded in good faith, providing answers as precise as possible in light of the detailed, complex, and technical requests.

### 2. Oracle's RFAs are Improper Because They are not "Simple, Direct, and Limited to Singular Facts."

"It is well settled that requests for admissions . . . are required to be simple and direct, and should be limited to singular relevant facts." *Safeco of Am. v. Rawstron*, 181 F.R.D 441, 446 (C.D. Cal. 1998) (quoting *S.E.C. v. Micro-Moisture Controls,* 21 F.R.D. 164, 166 (S.D.N.Y. 1957)). Moreover, "Rule 36 should not be used unless the statement of facts sought to be admitted is phrased so that it can be admitted or denied without explanation." *Id.* at 447 (quoting *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 968 (3d Cir. 1988)). "[W]hen good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest." Fed. R. Civ. P. 36(a)(4). Before ordering a matter admitted, the Court ordinarily should first order an amended answer and deem the matter admitted only if a sufficient answer is not timely filed. *See Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981). Such a severe sanction is only warranted where there is an intentional disregard for the obligations imposed by Rule 36. *See id.*

Here, Oracle's requests are neither simple nor direct and are not limited to singular facts. Rather, the requests involve extremely complex definitions and factual predicates that often

1    depend on references to exhibits and/or prior requests, thereby requiring that answers contain

2    precise explanations to parse out which facts are undisputed and which Defendants reasonably

3    believe are in dispute.  *See* Mot. at 19-20 and 24-25.  The fact that Defendants could have, but did

4    not, deny these requests outright based on the wholesale failure of Oracle's RFAs to comply with

5    the rules and controlling case law evidences Defendants' good faith in responding and attempting

6    to narrow the material facts in dispute for trial.  Defendants have not intentionally disregarded

7    their obligations under Rule 36, and Oracle does not suggest otherwise.

8              **3.      Oracle's Definition of the Term "Copy" is Overly Broad and Vague**.

9          Oracle's use and definition of the term "copy" is not as obvious as it contends.[16]  The fact

10   that this is a copyright case does not support Oracle's position that the term "copy" should be

11   broadly construed.  To the contrary, the fact that this is a copyright case highlights the need for

12   Defendants to be very precise when referring to an activity that may not be "copying" as a matter

13   of law, regardless of whether a lay person might broadly describe the activity as being, or at least

14   involving, some form of "copying" according to the plain meaning of that term.  "Copy" is a term

15   of art under the U.S. Copyright Act.  Whether particular conduct constitutes illegal "copying"

16   under that Act is to be decided on the specific facts and conduct at issue in each instance, not on a

17   general, non-legal definition.  Just as a cross examiner in a deposition cannot make a witness

18   agree to the cross-examiner's characterization of a fact, Oracle cannot make Defendants concede

19   to its overbroad definition of "copy".  Rule 36 allows Defendants to qualify their answer, and thus

20   that is why Defendants responded on an RFA by RFA basis and admitted those facts which they

21   agree to and denied those facts which they dispute.

22         In responding to Oracle's requests using the defined term "copy," Defendants attempted to

23   be as precise as possible about the specific actions which they were admitting.  Defendants have

24   that right under Rule 36 when it is necessary to qualify an answer to leave no room for debate

25   about what fact is being admitted.  For example, in the request and response that Oracle cites,

26   RFA 501, Defendants specifically used the term "download" to define the precise action at issue.

27   _____

28   [16] For a complete list of the RFAs put at issue in Oracle's Motion that contain the term
     "copy" see the Fuchs Decl ¶¶ 4-6.

1   Defendants should not be required to admit to all of the additional conduct and constructions

2   associated with Oracle's broadly defined term "copy," which includes not only the term

3   "download," but also many other terms.

4        Oracle concedes that Defendants were, in good faith, willing to reexamine certain of

5   Oracle's RFAs using the term "copy."  *See* Fuchs Decl. ¶¶ 17-18.  Oracle's request for this

6   reexamination, however, was not limited to the 223 RFAs put at issue by its motion, but included

7   all of the 1,315 RFAs served in the case.  *See* Fuchs Decl. ¶¶ 17-18.[17]  If Oracle were willing to

8   define "copy" as "the word's plain meaning" and withdraw its previous definitions of that term,

9   then Defendants indicated they would no longer rely on their objection to "copy" and would

10  constructively remove that objection from Defendants' responses.[18]

11          **4.    Where Reasonably Possible, Defendants Precisely and Accurately
                    Responded to RFAs Containing the Terms "Update" and "Fix."**
12

13       Oracle imprecisely defines and uses the terms "update" and "fix" by suggesting that: (a)

14  "fixes" and "updates" are interchangeable terms; and (b) fixes and updates are the smallest

15  component of the actual customer deliverables.[19]  *See* Mot. at 23-25.  Neither statement is correct.

16  Oracle argues that TN employees used, and were familiar with, these terms, but that is irrelevant

17  to Defendants' objection in the context of these RFAs.  Whether TN's employees used these

18  terms over the course of many years does not provide any clarity regarding the definition of the

19  terms "fix" or "update" in the context of these RFAs.

20       Fixes are made up of objects that can be several things, including file-based objects,

21  online objects, or data files.  *See* Declaration of Catherine Hyde in Support of Defendants'

22  Opposition to Oracle's Motion to Modify and to Compel ("Hyde Decl.") ¶¶ 2-5.  A fix is simply

23          [17] Out of the 1,315 RFAs, 539 contain the term "copy."  Out of the 223 RFAs, 118 contain
    the term "copy."  *See* Fuchs Decl. ¶¶ 4-6.

24          [18] Because there are hundreds of requests that contain the term "copy" and many of those
25  will not need to be supplemented simply because of the definition change, Defendants seek to
    avoid any unnecessary time and burden to amend each set of objections for those requests to take
26  out the objection to the term "copy."  Instead, Defendants proposed a blanket statement that, in
    light of the new definition, Defendants are not relying on their objection to the term "copy" in
27  providing these responses.

28          [19] For a complete list of the RFAs put at issue in Plaintiffs' Motion that contain the terms
    "fix" or "update," see the Fuchs Decl. ¶¶ 7-8.

1   the name given to a container (typically a .zip file) of one or more objects grouped together in a

2   certain manner that resolves a defined issue. *See id.* ¶ 5.[20]  Moreover, the specific name given to

3   any particular fix container for a specific customer is also referenced to a broader master fix

4   record. *See id.* ¶ 5.[21]   A master fix record is the identifier for the internal TN record of a

5   particular reported issue affecting one or more TN customers. *See id.* ¶ 4.  Fixes and master fixes

6   are not developed or tested.  It is the objects contained within them for which the actual

7   development and testing work is completed. *See id.* ¶ 5.  RFA 597, referenced in Oracle's

8   Motion, refers to Exhibit B which simply consists of a list of master fix records from the TN SAS

9   database and is not a list of what was developed, tested, and/or delivered to any specific TN

10  customer.[22]  Updates are simply containers of a group of fixes delivered together. *See id.* ¶ 6.[23]

11  Although TN employees colloquially referred to fixes and updates as what was delivered to

12  customers, that general reference says nothing about the underlying facts regarding how each

13  object inside a given fix was developed or tested. *See id.* ¶ 7.

14          To the extent the creation, testing, and delivery of any object is knowable, one must

15  examine the history of each object contained in each fix, not the fix "container" itself or the larger

16  update "container" that typically holds several fix "containers." *See id.* ¶ 7.[24]  Additionally,

17  although some fixes may have the same name, this does not require that each similarly-named fix

18  contains the same objects.[25]  Similarly, even if an object has the same name as another, that does

19          [20] The fix container WMI-TN-0102085972 listed by Oracle in footnote 8 of its Motion is
20  exemplary.  That fix container contains seven .sqr objects, one .dat object, and one .dms object—
    nine objects in total. *See* Fuchs Decl. ¶¶ 19-30 (providing explanatory screen shots).  The history
21  of each object must be evaluated individually to determine how it was scoped, developed, tested,
    and delivered, which is what the RFAs at issue seek. *See id.* ¶¶ 26-28.

22          [21] As demonstrated by footnote 8 in Oracle's Motion, Waste Management's fix WMI-TN-
    0102085972 is referenced to TN master fix record CSS-TN-0102085972.

23          [22] In fact, there were 96 objects prepared for ten different customers associated with
24  master fix record CSS-TN-0102085972. *See* Fuchs Decl. ¶ 30 and 32.

        [23] Updates are also often referred to as bundles.  Exhibit A, as referenced in example RFA
25  501, is a list of master bundle records from the SAS database.  And, like master fix records,
    master bundle records are simply an identifier for a collection of master fix records for which
26  specific objects would be developed, tested, and/or delivered to specific customers. *See* Fuchs
    Decl. ¶ 31.

27          [24] Oracle's technical expert, Kevin Mandia, expressly acknowledges this construct in his
    definition of "Fix." *See* Fuchs Decl. ¶ 35.
28
        [25] For example, RHI-TN-0102085972 is another fix container associated with CSS-TN-

1   not mean that both objects were developed or tested in the same environment.  To fairly and

2   precisely respond to the specific facts and conduct implicated by such broad and complex

3   requests, like RFA 597, Defendants, therefore, made admissions, to the extent they were

4   reasonably knowable, at the object level.[26]  Defendants appropriately denied the remainder of the

5   requests as allowed by Rule 36.  This level of granularity is needed to properly admit to actual

6   facts which are not in dispute, and to delineate the facts which are in dispute.  In responding in

7   this manner, Defendants also maintained their burden arguments, as discussed below.

8            **5.      Defendants Precisely and Accurately Responded to RFAs Containing
                  the Term "Generic Environment."**

9

10          To precisely respond to RFA 542, Defendants specifically admitted that the environment

11  being used was "one environment specific to TomorrowNow's retrofit support of specific

12  TomorrowNow customers."[27]  Mot. at 26.  Oracle's definition of "generic environment" does not

13  capture the important point that the environment being referenced in the RFA is an environment

14  that was used for retrofit support and, as such, had limitations on customers, scope, and purpose.[28]

15  Moreover, Oracle misstates Defendants' current objection to the term "generic environment,"

16  which states in relevant part:

17                  "Generic Environment" is a term created by Plaintiffs and as used
                    and defined by Plaintiffs is misleading by attempting to suggest that
18                  any such environment or environment component was not used for
                    limited customers, scope or purpose.

19

20  *See* Russell Decl., Ex. W at 9 (page numbered ("pg") 8); *See* Fuchs Decl. ¶¶ 13-14 and Ex. A.

21  _____

    (continued…)

22  0102085972, which was identified in footnote 8 to Oracle's motion.  Like fix container WMI-TN-
23  0102085972, fix container RHI-TN-0102085972 contains nine objects with the exact same names
    as that of WMI-TN-0102085972.  However, a careful examination of the objects actually reveals
24  that they are completely different and were developed and tested in a different manner.  *See* Fuchs
    Decl. ¶¶ 26-28 (providing example of ctx910au.sqr).

25          [26] Defendants included substantial detail regarding this breakdown in their 136 page
    response to interrogatory number 14, referenced below.

26          [27] For a complete list of the RFAs put at issue in Oracle's Motion that contain the term
27  "generic environment," see the Fuchs Decl. ¶¶ 9-10.

28          [28] In fact, during the meet and confer process, Defendants proposed, and Oracle rejected, a
    solution which reiterated this concept and further explained this point.  *See* Fuchs Decl. ¶ 16.

Oracle incorrectly asserts that the term "generic environment" had some sort of a common meaning or usage by TN employees.  This term, however, was not used in the frequent fashion or with any type of a uniform meaning as suggested by Oracle.  For example, John Baugh, head of the environments team at TN, only used the term once during two days of testimony and only after Oracle's counsel had used the term at least 21 times in his questioning, including in the question to which Mr. Baugh responded using the term.  *See* Fuchs Decl. ¶ 15.  Additionally, out of the millions and millions of documents produced by TN in this litigation, there are only a relative handful of documents that use the term "generic environment," further demonstrating that it was not a term commonly used by TN employees.  *See* Fuchs Decl. ¶ 15; Hyde Decl. ¶ 8.

To the extent an environment or environment component was not directly tied to a specific customer, the environment or environment component was tied to a specific use or group of customers, like those serviced under the retrofit model and who were continuing to pay maintenance to PeopleSoft/Oracle.  The term "generic environment" is a term posited by Oracle in deposition questioning[29] in an attempt to create a record and manufacture use of a phrase that was neither frequently used nor had a common meaning at TN.  Although Oracle may like the connotations of the phrase "generic environment," if that phrase does not accurately describe the facts that Defendants can in good faith admit, then the RFA at issue should be either denied or qualified in such a way as to describe the actual conduct at issue.  Defendants are under no obligation to accept as true a term and related definition that Defendants dispute.

**B.**  **RFAs Nos. 13-50 in Set No. 3 and 4-63 and 130-162 in Set No. 5 Are Unduly Burdensome.**

With these RFAs, Oracle seeks separate admissions concerning: (a) the creation, development, and testing of every object for which TN has a record of preparing to deliver to TN customers (RFAs Nos. 13-50 in Set No. 3 and 130-162 in Set No. 5); and (b) every file that TN may have conceivably downloaded from Oracle (RFAs Nos. 4-63 in Set No. 3) over the entire

---

[29] During Mr. Baugh's deposition, Oracle's counsel also expressly noted that "generic environment" was a term that he created for the purpose of his questioning.  *See* Fuchs Decl. ¶ 15, Ex. B ("Mr. Howard: . . . for extended support financials customers using a, as I've called it, ***generic environment***, similar to what was done for HR customers . . . .") (emphasis added).

DEFS' OPP. TO ORACLE'S MOT.
TO MODIFY AND COMPEL
Case No. 07-CV-1658 PJH (EDL)

1  history of the company.  These RFAs are actually millions and millions of separate requests

2  seeking specific and detailed information regarding data that has already been produced and is

3  equally accessible to Oracle.  In arguing that Defendants should be compelled to further respond,

4  Oracle attempts to combine two substantively different types of RFAs and, more importantly,

5  misses the crux of Defendants' position—that Defendants objected to these requests primarily

6  because they are compound and unduly burdensome.  Oracle does not address either of these

7  objections in its Motion.

8          **1.      There is no Legal Basis to Support Oracle's Request that this Court
                  Shift the Burden to Defendants to Analyze Information that is Equally
9                  Accessible to Both Parties.**

10         The Federal Rules set reasonable limits on discovery, including the Court's ability to

11  weigh the benefit of the requested discovery against the cumulative nature of the request and the

12  burden involved in responding.  *See* Fed. R. Civ. P. 1.  Additionally, Rule 26(b)(2)(C) specifically

13  describes the analysis that should be conducted to limit the "frequency or extent of discovery"

14  otherwise allowed by the Rules and states in pertinent part:

15              [T]he court must limit the frequency or extent of discovery
                otherwise allowed by these rules . . . if it determines that: (i) the
16              discovery sought is unreasonably cumulative or duplicative, or can
                be obtained from some other source that is more convenient, less
17              burdensome, or less expensive; . . . or (iii) the burden or expense of
                the proposed discovery outweighs its likely benefit . . .
18

19  Fed. R. Civ. P. 26(b)(2)(C).

20         Under Rule 36, "[e]ach matter must be separately stated."  Fed. R. Civ. P. 36(a)(2).

21  Additionally, requests for admission should be limited to singular relevant facts.  *See Rawstron*,

22  181 F.R.D. at 446.  Rule 36 also specifically allows for objections to any requests.  *See* Fed. R.

23  Civ. P. 36(a)(3).  Further, "[t]he answering party may assert lack of knowledge or information as

24  a reason for failing to admit or deny only if the party states that it has made reasonably inquiry

25  and that the information it knows or can readily obtain is insufficient to enable it to admit or

26  deny."  Fed. R. Civ. P. 36(a)(4).

27          **2.      Brief Description of RFAs and Defendants' Objections and Responses.**

28         With regard to RFAs 13-50 in Set No. 3 and 130-162 in Set No. 5, Oracle seeks

1   admissions relating to the manner in which specific objects were created, developed, and tested

2   by TN.[30]  Exhibit D is a 973 page, small font spreadsheet with 33,186 listings of file paths that

3   contain objects.[31]  It lists every object from a central server that Defendants reasonably believe

4   were made available to TN customers.  This means that Oracle's RFAs referencing Exhibit D

5   (13-50 and 130-162) total more than 1 million separate requests.  *See* Fuchs Decl. ¶¶ 33-34.

6          Defendants specifically objected to these requests by stating:[32]

7              . . . Further, Defendants object to this request as compound and
             unduly burdensome in that this request asks 33,185[33] separate
8              questions, and the request would require Defendants to review
             substantial business records to determine an answer, if possible, for
9              each of the 33,185 separate requests. . . .

10  Russell Decl., Exs. Y at 10 (pg 16) and Z at 76-77 (pg 120-121).

11         With regard to RFAs Nos. 4-63 in Set No. 5, Oracle seeks specific information regarding

12  each and every file under the specific file paths that were potentially downloaded from an Oracle

13  website.[34]  Under this folder path alone, there are 3,740,254 files spread over four hard drives (all

14  of which have been produced to Oracle).  *See* Fuchs Decl. ¶ 41.  This means that Oracle's RFAs

15  referencing these file paths alone total millions and millions of separate requests.

16         Defendants specifically objected to each of these requests at issue stating:

17             . . . Further, Defendants object to this request as compound and

---

18      [30] Using Oracle's examples, RFA 13 states: "**For each item** 1-33186 on Exhibit D, admit
    that a Copy of the listed Fix Object was Created using a Local Environment."  Mot. at 28
19  (emphasis added).  Oracle's RFA 130 states: "**For each item** 1-33186 on Exhibit D to Plaintiffs'
    Third Set of Requests for Admission, admit that Defendants do not have reasonable access to any
20  readily obtainable information indicating that a Copy of the listed Fix Object was not created
    using a Local Environment."  Mot. at 28-29 (emphasis added).

21      [31] Exhibit X to the Russell Decl. only contains the final page of Exhibit D.

22      [32] Defendants' objections across all of the requests vary slightly, but all contain this same
    basic language.  The full objections and language can be found in Exhibits Y and Z to the Russell
23  Decl.

24      [33] Defendants' original objection notes 33,185 separate questions, but as admitted by
    Oracle in its Motion, the number is 33,186.  *See* Mot. at 27.

25      [34] RFA 5 states: "**For each file** located in DCITBU01_G\PeopleSoft, as identified in
    Defendants' responses to Interrogatory 11 from Oracle Corp.'s first set, admit that the file was
26  originally downloaded from an Oracle website by TN."  Russell Decl., Ex. Z at 10-11 (pg 10-11)
    (emphasis added).  RFA 35 states: "**For each file** located in DCITBU01_G\PeopleSoft, admit that
27  Defendants do not have reasonable access to any readily obtainable information indicating that
    the file was not originally downloaded from an Oracle website by TN."  Russell Decl., Ex. Z at
28  42-43 (pg 42-43) (emphasis added).

1

2

3

4

5

6

7

> unduly burdensome in that this request asks for "each file" and, thus, asks hundreds if not thousands of separate questions and would require the review of substantial amounts of data. This request, therefore, does not separately state each matter sought. Moreover, Defendants object to this request on the basis that Defendants' burden associated with responding to this request is substantially similar to the burden for Plaintiffs to obtain the information sought through this request, especially because the available documents, data and other information sought from which the answer, if any, could be derived in response to this request have been produced by Defendants in response to Plaintiffs' other discovery requests and thus any relevant, available information is now as equally accessible to Plaintiffs as it is to Defendants. . . . .

8

9

Russell Decl., Ex. Z at 10-11 (pg 10-11).

10

Oracle's motion also does not mention that despite the forgoing objection and to extent it

11

was reasonably knowable, Defendants provided a substantive response to these RFAs.  For

12

example, in response to RFA 5, Defendants answered as follows:

13

14

15

16

> ADMITTED on the following qualified basis:  Defendants reasonably believe and thus ADMIT that it is likely that the majority (meaning at least one more than half of the total files) of the files located in DCITBU01_G\PeopleSoft were obtained at some point in time from a PeopleSoft, J.D. Edwards, or Oracle website.  Defendants, however, have not undertaken the extreme burden of evaluating each file as this information is as equally accessible to Plaintiffs as it is to Defendants.  To the extent this request is not admitted, it is DENIED.

17

Russell Decl., Ex. Z at 11 (pg 11).

18

19

> **3.      Rule 26(b)(2)(C) Requires that Oracle's Requests be Limited and that Defendants' Objections be Sustained.**

20

21

Oracle seeks (1) information that is unreasonably duplicative of other discovery requests

22

and information in Oracle's possession, and (2) to improperly shift the burden of proof to

23

Defendants with respect to information that is equally accessible to both parties.  Defendants'

24

objections should be sustained, and Oracle's requests should be denied.

> a.      Interrogatory 14.

25

26

Interrogatory 14, which directly relates to RFAs 13-50 and 130-162, asks for detailed

27

descriptions of how all environments were used to create, develop and test all objects.  *See* Fuchs

28

Decl. ¶ 36, Ex. C; *see also* D.I. 334 (Defendants' Opposition to Plaintiffs' Motion to Compel

Production of Documents Related to Damages Model and Interrogatory Responses Related to Use of Plaintiffs' Intellectual Property) ("Defs. Opp.") at 17 (pg 14).[35]  Defendants objected to the request as unduly burdensome, among other things, and relied on Rule 33(d) citing documents and data already produced and made available to Oracle.  Oracle moved to compel further responses to Interrogatory No. 14, arguing in part that such information was necessary to understand TN's "routine business conduct" and the manner in which TN serviced its customers.

After full briefing and a hearing, and taking into account the heavy burden imposed by such a request, this Court ordered Defendants to evaluate and provide detailed information about the support provided, including all information relating to how and what environments were used at every stage of the TN support process for the objects associated with only ten master fix records.  *See* D.I. 460.  To comply with that order, Defendants expended over 500 attorney hours in examining the environments used for the creation, development, and testing of the objects referenced by each of the ten master fix records.  *See* Fuchs Decl. ¶ 39, Ex. C.  This examination involved analyzing data from the SAS and BakTrak databases, TN's servers, deposition testimony, and produced documents.  *See id.* ¶ 37, Ex. C.  Moreover, this review further revealed that just for the ten example master fix records for which Defendants responded, there were approximately 1,772 objects reasonably believed to be made available to specific customers under those records.  *See id.* ¶ 38, Ex. C.  Defendants have already satisfied the Court's order to respond to Interrogatory No. 14.  Based on the prior time and costs associated with Interrogatory 14, Defendants anticipate having to spend thousands of hours and millions of dollars to respond to the millions of these RFA requests.  *See id.* ¶ 40.  Oracle has provided no new basis for this Court to impose any further burden on Defendants to evaluate additional information that is equally accessible to Oracle.

> b.      Interrogatory 11.

Interrogatory 11, which directly relates to RFAs Nos. 4-63, states "Identify all Software

---

[35] Defendants will not restate every argument or resubmit all of the evidence presented in support of its response to Oracle's Motion to Compel on Interrogatory 14.  However, Defendants do incorporate by reference their prior response, all declarations, and supporting evidence regarding the associated burden cited and submitted in their Opposition.  *See* Defs. Opp.

and Support Materials You have Downloaded." Fuchs Decl. ¶ 41, Ex. D. In responding to this request, Defendants incurred the extreme expense and burden of presenting data from TN's servers that Defendants reasonably believed was used in servicing TN's PeopleSoft, J.D. Edwards, and Siebel customers through an electronic "Data Warehouse." *See id.* In total, Oracle was presented 93 server partitions, consisting of approximately 10.2 terabytes of data for review, and was allowed to select the files it wanted produced. *See id.* Throughout this process, Oracle was able to examine and request production of possible software and support materials that were downloaded by TN on behalf of its customers and kept in a centralized location. *See id.* To respond to this request, relying on Rule 33(d), TN specifically stated "TN is aware of the following specific locations where materials downloaded by TN on behalf of its customers can be located . . . ." *Id.* Oracle did not move to compel further responses to this Interrogatory.

Oracle's RFAs 4-63 concern these file paths and ask Defendants whether each file under each file path was originally downloaded from an Oracle website (RFAs 4-33) or not originally downloaded from an Oracle website (RFAs 34-63). As noted above, such a determination would require reviewing and evaluating millions of files, and would take thousands of hours and millions of dollars to complete. *See* Fuchs Decl. ¶ 42. There is no basis for such a heavy burden to be imposed on Defendants when: (a) Oracle has already sought and received more than substantial discovery on this issue; (b) Defendants admitted at the highest level they could (*e.g.*, majority) without conducting a file-by-file review; and (c) Defendants would be required to incur the heavy burden and cost of reviewing the millions of files on top of the extreme expense already incurred to make the data available to Oracle in such a user-friendly format.

### 4. Defendants do not Seek to "Have It Both Ways" as Oracle Asserts.

Defendants position, as outlined above, is that Defendants have produced more than sufficient documents and data for Oracle to obtain the information sought by RFAs Nos. 13-50 in Set No. 3 and 4-63 and 130-162 in Set No. 5. Defendants have never taken the position that the documents and data that Defendants have produced to Oracle are not "readily obtainable." What Defendants state in their response to RFA No. 13, for example, is that "the information sought was not tracked, recorded, or maintained by TomorrowNow in a "readily obtainable manner."

1   Mot. at 28.  Defendants do not state as Oracle inaccurately quotes (with no citation) that

2   Defendants "do not have reasonable access to any readily obtainable information".  *Id.*

3       Defendants and Oracle both have reasonable access to readily obtainable information (*i.e.*,

4   the documents and data Defendants have produced to Oracle) from which the information

5   addressed by RFA 13 could, to the extent it is ascertainable, be compiled.  Defendants' objection

6   to RFA 13 is that the ***information sought by that request*** was not tracked, recorded, or

7   maintained in a "readily obtainable manner."  RFA 13 does not seek re-production of the

8   information Defendants have produced to Oracle (*i.e.*, the readily obtainable information), but

9   instead seeks to require Defendants to analyze, compile, abstract and summarize Defendants'

10  production in order to arrive at an answer to the request (*i.e.*, the information that was not tracked,

11  recorded, or maintained by TomorrowNow in a "readily obtainable manner").  Defendants

12  reiterated this very point when responding to RFA 130 by stating that "there is no readily

13  obtainable way to review TomorrowNow's records and other information to determine for each

14  listed item whether a copy of each listed fix object was not created using a local environment"

15  and that "Defendants have not undertaken the extreme burden of evaluating each item and have

16  objected on that basis because the requested information is as equally accessible to Plaintiffs as it

17  is to Defendants."  Mot. at 29.  Thus, both RFA 13 and RFA 130 evidence Oracle's continued

18  attempt to shift its burden to Defendants by seeking through two RFAs essentially the same

19  information that, to the extent it is ascertainable, is equally accessible to both parties.

20  **IV.   <u>CONCLUSION</u>**

21       For all of these reasons, Defendants respectfully request that the Court deny Oracle's

22  Motion to Modify the Protective Order and to Compel Deposition Testimony and Further

23  Responses to Requests for Admission.

24  Dated:  January 5, 2010                          JONES DAY

25                                                   By: /s/ Jason McDonell
                                                         Jason McDonell
26

27                                                   Counsel for Defendants
                                                     SAP AG, SAP AMERICA, INC., and
28                                                   TOMORROWNOW, INC.