BINGHAM MCCUTCHEN LLP
DONN P. PICKETT (SBN 72257)
GEOFFREY M. HOWARD (SBN 157468)
HOLLY A. HOUSE (SBN 136045)
ZACHARY J. ALINDER (SBN 209009)
BREE HANN (SBN 215695)
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: 415.393.2000
Facsimile: 415.393.2286
donn.pickett@bingham.com
geoff.howard@bingham.com
holly.house@bingham.com
zachary.alinder@bingham.com
bree.hann@bingham.com

DORIAN DALEY (SBN 129049)
JENNIFER GLOSS (SBN 154227)
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone: 650.506.4846
Facsimile: 650.506.7144
dorian.daley@oracle.com
jennifer.gloss@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International Corporation,
Oracle EMEA Limited, and Siebel Systems, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE USA, INC., *et al.*,<br><br>　　　　Plaintiffs,<br>　　v.<br><br>SAP AG, *et al.*,<br><br>　　　　Defendants. | No. 07-CV-01658 PJH (EDL)<br><br>**REPLY IN SUPPORT OF ORACLE'S MOTION TO MODIFY THE PROTECTIVE ORDER AND TO COMPEL DEPOSITION TESTIMONY AND FURTHER RESPONSES TO REQUESTS FOR ADMISSIONS**<br><br>Date:　　January 26, 2010<br>Time:　　2 p.m.<br>Place:　　Courtroom E, 15th Floor<br>Judge:　　Hon. Elizabeth D. Laporte |

Case No. 07-CV-01658 PJH (EDL)
REPLY MEMORANDUM IN SUPPORT OF ORACLE'S MOTION TO MODIFY THE PROTECTIVE
ORDER AND TO COMPEL

**TABLE OF CONTENTS**

Page

I. THE COURT SHOULD MODIFY THE PROTECTIVE ORDER ................................. 1
   A. 28 U.S.C § 1782 Is Inapplicable ............................................................................ 2
   B. SAP's Remaining Arguments Are Erroneous ........................................................ 3
II. THE COURT SHOULD ORDER MR. TRAINOR'S DEPOSITION ........................... 5
   A. SAP Concedes That More Questioning Is Proper .................................................. 5
   B. Trainor Should Be Required To Testify On The Identified Topics ...................... 5
   C. *In Camera* Review Of Exhibit 1683 And TN-OR00852363 Is Warranted ........... 7
III. THE COURT SHOULD ORDER ANSWERS TO THE RFAS BASED ON ORACLE'S DEFINITIONS ................................................................................................. 8
   A. SAP Contradicts Its Witnesses, Documents, And Pleadings ................................ 8
      1. "Generic Environment" ................................................................................ 8
      2. "Fix" and "Update" ...................................................................................... 9
      3. "Copy" ........................................................................................................ 11
   B. The Court Should Order Further Responses Based On The Record Above ....... 12
   C. SAP Exaggerates Its Burden, Which It Created .................................................. 13
      1. SAP Misses the Point of the Fix Object Creation RFAs .......................... 13
      2. The Fix Object Creation RFAs Are Relevant .......................................... 13
      3. SAP's Refusal to Stipulate Forced the Fix Object Creation RFAs .......... 14
      4. SAP Contradicts Its Own Motion to Compel ........................................... 15
      5. SAP Partially Exaggerates the Burden ...................................................... 15
IV. CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Asea, Inc. v. S. Pac. Transp. Co.*,
    669 F.2d 1242 (9th Cir. 1981) .................................................................................. 14, 15

*Danis v. USN Commc'ns, Inc.*,
    No. 98-7482, 2000 WL 1694325 (N.D. Ill. Oct. 20, 2000) ............................................. 13

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
    331 F.3d 1122 (9th Cir. 2003) ................................................................................. 2, 3, 4

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    255 F.R.D. 308 (D. Conn. 2009) ....................................................................................... 3

*In re Grand Jury Subpoena (Mark Tork/Torrf Envtl. Mgmt)*,
    357 F.3d 900 (9th Cir. 2004) ............................................................................................ 7

*In re Jenoptik AG*,
    109 F.3d 721 (Fed. Cir. 1997) .......................................................................................... 2

*In re Linerboard Antitrust Litig.*,
    333 F. Supp. 2d 333 (E.D. Pa. 2004) ............................................................................... 3

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) .......................................................................................................... 2

*Tardiff v. County of Knox*,
    246 F.R.D. 66 (D. Me. 2007) ............................................................................................ 7

**STATUTES**

28 U.S.C. § 1782(a) ................................................................................................................ 2

With fact discovery complete, expert discovery in full swing, and dispositive motions looming, SAP now offers inapposite law, concedes some of its deposition instructions were improper, and attempts to re-write facts and case history.  In doing so, SAP:

- Ignores controlling Ninth Circuit case law on modifying protective orders in favor of an inapplicable statute about taking new foreign discovery;
- Asserts it does not know the basis for former plaintiff J.D. Edwards Europe Ltd.'s ("JDEE") claims, which SAP already successfully moved to dismiss;
- Concedes counsel's instructions to SAP's in-house counsel not to testify were without basis, but still refuses to provide him again for deposition on those issues;
- Asserts new "definitions" for long-understood TomorrowNow ("SAP TN") business practice concepts, all of which contradict SAP's previous representations, testimony, documents, and positions before the Court and threaten to undo years of discovery; and
- Claims burden to avoid answering basic factual questions, despite having rejected the stipulation alternative urged by the Court.

These issues pervade SAP's Opposition.  The RFA argument raises serious additional issues because SAP contradicts its own witnesses' sworn testimony and its own representations leading to that discovery.  In fact, it was SAP's similar tactic – refusing to acknowledge its witnesses' testimony – that defeated the stipulation process, leading to the fix object creation RFAs.  The consequences for this should be serious, and may need to be addressed in a subsequent proceeding, because SAP's new positions would nullify much of the past two years and millions of dollars' worth of discovery.  Oracle asks the Court to disregard this contradictory evidence and require SAP to answer the RFAs.  This is the minimum first step in holding SAP to the consequences of refusing the easier alternative offered through the stipulation process, while using word games and contradictory testimony to justify evasive answers.

I.  **THE COURT SHOULD MODIFY THE PROTECTIVE ORDER**

Having persuaded the Court to dismiss JDEE on the ground that it should pursue its copyright claims in a non-U.S. court, SAP now tries to prevent that pursuit by insisting that Oracle cannot use existing discovery in its possession in the European litigation.  SAP's arguments against modifying the protective order contradict Ninth Circuit case law, which "strongly favors access to discovery materials to meet the needs of parties engaged in collateral

1   litigation." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1131 (9th Cir. 2003).  Courts

2   apply that strong presumption whether the collateral litigation is U.S. or foreign.

3         **A.**     **28 U.S.C. § 1782 Is Inapplicable**

4         SAP contends that 28 U.S.C. § 1782 "governs exportation of U.S. discovery for use in

5   foreign litigation" and that Oracle does not satisfy it. Opp. at 1.  SAP is wrong.  Section 1782 is

6   a procedure for *conducting* foreign discovery.  It states that "[t]he district court of the district in

7   which a person resides or is found may order him *to give his testimony* or statement or *to*

8   *produce a document* or other thing for use in a proceeding in a foreign or international

9   tribunal . . . ."  28 U.S.C. § 1782(a) (emphasis supplied).  As the Supreme Court has explained,

10  "Section 1782(a) provides that a federal district court 'may order' a person 'resid[ing]' or

11  'found' in the district *to give testimony or produce documents* 'for use in a proceeding in a

12  foreign or international tribunal . . . upon the application of any interested person.'"  *Intel Corp.*

13  *v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004) (emphasis supplied).

14        Section 1782 says nothing about the permitted use of materials already produced in

15  another action, which is the issue here.  Oracle already has discovery it wants to use in the

16  European litigation.  Oracle only seeks modification of the protective order to allow that use.

17  The authority Oracle cited confirms that SAP's reliance on section 1782 is misplaced:  "Case law

18  interpreting the requirements of section 1782 is not relevant to a determination whether a

19  protective order may be modified to permit the release of deposition testimony, already

20  discovered, to another court." *In re Jenoptik AG*, 109 F.3d 721, 723 (Fed. Cir. 1997).  That

21  determination proceeds under Rule 26(c) and the Ninth Circuit's ruling in *Foltz*.

22        SAP relies on the Supreme Court's 2004 decision in *Intel*, which it contends overruled

23  *Jenoptik* and held that section 1782 "governs exportation of U.S. discovery for use in foreign

24  litigation." Opp. at 1, 5.  It does not.  In *Intel*, Advanced Micro Devices, Inc. ("AMD") was

25  engaged in litigation against Intel before the European Commission.  AMD filed a section 1782

26  petition in the U.S. "for an order directing Intel to produce documents" that AMD did not already

27  have, but which had been produced by Intel in an Alabama lawsuit brought by a different

28  company. *Intel*, 542 U.S. at 251.  The Court's opinion, like section 1782 itself, concerns the

production of new evidence through discovery procedures. The holding does not address a litigant's ability to use discovery materials it already has for purposes of foreign litigation on the same issue.

After *Intel*, courts continue to modify protective orders to allow a party to use relevant discovery in its possession in foreign litigation, without regard for section 1782. For instance, in *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 255 F.R.D. 308 (D. Conn. 2009), the court allowed a plaintiff in a Canadian class action to intervene in a U.S. action to obtain a modification of the protective order to allow discovery materials that were already produced in the U.S. action to be used in the Canadian lawsuit. *See id.* at 325. That case – decided five years after *Intel* – observed that "[c]ourts have not distinguished between U.S. and foreign jurisdictions when considering motions to intervene for the limited purpose of modifying a protective order." *Id.* at 316 (citing cases). Another post-*Intel* case specifically rejects SAP's argument that section 1782 must be satisfied before domestically produced discovery materials maybe used abroad. *See In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 333, 340-43 (E.D. Pa. 2004) (citing *Intel* and holding compliance with section 1782 not required to justify modification of protective order in U.S. action to allow use of the materials produced in the U.S. action in Canadian action). Here, as in *Linerboard*, the Court should grant Oracle's requested modification of the protective order to "[a]llow[] the fruits of one litigation to facilitate preparation in other cases," which "advances the interests of judicial economy by avoiding the wasteful duplication of discovery." *Foltz*, 331 F.3d at 1131.

**B.     SAP's Remaining Arguments Are Erroneous**

*That the European action has not been filed does not make suit unlikely.* Citing case law applicable to section 1782, SAP argues that there are "no reliable indications" that Oracle will sue in Europe and that Oracle's European litigation is too "nebulous" for the Court to rule. Opp. at 2, 4. The idea that SAP does not know what it will be sued for in Europe – or that there are "no reliable indications" that JDEE will sue it (again) – is disingenuous. JDEE has already filed a copyright claim in this case against SAP. Third Amended Complaint, D.I. 182, ¶¶ 147-62. SAP was the one who argued that JDEE's claims had to be brought elsewhere. To be sure,

Oracle has not yet filed the European action and has not made a decision on venue within Europe, in part because the protective order currently forbids Oracle from sharing discovery materials with European counsel to advise on those decisions.

*Confidentiality protection is not an issue.* SAP asserts that "one thing is certain: once the documents leave the country, they will be beyond this Court's reach to enforce the terms of the protective order." Opp. at 4. That is not true. Oracle (and SAP) will be bound by the modified protective order just like they are bound by the existing protective order: "the same restrictions on use and disclosure contained in the original protective order" are sufficient to protect "[a]ny legitimate interest . . . in continued secrecy" of the discovery materials. *Foltz*, 331 F.3d at 1133 (internal citation omitted).

*Specifics of foreign court rules are irrelevant.* SAP also cites the second and third *Intel* factors that apply to section 1782 requests – "whether the foreign forum would be receptive to the discovery sought" and whether the request "would circumvent foreign proof-gathering restrictions." Opp. at 3-4. SAP says it is not possible to evaluate those factors without knowing in which European venue JDEE will sue. Putting aside that the section 1782 factors do not apply, SAP also misunderstands this Court's role in ruling on the present motion. "[T]he *only* issue" this Court "determines is whether the protective order will bar the collateral litigants from gaining access to the discovery already conducted." *Foltz*, 331 F.3d at 1132-33 (emphasis supplied). "The disputes over the ultimate discoverability of specific materials covered by the protective order must be resolved *by the collateral courts*," and the district court "*must* refrain from embroiling itself in the specific discovery disputes applicable only to the collateral courts." *Id*. at 1133 (emphasis supplied).

*Additional protections are unjustified.* Finally, SAP argues that if the Court does grant Oracle's Motion, it should also require Oracle to give SAP advance notice before any documents are used for the proposed foreign litigation. Opp. at 4 n.1. SAP cites no authority for such a requirement (including whether it would violate or contradict rules in various European venues) and it is not appropriate. Oracle's immediate use would be to provide discovery materials to European counsel so they can give legal advice about commencing the European lawsuit. The

4                                                                                              Case No. 07-CV-01658 PJH (EDL)

1 requested notice would invade the attorney-client and work product privileges.

2 **II.    THE COURT SHOULD ORDER MR. TRAINOR'S DEPOSITION**

3     **A.    SAP Concedes That More Questioning Is Proper**

4 SAP's Opposition and Scott Trainor's accompanying declaration contain a series of
5 concessions that additional questioning is warranted.  First, SAP previously stated it would allow
6 Trainor to be deposed again about Exhibit 1683 (which SAP clawed back during Trainor's
7 deposition, blocking all questioning about that exhibit) only if Oracle waived all of its other
8 concerns about Trainor's deposition.  Declaration of Chad Russell in Support of Oracle's Motion
9 to Compel ("Russell Decl."), D.I. 571, ¶ 10 & Ex. G.  SAP now retracts that condition, offering
10 "to present Mr. Trainor again to testify about Exhibit 1683."  Opp. at 9 n.7, 17 n.13.  Second,
11 Trainor now confirms he can answer, without violating attorney-client privilege or work product,
12 Oracle's questions about what he meant when he told a prospective customer that it was to the
13 customer's "advantage" to give SAP TN access to PeopleSoft software.  Declaration of Scott
14 Trainor in Support of Defendants' Opposition ("Trainor Decl."), D.I. 601, ¶ 3; Mo. at 14.  Third,
15 Trainor admits that he could have answered at least some of these questions about SAP TN's
16 misrepresentations to customers without disclosing privileged information.  Mo. at 14-15;
17 Trainor Decl., ¶ 4.  Fourth, SAP now contends that Oracle's questions about what steps Trainor
18 took to avoid relying on his memory of PeopleSoft licenses when negotiating SAP TN licenses
19 were cumulative, while abandoning its claim that Oracle's questions violated work product.
20 *Compare* Mo. at 12 *with* Opp. at 6-8.  SAP is mistaken in its cumulativeness argument, and its
21 work product argument no longer applies.  Accordingly, Trainor should appear for additional
22 deposition time to address the topics listed above.  Below, Oracle addresses the remaining areas
23 of Trainor's testimony that the Court should compel.

24     **B.    Trainor Should Be Required To Testify On The Identified Topics**

25 *Steps to avoid using knowledge gained as PeopleSoft's attorney.*  SAP instructed Trainor
26 not to answer Oracle's question about the steps he took to avoid relying on his memory of the
27 PeopleSoft licenses in negotiating licenses with SAP TN customers.  Mo. at 12.  SAP's argument
28 that Trainor effectively answered this question elsewhere in his deposition is incorrect.  In the

testimony SAP quotes, Trainor stated that to the best of his recollection he did not disclose to anyone at SAP TN or SAP information that he learned at PeopleSoft. Opp. at 7. But Oracle asked what *steps* he took, and that is the question SAP blocked him from answering. Oracle is entitled to know what Trainor did to protect PeopleSoft's privileged information.

*Communications with prospective customers.* Oracle asked Trainor about a draft contract he sent to a prospective customer that appeared to show him telling the customer that it was to its advantage to give SAP TN access to PeopleSoft software. Mo. at 13-14. Oracle asked him to admit that he was indeed saying this. SAP now acknowledges that Trainor's contemporaneous understanding of his non-privileged communication with a customer is not privileged. Opp. at 12; Trainor Decl., ¶ 3. But Trainor's current understanding of what he told a customer also is not privileged. Oracle was not asking him for a legal analysis of his non-privileged words.[1]

*Misrepresentations to customers.* Oracle asked Trainor both a narrow question and a broad one. The narrow was whether SAP TN's representation to customers that "Our rights to use the PeopleSoft software come entirely by way of the Waste Management license with PeopleSoft" was true. The broader one was: "To your knowledge, did SAP or TomorrowNow ever misrepresent facts to customers during negotiation of terms?" Mo. at 14-15. Neither question calls for legal analysis. Nobody thinks that asking a non-lawyer if he told a lie "is an example of a question seeking . . . legal analysis." Opp. at 13. Neither is the same question put to a lawyer.

*Indemnification policy.* Oracle asked Trainor about a PowerPoint he and others presented to SAP TN salespeople that stated that the indemnification policy was a "Key term – no removing this." Mo. at 15. SAP concedes the presentation was "non-privileged." Opp. at 14. But when Oracle asked if what was written in the PowerPoint was in fact SAP TN's business

---

[1] Trainor dodged the question before being instructed not to testify. Oracle asked him: "Do you deny that you were telling Waste Management that it was to their advantage to provide access to software?" Trainor answered, in part: "I don't believe it coincides with what you just concluded." Mo. at 14. Accordingly, SAP's assertion that "the note largely speaks for itself," Opp. at 12, is disingenuous because Trainor himself was arguing about what he had told Waste Management.

1   practice – "Was that true, that this was a key term for SAP, and it would not negotiate this term
2   away?" – SAP claimed privilege. That makes no sense. Oracle was not asking Trainor "to
3   provide legal analysis and advice." Opp. at 14. It was a yes or no question, and neither answer
4   would reveal the content of a privileged communication.

5   *Compliance with ethical obligations.* Oracle's questions to Trainor regarding his ethical
6   obligations do not ask for the content of any attorney-client communications nor any work
7   product developed in anticipation of litigation. Mo. at 16-17. *Tardiff v. County of Knox*, 246
8   F.R.D. 66 (D. Me. 2007), supports Oracle, not SAP. In *Tardiff*, an attorney was deposed
9   concerning whether his simultaneous representation of different clients in the same lawsuit had
10  complied with his ethical obligations. *Id*. at 66, 76. The Court overruled the work product
11  objection as to the attorney's understanding of the ethical rules and also as to hypothetical
12  questions asking if he would have perceived an ethical violation under certain assumed facts, *id*.
13  at 75-76, which is what Oracle asked here. The Court sustained the work product objection only
14  when the attorney was asked if a specific letter that had been sent by one of his clients caused
15  him to believe, *as a litigation analysis*, that a conflict of interest had arisen in the litigation. *Id*.
16  at 76-77. Here, SAP identifies no litigation Trainor anticipated when he formed an opinion
17  concerning whether he could ethically share PeopleSoft information with his new employer. *See*
18  *In re Grand Jury Subpoena (Mark Tork/Torrf Envtl. Mgmt)*, 357 F.3d 900, 907 (9th Cir. 2004)
19  (to qualify for work product, information must be prepared in anticipation of litigation).

20  *Willfulness of copyright infringement.* Oracle is entitled to know whether SAP
21  communicated to customers – for example, during a contract negotiation –any steps it took to
22  determine if its conduct constituted copyright infringement, and whether a customer could
23  provide access to Oracle's software. Mo. at 18. If the answer is that SAP did not take any such
24  steps, or did not communicate them to a third party, there is nothing privileged to protect.
25  Contrary to SAP's argument, Opp. at 16, these are foundational questions, and SAP improperly
26  blocked this line of questioning instead of asserting privilege on a question-by-question basis.

27  **C.   *In Camera* Review Of Exhibit 1683 And TN-OR00852363 Is Warranted**
28  *In camera* review of both of these documents is warranted because the non-redacted

1 portions suggest that the redacted portions contain business advice, not legal advice. Mo. at 9
2 n.3, 11 n.5. SAP does not oppose Oracle's request. Opp. at 16.

### III. THE COURT SHOULD ORDER ANSWERS TO THE RFAS BASED ON ORACLE'S DEFINITIONS

SAP's arguments against Oracle's RFAs' definitions contradict SAP's own documents and witnesses, including Catherine Hyde herself, on whom SAP relies as its main declarant. SAP employed this same tactic to torpedo the fact stipulation the Parties spent a year negotiating with the Court's help, which made these RFAs necessary in the first place. Now, the contradictions take the form of sworn testimony. If SAP stands by its Opposition's positions, there cannot help but be serious consequences: SAP will have contradicted most of its technical evidence to date, including its corporate testimony, documents, SAS database, and discovery responses relying on those sources. As to the burden of answering fix object creation RFAs, SAP had many chances to lessen it, but refused to accept those alternatives.

#### A. SAP Contradicts Its Witnesses, Documents, And Pleadings

Not liking Oracle's definitions of "generic environment," "copy," "fix," and "update,"[2] SAP offers new, unsupported definitions in order to avoid straight answers. *See* Opp. at 18-24.

##### 1. "Generic Environment"

SAP defends its RFA answers by saying the term "generic environment" was not in widespread use at SAP TN. For proof, SAP submits that the term appears in "a relative handful" of SAP TN documents. Opp. at 23-24. In reality, SAP concedes the term appears in 45 contemporaneous SAP TN documents, including high level status reports and emails from 2004-2006. Howard Decl., ¶¶ 2-5, Exs. A-D. SAP TN personnel on these emails, none of whom asked for clarification of the term, include the top-level relevant executives and developers at SAP TN: Shelley Nelson, Vice President of Support Services, John Baugh, Environments Team Manager, and Catherine Hyde, Head Developer.

---

[2] The RFAs relating to the terms "generic environment," "fix," "update," and "copy" are included in Oracle's Second Set, Nos. 496-680, and its Third Set, Nos. 13-50. *See* Mo. at 19.

1      Ms. Hyde now swears that she did not recall SAP TN employees "commonly, if at all,
2  using the phrase 'generic environment.'" Hyde Decl., ¶ 8.  But among those 45 documents just
3  described is Ms. Hyde's own August 10, 2006 email, stating "I created a new folder for GKN -
4  890 and put their bundle in it.  I don't have a *generic environment* for 8.9 . . . ."  Howard Decl.,
5  ¶ 4, Ex. C (emphasis supplied).  That email is consistent with Ms. Hyde's prior testimony on the
6  subject in which – inconsistent with her declaration now – Ms. Hyde had no trouble
7  understanding and adopting the term:  "I don't know if [those examples] were generic
8  environments or if they were for a particular client."  *See, e.g., id.*, ¶ 6, Ex. E at 34:15-21.  Many
9  other witnesses testified similarly, and for a simple reason:  they knew that the term, which they
10 *did* use at SAP TN, accurately describes how the business operated.  *See, e.g., id.*, ¶ 7, Ex. F at
11 170:23-171:5 ("This indicates that at least these two environments which are generic would have
12 been used for fix[] development . . . ."), 185:6-10 ("[This reflects s]creen shots from a generic
13 environment apparently.").  Finally, as Oracle noted in its Motion, SAP itself, in its Answer to
14 the Fourth Amended Complaint, stated that SAP TN internally described certain environments as
15 generic.  Mo. at 26-27.  SAP has no legitimate reason for rejecting this term now, after its
16 witnesses and documents have used and endorsed it and after years of its inclusion in the case.

17             **2.    "Fix" and "Update"**
18     Next, SAP ignores its own methodology of reviewing the frequency of a term's
19 appearance in SAP's own document production to determine its legitimacy.  Opp. at 21-23.
20     The word "fix" appears 615,671 times in SAP TN's contemporaneous documents.  The
21 phrase "fix container" – which SAP now suggests Oracle should have used in its RFAs – appears
22 *nowhere* in the same two million documents.  Worse, not a single SAP TN witness has used this
23 invented term "fix container" at deposition, or corrected definitions to "fixes" as incorrect.
24 Instead, they have repeatedly referred to and understood "fix" as meaning the actual functionality
25 that resolves an issue, not simply as "a container [] of one or more objects grouped together."
26 Opp. at 21-23; Declaration of Joshua L. Fuchs in Support of Defendants' Opposition ("Fuchs
27 Decl."), D.I. 604, ¶¶ 19, 21-24, 26-29 (repeatedly using the term "fix container").  Ms. Hyde
28 repeatedly testified about and understood that a fix meant the solution itself:

1  Q.  And is that reflective of – of the general practice, that for – for as large a group of clients as possible, a fix would be developed one time and then delivered to that group of clients?
2
3  A.  This – a group of clients could receive the same fix, if it was identical.  Howard Decl., ¶ 6, Ex. E at 124:10-17.
4
*******
5
Q.  When I – when I – again, when I say "fix," I'm referring to the objects that – that comprise the functionality that's being delivered to the client.  Does that makes sense?
6
7  A.  Yes.  *Id.* at 25:22-26:1.

8  *******

9  Q.  When would D702DATM be used for a critical support update?

10  A.  After we've created individual fixes, we could load them in there and then export them all out as one big group.  *Id*., ¶ 8, Ex. G at 75:22-76:1 (objections omitted).
11
Ms. Hyde's claim in her Declaration now that a fix was no more than a "container that contained
12
one or more objects" contradicts her repeated testimony to the contrary – testimony on behalf of
13
SAP TN that Oracle has relied on throughout the case.  Hyde Decl., ¶5.  Other witnesses have
14
testified similarly.  For example, Katherine Williams, SAP TN's former Director of PeopleSoft
15
Support Services, testified as SAP TN's Rule 30(b)(6) witness at length about the development,
16
testing, and delivery of solutions at the individual fix level, not the object level:
17
Q.  Would an individual fix be sent to more than one client outside of this six times a year scheduled delivery process?
18

19  A.  In some cases.

20  A.  In some cases, yes.

21  Q.  How would you – how would you identify individual fixes that were sent out separate from the six times a year delivery process?
22
A.  I would look in SAS. Howard Decl., ¶ 10, Ex. I at 113:23-114:7 (objections omitted).
23
*******
24
Q.  So as – is it – is it correct that this process that we've now been through for developing the individual fix would be done for each individual fix that would be included within a particular bundle?
25
26
A.  Are you asking me was each individual fix individually tested?
27
Q.  Well, I'm just talking about the general process of the unit testing and the quality assurance testing to arrive at a working individual fix.
28

10  Case No. 07-CV-01658 PJH (EDL)

REPLY MEMORANDUM IN SUPPORT OF ORACLE'S MOTION TO MODIFY THE PROTECTIVE ORDER AND TO COMPEL

Q. Does that process occur for each fix within a bundle?

A. Typically. *Id.*, ¶ 10, Ex. I at 142:21-143:9 (objections omitted).

Further, SAP's new positions that "fix" really means "fix container" and that functionality analysis is impossible at the fix level contradict one of its earliest representations to the Court – that SAP TN's SAS database contained all the answers to Oracle's questions about how SAP TN supported its customers. *See* Howard Decl., ¶ 13; Ex. L at 16:1-9 (SAP's counsel describing SAS as "a rich source of information" for Oracle to meet its burden of proof); ¶ 14, Ex. M at 48:9-10 (SAP's counsel stating "[t]he activity around fixing a customer's problem is reflected" in SAS). SAP then compounded that representation by repeatedly relying on SAS, through Rule 33(d), in answering interrogatories about how SAP TN developed its support products. *See, e.g.*, Fuchs Decl., Ex. C. SAS contains development and testing records for fixes and master fixes, and records for individual objects only as part of an overall fix. Were SAP's new construction of "fix" accurate, its reliance on SAS, which it now claims includes merely "records" of "containers," and its representation that Oracle could find all the answers there, would necessarily be wrong and the Parties would have wasted two-plus years of discovery.[3]

### 3. "Copy"

SAP has agreed that it is able to answer RFAs based on the plain meaning of "copy" (which Oracle believes its original definition provides). *See* Mo. at 22; Opp. at 21; Russell Decl., ¶ 13. The only remaining issue is SAP's unwillingness to amend its substantive responses

---

[3] For example, Ms. Hyde claims now that "in order to know what was done to create the items inside the fix container, one would have to analyze the development and testing history of each object inside the given fix. One would not be able to tell anything about the development history by analyzing the container (i.e., fix) itself." Hyde Decl. ¶ 7. But Ms. Hyde, as both an individual and as SAP TN's Rule 30(b)(6) witness, spent hours at deposition doing precisely what she now claims cannot be done – answering questions about how fixes were developed and tested – using the SAS records of that fix. *See, e.g.,* Howard Decl., ¶ 8, Ex. G at 37:19-48:6, 209:5-243:20; *id.*, ¶ 6, Ex. E at 247:6-256:25. In addition, Shelley Nelson, as SAP TN's Rule 30(b)(6) witness, testified that SAS contained the "repository for tracking what we're developing, the status of that development, what has been delivered to customers . . . it basically is our means of documenting the work that's done." *Id.*, ¶ 9, Ex. H at 145:15-146:1.

1  to reflect this reality. A "constructive removal" of the objection is insufficient, because – as
2  SAP's counsel admitted – the jury typically sees not objections but only substantive RFA
3  responses, which here avoid answering the question asked. Opp. at 21; *see also* Mo. at 22;
4  Russell Dec., ¶ 13. A withdrawn objection, known only to the Parties is no solution: the jury is
5  entitled to receive SAP's substantive admissions to the questions Oracle asked. Given that SAP
6  concedes it does understand the plain meaning of copy, any burden of revising the inadequate
7  539 responses is of its own making.

### B. The Court Should Order Further Responses Based On The Record Above

The Court has held Oracle to account for what it viewed as errors and omissions, and the failure to timely correct them, in Oracle's discovery responses and pleadings. Indeed, the Court held that prejudice was sufficiently severe as of May 2009 to rule a substantial amount of evidence out of the case. The record here is worse. Since the Rule 26(f) conference, through its discovery responses, testimony, and documents, SAP has taken positions inconsistent with those in the declarations it has submitted. It has taken Oracle's and the Court's time for over a year trying to reach a factual stipulation based on similar contradictions, and it now refuses to admit questions it cannot, under any interpretation, reasonably deny. The answers are, simply, evasive. SAP understands Oracle's terms, both because SAP TN used them and SAP carefully wrote its responses to circumvent them. The responses do not answer the questions asked. SAP may argue to the jury that SAP TN used generic environments for a limited set of customers if it wishes. That is irrelevant to the questions posed by the RFAs, and cannot form a basis for evading them. Similarly, if Oracle had wanted to ask about the development of objects, it could have (and for some RFAs, it did; *see* pp. 13-15, below). Instead, it asked SAP to admit the extent to which SAP TN developed *fixes* for multiple customers by using media that had been licensed for only one customer. Oracle relied on the Rule 30(b)(6) testimony to formulate this question and SAP should be held to that testimony in its responses.[4]

---

[4] Oracle reserves the right to pursue additional, appropriate relief related to these statements, including potentially a motion seeking preclusion, an adverse inference, or other sanction.

**C. SAP Exaggerates Its Burden, Which It Created**

**1. SAP Misses the Point of the Fix Object Creation RFAs**

SAP's burden argument involves the RFAs relating to fix object creation and blurs the distinction between Oracle's initial and follow-up RFAs.[5] Oracle first asked SAP to admit that portions of specific fixes, identified according to specific SAP TN customers, were in fact developed or tested using generic environments. Mo. at 27-28. SAP denied these RFAs, stating it lacked "sufficient information to respond to these requests as the information sought was not tracked, recorded, or maintained by TomorrowNow in a 'readily obtainable manner.'" *Id.* at 28. Oracle then served follow-up RFAs to confirm this fact, and asked SAP to admit that it does "not have reasonable access to any readily obtainable information" that would show the fix objects were *not* created in the way that Oracle believes. *Id.* at 28-29.

So long as its answers to the initial fix object creation RFAs are true, SAP can answer these subsequent RFAs without the work it complains about. The question is limited to whether readily obtainable information indicating a particular thing – that a copy of the fix object was not created using a local environment – exists. Either it does or it does not. SAP's responses evade that question, and instead contradict the earlier RFA response by stating that SAP has "records and other information" relating to the fix objects. *Id.* at 29.

**2. The Fix Object Creation RFAs Are Relevant**

SAP does not claim the fix object creation RFAs seek irrelevant information. SAP's burden argument, at essence, claims the RFAs are unfair because SAP infringed Oracle's rights *so often*, and because there is *so much* evidence of that misconduct. Opp. at 27-30. The volume of SAP's documents should not preclude straight answers. *See, e.g.*, *Danis v. USN Commc'ns, Inc.*, No. 98-7482, 2000 WL 1694325, at *49 (N.D. Ill. Oct. 20, 2000) (party "must be held responsible for knowing what documents are discoverable and where to find them" even if volume of records is vast).

---

[5] RFAs, Set No. 3, Nos. 13-50, Set No. 5, 4-63, 130-62. *See* Mo. at 27-30 for a full description of these RFAs, which generally seek information about the development of specific fix objects.

13      Case No. 07-CV-01658 PJH (EDL)

REPLY MEMORANDUM IN SUPPORT OF ORACLE'S MOTION TO MODIFY THE PROTECTIVE ORDER AND TO COMPEL

**3.     SAP's Refusal to Stipulate Forced the Fix Object Creation RFAs**

As SAP concedes, Opp. at 19, Oracle has tried, for eighteen months, to efficiently obtain this critical information about how SAP TN generated its complicated fixes it sent to its customers. Given the enormous scope of misconduct, Oracle preferred to stipulate to facts regarding how SAP TN supported its customers. The Court agreed with the logic of this approach. *See* 7/1/2008 Disc. Conf. Tr., D.I. 105, at 42:14-49:22. The Parties negotiated for several months, but SAP rejected each of Oracle's proposals. *See* 10/3/2008 Joint Disc. Conf. Stmt, D.I. 178, at 7:17-24; 1/5/2009 Joint Disc. Conf. Stmt, D.I. 226, at 3:4-4:15; 2/9/2009 Joint Disc. Conf. Stmt, D.I. 265, at 6:1-7:17. Throughout this long negotiation, the Court cautioned SAP that a stipulation would be more efficient and less burdensome than other discovery devices: "that is to say the alternative is to spend a huge amount more money and time on unearthing every fact." Howard Decl., ¶ 11, Ex. J at 34:18-22. The Court recognized that RFAs were an alternative, including requests offering variations in language. *Id.* at 34:2-6, 41:21-43:15.

After SAP's refusals to cooperate doomed the negotiations, Oracle resorted to the Court's alternative approach of using RFAs to confirm the details of SAP TN's business practices. Oracle provided variations in language as the Court had suggested. The Court commented that "without knowing what any of the nuances are[,] RFAs seem to me [an] appropriate vehicle . . . it seems like [] having to put them in one of four buckets – you know, all the time, most of the time, some of the time, never, or something along those lines – made a lot of sense." Howard Decl., ¶ 12, Ex. K at 4:6-14. The Court observed that while "absolute mathematical perfection" was improbable, "push has got to come to shove at some point . . . it can't be finessed forever or fudged forever, you know." *Id.* at 4:15-20, 5:8-11.

Push has come to shove. The stipulation and RFAs were alternatives, each with benefits and drawbacks for both Parties. When SAP rejected the stipulation, it chose the RFAs – which, as the Court recognized, require a "huge amount more money and time." Howard Decl., ¶ 11, Ex. J at 34:21. Without either, it will require exponentially more time at trial to put in evidence of the various fixes. Rule 36 exists to cure that problem. *See Asea, Inc. v. S. Pac. Transp. Co.*,

14     Case No. 07-CV-01658 PJH (EDL)

669 F.2d 1242, 1245 (9th Cir. 1981).[6]

### 4. SAP Contradicts Its Own Motion to Compel

In complaining about burden, SAP contends that it has produced or made available all the data necessary to answer the fix object creation RFAs, so that the "information [] is equally accessible to both parties" and, therefore, it need not respond. Opp. at 27. Based on this position, SAP is estopped from pursuing its own, simultaneous motion to compel related to "mapping," for which it must concede it has all the same underlying data as did Oracle. However, setting aside SAP's contradictory positions, Oracle cannot answer the RFAs as easily as can SAP. The fix objects at issue in the RFAs were created or modified by former SAP TN personnel, including six paid litigation consultants, to whom SAP has access but Oracle does not.

### 5. SAP Partially Exaggerates the Burden

SAP recounts the time spent on answering Interrogatories 11 and 14 to illustrate the effort it contends necessary to answer the fix object creation RFAs. Opp. at 27-29. In doing so, SAP admits that it has *already completed* at least some of the work necessary to answer the RFAs, because as part of answering Interrogatory 14, it must have analyzed the creation, development, and testing of the 1,772 fix objects it states were associated with the ten selected master fix records. Opp. at 28. Since that analysis is complete, answering the RFAs as to that subset of specific fix objects should take little additional time or effort, and SAP cannot rely on a one-size-fits-all burden argument to avoid it. Further, all fix objects were not created equal at SAP TN. There is no dispute, for example, that fix objects created using SAP TN's "retrofit" support model were developed and tested in generic environments, which is what the RFAs ask SAP to admit. *See, e.g.*, Howard Decl., ¶ 8, Ex. G at 44:25-61:14, 175:2-189:2.

## IV. CONCLUSION

For the above reasons, Oracle's Motion to Compel should be granted.

---

[6] SAP compares these RFAs to Interrogatory 14, which the Court ordered SAP to answer as to a subset of environments. Opp. at 27-28. But that Interrogatory was not part of the choice between using a stipulation or RFAs to explain SAP TN's business model. These RFAs address the same facts as the proposed stipulation, which Interrogatory 14 did not.

DATED:  January 12, 2010          BINGHAM McCUTCHEN LLP


                                  By:        /s/ Geoffrey M. Howard
                                           Geoffrey M. Howard
                                   Attorneys for Plaintiffs Oracle USA, Inc.,
                                  Oracle International Corporation, Oracle EMEA
                                       Limited, and Siebel Systems, Inc.