Oracle Corporation et al v. SAP AG et al

Doc. 614 Att. 4

Dockets.Justia.com

# EXHIBIT E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ORACLE CORPORATION, a Delaware )
corporation, ORACLE USA, INC., a )
Colorado corporation, and ORACLE )
INTERNATIONAL CORPORATION, )
a California corporation, )
    Plaintiffs, )
     )
vs. ) CASE NO. 07-CV-01658 (MJJ)
     )
SAP AG, a German corporation, )
SAP AMERICA, INC., a Delaware )
corporation, TOMORROWNOW, INC., a )
Texas corporation, and DOES 1-50, )
inclusive, )
    Defendants. )

"HIGHLY CONFIDENTIAL"

ORAL VIDEOTAPED DEPOSITION

CATHERINE HYDE

FEBRUARY 12, 2009

    ORAL VIDEOTAPED DEPOSITION OF CATHERINE HYDE, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 12th day of February, 2009, from 8:37 a.m. to 5:26 p.m., before Dana Richardson, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Jones Day, 717 Texas Avenue, Suite 3300, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

    Job No. 1603-90347

CATHERINE HYDE     February 12, 2009
HIGHLY CONFIDENTIAL

Page 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22     Q.   (By Mr. Howard)   When I -- when I -- again, when I
23   say "fix," I'm referring to the objects that -- that comprise
24   the functionality that's being delivered to the client.   Does
25   that makes sense?

1    A.    Yes.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15    Q.    And are those examples of the generic development
16    environments that were used to develop the initial fixes that
17    would be sent out as part of an HR payroll bundle of critical
18    support?
19              MS. LEE:  Objection, form.
20    A.    I don't know if they were generic environments or if
21    they were for a particular client.
22
23
24
25

10    Q.   And is that reflective of -- of the general practice,
11  that for -- for as large a group of clients as possible, a fix
12  would be developed one time and then delivered to that group
13  of clients?
14          MS. LEE:  Objection, vague and ambiguous, lack
15  of foundation.
16    A.   This -- a group of clients could receive the same
17  fix, if it was identical.

CATHERINE HYDE    February 12, 2009
HIGHLY CONFIDENTIAL

Page 247

      MR. HOWARD: Mark as Exhibit 930 the master fix printout from SAS for the 8.83 fix.

      (Exh. 930 marked)

Q. (By Mr. Howard) Now, you -- you were involved in developing the 8.83 fix as indicated by the Exhibit 930?

A. I don't think so.

Q. Well, specifically I'm looking at the Bates page -- no, it's not Bates numbered -- well, four -- five pages in, there's a note from you, "With regard to release 7.5, there are 2 different projects. CCW, COA," POH [sic], "TEL will receive the project which updates the record structure..."

      Do you see that?

A. Yes.

Q. Those are your notes in red?

A. Those are my notes.

Q. All right. Now, did some clients receive a TAX960LC.SQR file as part of this fix as opposed to a TAX960LT.SQR file?

      MS. LEE: Objection, vague and ambiguous.

A. I'd have to look through here and figure out what

1   this is.  This is what I would call a kludge.
2       Q.   (By Mr. Howard)  Thank you for that helpful
3   explanation.
4            Do you -- do you recognize TAX960LC.SQR as a
5   PeopleSoft file?
6       A.   Yes.
7       Q.   And do you know why the file referred to here in
8   Exhibit 930 and also in the e-mail that's Exhibit 929 is
9   referred to as TAX960LT.SQR?
10      A.   The "T" would be for TomorrowNow?
11      Q.   All right.  So, does that indicate a modification by
12  TomorrowNow of the TAX960LC.SQR?
13      A.   No.
14      Q.   What does it mean?
15      A.   It's supposed to be a new program.
16      Q.   Well, does the e-mail that you received from
17  Ms. Shiels as Exhibit 929 indicate that it wasn't a new
18  program, that TAX960LT.SQR was derived from the PeopleSoft
19  960LC.SQR file?
20           MS. LEE:  Objection, vague and ambiguous.
21      A.   No.
22      Q.   (By Mr. Howard)  How do you suppose the PeopleSoft
23  confidentiality copyright notice appeared in the TomorrowNow
24  file?
25      A.   I didn't write it.  I don't know.

CATHERINE HYDE    February 12, 2009
HIGHLY CONFIDENTIAL

Page 249

1   Q.  Would it surprise you if the TAX960LT.SQR was
2   substantially similar to the TAX960LC.SQR?
3   A.  Probably.
4   Q.  It would surprise you?
5       MR. HOWARD:  Let's mark as Exhibit 931 a master
6   fix view of an 8.83 fix.
7       (Exh. 931 marked)
8   Q.  (By Mr. Howard)  Does this Exhibit 931 appear to be a
9   printout of the master fix view of the 314061883 fix?
10  A.  What number did you say?
11  Q.  0314061883 fix ID.
12  A.  Where do you see that?
13  Q.  On the "Fix ID" line.
14  A.  Oh, okay.  Sorry.
15  Q.  Yes?
16  A.  Yes.
17  Q.  Now, turning to one, two, three, four, five pages in,
18  numbered 898, there's a heading titled "Fix Deliverables."
19      Do you see that?
20  A.  Yes.
21  Q.  And it says the fix for Pepsi consists of a UPD file
22  and a TAX960LC.SQR file?
23  A.  Yes.
24  Q.  And it says for the rest of the clients for 8.8 SP1,
25  there's the SQR in the -- this 962 fix and that's the

CATHERINE HYDE     February 12, 2009
HIGHLY CONFIDENTIAL

Page 250

1   TAX960LC.SQR.
2              Do you see that?
3       A.   Yes.
4       Q.   And then on the next page, at the top, it says for
5   8.3 SP1, for two clients, it -- there -- the -- the file is
6   TAX960LT.SQR?
7       A.   Yes.
8       Q.   And does that indicate that some clients are
9   receiving the PeopleSoft file, the LC file; and some clients
10  are receiving the TomorrowNow file, the LT file?
11      A.   Yes.
12      Q.   Why would that be true?
13      A.   It's the version they had.
14      Q.   But that file, if I read this correctly, is being
15  sourced from a TomorrowNow CSS-TN fix, right?
16             MS. LEE:  Objection, vague and ambiguous.
17      A.   Yes.
18      Q.   (By Mr. Howard)  So, for some clients, you would go
19  get a PeopleSoft file out of a different TomorrowNow critical
20  support fix and provide it as part of a different fix?
21             MS. LEE:  Objection, vague and ambiguous.
22      A.   I don't understand.
23      Q.   (By Mr. Howard)  Well, if I'm reading it right, at
24  the bottom of this page, under "Fixed Deliverables," it says
25  for 8.8 SP1, there's an SQR in the CSS-TN fix ending 962. And

1   that's TAX960LC.SQR.

2           Do you see that?

3   A.  Right.

4   Q.  And then that's what's being provided to the clients,
5   right?

6   A.  For that release.

7   Q.  Right.

8   A.  Yes.

9   Q.  And -- and that's -- so -- so for -- so, as part of
10  the 8.83 fix, which is what we're looking at here, the
11  developer would go to the 9.62 fix, pull out the PeopleSoft
12  TAX960LC.SQR file and provide it to those 8.8 SP1 clients?

13          MS. LEE:  Objection, vague and ambiguous.

14  A.  That's not what this is saying.

15  Q.  (By Mr. Howard)  What is it saying?

16  A.  It's saying this is the program that's going to be
17  modified for these clients.

18  Q.  Then -- then why is it that in the next group, the
19  8.3 SP1 clients, the file is 960LT.SQR?

20  A.  That's the file that those clients have that they're
21  going to add that functionality or modify that functionality.

22  Q.  So, in some cases, you are modifying a prior
23  TomorrowNow modification of the TAX960LC.SQR, right?

24  A.  Yes.

25  Q.  And in some cases, you are modifying the original

1   PeopleSoft TAX960LC.SQR?

2              MS. LEE: Objection, vague and ambiguous.

3       A.   Say that again.

4       Q.   (By Mr. Howard) Yeah. In -- in -- in -- in the

5   cases where you're not using the existing LT file, you're

6   taking the PeopleSoft-delivered LC file for modification?

7              MS. LEE: Objection, vague and ambiguous.

8       A.   Yes.

9       Q.   (By Mr. Howard) And ultimately, whether you're

10  modifying the 960LC file or modifying the previously modified

11  960LT file, you're delivering the same functionality in the

12  form of the modified file?

13      A.   Correct.

14      Q.   When -- in the critical support model, when fixes

15  were individually tested, did that testing result in output

16  files?

17             MS. LEE: Objection, vague and ambiguous.

18      A.   It could.

19      Q.   (By Mr. Howard) Would those output files take the

20  form of reports intended for regulatory agency?

21      A.   It could.

22      Q.   Did it?

23      A.   It could.

24      Q.   Well, the fact that it could hypothetically isn't as

25  helpful. We need to know whether it did or not.

1    Do you know whether individual fix testing
2 resulted in output files in the course of TomorrowNow testing
3 of critical support fixes?
4    MS. LEE: Objection, vague and ambiguous.
5    A.  Some fix would have created files that we could
6 possibly submit to agencies, yes.
7    THE REPORTER: I'm sorry, I didn't hear.
8    THE WITNESS: I said some files could create
9 output that we could submit to agencies for testing, yes.
10    Q.  (By Mr. Howard) And were you involved in individual
11 fix testing of those types of fixes?
12    A.  I could have been. I don't recall a particular
13 instance.
14    Q.  Do you know the extent to which individual fix
15 testing resulted in output files?
16    A.  Not all fixes require a file.
17    Q.  For the fixes that did result in output files, can
18 you say with knowledge the extent to which testing those fixes
19 did result in output files?
20    MS. LEE: Objection, vague and ambiguous.
21    A.  No.
22    Q.  (By Mr. Howard) And do you know whether TN -- if
23 there was an output file that resulted from testing an
24 individual fix, do you know whether TN, TomorrowNow, would
25 compare that output file to the output files generated by

1  tests in other releases or source groups?
2              MS. LEE: Objection, vague and ambiguous.
3      A.  I've seen that theory, but I don't know that it was
4  followed.
5      Q.  (By Mr. Howard)  What do you mean, you've seen the
6  theory?
7      A.  I've seen the theory of the plan of doing that, but I
8  don't know that it was implemented.
9      Q.  Okay.  Did you yourself do individual fix testing
10 that resulted in output files?
11     A.  Yes.
12     Q.  And -- and when you did that, did you ever compare
13 that output file to the analogous file generated by the test
14 in a different release?
15     A.  Not that I recall.
16     Q.  What would be the point of doing that?
17     A.  I don't know.
18     Q.  Just another part of the testing process?
19             MS. LEE: Objection, calls for speculation.
20     A.  I don't know.
21     Q.  (By Mr. Howard)  Would output files ever be compared
22 using Araxis Merge?
23     A.  They could be.
24     Q.  Do you know whether they were?
25     A.  No.

CATHERINE HYDE   February 12, 2009
HIGHLY CONFIDENTIAL

Page 255

1  Q. Were they compared to anything else other than other output files?

2  A. I don't know.

3  Q. Are you aware that TomorrowNow used the Newmerix program for bundle testing?

      MS. LEE: Objection, lack of foundation.

   A. I believe so, yes.

   Q. (By Mr. Howard) And when did it -- TomorrowNow begin using Newmerix bundle testing?

      MS. LEE: Same objection.

   A. I don't recall exactly.

   Q. (By Mr. Howard) Are you familiar with the process by which Newmerix was used to test bundles?

   A. Vaguely.

   Q. What do you know about it?

   A. There are scripts that they created based on individual fixes.

   Q. And then what's done with the scripts?

   A. I couldn't say.

   Q. And was it part of the regular practice at TomorrowNow, starting at a point in time, to use Newmerix to bundle test?

   A. I couldn't say.

   Q. And was Newmerix used for individual fix testing?

   A. I don't know.

Merrill Legal Solutions
(800) 869-9132

1  Q.  Were project files created for one customer provided
2  to other customers as part of a sync-up bundle?
3  A.  Pieces and parts of them could have been, yes.
4  Q.  Did -- did you modify DMS files that originally were
5  delivered by PeopleSoft as part of creating data file
6  deliverables for customers?
7  A.  Data files?
8  Q.  Yes.
9  A.  No.
10  Q.  Did you ever modify a DMS file as part of creating a
11  deliverable for a customer?
12  A.  What do you mean by "modify"?
13  Q.  Modify it, take the DMS from PeopleSoft, change it in
14  some way, send it to the customer.
15  A.  For extended support, yes.
16  Q.  What about for critical support?
17  A.  No.
18  Q.  And if there -- if a DMS file was modified, would
19  that result in some kind of a modification log?
20  A.  I don't know.
21  Q.  Do you think it would?
22        MS. LEE:  Objection, calls for speculation.
23  Q.  (By Mr. Howard)  You have no idea?
24  A.  That's out of my area or whatever.
25  Q.  Okay.

1  STATE OF TEXAS

   COUNTY OF HARRIS

2                    REPORTER'S CERTIFICATE

3       I, Dana Richardson, a Certified Shorthand Reporter in and

4  for the State of Texas, do certify that this deposition

5  transcript is a true record of the testimony given by the

6  witness named herein, after said witness was duly sworn by me.

7  The witness was requested to review the deposition.

8       I further certify that I am neither attorney or counsel

9  for, related to, nor employed by any parties to the action in

10 which this testimony is taken and, further, that I am not a

11 relative or employee of any counsel employed by the parties

12 hereto or financially interested in the action.

13      I further certify that the amount of time used by each

    party at the deposition is as follows:

14

         Mr. Geoffrey Howard - 06:58

15       Ms. Jacqueline Lee - 00:00

16      SUBSCRIBED AND SWORN TO under my hand and seal of office

    on this the 17th day of February,

17  2009.

18

19  _Nana Richardson_ (signature)

20  _____

21       Dana Richardson, CSR

         Texas CSR 5386

22       Expiration: 12/31/09

         Merrill Legal Solutions, Firm No. 210

23       315 Capitol, Suite 100

         Houston, Texas 77002

24       Phone (713) 426-0400

         Fax (713) 426-0600

25