IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE CORPORATION, et al., | No. C-07-01658 PJH (EDL) |
| Plaintiffs, | **OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO COMPEL AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL** |
| v. | |
| SAP AG, et al., | |
| Defendants. | |

On December 11, 2009, Plaintiffs filed a motion to compel seeking: (1) modification of the protective order to allow discovery materials obtained in this case to be used in European litigation; (2) an order compelling an additional half day deposition of Scott Trainor; (3) an order requiring Defendants to produce two documents in camera to determine if Defendants' redactions were proper; and (4) an order compelling supplemental responses to Plaintiffs' Requests for Admission. Also on December 11, 2009, Defendants filed a motion to compel seeking: (1) discovery relating to the mapping of Plaintiff's products to information downloaded by TomorrowNow, and the history of Plaintiffs' creation of, access to and ability to access and produce the information sought by the requests; (2) compliance with a third party subpoena served on Plaintiffs' counsel Folger Levin & Kahn for documents generated in the 2003 PeopleSoft v. Oracle litigation in state court; and (3) updated productions from six of Plaintiffs' key custodians.[1]  The Court held a hearing on January 26, 2010. For the reasons stated at the hearing and in this opinion, the Court issues the following

---

[1] Although the topics for Defendants' motion differ from those described to the Court at the last discovery conference where the Court gave the parties leave to file these motions, the Court will address Defendants' motion on the merits.

1 Order.

2 **Plaintiffs' Motion to Compel**

3     **1.    Modification of protective order**

4     In December 2008, Judge Hamilton dismissed Plaintiff JD Edwards Europe, holding that its
5 copyright infringement claims were extraterritorial and therefore could not be brought in this court.
6 Plaintiffs now seek to modify the protective order to allow it to use discovery obtained in this case in
7 potential European litigation, initially only to disclose to foreign counsel to provide legal advice on
8 whether and where to commence foreign litigation, and later, if they decide to institute foreign
9 proceedings, for use in those proceedings.

10     The Ninth Circuit "strongly favors access to discovery materials to meet the needs of parties
11 engaged in collateral litigation." Foltz v. State Farm Mut. Automobile Ins. Co., 331 F.3d 1122,
12 1131 (9th Cir. 2003) ("Allowing the fruits of one litigation to facilitate preparation in other cases
13 advances the interests of judicial economy by avoiding the wasteful duplication of discovery.")
14 (citing Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 472 (9th Cir. 1992)). "Where
15 reasonable restrictions on collateral disclosure will continue to protect an affected party's legitimate
16 interests in privacy, a collateral litigant's request to the issuing court to modify an otherwise proper
17 protective order so that collateral litigants are not precluded from obtaining relevant material should
18 generally be granted." Foltz, 331 F.3d at 1132. The Foltz court set out a two-step inquiry to
19 determine whether a request to modify the protective order should be granted. First, the "collateral
20 litigant must demonstrate the relevance of the protected discovery to the collateral proceedings and
21 its general discoverability therein." Id. Second, courts should consider "other factors in addition to
22 the relevance of the protected discovery to the collateral litigation," such as weighing "the
23 countervailing reliance interest of the party opposing modification against the policy of avoiding
24 duplicative discovery." Id. at 1133 (citing Beckman, 966 F.2d at 475). The Foltz court noted,
25 however, that "reliance will be less with a blanket [protective] order, because it is by its nature
26 overinclusive." Id.

27     Here, Plaintiffs have met the Foltz test. First, Plaintiffs' anticipated litigation in Europe
28 would be based on the same facts as alleged in this case. Second, because there is a blanket

1 protective order in this case, Defendant's reliance interest is diminished. See Foltz, 331 F.3d at
2 1133; see also CBS Interactive v. Etilize, 257 F.R.D. 195, 205-06 (N.D. Cal. 2009) ("Mere reliance
3 on a blanket protective order does not justify a refusal to modify it when a reasonable request for
4 disclosure has been made.").

5      Unlike the situation here, however, Foltz involved collateral litigation in the United States
6 rather than potential collateral litigation abroad. The parties dispute whether the foreign location of
7 the potential collateral litigation makes a difference to the analysis. Defendants argue that 28 U.S.C.
8 § 1782, rather than Foltz, applies, and that the statute as interpreted by Intel Corp. v. Advanecd
9 Micro Devices, Inc., 542 U.S. 241 (2004) supports denial of the modification of the protective order.
10 Section 1782 relates to the Court's authority to order persons found in the district to give depositions
11 or produce documents to be used in a foreign proceeding, primarily through a letter rogatory, but
12 also through a request by a foreign tribunal. See Intel, 542 U.S. at 246 ("Section 1782 provides that
13 a federal district court 'may order' a person 'resid[ing]' or 'found' in the district to give testimony or
14 produce documents 'for use in a proceeding in a foreign or international tribunal. . . upon the
15 application of any interested person.'"). Section 1782 contains three threshold requirements for
16 obtaining discovery: (1) that the discovery is found in the district where the application is made; (2)
17 that the information sought is for use in a proceeding in a foreign or international tribunal; and (3)
18 that the petitioner is an interested person in the foreign proceeding. Intel sets out several non-
19 exclusive factors for courts to consider in deciding whether to grant discovery under § 1782: (1)
20 whether the producing party is a participant in the foreign proceeding; (2) whether the foreign
21 tribunal would be receptive to United States federal-court judicial assistance; (3) whether the request
22 conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) the burden on the
23 producing party. See Intel, 542 U.S. at 264-65.

24      The Court does not agree with Defendants that § 1782 governs this motion. The statute
25 applies to court orders for new discovery to be conducted exclusively for use in a foreign proceeding
26 separate from any litigation pending before the United States court; it does not govern the discretion
27 of a court to modify a protective order to allow access to information already obtained in the regular
28 course of discovery in a case pending before it. See also In re Jenoptik AG, 109 F.3d 721, 723 (Fed.

1  Cir. 1997) (applying Foltz and stating that: "Case law interpreting the requirements of section 1782
2  is not relevant to a determination whether a protective order may be modified to permit the release
3  of deposition testimony, already discovered, to another court."). Here, there is no pending foreign
4  litigation, Plaintiffs already obtained the discovery at issue in the regular course of litigating their
5  case against Defendants in this Court, and Plaintiffs are not seeking additional discovery in a
6  separate proceeding that would be unduly burdensome on any party.

7  Accordingly, Foltz rather than § 1782 governs. The policy considerations set forth in Foltz
8  regarding efficient use of previously produced discovery in related proceedings weigh in favor of
9  modification of the blanket protective order in this case, especially to allow Oracle to reach an
10 informed decision whether to initiate foreign proceedings. At the same time, some of the policy
11 considerations set forth in Intel, while not binding because § 1782 does not apply, may arguably be
12 worthy of consideration if and when European proceedings commence, although it is far from clear.
13 For example, the second and third factors (whether the foreign tribunal would be receptive to United
14 States federal court judicial assistance, and whether undertaking new discovery using the assistance
15 of the United States courts through the mechanisms provided by § 1782 that might not be available
16 in the foreign forum is an attempt to circumvent foreign restrictions on discovery) would not be
17 precisely at issue, because this Court would not be providing fresh assistance in new discovery, as
18 under § 1782. Arguably, however, this Court could take into account whether the foreign tribunal
19 would be receptive to considering the kind of information that has been obtained here, even if that
20 information would not be discoverable through its own proceedings, due to the generally broader
21 scope of United States discovery compared to European jurisdictions. However, the better view
22 might be to allow Plaintiffs to proffer the fruits of discovery conducted in this case to the foreign
23 tribunal, which would appear to be best equipped to decide for itself whether to accept or refuse that
24 proffer. In any case, since no foreign proceedings have yet been initiated, it is premature and
25 impractical to apply such factors now, when it is uncertain whether or, if so, where Plaintiffs may
26 initiate such proceedings.

27 Therefore, the parties shall meet and confer to provide a joint proposed order to allow use of
28 protected information for the limited purpose that Plaintiffs now seek to use it - consultation with

4

1 foreign counsel. The parties are encouraged to discuss potential safeguards on the use of this
2 information as discussed at the hearing, such as retention by this Court of the authority to ensure
3 confidentiality of the information. If the parties cannot agree on this limited modification of the
4 protective order, the parties shall file a joint letter, each side using no more than two pages, setting
5 out their respective positions. The parties shall either file a joint proposed order or a joint letter no
6 later than February 16, 2010.

### 2. Scott Trainor deposition

Scott Trainor is the former in-house counsel for PeopleSoft and current in-house counsel for SAP. See Russell Decl. Ex. H at 9. He was deposed on October 13, 2009 about, among other things, how he negotiated contract terms with prospective and current TomorrowNow customers and how he maintained his ethical obligations to PeopleSoft. See Russell Decl. Ex. H at 17. Trainor's deposition was punctuated by numerous instructions not to answer based on attorney-client privilege and the work product doctrine. Plaintiffs argue that Trainor was improperly instructed not to answer with respect to six topics and so they are entitled to depose him for another half-day.

#### a. Compartmentalize

Plaintiffs asked Trainor what steps he took to avoid relying on his memory of PeopleSoft software license agreements and whether he compartmentalized his PeopleSoft experience. See Russell Decl. Ex. H at 111-113. As the Court indicated at the November 2009 discovery conference, a question to Trainor about what steps he took to avoid relying on his memory of PeopleSoft confidential information is proper. Therefore, Defendants' objections are overruled. Moreover, Defendants have not pointed to any anticipated litigation to support their work product objection. As described at the hearing, Plaintiffs are entitled to probe somewhat beyond the question of what steps he took to get more information about what exactly Trainor did.

#### b. Communications with prospective customers

Plaintiffs questioned Trainor about Exhibit 1681, which contained a draft contract from Trainor to a prospective customer, and which Plaintiffs argue states that it would be to the customer's advantage to give TomorrowNow access to PeopleSoft software. See Russell Decl. Ex. R at SAP-OR00682290. Trainor testified that he did not recall if he drafted the document and he did

1  not read it to say that it was to the customer's advantage to give TomorrowNow access. When
2  Plaintiffs asked Trainor how he read the document, Defendants' counsel objected and instructed
3  Trainor not to disclose his mental legal analysis. See Russell Decl. Ex. H at 109-111.

4  Trainor now states in his declaration that he misunderstood the question at the deposition as
5  asking for his explanation of the phrase as he understood it at the time of the deposition. He states
6  that he is able to testify, without disclosing privileged information or work product, about his
7  understanding of the phrase at the time of Exhibit 1681. See Trainor Decl. ¶ 3. Accordingly,
8  Plaintiffs are entitled to Trainor's testimony as to his understanding at the time of Exhibit 1681.

### c. Misrepresentations to customers

10  Plaintiffs also asked Trainor about another portion of Exhibit 1681 which states that
11  TomorrowNow's rights to use the PeopleSoft software come entirely by way of the customer's
12  license. See Russell Decl. Ex. R at SAP-OR00682292. Plaintiffs asked Trainor: "Is it true that you
13  were conveying to Waste Management the position that TN's rights to use the PeopleSoft software
14  come entirely by way of the Waste Management license with PeopleSoft?" See Russell Decl. Ex. H
15  at 113-114. Trainor responded that he did not recall drafting the document, but that the
16  representation was on the document. See id. at 114. Plaintiffs then asked whether Defendants'
17  position was that their rights come by way of the customer's license. Trainor answered that it
18  appeared so by looking at the document. See id. Plaintiffs then asked Trainor if that was a true
19  statement, which counsel instructed Trainor not to answer on the basis of work product. See id. at
20  114-15. Plaintiffs then asked whether Defendants ever misrepresented facts to customers during
21  negotiations, to which counsel instructed Trainor not to answer based on work product protection
22  and the attorney client privilege. See id. at 115.

23  Trainor now states in his declaration that he may have misinterpreted Plaintiffs' question
24  about whether the statement about rights coming from a customer's license was true. Trainer now
25  states that he can testify, without revealing privileged or protected information, as to whether
26  TomorrowNow took that position with Waste Management. See Trainor Decl. ¶ 4. As stated at the
27  hearing, Plaintiffs are entitled to Trainor's testimony regarding facts that do not implicate work
28  product and attorney-client concerns, such as whether Defendants took a certain position.

6

### d. **Indemnification policy**

Exhibit 1684 is a PowerPoint sales presentation given by Trainor and TomorrowNow's head of sales at training sessions for SAP salespeople. See Russell Decl. Ex. T. Under the heading of "Indemnification," the presentation states: "Key term - no removing this." See id. at SAP-OR01808861. Plaintiffs asked Trainor whether it was true that this was a key term for Defendants, and counsel instructed him not to answer based on the attorney-client privilege and the work product doctrine. See Russell Decl. Ex. H at 166.

As discussed at the hearing, Plaintiffs are entitled to Trainor's testimony as to facts about whether the indemnification clause was key, which requires a yes or no answer. Plaintiffs may also ask the factual question of whether the term had ever been deleted from a contract.

### e. **Compliance with ethical obligations**

Plaintiffs asked Trainor about Exhibit 1181, which is an email from TomorrowNow salesperson Spencer Phillips to Raytheon, a prospective customer, that related a conversation Phillips had with Trainor. See Russell Decl. Ex. Q. The email recounts what Trainor told Phillips about the content of PeopleSoft licence agreements concerning third party access to PeopleSoft software. Plaintiffs argue that the email raises an ethical concern based on Trainor's prior employment with PeopleSoft. At the time of the email in 2005, Trainor testified that he did not have access to a PeopleSoft license agreement. See Russell Decl. Ex. H at 131-32. Therefore, Plaintiffs believe that Trainor provided the information to Phillips based on his prior work with PeopleSoft, which would violate the prohibition against the use of confidential information obtained from a former employer or client with a current employer or client unless there is written authorization. See Cal. Rules of Prof. Conduct 3-130[E].

At his deposition, Plaintiffs asked Trainor whether he understood that he had certain ethical obligations as an attorney and that he had an obligation to keep information he learned from a former client confidential. See Russell Decl. Ex. H at 136. Plaintiffs asked Trainor whether providing the information to Phillips would violate an ethical duty, to which counsel instructed Trainor not to answer based on the attorney-client privilege and the work product doctrine. See id. Finally, Plaintiffs asked Trainor whether he would "have felt comfortable" conveying that

1  information to Phillips, to which counsel instructed Trainor not to answer. See id. at 139.

2  As discussed at the hearing, Plaintiffs are entitled to Trainor's testimony about what his
3  understanding was at the time of the email, not what his understanding was at the time of the
4  deposition. Plaintiffs should rephrase the last question so as not to use the vague term "comfortable"
5  in this context.

### f.     Willfulness of copyright infringement

7  Plaintiffs asked Trainor whether Defendants took steps to determine if their access to
8  software amounted to copyright infringement, to which counsel instructed Trainor not to answer
9  based on the attorney-client privilege and the work product doctrine. See Russell Decl. Ex. H at
10  115-16. Plaintiffs clarified that they sought information about whether steps were taken, not what
11  steps were taken. See id. Plaintiffs then asked Trainor whether Defendants ever analyzed, in
12  connection with the negotiation of a contract, the general topic of a customer's right to provide
13  access to software, to which counsel instructed Trainor not to respond. See id. Trainor states in his
14  declaration that he had discussions with TomorrowNow employees including the Vice President of
15  Sales about the legal strategy for interacting with customers on the issue of their rights to provide
16  PeopleSoft software to TomorrowNow, and that those discussions are privileged. See Trainor Decl.
17  ¶ 8.

18  As discussed at the hearing, Plaintiffs are entitled to Trainor's testimony regarding non-
19  privileged communications, such as those made to customers. Further, to the extent that Plaintiffs'
20  questions require a yes or no answer, Trainor should answer those questions. However, the
21  substance of Trainor's legal advice to TomorrowNow employees is privileged.

### 3.     In camera review of documents

23  The Court reviewed two documents in camera: (1) Exhibit 1683, which is an email chain
24  involving Trainor, which contains a redacted email from Mia Lee, the Senior Contracts Specialist
25  for SAP to Trainor, and (2) Document Number TN-OR00852363, which is an email, portions of
26  which are redacted, from Bob Geib, TomorrowNow's Vice President of Sales, to other
27  TomorrowNow executives and Trainor. As stated at the hearing, the Court ordered that only the last
28  sentence of the first paragraph and the second sentence of the second paragraph of Lee's email to

8

Trainor in Exhibit 1683 may be redacted. Document TN-OR00852363 remains redacted.

### 4. Requests for Admission

At issue are over two hundred Requests for Admission that Plaintiffs propounded on Defendants regarding Defendants' business model. Defendants argue that terms, "copy," "fix," "update" and "generic environment," as used in the Requests for Admission are vague and ambiguous, and objected to Requests for Admission numbers 496-680 in Set No. 2 and 13-50 in Set No. 3 on those grounds. They also argue that it would be overly burdensome to respond to all of Plaintiffs' Requests for Admission.

#### a. Definitions of terms

Plaintiffs defined copy as follows: "'Copy' in the noun form shall mean a copy, duplication, clone, backup, download, restore and/or a compressed copy, and in the verb form shall mean to copy, duplicate, clone, backup, download, and/or restore." See Russell Decl. Ex. V at 1. Although Defendants admitted to downloading certain fixes and updates, they argued that the definition of copy was overly broad. In their briefs and at the hearing, Plaintiffs agreed to use a dictionary definition of "copy," and Defendants argued similarly that a plain meaning definition should be used. Accordingly, the parties are ordered to meet and confer to agree on a more narrow definition of "copy" that reflects the plain meaning of the word. Following the parties' agreement, Defendants shall supplement their responses to Plaintiffs' Requests for Admissions.

Plaintiffs defined fix as "any software application patch, fix, code change, or update, including bug fixes, tax or regulatory updates or bundles, their constituent discrete units of code, data files, or any other instructional documentation or item." See Russell Decl. Ex. V at 2-3. Update is defined as: "any software application patch, fix, or update, including bug fixes, tax or regulatory updates or bundles, their constituent discrete units of code, data files, or any other instructional documentation or item." See Russell Decl. Ex. V at 5. Plaintiffs propounded many Requests for Admission using these terms, for example:

> Admit that for some Fixes or Updates listed in Exhibit B, TN Developed the Fix or Update once per "source group" (as the term is used in Request Nos. 576-79), in part by using a Local Environment installed from media or originally provided by one Customer within the source group.

Russell Decl. Ex. W at 578 (Request number 597). In response to this Request, Defendants stated:

9

> ADMITTED on the following qualified basis: Some of the objects (meaning more than one object) associated with the master fix records referenced in Exhibit B were developed once for a specific group of customers within a release level in part by using environment components installed from media provided by a specific TN customer within that specific group. To the extent not admitted, this request is DENIED.

Russell Decl. Ex. W at 581 (Response to Request number 597).

Defendants argue that fix and update are not interchangeable terms, and that fixes and updates are not the smallest component of customer deliverables. Catherine Hyde, a former developer for the PeopleSoft product lines for TomorrowNow, testified that fixes are made up of objects that can be several things, including objects, and a fix is the name given to a container of one or more objects. See Hyde Decl. ¶ 5 (stating that the name given to a fix container is also referenced to a broader master fix record). Hyde also stated that fixes and master fixes are not tested, and that only the objects contained within them are tested. See id. Further, Hyde stated that to the extent that the creation, testing and delivery of an object is knowable, one would have to examine the history of each object contained in each fix, not the fix container or the update container that holds several fix containers. See id. ¶ 7. Therefore, Defendants argue they responded at the object level to the Requests for Admission because that level of granularity is needed to properly admit to actual facts which are not in dispute.

Defendants' response to Request number 597 and others like it, which are directed at objects rather than fixes or updates as stated in the Request itself, are essentially non-responsive and evasive. Hyde, who provided the declaration on which Defendants rely, testified without clarification about fixes:

> Q. And is that reflective of – of the general practice, that for – for as large a group of clients as possible, a fix would be developed one time and then delivered to that group of clients?
> A. This – a group of clients could receive the same fix, if it was identical. Howard Decl., ¶ 6, Ex. E at 124:10-17.
> *******
> Q. When I – when I – again, when I say "fix," I'm referring to the objects that – that comprise the functionality that's being delivered to the client. Does that makes sense?
> A. Yes. Id. at 25:22-26:1.
> *******
> Q. When would D702DATM be used for a critical support update?
> A. After we've created individual fixes, we could load them in there and then export them all out as one big group. Id., ¶ 8, Ex. G at 75:22-76:1 (objections omitted).

Defendants have not pointed to any evidence or testimony in which any witness made the distinction

10

Defendants now seek to make in their responses. The Court agrees with Plaintiffs that Defendants' responses to Requests for Admissions relating to fixes and updates are inadequate. Defendants' objections to these Requests are overruled.

Plaintiffs define generic environment as: "any Local Environment that was both named without any reference to any specific Customer and used to support more than one customer." See Russell Decl. Ex. V at 3. Plaintiffs propounded many Requests for Admission using this definition, for example:

> Admit that in order to generate some Fixes or Updates listed in the first two columns of Exhibit A, part of TN's process was to compare Fix Objects in a Copy of one of its Generic Environments with Fix Objects in a different Copy of one of its Generic Environments for an earlier release.

Russell Decl. Ex. W at 415 (Request number 542). In response to this Request, Defendants stated:

> ADMITTED on the following qualified basis: For some of the objects (meaning more than one) associated with the master bundle records referenced in the first two columns of Exhibit A, one step in the process for generating the object was to compare the object in one environment specific to TN's retrofit support of specific TN customers to the same named object in an earlier release environment specific to TN's retrofit support of specific TN customers. To the extent not admitted, this request is DENIED.

Russell Decl. Ex. W at 416 (Response to Request number 542). Defendants' response and others like it, however, are evasive. Defendants argue that the term, "generic environment," did not have a common meaning at TomorrowNow, and that it was only used in a handful of documents. However, included in those documents are emails involving high level personnel who did not seek clarification of the term. See Howard Decl. Ex. B-D. Further, Hyde states in her declaration that TomorrowNow employees did not commonly use the phrase generic environment, but she used it herself in an email (see id. Ex. C) and testified about the term (see id. Ex. E at 34). Further, Defendants used the term in their answer to the fourth amended complaint. See Answer (Docket No. 448) at ¶ 19 ("Defendants further admit that TN kept copies of certain of its customers' "Oracle" software applications on its systems and that certain development environments TN used to service certain customers were described internally as "generic environments."). Accordingly, Defendants' objections to this term are overruled. The Court does not foreclose Defendants' ability to appropriately qualify their responses to these or other Requests for Admission.

      **b.**      **Burden**

11

Defendants argue that it would overly burdensome to specifically answer Requests for Admission numbers13-50 in Set No. 3, 4-63 and 130-162 in Set No. 5.  For example, Request number 13 states:

> For each item 1-33,186 on Exhibit D, admit that a Copy of the listed Fix Object was Created using a Local Environment.

Russell Decl. Ex. Y at 15-16.  Defendants argue that because Exhibit D is a 973 page listing of 33,186 file paths that contain multiple objects, the Requests referencing that Exhibit total more than one million separate requests.  Defendants objected to these Requests for Admission as unduly burdensome and compound, and more specifically:

> Subject to the General Objections and Responses and these specific objections, after a reasonable inquiry and based on Defendants' understanding of these questions, Defendants lack sufficient information to respond to these requests as the information sought was not tracked, recorded or maintained by TN in a "readily obtainable manner."  On this basis, therefore, these requests are DENIED.

Russell Decl. Ex. Y at 15-16 (response to Request number 13).  Plaintiffs then propounded follow up Requests for Admission based on Defendants' responses, for example:

> For each item 1-33,186 on Exhibit D to Oracle's Third Set of Requests for Admission, admit that Defendants do not have reasonable access to any readily obtainable information indicating that a Copy of the listed Fix Object was not created using a Local Environment.

Russell Decl. Ex. Z at 120 (Request number 130).  Defendants denied these follow up Requests for Admission, for example:

> DENIED.  Defendants have reasonable access to TN's records or other information relating to each item 1-33,186 on Exhibit D to Oracle's Third Set of Requests for Admission.  However, given the quantity of the items 1-33,186 on Exhibit D to Oracle's Third Set of Requests for Admissions, there is no readily obtainable way to review TN's records and other information to determine for each listed item whether a copy of each listed fix object was not created using a local environment.  Defendants have not undertaken the extreme burden of evaluating each item and have objected on that basis because the requested information is as equally accessible to Plaintiffs as it is to Defendants.

Russell Decl. Ex. Z at 121 (response to Request number 130).

In answering these Requests, Defendants appear to have relied on Federal Rule of Civil Procedure 36(a)(4), which states in relevant part that: "The answering party may assert a lack of

12

1  knowledge or information as a reason for failing to admit or deny only if the party states that it has
2  made reasonable inquiry and that the information it knows or can readily obtain is insufficient to
3  enable it to admit or deny." However, Defendants state that while they have reasonable access to
4  information, they cannot review it in a readily obtainable way without undue burden. Rule 36(a)(4)
5  does not address this precise situation. Instead, the Rule focuses on situations in which the readily
6  obtainable information has been reviewed, but is insufficient to allow a party to admit or deny a
7  Request for Admission. See William W. Schwarzer, Federal Civil Procedure Before Trial, §§
8  11:2046-11:2050; Asea, Inc. v. Southern Pac. Transp. Co., 669 F.2d 1242, 1247 (9th Cir. 1981)
9  (holding that a response which fails to admit or deny a proper request for admission does not comply
10 with the requirements of Rule 36 if the responding party has not, in fact, made "reasonable inquiry,"
11 or if information "readily obtainable" is sufficient to enable him to admit or deny the matter).

Further, with respect to Requests for Admission numbers 4-63, Defendants argue that Plaintiffs are actually seeking responses to millions of requests, which is unduly burdensome. For example, Request number 5 states:

> For each file located in DCITBU01_G\PeopleSoft, as identified in Defendants' responses to Interrogatory 11 from Oracle Corp's first set, admit that the file was originally downloaded from an Oracle website by TN.

Russell Decl. Ex. Z at 10-11. Defendants state that the specific file path in that Request contains 3,740,254 files spread over four hard drives. After raising general objections, including burdensomeness, Defendants responded to Request number 5:

> ADMITTED on the following qualified basis: Defendants reasonably believe and thus ADMIT that it is likely that the majority (meaning at least one more than half of the total files) of the files located in DCTIBU01_G\PeopleSoft were obtained at some point in time from a PeopleSoft, JD Edwards or Oracle website. Defendants, however, have not undertaken the extreme burden of evaluating each file as this information is as equally accessible to Plaintiffs as it is to Defendants. To the extent this request is not admitted, it is DENIED.

Russell Decl. Ex. Z at 11 (response to Request number 5).

The Court is not persuaded by Defendants' burdensomeness argument, because Defendants have had other opportunities to provide this information in a less burdensome way and refused to do so. For example, the Court has encouraged the parties to reach a reasonable stipulation regarding

13

the subject matter of these Requests for Admission, but Defendants would not agree to that approach. Further, the Court agrees with Plaintiffs that Defendants' responses were inadequate, and could have been at least improved with little burden. For example, Defendants' responses to Plaintiffs' follow-up Request for Admission number 130 was inconsistent with their responses to Plaintiffs' initial Request number 13. However, as stated at the hearing, the Court believes that there may be some ways to lessen the burden on Defendants. Specifically, with respect to Request number 130 and others like it, the Court recommends the following revision:

> For each item 1-33,186 on Exhibit D to Oracle's Third Set of Requests for Admission, admit that Defendants do not have reasonable access to sufficient readily obtainable information to indicate whether or not a Copy of the listed Fix Object was created using a Local Environment.

Further, with respect to Requests for Admission number 5 and others like it, the Court recommends adding another category, "vast majority," that Defendants can use to quantify their responses. Finally, to the extent that Plaintiffs use specific words in the Requests such as readily obtainable information (see Request number 130), Defendants should track that language in their responses. Accordingly, Plaintiffs' Motion to Compel is granted, on the condition that the parties shall meet and confer about ways to lessen the burden on Defendants. At the hearing, the Court ordered the parties to do so no later than January 29, 2010.

**Defendants' Motion to Compel**

  **1.  Mapping**

  Defendants seek all download-to-product mapping information that Plaintiffs possess. Defendants argue that for the first time at the December 4, 2009 deposition of Jason Rice, a Principal Software Engineer for Plaintiffs, Defendants found out that Plaintiffs could have, with little effort, produced a spreadsheet containing significant portions of the download-to-product mapping information that Defendants have continually sought since July 2007. Rice testified that he could produce the mapping information in about one day, which Defendants believe was contrary to Plaintiffs' position that there was no automated way to gather the mapping information. Plaintiffs did not produce the Rice spreadsheet until November 16, 2009 in connection with an expert report. Defendants are concerned that the lengthy delay in production means that there is a question as to whether all download-to-product mapping information has been produced.

Therefore, Defendants seek an order compelling Plaintiffs to: (1) fully respond to RFPs 44, 45, 47 and 51 and Interrogatory 7, which were served on July 26, 2007;[2] (2) certify that all documents and information responsive to these discovery requests have been produced; (3) identify by Bates number or otherwise, which documents Plaintiffs contend are responsive to the discovery requests; and (4) identify who created the responsive documents, when Plaintiffs acquired possession of the documents and when it was produced to Defendants.  Defendants's requests for production state:

> Request number 44 states:  All documents from which a TN customer or Named customer can determine which of the items described in Request No. 43 [documents to show downloadable software and support materials which Plaintiffs contend that TN improperly downloaded] above the customer is entitled to access or Download.
>
> Request number 45 states: All documents relating to communications between Oracle and any TN Customer or Named Customer concerning which Software and Support Materials the customer is entitled to access or Download.
>
> Request number 47 states:  All documents relating to which Software and Support Materials any TN customer or Named Customer is, or was at any time, entitled to access or Download.
>
> Request number 51 states:   Documents sufficient to show all Electronic Software Updates (ESUs) and Software Application Requests (SARs) relating to the Software and Support Materials, and the system code for each such SAR and ESU.

See Cowan Decl. App. 1-5.

Although Plaintiffs make several arguments as to why this discovery should be denied, the crux of the dispute is whether the information is protected work product.  Plaintiffs argue that spreadsheets like those compiled by Rice were created at the direction of counsel for purposes of filing the complaint in this matter.  The spreadsheets have been listed on a privilege log since May 2008.  See Cowan Decl. Ex. K.  Defendants have made no showing that the spreadsheets are not work product.

The Court is also not convinced that Plaintiffs have waived work product protection.  See Burlington N. & Santa Fe R.R. Co. v. U.S. Dist. Ct., 408 F.3d 1142, 1149 (9th Cir. 2005) (stating that to determine if a party waived work product protection, courts should consider: "the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to

---

[2] Defendants conceded at the hearing that Interrogatory 7 was not disclosed to Plaintiffs as an issue until the Motion to Compel was filed.  Therefore, the Court will not consider it.

United States District Court
For the Northern District of California

evaluate whether each of the withheld documents is privileged (where providing particulars typically contained in a privilege log is presumptively sufficient and boilerplate objections are presumptively insufficient); the timeliness of the objection and accompanying information about the withheld documents (where service within 30 days, as a default guideline, is sufficient); the magnitude of the document production; and other particular circumstances of the litigation that make responding to discovery unusually easy (such as, here, the fact that many of the same documents were the subject of discovery in an earlier action) or unusually hard."). Here, on balance, the factors do not weigh in favor of waiver. Although there is no argument that the objections were untimely, Defendants state that Plaintiffs did not object to Request number 51 on the grounds of work product, so Defendants would not know that Plaintiffs were withholding mapping information. Further, the privilege log entries were not extensively described, so Defendants may not have been on notice that Plaintiffs were withholding mapping information. See id. (almost all entries described as: "Confidential [document or email or spreadsheet] regarding TomorrowNow investigation prepared at the direction of counsel in anticipation of litigation."). However, the magnitude of discovery in this case has been colossal, and responding to discovery in this huge case was unusually difficult given its scope. On balance, Plaintiffs have not waived work product protection for this information. Accordingly, Defendants' Motion to Compel is denied.

### 2.     Folger Levin subpoena

In 2003, PeopleSoft brought an action against Oracle in Alameda County Superior Court in connection with Oracle's proposed acquisition of PeopleSoft, alleging that Oracle's tender offer for PeopleSoft was not made in good faith. PeopleSoft alleged in that case that in response to Oracle's hostile takeover effort, Oracle deliberately set out to create fear, uncertainty and doubt to cripple PeopleSoft's sales. The crux of the complaint was that Oracle was causing customers to flee PeopleSoft in order to reduce its value and allow Oracle to acquire it more cheaply. Thus, the subject matter of the litigation is relevant to damages in this case.

In September 2009, Defendants served a subpoena on PeopleSoft's then-counsel Folger Levin & Kahn for the 2003 litigation files. See McDonell Decl. Ex. B. After Defendants reviewed the Folger Levin pleading index, they eventually limited their request under the subpoena to sixty-

16

1   four documents.  See McDonnell Decl. Ex. I.  There is no additional burden to turning over these
2   documents to Defendants.  The Court has reviewed the list of sixty-four documents sought and, as
3   stated at the hearing, orders the documents, except for the Motion in Limine regarding Larry
4   Ellison's character, to be produced pursuant to the subpoena.  Therefore, Defendants' Motion to
5   Compel is granted in part and denied in part.

**3.     Custodian production**

7   In November 2008, the parties entered into an Expanded Discovery Timeline Agreement
8   under which the relevant time period for discovery was expanded, in relevant part, from March 22,
9   2007 to October 31, 2008.  On May 20, 2009, Defendants requested updated productions for the
10  March 2007 through October 2008 timeframe from eleven key custodians.  See McDonell Decl. ¶
11  14.  On November 17, 2009, Defendants sought confirmation that Plaintiffs had updated these
12  eleven custodians.  See id. ¶ 16; Ex. L at 4.  Plaintiffs argue that in June 2009, they rejected the
13  request to update and requested further explanation from Defendants, which was not forthcoming, so
14  Plaintiffs thought Defendants abandoned the request.  See id.  Defendants dispute that they
15  abandoned their request.  See McDonell Decl. ¶ 17.  The parties met and conferred again on
16  December 2, 2009, and recognizing that there had been a miscommunication, Defendants agreed to
17  reduce the request to six custodians.  See McDonell Decl. ¶ 18.  Defendants also proposed to limit
18  the search terms and provided Plaintiffs with a list of seventy-one search terms.  See id. ¶ 19.

19  As stated at the hearing, it appears that there was no meeting of the minds among the parties
20  as to whether Defendants were still pursuing this discovery.  The Court finds that the Expanded
21  Discovery Timeline Agreement does not foreclose Defendants' request for updated custodian
22  discovery.  This information is relevant, and Defendants have narrowed their request in light of the
23  late stage of the case.  Therefore, Defendants' Motion to Compel is granted, subject to Defendants
24  sharing in the costs.  As stated at the hearing, however, the parties shall meet and confer regarding a
25  reasonable time frame for this discovery, as well as Defendants' offer as stated at the hearing to
26  share in the cost of this production.

**Future issue of expert deposition scheduling**

28  At the end of the January 26, 2010 hearing, Defendants informed the Court that the parties

had a disagreement as to how many days of testimony would be permitted for certain experts. The Court encourages the parties to resolve this matter without court intervention, but the parties have leave to present that issue in a joint letter of no more than six pages to the Court stating each side's position.

**IT IS SO ORDERED.**

Dated: February 11, 2010

ELIZABETH D. LAPORTE
United States Magistrate Judge

United States District Court
For the Northern District of California

had a disagreement as to how many days of testimony would be permitted for certain experts. The Court encourages the parties to resolve this matter without court intervention, but the parties have leave to present that issue in a joint letter of no more than six pages to the Court stating each side's position.

**IT IS SO ORDERED.**

Dated: February 11, 2010

ELIZABETH D. LAPORTE
United States Magistrate Judge