# EXHIBIT R

Dockets.Justia.com

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
Joanne SIEGEL, an individual; and Laura Siegel
Larson; an individual
v.
WARNER BROS. ENTERTAINMENT INC., a
corporation; Time Warner Inc., a corporation; DC
Comics Inc., a corporation; and Does 1-10.
**No. CV 04-08400-SGL (RZx).**

July 8, 2009.

Keith Gregory Adams, Marc Toberoff, Nicholas Calvin Williamson, Toberoff & Associates P.C., Los Angeles, CA, for Plaintiff.

Anjani Mandavia, Michael Bergman, Adam Beriah Hagen, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA, James D. Weinberger, Roger L. Zissu, Fross Zelnick Lehrman & Zissu, Jonathan Zavin, Loeb & Loeb LLP, New York, NY, Patrick T. Perkins, Perkins Law Offices, Cold Spring, NY, for Defendant.

PROCEEDINGS: **IN CHAMBERS (NO PROCEEDINGS HELD) FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL**

Honorable STEPHEN G. LARSON, District Judge.

**\*1** Cindy Sasse, Courtroom Deputy.

In March, 2008, this Court held that plaintiffs, the widow, and the daughter of Jerome Siegel, the co-creator of the iconic comic book superhero Superman, had successfully terminated the 1938 grant Jerome Siegel and his creative partner Joseph Shuster had conveyed to DC Comics' predecessor-in-interest, Detective Comics, to the copyright in the Superman material published in the comic book *Action Comics No.1.* Left unanswered for trial was, *inter alia,* the question of "whether the license fees paid" by Warner Bros Entertainment Inc. ("Warner Bros") to its corporate sibling, DC Comics, for the audiovisual rights to the Superman copyright pursuant to various licensing agreements entered into during the 1999 to 2002 period "represents the fair market value therefor, or whether the license for the works between the related entities was a 'sweetheart deal.' "

To answer that question, the Court conducted a ten-day bench trial. In resolving this portion of the case, the Court must, based on the evidence at trial, ascribe a value for the audiovisual rights to the Superman copyright in the marketplace during the relevant time period, circa 1999 to 2002, and then discern whether the audiovisual licensing arrangements DC Comics entered into with Warner Bros. during that same time reflect, despite their closely-affiliated corporate nature, that market-based economic value.[FN1] After considering hundreds of exhibits, hours of testimony from several witnesses, and several hours of closing arguments, the Court enters the following findings of fact and the conclusions of law drawn therefrom beginning with the relevant agreements at issue in this case, as the remaining evidence introduced at trial has been evaluated by this Court with reference to and in the context of these agreements.

> FN1. At the conclusion of the trial and after listening to the closing arguments of counsel, the Court dismissed Time Warner, Inc. as a defendant in this case (there being no evidence that DC Comics licensed anything to Time Warner, Inc.) and likewise found in favor of defendants as to Warner Bros.' Consumer Products Division Agreement and the Superman Animation Agreement, there being no credible evidence produced by plaintiffs at trial demonstrating that either agreement was for below

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

fair market value.

### *General Terms Used in Film Licensing Agreements*

As testified to by numerous witnesses and confirmed by the various film licensing agreements in evidence, payment for the film rights to a literary property is the product of a fixed fee (in the form of a guaranteed advance, option payment and/or purchase price) and participation in contingent compensation derived from the later release of a film, expressed in a given percentage of some measure of the money received by the film at the box office and the surrounding activities from the exploitation of the film, including film-related merchandising and home video sales. Determining the amount of contingent compensation expressed as a percentage of the money thus generated is a complicated task.

The money received by the film's distributor (typically the studio) is referred to as the "distributor's gross," includes most, if not all, the money received at the box office, and typically serves as the largest pool of money available from which participation can be measured. From that, the monies paid to "gross profit participants" as well as the "production costs," "distribution costs," and "distribution fees" incurred by the distributor are deducted to arrive at a "breakeven point." [FN2] This last term is more fluid than it might appear, as the parties to a particular film agreement often decide that not all possible deductions should be made in determining the breakeven point, creating a contractually defined "artificial breakeven point" that differs from the standard formulation set forth above. Regardless, if the number that is arrived at after deducting from the distributor's gross some or all of those variables (depending upon the particular formulation used in the agreement) falls below the breakeven point, then no contingent compensation is owed thereunder.

> FN2. "Gross profit participants" are those participants (such as well-known directors

and actors) who have negotiated and executed agreements providing them a share of the distributor's gross. "Production costs" are all the costs directly attributed to producing and shooting the film so as to put it on a final film negative (sometimes referred to as "negative costs"). "Distribution costs," principally production of prints and advertising, are costs attributable to marketing and releasing a particular film; in contrast, "distribution fees" are not related directly to specific costs, but instead are assessed as a percentage of receipts, with the percentage varying based on the source (such as domestic box office or foreign box office).

**\*2** Thus, all participants' right to receive contingent compensation is dependent upon what amount of money comes into play *after* a breakeven point. It is in defining the breakeven point that distinguishes "net profits," "first dollar gross profits" participants, and the various gradations of participation in between.

The "net profit participants" normally must rely on the standard definition of a breakeven point noted earlier, that requires deductions for all the costs, fees, and expenses incurred in making and releasing the film before receiving any of their contingent compensation. For an obvious reason, and for perhaps one less obvious reason, this form of participation is less desirable than those held by other participants. The obvious reason is that a net profit participant collects compensation *only* if a film makes a profit after *all* the deductions identified earlier that could be made against the box office receipts are in fact made. The less obvious reason this position is less desirable relates to how other participants' share factors into the calculation of the breakeven point, which, in turn, triggers the net profits participants' right to compensation. The net profits participants stand in line behind the gross profits participants in that the gross profits participants' share of the box office receipts is deducted

© 2010 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

from the distributor's gross *before* the breakeven point, meaning that a film has to generate more revenue at the box office before a net profits participant is paid.

In contrast, the so-called "first-dollar gross" participation is only set off against the participants' fixed fee (amounting to a non-refundable advance against the contingent compensation) with no other deductions taken; literally, the first dollar generated at the box office from the release of a film goes into the available pool from which the first dollar participant takes a percentage share. In this sense, the first-dollar gross participant has a fixed breakeven point-the fixed fee divided by the percentage sharing rate-that again is calculated on box office receipts, with no deductions for production costs, distribution fees and distribution expenses. In this sense, first dollar gross participation is the most desirable measure upon which to share in the box office receipts generated by a film's release.

In between these two extremes in contingent compensation participation are gradations thereof, sometimes referred to as "adjusted gross" or "defined gross." That compensation functions in some respects as a net profits deal in that, unlike with first dollar gross, deductions are taken against the distributor's gross before arriving at a breakeven point; however, the breakeven point is reached sooner than for a true net profits participation because certain of the cost variables are not deducted, or are deducted at lesser amounts than for their true full measure.

With that general understanding of the terms used in such agreements, the Court turns to the particular agreements at issue at trial.

### Superman Film Agreement

**\*3** On November 6, 1999, DC Comics and Warner Bros. memorialized an Option Purchase Agreement for Warner Bros. to gain the exclusive rights to produce a film utilizing all the copyright in the Super-

man works owned by DC Comics (hereinafter referred to as the "Superman film agreement"). The Superman film agreement, however, was not formally executed until May 9, 2002, although the agreement that was executed remained largely unaltered from the earlier one, save for three minor modifications to the agreement itself and more sizable changes to the shortform option and assignment to more fully describe the property at issue. *See* Defs' Ex. 1047.

The executed Superman film agreement provided for an up-front payment by Warner Bros. to DC Comics of $1.5 million, which provided Warner Bros. the option to purchase the film rights to all the Superman works by December 31, 2002, subject to Warner Bros. having the ability to extend the initial option period for successive one-year periods for the remaining thirty-one years of the Superman copyright's term through the payment of option extension fees that began at $500,000 per year for each of the first eleven years after December, 2002, escalated to $600,000 per year for each of the next ten years, and then escalated to $700,000 per year for the remaining ten years. In total, the option extension payments amounted to $18.5 million, payable over thirty-one years.

Although designated as "option extension" payments, these payments were, in fact, treated in the agreement as a staggered, non-refundable purchase price, although complete payment of the contemplated total could be discontinued, necessarily ending Warner Bros.' rights to the Superman property itself. (*See* Defs' Ex. 1041 ¶ 4 (noting that even after "Warner [Bros.] exercises its option and a Picture is theatrically released" the agreement nonetheless noted that "Extension Payment(s)" still would "come(s) due")). Both the initial and extension option payments were designated as a "non-returnable advance" against the participation from the contingent compensation due and owing to DC Comics under the agreement from the gross receipts generated from the theatrical release of any Superman film developed thereunder. The agreement provided

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

that Warner Bros. "may exercise its option by [simply] giving DC written notice of its commencement of principal photography of a feature-length motion picture"; no purchase payment was called for in the agreement upon Warner Bros.' exercise of the option.

For each Superman film released by Warner Bros., the agreement provided that DC Comics would receive "an amount equal to 5%" of the first dollar of worldwide distributor gross, or 7 1/2 % of the first dollar of domestic distributor gross, whichever is greater. The Superman film agreement further provided that, "in the event Warner" failed "to make any payment due to DC" for the initial option or the extension option fee, or any payment for contingent compensation, then DC Comics had the right to notify Warner Bros. of its "desire to effect a reversion of rights," subject to Warner Bros. having a three month period from receipt of such reversion notice to cure said deficiency by making "the applicable payment due to DC for the then-current Extension Period." If, however, Warner Bros. failed to make such payment, the rights granted under the agreement would automatically revert to DC Comics. In addition, the agreement provided Warner Bros. the right to assign any or all of its rights under the agreement to anyone without any requirement for approval or input by DC Comics before doing so, the only proviso being that, if Warner Bros. assigned its rights to a party aside from "a major motion picture company," it would continue to be obligated to make the option extension payments called for in the agreement.

**\*4** DC Comics reserved certain rights to the Superman property to itself, the most notable being the merchandising rights. In this regard, the agreement provided that, although DC Comics reserved all said "merchandising rights," Warner Bros. was entitled to receive a share of the net proceeds from the merchandising generated utilizing new or additional characters or elements that were contained in any film that was released under the terms of the agreement. The precise extent of Warner Bros.' share of

said "net proceeds" was never delineated in the agreement; although it was provided that, in arriving at what constituted "net proceeds," DC Comics' costs and expenses were to be deducted as well as a 20% "overhead factor." There is, however, unrebutted testimony in the record that this specific provision in the agreement has not yet been applied, and that all the profits generated from merchandising done so far has been split on a 75/25 basis in favor of DC Comics.

The Superman film agreement also contained a litany of creative controls concerning the screenplay, costume, and actors used in any film, the stringency of which was tied to whether Warner Bros. and DC Comics were corporate affiliates at the relevant time: If so, then the creative controls were ultimately left to the discretion of Warner Bros.; if not, DC Comics' decision was considered final.

Finally, the agreement provided that, despite DC Comics' reservation of its television rights, its ability to exploit those reserved rights was limited to an affiliate of Warner Bros., a provision not surprising given the Superman television rights agreement (described below) that the parties had entered into just prior to the Superman film agreement.

### Superman Television Agreement

On December 5, 2000, DC Comics and Warner Bros. Television Production, a division of Warner Bros., memorialized a "Smallville" Rights Option and Assignment Agreement for Warner Bros. to gain the exclusive rights to produce a television series utilizing the copyright in the Superman works owned by DC Comics (hereinafter "the Smallville television agreement"). The Smallville television agreement was not fully executed until February 12, 2001, although, again, the final agreement remained largely unaltered from the one put in writing by the parties in 2000.

The Smallville television agreement provided that, in exchange for an up-front payment of $10,000,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

Warner Bros. was granted the exclusive option to acquire, within one year, the television rights to the Superman works owned by DC Comics. The initial option period could be extended by Warner Bros. for an additional year with the payment of another $10,000, and could be exercised by Warner Bros. giving DC Comics written notice of its intention to do so along with the payment of $45,000. The Smallville television agreement further provided that, should Warner Bros. actually produce "an episodic television series" utilizing the material so licensed, Warner Bros. was obligated to pay DC Comics $45,000 for each episode produced, to which the prior option payment(s) were applicable. The agreement also provided for a contingent compensation package for DC Comics should Warner Bros. produce the television series on a "per episode basis" for an amount equal to 3% of the first dollar distributor gross from the first $1.5 million garnered, and then 5% thereafter.

**\*5** The Smallville television agreement also provided that, should Warner Bros. fail to begin filming a television production within two years of exercising its option under the agreement, the rights granted thereunder would automatically revert to DC Comics without any possibility for Warner Bros. to cure or to extend the period. Insofar as creative controls was concerned, DC Comics was accorded a right of consultation "concerning all treatments and teleplays to be used," but the decision on whether to integrate such comments was left to Warner Bros.' sole discretion. Regarding money generated from the merchandising "based upon the pilot or [television] series," the agreement provided that the "net proceeds" from the same would be split 50/50 between Warner Bros. and DC Comics, again subject to a 20% deduction in favor of DC Comics for costs and expenses if the merchandising activity in question was done "primarily" by DC Comics.

The Smallville television agreement was thereafter amended by the parties by written instrument on September 5, 2002, with the basic terms outlined above remaining unaltered from the prior agreement (*See* Defs Ex. 1043).

### *The Evidence Presented*

#### *The Witnesses*

In assessing the testimony at trial, the Court found some witnesses very credible and others not very credible at all. The Court found the testimony by plaintiffs' comic book historian expert, Mark Evanier, as well as the testimony of the head of DC Comics, Paul Levitz, and the head of Warner Bros., Alan Horn, both credible and persuasive. Considering their demeanor and testimony, the Court observed that each attempted to answer directly and honestly the questions put to them without equivocation or evasion, even when their answers resulted (as was especially the case with Mr. Levitz) in the admission of certain facts that were not altogether beneficial to their companies. At the same time, certain witnesses were notable for their lack of credibility. In particular, the Court singles out the film industry expert witness testimony proffered by *both* parties, Mark Halloran for plaintiffs and John Gumpert for defendants. It is apparent to the Court that, at various points in their testimony, each film industry expert attempted to couch or shape answers to benefit the party paying their fees. Their testimony, therefore, is relied upon by the Court only to the extent that it is consistent with (and thus corroborated by) the limited universe of third party film licensing agreements introduced by the parties. However, even with this understanding, plaintiffs' film industry expert, Mr. Halloran, deserves special mention.

Mr. Halloran unquestionably possesses knowledge of and experience with the customs and practices of the film industry and, as the Court found following voir dire, is technically and professionally qualified to render opinions on the subjects and categories for which he proffered testimony in this case (defendants' protestations notwithstanding), but it is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)

**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

in how he put that knowledge to use that made him a particularly less-than-credible witness.

**\*6** Observing Mr. Halloran's demeanor on the stand, his reaction to questions posed to him by both counsel, and his failure to make certain material disclosures in his expert report convinces the Court that his testimony should be afforded the least amount of weight of all who testified at trial. The problems with Mr. Halloran's credibility permeate his testimony. The Court finds especially disturbing his failure to disclose in his February 16, 2009, expert report (*see* Pls' Ex. 332), as is required by Federal Rule of Civil Procedure 26(a)(2)(B)(v), recent testimony he provided in a 2008 case, *see Trademark Properties, Inc. v. A & E Television Networks,* 2008 WL 4811461 (D.S.C. Oct.28, 2008) , in which the federal district court judge *excluded* his expert testimony on *Daubert* gatekeeping grounds because the methodology Mr. Halloran used to arrive at his expert opinion was suspect. *Id* . at \*2. This omission is all the more notable in that Mr. Halloran also failed to disclose this same testimony in the expert report he submitted in connection with the *Watchman* case that was recently litigated and settled. When confronted with this *repeated* failure on his part, Mr. Halloran sought to ascribe it to an inadvertent mistake. The Court is not convinced. Given the nature of the information and the fact that Mr. Halloran has failed to make this disclosure in the two matters in which he has testified since his expert testimony was barred in the *Trademark Properties* action, the Court can only conclude that the failure was a deliberate effort to bury negative information.

Furthermore, Mr. Halloran's demeanor and answers to questions-notably the long pauses before answering defense questions (which grew in length as the trial progressed) and his repeated requests for defense counsel to repeat questions and/or provide him copies of agreements or prior deposition testimony, his repeated need to refer to his chart to answer fairly simple questions, and his attempts to interject objections to questions posed to him on

cross-examination-leave the Court with the distinct impression that Mr. Halloran's opinion is, at worst, largely malleable, bent and shaped to produce predetermined results to help his client, or, at best, so highly idiosyncratic as to be largely devoid of evidentiary value. Because the Court finds both parties' experts inadequate, both in terms of credibility and, as will be demonstrated below, in terms of the evidence they considered in reaching their opinions, the Court is reluctant to rely solely on the parties' designated expert witnesses in the accounting trial in this matter.[FN3]

> FN3. As disclosed by the Court at the status conference on July 6, 2009, the Court intends to appoint, subject to any sustained conflict-related objections by the parties, a Special Master and/or expert witness to review, and if necessary employ experts to review, all pertinent discovery herein, and thereafter submit an independent report and recommendation to the Court, which report will be subject to cross examination by the parties and may be used as evidence by the parties and the Court at the accounting trial.

### The Agreements

Experts aside, the Court is left with the dozens of third-party film and television licensing agreements, apparently negotiated at arms length, that were introduced by the parties as a basis to provide a "comparable" to what the Superman film and television licenses at issue in this case would have garnered on the open market. As with the parties' film industry experts, the Court is similarly troubled by the highly stilted nature of the evidence presented. The parties have presented evidence as if the film and television rights to the entirety of the Superman property was comparable in value to, in the case of plaintiffs, well-known musicals (*My Fair Lady, Annie* ) or bestselling novels by marquee authors (Tom Clancy, Michael Crichton, J.R.R. Tolkien, Clive Cussler, Thomas Harris); or, in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)

**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

case of defendants, as if Superman was equivalent to a low-tier comic book character that appeared mostly on radio during the 1930s and 1940s and that has not been seen since a brief television show in the mid-1960s (the Green Hornet); an early 20th century series of books (Tarzan) or a 1930s series of pulp stories (Conan) later intermittently made into comic books and films; or a television, radio, and comic book character from the 1940s and 1950s, much beloved by my father, that long ago rode off into the proverbial sunset with little-to-no exploitation in film or television for decades (The Lone Ranger). It is this limited universe of largely *incomparable* agreements from which the parties have forced the Court to make a choice as to which is more like Superman.

**\*7** In sum, the third party licensing agreements presented by the parties provide the Court with an *incomplete* and largely *inadequate* record upon which to decide what a comparable property to Superman would and did achieve in the open market at or near the relevant time period, and thus largely complicating the Court's task in assessing the valuation of the film and television rights to the Superman property transferred by DC Comics to Warner Bros.

Many of the most obvious comparable properties-namely, arms-length transactions for the film licensing rights to other *notable* and contemporaneously *popular* comic book characters-were not presented or, if so, were presented by *defendants,* albeit in an incomplete fashion to refresh a witnesses' recollection. Notably, despite plaintiffs' counsel's repeated refrain to the Court that the Superman film rights were highly valuable because comic book film rights were "hot properties" during the relevant period-expressly referencing the box office success of such comic book characters as X-Men and Spider-Man-nowhere did plaintiffs' counsel introduce (nor apparently even seek to subpoena) the film licensing agreements for these very comic book characters. For example, plaintiffs' counsel failed to introduce or even obtain the mid-

1990s film licensing agreement between Twentieth-Century Fox and Marvel Entertainment Group, Inc. (henceforward "Marvel Comics") for the X-Men comic book, or the 1999 film licensing agreement between Sony and Marvel Comics to the Spider-Man comic book character, or the film licensing agreement between Marvel Comics and Twentieth Century Fox to the Fantastic Four comic book, or the film licensing agreement between Marvel Comics and Universal Studios to The Incredible Hulk comic book. In lieu of providing licensing agreements for the film rights to intellectual property of similar popularity and awareness and from the same genre as the one at issue in this case, the Court was instead presented by plaintiffs' counsel with a patchwork of agreements covering varying types of literary properties outside the comic book genre, including musicals from the 1950s to 1970s (My Fair Lady, Annie, Chorus Line), recent best-selling novels (Tom Clancy's *Rainbow Six, Red Rabbit* and *Sum of All Fears,* Michael Crichton's *Timeline,* or Thomas Harris' *Hannibal* ), or, even more incredibly, a web creation then popular with little girls-the NeoPets. The reason for such a lack of direct comparable evidence on plaintiffs part was never explained by plaintiffs' counsel, even when expressly challenged in defense counsel's closing arguments.[FN4] Although, as noted above, defendants did no better in presenting truly comparable works, the Court is mindful that the burden of proof is on plaintiffs.

> FN4. The Court's puzzlement concerning this point was, in some measure, put to rest when it stumbled across a case involving a dispute between Stan Lee (the artist who helped create Spider-Man, X-Men, and The Incredible Hulk) and Marvel Comics over profit participation in the film receipts from those properties. *See Lee v. Marvel Enterprises, Inc.,* 386 F.Supp.2d 235 (S.D.N.Y.2005). In the order resolving the parties' cross-motions for partial summary judgment, the district judge (Honorable Robert W. Sweet) quoted certain of the dir-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)

**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

ect economic terms of the film licensing agreements of these two comic book properties-Spider-Man (which was characterized "as Marvel's most valuable asset," *id.* at 240) and The Incredible Hulk. For instance, Judge Sweet observed that the Spider-Man film agreement "contained a gross-participation provision," *id.* at 240, although it appeared that said participation was for less than a "first dollar gross profit participation" and keyed to some lesser measure of "gross receipts ." Marvel Comics' chief creative officer, for instance, conceded that there were "deductions taken off revenues before calculating the gross proceeds in which Marvel would participate" under the Spider-Man agreement. *Id.* at 241 n. 3. Nonetheless, Marvel Comics garnered "more than $50 million" in contingent compensation under the agreement against the "more than $800 million" the 2002 Spider-Man film generated in "worldwide box-office gross"; this amount would roughly translate into 6     1/4 % of first dollar worldwide gross, but was probably a higher percentage given that the agreement did not give Marvel Comics a share of first dollar gross. *Id.* at 240. Likewise, Marvel Comics' 2001 report, which consisted of the company's Form 10-K financial statement and also referenced in Judge Sweet's opinion, appears to suggest that the up-front fixed fee Sony paid for the property was significantly higher (perhaps approaching $10 million) than that contained in the comic book film agreements in the record before the Court. *Id.* at 241-42. Judge Sweet further elaborated on the merchandising arrangement in the Spider-Man agreement, noting that "Marvel reserved all merchandising rights and then contributed these rights to a limited partnership known as Spider-Man Merchandising LP. This entity is owned 50% by Sony and 50% by Marvel, and

Marvel is en titled to 50% of its profits." *Id.* at 243. Insofar as the merchandising for The Incredible Hulk agreement, Judge Sweet noted that the studio, Universal Pictures, "handle[d] all film-related international merchandising, with the revenues therefrom to be split evenly after certain deductions by Universal." *Id.* at 243. Interestingly, Stan Lee's accounting expert in the matter before Judge Sweet (and thus someone who had access to the agreements at issue in that case) is also plaintiffs' accounting expert in *this* case-Steven Sills, *Id.* at 242. Although the Court takes judicial notice of the district court's published opinion in *Lee,* the Court does not rely on that opinion, or the information contained therein, in deciding the issues at stake in this trial. It does, however, go a long way in addressing the Court's curiosity as to why *neither* party sought to introduce *the most comparable* film agreements at the time.

It is with these witnesses and exhibits that the Court is left to render a judgment, however incomplete and challenged that record may be, on "what a willing buyer would have been reasonably required to pay to a willing seller" for the film and television rights to Superman. *Frank Music Corporation v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d 505, 512 (9th Cir.1985) (setting forth the test for fair market value in the copyright infringement context). Such a market value approach is an objective analysis, focusing on such considerations as expert testimony as to market value, previous dealings between the parties, and the compensation obtained on the open market for the license of similar rights to other comparable literary properties. *See Jarvis v. K2 Inc.,* 486 F.3d 526, 534 (9th Cir.2007).

### *Analysis of Superman Film Agreement*

**\*8** To begin, the Court wishes to put to rest the interminable contest between the parties as to pre-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

cisely how valuable *in general* the Superman character as a film franchise and a comic book character was during the relevant period in question. Defendants' film industry expert witness, Mr. Gumpert, termed Superman as "damaged goods," a character so "uncool" as to be considered passe, an opinion echoed by Warner Bros. business affairs executive, Steven Spira. Plaintiffs' witnesses, on the other hand, provided a glowing assessment of Superman, terming him as being near the zenith of his value, due in some measure to his seventy years of continued exploitation and deep public awareness, but even more so because he was a comic book character and such properties had an overall high value to film studios at the relevant time as they were amenable to being developed into "tent-pole" franchise films, meaning big-budget film productions that appeal to all or most demographics of movie-goers.

The Court finds the assessment provided by Warner Bros.' President, Mr. Horn, as the most persuasive, reflecting a measured assessment that took into account all the positive factors mentioned by plaintiffs (but downplayed by defendants' expert), while acknowledging the sobering reality reflected in Superman's prior theatrical track record over the four films released in the 1970s to mid 1980s, a factor downplayed by plaintiffs' expert. Indeed, Mr. Horn admitted to being "daunted" by the fact that the 1987 theatrical release of *Superman IV* had generated around $15 million domestic box office, raising the specter of the "franchise [having] played out." (Trial Tr. at 128-29). As Mr. Horn gauged Superman's theatrical value: "My view of Superman as an evergreen theatrical motion picture property is that it is viable but not-but challenged." (Trial Tr. at 150).

Based on all the evidence, the Court is likewise convinced that, during the 1999 to 2002 period, Superman as a film property was indeed a *potentially* valuable franchise, subject to a studio's ability to successfully "reboot" it by adding something-a storyline or a perspective on the character-that perhaps had not been sufficiently explored, high-

lighted, or exploited before. The Superman property's potential value is illustrated by the fact that Warner Bros. was willing to spend over $60 million over a decade in an attempt to develop a film based on the property *before* it finally settled on beginning production of *Superman Returns*. At the same time, the property's challenge is also illustrated by the fact that Warner Bros. spent more than 10 years creating different scripts and attaching different directors and actors in its valiant attempt to translate Superman to the screen *before* it settled on the formula used in *Superman Returns*.

Next, the Court also rejects the argument put forward by plaintiffs' counsel and their film industry expert, Mr. Halloran, that the film licensing agreements to best-selling novels or wellknown musicals from times past should serve as the lodestar for gauging the fair market value to a well-known comic book superhero such as Superman circa 1999 to 2002. There are two reasons why the Court finds the film license agreements to such musicals and best-selling novels (and importantly the economic terms bargained for the same) are not the most comparable to, and are largely unpersuasive evidence of the value of, the Superman property.

**\*9** First, as several witnesses testified, and the Court finds persuasive, best-selling novels are much more valuable than comic book characters from a film-making perspective because the former are a more "known quality" in terms of what exactly the film studio is purchasing (or optioning to purchase). The film script is already in a more or less concrete form and has already been test-marketed in a similar form (as a novel) to the public; comic books may have well-known *characters,* but the storylines upon which a movie involving said characters are featured is not necessarily known or well-defined at the outset. This point is underscored by the numerous different film scripts, with different possible storylines and utilizing different actors and/or directors, that were being developed by Warner Bros. over the course of more than a decade prior to even bringing the property to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

the screen. (Trial Tr. at 74, 126).

Second, the further one gets away from literary properties that are not based on comic books, the more problematic it becomes to assess and calculate individual terms or provisions in licensing agreements. For instance, the opportunities and areas in which the audiovisual rights for novels or musicals can be exploited for profit are much narrower than comic-book based properties. This has a direct effect on the valuation of certain economic terms in the respective film agreements involving one category of properties as opposed to the other. A review of the film licensing agreements for best-selling novels submitted by plaintiffs, for example, demonstrates that the economic bottom-line is largely confined to the profits made by the box office receipts from those properties' theatrical release. Many of the novel and musical licensing agreements contain small or meager economic terms related to film-merchandise associated with the properties' film release.

Plaintiffs' expert, Mr. Halloran, acknowledged that there is a "distinction between a comic book, where there's either preexisting merchandising or a potential for merchandising revenue, and a literary work, where there's really no potential for merchandising. Those are two different animals." (Trial Tr. at 686). Indeed.

It is thus not surprising that, with respect to novels, parties focus on the value of the film license in terms of box office terms, namely, the purchase price (and/or option payments) and the percentage level of contingent compensation generated from a film's release. The audiovisual exploitation opportunities for comic books, on the other hand, are more broad-based, with the overall "value" of the property being divided into various streams of revenue arising from a theatrical release, including not only box office receipts but also merchandising, video games and the like. The limited number of file licenses submitted concerning comic book properties (again, nearly all of which were submitted by defendants) demonstrate this insight.[FN5]

The merchandising rights and the split in profits concerning the same are much more aggressively negotiated than in the case of a novel, for example, by Michael Crichton, Clive Cussler, or Tom Clancy, or a movie based on a book by Thomas Harris concerning the character Hannibal Lecter. Given this, it is not surprising to find that, for instance, the levels of contingent compensation are much lower across the board for the comic book properties in question than for novels, or that the purchase price for, or option payments toward, acquiring said comic book properties is much lower than for novels.[FN6] Conversely, it also appears generally true that the merchandising arrangements for comic book properties are much higher than is generally the case with novels.

> **FN5.** Again the distinction observed by the Court is predicated upon the comic book film licensing agreements that were presented at trial. Perhaps such a distinction would not hold up to scrutiny when speaking of well-known comic book characters, such as those entered into for Spider-Man, X-Men, and The Incredible Hulk. Again, plaintiffs' counsel never attempted to subpoena, let alone introduce, said licensing agreements against which this observation could be tested and either verified or disproved.

> **FN6.** For instance, the film license to the Clive Cussler work *Sahara* provides for the rights holder to receive 10% of producer's gross and a purchase price of $20 million; the film license to Thomas Harris' work *Hannibal* contains a 10% of first dollar gross and a $10 million purchase price, the film license to the musical *Annie* contains a participation of 10% of first dollar gross escalating to 12.5% and a purchase price of $9.5 million; the film license to the Michael Crichton work *Timeline* has a participation of 10% of "adjusted gross" (which appears to be less than distributor

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

gross) escalating to 20%; and the film licenses to the Tom Clancy works *Rainbow Six* and *Red Rabbit* have a participation of 10% in "adjusted gross" with a purchase price of $6 million and $7 million, respectively.

**\*10** To do as plaintiffs and their expert, Mr. Halloran, insist and use this "inflated" purchase price for novels and musicals as the basis for determining the fair market value for a comic book property, even one as well known as Superman, would be truly comparing apples or oranges. The proposed test and the one adopted by the Court in reaching its conclusion looks at the *overall* economic package contained in the film license agreements; it does not cherry-pick one or two terms from one license agreement (or even a class of properties such as a novel's or musical's purchase price and contingent participation) and then add to it the merchandising levels found in other agreements relating to comics book characters.

### Fair Market Valuation of the Direct Economic Terms

Based on the evidence at trial, the Court finds that the most comparable deal for the Superman property at issue would be that for a well-known comic book circa 1999 to 2002. Accordingly, the Court further finds that, *among the agreements produced at trial by the parties,* the deal reached for the film rights to the comic book X-Men best represents a reasonable range for adducing the fair market value for the Superman character and for judging the reasonableness of the terms in the Superman film agreement. The Court was presented with unrebutted evidence that, during the period of 1997 to 2002, Marvel Comics' X-Men comic was the most popular comic book published and that sales of the comic ranked as the highest among the top four comics at that time (the remaining comics being ranked, in order, as Spider-Man, Batman, and then Superman "on a good day"). (Trial Tr. at 1080). Moreover, there is unrebutted testimony that the

deal terms of the X-Men film agreement in evidence represented the most that a film studio had paid for a comic book property at the time of its execution. (Trial Tr. at 1088-89).

The X-Men film rights licensing agreement between Marvel Comics and Twentieth Century Fox was, according to the testimony of Mr. Levitz, executed sometime in the "mid-1990s" (based on his recollection from inspecting Marvel Comics books and records upon its filing for bankruptcy). Although the agreement itself was never admitted into evidence (instead it was identified by Mr. Levitz and shown to him to refresh his recollection of its terms), Mr. Levitz testified that the core economic terms were as follows: "[A]n initial option [payment] of $150,000 [made] against a purchase price of [$1.5 million] and a contingent compensation formula that basically began to be effective [in that money was paid out] after some form of artificial break even [point]." (Trial Tr. at 1085-86). At no point did plaintiffs' counsel seek to further examine Mr. Levitz as to the terms to which he testified, nor ask about the remaining terms in the X-Men film licensing agreement, nor seek to introduce the actual agreement into evidence. Instead, plaintiffs' counsel scoffed at the terms revealed in the mid-1990s X-Men agreement, suggesting that later amendments to the agreement executed *after* the hugely successful theatrical release of the *X-Men* film in 2000 led to large increases in the economic terms testified to by Mr. Levitz. Of course, what is notable about plaintiffs' counsel's argument is that it is based entirely on conjecture; plaintiffs' counsel never once introduced, much less even attempted to subpoena, these much-touted later amendments to the X-Men film agreement. Instead, the Court is presented with the economic terms to the agreement as testified to by Mr. Levitz after consulting with the actual agreement itself to refresh his recollection.

**\*11** In comparison, much of the economic terms in the Superman film agreement are within the same range as those identified in the X-Men film agree-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)

**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

ment. Admittedly, not all the possibly relevant direct economic terms in the X-Men film agreement are in the record (for instance, no mention is made of the merchandising split, or the exact percentage participation in contingent compensation), but there is enough to make a useful comparison. Thus, although no specific participation percentage was disclosed by Mr. Levitz for the X-Men agreement, the 5% of first dollar distributor worldwide gross in the Superman film agreement is as good as and, indeed, may be better than, that in the X-Men film agreement. The rights holder in the X-Men agreement does not even begin to receive payments on the contingent compensation from the film's box office receipts until the film crosses "some form of artificial break even [point]." DC Comics, on the other hand, receives payment under the agreement's contingent compensation provisions from the first dollar that is generated at the box office.

Moreover, the amount of the initial, up-front option payment and/or purchase price contained in both agreements are equal to one another: An up-front "option fee" of $1.5 million in the Superman film agreement and a $1.5 million purchase price to be paid at some point *after* the execution of the X-Men film agreement. Admittedly, the X-Men film agreement was entered into just on the cusp of the period when comic book characters were considered, in plaintiffs' counsel's words, "hot properties," but the relevant Superman film agreement itself was, for the most part, entered into by the parties only a few years later, in 1999 (the formal execution of the agreement coming three years later with relatively small changes of no consequence).

That the direct economic terms in the Superman film agreement circa 1999 stand in good comparison to those in a film agreement for a comparable comic book property (X-Men) undermines the suggestion that the Superman film agreement was a "sweetheart deal" entered into at the expense of DC Comics. Whether this comparison still holds three years later when the Superman film agreement was formally executed (as opposed to being initially memorialized) requires a comparison to what exists in the record from that later period.

Other arms length film licensing agreements involving comic book characters introduced by defendants confirm that much of the direct economic terms in the Superman film agreement are within the range of fair market value circa 2002. Although the film licensing agreements for the comic book properties in the record that were entered into between 2001 and 2004 are not in the same league as a Superman, and thus do not serve as a wholly adequate "comparable," the absence of any other evidence concerning what the film rights to a well-known comic book character would garner on the open market circa 2002 leaves the Court with little left in the record upon which to make a true "apples to apples" comparison.

**\*12 •** The 2003 Tarzan film agreement provided for a two-year initial option period in exchange for $250,000 that could be extended for three years for a payment of $750,000. The Tarzan film agreement also provided that, upon the exercise of the option, the purchaser would be required to make a payment of $1.75 million, for which the earlier option payments were made applicable. Although the purchase price amount the purchaser paid in securing the film rights to Tarzan was slightly more than the same price paid for Superman, one significant difference is that DC Comics realized the money from said payments up front, at the execution of the agreement, whereas the rights holder to Tarzan could be forced to wait for up to four years to realize the relatively same amount of money. Utilizing a net present value calculation, the purchase price for the Tarzan film rights comes in as roughly the same as that of the Superman film rights. Moreover, the contingent compensation in the Tarzan agreement of 2 1/2 %, escalating to 5%, of "defined gross" (again, something that would total less than the first dollar distributor gross in the case of the Superman film agreement) was much less than that provided to DC Comics in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

Superman film agreement.

• The 2002 Conan film agreement similarly provides for an initial 18 month option in exchange for the purchaser paying the rights holder $1 million that could be extended for another year with the payment of an additional $1 million. Upon the exercise of the option, the Conan film agreement called for the purchaser to pay a purchase price of $2.75 million, again with the previous option payment(s) made applicable to the purchase price. Although the Conan film agreement ultimately provided for a larger option/purchase price than was the case with Superman, DC Comics stood to realize the gain from its licensing arrangement immediately, upon the execution of the agreement, whereas the rights holder in the Conan agreement may have to wait up to two and half years to realize the same, and even then that was only if the purchaser decided to exercise the option, a contingency not required for DC Comics to realize the $1.5 million for Superman. Nonetheless, even with these caveats, the purchase price in the Conan film agreement was significantly higher than that provided in the Superman film agreement (exceeding the latter on a net present value basis by over $1 million). Moreover, the contingent compensation in the Conan agreement of 2 1/2 %, escalating to 5%, of "defined gross" was less than that provided to DC Comics in the Superman film agreement. Finally, the film-related merchandising split in the Conan agreement was on a 50/50 basis *after* a 20% deduction in favor of the rights holder as an administrative fee, which effectively translated to a 60/40 split in favor of the rights holder. The Superman film agreement's merchandising split, in comparison, was more advantageous (a 75/25 split in favor of DC Comics).

*13 • The 2001 Iron Man film agreement (later amended in 2002 and 2004) also contained relatively modest option payments in comparison to those called for in the Superman film agreement- an 18 month option in exchange for $250,000 that could be extended one year with the payment of $650,000-with no purchase price payable upon the exercise of the option. The contingent compensation in the Iron Man film agreement was 2 1/2 % of first dollar gross escalating to a "hard floor of 5%" of first dollar gross, which is less than that provided for in the Superman film agreement of 5% of first dollar world-wide gross or 7 1/2 % of first dollar domestic gross whichever was greater.[FN7] Finally, the merchandising split in the Iron Man film agreement is based on sales exceeding a baseline established for the two and half years preceding the film's release, any merchandising money generated in excess of this baseline being split on 50/50 basis subject to a deduction up to 40% (beginning at 25%) in favor of Marvel Comics as a distribution fee, which effectively made the split 37.5/62.5 up to a 30/70 split. The Superman film agreement's merchandising split, in comparison, was more advantageous.

> FN7. Defendants also introduced the 1987 film licensing rights to the Watchman graphic novel entered into between DC Comics and Twentieth Century Fox, but given its age as well as its relatively little known nature (again outside the context of comic book afficionados), the Court did not consider it noteworthy for performing a valuation of the Superman film rights at issue in this case.

Certainly none of these comic book characters were as well-known (outside of comic book fans) or as pervasively exploited at the time of the film licensing agreements as was Superman. Plaintiffs' comic book expert, Mr. Evanier, for instance, noted that, despite Iron Man's current popularity and heightened public awareness brought about in large measure by the successful release of the *Iron Man* film in 2008, at the time when the film rights to the property were sold, the comic book character was considered a "minor" or "lower-tiered" property held by Marvel Comics. (Trial Tr. at 84-85).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

Despite these problems, the film agreements for these lesser known comic book characters do provide a useful purpose, serving as a sort of baseline or floor for evaluating the Superman film agreement. Significantly, market valuation is not tied to finding what was the *best* price that DC Comics could have obtained for the film rights to the Superman property, but what a "reasonable" price would have been paid for it by a willing buyer. *Cf. Jarvis,* 486 F.3d at 534-35 (approving of district court's decision on market valuation as the value placed fell "within the range of" that supported by the evidence in the record). Although none of these comic book characters are fully comparable to Superman, the Court finds that some of these direct economic terms in the Superman film agreement, including the contingent compensation and merchandising provisions, well exceed this floor. Also significantly, these same terms in the Superman film agreement exceed those that a more comparable comic book property (that is, X-Men) fetched only a few years earlier. Indeed, even when judged against many of the novel and musical film licensing agreements produced by plaintiffs, which given their nature can be viewed to serve as a sort of ceiling for evaluating reasonability, these same provisions stand fairly well in comparison. This point is all the more noteworthy given that the terms at issue are the ones in those musical and novel agreements upon which much of the value of the property was poured into. Accordingly, the Court finds that the merchandising split and the contingent compensation provisions in the Superman film agreement were at fair market terms.

**\*14** That said, one other direct economic term in the Superman film agreement lies, at best, at the lower end (perhaps very bottom) of the range of what a willing seller would have sold the property for-namely, the up-front fixed fee that DC Comics received under the agreement. The fixed fees for Tarzan and Conan equaled or exceeded those found in the Superman film agreement despite the fact that those properties were less-known or imbedded in the public's awareness than Superman. Although

the up-front fixed fee in the X-Men agreement was the same as that found in the Superman agreement, Mr. Levitz acknowledged that, at the time of its execution, the X-Men agreement "still had not moved the market into the territory it would go into five or six years later." (Trial Tr. at 1089). Finally, when judged against the perhaps artificially inflated ceiling in the novel and musical film agreements, the up-front fixed fee in the Superman film agreement pales in comparison.

Given the close proximity of the Superman initial option payment to that found in the film agreements for the lesser known comics mentioned above, the value of well-known properties with great public awareness, and allowing for some inflation of the purchase price terms for the X-Men film licensing agreement from the mid-1990s (due to the increased interest studios exhibited for comic book properties at the time), the Court finds that a reasonable, market-driven, up-front fixed purchase price/initial option payment for the Superman property during the relevant period would have been somewhere in the range of $4 to $6 million, rather than the $1.5 million in the film agreement. An even higher purchase price may have been warranted but for the fact of the generous contingent compensation and merchandising provisions in the agreement. If such a market-determined term was inserted, then the share that Warner Bros. would have to contribute would be between $2.5 to $4.5 million (deducting the $1.5 million already conveyed as the initial option fee).

*Significance of the Nature of the Transferred Rights*

Despite this fair market "defect" in one portion of the value of the direct economic terms in the Superman film agreement, there lies a fundamental problem with the evidence presented by plaintiffs at trial that precludes recovery: Their failure to even attempt to place a value on that *part* of the Superman property which DC Comics transferred to Warner Bros., of which plaintiffs are coowners and, pursuant to this Court's earlier orders, have an undivided

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

one-half interest.

Plaintiffs spent nearly the entirety of the trial focusing on the value of the overall Superman property, as if they have an ownership interest in and right to an accounting for the same. Far from it. This point is not, as plaintiffs' counsel sought to diminish at the outset of the trial, an effort to "glom onto" something in an effort to obscure the issues in the case; it reflects the reality of what plaintiffs actually own and have an interest in and, consequently, to which DC Comics owes a duty to account. As the Final Pre-Trial Conference Order in this case clearly spelled out, the matter for trial was "whether the value of the various Superman option and assignment agreements ... and the amounts paid ... thereunder, reflect the fair market value of the nonexclusive rights that the Court determined were transferred from DC Comics to [Warner Bros.], and, if not, what accounting shall be required of Warner Bros.... to ensure an equitable result."

**\*15** In finding that DC Comics only transferred its non-exclusive rights in the Superman copyright to Warner Bros., the Court only spoke in terms of that portion of the copyright that is found in *Action Comics No. 1*. Outside of the copyright to the Superman material found in that one work, DC Comics did indeed transfer its exclusive rights to the remainder of the copyright in the other Superman works that had been created over the past seventy years in which it has been exploited. In this respect, both plaintiffs' film industry expert, Mr. Halloran, and defendants' film industry expert, Mr. Gumpert, both agreed that, by itself, a non-exclusive license to *Action Comics No. 1* was "not marketable," in Mr. Halloran's words, and that there existed "a very limited market for nonexclusive rights," in Mr. Gumpert's words. Why this is so is not surprising. Just as a party can force a buyer's bidding war when it owns the exclusive rights to a valuable property, as indeed was testified to have occurred with respect to some of the marquee authors referenced in this case, the opposite is true with respect to the sale of non-exclusive rights, especially where there

is more than one owner of the rights for sale. In that context, the buyer can force the co-owners of said rights to bid against themselves, leading to a lowering of the asking price. There is, in effect, a selling war-with each co-owner having the incentive to price down what they have for sale so as to underbid their co-owner of those same rights. The situation may be different were there but a single owner (or a commonly represented/assignee of the co-owners) of *Action Comics No. 1*. Without coordination, an increasing number of sellers has a negative depressing effect on the price for the property. Given that plaintiffs have presented no evidence indicating what value, if any, there would be to the non-exclusive rights to *Action Comics No.1* that DC Comics transferred, there is simply no evidentiary basis upon which the Court could even engage in the process of determining whether the Superman film agreement (or for that matter the Smallville television agreement) was consummated at less than fair market value.

This Court sits in equity in this case, but that does not license the Court to increase the assignment of that which plaintiffs own. At present, plaintiffs are the co-owners to the copyright in the Superman material published in *Action Comics No. 1*. They are not the owners of the entirety of the Superman copyright. Although, as noted above and below, there are, at least with respect to the Superman film agreement, certain troubling valuation questions raised by the evidence as to DC Comics' transfer of its remainder in the exclusive Superman audiovisual rights, plaintiffs have done nothing to value DC Comics' non-exclusive transfer of what they own.

Plaintiffs' counsel's general reference in closing argument (no specific reference being made, instead simply a citation to a *twenty* page portion of the trial transcript) to the testimony of his expert witness, Mr. Halloran, as somehow addressing the problems raised by defendants concerning valuation of the only relevant rights transferred, and hence at issue, does not advance his clients' cause. In essence, Mr. Halloran testified that attempting to value separ-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

ately the non exclusive rights in *Action Comics No. 1* transferred by DC Comics to Warner Bros was immaterial on its own; the value of any of the various copyrights (be they the original or derivatives thereof) that have been amassed over the course of the past seventy years, he testified, comes in their "package deal" nature-one is as essential to the overall copyright as the remainder combined (and, by extension, so too the valuation of the same). As Mr. Halloran testified:

**\*16** Q. Does the fact that the film rights and television rights to Action Comics No. 1, does the fact that that-that DC held only non-exclusive rights and therefore could only have transferred nonexclusive rights to Warner Brothers alter your opinion as to whether the relevant agreements were for fair market value?

A. No.

Q. Why is that?

A. Again, because there was no separate consideration in the agreement and the description of the property was very broad. The transfer was very broad; there was a transfer of literally thousands of copyrights. Action Comics [No. 1] was just one out of that universe of copyrights that was being transferred under both the film and television agreement.

Q. What was the quantitative impact, if any, on Warner Brothers of certain rights, in this case, Action [Comics] 1, turning out to be nonexclusive based on the Court's recent ruling?

A. I don't believe there's been any quantitative impact at this point.

Mr. Bergman: Objection. Lack of foundation.

The Court. Ask him why. [To the witness:] Why is that?

A. Warner has acted-once you get past the transfer on the face of the contract, Warner post notice of

termination went ahead and produced the movie, produced the television series, and has held themselves out to the public and acted as if they were the exclusive owner.

(Trial Tr. at 364-366).

There is much intuitive appeal to the notion that no film studio would seek to purchase, much less develop for film, a Superman motion picture that did not include the well-recognized costume, the familiar storyline template, and other noted elements contained in the material published for the first time in *Action Comics No. 1*. Of course, it may also be true that no studio would wish to develop a Superman film without the ability to utilize some of the other famous elements associated with the Superman character, be they arch villains, additional powers and abilities (for example, the ability to fly as opposed to simply leaping over buildings and x-ray vision), or weaknesses (kryptonite), all of which are found in the Superman material published *after Action Comics No. 1*. But even if this common-sense understanding as to the interwoven nature of the value of the component parts to the overall Superman character (as developed over seventy years) is acknowledged, there is no indication that this would have rendered the value of the particular rights conveyed by DC Comics in *Action Comics No. 1* as being co-extensive with the remainder that were conveyed.

At present, the copyright to *Action Comics No. 1* is co-owned. This co-ownership dilutes the value of this particular subset of the overall Superman property from the rest, as it allows for any buyer of such rights to force a bidding war among the co-owners, playing each off the other to obtain the lowest possible purchase price. In this sense, plaintiffs cannot piggyback off the value to the entire 70 years' worth of Superman material to overcome the need to present proof as to the separate value of the nonexclusive rights to *Action Comics No. 1*. Some separate valuation was needed by plaintiffs-an evidentiary burden they never attempted to meet.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

**\*17** Indeed, Mr. Halloran's opinion is predicated upon his view that Warner Bros., *once it received* the non-exclusive rights in *Action Comics No. 1,* was not impeded in its efforts to develop the property so transferred into a feature film. That point, however, does not address what Warner Bros. would have done, or been able to do, had it not had the rights to *Action Comics No. 1,* be they exclusive or nonexclusive for that matter, at the time. That Warner Bros. felt comfortable with the rights so transferred to make a Superman film is not surprising given that it had all the rights it would need, especially since all those rights, save for the one in a single comic book, were transferred to it on an exclusive basis. And it is that question, the value of those non-exclusive rights, that must be addressed for purposes of this trial.

Mr. Halloran's further observation that DC Comics would be in breach of the warranties and indemnification provisions in the film agreement because it represented that *all* the rights it conveyed were exclusive is similarly immaterial to the valuation of the non-exclusive rights in *Action Comics No. 1* itself. Mr. Halloran testified that such a breach would expose DC Comics to an action "in damages for the breach of that representation and warranty." (Trial Tr. at 367). What is missing from Mr. Halloran's testimony is any suggestion that Warner Bros. would not have purchased all the rights conveyed to it in the Superman film agreement for the same price even if it were made known that one of those rights was transferred on a non-exclusive basis.

Finally, Mr. Halloran made much of the fact that Warner Bros. did not make any attempt to enter into a separate license with the plaintiffs to procure their share of *Action Comics No. 1* after the parties' settlement talks broke down; the implication being that, if the exclusivity of said rights was important or viewed more valuably by Warner Bros., such an effort would have been undertaken after they received only non-exclusive rights from DC Comics. However, all this proves is that once Warner Bros. had some legal right to exploit the rights in *Action*

*Comics No. 1,* it no longer became important as to the exact nature of the rights so held, especially after having received the exclusive rights to the remaining seventy years of Superman works from DC Comics. Indeed, this underscores the Court's earlier observation that co-owned, non-exclusive rights face a downward pressure on their value in the marketplace, especially if the co-owners are willing to license their rights as was the case here. Where that value-or range of values-eventually settled is unknown to the Court in light of plaintiffs' failure to present evidence or testimony placing a separate value on their non-exclusive rights.

*Fair Market Valuation of Indirect Economic Terms (Reversion of Rights)*

From the Court's review of the various film licensing agreements submitted by the parties and the testimony regarding the same, it is apparent that the key problem with the Superman film agreement is not so much its direct economic terms (although as indicated earlier there is at least one problem with those terms), but the very real danger of the property's value being substantially diminished by the action or inaction of Warner Bros. What on paper appears to be largely, albeit not entirely, a reasonable price for the Superman property may prove illusory. The entire economics, the valuation if you will, of the Superman property in the agreement (as is true of any film agreement for a franchise property) is keyed to the ongoing development and theatrical release of the property at the box office. Simply put, the continued development and exploitation of the property in the marketplace is the economic lifeblood for the film rights to a literary property such as Superman. (*See* Trial Tr. at 711-12). Without continued theatrical release, DC Comics (nor any similar rights holder, for that matter) would not receive payment under the contingent compensation package nor would there be, as Mr. Levitz persuasively noted, any "uplift" in the merchandising realized from the property.

**\*18** Moreover, unlike the direct economic terms

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)

**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

discussed above, the non-exclusive nature of the rights transferred by DC Comics are largely irrelevant to the discussion over the continued ability to develop and exploit the Superman property in film. Whatever value those non-exclusive rights might have, they are certainly worth more than nothing, but without a mechanism to ensure the continued development and exploitation of the Superman property in film there raises the very real specter that nothing is exactly what DC Comics would receive in exchange for those rights.

Under the Superman film agreement, once the initial option payment is made, the economic value DC Comics can secure through its film licensing agreement of Superman with Warner Bros. is predicated entirely on the contingent compensation terms, which themselves are only triggered upon the release of a film. The agreement contains no purchase price when the option is exercised, and the option extension payments themselves are strung out in relatively small increments over the remaining term of the Superman copyright; even then, the option extension payments can be largely or wholly wiped away with any payment made to DC Comics by Warner Bros. under the contingent compensation generated from a single release of a Superman film.

The record presently indicates that DC Comics has received $12.1 million under the contingent compensation terms in the agreement with the 2006 Warner Bros. release of the movie *Superman Returns.* (Defs' Ex. 1027). Under the terms of the Superman film agreement, Warner Bros. does not have to make *any* option extension payment to DC Comics that would otherwise have been due and owing from 2003 to 2023 in order to continue to hold onto the film rights to Superman because of the contingent compensation made for Superman. That is, save for the initial option payment and the contingent compensation received for the first film (totaling $13.6 million), DC Comics in essence has locked its film rights to the Superman property for 21 years with Warner Bros. without any guarantee

that it will receive any further payment during that time or, just as importantly, without *any* means of it extracting the property from Warner Bros. to shop the property to other studios for possible development. Such a result was not unavoidable as there exists a provision to rectify such a situation customarily found in nearly all of the third-party film agreements presented by the parties-namely, a reversion of rights clause keyed to the failure to develop and then release a film utilizing the licensed property within a set period of time.

The presence of such a reversion provision keyed to the development of both an initial film release as well as sequels thereafter is found in nearly all the third-party, arms-length agreements produced by both sides. It is contained in the agreements produced by defendants-the Iron Man film agreement, the Tarzan film agreement, and the Conan film agreement. It is found in the licensing agreements to various novels produced by plaintiffs such as the Tom Clancy film rights to *Rainbow Six* and *Red Rabbit,* Thomas Harris' film rights to his book *Hannibal,* and the Lord of the Rings agreement.

**\*19** Of particular note, the Iron Man agreement contains incentives to force the purchaser to make a movie-either staggered out and reduced option extension payments if a director has been attached or filming has commenced, or reversion of the exclusive license if filming has not commenced within certain set period of time-pegged at 18 months from the exercise of the option for the first film and three years thereafter for making sequels. Thus, unlike Superman, Marvel Comics made sure that its Iron Man property would not fall into "development hell," as Mr. Halloran described; either Iron Man would be made into a movie by the purchaser within a certain relatively short period following exercise of the option and that sequels would be made quickly and repeatedly thereafter, or the rights would revert to Marvel Comics and it could look elsewhere to develop the property.

As the evidence at trial made clear, the value of a piece of intellectual property, especially that of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

franchise nature such as Superman, X-Men, Batman, or Spider-Man, is *not* in just the large, one-shot economic windfall that comes from the release from a single movie, but from the continuing ability to exploit and ensure more such windfalls for a long period of time. For instance, X-Men was not only made into a blockbuster movie by Twentieth Century Fox in 2000, but the property was and continues to have been exploited in that fashion for nearly a decade since, including the recent release of *X-Men Origins: Wolverine* this year. Similarly, the ability to extract value from the Spider-Man film rights was not how much Marvel Comics could receive for the single release of a Spider-Man movie, but in its continuing ability to have film sequels made, released, and then receive a share of the box office receipts therefrom (as happened with the release of the Spider-Man sequels *Spider-Man 2* and *Spider-Man 3* ). That potential for sustained, large scale economic profit makes these properties of the character Warner Bros.' President Alan Horn described as a tent-pole, franchise movie. The lack of a reversion clause as described by the Court makes the potential for DC Comics to realize such gains from its Superman property problematic.

When defendants' film industry expert, Mr. Gumpert, was asked about the impact on valuation such an omission in the Superman film agreement would have, he testified that it may have value "in certain contexts, but not in the context of Superman." (Trial Tr. at 1383). When asked to explain, Mr. Gumpert opined that Warner Bros. held free and clear of DC Comics the copyrights to the first four Superman films, making it very difficult for DC Comics to sell the property to another studio because the other studio would "need to be careful not to infringe upon Warner Brothers' rights." (Trial Tr. at 1383). This same argument was also made by DC Comics' president, Paul Levitz, who noted that Warner Bros. holding the rights to the John Williams famous film score and the crystal depiction of kryptonite rendered DC Comics "hostage" to its corporate affiliate. The hostage scenario appears to the Court to be overblown. When pressed on cros-

sexamination, Mr. Gumpert could not identify any means by which Warner Bros. could compete with (and hence impair) DC Comics' ability to market the Superman property to other studios other than Warner Bros.' ability to re-release old Superman films or perhaps make a remake of those same four films. (Trial Tr. at 1431-32). As for Mr. Levitz's concern with infringing the John Williams film score or use of the particular crystal structure of kryptonite utilized in the prior Superman films, the Court cannot help but note that new film scores can be commissioned and new ways of depicting kryptonite can be fashioned, especially in industries as noted for their creativity and imagination as are the comic book and film industries.

**\*20** The other objection cited by Mr. Gumpert to placing a value on the lack of a reversion provision keyed to the development of the property was that the length of the Superman film agreement would be cut short in 2013 once the termination notices submitted by the representative of the Joseph Shuster estate become effective. As Mr. Gumpert testified: "[T]he other reason is, as I understand it, the heirs of the co-creator have noticed a termination which becomes effective in 2013. So that there's a limited period of time. In effect, since the agreement was effective in 1999, it's a 13-year license." (Trial Tr. at 1383).

Although it is true that, *should* the Shuster estate be successful in terminating the grant to the copyright in *Action Comics No. 1,* then at that point in time plaintiffs and the Shuster estate, not DC Comics, would hold the entirety of the copyright published in that comic book and would sit, assuming common representation, in much the same position Warner Bros. was said to have sat at the beginning of the negotiations over the Superman film agreement-they would hold a very valuable, and perhaps, indispensable portion of the Superman copyright, rendering any effort to exploit the remainder of the television and film rights difficult, if not impossible, without their assent. At that point, the equities which plaintiffs have so desperately sought

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

the Court to take into consideration in viewing and valuing the agreement entered into by DC and Warner *could* suddenly reverse themselves-plaintiffs would be a position to dictate terms for future exploitation of the Superman property in all forms of media, including television, film, and animation.

The problem with this line of reasoning, however, lies in its speculative nature. Although the Court recognizes that there are competing cross-currents of leverage over the near term that *could* render the likelihood or potential for future exploitation and development of Superman film much more fluid and much more beneficial from a monetary point of view, the demands presently required by equity cannot be left unaddressed due to the possibilities of the future, especially a possibility keyed to successfully navigating the formalistic and complex termination provisions in the 1976 Copyright Act. It is by no means a foregone conclusion that the Shuster estate will be successful in terminating the grant to the Superman material published in *Action Comics No. 1.*

In considering the reversion of rights issue, the Court certainly acknowledges that the potentially illusory quality of the direct economic terms in the Superman film agreement may indeed give way should it be determined by Warner Bros. that Superman is a marketable film property-there has been no evidence introduced by plaintiffs evincing an intent on Warner Bros.' part to actually handcuff the Superman property even if it is marketable. Far from it. Every Warner Bros. executive who testified at trial noted that the company's bottom line has been and remains making money. That said, there may be instances when parties disagree as to the present marketability and profitability of a particular property. Under the Superman film agreement, as it is presently structured, Warner Bros.' opinion on that subject vis-a-vis Superman is determinative.

**\*21** Subject to the making of a relatively small option extension payment (which it may not even need to make until 2023), Warner Bros. retains the ability to keep the Superman property under wraps if it views it as not presently profitable, but nonetheless believes that it may become profitable sometime in the near to mid-future. And it is precisely that circumstance that could prove the direct economic terms contained in the agreement meaningless as judged over a period of the next fourteen years; the Superman property laying dormant and unexploited for more than a decade when perhaps other studios would be more than willing to pay for, develop, and release another Superman film. Mr. Horn's judgment may indeed be correct that Superman, at present, is a viable, but challenged, property to develop (based on his testimony, the Court has great confidence in his assessment and judgment in such matters); however, other studio executives may decide otherwise. It is this precise circumstance which is what a reversion clause keyed to development is meant to avoid, and its absence calls into question whether the otherwise largely reasonable direct economic terms in the Superman film agreement (save that of the up-front fixed fee) are illusory.

Accentuating this concern is the tangled corporate and intellectual property web that presently exists between DC Comics and Warner Bros., and that was extant *before* the Superman film agreement was entered into by the parties. This complicated arrangement had, with respect to DC Comics' other intellectual property, locked in DC Comics' audiovisual rights to the same, keeping them from full and free exposure to the marketplace for ongoing exploitation and development. Mr. Levitz suggested that this business model was actually sought by DC Comics as a means to build a long term business partnership with Warner Bros. built on each company's unique talent, expertise, and assets. That may be so, but it is precisely this web that lies at the center of any problem that may exist on account of the lack of a reversion of rights clause. And indeed, DC Comics' experience under the 1974 Salkind agreement (which *did* have a reversion mechanism keyed to development, albeit one with a much longer period of time allowed between a

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

film's release and when the option period would lapse, namely, fifteen years from the release of a film or possibly up to twenty-five years from the date of the agreement) only buttresses the Court's concern with the nature of the "reversion" clause in the Superman film agreement.[FN8] Again, Mr. Levitz testified about how DC Comics had to plead with Warner Bros. to assist it in buying out Salkind twenty-three years after entering into the Superman film licensing agreement with him. The Court is hard pressed to identify exactly who DC Comics could turn to "rescue" it out of a similar dilemma circa 2020 if Warner Bros. has yet to commence filming a sequel to *Superman Returns* by then.

> FN8. In the early 1970s, Warner Bros. passed on developing a Superman film, directing DC Comics to "go license it out to Alex Salkind; we don't think anyone will care." (Trial Tr. at 223-24.) As a result DC Comics shopped the property on the open market and eventually entered into a licensing agreement with a questionable independent film maker, Mr. Salkind, which then led to the production of the first four Superman films.

**\*22** Mr. Levitz also sought to diminish the fact that the Superman property was potentially tied up for close to the remainder of its copyright term without any mechanism to ensure its continued development by observing that, the agreement's provisions notwithstanding, he could always go over the head of the executives at Warner Bros. and seek to extract or gain better terms with executives at Time Warner. However, Mr. Levitz later admitted on examination by the Court that, by the same token, Warner Bros. executives could also try to go over his head and seek a reduction in the amount owed to DC Comics under the agreement. Mr. Levitz's efforts to diminish the omission of a reversion of rights clause keyed to development in the Superman film agreement only underscored the Court's concern; his testimony indicated that the provisions were themselves "flexible" and subject to change

without formal amendment, but ultimately determined and subject to change by the heretofore unidentified custom and practice within the Time-Warner interlocking corporate structure itself.

To that end, an internal memorandum from DC Comics not long after the Superman film agreement was entered into by the parties only bolsters the Court's concern regarding DC Comics' ability to extract the Superman property from Warner Bros. should things go as badly as they did under the Salkind agreement. In October or November, 2004, DC Comics' senior vice president of creative affairs, Gregory Noveck, generated an Annual Status Report in which he placed as one of the targets for development the ability to "successfully set up DC properties outside the Warner Bros. family once they have been fully considered internally." (Pls' Ex. 187). Under the heading of goals for the coming year, Mr. Noveck listed "Selling Elsewhere" as "the hardest arena to crack," observing that, "[w]hile this has been a primary goal, a number of different factors have conspired to prevent a true success in this area.... The most important part of the process however, is the ability to extract properties from the [Warner Bros.] studio in a timely manner ." (Pls' Ex. 187). Other documentary evidence submitted by plaintiffs reveals that the vast majority of DC Comics' intellectual property has been solely pitched and/or licensed to Warner Bros. Mr. Noveck's report provides a bird's eye view of DC Comics and Warner Bros.' interactions concerning treatment of DC Comics' intellectual property at a point close in time to when the Superman film agreement was executed. The portrait painted by the report is of a business relationship in which Warner Bros. held the leverage as to when and whether a DC Comic property would be developed. Indeed, Warner Bros. enjoyed a first refusal right vis-à-vis DC Comics' properties and could even intrude in DC Comics' subsequent dealings with another studio (should it pass on its first look).

With this understanding, the value of the Superman film agreement may well be below fair market giv-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

en the length of the agreement (the remaining term of the Superman copyright before portions of the works comprising it begin to fall into the public domain) and the lack of a reversion mechanism tied to the failure to develop (and continue to develop) the property (in lieu of the relative modest option extension payments, when required). If so, perhaps as a measure of damages for bringing the agreement into conformity with what would have been insisted upon in the open market, the agreement should be "reformed" to double or triple the price of the annual option extension payments required of Warner Bros. and further render any payments made to DC Comics for the contingent compensation received from the release of *Superman Returns* or other film releases not applicable to said option extension payments. This necessarily would increase the amount of money DC Comics would have received under the Superman film license agreement, which would in turn be distributed between DC Comics and the plaintiffs in the later accounting trial, to the tune of $7 million to $10.5 million, assuming Warner Bros. had up to this point applied its contingent compensation payments against the option extension payments called for in the Superman film agreement.

**\*23** Doing so would increase the overall "purchase price" (loosely used) for the Superman film rights over the remainder of the thirty-four years of the copyright from essentially $20 million over 34 years to $60 million over that same period. Such an increase in the amount of the "purchase price" would ostensibly make it less likely that the scenario noted above would occur (where Warner Bros. decides to store away Superman, thinking it is not presently profitable but the option extension payments (if even due at the time) were modest enough to allow continued payment so that it could still keep its rights to the property in case it becomes more valuable 5 to 10 years down the road). Increasing the option extension payments required would lessen the incentive for Warner Bros. to "hedge its bets" with the property and increase the incentive to seek out an opportunity for continued development (either at Warner Bros. or elsewhere).

The rationale for placing the multiplier at two or three times the current level of the option extension payments called for in the Superman film agreement is arrived at by the Court's examination of the amount required to extend the reversion of rights period in the third-party agreements noted earlier. These agreements demonstrate that said extensions are pegged to the same price as that paid for either the purchase price of the property itself ($900,000 to extend reversion period for filming of sequel in Iron Man, and $900,000 purchase price of property) or the price for the initial option period ($1 million for extending the reversion period for filming a sequel in Conan, and a $1 million initial option payment; $250,000 for extending the reversion period for filming a sequel in Tarzan, and $250,000 initial option payment). Here, the Superman film agreement's initial option payment was set at $1.5 million, but the option extension payments (upon which the reversion clause in the agreement is keyed to continued payment of) is set at roughly a third of that-only $500,000 per year, escalating to $700,000 per year for the last 10 years of the agreement.

However, in the Court's final analysis of this issue, it is *not* enough for plaintiffs to show that the lack of a reversion clause keyed to film development *could* cause harm or require damages in the form of higher option extension payments owed to ensure that such a sequel had been made or the film rights had reverted. "In a copyright action, a trial court is entitled to reject a proffered measure of damages if it is too speculative. Although uncertainty as to the *amount* of damages will not preclude recovery, uncertainty as to the *fact* of damages may." *Frank Music,* 772 F.2d at 513 (emphasis added). For plaintiffs to succeed in proving that the Superman film agreement was in fact below fair market value, they must establish that there would have been a film sequel or a reversion of rights by this point if the agreement contained such a reversion clause keyed to film development. This they have not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

shown.

**\*24** Mr. Horn testified that, aside from his "hopes" to develop the Superman character, at present the property is not under development at Warner Bros. (Trial Tr. at 166). No script has been written, filming has not commenced, and the earliest a Superman film could be theatrically released would be in 2012. (Trial Tr. at 155). As Mr. Horn explained, "we had hopes to keep the [Superman] character alive and to once again reinvent Superman. We are—our hope is to develop a Superman property and to try again. What hurt us is that the reviews and so on for the Superman movie ... did not get the kind of critical acclaim that Batman got, and we have other issues with Superman that concern us." (Trial Tr. at 153). Thus, in the seven years since the Superman film agreement was executed a single movie has been released and no further development has occurred. How does this compare to film licensing agreements with reversion provisions keyed to continued film development?

The Tarzan film agreement provided that the rights granted would automatically revert to the rights holder if the purchaser had not commenced filming the first film within four years after exercising the option, and that reversion would also occur if the purchaser had not commenced filming a sequel within four years after the release of the prior film (with said period to make a sequel subject to an extension for another two years upon payment of $500,000). Gauged under this agreement, Warner Bros. would not be required to begin filming a sequel and hence no harm would befall DC Comics due to the lack of a reversion clause, until 2010 at the earliest, and possibly 2012 (with the payment of a half million dollar extension).

Similarly, the Conan film agreement provided that the rights granted thereunder would automatically revert to the rights holder if the purchaser had not commenced filming the first film within two and half years following execution of the agreement (a period that could be extended by a year with the payment of $1 million). Moreover, the Conan film

agreement provided that reversion would occur if the purchaser did not commence filming a sequel within two and half years after the release of the prior film, said period again subject to extension for an additional four years provided payment of $1 million. Gauged under this agreement, reversion of rights or filming of a Superman sequel possibly could have occurred by now, save for the four-year extension payment upon which no filming of a Superman sequel would have been compelled until 2012 and hence no harm from the lack of a reversion clause.

The Iron Man film agreement likewise required filming to commence within a year after the final option payment was made (which could be upwards of two and half years after execution of the agreement itself). Thereafter the agreement called for the hiring of a screenwriter for a sequel within a year after the release of the prior film and commence filming within three years of the prior film's release along with a payment of $900,000 to the rights holder. Gauged under this agreement, the lack of a reversion clause in the Superman film agreement would be considered harmful. The film *Superman Returns* was released in 2006 and per the Iron Man agreement filming of a sequel would be required to commence sometime this summer, a fact which Mr. Horn's testimony clearly indicates has not and will not occur.

**\*25** Although the lack of a reversion clause has shown to be harmful under one particular agreement, the Court must look to the totality of the agreements presented to judge the certainty of the existence of any damages attributable to the lack of a reversion mechanism keyed to continued development of the property in film. In this context, the average reversion period for filming a sequel to commence or reversion to occur is three to five years after the release of the prior film. Indeed, even the testimony of plaintiffs' own film industry expert, Mr. Halloran, on this point did not differ from the Court's conclusion. Mr. Halloran testified that the industry custom was that, "notwithstanding that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)
**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

option had been exercised or a picture produced and released, that after a period of time, that if the studio was not continuing to produce one of these pictures, that the film rights would come back to the grantor, and that period is, for a high-end property is, let's say, in that sort of three- to five-year range. Sometimes less." (Trial Tr. at 407). Judged under this standard, no reversion would have occurred, and no filming would have commenced on a sequel to *Superman Returns,* until 2009 to 2011 even if the Superman film agreement contained a customary reversion clause keyed to continued development. Given that Mr. Horn testified that the *release* of a sequel to *Superman Returns* movie *could* occur in 2012, it is certainly now possible, based on the only competent evidence related to this issue introduced at trial, that filming of such a sequel could occur within the 2009 to 2011 time frame. Unless and until it can be shown *at that point in time* that no filming of a sequel to *Superman Returns* has commenced, it cannot be said, with any degree of certainty, that the Superman film agreement's failure to contain a reversion clause keyed to continued and regular development of the property in film has caused any harm.

In making this statement, the Court is certainly mindful of how close this market deficiency in the Superman film agreement is from shifting from speculation to concrete harm. Even under Mr. Horn's hopeful estimate, no filming of a Superman sequel will commence this year nor is it likely that it will commence next year. Without a script, and there is none at present, filming cannot be commenced. It is only the *possibility* that filming could begin on a Superman sequel in 2011 that has stayed the Court from making a finding on the reasonable certainty of harm having occurred. Given that the *potential* for said commencement of filming exists at the *present time,* plaintiffs have not shown that the Superman film agreement, sans a reversion clause, is below the reasonable range for what a willing buyer would pay for the property from a willing seller. If, however, by 2011, no filming has commenced on a Superman sequel, plaintiffs could

bring an accounting action at that time to recoup the damages then realized for the Superman film agreement's failure to contain a reversion clause.

**\*26 Accordingly, the Court finds for the remaining defendants because there is insufficient evidence that the Superman film agreement between DC Comics and Warner Bros., whether judged by its direct economic terms or its indirect ones, was consummated at below its fair market value.**

### *Analysis of Smallville Television Agreement*

The Court now turns to the Smallville television agreement, an agreement that received little attention from the parties at trial and one for which the Court finds that there is no evidence introduced at trial that demonstrates that the Smallville agreement was for less than fair market terms. The Smallville agreement's direct economic terms were within a "reasonable" range a willing buyer would have paid. The agreement has a per episode payment scheme above that of any of the other television agreements introduced by the parties, a comparable merchandising split, and a comparable contingent compensation participation. The other television licensing agreements submitted by the parties contain like or, more often than not, lesser terms.

The 2002 Birds of Prey television agreement between DC Comics and Warner Bros. Television Production concerns teen-aged comic book superheros associated with the Batman franchise. In some meaningful respects it has lesser terms than those in the Smallville agreement, such as a $33,000 per episode payment (as opposed to the $45,000 episodic fee in Smallville) and a contingent compensation participation percentage equal to that in the Smallville television agreement. Despite plaintiffs' counsel's statement to the contrary (*see* Trial Tr. at 1000), the Birds of Prey agreement is not for a "lesser known property" but is for essentially the same thing as that conveyed in the Smallville television agreement-a depiction of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)

**(Cite as: 2009 WL 2014164 (C.D.Cal.))**

Batman universe (without Batman himself) built on characters with superpowers in their teenage years, not all that much different from Smallville except that Superboy is a character that had been more widely and consistently exploited in comic books over the course of several decades as opposed to those portrayed in the Birds of Prey agreement.

Similarly, the arms length transaction for the television rights to Tarzan between Warner Bros Television and the rights holder, Edgar Rice Burroughs, Inc., also bolsters the conclusion that the Smallville television agreement was within the fair market range. The 2002 Tarzan television agreement provided a comparable $25,000 one-year option payment (made applicable to the exercise/purchase price) as well as an additional $25,000 to extend the option period for an additional year (not applicable to the exercise/purchase price). If the option was exercised by Warner Bros. then it was required to make a purchase payment to the rights holder of $150,000 (less the initial option payment) which would be applied against the contingent compensation generated from the property' exploitation. To that end, the Tarzan television agreement provided that the rights holder would receive $20,000 per episode for the first season and gradually increasing to the maximum of $30,000 per episode for the third season onwards. Furthermore, the rights holders share from the contingent compensation generated from the television production of Tarzan was set at 7.5%, reducible to a floor of 6.25% of modified adjusted gross, defined to mean gross receipts minus distribution fees and expenses and production costs (as opposed to DC Comics' receipt of a percentage of straight first dollar distributor gross under the terms of the Smallville agreement, which is a much bigger percentage of the overall amount of money generated from the exploitation of the property than the "adjusted gross" referenced in the Tarzan agreement).

**\*27** Plaintiffs' reference to the 1988 Superboy television agreement (negotiated between DC Comics and Salkind) containing a 7 1/2 % gross participa-

tion (as opposed to the 3% escalating to 5% gross participation in the Smallville agreement), only underscores how close the Smallville agreement lies in the ballpark of fair market value to those negotiated at arms length by unrelated corporate affiliates. Plaintiffs' counsel's focus (and that of its expert Mr. Halloran) on the provision in the Superboy television agreement requiring payment to DC Comics of $800,000 has been convincingly explained away by Mr. Levitz without any refutation by plaintiffs: Mr. Levitz testified that the $800,000 payment was meant for certain payments then outstanding from the then recent release of the *Superman IV* film. In other words, the $800,000 had nothing to do with payment for the exploitation of the Superman *television* rights in the Superboy agreement, but instead everything to do with an outstanding dispute over the recent exploitation of the Superman *film* rights. To this plaintiffs offer no evidentiary response.

**Accordingly, the Court finds that the non-exclusive rights conveyed by DC Comics to Warner Bros. in the Smallville television agreement was not for below fair market value and, therefore, finds for the remaining defendants on this point as well.**

### Conclusion

The Court decides this case, as it must, not on the evidence that could have been submitted or even the evidence that should have been submitted, but rather on the evidence that was in fact admitted at trial. Based on the preponderance of that evidence, the Court is compelled to reach the conclusions set forth above and accordingly finds in favor of defendants on the issue tried before the Court.

**IT IS SO ORDERED.**

C.D.Cal.,2009.
Siegel v. Warner Bros. Entertainment Inc.
Not Reported in F.Supp.2d, 2009 WL 2014164 (C.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.