# EXHIBIT X

Dockets.Justia.com

# INTELLECTUAL PROPERTY

## VALUATION, EXPLOITATION, AND INFRINGEMENT DAMAGES

GORDON V. SMITH

RUSSELL L. PARR



**WILEY**

JOHN WILEY & SONS, INC.

This book is printed on acid-free paper. ∞

Copyright © 2005 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400, fax 978-646-8600, or on the web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, 201-748-6011, fax 201-748-6008, and online at http://www.wiley.com/go/permission.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services, or technical support, please contact our Customer Care Department within the United States at 800-762-2974, outside the United States at 317-572-3993 or fax 317-572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books.

For more information about Wiley products, visit our web site at www.wiley.com.

*Library of Congress Cataloging-in-Publication Data:*

ISBN-13 978-0-471-68323-X

ISBN-10 0-471-68323-X

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

Case4:07-cv-01658-PJH   Document641-25   Filed03/03/10   Page4 of 27

Although most managers would prefer not to admit it, capital recovery rates are sometimes changed to "manage" earnings per share. Therefore it is unlikely that "accounting" depreciation matches the decline in value over time. Even if the original cost starting point was representative of value at some previous moment, depreciated original cost is not likely to equal current value.

Net book value does have relevance to the appraiser in the valuation of utility property under traditional regulation, in that earnings permitted by a regulatory commission are a function of book cost.

Book cost is, except for the regulated environment, useful only as a very rough benchmark suitable for "order of magnitude" comparisons. We occasionally use a permutation of book value as a surrogate for market value, but the caveats above should be borne in mind.

(i) TAX BASIS.   Tax basis is similar to book value as described above except that the calculation of capital recovery is in accordance with tax requirements. Capital recovery usually is calculated by some form of accelerated method, and the life is the result of some legislation rather than a value based on actual service life.

Tax depreciation methods and lives have been changed so often and so significantly over the years that tax basis is of no use as a measure of any form of value.

## 7.2  VALUATION METHODS

There are three accepted valuation methodologies that utilize the cost, market, and income techniques. One can find other methods named and described in articles and texts, but analysis will reveal that these are really forms of the basic three. In many instances, "new" valuation methods are based on alternative techniques for analyzing or obtaining ingredient inputs to the core methods named above.

(a) COST APPROACH.   The cost approach seeks to measure the future benefits of ownership by quantifying the amount of money that would be required to replace the future service capability of the subject property. This was defined above as cost of replacement. The assumption underlying this approach is that the price of new property is commensurate with the present economic value of the service that the property can provide during its life. The marketplace is the test of this equation. If, for example, the price of a new machine were set at a level far above the present value of the future economic benefits of owning the machine, then none would be sold. If the opposite were true, then demand would outstrip supply, and presumably the price would rise. The price of a new machine, absent some market aberration, is therefore equal to its market value.

(i) Depreciation.   One is rarely called upon to render an opinion of value on new property, however, and therefore the use of the cost approach nearly always brings with it the complexity of quantifying the reduction from (new) value due to the action of depreciation. Appraisal depreciation is the result of physical deterioration, functional obsolescence, and economic obsolescence. The proper reflection of all three is essential to estimating market value by the cost approach. These factors are discussed in detail in Chapter 8.

(b) MARKET APPROACH.   The market approach is the most direct and the most easily understood appraisal technique. It measures the present value of future benefits by obtaining a consensus of what others in the marketplace have judged it to be. There are two primary requisites: an active, public market and an exchange of comparable properties contemporaneous to the valuation date.

In essence, we are seeking a population of transactions from which we can select those that best match the description of the virtual transaction we are constructing.

The residential real estate market is a good example of a market where these conditions are usually present. There is generally some activity in this market in a given area, and selling, asking, and exchange prices are public. Of course not all residential properties are similar, but given enough activity, reasonable comparisons can be made. Where these optimal market conditions do not exist, using this approach involves more judgment, and it may become a less reliable measure of value. As we will discuss in Chapter 9, this technique is not often used for the valuation of intangible assets and intellectual property, largely because of the absence of the conditions noted below.

**(i)  Active Market.**   The ideal situation is to have a number of property exchanges to use in this analysis. One sale does not make a market. There are, for example, publicly traded common stocks in which only a few shares are traded in a year. Their exchange price has much less validity as a measure of their value than, for instance, that of General Motors stock, in which thousands of shares are traded each day, though all the other requisites except activity are present.

**(ii)  Public Market.**   To be useful, the exchange consideration must be known or discoverable. The prices of common stock in the primary exchanges are precisely known. For other types of property, it becomes more and more difficult to discover the exchange price. Even with real estate, the published price may be misleading due to financing arrangements between buyer and seller that are not made public. Transactions between businesses, such as the sale of a plant, product line, or subsidiary, may be very difficult or impossible to evaluate because competitive pressure motivates the participants to keep the details confidential.

**(iii)  Adjustments for Comparability.**   The best of all worlds for a real estate appraiser is to find, for a subject property, an arm's-length sale of an exact replica property, across the street, the day before the appraisal. Unfortunately, this does not happen with enough regularity to eliminate the need to make adjustments when the "comparable sales" are not exactly comparable. Real estate appraisers continually grapple with the problem of quantifying differences in property, so that the location, amenities, zoning, size, shape, and topography of comparable sales can be equated to the subject's and thus provide an indication of value. Analysts using this approach for other types of property have the same challenge, but comparability tends to be more obvious—one either has it or not—and there are fewer nuances.

**(iv)  Adjustments for Time.**   Sometimes it is necessary to utilize sale information that is not contemporaneous with the appraisal. In this case, the appraiser must adjust for price changes over time. This may necessitate a separate study of changes in property value in the subject area during a recent period of time so as to develop some specialized indices to use in the adjustment process.

**(v) .Summary.**   With this background, the reader can gain a picture of the strengths and weaknesses of the market approach. Where there is a good base of information about the sales of properties that are similar to the subject, the market approach can be the strongest indicator of value. As the number of comparable sales or the information about them

150  Ch. 7  Valuation Principles and Techniques

dwindles, or when the lack of comparability makes adjustment speculative, then this approach ceases to be useful. The market approach is then most effective for:

- Real estate
- Machinery and equipment in general use
- Vehicles
- General-purpose computer software
- Computer hardware
- Liquor licenses
- Franchises

The market approach is very often useful in the valuation of capital stock, other types of securities, or an entire business enterprise.

The market approach is typically least effective for:

- Special-purpose machinery and equipment
- Most intangible assets and intellectual property
- Properties highly restricted by zoning, environmental restrictions, or other forms of regulation

The market approach takes the analyst right to the bottom line of market value. The assumption is that other buyers of comparable property were willing, had knowledge of all relevant facts, and struck a deal that was fair and, therefore, their transactions represented market value at that time and for that property. It is assumed that the market measures and adjusts for all forms of appraisal depreciation: physical, functional, and economic.

(c) **INCOME APPROACH.**  The income approach focuses on a consideration of the income-producing capability of the property. This book is about the valuation of business property whose raison d'être is to provide a return on and return of the investment required to create it. As when buying common stock, our puzzle is to estimate the price a virtual buyer would be willing to pay for the anticipated returns from the property.

So the underlying theory is that the value of property can be measured by the present value of the net economic benefit (cash receipts less cash outlays) to be received over its life. This concept was nicely described by Campbell and Taylor:

> It has often been stated, but bears repeating, that assets (whether bricks and mortar, land, equipment or corporate shares) are only worth in the open market what they can earn, and the true measure of worth is the assets' earnings when related to the risk inherent in the business situation.[5]

(i) **Present Value Concept.**  Some background is provided here for the reader who may not be familiar with the concept of the "time value of money"—that a dollar to be received in the future is worth less today than a dollar to be received immediately. To assist to explain this concept, we provide the following example:

> Let us make the pleasant assumption that, as a result of some clever basement tinkering, we have designed a putter that unerringly propels a golf ball into the hole. . . . we have carefully guarded our design and have been awarded a patent. Let us further assume that our decision is to

---

5. Ian R. Campbell and John D. Taylor, "Valuation of Elusive Intangibles," *Canadian Chartered Accountant* (May 1972), p. 41.

exploit this intellectual property by selling it. We have approached the golf equipment companies, and two of them have made offers. Zing Golf Corporation has offered a cash payment of $550,000. Cougar Club Company has offered $300,000 cash and $300,000 a year from now.

The choice would be clear if the two offers were an immediate payment of cash. The proposed delay in Cougar's second payment complicates the decision. The additional fifty thousand dollars is certainly attractive, but we must consider all the uncertainties surrounding the second offer. Will Cougar Co. still be in business a year from now? Will it have the money to make the payment? What if the putter design does not turn out to be the answer to every duffer's prayer, and Cougar is unhappy with the deal? What if the design turns out to be very expensive to manufacture, and the market won't accept the high price? We must find a way to put the two offers on the same basis so they can be compared.

What is the essential difference between the offers of Cougar and Zing? This example presents the concept of the time value of money as measured by its "present value." The present value of a cash offer is obvious, and the comparison of two different cash offers can be made without difficulty. When we introduce the element of time, the complication begins. What is the present value of $300,000 to be received in one year? And what do we need to know about the situation in order to calculate it? The first consideration we must address is how confident we feel that the payment will be made, in full and on time. If we feel really confident about the buyer's integrity and ability to pay, our reasoning could be as follows:

1. If I had the $300,000 today instead of in one year, I could put it in my money market fund and earn 2%. At that rate, the $300,000 would be worth $306,055 (compounded monthly). This calculation uses the basic formula that we learned in early mathematics schooling, $I = Prt$ (Interest equals Principal multiplied by Rate multiplied by Time). To calculate the future amount directly, the formula is transformed to:

$$\text{Amount} = P(1 + rt)$$

2. Looking at the other side of the coin, we ask ourselves, how much would I have to put into my money market fund today in order to have $300,000 in one year? The answer is $294,118. This calculation uses another permutation of the basic interest formula:

$$\text{Present Value} = \text{Future Value} / (1 + rt)$$

3. Therefore, the present value of the right to receive 300,000 in one year is $294,118 at an interest rate of 2%.

If I feel that Cougar Club Company is as financially reliable as the holder of my money market fund, then my analysis is complete. If, on the other hand, I am not so confident about receiving the $300,000 payment on time (or at all!), I would want a greater return for accepting that additional risk. The interest rate in the calculation is the measure of my perceived risk. The present value of $300,000 to be received in one year at an interest rate of 15% is $260,870. At a rate of 25%, it is only $240,000. A comparison of the prospective sales is shown in Exhibit 7.2.

Armed with this calculation we can see that, depending on the level of confidence we have in Cougar honoring its commitment to pay the remaining $300,000 in a year, their offer could either be better or worse than that of Zing. What do we require in order to make these calculations? We need to know the amount of the delayed payment, when it is to be made, and how much risk is associated with receiving it.

(ii) **Amount of Income.**  In the example above, the amount of the payments to be received is clear ($300,000 now, $300,000 in one year). In the real world, the "amount" portion of the equation can be much more obscure, and can comprise payments to be received, as well as expenses to be borne.

| ZING'S OFFER | | $550,000 | | $550,000 | | $ 550,000 |
|---|---|---|---|---|---|---|
| COUGAR'S OFFER | | | | | | |
| Cash upfront | | $300,000 | | $300,000 | | $ 300,000 |
| Cash in 1 year | @2% | 294,118 | @15% | 260,870 | @25% | 240,000 |
| Total | | $594,118 | | $560,870 | | $ 540,000 |
| Cougar advantage | | $ 44,118 | | $ 10,870 | | $(10,000) |

**EXHIBIT 7.2**   PRESENT VALUE COMPARISON

**(iii) When the Income Is to Be Received.**   Sometimes the "when" of receipts or obligations is clear (as when they are to be made according to a prearranged schedule), but more often it is dependent on other events. . . . The "when" is a very important element in a present value calculation. The present value of the $300,000 payment to be received at different times in the future can vary as shown in Exhibit 7.3.

As illustrated in Exhibit 7.3, the relative effect of "when" is also greatly altered by the rate of interest assumed. At high interest rates, the deterioration in value is accelerated as receipt is delayed. The present value concept is applicable to any pattern of cash flow as well. At a rate of 15% compounded monthly, both of the following payment schemes have a present value of $300,000:

12 monthly payments of $27,077

$100,000 in cash plus 12 monthly payments of $18,052

**(iv) Risk of Achieving the Income.**   A difficult ingredient is the quantification of risk, as measured by the rate of interest, or discount rate. We will use the term "discount rate" henceforth, because expressing the receipt of future benefits in current terms is a process of discounting. There are a number of methods used to estimate an appropriate discount rate and many of these are discussed in Appendix A. The essence of these, however, is a consensus of returns required by investors on investments of different types in the marketplace.

As an example, investors in U.S. government securities typically accept rates of return at the lowest end of the range of possible investment returns, currently around 4%. At the other end of the range, investors in the common stock of a start-up, high-technology enterprise may require a rate of return of 30%, 40%, or 50%.

| Discount Rate | 1 Year | 2 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| 2% | $294,118 | $288,462 | $272,727 | $250,000 |
| 15% | $260,870 | $230,769 | $171,429 | $120,000 |
| 25% | $240,000 | $200,000 | $133,333 | $85,714 |

**EXHIBIT 7.3**   EFFECT OF TIME AND RATE ON PRESENT VALUE

**(v) Discounted Cash Flow Example**.   A calculation of the present value of future income is often referred to as a discounted cash flow (DCF) model. That is, one "discounts" the amount of future income to reflect its loss in value due to the delay in receiving it. The classic illustration of this technique is the purchase of a security, such as a share of common stock. Assume the following:

1. Today's market price of one share of the stock is $45.00.
2. The company currently pays a quarterly dividend of $.56 per share.
3. Earnings of the company are currently $3.75 per share, and are expected to grow at 8% annually.
4. We expect to hold the stock for 3 years.

Under these conditions, we could expect that the dividends paid by the company will grow at 8% per year and, if no market aberrations are expected, the price of the stock will also grow at that rate. If we purchase a share of this stock, the transaction will produce a series of positive and negative cash flows. First, there will be a negative cash flow when we reduce our savings and pay out the $45.00. Then, there will be a series of positive quarterly cash flows starting at $.56 and growing. Finally, when we sell the share of stock in 3 years, there will be a positive cash flow of $56.69 ($45.00 grown at an 8% annual compound rate for 3 years).

If all this were to go according to plan, what rate of return would we have achieved on this investment? To calculate this, we need to calculate the summation of the present values of the negative and positive cash flows, using different discount rates until they net to zero. Some refer to this as a calculation of the internal rate of return (IRR). This is a trial-and-error process best left to a computer or financial calculator. The result of this is the rate of return we would achieve if we entered into this transaction and if the dividends and future stock price were as expected. In this example, the discount rate is 12.37%. As an investor, we must decide whether that rate of return is appropriate relative to what we perceive as the risk of the investment. If it is, we purchase the stock. If it is higher than we require, we purchase it eagerly. If lower, we wait for the price to come down or look for an alternative investment.

If we apply these principles to the valuation of intangible assets or intellectual property, we can observe that the three essential ingredients of the income approach are:

1. The economic benefit that can be reasonably expected from the exploitation of the property
2. The pattern by which that economic benefit will be received
3. An assumption as to the risk associated with realizing the amount of economic benefit in the expected pattern.

These elements can be related to one another by means of a simple formula, $V = I/r$, where:

$V$ = Present value of the economic benefit attributable to the property

$I$ = Economic benefit derived from employment of the property, representing the net of cash inflows and outflows

$r$ = Capitalization rate reflecting all the business, economic, and regulatory conditions affecting the risk associated with employing the property and achieving the prospective earnings

154   Ch. 7   Valuation Principles and Techniques

For example, if an income of $100 will be received in perpetuity, and the appropriate rate of capitalization is 10%, then the value of that income is:

$$\frac{\$100}{.10} = \$1000$$

This is obviously the simplest of examples and one that never occurs in real life. Property ownership is rarely expected to produce income perpetually. Therefore, the calculation is always more complex, and the determination of an appropriate capitalization rate is more complex as well. Because business property is owned for the express purpose of earning a return on investment, the income approach is the strongest indicator of value for this type of property.

A number of methods can assist analysts in estimating the amount of income that can be realized from the ownership of an asset and an appropriate discount rate (risk factor). These are discussed at length in Chapter 10 and in Appendix A. As to the expected duration of income, one may be again relying on a consideration of the three forms of depreciation. That is, the assets that are the source of the income may be subject to a decline in both value and earning power. The income that they are capable of producing may decline proportionately, and this decline would become part of the calculation by the income approach.

The income approach is best suited for the appraisal of the following:

- Contracts
- Licenses and royalty agreements
- Patents, trademarks, and copyrights
- Franchises
- Securities
- Business enterprises

The income approach indicates fair market value directly and without intermediate calculations involving the three forms of appraisal depreciation.

(d) CORRELATION.   Valuation practice suggests that all three methods be employed when possible and appropriate. At the very least they should each be considered. Circumstances are often such that one or more of the methods is obviously inappropriate and should not be pursued, but it is not unlikely that an appraiser will have to reconcile two or three indications of value. Even more indications of value may be present if multiple assumptions were employed in the use of one method or another. This process is often referred to as "correlation."

In this process, the appraiser considers such factors as:

- The appropriateness of the method used
- The quantity and quality of information available as input to each method
- The extent to which judgment or alternative assumptions were employed
- The sensitivity of the value indication to various inputs and their relative reliability
- Whether the results of a single method should be relied upon or whether some weighting of results is appropriate

PART **II**

# LICENSING

In the Valuation section of this new volume, we explored the means for determining an absolute, fee-simple value for intellectual property. These values are a *walk away price*—the amount at which the owner transfers all rights to intellectual property. This section delves into another measure of value. Royalty rates are another form of value. They represent the economic foundation of licensing and consequently deserve their own section. Royalty rates are a form of value in that they set the price at which licensors will allow others to use a limited portion of their intellectual property rights. Instead of the prices being set as lump-sum amounts, they are set on a pay-as-you-go basis.

Joint ventures also require special attention, because such alliances require the establishment of methods for appropriately sharing the economic benefits of intellectual property rights contributed to alliances. Sometimes royalties are involved in these transactions, but sometimes an allocation of ownership in the joint venture turns on the value of the intellectual property rights contributed.

Subtle changes to the valuation methods already established in the first section of this volume are presented in this second section of this book.

PART 

# INFRINGEMENT DAMAGES

Infringement damages are yet another measure of value under unique circumstances. The question arises in matters relating to infringement as to what value was lost by the injured party due to the actions of an infringer. It can be an absolute amount or a running royalty translated into a lump sum. This third section of our volume delves into the methods recognized by the Courts for measuring intellectual property infringement damages. The law and methods for determining damages for patent, trademark, trade secret and copyright misappropriation are different, and we attempt to address the methods appropriate for quantifying damages for these different properties.

CHAPTER **43**

# RECENT DECISION: COPYRIGHT INFRINGEMENT DAMAGES CAN BE BASED ON VALUE OF LICENSES

## 43.1   INTRODUCTION

This chapter is derived from the opinion of the U.S. Court of Appeals for the Second Circuit, August Term, 1999, Docket No. 99–9081 regarding *On Davis (Plaintiff-Appellant) v. The Gap, Inc. (Defendant-Appellee)*. Before: Leval, Parker, and Katzmann, Circuit Judges.

## 43.2   *ON DAVIS v. THE GAP, INC.*

The U.S. Court of Appeals for the Second Circuit has ruled in *On Davis v. The Gap, Inc.* that the owner of a copyrighted product design can sue an advertiser for infringement when the advertiser displays the product in its ads without a license. In this case Gap included a jewelry prop in an advertisement without a license to use the prop. The decision reversed a lower court summary judgment ruling. The lower court had ruled that no such suit could be brought unless the copyright holder could prove actual damages. The Second Circuit concluded that copyright law allows damages to be awarded based on a provable analysis of the fair market value of a prop license.

**(a) BACKGROUND.**   Davis is the creator and designer of nonfunctional jewelry worn over the eyes. The Gap, Inc. is an international retailer of clothing and accessories marketed largely to a young customer base. It operates several chains of retail stores, largely under the names of GAP and OLD NAVY. Gap, without Davis's permission, used a photograph of an individual wearing Davis's copyrighted eyewear in an advertisement for the GAP trademarked stores. The photograph was widely displayed throughout the United States. Davis filed a copyright infringement lawsuit seeking a declaratory judgment of infringement and damages, including $2.5 million in unpaid licensing fees, a percentage of the Gap's profits, punitive damages of $10 million, and attorney's fees. The district court granted summary judgment for the Gap on the grounds that:

- Davis's claims for actual damages and profits under 17 U.S.C. § 504(b) (1994) were too speculative to support recovery, or were otherwise barred by a prior ruling of this court.
- Davis was not eligible for statutory damages or attorney's fees because he had not registered his copyright on a timely basis.
- The Copyright Act does not permit recovery of punitive damages.

732

Davis has created many different designs of eye jewelry, which he markets under the name ONOCULII DESIGNS. Davis describes Onoculii eyewear as "sculptured metallic ornamental wearable art." Each piece is made of gold, silver, or brass. The eyewear is constructed in a manner similar to eyeglasses (a frame hinged to templates that hook over the ears), but with a very different effect. The frames support decorative, perforated, metallic discs in the place that would be occupied by the lenses. The discs effectively conceal the wearer's eyes, although the perforations permit the wearer to see through them. Some of Davis's designs are of flowery or abstract shapes, and some are crescents with protruding spokes or wings. The specific piece that was the subject of the infringement lawsuit consists of a horizontal bar at the level of the eyebrows from which are suspended a pair of slightly convex, circular discs of polished metal covering the eyes, perforated with dozens of tiny holes. Davis registered his copyright for the design at issue, effective May 16, 1997.

Davis sought to gain recognition for his Onoculii line by promoting and marketing his designs "in carefully chosen media settings." As part of his marketing plan, Davis encouraged "known stylish and popular entertainers" to wear his creations in public. Entertainers who have worn Onoculii designs while appearing on stage, on MTV, in magazine photographs, or in other media include Vernon Reid, Thomas Mapfumo, Don Cherry, Sun Ra, Ryo Kawasaki, Cat Coore, Mr. Pepper Seed, Chuck Johnson, and Jack and Jill. Various fashion designers have also featured Davis's eyewear as accessories in runway shows or photographs. His work has been noted in such publications as *Vogue, Women's Wear Daily, Fashion Market, In Fashion*, the *New York Times*, the *New York Post*, and the *Village Voice*.

Since 1995 Davis has marketed his merchandise through boutiques and optical stores. The eyewear sold at wholesale prices of approximately $30 to $45 a pair and retailed for between $65 and $100 in 1995. Davis asserts he has earned approximately $10,000 from sales. He testified that on one occasion he received a $50 license fee from *Vibe* magazine for the use of a photograph depicting the musician Sun Ra wearing an Onoculii piece.

In May 1996, prior to Davis's 1997 registration of his copyright, the defendant created a series of advertisements showing photographs of people of various lifestyles wearing Gap clothing. The campaign was designed to promote the concept that all kinds of people wear Gap merchandise. The ad, which bears the caption "fast" emblazoned in red (the "fast" ad), depicts a group of seven young people of Asian appearance, standing in a loose V formation staring at the camera. They are dressed primarily in black, exhibiting bare arms and partly bare chests, several with goatees (accompanied in one case by bleached, streaked hair), large-brimmed, Western-style hats, and distinctive eye shades, worn either over their eyes, on their hats, or cocked over the top of their heads. The central figure, at the top of the V formation, is wearing Davis's highly distinctive eyewear and peers over the metal disks into the camera lens.

The "fast" photograph was taken by the Gap in May 1996 during a photo shoot in Manhattan. The defendant provided the subjects with Gap apparel to wear for the shoot and a trailer in which to change. The Gap claims that it did not furnish eyewear to any of the subjects, and that the subjects were told to wear their own eyewear, wristwatches, earrings, nose rings, or other incidental items. The Gap claims that it wanted the subject models to "permit each person to project accurately his or her own personal image and appearance."

The Gap's "fast" advertisement was published in a variety of magazines, including *W, Vanity Fair, Spin, Details*, and *Entertainment Weekly*. Davis claims that the total circulation of these magazines was over 2.5 million. For five weeks during August and September

1996, the advertisement was displayed on the sides of buses in New York, Boston, Chicago, San Francisco, Atlanta, Washington, DC, and Seattle.

Davis submitted evidence showing that during the fourth quarter of 1996, the period that Davis asserts is relevant to the "fast" advertisement, the net annual sales of the parent company, Gap, Inc., increased by about 10%, compared to the fourth quarter of 1995, to $1.668 billion. There was no evidence of what portion of the parent company's revenues were attributable to the stores operated under the Gap label, much less what portion was related to the ad in question.

Shortly after seeing the "fast" advertisement in October and November 1996, Davis contacted the Gap by telephone and in writing. The Gap's advertising campaign, which apparently ran during August and September 1996, had been completed by the time Davis wrote. Davis stated that he had not authorized the use of his design and inquired whether the Gap might be interested in selling a line of his eyewear. Davis filed this action on November 19, 1997. The Gap then filed a motion for summary judgment, arguing that Davis had no entitlement to damages and that his claims were barred by the *de minimis* and fair use doctrines.

**(b) SUMMARY JUDGMENT GRANTED: 17 U.S.C. § 504.**   On April 9, 1999, the district court granted summary judgment to the Gap. The district court first noted that Davis was not eligible for "statutory damages" under 17 U.S.C. § 504(c) due to the fact that he had not registered his copyright within 3 months of his first "publication" of his work or prior to the allegedly infringing use by the Gap. As regards damages under 17 U.S.C. § 504(b), the court rejected Davis's claim as unduly speculative and, insofar as it sought damages for Davis's failure to receive a license fee from the Gap, precluded by a prior decision of the court. Since the court also found Davis ineligible for punitive damages, it concluded that he was not entitled to any form of damages, and thus dismissed his claims. On appeal, Davis argued that (1) the district court erred by granting summary judgment without ruling on the merits of his claim for declaratory relief, and (2) he was entitled to both compensatory and punitive damages.

The statute 17 U.S.C. § 504 imposes two categories of compensatory damages. Taking care to specify that double recovery is not permitted where the two categories overlap, the statute provides for the recovery of both the infringer's profits and the copyright owner's "actual damages." It is important that these two categories of compensation have different justifications and are based on different financial data. The award of the infringer's profits examines the facts only from the infringer's point of view. If the infringer has earned a profit, this award makes it disgorge the profit to ensure that it not benefit from its wrongdoing. The award of the owner's actual damages looks at the facts from the point of view of the copyright owner; it undertakes to compensate the owner for any harm suffered by reason of the infringer's illegal act. See generally *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110, 1118 (2d Cir. 1986); *Walker v. Forbes, Inc.,* 28 F.3d 409, 412 (4th Cir. 1994).

The district court granted summary judgment dismissing Davis's claims for damages. As for Davis's claim of entitlement to a part of the "infringer's profits," the district court believed Davis failed to show any causal connection between the infringement and the defendant's profits. With respect to Davis's claim of entitlement to "actual damages" based on the license fee he should have been paid for the Gap's unauthorized use of his copyrighted material, the district court believed that his evidence was too speculative and that the Court of Appeal's decision in *Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399 (2d Cir. 1989), precluded any such award.

Davis submitted evidence that, during and shortly after the Gap's advertising campaign featuring the "fast" ad, the corporate parent of the Gap stores realized net sales of $1.668 billion, an increase of $146 million over the revenues earned in the same period of the preceding year. The district court considered this evidence inadequate to sustain a judgment in the plaintiff's favor because the overall revenues of the Gap, Inc. had no reasonable relationship to the act of alleged infringement. Because the ad infringed only with respect to Gap label stores and eyewear, the Appeals Court agreed with the district court that it was incumbent on Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eye-wear or accessories. Had Davis done so, the burden would then have shifted to the defendant under the terms of § 504(b) to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work.

It is true that a highly literal interpretation of the statute would favor Davis. It says that "the copyright owner is required to present proof only of the infringer's gross revenue," 17 U.S.C. § 504(b), leaving it to the infringer to prove what portions of its revenue are not attributable to the infringement. Nonetheless, the court found that the term "gross revenue" under the statute means gross revenue reasonably related to the infringement, not unrelated revenues.

The court presented a publishing example. If a publisher published an anthology of poetry that contained a poem covered by the plaintiff's copyright, the court did not believe the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, and so on. In the court's view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume.

The point would be clearer still if the defendant publisher were part of a conglomerate corporation that also received income from agriculture, canning, shipping, and real estate development. While the burden-shifting statute undoubtedly intended to ease the plaintiff's burden in proving the defendant's profits, the court did not believe it would shift the burden so far as to permit a plaintiff in such a case to satisfy his or her burden by showing gross revenues from agriculture, canning, shipping, and real estate where the infringement consisted of the unauthorized publication of a poem. The facts of this case are less extreme; nonetheless, the point remains the same: The statutory term "infringer's gross revenue" should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement.

(c) **RELATED CASE: *TAYLOR v. MEIRICK*.**   The district court relied on the Seventh Circuit's ruling in *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983). In that case the defendant was a mapmaker who copied and sold three of the plaintiff's copyrighted maps. During the relevant time period, the defendant sold 150 maps, as well as other merchandise. The plaintiff submitted evidence of gross revenues and profits deriving from the defendant's overall sales. The court rejected the plaintiff's claim, reasoning: "all [the burden-shifting language of § 504(b)] means is that [the plaintiff] could have made out a prima facie case for an award of infringer's profits by showing [the defendant's] gross revenues from the sale of the infringing maps. It was not enough to show [the defendant's] gross revenues from the sale of everything he sold. ..."

Applying this reasoning to the *Davis* case, the Appeals Court found that the district court was correct in ruling that Davis failed to discharge his burden by submitting the Gap, Inc.'s gross revenue of $1.668 billion—revenue derived in part from sales under other labels within the Gap, Inc.'s corporate family that were in no way promoted by the advertisement, not to mention sales under the "Gap" label of jeans, khakis, shirts, underwear, cosmetics, children's clothing, and infant wear.

Among the elements Davis sought to prove as damages was the failure to receive a reasonable license fee from the Gap for its use of his copyrighted eyewear. The complaint asserted an entitlement to a $2.5 million licensing fee. The district court rejected the claim on two grounds. First, the court found that Davis's claim was too speculative—that is, insufficiently supported by evidence. Second, the court believed that the Appeals Court decision in *Business Trends*, 887 F.2d 399, bars a copyright owner's claim for actual damages consisting of the infringer's failure to pay the fair market value of a license fee for the use the infringer made.

**(d) FAIR MARKET VALUE.** While there was no evidence to support Davis's wildly inflated claim of entitlement to $2.5 million, the court decided that his evidence did support a much more modest claim of a fair market value for a license to use his design in the ad. In addition to his evidence of numerous instances in which rock music stars wore Onoculii eyewear in photographs exhibited in music publications, Davis testified that on one occasion he was paid a royalty of $50 for the publication by *Vibe* magazine of a photo of the deceased rock star Sun Ra wearing Davis's eyewear.

On the basis of this evidence, the court found that a jury could reasonably find that Davis established a fair market value of at least $50 as a fee for the use of an image of his copyrighted design. This evidence was sufficiently concrete to support a finding of fair market value of $50 for the type of use made by *Vibe*. And if Davis could show at trial that the Gap used the image in a wider circulation than *Vibe*, that might justify a finding that the market value for the Gap's use of the eyewear was higher than $50. Therefore, to the extent the district court dismissed the case because Davis's evidence of the market value of a license fee was too speculative, the Appeals Court believed that the district court was in error.

**(e) *BUSINESS TRENDS* DECISION.** The district court believed that the Appeals Court decision in *Business Trends* interprets § 504(b) to foreclose "actual damages" to compensate a plaintiff for the defendant's failure to pay for the reasonable value of what the defendant took. The court believes this was a misreading of the holding in *Business Trends*. The district court decision under review in that case had not made an award of "actual damages" under this theory. The award that the court reviewed and rejected in that case was fashioned under the other prong of § 504(b)—the infringer's profits. (See *Business Trends*, 887 F.2d at 402.) While there is indeed some language in the *Business Trends* decision expressing disfavor for Davis's theory of actual damages, it was not at issue in that case. Furthermore, the court's decision did not purport to lay down an absolute rule; the decision made clear that the ruling depended on the particular factual circumstances—circumstances that are not present in the Davis case. Finally, the Appeals Court has either awarded such damages or implied that they were appropriate. See *Rogers v. Koons*, 960 F.2d 301, 310-13 (2d Cir. 1992); *Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 470-72 (2d Cir. 1985); *Szekely v. Eagle Lion Films, Inc.*, 242 F.2d 266, 268-69 (2d Cir. 1957). Moreover, other courts have adopted the same analysis, and the Supreme Court has suggested, albeit obliquely, that such a measure of damages is appropriate. See *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).

In *Business Trends*, the plaintiff and the defendant were competitors in the publication of economic analyses and forecasts—not a relationship where the defendant was a potential licensee of the plaintiff. Each produced a study of the robotics industry. The plaintiff, Business Trends Analysts, Inc. (BTA), marketed copies of its study for $1,500. The defendant produced a similar study, which it initially offered at the same price as BTA's study. In response to slow sales, the defendant cut its price by 90% to $150 during a 3-month special-offer period. It sold 37 copies at the reduced price. Plaintiff BTA registered its study with the U.S. Copyright Office, but only after the defendant had begun selling its version. See *Business Trends*, 887 F.2d at 401.

BTA sued the defendant, alleging that the defendant's report included portions that were copied from BTA's. The district court found copying and substantial similarity, and awarded damages of $54,028.35. The damages were found solely for the infringer's profits under the second prong of § 504(b). No damages were awarded under the first prong for the "actual damages" suffered by the owner. In fact, the district court expressly found that the plaintiff "failed to establish actual damages as a consequence of defendant's infringement of BTA's robotics study." See *Business Trends Analysts, Inc. v. Freedonia Group, Inc.*, 700 F. Supp. 1213, 1233 (S.D.N.Y. 1988).

The infringer's profits awarded were derived from two components: a smaller component consisting of the defendant's cash profit (revenues minus expenses) on its sale of the robotics study, and a larger amount consisting of noncash profit attributed in part to the value of acquired goodwill (a "value of use") deriving in part from the defendant's giving the report to customers at a 90% markdown. See *Business Trends*, 700 F. Supp. at 1237-41. In justifying the proposition that the profits of the infringement could properly include noncash benefits to the infringer resulting from the infringement, the district court referred to the Seventh Circuit's conclusion in *Deltak, Inc. v. Advanced Sys., Inc.*, 767 F.2d 357 (7th Cir. 1985), that "'saved acquisition cost is a measure of damages or profit' when calculating value of use under the statute, where cash was not generated." See *Business Trends*, 700 F. Supp. at 1238 (quoting *Deltak*, 767 F.2d at 362 n. 3).

The Appeals Court affirmed the award insofar as it was based on the defendant's cash profit from the sale of the infringing report. However, insofar as the district court had attributed profits to the defendant based on noncash elements consisting of either goodwill achieved by giving the infringing study to customers at a heavily discounted price or the "value of use" the defendant achieved by acquiring for free material for which it might otherwise have paid the plaintiff, the court found such attribution of profit to the defendant inappropriate. See *Business Trends*, 887 F.2d at 404–407.

The Appeals Court noted that the District Court had based its analysis of the noncash elements of the defendant's profits in part on *Deltak's* reasoning. See *Business Trends*, 887 F.2d at 404–405. The court declined to adopt *Deltak's* approach, relying primarily on two reasons. First, the court believed the instructions of § 504(b) relating to the proof of the "infringer's profits" indicated "that Congress means 'profits' in the lay sense of gross revenue less out-of-pocket costs, not the fictive purchase price that the defendant hypothetically chose not to pay to BTA." Second, given the defendant's larcenous intent and the competitive relationship between the plaintiff and the defendant, the court believed it was unreasonable to find that the defendant profited within the meaning of the statute by copying for free rather than paying the price it might have negotiated with the plaintiff.

The sole issue before the court was whether either the expenses saved by the infringer resulting from its decision to infringe rather than purchase or the goodwill the defendant generated by offering the infringing material to its customers at a greatly reduced price can be considered "infringer's profits" recoverable under § 504(b). The decision did not

involve the question under consideration in the *Davis* case—whether the amount the owner failed to collect as a reasonable royalty or license fee could be considered as constituting the owner's actual damages under § 504(a) and (b).

It is true that the *Business Trends* decision, in a digression, observed "that [actual damages] is hardly a reasonable description of the entirely hypothetical sales to the defendant lost by BTA."

For two reasons, the court believes *Business Trends* does not foreclose the use of the owner's loss of a reasonable royalty as its "actual damages" under § 504(a) and (b). First, as noted, that issue was not before the court. Second, the court went to pains in *Business Trends* to make clear that it was *not* laying down an absolute rule, but rather making a ruling that was heavily influenced by the particular facts of that case. The court rejected the defendant's argument that a "value of use" standard is always impermissible, saying "we see no legal barrier to such an award under Section 504(b) so long as the amount of the award is based on a factual basis rather than 'undue speculation.'" Again at the conclusion of the opinion the court "emphasize[d] that we are not rejecting as a matter of law" a recognition of the "value of use" theory. The court held "only that the proof in the instant case is inadequate to support such an award."

To the extent that the *Business Trends* decision was based on its observation that the defendant before it was no more inclined to negotiate a purchase price than a "purse snatcher," the facts of the Davis case are significantly different. The Gap was not seeking, like the *Business Trends* defendant, to surreptitiously steal material owned by a competitor. There is no reason to suppose that the Gap's use of Davis's copyrighted eyewear without first receiving his permission was attributable to anything other than oversight or mistake. To the contrary, the facts of this case support the view that the Gap and Davis could have happily discussed the payment of a fee, and that Davis's consent, if sought, could have been obtained for very little money, since significant advantages might flow to him from having his eyewear displayed in the Gap's ad. Alternatively, if Davis's demands had been excessive, the Gap would in all likelihood have simply eliminated Davis's eyewear from the photograph. Where the *Business Trends* decision was motivated by its perception of the unrealistic nature of a suggestion that the infringer might have bargained with the owner (see 887 F.2d at 405), such a scenario was in no way unlikely in the present case.

**(f) REASONABLE LICENSE FEE.** Because *Business Trends* did not rule on, much less foreclose, the use of a reasonable license fee theory as the measure of damages suffered by Davis when the Gap used his material without payment, we proceed to consider whether that measure of damages is permissible under the § 504(a) and (b) statute.

The question is as follows: Assume that the copyright owner proves that the defendant has infringed his work. He proves also that a license to make such use of the work has a fair market value, but does not show that the infringement caused him lost sales, lost opportunities to license, or diminution in the value of the copyright. The only proven loss lies in the owner's failure to receive payment by the infringer of the fair market value of the use illegally appropriated. Should the owner's claim for "actual damages" under § 504(b) be dismissed? Or should the court award damages corresponding to the fair market value of the use appropriated by the infringer?

Neither answer is entirely satisfactory. If the court dismisses the claim by reason of the owner's failure to prove that the act of infringement caused economic harm, the infringer will get its illegal taking for free, and the owner will be left uncompensated for the illegal taking of something of value. However, an award of damages might be seen as

a windfall for an owner who received no less than he would have if the infringer had refrained from the illegal taking. The more reasonable approach seems to be to allow such an award in appropriate circumstances.

**(g) ACTUAL DAMAGES.**   Section 504(a) and (b) employ the broad term "actual damages." Courts and commentators agree it should be broadly construed to favor victims of infringement. See William F. Patry, *Copyright Law and Practice* 1167 (1994) ("Within reason, any ambiguities should be resolved in favor of the copyright owner."); 4 *Nimmer* § 14.02[A], at 14-12 ("[U]ncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement."); *Fitzgerald Publ'g Co.*, 807 F.2d at 1118 ("[A]ctual damages are not ... narrowly focused."); *Sygma Photo News, Inc. v. High Society Magazine*, 778 F.2d 89, 95 (2d Cir. 1985) (stating that when courts are confronted with imprecision in calculating damages, they "should err on the side of guaranteeing the plaintiff a full recovery"). Cf. *In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 564 (2d Cir. 1994) (noting that any doubts in calculating profits that result from the infringer's failure to present adequate proof of its costs are to be resolved in favor of the copyright holder), *abrogated on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).

A principal objective of the copyright law is to enable creators to earn a living either by selling or by licensing others to sell copies of the copyrighted work. See U.S. Const. Art. I, § 8, cl. 8 ("Congress shall have the power ... [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."); Statute of Anne, 1709, 8 Anne, ch. 19 (Eng.), *reprinted in* III Patry, *supra*, at 1461 (first establishing copyright protection for authors because "Printers, Booksellers, and other Persons, have of late frequently taken the liberty of printing, reprinting, and publishing ... books, and other writings, without the consent of the authors or proprietors of such books and writings, to their very great detriment, and too often to the ruin of them and their families").

If a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, it seems entirely reasonable to conclude that the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for. There seems to be no reason why, as an abstract matter, the statutory term "actual damages" should not cover the owner's failure to obtain the market value of the fee the owner was entitled to charge for such use.

The problem is roughly analogous to illegal takings or uses in other contexts outside the realm of copyright. For example: D, who lives on property adjacent to P, without authorization regularly swims and canoes in P's lake and uses a road crossing P's land because it provides more direct access to town. The right to use P's property for such purposes has a fair market value. P proves neither harm to his property nor loss of opportunity to license others to use the property for such recreation. Nonetheless, P has lost the revenue he would have recovered if D had paid the fair market value of what he took.

In this case, the defendant has surreptitiously taken a valuable right, for which the plaintiff could have charged a reasonable fee. The plaintiff's revenue is thus smaller than it would have been if the defendant had paid for what he took. However, the plaintiff's revenue is no less than it would have been if the defendant had refrained from the taking. Between leaving the victim of the illegal taking with nothing and charging the illegal taker with the reasonable cost of what he took, the latter, at least in some circumstances, seems to be the preferable solution.

It is important to note that under the terms of § 504(b), unless such a forgone payment can be considered "actual damages," in some circumstances victims of infringement will go uncompensated. If the infringer's venture turned out to be unprofitable, the owner can receive no recovery based on the statutory award of the "infringer's profits." And in some instances, there will be no harm to the market value of the copyrighted work. The owner may be incapable of showing a loss of either sales or licenses to third parties. To rule that the owner's loss of the fair market value of the license fees that might have been exacted of the defendant does not constitute "actual damages" would mean that in such circumstances an infringer may steal with impunity. In the *Davis* case, the Appeals Court could not see reason why this should be so. Of course, if the terms of the statute compelled that result, the court's perception of inequity would make no difference; the statute would control. But in the court's view, the statutory term "actual damages" is broad enough to cover this form of deprivation suffered by infringed owners.

**(h) DETERMINING FAIR MARKET VALUE.** The Appeals Court recognized in the *Davis* case that awarding the copyright owner the lost license fee can risk abuse. Once the defendant has infringed, the owner may claim unreasonable amounts as the license fee— to wit, Davis's demand for an award of $2.5 million. The law therefore exacts that the amount of damages may not be based on "undue speculation." (See *Abeshouse*, 754 F.2d at 470.) The question is not what the owner would have charged, but rather what is the fair market value. In order to make out a claim that one has suffered actual damage because of the infringer's failure to pay the fee, the owner must show that the thing taken had a fair market value. But if the plaintiff owner has done so, and the defendant is thus protected against an unrealistically exaggerated claim, the court could see little reason not to consider the market value of the uncollected license fee as an element of "actual damages" under § 504(b).

The court recognized also that finding the fair market value of a reasonable license fee may involve some uncertainty. But that is not sufficient reason to refuse to consider this as an eligible measure of actual damages. Many of the accepted methods of calculating copyright damages require the court to make uncertain estimates in the realm of contrary to fact. See 4 *Nimmer* § 14.02[A], at 14-9. A classic element of the plaintiff's copyright damages is the profits the plaintiff would have earned from third parties were it not for the infringement. See 4 *Nimmer* § 14.02[A], at 14-9 to 10. This measure requires the court to explore the counterfactual hypothesis of the contracts and licenses the plaintiff would have made absent the infringement and the costs associated with them. See *Fitzgerald Publ'g*, 807 F.2d at 1118 (actual damages measured by "the profits which the plaintiff might have earned were it not for the infringement"); *Stevens Linen Assocs. v. Mastercraft Corp.*, 656 F.2d 11, 15 (2d Cir. 1981) (same).

A second accepted method, focusing on the "infringer's profits," similarly requires the court to explore circumstances that are counterfactual. The owner's entitlement to the infringer's profits is limited to the profits "attributable to the infringement"—17 U.S.C. § 504(b). The court, therefore, must compare the defendant's actual profits to what they would have been without the infringement, and award the plaintiff the difference. Neither of these approaches is necessarily any less speculative than the approach that requires the court to find the market value of the license fee for what the infringer took. Indeed, it may be far less so. Many copyright owners are represented by agents who have established rates that are regularly paid by licensees. In such cases, establishing the fair market value of the license fee of which the owner was deprived is no more speculative than determining the damages in the case of a stolen cargo of lumber or potatoes. Given

the court's long-held view that in assessing copyright damages "courts must necessarily engage in some degree of speculation," some difficulty in quantifying the damages attributable to infringement should not bar recovery. See 4 *Nimmer* § 14.02[A], at 14-12 ("[U]ncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement."); II Paul Goldstein, *Copyright* § 12.1.1, at 12:6 (second edition 2000) ("Once the copyright owner shows a connection between infringement and damage, uncertainty about the amount of damages will not bar an award."); *Szekely*, 242 F.2d at 269 (where "legal injury is certain ... [w]e should not allow difficulty in ascertaining precisely the value of the right destroyed, which difficulty arises largely from the destruction, to enable the infringer to escape without compensating the owner of the right").

**(i) COPYRIGHT INFRINGEMENT.** Davis contended that it was improper for the district court to grant summary judgment on his copyright claims without first determining whether the defendant infringed his copyright. The complaint expressly sought "a declaratory judgment in favor of Mr. Davis against Gap, declaring" that the Gap had infringed Davis's copyright by its reproduction of his eyewear in its advertisement. The district court granted the defendant's motion for summary judgment on the basis of a variety of theories that had no bearing on the demand for declaratory relief. No doubt because of the confusing and prolix nature of the complaint, this aspect of the relief sought was overlooked. The existence of damages suffered is not an essential element of a claim for copyright infringement. See *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (to establish a prima facie case of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original"); Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01, at 13-6 (1999) ("Notably absent from this formulation of the *prima facie* case is damage or any harm to [the] plaintiff resulting from the infringement."). The owner of a copyright is thus entitled to prevail in a claim for declaratory judgment of infringement without showing entitlement to monetary relief. Insofar as the judgment dismissed the claim for declaratory relief without discussion, the Appeals Court was obliged to vacate the judgment and remand for consideration of that claim.

The decisions of this and other courts support the view that the owner's actual damages may include in appropriate cases the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer.

Although the Supreme Court has never directly addressed this question, it has suggested in the somewhat different context of a fair use analysis that a critical question is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Nation Enters.*, 471 U.S. at 562.

In *Szekely*, a 1909 Act case, the court awarded such damages. A screenwriter sued a film distributor for damages based on its distribution of a film employing the plaintiff's screenplay. The plaintiff had contracted with a movie producer to sell the screenplay for $35,000. However, the producer encountered financial difficulties and failed to complete the purchase, leaving the ownership of the screenplay with the plaintiff. The production company nonetheless made the film using the plaintiff's screenplay. The screenwriter sued the distributor for infringement, and the distributor was held liable. The plaintiff's award of damages was based on the amount of the license fee the plaintiff would have been entitled to charge, calculated by reference to the contract the plaintiff had made with the production company. See *Szekely*, 242 F.2d at 268-69.

In *Abeshouse*, under the current act, the court again awarded such damages. The plaintiff had licensed the defendant to be the plaintiff's exclusive distributor for a poster design showing a Rubik's Cube solution. The defendant secretly caused infringing posters to be printed by an independent source and sold them. The court upheld an award of damages under § 504(b) in two parts: one part consisting of the infringer's profits from its sale of the infringing posters, and the second part representing the payments the plaintiff would have received if the defendant had obtained the infringing posters from the plaintiff. See *Abeshouse*, 754 F.2d at 470-71.

In *Koons*, the defendant, a famous pop art sculptor, appropriated the plaintiff's copyrighted photograph of a couple with a litter of puppies, and caused his workshop to fabricate a work of sculpture copying the plaintiff's image. In rejecting the defendant's claim of fair use, the court observed that while a finding of infringement would not necessarily prevent the defendant from publishing his expression, "it does recognize that any such exploitation must at least entail 'paying the customary price'"—*Koons*, 960 F.2d at 310 (quoting *Nation Enters.*, 471 U.S. at 562). In remanding to the district court to assess the plaintiff's actual damages, the court observed that "a reasonable license fee for the use of [the plaintiff's work] best approximates the market injury sustained by [the plaintiff] as a result of [the defendant's] misappropriation." See also *Ringgold v. Black Entertainment Television*, 126 F.3d 70, 81 (2d Cir. 1997) (The fact that infringement had little likelihood of adversely affecting sales of a licensed poster of copyrighted artwork "deserves little weight [in fair use analysis] against a plaintiff alleging appropriation without payment of a customary licensing fee").

*Szekely*, *Abeshouse*, and *Koons* are supported by the decisions of other circuit courts, as well as district courts. In *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.*, 513 F.2d 151, 152 (8th Cir. 1975), a 1909 Act case, the defendant infringed on the plaintiff's architectural plans. After a trial on damages, the jury returned with a verdict of no damages. On appeal, the Eighth Circuit held that the district court had erred by failing to instruct the jury that the defendants were liable for the "fair value," or market value, of the infringed plans.

In *Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp*, 562 F.2d 1157, 1174 (9th Cir. 1977), where the defendant had produced commercials infringing on the plaintiff's television show, the Ninth Circuit approved a jury instruction that allowed the jury to award an amount approximating "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiff's work."

In *Kleier Adver., Inc. v. Premier Pontiac, Inc*, 921 F.2d 1036, 1039 (10th Cir. 1990), the defendant automobile dealership infringed for 22 months on an advertising agency's syndicated advertising program. The Tenth Circuit upheld the jury's award of damages, concluding that the jury had intended an award of actual damages that represented the plaintiff's lost license fees over the 22-month period.

In *Encyclopedia Brown*, a cable television company and various cable operators infringed on the plaintiff's television program. The district court rejected the defendants' argument that the plaintiff's claim for a reasonable license fee was not cognizable as a matter of law. The court reasoned that if the lost sale of a product to a third-party customer constitutes "actual damages," then the lost sale of a license to a defendant who, absent the infringement, would have paid for a license may constitute "actual damages" as well. See *Encyclopedia Brown*, 25 F. Supp. 2d at 399–402. The court found authorization for such an award in *Koons*. See *Encyclopedia Brown*, 25 F. Supp. 2d at 401 (quoting *Koons*, 960 F.2d at 313).

In *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Constr. Co*, 542 F. Supp. 252 (D. Neb. 1982) the defendant construction company, after first engaging the plaintiff architectural firm to design an apartment complex, subsequently copied and used the plaintiff's plans in construction of an apartment complex on a neighboring parcel of land. The court determined that the fair market value of the modified architectural plans was the relevant measure for actual damages, and calculated that amount by determining "the amount [defendant] would reasonably have paid to the plaintiff and the plaintiff would reasonably have expected to receive for the revision and use of the [first set of] plans." Id. at 263. In *Kleier Adver. Co. v. James Miller Chevrolet, Inc*, 722 F. Supp. 1544, 1546 (N.D. Ill. 1989), where the facts were similar to the Tenth Circuit's *Kleier* case just cited, the court awarded lost license fees, which it characterized as "actual damages," as well as the infringer's profits. See also *Curtis v. General Dynamics Corp.*, No. C89-566S, 1990 WL 302725, at *11 (W.D. Wash. Sept. 26, 1990) (awarding plaintiff photographer the fee he would have been paid had defendant hired him instead of infringing his copyright); *Bishop v. Wick*, No. 88 C 6369, 1988 WL 166652, at *5 (N.D. Ill. Dec. 29, 1988) ("Plaintiffs shall recover the fair market value of the [infringed computer program] in an amount equal to the ordinary licensing fees charged to licensees of plaintiffs, multiplied by each time that defendants illegally copied or utilized the [program]." (emphasis omitted)); *Sherry Mfg. Co. v. Towel King*, 220 U.S.P.Q. 855, 859 (S.D. Fla. 1983) (awarding actual damages based on reasonable royalty that should have been paid for license to use infringed design), *rev'd on other grounds*, 753 F.2d 1565 (11th Cir. 1985).

## 43.3 CONCLUSION

The Appeals Court in the *Davis* case conclude that Section 504(b) permits a copyright owner to recover actual damages, in appropriate circumstances, for the fair market value of a license covering the defendant's infringing use. Davis adduced sufficiently concrete evidence of a modest fair market value of the use made by the Gap. The Gap's use of the infringed matter was substantial. If Davis were not compensated for the market value of the use taken, he would receive no compensation whatsoever. On remand, the district court should consider such factors as whether the infringement was innocent and whether for any reason it would be inequitable to impose an award.

The district court had correctly held that Davis was not entitled to punitive damages under the U.S. Copyright Act. As a general rule, punitive damages are not awarded in a statutory copyright infringement action. The purpose of punitive damages—to punish and thereby prevent malicious conduct—is generally achieved under the Copyright Act through the provisions of 17 U.S.C. § 504(c)(2), which allow increases to an award of statutory damages in cases of willful infringement. In any event, the question did not detain the Appeals Court for long because Davis had failed to show willfulness on the Gap's part.

The Gap contended that even if the Appeals Court found fault with the district court's reasons, its dismissal should be affirmed under the doctrine *de minimis non curat lex* because any copying of protected matter was trivial. The *de minimis* doctrine essentially provides that where unauthorized copying is sufficiently trivial, "the law will not impose legal consequences." *Ringgold*, 126 F.3d at 74. See also *Knickerbocker Toy Co. v. Azrak-Hamway Int'l, Inc.*, 668 F.2d 699, 703 (2d Cir. 1982) (denying relief under *de minimis* doctrine where defendant had made a copy of plaintiff's work but copy was never used); *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 916 (2d Cir. 1994) (suggesting that if photocopying for individual use in research is *de minimis*, it would not constitute an

infringement); Pierre N. Leval, *Nimmer Lecture: Fair Use Rescued*, 44 U.C.L.A. L. Rev. 1449, 1457–58 (1997).

The *de minimis* doctrine is rarely discussed in copyright opinions because suits are rarely brought over trivial instances of copying. Nonetheless, it is an important aspect of the law of copyright. Trivial copying is a significant part of modern life. Most honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for the *de minimis* doctrine, would technically constitute a violation of law. We do not hesitate to make a photocopy of a letter from a friend to show to another friend, or of a favorite cartoon to post on the refrigerator. Parents in Central Park photograph their children perched on José de Creeft's Alice in Wonderland sculpture. We record television programs aired while we are out so as to watch them at a more convenient hour. Waiters at a restaurant sing "Happy Birthday" at a patron's table. When we do such things, it is not that we are breaking the law but are unlikely to be sued given the high cost of litigation; because of the *de minimis* doctrine, in trivial instances of copying we are in fact *not* breaking the law. If a copyright owner were to sue the makers of trivial copies, judgment would be for the defendants. The case would be dismissed because trivial copying is not an infringement.

The Gap sought to avail itself of the *de minimis* rule. It argued that even in advertising it is a trivial matter for persons to be shown wearing their eyeglasses or wristwatches. Although the Gap's argument might well be valid in other circumstances, the court found it did not fit the facts of the case.

Here, the combination of circumstances convinced the Appeals Court that the *de minimis* doctrine was not applicable. In the "fast" advertisement, the infringing item is highly noticeable. This is in part because Davis's design and concept are strikingly bizarre; it is startling to see the wearer peering at us over his Onoculii. Because eyes are naturally a focal point of attention, and because the wearer is at the center of the group—the apex of the V formation—the viewer's gaze is powerfully drawn to Davis's creation. The impression created, furthermore, is that the models posing in the ad have been outfitted from top to bottom, including eyewear, with Gap merchandise. All this leads us to conclude that the Gap's use of Davis's jewelry cannot be considered a *de minimis* act of copying to which the law attaches no consequence.

Finally, the Gap contended its advertisement was protected by the fair use doctrine, and that the dismissal could be affirmed on that basis. Fair use is a judicially created doctrine dating back nearly to the birth of copyright in the eighteenth century—see *Burnett v. Chatwood*, 2 Mer. 441, 35 Eng. Rep. 100809 (Ch. 1720); *Gyles v. Wilcox*, 26 Eng. Rep. 489 (Ch. 1740)—but first explicitly recognized in statute in the Copyright Act of 1976. See 17 U.S.C. § 107 (1994).

The Appeals Court reviewed the Gap's claim of fair use in light of the Supreme Court's clarification in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), of the relationship among the four factors specified in the statute as appropriate for consideration.

The heart of the fair use inquiry is into the first specified statutory factor identified as "the purpose and character of the use"—17 U.S.C. § 107(1). This formulation, as the Supreme Court observed in *Campbell*, 510 U.S. at 578, draws on Justice Story's famous reference in *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (No. 4901), to "the nature and objects of the selections made." As the *Campbell* court explained,

> The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message ..., in other words, whether and to what extent the new work is "transformative." Although

such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. *Such [transformative] works thus lie at the heart of the fair use doctrine's guarantee of breathing space.* ... *Campbell*, 510 U.S. at 579 (emphasis added) (alteration in original) (citations omitted).

Pausing for the moment at that inquiry, the Appeals Court found nothing transformative about the Gap's presentation of Davis's copyrighted work. The ad shows Davis's Onoculii being worn as eye jewelry in the manner it was made to be worn—looking much like an ad Davis himself might have sponsored for his copyrighted design.

The first factor, as spelled out in the statute, goes on to mention "whether such use is of a commercial nature or is for nonprofit educational purposes"—17 U.S.C. § 107(1). By reason of dicta in the Supreme Court's opinion in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984), to the effect that commercial uses of a copyrighted work are "presumptively ... unfair," courts have sometimes given "dispositive weight" to whether the secondary use was commercial—*Campbell*, 570 U.S. at 584 (criticizing *Acuff-Rose Music, Inc. v. Campbell*, 972 F.2d 1429 (6th Cir. 1992)). The Supreme Court in *Campbell* rejected the notion that the commercial nature of the use could by itself be a dispositive consideration. The *Campbell* opinion observes that "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research ... are generally conducted for profit," and that Congress "could not have intended" a rule that commercial uses are presumptively excluded. The commercial objective of the secondary work is merely a factor. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."

In the *Davis* case, as in *Sony*, the secondary use was not transformative. The question of whether the new use is commercial thus acquired an importance it does not have when the new work is transformative. In *Sony*, however, the copied work was saved by its private, noncommercial character. See *Sony*, 464 U.S. at 449. Here the work, being an advertisement, is at the outer limit of commercialism. See *Campbell*, 510 U.S. at 585 ("The use, for example, of a copyrighted work to advertise a product ... will be entitled to less indulgence under the first factor ... than the sale of [the new work] for its own sake.").

The second statutory factor, the nature of the copyrighted work, see 17 U.S.C. § 107(2), is rarely found to be determinative. *Campbell* explained that "[t]his factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that [with the former] fair use is more difficult to establish" (*Campbell*, 510 U.S. at 586). In this case, as in *Campbell*, the plaintiff's copyrighted work is in the nature of an artistic creation that falls close to "the core of the copyright's protective purposes."

The third factor, which looks at the "amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), recognizes that fragmentary copying is more likely to have a transformative purpose than wholesale copying. In this case, the Gap's ad presents a head-on full view of Davis's piece, centered and prominently featured. The Gap cannot benefit from the third factor.

The fourth factor looks at "the effect of the use upon the potential market for or value of the copyrighted work." Although the Supreme Court had observed in dictum in *Nation Enters.*, 471 U.S. at 566, that this is perhaps the "most important" of the factors, *Campbell* made clear that this dictum, if misunderstood, was capable of causing confusion. As the *Campbell* opinion explained, if the secondary work harms the market for the original through criticism or parody, rather than by offering a market substitute for the original that supersedes it, "it does not produce a harm cognizable under the Copyright Act"

(*Campbell*, 510 U.S. at 592). "[T]he role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps [the market for the original]."

Thus, when secondary uses harms the market for, or value of, the original, courts must examine the source of the harm. If the harm resulted from a transformative secondary use that lowered the public's estimation of the original (such as a devastating review of a book that quotes liberally from the original to show how silly and poorly written it is), this transformative use will be found to be a fair use, notwithstanding the harm. If, on the other hand, the secondary use, by copying the first, offers itself as a market substitute and in that fashion harms the market value of the original, this factor argues strongly against a finding of fair use. *Campbell* explains that the market effect must be evaluated in light of whether the secondary use is transformative.

> [W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly "supersede[s] the objects," *Folsom v. Marsh* [9 F. Cas. at 348], of the original and serves as a market replacement for it, making it likely that cognizable [actionable] market harm to the original will occur. But when, on the contrary, the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred. Notwithstanding harmful effect, the use may be a fair use.

In the *Davis* case the Appeals Court noted that the Gap's use was not transformative. By taking for free Davis's design for its ad, the Gap avoided paying "the customary price" Davis was entitled to charge for the use of his design. See *Nation Enters.*, 471 U.S. at 562. Davis suffered market harm through his loss of the royalty revenue to which he was reasonably entitled in the circumstances, as well as through the diminution of his opportunity to license to others who might regard Davis's design as preempted by the Gap's ad.

In the Appeals Court's view, all the fair use factors favored Davis. The court said that they could not accept the Gap's claim that its use of Davis's design was protected by the fair use doctrine.

Finding no merit to the parties' other contentions, the court affirmed the grant of summary judgment in favor of the defendant denying Davis's claims for infringer's profits under 17 U.S.C. § 504(b), and for punitive damages. With regard to Davis's claim for declaratory relief and "actual damages" under § 504(b), the judgment of the district court was vacated and the case remanded for further proceedings.

The case has now been remanded to the trial court for further proceedings. Trial Court Judge Robert W. Sweet of the U.S. District Court for the Southern District of New York must consider whether Davis is entitled to damages flowing from his loss of a licensing fee and whether any factors would mitigate the imposition of such damages.