1  BINGHAM McCUTCHEN LLP
   DONN P. PICKETT (SBN 72257)
2  GEOFFREY M. HOWARD (SBN 157468)
   HOLLY A. HOUSE (SBN 136045)
3  ZACHARY J. ALINDER (SBN 209009)
   BREE HANN (SBN 215695)
4  Three Embarcadero Center
   San Francisco, CA  94111-4067
5  Telephone:  (415) 393-2000
   Facsimile:  (415) 393-2286
6  donn.pickett@bingham.com
   geoff.howard@bingham.com
7  holly.house@bingham.com
   zachary.alinder@bingham.com
8  bree.hann@bingham.com

9  DORIAN DALEY (SBN 129049)
   JENNIFER GLOSS (SBN 154227)
10 500 Oracle Parkway, M/S 5op7
   Redwood City, CA  94070
11 Telephone:  (650) 506-4846
   Facsimile:  (650) 506-7114
12 dorian.daley@oracle.com
   jennifer.gloss@oracle.com
13

14 Attorneys for Plaintiffs
   Oracle USA, Inc., Oracle International Corporation,
15 Oracle EMEA Limited, and Siebel Systems, Inc.

16                    UNITED STATES DISTRICT COURT

17                   NORTHERN DISTRICT OF CALIFORNIA

18                          OAKLAND DIVISION

19 ORACLE USA, INC., *et al.*,              CASE NO.  07-CV-01658 PJH (EDL)

20            Plaintiffs,                   **ORACLE'S NOTICE OF MOTION
                                            AND MOTION FOR PARTIAL
21       v.                                 SUMMARY JUDGMENT**

22 SAP AG, *et al.*,                        **REDACTED VERSION**

23            Defendants.                   Date:      May 5, 2010
                                            Time:      9:00 am
24                                          Place:     3rd Floor, Courtroom 3
                                            Judge:     Hon. Phyllis J. Hamilton
25

26

27

28

---

ORACLE'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT .................................................................... 1

II. SAP TN DIRECTLY INFRINGED OIC'S HRMS AND DATABASE
    COPYRIGHTS ........................................................................................ 4

    A.  OIC Owns The Relevant Copyrights ............................................. 4

    B.  SAP TN Copied Protected Expression ........................................... 5

        1.  SAP TN Engaged In Actual Copying ................................. 5

            a.   HRMS 7.0 - TX 4-792-577 ..................................... 5

            b.   HRMS 7.5 - TX 4-792-575 ..................................... 7

            c.   HRMS 8 SP1 - TX 5-501-312 .................................. 8

            d.   Database Software - 8.1.6 (TX 5-222-106), 9.2 (TX 5-673-
                 282), and 10.2 (TX 6-942-003) ................................. 8

        2.  SAP TN Copied Vast Amounts Of Protectable Expression ................. 10

    C.  SAP TN Has No License (or Other Defense) For Its Copying or Use ............... 11

III. SAP AG AND SAP AMERICA ARE LIABLE FOR VICARIOUS AND
     CONTRIBUTORY INFRINGEMENT ........................................................ 13

IV.  SAP TN VIOLATED THE COMPUTER FRAUD AND ABUSE ACT ...................... 17

    A.  SAP TN Violated CFAA Section 18 U.S.C. 1030 (a)(2)(C) ............................ 18

        1.  Oracle's Systems Are "Protected Computers" ........................... 18

        2.  SAP TN's Access And Downloading Was Intentional ........................... 18

            a.   SAP TN Intentionally Scraped Oracle's Systems ...................... 19

            b.   SAP TN Also Admitted To Downloading Numerous Files
                 Using Expired Credentials .......................................... 20

        3.  SAP TN's Access And Downloading Was Not Authorized Or
            Exceeded Authorization .................................................. 20

            a.   The Applicable Terms Of Use ...................................... 21

            b.   SAP TN Violated The Terms Of Use ................................. 21

        4.  SAP TN Obtained Oracle Support Materials And Caused More
            Than $5,000 Loss ...................................................... 22

    B.  SAP TN Violated 18 U.S.C. § 1030 (a)(5)(A)(i) ................................... 23

    C.  SAP TN Violated 18 U.S.C. §§ 1030 (a)(5)(A)(ii)-(iii) ............................ 23

    D.  SAP Is Liable For SAP TN's Computer Fraud ..................................... 24

V.   CONCLUSION ...................................................................... 25

i

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

CASES

4

*A&M Records, Inc. v. Napster, Inc.*,
5
    114 F. Supp. 2d 896 (N.D. Cal. 2000) ............................................................................. 16, 17

6

*A&M Records, Inc. v. Napster, Inc.*,
7
    239 F.3d 1004 (9th Cir. 2001).............................................................................. 14, 15, 17

*ABKCO Music, Inc. v. Harrisongs Music, LTD.*,
8
    944 F.2d 971 (2d Cir. 1991)................................................................................................ 5

9

*Apple Computer, Inc. v. Microsoft Corp.*,
10
    35 F.3d 1435 (9th Cir. 1994)............................................................................................. 10

11

*Bourne v. Walt Disney Co.*,
    68 F.3d 621 (2d Cir. 1995)............................................................................................... 11
12

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
13
    404 U.S. 508 (1972) .......................................................................................................... 11

14

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) .......................................................................................................... 11
15

*Celotex Corp. v. Catrett*,
16
    477 U.S. 317 (1986) ............................................................................................................ 4

17

*Co-Opportunities, Inc. v. Nat'l Broad. Co., Inc.*,
18
    510 F. Supp. 43 (N.D. Cal. 1981) ...................................................................................... 5

19

*Colum. Pictures Indus., Inc. v. Landa*,
    974 F. Supp. 1 (D. D.C. 1997) ......................................................................................... 10
20

*Computer Assoc. Int'l, Inc. v. Altai, Inc.*,
21
    982 F.2d 693 (2d Cir. 1992).............................................................................................. 10

22

*Creative Computing v. Getloaded.com LLC*,
23
    386 F.3d 930 (9th Cir. 2004)....................................................................................... 22, 23

24

*Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*,
    No. 06-3359, 2009 U.S. Dist. LEXIS 30610 (N.D. Cal. April 9, 2009) .......................... 24, 25
25

*Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*,
26
    307 F.3d 197 (3d Cir. 2002).............................................................................................. 10

27

*eBay Inc. v. Digital Point Solutions, Inc.*,
28
    608 F. Supp. 2d 1156 (N.D. Cal. 2009) ........................................................................... 21

*Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., Inc.*,
   499 U.S. 340 (1991) ................................................................................ 11

*Frank Music Corp. v. MGM, Inc.*,
   886 F.2d 1545 (9th Cir. 1989)............................................................. 14, 17

*Hanger Prosthethics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*,
   556 F. Supp. 2d 1122 (E.D. Cal. 2008).................................................... 23

*Harris v. Emus Records Corp.*,
   734 F.2d 1329 (9th Cir. 1984)................................................................... 12

*Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*,
   886 F.2d 1173 (9th Cir. 1989)................................................................... 11

*LGS Architects, Inc. v. Concordia Homes*,
   434 F.3d 1150 (9th Cir. 2006)................................................................... 12

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009).......................................................... 18, 20, 21

*MAI Sys. Corp. v. Peak Computer Corp.*,
   991 F.2d 511 (9th Cir. 1993).................................................................... 10

*MGM Studios, Inc. v. Grokster*,
   545 U.S. 913 (2005) ................................................................................. 14

*Michaels v. Internet Entm't Group, Inc.*,
   5 F. Supp. 2d 823 (C.D. Cal. 1998)..................................................... 11, 12

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007)............................................................. 13, 14

*Perfect 10, Inc. v. Google, Inc.*,
   416 F. Supp. 2d 828 (C.D. Cal. 2006) ...................................................... 17

*RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*,
   845 F.2d 773 (8th Cir. 1988)..................................................................... 17

*S.O.S., Inc. v. Payday, Inc.*,
   886 F.2d 1081 (9th Cir. 1989)................................................................... 12

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) ................................................................................... 24

*Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*,
   119 F. Supp. 2d 1121 (W.D. Wash. 2000)................................................. 24

*Stenograph L.L.C. v. Bossard Assocs., Inc.*,
   144 F.3d 96 (D.C. Cir. 1998).................................................................... 10

iii

*SuccessFactors, Inc. v. Softscape, Inc.*,
   544 F. Supp. 2d 975 (N.D. Cal. 2008) ................................................................ 22

*Triad Sys. Corp. v. Se. Express Co.*,
   64 F.3d 1330 (9th Cir. 1995) ................................................................ 4, 5, 10

*United States v. Drew*,
   259 F.R.D. 449 (C.D. Cal. 2009) ................................................................ 18

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ................................................................ 23

**STATUTES**

17 U.S.C. § 101 et seq. ................................................................ 1

17 U.S.C. § 410 ................................................................ 4, 5

17 U.S.C. § 501 ................................................................ 2, 5

18 U.S.C. § 1030 ................................................................ passim

California Penal Code § 502(c)(7) ................................................................ 1, 23

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ................................................................ 4

Fed R. Civ. P. 30(b)(6) ................................................................ 3, 5, 8

Melville B. Nimmer et al., *Nimmer on Copyright* (2009) ................................................................ 11,5

S. Rep. No. 99–432 (1986) ................................................................ 23

1

## NOTICE OF MOTION AND MOTION

2    PLEASE TAKE NOTICE THAT on May 5, 2010 at 9:00 a.m., in the United States

3    District Court, Northern District of California, Oakland Division, located at 1301 Clay Street,

4    Oakland, California, Courtroom 3, 3rd Floor, before the Hon. Phyllis J. Hamilton, Plaintiffs

5    Oracle International Corp. ("OIC") and Oracle USA, Inc. ("OUSA") (collectively "Oracle" or

6    "Plaintiffs") will bring a motion for partial summary judgment against Defendants SAP AG,

7    SAP America, Inc. (together, "SAP"), and TomorrowNow, Inc. ("SAP TN," and together with

8    SAP, "Defendants"), pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rules 7-2,

9    7-4, 7-5 and 56-1.[1]  This motion is based upon this Notice of Motion and Motion, the

10   accompanying Memorandum of Points and Authorities, Declarations, and all attached evidence.

11

## REQUESTED RELIEF

12    Plaintiffs respectfully request that the Court grant partial summary judgment that:

13   (1) SAP TN violated the Copyright Act, 17 U.S.C. § 101 *et seq.*, as described below; (2) SAP is

14   vicariously and contributorily liable for that copyright infringement; (3) SAP TN violated the

15   Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C) and (a)(5), and California

16   Penal Code § 502(c)(7) as described below; and (4) SAP is liable for the CFAA and § 502(c)(7)

17   violations under agency principles.[2]

18

## MEMORANDUM OF POINTS AND AUTHORITIES

19   **I.    PRELIMINARY STATEMENT**

20    This case is unique in several respects.  First, it involves SAP TN's undisputed, direct

21   copying of entire copyrighted software programs – indeed that was the basis of SAP TN's

22   business.  Second, the volume of copying is staggering, consisting of thousands of copies of

23   Oracle software and millions of related support downloads.  A trial encompassing the full scope

24

---

25   [1] Oracle's recent acquisition of Sun Microsystems, Inc. has resulted in certain limited changes to
     Oracle's corporate structure, including that Oracle America, Inc. has assumed all of plaintiff

26   Oracle USA, Inc.'s rights and obligations.  Oracle has confirmed by declaration to Defendants
     that the acquisition has not resulted in any other change to Oracle's corporate structure that

27   would be relevant to this case and has requested that Defendants stipulate to the substitution of
     Oracle America, Inc. for Oracle USA, Inc. as plaintiff.  Alinder Decl., ¶ 81, **Ex 114**.

28   [2] Oracle also seeks summary adjudication of SAP's second, third, and fourth affirmative
     defenses with respect to the issues in this motion.  *Id.* ¶ 72, **Ex 106** at p. 24 (¶¶ 2, 3, 4).

---

1   of this wrongdoing would take months, and a motion that marshaled all the evidence proving it

2   would consume thousands of pages.  Neither is necessary.  This motion presents illustrative

3   evidence sufficient for the Court to rule, as a matter of law, that SAP TN is liable under 17

4   U.S.C. § 501(a) for infringing six of Oracle's copyrighted works, that it has no license or other

5   defense to this infringement, and that it violated the CFAA.  Oracle also moves for an

6   adjudication that SAP is indirectly liable for SAP TN's infringement and CFAA violations.

7       The direct copyright part of this motion is limited to showing that SAP TN committed

8   copyright infringement when it made multiple copies of two Oracle products:  (1) three versions

9   of Oracle's PeopleSoft-branded Human Resources Management Systems application ("HRMS"),

10  used to run businesses' payrolls and to automate various other complex processes; and (2) three

11  versions of Oracle's Relational Database Management System ("Database") software, which

12  stores and organizes business data used by HRMS and other business application software.  No

13  license authorized any of this copying.  Although this motion addresses a tiny fraction of the

14  more than 3,000 illegal HRMS copies that SAP TN made, the Court's ruling will have a far-

15  reaching effect on trial management because the testimony and documents supporting these

16  examples are similar to the evidence supporting many other instances of infringement relating to

17  Oracle's other copyrights in the case.  As a result, the Court and the parties will have a template

18  to use in streamlining liability and damages, and trial will be far more focused and efficient.

19      The evidence of direct copying comes from SAP TN's detailed business records and

20  admissions based on them.  SAP TN referred to its internal copies of HRMS as "environments."

21  It typically acquired them by first making unauthorized copies of install CDs obtained from

22  customers.  To track its internal copies, SAP TN created a database called "Baktrak," which it

23  produced to Oracle as a series of spreadsheets.  SAP TN used Baktrak to track the date, location,

24  name, and other information about "backup" copies of HRMS environments, and to trace when

25  SAP TN "restored" (*i.e.*, copied) them for further use.  Baktrak includes "source" and "target"

26  fields, recording which "source" environments SAP TN copied and renamed as new "target"

27  environments.  The illustrative portions of Baktrak cited here detail hundreds of times over

28  several years when SAP TN copied HRMS environments created from one customer's install

2

1    CDs to use for other customers. Some of these environments were "generic," meaning the name

2    of the environment did not refer to any specific customer, either the one whose install CD SAP

3    TN originally copied or the customer(s) for whom SAP TN used the environment. Other times,

4    SAP TN *did* label and use an environment for a specific customer, but copied a *different*

5    customer's software to create that environment. Using Baktrak, SAP TN's Rule 30(b)(6)

6    witnesses gave clear, damning testimony that establishes beyond any dispute that SAP TN made

7    illegal copies and used them – generic or not – to support multiple customers, even after this

8    litigation began. Other corporate designees provided similar admissions that SAP TN

9    downloaded and copied multiple versions of the Database software, and used those copies for a

10    litany of things for which SAP TN had no license. Because SAP TN can point to no license that

11    permitted or excused its copies, Oracle also moves for partial summary judgment of these

12    defenses to Oracle's copyright claim (and as to Defendants' copyright misuse defense).

13        The CFAA portion of this motion establishes SAP TN's liability through employee

14    admissions of massive, unauthorized downloading from Oracle's systems. These witnesses

15    "crashed" Oracle's website while developing SAP TN's automated downloading tool, Titan, to

16    systematically scrape Oracle's systems. They also admit that they downloaded for customers

17    without valid support contracts with Oracle. Both violate Oracle's website Terms of Use. When

18    they questioned the legality of that activity, supervisors told them to continue because

19    downloading Oracle's support materials as fast as possible was critical to SAP TN's business.

20        The third, and perhaps most remarkable, aspect of this case is that SAP TN's parent

21    companies condoned SAP TN's illegal copying – even at the SAP AG Executive Board of

22    Directors ("Board") level – because they expected great financial benefit from it. The Board's

23    January 2005 "business case" for the proposed SAP TN acquisition incorporated this warning:

24

25

26

27

28



3

1  Alinder Decl., ¶¶ 3, 21, **Exs 53** at 7; **8** at 15-16, 101-103, 113-115; **26** at 16-17, 49-50; *see also*

2  *id.* at ¶ 3, **Exs 8** at 536-537 (SAP AG CFO and CEO knew of Oracle software on TN servers

3  around the time when SAP acquired TN); **15** at 18, 334-336.  Based on this analysis, the Board

4  says it issued an oral "directive" to SAP TN to remove Oracle software from its computers.  But

5  the Board never enforced its directive; the illegal copying continued for years, even though the

6  Board controlled every aspect of SAP TN's business down to the authority to buy "a bottle of

7  water or an eraser."  This and other evidence establishes SAP AG's and SAP America's indirect

8  liability for SAP TN's illegal activity.

9  **II.    SAP TN DIRECTLY INFRINGED OIC'S HRMS AND DATABASE
         COPYRIGHTS**

10

11      Summary judgment is appropriate when the evidence shows that "there is no genuine

12  issue as to any material fact and that the moving party is entitled to a judgment as a matter of

13  law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  To prove

14  copyright infringement, Oracle must show (1) ownership of the relevant copyrights, and

15  (2) copying of protected expression.  *See, e.g.*, *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330,

16  1335 (9th Cir. 1995), *overruled on other grounds by Gonzales v. Texaco, Inc.*, Nos. 07-17123,

17  07-17124, 2009 U.S. App. LEXIS 18370 (9th Cir. Aug. 17, 2009).

18      **A.    OIC Owns The Relevant Copyrights**

19      OIC owns the copyrights at issue in this motion:  HRMS 7.0 (TX 4-792-577), HRMS 7.5

20  (TX 4-792-575), HRMS 8, Service Pack 1 ("HRMS 8 SP1") (TX 5-501-312), Database 8.1.6

21  (TX 5-222-106), Database 9i, Release.2 ("9.2") (TX 5-673-282), and Database 10g, Release.2

22  ("10.2") (TX 6-942-003).

23      **HRMS.**  PeopleSoft obtained valid registrations for HRMS versions 7.0, 7.5 and 8 SP1

24  within five years of publication, and before the registrations were transferred to OIC on March 1,

25  2005, in connection with Oracle's acquisition of PeopleSoft.  Alinder Decl., ¶ 57, **Exs 86-88**.

26  These registrations establish valid copyrights in each of these works.  *See* 17 U.S.C. § 410(c).

27      Much of the HRMS part of this motion addresses infringements that occurred after March

28  1, 2005.  OIC owns these copyrights and claims directly.  Alinder Decl., ¶ 73, **Ex 107**.  OIC also

4

1  owns the claims for HRMS infringements prior to March 1, 2005.  Following the Court's

2  dismissal of Oracle Systems Corporation ("OSC"), which left OIC as the only appropriate

3  plaintiff for the pre-March 1, 2005 HRMS claims, OSC (PeopleSoft's successor in interest) and

4  OIC memorialized their intent, as of the March 1, 2005 acquisition, to transfer to OIC all rights

5  to sue for past infringement of the transferred copyrights "to the extent such rights were not

6  previously assigned, transferred, conveyed or delivered to OIC." *Id.*, ¶ 74, **Ex 108**; Mickelsen

7  Decl., ¶ 4, **Ex A**.  *See* 17 U.S.C. § 501(b); *ABKCO Music, Inc. v. Harrisongs Music, LTD.*, 944

8  F.2d 971, 980-81 (2d Cir. 1991) (new copyright owner may sue for past infringement where

9  assignment conveyed right to do so); *Co-Opportunities, Inc. v. Nat'l Broad. Co., Inc.*, 510 F.

10  Supp. 43, 46-48 (N.D. Cal. 1981) (assignment of right to sue on past infringement may be

11  executed after initiation of litigation).

12      **Database.**  Database versions 8.1.6, 9.2 and 10.2 were each registered within five years

13  of publication.  Alinder Decl., ¶ 57, **Exs 89-91**.  These registrations establish that OIC owns

14  valid copyrights in each of these works.  *See* 17 U.S.C. § 410(c).  Version 8.1.6 was originally

15  registered to OSC (the former Oracle Corporation), then transferred to OIC by written

16  agreement.  *Id.*, ¶¶ 3, 51, **Exs 16** at 69-71; **80**.  The facts set forth above establish OIC's

17  ownership of the copyrights and its standing to sue.  *See* 17 U.S.C. § 501(b).

18      **B.      SAP TN Copied Protected Expression**

19      The second element of infringement is showing the defendant copied from plaintiff's

20  work, and that copying included protected expression.  *Triad Sys.,* 64 F.3d at 1335; Melville

21  B. Nimmer et al., *Nimmer on Copyright* § 13.01[B] (2009).

22          **1.      SAP TN Engaged In Actual Copying**

23      This is the rare case of admitted, direct evidence of literal, wholesale copying.

24              **a.      HRMS 7.0 - TX 4-792-577**

25      Former PeopleSoft employee Catherine Hyde was SAP TN's third employee, "Lead

26  Developer" for HRMS support products delivered to its customers, and a Rule 30(b)(6) witness

27  for "environments" topics.  Alinder Decl., ¶ 3, **Ex 12** at 6-8.  Hyde admitted that SAP TN

28  obtained copies of HRMS 7.02 installation CDs from either Safeway Stores Inc. ("SAF") or

ORACLE'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

1   Washington Gas Light Co. ("WGL"), two of SAP TN's earliest customers. *Id.*, ¶ 3, **Exs 14** at

2   42-43; **12** at 232-233; *see also, id.* ¶ 3, **Ex 21** at 49, 74, 497-98.  Using Baktrak as her guide,

3   Hyde admitted that SAP TN installed HRMS 7.02 software from these SAF/WGL install CDs on

4   its own system, and then copied that initial install dozens of times to use for other customers.

5   *Id.*, ¶¶ 3, 35, **Exs 14** at 42-47; **65**.  Hyde admitted that nearly every one of the 89 HRMS 7.02

6   environment copies listed in Exhibit 1259 (a printout of BakTrak filtered for HRMS 7.02 source

7   environments) originated from the same SAF/WGL CDs.  *Id.*, ¶¶ 3, 35, **Exs 14** at 42-47; **65**.[3]

8   SAP TN used these HRMS 7.02 copies for multiple other customers.  *Id.*, ¶ 3, **Exs 23** at 5-7, 12-

9   13, 132-137; **24** at 363-365; **21** at 84-88; **12** at 116-117.  For but one example, SAP admitted the

10  SAF/WGL CDs were the source for an environment named H702RHIM, used to support

11  customer Robert Half International.[4]  *Id.*, ¶¶ 3, 35, **Exs 14** at 45-46; **65**; **12** at 103.

12         The 89 copies of HRMS 7.02 that Hyde identified from Exhibit 1259 were made from the

13  "backups" SAP TN made of environments originating from SAF/WGL CDs.  *Id.*, ¶¶ 3, 35, **Exs**

14  14 at 42-47; **65**.  A backup compressed the environment into a zip file and stored it in a different

15  server location, which SAP TN admits resulted in an additional copy.  *Id.*, ¶¶ 3, 10, **Exs 5** at 32-

16  34, 39-40, 278-279, 280-281, 288; **42**.  SAP TN then "restored" these backups into active,

17  working environments, making more copies.  *Id.*, ¶¶ 3, 11, 29, **Exs 14** at 42-47; **5** at 308-310; **43**;

18  13 at 85-89; **61**.  Baktrak shows that SAP TN made at least 42 of the 89 restore copies of the

19  SAF/WGL HRMS 7.02 software before its acquisition by SAP, and then at least 47 more after

20  the acquisition, all the way through March 4, 2008.  *Id.*, ¶ 36, **Ex 66**.

21  ─────────────
    [3] Defendants' installations of HRMS 7.02 and 7.51 include essentially all of the voluminous code
    in registered works HRMS 7.0 and 7.5, respectively, because Oracle incorporated virtually the

22  entire code base from the earlier registered version of each release into the slightly later version
    copied by SAP TN.  Ackermann Decl., ¶¶ 5-8. The same concept applies to all relevant versions

23  of Database. Fallon Decl., ¶¶ 4-7. To eliminate any doubt, and although such proof is
    unnecessary due to SAP TN's wholesale copying, Oracle undertook a limited comparison of

24  sample code from several of the SAP TN local environments for each HRMS release that is the
    subject of this motion, and found between 80 and 100 percent overlap (most were over 95

25  percent).  Ackermann Decl., ¶¶ 15-26, **App A-K**.
    [4] SAP TN had naming conventions for its environments, typically assigning one or two letters for

26  the product line ("H" or "HR" for HRMS), a three-number sequence for the version (e.g., "702"
    refers to version 7.02), and a three-character sequence to indicate either a specific customer

27  ("RHI" refers to Robert Half) or that the environment was generic (e.g., "CSS" referred to
    "critical support services," a general business model for providing support at SAP TN).  Alinder

28  Decl., ¶ 58, **Ex 92**.

ORACLE'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

### b.    HRMS 7.5 - TX 4-792-575

For HRMS 7.51, Hyde admitted that SAP TN copied install CDs from either SAF or WGL to create at least 157 HRMS 7.51 environment copies on SAP TN servers (Baktrak indicates 90 were made before SAP TN's acquisition by SAP and 67 were made afterward, through November 2007).  Alinder Decl., ¶¶ 3, 31, 34, **Exs 14** at 27-37; **63**; **64**.  Many were "generic environments," not associated with any particular customer but used to support multiple other SAP TN customers.  *Id.*, ¶ 3, **Exs 5** at 41-42; **23** at 132-137; **21** at 84-88.  Many others were used for customers besides SAF or WGL.  For instance, SAP TN admits the SAF/WGL CDs were the original source copied for an environment named HR751YR2, which SAP TN copied further to create local environments named for, and used to support, other customers.  *Id.*, ¶¶ 3, 12, **Exs 12** at 134-136, 138-139; **44**; **14** at 34-35.  This was "just a matter of efficiency." *Id.*, ¶ 3, **Ex 12** at 135-36.  Baktrak confirms that Hyde used HR751YR2 as the "source" for new copies she then labeled, for example, as the "ARC" (Alternative Resources Corp.), or "FTI" (Florida Tile Industries) "targets" (*id.*, ¶ 32):

| RESTORE_ID | MACHINE | APPLICATION | TARGET_ENV | SOURCE_ENV | RESTORE_ARCHIVE | BACKUP_FILENAME | RESTORE_DATETIME | DESCRIPTION | PERFORMED_BY |
|---|---|---|---|---|---|---|---|---|---|
| 122 | YOGI | HRMS | HR751ARC | HR751YR2 | TNBK0138 | HR751YR2_2004032 5_1005 | 5/26/2004 13:14 | create env for ARC - starting at 03G - still needs 04A/04B applied | chyde |
| 155 | YOGI | HRMS | HR751FTI | HR751YR2 | TNBK0138 | HR751YR2_2004032 5_1005 | 8/2/2004 14:25 | create starting point for Florida Tile. still needs ps 04a/04b applied | chyde |

SAP TN also copied SAF/WGL-originated environments and assigned them to at least two other specific customers – Providence Hospital (PHS) and Telapex (TEL) (*id.*, ¶¶ 3, 33, **Exs 14** at 34-36; **63**):

| RESTORE_ID | MACHINE | APPLICATION | TARGET_ENV | SOURCE_ENV | RESTORE_ARCHIVE | BACKUP_FILENAME | RESTORE_DATETIME | DESCRIPTION | PERFORMED_ |
|---|---|---|---|---|---|---|---|---|---|
| 94 | YOGI | HRMS | HR751PHS | HR75103B | TNBK0050 TNBK0051 | HR75103B_20030514_1326 HR75103B_20030502_0614 | 3/23/2004 15:44 | created starting environment for Providence Hospital from the fix master version of ps with all tax updates thru | chyde |
| 121 | YOGI | HRMS | HR751TEL | HR75104B | ONLINE | HR75104B_20040414_1128 | 5/26/2004 10:39 | create env for Telapax | chyde |

SAP TN also acknowledges it used SAF/WGL CDs to create a "generic" environment named HR751CSS, which it then used simultaneously to support at least four other SAP TN

1  customers:  Advanced Auto Parts, Bear Stearns, Heritage Valley Healthcare, and Universal City

2  Studios.  *Id.*, ¶¶ 3, 33, **Exs 5** at 43-44; **14** at 31-32; **63**; **12** at 34-35.  John Baugh, SAP TN's

3  "Environments Manager" and a Rule 30(b)(6) witness, testified that SAP TN was *still* using

4  HR751CSS to support these four customers at the time of his deposition – nearly a year after

5  Oracle sued.  *Id.*, ¶¶ 3, 44-45, **Exs 5** at 32-34, 43-44; **6** at 126-29; **73**; **74**.

6  <center>**c.      HRMS 8 SP1 - TX 5-501-312**</center>

7          For many of its HRMS 8 SP1 environments, SAP TN cannot even identify the customer

8  "source" CDs.  Hyde admits that SAP TN copied HRMS 8 SP1 install CDs from an unknown

9  customer to create a generic environment named HR81003C and then copied it again and again

10  to create at least 27 other generic HRMS 8 SP1 environments.  *Id.*, ¶¶ 3, 12, 59, **Exs 12** at 54-56;

11  **44**; **93**.[5]  SAP TN admits that it used at least 21 of these generic HRMS 8 SP1 environments to

12  create updates for *groups* of customers.  *Id.*, ¶¶ 3, 12, **Exs 44**; **12** at 54-58; *see also id.* ¶ 3, **Ex 23**

13  at 125-127, 128-131.  SAP TN also used at least two of these generic HRMS 8 SP1

14  environments to create client-labeled environments for Praxair and Quad Graphics, Inc.  *Id.*, ¶ 3,

15  **Ex 12** at 140-142.  BakTrak confirms that (*Id.*, ¶ 38):

16  

| RESTORE_ID | MACHINE | APPLICATION | TARGET_ENV | SOURCE_ENV | RESTORE_ARCHIVE | BACKUP_FILENAME | RESTORE_DATETIME | DESCRIPTION | PERFORMED_BY |
|---|---|---|---|---|---|---|---|---|---|
| 15 | HOMER | HRMS | HR810PRX | HR81004C | ONLINE | HR81004C_20040621_1243 HR81004C_20040701_1158 | 9/20/2004 9:27 | env for praxair at 04C | chyde |
| 17 | HOMER | HRMS | HR810QGI | HR81004D | ONLINE | HR81004D_20040920_0853 | 9/21/2004 11:11 | env for Quad Graphics at 04D | chyde |

18  <center>**d.      Database Software - 8.1.6 (TX 5-222-106), 9.2**</center>
19  <center>**(TX 5-673-282), and 10.2 (TX 6-942-003)**</center>

20          SAP TN also copied – first by downloading and then by making copies from that

21  downloaded install media – various entire versions of Oracle's database software.  Alinder Decl.,

22  ¶ 3, **Exs 7** at 166-67, 178-80, 181-82, 199-200, 234; **33** at 8-9, 10, 32, 79-80.  Baugh admits that,

23  in March 2004, he downloaded install media from Oracle for Oracle database software versions

24  8.1.7 and 9.2.0.1.  *Id.*, ¶¶ 3, 49, **Exs 7** at 167-168, 214-216; **78** at 1, 3.  He made several copies of

25  each release corresponding to different operating systems.  *Id.*, ¶¶ 3, 49, **Exs 7** at 178-180, 214-

26  _____

27  [5] SAP TN made at least 30 copies of an unknown customer's HRMS 8 SP1 software before its acquisition and then at least 19 more afterward, through January 23, 2006.  *Id.*, ¶ 37, **Ex 67** (Date-Sorted HRMS 8 SP1 Restores).  SAP TN continued to copy and use these environments

28  for at least another year.  *Id.*, ¶ 3, **Exs 5** at 189-190; 9.

<center>8</center>

1   216; **78** at 1, 3.  He then used a credential from a prior employer to log on to Oracle's support

2   website and download patches that he applied to the installed copies to create instances of later

3   versions.  *Id.*, ¶¶ 3, 49, **Exs 7** at 169, 180, 214-216; **78** at 1, 3.  SAP TN also downloaded version

4   10.2 install media in October 2005.  *Id.*, ¶ 3, **Exs 7** at 223-224, 227-228; **33** at 8-9.  As

5   summarized by the chart below, which catalogs *only* the information expressly admitted by

6   Defendants in discovery responses, SAP TN kept multiple copies of the downloaded install

7   media for each of these releases on its servers, and further used that media to install functional

8   copies of each release on multiple servers across SAP TN's systems:

| Copyrighted Release[6] | Copies of Install Media[7] | Functional Installs on Servers | Functional Installs on "Virtual Machines" | Total Copies |
|---|---|---|---|---|
| 8.1.6 | 7 | 4 | 3 | 14 |
| 9.2 | 4 | 7 | 9 | 20 |
| 10.2 | 2 | 3 | – | 5 |
| | | | Total: | 39 |

Alinder Decl. ¶¶ 3, 67-68, **Exs 101-02**; **33** at 8-9, 74-76; **7** at 167-168.

Furthermore, and again referencing *only* explicit admissions of copying in discovery

responses, SAP TN installed multiple copies of Database from a *single download* in at least 23

instances:

| Copyrighted Release (and OS) | Copies of Install Media | Functional Installs |
|---|---|---|
| 8.1.6 (Windows) | 1 | 5 |
| 9.2 (AIX) | 1 | 2 |
| 9.2 (Windows) | 1 | 14 |
| 10.2 (Windows) | 1 | 2 |
| | Total: | 23 |

*Id.*  SAP TN admits that it used *at least* the instances of 8.1.7 and 9.2 to support multiple

customers from March 2004 all the way through October 2008.  *Id.*, ¶¶ 3, 43, **Exs 7** at 172-74,

---

[6] This column groups SAP TN's copies of Oracle Database according to the copyright in Oracle's complaint the copy infringed.  *See* Fallon Decl., ¶¶ 4-6 (describing relationship of one version to the succeeding versions).

[7] Versions of Oracle Database are available to download for different operating systems – e.g., Windows, AIX, Solaris, etc.  Alinder Decl., ¶ 3, **Ex 7** at 178-80.  This column includes all copies of SAP TN's Database install media by release without regard to operating system ("OS").  For example, as the chart indicates, SAP TN had two copies of install media for Database 10.2 – one for AIX, and one for Windows.  *Id.* ¶¶ 67-68, **Exs 101-02**.

9

1 | 187-88, 189-90, 199-200, 250-53; **72**.

2 |         **2.     SAP TN Copied Vast Amounts Of Protectable
3 |                  Expression**

4 |         Having admitted to making wholesale copies of Oracle's Software, SAP TN cannot avoid

5 | the fact that its copying was unlawful.  Numerous courts have found infringement in virtually

6 | identical circumstances.  *See, e.g., Triad Sys.*, 64 F.3d at 1333 (prima facie case of copyright

7 | infringement where defendant was "copying [plaintiff's] entire [computer] programs" in order to

8 | provide software service and maintenance to plaintiff's software customers); *MAI Sys. Corp. v.

9 | Peak Computer Corp.*, 991 F.2d 511, 517-19 (9th Cir. 1993) (affirming infringement summary

10 | judgment where defendant copied plaintiff's software into computer memory to provide

11 | competing software maintenance services, and used unlicensed copies at defendant's

12 | headquarters); *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197,

13 | 208-09 (3d Cir. 2002) (finding infringement for "copying [plaintiff's] copyrighted [human

14 | resources software] source code while fixing bugs, creating tax updates, [and] customizing

15 | [plaintiffs' software]" in connection with software maintenance); *Colum. Pictures Indus., Inc. v.

16 | Landa*, 974 F. Supp. 1, 13-14 (D. D.C. 1997) (defendant who duplicated entire motion picture

17 | videocassettes copied protected material by definition).

18 |         As in the cases above, if an infringer makes literal copies of huge swaths of source code,

19 | "there is no doubt that protected elements of the software were copied."  *Triad Sys.*, 64 F.3d at

20 | 1335 (protectable expression plainly copied where accused infringer's "service activities

21 | involved copying entire programs"); *see Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d

22 | 96, 100, 102 (D.C. Cir. 1998) (in case of "wholesale copying" of source code plaintiff need not

23 | show which software elements were protectable).[8]

---

[8] By contrast, this is not a case where a defendant has taken only non-literal elements of a
24 | program such as idea, structure or appearance.  *See, e.g., Computer Assoc. Int'l, Inc. v. Altai,
Inc.*, 982 F.2d 693, 702-712 (2d Cir. 1992) (describing the abstraction-filtration-comparison
25 | procedure for distinguishing protected from unprotected elements in cases of non-literal
copying); *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994) (assessing
26 | whether visual elements of graphical user interface are protectable).  Here, SAP TN's admissions
establish it copied vast amounts of literal expression – often the entire application itself – just as
27 | one might photocopy a book or duplicate a DVD movie.  In that situation, there is no need to
parse the millions of lines of code or apply *Altai's* filtration analysis.  *See Altai*, 982 F.2d at 702-
28 | 03, 706-12 (specifically distinguishing literal from non-literal copying, and applying the

10

1    SAP's copying of protected expression is confirmed for two additional reasons.  First,

2  Oracle's copyright registrations carry a presumption that the registered works incorporate

3  protected materials.  *See Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173,

4  1175 (9th Cir. 1989).  Second, the software indisputably contained countless protected elements

5  representing a wide range of programmer choices in which each author was able to manifest

6  broad creativity; that creativity easily satisfies copyright law's relatively permissive originality

7  requirement.  Ackermann Decl., ¶¶ 3-4, 9-27, **App C-K**; Fallon Decl., ¶¶ 3, 8-12; *Feist Publ'ns.,*

8  *Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 346 (1991) (copyright requires only a "modicum

9  of creativity"); Melville B. Nimmer et al., *Nimmer on Copyright* § 2.01[B] (2009).

10    **C.    SAP TN Has No License (or Other Defense) For Its Copying or**
            **Use**

11
12    SAP TN has not pled any defense, or asserted any facts, that suggest its infringing acts

13  are immunized by the fair use doctrine, or any other provision of the Copyright Act.  *See, e.g.*,

14  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (fair use is an affirmative

15  defense).  It has also failed to assert sufficient factual support for its copyright misuse affirmative

16  defense[9] and its license defenses of permitted "use."[10]  SAP TN cannot excuse its vast copying

17  by claiming its "use" of the illegal copies detailed in the motion was licensed because it had no

18  license to make the copies in the first place.  Moreover, its subsequent "use" far exceeded the

19  scope of any license that could have applied.  Accordingly, Oracle also moves for partial

20  summary judgment on SAP TN's second and third affirmative defenses relating to licensed use.

21    To establish a license defense, SAP TN must first prove it holds some license.  *See*

22  *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995); *Michaels v. Internet Entm't Group,*

23  *Inc.*, 5 F. Supp. 2d 823, 831, 834 (C.D. Cal. 1998).  SAP TN has admitted it cannot determine

abstraction-filtration-comparison process only to the latter).
[9] SAP TN's fourth affirmative defense of copyright misuse asserts "Plaintiffs' initiation of the
24  instant suit is an attempt to secure an exclusive right to the maintenance of Plaintiffs' software."
    Alinder Decl. ¶ 72, **Ex 106** at p. 24 (¶ 4).  When Oracle asked for "all facts which support" that
25  defense, SAP TN did not identify a single fact relating to Oracle's initiation of this litigation, or
    any other facts sufficient to establish the defense.  *Id.* ¶ 66, **Ex 100**.  This affirmative defense
26  also fails as a matter of law.  *See, e.g., Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S.
27  508, 509-11 (1972) (describing a competitor's right to seek redress from the Courts).
    [10] Alinder Decl. ¶ 72, **Ex 106** at p. 24 (¶¶ 2-3) (claiming "use" was lawful and consented to, but
28  not "copying").

11

1   which customer's CDs it used to make many copies of HRMS 8 SP1, so it cannot identify any

2   license that might authorize that copying.  For HRMS 7.02 and 7.51, the most SAP TN can show

3   is that *SAF* and *WGL* had licenses from PeopleSoft to that software.  O'Neill Decl., ¶¶ 4-5, **Ex** A,

4   B, C, D.  That does not mean *SAP TN* had any license.  Copyright licenses are not transferable

5   unless they expressly say so; these did not.  *See Michaels*, 5 F. Supp. 2d at 834 (citing *Harris v.*

6   *Emus Records Corp.*, 734 F.2d 1329 (9th Cir. 1984)).

7         In any event, SAP TN admits to acts that exceeded the plain scope of any relevant license

8   for HRMS or Database software.  *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150,

9   1156 (9th Cir. 2006) (licensee liable for infringement where it exceeds scope of the license);

10  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989) (license is "assumed to prohibit

11  any use not authorized").  For HRMS, SAF and WGL were the only parties █████████████

12  ████████████████████████████████████████████████████████████████████████████

13  ██████████ O'Neill Decl., ¶¶ 4-5, **Exs A** at §§ 1.1, 1.2; **C** at §§ 2(b), 2(c); **D** at §§ 1.1, 1.3 ███

14  ████████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████ *Id.*, ¶¶ 4-

17  5, **Exs A** at § 2.1(a); **D** at § 2.1(a). ████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████

19  ████. *Id.*, ¶¶ 4-5, **Exs A** at §§ 1.1, 2.1(c), 2.1(e); **C** at § 2(b); **D** at §§ 1.1, 2.1(c).  SAP TN also

20  used the unauthorized copies for purposes beyond what the SAF and WGL licenses permitted.

21  SAF's license specifies that SAF may only use the Software for SAF's "internal data processing

22  operations."  *Id.*, ¶ 4, **Exs A** at §§ 1.1; **C** at § 2(b). ████████████████████████████

23  ███████. *Id.*, ¶ 5, **Ex D** at §§ 1.1, 1.2, 1.4, and 2.1(i).  SAP TN admits it used the copies not

24  for the internal operations of SAF or WGL, but rather to support SAP TN customers other than

25  SAF and WGL.  *See* Section II.B.1.a-c, above.

26        SAP TN claims it had a "Development License" for the Database software (a dubious

27  assertion that Oracle nevertheless accepts as true solely for purposes of this motion), but its

28  admitted copying exceeded anything that license permitted.  *Id.*, ¶ 3, **Exs 33** at 9-10, 40-41; **7** at

                                         12

1   181-82, 199-200.  The Development License permitted the installation of Oracle database

2   software on "one computer."  Alinder Decl., ¶¶ 3, 48, **Exs 33** at 16, 51; **77**.  SAP TN concedes it

3   installed that software on an array of servers and virtual machines.  *See* Section II.B.1.d, above.

4   Also, the Development License only permits one person to use the software.  *Id.*, ¶¶ 3, 48, **Exs**

5   **33** at 16, 51; **77**.  SAP TN admits that multiple support engineers used it.  *Id.*, ¶ 3, **Ex 33** at 25.

6   Finally, the Development License only permits use for developing a "single prototype of [an]

7   application" and "not for any other purpose."  *Id.*, ¶¶ 3, 48, **Exs 33** at 16, 51; 77.  SAP TN

8   admittedly did *not* develop *any* prototypes of *any* applications using Oracle database; rather, it

9   used the Database software to provide support to SAP TN customers, compete with Oracle, and

10  to develop and deliver SAP TN-branded products to them.  *Id.*, ¶¶ 3, 43, **Exs 7** at 172-74, 187-

11  88, 189-90, 250-53; **72**; **33** at 6, 22-26.  These activities also violate the prohibition on

12  "commercial use" in the Development License.  *Id.*, ¶ 48, **Ex 77**.

13          Since SAP TN exceeded the scope of any potentially relevant licenses beyond any

14  plausible dispute, Oracle is entitled to partial summary judgment of SAP's second and third

15  affirmative defenses.  Further, since no license authorizes the infringing acts SAP TN admits,

16  Oracle has established that SAP TN is liable as a matter of law for infringing Oracle's copyrights

17  in its HRMS and Database software.

18  **III.     SAP AG AND SAP AMERICA ARE LIABLE FOR VICARIOUS
            AND CONTRIBUTORY INFRINGEMENT**
19

20          SAP AG and SAP America are both liable for SAP TN's illegal copying under well-

21  established principles of vicarious and contributory liability.  A plaintiff establishes contributory

22  liability where it shows the defendant intentionally induced or contributed to the direct

23  infringement.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 (9th Cir. 2007).  Since

24  inaction, combined with specific knowledge, constitutes strong evidence of culpable intent, a

25  party is liable for contributory infringement where it knows that specific infringing material is

26  available using its systems and yet, despite that specific information, fails to remove it.  *Id.* at

27  1172 ("intent may be imputed" from "knowing failure to prevent infringing actions").

28          A plaintiff establishes vicarious liability where it shows the defendant "exercises the

1  requisite control over the direct infringer and that the defendant derives a direct financial benefit

2  from the direct infringement."  *Id.* at 1173 (citing *MGM Studios, Inc. v. Grokster*, 545 U.S. 913,

3  930 (2005)); *see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022-23 (9th Cir. 2001).

4  "Control" means the right and ability to stop the direct infringement.  *Perfect 10*, 508 F.3d at

5  1173; *see also Frank Music Corp. v. MGM, Inc.*, 886 F.2d 1545, 1553 (9th Cir. 1989) (parental

6  liability is appropriate where a "substantial and continuing connection" exists between a parent

7  and subsidiary with respect to infringing acts).  "Direct financial benefit" means expected future

8  financial benefits from the direct infringement.  *Napster*, 239 F.3d at 1023 (finding direct

9  financial benefit based on expected future benefits from expanded customer base).

10      The undisputed evidence satisfies these elements:

11      **Specific Knowledge And Failure To Act.**  SAP AG and SAP America knew about SAP

12  TN's copying of Oracle's software at the highest levels.  Even before acquiring SAP TN, Board

13  members knew from one of its senior managers – a former PeopleSoft executive – that "[i]t's

14  very likely that TomorrowNow is using the software outside the contractual use rights. . . ."

15  Alinder Decl., ¶¶ 3, 14, 19, 24, **Exs 1** at 39-40, 162, 164-66; **35** at 25-27, 43, 53-54, 158-61; **36**

16  at 93-94, 95, 96-97; **46**; **51** at 2; **56**.  A similar warning appeared in the Business Case the Board

17  used to approve the TomorrowNow deal (TN's "offsite production copies" "may be a serious

18  liability").  *See* Section I, above.  At some unknown point, the Board says it issued an oral

19  directive to SAP TN that required SAP TN to remove all copies of Oracle software from SAP

20  TN's computers.  *Id.,* ¶¶ 3, 65, **Exs 8** at 536-37; **15** at 340-42; **99** at 30.

21      SAP cannot deny knowledge of the continuing infringement.  Whether the "directive"

22  was real or not, it is undisputed that the Board never enforced it until long after Oracle sued –

23  despite reports to SAP attorneys and executives indicating that SAP TN had not removed Oracle

24  software from its systems.  *Id.* ¶ 3, 30, **Exs 34** at 10, 125-26, 346-50; **62** at 2 (directive was not

25  implemented after issued in 2005, or after suit, because continuing support to customers and

26  maintaining SAP's reputation took precedence); **36** at 367-73, 377, 383-386 (periodic discussion

27  of no software removal).  Post-acquisition, one of SAP America's own intellectual property in-

28  house counsel, Chris Faye, was assigned to advise SAP TN about intellectual property.  *Id.,* ¶ 3,

14

1   **Exs 10** at 19-20, 52-54; **34** at 14.  Faye met regularly with SAP TN management to discuss the

2   legality of SAP TN's operations and potential liability to Oracle, and also advised the SAP AG

3   Board on issues regarding SAP TN.  *Id.*, ¶ 3, **Exs 10** at 26-27, 74-77 (Faye provided legal advice

4   to SAP TN CEO and received updates); **22** at 87-88, 94; **24** at 400; **34** at 17-18.

5          Yet the SAP AG Board did nothing to ensure the removal of the software.  *Id.*, ¶ 3, **Exs 8**

6   at 342-345 (Oswald in charge of directive); **26** at 244-45 (Oswald did not follow-up on

7   directive).  Only post-lawsuit did SAP America COO, Mark White, take over cleaning up SAP

8   TN at SAP AG's direction.  *Id.* ¶ 3 **Exs 8** at 461-64; **34** at 6-9, 10-11.  SAP AG and SAP

9   America also knew about SAP TN's use of the Database software.  SAP AG CFO and Board

10  member, Werner Brandt, conceded it was "obvious" at the time of the acquisition that

11  "TomorrowNow was running its copies of PeopleSoft and JDE software in conjunction with a

12  database of some kind," and SAP AG knew SAP TN had no license, yet SAP AG undertook no

13  investigation.  *Id.*, ¶¶ 3, 16, 62, **Exs 8** at 536; **29** at 383-86; **48** (SAP TN Disclosures show only

14  two unrelated IP licenses); **96** at 10, 12 (no investigation "into whether or not TomorrowNow

15  had or used Oracle database server software, nor an investigation into the license agreement

16  under which TomorrowNow would have used such database server software."); **22** at 262-65.

17  After the acquisition, SAP TN made repeated "urgent" requests directly to SAP AG "to purchase

18  Oracle database licenses for environments where we develop our customer's deliverables" and as

19  "a critical need to support our customers running PeopleSoft on Oracle."  Alinder Decl., ¶¶ 3, 46,

20  **Exs 10** at 52-54; **30**; **75**.  After Oracle sued, Baugh told White that SAP TN was using Oracle's

21  Database software only pursuant to a Development License, but White responded that a new

22  Database license "wasn't a major priority."  *Id.* ¶ 3, **Exs 7** at 201-205; **33** at 13-15, 78-79.

23         This is more than enough to hold SAP TN's parents liable.  *Napster*, 239 F.3d at 1020-22

24  (defendant had actual knowledge of specific infringing material, yet failed to block access to it).

25         **Control.**  SAP TN became a wholly-owned subsidiary of SAP AG through SAP America

26  on January 19, 2005.  Alinder Decl., ¶¶ 15, 72, **Exs 47** at 1; **106** at p. 6, ¶ 44.  As of that date,

27  SAP AG had complete control over SAP TN's activities.  *Id.*, ¶ 3, **Ex 11** at 32, 105, 108-109.

28  SAP AG concedes it changed SAP TN's management and board at will.  *Id.*, ¶¶ 3, 17, **Ex 1** at

15

1    283-284; **8** at 208-12; **26** at 120-21; **29** at 493-494; 49.  SAP AG also imposed specific,

2    operational rules on SAP TN relating to Oracle software.  Shortly after the alleged oral directive,

3    in March 2005, and again in March 2006, the Board approved and issued "Rules of Engagement"

4    ("Rules") purportedly to "respect [Oracle's] intellectual property rights."  *Id.,* ¶¶ 7-8, 65, **Exs 39**

5    at 2; **40**; **99** at 29.  SAP AG installed its own SAP TN "Global Business Owner," who met

6    regularly with the SAP TN CEO, approved all SAP TN purchases, and reported back to SAP

7    AG's head of support, Gerd Oswald, who was on the Board and who other Board members

8    testified had operational oversight for SAP TN.  *Id.*, ¶¶ 3, 22-23, **Exs 1** at 224; **8** at 309-310, 353;

9    **15** at 88; **36** at 116-119, 134, 136-137, 383-385; **54** at 3; **55**.  SAP AG also judged SAP TN's

10   performance against specific goals SAP AG set for revenue, customers, geographical expansion,

11   and impact on Oracle.  *Id.*, ¶¶ 3, 13, 20, 28, **Exs 4** at 71-72; **21** at 357-58; **36** at 264, 275-76, 282-

12   86, 329, 330; **45** at 10; **52** at 6; **60** at 4.  SAP AG also controlled SAP TN's budget and

13   headcount from acquisition until wind down.  *Id.*, ¶¶ 3, 27, **Exs 21** at 384-385 (Oswald approved

14   headcount); **36** at 286-87 (board approved headcount); **8** at 282-83 (Brandt responsible for

15   budget); **26** at 204-06; **59** at 1.  SAP TN executives groused that SAP AG had to clear the

16   purchase of "a bottle of water or an eraser."  *Id.*, ¶ 3, **Ex 22** at 120; s*ee also id.*, ¶ 3, **Ex 21** at

17   137-38, 140-41.

18           SAP's corporate testimony and the testimony of SAP Board members concedes that SAP

19   AG could have secured SAP TN's compliance with the Board's alleged directive.  *Id.*, ¶ 3, **Exs**

20   **11** at 32, 105, 108-09, 166 (SAP AG had the authority and ability to "direct TomorrowNow to

21   operate its business in a particular way" and had the ability to force SAP TN to comply with the

22   Board's alleged "directive"); **1** at 283-84 (same); **8** at 349-51 (Brandt surmised directive would

23   be immediately implemented because "board decisions are [] implemented once they have been

24   made").  After Oracle filed suit, SAP AG replaced Andrew Nelson with White and moved

25   operational oversight of SAP TN to SAP AG's CFO, Brandt.  *Id.,* ¶ 3, **Exs 34** at 6-9; **8** at 383-84.

26   These executives still failed to remove Oracle software from SAP TN's servers.  *Id.,* ¶ 65, **Ex 99**

27   (all "customer local environments' on SAP TN computers were not "shut down permanently"

28   until April 30, 2008).  This alone is more than enough to establish the requisite control.  *A&M*

1   *Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 920-21 (N.D. Cal. 2000), *aff'd in relevant*

2   *part*, 239 F.3d 1004 (9th Cir. 2001) (right and ability to police direct infringement demonstrates

3   control even if not exercised); *Frank Music*, 886 F.3d at 1553; *RCA/Ariola Int'l, Inc. v. Thomas*

4   *& Grayston Co.*, 845 F.2d 773, 781-82 (8th Cir. 1988) (vicarious liability proper where

5   defendant issued instructions pertaining to use of infringing implements and "policed" potential

6   infringement but infringement occurred anyhow).

7       **Financial Benefit.**  SAP AG admitted it anticipated and enjoyed significant financial and

8   strategic benefits from SAP TN's illegal business model.  *Id.*, ¶¶ 3, 22, 28, **Exs 26** at 266-67,

9   271-272; **60** at 6, 7 (SAP TN used as an "enabler for future license revenue, to grow maintenance

10  contract volume taken away from Oracle and to generate additional maintenance revenue for

11  SAP"); **4** at 71-72; **3** at 12-13, 83, 223; **36** at 292, 298-302, 304-305; **54** at 2, 8.  Again, this is

12  ample evidence.  *Napster*, 239 F.3d at 1023 (expected future benefits from expanded customer

13  base shows direct financial benefit); *Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828, 856-57

14  (C.D. Cal. 2006) ("future hope to 'monetize'" infringement shows sufficient financial benefit),

15  *aff'd in relevant part sub nom. Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir.

16  2007).

17  IV.   **SAP TN VIOLATED THE COMPUTER FRAUD AND ABUSE ACT**

18      SAP TN's business model relied on illegally downloading millions of electronic support

19  materials from Oracle's Customer Connection customer support website ("Oracle's systems")

20  onto its own computers.  Alinder Decl., ¶ 71-72, 75, **Exs 105-06** at ¶ 22 (SAP AG CEO

21  admitting to "inappropriate" downloads); **109** (identifying over 4 million Oracle files on SAP

22  TN's computers).  SAP TN used these downloaded Oracle support materials to provide support

23  to customers who previously bought support from Oracle.  *Id.*, ¶ 72, **Ex 106** at 3 (¶ 19)

24  ("Defendants admit that TN, on behalf of its customers, downloaded and stored a large quantity

25  of Software and Support Materials, and further admit that TN used those materials for customer

26  support.").  Oracle discovered SAP TN's unauthorized downloading in late 2006 when it noticed

27  suspicious download requests coming from SAP TN's IP address in Bryan, Texas.  *Id.*, ¶ 77, **Ex**

28  **110**.  Oracle's discovery coincided with SAP TN's testing of new versions of its software

1    download program – Titan – purpose-built to "scrape" Oracle's systems quickly and completely.

2    In short, SAP TN employee testimony establishes beyond dispute that SAP TN's downloading

3    from Oracle's systems violated 18 U.S.C. §§ 1030 (a)(2)(C) and (a)(5) of the CFAA.[11]

4        **A.    SAP TN Violated CFAA Section 18 U.S.C. 1030 (a)(2)(C)**

5            To prove a violation of Section 1030(a)(2)(C), Oracle must show (1) that SAP TN

6    accessed a "protected computer," (2) the access was done "intentionally," (3) the access was

7    "without authorization" or "exceed[ing] authoriz[ation]," (4) that SAP TN thereby obtained

8    information, and (5) that as a result, there was loss to Oracle aggregating at least $5,000 in a one-

9    year period.  18 U.S.C. §§ 1030(a)(2), (g), (a)(5)(B)(i).

10                **1.    Oracle's Systems Are "Protected Computers"**

11           A "protected" computer under the CFAA must be "used in interstate or foreign

12    commerce or communication."  18 U.S.C. § 1030(e)(2)(B).  Defendants have admitted that

13    Oracle's systems "constitute a 'protected computer' within the meaning of 18 U.S.C.

14    § 1030(e)(2)."  Alinder Decl., ¶ 70, **Ex 104** at 14 (¶ 113).  SAP TN's access and downloading

15    requests came across state lines from its Texas headquarters to Oracle's systems located in

16    California and Colorado.  *Id.*, ¶¶ 3, 63, **Exs 18** at 21, 23-24, 26-27, 31-32; **17** at 155-56; **97** ("The

17    downloads were conducted by TomorrowNow's employees using certain laptop and desktop

18    computers as well as dedicated download servers located at TomorrowNow's data center in

19    Bryan, Texas"); Mickelson Decl., ¶¶ 2-3.

20                **2.    SAP TN's Access And Downloading Was Intentional**

21           Under the CFAA, "intentionally" means "a clear intent to enter, without proper

22    authorization," and that "the conduct . . . must have been the person's conscious objective."  *Id.*,

23    ¶ 78, **Ex 11**; *United States v. Drew*, 259 F.R.D. 449, 459 (C.D. Cal. 2009).  The evidence of SAP

24    TN's intent is widespread, but for purposes of this motion Oracle offers two indisputable

25

26    _____

      [11] The CFAA allows a party to maintain a civil action for violation of its sections "if the
      conduct" caused "loss to [Oracle] during any 1-year period . . . aggregating at least $5,000 in
27    value."  18 U.S.C. §§ 1030(g) & (a)(5)(B)(i) (2006).  Oracle cites the CFAA applicable prior to
      September 26, 2008, as those amendments were not retroactive.  Alinder Decl., ¶ 79, **Ex 112**;
28    *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131 n.3 (9th Cir. 2009).

                                            18

1   examples.[12]

2               a.      **SAP TN Intentionally Scraped Oracle's Systems**

3        In late June 2006, SAP TN hired an expert programmer – John Ritchie – to help develop

4   Titan.  Alinder Decl., ¶ 3, **Ex 27** at 10, 11-13, 55.  Ritchie testified that on the instructions of his

5   supervisors he developed and tested Titan using login credentials from a former Oracle employee

6   and with unidentified credentials from SAP TN's Project Management Office (which had

7   responsibility for the project under the supervision of Greg Nelson, the Chief Information Officer

8   and brother of SAP TN's founder and President, Andrew Nelson).  *Id*. at 72-75.  Indeed, SAP TN

9   tested Titan using a login credential for Rockwell Automation for months, knowing that

10  Rockwell's maintenance end date had passed much earlier and that not even Rockwell itself had

11  a license to download with the expired password.  *Id*., ¶¶ 3, 47, **Exs 27** at 145-147; **76**.  Using

12  those unauthorized user ids and passwords to gain access, Titan transmitted commands and

13  requests to Oracle's systems seeking to download *all* of the support materials available on them

14  – more than 15 different support files at a time for as long as it took to complete.  *Id*., ¶ 3, **Ex 27**

15  at 49-51, 76, 90-91.  Ritchie ultimately limited Titan to 15 download "threads" at a time, because

16  when he increased the downloading, he "crashed" the Oracle system.  *Id*. at 49-51.  To confirm

17  his conclusions about the impact of this extraordinary volume of downloading, Ritchie tested the

18  responsiveness of Oracle's website when Titan was in use and found that Titan slowed the

19  availability of the website.  *Id*. at 52-53, 169-70.  Ritchie, a 15-year software programming

20  veteran, deemed this impact so significant that he testified Titan "was equivalent to a – what we

21  call a denial-of-service attack, you know, where you basically pound on a server so hard that

22  nobody can get through to it."  *Id.* at 33-34, 49-51, 55-57, 62.  He reported these impacts on

23  Oracle's systems to his superiors, but was instructed to continue.  *Id*. at 14-26, 28-34, 57-61.

24        Ritchie also reported, to no avail, concerns regarding the legality of Titan's access and

25  downloading based upon his review of Oracle's Terms of Use.  *Id*. at 14-24, 26, 32-33, 173.

26  _____

27  [12] Though Oracle focuses below on just two examples of SAP TN's illegal downloading, SAP
    TN had terabytes of downloaded Oracle support materials on its systems.  It virtually ignored
28  licensing limitations, and admits that it has no way to prove whether any of the downloads were
    actually licensed when it took them from Oracle.  Alinder Decl., ¶¶ 3, 61, **Exs 95**; **24** at 570-71.

19

1    Ritchie was not alone – another employee, Owen O'Neil, who had specific familiarity with

2    Oracle's system, its Terms of Use, and PeopleSoft customer licenses from his tenure at

3    PeopleSoft, raised similar concerns about the legality of Titan and the consequent violations of

4    the Terms of Use during this same time period. *Id.*, ¶ 3, **Ex 25** at 68-73. Titan testing and

5    development nonetheless continued. *Id.*, ¶ 3, **Exs 25** at 72-73; **27** at 57-58 (in response to

6    Ritchie's concerns about Titan, Ritchie's manager told him: "'Well, we need to do it, and if

7    anything happens, I'll cover your back,' or actually, I think his actual words were, 'Yes, I'll be in

8    jail next to you.'"). Ritchie estimated that, during late 2006 and through April 2007, when he

9    was testing Titan, he accessed and copied approximately one million Oracle support materials

10   from Oracle onto SAP TN's computer systems, then deleted them. *Id.*, ¶ 3, **Ex 27** at 75-79. SAP

11   TN put Titan into production, downloading Oracle's support materials for SAP TN's own

12   commercial use. Alinder Decl., ¶¶ 3, 72, **Exs 22** at 47; **106** at p. 3, 11-12 (¶¶ 19, 93, 99).

> **b.      SAP TN Also Admitted To Downloading
> Numerous Files Using Expired Credentials**

15   SAP TN purportedly had one "golden rule" for downloading – not to download for a

16   customer after its maintenance end date ("MED") with Oracle had passed, because the customer

17   (and surely SAP TN) was not authorized to access Oracle's system after that date. *Id.*, ¶¶ 3, **Exs**

18   **31** at 21; **20** at 40; **21** at 95-96. SAP TN admitted that it failed to follow even this one rule on

19   multiple occasions. *Cf. Id.*, ¶ 71, 72, **Exs 105-06** at p. 35, 37-38 (¶¶ 107, 113); *id.*, ¶ 3, **Exs 24** at

20   574, 576-85 (customer Koontz-Wagner); **31** at 141-43 (customers MKS, Praxair); **28** at 86-88

21   (customer Ajinomoto). Indeed, in one email copied to the SAP TN CEO, SAP TN's VP of

22   PeopleSoft Support instructed employees to download for one customer even though she knew it

23   was almost three weeks after that customer's MED. *Id.*, ¶ 3, 40 **Exs 24** at 583-84; **69**.

> **3.      SAP TN's Access And Downloading Was Not
> Authorized Or Exceeded Authorization**

25   In the Ninth Circuit, "a person who 'intentionally accesses a computer without

26   authorization,' [under] §§ 1030(a)(2) . . . accesses a computer without any permission at all,

27   while a person who 'exceeds authorized access,' [] has permission to access the computer, but

28   accesses information on the computer that the person is not entitled to access." *LVRC Holdings*,

1    581 F.3d at 1133 (citation omitted); *see also* 18 U.S.C. § 1030(e)(6).  Further, "access and use

2    beyond those set forth in a user agreement constitute unauthorized use under the CFAA." *eBay*

3    *Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009).  SAP TN's

4    access and downloading were knowing violations of Oracle's Terms of Use, and therefore,

5    unauthorized.

6                            **a.      The Applicable Terms Of Use**

7            When logging onto Oracle's system with a username and password, a user was

8    confronted with Terms of Use, which the user was required to accept by clicking before

9    proceeding.  Alinder Decl., ¶ 3, **Ex 2** at 160-61, 163-64.  Without dispute, the Terms of Use

10   prohibit Defendants' Titan testing and post-MED downloading, *e.g.,*: "You agree that . . . the

11   Materials may be used solely in support of your authorized use of the Oracle Programs for which

12   you hold a supported license from Oracle" and not for any other "purpose."[13]  *Id.*, ¶¶ 3, 52-53,

13   56, **Exs 2** at 164-65, 169, 171-72; **81-82**; **85**.  The materials are not to be used to provide services

14   for third parties and may not be "shared with or accessed by third parties."  *Id.*

15           Users also were required to agree to Oracle's Download Agreement, again by clicking,

16   before downloading files from Oracle's system.  *Id.*, ¶¶ 3, 41, 54-55, **Exs 2** at 190-93; **31** at 108-

17   09, 114-15; **70** at 4 (instruction document requiring accepting terms); **83-84**.  The Download

18   Agreement prohibits downloading except pursuant to, and in compliance with, a valid Oracle

19   license agreement, and further states that "any reproduction or redistribution of the Software not

20   in accordance with the License Agreement is expressly prohibited."  *Id.*

21                          **b.      SAP TN Violated The Terms Of Use**

22           Pursuant to these terms, SAP TN had no right to access or download from Oracle's

23   system the comprehensive scrapes via Titan or to use credentials of customers that SAP TN

24   knew no longer had a valid Oracle support agreement.  Indeed, SAP TN concedes "only active –

25   or customers that had active support . . . agreements would be entitled to download material."

26   _____

27   [13] Alinder Decl., ¶ 52, **Ex 81**.  These quotations are from the version of the Customer Connection
     Terms of Use covering the bulk of Defendants' conduct – *i.e.*, September 20, 2005 to February
28   19, 2007.  *Id.*, ¶ 3, **Ex 2** at 163-65.  Both prior and later versions of the Customer Connection
     Terms of Use contain similar language.  *Id.*, ¶¶ 3, 53, 56, **Exs 2** at 169, 171-172; **81-82**.

                                             21

1   *Id.*, ¶ 3, **Exs 20** at 40; **21** at 95-96.  Defendants admitted that they reviewed these Terms of Use

2   prior to using Oracle's system.  *Id.*, ¶ 42, 60, **Exs 71**; **94**.  Even so, SAP TN *did* download for

3   customers without active support agreements, knowing full well that *no* access was authorized

4   for those customers – both through Titan and by using expired credentials.  *See* Sections

5   IV.A.2.a and IV.A.2.b, above.

6        Moreover, even if SAP TN had some access rights (and it did not), by using Titan and

7   expired login credentials, it far exceeded any conceivable access rights of any actual licensed

8   customer, meeting the alternative element of Section (a)(2)(c).  *See* 18 U.S.C. § 1030(e)(6)

9   (exceeding authorization includes using authorized access to obtain information the accesser is

10  not entitled to obtain).  In sum, both the Titan testing and post-MED downloads violate Oracle's

11  Terms of Use and are unauthorized.

12                    **4.      SAP TN Obtained Oracle Support Materials And**
                               **Caused More Than $5,000 Loss**
13
        The last two elements for Section (a)(2)(C) are that SAP TN obtained data of value

14  through its access and caused loss to Oracle of more than $5,000 aggregated over a year.  18

15  U.S.C. §§ 1030(a), (g), (a)(5)(B)(i); *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930,

16  934-35 (9th Cir. 2004).  As described above in Sections IV.A.2.a-b, SAP TN downloaded an

17  estimated one million files from Oracle just to develop and test their website scraping program,

18  and also took an untold number of support materials after the customers' MED for use in

19  supporting those and other customers.  There is no dispute that it obtained valuable Oracle data

20  for its own commercial gain.

21        Further, loss means "any reasonable cost to any victim, including the cost of responding

22  to an offense, conducting a damage assessment, and restoring the data, program, system, or

23  information . . . ."  18 U.S.C. § 1030(e)(11).  Oracle's expenses far exceeded $5,000:

24
        •   The mass downloading, bandwidth drain and computing resource usage about
25          which Ritchie testified (*see* Section IV.A.2, above), not only harmed Oracle but
            required Oracle to investigate – and investigation costs are recoverable.  Alinder
26          Decl., ¶¶ 3, **Exs 17** at 179-180; **18** at 54-56; *SuccessFactors, Inc. v. Softscape,*
            *Inc.*, 544 F. Supp. 2d 975, 980 (N.D. Cal. 2008).  Oracle's experts have
27          determined that the preliminary investigation, not including attorneys' fees,
            conservatively cost Oracle approximately $300,000 for the first year after
28          discovery.  *Id.*, ¶¶ 3, 50, 82-84, **Exs 115**; **17** at 31-32; **79**; Koehler Decl. ¶ 3.

                                          22

- SAP TN has admitted that these downloads were central to its business model, and used to support customers either directly, by using Oracle's own intellectual property, or indirectly, by using Oracle's files as templates to create their own. *Id.*, ¶ 3, 39, 64, **Exs 68**; **98**; **32** at 130-31.  Accordingly, SAP TN's computer fraud is also a substantial factor in causing the lost profits for each customer SAP TN took from Oracle, totaling in the hundreds of millions of dollars.  *Id.*, ¶ 82, **Ex 115**; *Creative Computing*, 386 F.3d at 935 (concluding that the "economic damages" includes "loss of business").  Just for the customers for which SAP TN admitted post-MED downloading, Oracle's lost support revenues were over $4.5 million.  *Id.*, ¶ 83-84, **Ex 116-17**; Section IV.A.2.b., above.

Accordingly, SAP TN violated Section (a)(2)(C).

**B.      SAP TN Violated 18 U.S.C. § 1030 (a)(5)(A)(i)**

To establish a violation of Section 1030(a)(5)(A)(i), in addition to the elements above, Oracle must also show that SAP TN "knowingly cause[d] the transmission of a program, information, code or command."  "Knowingly" means that the defendant "is aware 'that the result is practically certain to follow from his conduct, whatever his desire may be as to that result.'" Alinder Decl., ¶ 78, **Ex 111** (S. Rep. No. 99–432, at 5–6 (1986)) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 425 (1978)).  As discussed in Section IV.A.2. above, SAP TN was fully aware of its illegal Titan and post-MED downloading and its harm to Oracle.  Indeed, for each of the estimated one million files that SAP TN downloaded for Titan testing and each of the post-MED downloads, SAP TN had to transmit information or commands to Oracle's system with their login credentials.  *Id.*, ¶¶ 3, 72, **Exs 106** at p. 6 (¶ 44); **27** at 156-57 ("[T]he user information is actually being sent to the … Oracle website."); **17** at 21-24, 34-37; **18** at 42-47, 64-67.  The violations of Section (a)(5)(i) cannot be disputed either.[14]

**C.      SAP TN Violated 18 U.S.C. §§ 1030 (a)(5)(A)(ii)-(iii)**

For a violation of Sections 1030(a)(5)(A)(ii)-(iii), in addition to the facts above, Oracle must also show that SAP TN caused "damage" to Oracle, and for subsection (ii), acted "recklessly."  Damage means "*any* impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. §1030(e)(8) (emphasis supplied).  The facts show at least

---

[14] The CFAA evidence described in Sections IV.A. and B. also meets the elements of California Penal Code § 502(c)(7) – "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."  Summary judgment is appropriate on this claim as well.  *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131-32 (E.D. Cal. 2008) (considering summary judgment of CFAA and §502 claims together based on their "similar elements").

1   three different types of damage from SAP TN's illegal downloading.  First, Ritchie observed that

2   the Titan downloading took enough bandwidth to impair the ability of customers to separately

3   log in to Oracle's system.  *See* Section IV.A.2. above; *accord* Koehler Decl., ¶ 3.  Second, the

4   same downloading also ███████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████.  *Id.*, ¶ 3, **Exs 17** at 21-24,

6   34-37; **18** at 42-47, 64-67.  Finally, the access and use of Oracle's confidential support materials,

7   including use of scrapers to access internal Oracle files, for use in competition with Oracle and in

8   violation of the Terms of Use, also impaired the integrity and confidentiality of that data.  *See*

9   Sections IV.A.2. and IV.A.3., above; *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage,*

10   *Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000) ("The word 'integrity' . . . contemplates

11   maintaining the data in a protected state.").  SAP TN was at least reckless in causing this

12   damage; it knew of Titan and its harm to Oracle's systems.  *See Safeco Ins. Co. of Am. v. Burr,*

13   551 U.S. 47, 68-69 (2007) (recklessness means unjustifiably high risk of harm that is known or

14   should be known"); Alinder Decl., ¶ 3, **Ex 27** at 57-58.

15         **D.      SAP Is Liable For SAP TN's Computer Fraud**

16         SAP AG and SAP America are just as liable for computer fraud as SAP TN under the law

17   of agency, because "the nature and extent of the control exercised over [SAP TN] by [SAP was]

18   so pervasive and continual that the subsidiary may be considered nothing more than an agent or

19   instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities"

20   and "the liability premised on an agency relationship [arose] within the scope of that

21   relationship."  *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, No. 06-3359, 2009 U.S. Dist.

22   LEXIS 30610, at *23-26 (N.D. Cal. April 9, 2009) (considering control of parent, reporting to

23   parent, and that the subsidiary was part of parent's business and marketing).

24         SAP admits it had complete control of SAP TN's management, and through SAP TN

25   "assume[d] . . . complete responsibility for maintenance, service and support" of Oracle's

26   applications, which included the downloading referenced above.  *See* Section III, above; Alinder

27   Decl., ¶¶ 3, 25 **Exs 1** at 281, 282-84; **57** at 9.  SAP TN admits that its downloading from Oracle's

28   website was an "urgent step" in providing its service offering, *i.e.*, the very offering for which

24

1  SAP marketed SAP TN in an effort to win Oracle's customers.  *See, e.g.*, *id.*, ¶¶ 3, 6, 72, **Exs 106**

2  at p. 3 (¶ 19); **19** at 10, 166-168; **38** at 1 (on-boarding list shows downloading as "urgent" step).

3  　　　　SAP admits that it set up SAP TN, a 100%-owned subsidiary, as a "separate" entity in a

4  futile effort to maintain a "liability shield" against an Oracle lawsuit.  *Id.* ¶¶ 3, 18, 26, **Exs 8** at

5  119-121, 123; 58 at 7; 1 at 364, 366; 50 ("TNow is a separate entity due to the threat of

6  litigation").  But corporate formalities do not excuse SAP AG and SAP America from liability.

7  *See, e.g., Dong Ah Tire*, 2009 U.S. Dist. LEXIS 30610, at *14-15 (courts may disregard

8  corporate formalities when finding parents liable for acts of their subsidiaries).  Moreover, in the

9  meetings described above between SAP America's in-house lawyer and SAP TN employees, the

10  specific concerns raised by downloaders and Titan developers were discussed and the

11  downloading was not stopped, but SAP continued to allow this downloading even after Oracle

12  sued.  *Id.*, ¶ 3, **Exs 22** at 63-65; **9** at 66-67; **27** at 75-76.

13  **V.    CONCLUSION**

14  　　　　For the reasons stated above, the Court should grant Oracle's motion for partial summary

15  judgment and find Defendants liable as a matter of law for infringing six of Oracle's copyrights

16  (HRMS 7.0, HRMS 7.5, HRMS 8 SP1, Database 8.1.6, Database 9.2, and Database 10.2), and

17  for violating the CFAA.

18

19  DATED:  March 3, 2010　　　　　　　　Bingham McCutchen LLP

20

21  　　　　　　　　　　　　　　　　By:_____/s/ Geoffrey M. Howard_____
　　　　　　　　　　　　　　　　　　　　　Geoffrey M. Howard

22  　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs
　　　　　　　　　　　　　Oracle USA, Inc., Oracle International Corporation,

23  　　　　　　　　　　　　　　Oracle EMEA Limited, and Siebel Systems, Inc.

24

25

26

27

28