Robert A. Mittelstaedt (SBN 060359)
Jason McDonell (SBN 115084)
Elaine Wallace (SBN 197882)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700
ramittelstaedt@jonesday.com
jmcdonell@jonesday.com
ewallace@jonesday.com

Tharan Gregory Lanier (SBN 138784)
Jane L. Froyd (SBN 220776)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:     (650) 739-3939
Facsimile:     (650) 739-3900
tglanier@jonesday.com
jfroyd@jonesday.com

Scott W. Cowan (Admitted *Pro Hac Vice*)
Joshua L. Fuchs (Admitted *Pro Hac Vice*)
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002
Telephone:     (832) 239-3939
Facsimile:     (832) 239-3600
swcowan@jonesday.com
jlfuchs@jonesday.com

Attorneys for Defendants
SAP AG, SAP AMERICA, INC., and
TOMORROWNOW, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE USA, INC., *et al.*,<br><br>             Plaintiffs,<br><br>v.<br><br>SAP AG, *et al.*,<br><br>             Defendants. | Case No. 07-CV-01658 PJH (EDL)<br><br>**DEFENDANTS' TRIAL BRIEF** |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   DEFENDANTS' PROPOSAL TO STREAMLINE ISSUES FOR TRIAL ........................ 1

III.  FACTUAL BACKGROUND ................................................................................. 3

IV.   PLAINTIFFS' IMPROPER DAMAGES CLAIMS .................................................... 7

    A.   Legal Standards Applicable to Damages ................................................... 7

        1.   Copyright Damages.................................................................. 8

        2.   Damages under Plaintiffs' Non-Copyright Claims ..................... 10

    B.   Plaintiffs Are Attempting to Avoid the Court's Sanctions Order ............... 11

    C.   Plaintiffs' Damage Theories Are Flawed................................................. 12

        1.   Plaintiffs' Cannot Meet Their Burden of Proof with Respect to
            Their Infringer's Profits Claim, and Their Expert's Methodology Is
            Defective ............................................................................... 12

        2.   Plaintiffs' Lost Support Profits Claim Is Inflated and Fails to
            Address the Causation of Damages Requirement ...................... 14

        3.   Plaintiffs' Fair Market Value Damage Claim Is Based on a
            Defective Methodology and Unduly Speculative ...................... 15

        4.   Plaintiffs' "Saved Development Costs" Theory Is Legally
            Defective and Factually Absurd............................................... 16

V.    DEFENSES TO LIABILITY ................................................................................ 17

    A.   Preemption ........................................................................................... 17

    B.   Statute of Limitations, Laches, and Waiver............................................. 18

    C.   SAP Is Not Directly or Indirectly Liable for TomorrowNow's Conduct ............. 20

    D.   Defenses to Specific Causes of Action ................................................... 20

        1.   Copyright Infringement............................................................ 21

        2.   Computer Fraud and Abuse Act/CDAFA .................................. 21

        3.   Breach of Contract ................................................................. 21

        4.   Intentional/Negligent Interference ........................................... 22

        5.   Unfair Competition ................................................................ 22

        6.   Trespass to Chattels................................................................ 23

        7.   Unjust Enrichment/Restitution................................................. 23

        8.   An Accounting ....................................................................... 23

VI.   PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES ............................... 24

**TABLE OF CONTENTS**
(continued)

**Page**

VII. CONCLUSION ........................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*AccuImage Diagnostics Corp. v. Terarecon, Inc.*,
260 F. Supp. 2d 941 (N.D. Cal. 2003) .................................................................. 10

*Alberghetti v. Corbis Corp.*,
No. CV 09-5735 SVW (CWX), 2010 WL 2016853 (C.D. Cal. Apr. 29, 2010) ...................... 20

*Avago Techs. U.S., Inc. v. Venture Corp. Ltd.*,
No. C 08-03248 JW, 2008 WL 5383367 (N.D. Cal. Dec. 22, 2008) ........................................ 22

*Big Seven Music Corp. v. Lennon*,
554 F.2d 504 (2d Cir. 1977) ..................................................................................... 9

*Bourne v. Walt Disney Co.*,
68 F.3d 621 (2d Cir. 1995) ..................................................................................... 21

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
No. C 05-3465 PJH, 2006 WL 13058 (N.D. Cal. Jan. 3, 2006) ......................................... 23

*Creative Computing v. Getloaded.com LLC*,
386 F.3d 930 (9th Cir. 2004) .................................................................................. 10

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994) ................................................................. 9, 10, 13, 14

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
772 F.2d 505 (9th Cir. 1985) .............................................................................. 8, 9

*Goldberg v. Cameron*,
482 F. Supp. 2d 1136 (N.D. Cal. 2007) ................................................................. 20

*Golden West Ref. Co. v. SunTrust Bank*,
538 F.3d 1233 (9th Cir. 2008) .............................................................................. 19

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ........................................................................................ 8, 10

*Henderson v. Security Nat'l Bank*,
140 Cal. Rptr. 388 (Cal. Ct. App. 1977) ............................................................... 24

*In re S.B.*,
32 Cal. 4th 1287 (Cal. Ct. App. 2004) ................................................................... 19

*Intel Corp. v. Hamidi*,
30 Cal. 4th 1342 (2003) ......................................................................................... 23

*Jarvis v. K2 Inc.*,
486 F.3d 526 (9th Cir. 2007) .............................................................................. 8, 9

*Kling v. Hallmark Cards Inc.*,
225 F.3d 1030 (9th Cir. 2000) .............................................................................. 19

*Laws v. Sony Music Entm't*,
448 F.3d 1134 (9th Cir. 2006) .............................................................................. 17

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ............................................................................ 16

*Mackie v. Rieser*,
296 F.3d 909 (9th Cir. 2002) .............................................................................. 8, 9

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Netbula, LLC v. Bindview Dev. Corp.*,
  516 F. Supp. 2d 1137 (N.D. Cal. 2007) ...................................................................................... 21

*NLFC, Inc. v. Devcom Mid-America, Inc.*,
  No. 93 C-0609, 1993 U.S. Dist. LEXIS 16459 (N.D. Ill. Nov. 16, 1993) ................................. 21

*Parrish v. Nat'l Football League Players Ass'n*,
  534 F. Supp. 2d 1081 (N.D. Cal. 2007) ...................................................................................... 24

*Polar Bear Prods., Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) ............................................................................................... *passim*

*Rano v. Sipa Press, Inc.*,
  987 F.2d 580 (9th Cir. 1993) ....................................................................................................... 21

*RD Legal Funding, LLC v. Erwin & Balingit, LLP*,
  No. 08cv597-L(RBB), 2009 WL 2579230 (S.D. Cal. Aug. 19, 2009) ........................................ 21

*RealNetworks, Inc. v. DVD Copy Control Ass'n*,
  641 F. Supp. 2d 913 (N.D. Cal. 2009) ........................................................................................ 21

*Reudy v. Clear Channel Outdoors, Inc.*,
  693 F. Supp. 2d 1091 (N.D. Cal. 2010) ...................................................................................... 22

*S.F. Bay Area Rapid Transit Dist. v. Spencer*,
  358 F. App'x 793 (9th Cir. 2009) ............................................................................................... 23

*Shaffer v. Debbas*,
  21 Cal. Rptr. 2d 110 (Cal. Ct. App. 1993) ................................................................................. 10

*Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc.*,
  367 F.2d 236 (9th Cir. 1966) ......................................................................................................... 8

*Sparaco v. Lawler, Matusky, Skelly Engineers LLP*,
  313 F. Supp. 2d 247 (S.D.N.Y. 2004) ........................................................................................ 10

*Sully-Jones Contractors, Inc. v. Am. Safety Indem. Co.*,
  No. 08-CV-1976 BEN (AJB), 2010 WL 1839114 (S.D. Cal. May 6, 2010) ............................. 24

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008) ....................................................................................................... 22

*Ticketmaster Corp. v. Tickets.com, Inc.*,
  No. CV99-7654-HLH (VBKx), 2003 U.S. Dist. LEXIS 6483 (C.D. Cal. Mar. 7, 2003) .......... 23

*Youst v. Longo*,
  43 Cal. 3d 64 (2003) ................................................................................................................... 10

## **Statutes**

17 U.S.C. § 102 ............................................................................................................................... 17

17 U.S.C. § 103 ............................................................................................................................... 17

17 U.S.C. § 106 ............................................................................................................................... 17

17 U.S.C. § 504 ................................................................................................................... 8, 9, 12, 13

17 U.S.C. § 507 ............................................................................................................................... 20

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

18 U.S.C. § 1030 ....................................................................................................... 20, 21

Cal. Bus. & Prof. Code § 17208 (2010) ........................................................................ 20

Cal. Civ. Code 3333 ....................................................................................................... 10

Cal. Civ. Proc. Code § 337 (2010) ................................................................................. 20

Cal. Civ. Proc. Code § 338 ............................................................................................. 20

Cal. Civ. Proc. Code § 339 (2010) ................................................................................. 20

Cal. Penal Code § 502 ............................................................................................... 20, 21


## Other Authorities

4 *Nimmer on Copyright* §14.03 (2004) ........................................................................... 9

1   **I.      INTRODUCTION**

2          Since March 2007, an evolving roster of Plaintiffs has filed five complaints, each more

3   colorful than the last.  Plaintiffs contend that TomorrowNow cut too many corners in providing a

4   lower-cost alternative to Plaintiffs' expensive software maintenance, by improperly downloading

5   and copying software and support materials.  Plaintiffs leap from that contention to billions in

6   damages based on an alleged sinister plot by SAP.

7          As always, the truth is less exciting than the pleadings.  SAP bought TomorrowNow for

8   $10 million to provide a choice to customers frightened by Oracle's acquisition of PeopleSoft and

9   J.D. Edwards.  TomorrowNow served only a tiny fraction of Plaintiffs' customers—customers

10  who were already going to drop Plaintiffs' support and whom Oracle's own executives dismissed

11  as "unprofitable laggards."  TomorrowNow never made a profit, and, despite some initial

12  optimism, no customers chose to purchase SAP software because of TomorrowNow.

13         From the beginning of this case, SAP has acknowledged that there were mistakes in

14  TomorrowNow's service operations and acted responsibly to address the situation.  SAP changed

15  management at TomorrowNow.  It directed a revision of TomorrowNow's service procedures.

16  And, after it could assure that TomorrowNow's customers were protected, SAP shut down

17  TomorrowNow's operations rather than let them distract from efforts to resolve this dispute.

18         Years of litigation have made a few things clear: although TomorrowNow did make

19  mistakes in its operations, Plaintiffs' damage claims are vastly exaggerated, and Plaintiffs have no

20  interest in resolving this case.  Someone will have to take a major step, or this case will never end.

21         That "someone" is SAP.  SAP recognizes not only that TomorrowNow made mistakes but

22  that Plaintiffs are entitled to compensation, for which SAP will accept ultimate financial

23  responsibility.  That compensation must be based in reality and the law, however.  SAP's

24  proposal to streamline this case for trial, outlined below, will allow the Court and the parties to

25  focus on what matters most—a fair resolution of this case.

26  **II.     DEFENDANTS' PROPOSAL TO STREAMLINE ISSUES FOR TRIAL**

27         Beyond the fact that four Plaintiffs are suing three Defendants on ten claims, the principal

28  reason this case threatens to be so complex to try is that Plaintiffs have asserted a claim for

billions where their true damages measure in the tens of millions, at most.  Shining a clear and focused light on Plaintiffs' exaggerated damages claims may be the only way to bring this case to an end.  Defendants therefore propose a significant potential compromise—one that should allow this case to reach a fair and timely resolution without unduly burdening the Court or jury:

(1)  Defendants would not contest TomorrowNow's liability under the asserted claims (except that they would preserve the defenses raised in the pending motions for summary judgment, defenses of preemption, statute of limitations, laches and waiver, and all defenses to the alleged fact, amount or causation of or entitlement to damages or any other relief).

(2)  Defendants would not contest SAP's vicarious liability for any judgment against TomorrowNow on the copyright claim and would agree to stand behind and guarantee payment of any other judgment against TomorrowNow (but would preserve all defenses above and any other defenses regarding alleged direct or indirect liability).

(3)  Plaintiffs should agree to dismiss other direct or indirect claims against SAP.

(4)  The trial should be shortened to two weeks.[1]

This case is about TomorrowNow's conduct.  Defendants' proposal permits Plaintiffs to pursue (and collect, if awarded) the full range of legally available damages.  It also permits this case to be substantially shortened (an appealing prospect in view of Plaintiffs' demand to lengthen this trial, by eliminating the need to try most liability issues.

Defendants propose taking this significant step now because expert discovery has confirmed that Plaintiffs' damages claims are untethered to the facts or law.  Just as Defendants elected not to contest some issues on summary judgment to focus on the core dispute, they now propose that trial focus on the issue that truly divides the parties—damages.  Narrowing this case as Defendants propose, along with rulings on the pending summary judgment motions, allows this case to be tried more efficiently and to a result more closely approaching justice than by forcing the Court and a jury to spend weeks deciding issues that need not be in dispute.

---

[1] These proposals are not admissions and are made solely for purposes of focusing this case for trial.  Nor do these proposals affect Defendants' pending motion for partial summary judgment which, if granted, would also substantially narrow the issues to be tried.

1    **III.   FACTUAL BACKGROUND**

2        SAP and Plaintiffs[2] are competitors in the market for enterprise resource planning

3    ("ERP") software, each developing and licensing business software applications and offering

4    related customer support services.  Typically, Oracle licenses its software under perpetual

5    licenses and bundled with one year of customer support, which customers may renew on an

6    annual basis.  The support agreements entitle customers to future software releases.

7        Many customers elect not to renew support services, especially customers on stable or

8    highly customized software packages with no plans to upgrade to future software releases.  These

9    customers find little use for the support services and get no value from the payment of support

10    fees that are used in large part to fund future software releases that they do not want or need.  The

11    decision to leave one ERP vendor for another is one of enormous cost and business risk and is not

12    undertaken lightly.  The vast majority of customers that Plaintiffs claim to have lost to

13    TomorrowNow or SAP would have left even if TomorrowNow had never existed.

14        One reason that customers were driven to leave Plaintiffs arose out of Plaintiffs'

15    acquisition of PeopleSoft, Inc. ("PeopleSoft").  On June 2, 2003, PeopleSoft announced its

16    merger with J.D. Edwards ("JDE") in a combination that made PeopleSoft the world's second

17    largest ERP-software company, displacing Oracle from that position.  As the ink was drying on

18    the PeopleSoft/JDE merger agreement, Oracle's executives decided the time was ripe to strike.

19    Four days later, Oracle launched a hostile takeover bid for PeopleSoft, sparking a bitter battle that

20    included lawsuits against Oracle by PeopleSoft and by the United States Department of Justice.

21    PeopleSoft complained that Oracle was deliberately harming PeopleSoft's customer relationships

22    to drive down the price of PeopleSoft's stock and make the acquisition cheaper.  The DOJ sought

23    to block the takeover on antitrust grounds.

24        By December 2004, Oracle had defeated PeopleSoft and the United States and completed

25    its eighteen-month battle for control of PeopleSoft.  However, Oracle's tactics took a toll on the

26    PeopleSoft customer base.  During the takeover battle, Oracle had threatened to lay off thousands

27

28    [2] Plaintiffs are Oracle USA, Inc. ("OUSA"), Oracle International Corporation ("OIC"), Oracle EMEA Limited ("OEMEA"), and Siebel Systems, Inc. ("SSI") (sometimes, "Oracle").

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

of PeopleSoft employees, discontinue PeopleSoft's product lines, and force customers to replace their PeopleSoft information technology systems with an undefined future software package to be known as "Fusion."  PeopleSoft complained that these threats were damaging its customer relationships, deterring customers from purchasing PeopleSoft products, and generally driving customers away.  As a result, customers of Oracle's newly acquired PeopleSoft and JDE product lines, especially those that were at a stage in the life-cycles of their software where they needed to decide their future product direction, had good reasons to consider alternatives, including SAP. Oracle recognized this at the time, noting that its acquisition model "always assumed there would be some attrition" to SAP.  *See* ORCL00744446.

SAP had competed with PeopleSoft before the acquisition, including through its "Safe Harbor" marketing program, which offered discounts to customers that chose to replace their PeopleSoft products with SAP products.  Anticipating the consummation of Oracle's takeover of PeopleSoft, SAP introduced a modified program known as "Safe Passage," designed to welcome customers interested in leaving Plaintiffs to the SAP software platform.  The Safe Passage program was essentially a price discount.  First and foremost, Safe Passage gave PeopleSoft customers a credit of up to 75% of the price the customer had paid for their PeopleSoft software. In addition, SAP offered as an optional component the services of its newly acquired subsidiary, TomorrowNow, to provide support services for PeopleSoft products.

TomorrowNow was a small company based in Bryan, Texas that had been in business since 2002.  TomorrowNow provided customer support services for users of PeopleSoft software that were weary of paying high support fees to PeopleSoft.  TomorrowNow was an early entrant into the market for third party support of enterprise software, but the market has steadily grown and now has both established players and a multitude of emerging companies.

Despite Plaintiffs' manifest desire to snuff out the third party support competition, its business model inevitably produces a demand for third party support.  Plaintiffs' customers, including those running PeopleSoft and JDE applications, typically pay annual support fees of approximately 20% of their original software purchase price.  Customers recognize, however, that a large portion of those fees is used to fund development of future software, as opposed to

1  providing support for the products the customers are actually using. Thus, customers that are

2  content with their IT systems and not interested in future software upgrades have difficulty

3  justifying payment of the fees. These customers often seek alternatives, either through third party

4  support providers or self-service options. These third parties are able to support the existing

5  applications more cheaply because they do not need to charge customers for the cost of

6  developing future software applications.

7     Plaintiffs bristle at the notion that customers may wish to lower their support fees and

8  forego the right to future software upgrades. A senior Oracle executive wrote:

9     Let the bastards dream of reducing their maintenance fees. I just finished telling
   Toyota that we're not going to reduce their bill. Not only that, but they need to
10    buy more software from us!

11 Defs.' Dep. Ex. 373. That attitude contributes to customers leaving Plaintiffs' support.

12    While the evidence will show that SAP's marketing team positioned TomorrowNow as a

13 part of the Safe Passage offer, in reality it was an untested market concept, and no one knew

14 whether or to what extent the TomorrowNow component of the program would be effective in

15 persuading customers to leave Plaintiffs for SAP. Despite the high hopes of some members of

16 SAP's marketing team for its new marketing strategy, at no time prior to the launch of Safe

17 Passage did SAP ever quantify the extent to which *TomorrowNow itself* would cause sales of

18 SAP software that SAP would not otherwise have made.

19    These high hopes were never realized—the TomorrowNow offer had at best a modest

20 economic impact on SAP and Plaintiffs. During its entire existence, TomorrowNow generated

21 only 358 customers, the vast majority of which were "maintenance-only" customers, meaning

22 that TomorrowNow provided support for Plaintiffs' products and customers did *not* replace their

23 software with SAP products. The problem with that result is that TomorrowNow *lost* money.

24 During its life as an SAP subsidiary, TomorrowNow suffered total losses of $90 million.[3]

25    These "maintenance-only" customers had no interest in purchasing new software, whether

26 from Plaintiffs, SAP, or others. They were simply looking to lower their maintenance fees on

27

28    [3] *See* Expert Report of Stephen K. Clarke, Appendix O.

- 5 -

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

1    their existing systems.  In contrast to Plaintiffs' current litigation posturing, senior executives bid

2    good riddance to such customers, which they dismissed as "unprofitable laggards":

3           If TomorrowNow (SAP) is going to win a bunch of maintenance-only customers
            with no plans to upgrade for 5 years . . . then I don't think TomorrowNow will be
4           too long for this world as SAP won't make any profitable money on these
            customers if they can't get them to implement SAP.
5

6    Defs.' Dep. Ex. 367.

7           Moreover, actual experience has proven that the TomorrowNow offer had virtually no

8    impact on driving sales of SAP products and services that SAP would not otherwise have made.

9    Of the 358 customers that purchased TomorrowNow support, only 86 also purchased SAP

10   products or services thereafter.  Importantly, however, the TomorrowNow support was *not the*

11   *cause* of the SAP purchases.[4]  Upon analysis of the 86 customers, it is clear that their purchases of

12   SAP software were driven by considerations more important than and unrelated to the fact that

13   they may have received support services from TomorrowNow.  As an example, one customer that

14   purchased TomorrowNow support and SAP software was asked to explain why it chose SAP

15   software.  The customer testified that it developed a list of 300 relevant data points in selecting a

16   new software package.  TomorrowNow support was "not a data point," not even one of 300.

17          This is no surprise, as business customers are generally unwilling or unable to rip out the

18   IT systems that their business depend upon and replace them with entirely new systems unless:

19   (1) they have a compelling business or strategy reason for doing so; and (2) they are at a point in

20   the lifecycle of the technology where it is reasonable to make such a dramatic change.  The

21   financial cost and business risks inherent in replacing a company's business software are typically

22   enormous.  The notion that customers would do so because of an offer of discount support of their

23   old software during a transition from the old software to the new is unfounded.  Here again,

24   _____

25          [4] During discovery, the parties identified 86 customers that purchased software or support
     from SAP at or after the time they began receiving support from TomorrowNow.  This so-called
26   "List of 86" explicitly did not raise any inference about whether the customer's SAP purchases
     were related to the support services provided by TomorrowNow.  Rather, it was a purely
27   mechanical list intended to define the subset of customers for which Plaintiffs could obtain
     discovery (thereby preventing burdensome and unnecessary discovery into all of the
28   approximately 800 Safe Passage customers, the vast majority of which did not purchase
     TomorrowNow services).

1    Plaintiffs' senior executives recognized this fact in contemporaneous internal communications.

2    Referring to third party support providers as "gnats," Oracle's Senior Vice President of Support

3    Services derided the suggestion that customers would switch to SAP products because of

4    TomorrowNow as "the silliest argument I have ever heard!"  Defs.' Dep. Ex. 374.  This senior

5    executive continued:

6         "Migrating an application involves some expense; you don't just decide it
          overnight and the next day you spend the millions."  That's right.  It takes
7         MILLIONS.  The customer has to "spend the MILLIONS."  And it's fraught with
          business disruption and RISK!  How much were you going to "save" on that
8         support bill Mr. Customer?

9    *Id.*

10   In stark contrast to those admissions, Plaintiffs now portray TomorrowNow as the

11   ultimate Pied Piper, single-handedly capable of forcing hordes of ERP customers, who would not

12   otherwise have done so, to replace Plaintiffs' software with SAP.  Premised on that false

13   assumption, Plaintiffs overreach on each of their damages theories, claiming literally *billions* of

14   dollars of unjustified damages.

15   **IV.    PLAINTIFFS' IMPROPER DAMAGES CLAIMS**

16   The focus of this case should be the dispute over the nature and amount of Plaintiffs'

17   alleged damages.  Each side will present damages testimony through a primary damages expert,

18   Paul Meyer for Plaintiffs and Stephen Clarke for Defendants.  Defendants will also present

19   testimony from industry expert, Brian Sommer, and testimony from customers.

20   Plaintiffs have presented damages claims for: (1) actual damages for the copyright claim,

21   in the form of either lost profits on support services or loss in fair market value; (2) infringer's

22   profits for the copyright claim; and (3) investigation costs for the computer access claims.  Aside

23   from investigation costs, Plaintiffs' damage claims for its non-copyright claims are duplicative of

24   (1) and (2).  Only the first category of damages—the alleged lost support profits from customers

25   that chose to get support from TomorrowNow—is appropriate in this case.

26   **A.    Legal Standards Applicable to Damages**

27   Under each of their claims, Plaintiffs have the burden to prove that damages were *caused*

28   by the allegedly wrongful acts.  If Plaintiffs cannot prove that Defendants' alleged wrongful acts

SVI-83531v1

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

1    were the "but for" cause of their losses, they are not entitled to a recovery.  For example, even if

2    Plaintiffs were to prove that TomorrowNow's support model infringed Plaintiffs' copyrights in

3    the provision of support services, if the jury finds that a customer would have left anyway, then

4    Plaintiffs would not have made a profit and are not entitled to an award of lost profits for that

5    particular customer.  This is important in this case, as Plaintiffs are seeking the proverbial "pie-in-

6    the-sky" damages premised on overstated "facts" and unfounded assumptions.

### 1.    Copyright Damages

8        The Copyright Act allows for recovery of actual damages and, to the extent not duplicative

9    of actual damages, disgorgement of infringer's profits.  *See* 17 U.S.C. § 504(b)-(c).  Actual

10   damages are generally calculated "by the loss in the fair market value of the copyright," which is

11   determined by either "the profits lost due to the infringement" or "the value of the use of the

12   copyrighted work to the infringer."  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708

13   (9th Cir. 2004); *see also Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002); *Frank Music Corp.

14   v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985).  The Ninth Circuit has held that

15   "in situations where the infringer could have bargained with the copyright owner to purchase the

16   right to use the work," the "value of use" form of actual damages may be determined by using a

17   hypothetical license.  *Jarvis v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007); *see also Polar Bear*,

18   384 F.3d at 709 (stating that "a hypothetical lost license fee" may be awarded, "provided the

19   amount is not based on undue speculation") (citation omitted).

20       General "tort principles of causation and damages" apply when analyzing compensatory

21   damages awards for copyright infringement.  *Polar Bear*, 384 F.3d at 708; *see also Harper &

22   Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 567 (1985); *Jarvis*, 486 F.3d at 533-34;

23   *Mackie*, 296 F.3d at 915; *Frank Music*, 772 F.2d at 514 n.8 (citing *Shapiro, Bernstein & Co. v.

24   4636 S. Vermont Ave., Inc.*, 367 F.2d 236, 241 (9th Cir. 1966)).  Under Section 504(b), "actual

25   damages must be suffered 'as a result of the infringement,' and recoverable profits must be

26   'attributable to the infringement.'"  *Polar Bear*, 384 F.3d at 708 (quoting 17 U.S.C. § 504(b)).

27   The plain statutory language makes clear that "a causal link between the infringement and the

28   monetary remedy sought is a *predicate* to recovery of both actual damages and profits."  *Id.*

1    (emphasis added).

2          The copyright holder bears the burden of proving this necessary causal connection

3    between the infringement and any damages sustained.  *See id*. at 708 ("We take this opportunity

4    to reaffirm the principle that a plaintiff in a § 504(b) action must establish this causal

5    connection"); *Jarvis*, 486 F.3d at 533-34; *Mackie*, 296 F.3d at 914-15 (citing *Data Gen. Corp. v.*

6    *Grumman Sys. Support Corp.*, 36 F.3d 1147, 1170 (1st Cir. 1994); *Frank Music*, 772 F.2d at 514.

7    Specifically, the plaintiff must show that "the infringement was the cause-in-fact of its loss by

8    showing with reasonable probability that, but for the defendant's infringement, the plaintiff

9    would not have suffered the loss."  *Data Gen.*, 36 F.3d at 1171.  Further, the plaintiff must

10   "prove that the infringement was a proximate cause of its loss by demonstrating that the

11   existence and amount of the loss was a natural and probable consequence of the infringement."

12   *Id.* (citing *Big Seven Music Corp. v. Lennon*, 554 F.2d 504, 509 (2d Cir. 1977)).  Courts allow

13   both direct and indirect evidence to establish loss, but must "reject a proffered measure of

14   damages if it is too speculative."  *Mackie*, 296 F.3d at 915 (quoting *Frank Music*, 772 F.2d at

15   513); *see also Polar Bear*, 384 F.3d at 709-11 (stating that damages may not be "based on undue

16   speculation"); *Jarvis*, 486 F.3d at 534 (stating that "[e]xcessively speculative claims of damages

17   must be rejected").

18          With respect to infringer's profits, a defendant's "indirect profits" are difficult to prove

19   and are only awardable "under certain conditions" because of their "more attenuated nexus to the

20   infringement."  *Mackie*, 296 F.3d at 914.  Here the alleged indirect profits are SAP's profits from

21   selling its own software, as contrasted with direct profits of TomorrowNow from the sale of the

22   allegedly infringing support services.  Courts closely scrutinize claims for indirect profits and

23   require that "a copyright holder must establish the existence of a causal link before indirect

24   profits damages can be recovered."  *Polar Bear*, 384 F.3d at 6 (referencing 4 *Nimmer on*

25   *Copyright* §14.03, 14-34 (2004).  When an infringer's profits "are only remotely and

26   speculatively attributable to infringement," courts will "deny recovery" to the copyright owner."

27   *Frank Music,* 772 F.2d at 8.

28          If and only if the plaintiff carries its initial burden, the burden shifts and defendant may

then show that the damage complained of would have occurred even had there been no taking of the copyrighted expression. *See Harper & Row*, 417 U.S. at 567. Thus, if Plaintiffs carry their initial burden, Defendants may then show that customers would have ceased purchasing support services from Plaintiffs and would have made SAP software purchases, even if the infringement had not occurred. In determining causation of damages, the jury is entitled to take into account all of the diverse factors that might bear upon customers' purchasing decisions. *See Data Gen.*, 36 F.3d at 1172 n.44.

## 2. <u>Damages under Plaintiffs' Non-Copyright Claims</u>

Plaintiffs also must prove damages for each of their non-copyright claims (assuming any of the state law claims are not preempted by the Copyright Act). That proof is far more difficult than Plaintiffs suggest. Each claim requires Plaintiffs to prove causation by showing that "but for" the alleged actions by TomorrowNow, damages would not have occurred. Cal. Civ. Code 3333 (state law claims); *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 936 (9th Cir. 2004) (CFAA). Plaintiffs must meet their burden on a customer-by-customer basis to demonstrate both intentional and negligent interference with prospective economic advantage. *See Youst v. Longo,* 43 Cal. 3d 64, 71 n.6 (2003) (standard for intentional interference); *AccuImage Diagnostics Corp. v. Terarecon, Inc.,* 260 F. Supp. 2d 941, 957 (N.D. Cal. 2003) (standard for negligent interference). When Plaintiffs are held to their burdens of proof, the alleged damages are far below the amounts they claim.

Should Plaintiffs meet their burden, damages are further limited by two important principles. First, Plaintiffs cannot recover duplicative damages (*i.e.*, amounts taken into account in determining copyright damages). *See Sparaco v. Lawler, Matusky, Skelly Engineers LLP,* 313 F. Supp. 2d 247, 250 (S.D.N.Y. 2004). Additionally, under California law, "[a] plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." *Shaffer v. Debbas*, 21 Cal. Rptr. 2d 110, 114 (Cal. Ct. App. 1993). Evidence will show that Plaintiffs failed to take such mitigating steps.

1

### B.     Plaintiffs Are Attempting to Avoid the Court's Sanctions Order

2          For the first two years of this case, *Plaintiffs* insisted on limiting damages discovery in

3 this case to lost *support sales* to *customers that left for TomorrowNow*.  When, at the eleventh

4 hour, Plaintiffs attempted to add claims for lost *software license sales* and lost sales to *customers*

5 *that were never customers of TomorrowNow*, Magistrate Judge Laporte entered the Sanctions

6 Order precluding them from doing so.[5]  The Sanctions Order precludes Plaintiffs from presenting

7 evidence of alleged lost profits relating to: (1) customers that did not become customers of

8 TomorrowNow; (2) software licensing revenue, as opposed to support revenue; and (3) products

9 that were not supported by TomorrowNow.  *See* Sanctions Order at 26 (D.I. 482).

10          Plaintiffs filed objections to the Sanctions Order and sought clarification concerning its

11 scope.  In the objections, Plaintiffs expressly acknowledged that the Sanctions Order precludes

12 any claim for damages to goodwill.[6]  Plaintiffs nonetheless argued that their damages expert and

13 other witnesses should be permitted to offer the precluded evidence for purposes other than

14 proving lost profits damages, including in support of their expert's hypothetical license

15 calculation and other, unspecified, alleged "impacts."[7]  In response, Defendants argued that

16 Plaintiffs should not be permitted to offer the precluded evidence to bolster their other damages

17 claims.[8]  Specifically, Defendants argued that the prejudice finding on which the Sanctions Order

18 is based applies with equal force to Plaintiffs' other damage claims.  *Id.*[9]

19          In the Adopting Order, this Court adopted the Sanctions Order in its entirety.  D.I. 532.

20

---

21      [5] Judge Laporte held a hearing on the motion on August 19, 2009 (the "Sanctions Hearing") and granted the motion on September 17, 2009.  *See* D.I. 482 (the "Sanctions Order"). This Court adopted the Sanctions Order on November 2, 2009.  D.I. 532 (the "Adopting Order").

22

23      [6] "The damages that arguably fit Magistrate Laporte's premise are . . . damages to Oracle's goodwill . . . ."  D.I. 499 at 2.

24      [7] D.I. 499 (Oracle's Objections to Order of Discovery Magistrate Granting Defendants' Motion for Preclusion of Certain Damages Evidence Pursuant to Federal Rules of Civil Procedure 37(c) And 16(f)) at 14-15.

25

      [8] D.I. 526 (Defs.' Response to Plaintiffs' Objections to Order for Sanctions) at 21-22.

26      [9] "If Oracle's expert is permitted to testify on the amount of the precluded lost profits

27 damages for purposes of, for example, supporting his opinion on the value of the hypothetical license (or any other damage theory), the prejudice to Defendants is the same as if he was testifying for purposes of the lost profits claim.  Defendants will have been deprived of a full and

28 fair opportunity to rebut that evidence by Oracle's discovery misconduct.").  *Id.*

1  The Court further ruled that the precluded evidence will not be admitted for any other purpose. *Id.*

2  at 1 ("the precluded evidence will NOT be admitted through the back door . . . .") (emphasis in

3  original). Despite the Court's ruling, Plaintiffs have indicated their intent to offer the precluded

4  evidence in support of their damage claims. This includes a newly disclosed claim of damage to

5  goodwill, even though Judge Laporte asked Plaintiffs at the sanctions hearing whether they

6  intended to quantify or seek damages for alleged harm to goodwill and Plaintiffs responded

7  unequivocally that they did not intend to quantify "anything on goodwill" or to seek damages

8  related to goodwill. D.I. 462 (8/19/09 Tr.) at 38:18-25, 41:18-24, 43:11-22.[10] These issues are

9  subject of Defendants' Motions In Limine Nos. 1 and 2, filed concurrently.

10  **C.    Plaintiffs' Damage Theories Are Flawed**

11  The following sections highlight some of the many flaws in Plaintiffs' damages claims

12  and Mr. Meyer's approaches to calculating them.

13  **1.    Plaintiffs' Cannot Meet Their Burden of Proof with Respect to Their Infringer's Profits Claim, and Their Expert's Methodology Is**
14  **Defective**

15  Plaintiffs are pursuing a claim under 17 U.S.C. § 504(b) for disgorgement of $288 million

16  of SAP "profits" allegedly caused by TomorrowNow. *See* Defs.' Dep. Ex. 2017. Significantly,

17  the claim is for "indirect" profits made by SAP from selling its own software and services; there

18  can be no claim for the "direct" profits of TomorrowNow from selling the allegedly infringing

19  services because TomorrowNow made no profits.

20  Mr. Meyer's approach to calculating the infringer's profits claim impermissibly lumps

21  together hundreds of millions of dollars of SAP's sales without consideration of whether those

22  revenues were generated as a result of the alleged copyright infringement. While Mr. Meyer

23  purports to have performed his own causation of damages analysis and, indeed, has adopted

24  certain of the causation conclusions reached by Defendants' expert Mr. Clarke, Mr. Meyer's

25  causation analysis is woefully incomplete. For the vast majority of customers, Mr. Meyer has

26

27  _____
    [10] Plaintiffs' damages expert, Paul Meyer, did not provide an opinion on alleged harm to
    goodwill in his report. *See* Declaration of Jason McDonell in Support of Defendants' Motions In
28  Limine, ¶ 7.

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

1   applied a blanket assumption that if a customer was identified anywhere as a Safe Passage

2   customer, all of the customers' purchases of SAP software thereafter were caused by

3   TomorrowNow support services.  That assumption is invalid.

4       An actual example reveals the fallacy of this assumption.  Included in the $288 million

5   claim of infringer's profits are $34 million of profits resulting from SAP's software sales to a

6   large international corporation.  *See* Defs.' Dep. Ex. 2020.  SAP's software sales to this customer,

7   however, had nothing to do with TomorrowNow.  The actual facts are that customer has been an

8   SAP user for many years prior to SAP's acquisition of TomorrowNow.  In 2007, the customer

9   acquired a U.S. company, and according to a corporate policy converted the newly acquired

10  subsidiary to SAP software in order keep the subsidiaries operating on a common platform with

11  the parent.  Evidently because acquired subsidiary took advantage of TomorrowNow's support

12  during the transition to SAP software, Mr. Meyer claims that SAP's sales included in his

13  calculation were obtained "as a result of" TomorrowNow's alleged copyright infringement and

14  therefore should be disgorged.  Meyer Report, ¶ 435.  The reality, of course, is that it was parent's

15  policy of standardization on SAP software that caused the sales of SAP software, not the

16  TomorrowNow support.  Contemporaneous documents show this fact, including TomorrowNow

17  documents ("customer has a program in place for all of its acquired organizations to move to its

18  standard enterprise software applications, which is SAP"), SAP documents (noting the

19  "[w]orldwide replacement of JDE Systems into unified SAP template") and Oracle documents

20  ("the decision had been made by the [parent/subsidiary] Integration team to standardize all

21  applications on [parent's] SAP solutions").[11]  Mr. Meyer deliberately ignores this evidence and

22  persists in his opinion that TomorrowNow was *the* cause of the parent's purchases of SAP

23  software for its subsidiary.

24      There are literally dozens of other examples of Meyer ignoring Plaintiffs' burden to prove

25  that Defendants' alleged profits are "attributable to" the infringement,[12] ignoring the available

26  customer-specific information, and improperly relying on his blanket assumption.

27

28

---

[11] *See* TN-OR00152649, SAP-OR00147255, ORCL00182769.

[12] 17 U.S.C. § 504(b); *Polar Bear*, 384 F.3d at 709; *Data Gen.*, 36 F.3d at 1172 n.44.

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

2.     **Plaintiffs' Lost Support Profits Claim Is Inflated and Fails to Address the Causation of Damages Requirement**

Plaintiffs seek lost profits from support revenue they claim they would have made from the TomorrowNow customers "but for" the alleged infringement.  Plaintiffs' expert has calculated these lost profits as either $318 million or $91 million, depending on his timing assumptions. Defs.' Dep. Ex. 2017.  But Plaintiffs' own internal records, customer testimony, and other evidence confirm that most customers that came to TomorrowNow were going to leave Oracle's maintenance service anyway—if not for TomorrowNow, then for some other service provider or for self-support.[13]  After applying a rigorous customer-by-customer analysis, Defendants' expert has calculated these damages at less than $40 million.

Plaintiffs have the burden of proving a causal relationship between the alleged infringement and lost profits that resulted from the alleged infringement.[14]  Plaintiffs must prove that "but for" the alleged infringement, it would not have suffered lost profits.  If and only if Plaintiffs carry their initial burden does the burden shift to Defendants to show that all or some portion of the claimed lost profits were not caused by the alleged infringement.  *Id.*  Among other things, Defendants may show that customers would have ceased purchasing support services from Plaintiffs even had the alleged misconduct not occurred.

In their zeal to press this claim, Plaintiffs have manipulated evidence and thereby cast doubt on the overall credibility of the claim.  One of the maintenance-only customers Plaintiffs claim they would have retained but for TomorrowNow is the public entity Cowlitz County, Washington.  *See* Meyer Tr. at 930:1-932:20.  Plaintiffs' attorneys asked Cowlitz County to sign a declaration swearing that "had Cowlitz County known" that TomorrowNow "wrongfully" downloaded, copied and maintained "Oracle proprietary software," then Cowlitz County would not have entered into a support services agreement with TomorrowNow.  Defs.' Dep. Ex. 2049

---

[13] Similarly, the evidence is abundant that no SAP customers chose to purchase SAP software *because of* TomorrowNow support services for Plaintiffs' products.  The important decision to pick a business software platform was never driven by the chance of modest savings to interim maintenance and support.

[14] *Polar Bear*, 384 F.3d at 709; *Data Gen.*, 36 F.3d at 1172 n.44.

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

1  (Declaration of Kathy Sauer).  Plaintiffs gave this declaration to their expert Mr. Meyer who

2  relied on it when concluding that but for TomorrowNow Cowlitz County would have continued

3  to renew its support agreements with Plaintiffs.  Meyer Report, ¶ 357 n.668.

4          Thereafter it came to light that Plaintiffs had suppressed a critical part of the history—

5  indeed the key part.  In its discussions with Plaintiffs, Cowlitz County had proposed that the

6  declaration include the following explanation of what it would have done had it not used

7  TomorrowNow:

8          In light of the budgetary and other concerns that led Cowlitz County to choose
        TomorrowNow service, as referenced above, with this information Cowlitz County
9          believes it would have simply elected not to renew its services agreement with
        Oracle and relied on its own in-house technicians backstopped if necessary by time
10         and materials services from PeopleSoft.

11  Defs.' Dep. Ex. 2049 (Declaration of Kathy Sauer) (redlining omitted).  Plaintiffs declined to

12  accept this critical information, instead finalizing a declaration that omitted the fact that Cowlitz

13  "would simply have elected not to renew its services agreement with Oracle," and leaving the

14  impression that Cowlitz *would* have remained an Oracle support customer absent TomorrowNow.

15  *Id.*  Cowlitz ultimately submitted a supplemental declaration that revealed the complete story.

16  *See id.*  When confronted with the complete story, Mr. Meyer retreated and agreed that

17  TomorrowNow had not caused Plaintiffs to lose support profits with respect to Cowlitz County.

18  *See* Meyer Tr. at 930:1-932:20.

19          Mr. Meyer failed to adequately consider available customer-specific information and

20  instead relies on unwarranted assumptions (and Oracle's manipulation of the "facts").  In contrast,

21  Defendants' damages expert Mr. Clarke made a comprehensive analysis of the causation issue

22  and rendered an opinion on a customer-by-customer basis as to the reasons for and extent to

23  which the TomorrowNow support offering was the cause of any damage to Plaintiffs.

24          **3.      Plaintiffs' Fair Market Value Damage Claim Is Based on a Defective
                Methodology and Unduly Speculative**

25

26          Based on Mr. Meyer's analysis, Plaintiffs seek fair market value damages in excess of $2

27  billion.  *See* Defs.' Dep. Ex. 2017.[15]  That analysis consists primarily of a *Georgia-Pacific*

28  _____
[15] Defendants had sought summary judgment that this license theory was not available in

hypothetical license approach and will be the subject of a *Daubert* motion by Defendants. Defendants will show that Mr. Meyer relied almost entirely on an inappropriate metric, that is, corporate acquisitions rather than comparable or "benchmark" licenses. Essentially, Mr. Meyer's "analysis" consists of nothing more than charging Defendants a *pro rata* share of Plaintiffs' cost to acquire PeopleSoft and Siebel. Mr. Meyer compounds this problem by cherry-picking data so as to systematically exclude any data point that would undermine his $2 billion valuation, relying on information not of the type relied on by experts in the field, and making methodological errors in his use of that information. The result is a fair market value calculation that is inherently unreliable and unduly speculative.

Mr. Meyer also fails to base his fair market calculation on the alleged "actual use" of the registered works. For example, rather than considering the fact that TomorrowNow had only 358 customers, only 86 of which purchased anything from SAP, Mr. Meyer bases his *pro rata* share of the PeopleSoft and Siebel acquisitions on the assumption that Defendants would have acquired, outright, 3,000 PeopleSoft and 200 Siebel customers. Meyer Report, ¶¶ 122-124. Mr. Meyer's justification for ignoring actual use is his mistaken view that the law forbids him from considering reality. This is not the law, as recently confirmed by the Federal Circuit in *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) (overturning a $358 million verdict based, in part, on failure to consider actual use in the hypothetical license analysis).

### 4. Plaintiffs' "Saved Development Costs" Theory Is Legally Defective and Factually Absurd

As addressed in Defendants' pending motion for partial summary judgment, "saved development costs" are not available in this case as a matter of law. *See* D.I. 640 (Defs.' Mot. for Partial Summary Judgment). Plaintiffs' demand that TomorrowNow pay the full replacement cost of software—to which Plaintiffs retained at all times the right to use, distribute, license and

---

(continued…)

this case. The Court denied that motion (D.I. 628) but in so doing expressly cautioned that such damages must be reasonable and not speculative. D.I. 628 (Order Denying Defs.' Mot. for Partial Summary Judgment).

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

1   profit from—is as illogical and absurd as demanding that a user of the Bay Bridge, who neglected

2   to pay the toll, pay the state the entire cost of building the bridge.  Plaintiffs' claim for saved

3   development costs, which far outstrips the amounts Plaintiffs seek in lost profits, illustrates the

4   largess of Plaintiffs' overreaching.  In addition, Plaintiffs' claim for saved development costs is

5   based on expert opinion that will be the subject of a *Daubert* motion.

6   **V.**   **DEFENSES TO LIABILITY**

7       Plaintiffs' dramatic pleadings aside, liability is not a foregone conclusion.  While

8   Defendants propose not to contest TomorrowNow's liability for most purposes in this case,

9   substantial defenses to liability exist and may be a major focus of trial.  These issues are

10  summarized below.[16]

11      An important threshold issue is not so much a defense to Plaintiffs' claims as it is a

12  reminder of what Plaintiffs would rather forget—four named entities have sued three different

13  companies.  Referring generally to "Oracle" and "SAP" is a useful timesaver for many purposes.

14  But, as is apparent from the Court's order dismissing two plaintiff entities, Defendants' pending

15  motion for summary judgment against another, and Plaintiffs' own numerous adjustments of the

16  roster of named plaintiffs, "Oracle" is a shorthand term.  Each individual plaintiff must prove its

17  own claims, its standing, and its damages.  So too must each actual plaintiff prove the alleged

18  liability of and damages supposedly caused by each accused defendant on that plaintiff's claims.

19  Plaintiffs' efforts to conflate the parties on either side is not a timesaver here, nor can it provide

20  cover for their limited rights and inability to actually prove a case against SAP.

21      **A.**   **Preemption**

22      A state law claim is preempted by the Copyright Act if the subject matter of the state law

23  claim falls within the subject matter of copyright as described in 17 U.S.C. Sections 102 and 103,

24  and the rights under the state law are equivalent to rights under Section 106 of the Copyright Act

25  (the exclusive rights of reproduction, preparation of derivative works, distribution, and display).

26  *See Laws v. Sony Music Entm't*, 448 F.3d 1134, 1137-38 (9th Cir. 2006).  Plaintiffs' state law

27

28       [16] This summary references some issues addressed in the pending motions for summary judgment, but to avoid repetition does not repeat all those arguments.

1   claims for breach of contract, intentional and negligent interference, unfair competition, unjust

2   enrichment, and accounting, at least, all are based on the same essential claims—that

3   TomorrowNow should not have copied, distributed, or created derivative works from "Oracle's"

4   allegedly copyrighted software and support materials (few of which Plaintiffs themselves created).

5   These state law claims seek exactly the same (or subsets of) the relief that Plaintiffs seek as relief

6   under the Copyright Act (except punitive damages, which is probably the only reason state law

7   claims are cluttering up this copyright case).  These state law claims are preempted.

8           **B.      Statute of Limitations, Laches, and Waiver**

9           Years before it filed suit on March 22, 2007, Oracle's predecessor PeopleSoft was well

10  aware of TomorrowNow and many of its service activities at issue in this case.  For example, as

11  early as July 2002, PeopleSoft's internal lawyer wrote to TomorrowNow and alleged that its

12  activities "violate PeopleSoft's rights," among other things, through "access to confidential

13  PeopleSoft information in your possession," and accused TomorrowNow of unlawful interference

14  with PeopleSoft's relationships with support customers.  Defs.' Dep. Ex. 1323.

15          These concerns continued as Oracle acquired PeopleSoft.  On January 11, 2005, Richard

16  Blotner, Vice President, North America Operations at Oracle, stated in an e-mail:

17          "what i'm really concerned with is this . . . . . . . . is tomorrow now taking
            advantage of the situation by getting updates from their most recent new
18          customers, and applying them to their older ones?  i have no evidence and no one
            has said this, but i have a suspicious little mind.  worst case, it might be worth
19          sending them a legal letter, ensuring they know that they cannot do something like
            this."
20

21  ORCL00172524.  Oracle's concerns years before filing went straight to the top.  In an eWeek

22  article entitled "Oracle Warns SAP to Step Lightly," dated January 26, 2005, Oracle CEO Larry

23  Ellison was quoted as saying in response to SAP's acquisition of TN, "That's our intellectual

24  property, and they should be cautious."  Defs.' Dep. Ex. 404.

25          Yet, despite these concerns, PeopleSoft, then Oracle, actually assisted TomorrowNow in

26  the downloading and use of software "environments" at issue in this case.  For example, on April

27  21, 2004, Terry Wagner, Manager Subcontracts at Lockheed Martin, e-mailed Gregory Stevenson

28  at PeopleSoft, stating, "In order for Lockheed Martin to engage TomorrowNow for continued

1    support of V7.5 tax updates we need to have PeopleSoft's authorization to provide the CDs that

2    they are requesting." TN-OR00800751-53.  The April 21, 2004 e-mail received by Mr.

3    Stevenson includes an e-mail from Shelley Nelson of TomorrowNow expressly stating that

4    "TomorrowNow's standard procedure is to get a demo copy of your PeopleSoft Demo software

5    CD's in order to install a 'demo support environment' at TomorrowNow on your behalf."  *Id.*

6    The email also indicates that Mr. Stevenson "recommended" TomorrowNow to Lockheed Martin

7    for "continued tax update support of version 7.5."  *Id.*  Ironically, in view of Oracle's claims in

8    this case, Stevenson forwarded Wagner's e-mail to Seth Ravin, then co-president of

9    TomorrowNow, asking "Why would we need to provide authorization?"  *Id.*  In fact, even *after*

10   this lawsuit was filed, Oracle itself sent download help and updates to TomorrowNow.  *See* TN-

11   OR0017847.

12        On December 7, 2004, Nancy Lyskawa of PeopleSoft indicated that "My team is actually

13   leading the competive/marketing strategy on the emerging third party support providers.

14   [Redacted sentence] We are very aware of TomorrowNow and have quite a bit of information on

15   them."  Defs.' Dep. Ex. 414.  In addition, Plaintiffs' privilege logs contain literally dozens of

16   entries indicating that they anticipated litigation against TN *at least* as early as September 2004.

17   *See, e.g.,* Defs.' Dep. Ex. 420.

18        It is no surprise, then, that Defendants are pursuing their defenses of statute of limitations,

19   laches, and waiver.  Plaintiffs (or their predecessors) knew or should have known of Defendants'

20   allegedly objectionable conduct long before Plaintiffs filed their various complaints in this case,

21   and knowingly failed to act.[17]  Plaintiffs' claims for copyright infringement, violation of the

22   CDAFA, breach of contract, tortious interference, unfair competition, trespass to chattels, and

23   unjust enrichment are similarly barred by the applicable statutes of limitations.[18]

24   _____

     [17] "Laches is an equitable time limitation on a party's right to bring suit.  To obtain a
25   judgment on this affirmative defense, a defendant must prove both an unreasonable delay by the
     plaintiff and prejudice to itself."  *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir.
26   2000) (citation omitted).  "[W]aiver is the intentional relinquishment or abandonment [by a
     plaintiff] of a known right."  *Golden West Ref. Co. v. SunTrust Bank*, 538 F.3d 1233, 1242 (9th
27   Cir. 2008) (citing *In re S.B.*, 32 Cal. 4th 1287, 1293 n.2 (Cal. Ct. App. 2004)).

28        [18] Under the Copyright Act, a copyright owner must commence a legal action within three
     years from when the infringing action takes place or when the infringement was discovered or

1    A related point is the damages limitation on the CFAA claim.  OUSA and OIC failed to

2    comply with the applicable statute of limitations and thus are not entitled to pursue a claim for

3    violation of the CFAA prior to March 22, 2005.  Under 18 U.S.C. § 1030(g), a claim for

4    violations of the CFAA must be brought within two years of the date of the act complained of or

5    the date of Plaintiffs' damage.  Because, as explained on summary judgment, these Plaintiffs

6    cannot establish that such damage ever occurred, OUSA and OIC's recovery, should they prove

7    their CFAA claims, must be limited to violations occurring after March 22, 2005, two years prior

8    to the filing of the original complaint on March 22, 2007.  *See* D.I. 1.

9               **C.      SAP Is Not Directly or Indirectly Liable for TomorrowNow's Conduct**

10   This case is about TomorrowNow's service activities for its customers.  While to focus

11   this case for an efficient resolution SAP has offered to accept financial responsibility for its

12   subsidiary's liability, SAP itself did not do the downloading and copying alleged in Oracle's

13   complaints.  Thus, if it is liable, SAP is only secondarily liable.  But, as explained on summary

14   judgment, for those few claims that may in some circumstances recognize secondary liability

15   (copyright, CFAA, CDAFA), the facts here prevent that finding against SAP.  *See* D.I. 670.

16              **D.      Defenses to Specific Causes of Action**

17   Because it is not clear whether Plaintiffs accuse SAP directly (much less how they could),

18   Defendants briefly address substantive defenses to particular claims, notwithstanding their

19   election to limit their attack on TomorrowNow's alleged liability.

20

21   _____

22   (continued…)

23   reasonably should have been discovered.  *See* 17 U.S.C. § 507(b); *Polar Bear*, 384 F.3d at 706;
     *Goldberg v. Cameron*, 482 F. Supp. 2d 1136, 1148 (N.D. Cal. 2007).  A claim for violation of the
     CDAFA must be brought within three years of the claim's accrual.  *See* Cal. Penal Code
24   § 502(e)(5).  A claim for breach of contract must brought within four years of accrual.  *See* Cal.
     Civ. Proc. Code § 337 (2010).  Claims for intentional and negligent interference with prospective
25   economic advantage must be brought within two years of accrual.  *See* Cal. Civ. Proc. Code § 339
     (2010).  A claim for unfair competition must be brought within four years of accrual.  *See* Cal.
26   Bus. & Prof. Code § 17208 (2010).  A claim for trespass to chattels must be brought within three
     years of accrual.  *See* Cal. Civ. Proc. Code § 338 (2007).  "[U]njust enrichment causes of action
27   are governed by the relevant statute of limitations applicable to the central contentions"
     underlying the claim.  *Alberghetti v. Corbis Corp.*, No. CV 09-5735 SVW (CWX), 2010 WL
28   2016853, at *11 (C.D. Cal. Apr. 29, 2010).

1

### 1.     Copyright Infringement

2          A valid copyright license is an affirmative defense to infringement.  *See Rano v. Sipa*

3   *Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993); *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d

4   Cir. 1995).  Once a defendant identifies a relevant license, the copyright owner must prove that

5   the copying was unauthorized.  *See Bourne*, 68 F.3d at 631; *RealNetworks, Inc. v. DVD Copy*

6   *Control Ass'n*, 641 F. Supp. 2d 913, 945 (N.D. Cal. 2009).  Failure to show that a defendant's

7   conduct exceeded the license grant will result in a finding of non-infringement.  *See Netbula, LLC*

8   *v. Bindview Dev. Corp.*, 516 F. Supp. 2d 1137, 1151-53 (N.D. Cal. 2007); *NLFC, Inc. v. Devcom*

9   *Mid-America, Inc.*, No. 93 C-0609, 1993 U.S. Dist. LEXIS 16459, at *23-25 (N.D. Ill. Nov. 16,

10  1993).  It is undisputed that TN's access to and use of its customers' Oracle software and support

11  materials is governed by those customers' license agreements with Oracle, each of which is

12  unique.  *See* D.I. 670 (Defs.' Opp. To Pls.' Mot. Summ. Judg.) at 10-11.  Thus, it will be

13  Plaintiffs' burden at trial to prove that all of TomorrowNow's accused conduct exceeded the

14  scope of each of the various customer agreements governing each instance of accused conduct.

15  The evidence, including the testimony of the witness Plaintiffs identified as most knowledgeable

16  about the terms of Plaintiffs' customer agreements, will not support that burden.

17

### 2.     Computer Fraud and Abuse Act/CDAFA

18         All Plaintiffs' CFAA and CDAFA claims require proof that Defendants acted "without

19  authorization" or "permission."  *See, e.g.*, 18 U.S.C. §§ 1030(a)(5)(A)(i)-(iii) (2007) (CFAA); Cal.

20  Penal Code § 502(c)(2, 3, 6, 7) (2010).  Because TomorrowNow's customers gave permission to

21  TomorrowNow, consistent with the underlying licenses, as discussed on summary judgment,

22  Plaintiffs can not meet the "without authorization" or "without permission" requirement.

23  Similarly, and shown on summary judgment, Plaintiffs cannot prove the elements of "damage" or

24  "intentionally causes damage" to a computer.

25

### 3.     Breach of Contract

26         The elements of a claim for breach of contract are well known.  The key element here is

27  that there must be a contract between Plaintiff(s) and Defendant(s); without that, there is no claim.

28  *See RD Legal Funding, LLC v. Erwin & Balingit, LLP*, No. 08cv597-L(RBB), 2009 WL 2579230,

at *2 (S.D. Cal. Aug. 19, 2009).  OUSA has alleged breach of many so-called "contracts," but no

Defendant is a party to any of them, nor is OUSA even a party to some.  There cannot be a claim

for breach based on these non-agreements.

### 4.      Intentional/Negligent Interference

To prove a claim for intentional interference, OUSA, OIC and OEMEA must demonstrate

that (1) they had an economic relationship with a third party that carried a probability of future

economic benefit to these Plaintiffs, (2) Defendants had knowledge of the relationship, (3)

Defendants engaged in intentional acts designed to disrupt the relationship, (4) Defendants

engaged in independent wrongful conduct apart from the interference itself, (5) actual disruption

of the relationship occurred, and (6) OUSA, OIC, and OEMEA suffered economic harm

proximately caused by Defendants' acts.  *See Reudy v. Clear Channel Outdoors, Inc.*, 693 F.

Supp. 2d 1091, 1122 (N.D. Cal. 2010).

The damages analysis above makes clear both that the relationships at issue did not have

the requisite probability of future benefit and that TommorowNow did not cause the disruption.

Moreover, any interference was not intentional as TomorrowNow's contracts expressly required

TomorrowNow's customers to assure that their licenses with Plaintiffs permitted them to contract

for TomorrowNow's services.  Customers chose to sign up with TomorrowNow and told

TomorrowNow they had the right to do so; TomorrowNow did not interfere with any pre-existing

relationship, intentionally or otherwise.

The negligent interference claim fails for the same reasons.  In addition, Plaintiffs cannot

meet their burden of proving the existence of a special relationship between Defendants and

themselves, direct competitors—an additional and required element of a claim for negligent

interference.  *Id.*; *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1004

(9th Cir. 2008); *Avago Techs. U.S., Inc. v. Venture Corp. Ltd.*, No. C 08-03248 JW, 2008 WL

5383367, at *6 (N.D. Cal. Dec. 22, 2008).

### 5.      Unfair Competition

Plaintiffs OUSA, OIC, OEMEA, and SSI have alleged unfair competition.  An "unfair"

business practice occurs when a business practice "offend[s] an established public policy" or

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

1    when the practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to

2    consumers."  *See Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 WL

3    13058, at *9 (N.D. Cal. Jan. 3, 2006) (citation omitted).  TomorrowNow's customer services

4    activities were competitive (and inappropriate, in many instances), but they were not the sort of

5    "immoral" consumer-focused conduct at which Section 17200 is directed.

### 6.    Trespass to Chattels

7        Plaintiff OUSA has alleged a trespass to chattels claim against Defendants.  Under

8    California law, where a plaintiff asserts trespass to chattels based on a defendant's access to

9    computers, the plaintiff must establish that the defendant's conduct either "*damages* the recipient

10   computer system []or *impairs its functioning*."  *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1347

11   (2003) (emphasis added).  Mere unauthorized use of bandwidth or computer resources is not

12   sufficient to show the required "harm" to computers.  *Id.* at 1357 n.5; *see also Ticketmaster Corp.*

13   *v. Tickets.com, Inc.*, No. CV99-7654-HLH (VBKx), 2003 U.S. Dist. LEXIS 6483, at *12 (C.D.

14   Cal. Mar. 7, 2003).  OUSA cannot show the required harm, as explained on summary judgment,

15   nor can it show that any defendant acted without consent given Plaintiff's predecessors'

16   knowledge of TomorrowNow's accused actions, and the permission customers gave

17   TomorrowNow to download and perform support activities on their behalf.

### 7.    Unjust Enrichment/Restitution

19       Plaintiffs OUSA, OIC, OEMEA, and SSI have asserted a claim for unjust

20   enrichment/restitution.  To prove unjust enrichment, as well as a right to restitution, these

21   Plaintiffs must demonstrate that (1) Plaintiffs conferred a benefit on Defendants and (2) allowing

22   Defendants to retain the benefit at the expense of Plaintiffs is unjust.  *See S.F. Bay Area Rapid*

23   *Transit Dist. v. Spencer*, 358 F. App'x 793, 795 (9th Cir. 2009).  Plaintiffs gave nothing to any

24   Defendant, except copies (which copies would be covered by the Copyright Act).  This claim is

25   preempted, in addition to having no basis in fact.

### 8.    An Accounting

27       Plaintiffs OUSA, OIC, OEMEA, and SSI seek an accounting.  Plaintiffs must demonstrate

28   that (1) a balance is due to them and (2) there is no other adequate remedy at law.  *See Parrish v.*

SVI-83531v1

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)

1   *Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1100 (N.D. Cal. 2007).  Extensive

2   discovery on damages, and the significant damage award Plaintiffs seek, moot this claim.

3   **VI.**      **PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES**

4        As pled in their Fourth Amended Complaint (the fifth complaint filed in this case), OUSA

5   and OIC seek punitive damages on their CDAFA claim.  OUSA, OIC, and OEMEA also seek

6   punitive damages on their claim for intentional interference with prospective economic advantage.

7        Punitive damages may only be awarded where a defendant's behavior was malicious,

8   oppressive, or fraudulent.  *Sully-Jones Contractors, Inc. v. Am. Safety Indem. Co.*, No. 08-CV-

9   1976 BEN (AJB), 2010 WL 1839114, at *5 (S.D. Cal. May 6, 2010).  "[Punitive] damages are

10  never awarded as a matter of right; they are not favored by the law and they should be granted

11  with the greatest of caution; they will be allowed only in the clearest of cases."  *Henderson v.*

12  *Security Nat'l Bank*, 140 Cal. Rptr. 388, 392 (Cal. Ct. App. 1977) (citations omitted).

13  **VII.**     **CONCLUSION**

14       The point of a trial is to actually resolve disputes, not simply to serve as a stage to take

15  shots at a rival for satisfaction or perceived advantage in the marketplace.  SAP proposes to take a

16  significant step to focus this trial on what matters most, compensation for any injuries

17  TomorrowNow actually caused.  The result of that step should not only be a shorter, more

18  efficient trial, but a final and fair resolution of this dispute.

19  Dated:  August 5, 2010                         Respectfully submitted,

20                                                 Jones Day

21

22                                                 By:  /s/ Tharan Gregory Lanier
                                                        Tharan Gregory Lanier
23

24                                                 Attorneys for Defendants
                                                   SAP AG, SAP AMERICA, INC., and
25                                                 TOMORROWNOW, INC.

26

27

28

SVI-83531v1

DEFENDANTS' TRIAL BRIEF
Case No. 07-CV-01658 PJH (EDL)