# EXHIBIT 3

## I.   Introduction

### A.   Background and Experience

1.   I am the President of TM Financial Forensics LLC ("TMF") and the leader of the intellectual property practice.   TMF is a business, economic, financial and damages consulting company that provides services to government agencies, corporations and counsel.

2.   I am a Certified Public Accountant (CPA), Certified Fraud Examiner (CFE), Certified in Financial Forensics (CFF) and accredited in business valuation (CPA-ABV).   I am a Consulting Professor at Stanford University in the Graduate School of Engineering, where I have been teaching a course covering accounting, quantitative methods and financial issues for over fifteen years.   I am also a member of the Advisory Board for the McIntire School of Commerce at the University of Virginia.   I graduated from the University of Virginia in 1979.   I lecture on intellectual property valuation, including at the Sedona Patent Conference, the USC Intellectual Property Institute, the Licensing Executive Society and Law Seminars International.

3.   Prior to founding TMF, I was a Managing Director at Navigant Consulting, Inc. ("NCI") and a co-leader of NCI's national intellectual property practice. NCI is an international consulting company.   Before joining NCI in February 2004, I was co-founder and President of Tucker Alan Inc.   Tucker Alan Inc. was a business, economic, financial and damages consulting company with approximately 350 employees and 13 offices in the United States.   Prior to founding Tucker Alan Inc. in July 1994, I was employed by Peterson Consulting, an international consulting firm.   At Peterson Consulting, I held various positions including Executive Vice President and Member of the

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

Board of Directors.  Before joining Peterson Consulting in 1981, I worked for an international public accounting and consulting firm.

4.  I have over twenty-five years of experience consulting on financial, accounting, economic and damages matters.  I am experienced in financial, economic, damage, and accounting matters related to the scope of my work, analysis and study on this matter.  I have consulted on numerous intellectual property infringement, misappropriation, valuation and licensing-related matters.  I have analyzed hundreds of claims for lost profits and other financial and economic impacts, and have analyzed and determined reasonable royalty rates.  I have consulted on matters involving software including operating systems, natural language search software, ETL software, Unicenter software, mainframe application development tools, business analytics software, CAD verification software, sales management application software, hard drive partitioning software and server synchronization software, among others.  I have consulted on numerous matters related to claims of copyright infringement including software, audio streaming, training materials, hardware service manuals, online business methods, website designations and architectural plans, as examples.  I have testified in over two hundred depositions and approximately seventy trials and major arbitrations, including over thirty jury trials.

REDACTED -- NOT RELEVANT TO OPPOSITION

Subject to Protective Order
Highly Confidential Information – Attorneys' Eyes Only

REDACTED -- NOT RELEVANT TO OPPOSITION

110.    Just before SAP announced it was acquiring TomorrowNow to target the

PeopleSoft support customer base, Oracle had agreed to pay $11.1 billion for

PeopleSoft, including its significant annual support revenue stream.[283]  The

value that Oracle paid for PeopleSoft in an arm's length market transaction,

virtually identical in time to SAP's acquisition of TomorrowNow, is

particularly relevant to understanding the fair market value of SAP's value of

_____

REDACTED -- NOT RELEVANT TO OPPOSITION

[283] Oracle Annual Report for the fiscal year ended May 31, 2005, pgs. 72-74; "Oracle Corporation: Estimation of the Fair Value of Certain Assets and Liabilities of PeopleSoft, Inc. as of December 28, 2004," ORCL00313160-253, at 171 and 204.

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

use of the infringed materials in the assessment of damages in this matter. Of particular relevance is the value to Oracle of the acquired PeopleSoft on-going support customer revenue and enhanced customer relationships, which were expected to lead to additional license sales of PeopleSoft and/or other Oracle software. Without the copyrighted materials in suit, no support competitor could offer the same breadth and depth of support services as Oracle could as the copyright owner. In the alternative, massive investments in research and development to attempt to independently create the copyrighted materials in suit would be required. I understand that the PeopleSoft/J.D. Edwards copyrighted materials in suit would have been very costly to independently develop.[284]

111.    As explained further below, I have taken these issues into consideration in my determination of the fair market value of the copyrighted materials in suit using the market, income and cost valuation approaches, as well as in my analysis of financial, economic and other factors relevant to the determination of the outcome of a hypothetical negotiation between Oracle and SAP for SAP's use of the copyrighted materials in suit.

REDACTED -- NOT RELEVANT TO OPPOSITION

Subject to Protective Order
Highly Confidential Information – Attorneys' Eyes Only

REDACTED – NOT RELEVANT TO OPPOSITION

a.   **Oracle Application Software and Support Research And Development Cost**

144.      As discussed above, Oracle acquired the rights to developed PeopleSoft technology and its installed customer base for $11.1 billion in 2005.  Since 2005, Oracle has continued to incur development expenses related to PeopleSoft products, including development efforts primarily for support or "sustaining" the existing products, as well as other development efforts primarily related to updates or new product versions.  The identifiable research and development

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

efforts for applications and the specific products covered by the copyrights in suit are addressed in the remainder of this section of the Report.

145.    For Oracle's fiscal years 2005 through 2009 (June 1, 2005 through May 31, 2009), Oracle recorded total company research and development expense of over $11 billion for applications, middleware and database software and support materials.[338]   For comparison purposes, for the calendar years 2005 through 2008, SAP recorded research and development expenses of $7.4 billion.[339]

146.    Oracle recorded research and development expenses broken down by general product categories: application, database, middleware.   Oracle recorded expenses of $1.3 billion for application software development for PeopleSoft, J.D. Edwards and Siebel applications for the period December 2004 through August 2008.[340]

147.    For the period December 2004 through August 2008, (3.75 years), Oracle personnel prepared reports identifying direct research and development expenses by product line, with allocations of associated overhead.   These reports provide development expenses for the PeopleSoft products including Enterprise, World, and EnterpriseOne.   Over this period, Oracle spent $1.1 billion on PeopleSoft product applications development.[341]   On average, Oracle spent approximately $290 million a year developing PeopleSoft software application and software and support materials.[342]

---

[338] See SCHEDULE 1.

[339] See SCHEDULE 5.

[340] See SCHEDULE 10.

[341] See SCHEDULE 10.

[342] $1,087.7 million/3.75 years = $290.1 million per year.

Subject to Protective Order
Highly Confidential Information – Attorneys' Eyes Only

148.    Although Oracle's financial systems historically have not tracked research and development employee time by task, Oracle employees have analyzed the percentage of resources Oracle devotes to maintenance-related, as opposed to new product-related, research and development.[343]    I understand that based on these analyses, Oracle has estimated that 60-65% of its research and development expense of its applications products related to support-related development efforts.[344] Therefore, for the period of December 2004 through September 2008, support-related research and development expense for PeopleSoft and J.D. Edwards products was approximately $660 million to $715 million.[345]    However, given that TomorrowNow copied Oracle's PeopleSoft and J.D. Edwards support materials, as well as underlying applications, such apportioning of research and development expense between new product and support-related efforts is not necessary.

### b.  SAP Research And Development Costs

149.    SAP produced reports containing amounts identified as "SAP Cost of Support Development."   This account is described as "collect the costs provided for maintenance (code corrections) of existing software after Release to customer."[346] This account appears most directly correlated to the costs to provide sustaining development for application software.   Although not identifiable to a particular software application or product family, I have totaled expenses included in this account for the period 2005 through 2008.

---

[343] Discussion with Houman Behazadi (Oracle Director of Business Planning and Operations).

[344] *See, e.g.,* Oracle Presentation: "Applications Strategy – November 2007,"ORCL 00560527-566, at 533.  Fusion research and development expenses are excluded from this analysis [Discussion with Houman Behazadi (Oracle Director of Business Planning and Operations)].

[345] $1.1 billion * 60% = $660 million; $1.1 billion * 65% = $715 million.

[346] SAP Presentation: "Research, Development, Maintenance Costs and Headcount," SAP-OR00842955-980, at 959-961.

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

During this period, SAP spent over $1.3 billion on support development for its own software applications, indicating that SAP would be well aware of the significant cost associated with providing support to an existing installed base of software licensees at the time of its negotiation with Oracle.[347]

REDACTED -- NOT RELEVANT TO OPPOSITION

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

REDACTED -- NOT RELEVANT TO OPPOSITION

206.     Post-acquisition events demonstrate those competitive pressures.  Even
before the timing of the hypothetical negotiation, TomorrowNow had been
offering purportedly better service than Oracle for half the price, or less.[434]
Post-acquisition, SAP's website promised that "SAP and TomorrowNow can
cut your maintenance costs by as much as 50% through 2015."[435]  Furthermore,
in 2006, SAP ran a "Zero Dollar" marketing campaign where the customer
could get its PeopleSoft, J.D. Edwards, and Siebel support at no cost while the
customer migrated to SAP to "ensure we move these customer[s] off Oracle
completely."[436]

REDACTED -- NOT RELEVANT TO OPPOSITION

---

[436] Oracle USA Inc. et al v SAP AG et al, Fourth Amended Complaint In Case No. 07-CV-01658 dated August 18,
2009, pgs. 12.  The post-acquisition evidence, while relevant, is not necessary to determining value of use based on a
hypothetical negotiation approach.  I include it as an additional basis for my conclusions, and to reserve the position
to reference it should Defendants claim my valuation is "excessive" [Judge Hamilton's November 2, 2009 Order:
"Nevertheless, should Defendants take the position at trial that Oracle's damages are excessive, Oracle will be
permitted to advise the jury that it is not seeking all the damages to which it is entitled, or that the court has
precluded all the damages to which it believes it is entitled, or something similar."].

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

REDACTED -- NOT RELEVANT TO OPPOSITION

### D.   Value of Use Under the Hypothetical Negotiation – Summary

231.     The hypothetical negotiators would have considered the financial,
economic and other valuation inputs that I have identified and analyzed, and
then determined a reasonable royalty (i.e. license fee) by engaging in a "back
and forth" negotiation.[490]  Below, I summarize the hypothetical negotiation
and refer to the various financial metrics in the market, income and cost
approach section which would be relevant to determining the license fee in the
hypothetical negotiation.

### 1.   Summary of Factors Considered by Oracle and SAP

232.     As discussed above, in determining the license fee that it would be
willing to accept from SAP for SAP's use of the PeopleSoft/J.D. Edwards
copyrighted materials in suit, Oracle would consider at least the following
factors:

---

[490] I understand that the hypothetical negotiation would be conducted by a willing licensor (Oracle) and a willing
licensee (SAP) acting in a rational manner in or around January, 2005.

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

- The broad scope of the license, which would enable SAP to compete against Oracle in providing support services to its PeopleSoft/J.D. Edwards customers, and provide SAP with enhanced ability to convert those customers to SAP applications;

- Expected lost support revenue to SAP on customers that would go to TomorrowNow for support services, as well as lost up-sell and cross-sell revenues from those customers;

- The anticipated permanent impact on Oracle due to the lost future license revenue and ongoing support renewals for customers that would switch to SAP applications;

- Immediately prior to the contemplated hypothetical negotiation, Oracle paid approximately $11.1 billion to acquire PeopleSoft, including rights to the PeopleSoft/J.D. Edwards customer support contracts and related relationships and associated goodwill;

- Oracle's investment of over $1 billion in further research and development for its PeopleSoft and J.D. Edwards products since the acquisition, which Oracle would reasonably understand that it would have to spend, and that SAP would avoid spending by virtue of the license;

- The nature of the relationship between Oracle and SAP, as direct competitors in the software applications business, particularly in light of Oracle's goals for the PeopleSoft acquisition to enhance its competitive position with SAP in the applications market;

Page 144 of 281

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

- Anticipated changes to Oracle's business practices in order to compete with SAP to provide support services to Oracle customers; and,

- Anticipated negative impacts to the level of profitability and customer renewal rates of the Oracle support products that embody the copyrighted materials at issue, and the resulting impact on Oracle's ability to use that support revenue stream to fund ongoing research and development.

233.     Similarly, in determining the amount of a license fee that SAP would be willing to pay to Oracle for its use of the PeopleSoft/J.D. Edwards copyrighted materials in suit, SAP would consider at least the following factors:

- The license would allow SAP to use its TomorrowNow service offering to drive the conversion of Oracle's applications customers to SAP's platform;

- SAP's willingness to pay significant amounts to acquire intellectual property and customer relationships, as evidenced in particular by its 2007 acquisition of Business Objects for $7.1 billion;

- SAP's knowledge that access to Oracle's copyrighted materials is necessary for the level of support that it sought to provide and advertised to Oracle's PeopleSoft/J.D. Edwards customers;

- TomorrowNow's entire business model relied upon its access and use of Oracle's PeopleSoft/J.D. Edwards copyrighted materials in suit;

Subject to Protective Order
Highly Confidential Information – Attorneys' Eyes Only

- The nature of the competitive relationship between Oracle and SAP in the software applications business, and in particular the increased competitive threat that Oracle posed to SAP as a result of its acquisition of PeopleSoft;

- The significant development time, effort and risk that SAP would avoid by entering into the contemplated hypothetical license;

- The importance of timing and speed of SAP's offering of PeopleSoft/J.D. Edwards support services (to coincide with Oracle's acquisition of PeopleSoft and take advantage of customers' fear, uncertainty and doubt);

- The goals of SAP's Safe Passage program, of which the TomorrowNow service offering was an integral part, to convert the majority of the PeopleSoft/J.D. Edwards customer base to SAP; and,

- SAP's expected benefits from offering TomorrowNow support service, selling additional SAP products to those customers, and ultimately converting a portion of those customers to SAP.

REDACTED -- NOT RELEVANT TO OPPOSITION

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

REDACTED -- NOT RELEVANT TO OPPOSITION

   **b. Quantification of Oracle Lost Support Revenue by Plaintiff Entity**

396.    As explained above, I have calculated Oracle's lost profits damages on lost support revenue under two different scenarios: (1) lost profits of the Oracle organization as a whole; and, (2) lost profits specific to the Oracle plaintiff entities in this case.

REDACTED -- NOT RELEVANT TO OPPOSITION

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

397.    Under the first approach, Oracle's lost profits damages are calculated based on its total lost support revenue on all relevant cancelled contracts related to the support customers that were lost to TomorrowNow. Oracle's total lost support revenue under this approach is shown on SCHEDULES 34.SU and 34.1.SU.

398.    Under the second approach, I have calculated Oracle's lost support revenue specific to plaintiff entities in this case – Oracle USA (OUSA), Oracle International Corporation (OIC) and Oracle EMEA Limited (OEMEA).[743] For the purposes of calculating Oracle's lost support revenue by plaintiff entity, for each of the Lost Customers I have identified the Oracle entity that would have made that lost sale based on Oracle's customer-specific electronic data (i.e., Oracle OKI3 reports), customer contracts, and/or contract-related documents produced by Oracle.

REDACTED -- NOT RELEVANT TO OPPOSITION

Subject to Protective Order
Highly Confidential Information – Attorneys' Eyes Only

| Table 16:  Summary of Oracle's Lost Profits | | |
|---|---|---|
| | During TomorrowNow Service Period | Through May 2015 |
| **Scenario 1:  Total Losses to Oracle** | | |
| Based on Total Lost Support Revenue | $99.6 million | $349.0 million |
| Excluding Sales of EnterpriseOne and Siebel in Europe | $92.7 million | $318.2 million |
| | | |
| **Scenario 2:  Losses by Plaintiff Entity** | | |
| Oracle USA | | |
| Gross of Fees Paid to OIC | $83.4 million | $276.9 million |
| Net of Fees Paid to OIC | $47.2 million | $156.9 million |
| Oracle International Corporation | | |
| Revenue Ultimately Received by OIC | $37.0 million | $121.1 million |
| Including OTC and ORC Revenue | $42.2 million | $153.8 million |
| Oracle EMEA | | |
| Gross of Fees Paid to OTC | $9.0 million | $41.0 million |
| Net of Fees Paid to OTC | $4.3 million | $14.1 million |

REDACTED -- NOT RELEVANT TO OPPOSITION

*Subject to Protective Order*
*Highly Confidential Information – Attorneys' Eyes Only*

ORACLE USA, INC., ET AL

V.

SAP AG, ET AL

CASE NO. 07-CV-01658

## SUPPLEMENTAL EXPERT REPORT OF PAUL K. MEYER

TM FINANCIAL FORENSICS, LLC.
FEBRUARY 23, 2010

PAUL K. MEYER