1   BINGHAM MCCUTCHEN LLP
    DONN P. PICKETT (SBN 72257)
2   GEOFFREY M. HOWARD (SBN 157468)
    HOLLY A. HOUSE (SBN 136045)
3   ZACHARY J. ALINDER (SBN 209009)
    BREE HANN (SBN 215695)
4   Three Embarcadero Center
    San Francisco, CA  94111-4067
5   Telephone:  415.393.2000
    Facsimile:  415.393.2286
6   donn.pickett@bingham.com
    geoff.howard@bingham.com
7   holly.house@bingham.com
    zachary.alinder@bingham.com
8   bree.hann@bingham.com

9   BOIES, SCHILLER & FLEXNER LLP
    DAVID BOIES (Admitted *Pro Hac Vice*)
10  333 Main Street
    Armonk, NY 10504
11  Telephone:     (914) 749-8200
    Facsimile:     (914) 749-8300
12  dboies@bsfllp.com
    STEVEN C. HOLTZMAN (SBN 144177)
13  FRED NORTON (SBN 224725)
    1999 Harrison St., Suite 900
14  Oakland, CA 94612
    Telephone:     (510) 874-1000
15  Facsimile:     (510) 874-1460
    sholtzman@bsfllp.com
16  fnorton@bsfllp.com

17  DORIAN DALEY (SBN 129049)
    JENNIFER GLOSS (SBN 154227)
18  500 Oracle Parkway, M/S 5op7
    Redwood City, CA 94070
19  Telephone:  650.506.4846
    Facsimile:  650.506.7144
20  dorian.daley@oracle.com
    jennifer.gloss@oracle.com

21  Attorneys for Plaintiffs Oracle USA, Inc., *et al.*

22              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
23                   OAKLAND DIVISION

24  ORACLE USA, INC., *et al.*,              No. 07-CV-01658 PJH (EDL)

25              Plaintiffs,                  **ORACLE'S OPPOSITION TO SAP'S
                                             MOTION FOR JMOL OR NEW TRIAL**
        v.
                                             Date:  July 13, 2011
26  SAP AG, *et al.*,                        Time:  9:00 a.m.
                                             Place:  3rd Floor, Courtroom 3
27              Defendants.                  Hon. Phyllis J. Hamilton

28

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  THE EVIDENCE AT TRIAL ............................................................................. 3

A.  Oracle And SAP Invest Billions In Their IP In Reliance On The Right To Control And Protect It ............................................................................... 3

B.  Oracle's $11B PeopleSoft Acquisition Was A Game-Changer ............................ 4

C.  SAP Strikes Back With A Multi-Pronged Strategy Centered On TN .................. 5

1.  TN's Maintenance Was the "Major Cornerstone" of SAP's Plan ............ 5

2.  TN's Use of Oracle's Copyrighted Software Was Extremely Valuable as a Means to Convert Customers to SAP Applications ............ 6

3.  SAP's Executive Board Gave "Extensive Guidance" on SAP's Plans to Use TN To Generate Billions in Revenue and Disruption .......... 7

4.  TN's Use of Oracle's IP Was Also Extremely Valuable as "A Strategic Weapon Against Oracle" ........................................................... 8

D.  SAP's Deliberate Acceptance Of The Serious Liability And Reputational Risks Shows The Value Of TN To SAP ............................................................... 8

E.  SAP Expanded The Scope Of The Infringement By Directing TN To Offer Support For Siebel Customers .............................................................................. 9

F.  SAP's Contemporaneous Documents Continued To Show That TN's Use Of Oracle's Intellectual Property Was Worth Billions of Dollars ...................... 10

G.  SAP's Infringement Was Vast ............................................................................. 10

H.  The Hypothetical License Evidence ................................................................... 11

III. ARGUMENT ..................................................................................................... 11

A.  Oracle's Hypothetical License Damages Are Supported By The Law And The Evidence ....................................................................................................... 12

1.  Oracle Was Entitled to Recover a Reasonable Royalty as a Matter of Settled Law .................................................................................. 12

a.  The Ninth Circuit accepts hypothetical license damages ............ 12

b.  The Court has already rejected SAP's contention that Oracle is ineligible for hypothetical license damages ................. 14

2.  The Evidence, Much of It from SAP Itself, Supports this Award or Even a Greater One ............................................................................ 18

a.  Oracle's evidence related to and proved the fair market value of the hypothetical license .................................................. 19

(1)  The PeopleSoft/JDE/Siebel licenses ................................. 20

(a)  Oracle's negotiation perspective .......................... 20

(b)  SAP's negotiation perspective ............................. 21

(c)  Meyer's expert analysis ........................................ 23

(2)  The Oracle Database license ............................................. 26

i

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1

<u>TABLE OF CONTENTS</u>
(continued)

2                                                                              <u>Page</u>

3          b.    SAP's efforts to re-argue the evidence fail ................................. 27

4                (1)   Oracle's executives' testimony was proper, and
                       persuasive, evidence......................................... 28

5                (2)   Oracle explicitly limited its valuation model to the
                       specific use at issue ......................................... 29

6
                 (3)   Contemporaneous business projections show the
7                      value the parties placed on the infringed works.............. 31

                 (4)   Evidence of SAP's justifications and motivations
8                      for infringement supports the jury's award.................... 32

9                      (a)   SAP's need and the parties' competitive
                             relationship were relevant .................................. 33

10                     (b)   SAP's risk acceptance was probative of the
                             fair market value of the IP................................... 33

11               (5)   The range in Meyer's estimates does not suggest
12                     they are speculative ........................................ 35

          c.    The hypothetical database license valuation was supported
13               by substantial and undisputed evidence ..................................... 37

14    B.   The Court Should Deny SAP's Motion For New Trial Or Remittitur ................ 39

15    1.   Significant and Non-Speculative Evidence Supported the
           Hypothetical License Award.................................................. 39

16         a.    The award is based on SAP's actual use ..................................... 40

17         b.    Oracle's closing argument was appropriate ................................. 41

           c.    Meyer's analysis was properly grounded in Georgia-Pacific ...... 41

18         d.    Oracle properly provided contextual evidence ........................... 44

19    2.   The Jury's Award Does Not Exceed Actual Harm ................................. 45

20    3.   The Liability Evidence Oracle Presented Was Highly Relevant and
           Caused No Undue Prejudice .................................................. 46

21         a.    SAP agreed TN's direct liability evidence was relevant.............. 46

22         b.    SAP suffered no prejudice ......................................... 47

      4.   SAP's Remittitur Argument Fails ............................................ 48

23    IV.  CONCLUSION ............................................................... 50

24

25

26

27

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1

## TABLE OF AUTHORITIES

2

Page

3

CASES

4

*Anglo-American Gen. Agents v. Jackson Nat'l Life Ins. Co.*,
5
    83 F.R.D. 41 (N.D. Cal. 1979) ...................................................................................... 39

6

*Apple Computer, Inc. v. Microsoft Corp.*,
    35 F.3d 1435 (9th Cir. 1994)....................................................................................... 29

7

*Avocent Huntsville Corp. v. ClearCube Tech. Inc.*,
8
    2006 WL 2109503 (N.D. Ala.) .................................................................................. 41

9

*Barrera v. Brooklyn Music, Ltd.*,
10
    346 F. Supp. 2d 400 (S.D.N.Y. 2004).......................................................................... 34

11

*Bi-Rite v. Button Master*,
    578 F. Supp. 59 (S.D.N.Y. 1983) ............................................................................... 17

12

*Bird v. Glacier Elec. Coop., Inc.*,
13
    255 F.3d 1136 (9th Cir. 2001)............................................................................... 36, 41

14

*Brady v. Gebbie*,
    859 F.2d 1543 (9th Cir. 1988)..................................................................................... 48

15

*Bruce v. Weekly World News, Inc.*,
16
    310 F.3d 25 (1st Cir. 2002) ......................................................................................... 38

17

*Buritica v. United States*,
18
    8 F. Supp. 2d 1188 (N.D. Cal. 1998) .......................................................................... 48

19

*Business Trends Analysts, Inc. v. Freedonia Gp., Inc.*,
    887 F.2d 399 (2d Cir. 1989)........................................................................................ 16

20

*Childress v. Taylor*,
21
    798 F. Supp. 981 (S.D.N.Y. 1992) .............................................................................. 32

22

*Country Road Music, Inc. v. MP3.com, Inc.*,
23
    279 F. Supp. 2d 325 (S.D.N.Y. 2003)......................................................................... 30

24

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.*,
    754 F.2d 826 (9th Cir. 1985)........................................................................... 12, 17, 29

25

*DaimlerChrysler Servs. v. Summit Nat'l*,
26
    2006 WL 208787 (E.D. Mich.) ................................................................................... 33

27

*Deere & Co. v. Int'l Harvester Co.*,
28
    710 F.2d 1551 (Fed. Cir. 1983).................................................................................... 33

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1

## TABLE OF AUTHORITIES
(continued)

2

Page

3  *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
4      95 F.3d 1422 (9th Cir. 1996)..................................................................48, 49

5  *Drew v. Equifax Info. Servs., LLC*,
       2010 WL 5022466 (N.D. Cal.)....................................................................39

6
7  *eBay, Inc. v. MercExchange, L.L.C*,
       547 U.S. 388 (2006) ...................................................................................13

8  *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*,
9      25 F. Supp. 2d 395 (S.D.N.Y. 1998)............................................................17

10 *F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
       344 U.S. 228 (1952)....................................................................................14

11
   *Farber v. Massillon Bd. of Educ.*,
12     917 F.2d 1391 (6th Cir. 1990).....................................................................49

13 *Faulkner v. Nat'l Geographic Soc'y*,
       576 F. Supp. 2d 609 (S.D.N.Y. 2008).....................................................34, 35
14
   *Fenner v. Dependable Trucking Co., Inc.*,
15     716 F.2d 598 (9th Cir. 1983).......................................................................48

16 *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
17     772 F.2d 505 (9th Cir. 1985).............................................................13, 17, 28

18 *Fresenius Med. Care Holdings, Inc., v. Baxter Int'l, Inc.*,
       2008 WL 928539 (N.D. Cal.).......................................................................35
19
   *Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
20     318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*,
       446 F.2d 295 (2d Cir. 1971)...................................................................passim
21
22 *Getaped.com, Inc. v. Cangemi*,
       188 F. Supp. 2d 398 (S.D.N.Y. 2002) ....................................................15, 28
23
   *Greer v. Miller*,
24     483 U.S. 756 (1987)...............................................................................47, 48

25 *Guy v. City of San Diego*,
       608 F.3d 582 (9th Cir. 2010).......................................................................39
26
   *Gyromat Corp. v. Champion Spark Plug Co.*,
27     735 F.2d 549 (Fed. Cir. 1984).....................................................................34

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1

TABLE OF AUTHORITIES
(continued)

2

Page

3

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983)...................................................................... 19, 45

4

5

*Herrington v. County of Sonoma*,
  834 F.2d 1488 (9th Cir. 1998)........................................................................ 39

6

*Honda Motor Co. v. Oberg*,
  512 U.S. 415 (1994)........................................................................................ 39

7

8

*Huddleston v. U.S.*,
  485 U.S. 681 (1988)........................................................................................ 36

9

10

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
  274 F.3d 1371 (Fed. Cir. 2001)...................................................................... 19, 31

11

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
  2010 U.S. Dist. LEXIS 114306 (S.D. Tex.)................................................... 38

12

13

*Jamison Bus. Sys., Inc. v. Unique Software Support Corp.*,
  2005 U.S. Dist. LEXIS 45480 (E.D.N.Y.)..................................................... 36

14

*Jarvis v. K2 Inc.*,
  486 F.3d 526 (9th Cir. 2007)...........................................................................passim

15

16

*Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*,
  785 F.2d 656 (9th Cir. 1986)........................................................................... 36, 41

17

18

*Kelly v. City of Oakland*,
  198 F.3d 779 (9th Cir. 1999)........................................................................... 44

19

*Koster v. Trans World Airlines, Inc.*,
  181 F.3d 24 (1st Cir. 1999)............................................................................. 49

20

21

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986)......................................................................... 19, 37, 49

22

23

*Landes Constr. Co., Inc. v. Royal Bank of Canada*,
  833 F.2d 1365 (9th Cir. 1987)......................................................................... 18, 39

24

*Leland Med Ctrs., Inc. v. Weiss*,
  2007 WL 2900599 (E.D. Tex.)........................................................................ 31, 32

25

26

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)...................................................................... 42, 43, 44

27

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

TABLE OF AUTHORITIES
(continued)

Page

*Mackie v. Rieser*,
    296 F.3d 909 (9th Cir. 2002) .................................................................... 16, 17

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008) ........................................................................ 13

*McRoberts Software, Inc. v. Media 100, Inc.*,
    329 F.3d 557 (7th Cir. 2003) ............................................................. 13, 15, 35

*Medtronic Sofamor Danek USA Inc. v. Globus Med., Inc.*,
    637 F. Supp. 2d 290 (E.D. Pa. 2009) ............................................................... 15

*Monster Content, LLC v. Homes.com, Inc.*,
    2005 WL 1522159 (N.D. Cal.) ......................................................................... 19

*Nat'l Conf. of Bar Examiners v. Multistate Legal Studies, Inc.*,
    458 F. Supp. 2d 252 (E.D. Pa. 2006) ............................................................... 17

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ......................................................................... 18

*On Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001) ..................................................................... passim

*Ostad v. Or. Health Scis. Univ.*,
    327 F.3d 876 (9th Cir. 2003) .................................................................... 18, 32

*Pentech Int'l, Inc. v. Hayduchok*,
    931 F. Supp. 1167 (S.D.N.Y. 1996) ................................................................ 34

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) .................................................................... passim

*Powell v. Penhollow*,
    260 Fed. Appx 683 (5th Cir. 2007) .................................................................. 30

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
    989 F. Supp. 547 (D. Del. 1997) ............................................................... 21, 41

*Propet USA, Inc. v. Shugart*,
    2007 U.S. Dist. LEXIS 69222 (W.D. Wash.) .................................................. 30

*R.S.E., Inc. v. Pennsy Supply, Inc.*,
    523 F. Supp. 954 (D.C. Pa. 1981) .................................................................... 36

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1

TABLE OF AUTHORITIES
(continued)

2

Page

3      *Reeves v. Sanderson Plumbing Prods., Inc.*,
4          530 U.S. 133 (2000) ....................................................................................... 18

5      *ResQNet.com, Inc. v. Lansa, Inc.*,
           594 F.3d 860 (Fed. Cir. 2010) ......................................................................... 43
6
       *Rosco, Inc. v. Mirror Lite Co.*,
7          626 F. Supp. 2d 319 (E.D.N.Y. 2009) ............................................................. 15

8      *Salinger v. Colting*,
           641 F. Supp. 2d 250 (S.D.N.Y. 2009), *injunction vacated on other grounds*,
9          607 F.3d 68 (2d Cir. 2010) ............................................................................... 16

10     *Sheldon v. Metro-Goldwyn Pictures Corp.*,
11         309 U.S. 390 (1940) ......................................................................................... 29

12     *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
           562 F.2d 1157 (9th Cir. 1977) ................................................................... 12, 15
13
       *Smith Int'l, Inc. v. Hughes Tool Co.*,
14         1986 WL 4795 (C.D. Cal.), *vacated on other grounds by*
15         839 F.2d 663 (Fed. Cir. 1988) ......................................................................... 34

16     *Smith v. Rush*,
           2006 U.S. Dist. LEXIS 27412 (W.D. Wash.) .............................................. 38, 39
17
       *Snellman v. Ricoh Co., Ltd.*,
18         862 F.2d 283 (Fed. Cir. 1988) ......................................................................... 19

19     *Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc.*,
           335 F. Supp. 2d 466 (S.D.N.Y. 2004) ......................................................... 34, 35
20
       *Stewart v. Abend*,
21         495 U.S. 207 (1990) ......................................................................................... 16

22     *Technologies, S.A. v. Cyrano, Inc.*,
23         460 F. Supp. 2d 197 (D. Mass. 2006) .............................................................. 32

24     *Texaco, Inc. v. Pennzoil, Co.*,
           729 S.W.2d 768 (Tex. App. 1987) .................................................................... 49
25
       *Third Wave Techs., Inc. v. Stratagene Corp.*,
26         405 F. Supp. 2d 991 (W.D. Wis. 2005) ........................................................... 42

27     *Thoroughbred Software Int'l, Inc. v. Dice Corp.*,
28         488 F.3d 353 (6th Cir. 2007) ........................................................................... 13

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

TABLE OF AUTHORITIES
(continued)

Page

*TWM Mfg Co. v. Dura Corp.*,
   231 U.S.P.Q. 525 (E.D. Mich. 1985),
   *aff'd*, 789 F.2d 895 (Fed. Cir. 1986) ........................................................ 34, 41

*U.S. v. 329.73 Acres of Land*,
   666 F.2d 281 (5th Cir. 1981) ........................................................................ 49

*U.S. v. Vaccaro*,
   816 F.2d 443 (9th Cir. 1987) .......................................................... 36, 41, 48

*Uniloc USA, Inc. v. Microsoft Corp.*,
   2011 U.S. App. LEXIS 11 (Fed. Cir.) .......................................................... 43

*United Bhd. of Carpenters & Joiners, Lathers Local 42-L v. United Bhd.
   of Carpenters & Joiners*,
   73 F.3d 958 (9th Cir. 1996) ......................................................... 44, 47, 48

*Venegas v. Wagner*,
   831 F.2d 1514 (9th Cir. 1987) ..................................................................... 39

*Wall Data, Inc. v. L.A. County Sheriff's Dept.*,
   447 F.3d 769 (9th Cir. 2006) ........................................................... 16, 30, 40

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ..................................................................................... 18

*Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) ............................................................. 43, 44

*Worldwide Church of God v. Phila. Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) ..................................................................... 16

**RULES**

Fed. R. Evid. 401-403 .......................................................................................... 46

**STATUTES**

17 U.S.C. § 504 ................................................................................................... 16

**OTHER AUTHORITIES**

2 Paul Goldstein, *Goldstein on Copyright* (3d ed. 2005) .......................... 14, 15, 16, 17

N.D. Cal. Model Patent Jury Instrs., Instr. B.5 ................................................... 31

1   **I.      INTRODUCTION**

2           SAP's motions do little more than ask the Court to reverse legal rulings it has made and

3   substitute SAP's interpretation of the evidence for the jury's decision.  The Court's rulings at

4   issue were correct, and the trial was fair.  SAP's own recitation of the applicable legal standards

5   mandates rejection of its motions.  Voluminous contemporaneous evidence and well-

6   substantiated testimony supported the jury's decision that a hypothetical license best measured

7   Oracle's damages, and that such a license was properly valued at $1.3 billion.  The jury's verdict

8   was not speculative, unsupported by the evidence, or unfair in the least.

9           When Oracle acquired PeopleSoft for $11 billion on January 18, 2005, market leader

10  SAP saw an enormous business risk, and a commensurate opportunity.  The very next day, SAP

11  would announce its own acquisition of TomorrowNow ("TN"), a maintenance and support

12  provider for PeopleSoft and J.D. Edwards software.  SAP saw TN as the centerpiece of its

13  strategic plan to take away half (or more) of Oracle's newly acquired customer base, with its

14  associated, long-term support revenue stream, and to capture still more revenue by converting

15  those customers to SAP software applications.  Conceived, vetted, and approved at the highest

16  levels, SAP set out to seize the marketplace momentum, effect a multi-billion dollar revenue

17  transfer from Oracle to SAP, thwart Oracle's strategy to achieve competitive parity, and cripple

18  Oracle's ongoing ability to invest in new and better products.

19          There was only one problem.  TN, the "cornerstone" of SAP's "market changing"

20  Oracle-"attack" strategy, had built, and was running, its business through massive, continual,

21  unlicensed downloads and copies of Oracle's intellectual property.  Oracle would not learn that

22  fact for several years, but SAP knew it right from the start.  An intellectual property-based

23  company itself, SAP recognized the immense litigation and reputational risk from its strategy

24  founded on massive copyright infringement.  The huge projected rewards, however, proved

25  irresistible.  Recognizing that the TN acquisition was the only way to obtain them, the SAP

26  Executive Board voted to erect a purported corporate "liability shield" between SAP and TN,

27  proceeded with its plan, and even expanded it to target Siebel customers when Oracle acquired

28  that company for $6 billion, 18 months later.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    After Oracle finally uncovered SAP's and TN's wrongdoing and after SAP finally

2  admitted to massive copyright infringement, the case went to the jury on damages.  SAP told the

3  jury it would compensate Oracle but contested the amount.  The jury heard extensive evidence –

4  right from the time a hypothetical license negotiation would have occurred – establishing the

5  value of SAP's and TN's infringement from both SAP's and Oracle's perspectives, including:

6      • numerous contemporaneous SAP Executive Board and Board-approved

7         documents reflecting SAP's judgment that it could use TN as the "major

8         cornerstone" of a plan to make billions while disrupting and discrediting Oracle's

9         $11 billion PeopleSoft acquisition;

10     • SAP executives' testimony admitting that they had expected the value of TN to be

11        "astronomical" at the time SAP acquired it, just as their business plans projected;

12     • SAP executives' testimony that they knew, but ignored, that their plan created a

13        serious risk SAP would be liable for infringing Oracle's intellectual property;

14     • Oracle executives' testimony, based on their own contemporaneous documents,

15        that the multi-billion dollar acquisition values for PeopleSoft and Siebel, and the

16        economics of the enterprise application software industry, would have driven

17        their approach to any negotiated license;

18     • the parties' respective expert testimony agreeing on the scope of the license at

19        issue and the application of the seminal *Georgia-Pacific* case to valuing it; and

20     • the testimony of Oracle's damages expert, Paul Meyer, who synthesized the

21        evidence of what the parties would each have brought to a hypothetical license

22        negotiation, and provided his well-reasoned opinion as to its outcome:  Meyer

23        opined Oracle's damages were "at least" $1.65 billion.

24  The jury, instructed in accordance with settled Ninth Circuit law and this Court's prior rulings,

25  considered this and other voluminous evidence.  It rejected first SAP's competing damages

26  theory, then its expert's valuation.  The $1.3 billion verdict fell well below what the extensive,

27  contemporaneous evidence supported, and below the $1.65 billion hypothetical license amount

28  Meyer calculated based on that evidence.  The verdict is not, as SAP argues, "speculative,"

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    "subjective," or unfair in the least.

2         SAP's JMOL repeats legal and factual arguments this Court and the jury, respectively,

3    have properly rejected.  Both before and at trial, the Court held that a hypothetical license

4    measure of actual damages is available in this case – regardless of whether the parties actually

5    would have negotiated a license.  The jury properly applied this measure based on the fair market

6    value evidence presented to it.  SAP's motions disregard the required deference to the jury's

7    verdict by re-casting the key trial evidence – much of it from its own top executives' admissions

8    and business plans, admitted without objection or meaningful response – to better suit its

9    position.  SAP's fallback arguments that the award was excessive or tainted by error similarly

10   ignore the evidence, fail on the merits, and in most instances were waived to begin with.

11   II.      THE EVIDENCE AT TRIAL

12        Having prevailed, Oracle is entitled to the benefit of all disputed evidence and all

13   reasonable inferences from the admitted evidence.  The jury was entitled to, and presumptively

14   did, reject SAP's competing testimony and arguments.  The contemporaneous evidence,

15   summarized as follows, was consistent and overwhelming.

16        A.      Oracle And SAP Invest Billions In Their IP In Reliance On The
                  Right To Control And Protect It
17

18        In January 2005, as today, Oracle and SAP competed fiercely in the enterprise software

19   industry, though SAP was "a much larger company in the applications segment."  Phillips 517:8-

20   14, 521:16-522:4; *cf.* Brandt 686:7-687:8.[1]  Enterprise software is very difficult, laborious, and

21   expensive to develop.  Oracle devotes "massive" resources to that "long and arduous process."

22   Screven 452:6-453:11; Ellison 760:13-22.  As is common in the industry and necessary for

23   innovation to flourish, Oracle funds its R&D through software maintenance fees, which

24   customers pay to obtain annual support that includes technical assistance, fixes, and updates.

25   _____

26   [1] Trial testimony and statements by the Court are cited as "[Speaker] Page:Line," and other trial
     proceedings as "Tr. Page:Line."  The trial transcript excerpts are attached as Exhibit A to the
     accompanying Declaration of Lisa Chin ("CD").  Deposition testimony played to the jury but not
27   re-transcribed is cited as "[Witness] Depo Page:Line."  Trial exhibits are cited as PTX, DTX and
     JTX.  Deposition testimony and exhibits are also attached to the Chin Declaration, as noted.

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    Screven 453:12-23; Ransom 421:1-7.  Those fees enable Oracle's thousands of developers and

2    support employees to enhance and advance its software.  Ransom 428:6-13; Ellison 761:9-25.

3         Intellectual property protection allows a company to recoup its development investments

4    and eliminate free-riding on its efforts.  Both Oracle and SAP rely on those protections to invest

5    the enormous sums required to develop and improve enterprise software.  Larry Ellison, Oracle's

6    CEO, declared, "we'd be pretty close to going out of business" without IP protection.  Ellison

7    760:24-761:8; *see also* Phillips 516:5-12.  Leo Apotheker, SAP's former CEO, testified that

8    "The entire software industry was founded on IP rights."  CD, Ex. TT (PTX 4822 [Apotheker

9    Depo]) 104:7-8.  Werner Brandt, SAP's CFO, stated "SAP's business and Oracle's business

10   depends on [their] intellectual property."  Brandt 680:1-3.  Shai Agassi, a former SAP Executive

11   Board member, testified that "At SAP, we believe that without the ability to protect IP, most

12   companies will no longer invest so much of their current revenues in future product innovation."

13   CD, Ex. B (Agassi Depo) 27:4-15.

14        **B.    Oracle's $11B PeopleSoft Acquisition Was A Game-Changer**

15        Oracle completed the $11 billion acquisition of PeopleSoft in January 2005.[2]  Meyer

16   909:23-910:17.[3]  The acquisition's price was commensurate with its expected value.  Oracle's

17   conservative financial modeling called for it to obtain $5.4 billion in PeopleSoft customer

18   support revenue alone in the first four years after the deal's announcement.  CD, Ex. QQ (PTX

19   4809); Catz 842:7-843:22.  Oracle's President Safra Catz explained that those projections, based

20   on the PeopleSoft customers Oracle expected to retain, "were the basis for asking permission

21   from the board of directors to spend … $11 billion and to take on all the liabilities that come

22   with PeopleSoft and the assets.  So those models are literally the key justification to spend $11.1

23   billion."  Catz 846:12-21, 842:12-843:1, 864:20-865:6; CD, Ex. QQ (PTX 4809).  Based on

24   them, Oracle paid roughly $1 billion per percentage point of market share.  *See* Meyer 932:3-

25   [2] PeopleSoft had recently bought another competitor, J.D. Edwards (JDE).  Oracle acquired both companies' software and license and support contracts with existing customers.  The acquired
26   software is sometimes referred to as "PeopleSoft."  Oracle had announced a tender offer for PeopleSoft in June 2003 but it took time to resolve legal issues surrounding the acquisition.

27   [3] Oracle objects to Exhibit 28 to the Lanier Declaration, Dkt. 1045, because it contains slides that
28   were not "presented during Paul Meyer's testimony."  Dkt. 1045, ¶ 208; CD, ¶ 50.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    933:12; CD, Ex. Z (PTX 157).

2           Oracle's acquisition model relied on the informed and conservative assumption that

3    Oracle would retain more than 90% of the nearly 10,000 PeopleSoft customers and receive the

4    accompanying revenue stream for at least ten years.  Phillips 527:17-528:1, 528:17-25; Catz

5    854:18-21; CD, Exs. QQ (PTX 4809) & JJ (PTX 615).  "Having a customer base that renews

6    support and that stays with you over time is a huge value," because those customers provide the

7    "high-margin recurring revenue" Oracle needs to re-invest in R&D and "accelerate[ ]

8    innovation."  Catz 854:1-12; CD, Ex. RR (PTX 4811).  Phillips explained that competitive cycle:

9    "[T]he more customers you have, the bigger R&D budget you can have, the more developers you

10   can have.  The more developers, the more innovation."  Phillips 528:2-16.

11          Thus, as SAP itself recognized at the time, the PeopleSoft acquisition "changed the

12   competitive landscape."  CD, Ex. BB (PTX 171).  "[I]f someone else has three or four times as

13   many customers as you can, and you have the same costs, eventually they can spend more, and

14   you will never catch up."  Phillips 517:20-25; *see also id.* 525:25-527:8.  Oracle's acquisition of

15   PeopleSoft's 9,920 customers nearly doubled Oracle's market share, and made it a stronger

16   competitor.  *Id.* 518:1-11; Meyer 932:3-934:9; CD, Ex. Z (PTX 157).

17   **C.     SAP Strikes Back With A Multi-Pronged Strategy Centered On TN**

18          An SAP Executive Board presentation revealed the depth of the Board's concern:

19   "Oracle has positioned itself to aggressively challenge SAP for leadership in business software

20   solutions."[4]  CD, Ex. BB (PTX 171); *see also* Phillips 517:8-518:11; Meyer 934:10-935:7.  SAP

21   had suffered a recent "share price drop," "media interest" in the PeopleSoft acquisition was

22   "high," and so was "internal pressure at SAP … to 'take on Oracle.'"  CD, Ex. BB (PTX 171).

23          **1.     TN's Maintenance Was the "Major Cornerstone" of SAP's Plan**

24          SAP devised a "dramatic, market-changing" plan to mount an "immediate and serious

25   challenge to Oracle."  *Id.*, Ex. Y (PTX 141); Brandt 694:11-15.  It centered on SAP's immediate

26   purchase of TN, which provided half-price maintenance to PeopleSoft and JDE customers in

27   _____

28   [4] SAP's Executive Board comprised its most senior executives.  Court 1448:6-11.

1 competition with PeopleSoft.  CD, Ex. B (Agassi Depo) 84:3-8; 88:6-12.  SAP's top executives

2 considered TN the "cornerstone of [the] Safe Passage program," designed to recruit PeopleSoft

3 customers uncertain about their future because of the Oracle acquisition.  *Id.*, Ex. H (Ziemen

4 Depo 71:12-71:19, 302:9-302:17) & GG  (PTX 380) & HH (PTX 404).  TN was, in fact, the

5 "major cornerstone of our go-to-market strategy as our key Service-delivery unit."  *Id.*, Ex. AA

6 (PTX 161).

7         While TN would be "the vehicle through which [customers] would get the maintenance

8 services," that was only the beginning.  *Id.*, Ex. T (PTX 23).  The ultimate goal was to convert

9 customers from Oracle/PeopleSoft/JDE applications to SAP software.  SAP's "rationale" for

10 building Safe Passage around TN "is more around the value … that these customers represent as

11 a potential future set of customers for SAP applications.  And … the value was estimated by

12 Oracle, rightfully or wrongly, as $10 billion."  *Id.*; CD, Exs. P (PTX 12) & C (Hurst Depo 39:7-

13 14).  SAP saw TN as the "key" to its ultimate goal because customers could defer the expensive

14 decision to switch software, but could keep their old software supported with TN at half the cost,

15 then switch to SAP software later.  *Id.*, Exs. G (Oswald Depo 271:22-274:12) & M (PTX 6).

16         SAP's top executives expressed internally and to the public that the market reception to

17 SAP's TN maintenance offer would be "astronomical."  McDermott 1488:3-13.  They also knew

18 SAP had to move quickly to capitalize on market "uncertainties" "in this very short time frame,

19 from January to February of 2005, to gain this competitive advantage."  Brandt 684:20-685:5.

20 SAP's goal was to "serve the customers that had doubt" immediately after the PeopleSoft

21 acquisition closed.  CD, Exs. B (Agassi Depo 100:18-102:18) & Y (PTX 141).  It planned to use

22 the TN announcement "to create a 'good level' of market disruption" and turn momentum in its

23 favor.  Zepecki 610:12-611:2; CD, Ex. N (PTX 7).  The profits at stake were immense.

24                    **2.      TN's Use of Oracle's Copyrighted Software Was Extremely Valuable
                              as a Means to Convert Customers to SAP Applications**

25

26         SAP's "number one single-minded ambition" for Safe Passage was to convert Oracle

27 customers to SAP software.  McDermott 1458:19-1459:7.  SAP projected TN would be the

28 "bridge for future SAP license business" to "capture PeopleSoft customers as SAP customers."

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    CD, Ex. W (PTX 43); Zepecki 602:9-19.  The top SAP executives developed and executed on

2    the TN acquisition plan to convert Oracle's customers to SAP.  Brandt 682:9-685:5.

3    Specifically, SAP planned to convert half of PeopleSoft's customers, including all shared

4    customers, to SAP software.  CD, Ex. U (PTX 24); Brandt 682:9-683:3.  That would be

5    incredibly valuable to SAP, for both the approximately 5,000 customers – 50% of PeopleSoft's

6    customer base – in their own right and the added benefit of disrupting Oracle's $11 billion

7    acquisition and shrinking Oracle's application market share, for which Oracle had just paid about

8    $1 billion per percentage point.  Brandt 693:3-694:10; CD, Exs. B (Agassi Depo 314:5-318:3) &

9    U (PTX 24).

10            **3.      SAP's Executive Board Gave "Extensive Guidance" on SAP's**
                      **Plans to Use TN to Generate Billions in Revenue and**
11                    **Disruption**

12          Using TN to fuel its Safe Passage program, SAP planned to "enable[] future license

13    revenue, to grow maintenance contract volume taken away from Oracle and to generate

14    additional maintenance revenue for SAP."  CD, Exs. C (Hurst Depo 40:14-42:16, 77:20-79:10,

15    548:22-549:22) & LL (PTX 958).  SAP's Business Case to the Executive Board for the TN

16    acquisition projected it would both generate maintenance revenue and, most important, enable

17    future SAP license revenue.  *Id.*, Exs. CC (PTX 177) & H (Ziemen Depo 269:13-25).

18          A December 23, 2004 "Roadmap for PSFT Customers to SAP," presented to the

19    Executive Board and based on "extensive guidance" from it, projected that SAP would earn $897

20    million in revenue from the TN acquisition in just three years.  CD, Exs. SS (PTX 4814) & P

21    (PTX 12) & H (Ziemen Depo 66:11-14, 67:24-68:1, 68:9-11, 87:2-17).  The Board unanimously

22    adopted that projection.  *Id.*, Exs. G (Oswald Depo 44:3-6) & P (PTX 12).  Board member

23    Agassi thought SAP could do even better.  *Id.*, Ex. B (Agassi Depo) 310:17-311:23.

24          In fact, SAP stood to gain several times over, by shoring up its endangered dominance

25    while seizing an unprecedented opportunity to attack Oracle when it was most vulnerable

26    because of PeopleSoft customer uncertainty, take its software customers, undercut its acquisition

27    strategy, weaken it competitively, and earn billions in the process.  McDermott 1466:2-1467:3;

28    CD, Ex. B (Agassi Depo) 69:20-70:17, 71:18-22, 74:18-21.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1               **4.**         **TN's Use of Oracle's IP Was Also Extremely Valuable as "A**

2                       **Strategic Weapon Against Oracle"**

3       The contemporaneous evidence does not end there also showed that SAP saw TN as a

4 multi-pronged "strategic weapon against Oracle," potentially "a stronger weapon than Safe

5 Passage" itself. CD, Exs. H (Ziemen Depo 326:7-327:5, 504:8-505:10) & W (PTX 43) & HH

6 (PTX 404). TN would, SAP believed, not only help take Oracle's revenue and market share, but

7 also lessen Oracle's ability to pay for the PeopleSoft acquisition from cash, deplete its ability to

8 invest in research and development, and thereby "contain Oracle's potential growth in the next

9 generation application market." *Id.*, Exs. B (Agassi Depo 316:24-318:3) & G (Oswald Depo

10 89:1-23) & Y (PTX 141). The benefits to SAP were myriad: "anything that discredits [SAP's]

11 major competitor helps [SAP]." Brandt 693:25-694:10. SAP's damages expert, Stephen Clarke,

12 conceded it is "likely" and "reasonable to assume" that reducing Oracle's ability to invest in

13 R&D would help SAP. Clarke 1776:2-17. Moreover, interrupting Oracle's maintenance

14 revenue stream and discrediting its efforts to create a next-generation application platform would

15 "be a much more direct benefit" to SAP that is not measured in short-term revenues. Clarke

16 1778:13-21, 1776:19-1777:4.

17               **D.**        **SAP's Deliberate Acceptance Of The Serious Liability And**

18                     **Reputational Risks Shows The Value Of TN To SAP**

19       In devising this strategy, every SAP Executive Board member fully understood "there

20 could be substantial legal issues with TomorrowNow's service delivery processes." Brandt

21 718:8-21. The Board brought in John Zepecki, a recent PeopleSoft Vice President, to evaluate

22 the deal because of his familiarity with PeopleSoft software and licenses. Zepecki 596:1-9.

23 Zepecki told the Board it was "very likely that TomorrowNow is using the software outside the

24 contractual use rights granted to them." CD, Ex. O (PTX 11); Zepecki 619:4-22. SAP's real-

25 time risk assessments thus pointed out "serious liability issues with respect to the operation of

26 TomorrowNow." Brandt 694:16-23, 702:11-17.

27       The TN Business Case the SAP Executive Board evaluated before acquiring TN adopted

28 Zepecki's warning essentially verbatim: "the access rights to the PeopleSoft software is very

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    likely to be challenged by Oracle and past operating issues may be a serious liability if Oracle

2    challenges." CD, Ex. S (PTX 19); Brandt 717:1-18. This was probative with regard to valuation

3    and damages because, as Brandt acknowledged, "SAP would not lightly undertake a program

4    that had serious liability risks because of its risk to SAP's reputation." Brandt 695:2-8. The

5    Board specifically considered the billions in upside to SAP and harm to Oracle, "looked at those

6    risks[,] and decided to acquire" TN "with the knowledge that there was a risk that Oracle would

7    sue." CD, Exs. G (Oswald Depo 84:7-11) & B (Agassi Depo 53:14-17) & E (Kagermann Depo

8    304:21-305:2 ("SAP knowingly undertook" the "risk of legal action by Oracle")).

9        **E.**    **SAP Expanded The Scope Of The Infringement By Directing TN To Offer**

10           **Support For Siebel Customers**

11   Oracle acquired Siebel in fall 2006 for $6.1 billion. Phillips 541:17-23, 542:6-10; Catz

12   860:12-15. Oracle's Siebel acquisition model projected it would receive $500 million in annual

13   maintenance revenue from 4,000 acquired Siebel customers. CD, Ex. II (PTX 614); Meyer

14   1034:18-1036:1. Oracle's model was, again, conservative, particularly with its revenue inputs,

15   which were less than analysts' expectations. Catz 860:16-861:14.

16   "Once the decision was made by Oracle to consolidate [PeopleSoft, JDE, and Siebel] into

17   Oracle, then it really became a much more heated battle between Oracle and SAP." McDermott

18   1454:24-1455:1. With its acquisition of Siebel's 4,000 customers, Oracle surpassed SAP in the

19   customer relationship management (CRM) space. Catz 857:15-858:14. SAP foresaw an adverse

20   €1.52 billion (about $2.2 billion) impact, and projected that its competitive positioning had

21   dropped 40% overnight. Meyer 1025:19-1026:24; CD, Ex. DD (PTX 245).

22   SAP again turned to TN to mitigate Oracle's Siebel advantage. SAP's Siebel service

23   offering through TN, like that for PeopleSoft, was designed as "an enabler for future license

24   revenue, to grow contract volume taken away from Oracle and to generate additional

25   maintenance revenue for SAP." CD, Exs. H (Ziemen Depo 484:14-485:14) & G (Oswald Depo

26   289:17-290:1) & EE (PTX 267). SAP believed TN's opportunity to provide service to Siebel

27   customers was "huge." *Id.*, Ex. H (Ziemen Depo) 484:24-485:2. SAP knowingly "authorized

28   [TN] to service Siebel applications" even though "at that time [TN] didn't have any people at all

1    who had any experience with Siebel software."  Brandt 721:1-8.  As with PeopleSoft, the legal

2    implications of that deficiency were outweighed by the financial and competitive gains SAP

3    planned to achieve.

**F.    SAP's Contemporaneous Documents Continued To Show That TN's Use Of Oracle's Intellectual Property Was Worth Billions of Dollars**

6        As late as April 2006, SAP calculated TN's financial harm to Oracle and benefit to SAP:

> Every $1 of 2005 closed [TN] business typically represents 1) $2 taken from Oracle's annual maintenance; 2) $20 taken away from any 10-year maintenance-based justification for the PeopleSoft/ JDE takeover; 3) $10 increase to SAP's strategic license revenue pipeline.

10    CD, Exs. NN (PTX 970) & F (Nelson Depo 167:22-177:19 (over ten years, TN could take a

11    billion dollars from Oracle and increase SAP revenue opportunities by a billion dollars)).  SAP

12    projected, "Over the long term, every $1 of TN stand-alone revenue this year represents $18 of

13    originally expected Oracle revenue from their misguided acquisition strategy."  *Id.*, Ex. V (PTX

14    37); Meyer 1028:2-1029:3, 1031:7-1033:2.  SAP's TN "weapon" remained "integral to SAP's

15    efforts to attack Oracle" for years, right "up until the eve of Oracle's lawsuit."  CD, Ex. G

16    (Oswald Depo) 294:5-10.

**G.    SAP's Infringement Was Vast**

18        SAP's illicit downloading and use of Oracle's materials was unprecedented, in scale,

19    scope, and duration.  After years of denial, SAP eventually admitted that TN "copied millions of

20    updates and support materials for [JDE], PeopleSoft and Siebel by downloading them from

21    Oracle's websites [onto] TomorrowNow's computers," and further copied portions of those

22    materials internally, and that SAP intentionally contributed to that infringement.  Court 1447:16-

23    21 (stipulated facts).  SAP admitted it infringed every copyright-registered version of the Oracle

24    Database software.  CD, Ex. K (JTX 2) ¶¶ 1-2, 17-19 & Attachment A; Meyer 1042:12-24.[5]  In

---

[5] Oracle's technical expert, Kevin Mandia, found over 10 million downloaded Oracle files on its systems, some five terabytes of material.  Mandia 1381:18-25.  SAP admitted "at least 826,905" of the downloaded files were copies of updates and support materials included within Oracle's registered copyrights, and that many infringed.  CD, Ex. K (JTX 2) ¶ 20.  These numbers were lower bounds, in part because TN deleted, at least 1 million more downloaded Oracle files. Mandia 1382:8-14.  SAP's infringing reproduction of Oracle's software was equally extensive.

(Footnote Continued on Next Page.)

1    the end, SAP admitted to infringing all 120 copyright registrations Oracle had asserted.  CD, Ex.

2    J (JTX 1) ¶¶ 10, 15-17 & Attachment A.

3        **H.      The Hypothetical License Evidence**

4            The massive infringement, the value of the infringed IP and the customers put into play

5    because of the infringement, and the top-level strategic business decisions behind the

6    infringement set the scope of the hypothetical license.  A prudent copyright owner and a prudent

7    licensee, in the positions of Oracle and SAP, would have considered the extensive

8    contemporaneous evidence of those factors to negotiate in January 2005 and, for Siebel,

9    September 2006 for the licensee's right to use the licensed IP to make a reasonable profit while

10   compensating the copyright owner in an acceptable amount.

11           Oracle's damages expert, Paul Meyer, carefully walked the jury through the evidence,

12   and his consideration of it, to arrive at his opinions.  Meyer 890:2-944:13, 970:20-1037:15,

13   1041:19-1048:25.  Meyer weighed each negotiating party's contemporaneous perspective and

14   the evidence of their projected financial and other strategic motivations.  *Id.* 897:22-899:8,

15   903:9-906:1.  He applied an established valuation methodology to that evidence to determine the

16   fair market value of SAP's infringing use of Oracle's copyrighted software.  *See, e.g.*, *id.* 993:9-

17   994:22, 1032:25-1033:25.  Considering all the evidence, Meyer opined that the fair market value

18   of SAP's use of Oracle's copyrighted software was at least $1.656 billion:  $1.5 billion for

19   PeopleSoft, $100 million for Siebel, and $56 million for the Oracle Database.  *Id.* 1016:13-

20   1017:8, 1036:22-1037:15, 1045:16-1047:11.

21   **III.    ARGUMENT**

22           SAP's JMOL motion rehashes legal and factual arguments the Court and jury,

23   respectively, have considered and rejected.  *See* III.A, below.  Its new trial motion repeats those

24   arguments, and adds others that are also unsupported and, often, waived.  *See* III.B, below.

25   _____

26   (Footnote Continued from Previous Page.)

27   Mandia found evidence of "about 7,100 or more copies of Oracle applications software and
     Oracle database software" that had been on TN's servers – including at least 563 created *after*
     Oracle sued.  *Id.* 1384:6-9, 1393:11-18.  These copies totaled over 10 terabytes of data.  *Id.*

28   1383:6-15.  SAP admitted each copy infringed.  CD, Ex. K (JTX 2) ¶¶ 16-19 & Attachment A.

**A.      Oracle's Hypothetical License Damages Are Supported By The Law And The Evidence**

This Court previously held:

> Oracle should be permitted to present evidence regarding the fair market value of the copyrights that SAP allegedly infringed, including expert testimony based on established valuation methodology…. So long as "the amount is not based on 'undue speculation,'" the jury can consider evidence regarding a hypothetical lost license fee.

Dkt. 628 (MSJ Order) at 5:5-11 (quoting *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004)).  That decision was correct under settled Ninth Circuit law.  *See* III.A.1, below.  Oracle's proof at trial complied with it.  *See* III.A.2, below.

**1.      Oracle Was Entitled to Recover a Reasonable Royalty as a Matter of Settled Law**

The Court has held twice that copyright actual damages are what a "willing buyer would have been reasonably required to pay a willing seller," measured by the parties' expectations at the time of infringement.  Dkt. 628 (MSJ Order) at 3:15-23 (quoting *Jarvis v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007)); Dkt. 762 (MSJ Order) at 20:18-21:2.  That remains correct.

**a.      The Ninth Circuit accepts hypothetical license damages**

Had SAP not taken Oracle's IP, it would have had to negotiate, and pay, to license it.  An unbroken line of Ninth Circuit cases establishes Oracle's right to recover as actual damages the fair market value of a hypothetical license to the infringed copyrights as of the time of infringement.  *See, e.g.*, *Jarvis*, 486 F.3d at 533-35 (copyright owner entitled to recover fair market value of license defendant would have had to obtain to use 58 images infringed); *Polar Bear*, 384 F.3d at 708 (upholding actual damages award "within the range of the fair market value" of the rights infringed); *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 827 (9th Cir. 1985) (reversing damage award that failed to reflect full market value of hypothetical license to rights defendant infringed); *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977) (confirming "the value of use" of the

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   copyrighted work to the infringer as among actual damages available and upholding jury award

2   of license value where plaintiff's expert provided credible supporting evidence); Dkt. 628 (MSJ

3   Order) at 5:5-11; *see also Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116,

4   1121-22 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971) (adopting and

5   applying the "willing buyer and willing seller" hypothetical license approach to damages).[6]

6          The hypothetical license measure of actual damages is well-established for good reason.

7   A copyright represents the right to exclude, or to receive the value of exclusive rights by license.

8   *See, e.g.*, *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006).  Where an infringer

9   takes for free what it would have otherwise had to license, it deprives the copyright owner of the

10  license fee it would have been entitled to charge.  The hypothetical license royalty represents the

11  value the copyright owner was entitled to receive at that time, and the amount by which the

12  owner was damaged by not receiving it.  *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,

13  772 F.2d 505, 513 n.6 (9th Cir. 1985) (market value license approach "seeks to approximate

14  what a reasonable market price would have been at the time of the infringement"); *On Davis*,

15  246 F.3d at 166 ("[T]he defendant has surreptitiously taken a valuable right, for which plaintiff

16  could have charged a reasonable fee.  Plaintiff's revenue is thus smaller than it would have been

17  if defendant had paid for what he took ….").

18         The hypothetical license is therefore measured by contemporaneous "objective

19  considerations of market value," rather than after-the-fact events.  *See Jarvis*, 486 F.3d at 534 &

20  535 n.9 (rejecting expert's "legally defective emphasis on post-infringement damages rather than

21  the pre-infringement fair market value" of the copyrighted material); *accord, e.g., Mars, Inc. v.*

22  *Coin Acceptors, Inc.*, 527 F.3d 1359, 1374 (Fed. Cir. 2008) ("[A]lthough an infringer's

23  anticipated profit from use of the patented invention is among the factors to be considered in

24  determining a reasonable royalty, the law does not require that an infringer be permitted to make

25  a profit.") (quotations and citations omitted).  A contrary rule, urged repeatedly by SAP, that

26  ────────────────────
[6] Other circuits also endorse the fair market value of the rights infringed as a measure of actual
27  copyright damages. *See, e.g., Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 353,
358-60 (6th Cir. 2007); *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 565-67 (7th
28  Cir. 2003); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166-67 (2d Cir. 2001).

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   limits actual damages to the infringer's later success or failure to exploit the infringed material

2   would, perversely, reward incompetent infringers.  It would also reward infringers who give

3   away the infringed product to drive other sales, or those like SAP with significant ulterior

4   motives.  Doing so would fail to compensate the owner for the actual harm suffered at the time

5   of infringement.  *See On Davis*, 246 F. 3d at 166; *F.W. Woolworth Co. v. Contemporary Arts,*

6   *Inc.*, 344 U.S. 228, 233 (1952) (disapproving of "a rule of liability which merely takes away the

7   profits from an infringement [because it] would offer little discouragement to infringers").

8           **b.      The Court has already rejected SAP's contention that**
                       **Oracle is ineligible for hypothetical license damages**
9

10          SAP seeks to avoid the jury's verdict by inverting the long line of Ninth Circuit cases

11  endorsing the hypothetical license remedy.  It contends those cases somehow limit the remedy

12  based on two special "factors," which SAP conveniently finds in those cases but not in this one.

13  Mot. 16-21.  The Court already rejected SAP's arguments, and should again.

14          First, SAP insists Oracle cannot pursue hypothetical license damages because "there is no

15  evidence the parties actually would have agreed to a license."  Mot. 17.  It reasons that Oracle

16  never would have given its prime competitor a license on any terms, so it did not lose any license

17  fee.  Mot. 18-20.  Second, SAP contends hypothetical license damages are unavailable because

18  Oracle did not previously license these exact rights to SAP or other competitors.  Mot. 19-21.

19  SAP raised these arguments on summary judgment, *see* Dkt. 543 (MSJ Memo) at 7:3-16:23, and

20  the Court rejected them:  Oracle "is not required to prove it would have successfully negotiated a

21  license with SAP, nor is it precluded from seeking license damages simply because it has never

22  before licensed what SAP has infringed."  Dkt. 628 (MSJ Order) at 4:22-5:2 (quoting *On Davis*).

23          That conclusion remains correct.  SAP took rights for which Oracle was entitled to

24  charge.  *See Jarvis*, 486 F.3d at 533-34; 2 Paul Goldstein, *Goldstein on Copyright* § 14.1.1 at

25  14:19 (3d ed. 2005).  Contrary to SAP's rehashed argument, it is legally "irrelevant" to a

26  hypothetical license whether the parties actually would have reached an agreement, or even sat

27  down to negotiate one.  *On Davis*, 246 F.3d at 171-72.  The point is not to re-create an actual

28  agreement, but "to determine the fair market value of [the] valuable right" the defendant was

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1  supposed to pay for but took for free.  Dkt. 628 (MSJ Order) at 4:25-5:2 (quoting *On Davis*, 246

2  F.3d at 171-72).  *On Davis*, the very case SAP cites in the opening line of its brief, explains:

3         The usefulness of the test does not depend on whether the
       copyright infringer was in fact himself willing to negotiate for a

4         license.  The honest purchaser is hypothesized solely as a tool for
       determining the fair market value of what was illegally taken.

5

6  246 F.3d at 171-72 (citing 2 *Goldstein on Copyright* § 12.1.1.1, at 12:13 (2d. ed. 2000)).  Oracle

7  lost the licensing fee that represents the value of Oracle's rights that SAP misappropriated, and is

8  entitled to be paid that value.  *See Polar Bear*, 384 F.3d at 709 (infringer must pay fair market

9  value of rights it took, as determined by the jury).

10      That remains true whether or not SAP is a competitor, and whether or not Oracle has ever

11  licensed the rights SAP infringed.  In *Krofft*, both plaintiffs and defendants licensed the use of

12  television characters for merchandise and advertisements.  *See Krofft*, 562 F.2d at 1161-62.  The

13  Court recognized that defendants' infringement displaced substantial licensing opportunities by

14  plaintiffs, *see id.*, and endorsed plaintiffs' right to recover the fair market value of the rights

15  infringed.  *See id.* at 1174.  Other courts have likewise found the competitive relationship

16  between the owner and infringer may *enhance*, not eliminate, the fair market value of the license.

17  *See McRoberts*, 329 F.3d at 567 (affirming actual damages award against competing supplier of

18  character generation software based on fair market value of misappropriated work);

19  *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 405-06 (S.D.N.Y. 2002) (rejecting

20  hypothetical license damages award as inadequate because copyright owner "would not be

21  willing to let a direct competitor use an exact duplicate of its site for such a small fee").

22      Any reluctance by Oracle voluntarily to license the rights SAP took for free "weighs in

23  favor of a higher royalty rate."  *Medtronic Sofamor Danek USA Inc. v. Globus Med., Inc.*, 637 F.

24  Supp. 2d 290, 310 (E.D. Pa. 2009); *Rosco, Inc. v. Mirror Lite Co.*, 626 F. Supp. 2d 319, 332

25  (E.D.N.Y. 2009).  That is a lesson of the seminal case on the hypothetical license construct.  *See*

26  *Georgia-Pacific*, 318 F. Supp. at 1120 (Factors 4 and 5 consider "[t]he licensor's established

27  policy and marketing program to maintain his patent monopoly by not licensing others to use the

28  invention" and "[t]he commercial relationship between the licensor and licensee, such as,

1    whether they are competitors."); *cf. Salinger v. Colting*, 641 F. Supp. 2d 250, 267-68 (S.D.N.Y.

2    2009) (infringing sequel to *The Catcher In The Rye* would cause substantial market harm even

3    though author had never licensed infringed rights), *injunction vacated on other grounds*, 607

4    F.3d 68 (2d Cir. 2010).

5            Nothing in the Copyright Act says or suggests competitors are ineligible for remedies or

6    damage measures courts routinely allow others, or that a copyright owner is ineligible for

7    particular remedies or damage measures simply because it has not licensed its rights before. *See*

8    17 U.S.C. § 504(b). None of the Ninth Circuit cases SAP cites say so either. While *Jarvis*,

9    *Polar Bear*, *Mackie*, and *Wall Data* all involve copyright owners who happened to have licensed

10    their rights, none of them either limits its holding to those circumstances or holds or suggests

11    competitors may not pursue hypothetical license damages. While a competitive relationship may

12    make an *actual* agreement less likely, the parties' inability to agree to an actual license does not

13    bar a plaintiff from receiving the fair market value of the rights infringed. *See Polar Bear*, 384

14    F.3d at 709 (finding non-speculative a valuation based in part on a price quote that the infringer

15    had rejected). The absence of prior agreements cannot bar that remedy either, because the right

16    *not* to license is as important as the right to license. *See Stewart v. Abend*, 495 U.S. 207, 228-29

17    (1990) ("[N]othing in the copyright statutes would prevent an author from hoarding all of his

18    works during the term of the copyright"); *cf. Worldwide Church of God v. Phila. Church of God,*

19    *Inc.*, 227 F.3d 1110 (9th Cir. 2000) (reversing denial of preliminary injunction and granting a

20    permanent injunction against further distribution of religious materials by the infringer where the

21    rightsholder had permanently discontinued its publication).

22            As it did in its unsuccessful summary judgment motion, SAP continues to rely on

23    *Business Trends Analysts, Inc. v. Freedonia Gp., Inc.*, 887 F.2d 399 (2d Cir. 1989), to support its

24    theory that competitors do not qualify for hypothetical license damages. But *Business Trends*

25    focused on the entirely different infringer's profits measure of copyright damages, *id.* at 405, and

26    the Second Circuit has expressly refused to apply its holding to the actual damages analysis. *See*

27    *On Davis*, 246 F.3d at 161-64 (*Business Trends*' discussion of actual damages is dictum); *see*

28    *also* Goldstein § 14.1.1 ("*Business Trends* was wrong."). Instead, *On Davis* makes clear that

1    "the fair market value of a license covering the defendant's infringing use" is an appropriate

2    measure of actual damages.  246 F.3d at 172. [7]

3         SAP again defends its invented remedy limitations by arguing Oracle has not met its

4    burden of showing SAP caused it any damages.  *Compare* Mot. 15-16 *with* Dkt. 543 (MSJ

5    Memo) at 8:11-10:16.  But the causal link is plain.  The infringer who takes for free what the

6    copyright owner has the right to license automatically and immediately deprives the owner of the

7    license fee it was entitled to receive.  *See Jarvis*, 486 F.3d at 533-34; Goldstein § 14.1.1 at 14:19.

8    Only valuation remains for the jury to determine.  *See Polar Bear*, 384 F.3d at 709.

9         SAP's authorities impose no additional causation burden.  *Jarvis* does not mention, much

10   less impose, any additional causation requirement in its discussion of fair market value damages.

11   *See Jarvis*, 486 F.3d at 533-35.  *Polar Bear* and *Mackie* do discuss causation, but only as to

12   infringer's profits.  *See Polar Bear*, 384 F.3d at 708, 710-11; *Mackie v. Rieser*, 296 F.3d 909,

13   914 (9th Cir. 2002).  The portion of *Frank Music* SAP cites does not even mention causation,

14   and that case imposes no additional causation burden.  *See Frank Music*, 772 F.2d at 514 n.8.

15   The Court in *Cream Records* reversed a damage award because it failed to reflect the full market

16   value of the rights infringed and says nothing about causation.  *See Cream*, 754 F.2d at 827.

17        Courts should "broadly construe" available damages to "favor victims of infringement."

18   *On Davis*, 264 F.3d at 164.  Ninth Circuit law is in accord:  Having taken valuable rights for free,

19   SAP "is in no better position to haggle over the license fee than an ordinary thief and must accept

20   the jury's valuation unless it exceeds the range of the reasonable market value."  *Polar Bear*, 384

---

21   [7] SAP's repeated reliance on out-of-circuit district court cases, *e.g.*, Mot. 16-19, is similarly
22   misplaced.  *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 25 F. Supp. 2d 395, 401-
     02 (S.D.N.Y. 1998) extends *Business Trends*' holding to actual damages precisely as *On Davis*
23   later rejected.  *Nat'l Conf. of Bar Examiners v. Multistate Legal Studies, Inc.*, 458 F. Supp. 2d
     252, 261 (E.D. Pa. 2006), purports to follow – but directly contradicts – *On Davis* by rejecting
24   hypothetical license damages on the ground the parties would not have entered an actual
     agreement.  It also contradicts controlling law.  *See, e.g.*, *Polar Bear*, 384 F.3d at 709.  Ignoring
25   controlling Ninth Circuit authority, SAP also cites *Bi-Rite v. Button Master*, 578 F. Supp. 59
     (S.D.N.Y. 1983).  Mot. 23.  That court did not award a license because the sole evidence plaintiff
26   offered was alleged benchmarks "too vague to serve as a basis for computing damages," which
     "cover[ed] a broader range of merchandise" than the scope of infringement, and did not
27   "duplicate" the goods defendants distributed.  578 F. Supp. at 60.  Aside from the inapposite
     facts, the case supports Meyer's approach:  "The cost of a license generally represents prepaid
28   royalties on anticipated sales of the licensed merchandise during the license term."  *Id.* at 59.

---

17

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    F.3d at 709.  SAP offers no reason for the Court to reconsider its prior, correct rulings.

2         2.    **The Evidence, Much of It from SAP Itself, Supports this Award or**
              **Even a Greater One**
3

4         SAP's re-argument of the evidence fares no better.  On SAP's renewed JMOL motion,

5    the court must "inquire whether there is any legally sufficient evidentiary basis for a reasonable

6    jury to find for" Oracle.  *Weisgram v. Marley Co.*, 528 U.S. 440, 453-54 (2000) (citation and

7    quotation omitted).  The motion may be granted only if "the evidence … permits only one

8    reasonable conclusion, which is contrary to the jury's verdict."  *Omega Envtl., Inc. v. Gilbarco,*

9    *Inc.*, 127 F.3d 1157, 1161 (9th Cir. 1997).  The court "must review the evidence in the light most

10   favorable to the nonmoving party," *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 881 (9th Cir.

11   2003), and "must draw all reasonable inferences in favor of the nonmoving party and it may not

12   make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.,*

13   *Inc.*, 530 U.S. 133, 150 (2000).  "If there is substantial evidence presented at trial to create an

14   issue for the jury, a trial court may not grant" the motion.  *Landes Constr. Co., Inc. v. Royal*

15   *Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  "Substantial evidence is such relevant

16   evidence as reasonable minds might accept as adequate to support a conclusion even if it is

17   possible to draw two inconsistent conclusions from the evidence."  *Id.*

18        SAP acknowledges these standards, Mot. 13, but then violates them by re-arguing or

19   ignoring the evidence and second-guessing the jury's consideration of it.  SAP's impermissible

20   slant on the evidence must be disregarded.  *See Polar Bear*, 384 F.3d at 708 ("Although [we]

21   should review the record as a whole, [we] must disregard evidence favorable to the moving party

22   that the jury is not required to believe, and may not substitute [our] view of the evidence for that

23   of the jury") (citation omitted).  Oracle described above, *see* II, and summarizes below, *see*

24   III.A.2.a, the substantial relevant evidence with respect to how a prudent copyright owner and

25   licensee would have approached the fair market value of the copyrights at issue, and then

26   explains why SAP's arguments all fail, *see* III.A.2.b, below.

27

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1       **a.**     **Oracle's evidence related to and proved the fair market value of the hypothetical license**

2

3       The jury was instructed, consistent with the settled Ninth Circuit law and model

4 instruction, that "[t]he reduction of the fair market value of [Oracle's] copyrighted work is the

5 amount a willing buyer would have been reasonably required to pay a willing seller at the time of

6 the infringement for the actual use made by Defendants of Oracle's works." Dkt. 1005 (Final

7 Jury Instr.), Instr. 7; *accord*, *e.g.*, *Jarvis,* 486 F.3d at 533-34. The jury was told, correctly, that in

8 "determining actual damages, your award must be based on evidence, not on speculation,

9 guesswork, or conjecture." Dkt. 1005 (Final Jury Instr.), Instr. 8; *accord L.A. Mem'l Coliseum*

10 *Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986).

11       The jury was instructed, also correctly and without objection, to "consider all of the

12 information known to and all of the expectations of the parties on the dates of the hypothetical

13 negotiations, which are the dates on which infringement began." Dkt. 1005 (Final Jury Instr.),

14 Instr. 9. Much of that evidence came from SAP's own contemporaneous business records, which

15 are more reliable than its witnesses' *post hoc* denials or deflections of what they wrote. *See*

16 *Monster Content, LLC v. Homes.com, Inc.*, 2005 WL 1522159, *9 (N.D. Cal.)

17 ("[C]ontemporaneous emails and conduct at time of the transaction are more credible evidence"

18 than witness statements "years later in preparation for litigation.").

19       Indeed, the parties' contemporaneous goals and expectations of benefits from the

20 infringed materials – what they would have brought with them to the negotiating table – are the

21 ideal evidence to value a hypothetical license. *See, e.g.*, *Interactive Pictures Corp. v. Infinite*

22 *Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) (confirming "the rule that recognizes sales

23 expectations at the time when infringement begins as a basis for a royalty base as opposed to

24 after-the-fact counting of actual sales" ); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075,

25 1081 (Fed. Cir. 1983) ("The issue of the infringer's profit" determined not by "hindsight

26 evaluation" but according to what the parties to the hypothetical license negotiations would have

27 considered at the time.); *Snellman v. Ricoh Co., Ltd.*, 862 F.2d 283, 289-90 (Fed. Cir. 1988)

28 (upholding recovery amount based on an infringer's expected sales even though it far surpassed

1   the infringer's actual sales).

2          The evidence overwhelmingly supports the $1.3 billion hypothetical license fee by

3   showing that both parties at the time placed extraordinarily high valuations on the copyrights at

4   issue. *Georgia-Pacific*, 318 F. Supp. at 1120 (considering amount that "prudent licensee who

5   desired, as a business proposition, to obtain a license would pay" and still "make a reasonable

6   profit," and amount prudent licensor would have found acceptable).

7                      **(1)      The PeopleSoft/JDE/Siebel licenses**

8                              **(a)      Oracle's negotiation perspective**

9          Oracle's contemporaneous PeopleSoft and Siebel acquisitions would have dictated its

10  approach to the hypothetical license negotiations for the related intellectual property. Based on

11  its "serious" and "conservative" financial models, Oracle expected to obtain over $1.7 billion in

12  annual maintenance fees from existing PeopleSoft and Siebel customers. Catz 846:22-847:9,

13  851:5-13, 857:6-13, 860:16-861:14, 1897:3-13, 1908:23-1909:4. Those customer-based models

14  contained the "drivers, the important assumptions that underlie the profits and the revenues …

15  the whole operating structure of PeopleSoft." *Id.* 848:20-849:10; CD, Ex. JJ (PTX 615).

16         Since those models were "literally the key justification" for spending billions to acquire

17  the intellectual property, they are substantial, objective evidence of the fee Oracle would have

18  sought to license it. Catz 846:12-21, 860:12-15. As Catz explained, had Oracle known that SAP

19  would immediately deploy TN against newly-acquired PeopleSoft using TN's vast unlicensed

20  access to PeopleSoft's IP, "a lot of these customers would, in fact, be a jump ball. And we

21  couldn't count on the billion two [of PeopleSoft maintenance revenue], which underlies the

22  entire model … coming in minimally annually to pay the $11 billion" purchase price. *Id.*

23  864:20-865:6; *see also* Screven 457:25-458:11. The threat of losing customers and associated

24  maintenance revenue to SAP – the natural (and, of course, SAP's desired) result of TN's access

25  to the infringed IP – would have undermined "the entire [acquisition] model." Catz 864:20-

26  865:6, 865:16-867:4; Phillips 531:21-532:24, 536:19-537:16, 542:6-14; Ellison 767:15-768:25;

27  CD, Ex. RR (PTX 4811). "Just between PeopleSoft, J.D. Edwards, and Siebel, we're talking

28  about over a billion seven a year of just maintenance, just support. And … that's annually every

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   year.  That's what was exposed."  Catz 1908:23-1909:4.

2          Ellison testified that, in deciding how to value a hypothetical license, the "overwhelming

3   consideration" is how many PeopleSoft customers Oracle would have expected to lose to SAP.

4   Ellison 764:15-765:3.  He explained:

5          SAP is the number one applications company in the world.  We're
       number two.  They're the market leader.  They're credible.  They're
6          highly respected … And if they had access to all of our intellectual
       property, if they had access to all of our engineering, they're – they
7          could make a very credible offer to any of our customers to get
       services and – and pursue a future with SAP rather than with Oracle.
8

9   *Id.* 765:11-19.  In a hypothetical negotiation, Ellison would have believed, conservatively, that

10  SAP could take 20-30 percent of PeopleSoft's customers; Phillips would have thought 35-40

11  percent was more likely.  *Id.* 764:15-765:22; Phillips 532:25-534:9.[8]

12         Oracle's executives were thus unequivocal that, if Oracle were to license its largest

13  competitor to a significant portion of the IP for which Oracle had just taken a huge risk and paid

14  billions up-front to acquire, it would have asked SAP to pay billions, also up-front.  Phillips

15  523:1-13 ("If I paid for something one day for 11 billion and my competitor wants it the next

16  day, … I expect them to pay billions to have access to it as well."); Catz 865:16-867:4 (Oracle

17  would have sought "in the billions," up-front, for a license); Ellison 767:15-768:25 (Ellison

18  would have asked for $4 billion for a PeopleSoft, J.D. Edwards, and Siebel license).  No smaller

19  number would have compensated Oracle for what it would have expected to lose.  *Cf.* Meyer

20  935:21-936:18 (the appropriate license fee is higher where the parties are competitors).

21                  **(b)     SAP's negotiation perspective**

22         On the other side of the table, SAP would have approached a hypothetical PeopleSoft

23  negotiation just as its contemporaneous documents and executives' testimony described:  getting

24  [8] SAP's claim that Oracle did not actually expect significant losses, Mot. 9, is beside the point.
    Oracle did not know SAP was rampantly copying its software, thus allowing SAP to service
25  many more customers with far less effort and to provide otherwise impossible Oracle-level
    support.  Catz 841:20-842:6; CD, Ex. D (Jones Depo) 206:7-206:23.  The hypothetical license
26  valuation, by contrast, "contemplates a marshaling of all of the pertinent facts which, like cards
    dealt face up, are for all to see."  *See Georgia-Pacific*, 318 F. Supp. at 1121 (hypothetical
27  license inquiry assumes parties know all relevant information); *Procter & Gamble Co. v. Paragon Trade
    Brands, Inc.*, 989 F. Supp. 547, 606 (D. Del. 1997) (same).
28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   immediate access to Oracle's IP gave SAP a multi-billion dollar strategic opportunity to convert

2   half of the PeopleSoft customer base, disrupt Oracle's ability to pay for the PeopleSoft

3   acquisition out of cash flow, shrink Oracle's market share, and discredit Oracle's effort to create

4   a next-generation application platform.  CD, Exs. B (Agassi Depo 314:5-318:3) & U (PTX 24) &

5   Y (PTX 141).  SAP had its eye on "astronomical" customer gains, with no time to lose.

6   McDermott 1488:3-13; *see also* Meyer 928:19-929:8, 930:5-11 (SAP would have paid more to

7   obtain the IP right away); CD, Ex. Y (PTX 141) ("Announce … just as Oracle announces their

8   new strategy.").  SAP's contemporaneous, Executive Board-directed "PeopleSoft Attack

9   Program" projected an $897 million "SAP Business Opportunity" in just three years.  CD, Ex.

10  SS (PTX 4814).  By the time of the Siebel negotiation, the Board's continued confidence in TN

11  and Safe Passage led SAP to extend its strategy to Siebel, and to endorse a projection of billion-

12  dollar gains from maintenance revenues alone.  *Id.*, Exs. MM (PTX 960) & F (Nelson Depo

13  163:14-17, 166:1-168:8) & V (PTX 37) & NN (PTX 970).

14          SAP further intended to use TN "as a bridge for future SAP license business."  *Id.*, Ex.

15  GG (PTX 380).  Providing maintenance would not only generate revenue for SAP, but

16  strengthen its (and disrupt Oracle's) customer relationships.  Zepecki 608:3-20, 609:22-25,

17  610:12-611:13; CD, Ex. N (PTX 7).  SAP intended to convert some 5,000 PeopleSoft customers

18  to SAP software, maybe more.  Brandt 682:9-683:3 (SAP's goal was to convert 50% of

19  PeopleSoft customers); CD, Exs. U (PTX 24) (same) & Y (PTX 141) (convert "the majority") &

20  B (Agassi Depo 310:17-311:23, 314:5-318:3) (convert 50% or better); Meyer 1314:1-7

21  (calculating 50% customer conversion as approximately 5,000 customers).  When it extended the

22  plan to Siebel, SAP planned to convert "the 300+ SAP customers SAP and Siebel have in

23  common."  CD, Ex. MM (PTX 960); *see also id.*, Ex. F (Nelson Depo) 167:22-177:19 (over ten

24  years, TN could take a billion dollars from Oracle and increase SAP's prospects by a billion

25  dollars).

26          Moreover, TN's "value was not only related to the fact [of] becoming a profitable

27  revenue [] unit."  *Id.*, Exs. H (Ziemen Depo 304:21-305:23) & GG (PTX 380).  SAP also wanted

28  TN to "force Oracle to change its behavior or plans around pricing or positioning," Zepecki

1    613:16-614:7; CD, Ex. R (PTX 15), serve as "a strategic weapon against Oracle," *id.*, Exs. H

2    (Ziemen Depo 304:12-22) & GG (PTX 380), and disrupt Oracle's business, competitive position,

3    and effort to create a next-generation application platform.  McDermott 1494:16-1495:9.  In

4    pursuit of these goals, SAP decided to incur the significant liability and reputational risks of

5    infringing.  Brandt agreed that SAP would not take those risks "lightly."  Brandt 695:2-8.  That

6    was true.  SAP took them precisely because it projected such great rewards and would have

7    valued a license accordingly.  Meyer 931:13-932:2.

8         SAP argues the supposed "handful" of its documents show what SAP sought to achieve

9    through Safe Passage as a whole, not through the value TN added.  Mot. 10.  SAP disregards (or

10   buries in a footnote, Mot. 10 n.2) its own documents and executive testimony establishing TN as

11   "cornerstone" of and "key" to Safe Passage from TN's acquisition through its demise.  *See, e.g.*,

12   CD, Exs. H (Ziemen Depo 302:9-17) ("cornerstone") & AA (PTX 161) ("cornerstone") & GG

13   (PTX 380) ("cornerstone") & HH (PTX 404) ("cornerstone") & G (Oswald Depo 271:18-272:6)

14   ("key part") & Y (PTX 141) ("key tactic[]"); *see also id.*, Ex. H (Ziemen Depo) 504:8-505:10

15   ("TomorrowNow ... could be seen as a stronger weapon than Safe Passage").  SAP also

16   repeatedly argues that the *SAP Executive Board members*, who provided "input and extensive

17   guidance" to the $897 million projection prepared in connection with SAP's acquisition of TN,

18   never testified about its creation, so Meyer's reliance on it was "pure guesswork."  *Compare id.*,

19   Ex. SS (PTX 4814) *with* Lanier Decl., ¶¶ 109-11 *and* Mot. 10-11, 30-31.  That is remarkable.

20   SAP did not call any of the Executive Board members or Mr. Ziemen to rebut Meyer's

21   reasonable interpretations of it, or any of the other myriad documents reflecting SAP's at-the-

22   time expectations and goals, an implicit concession that it could not.  In any event, the jury was

23   entitled to disregard SAP's spin on the facts.  SAP is not, on the other hand, entitled to recast the

24   evidence in the light most favorable to it or ask the Court to now draw disputed inferences in its

25   favor.

26                          **(c)      Meyer's expert analysis**

27         Meyer's testimony relied on the undisputed principle that the willing-buyer, willing-seller

28   hypothetical license framework should account for the "*Georgia-Pacific* factors."  Meyer 901:8-

                                             23
ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   903:4; *see also* Clarke 1566:19-24; Tr. 1982:1-24 (argument re jury instructions) (SAP

2   conceding that "[o]nce you get to the valuation, *Georgia-Pacific* is appropriate").  Meyer

3   consolidated his presentation and described each party's negotiation perspective using three

4   factors.  For Oracle, he evaluated:  (1) "Oracle's Goals for PeopleSoft Acquisition," (2) "Risk to

5   Oracle's Investment in [the Acquisitions]," and (3) "Oracle's Expected Financial Impacts."

6   Meyer 1004:5-1005:8.  For SAP, he analyzed:  (1) "SAP's Goals for New Offering," (2) "SAP's

7   Expected Impact on Oracle," and (3) "SAP's Expected Financial Gains."  *Id.* 971:5-17.

8          ***Oracle's PeopleSoft Negotiation Perspective:***  Meyer weighed and explained the impact

9   the hypothetical license would have on Oracle's goals for the PeopleSoft acquisition, its

10  contemporaneous $11 billion investment, and its revenues and finances, *id.* 1004:5-1015:6.  He

11  then valued the projected adverse impact on Oracle at $1.36 billion for 1,375 customer

12  conversions and $2.46 billion for 3,000 customer conversions.  *Id.* 1014:15-1015:6.  He

13  considered the contemporaneous, customer-based models from Oracle and its third party

14  valuation experts presented to and relied upon by the Oracle Board of Directors in connection

15  with the PeopleSoft acquisition.  *Id.* 1011:13-1014:8.

16         Meyer determined (from SAP's projections) that SAP reasonably would have expected to

17  win and support 3,000 Oracle maintenance customers through October 2008.  *Id.* 1014:15-

18  1015:23; CD, Ex. P (PTX 12).[9]  Based on that evidence, he opined Oracle would have expected

19  to lose a substantial share of the maintenance customers and revenue it had just acquired.  Meyer

20  1010:4-24.  Oracle's business documents showed it conservatively expected $130,000 in

21  maintenance revenue per customer per year, at an 80% profit margin.[10]  *Id.* 1011:22-1013:16.

22  Meyer reduced the expected losses to present value as of January 2005 using Oracle's expected

23  [9] Using 3,000 customers was conservative:  SAP projected it would win 5,000 to 6,000 Oracle
24  customers.  Meyer 1001:20-1002:18, 1314:1-12, 1316:22-1318:25, 1321:24-1325:14; CD, Ex. P
    (PTX 12); *see also* III.A.2.1.b, above (discussing SAP's intended 50% customer conversion).  At
    the high end of that range, the indications of license fee value could have approached $5 billion.
25  Meyer 1314:1-12.

26  [10] SAP claims that because Oracle "failed to present objective evidence of benchmark licenses,"
    any hypothetical license measurement must be speculative.  Mot. 23-24.  Not only is that wrong
27  as a matter of law, *see* III.A.1.b, above, Meyer's $130,000 input is the same type of objective
    evidence that a benchmark license provides.  Through its history of selling maintenance, Oracle
28  determined the average annual revenue it would earn from each acquired customer.

1   10% discount rate.  *Id.*; CD, Ex. Q (PTX 13).  Because customers tend to remain loyal, he also

2   valued the future financial impact to Oracle of lost SAP customers through 2014.  Meyer

3   1011:22-1013:16.

4       *SAP's PeopleSoft Negotiation Perspective:*  Meyer looked to SAP's documents for its

5   expected revenue from exploiting Oracle's intellectual property.  He calculated a value to SAP of

6   the PeopleSoft license from $881 million to almost $2.7 billion, depending on the number of

7   PeopleSoft customers expected to convert to SAP software (from 1,375 to 3,000).[11]  *Id.* 999:1-

8   1001:19.  In making that calculation, he considered SAP's documents showing maintenance

9   revenue from providing support ($68K per year per customer), license revenue from customers

10   replacing Oracle software with SAP software ($358K per customer), and license revenue from

11   selling customers additional products ($86K per customer).  *Id.* 996:19-997:19; CD, Ex. P (PTX

12   12).  Using the projected customer and revenue amounts, Meyer calculated the revenue SAP

13   expected to earn from the customers it expected to win over time.  Meyer 997:1-14.  He then

14   deducted SAP's average costs (30%) to convert those revenues to projected profits, and used

15   SAP's discount rate shown in SAP valuation documents (14%) to discount those projected

16   profits to the January 2005 negotiation date.  *Id.* 997:14-998:7; *see also id.* 999:1-1001:19.

17       *The Siebel Negotiation Perspectives:*  Meyer's Siebel valuation method, under which he

18   measured Oracle's expected financial impact at $164 million, *id.* 1036:2-21, and the discounted

19   value of SAP's projected profit at $97-247 million, was similar.  *Id.* 1032:25-1034:14.  He

20   conducted the same discounted cash flow analysis for a license covering SAP's infringing use of

21   Oracle's Siebel software.  *Id.* 1033:3-25.  This time, Meyer focused on the parties' September

22   2006 contemporaneous projections and expectations.  *Id.* 1024:5-21.  Relying on SAP's own

23   projections, he determined that SAP reasonably would have expected to win and support 200

24   Siebel customers.  *Id.* 1030:16-1031:2; CD, Ex. LL (PTX 958).

25       *Synthesis of Perspectives:*  Considering the ranges of value, and the evidence as a whole,

26

27   [11] Meyer's $2.69 billion calculation used SAP's per-customer value with a focus on future value,
including future maintenance, cross-sale, and upswitch to SAP applications.  Meyer 1000:12-

28   1001:19.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    Meyer determined that the fair market value of the hypothetical license was at least $1.5 billion

2    for PeopleSoft and at least $100 million for Siebel, each near the bottom of the respective range.

3    *Id.* 1014:9-1017:8, 1036:22-1037:15.

4                          **(2)      The Oracle Database license**

5             To carry out its strategic "attack plan," SAP used Oracle's Relational Database

6    Management System ("Database") software along with Oracle's applications software "to help

7    provide service to customers that had PeopleSoft software running on an Oracle Database."

8    Clarke 1582:17-1583:13; *see also* Allison 673:23-674:1.  Thus, SAP would "also have to, in

9    tandem, take a database license."  Meyer 1043:8-14.  Abundant contemporaneous evidence,

10   competent testimony, and reliable expert opinion supported the jury's verdict as to its price.

11            Oracle's Database software is "a significant piece of work."  Clarke 1582:17-1583:1.  In

12   2005 (as now), Oracle licensed its Database software for end user licensees' "internal use" and

13   "internal business operations" only, as is industry-standard.  Allison 657:13-20, 659:21-660:4;

14   CD, Ex. PP (PTX 2841).  Richard Allison testified, based on his 17 years of licensing and

15   pricing experience for Oracle software, that because providing service to third-parties was not

16   consistent with internal use, SAP would have needed a separate license for each customer (end

17   user) supported using the Database software.  Allison 654:2-18, 660:17-661:10.  Because

18   Oracle's Database pricing varies depending on server size and number of processors, in a

19   negotiation Oracle would have considered TN's actual hardware configuration.  *Id.* 662:4-13,

20   663:25-664:16; CD, Ex. FF (PTX 269); Clarke 1584:25-1586:13; *see also* Meyer 1044:22-

21   1045:14.

22            Oracle has never licensed a competitor to use its Database software to compete for its

23   customers.  Allison 654:23-656:8.  Oracle's historical Database price lists guided the

24   hypothetical license value calculation.  *See, e.g.*, CD Exs. X (PTX 97) & KK (PTX 653) & OO

25   (PTX 984); *see also* Meyer 1045:15-1046:1.  It is undisputed that TN would have required an

26   enterprise license (including support services) for each supported customer, calculated under

27   those price lists.  Allison 656:18-657:1, 661:11-662:13; *see also* Meyer 1042:12-15.  Clarke used

28   the same price lists, though he disagreed (with no basis) on how many licenses SAP would need.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    Clarke 1584:23-1587:4.

2           Using Oracle's standard pricing ($240,000 license fee + $52,800 maintenance fee), the

3    number of TN customers benefitting from its use (172), and TN's hardware configuration as

4    inputs, Meyer calculated the fair market value for the use of Oracle's Database software as $55.6

5    million.  *See* Meyer 1045:16-1047:11.  Allison confirmed Meyer's methodology and calculation

6    were "reasonable."  Allison 662:18-23, 670:22-672:4.

7                          **b.      SAP's efforts to re-argue the evidence fail**

8           SAP mischaracterizes much of the voluminous damages evidence described above, and

9    complains that each bit in isolation fails on its own to support the verdict.  Mot. 24-33.  SAP's

10   argument fails for two reasons.  First, as a matter of law, SAP is not allowed to re-argue the

11   facts.  *See* p. 18, above.  Second, the evidence, viewed collectively – as it must be – was more

12   than sufficient to support the jury's award (or even a higher one).  *See Polar Bear*, 384 F.3d at

13   708 (the court "should review the record as a whole [and] must disregard evidence favorable to

14   the moving party that the jury is not required to believe …") (citation omitted).

15          SAP's arguments about sufficiency reprise those it made and lost in its motions for

16   summary judgment and to exclude Meyer's testimony.  Dkts. 541 (Opp. to MSJ) & 846 (Opp. to

17   Mot. to Excl. Meyer).  In response, Oracle set out the evidence it intended to offer at trial to

18   support its case and Meyer's opinions, and why it was proper, admissible, and sufficient to raise

19   a jury trial issue.  *See* Dkt 541 (Opp. to MSJ) at 14:3-23:5 (describing, among other evidence,

20   Oracle's acquisition models, SAP's projections, the scope of SAP's infringement, SAP's

21   executives' testimony about their projections and goals, SAP testimony and documents about the

22   importance of TN to Safe Passage and SAP's plans to use TN to otherwise attack Oracle); *see*

23   *generally* Dkt. 846 (Opp. to Mot. to Excl. Meyer) (describing similar evidence).  The Court

24   denied SAP's motions.  The evidence came in as Oracle described.  SAP offers no basis to reject

25   the jury's factual determinations.

26

27

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1          **(1)     Oracle's executives' testimony was proper, and
                      persuasive, evidence**

2

3          SAP deems Oracle's executives' testimony about how they would have negotiated for a

4    license at the time of infringement impermissibly "subjective" and "speculative."  Mot. 24-25.

5    Not true.  That testimony consistently was grounded in the contemporaneous valuations on

6    which Oracle's top executives – the very people who made the decision to acquire PeopleSoft

7    and Siebel and who would have participated in the hypothetical negotiation – and Board

8    evaluated and made multi-billion dollar business decisions.  *See, e.g.*, Catz 839:12-17; pp. 20-21,

9    above.  Such evidence is objective because it reflects the contemporaneous value placed on

10   PeopleSoft and Siebel at the time Oracle acquired those companies, without influence from a

11   possible negotiation with an infringing competitor.  SAP's view of things, aside from ignoring

12   the jury's determination, makes no sense.  In SAP's view, had Oracle sat down to negotiate with

13   SAP in a deal that could cost Oracle the very maintenance stream and customer base it had just

14   bought, Oracle could not reference the purchase price paid days before to set a valuation for the

15   license.  Contrary to SAP's view, this does not mean the license valuation was based only on

16   what Oracle "would have charged," Mot. 24, and it was not, Meyer 937:11- 938:24; but Oracle's

17   well-supported negotiation position is obviously relevant and admissible as one input to inform

18   the negotiation's outcome.  "Credible testimony by the [copyright] owner … regarding its value

19   can provide an adequate evidentiary basis for an award of damages."  *See Frank Music*, 772 F.2d

20   at 514 n.8 (quotation omitted); *see also Getaped.com*, 188 F. Supp. 2d at 405-06 (rejecting

21   inappropriately low licensing fee because copyright owner "would not be willing to let a direct

22   competitor use an exact duplicate of its site for such a small fee").[12]

23          "Common sense dictates that an expert may confer with the copyright holder and that the

24   _____

25   [12] SAP, of course, had every chance to cross-examine those witnesses or offer its own
     executives' competing testimony.  SAP started to do so, with one of its few witnesses, when it
     asked its own current CEO whether he would "pay more than a billion dollars for the chance to
26   run" TN.  McDermott 1498:21-1499:11.  Given that McDermott's explanation for his answer
     was that "TN was not a key contributor to my goal" of selling SAP software, whereas SAP's
27   Executive Board and McDermott himself had characterized TN as "key" to the Safe Passage
     program, McDermott 1481:11-23, it is not surprising that the jury discredited that lone denial.

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1  background data may be factored into calculations of [the hypothetical license measure of] actual

2  damages." *Polar Bear*, 384 F.3d at 709.  SAP's argument boils down to disputed facts and

3  credibility, issues fully contested at trial, decided by the jury, and off-limits on this motion.

4          (2)     **Oracle explicitly limited its valuation model to**
                   **the specific use at issue**
5

6          SAP next complains the jury failed to exclude non-copyrightable elements in determining

7  the hypothetical license value.  Mot. 25-26.  That argument gets the law wrong, ignores SAP's

8  liability stipulation, and contradicts Clarke's own testimony.  It also misstates (and improperly

9  re-argues) the R&D and acquisition cost evidence Oracle presented.

10         First, neither case SAP cites supports its argument.  *Apple Computer, Inc. v. Microsoft*

11  *Corp.*, 35 F.3d 1435, 1439 (9th Cir. 1994) was about liability, not damages.  *Apple* held the

12  district court did not err in setting aside unprotectable elements in determining infringement

13  liability.  *See id.* at 1438-39.  *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940),

14  involved infringer's profits, not actual damages, and held it appropriate to apportion them

15  between those earned from the infringement and those that were not where the *infringer* had

16  submitted elaborate, unrebutted evidence on that subject.  *See id.* at 407-08.  Neither holds or

17  suggests the jury must apportion a hypothetical license award according to the protectable

18  elements of an infringed work, particularly where the infringer has offered no proof on that issue.

19         Second, even if SAP had the law right, it waived any opportunity to challenge the scope

20  of its infringement of any work, or any element of any work, by stipulating to "all liability on all

21  [copyright] claims."  CD, Ex. K (JTX 4) at ¶ 1.  SAP offered no evidence to suggest – nor is

22  there any reason to believe – the value of a hypothetical license would change if a given work

23  contained five unprotectable elements or 500 (assuming it contains any at all).  Either way, SAP

24  would have needed to license the whole work.  *See Cream*, 754 F.2d at 827-28 (reversing

25  district court's award of less than the full hypothetical license amount where the record neither

26  supported a hypothetical negotiation for "a license for use of less than the entire copyrighted

27  work" nor contained evidence of the value of such a license); *cf. Sheldon*, 309 U.S. at 401-02

28  (observing plaintiff may recover all of defendant's profits where infringing elements and non-

1    infringing elements are so intermingled they cannot be separated).  SAP's excuse that it may

2    have used millions of infringing copies to serve only some of its customers is similarly beside the

3    point.  *See Wall Data, Inc. v. L.A. County Sheriff's Dept.*, 447 F.3d 769, 775 n.3, 786-87 (9th Cir.

4    2006) (upholding damages award based on 3,962 infringing software copies even where

5    evidence showed some of them "would remain installed, but unused" on defendant's computers).

6         Third, Meyer explained how he avoided the over-counting SAP asserts, and SAP cross-

7    examined him extensively on this.  Meyer 1077:5-1078:13.  Clarke also undermined SAP's

8    current argument that the jury's award exceeded the "actual use" of the infringed works, Mot.

9    26-27, by agreeing with Meyer that SAP's pervasive use would have required a license "to make

10   virtually unlimited copies of Oracle's software whenever it needed."  CD, Ex. UU (PTX 7028);

11   Clarke 1862:25-1865:25.  Accordingly, Meyer's hypothetical license valuations were expressly

12   based on the fair market value of the rights infringed, and nothing more.  *See* pp. 23-26, above.[13]

13        Fourth, Meyer did not base his hypothetical license valuations on the total R&D cost of

14   the infringed works.  Mot. 26-27.  Without objection, Oracle offered its R&D and acquisition

15   costs as background to explain its overall investments over time in its IP, and SAP's motivation

16   for "attacking" Oracle to deprive it of the revenue stream required to innovate, compete, and

17   finance those costs.  *See* pp. 3-4, above.  Oracle never argued, and no witness testified, that the

18   hypothetical license value was or should be based on Oracle's total R&D investment.

19        Finally, Meyer did not base his hypothetical license valuation blindly on the full amounts

20   Oracle paid to acquire PeopleSoft or Siebel.[14]  Instead, he looked to the value placed on the

21   intellectual property during those acquisitions, and considered Oracle's executives' testimony

22   _____

[13] SAP's cases (Mot. 26) involve situations where a plaintiff, unlike here, sought the value of a

23   license that blatantly exceeded the scope of infringement.  *See Country Road Music, Inc. v.

     MP3.com, Inc.*, 279 F. Supp. 2d 325, 331 (S.D.N.Y. 2003) (excluding damages opinion because

24   expert was "not concerned" with evaluating a license based on the actual scope of infringement);

     *Propet USA, Inc. v. Shugart*, 2007 U.S. Dist. LEXIS 69222, at *4-5 (W.D. Wash.) (disallowing

25   actual damages for more than the scope of infringement); *Powell v. Penhollow*, 260 Fed. Appx

     683, 690-91 (5th Cir. 2007) (disallowing recovery for the full value of complete architectural

26   plans where plaintiff created only preliminary drafts and was already paid their value).

     [14] Meyer also did not base his hypothetical license valuation solely on the testimony and

27   valuations of Oracle's executives.  *See* pp. 23-26, above.  As Meyer explained, even if he had

     never talked to the executives, he "would have come to the same opinion" he provided.  Meyer

28   1327:11-1328:2.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1     about how that value would influence their approach to a near-simultaneous license negotiation

2     with SAP.  Meyer 922:16-923:9.  Those witnesses carefully explained the clear and logical

3     connection between the many billions Oracle had just paid for PeopleSoft and Siebel and the

4     (much lower) hypothetical license valuation.  *See* pp. 20-21, above.

5
                            **(3)**      **Contemporaneous business projections show the**
6                                       **value the parties placed on the infringed works**

7        SAP complains that the evidence of both parties' contemporaneous projections relating to

8     the value of the infringed works and Meyer's opinions based on them are inherently unreliable

9     and too speculative to serve as a basis for a reasonable royalty.  Mot. 29-34.  It characterizes that

10     evidence as "Meyer's Primary Factors" – as though Meyer's analysis were the only way the

11     evidence was presented – and contends that, "as a matter of law," such evidence "cannot

12     establish the objective market price of a hypothetical license."  Mot. 29.

13        As discussed above, SAP is wrong on the facts.  The evidence – including but not limited

14     to the contemporaneous SAP projections – was overwhelming from both sides' witnesses and

15     documents.  SAP is also wrong as a matter of law.  The infringer's "sales expectations at the time

16     when infringement begins" are a proper "basis for a royalty base" when calculating the fair

17     market value of a hypothetical license.  *Interactive Pictures*, 274 F.3d at 1385; *see also* N.D. Cal.

18     Model Patent Jury Instrs., Instr. B.5 ("[T]he focus is on what the expectations of the patent

19     holder and infringer would have been had they entered into an agreement at that time and acted

20     reasonably in their negotiations."); pp. 19-20, above.  Although this law is not new – Oracle cited

21     it consistently in opposition to SAP's serial motions on this issue – SAP omits any discussion of

22     it.  *See* Mot. 29-34; *compare* Dkt. 846 (Opp. to Mot. to Excl. Meyer) at 13 & n.14.

23        Instead, as before, SAP rests its argument that projections are intrinsically unreliable on a

24     single, unpublished, case.  *See Leland Med Ctrs., Inc. v. Weiss*, 2007 WL 2900599 (E.D. Tex.)

25     (granting a *Daubert* motion to strike proffered expert testimony); Mot. 29-30, 34; *compare* Dkt.

26     798 (Mot. to Excl. Meyer) at 13 n.14 (relying on *Leland*).  *Leland* primarily addresses how to

27     apply Texas state law to the measurement of infringer's profits for unsold real property.  Its

28     cursory fair market value discussion rejects the expert's opinion because he considered irrelevant

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   evidence, such as the other profits the plaintiff hoped to earn from an unrelated third party, and

2   because he "discount[ed]" the willing buyer/willing seller approach based on his "subjective"

3   determination that the parties would not have entered into an actual license. *Id.* at *7-8.

4   Although the discussion is sparse, it appears the expert submitted little evidence about the

5   infringer's anticipated gains or how they related to the fair market value. *Id.* Oracle, by contrast,

6   submitted substantial evidence of what both parties calculated they would earn.[15]

7          Lacking a viable relevance argument, SAP recasts these sophisticated parties' top-level

8   business projections and assumptions as "guesses" and "hopes." *See* Mot. 29, 30, 33. But every

9   significant business decision relies on an assumption of the projected benefits it will yield.

10  "Assumptions are the most important" part of a projection, and reflect "the best information you

11  have at the time." Catz 1898:20-1900:4. Oracle's multi-billion dollar acquisitions, SAP's

12  "market-changing" strategy to use TN to usurp their value through infringement, and the price of

13  the license the parties would have had to negotiate for SAP to pursue that objective lawfully

14  were, or would have been, based on the exact "goals," "scenarios," and "assumptions" SAP

15  denigrates. Mot. 30. SAP's quarrels with and interpretations of its own strategic documents and

16  former executive's testimony, Mot. 31-33, are out of bounds on these motions. *See Ostad*, 327

17  F.3d at 881 (JMOL only proper where only one reasonable conclusion is possible and that

18  conclusion is contrary to jury's verdict).

19              (4)    **Evidence of SAP's justifications and motivations for**
                       **infringement supports the jury's award**
20

21         SAP erroneously dismisses evidence of its "alleged 'need for the works,' its 'competitive

22  relationship' with Oracle, and its 'risk acceptance'" – as "Meyer's 'Background' Factors," and

23  _____

24  [15] SAP cites two other cases, *Childress v. Taylor*, 798 F. Supp. 981, 991-92 (S.D.N.Y. 1992), and
    *Technologies, S.A. v. Cyrano, Inc.*, 460 F. Supp. 2d 197 (D. Mass. 2006). Both were bench trials
    determining infringement damages. The courts' discussions of the reliability of the projection
25  evidence before them are findings of fact, not holdings of law. Further, *Childress* predates its
    circuit's embrace of the fair market value measure of actual damages. *See On Davis*, 246 F.2d at
26  166-67. The *Technologies* court was concerned the plaintiff provided the defendant's former
    sales projections (but not its own) as a basis for damages *without* fact or expert witness testimony
27  to explain their reliability. 460 F. Supp. 2d at 201-03. In contrast, Oracle provided extensive
    fact and expert testimony to explain its own and SAP's projections. *See* pp. 20-26, above.
28

1    deems them "irrelevant" to the license valuation. Mot. 27-29.  In fact, evidence of these

2    motivations for SAP's infringement was both relevant and substantial.

3              (a)    **SAP's need and the parties' competitive**
                      **relationship were relevant**
4

5          SAP planned to use TN's infringing business model to attack and discredit Oracle's

6    stated strategic rationale and benefits from its acquisitions (and make lots of money for itself in

7    the process).  Those plans affect the fair market value of the IP SAP needed to execute them.

8    SAP's witnesses testified, and its documents declared, that SAP's goals for its TN "strategic

9    weapon" included various negative impacts on Oracle – forced changes in its pricing and

10   strategies, disruption of its momentum from the PeopleSoft acquisition, loss of market share, and

11   a decreased ability to innovate.  *See* pp. 21-23, above.  This evidence – which SAP largely

12   ignores – legally and logically supported the jury's damages award.  *See Deere & Co. v. Int'l*

13   *Harvester Co.*, 710 F.2d 1551, 1554 (Fed. Cir. 1983) (parties weigh expected benefits, costs, and

14   "all known existing economic factors" in the licensing process).

15         SAP rejects the relevance of its need for the infringed works based solely on

16   *DaimlerChrysler Servs. v. Summit Nat'l*, 2006 WL 208787 (E.D. Mich.).  Mot. 27-28.  That case

17   simply reiterated the fair market value standard and rejected the plaintiff's argument that actual

18   damages should be *higher* than the fair market value because the defendant had a unique need for

19   the material.  2006 WL 208787 at **1**-**2**.  No such argument is at issue here.

20             (b)    **SAP's risk acceptance was probative of**
                      **the fair market value of the IP**
21

22         The Court ruled that SAP's knowing acceptance of significant litigation, liability, and

23   reputational risk relates to damages and, in any event, could not prejudice SAP given its liability

24   stipulation.  Court 256:12-257:10 (ruling re liability evidence).  SAP nevertheless argues its risk

25   acceptance is "irrelevant" because a hypothetical license analysis "assumes no infringement will

26   occur."  *Compare* Mot. 28-29 *with* Dkt. 974 (Mot. to Excl. Evid. Related Solely to Contrib.

27   Infring.) at 1:20-2:12; *see also* Mot. 44 ("very premise of a hypothetical license negotiation is

28   that no infringement has yet occurred").

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1      SAP misses the point.  The premise of hypothetical license damages is that the infringer

2   must pay to license its use that actually occurred, based on the value of that use.  Evidence of

3   SAP's willingness to accept litigation and reputational risk indicates the high value SAP placed

4   on the rights it infringed and, therefore, is evidence of what it would reasonably pay if it had

5   negotiated instead of infringing.  *See Georgia-Pacific*, 318 F. Supp. at 1123, 1131 ("GP's

6   calculated infringement … is an admission by conduct" of value … "The Court finds that GP

7   would have been willing to pay a substantial royalty to USP in order to obtain reasonably

8   anticipated large profits without the risk of infringement liability."); *Gyromat Corp. v. Champion*

9   *Spark Plug Co*., 735 F.2d 549, 552 (Fed. Cir. 1984) ("Champion's decision to risk infringement

10  liability indicates the value it placed on the patented features."); *Pentech Int'l, Inc. v.*

11  *Hayduchok*, 931 F. Supp. 1167, 1175 (S.D.N.Y. 1996) (finding, in applying *Georgia-Pacific*,

12  that "the fact that Pentech would risk the expense of a law suit implies that the [patented] product

13  is valuable").  Oracle cited these same authorities during trial.  SAP still does not address them.

14      Further, acceptance of risk reflects the absence of non-infringing alternatives – a

15  recognized input to the hypothetical license analysis.  *See Smith Int'l, Inc. v. Hughes Tool Co*.,

16  1986 WL 4795, at *28 (C.D. Cal.) ("[c]ommon sense, as well as the cases, says that deliberate

17  infringement with its risks, together with the costs of fighting the inevitable legal battle … can

18  support an inference that there is not a viable alternative" and setting a higher reasonable royalty

19  rate to account for defendants' "undertaking of the major risk of infringing"), *vacated on other*

20  *grounds by* 839 F.2d 663 (Fed. Cir. 1988); *TWM Mfg Co. v. Dura Corp*., 231 U.S.P.Q. 525, 529-

21  30, 532 (E.D. Mich. 1985) (fact that defendant "chose to proceed to infringe" suggests absence

22  of non-infringing alternative relevant for calculating both reasonable royalty and lost profits

23  awards), *aff'd*, 789 F.2d 895 (Fed. Cir. 1986).

24      SAP's cases, also cited at trial, remain off-point.  In each, a court rejected a *punitive*

25  *multiplier* to a hypothetical license.  *See* Dkt. 976 (Opp. to Mot. to Excl. Evid. Related Solely to

26  Contrib. Infring.) at 3:19-5:8; *Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc.*, 335 F.

27  Supp. 2d 466, 467, 469 (S.D.N.Y. 2004); *Barrera v. Brooklyn Music, Ltd.*, 346 F. Supp. 2d 400,

28  410-11 (S.D.N.Y. 2004); *Faulkner v. Nat'l Geographic Soc'y*, 576 F. Supp. 609, 614-18

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   (S.D.N.Y. 2008).  Oracle sought, and the jury awarded, the "value of what was illegally taken,"

2   nothing more.  *Stehrenberger*, 335 F. Supp. 2d at 469.  None of SAP's cases considered, much

3   less excluded, risk of infringement evidence related to calculating a hypothetical license.[16]

4            **(5)       The range in Meyer's estimates does not suggest they
5                        are speculative**

6            Oracle was not required to establish the fair market value of the license fee it sought with

7   precision, but only to present evidence sufficient to allow the jury to assess that value without

8   "undue speculation."  Dkt. 1005 (Final Jury Instr.), Instr. 1; *Polar Bear*, 384 F.3d at 709

9   (infringer must accept jury's determination of fair market value "unless it exceeds the range of

10   the reasonable market value"); *see also McRoberts*, 329 F.3d at 567 (copyright owner "was not

11   required to establish the actual value [of rights infringed]; it was required only to provide

12   sufficient evidence of the value so that the jury did not have to resort to undue speculation in

13   estimating actual damages").  It easily met that standard.

14           SAP rehashes the same "range" argument that it made, and that the Court rejected, in its

15   motion to exclude Meyer's testimony.  Dkt. 798 (Mot. to Excl. Meyer) at 11:22-27, 18:26-19:7;

16   Dkt. 914 (Pretrial Order).  SAP is, again, wrong on both the law and the facts.  First, fact-finders

17   regularly make awards after being presented with damages ranges.  *See, e.g., Jarvis*, 486 F.3d at

18   534 (upholding damages amount picked from six estimates of FMV of infringed materials

19   because award fell "well within the range of the other five estimates"); *Fresenius Med. Care*

20   *Holdings, Inc., v. Baxter Int'l, Inc.*, 2008 WL 928539, at *3 (N.D. Cal.) ("the jury does not have

21   to adopt a royalty rate specifically articulated by a party, a jury's choice simply must be within

22   the range encompassed by the record as a whole.") (citation omitted).

23           Besides, Meyer did not simply offer the jury a "range."  His "at least $1.5 billion"

24   opinion was based on targeting a price "in the middle" of SAP's projections of the number of

25   customers it expected to gain.  Meyer 1016:13-24.  The range existed in the first place because

26

27   [16] *Faulkner*'s exclusion of willfulness evidence as irrelevant to *liability* has nothing to do with
     the relevance of risk acceptance to *actual damages*.  *Compare* Dkt. 974 (Mot. to Exclude Evid.
28   Related Solely to Contrib. Infring.) at 3:17-27 *with Faulkner*, 576 F. Supp. 2d at 613.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1  SAP projected different scenarios depending on the number of customer switches.  CD, Exs. P

2  (PTX 12) & AA (PTX 161) & LL (PTX 958).  The ranges were wide because of the enormous

3  value each customer represented.  *Jamison Bus. Sys., Inc. v. Unique Software Support Corp.*,

4  2005 U.S. Dist. LEXIS 45480 (E.D.N.Y.), Mot. 34, is inapposite.  The plaintiff there "offered no

5  evidence to support" its claim for a $75,000 license.  *Id.* at *57-61.  Oracle offered, and Meyer

6  meticulously explained, comprehensive evidence, mostly from SAP's documents, for the jury to

7  consider – evidence that would have supported a much higher damages award.  Meyer 1000:12-

8  1001:19, 1027:4-1028:1, 1047:1-11.

9      SAP's argument that Oracle "encouraged speculation" in closing, Mot. 35-36, also fails.

10  First, the supposed "range" presented was fully consistent with Meyer's opinion that damages

11  were "at least" $1.65 billion, and the extensive evidence the jury heard that supported a much

12  higher number.  Tr. 2099:7-2103:1 (Oracle's closing).  There was nothing improper about

13  argument grounded in the evidence the jury heard.  *R.S.E., Inc. v. Pennsy Supply, Inc.*, 523 F.

14  Supp. 954 (D.C. Pa. 1981), Mot. 35, is inapposite.  There, plaintiff's counsel suggested the jury

15  should cut down profit percentages if it believed they were too high, *without* presenting a

16  reduction formula from an expert, alternative discount rates, or any "raw data from which the

17  jury could discern" a reasoned damages number.  *Id.* at 970-71.  Second, counsel has "wide

18  latitude" in closing arguments.  *U.S. v. Vaccaro*, 816 F.2d 443, 451 (9th Cir. 1987) ), *abrogated

19  on other grounds by Huddleston v. U.S.*, 485 U.S. 681 (1988).  Indeed, both SAP's expert and

20  counsel similarly posited ranges of potential damages.  Clarke 1632:18-1633:9; Tr. 2169:1-

21  2170:18 (SAP's closing).  Third, in any event, SAP's complaint is waived.  *See, e.g.*, *Kaiser

22  Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th Cir. 1986) (failure to object

23  constitutes wavier absent showing of fundamental or plain error); *Bird v. Glacier Elec. Coop.,

24  Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001) (same).  Finally, it is moot.  The jury's award was

25  below the range counsel argued.

26      The jury was well-instructed and informed by extensive evidence to place its award

27  within the well-defined ranges both sides presented.  There is no basis to overturn its decision.

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1          c.      **The hypothetical database license valuation was supported by substantial and undisputed evidence**

2

3      Meyer analyzed the parties' objective considerations in entering into a hypothetical

4  Database software license negotiation, based on their documents and testimony.  The jury

5  evaluated that evidence and the parties' arguments, and reached its decision.  SAP's efforts to

6  avoid responsibility for the fair market value of its admitted infringement of Oracle's Database

7  software are much the same as their PeopleSoft and Siebel counterparts:  Oracle presented a

8  "one-sided" approach that was "speculative," "subjective," and "based on unjustified

9  assumptions."  Mot. 36-38.  These arguments fail for the same reasons.[17]

10     SAP argues that Meyer blindly adopted a "speculative" model Allison invented to inflate

11  damages.  Mot. 36.  To the contrary, Allison was a knowledgeable and (as must be presumed for

12  this motion, *see* p. 18, above) credible witness, so "common sense" dictates Meyer should

13  confirm underlying facts concerning database licenses, policies, pricing, and industry practices

14  with him.  *See Polar Bear*, 384 F.3d at 709.  SAP had the opportunity to cross-examine Meyer

15  and Allison on these points.  Besides, Allison's testimony was only part of the data Meyer

16  considered in calculating the fair market value of the Database license.  Meyer 1041:19-1048:1.

17  SAP ignores the other substantial, objective evidence, including Mandia's testimony and the

18  SAP documents that supported the numbers of customers benefiting from SAP's infringement of

19  Oracle's Database software.  *See* pp. 6-7, above.

20     SAP is also wrong that Oracle offered no evidence of "what TN, as a willing buyer,

21  would have agreed to pay."  Mot. 36.  SAP needed the Database license "in tandem" with the

22  others to enable its Oracle attack.  *See* pp. 26-27, above.  If SAP disputed that, it should have

23  offered its own evidence.  The time to argue the evidence is past.

24  ───────────────
[17] SAP's verdict form, adopted by the Court, did not ask the jury to differentiate among the
25  infringed copyrights.  Dkt 1004.  Even if the Database evidence were somehow insufficient (it is
not), the Court should not reduce the verdict piecemeal because the evidence relating to
26  PeopleSoft and Siebel alone supports the award.  *See L.A. Mem'l*, 791 F.2d at 1366 ("total
inadequacy of proof on isolated elements of damages … will not undermine a resulting
27  aggregated verdict" if supported by totality of evidence.); *see also* Dkt. 1030 (Order re Form of
Judgment) at 1-2 ("Since the jury did not apportion the $1.3 billion damage award, the court has
28  no basis upon which to do so.").

1    As with PeopleSoft and Siebel, SAP's unsupported argument that a benchmark license is

2    the only "objective" available measure fails for the same reasons.  *See* p. 24 n.10, above.  Allison

3    explained how Oracle's historical Database price lists were a reasonable benchmark in

4    calculating the hypothetical license value.  Clarke used them too.  *See* pp. 26-27, above.

5    SAP argues the Database license is too high because its value outstrips TN's revenues.

6    Mot. 37.  That argument is also incorrect.  First, Oracle's hypothetical license was with SAP, not

7    TN.  SAP used TN as a strategic weapon to inflict a variety of harm on Oracle, and TN's

8    individual profits were not the only goal.  *See, e.g.*, McDermott 1458:18-1459:7; CD, Exs. H

9    (Ziemen Depo 302:9-305:23, 319:19-327:11, 504:8-14) & W (PTX 43) & AA (PTX 161) & GG

10   (PTX 380) & HH (PTX 404).  And the strategy worked:  while TN's revenues may have suffered

11   in the short-term, SAP admittedly earned over $700 million from just 86 former Oracle

12   customers during the time that TN operated.  *See, e.g.*, Clarke 1630:25-1631:9.  Second,

13   regardless of TN's actual revenues, the law does not cap a hypothetical license based on an

14   infringer's success (or lack thereof) at exploiting what it infringed.  *See* pp. 13-14, above.  SAP

15   cannot hide behind TN's balance sheets.

16   SAP cites several cases in support of its argument that Oracle's Database evidence was

17   "subjective" and "speculative."  Mot. 37 (citing *Jarvis, Bruce, Interplan Architects,* and *Smith*).

18   *Jarvis* supports Oracle; the rest do not apply.  In *Jarvis*, the Ninth Circuit approved the district

19   court's calculation of actual damages, rejecting the appellant's claim (like SAP's) that the

20   calculation ignored one-half of the willing buyer-willing seller analysis.  486 F.3d at 534-35 &

21   n.8; Mot. 37.  Like Meyer's analysis, the *Jarvis* court calculated a hypothetical license based on

22   the objective considerations of both sides, not simply "what [one party] thought he should have

23   earned or wished he had charged."  486 F.2d at 534-35; *see* Meyer 1041:19-1048:1.  SAP's other

24   cases do not apply because they involved extreme cases where no objective evidence supported

25   the license fee calculation.  In *Bruce v. Weekly World News, Inc.*, 310 F.3d 25, 29-30 (1st Cir.

26   2002), the fee was supported only by the "conclusory and unsupported assertion" by an expert

27   that the fee "could be whatever we feel is fair."  In *Interplan Architects, Inc. v. C.L. Thomas,*

28   *Inc.*, 2010 U.S. Dist. LEXIS 114306, at *34-37 (S.D. Tex.), the proposed license fee was

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   supported *only* by the plaintiff's statement of what "he would have charged Defendant."  In

2   *Smith v. Rush*, 2006 U.S. Dist. LEXIS 27412, at *2-3 (W.D. Wash.), the "only evidence" in

3   support of the plaintiff's actual damages was a bare statement of what he would have charged.

4       **B.      The Court Should Deny SAP's Motion For New Trial Or Remittitur**

5           On a new trial motion, "a stringent standard applies when the motion is based on

6   insufficiency of the evidence," and it "may be granted on this ground only if the verdict is

7   against the great weight of the evidence or it is quite clear that the jury has reached a seriously

8   erroneous result."  *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987) (citation omitted).

9   While the court may weigh evidence and consider credibility on a new trial motion, "a decent

10  respect for the collective wisdom of the jury, and for the function entrusted to it in our system,

11  certainly suggests that in most cases the judge should accept the findings of the jury."  *Landes*

12  *Constr. Co.*, 833 F.2d at 1371-72 (citation omitted).  *See also Guy v. City of San Diego,* 608 F.3d

13  582, 585 (9th Cir. 2010) ("We must uphold a jury verdict if it is supported by … evidence

14  adequate to support the jury's conclusion, even if it is also possible to draw a contrary

15  conclusion.") (citation omitted).[18]

16          SAP largely repeats its JMOL arguments, and sprinkles in references to supposedly

17  improper evidence and arguments, with little or no effort to show error, preservation, or

18  prejudice, much less all three.

19      **1.      Significant and Non-Speculative Evidence Supported the Hypothetical
             License Award**

20

21          SAP declares the verdict "contrary to the clear weight of the evidence," Mot. 39, but then

22  ignores most of that evidence.  Using SAP's own documents and testimony, Oracle showed how

23  _____

24  [18] SAP's authority is off-point.  In *Herrington v. County of Sonoma*, 834 F.2d 1488 (9th Cir.
     1998) (Mot. 13-14), the court vacated damages in a § 1983 action alleging violations of the

25  Fourteenth Amendment for denial of a property subdivision application because the valuation
     was based on false assumptions, the damage was temporary, and the award was duplicative.  In

26  *Anglo-American Gen. Agents v. Jackson Nat'l Life Ins. Co*., 83 F.R.D. 41 (N.D. Cal. 1979) (Mot.
     14, 47), the court vacated an award of punitive damages as inconsistent with California law.  In

27  *Drew v. Equifax Info. Servs., LLC*, 2010 WL 5022466 (N.D. Cal.), Mot. 14, the court upheld and
     declined to remit a damages award.  *Honda Motor Co. v. Oberg*, 512 U.S. 415 (1994), Mot. 48,

28  is a constitutional punitive damages case.

1     SAP planned to usurp Oracle's marketplace momentum, its detailed plans and "number one

2     single-minded ambition" to use its TN "strategic weapon" to convert Oracle customers to SAP

3     software, and its projections of the value of the intellectual property at stake; it also showed the

4     contemporaneous value of that IP to Oracle. *See* pp. 5-10 above. SAP does not show how all

5     that evidence was clearly outweighed, or by what, and cannot.

6                 **a.**       **The award is based on SAP's actual use**

7         SAP complains, again, that the hypothetical license award does not reflect its "actual use"

8     of Oracle software. *See* Mot. 40 (citing *On Davis*, 246 F.3d at 166 n. 5; *Wall Data*, 447 F.3d at

9     786). SAP is, again, mistaken. The evidence described the scope of SAP's actual use and

10    limited the hypothetical license to that scope. Meyer 918:24-922:15, 1329:22-1331:15. Limiting

11    the award to the "impact on Oracle" is just another way of saying Oracle's recovery should be

12    limited to lost profits and that the jury should not have followed the law in its deliberations by

13    looking at the circumstances at the time the hypothetical license negotiations would have

14    occurred. That is wrong. *See* pp. 14-18, above.

15         The number of customers on whose behalf TN "used" the infringing copies is also beside

16    the point. The point is to identify the fair market value of the rights SAP infringed at the time of

17    infringement based on its scope. *See, e.g.*, *Polar Bear*, 384 F.3d at 709; *On Davis*, 246 F.3d at

18    172.[19] Both experts agreed TN's pervasive use of Oracle software would have required a license

19    "to make virtually unlimited copies of Oracle's software whenever it needed," CD, Ex. UU (PTX

20    7028); Clarke 1862:25-1865:25, and TN did, in fact, make millions of infringing copies. *See* pp.

21    10-11, above. Whether TN chose to use all of them, and for which customers, is irrelevant. *See*

22    *Wall Data*, 447 F.3d at 775 n.3. The jury clearly rejected SAP's repeated invitations to limit the

23    hypothetical license based on the assertion of limited use. *See* Tr. 2122:13-24, 2134:21-2135:18

24    (SAP's closing) (urging the jury to use 358 customers as a "reality check"). Its verdict was well-

25    supported as a matter of law and logic, and there is no basis on which to disturb it.

---

26    [19] SAP's suggestion, Mot. 40, that *On Davis* supports recovery of any less than the full market

27    value of the rights infringed is incorrect. *See On Davis*, 246 F.3d at 172  *On Davis* simply
observes that all infringements are not created equal; using an image of Mickey Mouse in a

28    school play is different from using it in a commercial production. *See id.* at 166 n.5.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1      **b.      Oracle's closing argument was appropriate**

2          Next, SAP complains that Oracle's counsel, in closing, issued "a rank invitation to

3  speculate" by suggesting the jury focus on what the evidence showed the parties would have

4  negotiated for at the time of infringement. Mot. 40-41.  First, SAP did not object, so the point is

5  waived.  *Kaiser Steel*, 785 F.2d at 658; *Bird*, 255 F.3d at 1148.  Second, Oracle's "invitation"

6  was exactly what the law requires (pp. 12-14, above), consistent with the stipulated instruction

7  that the jury *may* (but is not required to) consider the implications of facts from the post-

8  negotiation timeframe, Dkt. 1005 (Final Jury Instr.), Instr. 2, and well within the "reasonably

9  wide latitude" given to counsel during closing arguments.  *Vaccaro*, 816 F.2d at 451.  SAP

10  offered exactly the reverse suggestion in its closing.  Tr. 2148:1-14 (SAP's closing).  It was up to

11  the jury to decide.  SAP's string of cases relating to the "book of wisdom" is superfluous.

12  Mot. 41.  As its own argument demonstrates, they relate to the *admissibility* of post-negotiation

13  evidence, not the weight the jury must afford it.

14      **c.      Meyer's analysis was properly grounded in *Georgia-Pacific***

15          SAP claims Meyer did not follow *Georgia-Pacific*.  Mot. 41.  That is irrelevant as a

16  matter of law and wrong as a matter of fact.  The *Georgia-Pacific* factors are non-exclusive and

17  thus, by definition, do not require precise "following."  Some "may be of minimal or no

18  relevance to a particular case and other factors may have to be molded by the Court to fit the

19  facts of the case at hand."  *Procter & Gamble*, 989 F. Supp. at 607.  An expert need not apply

20  any or all of them.  *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986);

21  *Avocent Huntsville Corp. v. ClearCube Tech. Inc.*, 2006 WL 2109503, at *10 (N.D. Ala.) ("The

22  fifteen *Georgia-Pacific* factors are not exclusive, however; other factors also may be relevant.").

23  Rather, the parties are presumed to know and consider "all relevant information" during the

24  negotiation, just as Meyer did.  *Procter & Gamble*, 989 F. Supp. at 606.

25          In fact, Meyer's testimony, offered without objection, closely tracked the *Georgia-*

26  *Pacific* factors and subsequent cases applying them.  Meyer's "scope of duration of license,"

27  Meyer 901:22-902:2, tracked *GP* factors 3 and 7 ("nature and scope of license" and "duration").

28  *Georgia-Pacific*, 318 F. Supp. at 1119-20.  Meyer's "competitive relationship of the parties,"

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   Meyer 902:8-10, tracked *GP* factor 5 ("commercial relationship between licensor and licensee,

2   such as whether they are competitors").  318 F. Supp. at 1119-20.  Meyer's "risk acceptance"

3   and "need for copyrighted works," Meyer 902:3-7, tracked *GP* and other cases recognizing these

4   considerations reflect the value of the license and the availability of non-infringing alternatives.

5   *See* p. 44, above (citing *Georgia-Pacific*, 318 F. Supp. at 1131 ("GP's calculated infringement …

6   is an admission by conduct that it regarded [the product] as occupying a uniquely favorable

7   position in the market.")).  Meyer's "expected financial benefits and impacts," Meyer 902:17-23,

8   990:15-21, tracked *GP* factors 6, 8, 10, and 11 ("effect of selling the [copyrighted materials] in

9   promoting sales of other products," "established profitability of the [copyrighted] products

10  [and] … its commercial success," "nature of the [copyrighted] invention," the "extent to which

11  the infringer has made use of the invention … [and] the value of that use").  318 F. Supp. at

12  1119-20.  Meyer's "goals/business plans," Meyer 902:14-16, reflected that "[t]he point of the

13  analysis is its focus on the information the negotiators would have had at the time of their

14  negotiations."  *Third Wave Techs., Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 1014 (W.D.

15  Wis. 2005) (finding the jury had "ample credible evidence from which to reach its decision on

16  damages" and rejecting defendant's argument that the jury improperly relied on "misleading

17  [pre-infringement] market projections that do not even remotely approximate [post-negotiation

18  date] reality," because "the reality is that the market projections were defendant's own").[20]

19       SAP's passing suggestion that Meyer "plainly disregards recent Federal Circuit

20  guidance," Mot. 41 n.8, does not withstand scrutiny.  In a series of recent cases about expert

21  reliance upon benchmark licenses, the Federal Circuit has overturned damage awards where the

22  patent holder had not met its "burden to prove that the licenses were sufficiently comparable to

23  support" the awarded hypothetical license.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d

24  [20] SAP's argument is both waived and hypocritical.  Like Meyer, Clarke said his analysis tracked
    and relied on the *Georgia-Pacific* factors and presented a demonstrative about them.  Clarke

25  1566:19-1567:3.  Like Meyer, Clarke chose not to "go over all 15," but "group[ed] them
    together."  Clarke 1567:5-10.  Clarke considered the same factors about which SAP now

26  complains:  the parties' relationship (which he used to increase his royalty opinion), the ability to
    use the sale of one product to sell others, and whether non-infringing alternatives existed.  *Id.*

27  1568:17-1573:9.  Finally, like Meyer, Clarke opined based on "putting all those Georgia Pacific
    factors together."  *Id.* 1573:10-12.

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   1301, 1329 (Fed. Cir. 2009); *id.* at 1332 (reversing a lump-sum award "roughly three to four

2   times the average amount in the lump-sum agreements in evidence"); *id.* at 1327, 1329-30

3   (rejecting running royalty benchmark licenses where the patent holder's expert had testified that

4   the jury should "speculat[e] as to the extent of the future use" to determine an equivalent lump-

5   sum award); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (rejecting a

6   patent holder's "reliance on [benchmark] licenses because 'some of the license agreements

7   [were] radically different from the hypothetical agreement under consideration' and the court

8   was 'unable to ascertain from the evidence presented the subject matter of the agreements.'")

9   (quoting *Lucent*, 580 F.3d at 1327-28); *id.* at 868, 871 (verdict was "divorced from proof of

10  economic harm" *because* the expert based his opinion on purported benchmark licenses but "did

11  not even attempt to show that these agreements embody or use the claimed technology" at issue

12  in the case); *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed.

13  Cir. 2010) (rejecting all 13 benchmark licenses offered in support where the record did not

14  contain "any idea of the volume of sales or *projected sales*" and where running royalty

15  benchmarks could not be compared to the lump-sum award without speculation) (emphasis

16  supplied); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 2011 U.S. App. LEXIS 11, at *59-66

17  (Fed. Cir.) (rejecting 25% "rule of thumb" used in lieu of a benchmark license as not "tied to the

18  relevant facts and circumstances of the particular case at issue").

19      These cases do not support reversal of the jury's hypothetical license award.  *Lucent* and

20  its progeny teach that "a recitation of royalty numbers" is not enough to make a benchmark

21  license comparable, and that a basis of comparison must be laid for running royalty licenses to be

22  comparable to lump-sum awards.  *See Wordtech*, 609 F.3d at 1320; *see also id.* ("*Lucent* …

23  explained general criteria for comparing patent licenses ….").  Here, Meyer relied on extensive

24  contemporaneous evidence relating to the parties' expectations, goals, and costs rather than

25  comparisons of incomparable licenses or arbitrary rules of thumb, rendering the specific holdings

26  inapposite.

27      Viewed more broadly, *Lucent* and its progeny weigh in favor of a determination that the

28  jury's hypothetical license award was properly supported because the jury could "adequately

1    evaluate[] the probative value" of the evidence offered in support of Meyer's testimony.  *Lucent*,

2    580 F.3d at 1328.  A direct link can be drawn from Meyer's damages opinion to the specific

3    financial (revenue, profit margin, discount rate) inputs in his model, which are all based in the

4    parties' own contemporaneous evidence and related to the specific product lines and customers

5    at issue.  *See* pp. 23-26, above; *see Lucent*, 580 F.3d at 1334 (endorsing reliance on a party's

6    contemporaneous "rough estimates as to the expected frequency of use" for hypothetical license

7    analysis); *Wordtech*, 609 F.3d at 1319 ("[a] reasonable royalty can be calculated from … the

8    infringer's profit projections for infringing sales").  Thus, Meyer's testimony was consistent with

9    both *Georgia-Pacific* and Federal Circuit case law.

10                   **d.      Oracle properly provided contextual evidence**

11           Finally, SAP argues that Oracle's witnesses confused the jury by improperly discussing

12   R&D expenses, the acquisition costs for PeopleSoft and Siebel, and the size of the software

13   industry.  Mot. 42.  Because SAP failed to object at trial to the testimony at issue, *see* Ellison

14   760:13-22; Screven 451:22-452:12, 453:12-23; Phillips 522:20-523:13; Catz 856:2-857:13, the

15   argument is waived.  *United Bhd. of Carpenters & Joiners, Lathers Local 42-L v. United Bhd. of*

16   *Carpenters & Joiners*, 73 F.3d 958, 962 n.1 (9th Cir. 1996) (failure to object to testimony at trial

17   constitutes waiver).  SAP's reference to its denied motion *in limine* to exclude improper

18   technical opinions of lay witnesses is unavailing, as it concerned a different subject and did not

19   address the testimony of Ellison, Catz, or Phillips at all.  *See* Dkt 728 (SAP's MIL's) at 10:19-

20   15:13.  Even if it had, its denial does not preserve the issue.  *Kelly v. City of Oakland*, 198 F.3d

21   779, 786 (9th Cir. 1999).

22           In any event, SAP repeatedly mischaracterizes Oracle's purpose in offering the R&D

23   expenditures and software industry evidence.  Oracle offered that evidence as context to help the

24   jury understand the parties' competitive positions, the significant investments Oracle has made in

25   its IP over time, and the effects if SAP were to siphon off the maintenance revenue that funded

26   R&D, as SAP projected it would.  Oracle did not offer this evidence to support its damages

27   claim.  SAP cites no authority that says Oracle improperly offered this kind of context evidence,

28   nor did SAP object to it at the time.

1        ## 2.        The Jury's Award Does Not Exceed Actual Harm

2        Contrary to the law and in the face of numerous orders from the Court to the contrary,

3   Dkts. 628 (MSJ Order) & 762 (MSJ Order), SAP again contends Oracle's "actual harm" is

4   limited to lost profits, and Oracle's recovery should be limited to the $28 million (or no more

5   than $408.7 million) in lost profits it claims Oracle was able to prove.  Mot. 43-44.  But lost

6   profits cannot limit actual damages as a matter of law.  *See Polar Bear*, 384 F.3d at 708-10

7   (affirming a damage award based on fair market value where plaintiff was unable to prove *any*

8   lost profits); *On Davis*, 246 F.3d at 165-66 (copyright owner entitled to fair market value even

9   where infringement is unprofitable and no sales are lost).  SAP's suggestion to the contrary has

10   been rejected by this Court and the Ninth Circuit for good reason:  proving lost profits "is often

11   impractical" because it is difficult to prove them with specificity.  *See* Dkt. 762 (MSJ Order) at

12   20:22-24 (citing *Polar Bear*).

13        Here, SAP infringed a vast scope of work, including thousands of copies of Oracle

14   application software, and millions of update and support materials – and that was merely what

15   was left after TN had deleted at least a million more Oracle files.  *See* pp. 10-11, above.  SAP

16   used its stockpile of infringing material as a strategic weapon to harm Oracle's ability to pay for

17   the PeopleSoft acquisition from cash, deplete Oracle's ability to invest in research and

18   development, and contain its future growth in the next generation of the application market.  *See*

19   p. 8 above.  The fair market value license helps resolve the difficulty in quantifying these

20   downstream impacts, whereas the lost profits measure may not include them at all.  *See Polar*

21   *Bear*, 384 F.3d at 708-10; *Hanson*, 718 F. 2d at 1078.

22        The jury, given the choice, agreed.  The Court adopted SAP's version of the verdict form

23   that required the jury to choose between the hypothetical license or lost profits damages

24   measures.  The Court then allowed SAP to argue that the jury should decide lost profits as the

25   proper damages measure, and SAP did precisely that.  Tr. 2105:3-16, 2111:20-2112:4, 2148:1-16

26   (SAP's closing); *see also* Court 2215:22-2218:4 (instructing jury to pick the "best measure" of

27   Oracle's damages).  Having heard all the evidence, the jury rejected SAP's arguments and

28   expressly declined to adopt the lost profits measure.  *See* Dkt. 1004 (Verdict Form).  There is no

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   basis to overturn that decision, or deny Oracle its well-established measure of recovery.

2            **3.**     **The Liability Evidence Oracle Presented Was Highly Relevant and Caused No Undue Prejudice**

3

4         SAP asserts a new trial is warranted because the introduction of "irrelevant and

5   prejudicial liability evidence" improperly influenced the jury's award.  Mot. 45-47.  As discussed

6   above at pp. 33-35, the Court correctly ruled that evidence showing that SAP contributed to the

7   infringement was relevant to damages;[21] there is no artificial line between "liability" evidence

8   and "damages" evidence such that any particular document or piece of testimony cannot be

9   relevant to both, as was the case here for the reasons described above with regard to SAP's

10  acceptance of the risk of infringement.

11        The Court should also reject SAP's related new trial argument for two additional,

12  independent reasons:  (1) SAP agreed evidence of TN's liability on all claims against it

13  (including the CFAA, CDAFA, trespass, copyright and unfair competition) and vicarious

14  copyright liability as to SAP AG and SAP America was admissible, so any error was waived;

15  and (2) any error was harmless, and SAP cannot prove otherwise.

16                 **a.**     **SAP agreed TN's direct liability evidence was relevant**

17        SAP finally concedes, after several paragraphs, that "both sides agreed" the direct

18  liability evidence about which it now complains was admissible as "background or context."

19  Mot. 46.  SAP further stipulated that evidence was admissible as "relevant to damages."  CD, Ex.

20  L (JTX 4) at ¶ 4.  It also agreed, and the Court ordered, that "the Parties [would] not object to

21  evidence related to the stipulated claims pursuant to Federal Rules of Evidence 401-403

22  (including that the evidence is irrelevant, cumulative, unduly time consuming or prejudicial) on

23  grounds that the evidence relates to the stipulated claims."  *Id.* at 2:10-12.

24        Accordingly, SAP objected to none of this evidence at trial.  Now it ignores the

25  stipulation by claiming Oracle "abus[ed] the opportunity" by introducing testimony of "various

26  witnesses about supposed corruption of data, purported fraudulent access to Oracle's websites,

27  ---

   [21] The Court also found, correctly, that the contributory infringement evidence could not

28  prejudice SAP "given that SAP has now stipulated to liability."  Court 256:14-15.

1   and alleged crashes to Oracle's computers." Mot. 45-46. Oracle abused nothing. It offered the

2   evidence the parties agreed it could as part of a detailed negotiation facilitated by Magistrate

3   Judge Spero. If SAP believed differently, it was required to object, and it did not. Ransom

4   432:10-18; Screven 469:23-471:19; Mandia 1381:5-10, 1390:12-1392:17. The issue is waived.

5   *United Bhd. of Carpenters*, 73 F.3d at 962 n.1.[22]

6                          **b.    SAP suffered no prejudice**

7           SAP contends it was prejudiced because its witnesses were "prevented from testifying

8   about steps that SAP took to mitigate risk of infringement." Mot. 46. That is simply untrue.

9   Brandt testified "[SAP] did everything possible in order to have [TN] follow the correct

10  procedure and the [sic] respect of the copyright laws," including issuing a directive to TN to

11  remove Oracle software from its systems in 2005 that he believed had been followed. Brandt

12  714:2-4, 729:4-730:13. SAP also introduced an exhibit allegedly showing its executives thought

13  TN's business model was legal at the time of the acquisition. *Id.* 726:13-18; CD, Ex. I (DTX A-

14  4027). SAP then defended Brandt's violation of its liability stipulation by arguing it needed to

15  introduce evidence to mitigate the contributory liability evidence the Court had allowed (because

16  it related to context and damages). In response, the Court made clear that SAP could present any

17  evidence of mitigation and refused to tell the jury "how they should be looking at that evidence,"

18  "as long as there's something on the record that says that there is no disavowal of [SAP's

19  stipulated] liability." Court 1196:24-1197:5. Agassi testified he advised SAP to make sure its

20  employees did not have access to PeopleSoft code. CD, Ex. B (Agassi Depo) 347:13-348:2.

21  Ziemen testified he did not know how TN provided services for Siebel applications. *Id.*, Ex. H

22  (Ziemen Depo) 488:4-24, 490:4-17.[23]

23  [22] Far from giving Oracle "free license" to introduce "mountains" of liability evidence, the
    Court sustained many of SAP's other objections to liability evidence as cumulative. *See, e.g.,*

24  CD, Ex. VV (Rulings on Defs' Depo. Objs.) (sustaining SAP's objections to Agassi and Ritchie
    liability testimony); Court 309:1-4, 501:23-502:3.

25  [23] SAP's argument that the verdict "can only be described as a punitive damages award, which
    cannot stand under copyright law" also fails. Mot. 46. Both parties' damages experts told the

26  jury that "there should not be anything punitive" in the hypothetical license award. Meyer

27  1082:13-19; Clarke 1542:12-20. The Court instructed the jury to award only actual damages.
    Court 2212:14-20, 2215:22-2216:1. The Court must assume the jury's compliance with that

28  instruction absent an "overwhelming probability" of its inability to do so. *Greer v. Miller*, 483

                                                    (Footnote Continued on Next Page.)

                    ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    SAP also claims it was prejudiced by the use of language with "criminal overtones."

2  Mot. 46-47.  SAP did not object to Catz's analogies, so waived any complaint about them.  Catz

3  867:5-868:1; 1904:18-23; 1921:20-1922:5.  *See United Bhd.*, 73 F.3d at 962 n.1.  SAP concedes

4  the Court sustained its objection to Oracle's opening demonstrative exhibits that used the words

5  "theft" and "stole," but contends Oracle "flouted" the ruling in closing with its reference to Best

6  Buy.  Mot. 46.  SAP failed to object, then expressly declined any relief based on the "Best Buy"

7  argument, claiming it was "incurabl[y]" prejudicial.  Tr. 2255:7-20 (SAP's arg. re rebuttal).  Not

8  so.  Even statements that exceed the "reasonably wide latitude in closing arguments" to "strike

9  hard blows based on the evidence and reasonable inferences from the evidence" do not rise to

10  reversible error unless they were "so gross as to have probably prejudiced the defendants and the

11  prejudice was not neutralized by the trial judge."  *Vaccaro*, 816 F.2d at 451.

12    Contrary to SAP's claim, no witness used the terms "theft" or "steal" to describe SAP's

13  conduct or otherwise.  Mot. 46-47.  The Court also observed "reasonable jurors might differ on

14  whether or not the plaintiffs should have been able to characterize the conduct as theft or

15  stealing."  Court 2257:1-4.[24]  SAP can make no serious argument that these scattered analogies,

16  and not the voluminous evidence described above, caused the verdict.

17    **4.    SAP's Remittitur Argument Fails**

18    The Court may not disturb a jury's damages award unless it is "clearly unsupported by

19  the evidence," or "grossly excessive," "monstrous," or "shocking to the conscience."  *Brady v.*

20  *Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988).  In applying these standards, the Court must "view

21  the evidence concerning damages in a light most favorable to the prevailing party."  *Buritica v.*

22  *United States*, 8 F. Supp. 2d 1188, 1191 (N.D. Cal. 1998); *see also Fenner v. Dependable*

23  *Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983) (same).  The Court also must give

24  "substantial deference to the jury's finding of the appropriate amount of damages."  *Del Monte*

25  _____
(Footnote Continued from Previous Page.)

26  U.S. 756, 766 n.8 (1987).

27  [24] The Ninth Circuit has referred to an infringer as being in no better position "than an ordinary thief."  *Polar Bear*, 384 F.3d at 709.  The Second Circuit referenced allowing "an infringer [to] steal with impunity."  *On Davis*, 246 F.3d at 166.

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1   *Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996).  If the jury's

2   award falls within "the range sustainable by the proof," the Court must resist any temptation to

3   "play Monday morning quarterback" or supplant the jury's evaluation with its own.  *L.A. Mem'l*,

4   791 F.2d at 1366.  *See also id.* at 1365 ("we undertake only limited review of jury damages

5   awards, in order to avoid encroaching upon the jury's proper function under the Constitution").

6          The amount of deference does not change simply because the jury awarded a large sum.

7   *See Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 865 (Tex. App. 1987) ("Though the

8   compensatory damages [of $7.53 Billion] are large, they are supported by the evidence, and were

9   not the result of mere passion, prejudice, or improper motive. … [W]e are not authorized by law

10  to substitute our judgment for that of the jury….); *see also, Koster v. Trans World Airlines, Inc.*,

11  181 F.3d 24, 34 (1st Cir. 1999) (A court should "not disturb an award of damages because it is

12  extremely generous or because we think the damages are considerably less," but only "if it is so

13  grossly disproportionate to any injury established by the evidence as to be unconscionable as a

14  matter of law."); *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395-96 (6th Cir. 1990)

15  (court should not disturb award where jury awarded "the maximum" plaintiff had testified was

16  due her); *U.S. v. 329.73 Acres of Land*, 666 F.2d 281, 284 (5th Cir. 1981) (verdict "within the

17  range of figures" given by experts and jury had a "reasonable basis").

18         Last, SAP asks the Court to substitute SAP's view of the evidence and proper damages

19  amount for the jury's by reducing the award to the "maximum lost profits and infringer's profits

20  supported by the evidence."  Mot. 47-48.  That request assumes that lost profits, and not a

21  hypothetical license, is the only available damages measure.  The jury rejected that false premise

22  when it decided a fair market value license measured Oracle's damages better than lost profits.

23  The Court has already denied SAP's attempt to take the remedy question from the jury:  "Oracle

24  should be permitted to present evidence regarding the fair market value of the copyrights that

25  SAP allegedly infringed, including expert testimony based on established valuation

26  methodology."  Dkt. 628 (MSJ Order) at 5:5-7.  Oracle presented that evidence and expert

27  testimony, which overwhelmingly supported the jury's award (or, indeed, a higher one).  SAP

28  does not agree, but repeating its arguments does not make them more persuasive.

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL

1    This award is large because it is based on SAP's multi-billion dollar, Board-level

2 strategies and its sweeping infringement designed to implement them.  The jury required SAP to

3 pay the value of what it took.  That is not "shocking to the conscience."  It is justice.

4 **IV.    CONCLUSION**

5    The law and the evidence support this verdict.  The Court should deny SAP's motions.

6 DATED:  April 8, 2011                    Bingham McCutchen LLP

7

8                                          By:_____/s/ Geoffrey M. Howard_____
                                           Geoffrey M. Howard
9                                          Attorneys for Plaintiffs Oracle USA, Inc., *et al.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORACLE'S OPPOSITION TO SAP'S MOTION FOR JMOL OR NEW TRIAL