Robert A. Mittelstaedt (SBN 060359)
Jason McDonell (SBN 115084)
Elaine Wallace (SBN 197882)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700
ramittelstaedt@jonesday.com
jmcdonell@jonesday.com
ewallace@jonesday.com

Tharan Gregory Lanier (SBN 138784)
Jane L. Froyd (SBN 220776)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:     (650) 739-3939
Facsimile:     (650) 739-3900
tglanier@jonesday.com
jfroyd@jonesday.com

Scott W. Cowan (Admitted Pro Hac Vice)
Joshua L. Fuchs (Admitted Pro Hac Vice)
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone:     (832) 239-3939
Facsimile:     (832) 239-3600
swcowan@jonesday.com
jlfuchs@jonesday.com

Attorneys for Defendants
SAP AG, SAP AMERICA, INC., and
TOMORROWNOW, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE USA, INC., et al., | Case No. 07-CV-1658 PJH (EDL) |
| Plaintiffs, | **REPLY IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL MOTION** |
| v. | |
| SAP AG, et al., | Date:        July 13, 2011 |
| Defendants. | Time:        9:00 a.m. |
| | Courtroom: 3, Third Floor |
| | Judge:      Hon. Phyllis J. Hamilton |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................... 1

II.   REPLY ARGUMENT: RENEWED MOTION FOR JMOL ............................. 2

    A.    JMOL 1 - Oracle Is Not Entitled to Hypothetical License Fees as Actual Damages Because It Did Not Lose License Fees ...................................... 2

        1.    The Copyright Act Requires that a Plaintiff Prove that It Lost a License Fee as a Result of Infringement to Recover Damages in the Form of Lost License Fees ............................................................. 3

        2.    Ninth Circuit Law Confirms that a Copyright Plaintiff Must Prove that It Lost a License Fee as a Result of Infringement to Recover License Fees as Damages .......................................................... 4

        3.    Oracle Provides No Authority to Support Its Recovery of Hypothetical License Damages ............................................... 5

        4.    The Court's Ruling on Summary Judgment Does Not Dispose of Defendants' Motion ............................................................. 8

    B.    JMOL 2 - Oracle Failed to Offer Legally Sufficient Evidence to Value a Lost License Fee Award ............................................................... 9

        1.    The Lack of Objective Evidence of Benchmark Transactions Renders Oracle's Hypothetical License Claims Unduly Speculative ........ 9

        2.    Evidence Relating to the Parties' Purported "Negotiation Perspectives" Is Insufficient as a Matter of Law to Establish a Reasonable, Non-Speculative License Price for the PeopleSoft/JDE and Siebel Licenses ........................................................... 11

        3.    Evidence Offered in Support of Oracle's Database Damages Claim Suffers from Similar Deficiencies ......................................... 14

III.  NEW TRIAL ............................................................................................ 16

    A.    Standards for New Trial .......................................................... 16

    B.    The Court Should Grant SAP's Motion for New Trial or Remittitur ........... 17

        1.    Oracle Cannot Distinguish Federal Circuit Cases Rejecting "Reasonable Royalty" Awards Based on Insufficient, Speculative Evidence ............................................................................ 17

        2.    The Disparity Between the Award and Actual Lost Profits Plus Infringer's Profits Shows that the Award Is Clearly Excessive ............ 18

        3.    Oracle Failed to Identify Sufficient, Non-Speculative Evidence to Support the Hypothetical License Award ................................. 20

        4.    The Award Is Not Based on Actual Use ...................................... 24

        5.    Oracle's Reliance on Prejudicial Arguments and Evidence Contributed to the Miscarriage of Justice ............................... 25

    C.    Remittitur Is Appropriate Because the Award Is Grossly Excessive and Clearly Unsupported by the Evidence ....................................... 27

IV.   CONCLUSION ........................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Anglo-American Gen. Agents v. Jackson Nat'l Life Ins. Co.*,
  83 F.R.D. 41, 45 (N.D. Cal. 1979) ................................................................................ 16, 29

*Apple Computer, Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994) ................................................................................................ 14

*Baker v. Urban Outfitters, Inc.*,
  254 F. Supp. 2d 346 (S.D.N.Y. 2003) .................................................................................. 3, 7

*Bi-Rite v. Button Master*,
  578 F. Supp. 59 (S.D.N.Y. 1983) .................................................................................... 10, 14

*Blakely v. Continental Airlines, Inc.*,
  992 F. Supp. 731 (D.N.J. 1998) ............................................................................................ 29

*Bruce v. Weekly World News, Inc.*,
  310 F.3d 25 (1st Cir. 2002) ................................................................................................... 15

*Buritica v. United States*,
  8 F. Supp. 2d 1188 (N.D. Cal. 1998) .............................................................................. 27, 28

*Business Trends Analysts, Inc. v. Freedonia Grp., Inc.*,
  887 F.2d 399 (2d Cir. 1989) ........................................................................................ 4, 5, 6, 7

*Childress v. Taylor*,
  798 F. Supp. 983 (S.D.N.Y. 1992) ........................................................................................ 21

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.*,
  754 F.2d 826 (9th Cir. 1985) ............................................................................................... 3, 4

*DaimlerChrysler Servs. v. Summit Nat'l*,
  No. 02-71871, 2006 WL 208787 (E.D. Mich. Jan. 26, 2006) ....................................... 12, 15

*Donnelly v. DeChristoforo*,
  416 U.S. 637 (1974) .............................................................................................................. 27

*Drew v. Equifax Info. Servs., LLC*,
  No. C-07-00726 SI, 2010 WL 5022466 (N.D. Cal. Dec. 3, 2010) ....................................... 16

*Ek v. McDonald*,
  No. 2:08-cv-00962-JWS, 2010 WL 843760 (E.D. Cal. Mar. 9, 2010) ................................. 27

*Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*,
  25 F. Supp. 2d 395 (S.D.N.Y. 1998) .................................................................................... 4, 7

*Fenner v. Dependable Trucking Co.*,
  716 F.2d 598 (9th Cir. 1983) ........................................................................................... 27, 28

*Floyd v. Meachum*,
  907 F.2d 347 (2d Cir. 1990) ................................................................................................. 27

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
  772 F.2d 505 (9th Cir. 1985) ....................................................................................... 5, 7, 12

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
  593 F. Supp. 2d 1088 (N.D. Cal. 2009) ................................................................................ 16

*Gasperini v. Center for Humanities, Inc.*,
  518 U.S. 415 (1996) ......................................................................................................... 16, 28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Gaylord v. U.S.*,
   No. 06-539C, 2011 U.S. Claims LEXIS 613 (Fed. Cl. Apr. 22, 2011) ...................................... 15

*Getaped.com, Inc. v. Cangemi*,
   188 F. Supp. 2d 398 (S.D.N.Y. 2002)................................................................................ 5, 6, 13

*Guy v. City of San Diego*,
   608 F.3d 582 (9th Cir. 2010)...................................................................................................... 16

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983)............................................................................................ 13, 20

*Hill v. Airborne Freight Corp.*,
   212 F. Supp. 2d 59 (E.D.N.Y. 2002); ........................................................................................ 29

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006), *aff'd*, 616 F.3d 1357 (Fed. Cir. 2010) ........................... 16, 25, 26

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
   274 F.3d 1371 (Fed. Cir. 2001).................................................................................................. 13

*Interplan Architects, Inc. v. C.I. Thomas, Inc.*,
   No. 4:08-cv-03181, 2010 U.S. Dist. LEXIS 114306 (S.D. Tex. Oct. 27, 2010) ..... 10, 11, 14, 15

*Jarvis v. K2 Inc.*,
   486 F.3d 526 (9th Cir. 2007)........................................................................................... *passim*

*Kelleher v. New York State Trooper Fearon*,
   90 F. Supp. 2d 354 (S.D.N.Y. 2000)......................................................................................... 29

*Larson v. Neimi*,
   9 F.3d 1397 (9th Cir. 1993)........................................................................................................ 26

*Leland Med. Ctrs., Inc. v. Weiss*,
   No. 4:07cv67, 2007 WL 2900599 (E.D. Tex. Sept. 28, 2007) ............................................ 12, 13

*Locklin v. Switzer Bros., Inc.*,
   235 F. Supp. 904 (N.D. Cal. 1964) ............................................................................................ 13

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009).......................................................................................... 17, 18, 19, 25

*Mackie v. Reiser*,
   296 F.3d 909 (9th Cir. 2002)........................................................................................... *passim*

*Moist Cold Refrigerator Co. v. Lou Johnson Co.*,
   249 F.2d 246 (9th Cir. 1957)......................................................................................... 17, 27, 28

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007)...................................................................................................... 17

*Monster Content, LLC v. Homes.com, Inc.*,
   No. C 04-0570 FMS, 2005 WL 1522159 (N.D. Cal. June 28, 2005) ....................................... 21

*National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*,
   458 F. Supp. 2d 252 (E.D. Pa. 2006) ................................................................................. 4, 5, 7

*National Fed'n of Fed. Employees, Local 1309 v. Dep't of Interior*,
   526 U.S. 86 (1999)........................................................................................................................ 3

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*On Davis v. The Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001) ................................................................ *passim*

*Polar Bear Prods., Inc. v. Timex Corp.*,
   384 F.3d 700 (9th Cir. 2004) ............................................................... *passim*

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ................................................................. 18

*Russello v. U.S.*,
   464 U.S. 16 (1983) .................................................................................... 3

*Seymour v. Summa Vista Cinema, Inc.*,
   809 F.2d 1385 (9th Cir. 1987) ................................................................ 28

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   309 U.S. 390 (1940) ................................................................................ 14

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
   562 F.2d 1157 (9th Cir. 1977) ............................................................... 5, 6

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*,
   289 U.S. 689 (1933) ................................................................................ 13

*Smith v. Rush*,
   No. C04-2280Z, 2006 U.S. Dist. LEXIS 27412 (W.D. Wash. Apr. 7, 2006) .................. 12, 15

*Snellman v. Ricoh Co.*,
   862 F.2d 283 (Fed. Cir. 1988) ................................................................ 13

*Technologies, S.A. v. Cyrano, Inc.*,
   460 F. Supp. 2d 197 (D. Mass. 2006) ................................................ 10, 14

*Trans-World Mfg. Co. v. Al Nyman & Sons, Inc.*,
   750 F.2d 1552 (Fed. Cir. 1984) .............................................................. 13

*U.S. v. Garza*,
   608 F.2d 659 (5th Cir. 1979) .................................................................. 27

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .............................................................. 18

*Venegas v. Wagner*,
   831 F.2d 1514 (9th Cir. 1987) ................................................................ 16

*W.L. Gore & Assocs., Inc. v. Tetratec Corp.*,
   15 U.S.P.Q. 2d (BNA) 1048 (E.D. Pa. 1989) ......................................... 13

*Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) .............................................................. 18

## Statutes

17 U.S.C. § 412 ............................................................................................ 8

17 U.S.C. § 504 ................................................................................. 3, 4, 8, 14

35 U.S.C. § 284 ............................................................................................ 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**<u>Rules</u>**

Federal Rule of Civil Procedure 50 ................................................................................ 1, 2

Federal Rule of Civil Procedure 59 .................................................................... 2, 17, 25

Federal Rule of Evidence 702 ............................................................................................ 24

11 Charles A. Wright, Arthur R. Miller, Mary K. Kane,
    Federal Practice and Procedure § 2806 (2d Ed. 1995) ............................................ 17

1    **I.      INTRODUCTION**

2              The jury's $1.3 billion verdict should be set aside because it was based not on reliable,

3    objective evidence of Oracle's actual damages, but on speculation, prejudice and confusion.

4    Oracle asked for "hypothetical" lost license fees, even though it could not (and did not) offer

5    evidence of lost licensing opportunities with defendants or third parties due to TN's infringement

6    or proof of market benchmarks for comparable transactions.  Instead, Oracle relied on aggregate

7    values of corporate acquisitions, after-the-fact and self-interested opinions of its own executives,

8    SAP's marketing goals for its overall competition with Oracle (not limited to TN's use of the

9    works) and a cascade of now admittedly irrelevant "contextual" evidence of billions invested in

10   research and development.  Oracle piled on days of prejudicial and inflammatory liability

11   evidence, even though liability had been conceded.  And Oracle steadfastly insisted—and still

12   insists in its Opposition—that the evidence of its minimal actual losses (evidence that the U.S.

13   Supreme Court calls "a book of wisdom that courts may not neglect") should be ignored in favor

14   of speculation about the result of a hypothetical pre-infringement negotiation that all agree never

15   would have yielded any license, let alone a reasonable one.

16             This injustice occurred because Oracle insisted on pursuing "actual" damages that, based

17   on the trial evidence, are not available as a matter of law.  Oracle conflates a lost license fee

18   award under copyright law—a form of actual damage requiring proof of actual pecuniary loss—

19   with a reasonable royalty under patent law, an alternative, statutorily required remedy in patent

20   cases when one cannot prove actual damages.  Oracle's actual pecuniary loss in this case cannot

21   be measured by "hypothetical" lost license fees because Oracle admittedly never has licensed—

22   and never would license—the works to a third party support provider.  Oracle's actual loss was

23   support revenue from customers who left for TN, which is why lost profits (supplemented by

24   non-duplicative infringer's profits) is the appropriate measure of actual damage.

25             For these reasons, the verdict cannot stand.  The jury's award of a lost license fee is

26   legally impermissible under Rule 50(b) because Oracle did not actually lose license fees.  The

27   Court's previous summary judgment ruling, which did not have the benefit of the full trial

28   evidence, does not dispose of this issue.  Even if the law permits Oracle to seek lost license fees

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH (EDL)

1    here, the award in this case is still legally impermissible under Rule 50(b) because Oracle failed

2    to present sufficient evidence, resulting in a damages award based on undue speculation.  Finally,

3    the award also fails the new trial standard under Rule 59 because the jury's award was grossly

4    excessive, against the weight of the evidence and resulted in a miscarriage of justice.  The Court

5    should remit the verdict to no more than $408.7 million or order a new trial to determine

6    damages based on Oracle's actual lost profits and Defendants' infringer's profits.

7    **II.      REPLY ARGUMENT: RENEWED MOTION FOR JMOL**

8           The dispute with respect to Defendants' motion for judgment as a matter of law boils

9    down to two legal issues: (1) whether every copyright plaintiff may seek a lost license fee

10   remedy, or only those plaintiffs who actually lost a license fee and (2) whether Oracle's evidence,

11   which did not include objective benchmarks, is legally sufficient to establish a non-speculative

12   license price.  As shown in Defendants' Motion, and not refuted by Oracle, no court has ever

13   awarded a lost license fee ("hypothetically" measured or otherwise) to a copyright plaintiff who

14   did not actually lose license fees, and no court has ever awarded a lost license fee absent evidence

15   of benchmark transactions.  Mot. at 16.  The Copyright Act and Ninth Circuit precedent mandate

16   the same result here.  Oracle is not entitled to a lost license fee award because it did not suffer

17   damage in the form of lost license fees.  And because the license award Oracle sought is

18   unprecedented, no real-world benchmarks exist (or could exist) to prove objective market value.

19   As a result, the jury's verdict is based on speculative evidence of subjective "negotiation

20   perspectives," which could never properly support a non-speculative verdict, particularly one that

21   was many times larger than Oracle's actual harm.

22           **A.      JMOL 1 - Oracle Is Not Entitled to Hypothetical License Fees as Actual**
                      **Damages Because It Did Not Lose License Fees.**
23

24          Oracle does not dispute that it never would have licensed the copyrights to any third party,

25   much less its arch-rival, to provide maintenance services.  This concession should end the inquiry,

26   as it establishes that Oracle never lost a license fee, and therefore is not entitled to a license

27   award.  Oracle argues that, upon proof of infringement, copyright plaintiffs are automatically

28   entitled to seek "hypothetical" license damages because they are presumed to have suffered harm

1   in the form of lost license fees.  Opp. at 13, 17.  This extreme position has no support in the law.

2           **1.    The Copyright Act Requires that a Plaintiff Prove that It Lost a License Fee as a Result of Infringement to Recover Damages in the**
3           **Form of Lost License Fees.**

4           As discussed in Defendants' Motion, the most common and well-accepted way to

5   measure "actual damages" under the Copyright Act is to prove a plaintiff's lost profits.  Mot. at

6   15; *see also Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 356 (S.D.N.Y. 2003).

7   However, when a plaintiff's injury consists of lost or reduced license fees from the defendant or

8   third parties, courts have permitted plaintiffs to seek lost license fees as actual damages.  *Jarvis*

9   *v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007); *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*,

10  754 F.2d 826, 827-28 (9th Cir. 1985).  As a form of actual damages, license fee awards are

11  subject to the Copyright Act's requirement that "actual damages" be limited to those "suffered

12  by [the owner] as a result of the infringement."  17 U.S.C. § 504(b).  Accordingly, the Copyright

13  Act does not support Oracle's contention that a plaintiff is "automatically" presumed to have

14  suffered harm in the form of a lost license fee, such that "[o]nly valuation remains for the jury to

15  determine."  Opp. at 17.  The plain statutory language requires, without exception, that plaintiffs

16  prove actual damages suffered as a result of the infringement.  Absent that proof, a plaintiff has

17  no right under the statute to recover actual damages.  17 U.S.C. § 504(b).

18          In effect, Oracle asks this Court to judicially amend Section 504(b) by reading in the

19  Patent Act's requirement that an award of patent infringement damages be "in no event less than

20  a reasonable royalty for the use of the invention by the infringer . . . . "  35 U.S.C. § 284.  Of

21  course, that requirement appears nowhere in the Copyright Act.  And that Congress chose not to

22  include a minimum recovery of "hypothetical" license damages in the Copyright Act indicates

23  that Congress did not intend to guarantee recovery of license fees as it did in the Patent Act.

24  *National Fed'n of Fed. Employees, Local 1309 v. Dep't of Interior*, 526 U.S. 86, 104 (1999) (in

25  comparing Federal Labor Act to the National Labor Relations Act, noting that lack of

26  comparable duty-to-bargain language in Federal Labor Act "indicates that Congress did not

27  intend to include a similar duty in the Federal Labor Statute"); *cf. Russello v. U.S.*, 464 U.S. 16,

28  23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits

1   it in another section of the same Act, it is generally presumed that Congress acts intentionally

2   and purposefully in the disparate inclusion or exclusion." (citation omitted)).

3          Oracle's argument that the Copyright Act does not explicitly prohibit recovery of actual

4   damages by competitors or by plaintiffs who have not previously licensed their works misses the

5   mark.  Opp. at 16.  The statute only allows plaintiffs to recover the actual pecuniary loss suffered

6   as a result of infringement.  In considering whether infringement caused lost license fees, courts

7   have found proof of benchmark transactions by the plaintiff and competitive relationships

8   between the parties important, and usually determinative.  Mot. at 18; *Polar Bear Prods., Inc. v.*

9   *Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004) (allowing license award where parties had past

10  licensing history); *Business Trends Analysts, Inc. v. Freedonia Grp., Inc.*, 887 F.2d 399, 405-06

11  (2d Cir. 1989) (precluding license award where direct competitors would not have agreed to

12  license); *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 458 F. Supp. 2d

13  252, 261 (E.D. Pa. 2006); *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 25 F. Supp.

14  2d 395, 401-02 (S.D.N.Y. 1998).  Absent proof that it suffered a lost license fee "as a result of the

15  infringement"—proof that cannot be made where there is no evidence of past licensing and where

16  the parties never would have agreed to such a license—a copyright plaintiff cannot recover actual

17  damages in the form of lost license fees, even "hypothetical" ones.  17 U.S.C. § 504(b).

18              **2.    Ninth Circuit Law Confirms that a Copyright Plaintiff Must Prove
                        that It Lost a License Fee as a Result of Infringement to Recover
19                      License Fees as Damages.**

20          In addition to contradicting the plain language of the Copyright Act, Oracle's argument

21  that infringement "automatically and immediately deprives the [copyright] owner of the license

22  fee it was entitled to receive" conflicts with Ninth Circuit precedent.  Opp. at 17.  The Ninth

23  Circuit has never upheld an award of lost license fees absent proof that the plaintiff actually

24  would have licensed the infringed work to the defendant or a third party for the use at issue, and

25  that the infringement caused the loss of that opportunity.  *See Polar Bear*, 384 F.3d at 704, 709

26  (affirming license award where parties previously licensed work); *Jarvis*, 486 F.3d at 528, 533-

27  34 (same); *Mackie v. Reiser*, 296 F.3d 909, 913, 917 (9th Cir. 2002); *Cream Records*, 754 F.2d

28  at 827-28.  Further, the Ninth Circuit expressly rejected the argument that damage in the form of

1    lost licensing opportunities may be presumed as a "natural and probable result" of infringement.

2    *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 n.8 (9th Cir. 1985).

3            In *Frank Music*, the district court declined to award actual damages for the unauthorized

4    use of a portion of a musical in a Las Vegas show, having found no evidence that infringement

5    diminished the work's market value.  *Id.* at 513-14.  In affirming this ruling, the Ninth Circuit

6    rejected plaintiff's argument that it was not required to prove causation and that "actual damages

7    to the Las Vegas market should be presumed, that such damages are the 'natural and probable

8    result' of an unauthorized performance."  *Id.* at 514 n.8.  Contrary to Oracle's argument, the

9    Ninth Circuit made clear that, in seeking to recover value of use damages, a copyright owner is

10   not "relieved from or aided in proving actual damages by some presumption."  *Id.*

11           Faced with a lack of Ninth Circuit authority permitting recovery of "hypothetical" license

12   damages in this case, Oracle instead misconstrues Defendants' argument and proceeds to attack a

13   straw man.  Opp. at 16-17.  Defendants do not claim, as Oracle argues, that direct competitors

14   may never recover actual damages in the form of lost license fees or that copyright plaintiffs

15   must license their copyrighted works as a prerequisite to recovery of lost license fee damages.

16   Rather, Defendants argue that these circumstances are compelling evidence that no license fees

17   were lost, particularly in the absence of benchmark transactions or other evidence to show that

18   the particular competitors would have agreed to a license.  Again, absent evidence that the

19   plaintiff would have granted a license for the infringing use, actual damages in the form of

20   alleged lost license fees are impermissible.  *Jarvis*, 486 F.3d at 533; *Sid & Marty Krofft

21   Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1174 (9th Cir. 1977); *Business

22   Trends*, 887 F.2d at 405, 407; *National Conference of Bar Examiners*, 458 F. Supp. 2d at 261.

23           **3.    Oracle Provides No Authority to Support Its Recovery of Hypothetical

24                   License Damages.**

25           Oracle is unable to provide any basis in law or equity to support its purported entitlement

26   to hypothetical lost license fees.  Oracle's reliance on the district court opinion in *Getaped.com,

27   Inc. v. Cangemi*, 188 F. Supp. 2d 398, 405-06 (S.D.N.Y. 2002) is misplaced.  Notably,

28   *Getaped.com* acknowledges the statutory requirement, articulated in other Second Circuit cases,

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH

1    that a plaintiff seeking to recover lost license fees must generally show that the parties would

2    have agreed to a license.  *Id.*  Nevertheless, *Getaped.com* holds that there is an exception to this

3    rule where "a licensing fee may be the only way to approximate actual damages because proof of

4    more traditional damages (such as lost sales) is not possible or readily accessible."  *Id.* at 405.

5    Even assuming the use of such an exception were permissible under the Copyright Act and Ninth

6    Circuit law (which we submit it is not), this carve-out clearly would not apply here, since Oracle

7    itself offered proof of "traditional damages" in the form of lost profits.

8         Similarly, and contrary to Oracle's assertion, *On Davis v. The Gap, Inc.*, 246 F.3d 152,

9    161-62 (2d Cir. 2001), does not permit recovery of lost license fee damages without evidence

10   that the plaintiff would have licensed use of its work but for infringement.  Rather, in *On Davis*,

11   the Second Circuit permitted recovery of a license fee award for the defendant's unauthorized

12   use of copyrighted eyewear in its advertising campaign where the parties were not competitors

13   and the plaintiff presented evidence of a benchmark transaction—a $50 royalty for use of the

14   sunglasses in a magazine feature.  *Id.*  In so holding, the court distinguished its facts from those

15   in *Business Trends*, in which the Second Circuit denied recovery of a license award where "the

16   plaintiff and defendant were competitors . . . —not a relationship where the defendant was a

17   potential licensee of the plaintiff."  *Id.* at 162-63 (distinguishing *Business Trends* as being

18   "heavily influenced by the particular facts of that case").

19        In arguing that *On Davis* endorses recovery of hypothesized license damages even where

20   the parties would not have agreed to a license and no market benchmarks exist, Oracle

21   misunderstands the role, and *On Davis*' application, of the required willing buyer/willing seller

22   test.  Courts consider "what a willing buyer would have been reasonably required to pay to a

23   willing seller for plaintiffs' work" to determine the price of an actually lost license—not to

24   permit recovery without proof of whether license fees were actually lost (or the substitution of a

25   "hypothesis" for such proof).  *Jarvis*, 486 F.3d at 533 (quoting *Krofft*, 562 F.2d at 1174).  Further,

26   courts employ an "objective, not a subjective analysis" to ensure that the amount of license-

27   based damages is grounded in objective evidence, such as the parties' past course of dealing,

28   rather than on undue speculation.  *Mackie*, 296 F.3d at 917; *see also On Davis*, 246 F.3d at 166

1   ("The question is not what the owner would have charged, but rather what is the fair market

2   value."); Section II.B.1, *infra*. That the amount of lost license fees must be proven with

3   objective evidence does not mean, as Oracle suggests, that a plaintiff seeking such damages is

4   exempt from the burden of proving actual loss. Instead, objective evidence is considered only if

5   the plaintiff can surmount the threshold issue of proving that there would have been a license.

6       Oracle makes no effort to distinguish key cases that, consistent with Ninth Circuit

7   authority, preclude license awards absent evidence that the plaintiff would have actually licensed

8   its copyrighted work. Mot. at 17-18 (citing *Business Trends*, 877 F.2d at 407; *National*

9   *Conference of Bar Examiners*, 458 F. Supp. 2d at 261; *Frank Music*, 722 F.3d at 513-14;

10  *Encyclopedia Brown*, 25 F. Supp. 2d at 401-02). Instead, Oracle argues that the Court should

11  disregard these cases—in particular, *Business Trends*—because they purportedly conflict with the

12  *On Davis* holding. Opp. at 17 n.7. Oracle is mistaken. For the reasons described above,

13  *Business Trends* and *On Davis* are consistent, together instructing that a lost license fee award

14  may be appropriate in cases like *On Davis*, where "the defendant [is actually] a potential licensee

15  of the plaintiff" and not a competitor, but is inappropriate in cases like *Business Trends*, where

16  the plaintiff would not have licensed use of the works to defendant (for example, because of the

17  parties' competitive status) and there is no evidence to the contrary. *On Davis*, 246 F.3d at 161-

18  62. Subsequent cases within and outside the Second Circuit are in accord. *Baker*, 254 F. Supp.

19  2d at 357-58 (license award allowed in cases "factually similar to the situation in *On Davis*," *i.e.*,

20  cases where, "unlike in *Business Trends*, the parties are not direct competitors"); *Encyclopedia*

21  *Brown*, 25 F. Supp. 2d at 401-02; *National Conference of Bar Examiners*, 458 F. Supp. 2d at 261.

22      Finally, Oracle's argument that fairness dictates the award of a non-existent lost license

23  fee is unpersuasive. Oracle argues that automatically permitting recovery of hypothetical license

24  damages is necessary to "compensate the owner for the actual harm suffered at the time of

25  infringement" and to avoid "reward[ing]" infringers who do not profit from the infringement.

26  Opp. at 14. According to Oracle, allowing such an award is consistent with the principle that

27  "[c]ourts should 'broadly construe' available damages to 'favor victims of infringement.'" Opp.

28  at 17 (quoting *On Davis*, 264 F.3d at 164). Fairness, however, does not militate in favor of an

1   unsupported license award in this case because Oracle has a remedy.  Indeed, Oracle could have

2   recovered lost profits *and* non-duplicative infringer's profits (the purpose of which is to ensure

3   there is no incentive to infringe) or, prior to trial, elected statutory damages.  17 U.S.C. §§ 412(2),

4   504(c); *Polar Bear*, 384 F.3d at 708; *see also On Davis*, 246 F.3d at 159.  No inequity results

5   from limiting Oracle's recovery to the only damages it proved at trial.

6            **4.      The Court's Ruling on Summary Judgment Does Not Dispose of
                        Defendants' Motion.**
7

8            Despite Oracle's assertion otherwise, precluding Oracle from recovering license fees

9   where it lost none is not contrary to this Court's summary judgment ruling.  Opp. at 14.  The

10  Court held that "[g]eneral tort principles of causation and damages apply when analyzing

11  compensatory damage awards for copyright infringement," including actual damages.  ECF No.

12  628 (Order) at 2-3.  In the face of evidence that Oracle characterized as going only to valuation—

13  that Oracle and SAP would have radically different perspectives on the value of a "hypothetical"

14  license—the Court denied Defendants' motion, stating that "the fact that the Oracle executives

15  and the SAP executives testified to different views on the value of a potential license is not

16  sufficient to remove a market value license from the damages available."  *Id.* at 5.  The Court

17  cautioned, however, that Oracle could claim lost license fees only if it "present[ed] evidence

18  sufficient to allow the jury to assess fair market value without 'undue speculation.'"  *Id.* at 4.

19  Oracle failed to present such evidence.  The additional and unequivocal trial testimony by Oracle

20  executives—who testified clearly that they never would have granted a license to SAP or anyone

21  else—confirmed that Oracle did not lose license fees.  Based on the complete record, the Court

22  can and should grant judgment as a matter of law that Oracle cannot recover a license award.[1]

23

24       [1] Defendants' Motion is also not contrary to the Court's statement that Oracle "is not
     required to prove that it would have successfully negotiated a license with SAP, nor is it
     precluded from seeking license damages simply because it has never before licensed what SAP
25   infringed."  ECF No. 628 (Order) at 4.  Defendants do not argue that the law requires proof of
     successful negotiation between the parties or previous licenses of the works for a plaintiff to
26   recover lost licensing fees.  Rather, the law requires proof that the plaintiff actually suffered
     harm in the form of lost license fee.  Here, the trial evidence conclusively established that Oracle
27   is not entitled to recover a license award, because of the testimony that Oracle never would have
     licensed the works (or even considered negotiating a license) to anyone for the infringing use at
28   issue, which is further supported by the absence of any comparable market benchmarks.

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH

1

**B.     JMOL 2 - Oracle Failed to Offer Legally Sufficient Evidence to Value a Lost License Fee Award.**

2

3       The parties agree that no benchmark licenses comparable to the license awards Oracle

4  sought at trial exist.  Absent objective evidence of benchmarks, Oracle should not be permitted

5  to recover a lost license fee award and should be limited to damages in the form of lost profits.

6  Oracle's argument that the evidence it presented at trial relating to the parties' so-called

7  "negotiation perspectives" was sufficient to establish a non-speculative license price is wrong

8  and exposes internal inconsistency in Oracle's reasoning.  Specifically, Oracle argues that a

9  license award is available even where the parties never would have agreed to a license because

10  the only test relevant to a "hypothetical" license analysis is the "willing buyer/willing seller" test

11  to quantify the license.  Opp. at 13-15.  According to Oracle, this "objective" test ignores the

12  specific characteristics of the parties and seeks only to determine the license price to which an

13  abstracted willing buyer and willing seller would have agreed.  *Id.*  In practice, however, Oracle

14  seeks to value the hypothetical license based not on objective evidence of market value—which

15  evidence is lacking here—but on evidence that purports to reflect the very specific, subjective

16  viewpoints of Oracle and SAP immediately following Oracle's acquisitions of PeopleSoft, JDE

17  and Siebel.  *Id.* at 20.  As courts have repeatedly cautioned, such subjective evidence alone is

18  legally insufficient to establish an objective, non-speculative damages amount.

19

**1.     The Lack of Objective Evidence of Benchmark Transactions Renders Oracle's Hypothetical License Claims Unduly Speculative.**

20

21       Oracle does not dispute the absence of benchmark licenses to price the PeopleSoft/JDE,

22  Siebel and Oracle database licenses.  Indeed, it has always been Oracle's position that no such

23  benchmarks exist.  ECF No. 256 (Kelly Decl.) ¶¶ 3-4 (stating that Oracle has never given any

24  entity a license to "copy Oracle's application software and support materials in order to create

25  their own fixes, patches or updates for customers"); Mot. at 5-6.  Oracle's only response is to

26  claim that the absence of benchmark transactions cannot preclude recovery of a license award

27  "because the right not to license is as important as the right to license."  Opp. at 16.  Oracle's

28  argument misses the point.  There is no dispute that copyright owners may elect not to license

1   their copyrighted works.  But in the absence of any benchmark transactions to establish how

2   parties have valued comparable rights for comparable works, fact-finders are left with no

3   objectively reasonable basis on which to price a license fee and instead are forced to speculate

4   based on how these parties might have valued the infringed rights.

5           As Defendants describe in their Motion, it is exactly this guesswork that courts aim to

6   prevent by requiring objective evidence of a license price.  Mot. at 22-23.  Recognizing the

7   inherently speculative nature of calculating a fair license price based on what the parties claim

8   they would have demanded in a hypothetical negotiation, courts require an "objective, not a

9   subjective" analysis of fair market value.  *Jarvis*, 486 F.3d at 534.  This objective analysis

10  uniformly involves considering benchmark transactions, such as licenses previously negotiated

11  for comparable uses of the infringed or similar works.  *Id.* at 533 (affirming award based on what

12  defendant typically paid to license photographs, prior dealings with plaintiff and what plaintiff

13  typically charged to license photographs); *Polar Bear*, 384 F.3d at 709; *Interplan Architects, Inc.*

14  *v. C.I. Thomas, Inc.*, No. 4:08-cv-03181, 2010 U.S. Dist. LEXIS 114306, at *36 (S.D. Tex. Oct.

15  27, 2010) ("Fair market value may be established where '(1) a plaintiff demonstrates that he

16  previously received compensation for use of the infringed work; or (2) the plaintiff produces

17  evidence of benchmark licenses, that is, what licensors have paid for use of similar work.'").

18  Courts acknowledge that without objective evidence of benchmarks to establish that the rights

19  infringed had a "fair market value," plaintiffs "may claim unreasonable amounts as the license

20  fee."  *On Davis*, 246 F.3d at 161, 166 (rejecting "wildly inflated" $2.5 million license claim and

21  affirming $50 award based on past licensing); *see also Mackie*, 296 F.3d at 917 (rejecting $85,000

22  license claim and affirming $1,000 award where evidence showed plaintiff had granted

23  permission for others to use work for free); *Jarvis*, 486 F.3d at 534 ("[e]xcessively speculative

24  claims of damages are to be rejected").

25          As shown in Defendants' Motion, absent evidence of benchmark transactions, courts

26  preclude recovery of license fees.  *See, e.g., Technologies, S.A. v. Cyrano, Inc.*, 460 F. Supp. 2d

27  197, 200-03 (D. Mass. 2006) (holding unreliable evidence of projections too speculative to

28  support license award); *Bi-Rite v. Button Master*, 578 F. Supp. 59, 60 (S.D.N.Y. 1983) (holding

1  license award not appropriate where sole evidence offered was non-comparable benchmarks);

2  *Interplan Architects*, 2010 U.S. Dist. LEXIS 114306, at *34-37 (dismissing license award based

3  on price plaintiff claims he would have charged).  Indeed, the Ninth Circuit has never permitted a

4  lost license award absent evidence of benchmarks on which to calculate a non-speculative license

5  price.  *Jarvis*, 486 F.3d at 533; *Polar Bear*, 384 F.3d at 709; *Mackie*, 296 F.3d at 913, 917.

6
7
        **2.**    **Evidence Relating to the Parties' Purported "Negotiation Perspectives"
Is Insufficient as a Matter of Law to Establish a Reasonable, Non-
Speculative License Price for the PeopleSoft/JDE and Siebel Licenses.**

8         Oracle's concession that all of its evidence adds up to no more than the parties'

9  "negotiation perspectives" establishes that the jury lacked the required objective evidence on

10  which to calculate a reasonable, non-speculative license price.  As a result, the parties' disputes as

11  to what Oracle's trial evidence proves (or does not prove) about the parties' negotiation

12  perspectives does not change the analysis.  Whatever the evidence shows about the parties' hopes,

13  goals, expectations, projections, need, competitiveness or risk acceptance, it does not—indeed,

14  cannot—show how use of the infringed works is valued on the open market.[2]  Oracle's labeling

15  such evidence "objective" does not change this fact.[3]

16         This is because, as a matter of law, evidence of the parties' negotiation perspectives—

17  whether in the form of purported "goals and expectations of benefits from the infringed

18  materials," executives' claims as to what they would have charged for licenses or a defendant's

19  alleged need for the works—cannot independently establish objective market value.[4]  Opp. at 19.

20  Rather than providing objective indicia of fair market value, such evidence focuses on how each

21  side values use of the works given its particular circumstances—an inquiry that is necessarily

22         [2] *See* Section III.B.3, *infra*, for analysis of this evidence under the new trial standard.

23
24
25
       [3] Opp. at 24 n.10 (characterizing Meyer's per-customer valuation as "the same type of objective evidence that a benchmark license provides"), 28 (characterizing executives' claims as to the price they would have demanded to license use of the infringed works as "objective because it reflects the contemporaneous value placed on PeopleSoft and Siebel at the time Oracle acquired those companies").

26
27
28
       [4] Indeed, the range of valuations purportedly supported by Oracle's evidence is so wide—from $897 million to over five times that sum—that it confirms the impermissibly speculative nature of the evidence.  If the most the evidence can do is place the value somewhere between less than $1 billion and five times that amount, the jury by necessity must speculate as to value.  Declaration of Tharan Gregory Lanier iso Defs.' Renewed Mot. for Judgment as a Matter of Law and New Trial Mot. (ECF No. 1045) (hereafter, "Lanier Decl.") ¶¶ 151-152, Exs. 1, 40.

1   subjective.  Opp. at 31 (Oracle admitting that it offered evidence of purported goals and

2   expectations to show "the value the parties placed in the infringed works"); 30-31 (Oracle

3   admitting that it offered evidence of value of intellectual property as a whole to show "how that

4   value would influence [Oracle executives'] approach to a near-simultaneous license negotiation

5   with SAP"); 33-34 (Oracle admitting that it offered evidence of the competitive relationship,

6   SAP's purported need for the works and SAP's alleged risk acceptance to show "the high value

7   SAP placed on the rights it infringed").[5]

8          Accordingly, as shown in Defendants' Motion, courts preclude recovery of lost license

9   fees based on evidence relating to the parties' respective "negotiation perspectives," rather than

10  on objective evidence in the form of benchmark transactions.  Mot. at Section V.B. (citing

11  *DaimlerChrysler Servs. v. Summit Nat'l*, No. 02-71871, 2006 WL 208787, at *1-2 (E.D. Mich.

12  Jan. 26, 2006); *Leland Med. Ctrs., Inc. v. Weiss*, No. 4:07cv67, 2007 WL 2900599, at *6-8 (E.D.

13  Tex. Sept. 28, 2007); *Smith v. Rush*, No. C04-2280Z, 2006 U.S. Dist. LEXIS 27412, at *2-3

14  (W.D. Wash. Apr. 7, 2006)).  Oracle's superficial attempt to criticize and distinguish these cases

15  fails to detract from their holdings.  Opp. at 31, 33, 39.  In each case, a plaintiff attempted to

16  recover an award of lost license fees quantified not on the basis of benchmark licenses, but on the

17  basis of factors that might influence the parties' respective approaches to a hypothetical

18  negotiation.  In each case, the court rejected that attempt.  Individually and together, these cases

19  serve as a powerful demonstration that evidence of the parties' negotiation perspectives is

20  insufficient to ground a non-speculative license claim.

21         By contrast, Oracle fails to cite a single copyright case in which a court permitted

22  recovery of lost license fee damages based solely on evidence relating to the parties' negotiation

23  perspectives.  *See Frank Music*, 772 F.2d at 513-14 (declining to award license damages

24  _____

25         [5] Much of the evidence relating to the parties' negotiation perspectives cannot even
    establish a *subjective* valuation of use of the infringed works.  Indeed, Oracle does not dispute

26  that evidence of the parties' status as competitors, SAP's supposed need for the infringed works
    and SAP's alleged risk acceptance can, at best, provide only upward or downward pressure to a

27  "hypothetical" license price.  Opp. at 33-34 (claiming that SAP's "need" and parties' competitive
    relationship "affect the fair market value of the IP" and that SAP's "willingness to accept

28  litigation and reputational risk indicates high value SAP placed on rights it infringed").  At worst,
    and realistically, such evidence is irrelevant and prejudicial.  Mot. at 27-28.

1  calculated on basis of subjective testimony by copyright owner regarding value of use);

2  *Getaped.com*, 188 F. Supp. 2d at 406 (precluding license award in absence of sufficient proof "as

3  to what an appropriate licensing fee should be"); *cf. Leland Med. Ctrs.*, 2007 WL 2900599, at *7

4  (noting that "this Court has found no cases to support" recovery of license damages based on

5  evidence of parties' goals and expectations for exploitation of the infringed works).

6         Moreover, the patent cases on which Oracle relies do not support the proposition that "the

7  parties' contemporaneous goals and expectations of benefits from the infringed materials . . . are

8  the ideal evidence to value a hypothetical license."  Opp. at 19.  Contrary to Oracle's assertion,

9  none of these cases expresses preference for evidence of goals and expectations to price a

10  reasonable royalty.  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983)

11  (in the absence of evidence of established royalty, permitting reliance on estimated cost savings

12  to determine reasonable royalty); *Snellman v. Ricoh Co.*, 862 F.2d 283, 289-90 (Fed. Cir. 1988)

13  (permitting reliance on comparable licenses and projected sales to calculate reasonable royalty);

14  *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001)

15  (permitting, but expressing no preference for, consideration of non-speculative evidence of

16  expected sales as one factor in calculating a reasonable royalty).  Rather, even in calculating a

17  patent-law reasonable royalty, "the best measure of reasonable and entire compensation" is an

18  "established royalty rate."  *Hanson*, 718 F.2d at 1078.  Likewise, subsequent actual results are

19  inherently less speculative than speculative goals, and decades of precedent—beginning with a

20  1933 United States Supreme Court decision—establish that the jury's calculation of a reasonable

21  licensing fee should be informed by the actual financial results from sales of infringing products

22  and the nature and extent of consumers' actual use of the infringing technology.  *Sinclair Ref. Co.*

23  *v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933) ("But a different situation is

24  presented if years have gone by before the evidence is offered [at trial].  Experience is then

25  available to correct uncertain prophecy.  Here is a book of wisdom that courts may not neglect.");

26  *see also Trans-World Mfg. Co. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984);

27  *W.L. Gore & Assocs., Inc. v. Tetratec Corp.*, 15 U.S.P.Q. 2d (BNA) 1048, 1052 (E.D. Pa. 1989)

28  (same); *Locklin v. Switzer Bros., Inc.*, 235 F. Supp. 904, 906-07 (N.D. Cal. 1964).

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH

Finally, Oracle fails to rebut Defendants' argument that the license award impermissibly exceeds damages traceable to copyright infringement. Oracle primarily argues that Defendants waived any argument as to the scope of damages by stipulating to copyright liability, but in the very stipulation on which Oracle relies, Defendants specifically "retain[ed] all defenses to damages as described in paragraph 5 below." ECF No. 965 (Amended Trial Stip. and Order) ¶ 1.[6] Far from waiving this issue, Defendants expressly preserved it. And Oracle is also wrong on the merits. Copyright law permits only the award of damages as a result of the infringement. 17 U.S.C. § 504. The cases Defendants cite highlight that basic premise—a plaintiff cannot recover damages that are not tied to copyrightable elements. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir. 1994); *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 405-06 (1940). Nonetheless Oracle's Opposition openly concedes that Meyer did not value the right to use the copyrightable elements of the infringed works, but instead "look[ed] to the value placed on the intellectual property during those acquisitions [PeopleSoft and Siebel]." Opp. at 30-31. The deficiencies in Meyer's approach are most evident when Oracle attempts to fault Defendants for failing to offer evidence that "the value of a hypothetical license would change if a given work contained five unprotectable elements or 500 . . . ." Opp. at 29. It is Oracle's burden, not Defendants', to present evidence that tied the value of the license sought to use of protectable elements. Having failed to do so, Oracle cannot fault Defendants for not challenging apportionment evidence that Oracle failed to present in the first place.

### 3.   Evidence Offered in Support of Oracle's Database Damages Claim Suffers from Similar Deficiencies.

As with the PeopleSoft/JDE and Siebel license claims, Oracle did not offer objective evidence of benchmark transactions to calculate a reasonable price for the database license. The absence of benchmark licenses alone renders Oracle's database license damages claim unduly speculative. *Bi-Rite*, 578 F. Supp. at 60; *Interplan Architects*, 2010 U.S. Dist. LEXIS 114306, at *34-37; *Technologies, S.A.*, 460 F. Supp. 2d at 200-03. None of the evidence Oracle cites as the

---

[6] Paragraph 5 states that "SAP and TN retain all defenses to the alleged causation, fact or amount of or entitlement to disgorgement, actual or punitive damages . . . . " *Id.* ¶ 5.

1   basis for its database license calculation compensates for this lack of objective evidence.[7]

2           As explained in Defendants' Motion, testimony by Oracle executive Richard Allison on

3   the structure and price he claims Oracle would have demanded for an unprecedented license to

4   use its database software does not comprise objective evidence of value.  Mot. at 36-38.

5   Regardless of Allison's asserted credibility, such one-sided testimony, unsupported by evidence

6   of benchmarks, is exactly the type of evidence courts criticize as unduly speculative.  Opp. at 37;

7   *see also Jarvis*, 486 F.3d at 534; *Bruce v. Weekly World News, Inc.*, 310 F.3d 25, 29-30 (1st Cir.

8   2002) (rejecting per-use license award and expert's contention that license "could be whatever we

9   feel is fair"); *Gaylord v. U.S.*, No. 06-539C, 2011 U.S. Claims LEXIS 613, at *6-9 (Fed. Cl. Apr.

10  22, 2011) (rejecting plaintiff's over $3 million license fee claim based on 10% of "assumed

11  revenue" because no evidence supported plaintiff's assertion that the license would be structured

12  in that way, and instead awarding $5,000 license fee based on past licensing history); *Interplan*

13  *Architects*, 2010 U.S. Dist. LEXIS 114306, at *34-37 (dismissing license claim based solely on

14  plaintiff's statement regarding price he would have charged to use work); *Smith*, 2006 U.S. Dist.

15  LEXIS 27412, at *2-3 (same).  Further, Oracle's admission that Meyer "confirm[ed] underlying

16  facts concerning database licenses, policies, pricing, and industry practices" with Allison, rather

17  than with first-hand, objective evidence of benchmark transactions underscores the subjective and

18  speculative nature of Meyer's approach.  Opp. at 37.

19          Oracle's remaining evidence regarding the scope and duration of infringement (in the

20  form of testimony by Oracle's computer forensics expert Kevin Mandia), SAP's purported need

21  for the database works and alleged "numbers of customers benefiting from SAP's infringement

22  of Oracle's Database software" likewise cannot establish a non-speculative license value.  Opp.

23  at 37.  As addressed above, if relevant at all, such evidence can at most only provide upward or

24  downward pressure on a license price once calculated, but cannot establish that price.  Mot. at

25  27-28; *DaimlerChrysler*, 2006 WL 208787, at *1-2.

26          [7] Oracle's claim that "Oracle's historical Database price lists were a reasonable
    benchmark in calculating the hypothetical license value" (Opp. at 38) does not establish the
27  existence of appropriate benchmark licenses, particularly in light of Oracle's admissions, in its
    Opposition and at trial, that "Oracle has never licensed a competitor to use its Database software
28  to compete for its customers."  Opp. at 26; *see also* Lanier Decl. ¶¶ 33, 157.

1    That the evidence Oracle offered in support of its database license calculation resulted in

2  a claimed license fee almost equivalent to TN's revenues for its entire seven year history only

3  highlights the need for objective evidence of benchmark transactions to avoid "wildly inflated"

4  license claims.  *On Davis*, 246 F.3d at 161, 166; *see also Mackie*, 296 F.3d at 917; *Jarvis*, 486

5  F.3d at 534.  Because such evidence was lacking here, Oracle's database license claim was

6  unduly speculative and cannot support the jury's award.

7  **III.    NEW TRIAL**

8    No basis exists for Oracle or the jury to value a license award at more than *10 times*

9  Oracle's expert's calculation of actual damages measured by lost profits.  Oracle fails to identify

10  evidence to measure the harm resulting from TN's use of the copyrighted works as distinct from

11  SAP's assumptions and goals for its broader Safe Passage marketing program.  And Oracle fails

12  to justify the award on the basis of its "other harms," which are either lost profits by another

13  name or too poorly defined to measure at all.  Oracle's Opposition confirms that the award was

14  based not on evidence of actual damages, but on passion, prejudice and utter confusion.

15        **A.      Standards for New Trial**

16    Despite Oracle's rhetoric to the contrary, the Court has ample authority to order a new

17  trial.  A jury award cannot be upheld if "it is clearly not supported by the evidence or only based

18  on speculation or guesswork."  *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir.

19  2006), *aff'd*, 616 F.3d 1357 (Fed. Cir. 2010).[8]  Indeed, and as Oracle concedes, "[i]n contrast to

20  JMOL motions, in determining whether a verdict is contrary to the clear weight of the evidence,

21  the court has the duty to weigh the evidence as the court saw it and may set aside the verdict even

22  if it is supported by substantial evidence."  *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 593 F. Supp.

23  2d 1088, 1093 (N.D. Cal. 2009); Opp. at 39; *Gasperini v. Center for Humanities, Inc.*, 518 U.S.

24        [8] Oracle's quibbles with Defendants' other authorities have no bearing on the applicable
   standards.  Opp. at 39 n.18.  Oracle asserts that *Drew v. Equifax Info. Servs., LLC*, No. C-07-
25  00726 SI, 2010 WL 5022466, at *4 (N.D. Cal. Dec. 3, 2010), is inapposite because the trial court
   declined to remit a damages award, but that is an irrelevant distinction.  Oracle asserts that
26  Defendants' inclusion of a Section 1983 damages case is "off-point," but Oracle itself relied on
   two Section 1983 cases.  *See* Opp. at 39. (citing *Guy v. City of San Diego*, 608 F.3d 582, 585 (9th
27  Cir. 2010); *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987)).  Oracle mischaracterizes
   *Anglo-American Gen. Agents v. Jackson Nat'l Life Ins. Co.*, 83 F.R.D. 41, 45 (N.D. Cal. 1979),
28  as vacating an award of punitive damages, but the court actually remitted the "excessive" award.

1   415, 433 (1996) ("The trial judge in the federal system, we have reaffirmed, has discretion to

2   grant a new trial if the verdict appears to the judge to be against the weight of the evidence");

3   *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957) (holding that

4   it is appropriate to weigh damages evidence when granting a new trial); 11 Charles A. Wright,

5   Arthur R. Miller, Mary K. Kane, Federal Practice and Procedure § 2806 (2d Ed. 1995) ("The

6   judge is not required to take that view of the evidence most favorable to the verdict-winner.").

7   Oracle does not dispute that a new trial may be granted where the damages are excessive, to

8   prevent a miscarriage of justice or, for other reasons, the trial was unfair to the moving party.

9   Fed. R. Civ. P. 59(a); *see also Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

10          **B.      The Court Should Grant SAP's Motion for New Trial or Remittitur.**

11          Oracle boasts that the jury's $1.3 billion verdict is the "largest amount ever awarded for

12   software piracy."  Oracle Press Release, November 23, 2010.  The award was so large only

13   because it was founded on an imaginary negotiation framed with subjective, speculative and

14   prejudicial evidence.  In its Opposition, Oracle still cannot identify a legally sufficient basis for

15   the grossly excessive award.

16          **1.      Oracle Cannot Distinguish Federal Circuit Cases Rejecting
17                    "Reasonable Royalty" Awards Based on Insufficient, Speculative
                      Evidence.**

18          Oracle gives short shrift to the Federal Circuit cases cited in Defendants' Motion, which

19   reflect a growing line of patent cases rejecting "reasonable royalty" calculations premised on

20   speculative evidence.  Opp. at 42-44; Mot. at 41 n.8.  Even in patent cases, where a "reasonable

21   royalty" is meant to be a damages floor, courts are more frequently and firmly rejecting awards

22   based on a hypothetical negotiation that bear insufficient relationship to reality.  This approach is

23   even more applicable in the context of copyright law's lost license fee awards, which must

24   represent actual damages.

25          Oracle concedes that these cases impose a burden to prove the existence of benchmark

26   transactions that are "sufficiently comparable" to the infringing use in order to support the award.

27   Opp. at 42 (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009)).

28   Oracle concedes that it is error for an expert to encourage the jury to speculate about future use.

1  *Id*. at 43 (citing *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010)).  Oracle

2  concedes that it is error to rely on running royalty benchmarks that could not be compared to the

3  lump-sum award without speculation.  *Id*. at 43 (citing *Wordtech Sys., Inc. v. Integrated Network*

4  *Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010)).  And Oracle does not dispute that in

5  January, the Federal Circuit continued this trend in *Uniloc USA, Inc. v. Microsoft Corp.*, 632

6  F.3d 1292, 1316-18 (Fed. Cir. 2011), reiterating the reasoning in *Lucent* and its progeny that

7  reasonable royalty awards must be supported by evidence "tied to the relevant facts and

8  circumstances of the particular case at issue" and that unrelated evidence "does not support

9  compensation for infringement that punishes beyond the reach of the statute."[9]

10  Rather, Oracle argues that these concerns are absent here because Meyer supposedly

11  relied on contemporaneous projections of future sales.  Opp. at 44.  As shown below, Meyer

12  relied on wholly speculative assumptions and goals for SAP's broader Safe Passage program and

13  did not have projections of any kind measuring TN's limited use of the copyrighted works.

14  Instead, he encouraged rank speculation.

### 2. The Disparity Between the Award and Actual Lost Profits Plus Infringer's Profits Shows that the Award Is Clearly Excessive.

17  Oracle's expert calculated $120.7 million in lost profits and $288 million in infringer's

18  profits.  Lanier Decl. ¶¶ 2, 11, Exs. 1, 15.  Nevertheless, Oracle claims that the $1.3 billion award

19  is not grossly excessive because it purportedly compensates Oracle for harms not measurable as

20  lost profits.  These amorphous "downstream impacts" purportedly include limiting Oracle's

21  ability to pay for the PeopleSoft acquisition or invest in research and development for next

22  generation products.  Opp. at 45.  Oracle's argument has three fatal flaws.

23  First, there is no evidence that Oracle actually suffered any of these harms.  Second, there

24  is no evidence with which to measure these future harms within a license valuation.  None of

[9] These cases have drawn a great deal of legal, academic and political commentary because of the Federal Circuit's clear message to the district courts that reasonable royalty awards are out of control and must be carefully scrutinized to ensure they are adequately supported by the facts and appropriate evidence.  *See, e.g.*, Reply Declaration of Tharan Gregory Lanier ("Reply Lanier Decl.") ¶ 1, Ex. A, FTC, The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition (2011), at 23-24.  Oracle mischaracterizes these authorities as cases merely "about expert reliance on benchmark licenses."  Opp. at 42.

1   Oracle's cases permit a plaintiff to rely on an unidentified, unproven and unquantifiable

2   collection of alleged "downstream impacts" to justify a hypothetical license recovery.  Asking

3   the jury to speculate about the value of such future harms is comparable to the abuse prohibited

4   by *Lucent*.  580 F.3d at 1327, 1329-30 (rejecting royalty benchmark licenses where expert

5   testified that jury should "speculat[e] as to the extent of future use").  Third, a lost profits award

6   would, in fact, compensate Oracle for these harms.  Although it is true that if Oracle lost a profit

7   it would be unable to invest those funds in future research (or in anything else), it would be

8   double-counting to permit recovery of the lost profit *and* the value of the thing that would be

9   purchased with the profit.  If Oracle suffered any harm that would not be compensated by a lost

10  profits measure of damages, it is only because the Court's sanctions order precluded Oracle from

11  seeking compensation for such undisclosed harms.  ECF No. 532 (Order) at 1 ("The court

12  furthermore clarifies that the precluded evidence will NOT be admitted through the back door in

13  order that 'Oracle's witnesses can testify to all impacts they perceived from Defendants'

14  unlawful activities.'").  Thus, Oracle's "other harms" argument merely confirms that what

15  Oracle sought and received went beyond the actual damages recovery permitted by Congress.

16  Moreover, accepting Oracle's position—that lost profits are inadequate to compensate for a

17  plaintiff's inability to invest in future growth—would open up dangerous floodgates.  Oracle's

18  argument would apply to virtually every company, given that every company depends on income

19  from current operations to fund investment in future growth.  Oracle's argument would thus

20  justify a hypothetical license award in every case—an outcome contrary to established law.

21      Oracle's assertion that case law permits such double recovery for downstream impacts is

22  wrong.  Opp. at 45.  In *Polar Bear*, the Ninth Circuit rejected as "too 'pie-in-the-sky'" the

23  plaintiff's attempt to recover lost profits based on its assertion that, had the defendant paid for its

24  unauthorized use of the plaintiff's video, the plaintiff would have been able to use those proceeds

25  to sell additional videos.[10]  384 F.3d at 709-10.  Instead, the Court permitted recovery of lost

26      [10] Oracle's characterization of *Polar Bear* as "finding non-speculative a valuation based
    in part on a price quote that the infringer had rejected" is misleading.  Opp. at 16.  In *Polar Bear*,
27  the Ninth Circuit rejected the jury's verdict of $2.4 million, throwing out all but $115,000.  384
    F.3d at 705 n.3, 708.  That amount derived from what the plaintiff actually charged the defendant
28  in the past for use of its copyrighted video footage, as well as evidence of the parties' subsequent
    negotiations for a modified version of the footage.  *Id.* at 704, 709.

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH

1   license fees priced according to the parties' previous licensing practices.  *Id.*  Thus, *Polar Bear*

2   not only confirms that the type of "other harms" for which Oracle seeks compensation are lost

3   profits by another name, but also makes clear that courts do not allow such speculative claims.[11]

4               **3.      Oracle Failed to Identify Sufficient, Non-Speculative Evidence to
            Support the Hypothetical License Award.**

5

6               To manufacture a large damages claim, Oracle relied on evidence that bore no relation to

7   its actual losses or to Defendants' non-duplicative profits gained by virtue of infringement.

8   Defendants' opening brief shows why this evidence was insufficient to quantify at $1.3 billion

9   the value of a license for TN's use of the copyrighted works.  Mot. at 24-25.  Oracle's Opposition

10  reviews the evidence that it claims supports the award, and, as it did at trial, Oracle devotes much

11  time discussing SAP's plans to disrupt "Oracle's marketplace momentum," SAP's use of TN as a

12  "strategic weapon," SAP's "needs" and the "direct liability evidence."  Opp. at 39-40, 46.

13              But none of this evidence provides a basis to *quantify* the value of a license.  Indeed,

14  Oracle now concedes that much of its so-called "contextual evidence," like the billions of dollars

15  it invested in R&D, provides no basis for valuing a license.  *Id.* at 30 ("Oracle never argued, and

16  no witness testified, that the hypothetical license value was or should be based on Oracle's total

17  R&D investment."); 44 ("Oracle did not offer this evidence to support its damages claim.").

18  Oracle's concession that much of the evidence it offered was mere "context," not offered to

19  quantify its damage claim, underscores the lack of evidentiary support for the $1.3 billion award

20  and Oracle's apparent strategy of confusing the jury with this voluminous evidence.

21              To quantify the license, Oracle relied on its "negotiating perspective," as purportedly

22  reflected in its costs to acquire PeopleSoft and Siebel, and SAP's "negotiating perspective," as

23  allegedly measured by SAP's assumptions and goals for its Safe Passage marketing program.  *Id.*

24  at 20-21.  Even were this evidence the "objective" evidence on which a non-speculative award

25  _____

26              [11] *Hanson* is also inapposite.  718 F.2d at 1078.  *Hanson* is a patent case that permitted
    recovery of a reasonable royalty calculated by reference to the defendant's cost savings.  It did
    not permit double-recovery for "downstream impacts."  *Id.*  Moreover, as addressed above,

27  *Hanson* is distinguishable because it addresses calculation of a patent law reasonable royalty, not
    a copyright-law hypothetical license, and permits recovery based on saved costs, which this

28  Court has prohibited.  ECF No. 762 (Order) at 20-23.

1   must be based (which it is not, *see* Section II.B.2, *supra*), it would still fail to provide the

2   necessary link between TN's limited actual use of the copyrighted works and the jury's award.

3          The amount Oracle paid to acquire PeopleSoft and Siebel is insufficient as a matter of law

4   to quantify a hypothetical license.  On their face, those were acquisitions of entire companies, not

5   comparable license transactions.  Lanier Decl. ¶¶ 33-34, Ex. 1.  It speaks volumes that, after three

6   years of litigation, neither Oracle nor its expert has been able to identify precedent in which the

7   value of a corporate acquisition served as a benchmark to value a limited use license for

8   intellectual property owned by the corporation.  It is thus no surprise that Oracle presented no

9   evidence from which a jury could reasonably extrapolate from the price of those corporate

10  acquisitions to the value of the limited use license at issue.  Indeed, the *only* connection Oracle

11  offered was the biased, after-the-fact and superficial testimony of its executives, Phillips and

12  Ellison, about how many customers they would have "expected" to lose to SAP.  Opp. at 21:2-11.

13         Oracle admits that statements made "years [after the litigation] in preparation for

14  litigation" are less credible than contemporaneous evidence.  Opp. at 19 (citing *Monster Content,*

15  *LLC v. Homes.com, Inc.*, No. C 04-0570 FMS, 2005 WL 1522159, at *9 (N.D. Cal. June 28,

16  2005).  Oracle nevertheless relies on Phillips' testimony that 35-40 percent of customers were

17  likely to go to SAP.  But his testimony is a conclusion that is based on no facts or reliable

18  methodology.  He opined that because SAP had 35-40 percent market share, SAP would take 35-

19  40 percent of PeopleSoft's customers.  ECF No. 1058 (Chin Decl.), Ex. A-1 (Phillips) at 532:25-

20  533:13.  Alternatively, Phillips opined that because 40 percent of PeopleSoft's customers also

21  owned SAP products, those customers would drop Oracle support for their Oracle products.  *Id.*

22  at 533:14-534:9.  Each of these opinions is a *non sequitur*, and each is wholly unsupported by

23  facts.  Phillips presented no study, no empirical evidence and no logic substantiating why this

24  necessarily follows.  Instead, this is pure *ipse dixit*.  Phillips' unfounded assumptions about TN's

25  effect on the market are exactly the type of evidence on which a license price may not be based.

26  *Childress v. Taylor*, 798 F. Supp. 983, 991-92 (S.D.N.Y. 1992) (rejecting as unduly speculative a

27  license claim where the plaintiff's proposed royalty rate was "unsupported by the evidence," as it

28  required several "tenuous" assumptions, including that the infringed work (a play) would have

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH

1   been highly successful with another producer).  With even less support, Ellison testified that SAP

2   would have been able to get 20-30 percent of PeopleSoft's customers.  ECF No. 1058 (Chin

3   Decl.), Ex. A-1 (Ellison) at 764:15-765:22.  Again, there is no factual support for that opinion,

4   and he might as well have said between zero and 100 percent.  SAP repeatedly objected to this

5   executive testimony as unduly speculative.[12]  Without these executives' testimony, Oracle

6   literally had no basis upon which to translate its acquisition costs into any particular assumed

7   license value.  Even with the executives' testimony, it is on its face a comparison of apples

8   (corporate acquisitions) and oranges (a limited use license) that is prohibited by the case law.

9       If anything, the executives' testimony illustrates the speculative nature of Oracle's

10  approach.  According to Phillips, the PeopleSoft license was worth $3-4 billion, with an

11  additional unquantified "billions" due for the Siebel license; Ellison claimed the licenses were

12  worth a combined $4-5 billion.  Lanier Decl. ¶¶ 42-44, Exs. 1, 40.  How then was this a reliable

13  metric to justify the jury's award of $1.3 billion?  There is no answer to that question in the

14  record.  Indeed, even Meyer questioned the reliability of this testimony.  Reply Lanier Decl. ¶ 3,

15  Ex. C (Meyer) at 1133:3-8 ("Obviously I knew that [Ellison's] company had an interest in the

16  litigation.  And so whatever information I take from executives like that, I have to temper back

17  and consider, but come to my own opinions.")

18      SAP's assumptions and goals that supposedly prove "SAP's negotiation perspective" also

19  provide no basis from which to extrapolate the value of a limited use license.  First, there is no

20  evidence from SAP or any creator of any of these documents that they were intended to serve as

21  the basis for valuing and purchasing a limited use license, for the relevant works.  To the

22  contrary, the only witness in a position to know, Brandt, testified that such marketing documents

23  did not provide such a basis.  ECF No. 1058 (Chin Decl.), Ex. A-1 (Brandt) at 731:7-13.  Thus,

24  while Oracle asserts that "SAP intended to convert some 5,000 PeopleSoft customers to SAP

25  software, maybe more," it never comes to grips with the fact these were goals and not firm

26  _____

27      [12] Defendants objected to this testimony at trial, in their Rule 702 motion to exclude
    Meyer and their motion in limine to exclude testimony from undisclosed experts.  Lanier Decl. ¶¶
28  46-47, Ex. 1; ECF No. 798 (Mot. to Exclude Meyer) at 11; ECF No. 728 (Defs.' Mots. in Limine)
    at 10-11.

1    commitments that would justify paying billions of dollars.  Opp. at 22.  Indeed, Oracle admits

2    that these were mere "goals."  *Id.* ("SAP's goal was to convert 50% of PeopleSoft customers").

3          In its Opposition, as at trial, Oracle relied heavily on the so-called "Ziemen document" as

4    proof that a reasonable licensor would have expected TN's use of the works to generate $897

5    million in revenues in the first three years and thereby agree to pay a license fee on that basis.

6    Opp. at 22 (citing ECF No. 1058 (Chin Decl.), Ex. SS (PTX 4814)).  The document says no such

7    thing.  Oracle fails to mention that the very page containing that number describes the analysis as

8    based on "Assumptions."  ECF No. 1058 (Chin Decl.), Ex. SS (PTX 4814) at SAP-OR00493910.

9    This document does not even specifically concern TN, but contemplates that support might be

10   provided by TN "or other vendors" that SAP was investigating when the document was drafted.

11   Lanier Decl. ¶ 107, Ex. 20 at SAP-OR00253280.  Oracle also fails to mention that Meyer was

12   forced to concede on cross-examination that he took "a series of statements about goals" and

13   reclassified them as "expectations."  Reply Lanier Decl. ¶ 4, Ex. D at 1354:21-1355:5.

14         Moreover, Oracle has failed to show how evidence of SAP's goals for Safe Passage (*i.e.*,

15   the broader marketing of support services and SAP software) provides a basis to quantify the

16   value attributable to TN's use of the copyrighted works.  Mot. at 10.  Oracle's response is to

17   point to puffery in certain marketing documents characterizing TN as "key" and the

18   "cornerstone" of Safe Passage.  Opp. at 23.  Those terms are at best vague and general and do not

19   provide a metric for a quantitative valuation of the limited use license for TN.  For example,

20   Oracle relies on PTX 404 as purported proof of the value of TN's use of the works because it

21   refers to TN as a "cornerstone."  *Id.*  In fact, the document relates not to TN's projected impact,

22   but to the "Safe Passage Offering," a marketing program in which the sale of SAP products and

23   services were the main objective and technical support for Oracle products was only an optional

24   component.  Reply Lanier Decl. ¶ 6, Ex. F (PTX 404) at SAP-OR00007485; compare with ECF

25   No. 1058 (Chin Decl.), Ex. HH (PTX 404).  For similar reasons, the other documents to which

26   Meyer referred the jury did not establish the value, if any, that TN's use of the copyrighted

27   works lent to Safe Passage.  Oracle has no response to this fact.

28         It was apparent to all that Meyer was an evasive and argumentative witness, especially

1   prior to the Court's admonition about his testifying style.  Reply Lanier Decl. ¶ 3, Ex. C at

2   1170:8-1171:6.  He was evasive for a reason:  He had been assigned the task of making a silk

3   purse out of a sow's ear.  Oracle rested its hypothetical license claim on Meyer's ability to

4   somehow "synthesize" the parties' supposed negotiating positions by "[c]onsidering a ranges of

5   values, and the evidence as a whole . . . ."  Opp. at 25-26.  That, however, was a garbage-in-

6   garbage-out exercise.  Meyer started with speculative and incomplete evidence and had no basis

7   upon which to covert that evidence into a reliable valuation of TN's limited use of Oracle's

8   support materials.  As a another court found with respect to Meyer's testimony, "plus or minus a

9   guess is, after all, still a guess."  Lanier Decl. ¶ 103, Ex. 1.

10       Oracle fails to support its claim that Meyer "closely followed" the *Georgia-Pacific*

11   factors.  Opp. at 41-42.  Oracle simply reiterates the *Georgia-Pacific* factors and Meyer's list of

12   purportedly corresponding factors without addressing Defendants' argument that, to the extent

13   Meyer's factors even resemble the *Georgia-Pacific* factors, he failed to properly apply them.

14   Mot. at 27-29, 41.  As discussed in Defendants' Motion, Meyer relied almost exclusively on one

15   factor—the parties' purported goals and expectations—the evidence of which was speculative,

16   subjective and insufficient to support his hypothetical license opinion.[13]  *Id.*  With respect to his

17   other "background factors," such as SAP's alleged "need for the works," its "competitive

18   relationship" with Oracle and "risk acceptance," Oracle fails to respond to the cases cited by

19   Defendants showing that his reliance on these factors was improper.  Moreover, Oracle makes

20   the remarkable—and unsupported—assertion that it is "irrelevant" that Meyer failed to actually

21   follow the test he purported to apply in providing his hypothetical license opinion.  Opp. at 41.  It

22   plainly is relevant; it goes directly to the reliability of his opinion and whether it is sufficient to

23   support a $1.3 billion verdict.  Fed. R. Evid. 702 (expert must apply "the principles and methods

24   reliably to the facts of the case").

### 4.   The Award Is Not Based on Actual Use.

26       Oracle claims that the award is based on "SAP's actual use," but its argument again

---

27   [13] As described *supra* at Section II.B.2, even were Meyer's conclusions about the parties'
28   purported goals and expectations supported by reliable evidence, "goals" and "expectations" are
insufficient as a matter of law to establish a non-speculative license price.

1    misses the mark.  Opp. at 40.  Meyer did not value the way in which TN used Oracle's support

2    materials.  In fact, because of the speculative and irrelevant nature of the evidence on which he

3    relied, he had no basis to isolate and calculate the value of that use.  SAP's approach of

4    identifying specific lost customers and infringer's profits directly measured the impact and thus

5    the value of the use.  Oracle's hypothetical license approach has no reliable counterpart.  Indeed,

6    Oracle's assertion that the number of customers on whose behalf TN used the copies is irrelevant

7    demonstrates Oracle's fundamental mistake.  As in *Lucent*, Oracle has failed to show that TN's

8    actual use of the infringing works supported a substantial license.  580 F.3d at 1335 ("Lucent had

9    the burden to prove that the extent to which the infringing method has been used supports the

10   lump-sum damages award.").

11            **5.      Oracle's Reliance on Prejudicial Arguments and Evidence
                         Contributed to the Miscarriage of Justice.**
12

13           Oracle flooded the record with irrelevant and prejudicial evidence and arguments that

14   made the trial unfair and the outcome an award of grossly excessive damages.  Oracle recasts

15   these concerns as questions of admissibility of specific evidence and alleged waivers of

16   objections thereto.  For purposes of this motion, however, the Court need not address those

17   evidentiary issues.  Defendants do not here advance an evidence exclusion argument, but rather

18   argue that evidence Oracle presented to the jury led to an award bearing insufficient relation to

19   the damages authorized by the Copyright Act.  Here, the Court's charge is to weigh the evidence

20   and argument as a whole and determine whether the award was "based on speculation or

21   guesswork," the damages are excessive, or a new trial is necessary to prevent a miscarriage of

22   justice.  *In re First Alliance Mortg. Co.*, 471 F.3d at 1001 (citation omitted); *see also* Fed. R. Civ.

23   P. 59(a).  Oracle's reliance on the prejudicial evidence provided no objective basis for the jury to

24   measure the value of a license award and inflamed the jury to render a large, but unsubstantiated,

25   award.  Similarly, Defendants' argument that Oracle executives improperly testified regarding

26   R&D expenses, acquisition costs for PeopleSoft and Siebel and "size of the software industry" is

27   not an admissibility argument, but rather an argument that such evidence provided an improper

28   and insufficient basis for the damages award and led the jury astray.

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH

In defending its closing argument directing the jury to ignore facts about what actually happened after 2005, Oracle argues that it was within the "wide latitude" given to closing argument and that any objection was waived.  Opp. at 41.  Oracle does not, however, deny that its argument influenced the jury to ignore the actual facts of damages, as shown by the book-of-wisdom evidence of actual results, and instead to award a massive hypothetical license.

Similarly, as to Oracle's "contextual evidence" of the billions invested in R&D and the "size of the software industry," Oracle retreats to the position that it did not offer this evidence to support its damages claims.  Opp. at 30, 44.  While it is true that such evidence is not probative of its damages claim and does not provide a metric by which to measure a license award, the running narrative about these "billions of dollars" skewed the overall trial.

Further, the liability evidence prejudiced Defendants and led inexorably to an unfairly large award.  In response, Oracle argues that the evidence was relevant and that "any error was harmless, and SAP cannot prove otherwise."  Opp. at 46.  There is only one reasonable interpretation of the impact this evidence had, and that was to inflame the jury against Defendants and to encourage a punitive element to its award—it was not a harmless error.  *In re First Alliance Mortg.*, 471 F.3d at 999-1000 (an error is harmless only if it is more likely than not that the error did not affect the trial's outcome).  In addition, under the "cumulative error" doctrine, the cumulative effect of errors that, individually, might have been harmless can be sufficient to cause prejudice.  *Id*.  Here, even if the admission of some liability evidence would have been harmless, the cumulative effect of the continuous presentation of inflammatory, prejudicial and irrelevant liability evidence easily meets the more-likely-than-not standard for harmless error.

Finally, Defendants did not waive their arguments, but conscientiously attempted to exclude the improper evidence and argument presented.  Defendants repeatedly objected, including in motion practice, to the onslaught of improper liability evidence, Meyer's speculative testimony and other irrelevant evidence, and properly objected to evidence and argument with criminal overtones, which covered Catz's theft analogies.  *Larson v. Neimi*, 9 F.3d 1397, 1399 (9th Cir. 1993) ("It is pellucid that the district court was well aware of Neimi's position and that further objection would have been unavailing.  The fact that counsel courteously refrained from

1     carrying on about [its objection] did not, and does not, change the posture of the case.").[14]

2          Ultimately, however, much of Oracle's presentation—particularly of irrelevant and

3 prejudicial evidence and argument—was incurable. Opp. at 48 (noting Defendants' objection that

4 Best Buy analogy in closing resulted in incurable prejudice); *see also Floyd v. Meachum*, 907

5 F.2d 347, 356 (2d Cir. 1990) (finding "some occurrences at trial may be too clearly prejudicial

6 for . . . a curative instruction to mitigate their effect" and rejecting argument that failure to object

7 suggests lack of prejudice) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974)); *Ek v.*

8 *McDonald*, No. 2:08-cv-00962-JWS, 2010 WL 843760, at *3 (E.D. Cal. Mar. 9, 2010) ("Failure

9 to object does not bar [ ] review of an issue when an objection would have been futile."); *U.S. v.*

10 *Garza*, 608 F.2d 659, 666 (5th Cir. 1979) (acknowledging "at some point . . . objection to [ ]

11 extremely prejudicial comments would serve only to focus the jury's attention on them"). Only

12 remittitur or a new trial can remedy the resulting unfairness.

13        **C.**     <u>**Remittitur Is Appropriate Because the Award Is Grossly Excessive and**</u>

14              <u>**Clearly Unsupported by the Evidence.**</u>

15          Oracle argues that a higher standard applies for a remittitur, while conceding that this

16 higher standard does not apply for purposes of ordering a new trial under Rule 59 based on an

17 excessive damages award. Opp. at 39, 48; *see also Moist Cold Refrigerator*, 249 F.2d at 256

18 (holding that it is appropriate to weigh evidence when granting a new trial based on an excessive

19 damages award). Oracle relies on *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th

20 Cir. 1983) and *Buritica v. United States*, 8 F. Supp. 2d 1188, 1191 (N.D. Cal. 1998), a district

21 court decision that follows *Fenner*. Opp. at 48-49. However, *Fenner* is distinguishable and has

22       [14] *See, e.g.,* ECF No. 930 (Mot. to Exclude Meyer) at 16 (objecting to Meyer's
application of *Georgia-Pacific* factors); ECF No. 1058 (Chin Decl.), Ex. A-1 at 892:7-21

23 (renewing all Daubert arguments, including Defendants' motion to exclude Meyer); Reply
Lanier Decl. ¶ 4, Ex. D (11/12/10 Trial Tr.) at 1260:15-24 (Meyer admitting that he used only a

24 "*Georgia-Pacific*-type analysis. It's not exactly the same, but many of the same factors."); ECF
No. 1058 (Chin Decl.) Ex. A-1 at 257:16-22, 258:21-259:17 (objection to inclusion of R&D

25 costs in opening slides), 762:17-24 (objecting to Ellison testimony on development costs); ECF
No. 930 (Mot. to Exclude Meyer) at 3-5 (objecting to hypothetical license calculation based on

26 acquisition price); Lanier Decl. ¶ 75 (objections to liability evidence) ¶¶ 90-91 (objections to
"theft" and "steal"); Reply Lanier Decl. ¶¶ 2, 5, Ex. B (11/1/10 Trial Tr.) at 243:18-20, (same);

27 Ex. E (11/23/10 Trial Tr.) at 2255:7-2257:16 (request for curative instruction on
characterizations of theft and steal); Ex. E (11/23/10 Trial Tr.) at 2257:7-16 (raising issue of

28 "incurable" error resulting from reference to stealing from Best Buy in closing).

1    been misinterpreted by some courts, including *Buritica*.  *See also Seymour v. Summa Vista*

2    *Cinema, Inc.*, 809 F.2d 1385, 1388 (9th Cir. 1987).

3         In *Fenner*, the Ninth Circuit held that the trial court abused its discretion in denying

4    alternative motions for judgment notwithstanding the verdict ("JNOV") and for a new trial.

5    Consistent with the standard for JNOV, the trial court had reviewed the evidence "in a light most

6    favorable to the prevailing party" and found that the damages award was excessive.  716 F.2d at

7    602-03.  However, the trial court nevertheless refused to order a new trial and, instead,

8    conditioned a remittitur upon the parties' agreement to forfeit their rights to appeal.  *Id.*  On

9    appeal, the Ninth Circuit reversed, stating that once the trial court had determined that damages

10   were excessive, it had only two alternatives: order the new trial, or deny the new trial, conditioned

11   on the prevailing party accepting a remittitur.  *Id.*  The trial court could not condition acceptance

12   of the remittitur on waiver of the right to appeal.  *Id.*  The Ninth Circuit did not hold that the trial

13   court must draw all inferences in favor of the prevailing party when deciding the issue of

14   remittitur.  *Id.*  In fact, the Ninth Circuit did not even reach the issue of the standard of remittitur

15   because the trial court had already found the damages award to be excessive even under the more

16   stringent JNOV standard.  *Id.*  Oracle, and the *Buritica* court, simply misinterpret *Fenner*.

17        The standard for remittitur of an excessive damage award is the same as that for a motion

18   for a new trial based on excessive damages.  *Gasperini*, 518 U.S. at 433.  This is not surprising,

19   given that the issue in both instances is the excessiveness of the award.  As Oracle concedes, that

20   standard is well established.  In *Gasperini*, for example, the Supreme Court held that the district

21   court "has discretion to grant a new trial if the verdict appears to the judge to be against the

22   weight of the evidence.  This discretion includes overturning verdicts for excessiveness and

23   ordering new trial without qualification, or conditioned on the verdict winner's refusal to agree to

24   a reduction (remittitur)."  518 U.S. at 433.  Indeed, *Fenner* itself implicitly recognizes that this is

25   the standard for a new trial motion based on an excessive damages award.  716 F.2d at 603-04

26   (quoting language from *Moist Cold Refrigerator*'s discussion of the standard for a new trial based

27   on an excessive damages award).

28        *Buritica* and its ilk are inconstant with—and fail to even consider—this Supreme Court

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH

1   precedent and the many other decisions recognizing the trial court's discretion to weigh the

2   evidence on a motion for remittitur.  *See, e.g., Anglo-American Gen. Agents*, 83 F.R.D. at 41

3   (remitting award of damages despite "no precise evidence" to base award upon); *Blakely v.*

4   *Continental Airlines, Inc.*, 992 F. Supp. 731, 740 (D.N.J. 1998) (in granting motion for remittitur,

5   court "endeavored to follow [Third] Circuit's instructions[,] evaluate the evidence and determine

6   a damages figure that is rationally related to the evidence . . ."); *Hill v. Airborne Freight Corp.*,

7   212 F. Supp. 2d 59, 73-74 (E.D.N.Y. 2002) (weighing evidence upon motion for new trial or

8   remittitur and ordering remittitur); *Kelleher v. New York State Trooper Fearon*, 90 F. Supp. 2d

9   354, 64 (S.D.N.Y. 2000) (same).

10      The maximum amount of lost profits and infringer's profits supported by the evidence—

11   to which the Court should remit damages—is Clarke's $28 million.  In no event, however, could

12   remitted damages be higher than Meyer's $408.7 million.  Both experts offered opinions on

13   Oracle's actual lost support profits and Defendants' infringer's profits resulting from TN's use of

14   the copyrighted works.  Meyer calculated lost profits of $120.7 million and infringer's profits of

15   $288 million, totaling $408.7 million.  Lanier Decl. ¶¶ 2, 11, Exs. 1, 15.  He also presented

16   alternative calculations of $36 million of lost profits and $236 million of infringer's profits,

17   totaling $272 million.  Lanier Decl. ¶¶ 14-15, Ex. 1.  Clarke calculated Oracle's lost profits of

18   $19.3 million and SAP's infringer's profits of $8.7 million, totaling $28 million.  Lanier Decl.

19   ¶¶ 2, 22, Exs. 1, 15.  The Court should remit the verdict to $28 million (or no more than $408.7

20   million) or order a new trial to determine damages based on lost profits and infringer's profits.

21   **IV.    CONCLUSION**

22      For these reasons, the Court should grant Defendants' motion for judgment as a matter of

23   law, or, alternatively, the new trial motion, and order remittitur or a new trial.

24   Dated:  April 27, 2011                              JONES DAY

25                                                       By: /s/ Tharan Gregory Lanier

26                                                           Tharan Gregory Lanier

27                                                       Counsel for Defendants
                                                         SAP AG, SAP AMERICA, INC., and
28   SVI-92017v1                                         TOMORROWNOW, INC.

REPLY ISO DEFS.' RENEWED MOT.
FOR JMOL AND NEW TRIAL MOT.
Case No. 07-CV-1658 PJH